**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

IN RE COPAXONE 40 MG
CONSOLIDATED CASES

C.A. No. 1:14-1171-GMS

(CONSOLIDATED)

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

Frederick L. Cottrell, III (No. #2555)
Cottrell@rlf.com
Arun J. Mohan (No. #6110)
Mohan@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700

Shannon M. Bloodworth
Perkins Coie, LLP
SBloodworth@perkinscoie.com
700 13th Street, NW
Washington, DC 20005
Tel: (202) 654-6204

David L. Anstaett
DAnstaett@perkinscoie.com
Emily J. Greb
EGreb@perkinscoie.com
Perkins Coie LLP
1 East Main Street, Suite 201
Madison, WI 53703
Tel: (608) 663-7460

*Attorneys for Defendants Mylan, Inc., and Mylan Pharmaceuticals Inc.*

John C. Phillips, Jr. (No. 110)
jcp@pgslaw.com
David A. Bilson (No. 4986)
dab@pgslaw.com
PHILLIPS, GOLDMAN &SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806

Constance S. Huttner
Beshoy M. Sharoupim
BUDD LARNER, P.C.
150 John F. Kennedy Parkway
Short Hills, NJ 07078
(973) 315-4430

*Attorneys for Defendants DRL*

Richard L. Renck (No. 3893)
DUANEMORRIS LLP
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
(302) 657-4900
rlrenck@duanemorris.com

Anthony J. Fitzpatrick
Vincent L. Capuano, Ph.D.
Christopher S. Kroon
Carolyn A. Alenci
DUANEMORRIS LLP
100 High Street, Suite 2400
Boston, MA 02110-1724
(857) 488-4200

*Attorneys for Amneal Pharmaceuticals LLC and Amneal Pharmaceuticals Company GmbH*

Dominick T. Gattuso (No. 3630)
DGattuso@proctorheyman.com
PROCTOR HEYMAN &ENERIO LLP
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(308) 472-7300

William A. Rakoczy
Deanne M. Mazzochi
Rachel Pernic Waldron
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60654
(312) 222-7543
wrakoczy@rmmslegal.com
dmazzochi@rmmslegal.com
rwaldron@rmmslegal.com

*Attorneys for Defendants Sandoz Inc. and Momenta Pharmaceuticals, Inc.*

Neal C. Belgam (No. 2721)
SMITH, KATZENSTEIN & JENKINS LLP
The Brandywine Building
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com

E. Anthony Figg
Sharon L. Davis
R. Elizabeth Brenner-Leifer
Seth E. Cockrum
Jennifer Nock
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
607 14th Street, N.W., Suite 800
Washington, DC 20005
(202) 783-6040

*Attorneys for Synthon Pharmaceuticals Inc., Synthon B.V., and Synthon s.r.o.*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........ ii

I. INTRODUCTION ........ 1

II. ARGUMENT ........ 2

A. The Statements of Purpose and Intended Results Are Not Claim Limitations. ........ 2

1. None of Teva's Many Arguments Show How the Various Phrases Make Any Manipulative Difference in the Steps of the Claims ........ 3

2. Bristol-Myers Squibb ........ 4

3. The Preamble Statements of Intended Results Are Not Limiting ........ 6

4. The Concluding Statements of Intended Results Are Not Limiting. ........ 8

5. The "Wherein" Clauses Reciting Intended Results Are Not Limiting ........ 9

6. The "Further Comprising" Statements of Intended Results Are Not Limiting ........ 11

7. "Therapeutically Effective" Is a Non-Limiting Statement of Intended Result. ........ 12

B. The Claims Of The Patents-In-Suit Are Not Limited To "Three And Only Three Injections Per Week." ........ 13

1. The PTAB's institution decision is not binding, and was preliminary. ........ 14

2. Neither the claims' plain language nor the specification limits the claims to three and only three doses per week. ........ 14

3. Teva did not disclaim alternate-day dosing in the prosecution history. ........ 15

4. "Comprising" is open-ended, and allows for alternate-day dosing. ........ 17

5. A regimen is a program or system of treatment. ........ 19

C. "Brain Atrophy" Means "A Reduction In Brain Volume Over Time." ........ 20

III. CONCLUSION ........ 20

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Altoona Publix Theaters v. Am. Tri-Ergon Corp.*,
294 U.S. 477 (1935)........................................................................................ 15

*AstraZeneca AB v. Dr. Reddy's Labs., Ltd.*,
No. 05-5553, slip op. (D.N.J. May 17, 2010) ...................................................... 13

*Bell Communications Research, Inc. v. Vitalink Communications Corp.*,
55 F.3d 615 (Fed. Cir. 1995)........................................................................... 8

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
246 F.3d 1368 (Fed. Cir. 2001)........................................................................ passim

*CIVIX-DDI, L.L.C. v. Cellco P'ship*,
387 F. Supp. 2d 869 (N.D. Ill. 2005) ................................................................ 7

*Cubist Pharms., Inc. v. Teva Parenteral Meds., Inc.*,
No. 09-189-GMS (D. Del. June 7, 2010)............................................................ 13

*Dippin' Dots, Inc. v. Mosey.*,
476 F.3d 1337 (Fed. Cir. 2007)........................................................................ 18, 19

*Ecolab, Inc. v. FMC Corp.*,
569 F.3d 1335 (Fed. Cir. 2009)........................................................................ 17

*Endo Pharms., Inc. v. Watson Labs., Inc.*,
Case No. 2:13-CV-192-JRG, 2014 U.S. Dist. LEXIS 84804
(E.D. Tex. June 23, 2014) .............................................................................. 7, 8

*Genentech, Inc. v. Chiron Corp.*,
112 F.3d 495 (Fed. Cir. 1997)......................................................................... 19

*Griffin v. Bertina*,
285 F.3d 1029 (Fed. Cir. 2002)........................................................................ 11

*Hoffer v. Microsoft Corp.*,
405 F.3d 1326 (Fed. Cir. 2005)........................................................................ 9, 11

*HTC Corp. v. IPCom GmbH & Co.*,
667 F.3d 1270 (Fed. Cir. 2012)........................................................................ 12

*In re Cruciferous Sprout Litigation*,
301 F.3d 1343 (Fed. Cir. 2002)........................................................................ 7

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
579 F. 3d 1363 (Fed. Cir. 2009)........................................................................................ 17

*Minton v. Nat'l Ass'n of Secs. Dealers, Inc.*,
336 F.3d 1373 (Fed. Cir. 2003)........................................................................................ 9

*Novartis Pharmaceuticals, Corp. v. Wockhardt USA LLC*
No. 12-3967, slip op. (D.N.J. June 24, 2014) (Wigenton, J.) ............................................. 11

*Poly-America, L.P. v. GSE Lining Technology, Inc.*,
383 F.3d 1303 (Fed. Cir. 2004)........................................................................................ 8

*Pragmatus AV LLC, v. Yahoo! Inc.*,
No. C-13-1176 EMC, 2014 WL 1922081 (N.D. Cal. May 13, 2014) .................................. 14

*Prometheus Labs. Inc. v. Roxane Labs., Inc.*,
No. 11-230, 2013 U.S. Dist. LEXIS 135284 (D.N.J. Sept. 23, 2013) ............................... 9, 11

*Remediation Products, Inc. v. Adventus Americas Inc.*,
No. 3:07CV153-RJC, 2009 WL 57456 (W.D.N.C. Jan. 7, 2009) ........................................ 12

*Rensselaer Polytechnic Inst. v. Apple Inc.*,
No. 1:13-cv-0633 (DEP), 2014 U.S. Dist. LEXIS 5186 (N.D.N.Y. Jan. 15, 2014) ............. 14

*Rotatable Techs. LLC v. Motorola Mobility LLC*,
567 F. App'x 941 (Fed. Cir. 2014) ...................................................................................... 7

*Shelbyzyme LLC v. Genzyme Corp.*,
No. 09-768-GMS (D. Del. July 8, 2011) ............................................................................ 13

*Smith & Nephew, Inc. v. Ethicon, Inc.*,
276 F.3d 1304 (Fed. Cir. 2001)........................................................................................ 19

*Syntex USA LLC v. Apotex, Inc.*,
407 F.3d 1371 (Fed. Cir. 2005)........................................................................................ 13

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015)........................................................................................ 15

**STATUTES**

35 U.S.C. § 112................................................................................................................ 16

## I. INTRODUCTION

The original patent on glatiramer acetate expired decades ago. Teva obtained follow-on patents drawn to its 20 mg-per-day Copaxone® injectable product, and enjoyed years of monopoly profits on that product. Those patents all recently expired or were invalidated, so Teva now seeks to extend its branded monopoly for additional decades by attempting to protect an obvious "improvement": administering more of the exact same prior art compound less often. Indeed, the PTO recently found—in the course of instituting *inter partes* reviews of each of the patents-in-suit—a reasonable likelihood that all of the asserted claims are unpatentable, despite Teva's arguments, repeated in its opening brief, that its patented dosing regimen "contradicted the prior art" (an issue irrelevant to claim construction).

Indeed, nothing Teva said in its opening brief changes the fact that the prior art discloses each and every limitation of Teva's purported invention—namely, the administration of 40 mg of GA at least three times per week for treating MS. Knowing this, Teva now tries to rewrite its claims by: (*i*) creating additional limitations where there are none (the statements of intended results); (*ii*) importing limitations from the specification into the claims and manufacturing a purportedly unambiguous disclaimer (the comprising/regimen terms); and (*iii*) ignoring a definition given in the specification (brain atrophy). More specifically:

The various statements of intended results do not alter the claimed dosing regimen in any way (and Teva does not argue otherwise). Because these phrases are not material to patentability and do not affect how the methods are performed, controlling precedent holds they do not limit the scope of the claims. Also, Teva elected to use the open-ended transition "comprising" in every claim, each of which recites the single manipulative step of administering 40 mg of GA three times per week; thus, the claims do not exclude an additional injection every other week. There is nothing in the specification or prosecution history that meets the exacting standard for a

clear and unmistakable disavowal; indeed, the intrinsic evidence shows there is no justification for rewriting the claims to require three—and only three—injections per week, as Teva argues. Finally, Teva's construction of "brain atrophy" is flatly inconsistent with the patent specification and the understanding of a skilled artisan.

## II. ARGUMENT

### A. THE STATEMENTS OF PURPOSE AND INTENDED RESULTS ARE NOT CLAIM LIMITATIONS.

The dispute regarding certain phrases appearing in the patents-in-suit boils down to whether phrases that recite "clinical outcomes" and general effectiveness of the claimed treatment method limit the claims. Well-established precedent establishes that the answer is no. *See Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374-77 (Fed. Cir. 2001). Five types of phrases that are not limiting appear in the claims of the patents-in-suit: (i) preamble statements; (ii) concluding statements; (iii) "wherein" clauses; (iv) "further comprising" clauses; and (v) the phrase "therapeutically effective."

The reason why Defendants are correct is simple—the "clinical outcomes" and "endpoints" recited in these phrases do not modify how the claimed methods are performed. Glatiramer acetate ("GA") is administered exactly the same way in each of the claims, whether or not the recited "clinical outcomes" and "exploratory endpoints" are achieved, and whether or not the administration is therapeutically effective for a particular patient. Indeed, the claims-at-issue recite a single manipulative step that defines the dosage, dosing frequency, route of administration, and the patients to whom the therapy is administered—in other words, a

complete and operative therapeutic method.[1] None of these features is changed or adjusted in any way by the recitation of the various phrases-at-issue. These phrases merely recite intended results and are non-limiting because they do not change the "material claim limitations" or "otherwise limit the claim." *Id*. at 1375. Teva did not argue otherwise in its opening brief.

### 1. *None of Teva's Many Arguments Show How the Various Phrases Make Any Manipulative Difference in the Steps of the Claims*

In its opening brief, Teva does not even attempt to show how the phrases-at-issue actually "result in a manipulative difference in the steps of the claim." *Id.* at 1376. As such, Defendants respectfully request that the Court rule that the various statements of purpose and intended results are not claim limitations.

Moreover, Teva ***admits*** in its opening brief that the purpose and outcome of the claimed methods are the same as those of the prior art 20 mg daily injections. Teva Opening Brief (D.I. 91) ("Teva Br.") 1, 3; *see also* JA5 at 2:17-22. Teva also acknowledges that all of the claims-at-issue here are directed to a single regimen having only one manipulative step—not numerous different regimens. *See* Teva Br. 5-9. Tellingly, Teva consistently refers to each of the phrases-at-issue as "clinical outcomes" or "clinical benefits" or "effects" resulting from the administration of 40 mg of GA three times a week to a patient with MS. *Id.* at 12-13 (dependent claim phrases); 14 (preamble phrases), 16 (wherein phrases); 18 (concluding phrases), 19 (further comprising phrases). And Teva never argues that the various statements of purpose and intended results suggest ***any*** adjustments to the dosage or route of administration, the frequency

[1] For example, administering "three subcutaneous injections of a 40 mg dose of glatiramer acetate" to "a human patient suffering from relapsing-remitting multiple sclerosis or a patient who has experienced a first clinical episode and is determined to be at high risk of developing clinically definite multiple sclerosis" "over a period of seven days with at least one day between every subcutaneous injection." JA12 at 16:35-45 ('250 pat., claim 1).

or timing of injections, or the patients to whom the drug is given. *See generally id.* at 12-20. Indeed, the overall thrust of Teva's brief is a tacit admission that none of the disputed phrases is required to define how or to whom the 40 mg of GA is administered.

Teva's expert, Dr. Fox, also does not suggest that any of the phrases-at-issue modify how or to whom the drug is administered. Fox Decl. (D.I. 95) ¶¶ 67-82. Indeed, Dr. Fox repeatedly points out that not all patients who practice the claimed methods *will* observe the various clinical outcomes recited in the claims—further highlighting that those outcomes are only the purposes for, and expected results of, administering the recited regimen. *Id.* ¶ 69, 74, 76, 78. Under controlling Federal Circuit precedent, these phrases simply do not constitute claim limitations.

#### *2. Bristol-Myers Squibb*

The patent claims in *Bristol-Myers Squibb* are squarely on point with claims at issue here, Teva ignores this Federal Circuit decision in its brief. In *Bristol-Myers Squibb*, the court construed, *inter alia*, claim 1 of U.S. Patent No. 5,641,803 ("'803 pat."), which recites:

> 1. A method *for reducing hematologic toxicity* in a cancer patient undergoing [t]axol treatment comprising parenterally administering to said patient *an antineoplastically effective amount* of *about 135–175 mg/m$^2$ taxol over a period of about three hours.*

246 F.3d at 1371 (quoting '803 pat., 16:13–18) (emphasis added in original). The Federal Circuit held that the expression "for reducing hematologic activity" was non-limiting because "[t]he steps of the three-hour infusion method are performed in the same way regardless whether or not the patient experiences a reduction in hematologic toxicity, and the language of the claim itself strongly suggests the independence of the preamble from the body of the claim." *Id.* at 1375.

The Federal Circuit similarly held that the expression "an antineoplastically effective amount" was non-limiting because "[t]he express dosage amounts ["about 135–175 mg/m$^2$"] are material claim limitations; the statement of the intended result of administering those amounts

does not change those amounts or otherwise limit the claim." *Id*. The patentee in *Bristol-Myers Squibb* "assert[ed] that 'an antineoplastically effective amount' [was] limiting because it was added by amendment to distinguish over [the prior art, which] observed no antitumor efficacy," 246 F.3d at 1375—the same argument Teva makes here (Teva Br. 18, 20). But the Federal Circuit rejected that argument, noting that the phrase was not necessary for patentability, and holding that "unsolicited assertions of patentability made during prosecution do not create a material claim limitation where we have determined that the language does not create one." *Id*.

Teva repeatedly pleads that the various recited "outcomes" were "not preordained, inevitable results." *See, e.g.*, Teva Br. 13, 16. But whether a recited result is preordained or inevitable is not relevant to whether it constitutes a claim limitation. Indeed, in *Bristol-Myers Squibb*, the intended results of "reducing hematologic toxicity" and effecting tumor regression were not inevitable, and the Federal Circuit did not characterize them as such. 246 F.3d at 1375 (noting "[t]he steps of the...method are performed in the same way regardless of whether or not the patient experiences a reduction in hematologic toxicity"). To the contrary, although the prior art did not observe any anti-tumor effect when the same regimen was performed, the Federal Circuit still held that the phrases "antineoplastically effective amount" and "method of treating a cancer patient to effect regression of a taxol-sensitive tumor" were only non-limiting "statements of purpose and intended result." *See id.* at 1374-76.

Teva's claim differentiation also fails under *Bristol-Myers Squibb*. *See* Teva Br. 12-13. As Teva does here, the patentee in *Bristol-Myers Squibb* protested that, under the Federal Circuit's construction, several claims that included the same material steps but that recited different intended results would be rendered identical in scope, violating the doctrine of claim differentiation. 246 F.3d at 1376. The Federal Circuit rejected that argument, noting that the

doctrine of claim differentiation is not a "hard and fast rule," and "declin[ing] to blindly apply the doctrine in this case to supplant other canons of claim construction." *Id*.

The claims-at-issue here, like the claims-at-issue in *Bristol-Myers Squibb*, consist of action (administering GA as part of a specific dosing regimen) that is not limited by the addition of various expressions of intended purpose. For example, claim 1 of the '250 patent recites the action of administering "three subcutaneous injections of a 40 mg dose of glatiramer acetate" to "a human patient suffering from relapsing-remitting multiple sclerosis or a patient who has experienced a first clinical episode and is determined to be at high risk of developing clinically definite multiple sclerosis" "over a period of seven days with at least one day between every subcutaneous injection." JA12 at 16:35-45. The disputed phrases only recite an intended purpose and are non-limiting because they do not change the action required to perform the method, are not "material claim limitations," and do not "otherwise limit the claim." *See* 246 F.3d at 1375.

Thus, under controlling Federal Circuit precedent, the disputed claim terms reciting "the claimed regimen's various clinical benefits" are non-limiting because they "do[] not result in a manipulative difference in the steps of the claim[s]." *Bristol-Myers Squibb*, 246 F.3d at 1376. Claim terms reciting "a statement of purpose and intended result...do[] not result in a manipulative difference in the steps of the claim" and so are non-limiting. *Id*.

### *3. The Preamble Statements of Intended Results Are Not Limiting.*

The preamble terms, "alleviating a symptom of relapsing-remitting multiple sclerosis" ('250 pat., claim 1); "increasing the tolerability of GA treatment" ('250 pat., claim 15); and "reducing frequency of relapses"/ "reducing the frequency of relapses" ('250 pat., claim 19; '413 pat., claims 1, 19, 20), are non-limiting because they merely express intended results, and do not change or limit the claimed manipulative steps. Teva's arguments and cited cases are unavailing.

**Utility.** Tellingly, Teva provides no evidence for its complaint that "[t]he utility of the

claimed inventions is denigrated if [the preamble] phrases are cast aside." Teva Br. 14. Similarly, Teva's contention that the preamble statements reflect a reason why the claimed method would be adopted by physicians and patients is unavailing; if such an argument were relevant, the Federal Circuit would have found the phrase "reducing hematologic activity" to be limiting in *Bristol-Myers Squibb*. *See* 246 F.3d at 1375.

**Antecedent Basis.** Teva's argument that the preamble phrases must be construed as limitations because they provide antecedent basis for other claim limitations also is without merit. First, contrary to Teva's assertion, these phrases do not provide antecedent basis for other claim limitations—they merely contain words that also appear in phrases that themselves are non-limiting, such as the "wherein alleviating a symptom comprises…" clauses in dependent claims 2 and 4-11 of the '250 patent (discussed below). *See Endo Pharms., Inc. v. Watson Labs., Inc.*, Case No. 2:13-CV-192-JRG, 2014 U.S. Dist. LEXIS 84804, at *29 (E.D. Tex. June 23, 2014) ("[T]here is no reliance on the preamble phrase for antecedent basis for the same language appearing in the 'thereby' clause…since [the thereby clause] simply states the intended result of a process step."). A preamble's statement of intended use is non-limiting even where the body of the claim relies on the preamble for antecedent basis. *CIVIX-DDI, L.L.C. v. Cellco P'ship*, 387 F. Supp. 2d 869, 890 (N.D. Ill. 2005) (citing *Bristol-Myers Squibb*, 246 F.3d 1368).

**Cited Cases.** In *In re Cruciferous Sprout Litigation*, the Federal Circuit found a preamble limiting where the prosecution history showed "clear reliance by the patentee on the preamble to persuade the Patent Office that the claimed invention is not anticipated by the prior art." 301 F.3d 1343, 1348 (Fed. Cir. 2002); *see also Rotatable Techs. LLC v. Motorola Mobility LLC*, 567 F. App'x 941, 943-44 (Fed. Cir. 2014) (same). Here, although Teva argues generally that the specification supports its position, Teva cannot show any reliance on the preambles to

distinguish the prior art. *See* Teva Br. 14-15; Defs.' Opening Br. (D.I. 92) ("Defs.' Br.") at 6. In *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, the Federal Circuit found a preamble limiting because it affected the scope of infringement. 55 F.3d 615, 621 (Fed. Cir. 1995). Similarly, in *Poly-America, L.P. v. GSE Lining Technology, Inc.*, the preamble limited and defined the *type* of landfill liner at issue in that case. 383 F.3d 1303, 1310 (Fed. Cir. 2004). Here, Teva has made no attempt to show that any aspect of the therapeutic method is affected or altered by any of the expressions-at-issue.

#### ***4. The Concluding Statements of Intended Results Are Not Limiting.***

The concluding statements of intended results, *i.e.*, "regimen being sufficient to alleviate the symptom of the patient" ('250 pat., claim 1); "the regimen being sufficient to reduce frequency of relapses in the human patient" ('250 pat., claim 19); ('413 pat., claims 1, 19, 20); and "so as to treat the human patient" ('302 pat., claim 1), also are non-limiting because they merely express the intended results of the action steps of the method. *See Bristol-Myers Squibb*, 246 F.3d at 1375-76. Indeed, a comparison shows that the preamble and concluding statements are exactly the same. *See Endo Pharms.*, 2014 U.S. Dist. LEXIS 84804, at *20-23, *28-29 (intended result stated in preamble and repeated in concluding clause is not a limitation).

Teva advances the same flawed argument that was rejected in *Bristol-Myers Squibb*, namely, that the concluding terms should be construed as limitations because they were added in amendments during prosecution. Teva Br. 18. However, the prosecution history shows that these phrases were not material to patentability. During prosecution of the '250 patent, claim 1 was amended to recite a "therapeutically effective regimen" and the concluding phrase of claim 1 was revised to add the phrase "the regimen being sufficient." JA207. The claims of the '413 patent were similarly amended. JA1745. But Teva argued that ***regimen*** was the term that was material to patentability, ***not*** "alleviate the symptoms" or "reduce the frequency of relapses." JA213 ("As

amended the claims cannot reasonably be construed to read on only a single seven day period of administration, at least because the claims as amended require a "**regimen**.") (emphasis added); *see also* JA1758-59. As such, the concluding terms are analogous to the term "an antineoplastically effective amount" at issue in *Bristol-Myers Squibb*, discussed above. As in *Bristol-Myers Squibb*, "unsolicited assertions of patentability made during prosecution do not create a material claim limitation where…the language does not create one." 246 F.3d at 1375.

***5. The "Wherein" Clauses Reciting Intended Results Are Not Limiting.***

The "wherein" clauses reciting intended results are not limiting.[2] None of these clauses recite additional steps or otherwise limit claim scope, and none are material to patentability. *See Minton v. Nat'l Ass'n of Secs. Dealers, Inc.*, 336 F.3d 1373, 1381 (Fed. Cir. 2003); *Prometheus Labs. Inc. v. Roxane Labs., Inc.*, No. 11-230, 2013 U.S. Dist. LEXIS 135284, at *14-15 (D.N.J. Sept. 23, 2013); *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1329-30 (Fed. Cir. 2005). Teva incorrectly asserts—with no legal support—that the wherein clauses must be construed as limitations "unless there are exceptional circumstances that do not apply here." Teva Br. 15-16.

The "wherein" clauses in claims 2 and 4-11 of the '250 patent do nothing more than recite the various, expected and hoped-for "outcome measures" and "exploratory endpoints" for gauging the effectiveness of intermittent administration of 40 mg GA. The "outcome measures" are relapse rates (claims 2, 6, 7); measures of MRI activity (claims 4, 8, 9); brain atrophy (claim 5); and disability scores (claims 10, 11). JA12-13; Pachner Decl. (D.I. 93) ¶¶ 23, 26. They are not steps in the claimed methods, and they do not change how the steps are performed. During prosecution, Applicants never disputed the examiner's observation that "[i]n so far as certain of

---

[2] *See* Joint Claim Construction Chart, D.I. 88 at 22-29, 30-33 for a full list of "wherein" clauses.

the dependent claims require specific therapeutic outcomes, such outcomes would have been inherent in [the prior art].” JA118; *see also* JA1724. In other words, the “therapeutic outcomes”—intended results—recited in the claims do not distinguish the claimed process over the prior art and thus are not limitations. *See Bristol-Myers Squibb*, 246 F.3d at 1375-76.

Similarly, the “wherein” clauses in claims 14-17 of the ’250 patent and claim 7 of the ’413 patent simply state the expected result of decreasing the frequency of injections from daily to the claimed intermittent administration: decreasing injection-related adverse reactions and increasing tolerability. *See* JA8 at 7:34-36 (explaining tolerability is associated with frequency of reactions to injections); Pachner Decl. ¶ 25. They are not steps in the claimed methods and do not change how the steps are performed.

**“Inevitable” and “Essential.”** Teva applies an incorrect standard in arguing that the “wherein” clauses are limiting because they “describe methods of improving various, unpredictable injuries and disabilities associated with MS and not mere inevitable results of practicing the claimed regimen.” Teva Br. 16. As discussed above, whether a recited result is “inevitable” is not relevant to whether it constitutes a limitation. *See Bristol-Myers Squibb*, 246 F.3d at 1375, 1378. Teva’s argument that the terms are an “essential characteristic of the invention” fails because the recitation of these outcomes has no impact on how the manipulative method steps are performed. They are not essential to the practice of the method. The claim scope is exactly the same with or without the recitation of the expected results.

**Claim Differentiation.** Contrary to Teva’s assertion, the doctrine of claim differentiation does not require that the wherein clauses be construed as limitations. “The doctrine only creates a presumption that each claim in a patent has a different scope; it is not a ‘hard and fast’ rule of construction.” *Bristol-Myers Squibb*, 246 F.3d at 1376; *Prometheus*, 2013 U.S. Dist. LEXIS

135284, at *13, *17-18 (holding "wherein" clause that was the sole additional phrase in a dependent claim was only a non-limiting description of "desired results"). That presumption has been rebutted. *See supra.*

**Cited Cases.** Teva's cited cases do not support its position. In *Novartis Pharmaceuticals, Corp. v. Wockhardt USA LLC*, the court construed the phrase "wherein the solution is analyzable by reversed phase chromatography with a complexation agent" as limiting because "it appropriately describes what is required for the solution to be analyzable." No. 12-3967, slip op. at 13-15 (D.N.J. June 24, 2014) (Wigenton, J.) (cited in Teva Br. at 16). Similarly, in *Hoffer v. Microsoft Corp.*, the "whereby" clause required "interactive messaging," which was not an intended result but "part of the process itself." 405 F.3d 1326, 1330 (Fed. Cir. 2005). In contrast, here the disputed "wherein" clauses describe the intended effect of the claimed method, not anything "required for" the method itself to be carried out; the "wherein" clauses here are "merely laudatory terminology." *Novartis*, No. 12-3967, slip op. at 15.

Unlike the claims here, which recite only *known* purposes for administering GA, the "wherein" clauses in *Griffin v. Bertina* recited a previously unknown correlation and were "material to…patentability" because they identified the novel purpose for performing the method. 285 F.3d 1029, 1034 (Fed. Cir. 2002); Defs.' Br. 6.

***6. The "Further Comprising" Statements of Intended Results Are Not Limiting.***

The "further comprising" clauses in claims 2-4 and 8-11 of the '413 patent are non-limiting. The clauses are: "further comprising reducing the mean cumulative number of Gd-enhancing lesions in the brain of the patient" ('413 pat., claim 2); "further comprising reducing the mean number of new T2 lesions in the brain of the patient" (*id.*, claims 3, 8); and "further comprising reducing the cumulative number of enhancing lesions on T1-weighted images" (*id.*, claims 4, 9-11). As discussed above, these statements merely express the intended results of the

action required to carry out the claimed method; they do not change or limit the method.

Teva argues that "[t]he phrase 'further comprising' signals that the clinical outcomes that come after the phrase are distinct components of the claimed methods." Teva Br. 19. The clinical outcomes may be *related to* the claimed methods—just as "reducing hematologic activity" was a clinical outcome that was related to the claimed methods in *Bristol-Myers Squibb*—but it does not follow that the "further comprising" clauses should be construed as limiting in this case any more than "reducing hematologic activity" was in *Bristol-Myers Squibb*. 246 F.3d at 1375. Teva conspicuously does not argue that the phrases recite additional steps or modify in any way how the drug is administered in the claimed method.

The cases Teva cites do not compel a different conclusion. *HTC Corp. v. IPCom GmbH & Co.* analyzed the phrase "further comprising" as part of a hypothetical grammatical exercise, wholly unrelated to whether or not a clause should be construed as limiting. *See* 667 F.3d 1270, 1275 (Fed. Cir. 2012). And *Remediation Products, Inc. v. Adventus Americas Inc.* simply states that "[t]he construction of the phrase 'further comprising' includes additional recited elements," without even touching on whether or not those elements are required to be limiting. No. 3:07CV153-RJC, 2009 WL 57456, at *1 (W.D.N.C. Jan. 7, 2009).

***7. "Therapeutically Effective" Is a Non-Limiting Statement of Intended Result.***

"Therapeutically effective" in claims 1, 15, and 19 of the '250 patent, and claims 1, 19, and 20 of the '413 patent, does not modify the claimed dosage or frequency of administration of GA. Rather, the phrase as used here is analogous to: (i) the *Bristol-Myers Squibb* phrase "antineoplastically effective amount," which the Federal Circuit held was non-limiting because it "essentially duplicates" the dosage recited in those claims, 246 F.3d at 1375; and (ii) the phrase "in a stabilizing amount," which the Federal Circuit held was non-limiting because it did not modify the weight-to-volume ratio recited in those claims, *Syntex USA LLC v. Apotex, Inc.*, 407

F.3d 1371, 1378 (Fed. Cir. 2005).

The phrase "therapeutically effective amount" may be construed as limiting where it appears in claims that ***do not*** recite a precise numerical dosage, but all of the claims at issue here recite a precise dosage of 40 mg. That dosage is administered whether or not it is effective in a particular patient. Teva's cited cases are inapplicable because in those cases, "therapeutically effective amount" modified the claim scope in claims which recited either a broad range of dosages or no express dosage amount at all. *See* JA6828 (U.S. Pat. No. 7,011,831, claim 1) (construed in *Shelbyzyme LLC v. Genzyme Corp.*, No. 09-768-GMS (D. Del. July 8, 2011)); JA6841 (U.S. Pat. No. 6,468,967, claim 1) & JA6859 (U.S. Pat. No. 6,852,689) (construed in *Cubist Pharms., Inc. v. Teva Parenteral Meds., Inc.*, No. 09-189-GMS (D. Del. June 7, 2010)); JA6869 (U.S. Pat. No. 5,724,504, claims 6 & 7) (construed in *AstraZeneca AB v. Dr. Reddy's Labs., Ltd.*, No. 05-5553, slip op. at 18 (D.N.J. May 17, 2010). Here, as in *Bristol-Myers Squibb*, "therapeutically effective" only duplicates the express limitation requiring a dose of exactly 40mg. 246 F.3d at 1375.

### B. THE CLAIMS OF THE PATENTS-IN-SUIT ARE NOT LIMITED TO "THREE AND ONLY THREE INJECTIONS PER WEEK."

Teva asks this Court to construe the terms "regimen," "comprising," and "per week" as collectively limiting the claims to "three and only three subcutaneous injections each and every week," rather than construing the terms to allow for alternate-day dosing, in which there are three injections one week and four injections the next. Teva Br. 6-11. Teva is wrong. Its position conflicts with the claims' plain language and improperly imports an example from the specification into the claims. Teva contends it disclaimed alternate-day dosing during prosecution, but the excerpts from the file history on which it relies are too ambiguous to warrant rewriting the claim language. In the final analysis, Teva's deliberate decision to use the open-

ended "comprising" transition in all of the claims means that the claims are broad enough to encompass alternate-day dosing. And while Teva makes much of the preliminary claim construction the PTAB adopted in instituting *inter partes* reviews of the patents-in-suit, this Court is not bound by that non-final construction.

#### *1. The PTAB's institution decision is not binding, and was preliminary.*

Throughout its opening brief, Teva relies heavily on the PTAB's preliminary claim construction in its decisions instituting Mylan's petitions for *inter partes* review. This argument is, however, a red herring because this Court is not bound by the PTAB construction, and should make its own claim construction assessment. This is particularly true given that the PTAB itself has stated that its construction is only preliminary.

The PTAB concluded that Mylan had "established a reasonable likelihood of prevailing on its assertions that the claims...are unpatentable as obvious." JA4418; *see also* JA4392; JA4375. As part of its decision, the PTAB preliminarily construed the claims and found that they are not open to alternate-day dosing. *See, e.g.*, JA4402. A PTAB claim construction decision is, however, not binding on this Court. *See, e.g., Pragmatus AV LLC, v. Yahoo! Inc.*, No. C-13-1176 EMC, 2014 WL 1922081, at *4 (N.D. Cal. May 13, 2014) ("[T]his Court owes no deference to the PTAB's claim construction done as part of an *inter partes* review.") (citing *Rensselaer Polytechnic Inst. v. Apple Inc.*, No. 1:13-cv-0633 (DEP), 2014 U.S. Dist. LEXIS 5186, at *29 (N.D.N.Y. Jan. 15, 2014)). The PTAB was careful to couch its claim construction decision as limited to "this [institution] stage of the proceedings," and stated that "the Board has not made a final determination" regarding "the construction of any claim term." JA4402, JA4418. In sum, there is simply no basis in either law or fact for the Court to automatically defer to the PTAB on its self-described preliminary claim construction.

#### *2. Neither the claims' plain language nor the specification limits the claims to*

***three and only three doses per week.***

Teva argues that its construction limiting the "regimen terms" to "three and only three injections" each week "is consistent with the plain language of the claim," which Teva posits "consistently refer to three injections and make no mention of additional doses." Teva Br. 6. Tellingly, Teva provides no support for that statement. *Id.* Instead, as detailed in Defendants' opening brief and below, the claims' plain language opens them to additional elements through the use of the well-known patent-drafting term of art "comprising." Defs.' Br. 11-14.

Teva also argues that the specification "consistently" describes "three and only three injections." Teva Br. 8. To the contrary, the specification describes a dosing schedule *comprising* three injections. *Id.*; *see* JA5-8 at 2:60, 3:14, 4:18, and 5:26. In fact, the specification nowhere describes a "three and only three" limitation. *See id*. Teva's suggestion that the prophetic example in the specification supports its construction is without legal support. Canons of claim construction dictate that a court may not import into the claims a limitation from an example in the specification. Defs.' Br. 13; *see also Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346-47 (Fed. Cir. 2015) ("This court has repeatedly 'cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification."). Yet that is exactly what Teva seeks to do here. Its proposed construction must therefore be rejected. *See, e.g.*, *Altoona Publix Theaters v. Am. Tri-Ergon Corp.*, 294 U.S. 477, 487 (1935) ("[N]one [of the claims] can be aided by reading into it parts of the specification...which the patentee failed to include in it.").

***3. Teva did not disclaim alternate-day dosing in the prosecution history.***

Teva also states that "the prosecution history of the patents clearly support Plaintiffs' proposed construction." Teva Br. 6. Not so. The prosecution history is at best ambiguous and thus insufficient to support Teva's theory that it clearly disclaimed alternate-day dosing.

In support of its prosecution disclaimer argument, Teva quotes a statement in the file

history which—according to Teva—makes "clear that the claims do not cover alternate day dosing." *Id.* Read in context, however, the statement is far from clear. As detailed in Defendants' Opening Brief, the claims of the '413 and '250 patents were filed without the term "regimen," the '302 patent claims were filed without the term "per week," and none of the patents' claims originally included a 40 mg limitation. *See, e.g.*, JA93-94; *see also* JA3116-21. The Examiner rejected the claims, *inter alia*, because he read them to cover administration of GA for only a single seven-day period, rather than as a continuous program of treatment spanning multiple weeks or months. JA116-17, JA1722-23, JA3116-21.

After issuing the rejections in the '250 and '413 prosecutions, the Examiner conducted an interview with Teva. JA205. During the interview, the Examiner informed Teva that adding the term "regimen," thereby indicating a *continuous* program of treatment, would overcome outstanding enablement and written description rejections under 35 U.S.C. § 112. *Id.* He also told Teva that adding a 40 mg dose limitation would overcome an outstanding anticipation rejection based on prior art. *Id.* Thus, in both prosecutions, Teva added the term "regimen" to indicate a continuous program of treatment—not to specify three and only three injections per week. *See* JA207-09; *see also, e.g.*, JA213 ("As amended the claims cannot be reasonably construed to read on only a single seven day period of administration, at least because the claims as amended require a 'regimen.'"). Teva also added the 40 mg limitation. JA207-09, JA212-13, JA219, JA1758-59, JA1761-62. For similar reasons, Teva added the "per week" and 40 mg limitations during prosecution of the '302 patent. JA3191-97; *see, e.g.*, JA3195 (noting that amended claims "recite 'three subcutaneous injections of a 40 mg/ml dose of glatiramer acetate per week" and that "as amended, the claims cannot be reasonably construed to read on only a single seven day period of administration") (emphasis in original).

Teva's position—that it clearly and unmistakably disclaimed alternate-day dosing during prosecution—is unsupported by law. At best the file history is ambiguous, and ambiguity does not result in the "clear and unmistakable disclaimer" the law requires. *See Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009) ("Even if an isolated statement appears to disclaim the subject matter, the prosecution history as a whole may demonstrate that the patentee committed no clear and unmistakable disclaimer."); *see also Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F. 3d 1363, 1377 (Fed. Cir. 2009) (patentee "committed no clear and unmistakable disavowal" where certain "selected statements arguably support" disavowal, but "those statements are undercut considerably by additional statements."). The "regimen" term was added to make clear that the claimed method of treatment was continuous, and not limited to a single seven-day period.

The isolated statements in the prosecution history concerning alternate-day dosing that Teva points to are insufficient to show a clear and unmistakable disclaimer of claim scope—much less one that can overcome Teva's liberal use of the open-ended term "comprising" in all of the claims, as we discuss next.

***4. "Comprising" is open-ended, and allows for alternate-day dosing.***

Teva contends that "'comprising/comprises' does not need to be construed," but that if it is construed, it "should have its plain and ordinary meaning of 'included but not limited to.'" Teva Br. 10. If that were the full extent of Teva's argument, there would be little dispute. But Teva then argues that while "comprising" allows "additional *treatments* to be administered," it "does not open up the dosing regimen to allow more than three *injections* of GA over a seven day period." *Id.* (emphasis added). That is wrong—Teva cannot acknowledge that the claims are open, but then in litigation pick and choose which additional elements the claims embrace. The law is clear that by electing to draft claims using the transitional phrase "comprising," Teva

opened the claims to unrecited elements—including a fourth injection every other week.

The entirety of Teva's argument on this point rests on the Federal Circuit's decision in *Dippin' Dots, Inc. v. Mosey*. Teva Br. 10 (citing 476 F.3d 1337, 1343 (Fed. Cir. 2007)). *Dippin' Dots*, however, does not support Teva's argument because the claims there differed materially from those here. First, the *Dippin' Dots* patent had one independent claim directed to a method of making a particular form of ice cream, which recited six discrete elements:

> A method of preparing and storing a free-flowing, frozen alimentary dairy product, comprising the steps of:
> [(1)] preparing an alimentary composition for freezing;
> [(2)] dripping said alimentary composition into a freezing chamber;
> [(3)] freezing said dripping alimentary composition into beads;
> [(4)] storing said beads at a temperature at least as low as -20°F, so as to maintain said beads free-flowing for an extended period of time;
> [(5)] bringing said beads to a temperature between substantially -10°F and -20°F prior to serving; and
> [(6)] serving said beads for consumption at a temperature between substantially -10°F and -20°F prior so that the beads are free flowing when served.

*Id.* at 1340. Here, the claims-at-issue have only one manipulative step: "administering to the human patient a therapeutically effective dosage regimen of three subcutaneous injections of 1 ml of a pharmaceutical composition comprising 40 mg of glatiramer acetate over a period of seven days with at least one day between every subcutaneous injection." *E.g.*, '413 Pat. Cl. 1.

In *Dippin' Dots*, the dispute centered around the meaning of the noun "beads," which was recited in four of the six steps. The specification "specifically describe[d] 'beads' as having a 'smooth, spherical appearance,'" and the patentee argued at the claim construction hearing that "a 'bead' was 'a small round ball or round drop.'" 476 F.3d at 1343. Despite the specification's clear statement, the patentee contended that use of the term "comprising" opened the claims to methods that also produce "irregular or odd shaped particles" of ice cream. *Id*. (internal quotation marks omitted). The Federal Circuit disagreed and held that the "presumption raised by the term

'comprising' does not reach into each of the six steps [in the method claim at issue] to render every word and phrase therein open-ended—especially where, as here, the patentee has narrowly defined the claim term it now seeks to have broadened." *Id*. The Federal Circuit clarified that while the "six enumerated steps must…be practiced as recited in the claim for a process to infringe," the claims ***did*** cover a process that practiced "other steps in addition to the ones mentioned." *Id.*

Here, Teva's claims recite only a single affirmative step—administering three injections of GA over a period of seven days with at least one day between injections. But as the Federal Circuit stated in *Dippin' Dots*, because that single step is preceded by the transition "comprising," the claims are open to additional steps—here injections—provided there is still at least one day between each injection. Defendants' proposed construction is thus consistent with *Dippin' Dots*, and does not "render every word and phrase" in a ***multi***-step claim "open ended," as was the case in *Dippin' Dots*. *Id.*; *see also Smith & Nephew, Inc. v. Ethicon, Inc.*, 276 F.3d 1304, 1311 (Fed. Cir. 2001) ("It is neither a 'shortcoming' nor a 'weaseling' to use 'comprising' to recognize that inventions may be practiced with steps in addition to those listed in the claims."); *see also, e.g., Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) (stating that "comprising" allowed for the presence of additional nucleotides coding for additional amino acids at the beginning of the claimed construct).

Indeed, if Teva wished to limit the claims to three—and only three—injections, it easily could have done so by using the closed transition "consisting of." That is precisely what Teva has done in a continuation patent in the same family as the patents-in-suit. *See* Defs.' Br. 13-14.

***5. A regimen is a program or system of treatment.***

Teva asserts that its construction of "regimen" is correct because "the invention [is] not limited to a single seven day period of administration." Teva Br. 8-9. Defendants do not argue

that the claims are limited to a single seven-day period, and Defendants' construction accounts for that fact in defining a "regimen" as a "program or systemic plan of treatment." *Id.* at 5. The critical difference between Teva's and Defendants' constructions is that Teva asserts the claims are limited to "three and only three" doses in each seven-day period and exclude alternate-day dosing. As detailed above and in Defendants' opening brief, the claims are not so limited.

### C. "BRAIN ATROPHY" MEANS "A REDUCTION IN BRAIN VOLUME OVER TIME."

Defendants' proposed construction for "brain atrophy"—"a reduction in brain volume over time"—is consistent with the definition explicitly set forth in the specification, and is thus the only legally correct construction. Indeed, Teva acknowledges that "the clinical trial protocol described in the specification also measures changes in ***overall brain volume*** for purposes of assessing brain atrophy" (Teva Br. 12) (emphasis added).

Teva solely relies on extrinsic evidence to support its construction. But extrinsic evidence is particularly unnecessary here, because "brain atrophy" is explicitly defined by the patents' specification as a change in brain volume over time. *See*, *e.g.*, JA10 at 12:19-20 ("Brain atrophy as defined by the percent brain volume change from baseline to month 12"); *id.* at 12:46-49 (defining "brain atrophy" in terms of "normalized gray matter volume and in normalized white matter volume."). Moreover, the extrinsic evidence upon which Teva relies actually supports Defendants' proposed construction. 2nd Pachner Decl. ¶¶ 5, 8 (filed herewith) (discussing literature measurement of brain atrophy in terms of "brain volume change"). Lastly, Teva's proposed construction, "the loss of brain tissue," would improperly include losses of brain tissue that do not affect brain volume, such as lesions. *Id.* ¶¶ 3-5, 9.

## III. CONCLUSION

For these reasons, and those stated in Defendants' opening brief, Defendants respectfully request that the Court adopt their constructions and enter the parties' agreed constructions.

Dated: October 2, 2015

/s/ *Frederick L. Cottrell*
Frederick L. Cottrell, III (No. #2555)
Cottrell@rlf.com
Arun J. Mohan (No. #6110)
Mohan@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, Delaware 19801

Shannon M. Bloodworth
Perkins Coie, LLP
700 13th Street, NW
Washington, DC 20005
Tel: (202) 654-6204

David L. Anstaett
Emily J. Greb
Perkins Coie LLP
1 East Main Street, Suite 201
Madison, WI 53703
Tel: (608) 663-7460

*Attorneys for Defendants Mylan, Inc., and Mylan Pharmaceuticals Inc.*

*/s/ Richard L. Renck*
Richard L. Renck (No. 3893)
DUANEMORRIS LLP
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
(302) 657-4900
rlrenck@duanemorris.com

Anthony J. Fitzpatrick
Vincent L. Capuano, Ph.D.
Christopher S. Kroon
Carolyn A. Alenci
DUANEMORRIS LLP
100 High Street, Suite 2400
Boston, MA 02110-1724

*Attorneys for Amneal Pharmaceuticals LLC and Amneal Pharmaceuticals Company GmbH*

/s/ *John C. Phillips*
John C. Phillips, Jr. (No. 110)
jcp@pgslaw.com
David A. Bilson (No. 4986)
dab@pgslaw.com
PHILLIPS, GOLDMAN &SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806

Constance S. Huttner
Beshoy M. Sharoupim
BUDD LARNER, P.C.
150 John F. Kennedy Parkway
Short Hills, NJ 07078
(973) 315-4430

*Attorneys for Defendants DRL*

/s/ *Dominick T. Gattuso*
Dominick T. Gattuso (No. 3630)
DGattuso@proctorheyman.com
PROCTOR HEYMAN &ENERIO LLP
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(308) 472-7300

William A. Rakoczy
Deanne M. Mazzochi
Rachel Pernic Waldron
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60654
(312) 222-7543
wrakoczy@rmmslegal.com
dmazzochi@rmmslegal.com
rwaldron@rmmslegal.com

*Attorneys for Defendants Sandoz Inc. and Momenta Pharmaceuticals, Inc.*

*/s/ Neal C. Belgam*
Neal C. Belgam (No. 2721)
SMITH, KATZENSTEIN & JENKINS LLP
The Brandywine Building
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com

E. Anthony Figg
Sharon L. Davis
R. Elizabeth Brenner-Leifer
Seth E. Cockrum
Jennifer Nock
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
607 14th Street, N.W., Suite 800
Washington, DC 20005
(202) 783-6040

*Attorneys for Synthon Pharmaceuticals Inc., Synthon B.V., and Synthon s.r.o.*