```
1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          -   -   -

4   IN RE COPAXONE 40 MG          )     C.A. No. 14-1171-GMS
    CONSOLIDATED CASES            )       (CONSOLIDATED)
5
                               -   -   -
6
                        Wilmington, Delaware.
7                      Monday, September 26, 2016
                              9:00 a.m.
8                      Day 1 of Bench Trial

9                          -   -   -

10  BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

11  APPEARANCES:

12          JOHN W. SHAW, ESQ., and
            KAREN E. KELLER, ESQ.
13          Shaw Keller LLP
                    -and-
14          PAUL W. WARE, ESQ.,
            DARYL WIESEN, ESQ.,
15          JOHN T. BENNETT, ESQ.,
            ELIZABETH J. HOLLAND, ESQ.,
16          NICHOLAS K. MITROKOSTAS, ESQ., and
            WILLIAM JAMES, ESQ.,
17          Goodwin Procter LLP
            (Washington, D.C.)
18                  -and-
            STEPHEN B. BRAUERMAN, ESQ., and
19          SARA BRUSSIERE, ESQ.
            Bayard P.A.
20
                             Counsel for Plaintiffs
21

22

23

24

25
```

```
 1    APPEARANCES CONTINUED:

 2              FREDERICK L. COTTRELL, III, ESQ.
              Richards, Layton & Finger, P.A.
 3                    -and-
              DAVID L. ANSTAETT, ESQ.
 4            Perkins Coie LLP
              (Madison, WI)
 5                    -and-
              SHANNON M. BLOODWORTH, ESQ.,
 6            BRANDON M. WHITE, ESQ.,
              EMILY J. GREB, ESQ., and
 7            ROBERT D. SWANSON, ESQ.
              Perkins Coie, LLP
 8            (Washington, D.C.)

 9                          Counsel for Defendants
                            Mylan, Inc. and
10                          Mylan Pharmaceuticals, Inc.

11            DOMINICK T. GATTUSO, ESQ.
              Procter Heyman & Enerio LLP
12                    -and-
              WILLIAM A. RAKOCZY, ESQ.,
13            DEANNE M. MAZZOCHI, ESQ.,
              RACHEL PERNIC WALDRON, ESQ.,
14            MATTHEW V. ANDERSON, ESQ.,
              THOMAS H. ERLICH, ESQ.
15            ERIN FORBES, ESQ., and
              CHRIS GALLIGAN, ESQ.
16            Rakoczy Molino Mazzochi & Siwik LLP
              (Chicago, IL)
17
                            Counsel for Defendants
18                          Sandoz Inc. and Momenta
                            Pharmaceuticals, Inc.
19
              RICHARD W. RILEY, ESQ.
20            Duane Morris LLP
                      -and-
21            CHRISTOPHER S. KROON, ESQ., and
              ANTHONY J. FITZPATRICK, ESQ.
22            Duane Morris LLP
              (Boston, MA)
23
                            Counsel for Defendants
24                          Amneal Pharmaceuticals LLC
                            and Amneal Pharmaceuticals
25                          Company GmbH
```

```
 1
       APPEARANCES CONTINUED:
 2
                   DAVID BILSON, ESQ.
 3                 Phillips, Goldman, McLaughlin & Hall, P.A.
                         -and-
 4                 HANK HECKEL, ESQ.
                   Budd Larner
 5                 (Short Hills, NJ)

 6                                 Counsel for Defendant DRL

 7                 NEAL C. BELGAM, ESQ.
                   Smith Katzenstein & Jenkins LLP
 8                     -and-
                   E. ANTHONY FIGG, ESQ.,
 9                 ELIZABETH R. BRENNER-LEIFER, ESQ., and
                   BRETT A. POSTAL, ESQ.
10                 Rothwell, Figg, Ernst & Manbeck, P.C.
                   (Washington, D.C.)
11
                                 Counsel for Defendants
12                               Synthon Pharmaceuticals, Inc.,
                                 Synthon B.V., and Synthon s.r.o.,
13                               and Pfizer

14                                 -  -  -

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    THE COURT:  Good morning.

 2                    (Counsel respond "Good morning.)

 3                    THE COURT:  Please take your seats, ladies and

 4      gentlemen.  We are trying to do something about the

 5      temperature.  Incredibly enough, we have to call to New

 6      Jersey.

 7                    Let's begin with introductions, plaintiffs.  Mr.

 8      Shaw.

 9                    MR. SHAW:  Good morning, Your Honor.

10                    THE COURT:  Good morning.

11                    MR. SHAW:  John Shaw for the plaintiffs.  I will

12      start in the center at the front table.  Paul Ware from

13      Goodwin Procter, Elizabeth Holland, Daryl Weisen, then again

14      from the center, Bill James, John Bennett, and Nick

15      Mitrokostas.

16                    THE COURT:  Good morning, counsel

17                    (Counsel respond "Good morning.")

18                    MR. SHAW:  Thank you, Your Honor.

19                    THE COURT:  Who will start from the other side?

20                    MR. GATTUSO:  Good morning, Your Honor.

21      Dominick Gattuso with Procter Heyman Enerio on behalf of

22      Sandoz and Momenta Pharmaceuticals.  We have a number of

23      people to introduce this morning.  We have William Rakoczy.

24      We have Deanne Mazzochi.  In the back we have Rachel Pernic

25      Waldron, Matt Anderson, Thomas Ehrich, Erin Forbes, and
```

1    Chris Gallagher.

2           Then we also have from Sandoz Josephine Lu, and

3    in the back we have Julia Pike.  Then from Momenta we have

4    Phil Nixon, who is also in the gallery.

5           THE COURT:  Good morning.

6           MR. BELGAM:  Good morning, Your Honor.  Neal

7    Belgam for Synthon and Pfizer.  I have Anthony Figg with me,

8    along with Elizabeth Brenner-Leifer and Brett Postal.

9           THE COURT:  Good morning.

10          (Counsel respond "Good morning, Your Honor.")

11          THE COURT:  Counsel.

12          MR. WRIGHT:  Good morning, Your Honor.  Richard

13    Wright from Duane Morris in Wilmington, Delaware on behalf

14    of defendant Amneal Pharmaceuticals.  I have with me our

15    colleagues from our Boston office, Tony Fitzgerald, Chris

16    Kroone and Michael Gallagher.

17          THE COURT:  Good morning.

18          MR. BILSON:  Good morning, Your Honor.  David

19    Bilson from Phillips, Goldman, McLaughlin & Hall, here for

20    the DRL defendants.

21          With me in the courtroom is Hank Heckel from

22    Budd Lardner.

23          THE COURT:  Good morning, counsel.

24          Mr. Cottrell.

25          MR. COTTRELL:  Good morning, Your Honor.  Fred

```
1    Cottrell from Richards Layton for the Mylan defendants.

2    With me from Perkins Coie at counsel table, Shannon

3    Bloodworth, and then at certain points in the courtroom

4    David Anstaett, Brendan White, Rob Swanson, Emily Greb, and

5    our clients are here from Mylan, Your Honor, Matt Greniert

6    and Steve Flynn.

7                   THE COURT:  I might let them go home, because

8    they don't like being here.

9                   I am teasing.

10                  MR. COTTRELL:  Your Honor, one thing, this is

11   your courtroom, it is completely up to you.  There are some

12   folks that don't have seats that are out in the hallway.  Is

13   there any way a couple people could sit in the jury box?

14                  THE COURT:  Absolutely.

15                  Let's make sure there is no objection from Mr.

16   Ware and his colleagues.

17                  MR. WARE:  It depends who they are, Your Honor.

18                  MR. COTTRELL:  I will volunteer, Your Honor.  I

19   am happy to take one of the seats.

20                  THE COURT:  We don't want to have folks standing

21   up.

22                  THE COURT:  Why don't we take care of that

23   before we begin with openings.  Are there any matters that

24   we need to address?

25                  MR. WEISEN:  Your Honor, if I can have a moment.
```

```
 1    We worked late into the night to try to resolve the issues.

 2    We resolved most of them.  One or two are pending resolution

 3    and I think we will be able to resolve them.

 4              We had one issue we wanted to raise, and I

 5    believe the defendants had one we weren't able to resolve.

 6              Our issue concerns whether we need to put on

 7    evidence concerning the factors for an injunction during the

 8    liability phase or we should wait, and if it is necessary

 9    put it on either by affidavit or subsequently, since it is a

10    Hatch-Waxman case, and it may or may not be necessary.

11              We felt it was better to just wait and not spend

12    time during the liability phase.  The defendants want to

13    brief the issue all at the end of the liability phase.  Up

14    to you, certainly.

15              THE COURT:  To brief whether we should?

16              MR. WEISEN:  Whether we should have an

17    injunction or not.

18              THE COURT:  You mean the substantive aspects?

19              MR. WEISEN:  They want to brief the substantive

20    issue.

21              THE COURT:  Is this something we really need to

22    talk about this morning?

23              MR. WEISEN:  The witness that we would have put

24    on that evidence is the second witness.  We may or may not

25    get to him today.
```

```
 1                    THE COURT:  You don't want to put the witness
 2      on.
 3                    MR. WEISEN:  We don't want to, but we are
 4      prepared.
 5                    THE COURT:  Let's hear from the other side.
 6                    MS. MAZZOCHI:  Good morning, Your Honor.  Deanne
 7      Mazzochi.
 8                    Just briefly, Your Honor.  Teva all the time has
 9      the burden of proof on remedy.  They have come into the
10      Court.  They have made it a part of the their complaint,
11      they are seeking injunctive relief.  They can't waive that.
12      They never asked to postpone it.
13                    We never stipulated that Teva is entitled to
14      injunctive relief here.  We affirmatively challenged it.
15      The Federal Circuit is very clear that the burden remains
16      with the patentee to establish those factors.  There is
17      nothing from Teva in their proposed findings of fact and
18      conclusions of law on this issue.
19                    We asked during discovery, we submitted requests
20      for production, give us all of your documents relating to
21      this issue of remedy in your claim for injunctive relief,
22      and they said we are not going to produce any documents.
23      That was their tactical choice they made, to not come
24      forward with their evidence.  We think they had an
25      obligation to do that.
```

1          To the extent they think they can put on

2     evidence during trial, we think they have an obligation to

3     do that.   If we think it is inadequate we are happy to

4     address that in posttrial briefing.   They think it's

5     adequate.   We can deal with it in posttrial briefing.   I

6     don't like this idea of we are here for a trial and they are

7     saying they are not prepared to put on evidence of remedy

8     as part of the case.   They made the claim.

9          Let's go, we want to do it.   Let the record

10     stand for itself.

11          THE COURT:   You guys thought Monday morning

12     would be a good time to talk about this.

13          She raises some significant points, counsel.

14          MR. WEISEN:   She does, Your Honor.   We are not

15     suggesting we don't have to put on the evidence.   We are

16     asking to wait to do it later.

17          I do need to respond to the discovery dispute

18     point, that in response to the discovery we said it's

19     premature until there is a liability issue.   And the first

20     time they indicated they were going to dispute that was when

21     they provided us with their proposed findings and

22     conclusions.

23          We didn't know there was a dispute over the

24     timing until two weeks ago.   We have been trying to work it

25     out.

```
 1                THE COURT:  To be fair to both sides, I am not
 2   sure that we talked about more or less bifurcating this
 3   discovery.  My assumption generally is parties are going to
 4   engage in discovery in toto unless you tell me otherwise,
 5   unless --
 6                MR. WEISEN:  I can say they have gotten the
 7   discovery they would need on this subject, and we produced
 8   financial information concerning the sales of the product
 9   and the issues that would go to that.  We are prepared to
10   put that evidence on.  They have gotten it in discovery.
11   They deposed the witness who will testify about it.
12                THE COURT:  So you have one witness?
13                MR. WEISEN:  We would one witness who would
14   cover that subject.
15                THE COURT:  Did you want to say anything in
16   response?
17                MS. MAZZOCHI:  I will dispute that he was
18   adequately deposed on that issue.  We can try to deal with
19   it as we may.  Again, I think to the extent we say evidence
20   is untimely, outside the scope of their proposed findings,
21   et cetera, we can deal with that in posttrial briefing.  We
22   certainly don't want to have bifurcated proceedings because
23   we have been operating under the assumption it is their
24   burden, they have got to come forward, it is fine for us to
25   say you don't have enough proof and potentially prevail.
```

1                    We would prefer to just go.

2                    THE COURT:  Let me ask you, counsel, what

3     prejudice would you, and you as well, depending on how I

4     rule, if I say, yes, let's do it now, if I say no, you are

5     there, if I say no, we will do it later?

6                    MS. MAZZOCHI:  Your Honor, I think the scope of

7     what they are permitted to put on this evidence is as is

8     defined by the proposed findings of fact and conclusions of

9     law.  It happens all the time.  They try to make an argument

10    not in the proposed findings.  We will deal with it in the

11    posttrial briefs.

12                   MR. WEISEN:  Your Honor, if your preference --

13                   THE COURT:  I have not had to deal with this in

14    ANDAs before.  Usually, we get right to it.

15                   MR. WEISEN:  We are happy to put the evidence on

16    during this trial and brief it as you see fit.

17                   THE COURT:  Why don't we do that.

18                   MS. MAZZOCHI:  Thank you, Your Honor.

19                   MR. GATTUSO:  Your Honor, one or two other

20    issues.

21                    I am speaking on behalf of all defendants, Teva

22    has identified Ety Klinger, who is an inventor, and John

23    Asler, who is Teva's businessperson, as fact witnesses in

24    the case.  We would ask under Rule 615 that those witnesses

25    be sequestered outside the courtroom.  They are both being

1      called today, as I understand.

2                  THE COURT:  Is that correct?

3                  Let's sequester the witnesses.

4                  MS. BLOODWORTH:  Your Honor --

5                  MR. WARE:  Your Honor, sequestration even for

6      openings as well?

7                  MR. GATTUSO:  Your Honor, our request was for

8      openings straight through.

9                  THE COURT:  Yes.

10                 MR. GATTUSO:  Thank you.

11                 MS. BLOODWORTH:  Your Honor, I have one further

12     housekeeping discovery-related issue, we brought it up in

13     the final pretrial conference.

14                 THE COURT:  I don't remember that.  I am sure

15     you did.  I was on trial last week, you may have heard.

16                 MS. BLOODWORTH:  I did hear, Your Honor.  About

17     the scope of Dr. Klinger's testimony.  She is the first

18     witness who will be up this morning.  She is the inventor of

19     all four patents in suit, is the named inventor.  We served

20     an interrogatory request for the story of the invention

21     understanding that they would like to put the inventors up

22     at trial.

23                 We got a very vague response that said 30(b)(6)

24     testimony and the four prosecution histories.  We now

25     received a slide last night that had Dr. Klinger is going

1   talk about the research and development failures of Teva for

2   the trials CORAL, PROMISE, TV-5010, DEPOT, FORTE, and SONG.

3            We have never received any information in this

4   case regardless of the interrogatories on PROMISE or DEPOT.

5   They are not in any expert reports.  It is not in any

6   interrogatory responses.  They have no documents to support

7   that they have identified for these.

8            We don't know what she is actually going to say.

9   I can't actually do discovery live, during trial.  That is a

10  little unfair, I think.

11           THE COURT:  Let's hear a response.  What is your

12  request?

13           MS. BLOODWORTH:  That she be limited to the

14  prosecution histories or to her deposition testimony.  We

15  didn't have any documents admitted in her deposition

16  testimony on CORAL, DEPOT, SONG or PROMISE.

17           THE COURT:  Those are prior art, CORAL --

18           MS. BLOODWORTH:  That is a good question, Your

19  Honor.  FORTE is certainly prior art.  Again, a lot of

20  these, they weren't issues in discovery.  I would have to

21  look up exactly when they were performed and released

22  publicly.

23           MR. WARE:  Your Honor, neither of these is being

24  proffered for purposes of prior art.  In any event, Teva's

25  documents that were discovered by defendants do include both

1    PROMISE and DEPOT research and development efforts.

2              During the course of the deposition, the

3    inventor, of course, was asked, in effect, what is the

4    basis -- what led to your invention.  And she gives, among

5    other things, at one point a five-page answer.

6              There was no followup which said, can you

7    identify for me those research and development efforts which

8    ultimately led to the invention.  There simply was no

9    question.

10             THE COURT:  Let me interrupt you just a second,

11   Mr. Ware.  I think part of what I heard your colleague say

12   was there was an interrogatory.

13             MR. WARE:  Yes, there was.

14             THE COURT:  She maintains Teva was not

15   responsive.

16             MS. BLOODWORTH:  I have copies of it.

17             THE COURT:  I don't need to see it.

18             MS. HOLLAND:  Yes, Your Honor.  I can speak to

19   that.  There was an interrogatory asking for conception and

20   reduction to practice.  The answer to the interrogatory was

21   that we were going to be producing a 30(b)(6) witness on the

22   topic who will be able to testify.  There was no problem

23   with that.  We were never told that that was an insufficient

24   interrogatory response.  We produced Dr. Klinger for two

25   days of testimony.  The very last --

1          THE COURT:  This first time you are hearing a

2    complaint about her response to the interrogatory?  Today,

3    this morning?

4          MS. HOLLAND:  Not this morning.  But in

5    connection with the pretrial order.

6          THE COURT:  Go ahead.

7          MS. HOLLAND:  So, Your Honor, the inventor was

8    produced.  She was the 30(b)(6) on conception and reduction

9    to practice.  So it was a 30(b)(6) category that essentially

10   mirrored the interrogatory answers.  And we said we are

11   going to produce it via 30(b)(6) testimony.  There was no

12   problem with that.  No objection.

13         At the deposition, counsel did not ask her about

14   the invention story until the very last question in the

15   deposition, after two days of testimony.  There is a

16   five-page answer, which has a lot of detail in there.  Among

17   other things, Dr. Klinger says that she was exposed to a lot

18   of data from non-clinical, clinical studies, scientific

19   publications.

20         After the five-page answer, Ms. Bloodworth said

21   I don't have any further questions.

22         Dr. Klinger certainly testified about all this.

23   It seems to me, it was incumbent on counsel to follow up on

24   some of that and ask if more detail was necessary.  But that

25   didn't happen.

1          THE COURT:  What is your response?

2          MS. BLOODWORTH:  The interrogatory specifically

3    states, to the extent plaintiffs intend to present at trial

4    witness testimony regarding the invention and IN particular

5    any other, quote, story of the invention, relating to the

6    alleged invention's origination and/or development and/or

7    decision to develop, et cetera.

8          The response is, we think it's better to produce

9    it during 30(b)(6) testimony and here are your four

10   prosecution histories.  And this interrogatory was never

11   supplemented.  I actually think it is not my affirmative job

12   to put on the invention story.  It's not my job to ferret

13   that out.

14          I do have a very -- I am not objecting to Dr.

15   Klinger testifying or telling her invention story.  All I am

16   saying is I don't think she should be allowed to come in and

17   testify under the guise of her invention story, move in

18   documentary evidence that then is going to be used as

19   failure of others by Teva because when we asked last night,

20   this all came out when we got their slide, we said, are you

21   going to allow Dr. Wynn, have Dr. Wynn rely on Dr. Klinger's

22   testimony?  He is their expert on secondary considerations.

23   he said, We are not going to tell you that.

24          Dr. Klinger is going to testify.  She is going

25   to have her invention story.  No problem, Your Honor.

```
 1              We actually are also calling Dr. Klinger as an

 2    adverse witness.  So her testimony will be very critical.

 3    We are not trying to limit it.  We are just trying to get

 4    pointed out what documentary evidence they are allowed to

 5    move in, and then under the guise of hearing their testimony

 6    today, expand their expert reports with Dr. Wynn's

 7    testimony.

 8              THE COURT:  What documents are we talking about?

 9    The ones you have named?

10              MS. BLOODWORTH:  Several new documents.  They

11    produced them during discovery.  They identified them the

12    first time the other day.

13              MR. RAKOCZY:  Your Honor, thank you.  I want to

14    add a little flavor to this.

15              The interrogatory request asked for the

16    invention story.  In response Teva identified several

17    ranges, Bates ranges of documents.  Last night we got the

18    identification of exhibits for Dr. Klinger's direct

19    testimony and we tried to match up those documents with the

20    ranges that Teva identified for these invention story

21    documents.

22              I think of 15 documents identified under Dr.

23    Klinger's direct, only two pages fall within the rang that

24    Teva identified in its interrogatory as the invention story

25    documents.
```

```
 1                I am not sure what else we could have done.  We
 2      asked for the invention story.  We were told to go look in
 3      these ranges for documents.  We did.  And now we see a lot
 4      of documents identified for trial for her testimony and only
 5      two pages are identified in this interrogatory answer.
 6                So I am not sure how they are going to use those
 7      documents that they have identified as exhibits.  But we
 8      submit they shouldn't be able to use them and admit them as
 9      part of whatever invention story Teva wants to tell now
10      because we asked and they didn't answer.
11                THE COURT:  You say you are not sure how they
12      are going to use them.  Might it not make sense, Mr.
13      Rakoczy, let's find out, for you to re-interpose your
14      objection, and, Ms. Bloodworth, and have me rule upon it at
15      a time when I have the benefit of more than just -- this is
16      not to denigrate counsel -- just attorney argument?  And I
17      can make my own independent judgment about whether the rules
18      have been breached, whether you are suffering unfair
19      surprise, whether you are handicapped in some way as a
20      result of what you maintain is unfair surprise and the other
21      side says no, and let me make a determination as to whether
22      they have played by the rules, as it were.
23                MR. RAKOCZY:  Absolutely, Your Honor.  We wanted
24      to preserve this objection.  If we start popping up and
25      down --
```

1           THE COURT:  That's fine.  I think you should do

2     that.

3           Let's see what happens.

4           MR. RAKOCZY:  Thank you, Judge.

5           MS. BLOODWORTH:  Thank you, Your Honor.

6           THE COURT:  Did you want to say anything else?

7           MR. WARE:  I am a little mystified about this,

8     Your Honor, because the deposition, obviously, going on for

9     two days, she was asked, what led to her invention.  She

10    goes on for five pages about what that is, identifying at

11    least some of these projects.  But there was never -- no

12    followup at all saying can you identify for us those

13    research and development projects which ultimately led to

14    whatever decisions you made or whatever invention you

15    created.

16          That seems to me to be a gaping hole, given that

17    the inventor was there for two days and it is an easy

18    question to ask.

19          THE COURT:  Mr. Ware, with respect, what I am

20    hearing is that the plaintiff was deficient in its

21    affirmative obligation to identify, in addition to her

22    testimony, the basis, in response to the interrogatory,

23    thereby enabling the other side to conduct an effective

24    examination during the deposition, albeit that she did

25    identify at the last question, or was asked about it at the

1    last question, the invention story, that is.

2              MR. WARE:  As I understood the colloquy, it was

3    that we identified the fact that she would testify as a

4    30(b)(6) witness.  She did.  There was no followup

5    indicating to us that the interrogatory response was

6    inadequate.  All documents, any document that relates --

7              THE COURT:  That may be a basis upon which I

8    will rule.  I understand.

9              MR. WARE:  Yes.

10             THE COURT:  We will see.

11             Anything else?

12             At last, okay.  Let's have openings.

13             MR. WARE:  Thank you, Your Honor.  And good

14   morning again.

15             Paul Ware on behalf of the plaintiffs in this

16   case, Yeda and Teva Pharmaceutical.

17             As the Court knows, the four patents in suit in

18   this case claim different and improved dosing regimens

19   regarding a substance glatiramer acetate, which no doubt

20   will be referred to by its initials GA during the course of

21   the trial.

22             These four patents, Your Honor, in general

23   represent an improvement on the historic 20 milligram

24   glatiramer acetate pharmaceutical product that was in the

25   marketplace for 20 years.  And broadly speaking, they deal

1   with a claim, and claim a higher dosage of glatiramer

2   acetate rather than the 20 milligram dosage that had

3   historically been part of the product and dosing regimen of

4   three times a week as distinguished from a daily medication.

5           That has potential importance in a host of ways,

6   including the fact that the 20 milligrams being injected

7   daily involves individuals actually having to give

8   themselves a shot every single day.

9           So the improvement to three times a week has

10  implications not just for convenience but for the potential

11  consequences of that.

12          The inventions also claim an unexpected

13  reduction in what are termed injection related adverse

14  events.  Injection related adverse events I will talk about

15  in a minute.  They basically come in a couple of categories.

16          But importantly, the inventions resulted in a

17  reduced severity and frequency of those injection related

18  adverse events.

19          The active ingredient in Teva's drug, Copaxone,

20  is glatiramer acetate.  And historically, this became one of

21  the most important and widely used drugs for the treatment

22  of relapsing multiple sclerosis.  Importantly, as to these

23  patents, the dosing regimen of three times a week creates

24  intervals.  The intervals must be at least 48 hours, because

25  of the three times a week dosing, but can be as long as 96

1        hours during a given week.

2               So the unexpected finding of this invention was

3        that by increasing the dosage, efficacy of the dose was

4        still maintained, much as at the 20 milligram dosage.   But

5        the reduction in adverse events was an important consequence

6        of the invention.

7               Today, Copaxone 40 milligram, the inventive

8        dose, represents about 24 percent of the marketplace for

9        relapsing multiple sclerosis prescriptions.

10              Multiple sclerosis, we have all heard, is a very

11       unfortunate disease, which strikes principally women,

12       generally younger women.   I don't mean there are no males.

13       But the preponderance of victims are, in fact, young women,

14       Generally in their twenties or thirties.

15              Essentially, it involves the malfunctioning of

16       immune cells.   We think of immune cells as attacking

17       disease, as representing a good thing in the human body,

18       healing bacterial infections and so forth.   But with

19       multiple sclerosis, these immune cells actually destroy

20       tissue.   They turn on the human body and attack the central

21       nervous system in ways that will be explained.   And MS

22       results in multiple lesions on the brain.   And those

23       multiple lesions can cause a host of symptoms, including

24       those listed here, everything from paralysis, and all of the

25       indications that we see here, memory problems, anxiety, loss

1    of sensation.   Initially, maybe only tingling and pain in

2    the fingers and extremities, but eventually this progressive

3    disease attacks the immune system.   And it is not curable.

4    MS cannot be cured.   It is an irreversible disease and makes

5    an inexorable progression toward incapacitating victims.

6           So, indeed, these medications like Copaxone 40

7    milligram has tremendous importance and this invention as a

8    consequence was a major improvement.

9           This is simply a cartoon that depicts in some

10   ways what's happening in the immune system.   The Th1 cells

11   are inflammatory cells which are in the brain and which

12   cause inflammation and actually eat away essentially at the

13   protective sheathing around the nerves.

14          With application of glatiramer acetate, that can

15   be reversed or at least neutralized.   So in effect, what

16   happens with glatiramer acetate is that it converts those

17   Th1 cells to Th2 cells, neutralizing the anti-inflammatory

18   effect of those cells in the central nervous system.

19          It's a little unusual in that glatiramer acetate

20   is not injected into the bloodstream.   So it's not like

21   taking an aspirin or most medications with which we are

22   familiar.   Rather, it's injected subcutaneously, and that

23   area of the body turns out to be very rich in immune cells.

24   The way the drug works is to essentially to convert those

25   immune cells, and then send them on their way through the

1    blood brain barrier to the brain.  And those immune cells

2    attack the inflammatory cells in the brain, thus, hopefully,

3    neutralizing them.  And the ultimate effect is to at least

4    delay and sometimes prevent certain aspects of relapse --

5    certainly to delay the relapse.  That has importance in

6    terms of both quality of life and the progression of the

7    disease.

8              One of the reasons that these inventions are

9    important is that it was historically believed that the

10   glatiramer acetate needed to be injected on a daily basis

11   because it was necessary to have a constant infusion of the

12   medication to do the neutralizing of these immune cells in

13   the brain.

14             So it was an important discovery that three

15   times a week, with a hiatus among doses, which could last as

16   long as three days, 96 hours, would still be efficacious and

17   would be effective in treating multiple sclerosis.

18             I mentioned a moment ago certain adverse events.

19   I use the term injection related adverse events.  I said

20   these come in two categories, which will have importance in

21   the trial.  Injection site reactions is one kinds of IRAE,

22   and immediate post-injection reactions are a second

23   category.  Both are important and both cause MS patients in

24   some instances, depending on the severity and frequency of

25   these, to discontinue continue their medication.

1           That, obviously, is not a good thing.  As it

2    turns out from multiple studies, it's important that MS be

3    diagnosed early and that even under circumstances in which

4    the patient has symptoms that are relatively benign, perhaps

5    tingling or loss of some sensation, as opposed to a

6    disabling consequence, it's important that the patient get

7    on the medication and remain on that medication in order to

8    forestall what, as I said, is ultimately an inexorable

9    progression of this disease.

10           This medication is really for the relapsing form

11    of multiple sclerosis.  As that name implies, a relapsing

12    form of multiple sclerosis involves both relapses and

13    remissions.  During periods of remission, obviously, the

14    symptoms, as the name implies, abate somewhat.  The patient

15    may have months or weeks, certainly weeks during which the

16    symptoms are more moderate or don't exist at all.  But,

17    unfortunately, the disease marches on even during those

18    periods of remission.

19           The most common side effects from glatiramer

20    acetate associated with the daily injections were these

21    injection site reactions.  Those were the most common.  And

22    those involved a host of incidents around the injection

23    site.  It can be redness.  It can be swelling.  It can be an

24    expanded area of irritation.  It can be pain, or a mass

25    under the skin, or permanent scarring, hardness,

1    discoloration, and a loss of subcutaneous tissue.

2          Among the things that is important, of course,

3    is the fact of those irritations for the patient, because on

4    the old regime prior to the patents, the patient by

5    definition was injecting every single day.  So reducing

6    those injection site reactions is an important

7    accomplishment because it's important that the patient stay

8    on the medication.

9          As it turns out, among the most important

10    reasons that patients do not adhere to the dosing regimen

11    prescribed by their physician or indeed stop all together

12    during a period of remission is the injection site reactions

13    and the discomfort of those.  These can become necrotic.

14    They can become more serious.  In rare cases they may

15    require surgical intervention.

16          Briefly, with respect to the IPIRs, they are

17    systemic in nature as opposed to localized.  Essentially,

18    that describes circumstances in which there is a feeling

19    that there may be chest pain.  There may be flushing,

20    redness, heart palpitations.  Sometimes these IPIRs, at

21    least in the perception of the patient, are believed to be

22    heart attacks and cause the patient to call 911 or go to the

23    emergency room.  Among the more serious of these is called

24    lipoatrophy.  We will talk about that a little bit more

25    during the evidence.  Lipoatrophy is essentially a loss of

1    fatty tissue under the skin that is irreversible and leaves,

2    not an open hole but a dent, a pockmark in the patient's

3    skin.   They are very unbecoming, they are very disturbing to

4    patients.   As I say, they are irreversible.

5              Again, the importance of this is that they are

6    often a reason that patients do not adhere, indeed quit

7    their medication.

8              Let me turn then to Teva and to the invention.

9              As I mentioned, Copaxone 20 million dosage form

10   was introduced in 1997 and was among the leading, perhaps

11   the leading medication in terms of prescriptions over many,

12   many years.   Almost immediately after introduction of

13   Copaxone, the company turned its efforts to developing

14   either improved forms of Copaxone, better dosing regimens,

15   or broader uses of Copaxone.

16             Over the next almost two decades, the company

17   met with failure, until Dr. Klinger's invention of the 40

18   milligram three times a week dosing regimen.

19             I will just go through these quickly.

20             CORAL was an effort to develop an oral Copaxone

21   in the late nineties and early 2000s.   It failed in clinical

22   trials.

23             The PROMISE trial, clinical trial, was an effort

24   to expand the use of Copaxone for another form of multiple

25   sclerosis, not relapsing multiple sclerosis, but so-called

1    progressive multiple sclerosis.  That clinical trial failed

2    as well.

3            TV-5010 was a research effort for a higher

4    molecular weight substance, the belief being that if it was

5    higher molecular weight perhaps less of it would be used.

6    It was a very close cousin to glatiramer acetate that forms

7    Copaxone using the same four amino acids but a longer

8    polypeptide so-called chain, which is what gave it the

9    higher molecular weight.

10           That effort as well failed.

11           DEPOT was an extended release Copaxone, the

12   concept having been using a so called adjuvant, in effect,

13   injecting, say, a week's dosage under the skin, but wrapped

14   in a gelatinous type of material, such that even under the

15   skin it would release slowly over time.  That effort,

16   likewise failed, because an adjuvant, a substance suitable

17   for human use was not able to be found.  Accordingly, that

18   effort failed as well.

19           The FORTE trial the Court is going to hear more

20   about.  That was a comparison between 40 milligram daily and

21   20 milligram daily.  And that failed as well in its final

22   end point.

23           And the SONG trial had to do with lower volume

24   of Copaxone, as to which the FDA did not approve the drug.

25           Dr. Klinger was involved to one extent or

1       another in some of these projects more than others.  And

2       ultimately, after the FORTE trial, which actually tested 40

3       milligram Copaxone, it was believed that 40 milligram

4       Copaxone was essentially dead as the appropriate dosing

5       regiment.

6               The 40 milligram trial was very substantial.  It

7       involved well over a thousand patients in 17 or 20

8       countries, I have forgotten, and 130 or 40 trial sites.

9       That was a massive trial, involving a lot of expense,

10      involved tens of millions of dollars, and was a failure in

11      trying to show that the 40 milligrams would be more

12      effective than the existing 20 milligrams, and the release

13      of that trial showed that, no, 40 milligrams was not more

14      effective than 20 milligrams.

15              And accordingly, within the company, and persons

16      of ordinary skill in the art, I would contend, took the view

17      at that time that the 40 milligram dosing administration was

18      not going to be successful.

19              Dr. Klinger is a gifted biochemist, no longer

20      with Teva.  But at the time, for 17, 20 years or so, she

21      worked at Teva.  And she had some insights because she had

22      been involved in many of these efforts.  And based on that,

23      she continued to search for an efficacious dosing regimen of

24      Copaxone.  And building upon those innovative and

25      proprietary animal models that had been used in house and

1  building upon her knowledge and experience with Copaxone,

2  because it is really all she did in her entire career at

3  Teva Pharmaceuticals, she was, pardon the expression,

4  knee-deep in glatiramer acetate, and involved in every

5  conceivable effort to try and improve the product and create

6  different dosing regimens that would improve the response

7  for patients.  Ultimately, she theorized that 40 milligrams

8  could possibly be effective, and decided that three times a

9  week dosing, for reasons she will explain, had some promise.

10  And despite the fact that the company, there was a lot of

11  opposition within the company to yet another clinical trial,

12  having seen so many of these fail, she nonetheless persuaded

13  colleagues and more importantly senior management to stake

14  her again to fund the trial and to let her determine whether

15  or not her instincts, her hopes, could be realized with a 40

16  milligram three times a week dosing regimen.

17          A subsequent clinical trial proved her correct

18  and proved that her prophetic theory regarding 40 milligram

19  Copaxone would work.

20          Let me turn, Your Honor, if I may, to

21  infringement in this case.

22          Defendants propose, as the Court is aware,

23  inherent in this kind of proceeding is the manufacture and

24  sale of glatiramer acetate, generic glatiramer acetate 40

25  milligrams, if approved by the FDA.

1          Use of that generic product as described and

2    encouraged and directed by their package inserts will, Teva

3    asserts here, directly infringe in that physicians and

4    patients will use the drug and will both contributorily and

5    will induce infringement as a result of the direction it

6    gives both to patients and physicians to use the drug in

7    accordance with the package inserts of all five defendants.

8          In 2015, there was another clinical trial called

9    Glacier, about which the Court will hear some things.

10         In any event, an additional trial called Glacier

11   was conducted.  As a result of that, it's not among these

12   research and development efforts, however, the results of

13   that trial showed unequivocally, because it compared 40

14   milligram, 20 milligram, 40 milligram three times a week, 20

15   milligram daily or every other day, it showed that the 40

16   milligram three times a week was indeed more efficacious

17   and, as importantly, it showed that the adverse events that

18   we discussed earlier were significantly reduced.

19         As a result of that --

20         THE COURT:  20 milligram was daily dosing.

21         MR. WARE:  20 milligram was daily dosed.

22         Among the conclusions of the GALA study, which,

23   in effect, this is the second study -- I mentioned Glacier a

24   moment ago, prior to this was something called the GALA

25   study, and data from this GALA study is contained in the

1      package inserts.

2                  But in any event, importantly, as a result of

3      the GALA study, as the Court can see, the 40 milligram three

4      times a week represented a major reduction of, a 50-percent

5      reduction in certain of the adverse events that we discussed

6      in immediate post-injection reactions as well as injection

7      site reactions.

8                  That was of significance, and again underscored

9      the importance of what Dr. Klinger's invention had been.  As

10     importantly, it informs the world into which the generic

11     drugs will be sold.  In other words, part of the mission

12     here is to show that if these generics are approved by the

13     FDA and if they are sold, they will be sold into a

14     professional environment in which physicians are aware of

15     the benefits of Copaxone 40 milligrams three times a week

16     and will therefore be encouraged to dose them, to prescribe

17     the generic medications.

18                 THE COURT:  Mr. Ware, GALA predated Glacier?

19                 MR. WARE:  Yes.  The sequence is GALA, then

20     Glacier, yes.  And the GALA results appear, some of the GALA

21     results appear in the package inserts, so that a physician

22     prescribing as a result of the package inserts can compare

23     the information created by the GALA studies and would thus

24     be encouraged to use the 40 milligrams.

25                 I mentioned earlier, Your Honor, there is one

1    other study, I am not going to identify it, but in effect,

2    there was a study earlier in the 2000s, which, while it

3    failed -- it was called the Cohen study -- although it

4    failed in its primary end point, it did indicate some

5    potentially positive efficacious results.

6            If I can find the slide, which I am sorry to say

7    are out of order, it did show some efficacious results.  So

8    although the trial failed, Teva at that time in 2007 filed a

9    European patent application.  And among the claims of that

10   patent was a dosing regimen of 40 milligrams every other

11   day.  This, of course, becomes the centerpiece of

12   defendants' obviousness arguments.

13           In effect, if Teva knew this or at least

14   believed its potential in 2007, then it must have been

15   obvious to the world and to others that going to three times

16   a week would be child's play, one additional dose every two

17   weeks.

18           The problem with that is what I identified

19   earlier as the FORTE study.  The FORTE study came out in

20   2008.  And despite what was hoped for of the Pinchasi patent

21   application on which defendants rely, the FORTE study

22   unequivocally showed that 40 milligrams was not going to

23   work.  And eventually, the Pinchasi application, the

24   European application, was abandoned.

25           Among the results of the FORTE study, this just

1      summarizes one of the results from FORTE, these results came

2      out in 2008, after the Pinchasi patent application.  And it

3      showed, this is Slide 14, it showed adverse events were

4      worse for 40 milligrams and showed that that statistic, that

5      finding, was statistically valid, statistically significant.

6                  Accordingly, to the person of skill in the art,

7      this sent the message that 40 milligrams was not the way of

8      the future.

9                  The critical date in this case is August 2009.

10     In effect, defendants would like to move that up to 2007,

11     rely on the Pinchasi patent application, and ignore the

12     FORTE study.  That, I would just say editorially, is pure

13     hindsight.

14                 It's also the case that defendants themselves,

15     despite the trial epiphany of obviousness, in 2010 and '11,

16     did not believe that Teva's dosing 40 milligrams three times

17     a week would be effective.

18                 As the Court can see on Plaintiffs' Trial

19     Exhibit 625.1, which is Slide 13, this is a document from

20     Synthon, an e-mail from Maurice Weijers, as you can see,

21     project manager and former head of R&D at Synthon, in which

22     a year after the critical date he is making the observation

23     that even consulting neurologists in the U.S. and in Europe,

24     they are not convinced that Teva's product three times a

25     week is going to work.

1              Similarly, even two years after the critical

2       date, Slide 14, this is the joint steering committee meeting

3       summary, Mr. David Xu, of the U.S. launch team, a co-leader

4       of the U.S. launch team, specifically discussing test three

5       times a week dosing regimen, notes here that medical, quote,

6       offered a much lower probability, (20 percent chance success

7       rate).

8              So these are contemporaneous documents of what

9       these companies believed even a year after the critical date

10      and two years after the critical date, both of which

11      indicated that far from its being obvious, they, in fact,

12      even after they knew that Teva's product was coming out,

13      thought it would not be successful.

14             I want to just spend 30 seconds on PTAB's

15      decision because they were so central in the last month.

16      And I want to briefly outline a few of the witnesses that

17      Teva will call.

18             With respect to the PTAB decisions, four

19      observations.  First of all, the standard of proof in the

20      PTAB is preponderance of the evidence as opposed to clear

21      and convincing evidence with respect to the issue of

22      obviousness.

23             Second, in the PTAB, it's all a written record.

24      There is no opportunity for live witnesses.  There is no

25      ability for a judge like yourself to make any decisions as

1    regards credibility.  All of this is done by deposition and

2    by affidavit, in effect.

3              Third, we believe that the PTAB confused terms,

4    namely, the terms tolerability, that is the frequency and

5    severity of adverse events that we discussed, and efficacy.

6    Efficacy being how effective is the drug.  But severity

7    being quite different and relating to the extent to which

8    the adverse events, IPRs, that is immediate post-injection

9    reactions, and ISRs, injection site reactions, are more

10   severe.

11             Those terms, we believe, were misinterpreted by

12   the Patent Trial and Appeals Board.

13             Finally, with respect to the '776 patent, the

14   defendants did not prevail in the PTAB anyway, and that

15   patent remains unaffected.

16             Teva expects to call a number of witnesses, Your

17   Honor.  Among them, Dr. Daniel Wynn, obviously, the

18   inventors, Dr. Klinger, who has been referred to prior in

19   the openings and will testify as the first witness in the

20   case.

21             Dr. Daniel Wynn, who is a renowned neurologist,

22   will testify as regards infringement.  He will take each of

23   the asserted claims and demonstrate how the package insert

24   will induce or cause defendants to contributorily infringe

25   these patents, each of the asserted claims of the patents.

1            He will also explain a good deal about multiple

2    sclerosis in more articulate and scientific ways than I am

3    able to do here.

4            We will also hear the testimony of Dr.

5    Ziemmans, who heads up one of the largest MS centers in

6    Germany and who has performed extensive research with GA

7    regarding the drug and its mechanisms.  He will testify,

8    among other things, that at the critical date in August

9    2009, two years after the Pinchasi patent, and even two

10   years before defendants' own observations that they did not

11   believe the three times a week dosing regimen would work, he

12   will testify that a person of skill in the art in 2009 at

13   the critical date would not be motivated to administer GA 40

14   milligrams three times a week, in part for the reason I

15   identified earlier, namely, that it was believed at that

16   time that a constant influx of benign cells to the central

17   system was necessary to neutralize the inflammatory cells in

18   the central nervous system.

19           Finally, Your Honor, there will be testimony

20   from Dr. Edward Fox, a neurologist from the University of

21   Texas Medical Center regarding the disclosures in the

22   patents and their sufficiency.  And Dr. Laurentius Marais, a

23   statistician who is going to analyze some of the data of

24   these studies with respect to whether or not they are

25   significant and meaningful.

1          And with that, Your Honor, that's an outline of

2     the case for Teva.

3          THE COURT:  Thank you, Mr. Ware.

4          MS. BLOODWORTH:  Your Honor, may I approach?

5          THE COURT:  You may.

6          MS. BLOODWORTH:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MS. BLOODWORTH:  My name is Shannon Bloodworth,

9     and I am with the Perkins Coie firm.  We represent the Mylan

10    defendants.

11         I will be addressing the issue of obviousness

12    this morning on behalf of all defendants.  Mr. Rakoczy,

13    representing the Sandoz and Momenta defendants, will then

14    highlight defendants' challenge of the patents under Section

15    112.  And Mr. Figg, representing the Pfizer and Synthon

16    defendants, will then address defendants' noninfringement

17    case.

18         Your Honor, the obviousness evidence the

19    defendants will present will confront the Court with

20    essentially one question:  whether administering 40

21    milligrams of GA three times a week to treat multiple

22    sclerosis is patentable over administering 40 milligrams of

23    glatiramer acetate every other day to treat multiple

24    sclerosis.

25         We think the answer is no.  At the outset, I

1        would like to emphasize what we are talking about.

2                  The prior art taught 40 milligrams every other

3        day administration.  So that's Monday, Wednesday, Friday,

4        Sunday, Tuesday, Thursday, Saturday.  Three times one week,

5        four times the next.  The claims here are three times every

6        single week.  So just one less dose every two weeks.

7                  Patients and doctors had long recognized the

8        much greater convenience offered by the

9        Monday-Wednesday-Friday dosing schedule.  It is easy to

10       remember, and patients get their weekends off.  That's it.

11       That's what this whole case is about.  It's not about a new

12       compound.  Glatiramer acetate was patented in 1974.

13                 It is not about a new indication.  GA had been

14       FDA-approved to treat multiple sclerosis in 1996.  It is not

15       about a new formulation.  Teva used the 40 milligram dose in

16       clinical trials as early as 2005.  It is not about less

17       frequent than daily dosing, either.  Teva and others had

18       disclosed less frequent dosing years before 2009.

19                 This whole case is about using a known compound

20       in a known formulation known to treat a known disease in one

21       less dose every two weeks.

22                 The 40 milligram every other day regimen was

23       disclosed in July 2007 in a patent application, which we

24       call the Pinchasi application.  The Pinchasi application

25       disclosed virtually every element of the claims of the

1       patents in suit, safety, the requirement for exactly three

2       doses every seven-day period.

3               Instead, the Pinchasi application's every other

4       day dosing regimen delivers the three 40 milligram

5       injections one week and four such injections the next.

6               Moreover, Pinchasi explicitly states that the 40

7       milligram dose of GA is well tolerated and that it compares

8       favorably with the standard 20 milligram dose showing,

9       quotes, there is no corresponding increase of adverse

10      reactions which would be expected upon a doubling of the

11      administered dose.

12              Now, beyond the Pinchasi application, there is

13      also a wealth of prior art, human clinical data showing that

14      skilled artisans were motivated long before the critical

15      date to pursue less frequent GA dosing recommendations and

16      that they had more than a reasonable expectation that the

17      claimed regimen would be effective and better tolerated than

18      traditional GA injections.

19              Your Honor, this is a timeline of the key pieces

20      of prior art.  And as mentioned, glatiramer acetate was

21      first patented in 1974.  And FDA approval for the Copaxone

22      20 milligram daily product was first approved in 1996.  Even

23      before Copaxone's sale, an FDA review, analyzing the summary

24      basis of approval, questioned whether daily injections were

25      necessary, and recommended that Teva investigate less

1    frequent dosing recommendations.

2            This recommendation was made for the obvious

3    reason that painful daily subcutaneous injections in a

4    lifelong disease like MS are difficult for patients to

5    tolerate.  This is particularly true for Copaxone.  It was

6    well established before 2009 that Copaxone's major drawback

7    was injection site reactions.  These tolerability issues

8    undermine patient compliance and adherence to treatment.  So

9    the next natural step after the 1996 reviewers recognized

10   this was to investigate less frequent dosing.  Those

11   investigations followed.

12           In 2002, the Flechter article and his colleagues

13   run a human clinical trial experiment with administering 20

14   milligrams of glatiramer acetate every other day.

15   Flechter's results suggested that 20 milligrams every other

16   day was similarly effective to 20 milligrams every day.  And

17   it was well tolerated.

18           Dr. Flechter wasn't the only one.  In 2008, Dr.

19   Khan reported the results of a four year head-to-head

20   randomized rater-blind human clinical trial comparing the 20

21   milligram daily dose with 20 milligram every other day.

22           Like Flechter before him, Dr. Khan's results

23   suggested no difference in the efficacies between the daily

24   and every other day regimens and also reported improved

25   tolerability.

1          In fact, in the Khan 2008 study, every single

2     patient who was in the 20 milligram arm of the study after

3     two years elected to switch to 20 milligrams every other

4     day.  As expected, patients like less frequent injections.

5          At this time, in addition to doctors' and

6     patients' desire to less often GA dosing, Copaxone was under

7     market pressure to compete against a multitude of less

8     frequently injected FDA products, most notably, Rebif, which

9     was administered three time a week, was a prominent

10    treatment that was available before 2009 and competed with

11    GA.

12         So there was less demand for daily GA dosing,

13    including the one that was administered three times a week.

14         A little about the 40 milligram dose.

15         This dose was also known by August 2009 to be

16    safe, effective and well tolerated.  In 2007 the Cohen paper

17    reported the results of a clinical trial comparing a 40

18    milligram daily dose to 20 milligrams daily.  Cohen was

19    successful and reported that a 40 milligram dose of GA daily

20    is effective and well tolerated.

21         Cohen further found that the 40 milligram dose

22    resulted in more favorable efficacy trends than the 20

23    milligram dose.

24         And the 40 milligram dose was reported in

25    Pinchasi.

1            The next year, in a Phase III clinical trial

2    called FORTE, FORTE was a 40 milligram daily versus a 20

3    milligram daily study, FORTE did not meet its primary end

4    point of showing superiority of the 40 milligram dosing

5    regimen to the 20 milligram dosing regimen.  He found they

6    were equally safe and efficacious.  Teva calls this a failed

7    trial.  It failed because it didn't meet its primary end

8    point of superiority over the 20 milligram trial.

9            But what it did confirm was that it was as

10   effective as 280 and it's safe and it's well tolerated.

11           Your Honor, Slide 9 summarizes the prior art

12   clinical data with the relevant exhibit numbers and

13   excerpts, all of it pointing to the desirability of less

14   frequent GA dosing, and establishing the tolerability of the

15   40 milligram dose.

16           Looking at the prior art as a whole, it

17   discloses a known range of effective GA dosing and dosing

18   regimens.  The disclosed range ran from at least 70

19   milligrams per week administered in 20 milligrams every

20   other day dosing regimens in Flechter and Khan, up to 280

21   milligrams average actual dose, as shown in the 40 milligram

22   dose administered every day in Cohen and FORTE.

23           Of course, the Pinchasi application as well was

24   an average weekly dose of 40 milligrams administered every

25   other day.

1             As for the regimen claimed in the patents in

2    suit, it falls safely in the middle of the range disclosed

3    in the prior art.  The 20 milligram dose is inherently safe

4    and effective as compared to the 40 milligrams every other

5    day.  Patients needed it.  Clinicians wanted it, and there

6    was market pressure to develop it.

7             When Mylan presented these arguments to the

8    Patent Trial and Appeal Board, the board found all claims

9    of three of the patents in suit unpatentable, the '250,

10   '413, and '302.

11            The board expressly credited defendants' expert,

12   Dr. Green, a renowned physician at UCSF who runs the

13   university's MS clinic.  You will hear from Dr. Green in

14   this trial, Your Honor.  You will also hear from plaintiffs'

15   expert, Dr. Ziemssens, whose opinions the board explicitly

16   found unreliable.

17            Your Honor will of course have your own

18   opportunity to evaluate the merits of defendants' case.

19   However, Teva will be repeating most if not all of the same

20   non-persuasive nonobviousness arguments, including secondary

21   considerations, for a second time here.

22            Your Honor may be wondering, why, if everything

23   was known, why hadn't anyone commercialized the less

24   frequently dosed GA product before 2009?  The answer is Teva

25   had this blocking patent.  GA, again, first patented in

1       1974, Teva then were granted a second generation of patents

2       covering an improved GA composition and method of making it.

3                   Teva's second generation of patents expired or

4       were invalidated, which Mylan and Sandoz eventually

5       succeeded in doing in 2015, in the Mylan v. Sandoz case.  No

6       one at Teva could have brought to market a competing GA

7       product using any regimen.  So Teva needed a third way of

8       dosing patented.  They convened what they call a life cycle

9       management meeting to come up with new ways to prolong the

10      economic franchise.

11                  With the second generation patents about to

12      expire and its back against the wall, Teva adopted the tried

13      and true 40 milligram dose and dosed it just as frequently

14      as in the art and patients had been asking for for years.

15                  Your Honor will hear testimony disparaging the

16      prior art clinical trials.  And we would like to point out

17      that Teva sang a very different tune when it needed the

18      FDA's approval for the 40 milligram three times a week

19      clinical trial called GALA.  This was the clinical trial

20      that eventually was performed on the prophetic example of

21      the patents in suit.  Teva went to the FDA to receive

22      approval to administer this drug to patients.  And in the

23      GALA protocol, when Teva explained to the FDA its dosing

24      regimen, Teva pointed to the very same clinical trials of

25      FORTE, Flechter, Khan.  The FDA encouraged Teva to further

1    explore the optimal dosing regimen of GA.

2              And Teva relied on Flechter and Khan to support

3    the three times per week injection frequency.  Teva

4    furthered told the FDA that, quote, the conservative

5    approach was to give subjects the same weekly dose given by

6    three subcutaneous injections.

7              It may seem like defendants' obviousness case

8    could be made in the GALA protocol.  But Mylan filed its IPR

9    petitions in February of 2015 laying out our obviousness

10   arguments.  We did not receive this document or any

11   document, I think, in production from Teva until months

12   later.

13             Teva didn't inform the board about its

14   representations to the FDA that the smaller studies as

15   Flechter and Khan would support the 40 milligram three times

16   a week dosing regimen.  Without the GALA protocol, the

17   claims would have been determined unpatentable.  Teva told

18   one story to the FDA for seeking approval there and quite

19   another one in this court.

20             You may also hear Teva tell two different

21   stories on the '776 patent.  In the proceedings before the

22   board on the '776 patent, Teva told the board that the

23   claims to increased tolerability disclosed reduced severity.

24   But if true, this argument renders the '776 patent claims to

25   reduced severity obvious for all the same reasons that the

1   reduced tolerability claims of the '270 and the '413 claims

2   were found to be obvious.  Now that the board held these

3   claims to improved tolerability obvious, Teva tries the '776

4   vulnerability.  In stark contrast to what Teva told the

5   PTAB, Teva told Your Honor that the '776 claims novel

6   elements of the claimed treatment methods, namely, a

7   reduction in the severity of injection related adverse

8   events.  These claims are not found in any of the other

9   patents asserted in this case.

10          Reduced severity cannot be both coextensive with

11   improved tolerability and a novel concept that appears in

12   the '776 patent.  Teva made its choice when they told the

13   board that improved tolerability has the same scope as

14   reduced severity.  The board accepted it.  And Teva

15   benefited.  Teva can't change its mind now.

16          Apart from the bind Teva has put itself in with

17   witness statements from the board, Your Honor will hear from

18   Mr. Rakoczy and Mr. Figg why the '776 patent claims of

19   reduced severity faced a host of additional obstacles.

20          Your Honor, in sum, it was well known that the

21   three times per week dosing was preferred by patients to the

22   daily dosing regimen.  Patients didn't like daily lifelong

23   injections, a problem compounded by injection site

24   reactions, which was the most prevalent adverse event

25   associated with GA treatment.  Skilled artisans were

1    motivated to solve this problem in order to improve the

2    tolerability of GA treatment and in order to implement this

3    three times a week dosing.  Once a day wouldn't do the

4    trick.

5              A wealth of clinical data indicated that less

6    frequent intensity, 40 milligram weekly doses are comparable

7    to that of the approved 20 milligram daily dose, but on that

8    convenient three times a week schedule.

9              The patents in suit thus claim nothing more than

10   the use of an old compound for a known purpose in a known

11   amount known to be safe and effective in the prior art.

12             Your Honor, before I pass the baton to Mr.

13   Rakoczy, I would like to introduce you to experts you will

14   hear from defendants in this trial.

15             You already heard about Dr. Green.  He devoted

16   his distinguished career to MS research and treatment.

17   Defendants will also present testimony from Dr. Jeffries, a

18   skilled neurologist practicing at the Neurology Center in

19   the D.C. area.  Dr. Sam Pleasure, an experienced neurologist

20   and researcher at UCSF.  Dr. McKeague, a biostatistician

21   specializing in clinical trial methods at Columbia.  And Dr.

22   Joel Hay, who runs the acclaimed Pharmaceutical Economics

23   and Policy Center at U.S.C.

24             With that, I will cede the floor to Mr. Rakoczy.

25             THE COURT:  Thank you, Ms. Bloodworth.

1          MR. RAKOCZY:  Good morning, Your Honor.  William

2    Rakoczy for the Sandoz and Momenta defendants.

3          I will briefly address the Section 112 issues

4    for all the defendants.

5          As Your Honor has heard, it is our position that

6    the patents in suit are obvious just as the PTAB held for

7    the first three.  If they are not obvious, in the

8    alternative, we submit the patents cannot satisfy Section

9    112.

10         Here is the basic dilemma for Teva, Your Honor.

11   We submit the evidence will show they can't have it both

12   ways.  When you are talking about a patent that has no data,

13   no clinical testing, no rationale whatsoever at this time

14   for why the claimed dosing regimen would work, we submit

15   that the prior art, which is chockful of clinical data and

16   testing as you just heard, will lead to a reasonable

17   expectation of success and obviousness.  Or if it doesn't,

18   then the patent cannot satisfy Section 112.

19         This is a dilemma of Teva's own making.  Your

20   Honor, normally speaking, method of treatment patents will

21   have some kind of data in them.  Clinical testing, animal

22   testing, in-vitro testing.

23         Here, as the Patent Office recognized, there is

24   literally nothing in this patent, no clinical trial results,

25   no data of any kind.

1              The only example is prophetic.  It is not

2     experimental.  It was not actually performed.  And as the

3     Patent Office called it, this patent contains just, quote, a

4     wish list, end quote, or a statement of desired outcomes.

5              So nothing in here to support the actual claimed

6     dosing regimen or to suggest that the inventor actually

7     possessed this invention.

8              The question becomes, Your Honor, we juxtapose

9     that wish list or lack of data in the patent against Teva's

10    arguments on nonobviousness in the prior art here.  What

11    they are doing is they are treating the prior art

12    differently from their own specification.  Teva says these

13    patents are not obvious -- and you heard some of this

14    already -- because of seven deficiencies or alleged

15    deficiencies in the prior art.

16             They want to say the prior art lacks data on a

17    40 milligram dosing regimen either three times a week or

18    less than daily.  They want to say there is no

19    pharmacokinetic or pharmacodynamic relationship in the prior

20    art.  They want to say there is no established mechanism of

21    action that would justify three times weekly dosing.   In

22    fact, as you just heard, they are saying just the opposite.

23             If Teva is correct, the question under 112

24    becomes, does that specification answer those questions for

25    the skilled person?  Is there anything in the specification

1    that solves these deficiencies in the prior art?  We submit

2    the answer is unequivocally no.

3            The prior art contains much more than the

4    specification.  The specification contains nothing but a

5    wish list.  So if the patents aren't obvious, we submit they

6    can't be supported under 112 and would be invalid for that

7    reason.

8            The '776 so-called reduced severity patent you

9    just heard a little bit about is invalid for those same

10   reasons.  But additionally, it's separately and

11   independently invalid, Your Honor, because those reduced

12   severity terms, which I will get to in a moment, are not

13   described or enabled.

14           Here, just a little bit of context on this

15   patent and these claims, Your Honor, you may recall from the

16   Markman hearing, the '776 patent is directed to a patient

17   who is already taking that 40 milligram dosing regimen and

18   experiencing those injection site reactions or IPIRs.  The

19   patient is then selected to switch to the 40 milligrams

20   three times a week.  And as a result of that the patient

21   experiences so-called reduced severity of those ISRs.

22           And severity is something different from

23   frequency.  Frequency being the rate of occurrence of the

24   ISRs.  Severity being the intensity.

25           So this patent is all about that patient who is

1    on the 20 milligram regimen, switches to 40 milligram and

2    somehow has reduced severity.

3            The problem again is a lack of disclosure.  The

4    specification mentions severity in terms of ISRs only once

5    but it doesn't define it, Your Honor, and it doesn't tell

6    you anything about reduced severity.  Not how to measure it.

7    Not how to grade it.  Not how to figure out whether reduced

8    severity has actually been achieved.

9            Part of this will not be in dispute.  Teva's own

10   experts, Dr. Fox and Dr. Wynn, they agree, there is nothing

11   in the patent that tells you how you measure reduced

12   severity, how do you grade reduced severity.  That doesn't

13   seem to be in serious dispute.  There is nothing about that

14   in the patent.  And if there is nothing about how to grade

15   reduced severity or how to determine whether it has been

16   achieved, we submit the patent can't show possession of this

17   reduced severity invention.

18           In fact, that example that I just mentioned, the

19   prophetic example, can't help, either.  Again, it was never

20   performed.  But even if it had been performed, Your Honor,

21   the evidence will show that it's not capable of showing

22   relative or reduced severity because it was a clinical trial

23   protocol not on those switching patients but on a patient

24   who was just taking the 40 milligram and testing it against

25   placebo.

 1                     The Court's construction, which we see here on

 2      JTX-7003 Slide 15, is clear that the '776 patent only

 3      applies to patients who are already on the 20 milligram

 4      regimen and then switched.  But the prophetic protocol in

 5      this patent actually excludes patients who were already

 6      taking the 20 malignant daily regimen.

 7                     If we step back, we can see this protocol

 8      actually excludes the very patients that the '776 patent

 9      claims are about.

10                     So nothing in that example can support reduced

11      severity.  In fact, Your Honor, the clinical trial protocol

12      didn't even have any end points for measuring ISRs or IPIRs,

13      with reduced severity.

14                     We submit, again, no disclosure whatsoever to

15      tell the skilled person that this inventor actually invented

16      this reduced severity invention.

17                     This shouldn't come as a surprise, Your Honor.

18      These reduced severity claims were added five years after

19      the claimed priority date and four years after the named

20      inventor left her employment at Teva.  So years later these

21      were added to these patents.

22                     In fact, the inventor hadn't even seen these

23      reduced severity claims before the patent was filed and

24      issued.

25                     The first time she even saw the reduced severity

1    invention, so to speak, was after the patent had issued.

2              Again, we submit the evidence will show, there

3    is nothing in the patent about reduced severity, nothing to

4    show how it's achieved, and certainly nothing to show that

5    this inventor possessed this reduced severity invention,

6    which would render the claims invalid for violating the

7    written description requirement, for much the same reason we

8    submit the evidence will show that these reduced severity

9    claims are not enabled and they lack credibility.

10             We have already talked about what the claims are

11   directed to again.  I can't emphasized this enough.  It has

12   to be a patient on the 20 milligram who switches to the 40

13   and then experiences the reduced severity.

14             There is no dispute, there are no studies in the

15   art on a patient who took the 20 and then switched to the 40

16   milligram.  There is no guidance in the patent about that.

17   And there is no working examples.  We have a prophetic

18   example which actually excludes those switching patients

19   from the 20 to the 40.

20             Again, we submit there is nothing to show the

21   skilled person how this invention on reduced severity would

22   work and certainly nothing that would convince the skilled

23   person to accept without question that this reduced severity

24   invention would work, again, leading to a lack of

25   enablement.

1          To be sure, you heard a little bit about this

2     Glacier trial from Teva.  We suspect they will try and prop

3     up these reduced severity claims with this Glacier trial.  I

4     won't spend a lot of time on this, Your Honor.  But we

5     submit the evidence will show that Glacier cannot enable

6     these claims for at least several reasons.  Number one, it

7     happened many years after the patent.  It's post-filing

8     evidence and legally irrelevant.

9          Number two, it wasn't designed to test relative

10    severity.  Of the 16 end points you will hear from the

11    experts, none involved ISRs or IPIR severity as opposed to

12    incidence of frequency.  That is key, Your Honor.  These are

13    all different concepts.  Severity is the intensity of the

14    reaction; frequency is how much it occurs in an individual

15    patient; and then incidence is a percentage of a patient

16    population.

17         As Your Honor may recall from the Markman

18    hearing, we are talking here about reduced severity in an

19    individual patient, not a patient population.

20         So it's the patient on the 20 milligrams who

21    switches to the 40 and that individual patient somehow

22    experiences reduced severity of ISRs.

23         No. 3, Your Honor, Glacier, we submit the

24    evidence will show, does not prove anything, as the experts

25    will explain, it is deeply flawed and unreliable from the

1    way it was set up, from the way they collected the data to

2    the way they analyzed the data.  In fact, there are outliers

3    that completely skew the results.

4             We submit in the end, the specification is a

5    wish list, and even with Glacier, the evidence will show,

6    cannot enable these claims or convince the skilled person

7    that this reduced severity invention would work.

8             Lastly, Your Honor, just one more point on the

9    '776.  These claims we submit are also invalid because they

10   are fatally indefinite.  And they are fatally indefinite

11   precisely because of this reduced severity limitation,

12   because to determine whether you infringe or don't infringe,

13   you have to be able to measure reduced severity.  And the

14   evidence will show there are multiple methods for doing

15   that, and neither the patent nor the prior art picked which

16   one to use.

17            Depending on the method used, you might fall

18   inside or outside the claims.  That is a classic case of

19   indefiniteness.  In fact, Your Honor, in a case of

20   measurement method uncertainty the Federal Circuit has put

21   forth a very clear standard for how the evidence is supposed

22   to be evaluated.  Basically, where different approaches to

23   measurement are involved, the patent and prosecution history

24   must disclose a single known approach or establish that,

25   where multiple known approaches exist, a person having

1   ordinary skill in the art would know which approach to

2   select.

3           That is just called the Dow test.  Here we

4   submit the evidence will show and Dr. Pleasure will testify

5   on behalf of the defendants that these claims don't satisfy

6   the Dow test.

7           The first question is pretty much answered:

8   Does the patent or prosecution history have that method for

9   grading severity.  There doesn't seem to be any serious

10  dispute.  There is no such method in the claim.

11          The question then becomes, are there other known

12  methods, are there other methods in the art and does the art

13  say which one to pick?  As Dr. Pleasure will testify and

14  explain to Your Honor, there was no standard definition in

15  the art for grading the severity of ISRs.  In fact, there

16  were many different methods.  And Teva's experts here, both

17  Dr. Wynn and their lead Glacier investigator, Dr. Wolinsky,

18  agree there are different ways of measuring severity.

19          In fact, there are very simple examples, Your

20  Honor.  I am just going to preview two of them that Dr.

21  Pleasure will testify about, and we believe the evidence

22  will show.

23          The moral of the story for all of them is, what

24  is severe and whether infringement occurs or doesn't occur

25  all depends on the method.  We can look at injection pain

1   and Teva has a study, the SONG study.  It measured pain from

2   zero to 100 on a visual analog scale, zero being no pain,

3   100 being the worst possible pain.  We can drop down to the

4   next one, the CTCAE standard from Teva's Dr. Fox, which he

5   wants to rely on.  In that one, pain is always Grade 2, it

6   is always moderate.  We can drop down to the Pardo, a Teva

7   study, they used a ten-point bothersome scale, in which 1 is

8   not bothersome, ten is severely bothersome.

9            As we can see, the evidence will show there are

10  many different ways of measuring severity and many different

11  results depending on the method.

12           Only one more example, I am only pointing to

13  this one because this was the reaction that was mentioned in

14  Teva's opening, lipoatrophy.  On this one, again, the moral

15  of the story will be infringement depends on the method

16  used.  We can look at the Edgar method, whether lipoatrophy

17  is severe depends on the number, size and depth of

18  depression.  We can drop down to the standard Dr. Fox wants

19  to use, the CTCAE, it's always Grade 2.  It's always

20  moderate.  Then we can look at Glacier, which you heard

21  about a little and you will hear more about, Glacier is

22  internally inconsistent.  It calls lipoatrophy one of the

23  more severe ISRs, then Glacier goes on to say the patient

24  defines severity as mild if the IRAE is easily tolerated,

25  moderate if it interferes with normal daily activity, or

1           severe if it prevents normal daily activity.

2                       Even for an ISR like lipoatrophy, whether it is

3           severe, whether reduced severity occurred is going to depend

4           on which of these methods you use.

5                       We submit the evidence will show that neither

6           the patent nor the prior art picks which method to use.   In

7           that situation, that is a classic situation for failing the

8           Dow standard and that the evidence will clearly demonstrate

9           why.

10                      With that, I will relinquish the podium to my

11          colleague for noninfringement.

12                      MR. FIGG:  Good morning, Your Honor.  Tony Figg

13          for the Pfizer and Synthon defendants.

14                      I will be talking about noninfringement of

15          certain of the claims of all of the defendants.

16                      Particularly, Your Honor, plaintiffs cannot

17          prove indirect infringement either by inducement or by

18          contributory infringement of the '776 method of these

19          claims, and certain similar claims, a handful of similar

20          claims in the '250 and the '413 patent.

21                      And very central to this issue, Your Honor, is

22          this Court's claim construction.  You will recall during

23          Markman we spent quite a bit of time on the '776 claims.

24          Now it's time to see how that affects the case.

25                      We submit, Your Honor, there are two independent

1   and sufficient reasons that the plaintiffs cannot prove

2   direct infringement of these claims.

3            First, the defendants do not instruct,

4   encourage, or promote the required patient selection and

5   switching steps that these claims, as construed, require.

6            Second, totally independently of the inducement

7   or contributory issue, there can be no indirect infringement

8   in the absence of the absence of proof of direct

9   infringement.  And doctors and patients who use defendants'

10  ANDA products will not directly infringe.

11           Plaintiffs rely on the Glacier study to prove

12  reduction of severity, as required by the claims of that

13  patent.  But, as we will show, the Glacier study totally

14  fails in that.

15           Now, these are the claims I put on the screen

16  that we believe are at issue here.  There has been

17  discussion of which claims are actually going to be asserted

18  by plaintiffs as recently as late last night.  I think it's

19  been agreed that these are the claims that require this

20  patient selection step that I am referring to and are being

21  asserted by the plaintiffs.

22           Now, all of the claims require patient selection

23  and switching of dosages.  I will discuss that in a moment.

24  I am going to focus my comments on the claims of the '776

25  patent just to make this a little simpler.

1              Those claims, as you have heard, required that

2      when the patient is administered the 40 milligram three

3      times a week regimen, the severity of that patient's ISRs or

4      both ISRs and IPIRs is reduced relative to the 20 milligram

5      daily therapy.

6              So we refer and our witnesses will refer to

7      those claims sometimes as the reduced severity claims.

8              Three aspects of the Court's claim construction

9      are very important to the direct infringement issue.  First,

10     each of the '776 reduced severity claims and in fact all of

11     these claims I mentioned requires administration of the 40

12     milligram three times a week regimen to a patient already

13     taking the 20 milligram daily therapy.

14             So off the bat you have to find a patient for

15     treatment who has already taken that to infringe these

16     claims.  You will recall, Your Honor, that that was a

17     construction that was urged by the plaintiffs in this case

18     to avoid a holding that the reduced severity requirements of

19     the claims were simply non-limiting statements of intended

20     use.  They said, no, no.  These are different because these

21     require patient selection.  And based on that argument, we

22     agree, and we reached agreement on this construction.

23             The second point I want to emphasize in the

24     Court's claim construction, and Mr. Rakoczy mentioned this,

25     each of these claims is directed to treating an individual

1     patient, not a population of patients.

2              Third, and this, again, becomes very important

3     as we move through these issues, the term frequency with

4     respect to ISRs or IPIRs is separate and distinct from the

5     term severity.

6              That will become apparent as we go through the

7     evidence, Your Honor.

8              The significance of the Court's claim

9     construction to these claims, I think, can be illustrated

10    with a few demonstratives that we have prepared.

11             Each of the claims, and you have already heard

12    this, is directed to the treatment of a patient with a

13    relapsing form of multiple sclerosis.  And sometimes you

14    will hear this referred to as RRMS, which stands for

15    relapsing remitting multiple sclerosis.

16             Here on the screen we have an illustration of a

17    group of RRMS patients.  These, for example, could represent

18    the patients under the care of a particular physician.

19    Some, but not all of these patients, are patients who are

20    already taking the 20 milligram daily dosage.  Those are

21    illustrated on this in red.  The red doesn't show up too

22    well, I am afraid.

23             By the time plaintiffs launched their product,

24    plaintiffs' expert has estimated that about three-fourths of

25    the RRMS patients will be those not already taking the 20

1    milligram daily product.

2              So when we think about how this patient

3    selection works, we could think of it in terms of the

4    patients being in two groups.  And on the slide I have on

5    the screen now, we see on the left the patients who are not

6    already taking the 20 milligram daily regimen.  And on the

7    right, we see the patients along the top row there who are

8    already taking that 20 milligram regimen.

9              Recall that the Court's construction requires

10   selecting from these groups a patient for treatment.

11             Now, the patient group on the left includes

12   patients who are not taking a GA.  They could be newly

13   diagnosed patients.  They could be patients that were on

14   some other therapy.  But they are not already taking GA.

15   They also would include patients who are taking Teva's 40

16   milligram Copaxone product three times a week.

17             Your Honor, the administration of defendants' 40

18   milligram three times a week product to a patient on the

19   left cannot infringe these claims that I am talking about.

20   The reason for that is that those claims require that the

21   patient already be on the 20 milligrams, and they are not.

22             The fact that there is such a substantial

23   non-infringing use of defendants' products is not only

24   evidence that there is no contributory patent infringement,

25   but it is also evidence that the defendants do not have the

1    requisite intent for inducing patent infringement.

2              Now, if we look at the right side of the screen,

3    the reduced severity claims, obviously, require that the

4    severity of ISRs be reduced after switching.

5              So this actually means there is a further

6    patient selection step involved here.  The plaintiffs' and

7    the defendants' experts agree that you could reduce the

8    severity of ISRs in a patient who is not experiencing ISRs.

9    There is no doubt that there are patients who do not

10   experience ISRs.

11             If we look at the panel on the right here, you

12   start at the top row with the patients already taking 20

13   milligrams daily.  But then, from them, you have to find,

14   for the '776 claims, you have to focus on the patients who

15   are experiencing ISRs.  And then the claim requires that you

16   select a patient for treatment and that you reduce the

17   severity of ISRs in that patient.

18             Your Honor, even if a physician were to make all

19   of these patient selections, we see that there are still

20   treatment options, a number of treatment options, available.

21             The physician can prescribe the 20 milligram

22   daily product.  That still is an approved product on the

23   market, both in the branded and in the generic form.

24             The physician can prescribe defendants' 40

25   milligrams three times a week product.  The physician can

1    prescribe Teva's 40 milligrams Copaxone three times a week.

2    Or the physician can prescribe a non-GA therapy.

3                Only one of these several options even has the

4    potential to infringe these claims.  And not only do the

5    defendants not encourage doctors and patients to make those

6    patient selection steps or select one of these frequent

7    options, but as I will explain in a moment, even that one

8    option, that potentially could infringe, doesn't infringe

9    because there is no showing that severity is actually

10   reduced when the patient goes to the 40 milligram regimen.

11               Now, our expert witness, Dr. Eric Jeffries, who

12   Ms. Bloodworth introduced to you, will explain why

13   plaintiffs cannot prove infringement or inducement of

14   infringement from the perspective of a practicing

15   neurologist who is treating patients every day.

16               Our expert, Dr. Ian McKeague, who was also

17   introduced to you by Ms. Bloodworth, will explain that

18   plaintiffs cannot prove that anyone will directly infringe

19   when they take defendants' product.  That goes to this point

20   that severity -- there is no proof that severity is actually

21   reduced when you go to the less frequent dosing.

22               Frequency might be reduced, but not severity.

23   And we have to keep those two concepts separate in our

24   minds.

25               The plaintiffs rely on the Glacier study to

1    prove reduced severity.  You have heard about that already.

2    We will present evidence that that statement was severely

3    flawed and it totally fails as proof of infringement.

4              Now, as the Court is well aware, inducing

5    infringement under Section 271(b) is not a passive activity.

6              It must be proven that the defendant took active

7    steps to instruct or encourage the infringement of the claim

8    and that the user of the defendants' products will directly

9    infringe.  It must be shown that the defendant had an actual

10   intent to induce infringement.

11             And the fact that a physician or a patient may

12   choose to use the product in an infringing way is not

13   evidence of inducement unless there is a showing that the

14   defendants actively encouraged that.

15             Mere knowledge of infringement, mere knowledge

16   that someone might use your product in an infringing way, is

17   not proof of inducement.

18             The plaintiffs rely on defendants' package

19   inserts to support their induced infringement allegations.

20   The FDA-approved indication for defendants' products will be

21   the treatment of patients with relapsing MS, about which you

22   have already heard.  With that approved indication, it is

23   the physician, together with the patient, who will decide

24   which patients should be treated with this product.

25             The dosage, the indications and uses, the dosage

1          and administration, the instructions for use, the dosage

2          forms and strengths sections of the package inserts say

3          nothing about these points.

4                    These are the sections that courts have held are

5          relevant to the infringement question.  These sections do

6          not say anything that directs or encourages the selection of

7          a patient already taking the 20 milligram product.

8                    Plaintiffs know that those sections of the

9          package inserts don't help them.  So they ignore them.

10         Instead, they rely on materials not even in the package

11         inserts, as well as statements in the warnings and

12         precautions and the adverse reactions parts of these package

13         inserts.

14                   They argue infringement based on their own GALA

15         and Glacier studies, which are not even cited in the

16         defendants' package inserts.  What plaintiffs are suggesting

17         is that physicians will embark on what some court has

18         referred to as scholarly scavenger hunt to piece together

19         information from various sources to put together some kind

20         of an inducement of infringement argument.

21                   Courts have rejected that argument.  If any

22         physician decides to engage in such a scavenger hunt, that

23         would be the physician's own decision.  It is not something

24         encouraged by the defendants or their package inserts.

25                   This is one example.  Plaintiffs' expert created

1    a table comparing data from different clinical trials that

2    are results that are discussed in defendants' package

3    inserts.  The data in plaintiffs' table came from clinical

4    trials that were conducted more than a decade apart by

5    different investigators in different patient groups, using

6    different equipment, and even using different drug

7    formulations.

8              Now, this is the kind of evidence that they are

9    going to put forward as proof of inducement.  But what do

10   the package inserts say about this?  The package inserts

11   say, because clinical trials are conducted under widely

12   varying conditions, adverse reaction rates observed in the

13   clinical trials of a drug cannot be directly compared to

14   rates in the clinical trials of another drug and may not

15   reflect the rates observed in clinical.

16             Notwithstanding this statement, plaintiffs'

17   expert argues that physicians do compare, they do compare

18   results from different clinical trials and they make

19   treatment decisions based on that.  Frankly, Your Honor,

20   even if true, even if we accept that as true, the decision

21   to make that comparison and the weight to be given to the

22   comparison is the physician's decision.  It's not something

23   defendants' package inserts encourage.  They tell you not to

24   do it.

25             And, Your Honor, even if a physician were to

1    conclude that the 40 milligram three times a week product

2    provides a potential benefit over the 20 milligram daily

3    product, that would not encourage the physician to select

4    for treatment a patient already on the 20 milligram product,

5    much less one who is experiencing injection site reactions.

6    It would simply mean that the 40 milligram product offers

7    potential benefits to all RRMS patients.

8            Again, it's the physician's decision to decide

9    who will be treated with these products.

10           In addition, Your Honor, the data on which

11   plaintiff relies has nothing to do with losing severity.

12   The information that they point you to in the package insert

13   deals with the incidence at which certain reactions occur in

14   populations of patients, which is distinct from severity.

15           Mr. Rakoczy has already referred to this.  These

16   terms have different meanings.  There is really not much

17   dispute about that.

18           Ironically, the plaintiffs completely ignore the

19   only statements in the defendants' package inserts that have

20   anything to do with severity.

21           The package inserts describe adverse reactions

22   in the 20 milligram daily group and the 40 milligram three

23   times a week group in exactly the same way, adverse

24   reactions were usually mild in intensity.  That's what they

25   say.

1            And the Court, you will recall, you see at the

2    bottom here the construction, has said that severity means

3    intensity.

4            I want to switch gears a little bit to end up

5    this.  Plaintiffs' indirect infringement arguments also fail

6    because they cannot prove that severity is actually reduced

7    when the patient has switched.

8            Plaintiffs rely on their Glacier study.  And

9    their expert witness on infringement said that's all he

10   relies on.

11           That study was designed to establish the

12   unremarkable proposition that less frequent injections in

13   some people result in less frequent injection reactions.

14           The study was neither designed to prove reduced

15   severity nor did it prove it.

16           Your Honor, we will show that the Glacier study

17   was poorly designed and it was carried out in a careless and

18   a slipshod way.

19           The Glacier study purported to analyze and

20   compare highly subjective reports of injection reactions by

21   patients who were on the 20 milligram daily product with

22   those in people who were on the 40 milligram three times a

23   week product.

24           Plaintiffs argue that the incidence of moderate

25   and severe injection reactions was higher in the 20

1    milligram group.  This is their infringement argument, that

2    Glacier shows the more severe, moderate and severe were

3    higher in the 20 milligram group than the 40 milligram

4    group.

5              There are a host of defects in the Glacier study

6    which you will hear about during the course of trial.  In

7    the interest of time I am only going to talk about one of

8    them here.

9              Your Honor will recall that we had to seek your

10   assistance in getting data and information underlying this

11   Glacier study.  Among the things we found from that

12   information was that out of the approximately 200 patients

13   enrolled in the study, two patients, two patients, accounted

14   for 80 percent of the moderate and severe injection

15   reactions in the 20 milligram group.  There is a word that

16   clinical trial experts use for such widely divergent

17   results:  outlier.

18             I have displayed on the screen a slide which

19   illustrates this point.  It shows the moderate and severe

20   injection related reactions reported from the 20 milligram

21   daily arm and the 40 milligram three times per week arm.

22   These dots will be explained to you, they represent all of

23   the patients in the study.  And what we see is that on the

24   left, these two patients in the 20 milligram daily group are

25   clearly outliers.  They have far disproportionate numbers of

1    reactions compared to the other people in the group.

2              These two patients had three times more moderate

3    and severe ISRs than all of the ISRs in the remaining 99

4    patients.  Teva's person in charge of the Glacier study, Dr.

5    Kolodny, conceded that these patients are outliers, and you

6    will hear his testimony.

7              When the effect of the outliers is removed, the

8    results are actually reversed.  The number of moderate and

9    severe reactions in the 40 milligrams three times a week

10   group is higher than the number you see in the 20 milligram

11   daily group.  The exact opposite, Your Honor, of what is

12   required by the '776 patent claims.

13             Ironically, plaintiffs' own statistical analysis

14   for the Glacier study acknowledged that it was improper to

15   include these outliers in data assessing the study's

16   original primary end point, which relates to the frequency

17   of reactions, not the severity.  But for reasons we can only

18   surmise, Teva neither removed or even informed the reader in

19   the Glacier study of the existence of these outliers.

20             This is the data they rely on to to try to prove

21   infringement of the '776 patent.

22             Your Honor, such blatantly defective data cannot

23   prove defendants' liability.  Mr. Ware referred to this

24   Glacier study as unequivocal.  Well, it was far from

25   unequivocal.  If anything, it was unequivocally bad.

1                    So we submit, Your Honor, that plaintiffs cannot

2      prove indirect infringement of these claims that require

3      patient selection.

4                    Thank you.

5                    THE COURT:  Thank you.

6                    Why don't we take our 15 minutes.

7                    (Recess taken.)

8                    MS. HOLLAND:  Your Honor, plaintiffs call as

9      their first witness Ety Klinger, who is the named inventor

10     on the patents in suit in this case.

11                   THE COURT:  Thank you.

12                   ... ETY KLINGER, having been duly sworn as a

13     witness, was examined and testified as follows ...

14                   MS. HOLLAND:  Your Honor, may we approach with

15     exhibit books?

16                   THE COURT:  Sure.  Yes.

17                   You may proceed.

18                   MS. HOLLAND:  Thank you, Your Honor.

19                         DIRECT EXAMINATION

20     BY MS. HOLLAND:

21     Q.    Good morning, Dr. Klinger.

22     A.    Good morning, Ms. Holland.

23     Q.    Where do you live?

24     A.    In Israel.

25     Q.    Where in Israel?

Klinger - direct

1   A.   In Tel Aviv.

2   Q.   Is English your native language?

3   A.   No.

4   Q.   What is your native language?

5   A.   Hebrew.

6   Q.   What is your profession?

7   A.   I am a biochemist in training.  I am a scientist.

8   Q.   What industries have you worked in over the course of

9   your career?

10  A.   During my entire career I worked in the pharmaceutical

11  industry in R&D, research and development of new drugs.

12  Q.   Are you currently employed?

13  A.   Yes.

14  Q.   Where are you employed?

15  A.   I am working for MediWound.

16  Q.   What is the business of MediWound?

17  A.   MediWound is a biotechnology company specializing in

18  the development of drugs for severe burns and chronic

19  wounds.

20  Q.   What is your position at MediWound?

21  A.   I am the chief R&D officer.

22  Q.   Did you formerly work at Teva Pharmaceuticals?

23  A.   Yes.

24  Q.   When was that?

25  A.   I worked there between the period of 1993 to 2011.

Klinger - direct

1    Q.    For how much of that time did you work with Copaxone?

2    A.    Practically all these years I was working on the

3    product.

4    Q.    Have you been awarded any patents on Copaxone?

5    A.    Yes.

6    Q.    Would you please open your binder?  We can look

7    together at JTX-7000, 7001, 70002, and 7003.

8          The question is, do you recognize these patents?

9    A.    Yes.

10   Q.    What are these patents?

11   A.    These are the patents of the 40 milligrams three times

12   a week.

13         MS. HOLLAND:  Your Honor, plaintiffs offer into

14   evidence JTX-7000, 7 --

15         THE COURT:  Let me remind you, counsel, we had a

16   pretrial conference.  At that time I indicated, as is my

17   typical practice, that your exhibits are admitted.

18         MS. HOLLAND:  Understood, Your Honor.

19         THE COURT:  It happened in the last trial.

20   BY MS. HOLLAND:

21   Q.    Please open your binder now to PTX-644.  What is this

22   document, Dr. Klinger?

23   A.    My assignment, the assignment of my patents to Teva.

24   Q.    Dr. Klinger, we are going to come back to your work at

25   Teva on Copaxone.  But first, can you provide the Court with

Klinger - direct

1    your background, starting after high school?

2    A.    After high school, I joined the Israeli Army.

3    Q.    What was your job in the Army?

4    A.    I was an instructor.  I trained medics how to provide

5    medical care to soldiers that are wounded in the field

6    before they can be transported to the hospital.

7    Q.    How long were you in the Army?

8    A.    For two years.

9    Q.    What did you do when you finished the Army?

10   A.    I started to learn in the Hebrew University in

11   Jerusalem.

12   Q.    What degree did you receive from Hebrew University?

13   A.    I got my Bachelor's degree in biology.

14   Q.    What did you do after that?

15   A.    I moved to Tel Aviv University and I did my Master's

16   degree.

17   Q.    What was your Master's degree in?

18   A.    In biochemistry.

19   Q.    What did you do after your Master's degree?

20   A.    I started my Ph.D. at Tel Aviv University.

21   Q.    Did you ultimately receive your Ph.D. from Tel Aviv?

22   A.    Yes.

23   Q.    In what field?

24   A.    In biochemistry.

25   Q.    In what year did you receive your Ph.D.?

Klinger - direct

1    A.    In 1993.

2    Q.    What was the focus of your dissertation?

3    A.    I explored biochemical reactions in the immune cells

4    that lead to the reaction of immune cells against bacterial

5    infections.

6    Q.    Did you teach while you pursued your Ph.D.?

7    A.    Yes.

8    Q.    What did you teach?

9    A.    I teach biochemistry.

10    Q.    To who?

11    A.    Students from the first and second degree.

12    Q.    Have you received any other degree since your Ph.D.?

13    A.    Yes.  I have an executive M.B.A.

14    Q.    Where is that from?

15    A.    This is a joint program of Northwestern University,

16    the Kellogg School of Management, and Tel Aviv University.

17    Q.    When did you receive your M.B.A.?

18    A.    In 2010.

19    Q.    Let's go back to the time after you received your

20    Ph.D.  What did you do then?

21    A.    After I received my Ph.D., I joined Teva.

22    Q.    What positions did you hold at Teva over the years?

23    A.    I had several positions.  I started as a senior

24    scientist in the immunoanalytical lab.  Then I became a

25    project leader.  Later on I was the head of development of

Klinger - direct

```
 1    MS and autoimmune diseases.  And finally, I was in charge of

 2    special innovative projects.

 3    Q.      What division of Teva did you work in?

 4    A.      I worked in the Innovative R&D division.

 5    Q.      What is the Innovative R&D division?

 6    A.      This is a separate division from the generics.  The

 7    Innovative R&D division specialized, focused in development

 8    of innovative drugs.

 9    Q.      Why did you leave Teva?

10    A.      After 17 years in the company, I wanted to do

11    something new, something else, so I was invited by two Nobel

12    Prize Laureates, Professors Ciechanover and Hershko, who

13    established a startup company, a discovery company, and I

14    thought it would be a good opportunity to take this job.

15    Q.      What was the name of the company?

16    A.      Proteologics.

17    Q.      What was your position there?

18    A.      I was the VP, R&D.

19    Q.      How long did you stay at Proteologics?

20    A.      Until the beginning of 2014.

21    Q.      Why did you leave Proteologics?

22    A.      Unfortunately, the company did not succeed, and it was

23    closed.

24    Q.      Where did you go when you left Proteologics?

25    A.      I moved to MediWound.
```

Klinger - direct

1    Q.    And is that your current job?

2    A.    Yes.

3    Q.    When you left Teva, did you continue working for Teva

4    as a consultant?

5    A.    Yes.

6    Q.    Does that consulting relationship include the work you

7    have done on this case?

8    A.    Yes.

9    Q.    What else have you consulted on for Teva since you

10   left?

11   A.    I was approached by different people from a different

12   division in the company, from the Innovative R&D people,

13   people from the Patent Department, or from the legal,

14   usually on questions regarding Copaxone and related

15   developments.

16   Q.    I want to return now to the time you joined Teva in

17   1994.  What project were you assigned to?

18   A.    I was assigned to the Copaxone development team.

19   Q.    What was the status of the Copaxone project at that

20   time?

21   A.    The project was still under development.

22   Q.    Which Copaxone product was under development?

23   A.    This was the 20 milligram every day.

24   Q.    Had a New Drug Application been filed yet for the

25   Copaxone 20 milligram per day product?

1    A.    No.

2    Q.    How did Teva get involved with the development of

3    Copaxone?

4    A.    The Copaxone was developed at the Weitzman Institute.

5    And the professors at Weitzman Institute had a very, very

6    good background in preclinical development, and also they

7    managed to run a Phase II trial with Professor Murray

8    Bornstein in the U.S., and the results were very successful,

9    demonstrating the efficacy and safety of Copolymer-1.    And

10   Teva was interested in licensing the product from the

11   Weitzman Institute and continued the development from there.

12   Q.    You mentioned Copolymer-1 in your last answer.  Was

13   that a nickname that had been used previously for glatiramer

14   acetate?

15   A.    Yes.  The previous name was Copaxone 1 or Copolymer-1.

16   Q.    What was your specific role on the Copaxone project

17   when you were hired?

18   A.    I was a senior scientist, and I joined the

19   immunoanalytical team.

20   Q.    What was the immunoanalytical team?

21   A.    We had an analytical group that worked on the

22   analytical and chemical properties of the product, and I was

23   assigned to establish a lab in that department that was

24   focused to come on the immunological and biological assays

25   for the product.

Klinger - direct

1   Q.      Why was Teva establishing this new lab at that time?

2   A.      Because at that time they understood by interaction

3   with regulatory authorities that because the product is

4   chemically synthesized, because of its complexity, the

5   regulatory authorities considered it as a complex drug, like

6   a biological drug.  And they wanted Teva to develop more

7   biological and immunological assays as part of the

8   characterization and quality control of the product.

9   Q.      Did you learn anything about Copaxone and glatiramer

10  acetate when you established this new biological team?

11  A.      Yes.  When I got the job and I started to learn, I

12  learned that there are actually three levels of complexity

13  that we are dealing with here.  We have a complex drug,

14  which is not a small molecule, a defined drug.  We have a

15  mixture of peptides and a very complex product.

16          We have a complex mechanism of action.  Nobody

17  understood how the drug actually worked.  The mechanism of

18  action was not fully understood or elucidated.

19          And we are dealing, also, in a very complex

20  disease, where we don't know how the mechanisms, whether the

21  mechanisms that lead to this, to the multiple sclerosis and

22  to the progression of the disease and to the relapsing and

23  remitting in patients.

24          So there were several complexities that I needed

25  to start to learn and explore.

Klinger- direct

1    Q.    You mentioned that one of the complexities you learned

2    about was about the Copaxone product itself.  What did you

3    learn about Copaxone's structure?

4    A.    I learned that the product is produced by chemical

5    synthesis, and that to produce the product, we used four

6    building blocks, four amino acids, four different amino

7    acids in specific ratios, when we put them in the reactor.

8    And by the end of this reaction we get a very complex

9    mixture of peptides, which are strings that have different

10   sequences of amino acids.  The strings have different

11   molecular sizes.

12          We couldn't define and characterize it simply

13   because it was so complex.

14   Q.    How many different peptides are within this Copaxone

15   mixture?

16   A.    We didn't know how many peptides.  Once we gave an

17   exercise to mathematicians in Boston, to help us to try to

18   calculate and figure how many peptides we probably have in

19   the mixture.  They came up with the number of ten to the

20   29th or ten to the 30th.

21   Q.    Can you tell us a little more about what you learned

22   about Copaxone's mechanism of action?

23   A.    So at that time it was already understood that the

24   product is an immunomodulator drug.

25   Q.    What is an immunomodulator?

Klinger- direct

1    A.    It means that the peptides of the product, within the

2    product, interact with immune cells and the immune cells go

3    through these changes.  These changes made the cells,

4    changing their nature from inflammatory cells to

5    anti-inflammatory cells.  And these cells migrate into the

6    brain, get into the inflammatory areas in the brain, the

7    lesions that cause the disease, and secrete

8    anti-inflammatory cytokines.  And therefore there is a

9    reduction in the relapse rate.

10   Q.    What is a cytokine?

11   A.    So cytokines are proteins that are secreted from the

12   immune system and lead to the inflammatory response or

13   anti-inflammatory.  There are cytokines that are

14   inflammatory and cytokines which are anti-inflammatory.  It

15   depends.

16   Q.    You mentioned earlier that when you arrived at Teva

17   they were developing the 20 milligram daily product.  Did

18   you gain an understanding of why Teva was developing the 20

19   milligrams as a daily product?

20   A.    I have learned from the professor at the Weitzman

21   Institute that at the early days, when they just discovered

22   the product, they did animal studies.  The best results they

23   received were when they mixed the product with an adjuvant.

24   Adjuvant is an emulsion of oils.  And when they mixed it and

25   injected it into the site of injection it created like a

Klinger- direct

1    DEPOT.  And the drug was slowly releasing from that DEPOT,

2    and by that they didn't need to give the injection.  One or

3    two shots were sufficient.

4    Q.    Can you explain what you mean by a DEPOT?

5    A.    A DEPOT is, you have a mixture of oil with the drug.

6    The drug, when you inject it, it stays at the site of

7    injection, and the drug is releasing slowly from this

8    emulsion into the area of the skin.

9    Q.    So you said that the Weitzman Institute was using this

10   DEPOT like mixture in the animal testing.  Why didn't Teva

11   use the same thing?

12   A.    They used a material named Complete Freund's Adjuvant.

13   This was used in the animal studies.  And Teva -- and this

14   product, this emulsion cannot be used in humans.

15          So the professor at the Weitzman Institute could

16   not find a replacement for that material.  So they decided

17   that the continuous exposure could probably be mimicked by

18   daily injection instead of creating this formulation with

19   the adjuvant.

20   Q.    Did you learn anything from the scientists at the

21   Weitzman Institute about why they felt they needed the daily

22   exposure or the continuous exposure?

23   A.    Based on their experiments, I was told by Professor

24   Arnon many times that based on her experience, more is

25   better.  She was encouraging us to continue with the daily

Klinger- direct

1   injection, because --

2              MS. BLOODWORTH:  Objection, Your Honor.

3   Hearsay.

4              THE COURT:  Sustained.

5   BY MS. HOLLAND:

6   Q.   Let me try to rephrase that.

7          Did you do anything about the frequency of

8   injections based on your conversation with Dr. Arnon?

9   A.   We stayed for a long time with the daily injections

10  because we didn't want to change what we knew was working

11  well.

12  Q.   You said that you were brought into this bioanalytical

13  lab.  Were you successful in developing bioassays and

14  immunoassays for Copaxone?

15  A.   Yes.

16  Q.   What types of assays?

17  A.   We developed in the lab the animal models and we used

18  the EAE model, which is an animal model for MS.  It is a

19  model used by others.  But we standardized it for Copaxone.

20  Q.   Did you say EAE model?

21  A.   Yes, EAE.  We also developed an in-vitro assay,

22  biological assay, and also immunological assays specific for

23  the drug.

24  Q.   Did you also try to develop pharmacokinetic tests for

25  the glatiramer acetate?

Klinger- direct

1    A.    Yes.

2    Q.    Why were you trying to develop pharmacokinetic tests

3    for Copaxone at that time?

4    A.    It is a standard requirement by regulatory authorities

5    that companies that develop a new drug, they explore the

6    pharmacokinetics of the product.  So we were requested to do

7    that as well.

8    Q.    Do you have an understanding as to why you were

9    requested to perform pharmacokinetic studies, what that

10   shows you?

11   A.    In pharmacokinetic studies you inject the drug and you

12   measure the levels of the drug in the blood.  You measure

13   the peptide levels.  You measure how the drug is degraded,

14   how it is eliminated from the blood.  And based on this

15   important information, you can determine correctly the

16   schedule of the treatment.

17          This is the purpose why companies had to do this

18   and prove that the dosing regimen is in line with the

19   pharmacokinetics of the product.

20   Q.    At that time did you think that pharmacokinetic

21   studies would be relevant for a drug like Copaxone?

22   A.    I personally didn't think that this is relevant for

23   Copaxone.

24   Q.    Why not?

25   A.    Because, as I explained, the product is an

1     immunomodulator drug.  The mechanism of action that we were

2     thinking about is that when you inject the drug to the

3     subcu --

4     Q.    What is subcu?

5     A.    Under the skin -- then the product interacts with

6     immune cells that are under the skin, and this is the first

7     time when there is interaction between the product and the

8     immune cells.  It does not necessarily need to get into the

9     blood for this interaction.  Once this interaction occurs,

10    the cells undergo the changes from pro-inflammatory to

11    anti-inflammatory and they migrate to the brain and make the

12    biological effect.

13          Based on this understanding of the mechanism of

14    action, we understood that measuring the levels of the drug

15    in the blood may not necessarily indicate anything about the

16    pharmacological effect of the product.

17    Q.    Was it your understanding that Copaxone could have

18    pharmacological effect without making it to the bloodstream?

19    A.    There were several animal studies that actually showed

20    that once you have the immunomodulating drug and you -- you

21    have the immunomodulating cells, and you inject them into

22    animals, you can get the beneficial effect without actually

23    giving the drug.

24          So what is important is that the drug will

25    change the nature of the cell, the pro-inflammatory nature

1    of the immune cells.  Once you have this change and you

2    inject these cells into sick animals, you get recovery.

3    Q.    Doctor, were you able to develop a method that would

4    establish the pharmacokinetic profile of Copaxone?

5    A.    No.

6    Q.    Why not?

7    A.    Because of the complexity of the drug.  When you

8    inject the product, and you have incalculable number of

9    peptides getting into the blood, you cannot follow each

10    peptide.  You cannot follow the metabolites.  There is no

11    analytical technique that can capture this information.

12    Q.    Just to be clear, you said there were an incalculable

13    number of peptides.  Are those peptides all the same as each

14    other?

15    A.    No.  With different lengths and different sequences.

16    Q.    Was Teva ultimately successful in gaining approval of

17    the Copaxone 20 milligram daily product?

18    A.    Yes.

19    Q.    When was that?

20    A.    In '96 in the U.S.

21    Q.    Did Teva continue developing GA or glatiramer acetate

22    after the 20 milligram daily product was approved?

23    A.    Yes.

24    Q.    Why was that?

25    A.    Because when we saw the results of the Phase III

1    study, we realized that the product has 30 percent effect on

2    relapse rate, and that the product, we knew that it is

3    injected daily, and patients complain about the daily

4    injections.  This is a bigger hurdle for the patients.

5              So one of our main goals was to try to develop a

6    product that can be more potent, more efficacious, and a

7    product that can be more tolerable and more convenient for

8    use.

9    Q.    What do you mean by tolerable?

10   A.    That, as I said, the injections, if the patient had

11   tolerability issues, like they complained about the

12   frequency of injection site reactions and the severity of

13   injection site reactions.

14             And we wanted to reduce this burden from the

15   patient as much as possible by developing an improved

16   product.

17   Q.    Which group at Teva was responsible for development of

18   Copaxone post-approval of the 20 milligram daily product?

19   A.    At that time, it was mainly by our Innovative R&D

20   group.

21   Q.    Is that the group you were working in?

22   A.    Yes.

23   Q.    Did you have input from any other groups at Teva?

24   A.    As we established the marketing teams and the medical

25   teams of Copaxone, so we started to work together in

1     multi-disciplinary teams where R&D and marketing and medical

2     people were sitting together, sharing knowledge and ideas,

3     and think whether the next development product makes sense,

4     and can scientifically fully be developed, whether it can be

5     regulatory approved, and addressing any need in the market.

6     Q.     What is this group ever formalized?

7     A.     Over the years, we called these teams the life cycle

8     management team.  And the responsibilities of this team was

9     comprised of the different functions I just explained.

10    Q.     How did you select the name life cycle management

11    team?

12    A.     This is a standard name that is used in pharmaceutical

13    and in the industry when you have a product and you want to

14    improve it and keep it in the shelf for a long time, so you

15    are trying all the way to make improvement and make products

16    that look better and sustain the existence of the product in

17    the market.

18    Q.     Did you serve on the life cycle management team for

19    Copaxone?

20    A.     Yes.

21    Q.     What was your role?

22    A.     I represented the R&D on the team.

23    Q.     What roles did the medical, commercial and regulatory

24    representatives play?

25    A.     So the medical and commercial people brought into the

Klinger- direct

1      discussion the needs, what the patient needs, what the

2      medical community needs as a drug for -- what improvement

3      needs to be in our product for the next improved product.

4                 As a scientist from R&D, we were listening to

5      the immediate needs, based on what we knew about the

6      product, we evaluated whether we can address these immediate

7      needs and what product can we develop to for these needs in

8      the United States.  And regulatory people and the team were

9      taking care that our development and suggestions and plans

10     are actually going to be accepted by regulatory authorities

11     because the goal is to approve the product by the end of the

12     day.

13     Q.    Did Teva ultimately succeed in bringing an improved

14     Copaxone product to the market?

15     A.    Yes.

16     Q.    What product is that?

17     A.    This is the 40 milligrams three times a week.

18     Q.    How long did it take Teva to develop that improved 40

19     milligram three times a week product?

20     A.    We eventually get to it after many, many years.  I

21     left the company in 2011, and still this product was not in

22     the market.  It was approved later.

23     Q.    When did Teva start working on developing and

24     improving the Copaxone product ?

25     A.    Immediately after the approval of the 20 milligram

Klinger- direct

1    daily.

2    Q.    Did Teva explore the use of GA for any other

3    indications?

4    A.    Yes.

5    Q.    What other indications?

6    A.    Based on our understanding of the mechanism of action

7    and since we know that MS is both an autoimmune disease and

8    neurological disease, we thought that maybe the drug can be

9    useful also in the treatment of other autoimmune diseases,

10   or neurological diseases.

11   Q.    Which diseases in particular did you look at?

12   A.    In the area of autoimmune diseases we looked, for

13   example, at Crohn's Disease.  We had a preclinical program

14   in that indication.

15         In the area of the neurological disease we had a

16   large program, when we looked at the potential of the

17   product for the treatment of an ALS disease, Alzheimer's

18   disease, glaucoma.

19         So we had a very intensive preclinical program

20   around these new indications.

21         We also looked at other forms of MS, which were

22   more close to MS, like primary progressive MS.

23   Q.    When did Teva start development of a GA for primary

24   progressive MS?

25   A.    It was around the end of the nineties.

Klinger- direct

1    Q.    What was your rationale for thinking that Copaxone

2    could work with primary progressive MS?

3    A.    We knew by that time that Copaxone is effective in

4    relapsing and remitting mechanisms.  We thought other

5    diseases which are closely related to MS, like primary

6    progressive MS, GA can probably be useful.

7          So we considered that as one of the first

8    options.

9    Q.    Did Copaxone prove to be effective in treating primary

10   progressive MS?

11   A.    No.

12   Q.    What happened?

13   A.    We did a large Phase III trial involving almost 900 or

14   a thousand patients.  And the study failed.

15   Q.    What was the study called?

16   A.    PROMISE.

17          MS. BLOODWORTH:  Objection, Your Honor.  This

18   was be the objection before trial this morning about the

19   PROMISE study that was being used for secondary

20   considerations.  Outside the scope of the interrogatory

21   response.

22          MS. HOLLAND:  Your Honor, I understood the

23   objection to be documents on the topic.  I tailored the

24   testimony just to get it as testimony, not as documents.

25          MS. BLOODWORTH:  Your Honor, there was no

Klinger- direct

1    disclosure at all of PROMISE in any way, shape or form

2    during discovery.

3                    THE COURT:  Was there an opportunity to question

4    the witness at the deposition on this and other subjects,

5    counsel?

6                    If you listen, you would know what the question

7    is.

8                    Was there an opportunity at the deposition, as

9    has been asserted by Teva, I think, near the end of the

10   deposition, to question the witness on these and other

11   subjects.

12                   MS. BLOODWORTH:  Yes, Your Honor.  I questioned

13   the witness several times on the story of her invention.

14   And I did not hear the word PROMISE in any of her answers.

15   I did not question her just one time.  I questioned her

16   several times.

17                   THE COURT:  Let's see what Ms. Holland has to

18   say on this.

19                   MS. HOLLAND:  Yes, Your Honor.  Dr. Klinger at

20   her deposition, as I mentioned earlier, gave quite a long

21   extensive answer.  She said she looked at data from C and N,

22   non-clinical, clinical, scientific publications that were

23   generated by different investigators.

24                   Now, there was certainly an opportunity, and I

25   would think it would be a pretty obvious thing to do, to

1    follow that up with what clinical trials you were referring

2    to.  But that didn't happen.

3                After that very long answer, there was no

4    followup.  Ms. Bloodworh said that, I don't have any further

5    questions.

6                THE COURT:  Ms. Bloodworth.

7                THE COURT:  I would like to discuss this at

8    sidebar.  But I don't need the entire herd.

9                (The following took place at sidebar.)

10               THE COURT:  Here is the thing.  Trials, federal

11   or state, are not supposed to be by surprise.  That is what

12   you are contending, essentially, is that there is surprise,

13   and as a result you are prejudiced.

14               Apart from all of the minutae that you guys want

15   to throw at me, I want to discuss this in broad terms, basic

16   principles of fairness.  This is a Bench trial.  This is not

17   a jury trial.  So I want you all to keep that in mind as we

18   go forward because this is beginning early on to frustrate

19   me, if you can't see that right now.  I hope you can.

20               Tell me why this is not unfair.

21               MS. HOLLAND:  It is not unfair because we gave a

22   30(b)(6) on this topic, the purpose of the 30(b)(6)

23   deposition is to take testimony and to understand what the

24   story is.  The witness gave a story.  What happens at a

25   deposition ordinarily is that if you hear something like I

Klinger- direct

1    relied on a lot of clinical trials, the next question is

2    which clinical trials.  There was no question like that.

3            THE COURT:  Let's dial back just for a moment to

4    the initial interrogatory, the initial request.  All we know

5    is you try to discover the information you need for your

6    claims and defenses before you ever go into a deposition and

7    certainly before you ever get here.

8            Let me see the interrogatory.

9            THE COURT:  This is No. 11?

10           MS. BLOODWORTH:  Number 11 at the bottom.  We

11   asked for the story of the invention here.

12           THE COURT:  Just give me a moment.

13           (Pause.)

14           THE COURT:  And I think Ms. Bloodworth pointed

15   to the last -- second sentence in the interrogatory, for the

16   record, let's read it for the record.

17           To the extent plaintiffs intend to present at

18   trial witness testimony regarding the invention, in

19   particular, any description of how the alleged invention

20   came to be; any alleged obstacles to overcome; and any

21   synthesis sites; and any other story of the invention.  And

22   there is some additional language.  Go ahead.  You

23   responded.  Initially by objecting to the question as vague.

24   Then what did they say ?

25           MS. BLOODWORTH:  Then, Your Honor, they

Klinger- direct

1    pointed -- they said that we would, you can get this

2    information through a 30(b)(6) deposition, and we will have

3    the following documents and they cited to the range of

4    documents which is four prosecution histories of the patents

5    in suit.

6              MS. HOLLAND:  I think that that is not exactly

7    what it says.  I would rather it accurately be read in.

8              THE COURT:  Fair enough.

9              MS. BLOODWORTH:  I was paraphrasing.

10             THE COURT:  Do you want to read it in, Ms.

11   Holland?

12             MS. BLOODWORTH:  Actually, Interrogatory No. 11.

13             MS. HOLLAND:  It says discovery regarding facts

14   concerning the conception or constructive reduction to

15   practice of the inventions claimed in the patents in suit

16   can most efficiently be obtained through deposition

17   discovery, including the Rule 30(b)(6) deposition that

18   defendants have noticed, which includes topics identical to

19   the subject matter of the interrogatory.

20             Teva further states that the answer to this

21   interrogatory can be derived or ascertained through business

22   records included in the following list of documents which

23   Teva provides pursuant to Rule 33(d), that the burden of

24   ascertaining the answer is substantially the same for

25   defendants as it is for Teva.

Klinger- direct

1              So essentially we said we will give you some

2      documents.   The burden is the same on you to go through the

3      documents --

4              THE COURT:  Let me interrupt.  Did you object to

5      that response and seek an audience with me to engage a

6      discovery dispute?

7              MS. BLOODWORTH:  No, we didn't.

8              THE COURT:  That's the end of the story.  The

9      objection is overruled.

10             (End of sidebar conference.)

11             THE COURT:  The objection is overruled.

12     BY MS. HOLLAND:

13     Q.     Dr. Klinger, you had said that Teva had performed the

14     PROMISE trial.  When did the PROMISE trial fail?

15     A.     It was around 2002.

16     Q.     You also mentioned that Teva tried to develop GA for

17     neurological and autoimmune diseases.  What was the

18     scientific rationale for that?

19     A.     As I explained before, the drug mechanism of action is

20     the fact that it was effective in MS, which is an autommune

21     and neurological disease, which led us to think that maybe

22     the drug can be effective also in other autoimmune diseases

23     and other neurological diseases.

24     Q.     Was Teva ever successful in developing GA for any

25     other neurological or autoimmune diseases?

1    A.    No.

2    Q.    What happened?

3    A.    We tried different animal models for clinical work

4    that we did for different indications.  And we also did a

5    clinical trial in ALS patients.  Unfortunately, it failed.

6    Q.    How long did Teva work on development of GA for these

7    other indications?

8    A.    We started immediately after the approval of the

9    product, in '96-7.  And we continued, according to my

10   recollection, till 2008, almost ten years.

11   Q.    What if anything did you take away from the failed

12   attempts to develop GA for other indications?

13   A.    I understood personally that we don't fully understand

14   the mechanism of action of the drug.  We also do not fully

15   understand the mechanism of the diseases themselves and we

16   don't know if the drug can actually treat other disease.

17   Q.    Focusing now on Teva's efforts to improve Copaxone for

18   relapsing remitting multiple sclerosis patients, what was

19   the first project ever pursued?

20   A.    We started the development of the oral formulation of

21   Copaxone.

22   Q.    When did that project begin?

23   A.    In the late nineties.

24   Q.    What was your role on the oral Copaxone project?

25   A.    I was a member of the team.

Klinger- direct

1    Q.      What was your role on the team?

2    A.      I was responsible on the development of the bioassays

3    and immunoassays and the pharmacological studies that were

4    done with formulations of Copaxone.

5    Q.      Why did Teva decide to develop an oral Copaxone

6    product?

7    A.      We understood that the daily injection is a big hurdle

8    to patients.  It's a burden.  And we needed to develop a

9    much more convenient formulation.  At that time, there were

10   a lot of scientific publications coming from different good

11   labs in the world suggesting that immunomodulation can be

12   mediated by oral feeding and not necessarily only by

13   injection.

14          So we thought this could be a good opportunity

15   to explore whether we can administer glatiramer acetate in

16   the animal models that we study to look at and see if the

17   drug can be effective when it is administered orally.

18   Q.      What types of animal studies did you do?

19   A.      We did animal studies in the EAE model, which I

20   explained, the EAE model for multiple sclerosis.  We induced

21   the disease in the animals.  And we fed them with Copaxone

22   and tested whether this, the oral treatment reduced the

23   severity of the disease, or caused any recovery.

24   Q.      Did you perform immunological studies as well?

25   A.      Yes.  We performed immunological studies.  As part of

Klinger- direct

1     the animal studies, then, in-vivo animal studies that we

2     conducted in rats and mice and monkeys, we also explored

3     what happens immunologically.  And we found out that in the

4     animals we can see that, following treatment, we can see

5     similar changes in the immune response and that we get more

6     and more cells with anti-inflammatory properties, like -- I

7     didn't explain to you before, but the pro-inflammatory

8     cells, we classified them as T helper 1, Th1 cells, which

9     are pro-inflammatory, or Th2 cells, which are

10    anti-inflammatory.  And we saw that following oral

11    treatment, cells, the immune cells in the animals undergo

12    the changes that we wanted in the direction of being

13    anti-inflammatory.

14              So the results from our lab and from the lab at

15    the Weitzman Institute and other labs here in the U.S. were

16    quite consistent by showing that if you treat animals with

17    Copaxone in this model, you can actually get a beneficial

18    effect.

19    Q.    Did Teva perform a clinical trial on oral Copaxone?

20    A.    Yes.

21    Q.    What was the name of that trial?

22    A.    CORAL trial.

23    Q.    When was the CORAL trial started?

24    A.    It started by the end of the nineties, the year 2000,

25    around that time.

Klinger- direct

1    Q.    How large was the CORAL trial?

2    A.    It was a large trial, involving about a thousand

3    patients.

4    Q.    What was the outcome of the CORAL trial?

5    A.    Unfortunately, it failed.

6    Q.    What was the reaction at Teva to the failure of CORAL?

7    A.    It was a big disappointment.  It was a big

8    disappointment because we had very good animal data, very

9    good preclinical data that seemed to be robust, not only in

10   our hands, in external labs the immunological data was also

11   supportive.

12          We thought that we have a good chance to

13   succeed.  But actually, we didn't succeed.

14   Q.    Did you become aware of any reactions to the failure

15   of CORAL from outside Teva?

16   A.    Yes.  The disappointment was also in the academic and

17   medical community because everybody looked at this study,

18   because, if it was going to be successful, this would be the

19   first trial to show that we can induce an oral tolerance,

20   namely, reduce the inflammatory attack in MS by oral

21   treatment, which was a very important finding.

22   Q.    Did Teva continue pursuing oral Copaxone after the

23   failure of CORAL?

24   A.    Yes.

25   Q.    What did you do?

1    A.    So we understood that something in the puzzle doesn't

2    work.  We need to learn more.

3              So our team went to the preclinical stage.  And

4    one of our assumptions was that maybe the dose that we

5    administered in the CORAL study, the doses were not

6    sufficiently high.

7              We treated patients with five and 50 milligram

8    daily dose and we thought that maybe we missed the dose.  It

9    is known that sometimes we do not know how to translate with

10   immunomodulators the dose from animals to humans.

11             So the idea was maybe we missed the dose and

12   let's try and see if we give higher doses we can get better

13   effects.

14   Q.    Did you test that hypothesis?

15   A.    Yes.  We tested it.  And we did studies in large pigs,

16   in domestic pigs, to mimic the large body of a human, not

17   only in mice and rats or small monkeys.  And we found out

18   that in large animals we can induce the same oral tolerance

19   by treating with approximate 360 and more milligrams per

20   day, which is much higher than the doses we gave in CORAL.

21   Q.    What did you do after you got these animal results?

22   A.    So based on these results, we saw that we have

23   efficacy and it was safe, we decided to do additional

24   clinical trials to explore, Phase II trials.  This time we

25   went slowly and we did small trials with 360 milligrams of

Klinger- direct

1    Copaxone.

2    Q.    What were the results of those these trials?

3    A.    Unfortunately, they failed.

4    Q.    You used the word immunotolerance in a previous

5    answer.  Can you explain what you mean by that?

6    A.    When we wanted to show immunotolerance, we wanted to

7    show that we produced a pro-inflammatory characteristic and

8    the nature of the immune cells that were pro-inflammatory

9    and were thought to be the cells that attacked the brain and

10   induced the disease, and changed the nature, they can be a

11   more anti-inflammatory cell.  And this we can do by repeated

12   treatment with Copaxone.  It was shown in Copaxone with

13   repeated administration.

14   Q.    Altogether, how long did Teva work on oral Copaxone?

15   A.    So I would say we started by the end of the nineties.

16   And the last trials that failed were around 2005.  So

17   altogether, six to seven years.

18   Q.    After the failure of oral Copaxone, did Teva continue

19   to investigate ways to improve Copaxone?

20   A.    Yes.

21   Q.    What did you do next?

22   A.    So we looked at different directions.

23         We went back to the idea, maybe we can now,

24   after many years, find a material that can mimic the CFA,

25   the Complete Freund's Adjuvant and the DEPOT that was used

Klinger- direct

1    at the early days by the Weitzman in the animals, maybe

2    today there is some material that was developed and could be

3    used in humans, so that we can inject it and make, let's

4    say, once monthly or once every three months injection with

5    the DEPOT.

6                And we did several, did preclinical studies with

7    different materials that were approved for human use.

8                But we couldn't get positive results in the

9    animals.

10               So we stopped this program.

11               In addition, we had a project with the

12   40-milligram dose.  This project was initiated in an attempt

13   to increase efficacy.

14   Q.    Before you continue on that, let's just finish up on

15   the DEPOT, Dr. Klinger.  How long did Teva work on the DEPOT

16   delivery?

17   A.    About two years, we had a preclinical program on in.

18   Q.    Did Teva come back to the DEPOT later on in time?

19   A.    Yes, later on, in 2009 we were thinking again

20   whether -- all the time we were searching, are there other

21   new technologies that can be used in humans and can serve as

22   DEPOT for Copaxone.

23   Q.    Were you ever successful?

24   A.    No.

25   Q.    You were talking about a 40 milligram daily Copaxone ,

Klinger- direct

1     I believe.

2                 Were there two trials, two projects that were

3     initiated at about the same time?

4     A.    Yes.  We had the 40 milligram and the TV-5010 project.

5     Q.    Let's talk about TV-5010 first.

6                 First of all, what does the name TV-5010 stand

7     for?

8     A.    TV-5010 is a code name that we provided for this.

9     Q.    What exactly is TV-5010?

10    A.    5010 is a copolymer, like Copaxone is, is a mixture of

11    peptides.  We synthesized it using the same building blocks

12    that we used for Copaxone, the four building blocks.

13                We used a similar reaction to produce it.

14                We just introduced a few changes that resulted

15    in the mixture of TV-5010 contained peptides on average,

16    with higher molecular weight.  Namely, the peptides were

17    longer and their molecular size, molecular weight was higher

18    compared to the peptide with Copaxone.

19    Q.    When did Teva begin working on TV-5010?

20    A.    It was around 2002 or '3.

21    Q.    What was your role in the TV-5010 project?

22    A.    I was the project lead.

23    Q.    What was the goal of the TV-5010 project?

24    A.    We thought that the product with the high molecular

25    weight would be able, can potentially address both an

Klinger- direct

1    immediate need that we discussed, better efficacy, and can

2    potentially also inject it less frequently and address the

3    issue of convenience and tolerability.

4    Q.    What was Teva's scientific rationale for the

5    development of TV-5010?

6    A.    So high molecular weight, copolymer weight was used by

7    the scientists at the Weitzman Institute at the early stage

8    of development.  And they did the preclinical studies.  And

9    also, the clinical studies that was conducted by Professor

10   Bornstein in MS patients included batches with high

11   molecular weight.

12          The patients in this clinical trial were treated

13   daily with high molecular weight batches of copolymer, one.

14   And the result of the studies showed that the product is

15   effective, and overall, it is safe, but there were

16   tolerability issues with patients complaining on the

17   injection site reactions.  And the Weitzman scientists and

18   Teva people thought later on that the injection site

19   reaction, the severe injection site reactions were most

20   probably due to the high molecular weight of the peptides,

21   and therefore, when we licensed the product to Teva, we

22   worked on a product with a lower average molecular weight.

23   Q.    In your last answer you used the terms safety and

24   tolerability.  Are those distinct concepts to you?

25   A.    Yes.

1  Q.    Can you explain?

2  A.    When you look at safety, you look at the systemic

3  adverse events, and when you look at the adverse events

4  which are related to the injection site reaction, these are

5  more related to tolerability.  Because you can have

6  complaints with injection site reactions, and, but still,

7  the drug can be considered a safe product because it does

8  not induce systemic adverse events that make the patient

9  feel worse.

10 Q.    Dr. Klinger, did you do any preclinical studies on the

11 5010?

12 A.    Yes.

13 Q.    Can you explain those very generally?

14 A.    We did studies to show that, indeed, higher molecular

15 weight copolymers are more effective, and we proved that in

16 animal models in-vivo and in vitro.  We did also

17 immunological studies when we evaluated the immune response

18 to TV-5010 batches.

19 Q.    Did you perform any clinical trials on the 5010?

20 A.    Yes.

21 Q.    What trials?

22 A.    We performed two Phase II trials of the 5010.  These

23 were MRI based studies, where patients were treated with

24 once weekly 15 milligram of the 5010, 30 milligram of the

25 5010.

Klinger- direct

1    Q.      What do you mean by an MRI trial?

2    A.      This is a Phase II trial that we followed the

3    inflammatory lesions in the brain of patients.  We used this

4    trial as -- this marker, imaging marker to teach us whether

5    there is any response to the treatment of the MRI lesions in

6    the brain.

7              For these studies, we didn't need thousands of

8    patients.  We used the MRI in Phase II trials, usually,

9    before going into the clinical trials where we measured

10   clinical relapse rates.

11   Q.      What were the results of the Phase II trials of the

12   5010?

13   A.      So the trial where patients were treated with 15

14   milligrams once a week didn't show any improvement.  And

15   with the 30 milligrams, there were signs of improvements.

16             However, there were some problems with, the size

17   of the study was too small, there were some questions about

18   the 30 milligrams.

19   Q.      Were there any findings with respect to tolerability?

20   A.      Yes.  We noticed that patients that had the higher

21   dose of the 5010, the 30 milligram, reported, had more

22   reports on injection site reactions and IPRs.

23   Q.      Did Teva continue on with the Phase III clinical trial

24   of TV-5010?

25   A.      No.

Klinger- direct

1    Q.     Why not?

2    A.     Because at the time we were running the Phase II

3    trials, we did the safety studies that are required by the

4    regulations because the product was intended for chronic

5    use, so we needed to run chronic toxicity studies.  We had a

6    chronic toxicity study in monkeys for 52 weeks and a study

7    in rats.  And surprisingly, during the study, after a period

8    of several months of treatment, we noted a very severe toxic

9    response of the 5010, and the monkeys died, and in rats we

10   got deaths.  We got systemic reaction, and the adverse

11   event, like kidney damage and liver damage.  And the

12   injection site reactions were very severe.

13            So this was completely surprising for us.

14   Q.     What was the reaction at Teva to the results of the

15   monkey and rat toxicity testing you just described?

16   A.     As I said, it was surprising, it was a big surprise.

17   For us, the TV-5010 was a project, it was considered to be

18   straightforward.  We knew that patients in the more extended

19   study were treated with high molecular weight batches daily

20   for two years.  Besides the complaints on the injection site

21   reaction, the product was considered safe.  And in the two

22   small clinical studies that we did, we didn't notice any

23   severe toxicity in patients.

24            But the chronic toxicity studies actually were

25   very surprising to us, the results, anyway.

Klinger- direct

1   Q.      What happened to the of the TV-5010 project?

2   A.      When we got these results, we convened a committee

3   advisory board, a safety advisory board, toxicologists,

4   regulatory people.  They looked at the data and they advised

5   us not to continue with the development of TV-5010 because

6   of the severe adverse events and severe reactions.

7           We decided to close the project.

8   Q.      How long did Teva work on the 5010 project?

9   A.      I think that the project started around 2002 and ended

10  by the end of 2005, 2006.

11  Q.      What if anything did you take away from the failure of

12  the TV-5010 project?

13  A.      I learned that we don't know a lot of things.  We got

14  into projects like CORAL and TV-5010.  We were almost sure

15  we knew what we were doing, but the results were very

16  disappointing.

17          We learned with Copaxone you should expect the

18  unexpected.

19  Q.      You also mentioned a 40 milligram daily project.  When

20  did Teva begin working on that?

21  A.      Around 2002.

22  Q.      What was the goal of the 40 milligram daily project?

23  A.      The goal was to improve efficacy .  As we learned, a

24  30 percent relapse rate is good but not good enough, and we

25  should strive to have a product with better efficacy.

1           So one of the options was to try maybe to

2      increase the dose and have a better and more efficacious

3      product.

4      Q.    What was your role on the 40 milligram daily project?

5      A.    At the beginning, I was part of the team, and later

6      on, I became the head of the development, so this project

7      was in the portfolio of my therapeutic area.

8      Q.    Why did you think that a 40-milligram dose could be

9      more efficacious than a 20 milligram dose?

10     A.    We actually didn't know, because we didn't during the

11     development of Copaxone, neither the scientists at the

12     Weitzman Institute, nobody performed a dose ranging study in

13     humans to suggest that 40 milligrams would be more

14     efficacious than the 20 milligram daily.

15     Q.    Did the fact that Copaxone was an immunomodulator have

16     any impact on your thinking?

17     A.    Because when you are dealing with an immunomodulating

18     drug, this is not like a small molecule which has a simple

19     interaction between the drug, a metabolic protein, where

20     there you are usually getting the kind of linear

21     dose-response relationship.

22           When you are working with immunomodulators

23     sometimes, many times, you get, like a sigmoidal response.

24     At certain doses you don't see any response, then you get

25     the full response.

Klinger- direct

1          It's not linear and not predictable, the

2    dose-response relationship.

3          So we didn't know, with the 20 milligrams, where

4    we are in the dose-response curve.

5          MS. HOLLAND:  Your Honor, I would like to ask

6    Dr. Klinger's to testify about the dose-response

7    relationship she was talking about.  May she have permission

8    to approach the easel?

9          THE COURT:  Okay.

10         (Witness gets down from stand.)

11   BY MS. HOLLAND:

12   Q.    Dr. Klinger, what I would like you to do is kind of

13   put into picture form or illustrate the testimony that you

14   just gave with respect to the different dose-response curves

15   that you were aware of in thinking, at the time you were

16   thinking about the 40 milligram daily product?

17   A.    So when we learn about a dose-response relationship,

18   we usually plot on the y axis the efficacy of the drug,

19   versus the dose.  And we want to learn how the dose changed

20   the efficacy of the drug.

21         In a small molecule, where you have a simple

22   pharmacological effect between the drug and a receptor or

23   the target protein, most of the time we get a linear

24   dose-response relationship, which means the more dose you

25   give, you get better efficacy, higher efficacy.

Klinger- direct

1            And when you start to see you don't get further

2    efficacy, or you get safety problems, that's when you stop.

3    And you learn about this dose-response relationship and

4    usually it is linear.

5    Q.    Just for the record, the red line you have drawn is

6    for the small molecule drug.  Is that right?

7    A.    Yes.

8            When we consider immunomodulating drugs, many

9    times we see that at certain doses, there is no response.

10   And then there is a kind of -- a response that goes up in a

11   relatively --

12           MS. BLOODWORTH:  Objection, Your Honor.

13           Your Honor, this is expert testimony.  They have

14   a pharmacodynamic expert that has been disclosed and

15   submitted an expert report.  We appreciate Dr. Klinger's

16   knowledge.  But this goes beyond a fact witness.

17           THE COURT:  It sounds like it to me.

18           MS. HOLLAND:  Your Honor, the way it was

19   phrased, and I think this will be important to the thinking

20   about the invention here, is Dr. Klinger's understanding of

21   the way the pharmacokinetic curve -- I am sorry, the

22   dose-response curve would look for an immunomodulator like

23   Copaxone factors into her thinking about how to proceed with

24   the molecule.  I think it is easier to illustrate it than to

25   hear it.

Klinger- direct

1          MS. BLOODWORTH:  Your Honor, as long as it's

2   abundantly clear that this is not expert testimony.  Again,

3   they have disclosed expert reports on this.

4          THE COURT:  This is demonstrating her

5   understanding.  I will accept it on that basis.

6          MS. BLOODWORTH:  Thank you, Your Honor.

7   BY MS. HOLLAND:

8   Q.    Please continue, Dr. Klinger.  Maybe start over again

9   on describing the immunomodulator dose-response?

10  A.    The immunomodulating drugs, there is a range of doses

11  that you expose the body and you don't see any response.

12  But then you get a very steep response in a very narrow dose

13  range.  Then you get a plateau.

14          In the case of Copaxone, we didn't know where we

15  are on the curve.  Are we here in the linear range, for

16  example?  For example, if the 20 milligram dose is here, and

17  this is the effect, let's say 30 percent reduction in the

18  relapse rate, give 40 milligrams, if we are at this point,

19  giving 40 milligrams can bring us into better efficacy with

20  the higher dose.

21          However, if with the 20 milligram we are already

22  here in the dose-response curve, and we give 40 milligrams,

23  then increasing the dose between 20 and 40 would not provide

24  any difference in efficacy.  And with an immunomodulating

25  drug sometimes we get an inverse of the response where we

Klinger- direct

1    can see a reduction in activity when we give too high doses.

2              So when we started to discuss about the 40

3    milligram formulation, we didn't know where we are in the

4    curve and whether increasing the dose would actually

5    increase the efficacy or we are already in the plateau.

6    Q.    Thank you, Dr. Klinger.

7              (Witness resumes stand.)

8    Q.    Did Teva perform any clinical trials of the 40

9    milligram dose?

10   A.    Yes.

11   Q.    What was the first trial you performed?

12   A.    This was the Phase II trial, MRI based study.

13   Q.    Who was the lead investigator on that trial?

14   A.    This was Dr. Cohen.

15   Q.    Can we refer to that as the Cohen study?

16   A.    Yes.

17   Q.    What was the primary end point for the study?

18   A.    We looked at reduction of lesions of the MRI at seven,

19   eight and nine months after initiation of treatment.

20   Q.    What is the significance of a primary end point in a

21   clinical study?

22   A.    Usually, the primary end point reflects the primary

23   goal of the study, what you want to show in the study.  And

24   you power the study to this primary end point.

25   Q.    What do you mean by power the study to the primary end

Klinger- direct

1    point?

2    A.    You build a sample size, which is adequate to show the

3    effect that your hypothesis is expecting to see.

4    Q.    How many patients were enrolled in the Cohen study?

5    A.    We enrolled around 90 patients that were in two

6    treatment groups.

7    Q.    Who was that number of patients chosen?

8    A.    The Cohen trial was powered to do show 60 percent

9    difference between the 20 and the 40 milligram dose in favor

10   of the 40 milligram in reduction of MRI lesions.

11            So under this assumption, that the 40 milligram

12   would show 60 percent better efficacy compared to the 20

13   milligram, the statisticians claimed the number of about 45

14   patients needed per arm.

15   Q.    What did you mean by assumption in that last answer?

16   A.    When you plan a study, you need to have a hypothesis

17   or primary assumption, what would be the difference between

18   the groups.  Then you have to do a statistical calculation

19   to see what should be the sample size of the group in order

20   to show that effect, if it exists.

21   Q.    What were the results of the Cohen trial with respect

22   to the primary end point?

23   A.    The primary end point showed superiority of the 40

24   milligram by 38 percent, compared to the 20 milligram.

25   Q.    Did the primary end point reach statistical

1   significance?

2   A.    No.

3   Q.    So was that considered to be a failure?

4   A.    Yes.

5   Q.    What did the Cohen study find with respect to adverse

6   events?

7   A.    We found that the 40 milligram dose was safe, like the

8   20 milligram dose, but there were tolerability issues,

9   patients that were treated with the 40 milligram dose

10  complained more frequently, and/or more severe injection

11  site reactions.

12  Q.    What did Teva do after the results of the Cohen study?

13  A.    We looked at the data.  And we thought that this study

14  is encouraging, although at this time did not meet the

15  primary end point.

16  Q.    Why was it encouraging to Teva?

17  A.    Because we saw that a 38 percent difference between 40

18  to 20 Milligram.  For us, we thought if we can reproduce

19  these results in a large clinical trial, this would be a

20  great improvement compared to the 20 milligram Copaxone.

21  Q.    Did Teva do anything else in response to the results

22  of the Cohen study?

23  A.    We looked carefully at all other end points in the

24  study.  We looked at the additional MRI end points.  We

25  looked at clinical end points.  We saw that the data goes in

Klinger- direct

1    the same direction.  Many MRI clinical end points that were

2    collected in the study showed that 40 milligrams had a

3    favorable effect.

4    Q.    Did Teva file any patent applications as a result of

5    Cohen?

6    A.    As far as I know, yes.

7    Q.    Did Teva decide to proceed to a Phase III trial?

8    A.    Yes.

9    Q.    What was the name of that trial?

10   A.    This was the FORTE trial.

11   Q.    What was the primary end point of FORTE?

12   A.    FORTE was designed to be a Phase III clinical trial.

13   And the primary end point was reduction in relapse rate,

14   which is a clinical end point.

15   Q.    How big was the trial?

16   A.    This trial was also around a thousand patients.

17   Q.    How long did it last?

18   A.    Patients were treated for one year.

19   Q.    How was that number, a thousand patients, selected?

20   A.    The study was powered to show superiority of the 40

21   milligram versus the 20 milligram by 30 percent in reduction

22   of relapse rate.

23   Q.    So was the FORTE trial powered to show a lower

24   difference between the 40 and 20 milligrams arms than the

25   Cohen study had been powered for?

Klinger- direct

1    A.    Yes.  And a different end point.

2    Q.    Was the FORTE trial successful?

3    A.    No, unfortunately not.

4    Q.    When you say unfortunately not, did it fail the

5    primary end point?

6    A.    The product failed the primary end point.  We could

7    not demonstrate the superiority of the 40 milligram daily to

8    20 milligram daily.  Again, this was after we had a Phase II

9    trial which showed promising results on both MRI end points

10   and good trends in clinical end points.  And we were very

11   hopeful that the clinical study, the Phase III study, would

12   be successful.

13   Q.    What did the FORTE trial show in terms of adverse

14   events?

15   A.    The trial showed again that the 40 milligram daily

16   dose is safe like the 20 milligram daily dose, but there

17   were more complaints on injection site reactions, the

18   frequency and severity.

19   Q.    With which dose?

20   A.    With the 40 milligram.

21   Q.    What happened after the FORTE trial failed?

22   A.    After the FORTE trial failed and the TV-5010 project

23   closed, we were thinking, where are we going from here?

24   What are the options for us, to develop an improved product.

25   Q.    After the FORTE trial, what was the thinking about the

Klinger- direct

1    40 milligram product?

2    A.    We thought that this is, it's a dead formulation

3    because we could not use it for increased efficacy.

4    Q.    What happened to the patent application that had been

5    filed on the 40 milligram?

6    A.    It was abandoned.

7    Q.    How long did Teva work on the 40 milligram daily

8    project?

9    A.    We started it in 2002.  And I think that the FORTE

10   trial results were available in 2008.  So, again, around six

11   years.

12                THE COURT:  Let's take an hour lunch.

13                (Luncheon recess taken.)

14                MS. HOLLAND:  May I proceed?

15                THE COURT:  Yes, ma'am.

16   BY MS. HOLLAND:

17   Q.    Dr. Klinger, before the lunch break, you had been

18   talking about the failure of the FORTE trial and the

19   abandonment of the 40 milligram daily project.  What did

20   Teva do after the failure of FORTE?

21   A.    So we started to think, so where are we going from

22   here, what are the options for us, and we evaluated

23   different potential development programs, other development

24   programs.

25   Q.    Are you familiar with something called the half ml

Klinger- direct

1    project?

2    A.    Yes.

3    Q.    What was that?

4    A.    This is a project that we wanted to check the

5    possibility to administer the 20 milligram dose, instead of

6    a volume of 1 ml, in 0.5 ml.

7    Q.    Can you explain what you mean by that?

8    A.    The Copaxone 20 milligram, the 20 milligram active

9    material is dissolved in one ml of water.  And the full one

10    ml is injected into the skin.  And the assumption was that

11    when you inject a large volume, this is probably the reason

12    why you have injection site reactions and pain.

13          So we thought if we can have the same 20

14    milligram in half of the volume, and inject only half ml

15    under the skin, this might be a more tolerable formulation,

16    and for that purpose we used the 40-milligram dose in one ml

17    and we took half an ml of it.

18          So it included 20 milligrams in half an ml.

19    Q.    When you say you used the 40 ml, 40-milligram dose, do

20    you mean the formulation from the FORTE trial?

21    A.    No.  We used the solution of 40 milligrams per ml, and

22    we dispensed only half of it into the syringe.  So we had 20

23    milligrams in half a ml.

24    Q.    Did Teva request approval from the FDA to market that

25    half ml product?

Klinger- direct

1    A.    We supplemented the data that we had on this

2    formulation to the FDA, and we requested that this

3    formulation would be approved.

4    Q.    Was the change to the half ml approved by FDA?

5    A.    No.

6    Q.    Can we see PTX-95, please.

7              What is PTX-95?

8    A.    This is a letter we received from the FDA in response

9    to the supplemental NDA on the half ml.

10   Q.    What did Teva understand from the letter about FDA's

11   position on the half ml product?

12   A.    Maybe if you can go down to the last paragraph.

13   Q.    On the first page?

14   A.    Yes.

15   Q.    That is PTX-95.1.  The last paragraph, please.

16   A.    Yes.  We thought that this is a straightforward

17   change, that we didn't change the dose, we didn't change the

18   frequency of injection.  We just changed the volume.

19             We thought that with a pilot study we did that

20   showed that the injection site reaction looks good, this

21   will be sufficient to get the product into the market.

22             However, the FDA wrote us that the uncertainty

23   about the glatiramer acetate mechanism of action and the

24   fact that some of the effect may be related to activation of

25   lymphocytes in the periphery.

1   Q.    What does that mean, activation of lymphocytes in the

2   periphery?

3   A.    This is what I explained before, when you inject at

4   the site of injection, you have immune cells, lymphocytes,

5   that are activated by interaction with the drug, raise

6   questions about a possible impact of a higher

7   concentration/lower volume formulation on the safety and

8   efficacy of the product.  While the SONG study, the SONG

9   study is a clinical trial that we conducted with a half an

10  ml versus one ml to see the safety and injection site

11  reaction -- while the SONG study provides reasonable

12  short-term safety information, it is inadequate to support

13  efficacy of the new formulation.

14  Q.    What was your understanding of what the FDA was saying

15  about the half ml product?

16  A.    My understanding was that the FDA considered this

17  change in the volume as an attribute that can impact the

18  efficacy of the product.  And they wanted efficacy, a trial

19  that would show that the efficacy of the product was not

20  impaired, although the dose remained the same and the

21  frequency of injection remained the same.  They didn't take

22  it light that the change in the volume is not going to

23  impact the immunoresponse.

24  Q.    How long did Teva work on the half-ml project?

25  A.    I think altogether, we worked on it about two years.

Klinger- direct

1    Q.    We can take PTX-95 down.

2          Can we put on the screen PDX Demonstrative 2.2.

3    Thank you very much.

4          Dr. Klinger, I have put up on the screen a

5    demonstrative.  Is this an accurate summary of the failures

6    in reference to improving the 20 milligram daily Copaxone

7    product that you testified about so far today?

8    A.    Yes.  This is summarizing the story we discussed

9    before, starting with CORAL and PROMISE studies, and

10   continuing with the TV-5010, the DEPOT and FORTE

11   formulation, the 40 milligram studies, and finally, the

12   SONG.

13   Q.    Dr. Klinger, did you eventually discover a way that

14   would improve Copaxone?

15   A.    Yes.

16   Q.    What was that discovery?

17   A.    The discovery described the treatment of 40 milligram

18   three times a week is effective and safe.

19   Q.    When did you make that discovery?

20   A.    At the time we were thinking, what are we going to do

21   about the trial failure, we were starting to think about

22   different approaches.  And it was not just thinking, because

23   at the time that we developed TV-5010 and the 40 milligram

24   dose, we did a lot of preclinical studies, and in my

25   position, over the years, I was exposed to a lot of

1      information, starting from the analytical information, the

2      chemistry of the product.  Later on I was a project leader

3      on several projects, so I saw all the data that was coming

4      from clinical, from preclinical, regulatory information,

5      publications, scientific publications, and the information

6      that we gathered on TV-5010 and GA.

7              I looked at all of the data and put all the

8      pieces of information that I had in my mind, and tried to

9      think, so what would be the next hypothesis, our next

10     working hypothesis, how to continue and what are we going to

11     do next, what would be the best next step.

12     Q.    What was your hypothesis about the 40 milligram three

13     times a week regimen?

14     A.    My hypothesis was that, my working hypothesis was that

15     the treatment with high dose, with 40 milligram dose three

16     times a week would provide good safety and tolerability

17     resulting in higher efficacy of the product.

18     Q.    You testified earlier that the FORTE clinical trial

19     showed that the 40 milligram dose daily is no better than

20     the 20 milligram dose daily.  Given that result, why did you

21     decide to use a 40-milligram dose after FORTE?

22     A.    I knew from immunological studies that we did in our

23     labs that the fact that you have 20 and 40 look similar in a

24     daily dosing does not necessarily mean that if you will

25     change the frequency that we have the same effect.  So this

Klinger- direct

1    was one of the things that Copaxone opened my eyes from the

2    immunological studies.  I saw that immunologically the

3    response can be different if you treat the same two doses

4    daily versus less frequently.

5    Q.    I want to focus on the specific data that led you to

6    this hypothesis, what you called, your working hypothesis

7    about the 40 milligram three times a week regimen.  What

8    data did you consider?

9    A.    I considered the in-vivo and in-vitro studies, and the

10   immunology studies that we had, the preclinical studies that

11   we had.

12   Q.    Can you categorize those, the data that you looked at

13   to support your hypothesis?  What were the elements of the

14   data that you looked at?

15   A.    I looked at the biological activity and the

16   immunological responses in preclinical studies.

17   Q.    Is there a place where that data is gathered?

18   A.    We summarized this information in the investigator's

19   brochure for TV-5010.

20   Q.    Can we please see PTX-151.

21         What is this document, Dr. Klinger?

22   A.    This is a regulatory strategy meeting that was held in

23   Horsham, in the U.S.  It was related to the TV-5010.

24   Q.    Did you attend this meeting?

25   A.    Yes.

Klinger- direct

1    Q.    You have mentioned an investigator's brochure for

2    TV-5010.   If you look at the first page, you see that the

3    Attachment 3, the investigator's brochure.   Is that what you

4    were referring to?

5    A.    Yes.

6    Q.    Let's go to Page 151.8, then.   What is an

7    investigator's brochure?

8    A.    This is a document that we put together all the

9    information that was available on the product.   And usually,

10   when we started a clinical study or submit it to regulatory

11   authorities, a request to initiate the study, we provided

12   them with the investigator brochure that contained the

13   product information.

14   Q.    Can we go to 151.33.   This page says Section 4.

15   Clinical studies.   What is described in here, Dr. Klinger?

16   A.    This is a summary of the preclinical data that we had

17   at that time.

18   Q.    Who developed the models and assays that were used in

19   the experiments that are in the non-clinical study of the

20   investigators brochure?

21   A.    Some of the models were developed by me at the time in

22   the immunological lab.   Later on, our internal pharmacology

23   team developed additional methods, and they would test the

24   product.

25   Q.    Which of the experiments in this Section 4 formed the

1   basis of your hypothesis about the 40 milligram three times

2   a week regimen?

3   A.      There were two sets of experiments.  The first set of

4   experiments is described in Figure 2, I believe.

5   Q.      That's Page 151.36?

6   A.      Yes.

7   Q.      Can you please describe the experiment that's

8   reflected in Figure 2?

9   A.      I will just express this set of experiments in one

10  sentence and say that the experiments that I want to show,

11  now, these were the basis of the understanding that we got

12  that when you have in your mixture peptides with higher

13  molecular weight you get better potency.

14          So this is the first experiment that we did in

15  the lab where one of the questions was, are we needing it

16  actually, all the peptides that we have in the mixture?  We

17  have a lot of them.  Are they all needed for the biological

18  activity of the drug?

19          And in order to address that, we divided the

20  mixture into fractions, meaning we divided them into small

21  groups.  We divided the mixture into small groups.  Each

22  group we called a fraction.  And we divided them according

23  to their chemical properties, and the most important one was

24  the molecular weight of the peptides.

25          Then, when we had, instead of the whole mixture,

1      we had separate fractions of the mixture, we tested the

2      biological activity of each mixture.

3      Q.      Did you mean each fraction?

4      A.      Each fraction, sorry.

5              So we had Fraction No. 5, which included mainly

6      low molecular weight peptides, short peptides, short

7      fragmental peptides, running up to Fraction 11, which had

8      the longest, the highest molecular weight peptides.

9              And we tested the biological activity of each

10     fraction in the in vivo model for MS.  This is the EAE model

11     that I described before, in this model we inflict the mice

12     with the MS like disease, and we treat them with each one of

13     the fractions.

14             And on the y axis, you can see the percent

15     activity of each fraction.  In the x axis you see all the

16     fractions that we had.  And you see it very nicely, that the

17     longer the molecular weight of the peptides in the fraction,

18     the better activity we get.

19             So peptides -- or mixtures in Fractions 10 an 11

20     which had the highest molecular weight had the highest

21     activity.

22             We also looked at the biological activity of the

23     fractions on immune cells.

24     Q.      Is that Figure 3?

25     A.      This is Figure 3.

1    Q.      That is also Page 151.36.  What is described on Figure

2    3?  What is the experiment that we see here?

3    A.      This is an ex-vivo study, in-vitro study, where we

4    took immune cells and we cultured them.  These immune cells

5    were taken from animals that were purposely treated with GA,

6    with glatiramer acetate.

7             So when they were treated with GA, were

8    immunized with GA, in their spleen cells, there were immune

9    cells that recognized GA because they were immunized with

10   the drug.

11            So we took the spleen cells of these animals and

12   we cultured them.  When you culture cells that already had

13   the interaction with your drug and you interacted in the

14   vitro again, they start to make signs that they recognize

15   this product, because they saw it before.  The animals were

16   immunized with that drug.

17            The sign for us that the cells recognized the

18   material was by measuring a cytokine protein that they

19   secrete into the culture media, interleukin 2.

20            If the cells do not recognize the peptides, it

21   means that, if they do not secrete IL2, it means they do not

22   recognize the fraction .  They do not recognize the peptides

23   in the fraction.

24            We see here the same fractions, where we tested

25   their potency in the in-vitro potency test, and these are

Klinger- direct

1    cells taken from mice, immunized with GA.  We see when we

2    expose the cells to peptides in Fraction 5 and 6, which,

3    again, are peptides with low molecular weight, they are

4    short peptides, we get almost no response of the cell.

5    However, with the other fractions, by going up with the

6    molecular size of the peptides in the fraction, we get a

7    stronger response of the cell, and they secrete more IL2.

8              Here again is another demonstration, an in-vitro

9    system, that the higher molecular weight you have in the

10   mixture, the more potency you get.  And we saw it first in

11   the EAE model, in the in-vivo model, then we saw it in the

12   in-vitro model.

13   Q.    Dr. Klinger, let's move to Figure 4.  Can we put that

14   up on the screen, please?  That is on Page 151.37.

15             Is this one of the experiments that you looked

16   at to support your hypothesis about the 40 milligram three

17   times a week regimen?

18   A.    This is one of the experiments.

19   Q.    Can you describe it, please?

20   A.    So while the experiments that I described in Figure 2

21   and 3 were done with fractions of GA, we decided, let's try

22   and prepare batches with increasing molecular weight, with

23   increasing average molecular weight.

24             This is for more fractions of GA.  These are

25   actually batches that we produced.  And they differ from

Klinger- direct

1    each other by their molecular size.

2            In the figure legend, you can see that we had a

3    control, which is no treatment.  We have a Copaxone

4    reference standard, where the molecular weight, average

5    molecular weight of the reference standard was 7.5

6    kilodalton, we had batches with increasing molecular size

7    from 12.6 to 23.4 kilodalton.

8            And we went again into the EAE model.  In this

9    model we treated, again, the sick animals with GA or with

10   batches with increased molecular weight, where we used the

11   one dose, 25 microgram, which is a separate dose, because we

12   wanted to see differences.

13           If we go to the left column --

14   Q.    What is on the y axis, before you go on?

15   A.    On the y axis, this is the mean maximal score.  This

16   is the score that we used to record the severity of the

17   disease in the animals.  The higher the score, the more

18   severe is the disease.

19           Usually, Score 5, the mice are dead.  And, in

20   the y axis, we see the different activity, the maximum

21   severity in the group that was treated in each of the

22   batches.

23           We see here that animals that were treated with

24   just buffer or water had a very severe score of 4.5.  When

25   we injected the mice with reference standard of GA with a

Klinger- direct

1    suboptimal dose, we got somewhat better, 4.2 or 4.3.

2    However, you see a nice reduction in the severity score as

3    you go up with the molecular size of the batches.

4              You see the green batch, which is 15.5

5    kilodalton, and the batch with 20 kilodalton, had the best

6    reduction.  And if we go too high, then go we get a reverse

7    of the effect that animals do not feel good with very high

8    molecular weight.

9              So this was another demonstration.

10   Q.    Dr. Klinger, that reverse effect that you just

11   testified about, as you go up in molecular weight, does that

12   relate in any way to the graph that we had you draw earlier?

13   A.    It could be.  I don't know the reason for that.

14   Q.    But in both cases was there an increase that caused

15   actually a decrease in activity?

16   A.    We see here, when we increase too much, the molecular

17   weight, we start to get more severe disease.

18              So if we look at the left side, we see very nice

19   correlation or relationship between the molecular size of

20   the batch and the reduction in the severity of the disease.

21   Q.    Dr. Klinger, what did you take away from these

22   experiments that you just discussed with respect to your

23   hypothesis about the 40 milligram three times a week regimen

24   being able to be more tolerable without sacrificing

25   efficacy?

Klinger- direct

1   A.      I believe the picture would help me to explain it

2   best.

3   Q.      Is that Figure 6?

4   A.      Yes.

5   Q.      Please describe what we see on Figure 6?

6   A.      So in Figure 6, we took a high molecular weight batch,

7   and we tested its activity in the EAE model, the disease

8   model.  And we wanted to look at the dose-response

9   relationship of this batch of the high molecular weight

10   batch.  And we were happy to see this dose-response

11   relationship, and we found out that with 125 UG of high

12   molecular weight batch, we can get the same activity, like

13   we get with GA, with double the dose.

14              So when I looked at these results, we said, the

15   obvious conclusion was, yes, TV-5010 is more potent.  But

16   when I looked at it, I asked myself, why should we develop

17   TV-5010?  Maybe we should just adjust the dose of GA and we

18   get better frequency.

19              What is the reason for that?  My understanding,

20   based on my understanding of the chemistry of the mixture,

21   is that with GA, we have an average molecular weight of 7.5.

22   But we do have, also, high molecular weight and low

23   molecular weight peptides.  The average is between five to

24   nine.  But we have, also have a peptide in the lengths of 15

25   kilodalton and 20.

Klinger- direct

1            So if you would just double the dose, I will

2       double the amount of also the high molecular weight peptides

3       that I am injecting.

4            So as the head of development, I asked myself,

5       when I saw this experiment and other experiments, I said,

6       okay, TV-5010 is more potent but I can achieve the same

7       effect if I can double the dose of GA.  Maybe by doubling

8       the dose I would inject more high molecular weight peptides.

9       And by that I will get the same increased efficacy.

10      Q.   Dr. Klinger, were there experiments that are in this

11      investigator's brochure that also helped inform your

12      hypothesis about the 40 milligram three times a week

13      regimen?

14      A.   Yes, there are additional experiments presented on

15      Figure 7.

16      Q.   Figure 7 is on Page 151.40.  Can you please describe

17      the experiment on Figure 7?

18      A.   In Figure 7 we used an animal model, an additional

19      animal mode, we will call it a glutamate toxicity model.

20      Because there were literature publications suggesting that

21      MS is an inflammatory and neurodegenerative disease in which

22      nerve cells are undergoing changes and died, the question

23      that we asked ourselves, with Copaxone, or glatiramer

24      acetate, is the mechanism of action only dealing with

25      inflammation or it has also a neuroprotection?  Doesn't it

Klinger- direct

1    induce any mechanisms that prevent the cells from dying?

2              These are two distinct mechanisms, that can go

3    together or maybe the drug is working on one of them.

4              One of our ways to learn about it was to develop

5    a model, we developed it with a group at the Weitzman

6    Institute, for neuroprotection.  In this model we induced a

7    death of neuronal cells in the retina of the eyes.

8    Q.    What are neuronal cells?

9    A.    Neuro cells.  When we wanted to learn about that neuro

10   protective effect of the drug, we measured how much neuronal

11   cells were protected in the retina after treatment with the

12   drug.

13             So the experiment that is described in Figure 7,

14   we had three treatment groups.  We had a group of animals

15   that were treated with buffer, just water and salt.  We had

16   a group that was treated with GA, and a group that was

17   treated with a high molecular weight batch of TV-5010.

18             Animals were treated once weekly for nine weeks.

19   And then, after nine treatments, we injected the toxic

20   material, this is the glutamate, into the brain.  And this

21   toxic material induced -- it goes into the retina and caused

22   the death of the neuronal cells.

23             What we can see here in the control group that

24   was treated with just buffer, we see that on average, less

25   than ten percent of the neuronal cells in the retina were

Klinger- direct

1     protected.  More than 90 percent of the cells died weekly.

2     Treatment with GA induced about 30 percent protection.

3            However, weekly treatment with the high

4     molecular weight batch induced more than 50 percent

5     protection of neuronal cells.

6            What I learned from this experiment was, that if

7     you have more -- a high molecular weight peptide in your

8     batch, in your preparation, you can probably go with a less

9     frequent injection and get good effect.

10    Q.    Can we put Figure 8 on the screen, please.  151.41.

11    Dr. Klinger, can you describe the experiment that we see in

12    Figure 8?

13    A.    This is an immunological experiment that we conducted

14    ex-vivo.  Namely --

15    Q.    Doctor, what do you mean by ex-vivo?

16    A.    I will explain.  We immunized mice with either GA or

17    TV-5010, and after ten days, we took out the spleens of the

18    mice that were immunized, we cultured them, and incubated

19    the cells with immune -- with GA or TV-5010 to see if the

20    cells in the spleen recognized these immunizing agents.

21           After immunization, we took the spleens from a

22    set of mice after one day, after three days, and after seven

23    days.  In this kind of experiment, we wanted to learn, after

24    you inject the animal with GA or of the 5010, how long it

25    takes for the immune response to kick in and how much -- how

Klinger- direct

1    long it is sustained.

2              In this kind of experiment, we were interested

3    in immune response, because we wanted to know whether, for

4    example, if we inject on day one, can we get an immune

5    response and sustain it for a week?  Maybe this would

6    suggest that weekly injection can be sufficient.

7              When we did this set of experiments, we learned

8    that when we inject and take the spleen cells after one day,

9    we have a very small limited response.  But on Day 3, we got

10   the peak immunoresponse.  And after seven days, it is going

11   down.  We still see some, but it is much less.

12             This experiment and others like this like we did

13   teach me that maybe the immunoresponse after one injection

14   can be sustained more than 24 hours.  And maybe this is

15   another indication that we can potentially treat the patient

16   with less frequent injections because the immune response

17   doesn't eliminate within 24 hours.

18   Q.    Did Figure 8 support your hypothesis that it could be

19   given, 40 milligrams could be given three times a week?

20   A.    Yes.  This kind of experiment supported my hypothesis

21   that three times a week can potentially be feasible.

22   Q.    Were there any additional preclinical tests that

23   influenced your thinking about a 40 milligram three times a

24   week regimen?

25   A.    Yes, there were additional experiments where we tried

Klinger- direct

1    to explore the immune response after different dosing

2    regimens.

3    Q.     Can we look at PTX-83?

4            MR. RAKOCZY:  Your Honor, may I please request a

5    sidebar?

6            THE COURT:  Sure.

7            (The following took place at sidebar.)

8            MR. RAKOCZY:  Your Honor, I want to follow up.

9    I understand Your Honor's prior ruling on the testimony, and

10   I didn't see anything about the last document.  The

11   interrogatory response identified 11,000 pages to look to

12   for the invention story.  The last document and this

13   document are not in that 11,000 pages.

14           I at least want to renew that objection and put

15   a standing objection on the record.  If Your Honor's prior

16   ruling was meant to overrule that as well, I wanted clarity.

17           THE COURT:  This is the first I am hearing of

18   this.  I hope that my prior ruling was clear.  Essentially,

19   what I meant to rule was you waived your opportunity to

20   object by not following my process.  I think that's clear.

21   But a different subject.

22           MR. RAKOCZY:  This objection goes to the

23   interrogatory answers as Your Honor noted earlier, it says

24   that the invention story will be given through deposition

25   discovery including a 30(b)(6).  Then it says the answer may

Klinger- direct

1    also be derived or ascertained from business records.   Then

2    it identifies three ranges of business records.

3              The prior document -- and I don't have the

4    number --

5              THE COURT:  Was among them?

6              MR. RAKOCZY:  -- was not among them.

7              THE COURT:  The one we are talking about now.

8              MR. RAKOCZY:  And the prior one were not amongst

9    these ranges.

10             THE COURT:  Which figure was that?

11             MR. RAKOCZY:  All those figures we just marched

12   through.

13             MS. BLOODWORTH:  That 150-page document.

14             THE COURT:  This is just occurring to you?

15             MR. RAKOCZY:  No, Your Honor.  I wasn't sure if

16   we were going to march through every single document in the

17   book.

18             THE COURT:  We should talk about it while you

19   are here, those that were not among the documents.

20             MR. RAKOCZY:  I just checked the witnesses book

21   again.  Other than some of the patents themselves, none of

22   them are inside these thousand-some odd pages.

23             MS. HOLLAND:  Can I be heard, Your Honor?

24             THE COURT:  Yes.

25             MS. HOLLAND:  I think we are running into the

Klinger- direct

1    same issue earlier with accurate reading of what was said.

2    What we said was we were going to give a 30(b)(6) deposition

3    that was going to go into as much detail as defendants

4    wanted about the invention story.  We said that the answer

5    could be derived from business records, including you, and

6    we gave a list and we said that the burden of ascertaining

7    the answer is substantially the same for defendant as it is

8    for Teva.

9              In other words, you know, they can -- we went

10   into the discovery to find the right documents with Dr.

11   Klinger.  Defendants /SKPWAOGT documents themselves as well

12   to find the right documents.

13             Dr. Klinger at her deposition --

14             THE COURT:  As an aside, why are you saying the

15   burden was equal?  It's your story, it's Teva's story, not

16   the defendants'.  Why is their burden equivalent to going

17   through numerous documents?  How do you get to that?

18             MS. HOLLAND:  What I would say, Your Honor, is

19   there was a huge amount --

20             THE COURT:  To interrupt, why not just say to

21   the other side, when they produce an interrogatory like

22   that, here is what we are relying on, we are confident in

23   our story.  Why not?

24             MS. HOLLAND:  I will answer that, Your Honor.

25   Because we thought the best way to get at this information

Klinger- direct

1    was at the 30(b)(6) deposition.

2              THE COURT:  I get that.

3              MS. HOLLAND:  That's exactly what we said here.

4    When we gave that answer, we didn't hear any objection, we

5    didn't hear any problem on it.

6              THE COURT:  Because you gave them a universe of

7    documents.  Perhaps they didn't know.  I don't want to put

8    words in their mouth --

9              MS. HOLLAND:  Your Honor, maybe I can make this

10   a little more direct.

11             So TV-5010 is what we are talking about now.

12   There was a 30(b)(6) deposition that defendants noticed on

13   the topic of TV-5010.  Obviously, defendants knew that was a

14   big issue in the case.

15             We put up a witness on of the TV-5010 named Dr.

16   Pinchasi.  Defendants did not ask her one question about

17   TV-5010.  That was the 30(b)(6) testimony.  They were free

18   to ask that witness.  They were free to ask Dr. Klinger, who

19   gave a lot of testimony about TV-5010 AT her deposition, a

20   lot of testimony.  She testified specifically that she

21   relied on immunological tests from clinical data.

22             We are getting back to the same issue we were at

23   the morning where there was no followup questions.  There

24   was no question, can you tell me which immunological data

25   you looked at.

Klinger- direct

1              Discovery is a big process.  It is not just in

2    interrogatories.  It's interrogatories, it's documents, it's

3    depositions.

4              THE COURT:  This is the most expensive part of

5    any case.  I understand that.

6              MS. HOLLAND:  So by them asking for a 30(b)(6)

7    witness on TV-5010, they obviously identified it as an issue

8    in the case.  These are clearly documents related to

9    TV-5010.  These are documents they could have asked Dr.

10   Ben-Hazem about, who was the 30(b)(6) witness.  They chose

11   not to ask a single question on it.

12             I feel somewhat like the burden of discovery is

13   being solicited a little bit.  A deposition is for defense

14   to ask the questions they want to ask.  They didn't ask the

15   questions.  We weren't holding back at the deposition.  We

16   had two days, Your Honor.

17             THE COURT:  I will let Ms. Bloodworth speak.

18   Isn't discovery supposed to be a cooperative endeavor

19   between the parties?

20             MS. HOLLAND:  Yes, Your Honor.

21             THE COURT:  Where you ask for something, you

22   want production of documents so you can later do a

23   deposition?

24             MS. HOLLAND:  Yes.

25             THE COURT:  In a cooperative way?

Klinger- direct

1           MS. HOLLAND:  Yes.

2           THE COURT:  They ask you for documents, and you

3    sort of gave them one universe of documents.  They are

4    complaining, well, you know -- you tell them it's equally

5    burdensome for us as it is for you to discover our story.  I

6    am curious about that.

7           MS. HOLLAND:  I understand what you are saying,

8    Your Honor.  What I will say is, we were at a deposition

9    whereby they could have tried to figure out what the right

10   documents were.  They didn't even ask what experiments --

11   forget the documents for a second.  They didn't even ask

12   what experiments she relied on.

13          When you get an answer at a deposition that is

14   related on immunological preclinical data, clinical data,

15   different testing that we did, it seems to me that it would

16   be incumbent on the person taking the deposition to say,

17   What?  It's a simple question:  What?

18          And, I would add, it was the last question of a

19   two-day deposition.  If that would have been the first the

20   first question and Ms. Bloodworth would have said can you

21   please identify more particularly what documents you are

22   talking about, we would have done that.  But when it comes

23   as the last question of a two-day deposition and no

24   followup, there is really no opportunity to do anything with

25   that.

Klinger- direct

1              MS. BLOODWORTH:  I asked about six or seven

2    times.

3              THE COURT:  What?

4              MS. BLOODWORTH:  The story of her invention, how

5    did she come about her invention, what did the invention

6    mean?

7              They produced more than 1.6 million pages of

8    documents.  And I walked into that deposition with a

9    narrowed down 11,000 page range out of 1.6 million.

10             THE COURT:  How did you narrow --

11             MS. BLOODWORTH:  We looked at the 33(d).  We did

12   name searches for the name.  It's a one --

13             THE COURT:  Why didn't you come to the Court

14   before that deposition?

15             MS. BLOODWORTH:  Your Honor, it was all related

16   to the patent, and that was what I thought she would be

17   talking about.  It was all related to the patent and the

18   patent prosecution histories and everything and that's what

19   we did on the deposition.  This was not until we saw their

20   proposed findings of fact for trial that we realized she was

21   going to go well beyond what it was, the documents that they

22   relied on and that we tried to identify to mark as exhibits,

23   and we marked many.

24             THE COURT:  Did we discuss this during the

25   pretrial conference?

Klinger- direct

1          MS. BLOODWORTH:  Yes, we did.  We brought a

2     motion in limine on that.

3          THE COURT:  Remind me of my ruling on this.

4          MS. BLOODWORTH:  You wanted us to defer until

5     you saw how the evidence was going to go in.

6          MR. RAKOCZY:  Can I clarify one point?

7          THE COURT:  Yes.

8          MR. RAKOCZY:  I want to make sure we are not

9     ships passing IN the night by re-raising this objection.  I

10    am no re-raising the technical testimony objection.  I

11    understand you said we could take her dep.

12          I am raising the step that we asked for an

13    invention story, they said it is in these 11,000 documents.

14    Now the story is being told in the document not found in

15    that range.

16          THE COURT:  That is what I understood, to dial

17    back, you are right.

18          I interrupted you, had you finished.?

19          MS. BLOODWORTH:  I was making the point that we

20    did mark many, many.  We did a due diligence.  And Teva

21    never supplemented that hour-and-a-half deposition to say

22    this is what we are going to focus on because we would have

23    served more discovery and we would have called her back.

24          THE COURT:  Mr. Rakoczy is correct.  He is

25    trying to refocus the discussion on the objection.

1              MS. HOLLAND:  What I was going to say is there

2      is no way you could have sat through the deposition with the

3      documents here and thought, there is nothing else -- for me

4      to learn, there is just no way to sit through the deposition

5      of Dr. Klinger and hear her talking about all these things

6      and not know right then and there are other documents that

7      they should be asking about.

8              And I will say, Your Honor, they did do a

9      document search for Dr. Klinger.  What they chose to ask Dr.

10     Klinger about at her deposition was not the science.  It was

11     all this life cycle management stuff that I bet you are

12     going to see or I imagine you are going to see on

13     cross-examination.

14              It was a tactical decision that they don't care

15     about the science.  They wanted to talk about life cycle

16     management.  We had two days of that.

17              Then after all that, to say we didn't disclose

18     the invention.

19              THE COURT:  To respond to Mr. Rakoczy's

20     question, your response is, regarding -- I forget the

21     document number.

22              MR. RAKOCZY:  The response to Interrogatory 11

23     which identifies an 11,000-page range and the last two

24     documents are not in it.

25              MS. HOLLAND:  My response is that does not say

Klinger- direct

1  it's -- it does not say anywhere in there that it's a

2  complete list of all the documents.  It says, these are some

3  documents and you are free to take a deposition to discover

4  the rest of the information.  We didn't get an objection to

5  that.  It doesn't say these are all the documents.  It

6  doesn't.

7          If we would have heard something at the

8  deposition, if Ms. Bloodworth had come to me at the

9  deposition and said, I am hearing about all these

10  immunological tests that Dr. Klinger is testifying about, I

11  didn't see that in that 11,000 pages, is there something

12  else, I would have worked with Dr. Klinger overnight to make

13  sure she had the documents.

14          To ask the question on the last day of the

15  deposition, the last moment of the deposition, and not ask

16  any followup, I really believe we are prejudiced by that.

17          MS. BLOODWORTH:  I have to object to that

18  characterization.  I asked Dr. Klinger about the mechanism

19  of action repeatedly in her deposition.  I asked her for her

20  invention story many times.  I asked her twice at the end of

21  her deposition, to make sure we got it right.  And I was out

22  of time.

23          Ms. Holland was pulling Dr. Klinger out at the

24  seventh hour.

25          We were very patient and we were very thorough.

Klinger- direct

1    But to have served an interrogatory for business records

2    that would identify the story of the invention, get 11,000

3    pages and then for trial get documents that don't overlap

4    with those at all, it's their story of the invention, they

5    produced 1.6 million pages, that's almost impossible for me

6    to get into the minds of Dr. Klinger and find discrete assay

7    testing on a product that's not GA.  This is not GA.

8            MS. HOLLAND:  As I said --

9            THE COURT:  Had you finished?

10            MS. BLOODWORTH:  Yes, Your Honor.

11            MS. HOLLAND:  Let's focus on than TV-5010 for a

12    minute.  There was a 30(b)(6) topic.  They knew TV-5010,

13    they knew it was important to the case.  I can show you

14    there was a 30(b)(6) deposition topic asking for information

15    about that very topic.

16            Now, this takes it out of what Ms. Bloodworth is

17    talking about.  There was a narrow set of documents to look

18    at, the TV-5010 documents they knew were important.

19            THE COURT:  Here is what I am going to do.  It

20    gives me an opportunity to revisit my earlier ruling.  What

21    I am going to do is, I am going to listen to the testimony,

22    and I will let her use the document subject to this matter

23    being briefed separately at the time you submit proposed

24    findings and conclusions, unless you don't want to brief it,

25    if you choose not to, I am not ordering you to brief it.

Klinger- direct

1    But if it evolves over the course of this trial, Ms.

2    Bloodworth and Mr. Rakoczy, that this is important enough an

3    issue that you are not satisfied with my solution, then you

4    have leave to brief the issue.  Just remind me so I don't

5    strike it, that you want to do that.

6              But I think it would be unwise of me at this

7    stage -- you are asking me to go back in a way that is

8    really unfair to the Court, to try to untie a knot that is

9    pretty tightly bound at this point.  It's difficult to get

10   in between the two of you and know who has the right and

11   wrong of this.  Maybe during the course of trial it will

12   reveal itself to me.  Maybe you will be able to bring

13   further light later on and really tell me, either side, if

14   you are you are calculating prejudice, how are you being

15   prejudiced, I can evaluate that better.

16             I want to hear from this witness.  I think it's

17   important to hear from this witness.  Because you know what

18   your defense is.  It's tempting, initially, to -- I have

19   said to Ms. Felice, I said, this is why we play the game.

20   This is why we have the trial.

21             (End of sidebar conference.)

22             THE COURT:  So subject to the discussion we just

23   had on the record at sidebar, I am going to overrule the

24   objection.

25   BY MS. HOLLAND:

1   Q.   **PTX-083 is on the screen, Dr. Klinger.  What is that?**

2   A.   **This is an e-mail that I sent to my colleague in the**

3   **R&D, where I wanted to discuss within the R&D the results**

4   **that we have on high dose/low frequency, and the proposal to**

5   **go with a high-dose frequency regimen into a clinical trial,**

6   **so we put together the preclinical information and also some**

7   **statistical data and other consideration for the discussion.**

8   Q.   **Can you turn to PTX-83.3, please.  What is this page,**

9   **Dr. Klinger?**

10  A.   **This is a summary of the immunological results that we**

11  **had with GA/TV5010 infrequent injections.**

12  Q.   **Can we go to 83.19, please.  That's Slide 17 as well.**

13       **Dr. Klinger, is this one of the experiments that**

14  **informed your views about three times a week administration**

15  **of 40 milligram glatiramer acetate?**

16  A.   **Yes.**

17  Q.   **Can you explain this experiment, please?**

18  A.   **So in this experiment, we wanted to learn how does**

19  **the -- how does the immune response of different dosing**

20  **regimens, it looks like GA, and also we wanted to learn**

21  **about the different effect of the doses on the immune**

22  **response.**

23       **If we go to the figure with the type of GA**

24  **daily, here you see the experiments in which we immunized**

25  **mice at two different doses, one is 75 micrograms, and the**

Klinger- direct

1    second dose is 250 micrograms in daily injections.

2              And we took animals after time points and we

3    wanted to look at the immune response of the spleen cells,

4    in response to the daily injections.  Here we can nicely see

5    that at the beginning there is a tick or increase in

6    secretion of IL2, then we can see gradual decline in the

7    secretion of IL2 that for us it was a sign that we are

8    getting into the immune tolerance phase.

9              And we can see that with daily injections we can

10   get to it very fast.

11             What is more interesting is with two different

12   doses the profiles looked the same.  The dose didn't affect

13   the immunoresponse when we did it daily.

14             On the left experiment, this is a study which

15   was similar, but beside the fact that the animals were

16   treated weekly and not daily.  And if we look at the

17   immunoresponse, the first peak, but we don't see the same

18   profile that we saw with daily.  We saw some responses after

19   repeated injection, the weekly injections, but eventually

20   they all get into the immune tolerance later.  But the shape

21   of the curve looked differently.

22             If you look again, these are the same doses, 75

23   and 250, that we used in the daily, the profile.  When we go

24   to weekly, it looks different.

25             So in the previous -- in the daily, the graphs

Klinger- direct

1    superimposed, it was with less frequent, we see differences.

2            Here I learned -- I didn't know if this would be

3    reproduced in humans.  But the principle taught me that,

4    what I said before, that although with 20 and 40 we got

5    similar results with daily, it does not necessarily mean

6    that if we reduce the frequency the results would be the

7    same, because we changed the frequency, here you see, we

8    changed the frequency to weekly, with the same doses, the

9    immune response looks different.

10           Another insight from that study is that when we

11   used a very high dose of a thousand microgram GA weekly, the

12   immune response looks like daily.

13           You see that changing the dose or changing the

14   frequency will change the immune response.  What would it

15   be, the implication, of the changes of the immune response

16   on efficacy and safety?  We couldn't say that.  But we

17   understand that these are critical parameters.  And we don't

18   know exactly how to predict these changes in the

19   immunological response will be translated to efficacy or

20   safety.

21   Q.    Dr. Klinger, looking at the immunoresponse that you

22   see with the GA daily, were you trying to match that with

23   the GA weekly -- is that the curve that you were looking to

24   match with an improved product?  Let me ask it that way.

25   A.    Yes, because we didn't know what would be the effect

Klinger- direct

1    of a different curve, we looked for something that would

2    provide us a similar immune response like we got with daily.

3    And in the left picture, we got similar immune response with

4    high dose, although it was infrequent.

5              So there is an interplay, interplay with dose

6    and frequency, and again, these are animal studies.  We

7    learned from them that this interplay exists and the

8    critical parameters would be doses and frequency.

9    Q.    Dr. Klinger, you mentioned earlier that you also

10   thought the 40 milligram three times a week regimen would be

11   more tolerable.  What led you to believe, led you to form

12   that hypothesis?

13   A.    I recalled the safety advisory board that we convene

14   following the toxicology studies that we had with the 5010

15   and we tried to understand, what was the reason for the

16   toxicity?  Because we didn't anticipate this toxicity.  And

17   we asked the experts, based on your review of the data,

18   how -- can you explain the toxicity that we saw?  And the

19   pathologist that reviewed the slides of the animals, he said

20   that according to his hypothesis, because the monkeys and

21   the rats are relatively small animals , and you go

22   repeatedly to the same site of injection, repeatedly, you

23   overload the reaction of the skin to those injections.

24              And this reaction of the skin.  The repeated

25   injections, over time, increased the severity, and in the

Klinger- direct

1    case of TV-5010 it was even expanded into the whole system,

2    the whole body.

3              So it started with the injection site reaction,

4    and ended with systemic toxicity.

5              So I understood that it's not that only the

6    concentration of the material is what matters, it's also how

7    many times you repeat injections in the same site, in the

8    same place.  If you repeatedly inject the same areas,

9    repeatedly, with high molecular weight, you can get

10   toxicity.

11             I thought that if we would be able to reduce the

12   frequency, if we go to three times a week instead of a day,

13   for example, then the load on the inject site would be lower

14   then, and then the severity would be lower.

15   Q.    Can we go to PTX-153.  What is this document, Dr.

16   Klinger?

17   A.    This is the safety advisory board that we had.

18   Q.    Did you attend the safety advisory board?

19   A.    Yes.

20   Q.    You mentioned some pathology findings that you were

21   relying on.  Can we turn to Page 153.4.  In the executive

22   summary section of the page, does that contain the

23   hypothesis you were describing earlier.

24   A.    So if we go to the section that was just highlighted,

25   this is the section that all systemic toxicity responses

Klinger- direct

1    recognized in the toxicology studies are secondary to the

2    injection site lesions, was presented by A. Nyska, who was

3    the pathologist that reviewed the slides of the animals.

4    According to this theory, the systemic toxicities are not

5    relevant to humans since injection sites of similar severity

6    are not likely in clinical practice.

7             This is due to the larger body surface in humans

8    and since human subjects will not reuse painful injection

9    sites.

10            And here he associated it into the small bodies

11   of the animals that were loaded with the injection site

12   reaction.

13            I thought, if we go with 40 milligrams, which is

14   high dose, but we don't do it daily, we reduce it, and we

15   know the patients do not necessarily rotate the entire body,

16   they come to the same places that they are more comfortable

17   to inject, if they will do it less frequently, then there

18   will be a reduction in the injection site reactions that we

19   saw with 40 milligrams daily.

20   Q.    Dr. Klinger, we have looked ar a lot of data here

21   today.  Can you summarize what you took away from all of the

22   data that we have looked at?

23   A.    So when I was thinking about all the information that

24   I had from the preclinical studies, from the immunology

25   studies, I understand that high molecular weight peptides in

Klinger- direct

1   the formulation will contribute to efficacy.  And if we

2   cannot do it with TV-5010, probably the alternative option

3   is with a higher dose, because with 40 milligrams, the

4   amount, the total amount of high molecular peptide will be

5   double than with 20 milligram dose.

6           The other understanding is that frequency and

7   dose matter, and that with the immunological results and the

8   animal results that I saw, it seems to me that we can

9   potentially go into lower frequency injection, because the

10  immune response will sustain.  And to my opinion, it seems

11  to be that three times a week, 40 milligram dose, which was

12  the highest dose available to us, would be a good way to go.

13  And I also felt comfortable that the total exposure of the

14  drug would not be changed.  For example, it was 20

15  milligram, for example, if we inject in a week 40 milligram,

16  then here is 40, three times 40 is 120, so the total

17  exposure of the amount of drug that the immune system of the

18  patient will be exposed to will not be that dramatically

19  different.

20          Therefore, I thought that it would be, this

21  could be a good way to go.

22  Q.   Dr. Klinger, why did you need all this preclinical

23  data in order to formulate your hypothesis that the 40

24  milligram three times a week regimen could be more

25  convenient and tolerable without sacrificing efficacy?

Klinger- direct

1   A.     Well, we knew it was a complex route with an

2   immunolomodulating drug, you don't know how to predict what

3   the response will be.  You have to do the experiments to

4   learn.

5   Q.     Before your invention of 40 milligrams three times a

6   week, had Teva ever considered less frequent dosing of GA?

7   A.     Yes.  This idea was coming earlier from time to time,

8   it was raised.

9   Q.     Why didn't you follow through on it at that point?

10  A.     Because we didn't have data that we could -- to feel

11  reliable for us to go into a less frequent injection with

12  GA.  Because we didn't have the data, at least in the R&D,

13  we were concerned that if we were to inject patients with

14  less frequency, this would be a suboptimal dose.  Therefore,

15  MS is a difficult disease, it is a progressive disease, if

16  you treat patients with a suboptimal dose, it could be

17  devastating.

18          We didn't think because we didn't have the dose

19  ranging clinical studies, we didn't know how to extrapolate

20  from the animal data.

21          Additionally, we learned from the professor at

22  the Weitzman Institute, according to their understanding of

23  the mechanism in their experiments, they told us all the

24  time, more is better, more is better.

25  Q.     When you say more, did you mean more frequent?

Klinger- direct

1    A.    Daily.  Professor Arnon was saying, Stick to the

2    daily, it's good, it's better.

3    Q.    At the time you were working on a 40-milligram product

4    of GA at Teva, were you aware of a paper by Dr. Flechter

5    that discussed 20-milligram dosing?

6    A.    Yes.

7    Q.    Were you also aware of an abstract that mentioned 20

8    milligram every other day dosing?

9    A.    Yes.

10   Q.    Did the Khan abstract or the Flechter paper play any

11   role in your discovery that Copaxone could be administered

12   less frequently without sacrificing efficacy?

13   A.    No.

14   Q.    Why not?

15   A.    Because I thought these studies are very small.  They

16   didn't prove anything.  The study that was done by Dr.

17   Flechter included only one arm, no comparison, very small

18   sample size, uncontrolled study, with 60 or 70 patients, you

19   cannot determine if a drug is effective.  As you saw, we

20   evolved into a thousand patient trials with MS in order to

21   learn about it.  For me, relying on this information could

22   be misleading.

23   Q.    Let's turn to PTX-86.

24         What is this document, Dr. Klinger?

25   A.    This is an e-mail that I sent, that summarized the

Klinger- direct

1  life cycle management team data in assessment of the high

2  dose low frequency -- Mr. Mike Netz was the head of the

3  innovative business and doctor Ira Rivka Kreitman, she was

4  the head of R&D.  And they both planned to have the meeting

5  with the CEO of Teva in order to decide on the high dose/low

6  frequency program.

7             And we put together, that is LCM team, the

8  information that we thought would be relevant for that

9  discussion.

10  Q.    How important was that meeting with the CEO?

11  A.    It was important, because we wanted to get the CEO

12  approval to start the program that costs millions of

13  dollars, a lot of resources, and we wanted to provide him

14  with all the information that we had.

15  Q.    What was your contribution to the slides that are

16  contained in Exhibit PTX-86?

17  A.    Mainly I included the scientific parts in the

18  presentation.

19  Q.    Were others responsible for the other aspects of the

20  presentation?

21  A.    Yes.

22  Q.    Let's turn to Page 86.4, please.

23             Did you contribute to this page?

24  A.    Yes.

25  Q.    What does this slide show generally?

Klinger- direct

1    A.    This slide showed --

2           THE COURT:  Ms. Holland, do you have other

3    copies -- it's not in the binder that we have.

4           MS. HOLLAND:  Your Honor, would you prefer we go

5    ahead with the screen or get the copies?

6           We will have everything up on the screen, then

7    we will get copies.

8           THE COURT:  Your opposing counsel should at

9    least have one.

10          MS. HOLLAND:  I have one, Your Honor.

11          THE COURT:  Give it to Ms. Bloodworth.  All

12    right.

13          MS. HOLLAND:  Thank you, Your Honor.

14    BY MS. HOLLAND:

15    Q.    Dr. Klinger, is it comfortable for you to testify from

16    the screen?

17          THE COURT:  She has one.  She is fine.

18    BY MS. HOLLAND:

19    Q.    Dr. Klinger, we are talking about PTX-86.4.  You were

20    about to describe what the purpose of this slide was?

21    A.    So this was a description, presentation of different

22    formulations and dosing regimens that were discussed in the

23    LCM team, And the different doses that we introduced were,

24    we had three different doses, we had the 40 milligram every

25    other day, 32 to 40 milligram two to three times a week or

Klinger- direct

1    50 milligram formulation, one to two times weekly.

2    Q.    Did you view the 40 milligram every other day and the

3    50 milligram three times a week as different formulations?

4    A.    Yes.  You will see that in the different categories,

5    subtitles.  For each option we analyzed different criteria,

6    like time needed to complete development, the safety

7    consideration, probability of success, and marketing input.

8    Q.    Were there concerns about the probability of success

9    of a clinical trial for the 40 million three times a week

10   dosing?

11   A.    Yes.

12   Q.    Why were there concerns?

13   A.    Because we learned over the years that, again, we

14   should expect the unexpected.  In the previous program, we

15   also were very confident that we are going to win this time.

16   And we were not sure that this is going to work.

17   Q.    Let's turn now to 86.5.  What does this slide, just

18   very generally at first?

19   A.    It summarizes the currently available information in

20   the R&D regarding the high dose and low frequency

21   formulation.

22   Q.    Did you prepare this slide?

23   A.    Yes.

24   Q.    Did you include on this slide everything that you

25   believed supported the 40 milligram three times a week

Klinger- direct

1    regimen?

2    A.    I included all the information that I believed was

3    important for the CEO to know about the 40 milligram

4    formulation three times a week.

5    Q.    The first bullet point there talks about preclinical

6    immunology data available for TV-5010.  Does that relate in

7    any way to the data we looked at earlier today?

8    A.    Yes.

9    Q.    How does it relate?

10   A.    We discuss the immunology data that was available with

11   GA and TV-5010, and the fact we concluded from this data

12   that we may achieve immune tolerance and efficacy by less

13   frequent injections.

14   Q.    Now, the last bullet point on that slide, that's on

15   PDX-86.5, says the 40 milligram dose was safe in RRMS

16   patients.  Where did that observation come from?

17   A.    This is coming from the FORTE and the Cohen trials.

18   Q.    Was there any clinical data that supported your

19   hypothesis about the 40 milligram three times a week dosing

20   regimen?

21   A.    No.

22   Q.    Could you turn to Page 86.6, please.  Did you prepare

23   this slide?

24   A.    Yes.

25   Q.    Can you explain what you meant to tell the CEO with

Klinger- direct

1    this slide?

2    A.    Because this is a very serious decision, we wanted to

3    present what we have and the challenges as well, so that

4    they will have the full picture.

5          And this slide summarizes the challenges.

6    Q.    The first bullet point says no supporting data for the

7    selected dose or dosing regimen.  Then right under that it

8    says there is no supportive clinical data, no POC study.

9    What is a POC study?

10   A.    This is a proof of concept study.  Usually, we refer

11   to proof of concept study like Phase II studies where we got

12   our preliminary information in primarily small studies,

13   suggesting that the formulation is going to work or to be

14   effective or safe.  We didn't have such clinical data that

15   we can rely on for the high dose/low frequency.

16   Q.    You said earlier that you were aware of the Flechter

17   2002 paper and the Khan abstract.  Why didn't you include

18   those on the slide as supporting clinical data?

19   A.    As I indicated before, for me these studies did not

20   indicate that 20 milligram every other day would be

21   effective.  These are not proof of concept studies.  The

22   studies were not controlled and not powered, and were not

23   adequate to show efficacy .  And here, the proposal was to

24   go with higher doses, with 40 milligrams three times a week.

25   So for me, there was no clinical data, clinical proof of

Klinger- direct

1    concept for suggesting that this is going to work.

2    Q.    Did the rest of the folks at Teva agree with your

3    hypothesis about the 40 million three times a week dosing

4    regimen?

5              MS. BLOODWORTH:  Objection, Your Honor.

6    Hearsay.

7              THE COURT:  You can answer yes or no.

8              THE WITNESS:  Many people didn't.

9    BY MS. HOLLAND:

10   Q.    Can you describe the reaction of the R&D team at Teva

11   to the idea?

12             Let me rephrase that.

13             What did you understand the reaction of the R&D

14   team to be to the idea of the 40 milligram three times a

15   week regimen?

16             MS. BLOODWORTH:  Same objection.

17             THE COURT:  I will let her say what she

18   understood the reaction to be, without getting into the

19   hearsay aspects of the reaction.

20             MS. BLOODWORTH:  Thank you, Your Honor.

21             THE WITNESS:  My understanding was that the R&D

22   had a big push-back to this idea.

23   BY MS. HOLLAND:

24   Q.    How was the decision ultimately made to pursue 40

25   milligrams three times a week at Teva?

Klinger- direct

1    A.     The decision-making process took a long time, and then

2    there was the meeting with the CEO.  This was the first

3    meeting that, Dr. Kreitman and Mr. Netz, the CEO -- met with

4    the CEO, presented the options, and the conclusion of the

5    meeting was the design of the three-arm study, which I felt

6    it was completely not clear why.

7              So I approached my boss, Dr. Kreitman, and I

8    asked, why did you get into that decision?  I think we

9    should go to a very straightforward study, 40 milligram

10   three times a week over placebo and check if it works.  Why

11   should we complicate things?  She said --

12             MS. BLOODWORTH:  Objection.  Hearsay.

13             THE COURT:  Sustained.  Ms. Holland.

14   BY MS. HOLLAND:

15   Q.    Dr. Klinger, what did you do in response to the

16   conversation you had with Dr. Kreitman?

17   A.     I did not agree with his decision and requested

18   another meeting with the CEO in which I convinced him that

19   the best way to go is 40 milligram three times a week over

20   placebo.  And he agreed with my opinion and we started the

21   study.

22             MS. HOLLAND:  Thank you.  No further questions.

23             THE COURT:  We will have cross after the break.

24             (Recess taken.)

25             THE COURT:  Please take your seats, ladies and

Klinger- direct

1    gentlemen.

2              All right.  Your witness.

3              MS. BLOODWORTH:  Thank you, Your Honor.

4                        CROSS-EXAMINATION

5    BY MS. BLOODWORTH:

6    Q.    Hi, Dr. Klinger.  It's good to see you again.  Again,

7    I am Shannon Bloodworth and I represent the Mylan

8    defendants.

9              Dr. Klinger, there is a binder that will have

10   exhibits in it similar to what you had in your direct

11   examination, and there is a separate binder with your

12   deposition transcript.  We probably won't need that, so if

13   you want to just set it aside for now.  Are you settled?

14   Can you hear me okay?

15   A.    Yes.

16   Q.    If you could turn in your binder to JTX-7001, please

17   this is a copy of the '413 patent.  Correct?

18   A.    Correct.

19   Q.    If you could turn to Page 12, which has Claim 1 under

20   Column 16 on the right-hand side.  It begins around Line 25.

21   A.    You said Page 12?

22             THE COURT:  Column 16, about Line 25 there,

23   Claim 1.

24             THE WITNESS:  Yes.

25   BY MS. BLOODWORTH:

1    Q.    Thank you.  The claims of the patents in suit,

2    including Claim 1 of the '413 patent, include the same

3    active pharmaceutical ingredient as Copaxone 20 milligrams.

4    Correct?

5    A.    Claim No. 1?

6    Q.    Yes.  Around Line 34, you claim 40 milligrams of

7    glatiramer acetate?

8    A.    Yes.

9    Q.    Not TV-5010.  Right?

10   A.    Right.

11   Q.    TV-5010 and glatiramer are two different compositions.

12   Correct?

13   A.    They are two different copolymers.  But they share

14   similarities.

15   Q.    But they don't share the same composition.  Correct?

16   A.    They are not the same.

17   Q.    So you did not design an improved glatiramer

18   composition.  Correct?

19   A.    Correct.

20   Q.    And Copaxone 20 milligrams has been approved by FDA

21   for treating relapsing remitting multiple sclerosis

22   beginning in 1996.  Correct?

23   A.    Yes.

24   Q.    Claim 1 of the patents in suit also claims a method

25   for treating relapsing remitting multiple sclerosis.

1    Correct?

2    A.    Right.

3    Q.    You also did not invent the use of glatiramer acetate

4    to treat a new disease.  Right?

5    A.    Correct.

6    Q.    You had mentioned during your direct testimony a trial

7    by the name of PROMISE.  Do you recall that?

8    A.    Yes.

9    Q.    PROMISE was for the treatment, the use of PROMISE was

10   for the use of primary progressive MS.  Right?

11   A.    Yes.

12   Q.    And Claim 1 of the patents in suit did not claim the

13   use of primary progressive, the treatment of primary

14   progressive MS.  Correct?

15   A.    May I please read the entire claim?

16   Q.    You may.

17          (Pause.)

18   A.    Thank you.  Could you please repeat the question?

19   Q.    The patents in suit do not claim the treatment of

20   primary progressive multiple sclerosis?

21          MS. HOLLAND:  I have an objection to the extent

22   Ms. Bloodworth is asking Dr. Klinger to construe the claims

23   of the patent.  That is a matter of law.  The specification

24   I believe is different.  To ask Dr. Klinger to construe

25   claims of a patent, which are a legal matter --

 1                    THE COURT:  I didn't know that, Ms. Holland.  Is

 2    that a legal matter, really?

 3                    I am being facetious.  Yes.

 4                    Your response.

 5                    MS. BLOODWORTH:  My response is that she is the

 6    inventor.  I would think if anybody knows what the claims

 7    say --

 8                    THE COURT:  I don't think Ms. Bloodworth is

 9    asking for claim construction.

10                    You can answer the question.

11    BY MS. BLOODWORTH:

12    Q.    Do you need me to repeat it, Dr. Klinger?

13    A.    Yes.

14    Q.    The claims of the patents in suit claim the use of

15    glatiramer for treatment of relapsing remitting multiple

16    sclerosis.  Not of progressive multiple sclerosis.  Correct?

17    A.    Yes.

18    Q.    Copaxone 20 milligrams is also sold in a one

19    millimeter volume solution.  Correct?

20    A.    Correct.

21    Q.    Again, the patents in suit also identify the same

22    volume of one milliliter as Copaxone 20 milligram.  Right?

23    A.    Correct.

24    Q.    So the patents in suit do not claim a lower volume 0.5

25    milliliter Copaxone.  Correct?

Klinger - cross

1   A.   Correct.

2   Q.   And you discussed on your direct testimony the SONG

3   trial.  Do you recall that?

4   A.   Yes, I remember.

5   Q.   And the SONG trial used a lower volume of 0.5

6   milliliters Copaxone.  Correct?

7   A.   0.5 milliliter, and then 20 milligram Copaxone.

8   Q.   And it was not in a one milliliter volume syringe?

9   A.   It was in a half an ml.  I don't know which syringe

10  was used.

11  Q.   And in the SONG trial the Copaxone used also was

12  administered daily.  Correct?

13  A.   The 20 milligram, yes.

14  Q.   Yes, the 20 milligrams.

15       These patents don't claim a daily administration

16  of glatiramer in a one milliliter volume.  Do they?

17  A.   Which patent.  This one?

18  Q.   Yes.  Your patent, the '413, Exhibit 7001.

19  A.   They claim 40 milligrams three times a week.

20  Q.   And Copaxone 20 milligrams administered by

21  subcutaneous injection.  Right?

22  A.   Right.

23  Q.   The patents in suit also identify the same route of

24  administration as Copaxone 20, which is subcutaneous

25  injections.  Right?

Klinger - cross

1    A.    Correct.

2    Q.    The patents in suit don't claim any formulation of

3    Copaxone.  Right?

4    A.    Right.

5    Q.    And so in your direct testimony we talked about the

6    CORAL study.  That study was involving an oral formulation

7    of Copaxone.  Correct?

8    A.    The CORAL study, yes.

9    Q.    And again, oral administration of Copaxone or

10   glatiramer acetate covered in the patent in the suit.

11   Right?

12   A.    Right.

13   Q.    You were not the first person to invent the idea of

14   using a 40 milligram dose of glatiramer.  Right?

15   A.    Right.

16   Q.    Before you filed the patent application, the 40

17   milligram dose had already been found to be safe and

18   effective in the treatment of relapsing remitting multiple

19   sclerosis in clinical trials.  Correct?

20   A.    Daily injections.

21   Q.    Of 40 milligrams.  Right?

22   A.    40 milligram.

23   Q.    If you could turn in your binder to Exhibit 7060,

24   please.  Did you find it?

25   A.    Yes.

Klinger - cross

1   Q.      And Exhibit 7060 is an article authored by Cohen and

2   others published in Neurology in 2007 titled Randomized,

3   Double-Blind, Dose Comparison Study of Glatiramer Acetate in

4   relapsing remitting multiple sclerosis.   Correct?

5   A.      Correct.

6   Q.      And you were aware of the Cohen article before you

7   filed your patent application.   Right?

8   A.      Yes.

9   Q.      You were also aware -- during your direct testimony

10  did you testify that you were aware of the Pinchasi

11  application?

12  A.      I heard about it after.

13  Q.      Did you know that the Pinchasi application was filed

14  on a 40 milligram every day product?

15  A.      Yes, I learned about it.

16  Q.      When did you learn about that?

17  A.      Not long ago.

18  Q.      Since your deposition?

19  A.      About that time.

20  Q.      And you are aware as well that 40 milligrams, the

21  Pinchasi application claims 40 milligrams every other day

22  glatiramer.   Correct?

23  A.      I have heard about it.   I didn't read the patent.

24  Q.      If you could turn back to Exhibit 7060, which is the

25  Cohen article, if you could look at the abstract for me,

1    please.  The conclusion in the abstract of the Cohen article

2    is that glatiramer 40 milligram was safe and well tolerated.

3    Right?

4    A.    Yes.

5    Q.    So by 2007, it was known that the 40 milligram dose of

6    Copaxone or glatiramer was safe and well tolerated.  Right?

7    A.    In daily injections.

8    Q.    If you could turn to Exhibit 7035 in your binder.  Did

9    you find it?

10   A.    Yes.

11   Q.    And this is the press release put out by Teva from the

12   FORTE trial.  Correct?

13   A.    Correct.

14   Q.    And the FORTE trial was the comparison in the Phase

15   III clinical trial of the 40 milligram glatiramer acetate to

16   the 20 milligram glutarimide acetate.  Correct?

17   A.    Correct.

18   Q.    And Teva in its press -- you were aware of this

19   document before you filed your patent application?

20   A.    I don't remember.

21   Q.    I believe in your testimony, in your direct testimony

22   you testified that the FORTE trial had found that the 40

23   milligram dose was safe and well tolerated?

24   A.    I said in the direct testimony that the product was

25   safe, but the patient with 40 milligrams, there were more

1    complaints of injection site reactions and severity of

2    injection.

3    Q.    Right.  And the FORTE press release announced by Teva

4    states that the favorable safety and tolerability profile of

5    Copaxone 20 -- let me try again.

6          The press release by Teva says the 40-milligram

7    dose did not demonstrate increased efficacy in reducing the

8    relapsed rate.  However, the higher dose maintained the

9    favorable safety and tolerating profile of Copaxone 20

10   milligram did.  Do you agree with that statement?

11   A.    I believe that the safety was maintained.  With

12   tolerability there was a difference with the 40-milligram

13   dose.

14   Q.    So, Dr. Klinger, you also did not invent the concept

15   of using glatiramer in a 40-milligram dose to treat multiple

16   sclerosis.  Correct?

17   A.    You mean daily?

18   Q.    Daily.

19   A.    I didn't invent daily.

20   Q.    And the 40 milligram dose itself had already been

21   found to be safe and effective.  Right?

22   A.    Yes.

23   Q.    And, Dr. Klinger, you also did not invent the concept

24   of dosing glatiramer acetate frequently, did you?

25   A.    My invention focused on three times a week.

Klinger - cross

1   Q.     And right from the filing of your patent application

2   you were aware that there were already studies published on

3   less frequent dosing of glatiramer.  Right?

4   A.     Yes.

5   Q.     And if you can turn in the binder to Exhibit 7078,

6   please.

7              7078 is a copy of the article by Flechter

8   entitled Copolymer I (Glatiramer Acetate) in Relapsing Forms

9   of Multiple Sclerosis:  Open Multi-Center Study of Alternate

10  Day Administration.

11             Do you recognize this document?

12  A.     Yes.

13  Q.     If you could turn to Page 5 in the document, please.

14  Under the conclusion on the right-hand side.  Dr. Flechter

15  concluded that the results of this trial suggested that the

16  results of this treatment with Copaxone is safe, well

17  tolerated and probably as effective as daily Copolymer I in

18  reducing relapse rate and slowing neurologic deterioration.

19  You were aware of Dr. Flechter's conclusion before you filed

20  for your patent.  Correct?

21  A.     I was aware of the conclusion.

22  Q.     If you could turn in your binder to JTX -- 7089,

23  please.  I believe the title page might be on the second

24  page of the document.

25             If you look on Page 4 of 7089, there is an

Klinger - cross

1   abstract called -- that's labeled P-902.  Do you see that,

2   the abstract?

3   A.    Yes.

4   Q.    This is an extract titled Randomized, Prospective,

5   Rater-Blinder, Four Year, Pilot Study to Compare the Effect

6   of Daily versus every other day Glatiramer 20 milligrams

7   Subcutaneous Injections in RRMS.

8           And it's authored by Omar Khan.  Were you aware

9   of this before you filed your patent application?  Dr. Khan?

10  A.    Yes.

11  Q.    And Dr. Khan's study was a rater-blinded study.

12  Correct?

13  A.    Yes.

14  Q.    And you became aware of Dr. Khan's study when you

15  attended the external meeting in September of 2008.

16  Correct?

17  A.    One of the conferences, yes.

18  Q.    So you were aware of Dr. Khan's study prior to --

19  strike that.

20          If you can look at Dr. Khan's study, and if you

21  turn to the conclusions, Dr. Khan concluded that the pilot

22  studies that GA 20 SC Administered QD or QOD may be equally

23  effective in RRMS.

24          Dr. Klinger, for clarification, what does QD

25  stand for?

Klinger - cross

1                    THE COURT:  Do you want her to confirm that is

2       what it says?

3                    MS. BLOODWORTH:  I was going to ask her a

4       different question about QD, Your Honor.

5       BY MS. BLOODWORTH:

6       Q.    Dr. Klinger, looking at that statement, could you

7       please tell me what QD stands for, if you know?

8       A.    I am not sure.

9       Q.    Does it stand for daily?

10      A.    Daily.

11      Q.    And QOD, does that stand for every other day?

12      A.    I don't know.

13      Q.    Are you aware that Khan's study compared 20 milligrams

14      daily administration with 20 milligrams every other day

15      administration of glatiramer?

16      A.    Yes.

17      Q.    And also to treat RRMS?

18      A.    Yes.

19      Q.    And Dr. Khan concluded that either daily or every

20      other day 20 milligram GA may be effective for treating

21      RRMS.  Right?

22      A.    Maybe you could read the clinical conclusion.

23      Q.    Sure.

24      A.    However, large multi-center studies are warranted to

25      confirm our findings and to identify the optimal dose of GA

1    in RRMS.

2    Q.    So large term studies would be needed to confirm the

3    findings.   Correct?

4    A.    The findings that were suggested.

5    Q.    But the findings themselves, the conclusions

6    themselves were that it would be equally effective daily or

7    every other day.   Right?

8    A.    It's only a suggestion.

9    Q.    And you had no Phase II or pilot studies on 40

10   milligrams three times a week when you filed your patent

11   application.   Right?

12   A.    Right.

13   Q.    You didn't even have a suggestion in the clinical data

14   for 40 milligrams three times a week working.   Right?

15   A.    We didn't have clinical data.

16   Q.    So Dr. Khan has clinical data, you just don't think

17   it's sufficient for proving efficacy.   Is that right?

18   A.    Correct.   I don't think the trial is sufficient.

19   Q.    To prove efficacy.   Yes?

20   A.    To prove efficacy.

21   Q.    And efficacy in FDA approval terms, do you mean?

22   A.    Of course.   And efficacy scientifically, these studies

23   do not prove efficacy, also scientifically.

24   Q.    When you filed your patent application you had no

25   patent data, no clinical studies, to support 40 milligrams

1    three times a week dosing.  Right?

2    A.    No, we didn't have it.

3    Q.    Dr. Khan's study also reports that after two years

4    there was no differences in the relapse rate, disease

5    duration, changing in T2W lesion, or Gd enhancing lesions

6    between the two groups.

7              Did you have any data on 40 milligrams three

8    times a week indicating the differences in relapse rate,

9    disease progression, change in T2W disease progression?

10   A.    No.

11   Q.    Dr. Khan also states that the in vitro proliferation

12   of GA responsive T-cells and Th1/Th2 cytokine expression did

13   not differ between the two groups at any time point after

14   randomization.

15             Had you done any studies on the Th1/Th2 cytokine

16   expression of the 40 milligram three times a week prior to

17   filing your patent application?

18   A.    No.

19   Q.    Dr. Khan also pointed out that after two years

20   patients in the daily group all switched to the every other

21   day regimen.  Right?

22   A.    Please show me the section?

23   Q.    If we can put it on the screen, it's a little higher

24   up.  The sentence starts, After two years two lines under

25   Methods.  It says after two years.  At the bottom right-hand

1    corner, After two years, all patients, it's about ten lines

2    up from the bottom, do you see now?

3                So that means, Dr. Klinger, that all of the

4    patients who were enrolled in the 20 milligram daily arm

5    opted to switch to the every other day arm of the study.

6    Right?

7    A.    They opted.

8    Q.    Patients wouldn't opt to switch if their drug wasn't

9    working.  Right?

10               MS. HOLLAND:  Objection, Your Honor.

11               THE COURT:  Sustained.

12   BY MS. BLOODWORTH:

13   Q.    You understood there were clinicians evaluating doses

14   of GA before you filed your patent application.  Right?

15   A.    The Khan and the Flechter papers show that.

16   Q.    And they selected Dr. Khan to be the primary

17   investigator of the GALA trial.  Correct?

18   A.    As far as I remember, yes.

19   Q.    And the GALA trial is the clinical trial that was

20   eventually performed on the 40 milligram three times a week

21   dosing regimen?

22   A.    Correct.

23   Q.    Do you know when that trial was begun?

24   A.    2009.

25   Q.    It was after your patent filing.  Right?

Klinger - cross

1    A.    Yes.

2    Q.    And you had no idea whether or not it would work.

3    Right?

4    A.    I didn't know.

5    Q.    It would be completely unexpected if it did?

6    A.    I hope that it will work.

7    Q.    But you had no preclinical data or Phase II smaller

8    study clinical data to support your patent application when

9    you filed it on the 40 milligram three times a week dosing

10   regimen.  Right?

11   A.    We had preclinical data suggesting that low frequency

12   would work, but we didn't have data, or clinical data on 40

13   milligrams three times a week that showed that it will work.

14   Q.    Doctor, prior to August of 2009, it was also known

15   that a significant drawback to GA therapy is the requirement

16   for daily injections.  Right?

17   A.    Yes.

18   Q.    And in the clinical trials performed prior to 2009

19   injection site reactions were the most frequent adverse

20   reaction.  Right?

21   A.    Yes.

22   Q.    And you expected that dosing less frequently than

23   daily would reduce the injection site reactions.  Right?

24   A.    I hoped.  I was not sure.

25   Q.    It was like an educated hope?

Klinger - cross

1    A.    What do you mean by that, by educated hope?

2    Q.    What is a hope?  You filed a patent application.  Did

3    you have an educated hope?

4    A.    I had a hypothesis that this might work.  But I was

5    not sure this would happen.

6    Q.    Because with Copaxone you should expect the

7    unexpected.  Right?

8    A.    Because with Copaxone we had a lot of surprises.

9    Q.    Dr. Klinger, if you could please turn to JTX-7003 in

10   your binder.  This is the '776 patent.  You are the first

11   named author on it.  Do you see that?

12   A.    Yes.

13   Q.    Do you understand what I mean when I say the '776

14   patent?  It's the last three numbers of the patent?

15   A.    Yes.

16   Q.    And if you could turn to Column 8.  If you look at

17   around Line 60.

18   A.    Can you please direct me.  Column 8?

19   Q.    It should be on Page 15, if you look at JTX-7003.15,

20   is the page number.  And then the column number will be at

21   the top.  And down at the bottom around Line 60 on the

22   right-hand side, It says Example 1.  Do you see that?

23   A.    Yes.

24   Q.    And Example 1 continues through Column 15 of the '776

25   patent.  Right?  You can check if you would like.  It's from

1    about Column 8 through Column 15.

2    A.    Okay.

3    Q.    And Example 1 of the patent in suit describes the

4    proposal of a clinical trial to show efficacy and safety of

5    a 40 milligram three times a week regimen as compared to

6    placebo.  Correct?

7    A.    Copaxone 40 milligram, three times a week.

8    Q.    Versus placebo?

9    A.    Versus placebo.

10   Q.    There is no end point in the study, primary or

11   secondary, that compares 40 milligrams of GA dosed three

12   times a week 20 milligrams daily GA.  Is there?

13   A.    Glatiramer acetate?  Which dose?

14   Q.    Is there any example in Example 1 that compares the 40

15   milligrams three times a week to the 20 milligram daily, in

16   this example?

17   A.    No, there is not.

18   Q.    That is the only example in the patent specification,

19   right, is Example 1, to be clear?

20   A.    I don't see other examples.

21   Q.    And if you could turn the page to Page 15 -- I am

22   sorry, 16.

23              Looking at Lines 21 through 24.

24              THE COURT:  Which column?

25              MS. BLOODWORTH:  Column 9.

1                Column 9 states, Line 20 begins, The study

2       objective is to assess the efficacy, safety and tolerability

3       of glatiramer acetate injection 40 milligrams per ml

4       administered three times weekly compared to placebo in a

5       double-blind study design.

6                Do you see that?

7       A.      Yes.

8       Q.      So the example in the patents in suit is not designed

9       to determine whether the 40 milligram three times dosing

10      regimen is superior in efficacy to the 20 milligram daily

11      dose.  Right?

12      A.      Correct.

13      Q.      And the example in the patents in suit is not designed

14      to determine whether the 40 milligrams three times a week

15      dosing regimen has superior safety to the 20 milligram daily

16      regimen.  Right?

17      A.      The 20 milligram regimen does not exist in the

18      example.

19      Q.      So then the example also is not designed to determine

20      whether the 40 milligram and three times a week dosing

21      regimen was superior in tolerability to the 20 milligram

22      daily regimen.  Right?

23      A.      Correct.

24      Q.      If you can to Page 17, Column 11, approximately around

25      Line 28.  These are the exclusion criteria for the study in

1    the example in the patents in suit.  Right?

2    A.    Which line?

3    Q.    It's around 28, maybe 29.

4    A.    Got it.

5    Q.    These are the patients that are excluded from being

6    able to participate in the protocol in the patents in suit.

7    Correct?

8    A.    Correct.

9    Q.    And if you look down to around Line 43, you will see a

10   group of the patients that are excluded from the previous

11   use of GA or any other glatiramoid.  Do you see that?

12   A.    Yes.

13   Q.    Patients who had previously used GA were not eligible

14   for the 40 milligram three times a week study.  Right?

15   A.    Correct.

16   Q.    And they were also excluded from the example in the

17   specification?

18   A.    I am referring to the example.

19   Q.    So, in fact, the patent in suit is not designed to

20   determine any superiority claims of the 40 preliminary three

21   times a week dosing regimen relative to the 20 milligram

22   daily regimen.  Right?

23   A.    Right.

24   Q.    And the example provides no results that the 40

25   milligrams three times a week was superior to the 20

Klinger - cross

1  milligram daily for efficacy, safety or tolerability.

2  Right?

3  A.    Yes.

4  Q.    The independent clinical trial described in the

5  patents in suit, that was not performed before you filed for

6  the patent.  Correct?

7  A.    I am not fixed with the dates, the exact dates.

8  Q.    You filed your patent application in August of 2009.

9  It's on the first page of the exhibit.  In patent language

10 we trace all those dates back and find the earliest priority

11 application, which is August 20th, 2009, in Paragraph 60.

12 Does that refresh your recollection of when the patent was

13 filed?

14 A.    This is what it says here.

15 Q.    And GALA didn't begin in 2009.  Right?

16 A.    I don't remember the exact date.

17 Q.    It was after you filed your patent application?

18 A.    After.

19 Q.    Right?  After?

20 A.    I need to see when the protocol was filed.

21 Q.    We will come back to that.

22       Doctor, can you please turn to Exhibit 1707 in

23 your binder, please.

24       MS. HOLLAND:  I have an objection to this, Your

25 Honor.  This is a document that is dated after the filing of

1    the patent application in this case.  It doesn't have

2    relevance to Dr. Klinger's testimony about the invention in

3    this particular case, because it is a later document.

4             MS. BLOODWORTH:  We disagree.  We think it

5    actually goes to Dr. Klinger's credibility of her knowledge,

6    about her testimony here today about the relevance of the

7    clinicals trials FORTE, Cohen, and Flechter.

8             THE COURT:  Let's see.  For now, I will overrule

9    it.

10   BY MS. BLOODWORTH:

11   Q.    The GALA protocol is Exhibit 1707.  Correct?

12   A.    Yes.

13   Q.    And this is the clinical trial protocol for the 40

14   milligram three times a week trial.  Right?

15   A.    Yes.

16   Q.    And it was submitted to the FDA.  Right?

17   A.    The protocol was submitted, yes.

18   Q.    And the protocol was drafted when you were responsible

19   for special innovative projects including Copaxone, life

20   cycle management and decision-making processes.  Right?

21   A.    Yes.

22   Q.    And you were part of the design of this synopsis in

23   the protocol.  Right?

24   A.    Yes.

25   Q.    And the synopsis of the GALA protocol comprises

Klinger - cross

1    Example 1 of the specifications of the patent in suit.

2    Right?

3    A.    You are referring to the study title?

4    Q.    I was referring to the synopsis beginning on Page 8 of

5    Exhibit 1707.

6    A.    Yes.

7    Q.    Do you see it says Synopsis?

8    A.    Yes.

9    Q.    You were part of the design of this synopsis.  Right?

10   A.    Correct.

11   Q.    And the synopsis in the protocol comprises Example 1

12   of the patents in suit.  Right?

13   A.    I didn't read the entire example.  The study title is

14   the same.

15   Q.    And the primary end points are the same?

16   A.    I don't know that we reviewed the primary end point in

17   the example.

18   Q.    Let's just turn to Page 21 of DTX-1707.  This section

19   is entitled Rationale for Dose-Regimen Selection.  Right?

20              MS. HOLLAND:  Your Honor, I would ask that a

21   foundation be laid that Dr. Klinger actually wrote this

22   part.

23              THE COURT:  Fair enough.

24   BY MS. BLOODWORTH:

25   Q.    Dr. Klinger, you were involved in the preparation of

Klinger - cross

1    the GALA and the design of the GALA trial.  Right?

2    A.    I worked on the synopsis, and then all the protocol

3    was handled by the clinical people, the protocol.

4    Q.    You were head of special innovative projects at this

5    time.  Right?

6    A.    Yes.

7    Q.    This was your invention, right, this is your protocol,

8    this is the clinical trial for your invention of 40 miligram

9    three times a week.  Right?

10   A.    Yes.

11   Q.    You were involved with many clinical trial protocols

12   at your time at Teva.  Right?

13   A.    Yes.

14   Q.    Including FORTE and others?

15   A.    Yes.

16   Q.    So as part of your job you routinely reviewed clinical

17   trial protocols and were involved in the drafting of them?

18   A.    I am involved in directing the synopsis.

19   Q.    But you review clinical trial protocols.  Right?

20   A.    Yes.

21   Q.    And you would not allow a clinical trial protocol to

22   be submitted to the FDA without your review.  Right?

23   A.    Yes.

24   Q.    So you reviewed this document in the capacity of your

25   duties at Teva?

1    A.    I reviewed the synopsis and certain sections that were

2    important to me.  I cannot say today exactly what I reviewed

3    and skipped.  But the protocol includes a lots of things

4    that I usually skipped.

5    Q.    Do you disagree that this section, the rationale for

6    dosing regimen --

7              THE COURT:  They are creeping up on you.

8              MS. BLOODWORTH:  Your Honor, I was being

9    reminded that Teva made no foundation objections including

10   any type of, any objections to the use of this document with

11   Dr. Klinger today when we disclosed it.

12             THE COURT:  I will let her answer the question,

13   Ms. Holland.  I believe an adequate foundation has been

14   laid.

15             MS. HOLLAND:  Yes, Your Honor.

16             THE COURT:  And more specifically, about the

17   rationale section.

18             MS. BLOODWORTH:  Thank you, Your Honor.

19   BY MS. BLOODWORTH:

20   Q.    Dr. Klinger, the rationale for dose regimen selection

21   is the second of the GALA protocol describing to FDA the

22   rationale for why 40 milligrams three times a week should be

23   studied on MS patients.  Right?

24   A.    Yes.

25   Q.    And the rationale for dose regimen selection was not

1     included in the specification of the patents in suit.

2     Right?

3     A.     You mean the example that you showed me?

4     Q.     Yes.

5     A.     Again, I didn't read the entire examples, so I cannot

6     address this question.

7     Q.     Would you like to review that example?  It was in

8     Columns 8 through 15 of Exhibit 7001?

9     A.     If you want me to answer the question.

10    Q.     You don't recall what's in your patent?

11    A.     I cannot recall what you have in each one of them.

12    Q.     Do you recall talking about FORTE in your patent

13    application?

14    A.     I can't recall.

15    Q.     Do you recall disclosing Flechter in your patent

16    application to the Patent Office?

17    A.     I don't recall that.

18    Q.     Do you recall disclosing Khan, the 2008 study, in your

19    patent specification?

20    A.     Go and check.  I can't remember now exactly which

21    references were we put there.

22    Q.     Let's turn back to 1707.  The protocol.  Turn to, we

23    were on I believe Page 21, the Section headed 3.3.2, called

24    The Rationale for Dose Regimen Selection.

25              The first sentence says, The accumulated data

Klinger - cross

1    showing that GA acts as an immunomodulating drug, and the

2    results of the FORTE study showing that a higher dose of GA

3    does not increase the efficacy of the drug encouraged the

4    sponsor to further explore the optimal dose and dosing

5    regimen of GA and to study the safety and efficacy of

6    administered in a reduced injection frequency.

7             Do you agree with this statement?

8    A.    No, I don't disagree.

9    Q.    And it goes on, if we could turn to the bottom of Page

10   20, it says, While no superiority of the GA 40 milligram

11   dose over the GA 20 milligram was demonstrated, the GA 40

12   milligram formulation, then continuing on the top of Page

13   21, showed similar quality, safety and efficacy profile

14   compared to that of the GA 20 milligram dose.

15            Do you disagree with that sentence?

16   A.    Yes.  Similar.

17   Q.    Dr. Klinger, I didn't understand your response.  Do

18   you disagree with that sentence?

19   A.    I agree with the sentence.

20   Q.    Thank you.

21            Teva also justified the 40 milligrams three

22   times a week dosing selection.

23            Teva also then on the next sentence said the use

24   of the 40 milligram dose in this study would allow a gradual

25   approach for induction and injection frequency would be

Klinger - cross

1    offset of the use of a higher dose already shown to be

2    effective and safe in daily use.  Do you agree with that

3    sentence?

4    A.    I agree it would be offset by the use of a higher dose

5    already shown to be effective and safe in daily use.   I

6    agree that the -- yes, in principle, I agree.

7    Q.    If we could look at the second paragraph of the

8    section, it's on Page 21.  The first sentence reads, Further

9    support for this rationale was provided by several small

10   scale investigator initiated studies, which explored a

11   reduced injection frequency of GA.  Then it has some

12   footnotes.  Do you see that?

13   A.    Yes.

14   Q.    Do you agree with this sentence?

15   A.    No.

16   Q.    So you don't agree with what Teva told the FDA

17   providing its rationale for submitting to the FDA its

18   clinical trial protocol?

19   A.    I didn't agree with the interpretation of this area,

20   papers.

21   Q.    Did Teva disclose any studies other than the Flechter

22   , Khan studies and FORTE in supporting its rationale for

23   administering 40 milligram three times a week GA to over 900

24   patients in a clinical trial?

25              MS. HOLLAND:  Your Honor, my objection here is

Klinger - cross

1    that that the sentence that Ms. Bloodworth is referring to

2    includes non-prior art references.

3              There is an inherent problem with asking

4    questions where part of what's referred to is prior art and

5    part isn't.

6              THE COURT:  Ms. Bloodworth, are we still in

7    credibility?

8              MS. BLOODWORTH:  Your Honor, Dr. Khan --

9              THE COURT:  Why isn't she right?

10             MS. BLOODWORTH:  Footnote 21 and 22 are the

11   Flechter and Khan studies.  Your Honor, they are located on

12   Page 107 of the document.  Those are prior art.  The third

13   footnote is Footnote 23, that's to a Khan 2009 article.

14   That was published after the priority date.  The trial

15   started before the priority date.  It is evidence that

16   persons of ordinary skill in the art were indeed

17   investigating less frequent dosing.

18             MS. HOLLAND:  Your Honor, we had a motion in

19   limine on this very issue.

20             The 2009 paper, abstract, whatever you want to

21   call it that, Ms. Bloodworth is referring to is not prior

22   art, under the rules, it's not prior art.  It's dated after

23   the application.

24             There is no relevance to what happened after the

25   filing of the patent application as to what a person of

Klinger - cross

1  ordinary skill in the art would have known as the filing

2  date.  The additional issue, as I understood it, is that

3  defendants were perhaps trying to use this somehow as a

4  public use.  But they certainly have no evidence to

5  establish any of the criteria for public use.

6          And in any event it has to be the same

7  invention.  It's not.

8          It's not the same dosing regimen.  If you look

9  at that paper, it's 20 milligrams twice a week.

10          There is just no relevance at all of that 2009

11  paper to the discussion of the 40 milligram three times a

12  week invention.  That's what I am concerned about, Your

13  Honor.  There is a statement that is supported some by prior

14  art and some not by prior art.

15          THE COURT:  I am inclined to Ms. Holland's point

16  of view, Ms. Bloodworth.  Why should I not be?

17          MS. BLOODWORTH:  The issue, the statement -- I

18  can ask it very clearly -- is whether or not Dr. Klinger

19  agrees that the Khan study was supporting the 40 milligrams

20  three times a week.  The other issue she raised we can

21  address later.

22          THE COURT:  Do you have difficulty with that

23  question?

24          MS. HOLLAND:  I don't have a difficulty if the

25  question is asked outside of the context of the document.

Klinger - cross

1    My understanding was she was asking --

2              THE COURT:  I think I agree, Ms. Holland.  But

3    you can ask the question outside the contours of the

4    document.

5    BY MS. HOLLAND:

6    Q.    Do you agree that the Khan 2008 abstract is a rational

7    basis for selecting a 40 milligram three times a week dosing

8    regimen?

9    A.    I do not agree.

10   Q.    You don't agree that the article by Flechter is a

11   rational basis for selecting 40 milligram three times a week

12   dosing regimen?

13   A.    I do not agree.

14   Q.    And you had no clinical data on the 40 milligram three

15   times a week dosing regimen at all when you filed your

16   patent application.  Right?

17   A.    Right.

18   Q.    You had no preclinical at that time on the 40

19   milligram three times a week dosing regimen, either.  Right?

20   A.    No, we didn't have.

21   Q.    If you don't have any clinical data on the 40

22   milligram three times a week and you don't have the you

23   don't know the clinical data that was available on dosing

24   less frequent GA, you didn't put anything in your patent to

25   support the 40 milligrams three times a week regimen in

Klinger - cross

1    treating GA?

2                MS. HOLLAND:  Objection.  Compound.

3                THE COURT:  Overruled.  Do you in the understand

4    the question?

5                THE WITNESS:  Vaguely.

6                THE COURT:  Do you want to ask a better

7    question.

8    BY MS. BLOODWORTH:

9    Q.    You don't think the clinical data that was available

10   on less frequent dosing is a justifiable basis for 40

11   milligrams three times a week clinical trial.  Right?

12   A.    The clinical nature of the study that is cited here

13   are not a good rationale for 40 milligrams three times a

14   week.

15   Q.    And you had no data on 40 milligrams three times a

16   week, either preclinical or clinical.  Right?

17   A.    We didn't have it on this specific.  But it doesn't

18   say that this clinical data is more relevant or relevant at

19   all.

20   Q.    So why on earth would you give 900 patients,

21   chronically ill, a drug that you had absolutely no

22   reasonable expectation of working and no data to support it?

23   Is that your testimony?

24   A.    In the direct that I had with Ms. Holland, I presented

25   the data that convinced me that based on it I drafted my

1    hypothesis, my working hypothesis.

2    Q.    But if you didn't like the clinical data on 20

3    milligrams every other day, how on earth could you justify

4    giving 40 milligrams three times a week to patients?

5              THE COURT:  Overruled.

6    A.    Every other day 20 milligram, as I shown in the data,

7    when you change the dose and you change the frequency, you

8    may get something else.  The studies that are reported here

9    are very small and not good for efficacy.  Therefore, for me

10   this data was not the basis for the trial.

11   Q.    So you just roll the dice?

12   A.    I didn't roll the dice.  I just showed data that I was

13   relying on.

14   Q.    You didn't put any of that data on TV-5010 and the IL2

15   secretion that we saw and everything else we saw in the

16   direct, you didn't put any of that in your patent

17   specification.  Right?

18   A.    It's not there.

19   Q.    It's not in there.  Right?  No data is in there but

20   the clinical data you did have available to you on less

21   frequent dosing you are saying is insufficient to support

22   the 40 milligram three times a week dosing regimen?

23   A.    Yes, sir, because the studies are not as designed and

24   the treatment as was administered to patients was not

25   relevant to 40 milligrams three times a week.

Klinger - cross

1    Q.    It's not even relevant?

2    A.    No.

3    Q.    So you had no reasonable basis to support a clinical

4    trial for chronically ill patients for 40 milligrams three

5    times a week, over 900 patients, to run that trial?  Is that

6    your testimony?

7    A.    No.  My testimony was described in the direct with Ms.

8    Holland.  I explained the data that convinced me that we

9    should try it.  We had data with 40 milligrams, we knew it

10   was safe in patients.  And this was the trial that we wanted

11   to do to hypothesize it, to test my hypothesis, and this is

12   a legitimate way.

13   Q.    So you had -- you had 40 milligrams that you knew was

14   safe and effective.  And you had no data on less frequent

15   dosing in your opinion.  So you just wanted to run a

16   clinical trial using a thousand or more MS patients and test

17   your hypothesis?

18   A.    Yes.  I didn't have clinical data on this dosing

19   regimen.  But I had preclinical data suggesting that this

20   dosing regimen can work, potentially work.  And we had

21   safety data with the 40-milligram dose and daily injections.

22   Q.    If you had gone to the FDA based on your mouse spleen

23   data, do you think they would have approved the GALA study

24   to go forward?

25                MS. HOLLAND:  Objection.

Klinger - cross

1            THE COURT:  Sustained.

2    BY MS. BLOODWORTH:

3    Q.    That is the data you are referring to, the mouse

4    spleen data, the various in-vivo assays, in-vivo assays, not

5    even on charts?

6    A.    We had the clinicals data to support it and the

7    clinical data safety data was 40 milligram.

8    Q.    You first started discussing at Teva a 40 milligram

9    less frequent dosing in 2002.  Right?

10   A.    There were discussions at that early stage.

11   Q.    And you were involved in those discussions.  Right?

12   A.    I was part of the discussions.

13   Q.    And between 2002 and 2009 when you filed your patent

14   application you did not perform any in-vitro investigations

15   like you had with TV-5010 or the CORAL study, did you?  You

16   didn't perform any clinical data, preclinical data between

17   2002 when you first started discussing 40 milligram less

18   frequently and 2009 when you filed your patent application

19   on the 40 milligram three times a week dosing regimen?

20           I think you said did you perform any clinical

21   data.

22   BY MS. BLOODWORTH:

23   Q.    Strike that.  Did you have any preclinical data on 40

24   milligrams less frequently dosed between 2002, when Teva

25   first started talking about it, and 2009, when you filed

Klinger - cross

1    your patent application?

2    A.    Preclinical data on 40 milligrams.

3    Q.    Three times a week.

4    A.    No.

5    Q.    I would like to go back to Dr. Klinger's slide for a

6    minute.  In between 2002 and 2009, Teva didn't perform any

7    preclinical data on 40 milligrams less frequent dosing.

8    Right?

9    A.    40 milligram, this is a human dose.  We do not like

10   like to give the same dose to small animals.

11   Q.    Did you do any small animals studies to evaluate

12   whether or not a 40 milligrams three times a week dose would

13   indicate efficacy?

14   A.    As you probably noticed in the data that we showed,

15   the doses were micrograms, which were mostly for small

16   animals.  We do not use in small animals the same doses we

17   used in humans.  I couldn't inject 40 milligram.

18   Q.    But you could do the equivalent in mice, whatever

19   micrograms that is.  Right?

20   A.    I don't know what is the equivalent.

21   Q.    And you could do it three times a week.  Right?

22   A.    I could do it three times a week.

23   Q.    You didn't do it three time a week, though, did you?

24   A.    No.

25   Q.    In the meantime Teva investigated oral Copaxone.

Klinger - cross

1    Right?  And Teva investigated Copaxone for the treatment of

2    primary progressive relapse -- primary progressive MS.

3    Right?

4    A.    Yes.

5    Q.    And in that time Teva also worked on a higher

6    molecular weight TV-5010 project?

7    A.    Yes.

8    Q.    And the extended release DEPOT product, you also

9    worked on during that time period.  Right?

10   A.    Yes.

11   Q.    And you worked on the FORTE trial, 40 milligrams

12   versus 20 milligrams daily.  Right?

13   A.    Yes.

14   Q.    And you worked on SONG, a lower volume Copaxone

15   product administered daily.  Right?

16   A.    That was part of the LCM.

17   Q.    So by 2009 all of this had failed and you went to your

18   idea in 2002 of less frequent 40 milligram dosing.  Right?

19   A.    We didn't have the 40 milligrams three times a week in

20   2002.

21   Q.    You actually didn't really have 40 milligrams three

22   times a week ever.  Right?  I didn't see one document in

23   your direct examination that said I am proposing a 40

24   milligram three times a week dosing regimen.  Right?

25   A.    I think there was one, 40 milligrams three times a

Klinger - cross

1   week, 20 to 40 milligrams.

2   Q.    20 to 40 milligram grams three times a week.  Right?

3   A.    I don't recall.  I think the 40 milligrams two to

4   three times a week was proposed.

5   Q.    If you look at I think it was PTX-86.  It might be in

6   your binder, Dr. Klinger.

7   A.    I didn't have this one.

8   Q.    If you can turn to Page 3.

9   A.    This is not a slide that we were looking at.

10  Q.    Was this one of the documents that you looked at in

11  your direct presentation?

12  A.    Can you please flip it?  I don't have the copy with

13  me.

14            MS. BLOODWORTH:  The elusive PTX-86.

15  BY MS. BLOODWORTH:

16  Q.    We can look at the screen.  I was going to ask you

17  under possible resolution, the bullet point?

18            MS. HOLLAND:  May I hand one up?

19            THE COURT:  Yes.

20  BY MS. BLOODWORTH:

21  Q.    Is it possible here, you can see the first part, that

22  you put e.g., 32 to 40 milligrams GA two to three times per

23  week?  You didn't propose 40 milligrams three times per

24  week.  Right?

25  A.    What do you mean?  32 to 40 times.

Klinger - cross

1    Q.    You had some ranges that you proposed.   Right?

2    A.    Because these were the options.   It could be either

3    two times a week or three.

4    Q.    Where did you present your decision and your invention

5    of 40 milligrams three times per week?

6    A.    I discussed it during the LCM.   I discussed it during

7    the R&D meetings.

8    Q.    So the life cycle management committee is LCM.   Right?

9    A.    Right.

10   Q.    And R&D is research and development.   Right?

11   A.    Yes.

12   Q.    So you talked about a 40 milligram three times a week

13   dose?

14   A.    Yes.

15   Q.    Supposedly.

16         Strike that.

17         And you endorse any documents that actually

18   support that.   Right?

19   A.    I did present to the R&D the preclinical data that we

20   had with immunological data suggesting that we can go to

21   less frequent injections.

22   Q.    And that discussion, which began in 2002 with Dr. Comi

23   and others at Teva.   Right?

24   A.    This was not a discussion.   The discussion in 2002

25   was regarding the 40 milligram, every other day.

Klinger - cross

1    Q.    On the life cycle management team is members from

2    marketing and others.  Right?

3    A.    R&D, marketing, regulatory, medical.

4    Q.    And in developing the Copaxone products, marketing and

5    the life cycle management determined that there are two

6    important goals of the Copaxone product.  Right?

7    A.    It was the LCM determination.

8    Q.    And LCM determined those two goals were efficacy and

9    convenience?

10   A.    Increased efficacy, convenience, and we also discussed

11   other indications.

12   Q.    And as of 2009, the FORTE trial had failed.  Right?

13   A.    Right.

14   Q.    So there was no superior efficacy of the 40 milligram

15   dosed placebo at that time.  Right?

16   A.    In injections, yes.

17   Q.    That just left you convenience.  Right?

18   A.    Right.

19   Q.    And it's more convenient for patients to take less

20   frequent injections.  Right?

21   A.    I believe so.

22   Q.    If you could turn to DTX-1343, please:  You were on

23   the life cycle management committee in 2008?

24   A.    Yes.

25   Q.    And you were a member of the life cycle management

Klinger - cross

1    committee in 2008 for Copaxone.  Right?

2    A.    I remember that I was part of the life cycle

3    management for Copaxone for several years.

4    Q.    And if you could -- excuse me.  Let me back up.  This

5    is a PowerPoint connected with that life cycle management

6    committee.  Right?

7    A.    Yes.

8    Q.    And if you could please turn to Page 4, it appears you

9    presented at this meeting looking under the 9:45 time slot

10   for midterm developments.  No. 1.  It looks like you

11   presented at this meeting the high dose/low frequency

12   formulations.  Do you recall that presentation?

13   A.    No.

14   Q.    It looks like the introduction in the LCM summary

15   recommendations is going by Ety A.  Who is Ety A?

16   A.    Ety Amir.

17   Q.    What role at Teva does Ety Amir have?

18   A.    She was the head of the Copaxone marketing, the global

19   Copaxone marketing, and she chaired the LCM team.

20   Q.    And at this meeting, if you can turn to Page 2,

21   please, you will see that the challenge addressed at this

22   meeting were to effectively address the generic threat and

23   to extend Copaxone and life cycle in the changing MS market.

24   Do you recall any of those discussions at that meeting?

25   A.    I recall having this discussion in the LCM and I don't

Klinger - cross

1    recall specifically this meeting.

2    Q.    And to effectively address the generic threat, Teva

3    needed a product to get into the market between 2012 and

4    2014 depending on the RA requirement for the clinical trial.

5    Right?

6    A.    This is what this says.

7    Q.    And you are aware that Momenta and Natco had filed

8    applications with the FDA for the approval of the generic

9    Copaxone product.  Right?

10   A.    I don't remember what I was aware of at the time.

11   Q.    Do you know that there were generic filers in the U.S.

12   for Copaxone?

13   A.    I knew that Momenta and Natco worked on generic.  I

14   didn't know if they filed or not.

15   Q.    The challenge would be a 30 to 50 percent price

16   reduction.  Right?

17   A.    This is marketing input.

18   Q.    The marketing input on the LCM committee.  Right?

19   That set the goals of convenience --

20   A.    The LCM got the feedback from the marketing and the

21   medical regarding clinical efficacy.  All the information

22   regarding pricing is something that came from the marketing

23   people.

24   Q.    And pricing then was discussed at the LMC meetings,

25   also?

Klinger - cross

1    A.    It was presented by the marketing people.

2    Q.    And if you could turn in your binder to DTX-1354,

3    please.

4              This is an e-mail from Rivka Kreitman to you on

5    April 26, 2009?

6    A.    Yes.

7    Q.    Who is Dr. Kreitman?

8    A.    Dr. Kreitman was the VP R&D.

9    Q.    If you look, Dr. Kreitman is forwarding to you the

10   e-mail from Moshe because based on an LMC discussion in New

11   York we want to bring back to the next GA meeting a proposal

12   to develop a program with the following elements, dose,

13   between 20 and 40 milligrams, frequency, two to three times

14   per week.  Who is Moshe?

15   A.    Moshe Manor was the head of the Innovative

16   investigative business.

17   Q.    The head of Innovative business wanted to bring back

18   the discussion of dosing between 20 and 40 milligrams and

19   two to three times a week.  Right?

20   A.    Yes.

21   Q.    And that was discussed during the life cycle

22   management meetings at Teva.  Right?

23   A.    I don't know.

24   Q.    So Moshe brought back to the forefront the less

25   frequent dosing of GA.  Right?

Klinger - cross

1    A.    Yes, two to three times a week, he discussed here.

2    Q.    If you can turn to DTX-1349 in your binder, please.

3    This is an e-mail from Mike Netz to you dated June 9th,

4    2009.  Do you see that?

5    A.    Yes.

6    Q.    And who is Mike Netz?

7    A.    He was the head of marketing, global marketing.

8    Q.    I believe in your direct testimony you also said he

9    was one of the people who met with the CEO to discuss the

10   dosing regimen for the 40 milligram three times a week?

11   A.    To discuss the high dose/low frequency development.

12   Q.    Yes.  Thank you for that correction.

13         So Mike Netz is seeking information for that

14   presentation.  Right?

15   A.    He sent me back some slides for review.  He sent me

16   slides for review.

17   Q.    Yes.  Those slides for review proposed a 32 to 40

18   milligrams two to three times per week dosing regimen.

19   Right?

20   A.    Yes.

21   Q.    Were you at this meeting?

22   A.    With the CEO?

23   Q.    Yes.

24   A.    No.

25   Q.    Out of this meeting with the CEO came the decision to

Klinger - cross

1   perform a clinical trial on the 40 milligram three times a

2   week dosing regimen.  Right?

3   A.    In the first meeting, the decision was to have a three

4   arm study for 15 milligrams three times a week, 40

5   milligrams three times a week, and placebo.

6   Q.    So the 40 milligrams three times a week for the one

7   arm came out of the meeting with the CEO in June of 2009?

8   A.    No, not correct.

9   Q.    It's not correct because it's a three-arm study?

10  A.    No.  Because the idea didn't come from the CEO.

11  Q.    Okay.  At the meeting, the meeting was -- the

12  presentation went in 32 to 40 milligrams two to three times

13  per week.  Right?

14  A.    Yes.

15  Q.    And what came out of that meeting was a three-arm

16  study using 40 milligrams three times per week and placebo

17  and 15 milligrams three times per week.  Right?

18  A.    Again, the different doses that were proposed were

19  proposed by the LCM.  The LCM provided the ranges.  Before

20  the meeting with the CEO we had a lot of discussion about

21  the different doses and dosing regimens within the LCM,

22  including the 40 milligrams three times a week.

23  Q.    40 milligrams three times a week was not proposed,

24  though, right?  Not specifically?

25  A.    It was proposed.

Klinger - cross

1    Q.    In a range?

2    A.    Two choices were proposed.  The 40 milligrams three

3    times a week was one of them.

4    Q.    And the other one?

5    A.    32.  It's the range.  But 40 milligrams three times a

6    week was discussed way before that within the LCM team.

7    Q.    And you are a proponent of dropping the 15 milligram

8    three times a week arm.  Right?

9    A.    You mean I was in favor of dropping that arm.

10   Q.    And Etty Amir, the head of marketing, was also in

11   favor of dropping that arm.  Right?

12   A.    I don't recall.

13   Q.    If you can turn to Exhibit 1358 in your binder.  I am

14   looking at the bottom e-mail on the first page.  This is an

15   e-mail dated July 7th, 2009.  Correct?

16   A.    Yes.

17   Q.    It's just one month before your patent application is

18   going to be filed?

19   A.    The August application?

20   Q.    Yes.

21   A.    Yes.

22   Q.    And in the second sentence you say -- excuse me, the

23   first sentence you say, Hi, Rivka.  As you can see below the

24   GA LCM team are willing to revisit the decision to include

25   the 15 milligram dose and argue against it.  Although this

Klinger - cross

1   initiative is led by Etty/marketing, I fully agree with

2   this.

3           So it was Etty Amir, the head of global

4   marketing at Teva, that was leading the charge for dropping

5   the 15 milligram arm.  Right?

6   A.    They started a discussion.  But I agree with them

7   because of my scientific considerations.

8   Q.    You write to Dr. Kreitman, in the second paragraph,

9   the sentence begins, It is my opinion, it is my opinion that

10  if we want to try another dose it is better to use 40

11  milligram once weekly versus 40 milligrams three times a

12  week versus placebo.  It is easier to explain this kind of

13  dosing regimen, the total weekly dose say of 40 milligrams

14  weekly is similar to 15 by 3 times a week.  IF weekly works

15  then this is a big win.  If it does not work this is also

16  good because of pricing, et cetera.

17          So you are proposing a dose, an arm of a study

18  to give a clinical trial to patients, and you are okay if

19  one of the arms fails.  Right?  Because it's a big win

20  because of pricing?

21  A.    I didn't know if those would be a failure.  I thought

22  that if we -- to improve our product, there is no reason to

23  go to 15 milligrams three times of week because, first of

24  all, there is a safety concern.  This is a very low -- with

25  20 milligram, we had no problem with safety.  Why should we

Klinger - cross

1    reduce the dose?

2            So going with 15 milligrams seems to me at that

3    time point a reasonable approach to go to.  I thought that

4    if we want to explore something that -- if successful would

5    be really available, then the other option besides the 40

6    milligrams three times a week that we preferred is the

7    weekly.

8            Although I had some reservation with the weekly.

9    I didn't know if the three times a week would work.  I

10   didn't know if the weekly would work.  My preference was the

11   three times a week.

12   Q.    If it doesn't work it's okay because of pricing?

13   A.    What do you mean?

14   Q.    With the 40 milligrams once times a week, if that

15   doesn't work, that's okay because of pricing?  That's all

16   what you wrote.

17   A.    This is what it says.  I don't remember now, my

18   recollection of the pricing.  This is what the document

19   says.

20   Q.    You discussed pricing at the LCM meetings.  Right?

21   A.    Yes.  It came up from the marketing people.

22   Q.    Dr. Klinger, can you please turn to JTX-7003 in your

23   binder.  I believe we were looking at it earlier.  If you

24   can look at Page 2.  I don't have the number in the upper

25   right-hand corner.

Klinger - cross

1                    Again, you are the sole inventor listed on the

2    '776 patent.  Right?

3    A.    Yes.

4    Q.    And the filing data is May 22nd, 2015.  Right?

5    A.    Yes.

6    Q.    And the patent issued on October 13th, 2015?

7    A.    Where can I see that?

8    Q.    It's up in the upper right-hand corner.

9    A.    I can see that.

10   Q.    The patent was filed years after you left Teva in

11   2011.  Right?

12   A.    Yes.

13   Q.    And it issued even later, in 2015.  And you never saw

14   the patent before it was filed.  Right?

15   A.    No, I didn't see it.

16   Q.    You didn't see the patent, the '776 patent, until

17   months after it issued.  Right?

18   A.    I didn't see the patent.

19   Q.    Do you know that the claims of the '776 patent are to

20   a reduced severity of the 40 milligram three times a week

21   dosing regimen to the 20 milligram?

22   A.    Can you please show me that?

23   Q.    The claims are at the back of the document.  It looks

24   like it is Column 15.  Have you seen these claims before?

25   A.    I reviewed them in the past.  But I cannot remember by

1    heart what is written here.

2    Q.    Did you review them before it was filed with the

3    Patent Office?

4    A.    No.

5    Q.    Did you regard switching from 20 milligrams daily to

6    40 milligrams three times a week to reduce rejection site

7    severity to be your invention in August 2009?

8    A.    The initial invention, the initial application

9    included, also, a reduction in the tolerability issues.

10   Q.    You mean improvement?

11   A.    Improvement in tolerability.

12   Q.    And you will improve tolerability by reducing the

13   frequency of injection site reactions.  Right?

14   A.    The severity.

15   Q.    Can you improve tolerability by reducing the amount of

16   injections?

17   A.    Frequency and severity.  Frequency of injection site

18   reactions and severity.

19   Q.    So to increase tolerability you need to both reduce

20   the frequency of injection site reactions and to reduce

21   their severity?

22   A.    It is preferred.

23   Q.    In your patent application, you exclude patients who

24   are on 20 milligram who are taking GA therapy.  Right?  In

25   the example we reviewed?

Klinger - cross

1    A.    In the example, yes.

2    Q.    And in order to assess the relative severity of

3    injection site reactions that a patient suffers as between

4    two difference dosing regimens you would need some method

5    for grading the severity of the injection site reactions.

6    Correct?

7    A.    Yes, in the clinical trials there were some scales

8    that were being used to assess that.

9    Q.    And you didn't use any grading in the patent

10   application.  Right?

11   A.    I don't recall if I used that.

12   Q.    Did you want to check?  The word severity appeared one

13   time.  I can show you where that is if that helps refresh

14   your memory.  Or you can review the whole thing.

15   A.    You want me to review the whole example.

16   Q.    The example had a primary end point of 40 milligrams

17   to placebo.  Right?

18   A.    You mean the primary?

19   Q.    There is a primary outcome, there is a secondary

20   outcome, there is the exploratory end points?

21   A.    Yes.

22   Q.    And there are the tolerability outcomes?

23   A.    Where do you see them?

24   Q.    Under the secondary outcomes?

25   A.    Can you specify the column and the lines?

Klinger - cross

1    Q.    I am looking at Column 12, Line 56.  See the safety

2    and tolerability outcome measures?

3    A.    Yes.

4    Q.    And safety begins around Line 53 and tolerability

5    around Line 62?

6    A.    Yes.

7    Q.    And tolerability is proportion of subjects who

8    prematurely discontinued from the study, reason of

9    discontinuation and the time to withdrawal?

10   A.    Yes.

11   Q.    Is there anything about the severity of injection site

12   reactions there?

13   A.    I don't see it here.

14   Q.    As of August of 2009, you do not know if there was

15   more than one way to grade the severity of injection site

16   reactions.  Correct?

17   A.    This is usually, usually the grades and the scale that

18   were used in the clinical studies were determined by the

19   medical team and the clinical people.  I was not very much

20   involved with that.

21   Q.    As the inventors of the '776 patent to a claim for

22   reduced severity, didn't you need to explain what you meant

23   by that in your patent specification?

24         MS. HOLLAND:  Your Honor, I didn't hear it

25   exactly, it sounded like it was asking what the requirements

Klinger - cross

1     for a patent specification were for legally.

2               THE COURT:  No.  You can answer that question,

3     if you can.  Do you understand the question?

4               THE WITNESS:  Can you please repeat it?

5     BY MS. BLOODWORTH:

6     Q.    I can.  This patent is to claims of reduced severity

7     OF injection site reactions of 40 milligram patients

8     relative to 20 milligrams patients.  Right?

9     A.    Yes.

10    Q.    There is no comparison in Example 1 of 40 milligrams

11    to 20 milligrams.  Right?

12    A.    The study does not compare 40 to 20 milligrams.

13    Q.    In the patent specification, you didn't describe

14    anywhere how you would reduce the severity of the 40

15    milligram three times a week relative to the 20 milligrams,

16    either.  Right?

17    A.    The idea was that the method of treatment, new method

18    of treatment, would cause a reduction in the complaints and

19    increase tolerability.

20    Q.    How would you determine the reduced severity reading

21    your patent specification?  How would you grade the severity

22    reduction?

23    A.    Again, I don't know if the scales -- the medical

24    scales were included in the patents.  But in the protocol,

25    the medical and the clinical team should have provided the

Klinger - cross

1    tools on how to measure that.

2    Q.    Dr. Klinger, did you or did you not invent a method

3    for measuring the severity of injection site reactions in

4    your patent?

5    A.    The method of treatment, the 40 milligram three times

6    a week, the working hypothesis was that this would reduce

7    the injection site reaction and the severity, the actual

8    medical treatment.

9    Q.    Did you actually put in a method for measuring the

10   severity of the injection site reactions in your patent

11   specification?

12   A.    I don't recall if it is in the patent.  It should be

13   in the protocol.

14   Q.    And you as of August of 2009 knew that there were

15   multiple ways to grade severity of injection site reactions.

16   Right -- you did not know.

17              As of August 2009, you did not know that there

18   were multiple ways of measuring severity?

19   A.    There were ways to measure that.  I was not expert in

20   that.  I left it to the medical and to the clinical teams.

21              MS. BLOODWORTH:  Your Honor, may I consult?

22              THE COURT:  Yes, you may.

23              (Pause.)

24   BY MS. BLOODWORTH:

25   Q.    I am going switch topics on you to the GALA protocol

1    for a minute, if I may.  That was 1707.  If you could turn

2    to Page 21, please.  On Page 21.  If you look at the

3    paragraph, it's the penultimate paragraph on Page 21 that

4    begins in the absence of data.  Again, to reorient you, this

5    is the GALA clinical trial protocol that was submitted to

6    the FDA, we were in the section rationale for dose regimen

7    selection.  The protocol states, In the absence of data

8    about the efficacy of lower frequency administration of GA

9    20 milligrams in large, well controlled studies, the sponsor

10   has decided to make a more conservative approach.  Therefore

11   the subjects will receive approximately the same weekly

12   dose, given by three subcutaneous injections instead of with

13   a daily injection frequency of severance injections.

14             Do you agree with that statement?

15   A.    I agree that this is written here.  The reason to go

16   to the 40 milligrams three times a week  were the reasons I

17   described in the direct.  The fact that the weekly dose did

18   not, I felt more comfortable.

19   Q.    If you could turn to the next page, please.  Again, in

20   the middle, the first full paragraph on Page 22, it begins

21   Three Weekly Doses, if you look at the last sentence, it

22   states, "If this dose regimen is indeed found to be

23   effective, RRMS patients will benefit from a much more

24   convenient injection schedule, and the enhanced compliance

25   rebuttal from this will help maintain the long term efficacy

Klinger - cross

1    of this treatment.

2                Do you agree with that?

3    A.    Yes.

4    Q.    And it goes on and says in the next paragraph, It

5    should also be noted that considering the reduced injection

6    frequency and the fact that the GA/9016 study, local

7    reaction at the injection sites and immediate transient

8    reactions following injection were reported with a similar

9    incidence for both doses, one may certainly expect a return

10   in the frequency of such reactions with this new dose

11   recommendation, further enhancing subject adherence to

12   treatment.

13               Dr. Klinger, the GA 9016 study is the FORTE

14   trial.  Right?

15   A.    Yes.

16   Q.    Do you agree that the 20 milligram arm of the FORTE

17   study and the 40 milligram daily arm of the FORTE study had

18   local reactions to the injection site and might do immediate

19   transient reactions following injection with a similar

20   incidence for both doses?

21   A.    No.

22   Q.    You disagree what was told to the FDA there?

23   A.    A reference here, I know with the 40 milligrams, the

24   frequency and severity of the 40 milligram was higher.

25               MS. BLOODWORTH:  Your Honor, I have no further

1   questions.   I believe one of the co-defendants may have some

2   additional couple questions for the witness.

3             THE COURT:  Mr. Rakoczy.

4             MR. RAKOCZY:  Brief followup, Your Honor.

5             THE COURT:  Brief.

6   BY MR. RAKOCZY:

7   Q.    Good afternoon, Dr. Klinger.  My name is William

8   Rakoczy.   I represent the Sandoz and the Momenta defendants.

9   Could you please pull out the '776 patent again.   It's

10  JTX-7003.  Let's go to Column 16, Line 9.  It's on your

11  screen as well, Dr. Klinger.  It's the sentence that starts

12  with Finally.   It states quote, Finally, due to the complex

13  pharmacokinetic behavior of a drug, variation in the

14  frequency of administration is unpredictable and requires

15  empirical testing, end quote.

16            Do you see that?

17  A.    Yes.

18  Q.    Your patent does not contain any empirical clinical

19  testing 40 milligrams three times a week GA regimen.

20  Correct?

21  A.    Didn't have -- the patent doesn't have that, that's

22  correct.

23  Q.    That's a true statement, correct, in your view you

24  believe that because the frequency of administration of a

25  drug is unpredictable, you believe that it requires

Klinger - cross

1    empirical testing.  Correct?

2    A.    Yes.

3    Q.    Now, the only data that you had in your possession

4    when you filed this patent application was, and we went

5    through three documents and I have just a few documents on

6    the TV-5010 immunology or non-clinical data.  Correct?

7    A.    We had also the immunology.

8    Q.    You had the FORTE data.  Correct?

9    A.    You are discussing with only clinical data?

10   Preclinical or clinical?

11   Q.    I will be more specific.  Why don't you turn to

12   PTX-151.  This is one of the three documents referenced, the

13   R on TV-5010 in this document, I believe you testified about

14   the non-clinical data on TV-5010 then in animals.  Correct?

15   A.    Including GA.

16   Q.    Yes, including GA as well?

17   A.    Yes.

18   Q.    This is some of the data that you said supported your

19   hypothesis that the 40 milligrams three times a week GA

20   would work.  Correct?

21   A.    Yes.

22   Q.    This data, and I want to be crystal-clear now, this

23   data in PTX-151, is not in your patent.  Correct?

24   A.    It is not in the patent.

25   Q.    So the skilled person, in August of 2009, would not

Klinger - cross

1   have had access to this data that you testified about at

2   PTX-151.  Correct?

3                 MS. HOLLAND:  Objection.  That asks for opinion

4   testimony.

5                 THE COURT:  I am going to sustain that.

6                 MR. RAKOCZY:  I will move on, Your Honor.

7   BY MR. RAKOCZY:

8   Q.    Let's look at the other document you referenced, Dr.

9   Klinger, which is PTX-153.  Do you recall, this is the

10  TV-5010 safety data that you testified about?  Correct?

11  A.    Safety advisory, yes.

12  Q.    I want to make it clear for the record, this is also a

13  piece of data that you relied on to support your hypothesis

14  for the 40 milligrams three times a week regimen.  Correct?

15  A.    Yes.  It was taken into consideration.

16  Q.    And this data at PTX-153 is not in your patent.

17  Correct?

18  A.    Correct.

19  Q.    All right.  One last, I believe it's in your same

20  binder, PTX-83.  I believe it is a collection of PowerPoint

21  slides, which has some immunological results, again, for

22  both GA/TV5010.  Correct?

23  A.    What was the question?

24  Q.    I apologize.  I will ask again.  PTX-83, this is a

25  collection of slides that also contains some data on some of

Klinger - cross

1    the immunology testing that you had conducted on GA and

2    TV-5010.  Correct?

3    A.    Correct.

4    Q.    And this is some of the same data again that you

5    relied on to support your 40 milligrams three times a week

6    regimen.  Correct?

7    A.    Yes.

8    Q.    And this document and data at PTX-83, this is also not

9    in your patent.  Correct?

10   A.    It's not in the patent.

11   Q.    Now, the three documents that we just went through,

12   PTX-153, 151, and 83, those are not public information.

13   Correct?

14   A.    I don't know.  I don't know if it was public or not.

15   Q.    You don't know at the time --

16   A.    I know that the information, that was proprietary I

17   don't know if at that time any of this data was published.

18   I think it was not.  But I am not sure.

19   Q.    Okay.  One last document.  PTX-83.  This was the last

20   one you mentioned.  This was the one that was not in your

21   binder.  I am sorry.  The next one I want to go to is

22   PTX-86.  This document also contains immunology and other

23   data that you relied on and that supported your hypothesis

24   for a 40 milligram three times a week dosing regimen.

25   Correct?

Klinger - cross

1    A.    It was a summary.

2    Q.    And this summary, PTX-86, this is also not in your

3    patent.  Is that right?

4    A.    As far as I recall -- I don't know if it is in the

5    patent.  I don't know.

6    Q.    Now, in supporting your hypothesis that the 40

7    milligrams three times a week dosing regimen would work, I

8    want to be clear.  You did not rely on the Flechter and Khan

9    every other day studies.  Correct?

10   A.    Yes.  Personally, I did not.

11   Q.    Now, you are not an M.D., like Dr. Khan and Dr.

12   Flechter, are you?

13   A.    I am not an M.D.

14   Q.    And you don't prescribe GA and treat MS patients like

15   Dr. Flechter and Dr. Khan?

16   A.    Correct.

17   Q.    All right.  Switching gear on you, my last couple

18   question, hopefully.

19            The '776 patent and the severity limitations.

20   Now, if you hadn't seen the reduced severity claims in that

21   application before it was filed, then did the lawyers from

22   Teva, are they the ones that drafted up and filed those

23   claims?

24   A.    Again, the way it works is that I provided the

25   invention, the concept, the example of the clinical study as

Klinger - cross

1    we drafted the synopsis for the data.  And the actual

2    writing and preparation of the patents were done by patent

3    experts, not by me.

4    Q.    I understand that.  My question is a little more

5    specific to the '776 patent, at JTX-7003, on Page 2.  You

6    see this application was filed on May 22nd, 2015.  And you

7    had mentioned that you never saw this before it was filed.

8    My next question is, who drafted and prepared and signed off

9    on these reduced severity claims in the '776 patent filed on

10   May 22nd, 2015 if it wasn't you?

11   A.    I didn't draft the patent.  I received letters to sign

12   on the assignments.  I don't know what were the -- I don't

13   recall what were the letters for the signing.  But I didn't

14   draft these patents.  I understood that these are from my

15   original patent.

16   Q.    I will get to that in one second.

17         Actually, you mentioned something earlier

18   connecting this patent to your original patents.  And when

19   you were asked about tolerability, you kept saying frequency

20   and severity.  So I want to follow up on that, just a couple

21   quick questions.  Is it your view that if a medication like

22   40 milligrams GA dosed three times per week is more

23   tolerable than that, then that means that it has improved

24   the -- reduced the frequency and the severity of the

25   injection site reactions?

1   A.     Per the definition of tolerability that I consider,

2   yes.

3   Q.     So if the regimen, if giving the 40 milligram three

4   times a week regimen to a patient improves the tolerability,

5   then inherently it has reduced the frequency and severity of

6   injection site reactions.  Correct?

7   A.     Yes.  It has to.

8   Q.     Dr. Klinger, one last question.  You didn't submit

9   anything to defend your patents that were challenged by

10  Mylan in the PTAB proceedings.  Correct?

11  A.     I didn't submit anything.

12  Q.     Were you even aware of those proceedings?

13  A.     No.

14          MR. RAKOCZY:  Thank you.

15          THE COURT:  Thank you, Mr. Rakoczy.

16          MR. RAKOCZY:  No further questions, Your Honor.

17          THE COURT:  Anybody else from your team?

18          MS. BLOODWORTH:  No, Your Honor.  This side has

19  concluded.

20          THE COURT:  Your redirect, Ms. Holland.

21                  REDIRECT EXAMINATION

22  BY MS. HOLLAND:

23  Q.     Dr. Klinger, I would like to clear up a few things

24  about the filing of the patent and the patent applications.

25          Is it your understanding that the application

Klinger - cross

1    that was filed by you in 2009 is the same specification that

2    went forward in each of the patents in suit in this case?

3    A.    I don't understand exactly the question.

4    Q.    Dr. Klinger, you reviewed the patent application in

5    2009 before it was filed.  Correct?

6    A.    Yes.

7    Q.    And do you know one way or the other whether the

8    patent applications that came after that, for the other

9    three, were for the three patents at issue in this case,

10   have the same language other than the claims?

11   A.    I asked what are the other patent applications.  And I

12   understood that these patent applications are driven from my

13   original one.

14   Q.    But you did review in 2009?

15   A.    Yes.

16   Q.    I would like to talk a little about the '776 patent.

17   You were asked questions by both Ms. Bloodworth and Mr.

18   Rakoczy about that.  I would like to clear up some of the

19   confusion that might have happened about the tolerability --

20             THE COURT:  I am going to ask counsel not to

21   editorialize.

22             MS. HOLLAND:  Yes, Your Honor.

23   BY MS. HOLLAND:

24   Q.    Let's go to the '776 patent.  That was JTX-7003.  I

25   would like to point you first to Column 3 of the patent.

Klinger - redirect

1    That's on Page JTX-7003.13.

2            If we can go to Column 3, I would like to look

3    at Line about 34.  Is this part of your invention as

4    described in the patent the use of glatiramer in the

5    preparation of a medicament increasing the tolerability of

6    GA treatment in a human patient from relapsing remitting

7    multiple sclerosis?

8    A.    Yes.

9    Q.    Then if you look again at the bottom of Column 3, at

10   around Line 63, is this again something that you included in

11   your invention, This invention also provides glatiramer

12   acetate for use in increasing the tolerability of GA

13   treatment in a human patient suffering from relapsing

14   remitting multiple sclerosis?

15   A.    Yes.

16   Q.    Then again, in Column 5, which now we are on Page

17   JTX-7003.14, we are looking at Line 23, is this another

18   reference you included in your patent to a method of

19   increasing the tolerability of GA treatment?

20   A.    Yes.

21   Q.    And if we keep going down Column 5 and go to Line 54,

22   is there an additional disclosure of increasing the

23   tolerability of GA treatment in a human patient as being

24   part of your invention?

25   A.    Yes.

1     Q.     And then in the next paragraph down in Column 5, you

2     describe some different types of injection site reactions.

3     Is that right?

4               MS. BLOODWORTH:  Objection.  Leading.

5               THE COURT:  Sustained.

6     BY MS. HOLLAND:

7     Q.     What is described in the paragraph that begins on Line

8     57 of your -- '776 patent, Column 5?

9     A.     It describes what are the clinical symptoms of the

10     clinical attack.

11     Q.     I am looking at Line 58, the paragraph that begins, In

12     a further embodiment.  Just the first paragraph there.  What

13     is being described there, Dr. Klinger?

14     A.     It is describing the symptoms of injection site

15     reaction, these are erythema, hemorrhage, induration,

16     inflammation, mass, pain, pruritis, urtacaria or injection

17     site welt that occurs immediately around the site of

18     injection.

19     Q.     And did you consider what is described in the

20     paragraph beginning Column 5, Line 54 through the end of

21     Line 61, did you consider those to be part of your

22     invention.  Column 5, Lines 54 to 61?

23     A.     I am reading.

24          Yes.

25     Q.     And if we look at Example 1 itself, and you had some

Klinger - redirect

```
 1    questions about Example 1, that's in Column 8, if you look
 2    at the very beginning of Example 1, it starts on Lines 62,
 3    about, how do you describe what the clinical trial is meant
 4    to assess?
 5    A.    The efficacy, safety and tolerability of glatiramer
 6    acetate injection 40 milligrams per ml administered three
 7    times weekly by subcutaneous injection over placebo in a
 8    double-blind design.
 9    Q.    Then if you turn further in Example 1 and you go to
10    Column 12 of the '776 patent, that's on Page JTX-7003.17, is
11    there a section there that's called Safety and Tolerability
12    Outcome Measures?  And this is Column 12 at about Line 56.
13    A.    Yes.
14    Q.    And is there a section specifically called
15    Tolerability Measures?
16    A.    Yes.
17    Q.    And did you consider assessing the durability of the
18    treatment to be part of your invention?
19    A.    Yes.
20    Q.    Ms. Bloodworth asked you some questions about,
21    discussions about 40 milligram every other day in 2002 with
22    Dr. Comi.  Do you recall Ms. Bloodworth doing that?
23    A.    Yes.
24    Q.    What is your understanding of what doctor -- first of
25    all, who is Dr. Comi?
```

1    A.      Dr. Comi is a neurologist from Italy.  He is a key

2    opinion leader.  He worked with us in mini-trials that were

3    described today.

4    Q.      What is your understanding of what Dr. Comi's views

5    were with respect to the 40 milligram every other day

6    regimen that had been discussed in 2002?

7                    MS. BLOODWORTH:  Objection.  Hearsay.

8                    MS. HOLLAND:  I believe Ms. Bloodworth opened

9    the door on this.

10                   MS. BLOODWORTH:  No, Your Honor.  I asked her if

11   she -- if the discussion of 40 milligrams less frequent

12   dosing in 2002 occurred.

13                   THE COURT:  Does this not accurately

14   characterize what she referred to?

15                   MS. HOLLAND:  I wrote a note about it, but I

16   don't remember exactly what the question was.  I did

17   remember at the time there was an insinuation that Dr. Comi

18   was somehow involved in this whole 40 milligram every other

19   day in 2002.  I would --

20                   THE COURT:  I didn't understand that.

21                   MS. HOLLAND:  May I can ask it a little

22   differently.

23   BY MS. HOLLAND:

24   Q.      What did Teva do in response to the views of Dr. Comi

25   about the 40 milligram every other day?

Klinger - redirect

1            MS. BLOODWORTH:  Objection.  Foundation.

2            THE COURT:  If you know.  If they did anything.

3            THE WITNESS:  I recall that in 2002 the option

4  of having the study of every other day with 40 milligram was

5  raised.  But eventually, we did a Phase II -- this is a

6  trial that tested 40 milligrams every day.

7  BY MS. HOLLAND:

8  Q.    Did Teva pursue the every other day regimen at that

9  time?

10 A.    No.

11 Q.    Was Dr. Comi involved in that decision?

12 A.    I know that we consulted with him.

13 Q.    I want to go back to PTX-86.  You were asked about

14 this earlier on cross-examination.  You also talked about

15 this on your direct examination.  Do you recall that?

16 A.    Yes.

17 Q.    Do you have a copy of this in front of you?

18 A.    I have it on the screen.

19 Q.    Thank you.  Just to be clear, who prepared this

20 presentation for the CEO?

21 A.    The presentation was a collection of information of

22 the LCM team.  I included in the presentation the slides

23 that referred to the scientific.  But I collected also the

24 slides that were prepared by the other members of the LCM.

25 Q.    Just to make sure I understand your testimony, you put

Klinger - redirect

1    in the scientific pieces into this presentation and you

2    collated the parts that others had put in.  Is that right?

3    A.      The information that came from others.

4    Q.      The scientific parts of this presentation for the CEO,

5    those were your views, personal views.  Is that right?

6    A.      This was the information, yes, it was my view and R&D

7    view also.

8    Q.      Now, I want to go back to the Page 86.5.  Let's go to

9    86.4.  Then there is a discussion of three different

10   recommendation there.  Do you see that?

11   A.      Yes.

12   Q.      Did you ultimately advocate with the CEO for a

13   particular regimen?

14   A.      I was not present in that meeting.

15   Q.      Did you attend a second meeting with the CEO where you

16   advocated for one particular regimen?

17   A.      Yes.

18   Q.      What regimen was that?

19   A.      40 milligrams three times a week.

20   Q.      And Slide PTX-86.5, that is entitled Currently

21   Available Information, did you put this particular slide

22   together?

23   A.      Yes.

24   Q.      Does this slide reflect your thinking on what you used

25   to support the 40 milligram three times a week dosing

Klinger - redirect

1    regimen?

2    A.    This is what -- this is the currently available

3    information that I knew that was available to me, and I put

4    it here.

5    Q.    And what you told the CEO in June 2009 --

6          MS. BLOODWORTH:  Objection.  Foundation.

7    Mischaracterizing the testimony.

8    BY MS. HOLLAND:

9    Q.    Did you prepare these slides, Dr. Klinger?

10   A.    I just explained, I prepared the slides, the slides

11   are referring -- the slides referring to the scientific

12   information written by me.  I collected also the information

13   from the other LCM members to put it in one presentation.

14   Q.    Did you have an understanding at that time as to

15   whether these slides that you put together were going to be

16   presented to the CEO?

17   A.    Yes.

18   Q.    And when you put the slides together for the CEO in

19   June 2009, what is the first piece of information that you

20   wanted to give the CEO about the support for your 40

21   milligram three times a week regimen?

22   A.    I mentioned the technology data that was available

23   from GA and TV-5010 that suggests the immune tolerance can

24   be achieved by less frequent injections.

25   Q.    Is that the data you presented us today?

1    A.    Yes.

2    Q.    Teva had done clinical trials prior to 40 milligrams

3    three times a week trial where you didn't actually have

4    human data before you went and put it into patients.  Is

5    that right?

6    A.    This is how it works.  You need to start somewhere,

7    before patients.

8    Q.    For example, before the CORAL trial, what information

9    did you have about oral dosing of Copaxone?

10   A.    We had the Phase I, a small study in patients that

11   were treated for ten days with the oral formulation.

12   Q.    Did you have any efficacy data on humans before you

13   went into the CORAL trial?

14   A.    No.

15   Q.    TV-5010, did you have any efficacy data from humans

16   before you went into the Phase II studies you discussed?

17   A.    Not with the 5010 version that we developed in 2005,

18   no.

19   Q.    So in your experience at Teva, is it common to rely on

20   preclinical data as a basis for first use of a new regimen

21   or new compound in humans?

22   A.    Usually you start with preclinical data.  To start the

23   first trials, with the 40 milligrams, we had a lot of safety

24   data, clinical data.

25   Q.    You were asked about the Khan, the Flechter and the

Klinger - redirect

1   Khan papers in your cross-examination.  Do you recall?

2   A.   Yes.

3           MS. BLOODWORTH:  Objection.  I believe Ms.

4   Holland objected to my use of the Khan 2009 paper.

5           MS. HOLLAND:  It was the Khan 2008 paper.

6           THE COURT:  Are you two agreeing on that?

7           MS. HOLLAND:  I believe so.

8           THE COURT:  So you withdraw the objection.

9           MS. BLOODWORTH:  I withdraw the objection.

10  Thank you very much.

11  BY MS. HOLLAND:

12  Q.   I want to look at the Khan paper just for a minute,

13  7060.  I would like to turn to Page 7060.2.  I would like to

14  go to the abstract section.  I believe Ms. Bloodworth

15  pointed you to a sentence in the Conclusions section, but I

16  would like to point you to a sentence right before the

17  conclusions section.  Can we put that on the screen.  It

18  begins Some Features.

19  A.   Yes.

20  Q.   What is your understanding of what the Khan paper is

21  saying here?

22  A.   That some features of injection site reactions and

23  immediate post-injection reactions were more common and

24  severe with the higher dose.

25  Q.   Was that your understanding at the time you were

1    working on your invention?

2    A.    Yes.

3    Q.    I would also like to look at the Flechter paper

4    briefly.  That was 7078.  Again, Ms. Bloodworth had pointed

5    to the one sentence in the conclusion.  I would like to

6    point you to a sentence on Page 15, it's JTX-7078.5.  It's

7    the first full paragraph on the page.  What was your

8    understanding of the first sentence in this paragraph, Dr.

9    Klinger?

10   A.    That the author indicated that the study reported here

11   was uncontrolled, therefore, all conclusions cannot be used

12   to prove efficacy.

13   Q.    Was that your understanding of the Flechter paper at

14   the time you were working on your 40 milligram three times a

15   week invention?

16   A.    Yes.

17   Q.    Let's look briefly at the Khan paper, 7089.

18         I should say the Khan abstract.  This is an

19   abstract.

20   A.    Yes.

21   Q.    As far as you know, was this ever published as a full

22   paper?

23   A.    I don't know.

24   Q.    Well, let's take a look on Page 7089.4.

25         I want to go to the background section, please.

Klinger - redirect

1    The sentence before, where it says Methods.  It's the P902

2    abstract.  There is a sentence, the last sentence in the

3    background section that starts with The primary end point.

4    Can we look at that sentence please.  Right before where it

5    says Methods.  It says, The primary end point was based on a

6    composite of clinical, MRI, and immunologic outcomes.

7                    Do you see that?

8    A.    Yes.

9    Q.    Did the Khan paper provide you with any understanding

10   of what exactly the primary end point was in that study?

11   A.    No.

12   Q.    Is this a primary end point that you have ever seen

13   before in a clinical trial?

14   A.    No.  This is not a primary end point that indicates

15   efficacy.

16   Q.    Just to be clear, the Khan -- the Flechter and the

17   Khan -- the Flechter paper and the Khan abstract, were

18   either of those three times a week dosing?

19   A.    No.

20   Q.    Either of those 40 milligram dosing?

21   A.    No.

22   Q.    Is every other day dosing -- did you consider that to

23   be a different dosing regimen than your three times a week

24   dosing regimen?

25   A.    Yes.

Klinger - redirect

1   Q.   And did you have a specific scientific rationale for

2   the three times a week dosing regimen?

3   A.   I just showed the data that convinced me that we

4   should pursue this option and test it.

5   Q.   One more question.  Going back to 1707, DTX-1707, Ms.

6   Bloodworth asked you several questions about the section

7   that begins on Page DTX-1707.21.  I want to be clear.  Did

8   you write this section?

9   A.   No.

10        MS. HOLLAND:  I have nothing further, Your

11   Honor.

12        THE COURT:  We will begin again at 9.

13        MS. BLOODWORTH:  Thank you, sir.

14        (Witness excused.)

15        (Court recessed at 5:12 p.m.)

16

17

18

19

20

21

22

23

24

25