```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3                            -  -  -

 4    IN RE COPAXONE 40 MG          )      C.A. No. 14-1171-GMS
      CONSOLIDATED CASES           )        (CONSOLIDATED)
 5
                                   -  -  -
 6
                           Wilmington, Delaware.
 7                    Tuesday, September 27, 2016
                               9:00 a.m.
 8                      Day 2 of Bench Trial

 9                            -  -  -

10    BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

11    APPEARANCES:

12              JOHN W. SHAW, ESQ., and
                KAREN E. KELLER, ESQ.
13              Shaw Keller LLP
                     -and-
14              PAUL W. WARE, ESQ.,
                DARYL WIESEN, ESQ.,
15              JOHN T. BENNETT, ESQ.,
                ELIZABETH J. HOLLAND, ESQ.,
16              NICHOLAS K. MITROKOSTAS, ESQ., and
                WILLIAM JAMES, ESQ.,
17              Goodwin Procter LLP
                (Washington, D.C.)
18                   -and-
                STEPHEN B. BRAUERMAN, ESQ., and
19              SARA BRUSSIERE, ESQ.
                Bayard P.A.
20
                                Counsel for Plaintiffs
21

22

23

24

25
```

```
 1     APPEARANCES CONTINUED:

 2            FREDERICK L. COTTRELL, III, ESQ.
              Richards, Layton & Finger, P.A.
 3                   -and-
              DAVID L. ANSTAETT, ESQ.
 4            Perkins Coie LLP
              (Madison, WI)
 5                   -and-
              SHANNON M. BLOODWORTH, ESQ.,
 6            BRANDON M. WHITE, ESQ.,
              EMILY J. GREB, ESQ., and
 7            ROBERT D. SWANSON, ESQ.
              Perkins Coie, LLP
 8            (Washington, D.C.)

 9                           Counsel for Defendants
                             Mylan, Inc. and
10                           Mylan Pharmaceuticals, Inc.

11            DOMINICK T. GATTUSO, ESQ.
              Procter Heyman & Enerio LLP
12                   -and-
              WILLIAM A. RAKOCZY, ESQ.,
13            DEANNE M. MAZZOCHI, ESQ.,
              RACHEL PERNIC WALDRON, ESQ.,
14            MATTHEW V. ANDERSON, ESQ.,
              THOMAS H. ERLICH, ESQ.
15            ERIN FORBES, ESQ., and
              CHRIS GALLIGAN, ESQ.
16            Rakoczy Molino Mazzochi & Siwik LLP
              (Chicago, IL)
17
                             Counsel for Defendants
18                           Sandoz Inc. and Momenta
                             Pharmaceuticals, Inc.
19
              RICHARD W. RILEY, ESQ.
20            Duane Morris LLP
                     -and-
21            CHRISTOPHER S. KROON, ESQ., and
              ANTHONY J. FITZPATRICK, ESQ.
22            Duane Morris LLP
              (Boston, MA)
23
                             Counsel for Defendants
24                           Amneal Pharmaceuticals LLC
                             and Amneal Pharmaceuticals
25                           Company GmbH
```

```
 1
      APPEARANCES CONTINUED:
 2
                  DAVID BILSON, ESQ.
 3                Phillips, Goldman, McLaughlin & Hall, P.A.
                          -and-
 4                HANK HECKEL, ESQ.
                  Budd Larner
 5                (Short Hills, NJ)

 6                                 Counsel for Defendant DRL

 7                NEAL C. BELGAM, ESQ.
                  Smith Katzenstein & Jenkins LLP
 8                      -and-
                  E. ANTHONY FIGG, ESQ.,
 9                ELIZABETH R. BRENNER-LEIFER, ESQ., and
                  BRETT A. POSTAL, ESQ.
10                Rothwell, Figg, Ernst & Manbeck, P.C.
                  (Washington, D.C.)
11
                                   Counsel for Defendants
12                                 Synthon Pharmaceuticals, Inc.,
                                   Synthon B.V., and Synthon s.r.o.,
13                                 and Pfizer

14                                 -  -  -

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    THE COURT:  Please, take your seats.  Over the
 2       course of the evening -- I understand you have some issues
 3       you want to discuss with me -- please e-mail Mr. Buckson, so
 4       he can e-mail me, and I will be in the office, in chambers
 5       in time to be out here at 8:30, because I think it was only
 6       when we came out to chat that we were informed you had some
 7       issues.  That cuts into our time, which I am going to take
 8       away from you.
 9                    What are the issues?
10                    THE COURT:  Mr. Figg.
11                    MR. FIGG:  Good morning, Your Honor.
12                    There is an issue regarding plaintiffs'
13       infringement expert, Dr. Wynn, who is scheduled to testify
14       today.
15                    We have had correspondence back and forth over
16       the last couple of days with the plaintiffs on this.
17                    The issue is this, Dr. Wynn, as I say, is one of
18       the primary plaintiffs' witnesses on the infringement issue.
19       But the plaintiffs also included in his expert testimony
20       information about obviousness, namely, his view on the
21       secondary factors.
22                    THE COURT:  Counsel, if there are seats in the
23       well, that's where I prefer you sit.  That's an
24       accommodation to you.  Really, you are not my jury.  So go
25       back to the well, please.  I know those seats are more
```

1    comfortable, I get that.

2            MR. FIGG:  Your Honor, we asked them if they

3    intended to have Dr. Wynn talk about obviousness during the

4    infringement case or if they intended to recall him.

5            They said they wanted to talk about obviousness

6    during their infringement case and they reserve the right to

7    recall him.  We don't think that's appropriate.  The Court's

8    schedule in the pretrial order that everybody has agreed to

9    is very clear.  They put on their infringement case, and we

10   respond to their infringement case.  We put on our

11   obviousness case, they respond to our obviousness case.

12   They put on their secondary factors case.

13           THE COURT:  We talked about this.  Right?

14           MR. FIGG:  Yes.  Our point -- we are respectful

15   of Dr. Wynn's schedule.  I understand that he wants to get

16   done and leave today.  That is fine.  But they should make

17   the choice.  Either they elicit the anticipatory obviousness

18   testimony today and live with it or they put their

19   obviousness case on when they are supposed to in the

20   schedule.  I don't think they should have it both ways.

21           THE COURT:  Okay.

22           Mr. Ware.

23           MR. WARE:  Your Honor, I think that's a fair

24   point.  What I have said is, first of all, the testimony

25   from Dr. Wynn with respect to secondary considerations will

1    be brief and confined to the usual factors.

2              I have said we would not expect, except under

3    the most extraordinary circumstance, to have to call him

4    back, but that I didn't want to foreclose that possibility.

5              So my representation is that before I would

6    assume that we could even do that, I would be prepared to

7    come to the Court and give an explanation of why that was

8    appropriate in light of this accommodation that's been made.

9              I think there is a 99 percent chance we would

10   never need to call him back.  But I don't want to foreclose

11   it because we are taking him out of order.

12             However, I agree that absent lightning striking,

13   we shouldn't have the right to call him back.  And I

14   wouldn't ask the Court to do that.

15             THE COURT:  Mr. Figg.

16             MR. FIGG:  Your Honor, you probably could

17   understand my anxiety about a 99 percent chance.

18             THE COURT:  There is a one percent possibility.

19             MR. FIGG:  Yes.  I don't know whether it is 99

20   or 10 or 25.  But if they hear something during our

21   obviousness case that they want Dr. Wynn to respond to, then

22   they should put him, his testimony in the order so that he

23   can do that.

24             THE COURT:  I think Mr. Ware would agree with

25   that.

1           MR. WARE:  I certainly agree with that

2   principle.  I am making a representation that it would only

3   be under some unforeseen, extraordinary circumstance, at

4   which point I would come to the Court and say, I think this

5   is justified.  And you might say, I don't.  And that's a

6   risk that we are prepared to take.

7           THE COURT:  Both of you are well known to me.  I

8   am not in the habit of seeing you engage in gamesmanship,

9   neither one of you.  I wouldn't expect that to be the case.

10          MR. FIGG:  I am respectful of that, Your Honor.

11  Thank you.  I understand that there will be a showing of

12  good cause.

13          THE COURT:  Absolutely.

14          Anything else?

15          MR. WARE:  Your Honor, I gather there has been

16  some objection to our use of two joint trial exhibits with

17  Dr. Wynn.  In a nutshell, each of these has to do with

18  instructions given to Principal Investigators for purposes

19  of a clinical trial.  The documents, one document is a log

20  of an actual call among Principal Investigators during which

21  some instructions are given with respect to the dosing of

22  patients prior to the clinical trial.  The other is a list

23  of attendees.

24          I don't intend to ask Dr. Wynn anything about

25  the documents.

1             They are joint trial exhibits.  They are going

2       to be used with defendants' expert.  But I am going to

3       simply identify the fact they exist during the course of his

4       testimony so the record will reflect that they are there and

5       they relate to this subject.  I don't know why that is

6       controversial.

7             THE COURT:  Mr. Figg?

8             MR. FIGG:  I think our concern with the

9       documents, Your Honor, is they weren't discussed in Dr.

10      Wynn's expert report.  As far as we can tell, no one has

11      laid a foundation.  They don't identify who they are from,

12      who created them.  And as far as we can tell, there is no

13      foundation laid by any witness.  And certainly, Dr. Wynn is

14      an expert who was not involved in these details, historical

15      details.  So he can't lay a foundation.  I think that was

16      our main concern.

17            THE COURT:  These are joint trial exhibits.

18            MR. WARE:  Yes.  I don't intend to ask him

19      anything about the documents.  I intend to say, at the time

20      of this testimony, for purposes of the record, Your Honor,

21      Joint Trial Exhibit 7042 and 7043 or whatever they are

22      reflect the conversations about which the witness has just

23      testified.  But I am not going to ask him about the

24      documents because he has never seen the documents.  It's

25      really just for clarification.

1           THE COURT:  He is not going to ask him about

2    them.

3           MR. FIGG:  Your Honor, I am sorry if I am

4    interrupting anybody.

5           THE COURT:  Go ahead.

6           MR. FIGG:  Based on Mr. Ware's representation

7    that he is not going to ask Dr. Wynn anything substantively

8    about these documents, we are okay.

9           THE COURT:  Okay.

10          MR. WARE:  I misspoke.  They are in his report.

11   But I am not going to ask him --

12          MR. FIGG:  Actually, I was the one who misspoke.

13          THE COURT:  Anything else?

14          MR. WARE:  Nothing.

15          THE COURT:  Mr. Ware.

16          MR. WARE:  Teva calls John Hassler.

17          ... JOHN HASSLER, having been duly sworn as a

18   witness, was examined and testified as follows ...

19          THE COURT:  Good morning, Mr. Hassler.

20          THE WITNESS:  Good morning, Your Honor.

21                  DIRECT EXAMINATION

22   BY MR. WARE:

23   Q.    Good morning, sir.  Would you state your name for the

24   Court, please?

25   A.    John Hassler.

Hassler - direct

1   Q.   How are you employed, Mr. Hassler?

2   A.   I am the senior vice president and general manager for

3   Teva.

4   Q.   When you say Teva, do you work for a specific business

5   unit or division of Teva?

6   A.   Yes.

7   Q.   What is that?

8   A.   I lead the central nervous system business unit for

9   Teva.

10  Q.   Tell us briefly what the central nervous system unit

11  is?

12  A.   I manage our U.S. branded central nervous system

13  products, which focus on pain, migraine, multiple sclerosis

14  and neurodegenerative disease.

15  Q.   What are your responsibilities as general manager of

16  the business?

17  A.   I am responsible for sales and marketing.

18  Q.   How long have you been in that position?

19  A.   Since January of 2015.

20  Q.   And can you tell us when you joined Teva in any

21  capacity in any part of the organization?

22  A.   In 1996, I joined a joint venture partnership between

23  Teva and MarionMerrell Dow called Teva Marion Partners and

24  was responsible for managing the pre-launch and launch of

25  Copaxone in that capacity.

Hassler - direct

1    Q.      What was your responsibility during that launch?

2    A.      To manage the marketing activities for Copaxone.

3    Q.      What did you do following that responsibility until

4    you became general manager?  Perhaps you told us when you

5    became general manager.  But if not, when did you assume the

6    current position you hold?

7    A.      In January of 2015.

8    Q.      Can you fill us in on the position you held within

9    Teva from 1996 until your current position as senior vice

10   president and general manager of CNS?

11   A.      In 1999, I moved to our Canadian business, and I

12   managed Teva Marion Partners Canada at that time, from 1999

13   until 2003.  And during that time period the name of the

14   company changed to Teva Neuroscience Canada.

15           In 2003, I returned to the United States, and I

16   was vice president of administration and planning, which

17   meant that I had human resources, finance, IT, and training

18   and development that reported to me in that capacity.

19           And in 2007, I moved back into a marketing

20   leadership role, managing the marketing activities for Teva

21   Neuroscience, up through the merger with Cephalon in 2015,

22   when I became the general manager for Teva's CNS business

23   unit.

24   Q.      When Teva first launched Copaxone 20 milligrams, can

25   you tell us when that was?

Hassler - direct

1    A.    We launched in April of 1997.

2    Q.    At that time, were there competitors in the market,

3    that is, other disease modifying therapies for multiple

4    sclerosis?

5    A.    Yes.  There were two other competitors, Avonex and

6    Betaseron, both of those were Interferon products.

7    Q.    And in what way, in an overarching sense, did

8    Interferons differ from glatiramer therapy?

9    A.    They are very different.  They are a different

10   compound that works differently in the body.  One of the

11   most typical side effects that you see with Interferon

12   therapy are flu-like symptoms.  And those are not associated

13   with Copaxone or glatiramer.

14             MR. WHITE:  Objection, foundation, Your Honor.

15   He is not a medical doctor.

16             THE COURT:  We know that.  Overruled.

17   BY MR. WARE:

18   Q.    How did Copaxone 20 milligram perform in the market?

19   A.    Initially, Copaxone was considered to be a second-line

20   agent.  And then over time it became a first line agent.

21   And in 2008, it actually became the most commonly used

22   product in the category and the market leader.

23   Q.    When you say a second-line therapy, what does that

24   mean in the industry?

25   A.    Well, physicians would gravitate toward one of the

Hassler - direct

1    Interferons as a first choice before they would use

2    Copaxone, unless there were specific reasons that they

3    didn't think an Interferon would be an appropriate choice

4    for a given patient, in which case they would use Copaxone.

5    Q.    At some time did Copaxone become a first-line therapy?

6    A.    Yes.  Over time and as the product became better known

7    and better characterized, Copaxone did become a first-line

8    therapy, and then following head-to-head trials that showed

9    that Copaxone was not less effective than the Interferons,

10   it actually became the product of choice.

11   Q.    Have other competitors entered the market since that

12   time, including oral medications?

13   A.    Yes.  There have been two other Interferons that have

14   entered the market since the time that we were talking

15   about.  There have been monoclonal antibodies, drugs like

16   Tysabri that have been in the market.  And then in 2010,

17   between 2010 and 2013, we saw three orally administered

18   products enter the MS market.

19   Q.    When other therapies come into a market like the

20   glatiramer acetate market or the disease modifying therapy

21   market for MS, what is the effect on market shares across

22   the board, just in general?

23   A.    Because none of these therapies cure or completely

24   arrest the disease, patients are frequently looking for new

25   options that will manage their disease better.

Hassler - direct

1          So as new products enter the market, the market

2     tends to become more fragmented and we see shares split.

3     And the older products tend to lose share when that occurs.

4     Q.    We heard a lot of testimony yesterday with respect to

5     Teva development efforts.  I don't want you to go into any

6     detail about that.  But are you aware whether or not Teva

7     undertook additional efforts to improve Copaxone after 1996?

8     A.    Yes, many.

9     Q.    Generally, what were the goals of those efforts?

10    A.    The goals were to improve the treatment of MS patients

11    by improving the efficacy, tolerability, and convenience of

12    the products that we were working on, that we were trying to

13    introduce into the market.

14    Q.    Until 40 milligram Copaxone was introduced into the

15    market, did Teva succeed in making substantive improvement

16    to the glatiramer Copaxone 20 milligrams?

17    A.    No, we were not successful.  Glatiramer could be

18    unpredictable.  And despite our best efforts, we weren't

19    able to achieve the objectives that we had sought out with

20    several of those trials.

21    Q.    At some time did you become aware that 40 milligram

22    Copaxone, or 40 milligram three times a week dosing of

23    Copaxone product was under development at the company?

24    A.    Yes.

25    Q.    Approximately when did you learn that?

Hassler - direct

1    A.      I believe it was sometime in the later 2000s.

2    Q.      What were the circumstances under which you learned

3    it, and why was it relevant to your function?

4    A.      When I moved back into the marketing function, this

5    was one of the brands that I was managing.  And what I

6    learned about it was that we were planning to study 40

7    milligram three times a week administration of Copaxone

8    versus placebo in an attempt to demonstrate safety,

9    efficacy, and tolerability of that formulation with that

10   dosage schedule.

11   Q.      Did that occur in a particular trial of which you

12   became aware?

13   A.      Yes.  It was called the GALA trial.

14   Q.      Now, I want to talk to you a little bit about

15   marketing strategy.  When Teva introduces an improved

16   therapy like Copaxone 40 milligram, what obstacles are there

17   to a drug company getting that product accepted in the

18   marketplace?

19   A.      With any new product introduction, we have got to

20   create awareness of the efficacy safety, tolerability and

21   convenience of that product among physicians and patients.

22   And with a chronic disease, something like MS, we have also

23   got to make sure that we communicate where this fits into

24   the treatment regimen, and that patients are going to be

25   able to use this for a long period of time.

1          Another variable that we face is making sure

2     that patients have physical and financial access to a new

3     drug when it's introduced into the marketplace.

4          So we need to make sure that we get it into

5     distribution outlets where the can actually acquire the

6     product, and that they can get reimbursement for the product

7     so that they don't face financial barriers that eliminate

8     their ability to acquire it.

9     Q.     When you talk about financial access, are you talking

10    about health insurance and its potential coverage or not of

11    the product?

12    A.     Yes.  There are different barriers that insurance

13    companies can put in place that can make it more difficult

14    for patients to access the product.

15    Q.     Tell us what those barriers are as described here, or

16    summarized here?

17    A.     Typically, those barriers fall into four broad

18    buckets.  Denial of coverage is one, where the insurance

19    company simply denies to cover the new product that's being

20    introduced.

21          They can also place the product in tiers that

22    require high co-pays or high out-of-pocket expense for the

23    patients.

24          They can require prior authorization that

25    requires the physician's office to document additional

1    information on patients.  And it creates a marked burden on

2    the offices to be able to write the product.  They can also

3    require step-through requirements that require the patients

4    to use another product, typically a cheaper product for the

5    insurance company, before they get access to a new product.

6    Q.    With respect to Copaxone 40 milligram, subsequent to

7    its introduction, what steps did Teva take to address any

8    potential barriers to access posed by insurers or others?

9    A.    We worked with the insurance companies to explain the

10   benefits of this product and position it so that they

11   understood what this could mean to patients who would

12   benefit from it.

13         We also implemented, in essence, a parity

14   pricing type of strategy, with the intent of making sure

15   that 40 milligram would be equally accessible as 20

16   milligram from a payor's standpoint.

17         Then finally, for those payors or -- or for

18   those insurance companies that had very high co-pays, we

19   implemented a coupon program that would help buy down the

20   out-of-pocket costs for patients that wanted to initiate

21   treatment with this product.

22   Q.    With respect to the pricing strategy, did you price 40

23   milligram Copaxone the same as the existing 20 milligram

24   Copaxone?

25   A.    The wholesale acquisition cost of 40 milligram was two

Hassler - direct

1    percent less than the wholesale acquisition cost for 20

2    milligram.  But the intent, through various discounts and

3    rebates, was to try to ensure that we could get formulary

4    coverage that would be equal to the 20 milligrams.  So in

5    essence we were trying to manage a parity pricing type of

6    strategy.

7    Q.    When you say the wholesale acquisition cost for 40

8    milligram was within two percent lower than 20 milligram,

9    what is the relevance in the real world of the wholesale

10   acquisition cost?  Does that have anything to do with what

11   people pay or even insurers pay?

12   A.    No.

13   Q.    Why not?

14   A.    Because there are various discounts and rebates that

15   we negotiate, or that are mandated in the federal sector

16   that buy down that price that the insurance companies

17   actually pay.  And what patients actually see has to do with

18   what their insurance will cover and how much of the

19   remaining costs get passed along to the patient.  And we try

20   to address that through a coupon program to make sure that

21   patients would have access to the product.

22   Q.    As a result of the pricing strategies you have

23   described, was there any point at which Teva's pricing

24   strategy led payors to provide better coverage for Copaxone

25   40 milligram than they did for 20 milligram?

Hassler - direct

1  A.    No, I am not aware of any circumstances where there

2  was better coverage for 40 milligram than 20.

3         Our goal was to get equal coverage so that

4  insurance wasn't a barrier, that the price of the product

5  wasn't a barrier.  We wanted physicians and patients to be

6  able to choose which product would be best to them.

7  Q.    You mentioned co-pays and coupons.  Tell us what

8  strategy you employed with respect to coupons when 40

9  milligram Copaxone was launched?  What is a coupon and how

10  does it work?

11  A.    A coupon is essentially a means of reducing the cost

12  to the patient when they go to buy their drug at the

13  pharmacy or when they have mail ordered from their pharmacy.

14  A coupon can be applied that will help buy down the cost to

15  a certain level.

16  Q.    Go ahead.

17  A.    When we launched Copaxone, several other products

18  within the category were offering coupons with a zero dollar

19  co-pay.  So we wanted to be competitive with 40 milligram

20  with those competitors.  So we also offered a zero dollar

21  coupon on 40 milligram.

22  Q.    At the time that you offered zero dollar coupons for

23  Copaxone 40 milligram, what was the co-pay with respect to

24  20 milligram Copaxone?

25  A.    Historically, we had offered a $35 co-pay or

1     out-of-pocket coupon for the majority of 20 milligram

2     patients.

3     Q.     Did you make any determination at that time whether

4     the 35 dollar co-pay was in any sense a barrier to patients?

5     A.     No.   What we saw from the research that we had

6     conducted was that it didn't affect adoption or adherence to

7     20 milligram therapy to have a co-pay differential between

8     zero and $35.

9     Q.     Let me go back to a second issue that you raised,

10    namely, physician and patient awareness.   I want to ask you

11    what the marketing messages were so that you could achieve

12    that awareness.

13           What were the considerations at that time and

14    how did you get physicians and patients to become aware of

15    the product?

16    A.     We focused our marketing message around safety,

17    efficacy, and tolerability of the product.   And we

18    incorporated the package insert into all of our promotional

19    material, particularly the leave-behind materials that we

20    would provide for patients and physicians.

21           We also emphasized the convenience of a three

22    times a week dosing schedule in allowing patients the

23    opportunity to adapt the dosing to their needs as opposed to

24    having to comply to a more rigorous dosing schedule where

25    they had to adapt their lifestyle to the drug.

Hassler - direct

1    Q.    Directing your attention to Plaintiffs' Exhibit 652,

2    and to part of those materials, this is graphic PDX-3.5, can

3    you tell us what that is?  First of all, who is the audience

4    to whom this is directed?

5    A.    This would have been part of our professional

6    campaign.  So this would have been directed at neurologists.

7    And it announces the availability of three times a week

8    Copaxone 40 milligram.  And messages, the proven message is

9    a mix of safety and tolerability.

10   Q.    I notice there is a footnote next to tolerability.  To

11   what does that refer?

12   A.    It refers the physician back to the prescribing

13   information of the product for the product where a more

14   complete set of the data is available.

15   Q.    The footnote says please see prescribing information

16   available at this presentation?

17   A.    Yes.

18   Q.    That is referring to the package insert?

19   A.    Yes.

20   Q.    What was the importance of this message in

21   communicating with physicians, from your point of view?

22   A.    It emphasized the fact that Copaxone 40 milligram had

23   been studied in a well-controlled trial, and it had proven

24   that it was an effective medication at modifying the course

25   of MS through reduction and relapse rate, and that it also

1    was safe and very well tolerated.

2    Q.    Let me direct your attention to Exhibit 652 and to a

3    portion of that which is marked as a graphic, PDX-3.6.   To

4    whom is this directed?

5    A.    This is another element in the promotional -- in the

6    professional campaign.   This would have been directed toward

7    neurologists.

8    Q.    Do these exhibits we have looked at, including this,

9    are these part of the your commercial campaign for Copaxone

10   40 milligram?

11   A.    Yes, they are.

12   Q.    Do they include the message that you were trying to

13   communicate?

14   A.    Yes.   In this case we were highlighting specific

15   features with regard to the demonstrated tolerability

16   profile of 40 milligram.   And in this case, we were focused

17   on adverse events that were typically more serious, or had

18   more severe consequences.   So those adverse events that

19   required patients to discontinue from the trial were only

20   three percent, and injection site atrophy and necrosis,

21   which can be disfiguring side effects, were, atrophy was at

22   a .5 percent and there were no incidences in the trial of

23   necrosis, which is different than the experience that we had

24   with 20 milligram.

25   Q.    Again, the data here is derived from what source?

Hassler - direct

1   A.   This is coming out of the GALA trial, and is reflected

2   in the prescribing information for Copaxone 40 milligram.

3   Q.   Well, you have limitations on what you can say in

4   promotional materials.  Isn't that correct?

5   A.   Yes.

6   Q.   And essentially, what are those limitations?  What are

7   they confined by?

8   A.   We are restricted by the FDA in terms of our

9   commercial speech, in terms of what we can say about the

10  product and the claims that we can make.

11          In many cases we are communicating the data that

12  are available for a given product, and relying on the health

13  care professional to make informed decisions about how to

14  interpret that data.

15  Q.   In addition to communicating with physicians, did you

16  also do messaging or communicating with patients?

17  A.   We did.

18  Q.   Let me direct your attention to Plaintiffs' Exhibit

19  651 and to a graphic identified as PDX-3.7.  Can you tell us

20  to whom this is directed and what the message is?

21  A.   This would have been part of our direct to patient

22  communication campaign.  This was really focused on the

23  convenience of the three times a week dosing schedule.

24          It allowed patients to choose the days on which

25  they would dose the medication, provided that they had one

Hassler - direct

1    day in between each of those doses.  And it allowed patients

2    to adapt to their work schedules, or if a patient happened

3    to be traveling on a weekend and they didn't want to carry

4    the medication with them, it gave them that opportunity.

5              So it provided a great deal more flexibility and

6    convenience for patients who were trying to manage this

7    condition.

8    Q.   How do you actually communicate with patients.

9    Physicians you will visit.  Right?  Your personnel actually

10   go to their offices, talk with them and make presentations.

11   Right?

12   A.   Yes.

13   Q.   How do you communicate with patients or prospective

14   patients?

15   A.   There is information that is provided digitally so

16   that patients can access information over the Internet.

17             We also have patient programs, where we sponsor

18   programs to help educate patients on available MS treatment,

19   and specifically on Copaxone.

20   Q.   Earlier you mentioned what you referred to as the GALA

21   trial.  I think you said some of the data from that trial

22   was actually in the package insert.  Is that correct?

23   A.   Yes.  The GALA trial formed the basis of the FDA

24   approval, so that data is included in the package insert.

25   Q.   Was there a subsequent study, data from which is not

 1    in the package insert, which relates to comparison between

 2    glatiramer acetate 20 milligram and glatiramer acetate 40

 3    milligram three times a week?

 4    A.    Yes.   There was another study called Glacier that also

 5    evaluated 40 milligram.   In that case, it was an evaluation

 6    with patients who had been on 20 milligram for an extended

 7    period of time.   And then they were either randomized to 40

 8    milligram or maintained on 20 milligram.

 9    Q.    Did you play any role in the Glacier trial itself?

10    A.    I supported the idea of developing this data.   But I

11    didn't play any role in the clinical development or

12    execution of that trial.

13    Q.    Following the Glacier trial, did you become aware of

14    the results?

15    A.    Yes.

16    Q.    And from your point of view, and from the marketing

17    point of view, what was the importance of the Glacier trial?

18    A.    Well, we had data in the GALA trial that showed the

19    frequency of injection related adverse events and the

20    severity of some of those -- of those events was less in the

21    GALA trial with 40 milligram than we had seen previously in

22    multiple trials and with common knowledge in the marketplace

23    of 20 milligram.

24            So we had a good indication that 40 milligram

25    was going to be better tolerated.   But we wanted to show

Hassler - direct

1    specifically in patients who had been on Copaxone 20

2    milligram for an extended period of time that they, too,

3    would benefit in terms of the improved tolerability.

4              In fact, the Glacier trial demonstrated that

5    there was a 50-percent reduction in injection related

6    adverse events and the moderate to severe injection related

7    adverse events were 60 percent less.

8    Q.    Why was that significant?  These were by definition

9    patients who were initially on 20 milligrams and then

10   switched to 40 milligrams at some point in Glacier or

11   Glacier extension?

12   A.    Yes.

13   Q.    What was the significance from your point of view or

14   perhaps I should say to physicians, as you understand it, of

15   these data?

16              MR. WHITE:  Objection.  Expert testimony.  He

17   can't talk about the importance of the study.

18              THE COURT:  Sustained.

19   BY MR. WARE:

20   Q.    Do you have interactions with physicians for purposes

21   of marketing?

22   A.    Yes.

23   Q.    Do your employees communicate with physicians, meet

24   with physicians, and discuss Copaxone 40 milligram with

25   physicians?

Hassler - direct

1    A.    Yes, routinely.

2    Q.    As part of your marketing function, do you, in fact,

3    become informed with respect to what the physician community

4    believes about 40 milligram Copaxone?

5    A.    Yes.

6    Q.    Not speaking for any particular physician, what is

7    your understanding of the physician community's reaction

8    insofar as you know to 40 milligram Copaxone?

9              MR. WHITE:  Objection.  Hearsay.

10             THE COURT:  What is the exception?  Why isn't

11   that hearsay or what is the exception?

12             MR. WARE:  I am not asking about a conversation.

13   I am asking as a result of any conversations with his

14   employees and their interaction with physicians his

15   understanding from a marketing standpoint.

16             THE COURT:  Counsel?

17             MR. WHITE:  That is --

18             THE COURT:  What is your name again?

19             MR. WHITE:  Brandon White, Your Honor.

20             That is effectively hearsay.  He is simply

21   recapping --

22             THE COURT:  Isn't that going around the barn a

23   little bit to do the same thing you can't do regularly?

24             MR. WARE:  Well, that's the way it's done.

25             THE COURT:  Are we not going to learn this at

Hassler - direct

1    some point during this trial, Mr. White, whether it is from

2    his lips or somebody else's?  Probably one of the physicians

3    who is going to testify?

4              MR. WHITE:  It's also expert opinion.

5              THE COURT:  I am going to limit him to answering

6    this question.

7              MR. WARE:  Thank you, Your Honor.

8              THE COURT:  Go ahead.  Do you have the question

9    in mind?

10             THE WITNESS:  Could you ask it again, please?

11             MR. WARE:  Yes.

12   BY MR. WARE:

13   Q.    Not speaking for physicians but speaking for your

14   understanding as head of marketing responsible for 40

15   milligram Copaxone, what do you understand as a marketer on

16   behalf of the company physicians understood about the

17   importance of 40 milligram Copaxone?

18   A.    Well, my understanding of physicians' perception of 40

19   milligram was that it had demonstrated proven efficacy in

20   reducing relapse rates in MRI parameters of disease

21   activities, and that it was perceived to be more convenient

22   and better tolerated than the 20 milligram version of the

23   product.

24   Q.    Let me turn now to commercial success and ask you some

25   questions in that regard.

Hassler - direct

1              Not having in mind any legal standard, I am not

2     asking you anything about a legal standard here, but from

3     the point of view of Teva, has 40 milligram Copaxone been a

4     successful drug?

5     A.    Yes.

6              MR. WHITE:  Objection.  Calls for expert

7     testimony.  If he wants to talk about what the sales are, I

8     think that's fine.

9              THE COURT:  Could you rephrase that, please, Mr.

10    Ware.

11             MR. WARE:  Your Honor, I am limiting it to the

12    company's perception of whether the drug is successful.

13    Then I will ask him the reasons for that.

14             THE COURT:  Mr. White, the company's perception?

15             MR. WHITE:  He can answer that.

16             THE COURT:  All right.  You can answer the

17    question.

18             THE WITNESS:  40 milligrams has been very

19    successful.  It's exceeded our expectations in terms of

20    sales forecasts.  It leads the market in terms of total

21    prescriptions, and it leads the market in terms of new to

22    brand prescriptions for patients that are either entering or

23    changing products.

24    BY MR. WARE:

25    Q.    Can you describe what if anything the trend was for

1   the Copaxone brand prior to the launch of Copaxone 40

2   milligram in January 2014?

3   A.    The year before the launch, Copaxone 20 milligrams was

4   deteriorating rapidly.  We had lost about a quarter of our

5   share, dropping from around 40 to around 30 percent share in

6   the marketplace.  And with the launch of 40 milligram, we

7   saw that stabilize.  40 milligram has actually grown a bit,

8   as the market has adopted and accepted that as a

9   first-choice therapy within the category.

10  Q.    From your perspective within the company as head of

11  marketing for Copaxone 40 milligram, what are the reasons

12  for that success?

13  A.    I think that the fact that we have a drug that has

14  been proven to be effective in addressing the needs of the

15  MS patients, specifically, reducing relapse rates and

16  reducing MRI measures of disease activity, coupled with the

17  fact that it is more convenient and better tolerated than

18  the 20 milligram version that we had previously, I think

19  those are the reasons that Copaxone 40 milligram has been

20  such a success and so readily adopted.

21  Q.    Does Teva and you personally as part of your

22  responsibilities obtain market information and market

23  research?

24  A.    Yes, routinely.

25  Q.    Do you rely on such research for certain purposes?

Hassler - direct

1   A.   Yes.

2   Q.   Do you make business decisions in part based on the

3   information you receive from such surveys?

4   A.   Yes.

5   Q.   Let me next direct you to Joint Trial Exhibit 7018,

6   which is some financial information.  First of all, before

7   we talk about the numbers, can you tell us what the source

8   of this document and information is?

9   A.   This is a spreadsheet that is generated from Teva's

10  financial system, the books that we keep.

11  Q.   Are those books, if you will -- I think we all know in

12  this day and age they are electronic -- are these maintained

13  in a particular part of the company under the direction of a

14  particular individual?

15  A.   This information comes from my director of finance,

16  Alejandro Castro.  He pulled this information from Teva's

17  financial system.

18  Q.   Accordingly, is this information part of the books and

19  records of the company and kept in the ordinary course of

20  business?

21  A.   Yes.

22  Q.   Do you review this type of information, and documents

23  like this, in the course of carrying out your

24  responsibilities at Teva?

25  A.   Yes.

Hassler - direct

1    Q.    Can you tell us what records or what books the sales

2    reflected on Joint Trial Exhibit 7018 and the graphic that

3    is 3.8 contains?

4    A.    Gross sales, and net sales.

5    Q.    What is the difference between gross sales and net

6    sales?

7    A.    Gross sales, essentially, represent the wholesale

8    acquisition cost multiplied by the number of units that have

9    been sold.  That's not really the revenue that we take in as

10    the company.

11            The net sales are a reflection of the revenue

12    that we recognize after you reduce gross sales by the

13    discounts and rebates that are applied to other entities.

14    The net sales number is what we record as revenue.  And

15    that's what we report publicly.

16    Q.    Are Teva's records, including this record, audited in

17    the ordinary course of business at least on an annual basis?

18    A.    Yes.

19    Q.    Were these figures among those figures audited in the

20    past?

21    A.    Yes.

22    Q.    What were Teva's net sales for Copaxone 40 milligram

23    in its first two years in the aggregate?

24    A.    3.7 billion dollars.

25    Q.    And to the extent you have publicly reported any

Hassler - direct

1    updated information, have net sales continued to be strong

2    in 2016?

3    A.    Yes.  We continue to grow.

4    Q.    Are you able to share any numbers with us which have

5    already been made public or not?

6    A.    Through the first half of the year, 40 milligram net

7    sales would have exceeded 1.3 billion dollars.

8    Q.    Has the 40 milligram Copaxone product been profitable

9    to Teva?

10   A.    Yes.

11               MR. WHITE:  Your Honor, could we have a brief

12   sidebar?

13               THE COURT:  Yes.

14               (The following took place at sidebar.)

15               MS. MAZZOCHI:  Your Honor, yesterday, in

16   exchange for not objecting to certain of these exhibits, we

17   had an agreement with Teva that Teva would be explicit that

18   the entity that was booking sales was Teva Pharmaceuticals

19   USA, Inc.

20               MR. WARE:  I will ask that.

21               MS. MAZZOCHI:  Because you keep saying Teva.

22   Because there are four Teva entities.

23               MR. WARE:  I just haven't gotten there.

24               THE COURT:  Do you want to clarify that with

25   this witness?

Hassler - direct

1              MR. WARE:  Sure.

2              (End of sidebar conference.)

3    BY MR. WARE:

4    Q.    Directing your attention to another graphic, I want to

5    ask you some questions about the relationships here and

6    which entity actually sells the product.

7              Can you tell us the relationship or the

8    ownership of the patents in suit here?

9    A.    Yes.  Yeda Research & Development Company is the owner

10   of the patents in suit.

11   Q.    And are the patents licensed to another entity?

12   A.    Yes.  Teva Pharmaceuticals Industries, Ltd. is the

13   exclusive licensee and the manufacturer for Copaxone.

14   Q.    What is Teva Pharmaceuticals USA's relationship to the

15   Copaxone 40 milligram product?

16   A.    They hold the NDA in the United States and they are

17   the U.S. distributor of the product.

18   Q.    What is Teva Neuroscience, Inc.'s role?

19   A.    Teva Neuroscience provides the marketing support for

20   Copaxone.

21   Q.    Now, with respect to the financial information you

22   gave us, which entity actually books the sales and the

23   revenue for Copaxone 40 milligrams?

24   A.    Teva Pharmaceuticals USA.

25   Q.    How does Teva Pharmaceuticals USA acquire the product?

Hassler - direct

1   A.     They buy the product from Teva Pharmaceutical

2   Industries, Ltd.

3   Q.     The manufacturer in Israel.  Is that correct?

4   A.     Yes.

5   Q.     Are there agreements among these entities which spell

6   out these relationships?

7   A.     Yes.

8   Q.     Are the agreements kept by Teva in the ordinary course

9   of business?

10  A.     Yes.

11  Q.     Do you have access to those agreements in the course

12  of carrying out your duties?

13  A.     I have access.

14  Q.     Can you explain -- let me show you another graphic.

15  Can you explain essentially how the agreements involve the

16  relationships that you have just described?

17  A.     Yeda owns the Copaxone IP under a November 1987

18  agreement with Teva.

19  Q.     That agreement is Plaintiffs' Trial Exhibit 639?

20  A.     Yeda grants an exclusive license for Copaxone IP to

21  Teva under the November 1987 agreement.

22  Q.     And that's also Plaintiffs' Exhibit 639?

23  A.     Teva assigns the patents in suit to Yeda under a

24  February 2011 assignment.

25  Q.     That is reflected in Exhibit 642.  Is that correct?

1    A.    Yes.

2    Q.    Now, as you understand it, Dr. Klinger's invention,

3    the patents in suit in this case were assigned to Yeda.   Is

4    that correct?

5    A.    Yes.

6    Q.    What is the role of Teva Neuroscience?

7    A.    Teva Neuroscience markets Copaxone 40 milligram in the

8    United States pursuant to the December 2004 marketing

9    services agreement.

10   Q.    Is there also an amendment to that agreement?

11   A.    Yes, there is.

12   Q.    The marketing agreement, for the record, is

13   Plaintiffs' Trial Exhibit 649, and the amendment is

14   Plaintiffs' Trial Exhibit 650.

15         Let me direct your attention to Plaintiffs'

16   Exhibit 639.  You can't really read this.  Do you understand

17   that this is the agreement between Teva Pharmaceutical

18   Industries and Yeda Research?

19   A.    Yes.

20   Q.    This is the 1987 agreement to which your slide

21   referred.  Is that correct?

22   A.    Yes, that's correct.

23   Q.    Let me direct you to another document, Plaintiffs'

24   Trial Exhibit 642.  This represents part of the assignment

25   language pursuant to which Teva Pharmaceuticals Industries

Hassler - direct

1    assigns ownership to Yeda.  Is that correct?

2    A.    That's correct.

3    Q.    And with respect to the marketing service agreement

4    and amendment that you referred to, these are those

5    documents.  Is that correct?

6    A.    That's correct.

7    Q.    In the event that there is approval by the FDA of

8    generic products of the five defendants, and were those

9    products to be launched by the defendants, what would the

10   effect be on the company, on Teva?

11   A.    There would be a negative effect.

12          MR. WHITE:  Objection, Your Honor.  We have not

13   seen this before.  He was never designated as a witness to

14   testify about any of these issues.  His opinions on the harm

15   to Teva are completely new to us.

16          THE COURT:  Mr. Ware, did you hear the

17   objection?

18          MR. WARE:  Yes, Your Honor.  It is my

19   understanding that this issue, the irreparable harm issue,

20   was raised the day -- before -- the day of -- here is who

21   you need to talk to.

22          MR. BENNETT:  Your Honor, John Bennett for

23   plaintiffs.

24          This is just brief testimony on the irreparable

25   harm issue.  An issue that was raised literally the day the

Hassler - direct

1    pretrial order was due.  This is again the injunction issue

2    that we discussed at the beginning of the day yesterday.

3    This is the witness that is testifying on the issue that is

4    necessitated by dealing with this issue.

5         THE COURT:  Your colleague wants to respond.

6         MS. MAZZOCHI:  Deanne Mazzochi.  Thank you, Your

7    Honor.

8         Number one, Teva put forth no proposed findings

9    of fact or conclusions of law on irreparable harm.  We

10   certainly object to a witness now coming in here today and

11   talking about irreparable harm related facts that are not in

12   the final pretrial order.

13        Second, to the extent this particular witness

14   has ever been identified, the defendants are the ones who

15   took the deposition for reasons that the defendants wanted.

16   He was never identified in response to discovery requests.

17   He was never identified as someone who was going to have

18   knowledge on irreparable harm issues.  He was never

19   identified in Teva's initial disclosures who would have

20   knowledge of any of the claims or defenses in this action.

21        To the extent they are now trying to use this

22   witness to create facts that aren't found in the final

23   pretrial order, they can't do that.

24        THE COURT:  Mr. Bennett, she has a point.

25        MR. BENNETT:  Your Honor, again, this issue was

Hassler - direct

1    not raised as any type of issue in the case until literally

2    the day the pretrial order was due.

3              THE COURT:  Injunctive relief?

4              MR. BENNETT:  There was no challenge at all to

5    whether, in this case, a Hatch-Waxman case, whether

6    injunctive relief is presumably available automatically if

7    you win on the merits, under the statute.  There was no

8    issue raised as to the appropriateness of entering

9    injunctive relief.

10             We told them that we thought dealing with it as

11   part of this trial was premature.

12             THE COURT:  When would it be ripe in your view,

13   in Teva's view?

14             MR. BENNETT:  We thought after resolution on the

15   merits, it would be ripe to deal with any sort of injunctive

16   relief issue at that point.

17             THE COURT:  And what was the basis upon which

18   you drew that conclusion?  Why did you draw that conclusion?

19             MR. BENNETT:  We thought it would be a more

20   efficient way to deal with that sort of evidence, frankly,

21   we didn't --

22             THE COURT:  You decided unilaterally that that

23   would be a more efficient way.

24             MR. BENNETT:  Your Honor, I think the thinking

25   was that there typically is no issue raised with the entry

Hassler - direct

1    of an injunction in a Hatch-Waxman case.

2              THE COURT:  Typically, you are right, I think.

3              MR. BENNETT:  We didn't expect this to be a

4    contested issue.  And it wasn't identified to us until the

5    day the pretrial order was due.

6              THE COURT:  Counsel, in my experience, I think

7    he typically is right.  I usually don't have to deal with

8    this issue.

9              MS. MAZZOCHI:  I know you don't have to, because

10   usually judges in Delaware try to get things done before the

11   30-month stay expires.  I understand that.  The fact of the

12   matter is, we are here.  We denied that they were entitled

13   to injunctive relief.  They have the burden of proof.  The

14   e-Bay factors are what they are.  It is their burden.

15             I am perfectly entitled to say as a defendant I

16   deny you are entitled to that remedy and wait for them to

17   put on their proofs, and if I think they can't make their

18   proofs I need to put on a responsive case.

19             We always denied it.  We never stipulated they

20   would have a right to injunctive relief in this case even

21   under the e-Bay factors.

22             As Your Honor knows, we have had cases where

23   people have been found to have infringed and you have

24   declined to enter a permanent injunction because you say,

25   no, a reasonable royalty is more appropriate here.  The fact

Hassler - direct

1    of the matter is it is their burden, it has never been

2    bifurcated, we did not bifurcate it.

3                THE COURT:  Last word.

4                MR. BENNETT:  Your Honor, this is the issue that

5    we discussed yesterday.  They knew we were going to put that

6    witness on.  There was no objection raised at that point in

7    time to having testimony on this issue.

8                THE COURT:  I think there was an objection, if

9    memory serves.

10               MR. BENNETT:  The issue was whether we should

11   deal with it as part of this trial or not.

12               THE COURT:  Do you think they waived their

13   objection?  I think I recall some mention made that there

14   was nothing in the pretrial, proposed pretrial order.  I

15   think that mention was made by the defendant.  So I think

16   the issue has been reserved.

17               MR. BENNETT:  Again, I think we clearly

18   requested injunctive relief in the pleadings.

19               THE COURT:  I am going to sustain the objection.

20   BY MR. WARE:

21   Q.    Thank you, Mr. Hassler.  I have no further questions.

22               THE COURT:  Ms. Bloodworth, are you going to

23   handle this?

24               MS. BLOODWORTH:  My colleague, Mr. White, is

25   going to handle this.

Hassler - direct

1          MR. WHITE:  Good morning, Your Honor.  Brandon

2    White from Perkins Coie on behalf of the Mylan defendants.

3                      CROSS-EXAMINATION

4    BY MR. WHITE:

5    Q.    Good morning, Mr. Hassler.

6    A.    Good morning.

7    Q.    We looked at a few marketing materials, one to

8    patients and one to physicians this morning.  Do you

9    remember that?

10   A.    Yes.

11   Q.    Neither of those materials referenced the Glacier

12   trial.  Is that right?

13   A.    That's correct.

14   Q.    None of Teva's marketing materials with respect to

15   Copaxone 40 milligrams reference the Glacier trial.  Is that

16   right?

17   A.    That's right.

18   Q.    The Glacier trial is not something that Teva can use

19   in its promotional materials.  Is that right?

20   A.    No.  It is used in scientific exchange.

21   Q.    And what is scientific exchange?

22   A.    Peer-reviewed journal articles, presentations at

23   congresses, and our medical science liaisons are able to use

24   that in their discussions with physicians.

25   Q.    You cannot put the Glacier article in promotional

Hassler - cross

 1   materials that you provide to patients.  Right?

 2   A.    That's correct.

 3   Q.    I think in your testimony you said you supported

 4   Glacier, but you were actually the one who suggested the

 5   Glacier trial be conducted.  Is that right?

 6   A.    I proposed the idea that we wanted to have data on

 7   patients who had been on 20 milligram.  And then the medical

 8   and R&D group actually performed the trial.

 9   Q.    Can we have DTX-1406 on the screen.

10         You will see this in your binder, but it will

11   also be on the screen.

12         Do you recognize the e-mail that is DTX-1406?

13   A.    Yes.

14   Q.    This is an e-mail exchange between you, Mr. Kolodny

15   and some others?

16   A.    Yes.

17   Q.    This is in 2012?

18   A.    Yes.

19   Q.    It has an attachment to the e-mail starting on the

20   page number referred to, the DTX numbers ending in .4.  This

21   says, U.S. objectives for Copaxone 20 milligrams to 40

22   milligram conversion study?

23   A.    Yes.

24   Q.    Is this the protocol that would eventually become the

25   Glacier trial?

Hassler - cross

1    A.    I believe so.

2    Q.    So in 2014 you were still considering the idea of the

3    Glacier trial.  It hadn't been run yet?

4    A.    Yes.

5    Q.    Do you know if Ety Klinger was still in the company in

6    2012?

7    A.    I don't know, but I don't believe so.

8    Q.    One of the reasons that you suggested the Glacier

9    trial be performed was because prior to Glacier you did not

10   have data on patients who switched from the 20 milligram

11   product to the 40 milligram product.  Is that right?

12   A.    Yes.  We had data from the GALA trial that indicated

13   that 40 milligram would be better tolerated and we wanted to

14   show that was the case, specifically with patients who had

15   been on 20 milligram.

16   Q.    In the GALA trial, was it a 40 milligram plus placebo?

17   A.    Yes.

18   Q.    There was no 20 milligram arm in GALA?

19   A.    That's correct.

20   Q.    Can we have JTX-7017, please.  Mr. Hassler, do you

21   recognize JTX-7017?

22   A.    Not specifically.  I don't recall it specifically, no.

23   Q.    Does this appear to be an overview of the launch of

24   the 40 milligram product?

25   A.    Yes.

1    Q.    Is this the type of material that is prepared by the

2    marketing team?

3    A.    Yes.

4    Q.    Do you know who Mike Sheehy is?

5    A.    He was the director of Copaxone marketing at that

6    time.

7    Q.    Does he work under you?

8    A.    He did, yes.

9    Q.    If you could turn to, in that exhibit, Page

10   JTX-7017.6.

11   A.    The exhibit again is?

12   Q.    JTX-7017.  Does this appear to show the challenges

13   that Copaxone 40 milligram faced at launch?

14   A.    Yes.

15   Q.    And if you look at the clinical profile on the last

16   bullet, it reads, the Glacier study will provide limited

17   data regarding experience of 20 milligram patients switched

18   to 40 milligrams; not promotable.

19          Do you see that?

20   A.    I see that.

21   Q.    That's correct?

22   A.    We were not able to use this in promotional materials.

23   Q.    You also cannot tell patients that Copaxone 40 will

24   reduce the severity of injection site reactions as compared

25   to the 20 milligram product.  Is that right?

Hassler - cross

1    A.    That's correct.

2    Q.    You had started working with Copaxone prior to the

3    launch of the 20 milligram product.  Is that right?

4    A.    Yes.  That's correct.

5    Q.    And as part of the work that you have done preparing

6    for the 20 milligram launch you had done some market

7    research.  Is that right?

8    A.    Yes.

9    Q.    And one of the issues that was identified in the

10   market research as a potential weakness for the 20 milligram

11   daily product was the daily injections.  Is that right?

12   A.    That was one of several.

13   Q.    So as early as 1996 it was recognized that daily

14   injections were a weakness for Copaxone 20 milligrams.  Is

15   that correct?

16   A.    One of several.

17   Q.    Can we have JTX-7014.

18         Do you recognize this exhibit?

19   A.    It looks like one of our training meetings, or a

20   training meeting presentation.

21   Q.    Who would this type of presentation be given by?

22   A.    This would have been, I believe this would have been

23   for field trainers in helping train other sales

24   representatives.

25   Q.    May we have JTX-7041.16.  If you look on this slide,

Hassler - cross

```
 1    it is talking about the Copaxone 40 milligram per milliliter

 2    strategy.

 3                 If you look at the middle bullet, as we all

 4    know, the only knock on Copaxone over the years has been

 5    that it is a daily injection -- well, we have now fixed

 6    that.

 7                 Do you see that?

 8    A.    I see that.  That is inaccurate.

 9    Q.    That statement is incorrect?

10    A.    Yes.  There were many attributes that we have tried --

11    Q.    I didn't ask you why.

12    A.    Okay.

13    Q.    You discussed on your direct the pricing of Copaxone

14    40 milligrams.  Is that right?

15    A.    Yes.

16    Q.    Can we have DTX-1461, please.

17                 Do you recognize this e-mail?

18    A.    Yes.

19    Q.    This e-mail is from you to Jeff Janofsky and Mike

20    Sheehy?

21    A.    Yes.

22    Q.    The e-mail reads, This is the pricing rationale

23    document I sent to Jill Butler last Friday.

24                 Is that right?

25    A.    Yes.  It was a draft.
```

1   Q.      If you look at the second page of that exhibit, the

2   top reads, top paragraph, The recommended pricing strategy

3   for Copaxone 40 milligrams is to price it at a two percent

4   discount to 20 milligrams daily at a WAC of Jill to confirm

5   with Lynn for the following reasons.

6              Do you see that?

7   A.      I see that.

8   Q.      Was this the strategy that was adopted at the launch?

9   A.      We did price the wholesale acquisition cost at a 2

10  percent discount.

11  Q.      And that was to encourage the use of Copaxone 40

12  milligrams per milliliter?

13  A.      It was to encourage equal formulary placement for

14  Copaxone 40 milligram with 20 milligram based on the

15  discounts and rebates we were able to negotiate.

16  Q.      The pricing differential between, in the WAC pricing

17  between Copaxone 40 and Copaxone 20 has increased over time.

18  Is that right?

19  A.      Yes.

20  Q.      So in August of 2014 there had been a 9.9 percent

21  increase in the WAC on the 20 milligram product.  Is that

22  right?

23  A.      Is that listed here?

24  Q.      That is not in the slide?

25  A.      Say it again, please.

Hassler - cross

1    Q.    In August of 2014 would there have been a 9.9 percent

2    increase in the WAC with the 20 milligram product?

3    A.    I believe so.

4    Q.    At the same time, there was no increase for the 40

5    milligram product?

6    A.    That's right.

7    Q.    That would have further increased the differential in

8    the pricing of the 40 milligrams and 20 milligram products?

9    A.    Not that the payors actually pay.

10   Q.    That would increase the differential in the WAC

11   pricing.  Is that right?

12   A.    Yes.

13   Q.    What the payor actually paid depends on whatever

14   discounts and coupons that are confidential to your company

15   that you might provide.  Is that right?

16   A.    What the insurance company pays is based on the

17   discounts and rebates, and our strategy there was to --

18   Q.    I didn't ask for the strategy.

19           MR. WARE:  Your Honor, I ask that the witness be

20   allowed to finish his answer.

21           THE COURT:  Number one, it is rude.  Number two,

22   it is inappropriate.  Let him finish his response.

23   BY MR. WHITE:

24   Q.    You can finish.

25   A.    That was all I had to say.

1   Q.    In January 2015, there was another increase in the WAC

2   for the 20 milligram product of 9.9 percent.  Is that right?

3   A.    Yes.

4   Q.    The increase on the 40 milligram product was 7.9

5   percent.  Is that right?

6   A.    Yes.  That's correct.

7   Q.    Did that again further increase the increase in the

8   WAC pricing in the 40 milligram and 20 milligram products?

9   A.    It changed the WAC.  It didn't change the price to the

10  insurers.

11  Q.    I believe you also mentioned on your direct that the

12  co-pay benefit for the 40 milligram product was -- there was

13  a zero co-pay benefit.  Is that right?

14  A.    Yes.

15  Q.    That meant that patients on commercial insurance that

16  are prescribed the 40 milligram product pay zero dollars out

17  of pocket?

18  A.    Yes.  There was a ceiling to that.  But that was the

19  intent.

20  Q.    And for the 20 milligram product, patients had to pay

21  at least $35 for the co-pay.  Is that right?

22  A.    That was the program for the 20 milligram.

23  Q.    Can we have JTX-7017.  I think we looked at this one

24  earlier.

25        Can we have .7.

Hassler - cross

1                This is the training material we looked at

2     earlier, and this slide references challenges to Copaxone 40

3     milligram at launch.  Is that right?

4     A.    Yes.

5     Q.    If you look at the last bullet, I guess on the first

6     square, Many patients have already adjusted to less frequent

7     dosing with 20 milligrams.

8                Did you understand that to be true?

9     A.    No.  I don't know what that means.

10    Q.    These are marketing materials that are presented at

11    Teva.  Is that right?

12    A.    Yes.

13    Q.    So you didn't have an understanding with respect to

14    that bullet point?

15    A.    I am trying to put it into context.  I think there was

16    a concern that there were patients out there that were using

17    the 20 milligram less frequently and may not be getting an

18    effective dosage with that.

19                That was the concern that I remember.

20    Q.    So when you launched the 40 milligram product, the 20

21    milligram product was well known in the marketplace.  Is

22    that right?

23    A.    Yes.

24    Q.    So when you launched the 40 milligram product you had

25    the benefit of the past legacy and the heritage of the 20

1    milligram product.  Is that right?

2    A.    Yes.

3    Q.    If we look at PTX-652, I believe this is the one you

4    discussed on your direct.  Could you look at -- this slide

5    is showing discontinuation through adverse events, the title

6    of the slide says, Distinctions due to adverse events

7    similar to placebo.

8              Do you see that?

9    A.    Yes.

10   Q.    Again, this is in the materials that you provide to

11   physicians, to speak to other physicians.  Is that right?

12   A.    Yes.

13   Q.    And so, if you look in the chart, third bullet down,

14   Distinctions due to adverse events, the 40 milligram

15   product, it is 29 out of 943 patients, 3.1 percent.  Is that

16   right?

17   A.    Yes.

18   Q.    For placebo it is six out of 461 patients for 1.3

19   percent.  Is that right?

20   A.    Yes.

21   Q.    Teva's message is that those are similar.  Is that

22   right?

23   A.    Yes.

24   Q.    As part of these physician -- professional speaking

25   programs, do you engage private practice physicians and

Hassler - cross

1    academics to speak?

2    A.    Yes.

3    Q.    Are Omar Khan and Jerry Wolinsky physicians that Teva

4    engages to speak on their behalf?

5    A.    Yes.

6    Q.    While we are on 652, can we go to 3.  Again, this is

7    in that same exhibit, Page 3.  Is this a representation of

8    the treatment landscape for the 40 milligram when the 40

9    milligram product launched?

10   A.    Yes.

11   Q.    Those are all competitive products that compete with

12   Copaxone in the marketplace?

13   A.    Yes.

14   Q.    Betaseron is administered every other day.  Is that

15   right?

16   A.    Yes.

17   Q.    Aubagio and Tecfidera are oral treatments?

18   A.    That's correct.

19   Q.    Avonex is one week, I believe.  Is that right?

20   A.    Yes.  It's an intramuscular injection once a week.

21   Q.    Rebif is three times a week.  Is that right?

22   A.    Yes.

23   Q.    Extavia is every other day.  Is that right?

24   A.    Yes.

25   Q.    Tysabri is I believe once a month by infusion.  Is

Hassler - cross

1   that right?

2   A.    That's correct.

3   Q.    And Novantrone I believe is every three months.  Is

4   that right?

5   A.    I'm not sure.

6   Q.    If we could turn to 651, please.

7         If you go to .20 in this exhibit, is this the

8   prescribing information for Copaxone 40 milligrams?

9   A.    Yes.

10  Q.    The GALA trial did not provide definitive information

11  that 40 milligrams was more tolerable -- that the Copaxone

12  40 milligram product was more tolerable than the 20

13  milligram product.  Right?

14  A.    It provided data that physicians have indicated, their

15  perception is that it is more tolerable than the 20

16  milligram.

17  Q.    The GALA clinical trial is the only data on the 40

18  milligram -- 40 milligram prescribed.  Correct?

19  A.    Yes.

20         MR. WARE:  I am sorry.  I didn't get the

21  question.

22         THE COURT:  I didn't, either.

23  BY MR. WHITE:

24  Q.    The GALA clinical trial data is the only data on the

25  40 milligram product in the prescribed information.  Is that

1    right?

2    A.    That's correct.

3    Q.    Teva can only make a claim of superior tolerability

4    for the 40 milligram product compared to the 20 milligram

5    product if a clinical trial in fact establishes that to the

6    FDA's satisfaction.  Is that right?

7    A.    And that it's included in the label.

8              MR. WHITE:  Your Honor, nothing further.  But I

9    believe my co-counsel has some followup questions.

10             THE COURT:  Okay.

11             MR. WHITE:  Thank you, Mr. Hassler.

12             MS. WALDRON:  Good morning, Your Honor.

13   MS. WALDRON:

14   Q.    Good morning Mr. Hassler.  My name is Rachel Waldron,

15   and I am here on behalf of the Sandoz and Momenta

16   defendants.

17             Can we please take a look at JTX-7008.

18   Specifically the last page of the Exhibit, 7008.8.  Thank

19   you.

20             I believe you have that in your binder, Mr.

21   Hassler.

22   A.    Yes.

23   Q.    Do you see in the last page of this exhibit, on the

24   far right-hand corner at the bottom, you see it says

25   Marketed By?

Hassler - cross

1    A.    Yes.

2    Q.    You see it say, marketed By Teva Neuroscience, Inc. in

3    Overland Park, Kansas.  Correct?

4    A.    Yes.

5    Q.    You don't dispute that, do you?

6    A.    No.

7    Q.    And Teva Pharmaceuticals USA, Inc. books the sales of

8    Copaxone in the USA.  Is that correct?

9    A.    Yes.

10   Q.    Who books the cost of goods sold in the USA?

11   A.    I don't know.

12   Q.    Let's pull up PTX-649, please.

13         This is the document entitled Marketing Services

14   Agreement.  It's on the screen if it is more convenient for

15   you, Mr. Hassler.

16   A.    Okay.

17   Q.    I am going to point you to the first "Whereas" clause

18   on the face of PTX-649.  We see it says that Teva

19   Neuroscience will provide, quote, marketing and promotion

20   services for TPI.

21         Do you see that?

22   A.    Yes.

23   Q.    And if we turn and look at Page 649.3, Clause 1.17.

24   Clause 1.17, we see that Teva Neuroscience also contracted

25   with Aventis Pharmaceuticals, Inc. to sell product in the

 1    U.S.   Correct?

 2    A.     Yes.

 3    Q.     How much money did Aventis receive for that service?

 4    A.     I don't know.

 5    Q.     Let's please turn to Clause 1.20.  Clause 1.20 is

 6    entitled TPI's Promotional Share.  Do you see that?

 7    A.     Yes.

 8    Q.     And Clause 1.20 says that Teva Pharmaceuticals is

 9    making intracompany sales -- intercompany sales of Copaxone.

10    Do you see that?

11    A.     I see that.

12    Q.     How much money does TPI get paid on those intercompany

13    sales contracts?

14    A.     I don't know.

15    Q.     Just so the record is clear, do you understand what I

16    mean by TPI?

17    A.     Teva Pharmaceuticals Industries, Ltd.?

18    Q.     Yes, that is the way it is defined in the agreement.

19           Can we please turn back to Mr. Hassler's

20    Demonstrative 3.9.

21           You took us generally through the various

22    company roles.  Do you recall that?

23    A.     Yes.

24    Q.     Can you please clarify which of these corporate

25    entities is booking the cost of goods sold?

1    A.    I am not sure.

2    Q.    Which corporate entity listed on PDX-3.8 is booking

3    the distribution cost?

4    A.    I believe that that is Teva Pharmaceuticals USA.

5    Q.    But you are not sure?

6    A.    No.

7    Q.    Which corporate entity listed on your slide is booking

8    the marketing costs?

9    A.    Teva Neuroscience performs the marketing services, and

10   Teva Pharmaceutical Industries, Ltd. pays those fees.

11   Q.    So your answer to the question of which corporate

12   entity is booking the marketing costs is which entity?

13   A.    Teva Pharmaceuticals, Ltd.

14   Q.    What corporate entity is booking the R&D costs?

15   A.    I am not sure.

16   Q.    What price does Teva Pharmaceuticals USA, Inc. pay to

17   Teva Pharmaceuticals Industries, Ltd. for Copaxone 40?

18   A.    I don't know.

19   Q.    Do you know whether the price that I just referred to

20   is the cost number that was listed in JTX-7018.3?

21   A.    I don't.

22   Q.    Let's actually turn to JTX-7018.3.  If we blow this up

23   we see there is a listing for gross sales?

24   A.    Yes.

25   Q.    Which corporate entity is booking for gross sales?

Hassler - cross

1              MR. WARE:  Your Honor, I would like to object

2      and request a sidebar.

3              THE COURT:  Okay.

4              (The following took place at sidebar.)

5              THE COURT:  Mr. Ware.

6              MR. WARE:  I think the issue here is the

7      relevance of this.  For the moment, let me just say that.

8              MS. WALDRON:  Our response to that, Your Honor,

9      is a key component of their expert, Dr. Bell's, commercial

10     success case is the overall sales and profits of the

11     Copaxone franchise.  This is intended to show that that

12     number should not just be taken at face value.  So we would

13     summarize that this undercuts their commercial success

14     argument.

15             MR. WEISEN:  Your Honor, it's hard to say how

16     who books costs of goods sold is relevant to the sales

17     figures and the numbers that we are talking about for the

18     overall sales.

19             MR. WARE:  I can clarify that all financials are

20     rolled up and consolidated among the entities anyway.

21             MS. MAZZOCHI:  That is precisely the problem,

22     Your Honor, is that we are going to take issue that certain

23     costs from certain entities get rolled into the commercial

24     success calculation.

25             THE COURT:  Well, it seems for the most part he

Hassler - cross

```
 1    doesn't know the answers to your questions.

 2                  MS. MAZZOCHI:  Which is fine.

 3                  THE COURT:  I will let her continue.

 4                  (End of sidebar conference.)

 5    BY MS. WALDRON:

 6    Q.    I believe, I want to make sure I don't repeat myself,

 7    I believe we were on the following question:  Which specific

 8    corporate entity books the gross sales listed on 7018.3?

 9    A.    I believe that that is the distributor Teva USA.  But

10    I am not sure.

11    Q.    Do you see in the fourth row on this page, we see a

12    line, Total Costs?

13    A.    Yes.

14    Q.    What specific costs are included in this figure, the

15    costs listed on 7018.3?

16    A.    It's the cost of the product.

17    Q.    What specific variables go into calculating the cost

18    of that product?

19    A.    I don't know.

20                  THE COURT:  COGS, is that acronym defined?

21                  MS. WALDRON:  I appreciate that, Your Honor.

22    That is a good point.

23    BY MS. WALDRON:

24    Q.    What is your understanding of the acronym COGS?

25    A.    It is the cost of goods sold.
```

Hassler - cross

1    Q.    Is that a typical acronym used in accounting?

2    A.    Yes.

3    Q.    Let's just touch on a few more marketing concepts.

4    Can we please go back for a minute to JTX-7017.13.   This is

5    the marketing plan for Copaxone three times a week.

6    Correct?

7    A.    An overview of the launch.

8    Q.    When you were illustrating your 40 mg A Game Strategic

9    Framework, you were on the slide that says the 40 mg dose

10   offers comparable efficacy and safety to the 20 mg dose.

11   Correct?

12   A.    That's what it says.

13   Q.    What you are going differentiate the 40 mg dose on was

14   improved convenience.   Right?

15   A.    We were differentiating on convenience as well as

16   tolerability based on what was in the label.

17   Q.    To be specific, nothing in this mentions reduced

18   severity of ISRs or IPIRs for patients already on the 20 mg

19   product.   Correct?

20   A.    That's correct.   That was the interpretation that

21   physicians fed back to us when they reviewed the data.

22   Q.    But you concur that that is not reflected in this Teva

23   internal document.   Correct?

24   A.    It is not in this statement.

25   Q.    And if we look at Teva's official marketing messages

1    to 20 mg patients, none of them promoted the 40 mg three

2    times a week product on the grounds that patients would

3    experience reduced severity of ISRs or IPIR compared to the

4    20 mg daily regimen.  Right?

5    A.    We could only communicate the data, and patients and

6    physicians had to draw their own conclusion on that.

7    Q.    That is, for clarity, that's because the FDA does not

8    allow Teva to promote the 40 mg product as safer than the 20

9    mg product in terms of side effects or severity.  Right?

10   A.    That's correct.

11   Q.    You didn't provide this Court with any marketing

12   study, patient record, or anything else showing a patient

13   who did switch from 20 mg daily to 40 mg three times a week

14   who actually did have a less intense ISR or IPIR symptom on

15   the 40 mg product versus the 20 mg product.  Correct?

16   A.    I didn't submit anything.  I have had multiple

17   patients tell me they have experienced --

18             MS. WALDRON:  Objection.

19   MS. WALDRON:

20   Q.    I'm sorry.  Please continue.

21

22   A.    I have had many patients respond that they have

23   experienced fewer and less severe injection site reactions

24   as a result of having switched.

25   Q.    But you have no evidence of this.  Correct?

Hassler - cross

1    A.    Only what's been told to me.

2    Q.    There is no evidence before this Court.  Correct?

3              THE COURT:  Well, I am going to object to that.

4              MS. WALDRON:  I will move on.

5              THE COURT:  Mr. Ware doesn't want to.

6              MS. WALDRON:  I have just a few more questions

7    about Teva's marketing efforts for Copaxone.

8    BY MS. WALDRON:

9    Q.    Isn't it true that in 2014, PharmExec Magazine named

10   Copaxone as its brand of the year?

11   A.    Yes.

12   Q.    And PharmExec, is it okay if I abbreviate PharmExec?

13   A.    Yes.

14   Q.    PharmExec noted in 2014 with regards to Copaxone 40

15   that Teva had, quote, returned for an encore just in time to

16   upstage the potential entrance of generic competition for

17   Copaxone 20?

18             MR. WARE:  Objection.  I am not aware this is in

19   evidence or disclosed or anything else.

20             THE COURT:  Sustained.  And slow down.  Go

21   ahead.

22   BY MS. WALDRON:

23   Q.    Do you recall that there were publications regarding

24   the award of the brand of the year?

25   A.    Yes.

1    Q.     If I showed you a printout of a PharmExec article,

2    would that perhaps refresh your recollection as to specific

3    statements that were made at that time?

4              MR. WARE:  Objection.  There is nothing to

5    refresh.

6              THE COURT:  Could you flesh that out a little

7    bit, Mr. Ware?

8              MR. WARE:  Your Honor, the witness said he is

9    aware of the publication.  And then she asked whether

10   something would refresh his recollection.

11             MS. WALDRON:  Okay.

12             THE COURT:  I will sustain that.  Did you want

13   to nevertheless show him --

14             MS. WALDRON:  That's where I was going.

15             THE COURT:  Go ahead.

16             MS. WALDRON:  Can we pull up PharmExec.

17             MR. WARE:  Do we have a copy of this?

18             MS. WALDRON:  I apologize.  If I may approach

19   and give the Court and the witness a copy?

20             THE COURT:  I will view it on the screen, but

21   the witness might like a company.

22             Are you comfortable with the screen?

23             THE WITNESS:  I am having a little trouble

24   reading it.

25             THE COURT:  He needs a copy.

1   BY MS. WALDRON:

2   Q.    Have you had a moment to look at the PharmExec

3   article, Mr. Hassler?

4   A.    Yes.

5   Q.    Do you see the second paragraph under the picture,

6   there is a heading Copaxone - Built To Last?

7            MR. WARE:  Your Honor, I am going to object to

8   this.  It is a hearsay document.  It is just an article by

9   someone.  We know nothing about it.  It's not relevant to

10  this in any way, no matter what it says.

11           THE COURT:  Difficult to assess its relevance at

12  this point.  Why isn't this hearsay?  Tell me.

13           MS. WALDRON:  We are not offering this for the

14  truth of the matter asserted but rather to show that the

15  statements were made.  We are also not offering it into

16  evidence at this time.

17           THE COURT:  Sustained.  We can't do this.  This

18  is not proper.

19  BY MS. WALDRON:

20  Q.    Do you recall giving an article to FiercePharma

21  Marketing in approximately 2014?

22  A.    Giving an article?

23           THE COURT:  Giving an interview?

24  BY MS. WALDRON:

25  Q.    I am sorry.  Do you recall giving an interview to

Hassler - cross

1    FiercePharma in approximately 2014?

2    A.    Vaguely.

3    Q.    We will move on from all that.

4          One of Teva's marketing strategies is Shared

5    Solutions.  Is that right?

6    A.    Yes.  It's a patient support program.

7    Q.    And Shared Solutions still exists today.  Is that

8    right?

9    A.    It does.

10   Q.    Now, I want to clarify a couple more things.  If Teva

11   had secured FDA approval of a 20 mg every other day dose,

12   Teva would have lost sales.  Is that correct?

13                MR. WARE:  Objection.

14                THE COURT:  Basis?

15                MR. WARE:  Your Honor, it is speculative, what

16   would have happened in the event --

17                THE COURT:  Sustained.

18                MS. WALDRON:  No further questions, Your Honor.

19                THE COURT:  Redirect.

20                MR. WARE:  Yes, Your Honor.  Just a few.

21                      REDIRECT EXAMINATION

22   BY MR. WARE:

23   Q.    Mr. Hassler, you were asked early on in the

24   cross-examination about, quote, weaknesses of the 20

25   milligrams.  And you indicated that there were several

Hassler - redirect

```
1    limitations.  What did you mean by that?

2    A.     The product was considered to be less effective when

3    we initially launched it.  So much of our focus was around

4    how to demonstrate the efficacy or in fact improve the

5    efficacy of the product for patients so that they would have

6    a better experience.

7              We had developed an autoject to make it easier

8    to inject.  We had --

9    Q.     What's an autoject?

10   A.     It's a device that you can put the syringe into so

11   that when the patient injects it makes it easier for them to

12   give the self-injection.

13             We had no MRI data when we launched the product.

14   That was becoming more and more pronounced as an expectation

15   in the field, that you would be able to show disease

16   activity on MRI.  And that didn't exist.

17             The trial wasn't originally created to show an

18   impact on disability progression.  Now there is disability

19   data.

20             There were just a lot of weaknesses that we were

21   trying to sure up, to better characterize the product, and

22   then to improve the product for a better patient experience.

23   Q.     You were asked several questions about the two percent

24   discount and then some subsequent pricing changes to what

25   was referred to as WAC.  WAC is wholesale acquisition cost.
```

1    Correct?

2    A.    Yes.

3    Q.    And you said repeatedly that it isn't what payors pay.

4          What is wholesale acquisition cost and why does

5    it not reflect -- what does it not reflect?

6    A.    The wholesale acquisition cost is what we sell the

7    product to wholesalers for.  Then there is usually a

8    chargeback or a discount on that that the wholesalers end up

9    actually paying.

10         We negotiate rebates and discounts with

11   insurance carriers beyond that price to bring the price down

12   lower so that what they actually pay is negotiated between

13   the company and the insurance company.  And we do that in

14   order for them to make the product accessible to the

15   patients that they cover with a reasonable out-of-pocket

16   expense.

17   Q.    Does it follow that a difference between 20 milligram

18   and 40 milligram in terms of wholesale acquisition cost

19   doesn't tell you much about the real pricing?

20   A.    That's correct.

21   Q.    You indicated, I think, that the co-pay on 20

22   milligram was about a dollar a day or $35 a month.  Is that

23   right?

24   A.    That's correct.

25   Q.    You did not raise that co-pay when you launched 40

Hassler - redirect

1    milligram.  Is that correct?

2    A.    That's correct.

3    Q.    How long had that been in place historically?

4    A.    Several years.

5    Q.    Did you make any adjustment to increase the co-pay,

6    the burden on patients, when you launched 40 milligram?

7    A.    Not when we launched, no, we did not.

8    Q.    You were asked later a question about Shared

9    Solutions.  What was or is Shared Solutions?

10    A.    Shared Solutions is a program that we developed to

11    support patients in their management of MS.  It provides

12    educational information to MS patients generally on how to

13    best manage their disease and good healthy habits.

14            It also is intended to help educate patients on

15    Copaxone, and then ensure that they can get physical and

16    financial access to the product, so it helps them negotiate

17    with -- manage the hurdles through their insurance carriers

18    and things of that nature.

19            And we have nurses in the field that actually go

20    out and teach patients how to inject and self-administer the

21    product.

22    Q.    In the event of approval of the defendants' ANDA

23    products and the launch of generic 40 milligram glatiramer

24    acetate, would that have had any impact on the individuals

25    whom you have just described as part of Shared Solutions?

1          Defense Counsel:  Objection.  Calls for

2   speculation.

3          THE COURT:  Sustained.

4   BY MR. WARE:

5   Q.    Could I have the slide on the agreements.

6          While we are waiting a few seconds for that,

7   when you were discussing the financial statements and the

8   numbers that were reflected in the exhibits, when Teva's

9   financial statements are audited on an annual basis, how are

10  these numbers collected and are they consolidated for

11  purposes of the corporate entities?

12          MS. WALDRON:  Your Honor, objection.  This is

13  outside the scope of previous examination.

14          THE COURT:  Outside the scope of your cross?

15          MS. WALDRON:  Yes.

16          THE COURT:  No, it is not.  Overruled.  Come on.

17          THE WITNESS:  They are consolidated in Teva's

18  books, into our financial system.  And the data in that

19  system is audited routinely.

20  BY MR. WARE:

21  Q.    Does that system, and therefore the books of the

22  company, include all of these line items, including cost of

23  goods sold, net sales, gross sales, R&D costs and others?

24  A.    Yes.

25  Q.    With respect to the agreements that are depicted on

Hassler - redirect

1   PDX-3.10 about which you have testified and which appear as

2   Plaintiffs' Exhibit 639, 642, 649 and 650, are these

3   agreements subject to amendment should the entities choose

4   to do that?

5   A.   Yes.

6   Q.   These are the current arrangements.  Is that correct?

7   A.   Yes.

8   Q.   But only the current arrangements?

9   A.   Yes.

10              MR. WARE:  Nothing further.  Thank you, sir.

11              THE COURT:  Let's take a stretch.  Thanks, Mr.

12  Hassler.

13              (Witness excused.)

14              (Recess taken.)

15              THE COURT:  Please, take your seats, ladies and

16  gentlemen.

17              Mr. Ware.

18              MR. WARE:  Thank you, Your Honor.  Daniel Wynn.

19              ... DANIEL RICHARD WYNN, having been duly sworn

20  as a witness, was examined and testified as follows ...

21              THE COURT:  Good morning, Dr. Wynn.

22              THE WITNESS:  Good morning.

23              THE COURT:  Doctor, regardless of what they have

24  told you, you can project out that way, I am going to hear

25  what you are saying.  Sometimes it is a little easier to

1      make contact with your lawyer.  If you don't make eye

2      contact with me, I am not annoyed.  I want you to know that.

3                      THE WITNESS:  Thank you, Your Honor.

4                          DIRECT EXAMINATION

5      BY MR. WARE:

6      Q.      Doctor, can you repeat your name for us?

7      A.      Daniel Richard Wynn.

8      Q.      You are pretty well miked up there.  You don't need to

9      yell at us.  You might want to yell at me, but don't.  Take

10     it down just a notch.

11                     Where do you work, Doctor?

12     A.      My office is in Northbrook, Illinois.  Consultants in

13     Neurology.

14     Q.      What is Consultants in Neurology?

15     A.      Consultants in Neurology is a single specialty

16     neurology practice in the Chicago area.

17     Q.      When you say single specialty neurology practice, what

18     is the specialty?

19     A.      Neurology.

20     Q.      And does the company and you personally treat MS

21     patients?

22     A.      Yes.  We have a National Multiple Sclerosis Society

23     designated comprehensive care center within our office.

24     About 85 percent of the individuals that I see on a

25     day-to-day basis in my office have multiple sclerosis.

Wynn - direct

1    Q.    Can you briefly tell us a bit about your educational

2    background?

3    A.    Certainly.  I went to undergraduate at Reed College in

4    Portland, Oregon, and graduated in 1977.  I then returned to

5    Chicago, where I was born, and went to medical school at the

6    Chicago Medical School.

7    Q.    Subsequent to medical school, did you hold fellowships

8    as a result of which you did additional training?

9    A.    Yes.  I had a fellowship in internal medicine and

10   neurology at the Mayo Clinic in Rochester, Minnesota.  I did

11   fellowship level training in clinical neurophysiology,

12   epilepsy, and sleep disorders medicines, while doing

13   epidemiology and basic science research in multiple

14   sclerosis.

15   Q.    Was that also at Mayo?

16   A.    That was all in Rochester, Minnesota.

17   Q.    Following those fellowships, did you have any

18   additional specialized training?

19   A.    Yes.  As I mentioned, I had specialized training while

20   working in Rochester at the Mayo in both adult neurology, as

21   well as in clinical neurophysiology, studying things such as

22   peripheral nerve disease, everything from a pinched nerve in

23   the back to more severe diseases, like Lou Gehrig's disease,

24   amyotrophic lateral sclerosis, other conditions such as

25   epilepsy , as well as sleep medicine, everything from sleep

Wynn - direct

1    apnea to narcolepsy.

2    Q.    Can you with briefly describe for us neurology as a

3    discipline, What does it include?

4    A.    Neurology is the medical discipline that covers

5    diseases of the brain, the spinal cord, the nerves coming

6    off the brain, such as the nerves to the eye, as well as the

7    peripheral nerves in our arms and legs and torso, in both

8    adults and children.

9    Q.    And when you refer to neurophysiology, what do you

10   mean by that?

11   A.    Neurophysiology is a subspecialty within neurology

12   which measures how the nerves are working, whether or not

13   they be nerves in the brain, such as a brain test or

14   electroencephalogram, to evoke potentials which measures

15   conduction of the nerves in the eye, or peripheral nerves,

16   like EMDS, like one might have for carpal tunnel syndrome or

17   sciatica.

18   Q.    And you are board certified, are you not?

19   A.    Yes, I am a fellow in that area as well.

20   Q.    What's the board called?

21   A.    There are two boards.  I am board certified in

22   neurology by the American Board of Psychiatry and Neurology.

23   I am board certified by the American Board of Psychiatry and

24   Neurology, in Clinical Neurophysiology.  I am a fellow in

25   the, American Clinical Neurophysiology Society.  And I am

Wynn - direct

```
 1    board certified in sleep by the American Board of Sleep

 2    Disorders Medicine.

 3    Q.    You indicated that a substantial portion of your

 4    practice is treating MS patients?

 5    A.    That's correct.

 6    Q.    At any one time, or perhaps you can tell us, in a

 7    given year, approximately how many MS patients do you

 8    regularly see?

 9    A.    I see a little over 1500 unique individuals living

10    with MS per year.

11               MR. WARE:  Your Honor, at this time I proffer

12    Dr. Wynn as an expert in multiple sclerosis.

13               MR. FIGG:  No objection, Your Honor.

14               THE COURT:  The Doctor is accepted as an expert

15    in that field.

16    BY MR. WARE:

17    Q.    You understand, Doctor, that this action involves

18    multiple sclerosis and the drug glatiramer acetate and its

19    brand form Copaxone 20 milligram and ultimately 40

20    milligram.  Is that correct?

21    A.    Yes.

22    Q.    And you recognize this as the 40 milligram Copaxone?

23    A.    Yes.

24    Q.    Do you prescribe 40 milligram Copaxone?

25    A.    Yes, I do.
```

Wynn - direct

1   Q.      Can you tell us approximately how often or to what

2   extent you prescribe it?

3   A.      Approximately 30 percent of the individuals who I

4   treat are on Copaxone.  For many years, Copaxone has been

5   the most common disease modifying therapy drug to slow down

6   the progression of MS that I have used in our practice.

7   Q.      Given your familiarity with the field and physicians

8   who practice in the field, is that proportion of Copaxone

9   prescription as you understand it representative of the

10  field?

11  A.      My understanding is that it is.  Copaxone for many

12  years has been the most commonly prescribed disease

13  modifying therapy for treating individuals in the United

14  States with multiple sclerosis.

15  Q.      What is the active pharmaceutical ingredient in

16  Copaxone?

17  A.      The active pharmaceutical ingredient is glatiramer

18  acetate.

19  Q.      Have you had occasion to participate in clinical

20  trials during the course of your career?

21  A.      Yes.  I have been a principal investigator or

22  investigator in approximately 180 clinical trials, about 85

23  in multiple sclerosis.

24  Q.      We have heard a little bit about it, but essentially,

25  what is a clinical trial, the short version?

Wynn - direct

1    A.    A clinical trial is an experiment in clinical

2    research.

3    Q.    What do you mean by that?  It involves patients, does

4    it not?

5    A.    Yes, it does.  Where we are trying to show an

6    experiment, for example, does the use of a medication have a

7    beneficial effect on the illness as well as its safety and

8    tolerability?

9    Q.    Did any of the clinical trials with which you have

10   been involved or in which you have been involved concern

11   glatiramer acetate?

12   A.    Yes, I have been involved in many clinical trials with

13   glatiramer acetate.

14   Q.    Have you been involved with in clinical trials or

15   acted as a consultant to a number of different

16   pharmaceutical companies?

17   A.    Yes.  I have been a consultant to most pharmaceutical

18   companies that have had a product in development for

19   multiple sclerosis over the years.

20   Q.    Have you had occasion to work with or for any of the

21   defendants in the courtroom?

22   A.    Yes.

23   Q.    Have you had occasion to contribute to academic

24   journals?

25   A.    Yes.  I have published over 120 books, chapters,

1    abstracts, and peer-reviewed literature, as well as many

2    non-reviewed works as well.

3    Q.    I take it you serve on certain medical boards and are

4    a member of a number of professional societies.  Is that so?

5    A.    That's correct.

6    Q.    Now, have you prepared some slides in conjunction with

7    counsel with respect to your testimony today?

8    A.    Yes, I have.

9    Q.    And you are here to give certain opinions, are you

10   not?

11   A.    Yes, I am.

12   Q.    Can you tell us, give us an overview of the opinions

13   that you expect to offer?

14   A.    Yes.  Primarily, these three:  that a physician and

15   patient, I may refer to direct infringement, induced

16   infringement, or contributory infringement.  It is my

17   opinion that a physician and a patient using the defendants'

18   ANDA products will directly infringe each of the asserted

19   patents; two, that the defendants induced infringement by

20   encouraging patients and physicians to use the defendants'

21   ANDA products as described in the defendants' package

22   inserts; and three, the defendants contributorily infringe

23   by supplying the ANDA products and directing its infringing

24   use.

25   Q.    With respect to the first, direct infringement, I

Wynn - direct

1    think you said that you expect to give an opinion regarding

2    infringement of each patent.

3                Does your opinion involve an opinion of

4    infringement with respect to each asserted claim of those

5    patents?

6    A.    Yes, it does.

7    Q.    Do you also expect to give certain opinions regarding

8    secondary considerations?

9    A.    Yes, I do.

10   Q.    And tell us, in general, what those opinions are?

11   A.    In general, Copaxone 40 milligrams administered three

12   times a week embodies the claimed inventions and that

13   Copaxone 40 milligrams three times a week satisfies a long

14   felt, unmet need in the field, and that many prior clinical

15   trials have failed to produce these results.

16   Q.    Let me first then direct you to the patents

17   themselves.  Joint Trial Exhibit 7000, 7001, 7002 and 7003.

18   Tell us whether these are the patents to which your opinion

19   applies?

20   A.    Yes, they are.

21   Q.    Broadly speaking, what do you understand the patents

22   to cover?

23   A.    What the patents cover is the use of Copaxone 40

24   milligrams given three times a week at least 48 hours apart

25   to a person with relapsing multiple sclerosis in order to

Wynn - direct

1    decrease the frequency and severity of injection site

2    reactions, as well as to decrease the frequency and severity

3    of immediate post-injection reactions.   In other words, to

4    make it better tolerated.

5    Q.    Those are, in effect, side effects.   Is that right?

6    A.    That would be correct.

7    Q.    Let's talk a little bit about multiple sclerosis and

8    see if you could help us understand the disease.   What is

9    multiple sclerosis?

10   A.    Multiple sclerosis is the most common disabling

11   illness that affects individuals of working age in the

12   United States, in fact, in well over 400,000 people in the

13   United States and many million worldwide.   It occurs like

14   many illnesses that are autoimmune illnesses, more common in

15   women.   Most commonly starting in one's twenties, although

16   three percent of individuals will be stricken with the

17   illness prior to age ten.   And people may also get it later

18   in life.

19         It tends to be an inexorably progressive

20   irreversible disease, leading to substantial disability.

21   Q.    When you say inexorably progressive, what do you mean

22   by that?

23   A.    Unfortunately, today, there is no cure for MS.   And

24   when damage occurs, in the brain or spinal cord or nerves of

25   the eye, it tends to be permanent.   There is no way that we

Wynn - direct

1    know that we can reverse this damage.

2    Q.    How does multiple sclerosis get its name?

3    A.    In the diagram I have created, there is a picture of a

4    person, and green is their brain and the spinal cord.

5    Q.    Is that synonymous with the central nervous system?

6    A.    Yes.  So the central nervous system is the brain, the

7    spinal cord, and the nerve, the optic nerve.

8          In multiple sclerosis there is inflammation that

9    occurs normally here.  The immune system, as Dr. Klinger

10   mentioned the other day, normally protects us from bacterial

11   invaders or developing cancer.

12         In MS the immune system abnormally attacks our

13   central service system, the brain or the spinal cord.

14         So the name comes from, the diagram and the

15   scars, the brain you may see here, they may also of course

16   and commonly occur in the spinal cord.

17   Q.    Are there certain consequences to those scars both in

18   the brain and in the spinal cord?

19   A.    Yes.  Scars in different parts of the brain produce

20   symptoms.  Again, the diagram, if it affects the nerves of

21   the eye, the person will become blind.  If it affects the

22   front part of the brain, emotional stability.  Other parts

23   of the brain, our ability to reason, to think, the things

24   that make us different.  The brain stem, the back of the

25   brain, double vision, and vertigo.  In the spinal cord, the

Wynn - direct

1    dreaded syndrome, paralysis.  Hence, the National MS

2    Society's old saying, "MS, The great crippler of young

3    adults."

4    Q.    I wonder if we could hone in on the nerve cells and

5    you could explain for us exactly how this autoimmune disease

6    works.  For this purpose, let me direct you to PDX-4.10.

7    Please tell us what we are looking at here?

8    A.    Thank you.  My previous diagram was a picture of a

9    person showing their brain and spinal cord.

10           If we now hone in on an individual cell, like we

11   are looking through the microscope, we will see an

12   individual nerve cell here, the big thick part is what we

13   call the cell body, like the trunk of a tree, with many,

14   many branches coming off of it.

15           An axon is such a branch.  Each individual nerve

16   cell will connect to tens of thousands or millions of other

17   nerves, like transistors in a computer.

18           We now then hone in on this branch of the nerve.

19   Here, one can see that the axon wire here, so to speak, is

20   covered by insulation like a wire, the myelin is a fatty

21   substance, we call it myelin, the myelin protects the nerve,

22   allows its conduction to be normal and conducts

23   synchronously and quickly with the nerves next to it.

24   Q.    And what happens as the disease progresses?

25   A.    With progression of disease, as you can see, I have

1    added to this diagram these Th1 cells, these are immune

2    cells, get into the nervous system, brain, spinal cord,

3    optic nerve, and start to destroy insulation on the nerve,

4    and when they do so often destroy the nerve fiber itself.

5    And this loss of nerve fibers is part of what leads to the

6    inexorable progression of the disease and the irreversible

7    disability that many individuals suffer from.

8    Q.    Before we leave that slide, can you tell us what

9    glatiramer acetate potentially can accomplish in either

10   slowing or preventing what we are looking at here with this

11   nerve?

12   A.    Yes.  Our current understanding is that the Th1 cells

13   come in from the bloodstream, from the periphery, so to

14   speak.

15            MR. FIGG:  Your Honor, this testimony about the

16   mechanism of action of glatiramer acetate on Th1 cells is

17   not in Dr. Wynn's report.

18            THE COURT:  Mr. Ware.

19            MR. WARE:  That may be.  It's just a quick

20   overview for the Court.  I don't think this is

21   controversial.

22            MR. FIGG:  It is controversial.  And there are

23   witnesses who are going to talk about it on both sides of

24   the case.  Dr. Wynn was not one of them.

25            THE COURT:  I will sustain that.

1    BY MR. WARE:

2    Q.    Is MS a fatal disease?

3    A.    MS is not a fatal disease, in other words, one

4    typically does not die of MS.  Although we know individuals

5    with MS have shortened life spans, and certainly, as the

6    disability progresses in each individual, they lose the

7    ability to do the normal things that make up their life.

8    Q.    And is it inevitably disabling?

9    A.    Yes.  Prior to the advent of disease modifying

10   therapies, most people with MS would lose the ability to

11   work within ten to 15 years, lose the ability to walk within

12   about 15 years.  And if, again, the disease was not slowed

13   down, effectively, many people would become isolated, live

14   in nursing homes, be wheelchair-bound and die in due course

15   of complications of such disability.

16   Q.    How is MS diagnosed?

17   A.    MS is diagnosed by taking a history from the

18   individual, examining them, and doing imaging studies, an

19   MRI scan, a picture of the brain.  MS we diagnose by having

20   two episodes.

21   Q.    Directing your attention to the screen, are these

22   examples of MRI images?

23   A.    Yes.  So the image on the left is of a normal healthy

24   brain sliced from the front to the back.  Spinal fluid,

25   which is around the spine, is actually made deep inside the

1    brain, percolates down the spinal cord and then is drained

2    over the top of the head.

3              So this is a healthy brain.

4              The person with MS on the right shows evidence

5    of scarring or sclerosis.  Hence, that's where the disease

6    gets its name.  This person literally has many dozens of

7    scars, which is not unusual even in the first years of the

8    disease.

9    Q.    What relationship does the scarring have to the

10   disabling symptoms about which you spoke?

11   A.    The location of the individual scars to some extent

12   determines their symptoms.  Again, if the scar is on the

13   nerve to their eye, they will have blindness.  On the spinal

14   cord, paralysis, or loss of feeling or bladder or bowel

15   control.

16             These frontal lobe lesions on this scan, for

17   example, most commonly correlate with cognitive loss,

18   intellectual decline in the individual.

19   Q.    Are there different forms of MS?

20   A.    Yes.  There are two common forms of multiple

21   sclerosis, relapsing multiple sclerosis and progressive

22   multiple sclerosis.

23   Q.    Are you familiar with the term we have heard in the

24   courtroom relapsing remitting multiple sclerosis?

25   A.    Yes, I am.

Wynn - direct

1    Q.    Tell us what that is?

2    A.    Relapsing remitting multiple sclerosis is the phase of

3    the disease where a person has an individual flareup where

4    new symptoms come on over days or weeks.  After a period of

5    time, that will diminish and the person will be left many

6    times with a permanent disability, only to be followed by a

7    period of relative clinical stability.  And then the disease

8    will once again be more clinically apparent.

9    Q.    When the disease is in relapse or when there is a

10   relapse for a given patient, what is occurring with the

11   disease?

12   A.    During a relapse, the disease is active and tissue is

13   being affected.  But even in the periods of remission,

14   whether the person is not experiencing new clinical

15   symptoms, the disease is continuously active.

16   Q.    Are you familiar with the term clinically isolated

17   syndrome or CIS?

18   A.    Yes.

19   Q.    Tell us what that means?

20   A.    Clinically isolated syndrome is simply the first

21   episode of multiple sclerosis.

22   Q.    Do all patients who have relapsing multiple sclerosis

23   incur a CIS or clinically isolated syndrome in the first

24   instance?

25   A.    Yes, they do.

Wynn - direct

1    Q.    How do physicians, other than what you have explained

2    with MRI and so on, how do you track or measure the

3    progression of disease in individual patients you see?

4    A.    We track how they do with a combination of, do they

5    have new relapses, new episodes of symptoms, findings of

6    worsening on clinical examination, as well as using

7    neuroimaging tests, such as MRI, on the screen.

8    Q.    Using MRI, can you actually see deterioration in the

9    brain, for example?

10   A.    Yes.  In most patients, we can see deterioration.

11   This time-lapsed video, a sequence of many MRI scans we put

12   together, we point out, the dark area in the middle of the

13   brain is where there is spinal fluid in this image.  Spinal

14   fluid is made in this part of the brain.

15             As brain tissue is lost, what you may see is

16   that area of the brain is simply enlarging due to loss of

17   brain tissue.

18   Q.    The effect of that, I take it, is additional

19   disablement?

20   A.    Yes.

21   Q.    Can you just play it again so we can catch it.

22             (Pause.)

23   Q.    Are patients typically aware of brain atrophy or loss

24   of gray matter in the brain when it occurs?

25   A.    As it occurs, patients typically are not aware of it

1   occurring.  Even I think if they could feel it, they would

2   typically be in denial about it.  It's too frightening to

3   think about.

4   Q.    How do practicing neurologists treat patients with

5   relapsing MS?

6   A.    We treat patients with disease modification therapies

7   to try to prevent these types of occurrences, to try to

8   prevent the development of irreversible brain damage and

9   loss of function.

10  Q.    We have heard some evidence with respect to different

11  treatments for MS.  But among them, Copaxone 40 milligrams

12  is a so-called disease modifying therapy.  Correct?

13  A.    That's correct.

14  Q.    How do you determine which among these disease

15  modifying therapies to prescribe for a given patient?

16  A.    For each patient, it's a balance of the effectiveness

17  of the drug, how well it works, and its safety.  Safety is a

18  function of danger, things such as change in liver enzymes

19  or heart.  But also, its tolerability, what side effects

20  does the medication have.

21  Q.    When you talk about tolerability, can you tell us a

22  little bit more about that?  What does it mean in this

23  context to a physician?

24  A.    Tolerability is how well a person tolerates the

25  medication.

Wynn - direct

1 Q.    Why is tolerability important?  What's the consequence

2 of the medication not being well tolerated?

3 A.    If people don't take their medication because of side

4 effects, the progressive disability and brain shrinkage or

5 atrophy like we saw on the slide will more or less

6 invariably occur.

7           Ironically, often early in the disease, people

8 have relatively mild symptoms, numbness or tingling.  And we

9 also know that the brain shrinkage, like I showed on the

10 slide, the video, is most rapid early in the disease when

11 people are actually having the least symptoms.

12           Starting therapy early is critical in preventing

13 long-term disability because many symptoms are often mild

14 initially, often the side effects can feel worse than the

15 illness itself.

16 Q.    Is patient adherence important?

17 A.    Yes.  None of the medications work, of course, unless

18 people take them and take them in a way that's been shown to

19 be effective.

20 Q.    How widely used was 20 milligram Copaxone or

21 glatiramer acetate?

22 A.    For many years, 20 milligram glatiramer acetate,

23 Copaxone, was the most widely used drug for treating

24 multiple sclerosis.

25 Q.    Were there known limitations from the point of view of

1    the physicians treating patients to that therapy?

2    A.    Yes.   Limitations of patient, requiring a shot every

3    day, and the injection site reactions, and more systemic,

4    immediate post-injection reaction that many patients

5    suffered as a consequence of this treatment.

6    Q.    We have heard some testimony regarding injection site

7    reactions.   But can you tell us what they are and perhaps

8    give us some examples?

9    A.    Yes.   Injection site reactions are changes occurring

10   in the skin as the drug is given as a shot just under the

11   skin.

12              We have some pictures of this.

13              This is a young woman I take care of, who is a

14   weightlifter, she is very muscular.   The shot is just a

15   small dot here.   But in a very large area around that, there

16   is a very large red mark and in the middle there is a little

17   tiny dot where the shot was given.

18              On the picture on the right, there is also an

19   area of redness or erythema.   Again, think of it being the

20   summertime wanting to go out in a short-sleeve top or

21   getting shots in one's leg with short slacks or a short

22   skirt.   Many people want to keep their illness confidential

23   and do not want to ask questions about this.

24              Again, a person who might suffer mild symptoms

25   with these side effects, however, as a physician, a lot of

Wynn - direct

1    what I do is helping people manage these side effects.

2    Q.    Let me direct you to a couple of additional

3    photographs, if I may.

4              What is shown here?  Are these also injection

5    site reactions?

6    A.    Yes.  So those are two areas of urticaria or hives.

7    These are red raised areas of the skin that often burn and

8    sting, and likely erythema may last for many days and be

9    very painful.

10   Q.    Is there a particular type of injection site reaction

11   that is considered quite severe and disfiguring?

12   A.    Yes.

13   Q.    What is that called?

14   A.    Lypoatrophy.

15             As seen in the image, the thigh is also a common

16   location for injection.  And these are large areas in the

17   skin where underneath the surface of the skin, the fat has

18   dissolved, has shrunk, has atrophied.  And it's highly

19   disfiguring.  And there is no known treatment for

20   lypoatrophy.

21   Q.    You mentioned earlier immediate post-injection

22   reactions or what we have heard referred to as IPIRs.  Tell

23   us what those are?

24   A.    IPIRs are systemic reactions that typically occur

25   within two or three minutes after taking the shot.

Wynn - direct

1    Q.    When you say systemic, you are contrasting that with

2    more localized reactions that we will see with ISRs?

3              Excuse me.   Injection site reactions, ISRs?

4    A.    That's correct.

5    Q.    Tell us a little bit more immediate post-injection

6    reactions?

7    A.    Again, an immediate post-injection reaction, which

8    commonly occurs two to three minutes after the shot, where

9    the patient will often get tingling on the back of the neck,

10   rapid heart rate, palpitations, chest pain, shortness of

11   breath, feeling like they are going to die.

12   Q.    As a consequence of that, do some patients take

13   emergency action?

14   A.    Yes.   One of the most common times to take one's shot

15   is before going to bed, when we are retiring in the evening,

16   because people feel short of breath, many people will

17   reflexively hyperventilate, suck in air, giving them pain in

18   the chest.

19              When people get chest pain, one's natural

20   reaction is to think that one has a heart attack.   As a

21   physician, if a patient calls me in the evening and says I

22   am having chest pain, could it be from my Copaxone, am I

23   having a heart attack, I really have little option but to

24   encourage them to seek emergency care.

25   Q.    With respect to ISRs, the injection site reactions,

1    are there patients who report ISRs, an adverse event, on a

2    very frequent basis or a disproportionate basis?

3    A.    Yes.   There is nothing uniform about the experience of

4    these side effects.

5              MR. FIGG:   Your Honor, this was not in Dr.

6    Wynn's expert report.

7              THE COURT:   Mr. Ware.

8              MR. WARE:   I think it is.   It is inherent in

9    what an injection site reaction is and how frequently it

10   occurs.

11             THE COURT:   Is this controversial?

12             MR. FIGG:   Yes, Your Honor.

13             THE COURT:   Injection site reaction is?

14             MR. FIGG:   What Dr. Wynn is about to testify

15   about, I believe, has to do with an issue of this case

16   concerning the outliers.   He did not address that in any

17   way, shape or form in his expert report.

18             THE COURT:   Mr. Ware, do you want to confer with

19   your colleague?

20             MR. WARE:   I don't intend to ask him any

21   questions about that.   I am simply asking whether there are

22   patients who have a lot of injection site reactions.

23             THE COURT:   Mr. Figg, given that representation?

24             MR. FIGG:   If that is the last question and the

25   only question, I am okay with that.

Wynn - direct

1              THE COURT:  Okay.  Mr. Ware.

2              THE WITNESS:  Yes, there are many patients who

3     have a large number of reactions.  This is due to many

4     reasons.  Many people with MS have cognitive problems, as we

5     discussed, and more difficulty giving themselves medicine.

6              MR. FIGG:  Your Honor, I think that is going

7     beyond the question.

8              THE COURT:  I understand.  We will leave it

9     there.

10    BY MR. WARE:

11    Q.    How do injection site reactions and immediate impact

12    dose adherence -- that is the ability of the patient to stay

13    on the drug?

14    A.    The more immediate post-injection reactions, the more

15    injection site reactions, the less well the drug is

16    tolerated, the less likely the person is to stay on

17    medication.  Many people will simply stop taking their

18    medication entirely, or switch to another therapy.

19    Q.    Let's turn, if I can, to package inserts.  I think we

20    know in general what a package insert is.  From your point

21    of view as a physician, what is a package insert?

22    A.    A package insert, and this is one on the slide I have

23    created, simply is a description for the indications of use

24    for a physician and patient for taking the medication and

25    its use.

Wynn - direct

1    Q.    What does a package insert tell the physician or

2    patient?

3    A.    It tells us many things.  It tells us, what is the

4    indication and use for the medication?  What is the dose?

5    Warnings and precautions about this medication, as well as

6    strong information from scientific trials as to how well the

7    drug works.

8    Q.    On the screen now is a package insert from one of the

9    defendants, Synthon.  Did you review the package inserts of

10   all of the defendants in the case, all five defendants?

11   A.    Yes, I have.

12   Q.    And are those package inserts fundamentally identical?

13   A.    Yes, they are.

14   Q.    Does the package insert spell out in detail how to use

15   the proposed ANDA products, namely, glatiramer acetate 40

16   milligram?

17   A.    Yes, it does.

18   Q.    On the first page we see an index.  In addition to

19   what you have said, is there other information to which a

20   physician is directed by the package insert?

21   A.    Yes.  Not only is there, as you mentioned, indications

22   in usage and dosage administration, but key for doctors, and

23   maybe the most common thing that physicians look at in

24   package inserts, is the warnings and precautions and side

25   effects of the medication, to use the medication most

1    effectively.

2    Q.    Let me go back for a moment to IPIRs.  Is there data

3    in the package insert regarding immediate post-injection

4    reactions?

5    A.    Yes, there is.

6    Q.    And tell us where we see that?

7    A.    This is in Section 5.1, it mentions immediate

8    post-injection reactions.

9    Q.    Given the information provided in Section 5.1, what

10   would a physician who treats MS patients regularly

11   understand from the data provided here in the package

12   insert?

13   A.    One can clearly see in the package insert that 16

14   percent of patients on the 20 milligram daily formulation of

15   Copaxone experience immediate post-injection reactions,

16   whereas only two percent of patients on the 40 milligram do.

17   In other words, an eight-fold higher increase, incidence, of

18   immediate post-injection reactions on the 20 milligram

19   dosage form.

20   Q.    All right.  So the 16 relates to 20 milligram

21   glatiramer acetate.  Correct?

22   A.    Yes.

23   Q.    And the two percent, as you understand it, relates to

24   40 milligram glatiramer acetate?

25   A.    That's correct.

1    Q.    What would a physician infer or understand as a result

2    of seeing this information, in your opinion?

3    A.    My opinion is that a physician seeing this information

4    would be directly instructed to use the 40 milligram as it

5    is associated with one eighth of a chance of the person

6    having this particularly frightening kind of side effect.

7    Q.    Section 5.1 appears to indicate that the 16 percent

8    that relates to 20 milligram is derived from five placebo

9    controlled trials and that the two percent is derived from a

10    single trial, not the same as any of those five trials.  Is

11    that an accurate reading?

12    A.    Yes.

13    Q.    And is it appropriate for a physician reading the

14    package insert to do the kind of comparative that you just

15    did in your opinion, notwithstanding that they are not

16    head-on-head drug trials?

17    A.    Yes, it is.  Often, physicians, in choosing a

18    medication, do not have at their -- with them direct

19    head-to-head information.

20    Q.    Are head-to-head trials of competing therapies common

21    or infrequent or rare?  How would you characterize it?

22    A.    In the last few years, we have had some head-to-head

23    studies.  In the past, head-to-head trials in MS were very

24    uncommon.

25    Q.    Let me next direct you to what's termed

1    discontinuation data and specifically to the slides on the

2    screen.

3                  Where do we find discontinuation data in

4    defendants' package inserts?

5    A.       (Indicating.)

6    Q.       If it helps, I will direct you to Section 6.1.

7    A.       In Section 6.1, one can see that in Copaxone 20

8    milligrams, one milliliter per day, that fully five percent

9    of individuals stop taking the medication because of a side

10   effect, an adverse event.

11   Q.       Is there additional data with respect to 40 milligram?

12   A.       Yes.  Again, now we are looking again in Section 6,

13   with a 40 milligrams three times per week, only three

14   percent of individuals discontinue treatment because of an

15   adverse reaction.

16   Q.       Can we put up the comparative, please.

17                  Given that the package inserts provide these

18   data with respect to both 20 milligram and 40 milligram, do

19   you have an opinion what this package insert in this respect

20   would teach or indicate to a physician treating MS patients?

21   A.       Yes.  It is my opinion this package insert teaches

22   that the 20 milligram daily is associated with 67 percent

23   more individuals experiencing this discontinuation.

24   Q.       The discontinuation, it's indicated here, talks about

25   adverse reactions, and identifies what the discontinuation

1    was a result of.  Do you see that at the bottom of the

2    slide?

3    A.    I do.

4    Q.    And is it fair to say that includes ISRs and IPIRs?

5    A.    Yes, it does.

6    Q.    Does the package insert include additional data as

7    regards ISRs?

8    A.    Yes, it does.

9    Q.    Where do we find that in the package inserts proposed

10   for the ANDA products?

11   A.    As we can see here, in Table 1, there is the adverse

12   reactions to patients taking Copaxone 20 milligrams once a

13   day, and in Table 2, the side effects of taking Copaxone 40

14   milligrams three times a week.

15   Q.    And in your opinion, would a physician treating MS

16   patients compare these data as between 20 milligram and 40

17   milligram?

18   A.    Yes.  A responsible physician wanting their patients

19   to have the fewest side effects would be directed to use

20   that, which is associated with fewer side effects.

21   Q.    Now, 20 milligram glatiramer acetate was by definition

22   to be dosed seven times a week.  Is that correct?

23   A.    Yes.  One dose, once a day, every day of the week.

24   Q.    And the 40 milligram was intended or is intended, will

25   be intended to be dosed three times a week.  Is that correct

Wynn - direct

1      ?

2      A.     One dose, three days a week, 48 hours or more in

3      between injections.

4      Q.     Given the difference between three dosings a week and

5      seven doses a week, would you not expect improvement in

6      these injection site reactions anyway?

7      A.     Yes.

8      Q.     And why do you attach significance to what you see

9      here?

10     A.     Again, if we look at some of the side effects, some of

11     them were markedly less, more so than could be explained

12     solely on the decreased number of shots.

13             For example, at the top, redness or erythema,

14     like in the picture I showed you of my patient, it was 43

15     percent on 20, 22 percent on 40.   So roughly proportionate

16     to the number of shots.

17             However, pain was four times as common on the

18     daily shot than on the three times a week shot.

19     Q.     If we go down to the bottom of that slide, with

20     respect to injection site inflammation, do you attach any

21     significance to that disparity between 20 milligram GA and

22     40 milligram?

23     A.     Yes.   Again, the package insert, it is my opinion,

24     teaches that this is much less common on the three times a

25     week dosing of 40 milligrams than the 20 milligram daily,

Wynn - direct

1     more so than could be explained.

2                     And chest pain, again, second just up from the

3     bottom, another very frightening side effect, as you can

4     see, is four times as common, more than four times as common

5     on the 20 milligram than the 40 milligram three times a

6     week.

7     Q.     Do you have an opinion whether that would be expected

8     solely on the basis of a reduction in the number of

9     injections per week?

10    A.     Yes.   It is my opinion that these differences could

11    not be explained based upon simply a decreased frequency of

12    taking shots.

13    Q.     Can you tell us what the source of the data is in the

14    defendants' ANDA package inserts and for that matter in the

15    Copaxone 40 milligram package insert for the data that we

16    see in Table 2 and the other data we see with reference to

17    40 milligrams?

18    A.     Yes.   The data is from the historical trials of the

19    two formulations, the 40 milligram being from the more

20    recent GALA trial with glatiramer acetate, low frequency of

21    administration study.

22    Q.     Did you participate as a clinical site investigator in

23    the GALA trial?

24    A.     Yes.

25    Q.     Tell us what your role was?

Wynn - direct

1    A.    I was a principal investigator for our investigative

2    site.

3    Q.    Next, above these tables, we can take either one, but

4    Table 2, for example, in the upper right corner, we see the

5    term incidence.  To what does that refer?

6    A.    The percentage of victims that experience a given side

7    effect.

8    Q.    It does not purport to refer to the number of

9    incidents, TS?

10   A.    Well, that's correct.  While it does not state

11   frequency of side effects, a practicing physician would

12   understand a side effect that occurs in a higher percent of

13   the population would also most likely be one that occurs

14   more commonly, more frequently.

15            MR. FIGG:  Your Honor, that answer was not

16   predictable from the question.  I move to strike the answer.

17   It's beyond the scope of Dr. Wynn's report.

18            THE COURT:  Mr. Ware.

19            I confess, I did not hear the response or the

20   question.

21            Actually, should we revisit that, Mr. Figg?

22            MR. WARE:  I can re-ask the question, Your

23   Honor.

24            THE COURT:  I will strike it for now.

25   BY MR. WARE:

Wynn - direct

1    Q.    You indicated that incidence is not referring to the

2    number of incidents that a patient might have as a result of

3    an adverse event.  Is that correct?

4    A.    That's correct.

5    Q.    In your experience as a treating physician, do you

6    draw any inference with respect to the frequency of an event

7    on the basis of the percentage of patients who experience

8    the event?

9    A.    Yes, I do.

10          MR. FIGG:  That is my objection, Your Honor.

11          THE COURT:  You say what?

12          MR. FIGG:  I don't believe Dr. Wynn offered that

13   opinion in his report.  In fact, I believe he offered

14   exactly the opposite opinion in his deposition.

15          THE COURT:  Then you can cross-examine him.  Go

16   ahead.

17          THE WITNESS:  I think a reasonable physician, it

18   is my opinion, would recognize someone experienced in

19   treating people with MS, experienced in using glatiramer

20   acetate, recognizes the events that occur with a higher

21   incidence, greater number of the population, as events that

22   occur more frequently.  So the greater the incidence, the

23   greater the frequency, in general terms.

24   BY MR. WARE:

25   Q.    I am not going to show them to you.  But I think you

1    indicated you did review each of the defendant package

2    inserts.  Is that correct?

3    A.    Yes.

4    Q.    And for the record those are Plaintiffs' Trial

5    Exhibits 382, 413, 445, 502, and 579.

6              Based on the data that you reviewed from the

7    defendants' package inserts, all of the data that you have

8    discussed so far, do you have an opinion what a practicing

9    physician would conclude with respect to the use of 40

10   milligram glatiramer acetate?

11   A.    Yes.  I have an opinion.

12   Q.    What is that?

13   A.    My opinion is that the package inserts teach and

14   direct a physician to use the 40 milligram three times a

15   week rather than the 20 milligram every day.

16   Q.    Now, let me direct you again to Section 6.1 and to

17   some cautionary language which appears there.

18             You have just been comparing some information in

19   the package inserts.  Is that correct?

20   A.    That's correct.

21   Q.    This language seems to indicate that if data comes

22   from derivative clinical trials, one cannot -- it says

23   directly compare to rates in another clinical trial.  What

24   do you understand that to mean and why are you saying that

25   it is appropriate for a doctor to make the kind of

Wynn - direct

1    comparison that you did?

2    A.    While an epidemiologist would not take the data in the

3    package insert to tell you exactly how many might occur, or

4    to compare a trial of Copaxone, glatiramer acetate, with a

5    different medication, this paragraph certainly does not tell

6    me to not look at again, because, again, head-to-head

7    trials, as we discussed, are not commonly available, and a

8    wise physician, a responsible physician, would look towards

9    the historical data on the different frequency of different

10   side effects.

11   Q.    Do you have an opinion whether it would be appropriate

12   for a practicing physician treating MS patients to simply

13   ignore the data because it's not in the same clinical

14   trials?

15   A.    I do have an opinion.

16   Q.    What is that?

17   A.    That a responsible physician would never ignore that

18   information.

19   Q.    Does the package insert or do the package inserts of

20   the defendants in any way limit the patient population, that

21   is, those MS patients for whom their glatiramer acetate

22   that's the subject of the ANDAs should be prescribed?

23   A.    No, it does not.

24            MR. FIGG:   Excuse me, Your Honor.   I believe

25   this is beyond the scope of Dr. Wynn's expert report.   He

1    didn't talk about selecting patient populations in his

2    expert report.

3              THE COURT:  Mr. Ware.

4              MR. WARE:  Your Honor, it is inherent in a

5    particular paragraph of the package insert.  He certainly

6    did refer to it.

7              THE COURT:  You disagree with Mr. Figg?

8              MR. WARE:  Yes.

9              THE COURT:  Gentlemen, why the don't you

10   conference.  I get so tired of all the Rule 26 objections

11   about experts and the scope.  It is ridiculous.  Not just in

12   this trial.  You are suffering because I continually hear

13   it.  And given the number of ANDA cases that I have, you can

14   imagine, it is like a death by a thousand cuts.

15             MR. FIGG:  I have had this conversation before

16   with you, Your Honor.

17             THE COURT:  Yes, you have.

18             (Counsel confer.)

19             MR. WARE:  I am not going to have the questions

20   micromanaged.  The subject is part of his expert report.

21   The point is -- let me rephrase the question.  See if we can

22   just move on here.

23   BY MR. WARE:

24   Q.    Let me direct you to Section 1, Indications and Usage

25   of the package insert.  Did you in fact review that with

Wynn - direct

1    respect to each of the package inserts?

2    A.    Yes.  I reviewed each of the defendants' ANDA package

3    inserts as well as the package inserts for Copaxone.

4    Q.    Did you form an opinion of the kinds of MS patients

5    that that indicated for the ANDA product medications that

6    appears in Section 1 of the package insert?

7    A.    Yes.

8    Q.    And for whom, as you understand it, in your opinion,

9    is the medication indicated?

10   A.    For patients with relapsing forms of multiple

11   sclerosis.

12   Q.    Does that exclude any category of relapsing MS

13   patients, whether on 20 milligram previously or not on it or

14   on it in the future?

15   A.    It's non-limiting whether or not people are newly

16   diagnosed and never treated, people freely treated with

17   glatiramer acetate, Copaxone, or another disease modifying

18   therapy.

19   Q.    You mentioned earlier the GALA study.  I don't want to

20   go into that again.

21         Were there also particular results from the GALA

22   study other than what we have looked at that appear in the

23   package inserts on the basis of which a physician would come

24   to some opinion about the appropriateness of prescribing?

25   A.    Yes, there are.

Wynn - direct

1    Q.    Let me direct you to some of those results, if I may.

2    A.    As shown in my slide --

3    Q.    Can you tell us what section we are looking at or

4    where to find it?

5          This is contained in Joint Trial Exhibit 7090.

6    Page 7.

7          This is Joint Trial Exhibit 7090.  It's Page 7

8    of the document.

9          7090.7, Your Honor.

10         Does that page provide certain comparative

11   information or information regarding glatiramer acetate?

12   A.    Yes, it does.

13   Q.    What significance does that information have?  First

14   of all, what is the information?

15   A.    The information is that glatiramer acetate 40

16   milligrams was safe and well tolerated.  And notably, the

17   incidence of injection site reactions in patients treated

18   with Copaxone 40 milligrams three times a week was

19   approximately 20 to 50 percent less compared with previous

20   studies of patients treated with either glatiramer acetate

21   20 milligrams or 40 milligrams given daily.

22   Q.    Based on your knowledge of physicians in the field of

23   treating MS patients, were these results significant?

24   A.    Yes, they were highly significant.

25   Q.    In addition to the GALA study, are there other studies

Wynn - direct

1    which inform the professional community into which the GA

2    products would be sold and prescribed?

3    A.    Yes, there are.

4    Q.    And what is an additional study on which you rely for

5    this purpose?

6    A.    The Glacier study, an extension of the Glacier study,

7    the so-called Glacier extension.

8    Q.    What was the Glacier study?

9    A.    The Glacier study was an open label randomized study

10   to look at the safety and tolerability of Copaxone given 40

11   milligrams three times a week versus 20 milligrams given

12   daily in patients with relapsing remitting MS.

13   Q.    So Glacier was, in fact, the kind of head-to-head

14   study that you said is unusual to have available?

15   A.    Yes.  This provided very important information for

16   physicians treating patients who were on the 20 milligram

17   formulation who are considering using now a double dose per

18   shot formulation of a drug which has been used for many

19   years, and in many ways led the market in market share.

20   Q.    And how are patients divided in that study?

21   A.    Patients who entered in clinical trial were randomly

22   essentially assigned to be on 20 milligrams every day or 40

23   milligrams administered three times a week.

24   Q.    Were patients instructed to administer the medication

25   and the different GA regimens and how to administer?

Wynn - direct

1    A.    Yes.  Patients on 20 milligrams were instructed to

2    take the medication once per day, with the patients on the

3    40 milligrams, they were instructed to take a shot three

4    times a week, with at least 48 hours in between injections.

5    Q.    Was that dosing regimen set forth in the Glacier study

6    protocol?

7    A.    Although not listed specifically as such in the

8    protocol, like other clinical trials, there is a pretrial

9    meeting and conference calls throughout the study, and

10   during this time, these directions were specifically given

11   to research centers and their staff.

12   Q.    Were you -- did you attend the meeting to which you

13   refer, or meetings?

14   A.    Yes, I did.

15   Q.    Were you given instructions with respect to how to

16   dose 20 milligram and 40 milligram for purposes of this

17   study?

18   A.    Yes.

19   Q.    At this time I just note for the record that Joint

20   Trial Exhibit 7042 and 7043 reflect these discussions and

21   attendance at this meeting.  I am not going to show them to

22   the witness.

23         Why were patients tasked with grading severity

24   rather than physicians or health care workers?

25   A.    There are many reasons.  One, many reactions a person

Wynn - direct

1    has from the shots are not visible to someone else.  An

2    immediate post-injection reaction, where patients have

3    palpitations and chest pain, shortness of breath, there is

4    nothing you can really see on the outside.

5              Also, some of the reactions, redness at the site

6    of injection, are very common.  If all of these had to be

7    directly observed and measured, some are not directly

8    measurable because there is nothing to sort of see, warmth,

9    for example, and because of their frequency, and

10   unpredictability, when they might occur, were someone to

11   participate in the trial, they basically had to live at our

12   office for months, which would not be practical.

13   Q.    And we have heard the term blinded.  Was the trial

14   blinded?

15   A.    No.

16   Q.    What does that mean?

17   A.    So in this study, patients realized, if they were

18   taking Copaxone 20 milligrams or Copaxone 40 milligrams.

19   You couldn't also blind it because patients would be aware

20   if they were taking a shot every day or three days per week.

21   Q.    Even if that were true, could that have been solved by

22   having them take placebo injections so that everybody was

23   taking the same number of shots?

24   A.    Although people could have been given placebo shots,

25   this would not -- this would have prevented us from learning

Wynn - direct

1  what we really need to learn from the study.  That is, would

2  the tolerability increase by decreasing the frequency of

3  injections.

4          We know that injections, even of placebo, are

5  associated with injection site reactions.

6          So adding in placebo dosing would not have given

7  us the information, would patients on 20 being switched to

8  40 fare better or not.

9  Q.    Let me direct you to Table 3 from the Glacier report.

10  To what does this refer?

11  A.    Table 3 lists the frequency and annualized rates of

12  different injection site reactions.

13  Q.    Are there a few examples there that you regard as

14  significant for illustrative purposes?

15  A.    Yes.

16  Q.    Tell us why?

17  A.    As we discussed earlier, some reactions might be less

18  simply because there are fewer shots.  But several that I

19  have marked in yellow are very different.  Starting from the

20  bottom, warmth was almost 11 times as common on the daily

21  than the three times a week administration.

22          Moving up to urticaria, those raised weals,

23  painful skin reactions, like in the photograph I showed,

24  again, are a little more than twice as common.

25          Swelling is just under four times as common with

1    20 taken daily.  And then bruising at the site of injection,

2    black and blue marks, so to speak, as you can see, you know,

3    more than 20 times as common.

4    Q.    On the 20 milligram than on the 40?

5    A.    Yes.  These side effects were markedly more common

6    with 20 milligram given daily than the 40 milligram given

7    three times a week.

8    Q.    Did the Glacier study provide any data as regards

9    severity of injection site reactions?

10   A.    Yes, it did.

11   Q.    Directing you to Table 2, is this important to your

12   opinion?

13   A.    Yes.

14   Q.    And what inference do you, as a treating MS physician,

15   draw from this table and its results?

16   A.    My opinion, based upon these results, is that the 40

17   milligrams three times a week is much better tolerated,

18   there are not only fewer injection related adverse events,

19   but markedly less moderate or severe injection related

20   adverse events.

21              Again, it is those that often lead to patients

22   stopping therapy and allowing that disease to progress.

23   Q.    Was there a statistical analysis of this difference?

24   A.    Yes, there was.

25   Q.    Can you tell us what we see here in Figure 3?

Wynn - direct

1    A.    What we see here is the mean annualized moderate or

2    severe injection related adverse events, being again much

3    higher for the 20 milligram daily, were less for the 40,

4    three times per week.

5              Again, this was highly statistically

6    significant, with a p value of .0021 marked difference.

7    Q.    How much of a reduction was reflected as a result of

8    these figures that you have alluded to?

9    A.    Approximately 60 percent.

10   Q.    Reduction using 40 milligram rather than 20 milligram?

11   A.    Yes.   There was a 60 percent relative reduction in

12   moderate or severe injection related adverse events using

13   the 40 relative to 20.

14   Q.    In your opinion, does such a reduction teach a

15   physician using the defendants' ANDA products should they be

16   approved anything regarding the potential patient adherence?

17   A.    Yes.   The more frequent, the higher the rate of

18   moderate or severe, the less likely a person is to stay on

19   the medication.   And therefore, fewer events, as shown with

20   40 milligrams three times a week, the number of reactions

21   being so much less, the more likely people would simply stay

22   on their medication.

23   Q.    You mentioned earlier the Glacier extension.

24              Just tell us briefly what that is?   What

25   happened on the Glacier extension?

Wynn - direct

1    A.    So in the core study that we just discussed, half the

2    patients, a little more than a hundred, stayed on 20

3    milligrams every day, and a little more than a hundred, 50

4    percent of the patients, were switched to 40 milligrams

5    three times per week.

6              In the extension of the core study, everyone was

7    administered 40 milligrams three times per week.

8    Q.    What was the purpose of switching some of the 20

9    milligram patients to 40 milligrams for the extension study?

10   A.    This allowed us to see whether or not the change we

11   saw in the core study, between 20 and 40, would be

12   comparable in the patient switch from the core study to the

13   extension, would that benefit we saw in the first core study

14   be sustained in the second half of the study as well.

15   Q.    And what was the result of the extension?

16   A.    What we saw in the extension was that patients who in

17   the core were on 20 and then flipped over into the 40 had

18   markedly fewer injection related adverse events, and their

19   frequency and severity of injection site reactions was much

20   lower on 40 relative to 20.

21   Q.    You would agree, would you not, that neither Glacier

22   nor the Glacier extension were part of -- are contained in

23   the package insert?  Is that correct?

24   A.    That's correct.

25   Q.    What have these got to do, then, with your

Wynn - direct

1    infringement opinion?

2    A.    Should the defendants' ANDA products come to market,

3    this is information that those of us who are familiar on a

4    day-to-day basis caring for people with MS -- and patients

5    with MS are commonly familiar with from reading on their

6    own, are aware of, and it would teach one, it is my opinion,

7    to use the 40 three times a week instead of the 20 every

8    day.

9    Q.    Do you have patients in your own practice who have

10   previously been on 20 milligrams and have been switched to

11   40 milligram glatiramer acetate or Copaxone?

12   A.    Yes.

13   Q.    And have you made observations whether or not those

14   patients improve in some way?

15   A.    Yes.  My experience has been the number of injection

16   related reactions such as we saw in the picture is markedly

17   less now that people have switched.

18   Q.    Do you have any understanding whether your experience

19   is representative of those physicians who, like you, have a

20   substantial practice in MS patients?

21            MR. FIGG:  Your Honor, this calls for hearsay.

22   There was no substantiation -- he is basically testifying

23   what other physicians have told him.

24            THE COURT:  Is it being offered for the truth?

25            MR. FIGG:  Yes.

Wynn - direct

1                    THE COURT:  Mr. Ware.

2                    MR. WARE:  Let me see if I can lay a bit of a

3       foundation.

4                    THE COURT:  All right.

5       BY MR. WARE:

6       Q.    In your practice and as a principal investigator in

7       over 80 MS clinical trials, are you familiar with the

8       practices and experiences of other MS physicians who treat

9       relapsing forms of MS?

10      A.    Yes.  Including the doctors who practice within the

11      same practice as myself.

12      Q.    Do you have any understanding, just yes or no, whether

13      your experience in terms of how patients have done when

14      switched from 20 to 40 milligrams glatiramer acetate is

15      representative?

16                   MR. FIGG:  Same objection.

17                   THE COURT:  I am going to sustain it.

18      BY MR. WARE:

19      Q.    Do you continue to recommend that patients on 20

20      milligrams switch to 40 milligrams three times per week?

21      A.    Yes, I do, if the patient didn't bring it up already

22      themselves.

23      Q.    Do you have patients who continue to take 20 milligram

24      therapy, notwithstanding the availability of 40 milligram

25      Copaxone?

Wynn - direct

1    A.    Yes, there is quite a segment of those individuals.

2    Q.    Why do patients, if you know, stay on 20 milligrams

3    despite the fact that 40 milligram Copaxone, with the

4    advantages you have told us about, is available?

5    A.    There are many individuals for which I care who do not

6    have access to the 40 milligram formulation.

7    Q.    What do you mean by that?

8    A.    In other words, their insurance, for example, will not

9    reimburse should they take this medication, will not pay for

10   it.

11   Q.    How common is it, in your experience, that patients

12   have to stay on the 20 milligram as a result of access

13   barriers?

14   A.    Certainly, more than ten percent, perhaps as much as

15   20.

16   Q.    Let's turn, then, to your infringement opinions.

17             I don't know when you plan to break.

18             THE COURT:  This would probably be a good time.

19   Let's come back at 1:30.

20             (Luncheon recess taken.)

21

22             THE COURT:  Good afternoon.  Please, take your

23   seats.  Doctor.

24   BY MR. WARE:

25   Q.    Dr. Wynn, let's proceed to a discussion of

Wynn - direct

1    infringement and to the opinions at which you arrived for

2    purposes of the trial.

3            You summarized them earlier.  I would like to

4    take another look at that -- these are the four patents,

5    obviously, that you considered.  Isn't that correct?

6    A.    Yes.

7    Q.    And then you already summarized the opinions that you

8    expect to give.  Correct?  As we see here on the slide?

9    A.    Yes.

10   Q.    And, so, I want to talk to you in a little bit

11   different order than these.  Let's begin with induced

12   infringement.  What are your understandings of the criteria

13   by which you judge induced infringement?  What are the

14   standards that you use for purposes of forming an opinion in

15   that regard?

16   A.    That the defendants will induce infringement if they

17   know the patents, that the defendants' package inserts

18   encourage patients and physicians to instruct to patients to

19   use defendants' ANDA products to infringe, and that direct

20   infringement will occur.

21   Q.    With respect to defendants' knowledge, did you infer,

22   for whatever reasons, that the defendant companies know of

23   the patents?

24   A.    I do.

25   Q.    And did you form an opinion whether by offering their

1   ANDA products in the United States and providing a package

2   insert indicating how the ANDA product is to be used that

3   defendants encourage patients and physicians to infringe?

4   A.    Yes.

5   Q.    And did you perform the same analysis for each of the

6   five defendant companies?

7   A.    Yes, I did.

8   Q.    And in general, what did you conclude?

9   A.    That the defendants' ANDA products, with the package

10  inserts, will induce physicians and patients to use the

11  defendants' product to infringe.

12  Q.    In analyzing infringement, how did you determine the

13  scope of the claims?  What did you consider?

14  A.    Well, in order to determine the scope of the claims, I

15  looked at the person of ordinary skill in the art in light

16  of the Court's claim construction.

17  Q.    For purposes of understanding what the definition of

18  the person of skill in the art in this case and directing

19  you to an additional graphic, what definition did you use?

20  A.    Well, generally, as I put on my slide, a person with

21  several years experience practicing medicine or in the

22  pharmaceutical industry, who is who has experience with

23  multiple sclerosis and glatiramer acetate specifically.

24  Q.    And there are material alternatives that appear on the

25  slide .  Namely, a Ph.D. in pharmacology, is that correct?

Wynn - direct

1    That might also be a person of skill in the art?

2    A.    Correct.  A doctor that has a Ph.D. in pharmacology or

3    a physician with experience in clinical pharmacology and

4    access to individuals experienced and expert in statistics.

5    Q.    You mentioned the Court's claim construction.  Did you

6    review that claim construction?

7    A.    Yes, I did.

8    Q.    Did you also review the stipulation among the parties

9    with respect to certain aspects of that claim construction?

10   A.    Yes.

11   Q.    The claim elements?

12   A.    Yes.

13   Q.    Directing you first then to the '776 patent, let's

14   start with Claims 1 and 2, can you tell us the substance of

15   what these claims provide?  I am going to take Claims 1 and

16   2 together.

17          What is the highlighting, as distinguished from

18   the rest of what we see in Claim 1?

19   A.    To me, I have highlighted these aspects to mark the

20   key elements of this claim.

21   Q.    And did you similarly indicate the elements, the

22   elements which are in fact limiting pursuant to the Court's

23   order in Claim 2?

24   A.    Yes, I did.

25   Q.    And can we see those?

Wynn - direct

1              Have you formed an opinion whether defendants'

2      package inserts would teach or encourage a physician or

3      patient to directly infringe the claims or Claims 1 and 2 of

4      the '776 patent?

5      A.    Yes, I have made an opinion.

6      Q.    Can you identify how or where in the package insert

7      defendants encourage a physician or patient to directly

8      infringe the first element regarding treatment for relapsing

9      forms of multiple sclerosis?

10     A.    Yes, I can.  Again, the first element is a relapsing

11     form of multiple sclerosis.  And if we now show, in the

12     Synthon package insert, under Indications and Usage, it

13     specifically states, Treatment of patients with relapsing

14     forms of multiple sclerosis.

15     Q.    You earlier testified that you reviewed each of the

16     defendant package inserts.  Is that correct?

17     A.    That's correct.

18     Q.    And that they are substantially the same?

19     A.    Yes.

20     Q.    Are there any material variations among those so far

21     as you are concerned?

22     A.    No, there are not.

23     Q.    With respect to the second element, regarding the

24     package insert -- let me try again.

25              With respect to the second element we see on the

Wynn - direct

1    screen, that is, the one milliliter of 40 milligrams of

2    glatiramer acetate, where in the package insert or how does

3    the package insert encourage or teach defendants -- let me

4    recalibrate.

5         Where in the package insert do you find that

6    defendants teach or encourage physicians or patients to use

7    the 1 milliliter formulation of 40 milligram glatiramer

8    acetate?

9    A.    In the defendants' package insert, Section 2.1, it

10   simply states, glatiramer acetate injection, 40 milligrams

11   per ml.

12   Q.    With respect to the third element on your list,

13   relating to a single injection three days a week with at

14   least a day in between, how does the package insert

15   encourage a physician or patient to infringe that element?

16   A.    Now, again, looking at Section 2.1 of the defendants'

17   ANDA package insert, it says to administer three times per

18   week and at least 48 hours in between.

19   Q.    With respect to the next numbered element of a

20   prefilled syringe, can you direct us in the package insert

21   to where defendants encourage or teach a physician to

22   infringe that element of the patents?

23   A.    Yes.   In Section 2.2, Instructions For Use, it lists

24   the medication comes in a prefilled syringe.

25   Q.    And if we can go back to your list, let's take the

Wynn - direct

1    next two elements, 5 and 6, together, that is, a solution

2    comprising mannitol with a certain pH range, where in the

3    package insert do you find defendants to have encouraged

4    infringement of that element?

5    A.      Again, to go back to the defendants' package insert

6    under Description, Section 11, it states the inactive

7    ingredient, 40 milligrams of mannitol and the pH of the

8    solution in the syringe is approximately 5.5 to 7.0.

9    Q.      Let's refer then to the element numbered 7, regarding

10   reduced severity of injection site reactions relative to 20

11   milligram.  Where in the package insert do defendants

12   encourage a physician or patient to use their ANDA product

13   in such a way as to infringe that element?

14   A.      Again, referring back to the defendants' package

15   inserts, in Section 5 and 6, Warnings and Precautions, and

16   Adverse Reactions, Section 5, immediate post-injection

17   reaction, the systemic reactions, and lipoatrophy and skin

18   necrosis, and adverse reactions, in 6.1, from the clinical

19   trials of the two products.

20   Q.      If we could go back to your list, the element you have

21   listed as 7 relates to reduced severity of injection site

22   reactions.  Is that correct?

23   A.      It does.

24   Q.      And Claim 2, Element No. 8, relates to reduced

25   frequency and severity of immediate post-injection

Wynn - direct

1    reactions.  Did you consider both of those?

2    A.    Yes, I did.

3    Q.    And the reference you gave us with respect to the

4    package insert encompasses both of those claim elements.  Is

5    that correct?

6    A.    That's correct.

7    Q.    In addition to Claims 1 and 2, did you look at any

8    remaining asserted claims of the '776 patent and whether or

9    not defendants' package insert encourages a patient or

10   physician to infringe those elements?

11   A.    Yes, I did.

12   Q.    Tell us what patent claims you considered for that

13   purpose?

14   A.    I looked at Claim No. 5, 6, and 9.

15   Q.    And, again, directing you to a checklist, what is the

16   significance of all of those elements as indicating

17   infringement?

18   A.    Again, as we just reviewed, I would use the same

19   analysis as I just went through in Claims 1 and 2 for

20   reviewing Claims 5, of 6 and 9.

21   Q.    Are the elements the same for Claims 5, 6 and 9 of the

22   '776 as those as to which you have already testified for

23   Claims 1 and 2?

24   A.    Yes.

25   Q.    What is your opinion as to Claims 5, 6 and 9?

Wynn - direct

1    A.    It is my opinion that Claims 5, 6 and 9 are also

2    infringed.

3    Q.    Are there additional claims you looked at from the

4    '776?  And if so, which?

5    A.    I also looked at Claim No. 12.

6    Q.    And directing you again to your list of claim

7    elements, you have indicated infringement with respect to

8    all seven on this slide, including Claim 12 elements?

9    A.    Yes.

10   Q.    And why is that the case again?

11   A.    Again, using the same analysis we went through for

12   Claims 1 and 2, it is my opinion that each of the elements

13   of Claim No. 12 are also infringed.

14   Q.    Are those the same elements as you have already

15   testified to?

16   A.    Yes, they are.

17   Q.    Did you also analyze additional claims of the '776?

18   A.    Yes.  I also evaluated Claim No. 16 and 17.

19   Q.    Again, turning to your list, all of the claim elements

20   on this slide indicate your opinion of infringement.  Is

21   that right?

22   A.    That's correct.

23   Q.    What is your opinion, then, regarding whether

24   defendants' package insert encourages a physician or patient

25   to directly infringe, or to infringe, I should say, Claims

Wynn - direct

1    1, 2, 5, 6, 9, 12, 16 and 17?

2    A.    It is my opinion that each of the elements of each of

3    the claims we have discussed is infringed.

4    Q.    Did you perform that same analysis with respect to all

5    of the package inserts?

6    A.    Yes, I did.

7    Q.    Would your conclusion regarding infringement be

8    different if you were to choose a different defendants'

9    package insert?

10   A.    No, it would not.

11   Q.    Let me then ask you to talk about the '250 patent.

12         Did you similarly go through an infringement

13   analysis with respect to elements of asserted claims in the

14   '250?

15   A.    I did.

16   Q.    Can you tell us whether you used the same criteria

17   that you identified earlier, considered the same stipulation

18   among the parties, and took the Court's claim construction

19   into account?

20   A.    I did.

21   Q.    Can you identify the claims of the '250 patent as to

22   which you considered whether they are infringed or not?

23   A.    Yes.  I looked at Claims 1 and 5, 13 and 14, in patent

24   '250.

25   Q.    How do the elements of that first set of claims of the

1    '250 patent compare to the elements as to which you have

2    already given an opinion a few moments ago?

3    A.    In Claim 1 of the '250 patent, Element 2 and 3, I

4    would use the same analysis as in the other patent we just

5    completed reviewing.  And it is my opinion that Elements 2

6    and 3 of Claim 1 are infringed.

7    Q.    For the same reasons you have already testified to.

8    Is that correct?

9    A.    That's correct.

10   Q.    With respect to the element you have identified as No.

11   1 on the slide, where in the package insert do defendants

12   encourage a physician or patient to use defendants' ANDA

13   product in accordance with the first element, that is, for a

14   patient suffering from relapsing remitting MS who has

15   experienced the first clinical episode?

16   A.    Again, as we did earlier, looking at the indications

17   and usage section of the package insert, treatment of

18   patients with relapsing forms of MS, relapsing remitting is

19   considered a form of relapsing MS as a clinically isolated

20   syndrome.

21   Q.    Do you have an opinion whether the package inserts

22   under Indications and Usage Paragraph No. 1, exclude any

23   relapsing MS patients?

24   A.    No.  It is my opinion that it does not exclude

25   patients who have been previously treated or have been

Wynn - direct

1   treated either with a formulation of glatiramer acetate or

2   not.

3   Q.      Directing your attention to Claim 13, did you

4   similarly come to an opinion whether or not defendants' ANDA

5   products will, pursuant to the package inserts, infringe

6   this claim element?

7   A.      Yes.   It is my opinion that the element in Claim 13 is

8   infringed.   Again, as it states, Treatment of patients with

9   relapsing forms of MS, but is not limited to whether or not

10  people have been treated previously or not.

11  Q.      In we can turn back to your list, with respect to

12  Claim 14, you also arrived at an opinion.   Is that correct?

13  A.      I did.

14  Q.      How do the package inserts encourage a physician or

15  patient to use defendants' ANDA product to reduce the

16  frequency of an immediate post-injection reaction or the

17  frequency of an injection site reaction relative to 20

18  milligrams?

19  A.      Again, looking at Sections 5 and 6, one can see the

20  relative frequency and severity of the injection site

21  reactions and immediate post-injection reactions relative to

22  20 milligrams of the glatiramer acetate given daily.

23  Q.      As a result, directing you to your '250 slide and the

24  checkmarks, those indicate your opinion of infringement of

25  those in elements.   Correct?

1   A.    Yes.   It is my opinion that each element in the claims

2   listed here are infringed.

3   Q.    Did you consider other elements of the '250 patent?

4   A.    Yes.

5   Q.    Excuse me.   Other claims of the '250 patent?

6   A.    Yes.

7   Q.    Tell us which?

8   A.    I also examined Claim 15 and Claim 16 and 17.

9   Q.    Directing you to those claims, did you also isolate

10   the elements which are limitations of those claims?

11   A.    Yes.   For the value of the Court, I created again this

12   chart, listing the different elements of the claims, those

13   which, using the same analysis as we did previously, I

14   marked as infringed, and, two not checked yet.

15   Q.    And the two that are unchecked, let's start with

16   Element No. 2 on the screen, did you come to an opinion

17   whether defendants' package inserts would encourage or teach

18   a physician or patient to infringe the patents in suit

19   insofar as the element No. 2, that is reducing the frequency

20   of injections from daily injections of 20 milligrams?

21   A.    Yes, I did.

22   Q.    And what is that opinion?

23   A.    Again, looking at Section 2.1, it states, administer

24   three times per week, which is of course less than once a

25   day.   Therefore, this element of this claim would be

1    infringed.

2    Q.    With respect to your element No. 5 of Claim 15, did

3    you similarly come to an opinion whether or not defendants'

4    package insert would cause a physician or patient to

5    infringe that element of Claim 15?

6    A.    Yes, I did.

7    Q.    And what is your opinion?

8    A.    Again, looking at the patent definition of

9    tolerability, tolerability refers to the level of discomfort

10   associated with glatiramer acetate therapy.  It's associated

11   with the frequency and severity of post-injection reactions

12   and immediate post-injection reactions.

13         Tolerability, of course, as we discussed this

14   morning, influences the period the patient can follow on

15   glatiramer acetate Copaxone treatment.

16   Q.    Did you refer to other sections of the package insert

17   for purposes of coming to your opinion regarding the

18   frequency and severity, as defined in the -- the

19   tolerability as defined in Claim Element 5?

20   A.    Yes.  Similarly, as we reviewed a moment ago, looking

21   at Section 5, 5.1 and 5.3, and Section 6, particularly 6.1,

22   the clinical trials experience, we can see the different

23   tolerability of the 20 milligram and 40 milligram products.

24   Q.    Accordingly, did you form an opinion whether all of

25   the asserted claims, or the asserted Claims 15 through 17 of

Wynn - direct

1   the '250 would be infringed?

2   A.    Yes.  It is my opinion that each of the elements of

3   each of these claims are infringed.

4   Q.    Did you form the same opinion with respect to each of

5   the defendant package inserts?

6   A.    Yes, I did.

7   Q.    Let's turn, then, to the '413 patent.  Did you form

8   opinions regarding whether defendants' package insert

9   teaches or encourages a physician or patient to infringe the

10  asserted claims of the '413?

11  A.    Yes, I did.

12  Q.    Did you perform the same kind of analysis that you

13  testified about, taking into account the Court's claim

14  construction as well as the stipulation among the parties?

15  A.    Yes, I did.

16  Q.    And what claims did you consider in the '413 patent?

17  A.    For the purposes of evaluating '413, I looked at

18  Claims 1, 7 and 15.

19  Q.    Did you similarly prepare a chart?

20  A.    Yes, similar to the previous patents, I prepared a

21  similar table.  Those of which I marked off already with

22  checkmarks are those elements from the analysis I made

23  before, it shows that these elements of these claims are

24  infringed.

25  Q.    Are these the same elements as those you have

Wynn - direct

1    previously testified to?

2    A.    Yes, they are.

3    Q.    Now directing you to Claim 1, where do we find in the

4    package insert that defendants' insert teaches or encourages

5    a physician or patient to use defendants' ANDA products to

6    treat a patient that has experienced a first clinical

7    episode and has MRI features consistent with MS?

8    A.    Again, looking at the indication and usage section, it

9    states for treatment of patients with relapsing forms of MS.

10   And again, to make a diagnosis of MS, one has to have had at

11   least one episode or multiple, and findings of lesions on

12   MRI scan like we looked at this morning.

13   Q.    Let me then direct you to Claim 15.  You similarly

14   formed opinions with respect to that claim, did you not?

15   A.    Yes, I did.

16   Q.    And this claim relates to a patient who has had

17   cerebral demyelinating white matter lesion visible on brain

18   MRI at least three millimeters in diameter.

19         Where do you find in the package insert that

20   defendants teach or encourage a physician or patient to

21   infringe that element regarding at least one cerebral

22   demyelinating white matter lesion visible on a brain MRI?

23   A.    Again, we are using similar analysis, indications and

24   usage states treatment of patients with relapsing forms of

25   MS.  And as we discussed in what is MS this morning, these

Wynn - direct

1    patients have lesions of three millimeters or more in size

2    on MRI.

3    Q.    In addition to the claims of the '413 as to which you

4    have given testimony, did you consider any additional

5    claims?

6    A.    Yes, I did.

7    Q.    Tell us what you considered?

8    A.    I also considered Claim No. 20.

9    Q.    Directing you to your infringement chart, all of the

10   elements that you have identified there indicate that these

11   elements were previously considered by you and found to have

12   infringed?

13   A.    That's correct.

14   Q.    Again, you performed this analysis with respect to

15   each of the defendants' package inserts.  Is that correct?

16   A.    Yes, I did this for each of the defendants' package

17   inserts.

18   Q.    Let's then look at the '302 patent.  Can you tell us

19   what your opinion is with respect to the '302?  Just

20   summarize that.

21   A.    Certainly.  It is my opinion that the individual ANDA

22   products, through their package insert, would have a

23   physician administering medication or instruct a patient to

24   use the ANDA products and infringe the elements of this

25   patent.

Wynn - direct

1    Q.    Tell us what claims you analyzed in the '302?

2    A.    I looked at Claim No. 1.

3    Q.    And in that respect, you prepared a chart on which the

4    three elements appear to represent your conclusion of

5    infringement?

6    A.    That's correct.  It is my opinion that each of these

7    elements of Claim No. 1 are infringed.

8    Q.    And you have previously discussed those elements with

9    respect to other claims.  Is that right?

10   A.    Yes.

11   Q.    Did you consider additional claims of the '302 patent?

12   A.    Yes, I did.

13   Q.    Tell us what you considered?

14   A.    I also looked at Claims 10 and 11 of the '302 patent.

15   Q.    And with respect to each of the elements that we see

16   marked in red, you have already determined infringement

17   because those elements are the same.  Is that right?

18   A.    That's correct.

19   Q.    Let me then direct you to Claim 11 and to the seventh

20   element on your chart.

21         How do defendants' package inserts encourage a

22   physician or patient to infringe the claim elements with

23   respect to each of the subcutaneous injection permutations

24   that we see in 7?

25   A.    Again, looking at the package insert, this instructs a

Wynn - direct

1    physician or patient to administer the medication three

2    times per week with at least 48 hours between injections,

3    the different permutations listed in the element of that

4    claim would match that.

5    Q.      The permutations we are talking about are the days on

6    which such injections might occur consistent with the

7    patent, with a period of time in between.  Is that right?

8    A.      Yes.  The package insert, as I mentioned, lists an

9    injection three days a week with at least 48 hours between

10   injections, and numbering days of the Week 1 through 7,

11   these are the different possible permutations.

12   Q.      Did you perform the same analysis with respect to each

13   of defendants' package inserts?

14   A.      Yes.

15   Q.      And would your conclusion be different depending on

16   which package insert or which defendants' package insert you

17   reviewed?

18   A.      No.

19   Q.      Let's turn our attention to direct infringement.

20   Assuming that defendants' ANDA products were approved and

21   assuming the package inserts that you reviewed are in fact

22   published and made available to physicians and patients, did

23   you form an opinion regarding whether a physician or patient

24   using those package inserts would be encouraged to use

25   defendants' products to infringe the asserted patents?

Wynn - direct

1    A.    Yes, I did.

2    Q.    What is that opinion?

3    A.    And that's that a physician would administer or a

4    patient would administer the medications based on the

5    package inserts to infringe.

6    Q.    Have you also formed an opinion with respect to

7    contributory infringement?

8    A.    Yes, I have.

9    Q.    For that purpose, can you tell us you what your

10   understanding of the standards or criteria are to support

11   such a finding?

12   A.    Yes.  Again, in my slide, I simply state that

13   defendants will contributorily infringe should they supply

14   physicians and patients with a material component of

15   practicing the patented method, such as the medication with

16   its package insert, that the defendants' ANDA products have

17   no substantial non-infringing use, and that direct

18   infringement will occur.

19   Q.    You testified that if defendants' ANDA products are

20   approved that defendants' ANDA products will directly

21   infringe.  Is that correct?

22   A.    Yes.

23   Q.    Did you come to an opinion whether each defendant will

24   supply a material component of that infringement?

25   A.    Yes, I have.

Wynn - direct

1    Q.    What is that opinion?

2    A.    That they would.

3    Q.    And how would they do that?  What are the material

4    components that you believed would constitute an element of

5    infringement?

6    A.    They would supply the ANDA product as well as the

7    package insert, which, of course, is required to be

8    distributed with the product for patient and physician use.

9    Q.    In addition, did you form an opinion whether there is

10   a substantial use for defendants' ANDA products or package

11   insert that would not infringe?

12   A.    Yes.  It is my opinion that the defendants' ANDA

13   products have no substantial non-infringing use as the

14   medication, as described in the defendants' ANDA package

15   inserts, is only approved for relapsing multiple sclerosis.

16   Q.    And would any use, in your opinion, of the medication

17   to treat relapsing MS constitute infringement of one or more

18   claims of the patents?

19   A.    Yes, it would.

20   Q.    Is your opinion different depending upon which package

21   insert or defendant you considered?

22   A.    No, it is not.

23   Q.    Finally, then, did you -- are you also prepared to

24   give an opinion regarding what are termed secondary

25   considerations, or certain of them?

Wynn - direct

1    A.    I am.

2    Q.    Have you formed opinions regarding whether there

3    exists such considerations that suggest that the asserted

4    patents are not obvious?

5    A.    Yes, I have.

6    Q.    What are your opinions?

7    A.    My opinions are that Copaxone 40 milligrams

8    administered three times a week embodies the claimed

9    invention, and that this product satisfies a long-felt unmet

10   need for patients and physicians who treat people with MS,

11   and that prior clinical trials have failed.

12   Q.    What is the relevance of prior clinical trials having

13   failed to your opinion?

14   A.    It's critical.  As was discussed yesterday, there have

15   been many previous trials of glatiramer acetate in different

16   formulations as well as other multiple other medications.

17            Teva would have the greatest to gain from having

18   succeeded in one of these previous trials, and they were

19   unable -- they went through many clinical trials, spent lots

20   of money, treated many patients, and even with all the

21   knowledge that they had, were unable to find a product that

22   embodied the claimed invention that we have discussed.

23   Q.    Did you form an opinion of whether Copaxone 40

24   milligrams to be dosed three times a week with 48 hours in

25   between is an embodiment of the asserted claims of one or

Wynn - direct

1    more of the patents in suit?

2    A.    Yes.   My opinion is that Copaxone 40 milligrams three

3    times a week is a commercial embodiment.

4    Q.    Did you make a determination whether or not in the

5    marketplace there was an unmet but long-felt need?

6    A.    Yes, I did.

7    Q.    And what conclusion did you come to?

8    A.    That there was a long-felt need, and that the Copaxone

9    40 milligrams administered three times a week pursuant to

10   the Copaxone package insert meets every element of the

11   asserted claims of the patents.

12   Q.    Now, were there other treatments in the marketplace

13   about which we have heard some things prior to your

14   testimony?

15   A.    Yes.

16   Q.    As you understand it, were there other available

17   treatments?

18   A.    Yes, there are.

19   Q.    What is the relevance of those treatments and why was

20   there an unmet and long-felt need despite those other

21   disease modifying therapies?

22   A.    There are several other medications.   On this slide, I

23   listed four brands, of beta interferon, Betaseron, Avonex,

24   Rebif, and Extavia.

25              These medications are limited in that many

Wynn - direct

1    individuals develop neutralizing antibodies against the

2    drug, which blocks its effectiveness.

3              Furthermore, these drugs, in many individuals,

4    are associated with severe limiting flu-like side effects,

5    and in some individuals, liver and bone marrow

6    complications.

7    Q.    Are the side effects to which you have just testified

8    of potential concern to treating physicians?

9    A.    They are of great concern, and it is recommended in

10   these individual package inserts, because of the safety

11   warnings on these patients, that the patients have regular

12   blood work.  And again these medications are also given by

13   injection.

14   Q.    In what way -- well, did Copaxone 20 milligrams

15   address the limitations you associated with other products?

16   A.    It did meet some of them.  But not completely.

17   Q.    And what issues did Copaxone 20 milligram fail to

18   solve?

19   A.    It failed to solve injection site reactions that were

20   seen with the other injectable medications.

21   Q.    In what way did Copaxone 40 milligram dosed three

22   times per week with 48 hours between such doses address that

23   long-felt need?

24   A.    Copaxone 40 milligrams dosed three times a week

25   provided a product with comparable averages, dosed every

Wynn - direct

1    day, with improved tolerability, less frequent and less

2    severe injection site reactions, and immediate

3    post-injection reaction, while increasing convenience to

4    patients.

5    Q.    A few minutes ago you referred to some of Teva's

6    studies.  Were you a participant, that is an investigator, a

7    principal investigator, in any of the trials which have been

8    described by Dr. Klinger as having been failures?

9    A.    Yes, I was.

10   Q.    And which of the trials were you involved in?

11   A.    I was involved in several, many years ago, we were a

12   key site in the trial of oral Copaxone, the Copaxone Coral

13   trial.

14   Q.    And subsequently, were you involved in any additional

15   trials?

16   A.    The Phase II proof of concept study for using 40

17   milligrams every day relative to 20 every day, the Cohen

18   study.  We were the largest site in this trial, which showed

19   some promise but also failed.

20   Q.    And did you have any relationship to the four-day

21   trial?

22   A.    Yes.  I was also a principal investigator in the Phase

23   III Multi-Center Multinational Trial of 20 versus 40

24   milligrams of glatiramer acetate given every day.

25              Again, as was discussed by Dr. Klinger, also

Wynn - direct

1  failed.

2  Q.    So each of these three trials, Coral, Cohen and FORTE,

3  was in your view a failure?

4  A.    Yes, unfortunately.

5           MR. WARE:  Your Honor, may I confer with counsel

6  for a moment?

7           THE COURT:  Yes.

8           (Counsel confer.)

9           MR. WARE:  Judge, I am finished with the direct

10 with this witness.  However, despite whatever aggravation it

11 causes, I would like to revisit a question I tried to ask

12 the witness which the Court prevented me from asking.

13          There was an objection -- I asked the witness

14 whether, in effect --

15          MR. RAKOCZY:  Your Honor, can we do this at

16 sidebar?

17          THE COURT:  Okay.

18          (The following took place at sidebar.)

19          MR. WARE:  So, in effect, I asked the witness

20 about uneven distribution of some of these adverse effects

21 and whether certain patients have a disproportionate number

22 of these reactions.  And there was an objection interposed

23 on the basis that it is not in one of our reports or

24 something.  I looked at the transcript of his deposition,

25 and there are six pages of questions by counsel on this very

1    issue.  I think under these circumstances I ought to be

2    entitled to ask about it.

3              MR. FIGG:  Your Honor, we have been operating

4    under the notion that the expert reports are what define the

5    scope of the opinions to be offered at trial.

6              I simply would like to have a clarification from

7    the Court on this issue.

8              If this -- I did, indeed, ask Dr. Wynn about the

9    subject matter that Mr. Ware wants to interrogate him about.

10   If that is enough, under Your Honor's rules, I understand

11   from our location, this is sort of a gray area.

12             THE COURT:  It is a gray area.  And it should

13   be.  And each circumstance is different.  I don't apply

14   wooden rules when it comes to the Federal Rules of Civil

15   Procedure and the Rules of Evidence.

16             I believe circuit courts allow us to exercise

17   appropriate discretion.  And I will in this case and allow

18   Mr. Ware to ask questions.

19             MR. FIGG:  Just so we are clear, I mean, this is

20   sort of the rule that now applies --

21             THE COURT:  No.  You weren't listening.

22             MR. FIGG:  I did.

23             THE COURT:  You have tried with me before.  You

24   know that you could persuade me otherwise.  But you have had

25   an opportunity.  You are not surprised .

Wynn - direct

1              I understand the import of what you are saying,

2    and perhaps the appropriateness of the objection.

3              But I just disagree with you under these

4    circumstances.

5              No.

6              MR. RAKOCZY:  I think we were getting at our

7    witnesses, Your Honor.

8              MR. FIGG:  You misunderstood me.  I didn't mean

9    to imply that you were now setting a new rule that now in

10   every case.  In this case, we can operate under this rule.

11             THE COURT:  I think that's fair.  I am sure, Mr.

12   Ware, you and your colleagues would agree with that.

13             MR. WARE:  Let's wait and see if there is a

14   problem.

15             MR. RAKOCZY:  That is the issue, Your Honor.  He

16   is going to stand up and object and he is going to say,

17   well, it is okay if it is in his transcript.

18             THE COURT:  You will remind me, that sauce --

19             MR. RAKOCZY:  The goose-Gander rule.

20             (End of sidebar conference.)

21   BY MR. WARE:

22   Q.   Dr. Wynn, you testified earlier that you have occasion

23   to see as many as 1500 patients a year.  Is that correct?

24   A.   I see an average of 1500 unique individuals living

25   with MS each year in my practice.

1    Q.    And you have been practicing and treating MS patients

2    for how long?

3    A.    30 years or so.

4    Q.    During the course of your professional career and

5    treatment of MS patients, have you had occasion to see

6    patients who have what might be considered disproportionate

7    numbers of injection site reactions or indeed immediate

8    post-injection site reactions?

9    A.    Yes.  As I mentioned earlier, a large part of my

10    practice counterintuitively is dealing with the side effects

11    of medications early in patient's disease, not just the

12    disease itself.

13    Q.    And tell us about circumstances in which and why

14    certain patients may report disproportionate numbers, of

15    what might be thought on the face of it to be

16    disproportionate numbers of injection site reactions?

17    A.    Some patients -- we know that 40 percent of

18    individuals when diagnosed have some cognitive impairment.

19    They have difficulty learning how to self-administer the

20    medication, even with an auto-injector.

21           These patients understandably are more likely to

22    get areas of redness or scarring at their injection.  Or are

23    less likely to rotate when they give the shot and have

24    similar problems.

25           Many patients simply have a very difficult time

1    accepting developing a chronic illness, particularly given

2    that they are often very young.  And therefore, the concept

3    of having to not only have such a disease but take a drug by

4    a shot is more difficult to accept and again report side

5    effects at a higher frequency than patients who are less

6    challenged cognitively from their disease and have a greater

7    acceptance for unfortunately being burdened from what used

8    to be called such a crippling illness.

9    Q.    How common is it that you see patients for whom there

10   is an uneven distribution of injection site reactions?

11   A.    It is quite common.  Maybe not as common as it feels,

12   but I can certainly tell you, not only are there patients

13   who have a disproportionate number of such reactions, they

14   take a disproportionate amount of our time, as you might

15   imagine.

16              MR. WARE:  Thank you, sir.  No further

17   questions.

18              THE COURT:  Mr. Figg.

19                      CROSS-EXAMINATION

20   BY MR. FIGG:

21   Q.    Good afternoon, Dr. Wynn.  Nice to see you again.

22   A.    Good afternoon.

23   Q.    I think you testified on direct, and we have talked

24   about this before, you have worked with Teva for a long

25   time.  Right?

Wynn - cross

1    A.    Yes.

2    Q.    In fact, you have been rather closely involved with

3    Teva since the, around the early 2000s.  I believe.

4    Correct?

5    A.    Right.  We have been involved with Teva as well as

6    most of the other companies who have had a drug in

7    development for multiple sclerosis.

8    Q.    I understand.

9              You have already indicated today you have worked

10   on numerous clinical studies with Teva?

11   A.    Yes.

12   Q.    And since 2000, you have given presentations on behalf

13   of Teva at professional meetings of physicians to discuss

14   Teva products.  Right?

15   A.    That's correct.

16   Q.    And you have been compensated by Teva for giving those

17   presentations.  Correct?

18   A.    That's correct.

19   Q.    And you have worked in these clinical studies on which

20   you have worked over the years.  Did I understand you

21   correctly, you said you have been the principal investigator

22   on 85 clinical studies?

23   A.    Approximately 80 or more clinical trials over the

24   years, yes.

25   Q.    And you were principal investigator, not a site

Wynn - cross

1    investigator on all of them?

2    A.    I was the principal investigator, which refers to the

3    lead investigator, at the individual site, not the primary

4    principal investigator for the trial as a whole.

5    Q.    Thank you for that clarification.

6          Now, am I correct that when you are the

7    principal site investigator, you receive compensation from

8    Teva for that participation?  Correct?

9    A.    I have not been the primary principal investigator

10   over an entire trial.  So I don't know the answer to your

11   question.

12   Q.    Maybe my question wasn't clear.

13         You indicated you have been the principal site

14   investigator.  Let's just call it site investigator.  You

15   have been the site investigator on a number of trials.

16   Right?

17   A.    Yes.

18   Q.    And a number of trials sponsored by Teva?

19   A.    Correct.

20   Q.    And you have received compensation, you or your

21   consulting firm have received compensation for that

22   participation.  Correct?

23   A.    Right.  The neurology practice where I work is

24   reimbursed for the work that's done on a piece basis per the

25   industry standard.

Wynn - cross

1    Q.    And am I correct that the amount of compensation that

2    you or your firm receives is related to the number of

3    patients that you have enrolled in the study?

4    A.    It's related to the number of procedures, and

5    therefore, of course, the more patients, the more procedures

6    there will be, because each patient has a set number of

7    procedures.  As is the standard for any clinical trial.

8    Q.    So the greater the number of patients, the greater

9    number of procedures that are involved, the greater the

10   compensation is that you and your firm receive?

11   A.    That's correct.

12   Q.    And you oversaw one of the highest enrolling sites for

13   the Glacier study.  Correct?

14   A.    Yes.

15   Q.    And you were also a large enrolling site for the GALA

16   study.  Correct?

17   A.    Among U.S. sites.  But primarily this was non-U.S.

18   sites.

19   Q.    Thank you.  But in the U.S. you were?

20   A.    Yes.

21   Q.    On direct examination, you referred to the Court's

22   claim construction.  We can look at this if we need to.  But

23   maybe we can get through it quickly.  You understand that

24   the Court has provided separate definitions for frequency

25   and severity in connection with injection related adverse

Wynn - cross

1  events?

2  A.    Yes.  If we are referring to a specific document, you

3  can help maybe reference it.  If you have another question,

4  if you give me the document, I might be able to pull it up

5  in my binder.

6  Q.    We can present it on the screen here, to help you,

7  Doctor, and it will be on the screen in front of you as

8  well.

9         You understand that the Court has provided

10 separate definitions for frequency and severity.  Correct?

11 A.    That's correct.

12 Q.    And we see that on the screen in the stipulated -- or

13 in the Court's claim construction, and those are separate

14 and distinct concepts.  Correct?

15 A.    Yes.  I might ask you to tell me which documents.  It

16 is very hard for me to see the screen where I am sitting

17 with my vision.

18 Q.    I have limited time here.  He can blow it up for you.

19 Maybe you can see it on your screen.  If not, you are

20 welcome to look at it in your binder.

21        THE COURT:  He is nearsighted, so the screen is

22 difficult for him.  That is why he almost fell.

23        MR. FIGG:  I am sorry.  I didn't realize that.

24 BY MR. FIGG:

25 Q.    Okay, Doctor.  It is DTX-1520.  It should be in your

1    book?

2    A.    I have that.

3    Q.    You have seen this before.  Right?

4    A.    Correct.

5    Q.    A reduction in the frequency of ISRs did not

6    necessarily correlate with the reduction in the severity of

7    ISRs.  Correct?

8    A.    Not in all circumstances.

9    Q.    And the incidence, in the context of ISRs, refers to

10   the percentage of patients in a patient population who

11   experience at least one ISR.  Correct?

12   A.    That's correct.

13   Q.    Now, you referred to direct infringement in your

14   direct examination.  You were offering an opinion that

15   patients and physicians who use defendants' products will

16   directly infringe.  Right?

17   A.    Yes.

18   Q.    There is another notion of direct infringement.  You

19   have offered no testimony or opinion that the defendants

20   themselves will directly infringe any of these

21   method-of-treatment claims.  Correct?

22   A.    My understanding is that the defendants will induce

23   infringement, are responsible for contributory infringement,

24   as well as there being direct infringement happening.

25   Q.    Direct infringement by the patients or physicians?

Wynn - cross

1             Let me clarify my question.

2             Defendants are pharmaceutical companies.  Right?

3   A.    Yes.

4   Q.    They don't treat patients?

5   A.    That's correct.

6   Q.    They will not perform the methods of treatment that

7   are defined in any of the asserted claims.  Is that correct?

8   A.    That's correct.

9   Q.    Okay.  Now, the claims of the '776 patent require

10  reducing the severity of ISRs in patients who already have

11  been taking the 20 milligram daily therapy, and then are

12  switched to 40 milligrams three times a week.  Right?

13  A.    Yes.

14  Q.    And I think I heard you say this on direct, maybe not.

15  There are patients that will receive defendants' ANDA

16  products who have never taken the 20 milligram product.

17  Correct?

18  A.    No, that's not what I said.

19  Q.    Well, is it a fact that we could expect when

20  defendants' products are launched there will be patients who

21  take their 40 milligram three times a week product who have

22  not previously been administered the 20 milligram daily

23  product?

24  A.    It is my assumption that should the defendants ANDA

25  products be approved, yes, there may be some patients who

Wynn - cross

1    may take defendants' ANDA products who have never taken

2    glatiramer acetate in any formulation previously.

3    Q.     That was my question.  These patients may have

4    previously been taking other therapies, such as one of the

5    interferons or one of the oral or IV therapies.  Right?

6    A.     Correct.

7    Q.     And there may be patients who take defendants'

8    products who are newly diagnosed with multiple sclerosis and

9    have never taken any kind of therapy for that disease.

10   Right?

11   A.     Yes.

12   Q.     Other patients may be patients who are previously

13   taking -- who are currently taking Teva's 40 milligram three

14   times per week Copaxone product who decide to switch to one

15   of the defendants' 40 milligram products.  Correct?

16   A.     There may be some of those, yes.

17   Q.     Now, for a patient to experience a reduction in

18   severity of ISRs on the 40 milligram three times a week

19   therapy relative to the 20 milligram daily therapy, the

20   patient must necessarily have experienced ISRs on that 20

21   milligram daily therapy.  Is that correct?

22   A.     If what you mean, if someone goes from 20 to 40 and

23   they have improvement, they have less reactions than they

24   had on 20, that would be yes.  If you meant, would they be

25   less likely to have them even if they had not -- they would

1    be less likely to have them even if they had not had the 20.

2    Q.    Let's try to make it a little simpler.  You can't

3    reduce the severity in a patient of an ISR in a patient who

4    has never had an ISR, can you?

5    A.    Right, so patients who have never taken Copaxane would

6    have never had a reaction.  That makes sense.

7    Q.    Yes.  And you have indicated there are patients who do

8    not experience ISRs on the 20 milligram daily therapy.

9    Right?

10   A.    Yes.  That occurs, and is uncommon.

11   Q.    Those are patients that are encountered in your

12   practice.  Right?

13   A.    Occasionally, yes.

14   Q.    There are some patients -- withdrawn.

15        Is it correct that to some extent, whether the

16   patient reports to you that they experience an ISR depends

17   upon that patient's perception of what an ISR is.  Right?

18   A.    Well, it's very rare for a patient to come in and say

19   I had an ISR.  They will tell me, they come in, we say, how

20   are you doing, and they tell us how they are tolerating the

21   medication.  One of the deficiencies we obviously have is,

22   patients are often more afraid of the disease than the

23   medication, and tend to underreport the ISRs because of fear

24   of disability if they stop the medication, or should the

25   physician ask them to stop.

1   Q.      Some patients are more inclined to complain about

2   reaction to a needle injection and other stuff.  Right?

3   A.      Yes.

4   Q.      Now, Doctor, the only information that you have relied

5   on in your direct examination for your opinions on indirect

6   infringement are the defendants' package inserts.  Correct?

7   A.      That's correct.

8   Q.      Now, defendants' package inserts do not contain any

9   data in a single study comparing 20 milligram daily to 40

10  milligram three times a week.  Correct?

11  A.      Well, there is no head-to-head study such as Glacier

12  within defendants' ANDA package inserts.  When the GALA

13  trial was performed, there was a tremendous amount of

14  historical information that was known about 20 to practicing

15  physicians.

16          So in some ways the GALA trial was designed, or

17  would allow physicians to understand the difference and to

18  infer the relative safety.  And, no, not in the package

19  insert.

20  Q.      I would like -- so that last little bit you added I

21  think was responsive to my question.

22          There is nothing in defendants' package inserts

23  that contains any data from a single study comparing 20

24  milligrams daily to 40 milligrams three times a week.

25  Correct?

Wynn - cross

1    A.    Not in that particular sense, no.

2    Q.    Defendants' package inserts contain data from clinical

3    studies comparing the 20 milligram daily regimen to placebo.

4    Right?

5    A.    Yes.

6    Q.    Much of what data there is in defendants' package

7    inserts -- incidentally, so we are on the same wavelength

8    here, defendants' package inserts are substantial copies of

9    Teva's package insert.  Right?

10   A.    Yes.

11   Q.    And so the clinical data that were from the --

12   withdrawn.

13         The data in the studies on the 20 milligram

14   daily product that we find in defendants' package inserts

15   came from studies going back as far as 20 years or more ago.

16   Correct?

17   A.    Some of the earliest, yes.

18   Q.    Because we heard earlier that Copaxone was first

19   approved in that regimen in 1996.  Right?

20   A.    Yes.

21   Q.    And so presumably the studies that led to that

22   approval were done before 1996?

23   A.    Yes.

24   Q.    Now, defendants' package inserts also contain data

25   from the GALA study?

1    A.    Yes.

2    Q.    And the GALA study was conducted in the 2011-2012 time

3    frame.  Correct?

4    A.    Yes.

5    Q.    And the GALA study is the study in which 40 milligrams

6    of glatiramer acetate administered three times a week was

7    compared to placebos.  Right?

8    A.    Yes.

9    Q.    The GALA study did not have a 20 milligram arm.

10   Correct?

11   A.    Correct.

12   Q.    So the patients in the GALA study either received 40

13   milligrams of glatiramer acetate three times a week or they

14   received three injections of a vehicle that did not contain

15   active ingredient.  Right?

16   A.    Correct.  The placebo had no glatiramer acetate.

17   Q.    The reason for that was to blind the study, you wanted

18   the patients in both the active arm and the placebo arm to

19   get the same number of injections every week.  Right?

20   A.    Correct.

21   Q.    There is no citation in the GALA study in defendants'

22   package inserts.  Would you agree with that?

23   A.    If what you mean is, is there a bibliography in

24   defendants' package inserts?  No, I am not familiar with

25   that.

1          However, the data of 40 milligrams in the

2    defendants' ANDA contain sources in the GALA trial.

3    Q.    We will get to that.  As I say, with all due respect,

4    Doctor, my time is limited.

5          My question was very simple.  There is no

6    citation to the publication describing the GALA study in any

7    of the defendants' package inserts.  Correct?

8    A.    Correct.

9    Q.    Thank you.  So if a physician were interested in

10   reading publications regarding the clinical trials on the 40

11   milligram three times a week regimen, that physician would

12   have to find that GALA publication on his or her own.

13   Right?

14   A.    There is no bibliography, yes, in the package inserts,

15   so one would look to other sources.

16   Q.    During your direct examination, you referenced some

17   conclusions from the GALA study.  Right?  It's on the screen

18   here.

19          I hope you can read this.

20          Do you recall referring to this excerpt in the

21   GALA publication?

22   A.    I do.

23   Q.    For the record, it's Joint Trial Exhibit 7090.

24          Those conclusions that you have referenced in

25   your direct examination from the GALA study, they are not in

1    defendants' package inserts.  Right?

2    A.    Well, I think the first box is, that it's safe and

3    well tolerated, and, you know, you can tell the relative

4    incidence of ISRs from the defendants' package insert.

5    Q.    Okay.  This is a significant point.  I am glad you

6    raised it.

7              The second box here talks about the incidence of

8    ISRs in the 40 milligram three times a week product as

9    compared to previous studies of patients treated with 20

10   milligrams and 40 milligrams once daily.  Right?

11   A.    Yes.

12   Q.    It's your view that a physician can pick through the

13   data in the package insert and find information that might

14   support that.  Is that your point?

15   A.    There is nothing in any of the package inserts

16   regarding 40 milligrams daily.

17   Q.    Okay.  40 milligrams three times a week, 20 milligrams

18   daily?

19   A.    Yes.

20   Q.    My point is, the quotation that you referred to from

21   the GALA study in your direct testimony is not in any of the

22   defendants' package inserts?

23   A.    The package inserts list the raw data and allow a

24   physician to make the decisions.

25   Q.    I am sorry, Doctor.  Can you focus on my question,

1    please.  The quotation that you have shown the Court in your

2    direct examination is not a quotation we can find in any of

3    defendants' package inserts.  Correct?

4    A.    Yes.  This quotation is not in defendants' package

5    inserts.

6    Q.    I understand your contention about looking at other

7    data and matching things up.  I would like for you to just

8    focus on my questions.

9              Now, the only study that compared adverse event

10   profile of 20 milligrams daily to that of 40 milligrams

11   three times a week is the Glacier study.  Is that right?

12   A.    That's correct.

13   Q.    That is the only one you are aware of?

14   A.    That's correct.

15   Q.    Defendants' package inserts do not cite the Glacier

16   paper anywhere.  Right?

17   A.    That's correct.

18   Q.    They don't contain any data from the Glacier study.

19   Correct?

20   A.    That's correct.

21   Q.    The Glacier study actually is something Teva refers

22   physicians to.  Right?

23   A.    Medical science, liaisons, and at professional

24   meetings, yes.

25   Q.    And sales reps from physicians' offices.  Right?

Wynn - cross

1   A.     I think there was testimony earlier today about local

2   sales reps significantly reference Glacier.

3   Q.     Doctor, if you don't know the answer, please tell me.

4   I will move on.

5          Defendants had no role in sponsoring or

6   conducting the Glacier study.  Right?

7   A.     The defendants had nothing to do with sponsoring

8   Glacier.

9   Q.     They had no role in publishing the Glacier study or

10  presenting its results at any meeting?

11  A.     No.

12  Q.     Those were all things Teva did?

13  A.     Correct.

14  Q.     The claims of the '776 patent require that a patient

15  experience reduced severity of ISRs on 40 milligrams three

16  times a week relative to 20 milligrams daily.  Right?

17  A.     Yes.

18  Q.     And is it your understanding every single claim, every

19  single asserted claim from the '776 patent requires a

20  reduction of the severity of ISRs?

21  A.     Or immediate post-injection --

22  Q.     That was the point I was getting at.  Are you aware

23  that all of the claims require either reduction of the

24  severity of ISRs or reduction of the severity of both ISRs

25  and IPIRs?

Wynn - cross

1    A.    Yes.

2    Q.    No claim just says reduces the severity of IPIRs?

3    A.    Correct.

4    Q.    So I would like for you to refer to DTX-1622.  This

5    is, I guess, defendants' exhibit number.  For the Synthon

6    package insert that you referred to in your direct

7    examination.

8              Do you recognize that?

9    A.    I do.

10   Q.    You talked about Section 6.1 on Page 4 of that package

11   insert.  Right?

12   A.    Yes, I did.

13   Q.    And Section 6.1 on Page 4, I am not sure you did refer

14   to this in your direct examination.  I would like to go to

15   the table heading there.  You understand, Table 1 presents

16   clinical data from the 20 milligram clinical trials that

17   were conducted 20-plus years ago?

18   A.    Up to 20-plus years ago, yes.

19   Q.    And the heading on that table refers to the intensity

20   of adverse reactions that were observed in those trials.

21   Right?  Do you see the last sentence?

22   A.    Yes, it does.

23   Q.    It says adverse reactions were usually mild in

24   intensity?

25   A.    I see that.

Wynn - cross

1    Q.     And the Court has construed the word severity to mean

2    intensity with respect to ISRs.  Right?

3    A.     Yes, it has.

4    Q.     And so that's the statement that's made about the

5    severity of ISRs experienced by patients in the 20 milligram

6    daily dose?

7    A.     Yes.

8    Q.     Let's take a look at Pages 8 and 9 of defendants'

9    package inserts.

10          Before you blow this up -- before our assistant

11   here blows this up, this is the table that presents clinical

12   data from the GALA study conducted in 2011-2012.  Right?

13   A.     Yes.

14   Q.     Let's take a look at the table heading for that table.

15          It has a very similar table heading.  And you

16   see how the severity of adverse reactions is described

17   there?

18   A.     Yes.  Most side effects are mild in intensity,

19   although we know that the more frequent the side effect for

20   a given patient, the more likely it is to be experienced as

21   moderate or severe.

22   Q.     I understand that is your contention.  But that is not

23   what this tables says.  Right?

24   A.     That's correct.

25   Q.     This table says adverse reactions were usually mild in

Wynn - cross

1    intensity.  Right?

2    A.    And the way as a treating physician I interpret that

3    is adverse reactions were usually, the operation of the word

4    usually, meaning most commonly.

5    Q.    And the same exact words were used for the 20

6    milligram daily therapy?

7    A.    Yes.

8    Q.    Doctor, you understand that these statements also are

9    in Teva's package insert for Copaxone?

10   A.    I did.

11   Q.    Is the 20 milligram Copaxone product for daily

12   injection still a commercially available product?

13   A.    Yes.

14   Q.    And it's still a product that you prescribe to some of

15   your patients.  Right?

16   A.    Yes.

17   Q.    So Teva does not regard that product as having

18   unacceptable safety or tolerability problems.  Right?

19   A.    That's correct.

20   Q.    Now, you referred to Section 6.1 of defendants'

21   package insert on Page 4.  I am focusing on the first

22   paragraph in that, under Clinical Trial Experience.  Do you

23   see that, Doctor?

24   A.    I do.

25   Q.    Now, that is a -- that statement is that because

1    clinical trials are conducted under widely varying

2    conditions, adverse reaction rates observed in the clinical

3    trials of a drug cannot be directly compared to rates in

4    clinical trials of another drug and may not reflect the

5    rates observed in clinical practice.

6              I read that, I think, correctly.  Right?

7    A.    Yes, you did read that correctly.

8    Q.    Thank you.  Just to be clear, 40 milligram Copaxone is

9    a different drug product than 20 milligram Copaxone.  Right?

10   A.    It's a different formulation of glatiramer acetate,

11   yes.

12   Q.    The FDA would certainly consider it a different drug,

13   wouldn't it?

14   A.    I am not an expert in that matter.

15   Q.    Okay.  Now, do you understand, and perhaps you are not

16   an expert here, either, and I will give you that caveat --

17   before I ask this question, this statement in Section 6.1,

18   do you understand that also came from Teva's package insert?

19   A.    I do.

20   Q.    Is it your understanding that the reason that

21   statements like this are in these package inserts is to

22   avoid an implication that one product is safer or better or

23   more tolerable or more efficacious than another?

24   A.    No.

25   Q.    Isn't it a fact that -- we heard Mr. Hassler testify

1    this morning that Teva is not permitted to promote its

2    product on the basis of superiority.  Right?  You heard

3    that?

4    A.    Right.

5    Q.    And so the conclusions that you are drawing from the

6    package insert, that comparing these data from these

7    separate clinical trials demonstrates a superiority in terms

8    of tolerability, that is something Teva cannot say to

9    physicians.  Right?

10   A.    The package insert from Teva for 20 and 40 milligrams,

11   like the package inserts proposed for the defendants' ANDA

12   product, lists the relative tolerabilities, side effects,

13   severity and frequency of immediate post-injection reactions

14   and injection site reactions.

15          The package inserts are written for those of us

16   who treat MS so that we can compare, so we can pick which

17   therapy, for the person sitting with us the therapy we think

18   will be best.

19          And the package inserts teach me as a physician,

20   had I not been a prospect in the trials, which product to

21   pick.

22   Q.    So your testimony is physicians would understand this

23   and they would go in and make their own determination?

24   A.    I think as it was testified earlier by the general

25   manager from Teva, that while they are not allowed to speak

Wynn - cross

1    about the Glacier trial, as it is not included in the

2    package insert, their package inserts are left in doctors'

3    offices for them to specifically look at, so they can know

4    the safety and tolerability and the effectiveness of the

5    product.

6              I can tell you personally there was a lot of

7    fear when the 40 milligram came to market regarding whether

8    or not it would be less tolerant, especially given the

9    result from earlier trials.

10   Q.   What I am trying to focus on, Dr. Wynn, is what do

11   defendants' package inserts tell patients to do.

12             Now, let me finish my question.  Teva cannot

13   market its product as having a superior adverse event

14   profile to the 20 milligram product.  Would you agree with

15   that?

16   A.   That is my understanding.  However, I think that

17   someone in Teva said this earlier today.  I am not Teva so I

18   can't speak for Teva.

19   Q.   I just wanted to get your understanding.

20             You are drawing the conclusion that physicians

21   will look at the data in defendants' package insert and draw

22   that conclusion for themselves?

23   A.   I think if a physician did not look at this package

24   insert, which, by the way, pops up in many physicians', such

25   as my electronic medical record, that their patients will

Wynn - cross

1    have seen it and be often aware of it.  This is why we had

2    so many people ask to switch to 40 milligrams when this

3    formulation came out.

4    Q.    Do you understand that Teva has not conducted a

5    clinical trial that is sufficiently powered to establish

6    superiority such that they could make superiority claims?

7    A.    Superiority in which regard?

8    Q.    In regard to safety and tolerability?

9    A.    You mean other than the Glacier trial?  I am certainly

10   aware of the one study that Teva has conducted comparing the

11   two formulations of Copaxone.

12   Q.    Doctor, my question was a little different from that.

13   You understand that Teva has not conducted a clinical trial

14   powered to established superiority in terms of safety and

15   tolerability that would permit Teva to promote its product

16   as a superior product?

17   A.    I don't know the answer to that question.

18   Q.    Okay.  Now, if we can take a look at Section 5.1 of

19   defendants' package inserts on Page 3.  You referred to this

20   section in your direct examination.  Right?

21   A.    Yes.

22   Q.    And you highlighted that 16 percent number and the

23   four percent number.  Right?

24   A.    No.  I think the 16 percent and the two percent.

25   Q.    Okay.  Thank you.  This data refers to the incidence

Wynn - cross

1    of IPIRs seen in the populations of patients that were

2    treated in these two sets of clinical trials.  Right?

3    A.    Yes.

4    Q.    Now, if we look at the placebo numbers, those are the

5    patients who got an injection vehicle or saline without

6    active ingredient.  Right?

7    A.    Correct.  Mannitol plus the saline.  Mannitol

8    excipient, plus saline, but not an active ingredient.

9    Q.    The number of IPIRs that the placebo patients

10   experienced were also different.  Right?

11   A.    Although I am not clear that is statistically

12   different, that number is different.

13   Q.    You don't know whether the 16 and the two percent

14   numbers are statistically different, do you?

15   A.    As a physician treating patients --

16   Q.    Please answer my question, Doctor.

17             MR. FIGG:  I am sorry, Your Honor.

18             THE COURT:  Go ahead.

19   BY MR. FIGG:

20   Q.    Doctor, please proceed with your answer.

21             THE COURT:  A good rule of thumb here.  Mr.

22   Maurer can't take both of you speaking at the same time.

23             THE WITNESS:  I apologize, Your Honor.

24             THE COURT:  That goes for Mr. Figg as well.

25             MR. FIGG:  Yes, indeed.  Should I start over?

1                    THE COURT:  Please, I would appreciate that.

2        BY MR. FIGG:

3        Q.    You indicated that you don't know whether the

4        difference in the placebo numbers that we see here are

5        statistically different?

6        A.    That's correct.

7        Q.    Now, you also don't know whether the 16 versus the two

8        percent are statistically different, do you?

9        A.    Correct.

10       Q.    Now, in these two sets of clinical trials --

11       withdrawn.

12                    Do you know, Doctor, whether the criteria that

13       were used back 20 years ago or so for determining whether a

14       patient had an IPIR were the same criteria that were used in

15       the GALA study for determining whether a patient had an

16       IPIR?

17       A.    No, I don't know.  I know there are two descriptions,

18       a European and a U.S. definition of IPIR.

19       Q.    The vehicle used in the 20 milligram trials was

20       saline.  Right?

21       A.    With the excipient mannitol, it is my understanding.

22       Q.    In the 20 milligram trials?

23       A.    I think it may have had both.  I may be wrong.

24       Q.    Let's take a look at JTX-7057.

25                    Let me know when you have found it, Doctor.

Wynn - cross

1    A.    I have found it.   Thank you.

2    Q.    I would like to focus your attention on the abstract.

3    You can see what we are focusing on on the screen, then you

4    can read it in your book.

5                You see the paragraph that says, In a

6    double-blind, randomized, placebo controlled pilot trial?

7    A.    Yes.

8    Q.    This is one of the early 20 milligram studies.   Right?

9    A.    Yes.   This was the first.

10   Q.    And it says that these patients self-injected either

11   20 milligrams of Copaxone 1, which is Copolymer 1, Copaxone,

12   right, dissolved in one milliliter of saline or saline alone

13   daily for two years.   Right?

14   A.    That's what it states.

15   Q.    So this one doesn't have mannitol in it.   Right?

16   A.    It does not state to have mannitol.

17   Q.    But you pointed out in direct examination the current

18   formulations do have mannitol.   Right?

19   A.    Yes.

20   Q.    So the formulations, whether there is significant or

21   not is for somebody else to decide, but the formulations

22   used in the 20 milligram study were different from the

23   formulations used in the later 40 milligram?

24   A.    Yes.

25   Q.    And, Doctor, the injection technique may have an

Wynn - cross

1    impact on the incidence of ISRs.  Right?

2    A.    Yes.

3    Q.    And the device used for injection can have an impact

4    on the incidence of ISRs.  Correct?

5    A.    It could.

6    Q.    The studies that were conducted 20 or more years ago

7    with the 20 milligram daily product used conventional

8    syringes for patients injections.  Right?

9    A.    Yes.

10   Q.    The more recent studies, the GALA study, used

11   prefilled syringes or sometimes even autoinjectors.  Right?

12   A.    There was no autoinjector in the GALA study.

13   Q.    Okay.  Have you gone back and looked at that since

14   your deposition?

15   A.    Well, the 40 milligram was not approved at that time.

16   The injector is an approved product.  And therefore, you

17   can't have an approved injector for a non-approved product.

18   I remember that was a sore point among investigator sites,

19   that patients who would want to use the autoinjector

20   couldn't.  And we had to instruct patients to not get one.

21   Q.    So they used prefilled syringes?

22   A.    Correct.

23   Q.    Now, during your direct testimony you referred to

24   discontinuation data in Section 6.1 of defendants' package

25   inserts?

Wynn - cross

1    A.    Yes.

2    Q.    Would you agree, Doctor, that there are many reasons

3    that a patient may discontinue therapy in a clinical trial?

4    A.    Yes.  Can you remind me of the number?

5    Q.    What am I reminding you of?

6    A.    The exhibit for the package insert.

7    Q.    It's DTX-1622.

8    A.    Thank you very much, sir.

9    Q.    Now, some of the reasons for which a patient may

10   discontinue therapy in a clinical trial have nothing to do

11   with injection reactions.  Right?

12   A.    Yes.

13   Q.    And they could have to do with injection reactions but

14   they could have to do with the frequency with which the

15   patient has experienced them.  Right?

16   A.    Yes -- I am sorry.  Could you repeat the question?  I

17   am not sure I understood that question.

18   Q.    You are really challenging me, Dr. Wynn.

19         THE COURT:  Mr. Maurer, will you read back the

20   question.

21         (Question read.)

22         THE WITNESS:  So it could have to do that they

23   have injection site reactions or the frequency from having

24   injection site reactions, yes.

25   BY MR. FIGG:

Wynn - cross

1    Q.    That was my question.

2    A.    Yes.

3              THE COURT:  Mr. Figg, while you are

4    contemplating, why don't we take a stretch.

5              (Recess taken.)

6              MR. FIGG:  May I proceed, Your Honor?

7              THE COURT:  Yes, sir.

8              MR. FIGG:  Thank you.

9    BY MR. FIGG:

10   Q.    Doctor, let's go back to Defendants' Exhibit 1622,

11   which is the representative package insert to which you and

12   I have been referring.  Right?

13   A.    Yes, sir.

14   Q.    Again, you referred in your direct testimony to I

15   believe Section 5.1 in that document.  Correct?

16   A.    Yes, sir.

17   Q.    And Section 5.1 -- I apologize if I have covered this,

18   but I just want to be sure, the percentage numbers that you

19   referred to in that section are the incidence of the

20   occurrence of IPIRs in the populations of patients that were

21   treated in these two sets of clinical trials.  Right?

22   A.    Yes.

23   Q.    Now, let's look at Section 5.3.  That also refers to

24   the incidence of these reactions in the two different

25   patient population groups.  Correct?

Wynn - cross

```
 1    A.    Yes.

 2    Q.    And let's take a look.  I wonder if we could get

 3    Plaintiffs' Demonstrative Exhibit 4.25 on the screen.  Can

 4    you guys do that.

 5          You recall, this is one of the demonstrative

 6    exhibits that you used in your direct testimony?

 7    A.    I do.

 8    Q.    And am I correct that the data on the left-hand side

 9    here represents the incidence at which these various

10    reactions occurred in the patient population on the 20

11    milligram daily trials that are represented in the package

12    inserts.  Right?

13    A.    Yes.

14    Q.    And the information on the right hand, Table 2,

15    represents the incidence of these various reactions in

16    patients, the patient population that was involved in the

17    GALA trial in 2011 and 2012?

18    A.    Yes.

19    Q.    And in defendants' package inserts, these occur as two

20    separate tables.  Right?  In other words, they don't have

21    this side-by-side comparison that you are doing?

22    A.    That is correct.

23    Q.    Now, Doctor, I would like to switch topics a little

24    bit, and talk about the Glacier study.  Okay?

25    A.    Yes.
```

Wynn - cross

1    Q.    You are aware that the data that is discussed in the

2    Glacier publication was compiled -- was obtained from a

3    compilation called the ECRF?  Are you aware of that?

4    A.    Yes.

5    Q.    And the ECRF was the electronic case report form?

6    A.    Yes.

7    Q.    And just so we are clear, that was an electronic

8    database of data that was input by various clinical sites

9    that were involved in the study.  Right?

10   A.    Yes.

11   Q.    Did you ever see the ECRF yourself?

12   A.    At our site I reviewed that.

13   Q.    The data that came from your site and went into the

14   ECRF, you saw that?

15   A.    Yes, and signed off on those pages.

16   Q.    How many additional sites were there?

17   A.    There were approximately 30 sites.

18   Q.    And did you see the ECRF data from any of those other

19   sites?

20   A.    I saw a small amount of information that you showed me

21   at the deposition.

22   Q.    Aside from that?

23   A.    No.

24   Q.    Just to be sure, you didn't see any of the patient

25   diary cards from any of those other sites.  Correct?

Wynn - cross

1    A.     Not other than something you may have shown me at

2    deposition.

3    Q.     Let's focus on what you saw -- withdrawn.

4           You are an author on the Glacier paper?

5    A.     Correct.

6    Q.     Just so the record is clear, the Glacier paper is

7    Defendants' Trial Exhibit 7134.  I am sorry.  It's Joint

8    Trial Exhibit 7134.  Do you have that there in your binder,

9    Dr. Wynn?

10   A.     Yes, I do.

11   Q.     So prior to the submission of the manuscript for this

12   paper for publication, you had not seen any ECRF data other

13   than the data that came from your own site or any patient

14   diary cards other than the diary cards that came from your

15   own site?

16   A.     No.  I had the opportunity to review the compiled data

17   from the trial prior to.  But, no, I did not review, you

18   know, the individual cards that patients took home and

19   filled out or the full case report forms for each site.

20   That would be, I would assume, tens of thousands of pages.

21   Q.     There was a lot of information there.

22          So you relied on the compilation of that data by

23   the people who actually wrote the paper.  Right?

24   A.     By the people who were helping run the study.

25   Q.     Let's turn to JTX-7026.  Exhibit 7026 is something

Wynn - cross

1    called the statistical analysis plan.  Right?

2    A.    Yes.

3    Q.    And this is the statistical analysis plan for the data

4    that is reported in the Glacier publication.  Correct?

5    A.    Yes.

6    Q.    Can we turn to Page 57 of this document.

7             About midway down on that page there is a

8    paragraph beginning with the word Following.  Do you see

9    that?

10   A.    I do.

11   Q.    It says, Following IRAE distribution check, two

12   patients with an extremely high number of IRAEs were found

13   in the data.

14            Do you see that?

15   A.    I do.

16   Q.    And if we look a little further down in that

17   paragraph, there is a sentence that says, in order to

18   evaluate the influence of these two observations on the

19   overall parameter estimate for IRAE rate, the primary model

20   was fitted to the overall data (using only intercept) with

21   and without the above extreme values.

22            Do you see that sentence I just read?

23   A.    I see that, yes.

24   Q.    Is it your understanding that what this document is

25   telling us here is that they ran the analysis of the data

1    both with and without these two patients?

2    A.    Yes.

3    Q.    And then, if we look at the last sentence in this

4    paragraph, it concludes that, Therefore, inclusion or

5    exclusion of these two patients could influence dramatically

6    on overall event rate estimate.

7             Right?

8    A.    Yes, it states that.

9    Q.    And you understand what that means is that whether or

10   not these two patients are included has a big effect on the

11   way we -- the conclusions we make from the data?

12   A.    It could dramatically influence the overall event rate

13   estimate, yes.

14   Q.    Now, if we can take a look at the next paragraph.  The

15   one beginning with the word Moreover.  I am focusing on the

16   last sentence in this paragraph.  Do you see that the

17   conclusion by the Teva statisticians here is that only the

18   above two patients have high influence on the fitted

19   response values and thus may bias the final analysis

20   inference.

21            So do you understand what they are saying there

22   is that these two patients we identified in the previous

23   paragraph are the only two we found that had this

24   significant impact on the result?

25   A.    It states that only the two above patients have a high

1    influence on the fitted response values.

2    Q.    Now, again, you are an author on this publication.

3    Right?

4    A.    Yes.

5    Q.    Prior to the submission of the manuscript, no one ever

6    discussed with you the fact that the data was dramatically

7    influenced by two patients prior to this litigation.  Right?

8    A.    Correct.

9    Q.    And, in fact, you never saw Teva's statistical

10   analysis plan prior to the submission of the manuscript for

11   publication.  Right?

12   A.    Not this revised plan, correct.

13   Q.    You never saw this until it was shown to you at your

14   deposition in this case.  Right?

15   A.    Correct.

16   Q.    And Teva never told you that approximately 80 percent

17   of the moderate and severe IRAEs in the 20 milligram arm

18   were attributable to two patients.  Correct?

19   A.    Correct.

20   Q.    You mentioned in your direct examination that you see

21   non-uniform reactions among patients.  Right?

22   A.    I see some patients with a large number and some with

23   a few.  It is not an even distribution.

24   Q.    Right.  And you identified the kinds of patients from

25   which we see those kinds of non-uniform results in your

Wynn - cross

1    direct testimony.  Right?

2    A.    Yes.

3    Q.    We don't see those sorts of anomalies in the 40

4    milligram data in the Glacier paper, do we?

5    A.    No.

6    Q.    Now, you would have wanted to know that approximately

7    80 percent of the moderate or severe IRAEs in the 20

8    milligram arm were attributable to two patients.  Right?

9    A.    If you are asking me would I have wanted to know?  It

10   would have been interesting.  I don't think it would have

11   changed my interpretation of the study.

12   Q.    You would have wanted to have known that that sort of

13   data existed.  Correct?

14   A.    It would have been nice to know.

15   Q.    You would rely on statisticians to interpret the

16   effect of outliers on the data.  Right?

17   A.    I would rely on statisticians to look at these

18   patients, some of whom have different numbers than others.

19   Q.    And, in fact, we see here Teva's statisticians

20   concluded that these outliers dramatically influenced the

21   results.  Right?

22   A.    Yes.  With permission, I would rather not use the word

23   outlier.  I think it has a connotation that I wouldn't want

24   to infer.

25   Q.    Would you rather use the term that the statistician

1    used, extreme values?

2    A.    Sure.

3    Q.    And after the Teva statisticians reached that

4    conclusion, they adopted an alternate definition of IRAE.

5    Correct?

6    A.    Yes.

7    Q.    And if we look at the second-to-the-last paragraph on

8    this page, it discusses the use of that alternative

9    definition of IRAEs.  Correct?

10   A.    Yes.

11   Q.    And in that alternative definition, instead of

12   counting all of the IRAEs that were reported, they treated

13   all of the IRAEs reported on one day as one IRAE.  Correct?

14   A.    Yes.

15   Q.    Do you understand that altering definition of IRAEs in

16   that way greatly altered the impact of these two extreme

17   value patients on the final result?

18   A.    It would simply make the distribution less skewed.  I

19   don't know that it changes the interpretation of the study.

20   Q.    But it did change -- their term was dramatically

21   influence -- it no longer dramatically influenced when they

22   redefined IRAEs in this way.  Correct?

23   A.    I am sorry.  Could you direct me to where it says

24   that?

25   Q.    I think it's in the second -- the paragraph we were

1    looking at earlier, the sentence at the end:  Therefore,

2    inclusion or exclusion of these two patients could influence

3    dramatically on overall event rate estimate?

4    A.    Right.  So if you had five injections related adverse

5    events with a time of one shot, or one day, that would be

6    counted as one.  So the total number of events would

7    obviously be reduced, assuming it occurred in one day.

8    Q.    Once they made the adjustment in the definition, it no

9    longer had the dramatic influence on the overall event rate

10   estimate?

11   A.    Yes.

12   Q.    Now, let's go back to JTX-7134, which is the Glacier

13   publication.  I would like to focus your attention on

14   Section 2.3.  Let me know when you are there.

15   A.    Yes.

16   Q.    In that paragraph, the Glacier paper states that for

17   the primary end point a rate of IRAEs, multiple IRAEs

18   starting on the same day were counted as one.

19          Do you see that?

20   A.    I do.

21   Q.    So this confirms that the recommendation of the

22   statisticians was adopted for the primary end point of this

23   paper.  Correct?

24   A.    Yes, I do.

25   Q.    Now, if you could turn to Table 2 in this paper.  Let

1    me know when you have found it?

2    A.    I have, sir.

3    Q.    You referred to this in your direct examination.

4    Right?

5    A.    Yes, I did.

6    Q.    In fact, this is what you rely on for your opinion

7    that whether a patient is switched from the 20 milligram

8    daily to the 40 milligram three times a week therapy, the

9    severity of ISRs and IPIRs is reduced.  Right?

10   A.    In part, yes, that's correct.

11   Q.    And can you take a look at the footnote at the bottom

12   of Table 2.

13   A.    Yes.

14   Q.    That says the number of IRAEs and ISRs represent the

15   individually reported events.

16             Right?

17   A.    Yes.

18   Q.    So the adjustment that was used for the primary end

19   point was not used for the severity analysis in Table 2.

20   Correct?

21   A.    That's correct.

22   Q.    Doctor, if you had known about these data when -- when

23   the manuscript for Glacier was submitted, you would have at

24   least included a footnote explaining the existence of these

25   outliers -- excuse me, of these extreme values.  Correct?

Wynn - cross

1   A.      I might have made a footnote stating that the instance

2   was not uniform, and that would be consistent with my

3   experience of patients having non-uniform rate of injection

4   related adverse events.

5           It was one way that could be handled.

6   Q.      If you could take a look, now, at Figure 3 of the

7   Glacier publication, you referred to this also during your

8   direct examination.  Right?

9   A.      I did.

10  Q.      Now, I noticed that when you put up the demonstrative

11  exhibit of Figure 3 you left off the -- I am sorry, I didn't

12  know I would make a mark on it -- you left off the figure

13  legend at the bottom.  Right?

14  A.      You mean was that projected?

15  Q.      Yes.

16  A.      I don't recall if it was projected.

17  Q.      When I was looking at it, it looked to me like you

18  presented the chart but not the explanation of the chart

19  that appears below it.

20          Let's look at that.  First of all, I think you

21  testified this figure shows that there was approximately a

22  60 percent reduction of, I have forgotten exactly how you

23  said it, 60 percent reduction of moderate and severe

24  reactions between the 20 and the 40 milligram products.

25  Right?

Wynn - cross

1    A.    Correct.

2    Q.    What this is showing a reduction of is a reduction of

3    the annualized rate of moderate or severe IRAEs.  Correct?

4    A.    Yes.

5    Q.    It's not a reduction in the severity of them.

6    Correct?

7    A.    Moderate or severe refers to severity, so I would say,

8    no, it does.  These are the moderate and severe reactions.

9    Q.    They are focusing on moderate and severe reactions in

10   this figure.  But what they are telling us is that the rate

11   at which those moderate and severe reactions occur in the 20

12   milligram group is reduced by about 60 percent in the 40

13   milligram group?

14   A.    Yes.

15   Q.    Am I correct that the rate at which the product is

16   injected with the 40 milligram product is about 57 percent

17   fewer injections than in the 20 milligram product?

18   A.    That's correct.

19   Q.    Now, you pointed out that that this data in Figure 3

20   was accompanied by a statistical analysis.  Right?

21   A.    Yes.

22   Q.    The data in Table 2 was not statistically analyzed.

23   Right?

24   A.    It's not listed there as such, correct, in Table 2.

25   In Figure 2, not Table 2.

Wynn - cross

1    Q.    I am sorry.

2    A.    In Figure 2 it was.

3    Q.    Figure 2 also refers to the rate.  Right?

4    A.    Yes.

5    Q.    Table 2 refers to severity.  Right?

6    A.    Yes.

7    Q.    Doctor, switching gears here a little bit, when a

8    clinical study is designed, it is important to have defined

9    end points to ensure that the measures used for assessing

10   the results are designed to reliably assess whether the end

11   point is achieved.  Right?

12   A.    Yes.

13   Q.    And end points are important to ensure that a study is

14   powered to give the answer that is being examined.  Correct?

15   A.    It allows you to do a power calculation to understand

16   how patients you expect to have to put in the trial to have

17   a successful experiment.

18   Q.    Okay.  Just to make sure my question is answered.  The

19   end points are important to ensure that the study is powered

20   to give the answer that is being examined.  Right?

21   A.    I am not sure I understand your question.  It sounds

22   like a simple question, but I want to give an accurate

23   answer to your question.

24             MR. FIGG:  May I approach the witness, Your

25   Honor?

Wynn - cross

```
 1                    THE COURT:  Yes, you may.

 2   BY MR. FIGG:

 3   Q.    Doctor, I have handed you a copy of the transcript of

 4   your deposition that was taken in this case.  You recall,

 5   you and I had the opportunity to chat with each other a

 6   couple months ago?

 7   A.    I do.

 8   Q.    And that was your deposition.

 9                    Would you turn to Page 151.

10                    MR. WARE:  Objection, Your Honor.

11                    THE COURT:  Yes, sir.  What is the basis of the

12   objection, Mr. Ware?

13                    MR. WARE:  The deposition is hearsay.  And I

14   don't know that this is going to be impeachment or why he is

15   being asked to look at it.

16                    THE COURT:  I am assuming -- Mr. Figg knows the

17   rules.

18                    MR. FIGG:  I am offering it for purposes of

19   impeachment, Your Honor.

20                    THE COURT:  Yes.

21   BY MR. FIGG:

22   Q.    Doctor, do you see --

23                    THE COURT:  Mr. Figg, my process, please

24   identify the page, identify the lines to the witness so the

25   witness can read them to himself.
```

Wynn - cross

1                    MR. FIGG:  Understood.

2     BY MR. FIGG:

3     Q.    Doctor, could you read to yourself the question and

4     the answer that appear at Lines 5 through 14 on that page?

5                    THE COURT:  Which page?

6                    MR. FIGG:  Page 151.

7                    (Pause.)

8                    THE WITNESS:  Yes.

9     BY MR. FIGG:

10    Q.    Do you see that I asked you the question, "And another

11    reason for defined end points is to ensure that the

12    patient -- the study is powered to actually give you the

13    answer you're looking for.  Right?"

14    A.    Yes.

15    Q.    And you responded, "One looks" --

16                   MR. WARE:  Objection, Your Honor.  This is not

17    impeachment.  He simply asked him to repeat the question.

18                   MR. FIGG:  That's not what he did, Your Honor.

19    He responded to my question.

20                   MR. WARE:  I don't believe so.  Maybe I am

21    mistaken.  I thought he asked a clarification of the

22    question.

23                   MR. FIGG:  Maybe we are looking at a different

24    question.

25                   THE COURT:  Doctor, do you have the original

Wynn - cross

1    question in mind that Mr. Figg posed to you?

2                 THE WITNESS:  I seem to recall him asking me,

3    can you put a certain number of patients --

4                 THE COURT:  Mr. Maurer --

5                 MR. FIGG:  I can re-ask it if you would like,

6    Your Honor.

7                 THE COURT:  Would you?

8                 MR. FIGG:  I would be happy to.

9    BY MR. FIGG:

10   Q.    Doctor, end points in clinical trials are important to

11   ensure that a study is powered to give the answer that is

12   being examined.  Correct?

13   A.    Yes.  You need to know the end point to do your power

14   calculation.

15   Q.    Stated differently, you want to be able to verify

16   statistically that the end point has been established.  You

17   have enough data to do that.  Right?

18   A.    Yes.

19   Q.    And referring to Section 2.2 of JTX-7134:  The primary

20   end point of the Glacier study was the rate of IRAEs in each

21   treatment arm.

22                 Correct?

23   A.    Yes.

24   Q.    So it's talking about the frequency?

25   A.    Yes.

Wynn - cross

1    Q.    The primary end point of the Glacier study does not

2    relate to severity.   Correct?

3    A.    That's correct.

4    Q.    The Glacier study was powered to address the frequency

5    of IRAEs.   Correct?

6    A.    Yes.

7    Q.    The Glacier study was not powered to address the

8    severity of IRAEs.   Correct?

9    A.    That's correct.   That was an unanticipated finding.

10   Q.    Turning to a different topic.   There are different

11   ways of measuring the severity of ISRs.   Correct?

12   A.    Yes.

13   Q.    And in your personal practice, you focus on the

14   physical attributes of the ISRs in addition to patient

15   self-reporting.   Right?

16   A.    I rely on both, yes.

17   Q.    If you still have your thumb in the JTX-7134.   I hope

18   I won't use your deposition again, Doctor.

19          Let's go back to JTX-7134, Section 2.2.   Do you

20   see that?

21   A.    I do.

22   Q.    The Glacier study defines an IRAE as mild if it was

23   easily tolerated.   Right?

24   A.    Yes.

25   Q.    It defines it as moderate if the IRAE interferes with

1    normal daily activity?

2    A.    Correct.

3    Q.    And it identifies it as severe if the IRAE prevents

4    normal daily activity.  Correct?

5    A.    Yes.

6    Q.    You have never seen those definitions of mild,

7    moderate or severe before.  Correct?

8    A.    These particular definitions were created for the

9    study.

10    Q.    So the answer to my question is, that's correct, you

11    have never seen --

12    A.    Not prior to the study.

13    Q.    Thank you.  Now, whether an ISR is characterized as

14    mild, moderate or severe is entirely dependent on the

15    patient's perception of how that reaction affected that

16    patient's daily lifestyle.  Right?

17    A.    It is a function of how well it is tolerated by the

18    patient, yes.

19    Q.    And you showed us some pictures during your direct

20    examination and indicated that some people who may want to

21    wear short pants or skirts might consider something to

22    interfere with their daily lifestyle that you or I wouldn't

23    consider to interfere with our daily lifestyles.  Right?

24    A.    That's fair enough.

25    Q.    Now, the way that adverse events are defined as mild,

Wynn - cross

1    moderate or severe in the Glacier study does not appear in

2    any of the patents in suit.  Correct?

3    A.    I think that the patent talks about tolerability, and

4    the severity of side effects clearly relates to that.  So in

5    that sense, severity, tolerability is specifically mentioned

6    but the word tolerability is -- the word tolerability is in

7    the patent but not the word severity repeatedly.

8    Q.    I don't think that was my question, Doctor.  We just

9    went through the fact that mild, moderate and severe IRAEs

10   are defined in the Glacier paper in terms of interference

11   with daily lifestyle.  Right?

12   A.    Yes, daily activities.

13   Q.    And those definitions of mild, moderate and severe do

14   not appear in the patents in suit.  Correct?

15   A.    Not written as such.

16   Q.    There is nothing in the patents in suit that describe

17   how to measure severity.  Correct?

18   A.    Correct.

19   Q.    Now, if we refer to Table 2 of the Glacier study,

20   moderate and severe ISRs were grouped together.  Right?

21   A.    Yes.

22   Q.    I am going to switch you to a different paper here.

23   If you could turn to JTX-7090, which is the GALA

24   publication, and take a look at Page 710 of that document --

25   no, that's not right.

Wynn - cross

1              It's the Exhibit No. .6 at the bottom?

2    A.     Yes, Page 7 in the manuscript.

3    Q.     In the right-hand column.  Do you see in the GALA

4    study, mild and moderate ISRs were grouped together.  Right?

5    A.     Yes.

6    Q.     And do you understand that the reason that moderate

7    and severe were grouped together in the Glacier study was

8    that there were so very few severe ISRs?

9    A.     Correct.

10   Q.     Doctor, I am going to switch gears on you a bit here

11   again.  In 2009, you would have wanted to know more about

12   the results of a clinical trial than an unproven mechanism

13   of action theory when choosing a therapy.  Correct?

14   A.     It would depend on many factors.  Sometimes I would

15   care more about one than the other.

16   Q.     You would want to know what the results of the trial

17   were in terms of tolerability, safety and acceptance versus

18   an unproven theory of how a drug works.  Right?

19              MR. WARE:  Objection, Your Honor.  Counsel

20   objected to my eliciting anything on the mechanism of action

21   from this witness in his direct testimony.  And he is now

22   cross-examining with respect to the mechanism of action.

23              MR. FIGG:  I am not asking him what the

24   mechanism of action of GA is.  I didn't refer to GA.  This

25   was a general question of whether he puts more priority on

1    actual clinical results as opposed to unproven mechanisms of

2    action.

3                    THE COURT:  Overruled.

4    BY MR. FIGG:

5    Q.    Do you understand my question, Doctor?

6    A.    I lost track.  Forgive me, sir.

7    Q.    My question is, tolerability safety and tolerability,

8    safety and acceptance -- withdrawn.

9                    You would want to know what the results of the

10   trial were in terms of tolerability, safety and acceptance

11   versus an unproven theory of how a drug works.  Right?

12   A.    I would want to know that.  Partly depends if I was

13   switching a patient from one drug to another where the

14   method of action would be key to me.  But clearly I would

15   also want to know the effectiveness, safety and

16   tolerability.

17   Q.    Doctor, you were a clinical investigator for the GALA

18   study.  Right?

19   A.    Yes.

20   Q.    As a clinical investigator, you are familiar with the

21   ICH guidelines related to the conduct of human clinical

22   trials.  Right?

23   A.    Yes.

24   Q.    And those ICH guidelines require that there be a basis

25   for believing that a therapy will benefit a patient before

Wynn - cross

1   exposing the patient to the therapy.  Right?

2   A.   In general terms, yes.

3   Q.   And you follow the ICH guidelines in your practice,

4   don't you?

5   A.   Yes.

6   Q.   You would not enroll a patient in a study where there

7   was not -- withdrawn.

8        You would not enroll a patient in a study in

9   which the patient might get a placebo and would also get a

10  drug if you felt the drug was going to be ineffective.

11  Right?

12  A.   If I thought a drug was not going to be ineffective, I

13  would not do a study of that drug.

14  Q.   And you enrolled many of your patients in the GALA

15  trial knowing that they would receive the 40 milligram three

16  times a week therapy.  Correct?

17  A.   Yes.

18  Q.   There were a lot of reasons to believe that the 40

19  milligram -- three times a week therapy would be effective

20  prior to the GALA study.  Right?

21  A.   I certainly hoped it would work.  But I certainly

22  didn't have any specific expectations.  There were concerns

23  that we had, of course.

24  Q.   I am going to have to refer you back to your

25  deposition transcript again.  Would you turn to Page 88, and

1    read to yourself your testimony at Lines 4 through 14.

2            (Pause.)

3            MR. FIGG:  Your Honor, is it your preference now

4    that I ask the question again or should read this testimony

5    into the record?

6            THE COURT:  Ask him if he has read the lines and

7    then go ahead and pose the question.

8    BY MR. FIGG:

9    Q.    Doctor, you see the testimony I referred you to?

10    A.    Yes.

11    Q.    So my question is, there were a lot of reasons to

12    believe the 40 milligram therapy might be effective.

13    Correct?

14    A.    Yes.

15            MR. WARE:  Objection to putting it on the

16    screen.

17            MR. FIGG:  You can take it off the screen.

18    BY MR. FIGG:

19    Q.    Doctor, you testified on your direct testimony that

20    there was a long-felt need for a therapy that increased the

21    tolerability of Copaxone.  Do you recall that?

22    A.    I do.

23    Q.    That long-felt need was not met when the protocol for

24    the GALA study was designed.  Correct?

25    A.    Correct.

Wynn - cross

1    Q.      And that long-felt need was not met when the results

2    of the GALA study were completed.  Correct?

3    A.      Not until the drug became available.

4    Q.      And the GALA study had not even been conducted in

5    2009, when the first of the applications for the patents in

6    suit was filed.  Right?

7    A.      Correct.

8    Q.      Can you turn to in your binder to DTX-1686.  Let me

9    know when you are there, Doctor.

10   A.      Yes.

11   Q.      This is a response that plaintiffs provided to some

12   requests for admissions by the defendants.  I am not going

13   to ask you about your knowledge of those responses or even

14   the underlying basis for them.  But I would just like to, as

15   a foundation, I would like for you to read, on Page 5, you

16   see the statement that plaintiffs admit that U.S. Patent No.

17   6,054,430, U.S. Patent No. 6,342,476, U.S. Patent No.

18   6,362,161, U.S. Patent 7,199,098, and U.S. Patent 8,367,605

19   were listed in the Orange Book in connection with the

20   Copaxone 40 milligram product.

21            I am just asking, I want to reference you to

22   that.  Do you see that?

23   A.      I do.

24            MR. WARE:  Objection, Your Honor.  This is well

25   beyond the scope of the direct.

Wynn - cross

1              MR. FIGG:  It is not, Your Honor.  I will tie it

2     into the long-felt need argument.

3              THE COURT:  Overruled.

4     BY MR. FIGG:

5     Q.    Now, if we stay with this document and turn to the

6     next page, Page 6, you see at the bottom of that page, it

7     states that plaintiffs admit that U.S. Patent No. 6,054,430,

8     U.S. Patent No. 6,342,476, U.S. Patent No. 6,362,161, U.S.

9     patent 7,199,098, and U.S. patent number 8,367,605 expired

10    on May 24, 2014.  Do you see that?

11    A.    I see that.

12    Q.    Those are the same five patents that were identified

13    in the response that I read into the record earlier.  Right?

14    A.    I will take your word for it, yes.

15    Q.    In forming your opinion that there was a long felt and

16    unmet need for a 40 milligram three times a week product,

17    you did not consider the pharmaceutical companies that were

18    in a position to meet that need were blocked by these

19    patents identified in Teva's admissions.  Right?

20    A.    I have not seen this document before.

21    Q.    My question was a little broader than that.  When you

22    testified that there was a long felt but unmet need, you

23    didn't consider the impact of Teva's patents on Copaxone in

24    forming your opinion.  Correct?

25    A.    On blocking patents, if that is the correct legal

1    term, no, I have not.

2    Q.    Now, Doctor, would you turn to DTX-1122.

3          Do you recognize this as one of your

4    publications?

5    A.    I do.

6    Q.    I would focus you on the sentence about four lines up

7    from the bottom.  Actually, why don't you read to yourself

8    the section starting with Results.  Just read that to

9    yourself and let me know when your done.

10         (Pause.)

11   A.    On Page 6, sir?

12   Q.    In the abstract, the first page, where it says

13   results?

14   A.    Yes.

15   Q.    You are referring here to a study in which 40

16   milligrams of glatiramer acetate dosage was compared to a 20

17   milligram glatiramer acetate dosage.  Right?

18   A.    Yes.  The Cohen study.

19   Q.    And this is clinical trial results?

20   A.    Yes.

21   Q.    And do you see that you stated in your publication,

22   Both GA doses were safe and similarly well tolerated.

23         That's what you told the readers of your

24   publication back in 2008.  Right?

25   A.    Yes.

Wynn - cross

1    Q.    Now, I want to go to a different topic.

2              During your direct testimony, you discussed what

3    you alleged were several failures of Teva and others.

4    Right?

5    A.    Yes.

6    Q.    And you mentioned the Copaxone oral product.  Right?

7    A.    Yes.

8    Q.    So just to be clear, Teva was not attempting to

9    develop a less frequently administered injectable product,

10   right, in that study?

11   A.    Correct.

12   Q.    And so that study was not a failure to develop a less

13   frequent injectable product?

14   A.    No, it was a study to create one that would be better

15   tolerated and be as effective.

16   Q.    It was really a study to develop a completely

17   different kind of product, right?  A product that patients

18   could take orally?

19   A.    An oral formulation.

20   Q.    You also mentioned the FORTE study as a failure.

21   Right?

22   A.    Yes.

23   Q.    And just to refresh everybody's recollection, the

24   FORTE study was a comparison of 40 milligram Copaxone

25   administered once daily to 20 milligrams of Copaxone

Wynn - cross

1   administered once daily?

2   A.    Yes.

3   Q.    And that study concluded that those two dosages were

4   equivalent in efficacy.   Right?

5   A.    There was no statistical difference between 20 daily

6   and 40 daily.

7   Q.    The only part of that that would be regarded as a

8   failure is Teva did not have data that would support a new

9   40 milligram dosage based on the results of that study?

10  A.    Right.   The purpose of the study was to see if we

11  could offset the side effects that were known with the

12  therapy daily by increasing its efficacy for patients to

13  make it a more successful therapy for patients.   But you are

14  right.

15  Q.    Okay.   My point is simply, it didn't establish

16  superiority of the 40 milligrams, but it did establish that

17  it was equivalent to the 20?

18  A.    In terms of efficacy, correct.   Or not superior.

19  Q.    You also mentioned a reduced volume product.   Right?

20  Maybe you didn't mention that.   Did you mention the Teva

21  one-half milliliter product in your direct examination?

22  A.    No, I didn't.

23  Q.    You did mention the Cohen study in your direct

24  examination.   Right?

25  A.    Yes.

Wynn - cross

1   Q.   And the Cohen study, like the FORTE study, suggested

2   that the 40-milligram dose was equally effective to the 20

3   milligram dose when administered on a daily basis.  Right?

4   A.   Correct, in the primary outcome.

5   Q.   You mentioned a number of other products, interferon

6   products, like Avonex and other products in your direct

7   testimony.  Right?

8   A.   I did.

9   Q.   And you seemed to be implying that you regarded them

10  as failures?

11  A.   They did not offer improvement in safety or

12  tolerability.  And there were simply limitations in their

13  use by patients.  There are limitations in the use of that,

14  which is why many people have switched from interferon to

15  another therapy.

16  Q.   There are limitations in the use of almost every drug.

17  Yes?

18  A.   Unfortunately, we don't have a product that is a cure,

19  yes.

20  Q.   Just to be clear, you identify Betaseron, Avonex,

21  Rebif, and Extavia.  Right?

22  A.   Yes.

23  Q.   Those are all FDA approved commercial products.

24  Right?

25  A.   Correct.

Wynn - cross

1   Q.      Physicians prescribe them to their patients every day.

2   Right?

3   A.      Yes.

4   Q.      Doctor, in your direct examination you have not

5   identified anyone who attempted to develop a 40 milligram

6   dosage who found that dosage to be ineffective, have you?

7   A.      Have I identified an individual patient, are you

8   asking me?

9   Q.      Anyone who attempted to develop such a product, or

10  tested such a product who found it to be ineffective?

11  A.      Not in the three times -- there is the one three times

12  a week dosing, which was an effective study.  The daily

13  ones, there was not one 20.

14  Q.      You have not identified anyone who tested a 40

15  milligram dosage that found that dosage to be ineffective,

16  have you?

17  A.      No.

18  Q.      And you have not identified anyone who attempted to

19  develop a less frequent dosing regimen for Copaxone or

20  glatiramer acetate who found that less frequent dosing

21  regimen to be ineffective, have you?

22  A.      No.

23          MR. FIGG:  Excuse me just one moment, Your

24  Honor.

25          I understand that Ms. Bloodworth may have a

1    couple of questions for you.  That concludes my cross

2    examination, Your Honor.

3                   THE COURT:  Thank you, Mr. Figg.

4                   MS. BLOODWORTH:  Thank you, Your Honor.

5    BY MS. BLOODWORTH:

6    Q.    Hi, Dr. Wynn.  I am Shannon Bloodworth.  I represent

7    the Mylan defendants.

8                   In your direct testimony, you mentioned that you

9    reviewed the Mylan package insert.  Correct?

10   A.    Yes.

11   Q.    If you could please turn to that in your white binder,

12   the plaintiffs' binder, I believe it was PTX-445.

13   A.    I have that.  Thank you.

14   Q.    Is this the copy of the label that you reviewed to

15   testify and craft your opinions here today of Mylan's label?

16   A.    Yes.

17   Q.    If you could turn to Page 29 of that label for me,

18   please.  As you can see on the upper right-hand quadrant the

19   label is dated January 2014.  Correct?

20   A.    Yes.

21   Q.    And the Glacier study was published in 2015.  Right?

22   A.    Yes.

23   Q.    So Mylan's labeling that was submitted to the FDA that

24   was the basis of your infringement opinions was not even --

25   was submitted to the FDA prior to the Glacier study even

Wynn - cross

1    being published.  Right?

2    A.    Yes.

3    Q.    And there is no Glacier information on Mylan's label.

4    Right?

5    A.    No.

6    Q.    And you have not testified today regarding a single

7    document suggesting that Mylan even knew about the Glacier

8    study.  Correct?

9    A.    I haven't given testimony to that.  I haven't been

10   asked.

11   Q.    So in rendering your opinions here today you have no

12   evidence that Mylan even knew of the Glacier study results

13   at the time they submitted their labeling to the FDA.

14   Right?

15   A.    I don't know how I would have that kind of insider

16   information.

17   Q.    Well, have you reviewed any documents showing that

18   Mylan prepared, Mylan is proposing to market Glacier as part

19   of its promotion materials when it gets approved for the 40

20   milligram product?

21   A.    No.

22   Q.    Have you reviewed any deposition transcripts or

23   exhibits that shows that Mylan has knowledge of the Glacier

24   study?

25   A.    No.

Wynn - cross

1   Q.    And just to clear up one point on the Glacier study

2   for me, please.  If you could turn to JTX-7134, and Page 4,

3   when you get there.

4   A.    From the front of the binder to the back of the

5   binder.

6   Q.    And yet we are in an electronic age.

7   A.    I am there, thank you.

8   Q.    And if we could turn your attention to Table 2.  This

9   was the table that you testified about in your direct

10  examination.

11  A.    Yes.

12  Q.    And I just wanted to clarify, when it lists the number

13  of moderate or severe IRAEs in the GA 20 milligram arm as

14  1083, that includes the two extremely high values of the

15  patients who reported IRAEs.  Correct?

16          MR. WARE:  Objection, Your Honor.  Mr. Figg went

17  all over this Table 2.

18          MS. BLOODWORTH:  Two questions about it, Your

19  Honor.  I wanted to make sure that I clearly understood his

20  testimony on it, as well as the Court.

21          THE COURT:  I understood it.  You want to make

22  sure that you understood it.

23          MS. BLOODWORTH:  One more question, Your Honor,

24  please.  I know it's late.

25          THE COURT:  It is.  Go ahead.

Wynn - cross

1    BY MS. BLOODWORTH:

2    Q.    So if you remove the two extremely high values that

3    1083 number will be reduced by approximately 80 percent.

4    Right?

5    A.    Yes.

6              MR. WARE:  Same objection.

7              THE COURT:  It's asked and answered, Mr. Ware.

8              MS. BLOODWORTH:  Appreciate your indulgence.

9    Thank you, Dr. Wynn.  Thank you, Your Honor.  That's it for

10   me.

11             THE COURT:  What do you want, Mr. Rakoczy?

12             MR. RAKOCZY:  May I ask just a couple very quick

13   questions, Your Honor?

14             THE COURT:  Go ahead.

15   BY MR. RAKOCZY:

16   Q.    Sir, may I have your PDX-4, Slide 59, please.  To

17   speed things up here.

18             Dr. Wynn, my name is William Rakoczy.  Hello.  I

19   am here for Sandoz and Momenta.

20   On the slide do we have your PDX-4 on Slide 59 which I

21   believe you were going through the elements of the '776

22   patent, Claims 1 and 2?  Is that right?

23   A.    Yes.

24   Q.    And for Element 7, that's the element that goes to

25   reduce severity of injection site reactions relative to 20

Wynn - cross

 1   milligram daily.  Correct?

 2   A.    Yes.

 3   Q.    And then you testified that in support of that element

 4   you cited -- and could we have the next slide please, 60 --

 5   you cited just Section 5, warnings and precautions, and

 6   Section 6, adverse reactions, from the Synthon package

 7   insert.  Correct?

 8   A.    Yes, sir.

 9   Q.    And that would be the same answer for the Sandoz

10   package insert.  Correct?

11   A.    Yes, sir.

12   Q.    Then your testimony on where you found that defendants

13   would encourage that element on reduced severity, you did

14   not cite Section 1, indications and usage, Section 2, dosage

15   and administration, and Section 3, dosage forms and

16   strengths.  Correct?

17   A.    As it pertains to Element 7, no.

18   Q.    Okay.  One last question on the package insert.

19         Could you please go to Page 18.  It could be any

20   of the package inserts.  It could be DTX -- I am sorry.

21   PTX-502, if you have it.  That is the Sandoz package insert?

22   A.    I have it, sir, thank you.

23   Q.    And Page 18, I am not sure if you mentioned it, that

24   is the patient information that the patient is supposed to

25   read before they take their GA and when they get it

1    refilled.  Correct?

2    A.    Yes.

3    Q.    And on the next page, 19, it actually gives some

4    possible side effects of their GA injections.  Correct?  Do

5    you see at the top?

6    A.    I am just trying to...

7                I see this.  I am looking at a different package

8    insert.  Forgive me.  I see this.

9    Q.    When it then lists the possible side effects, it

10   doesn't distinguish the side effects on the 20 milligram

11   versus the 40 milligram dose.  Correct?

12   A.    Not in the section we are looking at.

13   Q.    So the section that the patient goes to read when they

14   get their GA injection doesn't tell them that it's worse on

15   the 20 milligram or the 40 milligram.  Correct?

16   A.    If what you mean by that is does the section

17   specifically written for the patient says this, no.  But

18   patients I promise you look at the whole package inserts,

19   some of which they understand and some of which they don't,

20   depending patient by patient.

21   Q.    This is what they are supposed to read, my question

22   is, it doesn't tell them that the 20 milligram may be worse

23   than the 40 milligram in terms of side effects.  Correct?

24   A.    Correct.

25   Q.    And it doesn't tell them that if you are suffering

1    severe side effects on the 20 milligram that you should then

2    switch to the 40 milligram.   Correct?

3    A.    Not in this part of the slide, no.

4              MR. RAKOCZY:  Thank you, Dr. Wynn.  That's all I

5    have.

6              THE COURT:  Mr. Ware, I think it's your turn.

7              MR. WARE:  No questions, Your Honor.

8              THE COURT:  Thank you, Doctor.  You are excused.

9    Be careful getting down.

10             (Witness excused.)

11             THE COURT:  All right, Mr. Ware.  What's next?

12             MR. WARE:  Your Honor, mindful of the Court's

13   admonition at the beginning that you don't like to do

14   videos, I would like to suggest that we do a half-hour

15   video.

16             THE COURT:  Really?  How are we doing on time,

17   counsel?  You are both keeping one another's times.

18             MR. FIGG:  You are asking the wrong person if

19   you are looking at me, Your Honor.  I will find out.

20             THE COURT:  Let's see.

21             MR. FIGG:  I am getting blank stares.

22             MR. WARE:  My understanding is that jointly we

23   are not going as quickly as we sometimes anticipated here.

24             THE COURT:  I guess we need to do the half-hour.

25   That is my sense as well, that we are not going as quickly.

1              MR. FIGG:  I would concur with Mr. Ware on that,

2     jointly and collectively.

3              THE COURT:  We will do the video, with the

4     fact-finders eyes glazing over.

5              MR. WARE:  Thank you, Your Honor.  Much

6     appreciated.

7              MR. MITROKOSTAS:  Good afternoon, Your Honor.

8     Nick Mitrokostas on behalf of plaintiffs.  We are going to

9     be playing four sets of short clips from videotape

10    deposition testimony of defendant company witnesses.

11             THE COURT:  Okay.

12             MR. MITROKOSTAS:  I will introduce them one by

13    one.  They generally relate to issues of infringement,

14    including knowledge of Glacier.

15             THE COURT:  Do you have a transcript?

16             MR. MITROKOSTAS:  Yes.

17             THE COURT:  Would you like them all at once,

18    Your Honor, or separately?

19             THE COURT:  Please give us the transcripts and

20    we will follow along.

21             MR. MITROKOSTAS:  The first witness is John

22    McCracken, who at the time was vice president of business

23    alliances at Pfizer.

24             "Question:  Could you please state and spell

25    your name for the record?

1                   "Answer:  Sure.  John McCracken, M-c, capital

2       C-r-a-c-k-e-n.

3                   "Question:  I think you mentioned this earlier,

4       but did you say that you became aware of the study through

5       press release -- through a series of press releases?

6                   "Answer:  Yes.

7                   "Question:  At the time Pfizer entered into the

8       agreement with Synthon on the 20 milligram daily product,

9       did Pfizer have knowledge of Teva's work on a 40 milligram

10      daily product?

11                  "Answer:  Yes.

12                  "Question:  And does -- and that's what's being

13      referred to in this e-mail here.  Right?

14                  "Answer:  I believe so, yes.

15                  "Question:  And was it Pfizer's understanding

16      when it entered into the agreement with Synthon on the 20

17      milligram daily product that Teva's 40 milligram daily

18      product didn't work in the clinical studies that it -- that

19      it had conducted prior to that?

20                  "Answer:  Yes.

21                  "Question:  And what was that understanding

22      based on?

23                  "Answer:  My understanding is that it was based

24      on press releases from Teva.

25                  "Question:  Okay.  I'll -- I'll -- I'll just

M cCracken - depo.

1    represent to you that these were produced by Pfizer

2    sequentially and Exhibits 11 and 12 were produced as

3    attachments to the e-mail.

4              "Now, Exhibit 11 is a paper titled Phase Three

5    Dose-Comparison Study of Glatiramer Acetate for Multiple

6    Sclerosis.

7              "Do you see that?

8              "Answer:  Yes.

9              "Question:  The first author is Comi.  Right?

10             "Answer:  Yes.

11             "Question:  And this paper appears to have been

12   published in 2011?

13             "Answer:  Yes.

14             "Question:  Have you seen this paper before?

15             "Answer:  I don't recall, no.

16             "Question:  Do you understand this paper to be

17   a -- a report on Teva's study comparing its 20 milligram

18   daily dose of Copaxone to a 40 milligram daily product?

19             "Answer:  Yes.

20             "Question:  And is it Pfizer's understanding

21   that the 40 milligram daily product that Teva was comparing

22   to its 20 milligram daily product failed as a result of this

23   study?

24             "Answer:  Yes.

25             "Question:  Just so it's clear for the record,

McCracken - depo.

1    Exhibit 12 is -- -is -- I believe it's the same e-mail we

2    looked at earlier from David Engels to you and Stephen Smith

3    from December of 2014 where Mr. Engels sends a link to press

4    release reporting on the results of the same study comparing

5    Teva's 20 milligram daily product to a 40 milligram daily

6    product.  Right?

7              "Answer:  Yes.

8              "Question:  Do you -- in -- in one of your

9    previous answers, you said that based on the results of --

10   of the study that was reported in the press release in -- in

11   Exhibit 12 and the paper in Exhibit 11, it was Pfizer's

12   understanding that the 40 milligram daily product failed

13   compared to the 20 milligram product.

14             "What was that understanding based on?

15             "Answer:  What was the understanding that it

16   failed based on?

17             "Question:  Yes.

18             "Answer:  Is that the question?

19             "Question:  Yes.

20             "Answer:  We're always -- in pharmaceuticals

21   you're looking for the lowest effective dose.  So the 40

22   milligram -- according to my understanding, the 20 milligram

23   was as effective as the 40; therefore, the 20 milligram was

24   the lowest effective dose.

25             "Question:  And that understanding is based the

McCracken - depo.

1   information reported in -- in the public press release?

2            "Answer:  What -- what do you mean by that

3   information?

4            "Question:  The -- the information -- the --

5   that the 20 milligram is -- is the least effective dose.

6            "Answer:  It was my understanding from reading

7   what was said by Teva's Moshe Manor that the 20 milligram

8   trial did not demonstrate enhanced efficacy at the higher

9   dose, reaffirms the 20 milligram remains the optimal

10  treatment dose.  And since it's a lower dose, it makes sense

11  that it would be recommended or that Teva would call it the

12  optimal treatment dose.

13           "Question:  You've just been handed two

14  documents that have been marked as Exhibits JM-13 and JM-14.

15  JM-13 has Production Nos. 62486 and JM 14 has production

16  numbers 62487 through 62518.

17           "Starting with Exhibit 13, does this appear to

18  be two e-mails exchanged between some of your colleagues at

19  Pfizer which you were on from February 2015?

20           "Answer:  Yes.

21           "Question:  And in the top e-mail, Gretchen Fox

22  is -- is writing to a group of people from Pfizer,

23  including, where she notes in the second paragraph that

24  she's attaching an updated slide deck relating to the

25  Scorpion II project; right?

McCracken - depo.

1                    "Answer:  Yes.

2                    "Question:  And Exhibit 14 is a copy of the

3        slide deck that Gretchen Fox attached to the e-mail.  Right?

4                    "Answer:  It appears to be so, yes.

5                    "Question:  Now, if you turn to Page 3, staying

6        on Exhibit 14, this slide is titled Market Dynamics have

7        Shifted Opportunity.

8                    "Do you see that?

9                    "Answer:  Yes.

10                   "Question:  There's a small table in the bottom

11       right-hand corner titled Inflection Points.

12                   "Do you see that?

13                   "Answer:  Yes.  And the first row in the

14       inflection points table has a date of January 11th and next

15       to it says, Teva, quote, failed Phase III trial comparing 40

16       milligram versus 20 milligram published.

17                   "Do you see that?

18                   "Answer:  Yes.

19                   "Question:  So that's referring to the same

20       FORTE trial that we looked at a little while ago where Teva

21       tested its 20 milligram daily product versus its -- versus a

22       40 milligram daily product and determined that the 40

23       milligram product failed in comparison to the 20 milligram.

24       Right?

25                   "Answer:  Yes.

McCracken - depo.

1        "Question:  I've just handed you what's been

2   marked as Exhibit JBX-117.  This has production numbers

3   14726 through 14767.

4        "Does this appear to be another draft of the

5   March 12, 2015 project Scorpion, Scorpion II slides that

6   we've looked at in some of the previous exhibits?

7        "Answer:  Yes.

8        "Question:  I've just handed you two documents

9   marked as Exhibits JM-18 and JM-19.  JM-18 has Production

10   Nos. 3257 through 3261, and JM-19 has production numbers

11   3330 through 3333.

12        "Starting with Exhibit 18, does this appear to

13   be an e-mail from David Engels to Michael Kyle and Steven

14   Smith, copying you, from September 4th, 2014 with the

15   subject:  FYI Actrims?

16        "Answer:  Yes.

17        "Question:  And here, David Engels is forwarding

18   a press release to you and others at Pfizer, a press release

19   dated September 3rd, 2014.  Is that correct?

20        "Answer:  Yes.

21        "Question:  Now, do you see on the first page of

22   the document, about halfway down the page, there's a title,

23   Copaxone, and then there's a series of abstracts that I

24   guess were -- that were -- that were part of this meeting

25   in -- in Boston in 2014.

1            "Answer:  I -- I see it, yes.  It does appear

2    there's abstracts that are referenced there.

3            "Question:  And the first abstract that's

4    referenced under Copaxone is -- is titled Glacier.

5            "Do you see that?

6            "Answer:  Yes.

7            "Question:  Do you have an understanding of what

8    the Glacier study was?

9            "Answer:  Well, I have an understanding of what

10   is basically summarized here, yes.

11           "Question:  But I guess putting this document

12   aside for a moment, have you heard of the Glacier study?

13           "Answer:  Yes.

14           "Question:  What -- what -- and what do you

15   understand it to be?

16           "Answer:  It -- I understand it to be a clinical

17   study done by Teva related to the 40 milligram."

18           MR. MITROKOSTAS:  Your Honor, if I may, the next

19   deposition designation videotape is from Marc Scheren, head

20   of regulatory affairs at defendant Synthon at the time he

21   was deposed.

22           "Question:  Could you state and spell your name

23   for the record, please?

24           "Answer:  M-a-r-c, S-c-h-e-r-e-n.

25           "Question:  So you started working at Synthon in

Scheren - depo.

1   1999?

2               "Answer:  In 2000, February.

3               "Question:  So your current title today is head,

4   regulatory affairs, new products; is that correct?

5               "Answer:  Correct, correct.

6               "Question:  I just handed you a document that's

7   been marked as Exhibit Scheren 6, has production numbers

8   8346 through 8371.  Do you recognize this document?

9               "Answer:  Yes, I've seen this before.

10              "Question:  This document is a series of slides

11  that has the title 'GTR - US regulatory Strategy/Options',

12  right?

13              "Answer:  Um-hmm, yes.

14              "Question:  And it's dated January 2011,

15  correct?

16              "Answer:  Yes.

17              "Question:  Is this one of the documents you

18  reviewed in preparation for your deposition today?

19              "Answer:  I remember seeing it during

20  preparation.

21              "Question:  Okay.  If you could flip back in

22  Exhibit 6 to Slide 13 that has the production numbers 8358,

23  there's a slide titled 'Option 2, ANDA Route No. 2.'  Do you

24  see that?

25              "Answer:  Yes.

Scheren - depo.

1          "Question:  And the first bullet point beneath

2      that reads, 'file ANDA against Copaxone 40 milligram per

3      milliliter prefilled syringes three times weekly dosing

4      (expected launch Q1, 2014, based on estimated completion of

5      GALA study double-blind phase).'

6          "Do you see that?

7          "Answer:  Yes.

8          "Question:  So you would agree that as of

9      January 2011, Synthon was evaluating whether to file an ANDA

10     for a 40 milligram three times a weak glatiramer acetate

11     product, true?

12         "Answer:  We were considering the development of

13     that product.

14         "Question:  And if you look at the very last

15     line on the page, 'One of the risks associated with the

16     development of a 40 milligram three times a week product in

17     January 2011 was long time until product gets to market.

18     Study may fail, or another Teva product may be in

19     development,' correct?

20         "Answer:  That's what the slide states.

21         "Question:  Do you know how Synthon was aware of

22     the GALA study in January 2011?

23         "Answer:  How?

24         "Question:  Yes, how it became aware?

25         "Answer:  I believe we were informed by the

Scheren - depo.

1    clinical department.

2              "Question:  Do you know how the clinical

3    department became aware of the GALA study?

4              "Answer:  They were following, let's say,

5    publications on glatiramer.

6              "Question:  Do you know which specific

7    publications on glatiramer informed the clinical department

8    of the GALA study prior to January 2011?

9              "Answer:  I believe it was based on an entry to

10   the ClinicalTrials.gov database.

11             "Question:  I just handed you a document that's

12   been marked as Exhibit Scheren 8.  This has production

13   numbers 8499 through 8544.

14             "Is Exhibit 8 the document that you discussed

15   with Kimberly Edgerton yesterday?

16             "Answer:  Yes.

17             "Question:  So based on your discussion with

18   Kimberly Edgerton, you learned that this document was

19   prepared by Pieter de Ridder; is that right?

20             "Answer:  That's correct.

21             "Question:  This document is titled on the first

22   slide 'MS - GTR U.S. business plan,' and it's dated

23   September 15th, 2010, correct?

24             "Answer:  Yes:

25             "Question:  I just handed you two documents that

1   have been marked as Exhibits Scheren 10 and Scheren 11.

2   Exhibit 10 has production number 11922, and Exhibit 11 has

3   production numbers 11923 through 928.

4              "Starting with Exhibit 10, does this appear to

5   be an e-mail from Maurice Weijers to you and some of your

6   colleagues at Synthon dated November 21st, 2012?

7              "Answer:  That's what it appears to be, yes.

8              "Question:  Well, you would agree that the

9   second line of the e-mail identifies attendees?

10             "Answer:  I misread it.  It says 'attendees.'

11  The e-mail says 'Attendees, Jacques, Gerrit, Evelyn, Frank,

12  Marc. I suppose the next name is Genevieve.  And Maurice.

13             "Question:  And Marc is you, correct?

14             "Answer:  I think that's supposed to mean me,

15  yes.

16             "Question:  And I'll just represent to you that

17  Exhibit 11 was produced to Teva by Synthon as the attachment

18  to this e-mail.  Do you recognize Exhibit 11?

19             "Answer:  No.

20             "Question:  Mr. Scheren, I've just handed you a

21  document that's been marked as Exhibit Scheren 12.  It has

22  production numbers 70 through 100.  Have you seen this

23  document before?

24             "Answer:  Yes.

25             "Question:  Exhibit 12 is the proposed label for

Scheren - depo.

1    Synthon's 40 milligram three times a week glatiramer acetate

2    product, correct?

3                "Answer:  Appears to be.

4                "Question:  It's also the proposed label for

5    Synthon 20 milligram daily glatiramer acetate product, true?

6                "Answer:  I guess so.

7                "Question:  Exhibit 12 is also sometimes

8    referred to as the package insert; is that right?

9                "Answer:  I think so, yes.

10               "Question:  Exhibit 12 reflects the prescribing

11   information for Synthon's ANDA, correct?

12               "Answer:  Yes.

13               "Question:  Is Exhibit 12 the current version of

14   the proposed label for Synthon's 40 milligram three times a

15   week glatiramer acetate product?

16               "Answer:  I think so.

17               "Question:  One of the purposes of Exhibit 12 is

18   to describe how Synthon's ANDA product is intended to be

19   used by doctors, correct?

20               "Answer:  The prescribing information contains

21   instructions for use.

22               "Question:  So the prescribing information

23   instructs patients how to use Synthon's ANDA product,

24   correct?

25               "Answer:  It contains instructions for the

Scheren - depo.

1    reader how to use the product, correct.

2              "Question:  So Exhibit 12 instructs patients how

3    to use Synthon's product, true?

4              "Answer:  I think, yes.

5              "Question:  And Exhibit 12 also instructs

6    doctors how to prescribe Synthon's product, correct?

7              "Answer:  Yes.

8              "Question:  Let's pull back out Exhibit 11.

9    Please keep that page open.  Let's look at Slide 3 in

10   Exhibit 11.  And just for the record, Exhibit 11 contains

11   some slides that you reviewed and that you received that

12   describe results from the GALA study, right?

13             "Answer:  I assume these results to be from the

14   GALA study.

15             "One of the patents in suit is the first patent

16   that's identified on Slide 18, U.S. Patent, 8,232,250.  Is

17   that right?

18             "Answer:  Yes.

19             "Question:  When did Synthon first learn of that

20   patent?

21             "Answer:  Shortly after it was published.

22             "Question:  Shortly after the patent was

23   published or shortly after the application was published?

24             "Answer:  After the application was published.

25             "Question:  And is your answer the same for each

Scheren - depo.

1    of the four patents in suit, namely, that Synthon learned of

2    them shortly after the applications were published?

3              "Answer:  For the -- we learned about the

4    application for the three times weekly patent when the

5    application was published and the other patents shortly

6    after they were published.

7              "Question:  What about U.S. patent 8,399,413?

8              "You understand that to be one of the patents

9    that's in suit in this litigation?

10             "Answer:  I don't know.  If that's the -- this

11   is the number.

12             "Question:  When did Synthon first become aware

13   of that patent?

14             "Answer:  Are you referring to the '413 patent?

15             "Question:  Yes.

16             "Answer:  I think shortly after it was

17   published.

18             "Question:  And is your answer the same for the

19   other two patents in suit, namely, the '302 patent and the

20   '776 patent?

21             "Answer:  Yes.

22             "Question:  And for the '413, the '302, and the

23   '776 patent, when you say Synthon learned of them shortly

24   after they were published, you're referring to the date on

25   which the patent published as opposed to the date the patent

Sobecki - depo.

1    application published?  Is that correct?

2                  "Answer:  I think so.

3                  "Question:  And just so I understand, the

4    distinction you're trying to make with the '250 patent is

5    Synthon first became aware of that patent when the

6    application published.  Is that right?

7                  "Answer:  Yes."

8                  MR. MITROKOSTAS:  Your Honor, the next videotape

9    deposition is approximately seven minutes, it's from --

10                 THE COURT:  Not at the rate you are questioning

11   the witness:  Go ahead.

12                 MR. MITROKOSTAS:  It is from Joseph Sobecki, who

13   was vice president of regulatory affairs at Mylan at the

14   time he was deposed.

15                 "Question:  Please state your name for the

16   record?

17                 "Answer:  Joseph John Sobecki.

18                 "Question:  And when did you start working at

19   Mylan?

20                 "Answer:  After I took about three months off to

21   sleep in January 2012.

22                 "Question:  Where do you work for Mylan

23   physically?

24                 "Answer:  I work in Morgantown, West Virginia.

25                 "Question:  And do you know which entity of

Sobecki - depo.

1    Mylan that you technically work for?

2              "Answer:  Mylan Pharmaceuticals, Inc.

3              "Question:  And I believe you said your title --

4    if I get this wrong, I apologize -- I believe you said your

5    title was vice president of regulatory affairs?

6              "Answer:  I'm not sure you asked me that, but my

7    title is vice president of North America regulatory affairs.

8              "Question:  Has that been your title the entire

9    time you've worked at Mylan?

10             "Answer:  No.

11             "Question:  So what is your -- is vice president

12   of North America regulatory affairs your current title?

13             "Answer:  Yes.

14             "Question:  And prior to that, what was your

15   title?

16             "Answer:  Vice president of MPI regulatory

17   affairs.

18             "Question:  And did -- how did the job

19   responsibility differ between those two titles?

20             "Answer:  My current responsibility includes

21   responsibility for Canada regulatory affairs and also has

22   expanded beyond oral solid and transdermal products to

23   including responsibility for regulatory submissions

24   associated with all of Mylan's products to the FDA.

25             "Question:  When did you first become aware of

Sobecki - depo.

1   Teva's 40 milligram three times per week product?

2           "Answer:  Probably around mid-2012.

3           "Question:  And what happened in mid-2012 that

4   made you aware of Teva's 40 milligram three times per week

5   product?

6           "Answer:  I believe it was around that time that

7   Teva had updated the listing for their clinical trial on

8   clinicaltrials.gov.

9           "Question:  And was that for Teva's GALA study?

10          "Answer:  I believe that's the term Teva used in

11  association with that study.

12          "Question:  So Teva -- in mid-2012 you said you

13  became aware of Teva's GALA study.  Was Mylan following that

14  study?

15          "Answer:  Mylan was staying in tune to any

16  publicly available or released information from Teva on its

17  Copaxone products.

18          "Question:  And why was Mylan doing that?

19          "Answer:  Because Mylan was pursuing approval of

20  the 20 milligram per ml product and anticipated the

21  possibility of pursuing a 40 milligram per ml product once

22  Teva submitted and received approval for it.

23          "Question:  Have they analyzed it?"

24          MR. MITROKOSTAS:  I apologize, Your Honor.  We

25  are having a technical issue.

Sobecki - depo.

1          THE COURT:  I understand.

2          "Question:  Have they analyzed the results of

3     the GALA trial?

4          "Answer:  I'm sure people within the company

5     have reviewed the results of the trial.

6          "Question:  And do you know which people would

7     have reviewed the results of the GALA trial?

8          "Answer:  I don't know who may or may not have

9     within the company.

10          "Question:  In preparing for today's deposition

11     did you talk to anyone about Mylan's review of the GALA

12     trial?

13          "Answer:  Yes.

14          "Question:  And who did you talk to?

15          "Answer:  I talked to Pat Vallano and Dan

16     Snyder.

17          "Question:  And what did Pat Vallano say about

18     the review of the GALA study?

19          "Answer:  As I recall, he didn't really have

20     anything to tell me about that topic.

21          "Question:  Okay.  You mentioned Dan Snyder,

22     what did Dan Snyder have to tell you about the review of the

23     GALA study?

24          "Answer:  Dan told me that the R&D group had

25     reviewed the study in the context of confirming our strategy

Sobecki - depo.

1    to submit a biowaiver approach for the ANDA for the

2    glutarimer acetate injection 40 milligram per ml product.

3              "Question:  And what was Dan Snyder's title?  I

4    know you mentioned this once this morning but --

5              "Answer:  He's the head of Morgantown R&D

6    development.

7              "Question:  Besides confirming the strategy for

8    the 40 milligram bioequivalency, did Dan Snyder say anything

9    else about the review of the GALA study?

10              "Answer:  Not that I can recall.

11              "Question:  Do you know if Mylan has conducted a

12    review of any other Teva studies relating to a 40 milligram

13    glatiramer acetate product?

14              "Answer:  I'm not sure what publicly available

15    information people within the company might have reviewed.

16              "Question:  In preparation for today's

17    deposition did you talk to anyone about any other Teva

18    trials besides the GALA trial?

19              "Answer:  We didn't talk about specific trials.

20              "Question:  Did you talk generally about other

21    trials besides the GALA trial?

22              "Answer:  I spoke with individuals I had

23    mentioned earlier in general terms about evaluations we had

24    done of published information with regard to the Teva

25    Copaxone 40 milligram per milliliter product."

Sobecki - depo.

1          MR. MITROKOSTAS:  The last videotape deposition

2    transcript today, Your Honor, is from Narasimhan Mani, who

3    is vice president --

4          MS. BLOODWORTH:  Your Honor, for the record, I

5    don't think that was our complete counter.  I will work with

6    Mr. Mitrokostas to address that after court today.

7          THE COURT:  Okay.

8          MS. BLOODWORTH:  Thank you, Your Honor.

9          MR. MITROKOSTAS:  Narasimhan Mani, who was

10   Amneal's vice president of global corporate structuring.

11   This is a little under two minutes.

12          "Question:  Can you please state and spell your

13   full name for the record?

14          "Answer:  Yes.  It's Narasimhan Man.  First name

15   is N-a-r-a-s-i-m-h-a-n, and Mani, M-a-n-i.

16          "Question:  What are your current duties and

17   responsibilities at Amneal?

18          "Answer:  So I have three specific groups

19   reporting to me at Amneal; one is business development,

20   where we look at new opportunities and partnership

21   opportunities for the company.

22          "I also have portfolio management reporting in

23   to me, and portfolio management is responsible for new

24   product selection and the company's product pipeline that

25   we'd like to work on, and I also have project management

Mani - depo.

1    reporting in to me.

2              "Question:  So what's your current job title?

3              "Answer:  It's vice president of global

4    corporate strategy and business development.

5              "Mr. Sherry:  I'm going to mark as Exhibit 9 a

6    document produced as MRANM_CPX0283A5656 to 380.

7              "I'll ask you to turn to Page 4 of that exhibit

8    number.

9              "Answer:  I'm sorry, which page?

10             "Question:  Page 4.

11             "Answer:  Page 4, yes.

12             "Question:  And you see that Exhibit 9 has a

13   series of press releases and the bottom one on Page 4 says,

14   Teva announces top line results from the GALA Phase III

15   trial.

16             "Do you see that?

17             "Answer:  Yes.

18             "Question:  Are you aware that the information

19   from Table 6 comes from the GALA study references in Exhibit

20   9?

21             "Answer:  As this press release references, it

22   does, yes.

23             "Question:  But did Amneal learn the results of

24   the GALA study when Teva put out that press release in

25   Exhibit 9?

Mani - depo.

1                "Answer:  Yeah, we got to know what this press

2        release says.

3                "Question:  Is Teva's press release the first

4        time that Amneal learned about the results of the GALA test?

5                "Answer:  I assume so.

6                "Question:  Is it fair to say that Amneal did

7        not consider developing 40-milligram glatiramer acetate

8        until after Teva's press release showed that 50-milligram

9        glatiramer acetate administered three times a week is safe

10       and effective?

11               "Answer:  Yeah, the timeline suggests that."

12                COURT:  We will adjourn for the day.

13               (Court recessed at 5:02 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25