```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          -  -  -

 4   IN RE COPAXONE 40 MG           )     C.A. No. 14-1171-GMS
     CONSOLIDATED CASES            )      (CONSOLIDATED)
 5
                                -  -  -
 6
                         Wilmington, Delaware.
 7                   Wednesday, September 28, 2016
                              9:00 a.m.
 8                     Day 3 of Bench Trial

 9                          -  -  -

10   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

11   APPEARANCES:

12            JOHN W. SHAW, ESQ., and
             KAREN E. KELLER, ESQ.
13           Shaw Keller LLP
                    -and-
14           PAUL W. WARE, ESQ.,
             DARYL WIESEN, ESQ.,
15           JOHN T. BENNETT, ESQ.,
             ELIZABETH J. HOLLAND, ESQ.,
16           NICHOLAS K. MITROKOSTAS, ESQ., and
             WILLIAM JAMES, ESQ.,
17           Goodwin Procter LLP
             (Washington, D.C.)
18                  -and-
             STEPHEN B. BRAUERMAN, ESQ., and
19           SARA BRUSSIERE, ESQ.
             Bayard P.A.
20
                         Counsel for Plaintiffs
21

22

23

24

25
```

```
 1    APPEARANCES CONTINUED:

 2              FREDERICK L. COTTRELL, III, ESQ.
                Richards, Layton & Finger, P.A.
 3                      -and-
                DAVID L. ANSTAETT, ESQ.
 4              Perkins Coie LLP
                (Madison, WI)
 5                      -and-
                SHANNON M. BLOODWORTH, ESQ.,
 6              BRANDON M. WHITE, ESQ.
                EMILY J. GREB, ESQ., and
 7              ROBERT D. SWANSON, ESQ.
                Perkins Coie, LLP
 8              (Washington, D.C.)

 9                              Counsel for Defendants
                                Mylan, Inc. and
10                              Mylan Pharmaceuticals, Inc.

11              DOMINICK T. GATTUSO, ESQ.
                Procter Heyman & Enerio LLP
12                      -and-
                WILLIAM A. RAKOCZY, ESQ.,
13              DEANNE M. MAZZOCHI, ESQ.,
                RACHEL PERNIC WALDRON, ESQ.,
14              MATTHEW V. ANDERSON, ESQ.,
                THOMAS H. ERLICH, ESQ.
15              ERIN FORBES, ESQ., and
                CHRIS GALLIGAN, ESQ.
16              Rakoczy Molino Mazzochi & Siwik LLP
                (Chicago, IL)
17
                                Counsel for Defendants
18                              Sandoz Inc. and Momenta
                                Pharmaceuticals, Inc.
19
                RICHARD W. RILEY, ESQ.
20              Duane Morris LLP
                        -and-
21              CHRISTOPHER S. KROON, ESQ., and
                ANTHONY J. FITZPATRICK, ESQ.
22              Duane Morris LLP
                (Boston, MA)
23
                                Counsel for Defendants
24                              Amneal Pharmaceuticals LLC
                                and Amneal Pharmaceuticals
25                              Company GmbH
```

```
 1    APPEARANCES CONTINUED:

 2              DAVID BILSON, ESQ.
                Phillips, Goldman, McLaughlin & Hall, P.A.
 3                   -and-
                HANK HECKEL, ESQ.
 4              Budd Larner
                (Short Hills, NJ)

 5
                          Counsel for Defendant DRL
 6
                NEAL C. BELGAM, ESQ.
 7              Smith Katzenstein & Jenkins LLP
                     -and-
 8              E. ANTHONY FIGG, ESQ.,
                ELIZABETH R. BRENNER-LEIFER, ESQ., and
 9              BRETT A. POSTAL, ESQ.
                Rothwell, Figg, Ernst & Manbeck, P.C.
10              (Washington, D.C.)

11                        Counsel for Defendants
                          Synthon Pharmaceuticals, Inc.,
12                        Synthon B.V., and Synthon s.r.o.,
                          and Pfizer
13
                          -  -  -
14

15

16

17

18

19

20

21

22

23

24

25
```

1                  THE COURT:  Good morning.

2                  (Counsel respond "Good morning.")

3                  THE COURT:  Please, take your seats.

4                  I understand that we have an issue or two.  Who

5       wants to go first?

6                  MR. WARE:  Yes, Your Honor.  I would appreciate

7       if the Court would entertain us at sidebar.

8                  (The following took place at sidebar.)

9                  MR. WARE:  Your Honor, yesterday, we had some

10      colloquy about Mr. Hassler and the extent to which I would

11      be precluded from asking questions on irreparable harm.

12                 THE COURT:  Yes.

13                 MR. WARE:  I believe representations were

14      made -- I am not going to characterize those -- I asked for

15      the Bench conference in part because I don't want to

16      embarrass anybody -- but the representations were made to

17      you, including these:  that he was never identified in

18      response to discovery requests; he was never identified as

19      someone who was going to have knowledge on irreparable harm

20      issues.

21                 That is not true.  Among other things, we gave

22      in discovery his declaration filed in the U.S. Supreme

23      Court, the subject of which is irreparable harm.

24                 In fairness, it has to do more with 20 milligram

25      than 40 milligram because that was the nature of the case.

1      But the entire content is on the issue of irreparable harm.

2              Defendants have marked that as a defense exhibit

3      in this case.

4              He was deposed six months, ago and he was asked

5      time and time again about this issue in the deposition in

6      this case.

7              My feeling was that yesterday, knowing the

8      premium the Court puts on fairness, that the Court felt that

9      defendants had not been given appropriate notice or an

10     opportunity.  And that is absolutely not the case.  He was

11     deposed endlessly on this.

12             That is my issue, Your Honor.  We should be free

13     to inquire on this.  I have a suggestion if we get to it.

14             MS. BLOODWORTH:  Your Honor, if I may.

15             First of all, this is the first we are hearing

16     about this.  We met and conferred with plaintiffs many times

17     last night on a variety of issues and this was never brought

18     to our attention, that they were going to make this motion

19     this morning.  So I have no information in front of me about

20     what testimony Mr. Ware is actually referencing.

21             I can tell you that I was counsel for Mylan in

22     the 20 milligram case which went to the Supreme Court.  Mr.

23     Hassler submitted that harm declaration on whether or not

24     generic competition entry of the 20 milligram product

25     against Teva's 20 milligram product would cause irreparable

1    harm.   That injunction was denied.   The Chief Justice of the

2    Supreme Court said that that showing did not meet

3    irreparable harm.

4              Mr. Hassler's deposition, again, Your Honor, I

5    have not been able to verify this -- with accusations and

6    speaking to Your Honor, I want to be very careful and ask

7    for an additional read -- but I want to make the point that

8    I do want to say the declaration was used as background in

9    Mr. Hassler's deposition because it was all laid out very

10   nicely and clearly, his titles and his roles.   I believe it

11   came up later on.   But it was not whether or not a launch of

12   a generic product, 40 milligram product, would cause

13   plaintiffs harm.

14             It was about the market, what plaintiffs were

15   saying about the 20 milligram market vis-à-vis the 40

16   milligram market.   As you know, commercial success is a very

17   important issue in this case.

18             Again, Your Honor, I am a little sandbagged here

19   because I haven't had notice and I don't want to

20   misrepresent anything.   But I don't see where those two

21   issues are related.   A harm declaration on a different

22   product in a different case and irreparable harm about the

23   generic entry of our product vis-à-vis the 40 milligram

24   product, that is an issue that is very distinct and

25   discrete.

1              And I don't want to misrepresent Ms. Mazzochi's

2     comments.  I think that is the irreparable harm she was

3     talking about.

4              Mr. Hassler wasn't able to say, what is the harm

5     to Teva if a 40 milligram generic enters the market.

6              I do not believe that Mr. Hassler was asked

7     about that at his deposition.

8              MS. MAZZOCHI:  Your Honor, I very much object

9     that I was making a misrepresentation, because I personally

10    went through the initial disclosure, the supplemental

11    disclosures.  Mr. Hassler was not identified as having

12    knowledge on this issue.

13             If Teva is saying we put forth his declaration

14    for the on the 20 milligram product, defendants should have

15    known, they had knowledge on this issue and deposed him.

16             Second, we went through documents, they produced

17    documents related to harm.  They said they are not producing

18    them.  When they are not going to produce any documents on

19    this issue, okay, let them live with that choice.

20             Your Honor, what they are avoiding is the

21    fundamental issue, which is that they put nothing on harm in

22    the final pretrial order proposed findings of fact and

23    conclusions of law.

24             That is the universe for the operative facts we

25    are talking about here.  They didn't do anything on it,

1        despite it being their burden.

2              I think, frankly, this issue, it's on them.

3        They knew about it.  If they thought -- if they were

4        anticipating they were going to call Mr. Hassler to talk

5        about harm, they could have put that in the proposed

6        findings of fact.  And they didn't.

7              MS. BLOODWORTH:  Your Honor, we did raise the

8        waiver of the irreparable harm issue in our exchanges

9        leading up to the final, submission of the final pretrial

10       order.  It is H in the schedule.  I may have the letter

11       wrong.  They still didn't put it in any proposed findings of

12       fact and conclusions of law.

13             Our pretrial disclosures are a very condensed

14       time, it is understood.  But they had notice, even a little

15       bit, which should have been enough to put in the prima facie

16       elements.

17             MR. WIESEN:  On last point, Your Honor, we had

18       flagged that and we had objected because of the late notice

19       that it was an issue.  Right before the final pretrial

20       conference we engaged in a meet-and-confer and we thought we

21       were working towards a resolution.

22             Rather than raise it with you, we tried to

23       resolve it.  And it wasn't until basically the day before

24       trial that the discussions fell apart about whether we could

25       resolve that issue, maybe a week before.

1            MS. BLOODWORTH:  I disagree with that timeline.

2            MS. MAZZOCHI:  I disagree as well.

3            MS. MAZZOCHI:  It doesn't change the fact that

4    it was your burden to put it forward anyway.

5            THE COURT:  So let me ask a fundamental question

6    from both parties' perspectives.  The net effect of my

7    ruling as it stands today is what?

8            MR. WARE:  The net effect is that we are

9    precluded from putting in evidence regarding irreparable

10   harm.

11           THE COURT:  What is your view, Ms. Bloodworth?

12           MS. BLOODWORTH:  My view is the same.

13           THE COURT:  At the end of the day, where does

14   that leave the parties?  I don't let you put in evidence of

15   irreparable harm, you don't get an injunction.  Right?

16           MR. WARE:  Yes.

17           THE COURT:  That is what we are here about.

18   Right?

19           MR. WIESEN:  Your Honor, if I could, we may not

20   be able to get an injunction under Section 283, although

21   that is certainly an eBay balancing question.  I will

22   confess, it is a difficult question.

23           We are also entitled to an injunction under

24   271(e)(2)(4) and --

25           THE COURT:  Do you want to tell me what those

1    sections say?

2             MR. WIESEN:  When an action is brought under the

3    Hatch-Waxman Act, 271(e)(4)(1) --

4             THE COURT:  Whatever section.

5             MR. WIESEN:  The (e)(4)(A) section is that you

6    order the FDA not approve material with regard to patent

7    expiration.  The E(4)(B) order is that they not engage in

8    commercial manufacture.

9             THE COURT:  So they got a statutory injunction

10            MR. WIESEN:  Yes.  To be clear, we will talk

11   about what is only in the proposed findings and conclusions,

12   specifically they only contest the injunction, not the 271

13   injunction on the injunctive relief.  They have a standing

14   argument apparently about the 271(e) injunction.  What the

15   are trying to do is put us in a position that even if we

16   win, you would not enter an injunction.

17            THE COURT:  If what you say is true and there is

18   a statutory prescription that requires, if you are the

19   liability winner, that you get your injunction, why do you

20   care about eBay?  What does it matter?  Why do you care

21   about Mr. Hassler?  Is this much ado about nothing?  If I am

22   required to impose an injunction by statute, which I sort of

23   wonder about.  But go ahead.

24            MR. WIESEN:  We think that is the correct

25   interpretation of the law.  I am not aware of their

1            authority on that.

2                        THE COURT:  Has this issue been litigated

3            MS. BLOODWORTH:  Yes, Your Honor, in the Apotex

4            case.  271(e)(4)(B) injunctions are subject to the eBay

5            factors.

6                        THE COURT:  That is my understanding of the law.

7                        MR. WIESEN:  But the 271(e)(4)(A) objections are

8            not.

9                        MS. BLOODWORTH:  That is not an injunction.  It

10           is a prohibition against FDA approving our ANDA products

11           until the expiration of the patents.  There are no

12           restrictions on commercial manufacture, use, et cetera,

13           under the traditional statute.

14                       THE COURT:  I have not had to encounter this

15           yet.  Maybe I will.  But it gets back to the fundamental

16           issue that Mr. Ware raised earlier, my concern in any trial

17           is being fair to both sides.  It seems in this case that Mr.

18           Ware and company -- that the defendants have raised a

19           legitimate complaint that could have easily been dealt with

20           in the lead-up to where we are today.

21                       MR. WARE:  Your Honor, with all deference, I

22           think there was an effort to deal with the issue.  And

23           discussions broke apart.  It all happened at the 11th hour.

24           The problem couldn't be solved.

25                       But as important --

1               THE COURT:  Are you talking about during the

2      negotiation of the pretrial order?

3               MR. WARE:  Yes.

4               THE COURT:  Why not dial the Court up?  I am

5      available.

6               MR. WARE:  Your Honor, there is a limit to how

7      often we can dial the Court up.

8               THE COURT:  That is true.  But we were coming on

9      a trial.  All these cases are important, but obviously this

10     case is very important to the parties.  I would have made

11     myself available.

12              MR. WARE:  I think the other issue is, this

13     declaration dealing with irreparable harm was produced.  Mr.

14     Hassler was obviously identified as the person with

15     knowledge about it, because he was deposed on it.

16              Maybe it had to do with 20 milligrams for the

17     most part.  But the deposition didn't.  The deposition was

18     in this case with respect to irreparable harm in this case

19     and what would happen in the event of a generic launch.

20              THE COURT:  I was reminded by my law clerk that

21     I had said something during the discussion when we first

22     addressed this that indicated that I was willing to take

23     evidence subject to potentially further briefing.  I know I

24     ruled the following day, and Ms. Felice said, "Well,

25     Judge..."

1               And I said, you know, that's what I said.  But

2     they are advocates and they didn't remind me that I said it.

3     You, Mr. Bennett, didn't remind me.  I think you were

4     standing up for plaintiff on this issue.  Right?  And I

5     said -- you know, people have to advocate.  Judges don't

6     remember everything.  My ruling may in fact have been

7     inconsistent with what I said the day before.  So in the

8     interests of fairness -- do you recall that, Ms. Bloodworth,

9     that I said that?

10              MS. BLOODWORTH:  I don't recall that.  I thought

11    I recalled that about the testimony of Dr. Klinger on the

12    scope of her exhibits going in under Rule 26 that had not

13    been disclosed in response to the interrogatories.

14              MS. BRENNER-LEIFER:  That was the issue.

15              THE COURT:  Counsel.

16              MS. BLOOODWORTH:  I attended the deposition.

17    Mr. Swanson took the deposition.  It is my recollection that

18    that was a Mylan exhibit that he used on Mr. Hassler that

19    was not produced by plaintiffs.  And I am asking him to

20    confirm that.

21              MR. BENNETT:  I have a copy.

22              THE COURT:  Do you folks want to write something

23    on this that I and my law clerk can look at during the

24    course of the proceedings?

25              Mr. Hassler may just have to come back, Mr.

1    Ware, if I end up agreeing with you.

2              MR. WARE:  I understand, Your Honor.  I held him

3    in the area.  He lives in Kansas City.  He works in Kansas

4    City.  He is here through tomorrow.

5              MS. BLOODWORTH:  Your Honor, may I ask a couple

6    logistic questions?

7              THE COURT:  Sure.

8              MS. BLOODWORTH:  We would strongly disagree with

9    revisiting the issue.  We believe that the 20 milligram

10   questions which this is supposedly based on, all the

11   questions at his deposition dealt with the 20 milligram

12   product.

13              Probably my more pertinent point is that it

14   still doesn't change the fundamental flaw in the fact that

15   the plaintiffs still have not put in any evidence in the

16   proposed pretrial findings.  We still don't know what Mr.

17   Hassler will say.

18              Additionally, Mr. Hassler hasn't been

19   sequestered.  He has been talking to his attorneys about

20   this issue.  There are problems with calling him

21   logistically, Your Honor.

22              MR. WARE:  No, he has not had any substantive

23   conversation with us.

24              THE COURT:  Why don't you address the point

25   before that, concerning the order, the failure, just the

1   failure to put them on notice.

2            MR. WARE:  Well, I guess it is a question of

3   what is putting them on notice.  I think substantively they

4   were on notice.

5            THE COURT:  The affidavit?

6            MR. WARE:  The affidavit.  They are right, there

7   is a failure on proof with respect to the conclusions of law

8   or the findings of fact.  I can't dispute that.  I am not

9   going to make a representation to the contrary.

10           I think, ultimately, it was up to us to figure

11   that out.  We didn't do it.  But all of this information has

12   been available.  It was discovered.  They have this

13   affidavit on their exhibit list.

14           The substance of all of the irreparable harm

15   questions that were asked at the deposition are applicable

16   to the 40 milligram.  And that was the purpose of asking him

17   the questions at the deposition.

18           THE COURT:  You know I have enormous respect for

19   you, Mr. Ware.  But these lawyers disagree with you.  It's

20   clear.

21           MR. WARE:  I have it.

22           THE COURT:  I know.  I will look at it.  I will

23   at least look at it.

24           I know you object, Ms. Bloodworth.  And you have

25   a right to do so.

1          I typically, as I think most people here in this

2     conference know, I don't like to revisit rulings, and judges

3     shouldn't.  This is a never-ending polemic, if we do that,

4     it continues, because lawyers are smart, you all are clever,

5     a lot more than me and Ms. Felice.

6          At some point it just has to stop.  This is the

7     last I am going to look at this.  I will look at the

8     affidavits.  If I have some additional questions, I will ask

9     them of you in a sidebar conference or in some way to see if

10    I can resolve to my satisfaction whether Teva has been fair

11    to the various defendants in this case and whether they are

12    put to a disadvantage as a result of certain failings.  You

13    can give me whatever you want to give me.

14         MS. BLOODWORTH:  That is what I was going to

15    ask.  Should we submit the deposition transcript, the

16    relevant portions?

17         THE COURT:  Just the relevant portions.

18         MS. BLOODWORTH:  And the Supreme Court

19    affidavit?

20         THE COURT:  Yes.

21         MS. MAZZOCHI:  Your Honor, I want to have the

22    opportunity -- I think it would be easiest for me to know

23    exactly the target I am trying to respond to.  If Mr. Ware

24    could put together whatever he is going to put together, you

25    know --

```
 1                    THE COURT:  And then you respond.  That's fair.

 2      I think that's fair.  That will be the logistics.

 3                    MS. BLOODWORTH:  Should we do that in one

 4      submission, plaintiffs send it to us and we will respond?

 5                    THE COURT:  You have your teams work it out,

 6      your poor associates work it out.  Let's see where we go

 7      from here.

 8                    It may come to pass that we will have to

 9      re-convene if I agree.  I may not resolve it.  I am not

10      going to promise that I am going to resolve it.

11                    I will leave it there.  We will see where we go.

12      Okay?

13                    Please, no depositions at the end of the day,

14      Mr. Ware, today.  That was excruciating yesterday.

15                    Who was that?

16                    MR. WARE:  I don't want to identify him.

17                    THE COURT:  We will start in a few minutes.

18                    (End of sidebar conference.)

19                    (Recess taken.)

20                    MR. WARE:  Your Honor, could I ask that the

21      transcript at sidebar only be sealed?

22                    THE COURT:  Any objection?

23                    MS. BLOODWORTH:  May I ask why it's

24      confidential, Your Honor?

25                    THE COURT:  You may.  You may respond.
```

```
1              MR. WARE:  I won't ask for a sidebar.

2              THE COURT:  Do you need to go to sidebar?

3              MR. WARE:  If you don't mind.

4              THE COURT:  Just the two of you.

5              (There followed a short conference at sidebar,

6      ordered sealed by the Court.)

7              (End of sidebar conference.)

8              MR. ANSTAETT:  Your Honor, I will address this

9      issue for all the defendants.

10             Dr. Green, Dr. Ari Green is one of the experts

11     you will be hearing from in the invalidity portion of the

12     case.

13             THE COURT:  For who?

14             MR. ANSTAETT:  For the defendants.  One of the

15     defendants' witnesses on invalidity.  An issue has arisen.

16             We exchanged exhibits that parties are going use

17     with the experts.  A couple of objections have been raised

18     to exhibits we plan to use with Dr. Green.

19             Dr. Green we expect will go on tomorrow.  But we

20     wanted to raise the issue today because the parties exchange

21     slides at night and we want to know, is this in or out.  The

22     issue is with a particular prior art reference, Khan 2009.

23     I just misspoke.  It is not prior art.  It is a publication

24     that appeared three weeks after the priority date.

25             It describes a two-year study that Dr. Khan had
```

1    conducted of dosing 20 milligrams of glatiramer acetate

2    twice a week and compared that to daily dosage.  I know you

3    heard in a lot of studies every other day versus daily.

4    This was two times a week, even less frequently, versus

5    daily.

6              THE COURT:  This was 20 milligrams.

7              MR. ANSTAETT:  Exactly, yes.  The issue is that

8    the study, as I say, was begun in 2007, so well, well,

9    before the priority date.  The publication announcing the

10   results of the study came out three weeks after the priority

11   date.

12             The issue is, I think they are moving to exclude

13   it because they contend it's not prior art so it can't be

14   relevant.  There is no issue about whether Mr. Green had

15   this in his report, he did.  It is not a Rule 26 issue.  The

16   law on this is abundantly clear that -- I have some case

17   citations that may be helpful from the Federal Circuit.  But

18   the upshot is that you may use later publications as

19   evidence of the state of the art before the priority date.

20             THE COURT:  I have ruled in cases in that way.

21             MR. ANSTAETT:  Here, we have had -- this is the

22   second time we are having this argument with plaintiffs.

23             THE COURT:  I am better authority than the CAFC.

24             MR. ANSTAETT:  I absolutely believe that.  I

25   couldn't agree with you more.

1           THE COURT:  I am being facetious, colleagues.

2           MR. ANSTAETT:  You would also be, in your

3    rulings in the past, you would be on the same page with the

4    Patent Trial and Appeal Board, because Dr. Green relied on

5    this in a reference in his declarations before the Patent

6    Trial and Appeal Board on the IPRs in the first three

7    patents in this case.  They moved to exclude it before the

8    PTAB.  And the PTAB considered the issue and they said, no,

9    this is admissible evidence, it shows motivation, that there

10   was no motivation in the art before 2009, before the

11   priority date, that skilled artisans were interested in

12   dosing glatiramer acetate less frequently.

13           Yes, the publications didn't come out until a

14   few weeks after.  But the study started two years before the

15   priority date.  So we are not asserting it as an obviousness

16   combination.

17           We are not going to ask Your Honor to invalidate

18   the patents based on the disclosure in that prior art.  But

19   we are going to ask Your Honor to look at it and potentially

20   infer that, yes, skilled artisans were interested in less

21   frequent dosing because Dr. Khan had started this study two

22   years prior to the priority date.

23           Again, you are better authority than the Federal

24   Circuit, but if you do want case citations --

25           THE COURT:  Do you want to go ahead?

1              MR. ANSTAETT:  Sure.  There is the Syntex v.

2    Apotex case, 407 F.3d 1371, Federal Circuit 2005.  In that

3    case a reference was published five days after the priority

4    date.  I am reminded to be slow with the cites.

5              That is 407 F.3d 1371, Syntex v. Apotex.

6              A reference published five days after the

7    priority date established that a drug was a well-known

8    ingredient in pharmaceutical products.  And although the

9    patent owner in that case contended that because the

10   reference was published five days after the priority date,

11   it disclosed no prior uses of that --

12             THE COURT:  Just give me the cite.

13             MR. ANSTAETT:  All right.  But the upshot was

14   that the Federal Circuit said it is a little bit incredulous

15   that, you know, this motivation would have arisen in the

16   five days between the priority date and whether it was

17   published.  So they said it was relevant.

18             The other case, one that was cited by the Patent

19   Trial and Appeal Board in its decision is Plant Genetic

20   Systems v.  DeKalb Genetics Corp., that is 315 F.3d 1335.

21   And again, that was a finding -- that was a case that

22   approved the use of later publications as evidence of the

23   state of the art existing on the filing dates of a patent

24   application.

25             On that basis, the PTAB said we think this is

1      relevant and we have considered it for motivation purposes.

2                THE COURT:  Ms. Holland.

3                MS. HOLLAND:  Thank you, Your Honor.

4                First of all, I want to remind you, this is an

5      issue that came up during the cross-examination of Dr.

6      Klinger.  There was a nonpublic document that Ms. Bloodworth

7      tried to use during that cross-examination, which included a

8      citation to this post art.  And we discussed it at that

9      time.  And Ms. Bloodworth wasn't permitted to question Dr.

10     Klinger about that document, other than on issues of

11     credibility.  Your Honor may remember.

12               The issue here, Your Honor, is that when you

13     look at the pretrial order, what defendants say they are

14     using this post art publication for is evidence of prior

15     public use.  But there is very, very clear case law and the

16     showing you have to make if you want to use something as --

17               THE COURT:  Again, Ms. Holland, what do you

18     understand the purpose is?

19               MS. HOLLAND:  When you look at their pretrial

20     order, they say that they want to prove that there was a

21     prior public use, and that that is what this 2009 reference

22     established.

23               THE COURT:  That is not what counsel said.

24               MS. HOLLAND:  That is why I am confused, Your

25     Honor.

1          MR. ANSTAETT:  I can clear up any confusion,

2    Your Honor.  It is a fair point that Ms. Holland is making.

3    We put that in as an abundance of caution.  We do not intend

4    to offer it as evidence of prior public use.  We intend to

5    offer it as simply there was motivation in the art before

6    the prior art to explore these.

7          MS. HOLLAND:  I don't think that quite does it,

8    Your Honor, because if it is not prior art, and we don't

9    have any testimony from Dr. Khan or anybody else about what

10   he was thinking at the time, it can't be used as prior art

11   in this case.

12         The inquiry is what would a person of ordinary

13   skill in the art have been able to know based on prior art

14   references.

15         There is no question that Khan 2009 is not a

16   prior art reference.  There is no evidence in the record and

17   defendants are not prepared to offer that what Dr. Khan was

18   using was a public use, what he was doing was in any way

19   public.  There is no evidence of that.  So consideration of

20   this is just improper under Section 102 and Section 103,

21   which require that the expert does his analysis about the

22   state of the art as of the time.

23         If Dr. Green wants to get on the stand and say

24   that he had some knowledge what was going on at the time,

25   that's different.  But Dr. Green is not going to say he knew

1    Dr. Khan was doing this at the time.  He is using it in

2    effect as prior art to try to prove motivation of a person

3    of ordinary skill in the art before the filing date.

4                I would also add, if you look at the Syntex case

5    that was cited by Mr. Anstaett, you see that what the Court

6    there said was that there was an admission by the inventors

7    in that case that an element of the invention was in the

8    prior art.  The admission came after the filing date.  But

9    it's clear in the context of that case that the reason this

10    was let in was because the inventors themselves admitted

11    that there was something in the prior art that was relevant

12    to their invention.  We don't have anything like that here.

13                This is kind of an end run around the prior art

14    requirements.  We believe that is improper.

15                If I could bring up a related issue, Your Honor.

16    Maybe Mr. Anstaett can clear this up as well.

17                So the document that Ms. Bloodworth tried to use

18    with Dr. Klinger on cross that references this post art

19    publication, I don't know if that is something that they are

20    planning on having Dr. Green testify about as well, but if

21    so, I can address that now.

22                THE COURT:  Mr. Anstaett.

23                MR. ANSTAETT:  Yes, Your Honor.  There seems to

24    be some confusion.  We are not contending that the

25    publication itself is prior art.  What we are contending,

1       consistent with, I think, crystal-clear cases from the

2       Federal Circuit, is that you can rely on a reference after

3       the priority date as evidence of what was happening in the

4       art before the priority date.

5               Like I said, we are not asserting it as a prior

6       art combination that Dr. Green is going use.  But he is

7       going to simply make the observation, as the PTAB did,

8       saying here, at Exhibit 1154, which is the Khan 2009

9       abstract, was published three weeks after the priority date

10      of the '250 patent, the study reported therein had commenced

11      two years before.  In other words, Exhibit 1154 reflects

12      that before the '250 patent invention, those skilled in the

13      art were motivated to investigate dosing regimens with less

14      frequent than daily injections.

15              That is all we intend to use it for here.  Not

16      as a piece of invalidating prior art.

17              With respect to the second document that Ms.

18      Holland talked about, that's the GALA protocol that there

19      has been testimony on already, including with Dr. Klinger,

20      and we were allowed to use that document with Dr. Klinger

21      because it cites the Khan 2008 publication of every other

22      day dosing, and the Flechter 2002 publication of every other

23      day dosing, there is no dispute that those are prior art.

24      And Teva told the FDA the rationale for the reason we

25      selected this dosing regimen of 40 milligrams three times a

1     week was based in part on these studies.

2             So we are going to talk to Dr. Green,

3     absolutely, about that GALA trial protocol because it

4     corroborates his opinions.

5             When he came to his opinions, he didn't have the

6     benefit of that GALA trial protocol.  But he analyzed the

7     prior art and offered opinions in this case.  Then we got

8     the GALA trial protocol, and lo and behold, Teva had a quite

9     similar rationale that Dr. Green offers.

10            So we are fully intending to use that document

11     with Dr. Green, and it was in his expert report.

12            MS. HOLLAND:  It certainly was in the expert

13     report.  That doesn't mean, of course, that it is

14     admissible.

15            I will address the points Mr. Anstaett made.

16            He is correct that the Patent Trial and Appeal

17     Board did have that view of the Khan 2009 reference.  We

18     believe that that is clear legal error.  That is something

19     that we are going to be pursuing.

20            Certainly, that shouldn't be an invitation to

21     this Court to make legal error.

22            We believe that that happened at the Patent

23     Trial and Appeal Board and that is one of the reasons that

24     there is a problem with the opinion.

25            Setting that aside, it is very --

1           THE COURT:  This is how you guys talk about me

2    in the Federal Circuit?

3           (Laughter.)

4           We have broad shoulders, us trial judges.  Okay.

5           MS. HOLLAND:  It is a very different thing to

6    say that there was knowledge in the prior art of Element X

7    of an invention.  That is what Syntex says.  It is a very

8    different thing to say -- we are going to look at a

9    report -- obviously --

10          THE COURT:  Let me offer this, Ms. Holland, not

11   to cut you off, and I will let you continue if you want to,

12   in the interests of getting the testimonial day started, is

13   there anything you would like to submit?  I am not going to

14   decide this right now.  I will look at the cases that have

15   been cited.

16          I will let you know by the end of the day.  Is

17   there anything you want I and my law clerk to take a look

18   at?

19          MS. HOLLAND:  Yes.  I would say the cases of --

20   there is a Fox Spring v. Rapmaster case, 560 F.3d 1317.  SRI

21   International versus International Security, 511 F.3d 1186.

22   Day versus Sanovian, 715 F.3d 1351.

23          THE COURT:  Okay.  Those are all CAFC cases?

24          MS. HOLLAND:  They are.

25          THE COURT:  We will take a look.  Anything else?

1          MR. ANSTAETT:  The only other authority

2     actually, this is just a copy of it.  If you would like the

3     decision, I think it is an exhibit, a PTAB decision, their

4     discussion of this issue would be authority.

5          MS. HOLLAND:  Your Honor, that was about the

6     prior art reference.

7          I would just like to say one thing about the

8     internal document.  I just want to make sure it is clear --

9          THE COURT:  The second issue.

10          MS. HOLLAND:  Yes.  What we are talking about

11     here.  This is a nonpublic document.  Dr. Klinger was asked

12     about the document, and her testimony was clear.  She didn't

13     write any of the sections that had anything to do with these

14     references.

15          The expert in this case that they are offering,

16     Dr. Green, is supposed to be looking at the prior art as of

17     the priority date.

18          THE COURT:  Let me get you to dial back, because

19     you brought this issue up in the context of an entirely

20     different discussion.  So do you want to restart and tell me

21     what it is you want to complain about?  You are anticipating

22     a problem.  It's been confirmed by Mr. Anstaett that you

23     have a reason to have a complaint.

24          The second issue, I am calling it the second

25     issue, start again.

1              MS. HOLLAND:   The clinical trial protocol.   This

2       is an internal document.   This is not a public document.

3       This is a clinical trial protocol, the GALA trial protocol.

4       It was drafted -- the document they want to put into

5       evidence is dated after the priority date.

6              THE COURT:   This is going to come in with Dr.

7       Green.

8              MS. HOLLAND:   That is why I raised it now,

9       because if they are going to raise things that are coming in

10      with Dr. Green, that is one of them.

11             So this is a document that the person of

12      ordinary skill in the art would not have had access to.   And

13      I don't think that is disputed, but we can find out from Mr.

14      Anstaett.

15             So there is two issues with it.   It is a

16      document that the person of ordinary skill in the art would

17      not have had access to, and it's a document that postdates

18      the patent application in the case.

19             The third issue is that it relies on this Khan

20      reference in support of certain statements about why the

21      trial is being conducted.   For whatever -- you know, even if

22      Mr. Anstaett wants to use that Khan reference for what he

23      said was motivation, that is very different than using that

24      reference in the context of an internal document as support

25      of statements that were made after the priority date.

1           So we think there is a problem with the Khan

2    2009 reference.  We think there is a problem with the use of

3    the Khan 2009 reference imbedded within the clinical trial

4    protocol.

5           And separately, the clinical trial protocol as a

6    whole is not a prior art document.  It's not a document that

7    an expert like Dr. Green should be looking at at all with

8    respect to his opinions.

9           My understanding is what Dr. Green should be

10   doing is looking at the prior art -- and we have no

11   complaints about that.  It is just looking at internal

12   nonpublic postdated documents that are at issue.

13           THE COURT:  Okay.

14           MR. ANSTAETT:  I will just address that second

15   issue, Your Honor.  First of all, on the GALA trial protocol

16   itself, the last thing Ms. Holland was talking about, the

17   cat is out of the bag on that, Your Honor.  That came up in

18   Dr. Klinger's cross-examination.

19           You asked Ms. Bloodworth to lay a foundation for

20   its use with Dr. Klinger.  You ruled that she had laid a

21   sufficient foundation and permitted her to ask questions of

22   Dr. Klinger on the GALA trial protocol.

23           There are many things in that GALA trial

24   protocol that are indisputably prior art, references to Khan

25   2008, references to Flechter 2002, references to the Forte

1    study.  All of these things that we say provided evidence of

2    obviousness.

3             Teva told the FDA, these are the reasons we

4    think this dosing regimen is going to work, when they sought

5    permission to run the GALA trial.  It is perfectly fair to

6    Dr. Green to rely on that document, not as prior art, but to

7    say, Teva's experts came in and said, the Khan trial, nobody

8    would have paid attention to that.  The Flechter trial,

9    nobody would have paid attention to that.

10            That is flawed when, lo and behold, those are

11   the exact trials that Teva was telling the FDA justified the

12   choice of the 40 milligram three times a week dosing

13   regimen.

14            So it goes to the credibility of the defenses

15   that they have put up that corroborate Dr. Green's opinions

16   that he reached after seeing that GALA trial protocol.

17            It is a party admission, because it is from

18   Teva, the patentholder.

19            So I stress that it is already in evidence, a

20   foundation was laid for it, and a witness has been examined

21   on it.  In fact, Dr. Klinger agreed with some of the stuff

22   in it.

23            This notion of revisiting that is I think

24   completely improper.  It does also reference the Khan 2009

25   article.  If Your Honor were to say, let's not talk about

1     that, we won't talk about that part of it.  But again, we

2     think we should be able to talk about that.  But quite apart

3     from that, the protocol is in and very relevant.

4             MS. HOLLAND:  Your Honor, we don't agree the

5     protocol is in.  I took out the transcript and marked it so

6     I won't be mischaracterizing what happened.  Ms. Bloodworth

7     took out the document to use with Dr. Klinger, I asked that

8     a foundation be laid.

9             Ms. Bloodworth, I believe, asked her whether she

10    had reviewed the document.  It came out that she didn't

11    draft the sections that they are interested in, but she did

12    say she reviewed it.

13            Your Honor permitted Ms. Bloodworth to use the

14    document for credibility purposes with Dr. Klinger.

15    However, when Ms. Bloodworth asked her whether she agreed

16    with statements, the very same statements that Dr. Green

17    wants to put into evidence, I made an objection and I said,

18    this is improper because the statements that we are looking

19    at here mix pre and post art and rely on things that are not

20    in the prior art.

21            Your Honor, I am going to the transcript, you

22    said:  I am inclined to Ms. Holland's point of view, Ms.

23    Bloodworth.

24            Then I said that I didn't have a problem asking

25    outside the context of the document, do you agree that

1    Flechter would have been something that the person of

2    ordinary skill would have relied on.  And Dr. Klinger

3    answered that question.

4              But certainly, our understanding, when Your

5    Honor did not permit Ms. Bloodworth to question the witness

6    about the contents of the document, that the document was

7    not in evidence at that point.

8              MR. ANSTAETT:  Your Honor, I disagree.  I think

9    if we -- I don't have the transcript of that colloquy.  But

10   you said I believe we have laid an adequate foundation.  The

11   issue was with Khan 2009, because we haven't had this

12   discussion yet about whether it is appropriate to use, stay

13   away from that.

14             And Ms. Bloodworth, after this, with the

15   portions of the trial transcript that Ms. Holland just read,

16   went on to ask Dr. Klinger, because there is another thing

17   in there that says -- and another reason we feel comfortable

18   with this dosing regimen is because it provides essentially

19   the same total weekly dose as the prior art 20 milligram

20   seven days a week daily dosing regimen.  Seven times 20 is

21   140 milligrams, three times 40 is 120 milligrams.

22             We take comfort from the fact that those weekly

23   doses are the same.  It leads us to believe this would work.

24   Dr. Klinger said, yes, that did give me comfort.

25             So Dr. Klinger provided testimony on this

1    document.  It was clearly in.  And it was clearly asked.

2              Separate and apart from whether it can be used

3    with Dr. Klinger, Dr. Green is entitled to rely on it also

4    for credibility purposes.  Their expert said nobody would

5    pay attention to these studies.  It turns out Teva was

6    telling the FDA these studies were very informative.  And

7    Dr. Green is entitled to offer his opinions, as he did in

8    his expert report, on that.  Furthermore, we would be

9    entitled to cross-examine their experts on these very

10   admissions by Teva.

11             MS. HOLLAND:  The issue, Your Honor, is that the

12   admissions that are being talked about by Dr. Green, that

13   they would like to talk about with Dr. Green, do not refer

14   to the prior art.  And they do not refer to the time that

15   the patent application was filed.  Inherently, they do not

16   do that because there are references.  So there is a

17   statement in the rationale section that is supported by

18   three footnotes, One of which is not in the prior art.

19   There is no way to tease out of that statement what a person

20   of ordinary skill in the art would have been thinking as of

21   2009 because it's all intertwined.  There is no way in that

22   reference to tease it out.

23             Can I say one more thing?

24             Ms. Bloodworth made a specific representation on

25   the record that the reason she was asking the question to

1   Dr. Klinger was about Dr. Klinger's credibility.  And, in

2   fact, when Ms. Bloodworth tried to go further than that, you

3   asked Ms. Bloodworth whether we are still talking about

4   credibility here, before sustaining the objection to asking

5   questions about the documents.

6            MR. ANSTAETT:  Again, Your Honor, I emphasize

7   that you permitted questioning on this document.  And Dr.

8   Klinger admitted that she agreed with some of the statements

9   in the document.

10           Ms. Holland, with all due respect, said the

11  footnotes are not prior art.  They are -- two of the three

12  references are indisputably prior art.  Khan 2008, Flechter

13  2002.  There is a reference, the third footnote is to

14  Flechter 2009 which we have been discussing, the twice

15  weekly.  But the other footnotes, the studies that they

16  relied on are indisputably prior art.

17           Furthermore, there is more in this protocol.

18           THE COURT:  Ms. Bloodworth is feverishly writing

19           MS. BLOODWORTH:  It might not be a good point,

20  Your Honor.

21           MR. ANSTAETT:  I stress that, again, Your Honor,

22  I don't know, I think, how much clearer this could be.

23  There has been questioning on it.  Dr. Klinger made some

24  admissions about it.  I say quite apart from this issue of

25  the references to Flechter, Khan and Khan 2009, there is

1    other stuff in the GALA protocol that goes directly to the

2    issues of the obviousness that are implicated by any of

3    these arguments.  So we fully intend to use them for that.

4                THE COURT:  You say they are indisputably prior

5    art.

6                MR. ANSTAETT:  Absolutely.

7                MS. HOLLAND:  The document is not prior art --

8                MR. ANSTAETT:  The document is not prior art.

9                MS. HOLLAND:  May I finish my sentence?

10               MR. ANSTAETT:  I was talking.

11               THE COURT:  Go ahead.

12               MR. ANSTAETT:  I don't think Ms. Holland can

13   reasonably dispute that the citations are to Khan 2008,

14   prior art, no dispute, Flechter, 2002, prior art, no

15   dispute.  We have a dispute over Flechter 2009 that Your

16   Honor is going to consider and resolve.  But that doesn't

17   implicate whatsoever the prior art.

18               She is saying you can't read the sentence and

19   tease out whether, you know, the reference to Flechter 2009

20   was absolutely critical to the citation.  I think Your Honor

21   is capable of doing that.  I think in a Bench trial you can

22   hear this testimony and consider it for what you think it's

23   worth.  Again, I think there is a whole host of reasons why

24   these documents should come in.

25               THE COURT:  Last word.

1              MS. HOLLAND:  Fundamentally, Your Honor, this is

2      not a document that an expert in a litigation should be

3      relying on.  It is not a public document.  Experts on

4      obviousness rely on public documents so that they can know

5      what the person of ordinary skill in the art was thinking as

6      of the priority date.

7              There is an additional problem here --

8              THE COURT:  Let's just talk about that.

9              MR. ANSTAETT:  I am a little taken aback here,

10     because we listened to three or four hours of Dr. Klinger

11     testifying about nonpublic internal Teva information that

12     led her to believe that this dosing rationale would work.

13     And I guarantee you in the posttrial briefing you will hear

14     all about how this nonpublic information was critical to why

15     the patents in suit were not obvious.

16             But again, the trial protocol that Teva told the

17     FDA these are the reasons why we think this dose regimen

18     selection would work, which virtually tracked our expert's

19     analysis, those are fair game to say, yeah, and these

20     corroborate my opinions.  Yes, it's not prior art.  And it's

21     perfectly appropriate on cross-examination of their experts,

22     who have diminished these references, to say, Teva had a

23     different view, didn't they, in the trial protocol that they

24     submitted to the FDA when they said, FDA, this is why you

25     should let us run the study.

1          MS. HOLLAND:  There is a difference between a

2    fact witness who is getting on the stand to talk about what

3    her invention was and what she knew and an expert who is

4    supposed to be making a very different analysis as of the

5    priority date when a person of ordinary skill in the art --

6    it is almost the opposite analysis -- only what the person

7    of ordinary skill in the art would have known from public

8    information.

9          I understood the rationale of Your Honor's

10   decision to permit the questioning of Dr. Klinger about the

11   internal document on the issue of credibility only, because

12   that was the ruling.

13         But it's a far different thing to say that we

14   should have a medical doctor come in here and make

15   determinations about the credibility of what Teva told the

16   FDA.

17         Medical doctors should come in and say this is

18   what the person of ordinary skill --

19         THE COURT:  He doesn't get to make credibility

20   determinations.  I get to make credible determinations.

21         MS. HOLLAND:  I understand --

22         THE COURT:  We can't talk together.

23         Based upon his permitted assertions from the

24   witness stand I can make certain determinations.  What Mr.

25   Anstaett is saying is I should be able to do that based --

1    with those assertions in mind.  I will look at it.

2              I am going to take a quick stretch.  You can do

3    so if you would like.  And we will come back in about five

4    minutes.

5              (Recess taken.)

6              THE COURT:

7              THE COURT:  Please, let's get a witness on the

8    stand, if we can.

9              MR. WIESEN:  Good morning, Your Honor.

10   Plaintiffs call Dr. Laurentius Marais.

11             THE COURT:  All right.

12             ... M. LAURENTIUS MARAIS, having been duly sworn

13   as a witness, was examined and testified as follows ...

14             THE COURT:  Good morning, Doctor.

15             THE WITNESS:  Good morning, Your Honor.

16             THE COURT:  Be careful getting up and down from

17   there.  There is a ledge.  We have actually lost a witness

18   or two because of that.

19             THE WITNESS:  I see.

20             THE COURT:  Mr. Wiesen.

21                        DIRECT EXAMINATION

22   BY MR. WIESEN:

23   Q.    Good morning, Dr. Marais.

24   A.    Good morning, Mr. Wiesen.

25   Q.    Where do you work, sir?

Marias - direct

```
 1    A.      At William E. Wecker Associates, a consulting firm in

 2    Jackson Hole, Wyoming.

 3    Q.      What does William E. Wecker Associates focus on?

 4    A.      We provide consulting services in the areas of applied

 5    mathematics and applied statistical analysis.

 6    Q.      So are we going to spend some time talking about

 7    statistics this morning?

 8    A.      That is my understanding.

 9    Q.      If you could turn to PTX-14 in your binder, what is

10    this?  It should come up on the screen as well.

11    A.      This is a copy of my CV as of April of 2016.

12            MS. BLOODWORTH:  Objection to it coming into

13    evidence, Your Honor.

14            THE COURT:  Yes.

15            MR. WIESEN:  It is fine either way, Your Honor.

16    I think in this courtroom sometimes CVs have come in,

17    sometimes not.

18            THE COURT:  It doesn't need to be in evidence.

19    It is here.

20            MS. BLOODWORTH:  Thank you, Your Honor.

21    BY MR. WIESEN:

22    Q.      Does your CV accurately reflect your education and

23    experience, sir?

24    A.      It does.

25    Q.      Could you please describe your educational background
```

Marais - direct

1   for the Court?

2   A.    I obtained a Bachelor's degree from Stellenbosch

3   University in South Africa in three major fields, being

4   mathematics, applied mathematics and computer science.

5         I studied at Stanford University in California

6   as a graduate student.  From Stanford I obtained Master's

7   degrees in statistics and in mathematics, and a doctorate in

8   business administration with a minor in mathematics, and an

9   area of concentration in the application of computer

10  intensive statistical methods.

11  Q.    Please describe your professional experience?

12  A.    From Stanford I moved to the University of Chicago,

13  where I was on faculty for approximately ten years.  From

14  the University of Chicago, I moved into the private sector

15  to join the consulting firm of William E. Wecker Associates,

16  where I am still employed and have been so for a little over

17  25 years now.

18  Q.    What area of statistics do you work in?

19  A.    My consulting practice spans the area applied

20  statistics.  But the single most prominent area which

21  accounts for about half my time over the past 25 years is

22  applications in the area of biostatistics and statistical

23  epidemiology.

24  Q.    Are you active in any professional societies?

25  A.    Yes.

Marais - direct

1    Q.    Would you just name a few?

2    A.    I am a Fellow of the Royal Statistical Society, and I

3    am a member of the American Statistical Association.  Also,

4    of the Society For Industrial and Applied Mathematics.  And

5    other professional societies.

6    Q.    Have you testified before in court?

7    A.    Yes.

8    Q.    About how many times?

9    A.    Approximately 40 times.

10   Q.    And have you consulted or testified previously in

11   litigation about pharmaceuticals?

12   A.    I have.

13   Q.    Could you give us a couple examples?

14   A.    Certainly.  I have worked on a medication for obesity

15   called sibutramine or Meridia.  I have done work with

16   antipsychotics, with anti-inflammatory drugs, including Cox

17   II inhibitors and known steroidal anti-inflammatory drugs.

18             I have done work on various hormone therapies,

19   including oral contraceptives.  I have done work on medical

20   devices.

21             I have worked in a number of areas.

22   Q.    Thank you, Doctor.

23             Is there another case you worked on that we all

24   might have heard of?

25   A.    I think I know the case you mean.

1   Q.    What case am I talking about?

2   A.    I was retained to analyze rates of undervoting in the

3   so-called Hanging Chads case, and to testify in the Florida

4   trial involving the outcome of the presidential election of

5   2000.

6              MR. WIESEN:  Your Honor, with that brief

7   background, the plaintiffs would offer Dr. Marais as an

8   expert in biostatistical methods and statistical analysis of

9   large data sets.

10             MS. BLOODWORTH:  No objection.

11             THE COURT:  The Doctor is accepted as an expert

12  in those fields.

13             MR. WIESEN:  Thank you, Your Honor.

14  BY MR. WIESEN:

15  Q.    Dr. Marais, did you prepare some slides to assist us

16  in your testimony today?

17  A.    Yes.

18  Q.    We have PDX-5.2 up.  Could you just give us a brief

19  overview of what you are going to talk about right now?

20  A.    The slide on the screen right now summarizes what I

21  expect you will be asking me about, which has to do with the

22  statistical analysis from the Glacier trial, both the core

23  phase of Glacier and the so-called extension phase, with

24  respect to the frequency and severity of injection-related

25  adverse events.

Marais - direct

1    Q.      If we could have Slide PDX-5.4.

2            When you refer to the core of the Glacier study,

3    could you describe for the Court the pieces of the Glacier

4    study you are going to talk about today?

5    A.      Certainly.  Patients participating in the Glacier

6    study were randomized into one of two arms in the core

7    phase, in the first phase of, about four months of the

8    Glacier study.

9            Those two arms, in those two arms they were

10   assigned to receive, either to continue receiving GA 20

11   treatment or else to switch at the beginning of the trial to

12   GA 40 treatment.

13   Q.      You were here for Dr. Wynn's testimony yesterday?

14   A.      Yes.

15   Q.      I am going to try not to repeat the background Dr.

16   Wynn provided on the Glacier study.  But when you refer to

17   GA 20 and GA 40, could you just make clear what you are

18   referring to in terms of the dose and schedule?

19   A.      GA 20 refers to dosing of 20 milligrams daily.  GA 40

20   refers to dosing of 40 milligrams taken three times weekly.

21   Q.      Thank you, Dr. Marais.

22           So during -- what was studied then during the

23   extension of the Glacier study?

24   A.      During the extension, the participants in the core

25   phase were given the opportunity to continue in the study.

1    The GA 40 patients from the core phase continued on GA 40.

2    The GA 20 patients were switched to GA 40 in the extension

3    phase.  Those are the patients that I will refer to probably

4    as the switchers.

5    Q.    If you could turn to JTX-7134 in your binder.

6          Do you recognize this paper?

7    A.    Yes.

8    Q.    What is this paper?

9    A.    This is the article by Wolinsky and others published

10   in 2015 on the results, their results for the Glacier study

11   for their analysis of the core phase of the Glacier study.

12   Q.    And did you hear during opening defendants' argument

13   that Glacier is totally unreliable?

14   A.    I did.

15   Q.    Do you agree with that conclusion?

16   A.    No.

17   Q.    We will get into that in more detail.

18         What analysis did you do of the core phase of

19   the Glacier study?

20   A.    I replicated certain of the calculations reported in

21   the Wolinsky study.

22   Q.    Then what analysis did you do on the extension phase?

23   A.    I performed calculations concerning the frequency and

24   the severity of IRAEs, that is injection related adverse

25   events, comparing the experience of patients receiving the

1   GA 40 regimen to the experience of those same patients on

2   the GA 20 regimen in the core phase.

3   Q.    So in what we call your core extension analysis, you

4   had data on the same exact individuals taking GA 20 and then

5   taking GA 40?

6   A.    Correct.

7   Q.    Why did you analyze both IRAEs and ISRs?

8   A.    Because I understand that both are referred to in the

9   patent claim limitations at issue in this case.

10  Q.    I want to turn, then, to the claim limitations briefly

11  that you are going to address.  I want to make sure that we

12  don't overlap with the testimony from Dr. Wynn.

13          How do you understand your testimony relates to

14  what Dr. Wynn talked about yesterday?

15  A.    Dr. Wynn's testimony, as I understood it, was from the

16  perspective of a physician who treats MS patients using

17  these therapies and other therapies, and makes treatment

18  decisions about which therapy to use for a given patient.

19          My testimony is from the perspective of a

20  statistician, analyzing the data from the Glacier trial and

21  making comparisons corresponding to what I understand --

22  making statistical comparisons corresponding to what I

23  understand are the substantive questions at issue in this

24  proceeding.

25  Q.    If we look at Slide PDX-5.8, we have put up what we

Marais - direct

1   have called the severity limitations that you are analyzing

2   from Claims 1, 2, 5, 9, 12 and 16 of the '776 patent.

3           Did you look at just this limitation of these

4   particular claims for your statistical analysis?

5   A.    Yes.

6           MR. WIESEN:  Your Honor, there are two other

7   dependent claims, 6 and 17, that also through the dependency

8   include the limitation, but don't specifically call out this

9   language.

10  BY MR. WIESEN:

11  Q.    Based on all of your analysis, sir, what conclusion do

12  you reach about whether these elements are met?

13  A.    I conclude that they are met.

14  Q.    Then I think you said you also looked at some

15  frequency issues, if we can have SlidePDX-5.9.  Are these

16  the frequency limitations you looked at from Claims 14 and

17  17 of the '250 and Claim 7 of the '413?

18  A.    Yes.

19  Q.    And I think you saw, also, the claim construction

20  issues with Dr. Wynn yesterday.  Are you similarly applying

21  the Court's claim constructions in the case?

22  A.    Yes.

23  Q.    All right.  I want to turn to the Glacier study

24  itself.  Can you describe the data that you used for the

25  analysis?

1    A.    Yes.   I was provided with the electronic data

2    collected in the course of the Glacier study, the so-called

3    ECRF data, which consisted of a large electronic file

4    describing patient attributes and recording the IRAE

5    experience of the patients in the trial.

6    Q.    I want to turn to an excerpt from JTX-7029 that should

7    be in your binder.

8                MR. WIESEN:  Your Honor, for the record, we have

9    JTX-7029.3428 to .3446.

10               This comes from the middle of an approximately

11   10,000-page PDF.  We have been working with the defendants

12   so that we will not provide you with 10,000 pages of

13   electronic data, but instead we will just provide excerpts

14   with the witnesses.

15   BY MR. WIESEN:

16   Q.    Doctor, can you explain what we have here in JTX-7029?

17   A.    This is a sample page from the PDF version of the

18   electronic data file provided to me.  This page describes a

19   portion of the experience of an individual patient.  This is

20   a patient whose patient number is shown on the page, and who

21   was randomized to receive the GA 20 regimen during the core

22   phase of the study.

23   Q.    Just so that it is clear, did the authors of the

24   Wolinsky 2015 paper, JTX-7134, use the same database you

25   used?

1    A.    Yes.

2    Q.    Is it typical to rely on an electronic database for

3    statistical analysis?

4    A.    It is entirely typical of how applied statistical

5    analysis is done.

6    Q.    Now, Dr. Marais, in this analysis, you flagged that

7    the severity is entered in the database.  Who determined the

8    severity of the reactions in the Glacier study?

9              MS. BLOODWORTH:  Objection.  Foundation.

10   Hearsay.

11             MR. WIESEN:  Your Honor, we are trying to

12   provide a little bit of background.

13             MS. BLOODWORTH:  I thought he was asking for the

14   statistical perspective.  If he just means what came from

15   the diary cards, I apologize.

16             MR. WIESEN:  That is all I am trying to elicit.

17   BY MR. WIESEN:

18             THE COURT:  Go ahead.

19   BY MR. WIESEN:

20   Q.    In the Glacier study, Dr. Marais, who was it that

21   determined the severity of the injection site reactions?

22   A.    It was the patients themselves, the patients who

23   experienced the reactions were asked to come up with the

24   severity.

25   Q.    Why don't we turn then to PTX-109 in your binder.  We

Marais - direct

1   can look at that as well.

2           This is again an excerpt from a large collection

3   of documents.

4           Could you explain to the Court what PTX-109 is

5   an example of?

6   A.    This is an example of the patient diary cards on which

7   patients were instructed to fill out a record of their IRAE

8   experience.

9   Q.    Does this card contain the same information as the

10  electronic database entry we saw previously?

11  A.    Yes, indeed.  This card does correspond -- it shows

12  the same August 1st, 2013 record of burning at the injection

13  site that was shown in the electronic record that was on the

14  screen.

15  Q.    Just for the record, we have culled out the second

16  line of PTX-109.330, which matches up with the electronic

17  record we looked at earlier.

18          Now, does the diary card contain information

19  about how it asked the patient to record the severity of the

20  reaction?

21  A.    It does.  At the top of the card.

22  Q.    What does the diary card say about how to record the

23  severity of the reaction?

24  A.    The diary cards, each diary card like this provides a

25  three-point scale with descriptions of the levels of the

1    three points on the scale.  The three points are mild,

2    moderate, and severe.  And next to each appears a

3    description of how to decide whether that is the right level

4    to code.

5              For example, severe means symptoms that prevent

6    normal daily activities.

7    Q.    How was the information on these diary cards

8    physically collected?

9    A.    The patients were asked to bring cards to their visits

10   to the study centers.  That instruction appears on each

11   card.

12   Q.    And then how was the information on the diary cards

13   collected to make the electronic database?

14   A.    My understanding is that staff at each treatment

15   center entered the information from the diary cards into an

16   electronic form, and those separate electronic documents

17   were consolidated ultimately into the ECFR electronic data

18   provided to me and used by the Wolinsky 2015 authors.

19   Q.    Dr. Marais, is the data entry for electronic databases

20   such as this one typically error-free?

21   A.    One would wish that it were.  But it very rarely is.

22   Q.    Do statisticians rely nevertheless on electronic

23   databases for their analyses?

24   A.    Statisticians do routinely rely on electronic

25   databases for their analyses, indeed, they do.

Marais - direct

1    Q.    We are going to come back to this in more detail in a

2    little while.  Have the defendants criticized, that you are

3    aware of, the Glacier database data entry?

4    A.    Yes.

5    Q.    What analysis did you perform to account for that

6    criticism?

7    A.    I performed a sensitivity analysis of the effect of

8    the issues pointed out by the plaintiffs concerning the data

9    entry of the Glacier diary cards.

10             THE COURT:  You mean by the defendants.

11             THE WITNESS:  I am so sorry, Your Honor.  Thank

12   you.

13   BY MR. WIESEN:

14   Q.    What do you mean by a sensitivity analysis?

15   A.    Sensitivity analysis is the term for the procedure of

16   changing an assumption or an input to a calculation about

17   which there is some question or about which some issue has

18   been raised, then carrying through the calculations, all the

19   way to the bottom line of the calculation, in order to see

20   how much of a difference in the bottom line results from the

21   change at the top.  That's sensitivity analysis.

22   Q.    What sensitivity analysis did you perform for

23   defendants' criticism about the data entry?

24   A.    I adopted, without question, all of the comments and

25   criticisms made by the defendants.  I did not investigate

Marais - direct

1    each individually.  I simply adopted them all wholesale,

2    changed the ECRF data to conform in the manner suggested by

3    those criticisms and comments, and then repeated all of the

4    calculations that I had performed in this case on the

5    modified data to see what was the difference at the end.

6    Q.    When you refer to the relative data, that is the big

7    electronic database you analyzed?

8    A.    Yes.

9    Q.    What did you find when you changed the data to reflect

10   the data entry errors identified by the defendants?

11   A.    I found that there were differences in the precise

12   numbers.  The numbers didn't change, but I found no change

13   in my overall qualitative conclusions, conclusions that I

14   anticipate you may be asking me about.

15   Q.    We will get to those conclusions in a little while.

16             There are also some individuals, you are aware,

17   for whom we did not find or don't have the diary cards in

18   this case.  Correct?

19   A.    I am aware of those.

20   Q.    For those people that we don't have the paper diary

21   card for, are we missing their data entirely?

22   A.    No, not at all.

23   Q.    What data do we have for those people?

24   A.    Well, we have the ECRF data, the electronic data set

25   for those patients, those roughly ten percent of the patient

1    population in the Glacier trial.

2    Q.    Thank you, Dr. Marais.

3         Now that we understand at least a little about

4    how the database was built in the Glacier study and how the

5    study was run, I want to look at the analyses that you did.

6    And I want to start with the analysis of the core, the GA 20

7    arm versus the GA 40 arm in the core analysis.  Can you

8    describe for the Court generally what you did?

9    A.    I consulted the Wolinsky 2015 article, the Methods

10   section in particular, to review the author's description of

11   the calculations that they had performed.

12        I then repeated those calculations using the

13   electronic data provided to me for the core phase of the

14   Glacier study alone, and compared the results that I

15   obtained from those calculations to the results reported by

16   the Wolinsky authors in the original publication.

17   Q.    Why did you repeat or replicate the analysis that was

18   already in the paper?

19   A.    Partly to confirm that I had properly read and

20   understood the calculations that they had performed and that

21   I was implementing the same methods that they were

22   describing, even though I was using different computer

23   software and a different computer, since I had none of the

24   computer code or programs used by the original authors.

25        Partly, therefore, also, to confirm through

Marais - direct

1    replicating the bottom-line numbers that the Wolinsky

2    authors themselves had implemented those calculations

3    correctly as they have described them in the article.

4    Q.    If you could turn in your binder to PTX-35.  We are

5    going to pull up a slide, PDX-5.18, which is an excerpt from

6    that.

7              MR. WIESEN:  Your Honor, because we have a

8    statistician and they are going to have a statistician

9    testify later in the case, we would suggest jointly, and we

10   can identify which ones, that some of these come into

11   evidence under Rule 1006 as summaries of the data.  Maybe it

12   would be helpful to you.  Maybe not.  We will identify later

13   for the record, if that is okay with you, the universe of

14   these figures.

15             THE COURT:  That's fine.

16             MR. WIESEN:  Thank you, Your Honor.

17   BY MR. WIESEN:

18   Q.    Can you tell us what the results were when you

19   replicated the Wolinsky core phase frequency analysis?

20   A.    Certainly.  The slide on the screen right now shows

21   two panels side by side.  The left-hand panel on this slide

22   is an excerpt from the Wolinsky article.

23             It is, in fact, it corresponds to Figure 2 of

24   the Wolinsky article.  And that figure has to do with the

25   annualized rate of IRAEs.  On the left-hand side of that

1    panel, for the GA 20 therapy, and right next to it for the

2    GA 40 therapy, both of those bars being the bars on the

3    left-hand side, in the slide or the panel on the left-hand

4    side of the slide.

5           So what those two bars show is annualized rates

6    of IRAEs.  Of 70.4 IRAEs per year of treatment on GA 20 and

7    approximately 35.3 IRAE days, in fact, per year of treatment

8    on the GA 40 therapy.

9    Q.    A couple of followup questions on that, Dr. Marais.

10          First, you referenced IRAE days.  What is that

11   and why does it matter?

12   A.    That is a way of counting the occurrence of IRAEs, the

13   frequency of IRAEs, in which one looks at the record of the

14   experience of a patient, looks at each treatment day, and

15   asks -- or each day during the period of treatment, that is,

16   and asks about that day, did an IRAE occur on this day or

17   not.  And it could be more than one IRAE or it could be one

18   or it could be zero.

19          If an IRAE occurred, one or more, that counts as

20   one IRAE day.  And the rate of days with IRAEs is a way of

21   measuring the frequency of IRAEs.  That is the frequency

22   metric that was adopted for the Glacier study by the

23   administrators of that study.  And it is the frequency

24   metric used and published in the Wolinsky article.  And it's

25   the frequency metric that is displayed on this slide.

1    Q.    Now, I also notice, Dr. Marais, that in PDX-5.18 your

2    replication has slightly different numbers over the bars

3    than the Wolinsky analysis.  Does that matter?

4    A.    No.  That is not unexpected in a replication from a

5    complex database.  Importantly, the summary statistics,

6    including the p value for statistical significance shown at

7    the top of the panels are identical up to the number of

8    decimal places reported in the slide, in the exhibits that

9    we are looking at.

10   Q.    So what conclusion did you reach from your frequency

11   replication of the Wolinsky core analysis?

12   A.    I concluded that my analysis and the Wolinsky analysis

13   were essentially identical, and supported, both supported

14   the conclusion of a substantial and highly statistically

15   significant reduction in the rate of IRAEs, the annualized

16   rate, under GA 40 compared to GA 20.

17   Q.    Now, I think we also heard from Dr. Wynn about some

18   analysis of the moderate and severe reactions, the severity

19   analysis in the Wolinsky paper.  Did you replicate that as

20   well?

21   A.    I did.  That is shown on the slide that is now up on

22   the screen.

23   Q.    That is PDX-5.19.

24         What did you find in your replication of the

25   Glacier paper, JTX-7134, as Figure 3's severity analysis?

Marais - direct

1   A.      Again, I was able to replicate the results from the

2   Wolinsky paper.  In this case the bar heights are identical,

3   reported to the one decimal place reported in the original

4   article.  The summary statistics at the top of the page are

5   identical with respect to the risk ratio and the confidence

6   interval around, or essentially identical with respect to

7   the, the confidential interval around that risk ratio.  The

8   p values on their face look a little different, .0021,

9   .0014.  That is a difference of no material consequence from

10  the perspective of a statistician, which I would be happy to

11  explain, of course.

12  Q.      On this one I think I am not going to ask you, if

13  that's okay.

14          The severity analysis that we are looking at

15  from the Wolinsky Figure 3, was this part of the original

16  design of the Glacier trial?

17  A.      I understand that it was not, although that question

18  is a little complicated.  The particular form of this

19  calculation was not specified in the statistical analysis

20  plan.  But the data reflected in this calculation were

21  collected as part of the original design.  There was no

22  after-the-fact creation or decision about how to classify

23  IRAEs.

24  Q.      Was that original collection of data what we saw on

25  the cards originally, with the mild, moderate and severe

Marais - direct

1    categories?

2    A.    Exactly right.

3    Q.    Do you think it matters that the specific statistical

4    analysis was not identified ahead of time before the Glacier

5    study was done in this particular case?

6    A.    Your question raises the issue of so-called post hoc

7    analysis.  It is my opinion that in these circumstances in

8    this case, post hoc, the post hoc nature of this analysis

9    does not raise any material issue of the kind sometimes

10   associated with post hoc analysis.

11   Q.    Why does the issue in this case with the severity

12   analysis not raise the post hoc concerns that sometimes

13   arise?

14   A.    The critical concern that sometimes arises in

15   connection with post hoc analysis, that is, analyses that

16   were not pre-specified, is that it allows researchers the

17   opportunity to data-mine, in other words, to rummage around

18   in the data and find a question to which they like the

19   answer, and then to state that question as if it were an a

20   priori question, and to report the answer that they like.

21        That typically involves identifying some

22   agreeable subset of the data, such as the 43- to 57-year-old

23   women in the data set, or some subset for whom there is an

24   agreeable answer .

25        In this case, there is no subsetting of the

Marais - direct

1    data.  There is no after-the-fact classification of IRAEs

2    among categories of severity.  The severity categories were

3    predefined, pre-described, and collected as part of the

4    original collection of the primary end point data of this

5    study.  That is the occurrence of IRAEs.

6    Q.    We also talked a little bit about the fact that you

7    are applying the Court's claim construction.  You will

8    remember that the Court construed the claims to apply to a

9    patient.  Do you recall?

10   A.    I do.

11   Q.    We are looking here at a population study.  Would a

12   person of -- would you consider a population study useful to

13   understand what would happen for a patient?

14   A.    As a general matter, certainly with respect to

15   clinical trials, that is exactly why clinical trials are

16   conducted.  It is my understanding, in all of the years I

17   have dealt with clinicals trials data, that they are

18   designed to inform doctors about treatment choices for

19   individual patients coming to them for treatment.

20   Q.    Dr. Marais, based on the results of the Wolinsky

21   paper, JTX-7134, and your replication of the severity

22   analysis, did you reach any conclusions about whether the

23   improved severity limitations we saw before would be met by

24   defendants' GA 40 products?

25   A.    I did.

1    Q.    What was that conclusion, sir?

2    A.    That those limitations are indeed met.

3    Q.    I want to talk about one other thing that has come up

4    a little bit in the trial so far.  Did you hear Dr. Wynn

5    describe Glacier as an open label unblinded study?

6    A.    Yes.

7    Q.    Could you explain what that means in a clinical trial

8    setting?

9    A.    It means that key participants in the study actually

10   knew what the form of treatment was assigned to a given

11   patient.  That's the open label part.  The question there is

12   to whom is the label open.  Who is blinded to the treatment?

13           Unblinded in this case means, importantly, that

14   the patients receiving the treatment knew what treatment of

15   the two treatments they were receiving, GA 20 or GA 40,

16   because they knew how many injections they were giving

17   themselves.

18   Q.    Did we ask you to investigate how common this is as a

19   study design?

20   A.    Yes.

21   Q.    What did you do to look into that question?

22   A.    I did what statisticians do.  I looked for data on

23   that question, and I found that someone had done some of

24   that work, for instance.

25           Among other things, I found an article that

1   performed a systematic study of a portion of the medical

2   literature in order to find the answer to questions like

3   that.

4   Q.    Not surprisingly, that paper is in your binder.  If

5   you would turn to JTX-7088.

6   A.    I have got it.  I am there.

7   Q.    Could you describe for the Court what JTX-7088, the

8   Kahan paper, is?

9   A.    It is a research article in PLOS 1, the Public Library

10  of Science, published, I believe -- yes, June of 2015 with

11  the title Blinded Outcome Assessment Was Infrequently Used

12  and Poorly Reported in Open Trials.

13         It is a study of open label trials and their

14  attributes and how various characteristics of the trials

15  were reported.

16  Q.    And what journals were studied for this paper?

17  A.    These authors chose to search the four -- I think

18  these can reasonably be called the four preeminent medical

19  journals in the world.  That would include JAMA, the Journal

20  of the American Medical Association, The Lancet, and the New

21  England Journal would be three of those four.

22         Rather than look at the entire recorded history

23  of those journals, they chose one year and searched for all

24  articles, all articles describing clinical trials, Phase III

25  clinical trials in those four preeminent medical journals in

1    2010, and they then studied those articles and reported on

2    what they found.

3    Q.    What did they find, just generally, what was their

4    conclusion?

5    A.    They found that between two and three hundred articles

6    on Phase III trials had been published in that one year in

7    those four preeminent journals, that a substantial majority

8    of those Phase III clinical trial reports were of open label

9    clinical trials, that when ratings, like pain rating or the

10   rating of severity in this case, when ratings were required

11   to be for the end point of those articles, in a substantial

12   majority of cases the raters were the patients themselves.

13   And in those cases where ratings were required and the

14   patients were the raters, in a substantial majority of cases

15   the patients were unblinded, in other words, knew which

16   treatment that they were receiving.

17   Q.    If we go to the next slide, PDX-5.21, I realize there

18   were a lot of subsets of subsets of subset papers that you

19   described here, but in this study, in Kahan, did they find

20   in these four preeminent journals a number of papers that

21   had the same attributes as Glacier?

22   A.    They did.

23   Q.    Thank you, Dr. Marais.

24         I want to turn then from the specific discussion

25   of the Glacier paper we have been having to the additional

1    analysis you did of the Glacier database.

2              I think this analysis, I think, has not really

3    come up yet in the case, I don't think this was discussed in

4    the openings.

5              So I want to slow down and explain a little bit

6    what you did.

7              Other than this replication of the Wolinsky

8    data, what analysis did you conduct in this case of the

9    database from Glacier?

10   A.    I compared the experience of Glacier patients on GA 40

11   therapy in the extension phase of the Glacier study with

12   respect to IRAEs to the experience of those same individual

13   patients while they were in the core phase of the study and

14   receiving GA 20 therapy.  In other words, I looked at the

15   switchers who started out on GA 20 and then were switched to

16   GA 40 during the conducting of the Glacier trial.

17   Q.    I think we put up on Slide PDX-5.23 that core versus

18   extension analysis you did.

19             So let's start then with the frequency analysis

20   you did of the core versus extension data, and it's in, the

21   charts are in PTX-39 of your binder.

22             But we can actually -- well, we can look at the

23   charts if we want, we will get to them in a little more

24   detail later.

25             Generally, what results did you find from your

1    analysis of the frequency of IRAEs and ISRs in the core

2    versus extension data?

3    A.    That there was a substantial and a highly

4    statistically significant reduction in the frequency of

5    IRAEs on GA 40 compared to GA 20 for both -- and that holds

6    not only for IRAEs but also for ISRs.

7    Q.    I want to take a couple of minutes to explain in a

8    little bit of detail how you did your analysis.  So let's

9    put up the next slide, PDX-5.24.  Can you explain what we

10   see in this graph?

11   A.    Right.  So far, this is an essentially blank piece of

12   graph paper with a 45-degree reference line drawn into the

13   chart.

14         It has two axes, the horizontal, the x axis, is

15   labeled GA 20 and the vertical or y axis is labeled GA 40.

16   And the heading of the chart tells us IRAE days, annualized,

17   indicating that eventually some IRAE days, annualized rates

18   were going to show up in this chart.

19   Q.    How did you -- I think we talked about IRAE days

20   before.  Why did you use IRAE days in this analysis?

21   A.    Because it is a meaningful measure of frequency, and

22   it is the measure of frequency adopted both by the Wolinsky

23   authors and by the administrators and analyzers of the

24   Glacier trial.

25   Q.    Can you explain how you used the data from the Glacier

Marais - direct

1    database to annualize the frequency?

2    A.    Yes.   There are -- I have prepared some slides that

3    would help to explain that, if we could go to the next

4    slide.

5              This slide shows a sample data-like element for

6    a single patient.  This is not hypothetical.  This is an

7    actual data element.

8              The patient is identified on the right-hand side

9    of the slide.  And that same panel on the right-hand side

10   reports that on an annualized basis, this patient

11   experienced IRAEs at the rate of 101.9 IRAE days per full

12   year of treatment.  And that value is plotted on the

13   horizontal access of the chart, because this was treatment

14   on GA 20.

15             So that value of 101.9 is shown as the large red

16   dot at the bottom of the chart.

17   Q.    Then did you also have data for this same person on GA

18   40 in the extension?

19   A.    Yes.  Because this was a switcher patient who

20   continued into the extension on GA 40, and there is a

21   parallel calculation, on GA 40.  The details are shown on

22   the left-hand right-hand side of this slide.  And the data

23   point is shown as the large green dot on the vertical or y

24   axis on the chart.

25   Q.    Using the x and y information on the chart, did you

Marais - direct

1    plot that individual?

2    A.    In the usual way, those two individuals values lead to

3    a point in the chart which is now shown as the blue dot,

4    actually plotted in the body of the graph.

5    Q.    You referenced before that 45 degree line that cuts

6    across the middle.

7              What does that indicate?

8    A.    It is intended to be a helpful reference line for the

9    following purpose.

10             If a data point in this plot falls below that

11   45-degree line, it means that for that patient, their IRAE

12   day rate on GA 40 was lower than their IRAE day rate on GA

13   20.   In other words, that that patient experienced a

14   reduction.

15             Contrary-wise, if a data point falls above the

16   45-degree line, then that patient had a lower rate on GA 20

17   than on GA 40.

18   Q.    Did you plot all of the 97 patients for whom we had

19   data in the core versus extension?

20   A.    Yes.

21   Q.    I don't want to go through the process one by one of

22   doing them.  But did you then create a graph with all of

23   them?

24   A.    I did.  And I created a slide which shows that.

25   Q.    Is that what we are looking at in Slide PDX-5.26?

1    A.    Yes.

2    Q.    If we were to count them up, do we see 97 dots here

3    for the 97 Different people?

4    A.    We could not see 97 distinct dots in this chart

5    because there are some patients who have identical values of

6    the coordinates, so their dots coincide.  Specifically,

7    there are 40 patients who had zero IRAEs recorded on GA 20

8    and zero IRAEs also report on GA 40.  So each of those

9    patients cross at the zero-zero point, so they are in effect

10   40 dots plotted right on top of each other looking like a

11   single dot.

12   Q.    And you have indicated that on PDX-5.26?

13   A.    Yes.

14   Q.    Can you summarize for us how many patients experienced

15   a decrease in frequency of IRAEs when switching from GA 20

16   to GA 40?

17   A.    Yes.  I actually prepared a slide that reports that

18   summary.

19   Q.    If we can have the next slide, PDX-5.27.  What did you

20   find?

21   A.    There were 56 of the 97 patients total who experienced

22   a lower annualized rate as reported on GA 40 than on GA 20.

23   There was actually one patient who reported a lower

24   annualized rate on GA 20 than on GA 40.  That was the

25   isolated single point on the previous slide above the

Marais - direct

```
 1    45-degree line.  And of course there were the 40 patients

 2    who experienced no recorded adverse event of the IRAE type

 3    on either treatment regimen, for a total of 97 patients.

 4    Q.    I think we were talking and graphing the IRAE data.

 5    Did you do all of the same analysis for ISRs?

 6    A.    I did.

 7    Q.    What did you find?

 8    A.    Those numbers are shown on the right-hand side of the

 9    same table that is up on the slide now.  And those counts

10    are, in fact, identical.

11    Q.    That's also on Slide PDX-5.27.  How did you determine

12    whether this reduction in IRAEs and ISRs satisfies the

13    frequency claim limitations that we looked at earlier?

14    A.    I interpreted this table from what I understand is the

15    perspective of a physician, interpreting the frequency

16    claims at issue here.

17            MS. BLOODWORTH:  Objection.  Dr. Marais has not

18    been qualified to speak on what a physician would attribute

19    to the various analyses.

20            MR. WIESEN:  I will try and set a foundation,

21    Your Honor.

22            THE COURT:  Okay.

23    BY MR. WIESEN:

24    Q.    Were you here yesterday for Dr. Wynn's testimony?

25    A.    Yes.
```

1    Q.    And have you tried to conduct an analysis that's

2    consistent with your understanding as a statistician who is

3    experienced in doing clinical trial analysis what analysis

4    would be consistent with Dr. Wynn's understanding of how a

5    doctor would look at frequency and severity?

6                MS. BLOODWORTH:  Same objection, Your Honor.

7                THE COURT:  What is the objection?

8                MS. BLOODWORTH:  Your Honor, I think he is

9    saying that Dr. Marais is testifying relying on Dr. Wynn's

10   testimony of what Dr. Wynn would perceive a statistical

11   analysis to be.  But Dr. Wynn didn't hear Dr. Marais's

12   opinions -- I am very confused.

13               THE COURT:  You are confusing me, because I

14   don't understand your objection.

15               MS. BLOODWORTH:  I am sorry, Your Honor.  Dr.

16   Marais is not a physician.  Dr. Marais does not interpret

17   patient diary data.  Dr. Marais has no qualifications to be

18   able to interpret whether or not a mild injection site

19   reaction --

20               THE COURT:  That is controversial?

21               MS. BLOODWORTH:  I understand, Your Honor.  But

22   whether or not it is a frequently experienced mild IRAE

23   versus what they would interpret, the physician would

24   interpret what that data is, that is what I understood Dr.

25   Marais to start talking about.

1            MR. WIESEN:  I think, Your Honor, all we are

2     trying to say here is he heard Dr. Wynn's testimony and he

3     has tried to conduct what he understands to be a statistical

4     analysis of the type of question that Dr. Wynn was talking

5     about yesterday, for trying to analyze from the Glacier

6     study and from these types of data sets what the frequency

7     results would be.

8            MS. BLOODWORTH:  I am not clear on how Dr.

9     Marais could make that statement.

10            I might have misspoken earlier, my colleagues

11     pointed out.

12            If they wanted to have this testimony, they

13     should have had Dr. Marais lay the statistical understanding

14     and then Dr. Wynn would testify about what and how he

15     applied as a physician that statistical understanding.  What

16     we heard was Dr. Wynn give very broad testimony about

17     clinical trials, and no foundation for how Dr. Marais would

18     statistically interpret that data.

19            MR. WIESEN:  Your Honor, you can analyze whether

20     you think Dr. Marais has properly applied the testimony from

21     Dr. Wynn.

22            There is a chicken and egg problem, because he

23     needs to hear Dr. Wynn say how he would look at the data.

24            MS. BLOODWORTH:  He is not a physician.  He

25     can't step into the mind of Dr. Wynn.  For example, we had

 1    Dr. McKeague's analysis in our statistical reports.  We

 2    provided that completed expert report to Dr. Green for Dr.

 3    Green's reliance on that.  And then we put in our evidence

 4    accordingly of our criticism of Glacier.

 5              THE COURT:  I was going to ask, was he relying

 6    on the report, this witness?

 7              MR. WIESEN:  I honestly don't remember whether

 8    he had seen -- which -- I will withdraw the question, Your

 9    Honor, and we can move on, just to solve the problem.

10              THE COURT:  I think you should.

11              MS. BLOODWORTH:  Thank you, Your Honor.

12    BY MR. WIESEN:

13    Q.    Dr. Marais, what statistical analysis did you perform

14    to calculate the expected frequency or rate of IRAEs and

15    ISRs in your analysis of the core versus extension study in

16    the Glacier paper?

17    A.    I performed an analysis paralleling exactly the

18    analysis represented in the bar charts that were shown on

19    the slide of about 20 minutes ago.

20              That is the analysis, the frequency analysis

21    from the Wolinsky 2015 article, which I replicated.  I

22    performed a parallel analysis comparing the GA 40 to GA 20

23    experience, not cross-sectionally during the core phase in

24    the manner of the Wolinsky article, but, rather,

25    longitudinally within the core and extension phase for the

Marais - direct

1     switcher patients in the Glacier trial.

2     Q.     If we turn to Slide PDX-5.28, what did you find on

3     that frequency analysis in the core versus extension?

4     A.     I found that there was a substantial and a highly

5     statistically significant reduction in the rate of IRAE

6     days, a result that is essentially consistent with that of

7     the Wolinsky article, but here, the important difference is,

8     these are individual patients who were first on GA 20 and

9     then switched to GA 40, which is not the same comparison

10    that was made in the Wolinsky article.

11    Q.     Just for the record, this comes from PTX-39, Figure 3.

12           Did you also do an analysis of ISRs instead of

13    IRAEs?

14    A.     I did, with substantially the same conclusion.

15    Q.     I want to move, then, to a related but slightly

16    different topic, which is that up until now, we have been

17    looking at adverse events per day annualized.

18           Did you conduct any other frequency analysis

19    with the core versus extension data?

20    A.     Yes.

21    Q.     What did you look at?

22    A.     I also looked at adverse events at the, at the rate of

23    adverse events on a per-injection basis rather than a per

24    treatment year annualized basis.

25    Q.     Did you think that analysis to be clear was necessary

Marais - direct

1    to establish whether the claim terms we saw before were met

2    for frequency?

3    A.    No.

4    Q.    Then why did you do that analysis?

5    A.    Two reasons.  I anticipated that defendants' expert

6    might assert that rather than do it the way I did do it I

7    should have done it some different way and this is a

8    different way of doing it.

9              Secondly, I understand that here, injection

10   rates may have some bearing on the question of expectedness

11   or unexpectedness in this proceeding.

12   Q.    If we look to -- can you explain for the Court how you

13   did the per-injection analysis rather than the per-day

14   analysis?

15   A.    Certainly.  I counted IRAE days in the same manner

16   that I described earlier, but instead of annualizing the

17   rate of IRAE days, I looked at the rate of IRAE days per

18   injection day rather than per -- full year of treatment.

19   Q.    If we look at PDX-5.31, I believe, what conclusions

20   did you reach on the frequency analysis per injection?

21   A.    Understanding that the numbers on these bar graphs are

22   quite different because it is a quite different measure,

23   these are events per injection rather than events per year

24   under treatment, so the numeric values are quite different,

25   of course, but the appearance and the conclusion of a

1    substantial reduction shows up again in these charts on the

2    left side for IRAEs and on the right-hand side for ISRs, and

3    the summary statistics reported at the top of each of these

4    two panels again documents a substantial and a statistically

5    significant result.

6    Q.    So that's a statistically significant reduction in the

7    number of reactions per injection on GA 40 compared to GA

8    20?

9    A.    That is correct.

10   Q.    Then I want to turn next to the severity limitations,

11   if we can.

12         How many different ways did you analyze severity

13   in this core versus extension Glacier data set we have been

14   talking about?

15   A.    Two different ways.

16   Q.    What was the first way?

17   A.    The first, for the first way, I again followed the

18   lead of the Wolinsky 2015 publication, and performed an

19   analysis that follows exactly the trail blazed by Wolinsky,

20   except that my comparison compares GA 40 in the extension

21   phase for the switcher patients to their own experience on

22   GA 20 in the core phase.  That is not the comparison made in

23   Wolinsky.

24   Q.    So, again, here we are looking at the same people

25   taking GA 20 and taking GA 40 and looking at the relative

Marais - direct

1    severity?

2    A.    Yes.

3    Q.    If we could have Slide PDX-5.33.  These are also in

4    PTX-38.

5            MR. WIESEN:  It is going to be one of the

6    exhibits we offer, Your Honor.

7    BY MR. WIESEN:

8    Q.    Could you explain what results you got in your core

9    versus extension severity analysis that followed the blaze

10   marks of the Wolinsky paper?

11   A.    Here again, one sees the substantial reduction

12   reflected in the fact that the bar on the right-hand side is

13   short compared to the bar on the left-hand side.  The bar on

14   the right-hand side is for GA 40, the bar on the left is for

15   GA 20.  Here again, the statistics reported at the top of

16   the panel confirm that this is a substantial and a highly

17   statistically significant reduction.

18   Q.    I believe what we are looking at here on Slide

19   PDX-5.33 is the IRAEs.  Did you do that as well for ISRs?

20   A.    Yes.  With substantially the same result.

21   Q.    If we pull up the next slide, is that the ISRs?

22   A.    Yes.

23   Q.    I want to turn to your second severity analysis of the

24   core versus extension Wolinsky data.

25            Why did you run the second analysis?

Marais - direct

1    A.      Several reasons.

2            The Wolinsky severity analysis focuses on the

3    combination of moderate and severe IRAEs and the reduction

4    in the rate of moderate and severe IRAEs on the GA 40

5    compared to GA 20.

6            My analysis goes a step farther and

7    distinguishes between all three categories of severity,

8    treating separately mild, moderate, and severe.  So it is a

9    more refined analysis in the sense that it distinguishes not

10   only between the less severe and the more severe, but even

11   among degrees within the more severe IRAEs.

12           But in addition to that, the second analysis

13   that I performed focuses directly on the experience of

14   individual patients, it looks at it in a way that the

15   Wolinsky analysis did not, at the experience of each

16   individual patient and determines whether for that

17   individual patient there was a reduction in severity on GA

18   40 compared to GA 20.

19           So these are different lenses onto the same data

20   and the same subject matter, but I performed this, conceived

21   and performed the second analysis for the reason I just

22   explained.

23   Q.   Then I want to ask you to back up and explain this

24   analysis a little bit the way that we did previously with

25   the frequency analysis.  So if we could have Slide PDX-5.35.

1    Could you explain what this is?

2    A.    This is again a scatter plot of IRAE type event rates

3    for GA 20 on the x axis compared to GA 40 on the y axis or

4    the vertical axis, with the same 45-degree line, with the

5    same interpretation as previously.

6    Q.    Now, I notice, this one says IRAEs, not IRAE, days.

7    Is that why we see different scales on the x and y axis?

8    A.    That is exactly why.  This is a different measure or a

9    different metric from the IRAE day metric.

10   Q.    Could you explain what the difference is?

11   A.    Certainly, I explained previously how the IRAE day

12   metric works by focusing on the frequency of days with IRAEs

13   during the experience of a patient on one of these

14   therapies.  But that was all about frequency.  This is all

15   about severity.  And for purposes of a comparison of

16   severity, it was my judgment that a patient reporting

17   several IRAE events on the same day can reasonably be judged

18   to have a more -- to be reporting a more severe experience

19   than a patient reporting just one IRAE -- IRAE on that day.

20   And therefore --

21            MS. BLOODWORTH:  Objection, Your Honor.  Beyond

22   the scope of his report.

23            MR. WIESEN:  I will stop there, Your Honor.

24   BY MR. WIESEN:

25   Q.    Did you conduct a --

1                    MS. BLOODWORTH:  I move to strike his answer,

2        Your Honor.

3                    THE COURT:  I will strike it.

4                    MR. WIESEN:  Your Honor, in that situation, I

5        would rather go to the deposition and try to show her where

6        he gave this answer before.

7                    THE COURT:  Why don't you do that.

8                    MR. WIESEN:  Your Honor, we will strike that

9        answer and I will ask the next question.

10                   THE COURT:  You want me to strike the answer?

11                   MR. WIESEN:  Your Honor, I would request that

12       you strike the answer.

13                   THE COURT:  The request is granted.

14                   MR. WIESEN:  Thank you, Your Honor.

15       BY MR. WIESEN:

16       Q.    Dr. Marais, did you do a sensitivity analysis to see

17       whether it mattered if you did events or event days?

18       A.    Yes.

19       Q.    What was the result?

20       A.    Although I think that this is the right way to look at

21       this question, I did perform the same calculation using

22       event days with a conclusion and a result that is consistent

23       with the conclusion that I arrived at from this method.

24       Q.    So that I want you to explain again with this

25       photograph sort of how you built the analysis that you did.

1      Let's use another sample patient.  How did you measure

2      severity for an individual patient, if we go to -- you have

3      identified Patient 10727004.

4      A.    That individual patient corresponds to the dot that

5      has been expanded into a large dot in this graph.

6      Q.    If we go to the next slide, let's zoom in a little bit

7      on that portion of the graph so we can see more clearly

8      what's going on.  If you can explain, then, I think we are

9      around Slide PDX-5.36 and 5.37, explain how you analyzed

10     severity for this individual patient?

11     A.    The two cursor lines overlaid in this chart, the

12     dashed vertical and horizontal lines, show, again, how that

13     dot representing that patient corresponds to a GA 20 value

14     and a corresponding GA 40 value, each of those being an

15     annualized IRAE rate.  But it is important to understand

16     that on the basis of each individual IRAE comes with the

17     patient's own coding of the level of severity of mild,

18     moderate or severe.

19            And so the GA 20 rate can be partitioned into

20     how much of that rate comes from mild IRAEs, how much comes

21     from moderate IRAEs, and how much comes from severe IRAEs.

22     And the next slide, I think, illustrates -- is meant to

23     illustrate that partitioning.

24     Q.    So what do we see then on Slide PDX-5.37?

25     A.    This slide now includes a colored bar next to the x

1    axis and a colored segmented bar next to the y axis, with

2    color coding explained in the legend in the top right-hand

3    corner.  So the yellow segment of the horizontal bar

4    represents the portion of the annualized GA 20 rate for this

5    patient coming from mild IRAEs and correspondingly for the

6    other categories.

7    Q.    How did you use the yellow, orange and red results for

8    the GA 20 and GA 40 to figure out the severity for this

9    patient?

10   A.    I compared those three rates separately in order to

11   determine whether this patient could be classified as

12   unambiguously experiencing a lower severity of IRAEs or not.

13   And I prepared a slide to explain that slightly complicated

14   comparison.

15            If we click through, I have prepared a little

16   animation to show these bars moving so you can compare them.

17            We get to PDX-5.40.  Can you explain how you

18   figured out the severity for this patient based on the data

19   that we are looking at?

20   A.    Certainly.  What we see here is the GA 20 colored bar

21   segments placed side by side with the corresponding GA 40

22   colored bar segments.

23            So in this slide I am able to compare the rate

24   of mild IRAEs, the annualized rate, between GA 20 and GA 40,

25   and similar for moderate and severe.

1          What we see here is that this patient

2     experienced a lower rate of mild IRAEs, and a lower rate

3     will have moderate IRAEs and a lower rate of severe IRAEs,

4     from which I conclude that no matter how this patient

5     personally would trade off some number of mild IRAEs against

6     a single moderate or severe IRAE, any rational tradeoff of

7     that kind would classify this patient as having a less

8     severe IRAE experience on GA 20 compared to GA 40.

9          So I classified this patient as an individual

10    patient, as having had a lower severity of IRAEs on GA 40

11    than on GA 20.

12    Q.    To be categorized in the analysis you did as "better

13    off under GA 40" or as having a lower severity, did the

14    patient have to be lower on all three, the mild, moderate,

15    and severe measures?

16    A.    The patient had to be lower, strictly lower, meaning

17    truly lower, on at least one, but it could be a tie on one

18    or even two of the others, as long as the patient was not

19    higher on any and truly lower on at least one.

20    Q.    Then did you do this analysis for all of the patients

21    in the core versus extension data?

22    A.    Yes.

23    Q.    If we go to Slide 41, did you calculate how many

24    patients were better off on GA 40 under this analysis?

25    A.    Yes.

Marais - direct

1    Q.    How many were on the IRAEs and ISRs?

2    A.    49 out of the 97 patients were better off in the sense

3    of a lower rate of -- lower level of severity in the manner

4    that I have just explained on GA 40 than on GA 20.

5    Q.    Did you look at other patients to see if a patient is

6    better off on GA 20?

7    A.    Yes.

8    Q.    Do you have an example of a patient like that, if we

9    go to the next slide?

10   A.    Yes.

11   Q.    What do you see on Slide PDX-5.43?

12   A.    Here we see an example of a patient who had zero rates

13   of mild and of severe, so this patient had a tie on both

14   mild and severe, but this patient had a somewhat lower rate

15   of moderate IRAEs, and therefore, I classified this patient

16   as better off, meaning with a lower level of severity, on GA

17   20 than on GA 40.

18   Q.    If we come back to the chart with the calculations,

19   how many patients by this analysis were better off on GA 20

20   or had more severe reactions on GA 40 than GA 20?

21   A.    Exactly one.  It turns out that the example I just

22   showed you is the only one.

23   Q.    Now, the next category you have here is Inconclusive.

24   Can you explain what that means?  Maybe we will use an

25   example for that, too, if we go the next slide?

1  A.      An inconclusive case would be one in which the patient

2  experienced lower rates on one regimen here -- in some

3  severity categories and a higher rate on that same regimen

4  in a different severity category, and one can see that

5  happening in this example.

6           This patient has lower rates of mild and

7  moderate severity categories but a higher rate of severe

8  IRAEs.  And therefore, how this patient would rank these two

9  experiences depends on the degree to which, for this

10  individual person, the somewhat higher rate of severe IRAEs

11  overrides and outranks their lower rates of moderate and

12  mild IRAEs.

13           So this is inconclusive.  It is not a judgment

14  that I can make.  It is possibly a judgment that the patient

15  herself could have made, but it is not a judgment that I

16  could make as a statistician looking at these rates.

17  Q.      If we turn back to the table then, how many people

18  were in this inconclusive category?

19  A.      There were seven of those.

20  Q.      Then were there still the 40 people at the zero-zero

21  point, no reaction on GA 20 and no reaction on GA 40?

22  A.      The same 40 people for purposes of this analysis still

23  have zero-zero rates.

24  Q.      What did you do to measure the statistical

25  significance of this result?

1     A.     I applied a standard statistical procedure, this is

2     not an elementary statistical procedure that one could find

3     in a high school or in a stats 101 book, but I applied a

4     standard statistical procedure for testing the relationship

5     between so-called trinomial probability parameters.

6            What it boils down to is determining whether the

7     imbalance between 49 better off and one worse off could

8     arise by chance alone, whether that could just reflect

9     chance variation from patient to patient and from day to

10    day.  And that test procedure, like essentially all

11    statistical tests, leads to something called a p value.  And

12    I have prepared a slide that shows the p value.

13    Q.     Before we get to the p value, you referenced a

14    trinomial analysis, but we have four categories here.  Could

15    you explain how you grouped the categories together to do

16    the analysis?

17    A.     Certainly.  Trinomial refers to three categories.  And

18    we have, as you point out, four categories on the chart.  I

19    looked at the category of Inconclusive, and because

20    inconclusive could turn out to be, in the judgment of the

21    individual patients, better off under GA 40 or better off

22    under GA 20, not a judgment I can make, because they could

23    go either way, what I did is I assigned the Inconclusives to

24    be conservative in this procedure, I treated them as if they

25    were all actually worse off on GA 40 and therefore better

1    off on GA 20.

2              So I included the seven inconclusives with the

3    single better off on GA 20.  So instead of a 49-to-one

4    imbalance, the imbalance that I looked at was actually 49 to

5    eight, by conservatively treating the inconclusives as if

6    they were better off under GA 20.

7    Q.    Now, is it standard in statistics, sometimes, Dr.

8    Marais, to use the trinomial analysis, analyzing three

9    different variables together?

10   A.    There is nothing unusual about a trinomial or a

11   multinomial probability distribution or analysis.  Those are

12   perfectly standard topics in treatises on probability and

13   statistics.

14   Q.    Now we will go to the p values and see what results

15   you got from the statistical analysis.

16   A.    These p values represent the result of the test

17   procedure that I applied.  They both signal highly

18   statistically significant differences, meaning that the

19   imbalance that I have just described is way too big to arise

20   as a result of mere chance variability among patients or

21   among days on treatment.

22   Q.    We have been talking I think about IRAEs.  Did you

23   also separately analyze ISRs through this analysis?

24   A.    I did.

25   Q.    What conclusions did you reach as we see on PDX-5.50?

Marais - direct

1    A.    They are shown on the right-hand side.  Again, the ISR

2    numbers are identical to the IRAE numbers.  And that is not

3    surprising, because the vast majority of IRAEs are ISRs.  So

4    the ISR analysis really is very similar to the IRAE

5    analysis.

6    Q.    Thank you, Dr. Marais.

7          Did you also conduct a per-injection severity

8    analysis?

9    A.    I did.

10   Q.    Why did you do that?

11   A.    Two reasons.  I both anticipated, and then it turned

12   out to be true, that defendants' expert suggested that

13   rather than do what I did do, I should have done it in some

14   different way and the particular different way was to do it

15   on a per-injection basis.

16          So I did that.  In my own opinion, this is the

17   correct way to do this analysis.  But I did do it the other

18   way.  And my second reason was that I understand that the

19   per-injection rates may have a bearing on the question of

20   unexpectedness.

21   Q.    If we go to PDX-5.51, what conclusion did you reach on

22   your per injection severity analysis?

23   A.    In this case, the details of the numbers on the

24   right-hand side of the chart, of the slide, that's the

25   per-injection panel of the slide, the detailed numbers are

Marais - direct

1    visibly different.

2             What is the same is the imbalance and the level

3    of the p value reported at the bottom of the chart, which

4    again indicates a highly statistically significant effect.

5    Q.    And is this true for both IRAEs and ISRs?

6    A.    Yes.

7    Q.    All right.  Doctor, what is your ultimate conclusion

8    regarding how switching a patient from 20 milligrams of

9    glatiramer acetate administered daily to 40 milligrams of

10   glatiramer acetate administered three times a week affected

11   the severity of injection-related adverse events based on

12   these analyses we have been discussing of the core extension

13   data in the Glacier database?

14   A.    That there is a substantial and a highly statistically

15   significant reduction in the severity of IRAEs, and also of

16   ISRs, on GA 40 compared to GA 20.

17            MR. WIESEN:  Your Honor, we have got a little

18   bit more to go.  I don't know if you want to take a break.

19   I know we started a little late.

20            We will keep going.

21   BY MR. WIESEN:

22   Q.    Before we finish with your infringement testimony, Dr.

23   Marais, I want to talk about a couple more criticisms that I

24   think we are anticipating coming from the defendants.  We

25   are going to try and hit them now and not have to call you

Marais - direct

1   in the rebuttal case to respond.  But I am not going to get

2   all of them right.  But the goal is to respond to them.

3   Although I don't think we heard this one in the opening,

4   defendants have complained that you shouldn't have put the

5   patients in this last analysis into three different

6   categories, better off under 40, better off under 20, and

7   the same or non-reactors.  Rather, they say everyone should

8   have been in two categories, better off under 40 and

9   everyone else.

10              Are you familiar with that criticism?

11  A.    Yes.

12  Q.    And what is your opinion regarding the criticism?

13  A.    It's my opinion that it is incorrect and untenable.

14  Q.    Why do you say it is incorrect?

15  A.    For several reasons, but the most important are that

16  it is illogical and ignores, effectively throws away

17  scientifically important information revealed by these

18  comparisons.

19  Q.    What do you mean by that?

20  A.    I mean that I would advise, in consultation with

21  physicians, as I often am in my work --

22              MS. BLOODWORTH:  Objection.  Beyond the scope.

23  The I consult with physicians and I advise portion of his

24  answer.

25              THE COURT:  Speak up.  You don't need a mike.

1                MS. BLOODWORTH:  Your Honor, the I would advise

2   physicians portion of his --

3                THE COURT:  Reports.

4                MS. BLOODWORTH:  -- of his answer right now,

5   Your Honor.

6                It is not in his expert's report.

7                THE COURT:  That is what I am trying to

8   understand.

9                Is it in his expert's report?

10              MR. WIESEN:  There was extensive --

11              THE COURT:  Is it in his expert's report?

12              MR. WIESEN:  Let me check.

13              THE COURT:  Can you fairly complain that you

14   were surprised by this?

15              MS. BLOODWORTH:  I would complain about anything

16   he is going to have conversations with his physicians --

17              THE COURT:  Was he questioned at his deposition

18   as asserted by Mr. Wiesen?

19              MS. BLOODWORTH:  He said he had not had

20   conversation with physicians at his deposition.

21              MR. WIESEN:  I am not talking about specific

22   conversations with physicians.  We are talking about how he

23   would as a statistician advise analyzing data in a clinical

24   trial.

25              THE COURT:  I am overruling the objection.  I

1    see you shaking your head, counsel.  But I am overruling the

2    objection.

3              I am talking to your colleague there

4    gesticulating.

5              Sit down, please, and let's go.

6    BY MR. WIESEN:

7    Q.    Let me ask the question again.

8              Doctor, why did you say it doesn't make sense to

9    you as a statistician?

10   A.    Because it ignores scientifically important

11   information in the comparison, which, in the kind of

12   consultation that I have routinely with physicians in the

13   course of my work, I would be drawing to their attention as

14   an important part of the outcome of the comparison that I am

15   making, which has the consequence that when that logic is

16   applied to familiar situations, to illustrate how it works,

17   it leads to absurd conclusions.

18   Q.    What do you mean?

19   A.    The logic of the criticism, as I understand it,

20   requires that the proportion of patients who actually

21   benefit from the intervention or the change, that would be

22   in this case the proportion of patients who as individuals

23   have a reduction in severity, must exceed 50 percent by a

24   statistically significant margin.

25              That is the core of the criticism, as I

Marais - direct

1   understand it.  And I understand it from deposition

2   testimony and reports.

3              That same logic, if applied to the flu vaccine,

4   would say, absent the intervention of the flu vaccine, fewer

5   than 50 percent of people who receive the flu vaccine would

6   have got flu anyway.  Even in the pandemic of 1918, not 50

7   percent of the population suffered from the flu.

8              And because fewer than 50 percent of the

9   population as individuals benefit from this intervention,

10  therefore, the intervention does not cause a reduction in

11  the rate of occurrence.

12             And on that logic, no one should be advised to

13  get a flu vaccine, let alone a tetanus shot.  That is the

14  absurd conclusion that the logic of this criticism reaches

15  when applied consistently to familiar situations.

16  Q.   Thank you, Dr. Marais.

17             I want to then go to another criticism that I

18  think we heard a little bit about from the defendants, which

19  is about the data entry diary card issues that we talked

20  about before.

21             What test did you run to measure whether the

22  data entry issues the defendants identified impacted your

23  results?

24  A.   I ran what I described earlier as a sensitivity

25  analysis of that issue.  And I could explain more about what

Marais - direct

1    I actually did, if you would like me to.

2    Q.    I think we already did this before and I don't want to

3    repeat it, that you talked about, you made the changes to

4    the underlying data and re-ran your analysis.  Is that

5    right?

6    A.    Yes.

7    Q.    And did you analyze whether you thought the

8    defendants' criticisms of the data entry were right or

9    wrong?

10   A.    No, I did not audit individual criticisms and try to

11   get to the bottom of each of them.  I simply adopted them

12   wholesale, every criticism suggested some change to the

13   data.  And I made only those changes en masse.  Not one at a

14   time, but all of them together.

15   Q.    And is that the standard thing to do for a sensitivity

16   analysis?

17   A.    It is certainly a standard kind of thing to do for a

18   sensitivity analysis.

19   Q.    All right.  And when you re-ran all of the studies,

20   all of the results we have looked at, with the revised data,

21   did it change any of these results?

22   A.    It changed nothing in substance.  There were changes

23   in the individual numbers.  Of course, they didn't stay the

24   same.  You have changed the input numbers, and the output

25   numbers change.  But it changed no conclusion that I have

Marais - direct

1    testified about here or described in my reports in this

2    matter.

3    Q.    So based on this analysis you have described, what do

4    you conclude about this criticism about the errors in data

5    entry?

6    A.    That it is a criticism with no material empirical

7    consequence for the analyses in the Wolinsky article or in

8    my own additional core versus extension analysis of

9    frequency and severity.

10   Q.    All right.  I want to turn to, I think, one more

11   criticism from the defendants.

12             It's one we did hear about from Mr. Figg in

13   opening.  It's these so-called outliers.

14             Can you explain the nature of the criticism of

15   these two highly reactive or outlier patients, as you

16   understand it?

17   A.    As I understand it, the criticism recognizes that

18   there are two patients first identified by the Teva -- the

19   Glacier study administrators who have quite unusual numbers

20   of IRAEs recorded that stand out from the bulk of the

21   patients' histories recorded in the Glacier study.

22             Some people have used the term outliers for

23   those two patients.  They could also be called highly

24   reactive patients.

25   Q.    Were these two patients in the electronic data set?

Marais - direct

1    A.    They were, yes.

2    Q.    Do you know how the administrators of the Glacier

3    study handled these two patients?

4    A.    Yes.

5    Q.    What did they do?

6    A.    They, upon recognizing these two patients at an

7    intermediate point from the electronic data, which is all

8    they had, and at a point when the administrators were

9    blinded to the treatment assignment of these patients, they

10   did not know whether these were GA 20 or GA 40 patients in

11   the trial, they decided not to change the definition of

12   IRAE, but to change the measure of frequency of the IRAEs,

13   in the following way.

14         The original statistical analysis plan for the

15   Glacier study had contemplated and described the process of

16   counting every individual IRAE and calculating a rate of

17   individual IRAEs, whether or not those IRAEs all happened on

18   the same day or not.

19         The study administrators proposed a change in

20   the frequency measure to an IRAE day measure of frequency in

21   which multiple IRAEs occurring on a single day were no

22   longer treated as multiple events, but any day with an IRAE,

23   one or more IRAEs in it, would be treated as, counted as one

24   IRAE day .

25         And they proposed and then adopted that

1    different metric for expressing the frequency of IRAEs, IRAE

2    days instead of individual IRAE events.

3            That is the metric that was ultimately used in

4    the statistical analysis of the Glacier trial by the study

5    administrators.  It is also the metric that was used in the

6    published peer-reviewed Wolinsky article.  And in terms of

7    that metric, these two patients were no longer extremely

8    aberrant from the body of the data.  And the analysis of the

9    study continued to include all of the gathered data,

10   including data for these two patients, who with this method,

11   this metric frequency, no longer stood out in the stark way

12   that they had stood out originally.

13   Q.    Dr. Marais, do you have an opinion about this

14   criticism that the two outlier patients or highly reactive

15   patients, whatever we choose to call them, undermine the

16   reliability of the Glacier data and results we have been

17   looking at?

18   A.    Yes, I do.

19   Q.    And what is that opinion?

20   A.    That the presence of these two so-called outlier

21   patients does not undermine the validity of the Glacier --

22   of conclusions from the Glacier study, in fact.

23   Q.    And in your opinion as a statistician, would it be

24   appropriate to just drop these patients out of the analysis

25   and analyze it as if there were 207 patients instead of the

Marais - direct

1    209 that there were?

2    A.    Based on everything that I have reviewed in this

3    proceeding and heard in this courtroom, it is my opinion as

4    a statistician that I have heard no compelling basis for

5    dropping these two patients from the Glacier data.  To the

6    contrary, I have heard a basis in the testimony of Dr. Wynn

7    yesterday for the proposition that such patients do exist in

8    the MS patient population.

9              MS. BLOODWORTH:  Objection, Your Honor.  Move to

10   strike his characterization of Dr. Wynn's testimony, because

11   it is not accurate and I don't believe that that

12   testimony --

13             THE COURT:  In your opinion.

14             MS. BLOODWORTH:  In my opinion, Your Honor, yes.

15             THE COURT:  What is your opinion?

16             MR. WIESEN:  Your Honor, I think it is

17   consistent.  I think you can judge that.

18             THE COURT:  Overruled.

19             MS. BLOODWORTH:  Your Honor, if I may, Your

20   Honor sustained -- Mr. Figg objected to --

21             THE COURT:  I am overruling your objection.

22             Is that all right, Mr. Figg?  I know it's not.

23   But the objection is overruled.

24             MR. FIGG:  I am fine with that, Your Honor.

25             THE COURT:  Let's go.

Marais - direct

1  BY MR. WIESEN:

2  Q.    You were saying, Dr. Marais?

3  A.    In summary to what I was saying, the default

4  position -- and I am speaking loosely here because there is

5  no bright line of what is the default -- but the default

6  position of the profession, certainly my default position,

7  is not that data points be removed from an analysis because

8  somebody has labeled them an outlier, but to look at the

9  reason for why those outliers are in the data.

10       If an outlier is in the data because it was

11  mistyped as a hundred thousand when the true value is

12  actually 100, there is an appropriate response to that.

13  That is to correct the error.

14       If it is a grossly implausible value like

15  100,000 but we can't quite get to the bottom of how it came

16  about, but it is grossly implausible, then there could be

17  circumstances in which it is appropriate to delete it from

18  the data.

19       But when values simply stand out in a manner

20  that is consistent with some known, apparently known facts

21  about the attributes of the population from whom those

22  measurements were taken, of the kind to which I have

23  referred in this answer, there is no basis for deleting

24  those observations.  In fact , rather than removing a bias,

25  it would create a bias to edit data to remove unusual

Marais - direct

1    observations if those unusual observations are in fact

2    representative of some slice of the underlying population.

3    Q.    Then did you do another one of your sensitivity

4    analyses to analyze these outliers?

5    A.    I did.

6    Q.    And what was the sensitivity analysis you did?

7    A.    Notwithstanding my previous answer, I deleted these

8    observations from the Glacier data set and re-ran the entire

9    suite of all of the calculations that I had performed and

10   about which I have testified here today.

11   Q.    When you deleted these two people, did it have any

12   effect on any of the results we have looked at for the

13   frequency analysis from the Glacier data you looked at?

14   A.    It had no material effect on any of the frequency

15   results, which is not to say that the numbers did not change

16   visibly.  But the implication of the numbers and the

17   qualitative conclusions that I have drawn from those numbers

18   did not change.

19   Q.    Did you do a sens -- a similar sensitivity analysis on

20   all the severity analyses?

21   A.    Yes.

22   Q.    What did you see with the severity analysis

23   sensitivity when you dropped out the two outliers just to

24   see what would happen?

25   A.    For the severity analysis, the picture was a little

Marais - direct

1    different.

2            I performed a total of three severity analyses,

3    not counting the many sensitivity analyses that I also

4    conducted.  But the three distinct severity analyses were my

5    replication of a severity analysis from the Wolinsky 2015

6    article, and then the two severity analyses, one of them

7    following on the trail blazed by Wolinsky, but comparing

8    extension to core in the Glacier study, and the other being

9    the more refined analysis about which I have testified here.

10   Q.   What did you find in the sensitivity analysis for

11   those three different severity analyses?

12   A.   The conclusions and the statistical indications from

13   the latter two, the analyses that I performed that were

14   different from, not simply replicating Wolinsky, were

15   unchanged.

16           With respect to the Wolinsky analysis of

17   severity, that is Figure 3, a result that had been reported

18   in Wolinsky as statistically significant switched to not

19   statistically significant.  Now, it is important to

20   understand that that is not a reversal.  And I can explain

21   why I say that.

22   Q.   Can you explain why that's not a reversal?

23   A.   Statistical significance means that the measured

24   effect is so far different from no effect at all that it

25   could not be the result of mere chance.  Statistical

Marais - direct

1    insignificance does not mean the opposite of that.  It does

2    not mean that there is no effect.  It means, in general, and

3    in this case, that there could be an effect, but we just

4    can't distinguish it from -- we can't distinguish the

5    potential signal from the background -- we can't say -- but

6    it doesn't rule out that there is an effect one way or the

7    other.  That's why I say it's not the opposite.

8    Q.    And based on your sensitivity analysis and all of the

9    analysis of the data that you have done and that you have

10   testified about here today, what is your conclusion about

11   whether the outliers, these two patients, affect and make

12   unreliable a conclusion that reactions on GA 40 are less

13   severe than reactions on GA 20?

14   A.    Based on everything that I have testified about here

15   and explained here, including, importantly, the absence of a

16   compelling basis for removing these two unusual data points

17   from the data set, and the fact that my own two analyses of

18   severity are in any case essentially unaffected by removing

19   them, I conclude that there is a substantial -- that the

20   Glacier study provides a substantial -- a basis for

21   concluding that there is a substantial and a statistically

22   significant reduction in severity on GA 40 compared to GA 20

23   for both IRAEs and ISRs.

24   Q.    And I just want to make sure it's clear.  When you

25   describe the adjustment that was made in the Glacier study

1    based on that analysis that went from IRAEs to IRAE event

2    days, that was the same use of IRAE event days that we have

3    talked about earlier and that you have used in some of your

4    analyses?

5    A.    Correct.

6    Q.    I want to turn then just quickly to the claim terms

7    again, if we go to Slide PDX-5.55, and just get your

8    ultimate conclusions from all of the analyses we have talked

9    about today.  Let's just start with the frequency

10   limitations.  Again, they are in Claim 14 of the '250, Claim

11   17 of the '250, and Claim 7 of the '413 patent.  Based on

12   all of these analysis and all the sensitivity analyses and

13   the discussions we have had, Dr. Marais, what is your

14   conclusion and what is your opinion about whether the

15   Glacier data shows that the GA 40 regimen that will be

16   offered for sale by defendants' regimen satisfies the

17   frequency limitations we are looking at here?

18   A.    I conclude that they do satisfy these frequency

19   limitations.

20   Q.    And if we move on to Slide PDX-35.56, the severity

21   limitations, again, it's all in the '776, Claims 1, 2, 5, 6,

22   9, 12 and 16, by dependence I think 6 and 17, what

23   conclusion do you reach, Dr. Marais concerning whether the

24   Glacier data reliably demonstrates that the GA 40 regimen

25   that defendants seek to offer for sale would satisfy the

Marias - cross

1   severity limitations of the '776 patent?

2   A.    I conclude that the Glacier data do so demonstrate.

3             MR. WIESEN:  No further questions, Your Honor.

4             THE COURT:  Let's have cross after a break.

5             (Recess taken.)

6             MS. BLOODWORTH:  May we approach, Your Honor?

7             THE COURT:  You may.

8             MS. BLOODWORTH:  We have also prepared some

9   slides.  I am not sure if we are going to use them.  But I

10  would like to hand them up just in case, if that's okay.

11            May I proceed, Your Honor?

12            THE COURT:  Yes.

13            MS. BLOODWORTH:  Your Honor, we might as well

14  hand up all the paper at one time.  This is his deposition.

15            THE COURT:  Might as well.

16                       CROSS-EXAMINATION

17  BY MS. BLOODWORTH:

18  Q.    Hello, Dr. Marais.  I am Shannon Bloodworth.  I

19  represent the Mylan defendants.

20            I just wanted to start off, IRAEs is not a

21  phrase that is used in the patents in suit.  Correct?

22  A.    I, frankly, don't recall.  I do recall ISRs and IPIRs.

23  I don't recall if IRAEs appears or not.

24  Q.    You have no specific analysis related to IPIRs.

25  Correct?

1    A.    My analysis includes IPIRs.  But if you mean by

2    specific analysis an analysis that focuses solely on IPIRs,

3    that is correct.

4    Q.    And if we could turn to the Glacier article, which is

5    JTX-7134, and I believe, sir, it might be the last exhibit

6    in that big binder.

7    A.    I am there.

8    Q.    Thank you.  If you could please turn to Page 4 of

9    7134.

10   A.    I am assuming you mean by that the fourth page, which

11   starts 373?

12   Q.    In the bottom right-hand corner it would be marked

13   JTX-7134.4?

14   A.    I have got it.  Now I understand the system.

15   Q.    We will be using that routinely.  The dots following

16   the exhibit number will be the page numbers.

17   A.    Got it.  Thank you.

18   Q.    If you could look at Figure 3, let me please direct

19   your attention there, I believe at the end of your direct

20   testimony you mentioned or you testified that under your

21   sensitivity analysis, Figure 3 of the Glacier paper would no

22   longer report a statistical significance.  Is that correct?

23   A.    I remember testimony that I think you are referring

24   to.

25   Q.    Okay.  And so it is your opinion that, under your

Marias - cross

1    sensitivity analysis, Figure 3 of the Glacier article would

2    no longer have a statistically significant difference

3    between the GA 20 arms and the GA 40 arms.  Correct?

4    A.    No, I can't quite agree with that.

5    Q.    There will be a statistically significant difference

6    between the GA 20 milligram arm and the GA 40 milligram arm

7    under your sensitivity analysis?

8    A.    For the most part, yes.

9    Q.    Can you explain how you can have for the most part a

10   statistically significant number?

11   A.    Your question refers to my sensitivity analysis.  Your

12   question seems not to recognize that I performed many

13   sensitivity analyses.  For many of those sensitivity

14   analyses, there was no material change in Figure 3.

15             So, for the most part, no, I cannot agree with

16   what you are asking me to agree with.

17   Q.    If you performed your sensitivity analyses by removing

18   the patients who reported extremely high values in the 20

19   milligram arm, is there any longer a statistically

20   significant difference between the 20 milligram arm and the

21   40 milligram arm in Figure 3?

22             THE WITNESS:  I take it you mean by the patients

23   who reported extremely high values, those patients who

24   frequently reported an IRAE, which is not quite the same

25   thing.  But if those are the -- I think you are referring to

Marias - cross

1    the so-called outlier patients.  If your question means that

2    upon removing the outliers the statistical significance

3    reported in this figure goes away, yes, as I testified on

4    direct, it does.

5    Q.    Thank you.  For Table 2, if I could direct your

6    attention there, although my question is going to also refer

7    back to your direct testimony, in the Glacier paper the

8    primary end point was for the reduction in frequency of

9    IRAEs.  Correct?

10   A.    I would say more precisely that the frequency of IRAEs

11   was the primary end point.  Whether there would be a

12   reduction or not is not an end point in itself.

13   Q.    Fair.  Thank you for clarifying.

14         And for Table 2, the data that is reported in

15   Table 2 does not take into account the change in counting

16   the IRAEs to be an IRAE event day accounting.  Correct?

17   A.    No.  Table -- well, by no, I mean to agree with you,

18   Table 2 is constructed in accordance with the modified

19   statistical analysis plan which says that this is the way it

20   should be constructed.  So it conforms to the plan.

21   Q.    And so Table 2 reports the data from the two outlier

22   patients.  Correct?

23   A.    If you mean the counts in Table 2, like all of the

24   other calculations in the Glacier article, include the two

25   so-called outlier patients, yes.

Marias - cross

1    Q.    And if we could turn your attention to your slide in

2    your direct testimony 5.18 --

3              MS. BLOODWORTH:  Excuse me, Your Honor.  I think

4    I am having a technical issue.  I need to consult, if that

5    is okay.

6              THE COURT:  Sure.

7              (Pause.)

8              THE WITNESS:  Is that in a binder?

9    BY MS. BLOODWORTH:

10   Q.    I believe it was in your white binder in your direct

11   examination.

12             THE COURT:  What is the number?  There it is.

13             MS. BLOODWORTH:  It is 5.18.

14             MR. WIESEN:  I think we can help with that.

15   BY MS. BLOODWORTH:

16   Q.    You recall this from your direct testimony, Dr.

17   Marais?

18   A.    Yes, I do.

19   Q.    This is your replication of the Wolinsky analysis, and

20   it's IRAE days.  Right?

21   A.    That is correct.

22   Q.    And this is a frequency analysis.  Right?

23   A.    Indeed.

24   Q.    And on the GA 20, the reported frequency is about

25   twice as many as GA 40.  Right?

Marias - cross

1    A.      That's approximately correct, yes.

2    Q.      And, of course, this is expected because patients

3    inject GA 20 a little more than twice as often as GA 40.

4    Correct?

5              MR. WIESEN:  Objection, Your Honor.  Ms.

6    Bloodworth's objections were about Dr. Marais not being a

7    doctor, what would be expected about injection frequency

8    affecting results.

9              THE COURT:  Sustained.

10             MR. WIESEN:  Thank you, Your Honor.

11   BY MS. BLOODWORTH:

12   Q.      Dr. Marais, will you agree with me that even if the

13   GA 40 ISR rate per injection day were twice that of GA 20,

14   the mean annual ISR rate for GA 40 would nevertheless be

15   lower than that for GA 20 because the GA 20 regimen has more

16   than twice as many injections, seven per week, as GA 40,

17   which is three times per week?

18             THE COURT:  Wow.  Do you want to break that

19   down.

20             MS. BLOODWORTH:  I would like to break that

21   down, Your Honor.

22   BY MS. BLOODWORTH:

23   Q.      Dr. Marais, strike that, please.  Withdrawn.

24             Would you agree with me that you have on the GA

25   40 regimen about twice as many injections as the -- about

Marias - cross

```
 1    half as many injections as the GA 20 regimen?

 2    A.     Did you say twice or half?

 3    Q.     About three-sevenths.  Right?

 4    A.     Okay.  Three-sevenths, it's not twice or half but

 5    three-sevenths.

 6    Q.     Okay.  That the mean annualized ISR rate for GA 40

 7    would be, per injection, would be three three-sevenths of

 8    the GA 20 rate.  Right?

 9    A.     Not necessarily so.

10    Q.     Well, if you have a patient that has an injection

11    site -- an injection site reaction, just one, every day that

12    they inject on the GA 20 milligram, and they have just one

13    injection site reaction on every day that they inject on the

14    GA 40 milligram regimen -- are you with me so far?

15    A.     Yes.

16    Q.     -- you would agree with me that the rate of injection

17    site reactions would be lower on the GA 40 arm than the GA

18    20 arm.  Correct?

19    A.     I can readily agree that on the assumption of exactly

20    one reaction for every single injection, there is no

21    difference between the reaction rate and the injection rate.

22    They are simply the same.

23           So if one of them goes down, the other goes down

24    in lock step.  I can agree to that.

25    Q.     And looking back at PDX-5.18, the IRAE days on the GA
```

Marias - cross

1    20 milligram arm are also approximately twice as many as the

2    GA 40 arm.  Right?

3    A.    Yes.

4          There is an approximate twofold ratio there.  It

5    is a different kind of two from the ratio you were just

6    asking me about a minute ago, which I could explain.  It is

7    apples and oranges.  But they are both two, more or less.

8    Q.    You understand that in this case the rate of the

9    injection site reaction is different from the severity of

10   the injection site reaction.  Correct?

11   A.    I do.

12   Q.    And so if you had one mild injection site reaction

13   every time injected on a GA 20 milligram patient and one

14   moderate injection site reaction every time on a GA 40

15   milligram patient, under your analysis, is there a reduction

16   in severity under the 40 milligram arm?

17   A.    So I am assuming one, exactly one mild reaction with

18   each injection and fewer injections, then, indeed, on my

19   analysis, the number of reactions occurring in a year of

20   treatment -- and only hypothetically you are asking me to

21   assume that there are no moderates, there are no severes,

22   it's all mild.

23   Q.    I am sorry.  May I correct myself then, if that's what

24   I said?  Because I did misspeak then.

25          I wanted to say one mild on the GA 20 every time

1    injected, and one moderate on the 40 milligram every time

2    injected.

3                    THE COURT:  Mr. Wiesen?

4                    MR. WIESEN:   Could we get clarification which of

5    the analyses she is talking about for the hypothetical?

6    Since Dr. Marais did a number of them.

7                    THE COURT:  Okay.  Which analysis?

8                    MS. BLOODWORTH:   The analysis --

9    BY MS. BLOODWORTH:

10   Q.    Can you answer the question for any of your analyses,

11   Dr. Marais?

12   A.    I performed three analyses of severity and a number of

13   sensitivity analyses of those.  Are you inviting me to pick

14   one and describe its consequence?

15   Q.    Yes.

16   A.    If I pick what I refer to as my own more refined

17   analysis that looks at individual patient experience, if I

18   applied it to the facts that you describe, that would be an

19   inconclusive case.

20   Q.    And that would be inconclusive because there are less

21   moderate injection site reactions on the 40 milligram arm

22   total but higher mild injection site reactions on the 20

23   milligram arm.  Right?

24   A.    I think I see what you are trying to get at.  But that

25   just isn't how I would describe it.  So I don't disagree

Marias - cross

1    with what I think you were trying to say there.  But I can't

2    sign up to the statement that you made.

3    Q.    If you could turn again in your white binder to the

4    slides you used on your direct examination, please.

5    A.    I am there.

6              THE COURT:  This is 5.18?

7              MS. BLOODWORTH:  5.48.

8              THE WITNESS:  I am sorry.  But the coding scheme

9    here has me baffled.

10             THE COURT:  It looks like this.

11             THE WITNESS:  Thank you, Your Honor.

12             These numbers at the foot of these --

13             THE COURT:  In the middle, at the bottom, in the

14   blue line.

15             THE WITNESS:  Okay.  I am looking for 5.48.  I

16   have found 5.4.

17             Thank you so much, Your Honor.  It's near the

18   end.  I have got it.

19   BY MS. BLOODWORTH:

20   Q.    Great.  On this slide, you have highlighted seven

21   inconclusive patients under IRAEs and ISRs.  Correct?

22   A.    Yes.

23   Q.    For the inconclusive patients in your data set did you

24   try to determine whether they experienced reduced or

25   increased severity?

Marias - cross

1    A.    Yes.

2    Q.    And how would you resolve whether those inconclusives

3    were better off under GA 40 or better under GA 20?

4    A.    In the manner that I testified about on direct.

5    Q.    And that was your trinomial analysis.  Is that what

6    you are referring to?  I used the wrong term there.  But

7    hopefully you will give me some leeway.

8    A.    No.  The trinomial analysis applies -- is an analysis

9    of the aggregate outcome of all of the individual

10   determinations.  And I understand your question to be about

11   an individual determination.

12   Q.    Well, let me ask a better question then.  Is it

13   possible to devise a weighting protocol to combine the ISR

14   events at their various severity levels to generate a single

15   standardized rate?

16   A.    Yes, I can conceive of such a scheme.  I think I even

17   referred to such an approach during my direct testimony.

18   Q.    I wanted to follow up a little bit on that, if I

19   could.  Under that type of weighting analysis, it would

20   depend upon how much weight you gave to the frequency and

21   severity of the ISRs in the different arms.  Is that

22   correct?

23   A.    No, not quite.

24   Q.    Well, in order to generate a single standardized rate

25   between mild, moderate and severe ISRs, for example, you

Marias - cross

1    could weight the value of the number of experiences of mild,

2    moderate or severe, and come up with one annualized rate, or

3    one standardized rate?

4    A.    That seems closer to something I could agree with,

5    except I still don't know what you mean.  If you could

6    define for me a standardized rate, what do you mean by one

7    standardized rate?

8    Q.    Okay.  Do you recall in your expert report providing

9    an example that if there was a patient with one moderate ISR

10   who was deemed with equivalent to two mild ISRs, then the

11   rates of hypothetically equivalent mild ISRs would be 78.21?

12   A.    Yes.  Footnote 47, I think.

13   Q.    That is the one I am trying to draw your attention to.

14   And if you had, instead, for the same patient one moderate

15   ISR, if you weight it with the equivalent of three ISRs,

16   then the rates of hypothetically equivalent mild ISRs would

17   be 91.25.  Do you recall that?

18   A.    No.  I had not actually committed the whole thing to

19   memory.  If you would like me to look at the actual

20   footnote, I would be glad to agree or disagree that that is

21   the import of the footnote.

22            MS. BLOODWORTH:  May I refresh the witness'

23   recollection, Your Honor?

24            THE COURT:  Yes.

25   BY MS. BLOODWORTH:

Marias - cross

1   Q.      I think you mentioned it was 47?

2   A.      Yes.  I have reread Footnote 47.

3   Q.      Do you agree with me that there is a way, when you are

4   calculating an annualized rate of mild, moderate and severe

5   ISRs, that depending upon at any weighting protocol used,

6   you could have a result that is better off under 20 than if

7   you used a different weighting protocol you would have a

8   better result for better off under 40?

9   A.      To the extent you are characterizing the example in

10  this footnote, yes, I certainly agree that was the purpose

11  of my presenting this example.  It is a little hard to do

12  mental arithmetic on the fly.  That was the import of the

13  example.  I can readily agree to that.

14  Q.      In your opinion, based on the footnote and what we

15  just talked about, the weighting protocol, a patient could

16  be better off under the 40 milligrams if the weight was

17  applied one way and that same patient would be better off

18  under the 20 milligram if the weight was applied a different

19  way?

20  A.      Yes, as long as we have in mind the understanding that

21  this is about the facts pertaining to a specific individual,

22  inconclusive case.  This is not a general proposition.  It

23  is a single illustrative example with numbers drawn from

24  data for a single specific patient.

25  Q.      Thank you.  If we could look at the numbers about a

1    single inconclusive patient as well.  If you could turn in

2    your binder to JTX-7012, please.  It's the black binder, the

3    big one.

4    A.    I am at 7012.

5    Q.    I believe you used this document in your direct

6    examination as well.  Correct?

7    A.    I don't recall this document.

8    Q.    My apologies.  You referenced a patient whose number

9    is listed on the document.  You did not refer to this

10   document.  Have you seen this document before?

11   A.    Yes, I have.

12   Q.    If you could look under the left-hand side, there are

13   three categories, IRAE categories, better off under GA 20,

14   better off under GA 40, and inconclusive.  Do you see those

15   categories?

16   A.    I see those three groups, yes.

17   Q.    And then there is another category under Tie.  But I

18   want to draw your attention to the inconclusive category,

19   please?

20   A.    Yes, I am there.

21   Q.    If you could look at the first patient, the patient

22   experienced 55.40 annualized mild IRAEs, 19.55 moderate

23   annualized IRAEs and 13.04 severe annualized IRAEs on the 20

24   milligram arm.  Correct?

25   A.    Yes.

Marias - cross

1    Q.    And on the 40 milligram arm the patient experienced

2    less annualized mild IRAEs at 42.81.  Correct?

3    A.    Yes.

4    Q.    And they experienced more moderate, reported to

5    experience more moderate IRAEs annualized on the 40

6    milligram arm at 31.54?

7    A.    Yes.

8    Q.    Looking at the severe column, that reports an

9    annualized IRAE of 11.27.  Correct?

10   A.    Yes.

11   Q.    So for this patient, 10710001, would the results --

12   would the determination of whether or not the patient would

13   be better off under 20 versus better off under 40 be

14   different under different weighting protocols?

15   A.    Yes.  That is the meaning of the inconclusive label.

16   Q.    Also in this column, I think it's five down, the fifth

17   patient on inconclusive, it is 10727001?

18   A.    I see that one.

19   Q.    There are 1772.29 mild, 238.32, but no severe

20   annualized IRAEs on the 20 milligram arm?

21   A.    That is what is reported here.

22   Q.    If you go over to the 20 milligram arm it is 581.53

23   mild, 88.61 moderate and 296.95 analyzed severe IRAEs.

24   Correct?

25   A.    I think you probably meant to direct me to the 40

Marias - cross

1    milligram arm for those numbers.

2    Q.    I did, sir.  Thank you for that correction, yes.  With

3    that correction, is that correct?

4    A.    I see those numbers, yes.

5    Q.    So that is in your analysis an inconclusive patient?

6    A.    Yes.

7    Q.    Even though under the 40 milligram arm, the patient

8    experienced nearly 300 severe IRAEs annualized and no severe

9    injection site reactions at all under the 20 milligram arm?

10   A.    It is an inconclusive case, given the entire set of

11   six numbers, including the ones that you have just directed

12   my attention to.

13   Q.    And, in fact, this patient, 10727001, had more severe

14   annualized IRAEs under the 40 milligram regimen than they

15   did severe and moderate under the 20 milligram regimen.

16   Right?

17   A.    Yes.

18   Q.    So the patient had more severe -- they had more

19   moderate and severe.  Now I am looking, Your Honor, and Dr.

20   Marais, please look at the 88.61 and the 296.95 numbers in

21   the GA 40 regimen for the same patient.

22         We are still at 10727001 under the 40 milligram

23   arm, the moderate IRAEs annualized reported is 88.61.

24   Correct?

25   A.    Yes.

Marias - cross

1  Q.    And the 296.95 for the severity in that arm.  Right?

2  A.    Yes.

3  Q.    So in the 40 milligram arm, this patient experienced

4  more moderate and severe IRAEs than on the 20 milligram arm.

5  Right?

6  A.    Yes.

7  Q.    And that data is inconclusive under your analysis for

8  whether or not this patient was better off under 40 or 20?

9  A.    That's the bin I put that patient in for purposes of

10  making the table, not, of course, for the statistical test

11  that I performed, as you know, and as I testified about on

12  direct.

13        So I have agreed a little too readily with where

14  I put this patient.  Certainly, in this table, this patient

15  belongs appropriately in the inconclusive group, then

16  without their telling the whole story, I testified about on

17  direct, treats all of these as if they were on GA 40 and

18  better off on GA 20.

19  Q.    Let's turn then to -- can we get PDX-5.50 back up.

20        This was a slide that you also presented during

21  your direct examination.  Correct?

22  A.    Yes.

23  Q.    Now, just to be oriented, the 40 that's reported in

24  the fourth row, it says no reaction on either 40 IRAEs and

25  40 ISRs, so there are 40 patients that experienced no

Marias - cross

1    reactions in either the 40 milligram arm or the 20 milligram

2    arm, ISRs?

3    A.    As reported in the ECRF data, yes.

4    Q.    That is data that you reported on when you made this

5    slide.  Correct?

6    A.    Correct.

7    Q.    So the use of defendants' products for these patients

8    wouldn't infringe the claims that you were looking at.

9    Right?

10   A.    I fear that question is drawing me outside my

11   expertise.  I am able to testify about statistical measures

12   and comparisons of rates and about -- I realize that is a

13   part of an infringement analysis.  But I just have not

14   expressed any overall opinion about infringement, which I

15   understand is a legal conclusion.

16             I can readily testify to comparisons of rates.

17   But your question seems outside my field.

18   Q.    I can rephrase.  That is, that for no reaction on

19   either, that is either the 20 milligram arm or the 40

20   milligram arm, those patients showed no reduction in

21   severity on the 40 milligram arm relative to the 20

22   milligram arm.  Correct?

23   A.    That is fair.  Those 40 individual patients, based on

24   these data, did not experience a reduction.  They had --

25   there was nowhere to reduce to, as it were.

1    Q.    If we could look at a slide that we made, to help this

2    along, is DDX-1550.3.

3          Dr. Marais, this is an adaptation of your slide

4    that we were just looking at.  I wanted to ask you some

5    questions.

6          Under your analysis, the better off under GA 40

7    was 49 for the IRAEs and 49 for the ISRs.  Right?

8    A.    Correct.

9    Q.    And the better off under GA 20 was one for each of the

10   IRAEs and the ISRs.  Right?

11   A.    That is also correct.

12   Q.    And the inconclusive patients, a couple of whom we

13   just discussed, were seven for the IRAEs and the ISRs.

14   Right?

15   A.    That's what I remember.

16   Q.    And then the patients that had no reaction on either

17   of the GA 20 or the GA 40 patients per IRAEs and ISRs.

18   Right?

19   A.    Yes.  As a whole, I believe these are the numbers from

20   my table.

21   Q.    So if you add up the patients that are better off

22   under GA 20, inconclusive or no reaction on either arm, for

23   the IRAEs and the ISRs, you would, it would sum up to be 48.

24   Correct?

25   A.    Yes.

Marias - cross

1   Q.    So the patients that are better off under GA 40 is 49

2   for IRAEs and 49 for ISRs, and those patients who are not

3   better off under GA 40 are 48 and 48 for the IRAEs and the

4   ISRs respectively.  Correct?

5   A.    I can readily agree.  Those patients that you have

6   labeled as not better off, when you do that arithmetic, you

7   do get 48, I do agree.

8   Q.    And for patients who are inconclusive, they are not

9   better off under GA 40.  Right?

10  A.    They might be.  They are inconclusive.

11  Q.    So you can't say either way.  Right?

12  A.    You can't say -- I can't say, as I testified on

13  direct, as a statistician, I can't say.  They could be

14  individually.  Some further inquiry could resolve that.

15  Q.    And I am just asking you as a statistician, not the

16  individual patient's perspective.  I am saying from the

17  numbers here you label them as inconclusive and I believe

18  you testified on direct that you, in doing your trinomial

19  analysis, included them in the better off under GA 20

20  analysis?

21  A.    I made that conservative choice, yes.

22  Q.    And the patent requires that there be proven reduced

23  severity of the 40 milligram relative to 20.  Right?

24  A.    I do recall that.

25  Q.    So if you have an inconclusive patient that is not

1     evidence of a reduced severity of 40 over 20.  Right?

2     A.     That seems fair.

3     Q.     And if you had no reaction on either, that is not

4     reduced severity of 40 over 20, either.  Right?

5     A.     For an individual patient of that kind with zero on

6     either, there is no increase and there is no reduction, I

7     agree.

8     Q.     And, of course, the patient is better off under GA 20

9     having shown a reduction in severity over the patient on the

10    GA 40.  Right?

11    A.     Certainly.  Those are easy to agree to.

12    Q.     So there is no statistical difference between the

13    patients for IRAEs or ISRs that are better of off under GA

14    40 and those that are not better off under GA 40.  Right?

15    A.     That depends on exactly what you mean by no

16    statistical difference.

17           I would be glad to explain why I add that

18    qualifier.

19    Q.     I would first ask you if you have ever done a

20    statistical analysis of the patients that are better off

21    under GA 40 versus the patients that are not better off

22    under GA 40?

23    A.     Yes.  That's how I view my analysis of severity.

24    Q.     Okay.  So is there a statistical significance between

25    49 and 48?

1    A.    That's a different question.  And it depends on

2    exactly what you mean by is there a statistical difference

3    between 49 and 48.  I would be -- I don't intend this to be

4    difficult at all.  But that's just not a question as a

5    statistician I can answer.  I would be glad to help you

6    clean up the question and then give you a simple answer to

7    it.

8    Q.    Let me try this:  Again, between better off under GA

9    40 and not better off under GA 40, this 49 to 48, there is

10   no statistically significant result.  Correct?

11   A.    Statistically significant result, that term always

12   requires that there be a well-defined question in the

13   background.  And you haven't yet -- you are pointing me,

14   with all due respect, you are pointing me to a table of

15   numbers and asking me if there is a statistically

16   significant result.  Statistically significant result with

17   respect to exactly what question?

18   A.    What is the question that you have in mind when you

19   asked me?

20   Q.    Is there a statistical difference between the patients

21   of 49 who are better off under GA 40 and 48 who are not

22   better off under GA 40?

23   A.    Interpreting your question as whether it is possible

24   to say from this that there is a statistically significant

25   excess probability over .5 of the category better off under

Marias - cross

1    GA 40, based on 49 versus 48, which I have testified, I

2    believe, is a scientifically irrelevant question.  But

3    interpreting your question as that, I agree that one could

4    not conclude from this table that the excess of 49 over 48

5    represents a statistically significant excess, over a 50

6    percent rate of "better offness" under GA 40.

7    Q.    And you said you don't think that's relevant.  That's

8    because you were comparing patients who are better off under

9    GA 40 to those who are better off under GA 20.  Correct?

10   A.    No.  That's not the reason I had in mind.

11   Q.    Okay.  In your analysis, did you ever look and compare

12   the patients -- excuse me.  Let's strike that.

13         You never counted into your analysis that the

14   patients who have no reaction on either the 40 milligram arm

15   or the 20 milligram arm of 40 for the IRAEs or the ISRs,

16   whether those patients would be statistically different from

17   the patients who are better off under GA 40.  Right?

18   A.    I think you are referring back to the question about,

19   which I have already answered, that there is not a

20   statistically significant excess frequency?  If by what you

21   have just asked you mean that same question again, I still

22   have the same answer as before.

23   Q.    The patents require the results of your analysis to

24   show that the patient will be better off under the 40

25   milligram regimen relative to the 20 milligram regimen.

Marias - cross

1    Correct?

2    A.    The words better off, to the best of my knowledge, do

3    not appear in the patent.  And therefore, I can only answer,

4    respectfully -- it depends on what you mean when you say

5    better off.

6    Q.    Those are your words, right, Dr. Marais, better off?

7    A.    They are my words.  But I think your question is not

8    about my interpretation of my words but about my

9    interpretation of the patent language, I thought.

10   Q.    I thought you testified, based on your analysis, that

11   patients -- that defendants' product would infringe these

12   claims because you clearly concluded that patients were

13   going to be better off under a GA 40 regimen?

14   A.    There is a chain of logic in my analysis where points

15   are linked together.  Your question does refer to two of the

16   links in that chain.  But there are some links in between.

17   Q.    It's a simple question, Dr. Marais.  The patent

18   requires reduced severity of 40 milligrams relative to 20

19   milligrams.  Right?

20   A.    I can easily agree to that, yes.

21   Q.    And a showing of 49 patients being better off under GA

22   40 is not evidence that there is, to a statistical

23   significance, that the patients are better off under GA 40

24   versus those that are not better off under GA 40.  Right?

25   A.    There I can't agree with you.

Marias - cross

1    Q.    Because you don't think it's proper to compare, or to

2    summarize, or sum up the patients that are under the

3    categories better off under GA 20, inconclusive, or no

4    reaction in either?

5    A.    No, because I don't find the .5 or 50-percent

6    requirement anywhere in the patent language or in the

7    concept of a reduction in severity, as I testified on

8    direct.

9    Q.    Well, the patent requires there to be a showing of

10   reduced severity relative to 20.

11            The patent sets the odds.  Right?

12   A.    The patent contains the reduced severity language.  As

13   a statistician, reading that language, I never encountered

14   50 percent or a margin of excess over .5 in the language of

15   the patent.  I read reduction in severity.  But where your

16   question eludes me is how you possibly can get a 50 percent

17   requirement from that.  And I would be -- I could explain

18   what seems to be the difference between the premise of your

19   question and my own thinking in an illustrative example.  I

20   would be happy to do that if you would like.

21   Q.    The patent requires there to be a reduction in

22   severity over -- relative to the 20 milligram.  Correct?

23   A.    Absolutely.

24   Q.    So if you have no evidence of a reduction of severity

25   in the 40 milligram arm compared to the 20, then there has

Marias - cross

1    been no shown reduced severity.  Correct?

2    A.    If, counterfactually, I have no evidence of a

3    reduction in severity, then I would have no evidence of a

4    reduction in severity.  But I spent well over an hour

5    testifying on the evidence that I have of a reduction in

6    severity.  So it is counterfactual.

7    Q.    It is not counterfactual.  It is right there on the

8    screen.  It says no reaction on either, no reaction on

9    either the 20 milligram or the 40 milligram arm means that

10   there was no reduction on the 40 milligram arm.  Right?

11   A.    I respectfully am unable to agree with you.  That is a

12   logical fallacy.  I would be glad to explain why it is a

13   fallacy.

14   Q.    It's the claim of the patent that you were asked to

15   opine on, you submitted three expert reports, you were

16   deposed, you testified for an hour and a half.  Is it your

17   understanding that what you are here to do today is to not

18   show a reduction of 40 milligram in severity relative to 20?

19   A.    It is my understanding that that is exactly one of the

20   principal focuses of my testimony.

21   Q.    So a tie, like no reaction on either, is not a proven

22   reduction in severity on GA 40.  Right?

23   A.    For that single patient, there is no reduction.  But I

24   do not understand the patent language to be referring to the

25   individual single patient that you have just picked as an

Marias - cross

1    example.

2              Neither to that individual patient nor to the

3    individual patient better off under GA 20.  We are not -- I

4    don't think we are meeting each other.

5              THE COURT:  This would be a good time to take

6    lunch.

7              (Luncheon recess taken.)

8              THE COURT:  Please, take your seats.

9              Ms. Bloodworth, continue.

10             MS. BLOODWORTH:  Thank you, Your Honor.

11   BY MS. BLOODWORTH:

12   Q.    Good afternoon, Dr. Marais.

13   A.    Good afternoon.

14   Q.    If we could please look at your Slide PDX-5.16?

15   A.    I am there.

16   Q.    I am told it takes a second to come up on the screen.

17   I can continue.

18             Thank you for your patience, Dr. Marais.

19             You relied on this slide in your direct

20   examination.  Correct?

21   A.    I used it as an illustrative example, if that is what

22   you mean by relying on it, yes.

23   Q.    And in your analysis, you used the data regarding

24   severity from the Glacier trial.  Right?

25   A.    That's correct.

Marias - cross

1    Q.    And the scale regarding severity was mild, moderate or

2    severe in that trial.  Right?

3    A.    Yes.

4    Q.    And on PDX-5.16, it defines how mild, moderate and

5    severe were used in the Glacier trial.  Correct?

6    A.    It -- the slide contains the written direction

7    provided to patients in the form of a diary card.  That is

8    not quite the same as how mild, moderate and severe were

9    used in the Glacier trial.  If that's what you mean, yes.

10   Q.    Yes, that's how patients understood how to record a

11   mild, moderate or severe injection site reaction or IRAE in

12   the diary card.  Right?

13   A.    This is one of the forms in which a communication was

14   made to patients.  I can't testify about what patients

15   understood.  I can testify that it is my understanding that

16   this is one of the forms of instruction provided to them.

17   Q.    And then the diary card, it was your testimony that

18   the diary card information for mild, moderate and severe was

19   then transferred into an ECFR database.  Correct?

20   A.    That is my understanding.

21   Q.    And then the database is what was used to generate the

22   data and create your paper.  Correct?

23   A.    Yes .  I would call it the data used for the results

24   in the Glacier paper.  I think that's what you meant.

25   Q.    These definitions of mild, moderate and severe, for

Marias - cross

1   the record, mild means symptoms which are easily tolerated,

2   moderate, symptoms sufficiently discomforting to interfere

3   with daily activity, and severe, symptoms which prevent

4   normal daily activities.  Those definitions of mild,

5   moderate and severe are not in the patents in suit.

6   Correct?

7   A.    I don't know the answer to that one way or the other.

8   Q.    You didn't review the patents in suit in forming your

9   opinions today?

10  A.    I reviewed portions of the patents in suit.  But the

11  patents are quite long and quite dense.  And I did not

12  commit them to memory sufficiently for me to answer that

13  question.

14  Q.    So it's fair to say you didn't factor into your

15  analysis any other definition of severity other than the

16  mild, moderate and severe definition that was used in the

17  Glacier trial.  Correct?

18  A.    No.  I did not use in my analysis, factor in -- this

19  is the definition that I employed and these are the

20  categories on which I based my work.

21  Q.    Thank you, Dr. Marais.

22          I have no further questions, Your Honor.

23          THE COURT:  Mr. Figg.

24  BY MR. FIGG:

25  Q.    Good afternoon, Dr. Marais.  My name is Tony Figg.  I

1    represent the Pfizer and Synthon defendants.  I have what I

2    hope to be just a few followup questions on the Glacier

3    paper, which is JTX-7134.  If you could locate that for me.

4              We will put the parts of it that I am going to

5    ask you about on the screen.

6              Let me know when you have found it?

7    A.    I have it in front of me, Mr. Figg.

8    Q.    If you would turn to the page with .4 at the bottom.

9    I think you have seen this before?

10   A.    I am there.  I am on that page.

11   Q.    I would like to take a look at Figure 2 first.  Figure

12   2 focuses on annualized rates of all IRAEs, mild, moderate

13   and severe, in both arms of the Glacier study.  Right?

14   A.    With one small but important correction, that would be

15   right, yes.

16   Q.    Well, it is entitled Annualized Rates of IRAEs.

17   Correct?

18   A.    I agree that the vertical access label reads

19   annualized -- and, you are referring me to the footnote, the

20   Figure 2 legend.  Yes, I do see those words.

21   Q.    And the only point I was trying to make is in this

22   figure there is no distinction between mild, moderate and

23   severe?  They are all lumped together?

24   A.    Agreed.

25   Q.    If we take a look at Figure 3, in Figure 3, moderate

Marais - cross

```
 1    and severe reactions are lumped together.  Right?

 2    A.    That is correct.

 3    Q.    And Figure 3 focuses on the annualized rate of the sum

 4    of those moderate and severe ISRs in each arm of the Glacier

 5    study.  Right?

 6    A.    Again, a small but important correction is needed.

 7          You referred to the sum of those.  They weren't

 8    simply added.

 9    Q.    They were counted together.  And what we see here are,

10    for example, in the first bar in that graph are the total,

11    moderate and severe IRAEs reported in the 20 milligram arm,

12    expressed as a rate?

13    A.    Expressed as an annualized rate, yes.

14    Q.    And similarly, what we see in the bar on the left of

15    this graph would be the annualized rates of moderate and

16    severe IRAEs that were reported in the 20 milligram arm?

17    A.    Yes.

18    Q.    And if we focus on the 20 milligram arm, from this

19    figure, we cannot determine the proportion of ISRs that were

20    severe in that arm.  Correct?

21    A.    I would agree.

22    Q.    And similarly, if we look at the 40 milligram arm, we

23    cannot determine the proportion of ISRs that were severe?

24    A.    I would agree again.

25    Q.    So we cannot determine from Figure 3 whether the
```

1    proportion of ISRs that were severe is higher, lower, or the

2    same in the 40 milligram group.  Right?

3    A.    We cannot find the answer to that question in Figure

4    3.

5              MR. FIGG:  Thank you.  Those are all my

6    questions, Dr. Marais.  Thank you.

7              THE COURT:  Mr. Wiesen, any redirect?

8              MR. WIESEN:  One or two short questions, Your

9    Honor.

10             THE COURT:  Go ahead.

11                      REDIRECT EXAMINATION

12   BY MR. WIESEN:

13   Q.    I want to make sure.  In response to Ms. Bloodworth's

14   questions right now after lunch, you did apply the Court's

15   claim construction in doing your analysis in this case?

16   A.    I did.

17             MR. WIESEN:  No further questions, Your Honor.

18             THE COURT:  Thank you, Doctor.  You are excused.

19             (Witness excused.)

20             MS. BLOODWORTH:  Your Honor, if we may approach

21   the podium?

22             After Dr. Marais's testimony, we have one

23   cleanup issue from the dep designation that were played last

24   night.  We are in agreement, Your Honor, that there somehow

25   was a mistake in the dep clip that was played for the Mylan

1    witness last night.  It omitted the last about 18 lines of

2    the designated testimony.

3              We were going to ask Your Honor for instructions

4    on how you would like us to handle it.  We can move in the

5    connected clip.  We can read them.  I was trying to save the

6    Court from having to watch the whole video.

7              THE COURT:  I am not going to watch the whole

8    video.

9              MS. BLOODWORTH:  I would just like it in

10   evidence.

11             THE COURT:  It should be in evidence.

12             Do you think it's critical for me to see it?

13             MS. BLOODWORTH:  I don't think it is critical

14   for you to see it.  There are a couple of lines that I

15   thought were critical.  If we could read it into the record,

16   that might be the best..

17             THE COURT:  Are you in agreement with that, Mr.

18   Mitrokostas?

19             MR. MITROKOSTAS:  That is fine, Your Honor.

20             THE COURT:  Go ahead.

21             MR. MITROKOSTAS:  For the record, Your Honor, we

22   are going to pick up from the deposition of Joseph Sobecki,

23   which is PTX-655, at Page 150, starting at Line 3.

24             "Question:  And besides the GALA trial were

25   there any other trials specifically referenced?

1                    "Answer:  No.

2                    "Question:  Did you talk to anyone about a trial

3        referred to as Glacier?

4                    "Answer:  No one other than outside counsel.

5                    "Question:  And those conversations were in

6        preparation for today's deposition?

7                    "Answer:  Yes.

8                    "Question:  Earlier you mentioned that Mylan has

9        not done any study on the efficacy, the safety or the

10       tolerability of its 40 glatiramer acetate product.  Do you

11       know why Mylan has chosen not to perform any such studies?

12                    "Answer:  FDA requirements for an ANDA

13       submission don't require us to conduct any clinical studies

14       of that nature in support of the FDA approval of our

15       glatiramer acetate injection 40 milligram per milliliter

16       product."

17                    THE COURT:  Okay.

18                    MR. MITROKOSTAS:  Thank you, Your Honor.  Would

19       you like us to hand in the clip?

20                    THE COURT:  However you want to handle it.

21                    MR. MITROKOSTAS:  Thank you, Your Honor.

22                    THE COURT:  It's in the record.

23                    MR. WIESEN:  Your Honor, with that, I believe,

24       subject to a couple of things that I will explain, the

25       plaintiffs rest on their infringement case.  It's subject to

```
 1    two things.  First, what we discussed at sidebar this
 2    morning that hasn't been resolved fully yet.  And second,
 3    there are short additional clips for Sandoz that include
 4    some issues that relate to validity as well.  And we have
 5    agreed to play them later in the case.  So it's subject to
 6    those clips for purposes --
 7              THE COURT:  So the record is open.
 8              MR. WIESEN:  For that purpose.  We have been
 9    told there will be no motions based on the lack of evidence
10    on that subject.
11              THE COURT:  Then I am about to hear a motion.
12              MR. WIESEN:  You may be.  Not from us, but from
13    them.
14              THE COURT:  I suspect I will.
15              Ms. Bloodworth.
16              MS. BLOODWORTH:  Your Honor, yes, we would like
17    to make a motion under Federal Rule of Civil Procedure 52(c)
18    for entry of partial findings.
19              THE COURT:  Okay.
20              MS. BLOODWORTH:  Your Honor, I actually made a
21    slide because there are a lot of claims at issue in this
22    case, and I thought it might be helpful if we could have it
23    written down.
24              Let me try the easy one first.  There is two
25    bases, at least for Mylan's motion.  I probably speak on
```

1      behalf of many defendants.  The first is that the plaintiffs

2      have asserted Claims 1 through 9, 12 through 20 of the '250

3      patent, 1 through 20 of the '413 patent, 1 through 12 of the

4      '302 patent, one 2, 5 through 7, 9, 12 through 13, 16

5      through 19 and 21 through 24 of the '776 patent.

6                   Yesterday and today we have heard no evidence

7      from plaintiffs relating to Claims 2 through 9, 12, and 18

8      through 20 of the '250 patent, Claims 2 through 6, 8 through

9      14, 16 through 19 of the '413 patent, 2 through 9 and 12 of

10     the '302 patent, and 6 and 7, 13, 17 to 19 and 21 to 24 of

11     the '776 patent.

12                   So, Your Honor, this leaves us with the

13     remaining claims in the far right column.  We would again

14     request entry of partial findings of no infringement as to

15     the claims for which there has been presented no evidence.

16     This would greatly streamline the invalidity portion of the

17     case.

18                   THE COURT:  Mr. Wiesen, do you and your

19     colleagues agree with that assessment?

20                   MR. WIESEN:  Your Honor, we certainly agree, as

21     we said in the opening, and we proved with our witnesses,

22     that we did not assert all of the claims through the trial .

23     I do not agree with the list that Ms. Bloodworth has here.

24     I am double-checking the list.  But I know that there were

25     additional claims that we did put on evidence for.  I want

1    to double-check that list against her list.

2         I agree, there are some claims that we indicated

3    on Monday in the opening we were dropping.

4         THE COURT:  So perhaps, after some opportunity

5    to confer, you can agree on a stipulation.

6         MR. WIESEN:  I suspect we can, Your Honor.  That

7    is why we dropped them before trial.  There wasn't a

8    stipulation entered.  But we can find some language to

9    address those claims.

10         THE COURT:  Okay.

11         MS. BLOODWORTH:  Your Honor, I will clarify that

12    in going through his infringement proofs yesterday, we have

13    heard nothing else today, Dr. Wynn did not proffer evidence

14    on some of the claims in addition to what plaintiffs had

15    already represented they may think about dropping.  So we

16    will hear from them and our motion has been made.

17         Thank you.

18         THE COURT:  Okay.

19         MS. BLOODWORTH:  Then the other motion, Your

20    Honor, we would like to make is that we move for partial

21    findings as plaintiffs have proffered no showing that

22    defendants directly or indirectly infringe Claim 7 of the

23    '413 patent, Claims 14 through 18 of the '250 patent or any

24    claims of the '776 patent.

25         There is no direct infringement under 271(a).

1    It is undisputed that the defendants are manufacturing

2    companies.  There is no evidence of induced infringement in

3    this case so far proffered by plaintiffs.

4            All of the claims of the '776 patent and Claim 7

5    of the '413 and Claims 14 through 18 of the '250 all require

6    improved tolerability based on reduced frequency of

7    injection site reactions or immediate post-injection

8    reactions, or reduced severity of those, all relative to the

9    20 milligram product.

10           There is no evidence that defendants will

11   encourage doctors and patients to use their products to

12   treat patients in order to have improved tolerability or

13   reduced severity at all.

14           It is undisputed that there is no information on

15   defendants' package inserts making tolerability or reduced

16   severity claims.  There is no evidence of reduced frequency

17   of ISRs or IPIRs and no evidence of reduced intensity of

18   ISRs and IPIRs.

19           The only evidence adduced by plaintiffs was that

20   various clinical trials information on our labels have

21   certain lower incidence of certain reactions reported in 40

22   milligram trials versus placebo and 20 milligram trials

23   versus placebo.  Incidence is not frequency and a lower

24   value in incidence is not what the claims as construed by

25   this Court require, which is a reduced review rate of

1    frequency or a reduced intensity, which is severity.

2             Plaintiffs' evidence ignored the express

3    instruction on defendants' label to not compare results in

4    various clinical trials and that appears immediately above

5    the information that they relied upon.

6             Another undisputed fact is that even Teva cannot

7    undertake improved tolerability or reduced severity claims

8    over the 20 milligram product on its label.  So it is hard

9    to understand how generics can also make those claims on our

10   label.

11            This brings us to the Glacier study.  Glacier is

12   simply not in our labels whatsoever.  There is no evidence

13   that the Glacier label appears on our labels.  This really

14   is -- this case is based on the submission of our ANDAs,

15   that included our package inserts.  At the time that we

16   submitted our package inserts Glacier had not even become

17   published yet.

18            There is no evidence that any of the defendants

19   would promote their patients based on the Glacier data.  In

20   Mylan and some of the other defendants cases, there is no

21   evidence that the Glacier trial was even known to Mylan,

22   much less that it would be used to try and encourage,

23   actively encourage doctors to treat patients using it for

24   the purposes of reduced severity or increased tolerability

25   over the 20 milligram product.

```
 1              So this is a Hatch-Waxman case, Your Honor.  I

 2   do understand that it is a little uncommon to have

 3   noninfringement.  But we have been accused of infringement

 4   based on indications that are not even FDA-approved for

 5   plaintiffs yet.  So this is an interesting Hatch-Waxman case

 6   where if our label copies the plaintiffs label, game over.

 7              These are claims, and the attributes of the

 8   method that aren't even approved by the FDA.  And the

 9   testimony has been very clear and undisputed that neither

10   side can make these claims -- well, to doctors using the

11   product insert.  Not until the FDA approves it.

12              So therefore, Your Honor, we would like to move

13   under Rule 52(c) that Claim 7 of the '413, Claims 14 through

14   18 of the '250, all of the claims of the '776 patent are not

15   infringed under 271(b) or induced infringement.

16              Also, for the same claims, Your Honor, we would

17   like to enter a 52(c) that there is no evidence of

18   contributory infringement.  It is undisputed that

19   plaintiffs' product will be used to treat patients other

20   than those patients currently taking the 20 milligram

21   product.  Defendants' product will be used to treat patients

22   who are currently using Teva's 40 milligram product .  And

23   plaintiffs' evidence from Mr. Hassler is that this is a

24   significant part of the market.  And of course defendants'

25   products will be used to treat patients who have
```

1     unfortunately been recently diagnosed with multiple

2     sclerosis.

3                Again, it was in Mr. Hassler's testimony

4     yesterday that these products are FDA-approved as a

5     first-line treatment, so there really can be no dispute that

6     there are substantial non-infringing uses for defendants'

7     products.  For that reason, Your Honor, we would also

8     request a partial entry of judgment on Claim 7 of the 413,

9     Claims 14 through 18 of the '250, and all claims of the

10    '776.

11               Thank you, Your Honor.

12               THE COURT:  Let Mr. Rakoczy go.  And you can

13    respond.

14               MR. RAKOCZY:  William Rakoczy for Sandoz and

15    Momenta, Your Honor.  Sandoz and Momenta would like to join

16    that motion.

17               THE COURT:  I sort of assumed that all

18    defendants did.

19               MR. RAKOCZY:  I wanted to make it clear she

20    said -- didn't you say you were speaking for all defendants?

21               MS. BLOODWORTH:  If I didn't make the record

22    absolutely clear, that's correct, Your Honor.

23               THE COURT:  That's what I thought.

24               MR. WIESEN:  Your Honor, I think our view, I

25    have gotten a list of claims, is that we have presented

1    sufficient evidence to move past this motion for Claims 1,

2    2, 5, 6, 9, 12, 16 and 17 of the '776 patent, Claims 1, 5,

3    13 through 17 of the '250 patent, Claims 1, 7, 15 and 20 of

4    the '413 patent, and Claims 1, 10 and 11 of the '302 patent.

5              THE COURT:  You are able to say, other than

6    that, you can agree.  So at least we can pare this down?

7              MR. WIESEN:  A little, Your Honor.

8              THE COURT:  I would expect a stipulation to that

9    effect.

10             MR. WIESEN:  We will prepare that, Your Honor.

11             In response to what Ms. Bloodworth said, I think

12   the evidence you have heard is more than sufficient to carry

13   our burden.  There are some claims, to be clear, that I

14   think she is not asking for a directed verdict on.  I think

15   she will admit that some of the claims that were left on her

16   chart would have to go forward and they are trying to narrow

17   the case but not eliminate it, because there are some claims

18   that they have no defense to infringement on.  She is only

19   trying to knock out the claims with the reduced severity and

20   the reduced tolerability or reduced frequency based on the

21   Glacier study and based on the question of direct and

22   induced infringement .

23             We think on those issues we have presented more

24   than sufficient evidence to survive the motion.

25             When it comes to the direct infringement

624

```
1    question, we heard from Dr. Wynn and Dr. Marais that
2    patients and doctors will practice the invention based on
3    the labels and based on the products, as we understand them.
4    In a Hatch-Waxman case, all we have is what they are seeking
5    to get approval for and we work off of that.
6              The evidence from Dr. Wynn and Dr. Marais is
7    more than enough to establish, for this standard, certainly,
8    that there is direct infringement, including the reduced
9    tolerability, reduced frequency, and reduced severity
10   claims.
11             If we then turn to the inducement question I,
12   Ms. Bloodworth had a number of arguments about what was or
13   was not in their label.  I think your decision, Your Honor,
14   in the Bone Care case addresses this almost directly and the
15   evidence we put on here is similar to the evidence there,
16   which is that the defendants would like to ignore what
17   doctors know when they sell this product.
18             This is not a case about an off-label use.  The
19   use that they are seeking approval for is to give this
20   product to MS patients, to relapsing remitting MS patients.
21   That is what the label requires.  The claims are directed to
22   population with relapsing remitting MS.
23             It is not a case where the label is for the flu
24   and we are excusing them of infringing a patent for treating
25   cancer.
```

1          This is a case where their label encourages

2     people to treat MS, and if they treat the MS the result of

3     the evidence here is that we will end up with some of the

4     patients with, as you said, a patient, at least, in your

5     claim construction, will infringe.  And they would like you,

6     contrary to your decision in the Bone Care case, and your

7     decision a few weeks ago in the Vanda Pharmaceuticals case,

8     where you did not focus on just the label but understood

9     that doctors and patients bring to the table other

10    information that's provided.

11         We think that evidence is more than sufficient

12    and that under the current law from the Federal Circuit on

13    inducement, you have gotten that correct and that we have

14    established induced infringement and the direct

15    infringement.

16         If I could turn to the contributory infringement

17    issue, I think the additional argument Ms. Bloodworth makes

18    is the question of whether there are substantial

19    non-infringing alternatives.  We think here the question is

20    not whether there is a substantial non-infringing

21    alternative for each individual claim, but for the patents

22    as a whole.

23         Here, since they are not contesting that the

24    uses infringe at least some of the asserted claims, there is

25    no substantial non-infringing alternative.

1               There is case law certainly in the damages

2     context that suggest that one looks at the entire market and

3     the entire set of claims to determine what is a substantial

4     non-infringing alternative.

5               With that, we think, unless you have questions,

6     which I am happy to address...

7               THE COURT:  No.  I am going to reserve on these.

8     It would be a fool's errand for me to try to parse the

9     arguments of both sides.

10              When you say, Ms. Bloodworth, there is no

11    evidence, and you say there is, well, I think I should

12    afford myself the opportunity to look at the record as

13    fulsomely as I possibly can.

14              Since we are not too far from Philly and Philly

15    has turned into "Wentzylvania" who has a photograph memory,

16    I don't have a photographic memory like the young

17    quarterback.  'I have no idea where that came from.

18              In any event, I will reserve and anxiously await

19    your submissions.

20              I do have a question.  That is, would it make

21    sense to take a quick break to give you a chance to confer

22    on the claims you agree are out, and then the other side,

23    the defense doesn't have to adduce evidence on that?

24              MS. BLOODWORTH:  Thank you, Your Honor.  If we

25    could do that.

```
 1                    THE COURT:  I do have another question.  It's

 2       for Ms. Holland.  I want you, if you could, to refocus my

 3       attention on the, what I have called the second issue.  I

 4       have, I think, the solution to the first one.  You are not

 5       going to like it.

 6                    MS. HOLLAND:  It happens, Your Honor.

 7                    THE COURT:  Okay.  But what is the second issue

 8       again?

 9                    MS. HOLLAND:  The second issue, I believe what

10       you are referring to, Your Honor, is the clinical trial, the

11       GALA clinical trial protocol, which is a nonpublic document

12       dated after the filing date of the patents in suit here,

13       containing information on art that is postdated the filing

14       date of the patents in suit here.

15                    THE COURT:  So refocus for me what your

16       complaint is exactly.

17                    MS. HOLLAND:  Yes, Your Honor.

18                    THE COURT:  You are anticipating, right,

19       something that you think they want to do.

20                    MS. HOLLAND:  I am anticipating it based on the

21       pretrial order.

22                    THE COURT:  Go ahead.

23                    MS. HOLLAND:  What I am anticipating is that

24       they are going to have an expert get on the stand and give

25       opinions with respect to a document that is not prior art,
```

1    that is not public.

2           So there is two problems right there with the

3    opinions.

4           I understood when Dr. Klinger was on the stand

5    there was an allegation that this would go to her

6    credibility.  And since it was an internal document, Ms.

7    Bloodworth offered -- asked questions that she thought were

8    going to that issue.  However, when we are talking about an

9    expert, the expert's job is to look at the prior art that

10   was available as of the filing date.  This document does not

11   fall into that category for the two reasons I said.

12          Not prior art, and not public.

13          THE COURT:  Okay.

14          Mr. Anstaett --

15          MS. BLOODWORTH:  Mr. Anstaett is not here, Your

16   Honor.

17          MS. MAZZOCHI:  I can respond, if you would like.

18          Your Honor, I think it's very straightforward.

19   The GALA protocol was submitted to the FDA.  Their

20   statements that Teva made about prior art references in the

21   GALA protocol to FDA are fundamentally at odds with how they

22   and their experts are characterizing the prior art here.

23          The characterization that Teva made in the GALA

24   protocol to the FDA about why this should work, why you

25   would have had a reasonable expectation of success, then or

1   earlier, is based on certain references that today they are

2   going to come in and tell Your Honor, no, no, no, there was

3   never any expectation of success because look at this

4   factor, this factor, this factor.

5           So in this document that they submitted to FDA

6   and this GALA protocol, when they were giving rationales for

7   why this would actually work, all the things are going to

8   come up today that their experts are going to get on the

9   stand and say, no, no, no.  The art was there, they are not

10  in there.  We want to ensure that the document is introduced

11  so that we have the ability to say, essentially, that Teva

12  is trying to have it both ways.  They are trying to say art

13  is unpredictable here, in front of the PTAB.  But when it

14  comes to the way in which these references and what they

15  would have taught -- and these are prior art references, so

16  they are trying to say what they would have taught to

17  support their three times a week trial, is completely at

18  odds with what they are going to tell the Court they taught

19  back then.

20          And there is no intervening act or event that

21  came to light that changed the nature and state of the art,

22  that somehow made one thing relevant and one not.

23          I think we are perfectly entitled in terms of

24  probing frankly the credibility of Teva's case to be able to

25  say, look, this, Teva, is what you said before the

1     litigation about what these references taught.  Whether or

2     not that protocol is prior art or not, it is still an

3     admission against their interest.

4                 THE COURT:  Is there a disagreement over whether

5     it's prior art?

6                 MS. HOLLAND:  No, I don't believe --

7                 MS. MAZZOCHI:  We are not making the

8     representation that this is a prior art document.  We are

9     just saying it makes characterizing statements about the

10    prior art that are admissions against interest and we should

11    be allowed to point that out.

12                MS. HOLLAND:  Your Honor --

13                MR. FIGG:  Can I follow up with one point from

14    counsel table here?

15                THE COURT:  Yes.

16                MR. FIGG:  I think another issue here that the

17    Court may want to consider is the question is really can the

18    defendants ask Dr. Green about this document.  And I think

19    the foundation question is, as an expert opining on the

20    obviousness of an invention, is if an admission made by the

21    patent owner to a federal agency about the prior art

22    something that you would use to inform your opinion.  And if

23    it is, then Dr. Green should be able to talk about it.

24                MS. HOLLAND:  I still, with all due respect to

25    Mr. Figg, and I do have respect for Mr. Figg, and Ms.

1    Mazzochi, I don't believe that that is the right question

2    because the expert's opinion has to be about the prior art

3    as of the filing date.  The way the person of ordinary skill

4    and --

5              THE COURT:  I think the plaintiff has an unduly

6    narrow view and a constraining view on fact-finders like me

7    when it comes to this constant assertion that it's not prior

8    art, it's not -- in the cases that you site, some of the

9    cases that you cite, and I left them on my desk, my law

10   clerk has highlighted some quotes for me and I have looked

11   at them, and I will come back out and regurgitate them for

12   you, suggests a different result than the one you suggest I

13   should come to, on both questions.

14             MS. HOLLAND:  Your Honor, I believe that the --

15   there are two separate questions.

16             THE COURT:  There are two separate questions.

17             MS. HOLLAND:  Your Honor, I think the

18   distinction that I am trying to make is that this was -- Dr.

19   Klinger was on the stand and there were questions asked of

20   Dr. Klinger.  To the extent that defendants are saying this

21   is a credibility issue, which is my understanding of why

22   they are trying to bring this in, those questions were asked

23   of Dr. Klinger, the fact witness for Teva.

24             They are trying to double down on that with Dr.

25   Green, who is not a fact witness, and would not have had

1        access to that document.

2                THE COURT:  I disagree with you.  I think Mr.

3        Figg's question is well put.  There may be other questions

4        that, I am sure there will be, but I think that is one of

5        the question, foundationally, that needs to be propounded to

6        him.  I am willing to hear the answer to the question.

7                I guess I have ruled, in effect.  I will be a

8        little more specific at the end of the day, after we resume.

9                I am going to leave so you can talk about paring

10       the evidence down a little bit.

11               (Recess taken.)

12               THE COURT:  Take your seats.

13               Were you successful?

14               MR. WIESEN:  Yes, Your Honor.  We figured out

15       what the confusion was.  There are three additional claims

16       that were not in the remaining claim here, that we are

17       asserting 6 and 17 of the '776 and Claim 5 of the '250

18       patent.  Those are claims that for purpose of this trial we

19       won't require any additional evidence for infringement or

20       invalidity, because they will contain additional limitations

21       you construed as non-limiting in the claim construction

22       process.  They are being asserted in an abundance of caution

23       to preserve appellate rights.  We have agreed they will stay

24       in the case.  But in terms of evidence you will hear, you

25       will probably hear very little about them because the

1    additional limitations -- you will hear nothing about them,

2    because the additional evidence is by you construed as

3    non-limiting.  We are all following that claim construction,

4    preserving our rights, of course, to appeal it.

5                    THE COURT:  Sure.

6                    MS. BLOODWORTH:  Your Honor, I hand-wrote,

7    amended my chart.

8                    MR. WIESEN:  We can put it together in a

9    stipulation.

10                   MS. BLOODWORTH:  Much better than my

11   handwriting.  Thank you, Your Honor.

12                   THE COURT:  Mr. Rakoczy.

13                   MR. RAKOCZY:  Good afternoon, Your Honor.

14   William Rakoczy for Sandoz and Momenta.

15                   The defendants call as their first witness Dr.

16   Eric Jeffries as an expert to discuss various issues related

17   to noninfringement to certain claims of the patents in suit.

18                   THE COURT:  All right.  Do you want to pass out

19   those binders.

20                   ... ERIC JEFFRIES, having been duly

21        sworn as a witness, was examined and testified

22        as follows ...

23                   THE COURT:  Good afternoon, Doctor.

24                   THE WITNESS:  Good afternoon, Your Honor.

25                       DIRECT EXAMINATION.

1    BY MR. RAKOCZY:

2    Q.    Good afternoon, Dr. Jeffries.

3    A.    Good afternoon.

4    Q.    Would you please state your full name for the record,

5    sir?

6    A.    Eric M. Jeffries, M.D.  I am from Silver Spring,

7    Maryland.

8    Q.    Have you ever testified in court before, sir?

9    A.    No, sir, I have not.

10   Q.    Have you been retained as an expert in this case on

11   behalf of all of the defendants?

12   A.    Yes, I have.

13   Q.    What is your area of expertise?

14   A.    I am a practicing clinical neurologist with a focus on

15   multiple sclerosis.

16   Q.    Please look on your screen at JTX-7000, 7001, 7002,

17   and 7003.  Here we have the four patents in suit.  Have you

18   in fact reviewed these patents?

19   A.    Yes, sir, I have.

20   Q.    Have you formed opinions with respect to these

21   patents?

22   A.    Yes, I have.

23   Q.    Just generally, without telling me the specifics of

24   those opinions, what issues are you here to address today?

25   A.    Noninfringement of the claims in the patents in suit.

1  Q.    Have you prepared some slides to assist you with your

2  testimony?

3  A.    I have.

4  Q.    Sir, let's talk a little bit about your qualifications

5  and experience.

6          I would like to direct your attention to

7  DDX-1400, Slide 2.  Can you please tells, what is your

8  occupation?

9  A.    I am a practicing clinical neurologist at the

10  Neurology Center in the Washington, D.C. area.

11  Q.    What is the Neurology Center?

12  A.    The Neurology Center is the largest single specialty

13  private practice neurology group east of the Mississippi.

14  Q.    How long have you been treating neurological patients,

15  including patients with MS?

16  A.    Since I began my residency in 1999.

17  Q.    Where did you go to school?

18  A.    I did my undergraduate work at Johns Hopkins

19  University.  I did medical school at Howard University,

20  followed by an internship in internal medicine there.

21          I did a residency at the Tufts program in the

22  Boston area, followed by two fellowships at the University

23  of Maryland.

24  Q.    What were those fellowships in?

25  A.    The first was in clinical neurophysiology and the

1    second was in epilepsy.

2    Q.    And after your fellowships, what did you do next?

3    A.    I then became an attending physician at the Neurology

4    Center.

5    Q.    That is the position you still hold today?

6    A.    Yes, sir.

7    Q.    Do you have any board certifications?

8    A.    I am board certified in neurology by the American

9    Board of Psychiatry and Neurology.

10   Q.    Do you have a particular focus in neurology?

11   A.    My main focus is MS patients.  That is my largest

12   patient population.

13   Q.    Since 1999, about how many patients with MS would you

14   say you treated?

15   A.    Well over 500.

16   Q.    Have you treated patients with MS continuously

17   throughout your career?

18   A.    Yes, sir, I have.

19   Q.    About how many MS patients would you say are currently

20   treating?

21   A.    I currently care for 150 to 200 MS patients.

22   Q.    Of those MS patients you are now caring for, about how

23   many have a relapsing form of MS?

24   A.    Virtually all of them.

25   Q.    Is it fair to say you have experience using the

Jeffries - direct

1    different therapies in treating MS?

2    A.    Yes I do.

3    Q.    Do you have experience in particular with glatiramer

4    acetate or as the parties have been calling it GA

5    specifically?

6    A.    Yes, both in the 20 milligram and 40 milligram forms.

7    Q.    And you personally prescribe both the 20 milligram and

8    40 milligram GA formulations to your patients?

9    A.    I have.

10   Q.    Were you familiar with the various therapies available

11   to treat MS and particular relapsing forms of MS back in

12   2009?

13   A.    Yes, I was.

14   Q.    Can you look at your screen at DTX-1586.  Is this your

15   current CV, Doctor?

16   A.    Yes, sir, it is.

17   Q.    Are you a member of any professional societies?

18   A.    The American Academy of Neurology.  The American

19   Epilepsy Society, the Maryland State Medical Society, MedChi

20   and the Medical Society of the District of Columbia.

21   Q.    To what extent do you keep abreast of the current

22   literature on MS and epilepsy?

23   A.    I stay up to date by reading multiple journals each

24   month and following drug design and what's in the pipeline.

25   Q.    Have you attended any conferences on MS?

1    A.    I have.  I attend the American Academy of Neurology's

2    annual metering virtually every year.  And I have been to

3    the Atkins Conference several times and the American

4    Neurology Association conference.

5    Q.    Do you have any experience with clinical trials?

6    A.    Yes, I do.  I have been involved with patient

7    selection and trial design.

8    Q.    Please take a look at your screen, DTX-107.4.  We have

9    the 2004 Miller paper that you reviewed entitled The

10   Importance of Early Diagnosis of Multiple Sclerosis.

11           Have you ever reviewed this paper?

12   A.    Yes, sir, I have.

13   Q.    On the bottom right-hand on the first page under

14   Treatment of Multiple Sclerosis, Doctor, that quote, "Only a

15   small subset of the medical community makes treatment

16   decisions in patients with MS."

17           Are you a member of that small subset?

18   A.    Yes, I am.

19           MR. RAKOCZY:  Your Honor, at this time

20   defendants proffer Dr. Jeffries as an expert in the

21   diagnosis and treatment of patients with neurology

22   disorders, including patients with multiple sclerosis.

23           MR. WARE:  No objection to that, Your Honor.

24           THE COURT:  The Doctor is accepted as an expert

25   in that field.

1          MR. RAKOCZY:  Thank you, Your Honor.

2    BY MR. RAKOCZY:

3    Q.    Dr. Jeffries, before we get into more of the specifics

4    of your opinions of the patents in suit, I would like to

5    cover some of the basic fundamentals of MS.  We will try to

6    do this briefly.  We have already heard a little about this.

7    Let's look at your slide DDX-1400, Slide 4, this is the

8    Miller paper again.  What briefly is MS?

9          MR. WARE:  Your Honor, I have no objection,

10   obviously, to the Doctor explaining to us.

11          As far as referring to these articles, I don't

12   see why these are admissible or in what way they should be

13   used.  We should be hearing from the physician with respect

14   to his understandings.

15          THE COURT:  Do you really think he needs that?

16          MR. RAKOCZY:  I don't believe he does.  He cited

17   these in his report.  I thought I was being fair to the

18   plaintiffs.

19          THE COURT:  I am sure the Doctor is perfectly

20   comfortable discussing his area of expertise.

21          MR. RAKOCZY:  We can take it down.  I agree.

22          THE WITNESS:  Certainly.

23   BY MR. RAKOCZY:

24   Q.    Dr. Jeffries, just briefly, what is MS?

25   A.    Multiple sclerosis is a progressive disorder, a

1    chronic progressive disorder of the central nervous system,

2    which encompasses the brain and the spinal cord.

3              It involves lesions, which are due to the body's

4    own defense mechanisms, causing damage to the structures of

5    the central nervous system, nerves structures primarily that

6    are the coverings over the nerves in the central nervous

7    system.  It serves essentially like wires, it's called

8    Myelin.  It's like insulation.

9              What happens is that gets broken down, which

10   decreases the ability of transmission through that wire.

11             This happens both in the brain and the spinal

12   cord.  And beyond that, the underlying nerve fiber itself

13   can be damaged, as can the cells that produce that myelin,

14   cells called oligodendrocytes.

15             THE COURT:  Doctor, just direct your attention

16   that way.

17             THE WITNESS:  I apologize.

18             MS can result in a lot of different kinds of

19   symptoms, vision change, numbness, weakness, essentially

20   sensory issues, difficulties in cognition, that sort of

21   thing.

22   BY MR. RAKOCZY:

23   Q.    Are there different types of MS?

24   A.    Yes, sir.  There are multiple types of MS.

25   Q.    Let's take a look at DDX-1400, Slide 4.  What are the

Jeffries - direct

1   different types of MS?

2   A.      These are the primarily described types, relapsing

3   remitting multiple sclerosis, secondary progressive MS,

4   primary progressive MS, and progressive relapsing MS.

5   Q.      Is there one type more common than the other?

6   A.      RRMS is the most common type.

7   Q.      What briefly is RRMS?

8   A.      In relapsing remitting MS, patients experience

9   relapses in which they have rapid onset of neurologic

10  symptoms.  Those symptoms continue for a period, before

11  either improving and resolving or just settling down for the

12  baseline.

13          Then the patient has a period of where he felt

14  quite a sense of the disorder, in which they have a

15  remission, before they have another relapse.

16  Q.      I would like to discuss your own clinical practice in

17  a little more detail.  You stated you currently treat about

18  150 to 200 patients with MS?

19  A.      Yes, sir.

20  Q.      And over 500 in your career?

21  A.      Correct.

22  Q.      Could you please describe your general approach for

23  the Court in choosing a therapy for MS patients?

24  A.      Certainly.  The medications for MS all work, all the

25  FDA-approved medicines for MS are effective medicines.

Jeffries - direct

1             Patients who have MS are expected to be on the

2    medication essentially for the rest of theirs lives.  Given

3    that all these medications work, the most important thing is

4    to make sure they are actually willing and able to take the

5    medications.  Based on that what we are really looking at

6    primarily is the lifestyle factors of the patient, what they

7    are willing to do, what they are able to do.

8             So most of the decision-making is really theirs.

9    I laid out what the medications are, what the risks are, how

10   the medication is dosed, et cetera.  But ultimately, they

11   make the decision about what they are going to take.

12   Q.   Can I assume then you are familiar with package

13   inserts for various MS therapies?

14   A.   Yes, sir, I am.

15   Q.   We are going to get into the package inserts in more

16   detail.  What generally is your understanding of a package

17   insert?

18   A.   A package insert is a collection of information

19   regarding how the FDA approved the medication, what its

20   indications are and the possible risks and pitfalls

21   associated with the medication.

22   Q.   In your own practice, do you review or go over package

23   inserts with patients before you prescribe an MS therapy?

24   A.   We do not go over them with patients, no.

25   Q.   Do you make prescribing decisions for your MS patients

1   based on the package insert?

2   A.    No, sir, I don't.

3   Q.    In your practice, then, who ultimately makes the

4   decision about what MS therapy is going to be used?

5   A.    Ultimately, the decision is made by the patient, with

6   some input from me.

7   Q.    What therapies for MS have you prescribed to patients

8   suffering from RRMS?

9   A.    I have prescribed all the medications that are

10  currently on the market, save for one.  Both the 20 and 40

11  milligram formulations of glatiramer acetate, the

12  interferons, Avonex, Betaseron, Extavia, Plegridy, the oral

13  medications, Tecfidera, Gilenya, Aubagio, the monoclonal

14  antibodies, Ampyra, Tysabri, Lemtrada and the newest

15  medication I have actually not prescribed is called

16  Zynbryta, it came to market last month.

17  Q.    You mentioned you prescribe both the 20 milligram and

18  40 milligram GA products to patients with RRMS.  Are there

19  typical side effects associated with GA?  And can you give

20  us a few examples?

21  A.    Glatiramer is a pretty benign disease as far as side

22  effects go.  But commonly, we see patients who have

23  injection site reactions and immediate post injection

24  reactions, ISRs, injection site reactions, are at the site

25  of the injection itself, things like redness, itching,

1    swelling or pain.  And then IPIRs, immediate post-injection

2    reactions, are more systemic, things like chest pain,

3    anxiety, flushing, that sort of thing.

4    Q.    In your experience do all patients taking Copaxone or

5    GA experience ISRs or IPIRS?

6    A.    No, not at all.

7    Q.    Have you had patients experience ISRs on either the

8    Copaxone 20 milligram daily regimen or the Copaxone 40

9    milligram three times a week regimen?

10   A.    Yes, sir, I have.

11   Q.    Let's move on to some of your opinions that are more

12   specific to this case and the work you performed in

13   connection with those opinions.

14          Again, what were you generally asked by the

15   defendants to do in this case, Dr. Jeffries?

16   A.    To evaluate the patents in suit for the question of

17   infringement of the claims.

18   Q.    Did you consider both direct infringement by the

19   defendants and alleged indirect infringement?

20   A.    Yes, I did.

21   Q.    Were you also asked to evaluate and respond to the

22   opinions of Dr. Wynn with regard to alleged infringement?

23   A.    Yes, sir, I was.

24   Q.    Did you hear Dr. Wynn testify in court yesterday?

25   A.    I did.

Jeffries - direct

1    Q.    Let's look at DDX 1400, Slide 7.  Does this slide -- I

2    don't want to spend a lot of time on this -- just briefly,

3    does this set forth your understanding of a person of

4    ordinary skill in the art?

5    A.    Yes, sir.

6    Q.    Is this the definition you used in understanding of

7    the scope of the claims?

8              MR. WARE:  Objection.  I mean, foundation

9    questions are fine if they are leading.  But I think the

10   witness ought to be testifying.

11             THE COURT:  Okay.  That's fair.  Sustained.

12   Rephrase.

13             MR. RAKOCZY:  Absolutely.

14   BY MR. RAKOCZY:

15   Q.    Dr. Jeffries, did you apply a definition of the person

16   of ordinary skill in the art in rendering your understanding

17   of the claims in conjunction with the Court's claim

18   construction?

19   A.    Yes, sir, I do.

20   Q.    Does your slide, DDX-1400, Slide 7, set forth that

21   definition?

22   A.    It does.

23   Q.    Were you here yesterday to hear Dr. Wynn's definition

24   of the person of ordinary skill?

25   A.    Yes, I was.

Jeffries - direct

1   Q.      Would your understanding of the claims change using

2   his definition?

3   A.      No, sir, it would not.

4   Q.      Let's look at DDX 1400, Slide 8.   Which claims have

5   you formed opinions on, Dr. Jeffries?

6   A.      I formed opinions on direct infringement on all the

7   asserted claims of the patent in suit.   The indirect

8   infringement, I have formed opinions on indirect

9   infringement on Claims 14 through 17 of the '250 patent,

10  Claim 7 of the '413 patent, and Claims 1, 2, 5, 6, 9, 12, 16

11  and 17 of the '776 patent.

12  Q.      Just very briefly, Dr. Jeffries, what is your opinion

13  as to direct infringement of the asserted claims of the

14  patents in suit by the defendant?

15  A.      There is no direct infringement.

16  Q.      And just briefly, what are your opinions as to alleged

17  indirect infringement by the defendants as to the asserted

18  claims of the '776 patent, Claims 14 to 17 of the '250

19  patent, and Claim 7 of the '413 patent?

20  A.      There is no indirect infringement.

21  Q.      Let's take a look at DDX 14, Slide 9.   Just briefly,

22  what are some of the documents reviewed in forming your

23  opinions?

24  A.      I reviewed the four patents, the opening expert

25  reports of both Drs. Wynn and Bell, the defendants' proposed

Jeffries - direct

1    package inserts, some prior art, and the Court's claim

2    construction orders.

3    Q.     You mentioned the Court's claim construction orders.

4    Let's take a look at DDX-1400, Slide 10.  From your review

5    of the Court's claim construction orders, what is your

6    understanding of the term severity in the context of the

7    '776 patent?

8    A.     Severity refers to the intensity of a given patient's

9    injection site and immediate post-injection reactions.

10   Q.     We have also heard a lot about the term frequency.

11   Are the terms severity and frequency of ISRs or IPIRs, are

12   those different or the same?

13   A.     They are different.

14   Q.     And how so?

15   A.     The frequency refers to how often an event occurs, The

16   rate of occurrence of a patient's injection site or

17   immediate post-injection reactions.

18   Q.     Now, let's take a look at DDX-1400, Slide 11.  Is this

19   part of the Court's claim construction order you also

20   reviewed?

21   A.     Yes, sir.

22   Q.     So we are going to get to the '776 patent obviously in

23   more detail.

24          When it comes to the reduced severity of

25   injection site reactions or IPIRs, what is your

Jeffries - direct

1   understanding of the Court's claim construction?

2   A.    My understanding is that it requires reduced severity

3   of a given patient's injection site reactions or IPIRs, not

4   over a population.

5   Q.    Now, can a patient experience less frequent ISRs

6   without a change in the severity of the ISRs?

7   A.    Yes, sir.

8   Q.    And than can you give us an example?

9   A.    Sure.  If a patient has an injection site reaction

10  every time they inject, say six millimeters of redness or

11  erythema, and if they inject seven days out of the week,

12  they are going to have seven injection site reactions over

13  the course of a week.  If they only inject three times of a

14  week, they are only going to have three injection site

15  reactions.  Same six millimeters, erythema.  So the

16  severity, the intensity of these reactions has not changed.

17  But the frequency of those clearly decrease.

18  Q.    There is another term, there is one more term I want

19  to go over that has been thrown around here.  That is

20  incidence of ISRs or IPIRs.  Can you tell us your

21  understanding of incidence?

22  A.    Incidence relates to how often an event occurs over a

23  population of individuals, how often we see it happen.

24  Q.    Is incidence different from frequency and severity of

25  an ISR or IPR?

Jeffries - direct

1    A.    Yes.   So the terms incidence, frequency and severity

2    are not specific to MS or ISRs or IPIRs.  They are general

3    medical terms.   I would like to go outside of MS, just to

4    describe something that I think we all sort of understand.

5              It occurred to me that one of the easiest things

6    to describe would be is something probably most of most of

7    us have experienced.   Nosebleeds.   Virtually everybody has

8    had a nosebleed over their life.   Over the course of a

9    lifetime the incidence of those bleeds is extremely high.

10   Throughout the population, everybody has them.

11             I haven't had a nose bleed since I was a child.

12   So my frequency of a nosebleed is extremely low, once over

13   the course of 45 years, might be, something like that.   So

14   the frequency of my nosebleeds is very low.

15             The incidence of those nosebleeds across the

16   population is extraordinarily high.  You didn't ask me about

17   severity, but, obviously, it is expected that those could

18   vary in one way or another.

19   Q.    Does the difference in the incidence of an ISR or an

20   IPIR indicate that the severity will be different?

21   A.    No, not at all.   They are unrelated concepts.

22   Q.    Is there any correlation in your opinion between

23   incidence and severity of ISRs or IPIRs?

24   A.    There is not.

25   Q.    Now, did you hear -- strike that.

Jeffries - direct

1                     You heard Dr. Wynn testify?

2    A.    I did.

3    Q.    What is the only type of data from the defendants'

4    package inserts that he cited and relied on in his

5    testimony?

6    A.    The only data he relied on was incidence data.

7    Q.    And again, that has nothing to do with severity?

8    A.    Nothing whatsoever.

9    Q.    Back for the '776 patent briefly -- why don't we pull

10   up the claims, DDX-1400, Slide 12, if we could, please?

11                    Here we have got independent Claims 1 and 5 of

12   the '776 patent.  And could you please just give the Court

13   your understanding of what these claims require?

14   A.    So in my view, the claims require that a patient was

15   immediately previously on 20 milligrams of glatiramer, and

16   had injection site reactions, or IPIRs, was then chosen to

17   be changed to 40 milligrams of glatiramer in order to reduce

18   the severity of those ISRs or IPIRs, and had such a

19   reduction.

20   Q.    Now, on your DDX-1400, Slide 12, there is some

21   highlighting in the claims, of Claims 1 and 5 of the '776

22   patent.

23                    What have you highlighted in, I guess that would

24   be pink on this slide?

25   A.    It's pink on the screen.  It's not so great on that

1   screen.

2          So the pink is the requirement for reducing the

3   severity of the injection site reactions of a given patient.

4   Q.    What about the blue highlighting here on your Slide

5   DDX-1400, Slide 12, for Claims 1 and 5 of the '776 patent?

6   A.    Blue is the requirement that the patient had

7   immediately previously been on 20 milligrams of glatiramer

8   acetate, which is based on the Court's claim construction of

9   the patient already taking 20 milligrams of the medication.

10  Q.    So let's look at DDX 1400, Slide 13, and a couple more

11  of the independent claims of the '776 patent.  Here we have

12  got Claims 12 and 16.  Have you done the same highlighting

13  exercise here?

14  A.    Yes, I have done the same thing.

15  Q.    In a nutshell, what is your understanding in the '776

16  patent as a practicing neurologist and in view of the

17  Court's claim constructions, obviously, on what it means for

18  reduced severity of the '776 patent?

19  A.    Reduced severity would mean that the patient would

20  have injection site reactions or IPIRs on 20 milligrams and

21  be chosen to change to 40 milligrams to have a reduction in

22  the intensity of that individual patient's ISRs or IPIRs in

23  going to 40 milligrams.

24  Q.    When you say the patient is chosen to switch from the

25  20 milligram to the 40 milligram, then what is your

Jeffries - direct

1  understanding of what kind of switches these claims cover?

2  A.    These would be direct switches from the 20 milligrams

3  glatiramer to 40 milligrams in order to reduce the severity

4  of the injection site reactions.

5  Q.    What about a switch from a 40 milligram branded

6  product to a 40 milligram generic product?

7  A.    I don't think that's what's required here.  The

8  requirement here is that the patient is already taking 20

9  milligrams and is moving to 40 in order to reduce the

10  severity.  You wouldn't move from a 40 milligram product to

11  a 40 milligram product in order to reduce severity of ISRs.

12  That wouldn't make any sense.

13  Q.    Let's move on to a quick summary of the opinions, your

14  anticipated opinions here.

15        Let's look at DDX-1400, Slide 14.  Can you

16  please briefly summarize the opinions and testimony you

17  intend to give, Dr. Jeffries?

18  A.    That there is no direct infringement of the asserted

19  claims of the '250, '413, '302 or '776 patents, and there is

20  no indirect infringement of the asserted claims of the '776

21  patent, claims 14 through 17 of the '250 patent or Claim 7

22  of the '413 patent.

23  Q.    You mentioned you heard Dr. Wynn's testimony on

24  alleged infringement?

25  A.    Yes.

Jeffries - direct

1   Q.   Can you summarize for the Court, do you agree or

2   disagree with Dr. Wynn's testimony?

3   A.   I disagree with Dr. Wynn's testimony.

4   Q.   Can you just briefly explain why for the Court?

5   A.   First of all, Dr. Wynn said nothing at all about

6   direct infringement of the claims by the defendants.   And

7   then as far as indirect infringement goes, his initial

8   premise first of all is that the package inserts somehow

9   instruct a physician to infringe the claims.

10          But the package insert doesn't instruct

11   anything.   It's a list of information, a set of information,

12   that doctors can choose to use however they choose to do it.

13          Then, in sort of cobbling this together, he

14   looks at very varied areas of the package insert and even

15   outside information that isn't related to the package insert

16   directly, and believes that other doctors would do that even

17   despite the fact that the package insert itself says not to

18   do that.

19   Q.   What is your understanding of some of the assumptions

20   Dr. Wynn made regarding the data in the package inserts,

21   which we will get to more in a moment?

22   A.   Well, he used all this incidence data and conflated it

23   with severity data.   He then, again, put this incidence data

24   from very varied studies side by side, as if every doctor

25   would do that.   But we all took statistics and epidemiology

1     in order to become M.D.'s.  So we recognize that you can't

2     really do that.  You can't put that incidence data side by

3     side particularly and then call it severity.  I think those

4     are assumptions that were just inappropriate.

5     Q.    Let's move on to your evaluation of the infringement

6     issues.  We have to start with direct infringement.  As far

7     as I can tell, this could still be in the case, so we will

8     march through it real quickly.

9     A.    Yes, sir.

10    Q.    At a high level, what are all the claims of the

11    patents in suit directed to?

12    A.    Administration of a medication to a patient.

13    Q.    Now, what is your understanding of the defendants'

14    planned activities with respect to their generic 40

15    milligram GA products?

16    A.    The defendants are all pharmaceutical manufacturers,

17    intend to manufacture the medication.

18    Q.    Who will administer the defendants' 40 milligram GA

19    products once approved?

20    A.    The patient, him or herself usually, sometimes

21    caregivers, and on occasion medical professionals.

22    Q.    Will the defendants directly administer their

23    respective GA products, in your opinion?

24    A.    No, sir, they will not.

25    Q.    What is your opinion then regarding direct

Jeffries - direct

1    infringement by the defendants of any of patent in suit?

2    A.    There is no direct infringement.

3    Q.    Did you hear any opinions from Dr. Wynn or any

4    testimony regarding direct infringement by the defendants?

5    A.    No, I did not.  None whatsoever.

6    Q.    Let's move on to indirect infringement then.

7              We will start with just a very quick general

8    overview of defendants' package inserts, then we will get

9    into some more specifics of those inserts and some of Dr.

10   Wynn's opinions.

11             To speed things up, can you please look on your

12   screen at DTX-3012, which is Mylan's package insert,

13   DTX-1619, which is Amneal's package insert, DTX-1620, which

14   is Dr. Reddy's package insert, DTX-1622, which is the

15   Synthon package insert, and DTX-1621, which is the Sandoz

16   package insert.

17             Have you reviewed all of these, of the

18   defendants' package inserts, Dr. Jeffries?

19   A.    Yes, sir, I have.

20   Q.    Are there any differences in any of the defendants'

21   package inserts that at all affect your opinions?

22   A.    Not that affect my opinions.  The only difference is

23   that the Synthon and Sandoz package inserts have language

24   regarding the use of 20 milligram glatiramer, whereas the

25   others only talk about the 40 milligram material.

1    Q.    Are you referring to the Dosage and Administration

2    sections?

3    A.    Yes, sir.

4    Q.    Do those dosages have any impact on your opinion?

5    A.    Not at all.

6    Q.    Would it be sufficient for your discussion today if we

7    used the Sandoz package insert at DTX-1621 as our

8    representative package insert?

9    A.    Absolutely.

10   Q.    Are your opinions equally applicable to all of the

11   defendants' package inserts?

12   A.    They are.

13   Q.    Let's look at DDX 1400, Slide 15.  Can you please just

14   briefly identify for the Court some of the sections we will

15   be discussing from the defendants' package inserts?

16   A.    Certainly.  We will be talking about the indications

17   and usage section, recommended dose and instructions for

18   use, the warnings and precautions, and the adverse reactions

19   with the clinical trials subheading.

20   Q.    Just generally, the indications and usage section, the

21   recommended dose section and the instruction for use

22   sections, what do these inform the physician, just

23   generally?

24   A.    The way the medication was approved for usage by the

25   FDA and how the FDA believes it should be used.

Jeffries - direct

1   Q.   Now, during his testimony on the reduced severity

2   limitations of the '776 patent, did Dr. Wynn, to your

3   understanding, rely on any of these sections?

4   A.   No, he did not.

5   Q.   Which sections did he point to?

6   A.   He pointed to warnings and precautions and adverse

7   reactions.

8   Q.   Just generally, what are those sections?

9   A.   Those are information regarding the pitfalls and risks

10  associated with using the medication.

11  Q.   Now, do the warnings and precautions section and the

12  adverse reactions section on the package inserts instruct

13  the physicians about how he or she must treat the patient?

14            MR. WARE:   Objection to the leading nature of

15  that.

16            MR. RAKOCZY:   Strike that, Your Honor.

17  BY MR. RAKOCZY:

18  Q.   What do the warnings and precautions and adverse

19  reaction sections inform the physicians?

20  A.   Just about what the possible risks are, in the case of

21  6.1, what the experience in clinical trials was.

22            But nothing in the package insert is

23  specifically directed at what a physician must do regarding

24  the medication.

25  Q.   Let's talk a little more specifically about the claim

Jeffries - direct

1    limitations that we are going to go through with the

2    defendants' package inserts.  If we could look at DDX-1400,

3    Slide 16.  If you could briefly summarize what the '776

4    patent claims require, and we will break these down?

5    A.    The requirements, administration of 20 milligrams in a

6    patient that results in ISRs and/or IPIRs, that patient is

7    selected to be switched to 40 milligrams three times a week,

8    and that patient experiences reduced severity of the ISRs

9    and IPIRs.

10   Q.    Now, to simplify these things I am going to try to put

11   these things into a couple of buckets.  Can we refer to the

12   first two elements here, administering GA 20 mg daily

13   resulting in ISRs or IPIRs, then switching to the 40

14   milligrams three times a week, can we refer to those as the

15   prior GA therapy claims?

16   A.    Yes, sir, we can.

17   Q.    Dr. Jeffries, by the time the defendants' 40 milligram

18   GA products could be approved and commercially marketed,

19   would there be patients with a relapsing form of MS that

20   could be prescribed the defendants' 40 milligram products

21   that would not have already been taking the 20 milligram

22   daily regimen?

23   A.    Of course, they are.

24   Q.    Can we call those the non-switcher patients?

25   A.    Certainly.

1    Q.    Can you be more specific about who those are.  Let me

2    direct you to DDX-1400, Slide 17.

3    A.    Those would include patients who are medication naive,

4    who have never been on any medication despite having a

5    diagnosis of MS, patients who have been on other MS

6    therapies other than GA, and patients who are currently on

7    the branded 40 milligram Copaxone product.

8    Q.    Now, to your understanding, having heard Dr. Wynn

9    testify, was there any serious dispute that these encompass

10   those patients who would not already be taking the 20

11   milligram daily GA regimen?

12   A.    No, I don't think so.

13            MR. WARE:  Objection.  I think that is for the

14   Court to resolve, as opposed to the witness having heard the

15   testimony.

16            THE COURT:  I tend to agree with that, Mr.

17   Rakoczy.  I think it's not a controversial subject, either.

18            MR. RAKOCZY:  I was trying to knock it down,

19   Your Honor.  I didn't think it was in dispute.

20            THE COURT:  I don't think there is anything to

21   knock down.

22   BY MR. RAKOCZY:

23   Q.    Dr. Jeffries, let's go back to your summary slide,

24   DDX-1400, Slide 18.  I want to focus on the third element

25   you mentioned, where the patient switches to the 40

1    milligrams three times a week and experiences reduced

2    severity of ISRs or IPIRs.  Can we refer to that bucket that

3    is the reduced severity limitations?

4    A.    Certainly.

5    Q.    So what type of patient, then, do the reduced severity

6    limitations refer to?

7    A.    Patients who had ISRs or IPIRs on the 20 milligram

8    dosage form and were changed to 40 milligram dosage form and

9    had a reduction in the severity of the ISRs or IPIRs, the

10   intensity of the ISRs or IPIRs.

11   Q.    Do all patients experience ISRs or IPIRs when given

12   the 20 milligram GA daily regimen?

13   A.    No, sir.

14   Q.    Let's start with the prior GA therapy limitations of

15   the '776 patent.  And let's go to DDX-1400, Slide 19.  What

16   have you set forth here?

17   A.    So these are the requirements that the patient had

18   immediately previously been on a 20 milligram dose of

19   glatiramer acetate.

20   Q.    We are going to get into the defendants' package

21   inserts and the sections in more specifics in a moment.

22         I just want to get your overall opinion then.

23   To what extent do the defendants' package inserts inform the

24   physician regarding the prior GA therapy limitations?

25   A.    There is nothing in the package inserts whatsoever

1    that references the patient having previously been on 20

2    milligrams of glatiramer.

3    Q.    Did you find any instructions regarding switching

4    therapies in the defendants' package inserts?

5    A.    There are no such instructions throughout the

6    entire -- throughout any of the PIs.

7    Q.    Did you find any instructions regarding selecting a

8    patient who is already having ISRs?

9    A.    Not at all.  No mention of selecting patients with

10   ISRs.

11   Q.    Let's start marching through the defendants' package

12   inserts.  I want to start with the indications and usage

13   section.  Let's look at Page 1 of our representative package

14   insert.  It's DTX-1621.  You see we have Section 1,

15   Indications and Usage.  What does this inform the physician,

16   Dr. Jeffries?

17   A.    This informs the physician what the medication is --

18   the group in which the FDA approved this use for.

19   Q.    Is there -- what is that use?

20   A.    In this case, treatment of patients with relapsing

21   forms of multiple sclerosis.

22   Q.    Other than relapsing forms of MS, is there any mention

23   of the patient's clinical history or therapy?

24   A.    No --

25   Q.    In the Indications and Usage section?

Jeffries - direct

1    A.    No, sir, not at all.

2    Q.    Now, does the Indications and Usage section -- let me

3    strike that.

4          What does this then, in your opinion, inform the

5    physician about the use of the defendants' 40 milligram GA

6    products?

7    A.    Well, so it says that the FDA approved it for this

8    group.  I want to be clear that physicians can choose to do

9    whatever they want with this medication.  The reality is

10   that this is not an instruction.

11         But the only limitation that the FDA even put on

12   this was patients with relapsing forms of multiple

13   sclerosis.

14   Q.    So does this Indications and Usage section specify a

15   target patient population?

16   A.    Only inasmuch as it says for the treatment of patients

17   with relapsing forms of multiple sclerosis, not anything

18   more specific than that.

19   Q.    In your experience as a treating clinical neurologist

20   and your knowledge of package inserts for MS therapy, if

21   there's a target patient population, where would you expect

22   to find it in a package insert?

23   A.    You would expect to find it here, in fact, that is

24   what it says, relapsing forms of multiple sclerosis.  That

25   is what it is indicated for.

Jeffries - direct

1   Q.      Is there anything in the Indications and Usage section

2   about selecting a patient in a 20 milligram therapy

3   switching to the 40 milligram therapy?

4   A.      No, not at all.

5   Q.      Let's look at DDX 1400, Slide 20.  In terms of drug

6   therapies for patients that have relapsing forms of MS, what

7   is the universe of those patients?

8   A.      Patients who have never been on GA, patients -- who

9   have never been on any medication and have never been on GA.

10  Patients who have never been on GA but have been on other

11  medications for their multiple sclerosis.  Patients

12  currently taking the branded Copaxone 40 milligrams.  And

13  patients who are taking 20 milligrams of GA.

14  Q.      Does the Indications and Usage section express a

15  preference for any of these therapy options?

16  A.      No, it doesn't.  Doesn't mention that at all.

17  Q.      Who again makes the ultimate decision regarding

18  choosing a therapy for MS?

19  A.      The patient does in conjunction with their physician.

20  Q.      Now, I want to drill down on this a little more.  What

21  therapy options are available for treating a patient who is

22  already taking the 20 milligram GA daily therapy?

23  A.      They can be maintained on their 20 milligram therapy.

24  They can be changed to branded Copaxone, 40 milligrams.

25  Once approved, they could be changed to generic 40

1  milligrams GA.  Or they can be moved to one of the non-GA

2  therapies for MS.

3  Q.    Does the Indications and Usage section, one of the

4  defendants' package inserts, or anywhere else, for that

5  matter, recommend or state a preference for which of those

6  options should be pursued by the physician in a patient?

7  A.    That is never mentioned at all throughout the PIs.

8  Q.    Let's go to the recommended dose section, that you

9  mentioned to the Court.  This is at Page 2 of DX-1621.  A

10  representative insert, generally, what does this section

11  inform the physician, Dr. Jeffries?

12  A.    This talks about what the medication -- what use it

13  was intended for, what the FDA has approved it for, how to

14  administer the medication, and what the dosage is.

15  Q.    What does this inform the physician about selecting a

16  particular patient for treatment?

17  A.    It says nothing about a particular patient.

18  Q.    What about switching from one therapy to another?

19  A.    It doesn't say anything about switching from one

20  therapy to another.

21  Q.    Let's go to the Instructions For Use section, this is

22  on Page 2 of DTX-1621.  What does the Instructions For Use

23  section inform the physician about the use of the

24  defendants' 40 milligram GA products?

25  A.    It just talks about how to actually administer the

Jeffries - direct

1    product, in this case it talks about storage and how to

2    prepare the medication or to use it, and some of the things

3    to look out for.

4    Q.    Now, this one is actually titled Instruction.  So does

5    this instruct anything about which therapy to use?

6    A.    No, it doesn't.  It doesn't specify anything about

7    which therapy or which patients to choose.

8    Q.    Did you hear any testimony about these sections with

9    respect to the reduced severity limitations of the '776

10   patent?

11   A.    Sections 1 or 2, no, I did not.

12   Q.    I would like to turn to some of the sections that Dr.

13   Wynn specifically mentioned regarding the reduced severity

14   limitations and I want to start with the warnings and

15   reactions and -- strike that.

16          I would like to start with the Warnings and

17   Precautions and the Adverse Reaction sections, which start

18   on Page 2 of DTX-1621.  Could you please give the Court your

19   understanding of these sections and what they inform the

20   physician?

21   A.    Sure.  These are sections that talk about possible

22   adverse reactions associated with the medication, the risks

23   and pitfalls associated with the medicine.

24   Q.    Is there any instruction about a particular patient in

25   these sections?

Jeffries - direct

1    A.    No.   There is no discussion of choosing a particular

2    patient whatsoever.

3    Q.    Nothing about selecting a 20 milligram daily patient?

4    A.    No, not at all.

5    Q.    Is there any instruction regarding switching that

6    patient from one therapy to another?

7    A.    None whatsoever.   The only instructions out of at

8    least two sections is the instruction under 6.1 that says

9    that you shouldn't be comparing data from the two data sets

10   that they put into the clinical trials.

11   Q.    You got ahead of me, Dr. Jeffries.   Let's turn -- 6.1

12   is the clinical trials experience section.   Is that right?

13   A.    It is.

14   Q.    Okay.   What does this section inform the physician?

15   A.    Well, it talks about the incidence data from a

16   placebo -- the five placebo controlled trials for the 20

17   milligram glatiramer product.   It also separately talks

18   about the incidence data of adverse reactions in the single

19   40 milligram placebo controlled trial.

20         Then it specifically says that you shouldn't

21   compare those two sets of data.

22   Q.    I am going to come back to that statement in a moment.

23   I don't think this next point is controversial.   Just to be

24   crystal-clear here, what kind of clinical trials did the

25   sets of data come from on the 20 milligram and the 40

1    milligram products?

2    A.    They were placebo controlled trials.

3    Q.    So 20 milligram daily therapy versus placebo?

4    A.    Correct.  Five of those trials.

5    Q.    Then 40 milligram versus placebo?

6    A.    Right, one of those.

7    Q.    Is there any data in the package inserts or in the

8    defendants' package inserts on any trials in which the

9    patient was already taking 20 milligram daily therapy and

10   that were switched to the 40 milligram three times a week

11   therapy?

12   A.    No, sir, none whatsoever.

13   Q.    You mentioned something about not comparing these data

14   sets.  What did Dr. Wynn do in his opinion?

15   A.    He directly compared the data sets that are in this

16   section.

17   Q.    The package insert says don't do that?

18   A.    It says it right there.  It says that because clinical

19   trials are conducted under widely varying conditions,

20   adverse reaction rates observed in the clinical trials of a

21   drug cannot be directly compared to the rates in the

22   clinical trials of another drug.

23   Q.    What would a physician take away from that statement,

24   Dr. Jeffries?

25   A.    I mean, I think that physicians already know this.

Jeffries - direct

1    What we would take away from it is that the FDA is telling

2    you not to compare those two sets of data.  These are trials

3    that were done decades apart in completely different patient

4    populations under completely different conditions.

5              Like I said, I think we know you are not

6    supposed to compare this data.

7    Q.    Now, you said trials conducted under different

8    conditions.  What did you mean by that?

9    A.    Well, so, the placebo controlled trials for 20

10   milligram glatiramer, like I said, were done decades before

11   the 40 milligrams, but the injections that were used for the

12   20 milligram were prepared differently than the injections

13   that were used for the 40 milligram.  And then, as I said,

14   the patient populations are completely different.  There is

15   no overlap in those patients.  In fact, patients who had

16   been on glatiramer were intentionally excluded.

17   Q.    I want to quickly touch on a couple other sections,

18   then we will jump back to some of the data sets that Dr.

19   Wynn relied on.

20              Let's move deeper into the package inserts.

21   Page 16 of DTX-1621, there is a Section 17 entitled Patient

22   Counseling Information.  What does that inform the

23   physician, Dr. Jeffries?

24   A.    This is a group of information that the FDA would like

25   for us as physicians to impart to our patients.  It's things

1    they want us to counsel the patient on regarding possible

2    risks, side effects, and pitfalls of taking the medication.

3    Q.    Does the package insert say anything about what type

4    of counsel to give the patient regarding 20 milligram versus

5    40 milligram therapy?

6    A.    No, nothing whatsoever.

7    Q.    Any indication to counsel a patient to switch from one

8    therapy to another?

9    A.    Nothing about switching at all.

10   Q.    Does this instruct a physician to select a particular

11   patient for treatment?

12   A.    Certainly not.

13   Q.    I would like to direct your attention, it's on Page

14   18, it's the next section.  It's entitled Patient

15   Information Section.  Just briefly, what is this for?

16   A.    This is a pamphlet for the patient, him or herself,

17   actually.  It is intended for them to read it.  It's

18   information about what the medication is for, how it's used,

19   what the risks are, what they should and shouldn't be doing

20   with it.

21   Q.    Does this section express a preference for either

22   therapy, 20 milligram or 40 milligram?

23   A.    No, it doesn't, not at all.

24   Q.    Does it distinguish ISRs or IPIRs on the 20 milligram

25   therapy versus the 40 milligram therapy?

Jeffries - direct

1    A.    No, not in any way.

2    Q.    Does it tell the patient that they should ask their

3    doctor to switch if they are on the 20 milligram therapy and

4    suffering ISRs?

5    A.    No, it doesn't.

6    Q.    I would like to sum up on the prior GA therapy

7    limitations.  If we could look at your slide DDX-1400, Slide

8    21.  On your slide DDX 1400, Slide 21, are these the prior

9    GA limitations that you mentioned from all asserted claims

10   of the '776 patent, in particular, Claims 1, 2, 5, 6, 9, 12

11   and 16 and 17?

12   A.    Yes, they are.

13   Q.    In your opinion, Dr. Jeffries, as a treating clinical

14   neurologist, based on your review of the defendants' package

15   inserts, do those instruct, encourage or suggest the

16   selection of a patient who is currently taking the 20

17   milligram GA daily therapy and then to switch that patient

18   to the 40 milligram three times a week therapy as required

19   by all the asserted claims of the '776 patent, as we see on

20   DDX-1400, Slide 21?

21   A.    No, they do not.

22   Q.    What is your ultimate conclusion then on any alleged

23   or indirect infringement of the prior GA therapy limitations

24   of the '776 patent?

25   A.    There is no indirect infringement.

Jeffries - direct

1   Q.    Let's move on to the second bucket that you mentioned.

2   The reduced severity limitations.  Let's look at DDX-1400,

3   Slide 22.  What do we have here, or what have you shown

4   here?

5   A.    So this is the other thing that I had highlighted

6   previously, which is the requirement of producing reduced

7   severity of injection site reactions in a patient who

8   had had ISRs on 20 milligrams previously.

9   Q.    We are going to get into the specific sections of the

10   package insert again, particularly the ones Dr. Wynn pointed

11   to.  Before we do that, I want to get your overall

12   conclusion.  To what extent, in your opinion do the

13   defendants' package inserts instruct anything regarding the

14   severity of ISRs or IPIRs?

15   A.    Nothing overall.  The only time that the package

16   inserts talk about severity or intensity of ISRs and IPIRs

17   is to say that on 20 milligrams and on 40 milligrams, the

18   intensity was generally mild.

19   Q.    Hold on a second.  Let's take a closer look at that.

20         Let's look at Page 4 of DTX-1621.  I would like

21   to pull up, also, Page 8 of DTX-1621, which I think you have

22   on your screen here.  What is depicted here from Table 1 and

23   Table 2 of the defendants' package inserts, Dr. Jeffries?

24   A.    Okay.  So Table 1 is the incidence data on adverse

25   events from the 20 milligram glatiramer placebo controlled

1  trials.  Table 2 is the same type of data, incidence data on

2  adverse events, from the 40 milligram placebo controlled

3  trial.  And the heading over each of them -- again, these

4  two tables are four pages apart in the PI.  The heading on

5  each of them, at the end of the paragraph, each of them says

6  adverse reactions were usually mild in intensity.  That is

7  the only statement about intensity that is in the entire PI.

8  Q.    The same language in characterization for both the 20

9  and 40 milligram therapy?

10  A.    In that case.

11  Q.    Just to be clear, did you find any other mention of

12  intensity or severity of ISRs or IPIRs anywhere in the

13  defendants package inserts?

14  A.    Nowhere else throughout the entire PIs.

15  Q.    Is there any differentiation between the intensity or

16  severity of ISRs or IPIRs in these package inserts?

17  A.    They do not differentiate.

18  Q.    To what extent do these package inserts, then,

19  instruct the physician about selecting a patient who is

20  already suffering ISRs in the 20 milligram daily therapy

21  then switching that patient to the 40 milligram three times

22  a week therapy to reduce the severity of ISRs or IPIRs?

23  A.    They don't at all.

24  Q.    Let's go now to some of the specific data sets that

25  Dr. Wynn focused on yesterday and that you have also opined

Jeffries - direct

1    on.  Are you with me?

2    A.    I am.

3    Q.    Let's start with Section 6.1 on Page 3 of DTX-1621, I

4    want to focus on the ISR incidence data here.  Do you see

5    that?

6    A.    Yes, sir.

7    Q.    So can you just generally tell us, tell the Court,

8    what does 6.1 disclose regarding incidence data?

9    A.    Just, you know, we talked about this a little earlier.

10   This is just saying that it presents the incidence data from

11   the 20 milligram trials and the 40 milligram trials, but

12   that that data should not be compared.

13   Q.    Do you recall a chart yesterday that Dr. Wynn

14   presented during his testimony regarding some of the ISR

15   incidence data?

16   A.    Yes, sir, I do.

17   Q.    Could we please take a look at that chart, for the

18   record, it's PDX-4, Slide 25.  What is your understanding --

19   strike that.  For foundation, had you seen a similar chart

20   that Dr. Wynn prepared from his expert report?

21   A.    Yes.  He put a similar chart in his expert report.  It

22   is not exactly the same but it is from the same sources.

23   Q.    What is your understanding of this chart that Dr. Wynn

24   used at PDX-4 slide 25?

25   A.    Dr. Wynn took the two tables of data, the 20 milligram

1    incidence data and the 40 milligram incidence data, from the

2    separate placebo controlled trials.

3    Q.    Let me stop you.  I apologize.  Did you prepare a

4    slide to try to help explain what the analysis is?

5    A.    I did.

6    Q.    Can we go to DDX-1400 Slide 23?

7    A.    Yes.  This is it.  So he took the 20 milligram data

8    from Page 4, and the 40 milligram data from Page 8, stripped

9    them of the placebo information, which I thought was an

10   interesting choice in part because the placebo data is

11   dramatically different as well and would seem to suggest a

12   comparison of the data might not be a smart choice.  And

13   then ignores the statement on 6.1 that says that you

14   shouldn't compare this data.  And also never mentions the

15   point that the data suggested these adverse reactions were

16   mild in intensity in both situations.

17   Q.    Let's go back to that prior demonstrative, please.

18   Again, I am referring to PDX-4, Slide 25.  Dr. Jeffries,

19   where does this chart that Dr. Wynn made happen in the

20   defendants' package inserts?

21   A.    It doesn't appear in the package inserts.  Not in this

22   form.

23   Q.    So this data comes from different sections, four pages

24   apart?

25   A.    Four pages apart.  And again, stripped of placebo

Jeffries - direct

1    information, which I think is informative as well.

2    Q.    I want to emphasize this again.  What does the package

3    insert tell the physician about making a chart like this?

4    A.    It specifically tells you not to compare this

5    information.

6    Q.    Have you as a practicing neurologist ever assembled

7    data like this from a package insert for -- strike that.

8          Have you as a practicing neurologist ever

9    assembled data like this from a package insert for an MS

10   therapy, whether it be GA or a non-GA therapy?

11   A.    No, I have not.

12   Q.    Would you do that?

13   A.    No.  I don't think it's appropriate.

14   Q.    You already mentioned the instruction in the package

15   insert not to make that comparison.  Why else?  Is there

16   another reason why you wouldn't do it?

17   A.    Well, I mean, again, I don't think -- I don't think

18   that it's reasonable to put these two sets of data side by

19   side.  We understand that clinical trials are done under

20   widely varying conditions that, that the patient populations

21   are different and you can't compare one to the other.  The

22   reality is that when a new medication comes to the market,

23   drug companies, frankly, frequently try to say, well, our

24   drug is better because these numbers look like this, but we

25   have to understand that that isn't an appropriate comparison

1    to make.

2              To do that in this situation I think is just

3    outside the scope of what we would normally do.

4    Q.    Well, focusing on the package insert, though, does the

5    package insert say one therapy is better than another?

6    A.    No, it doesn't.

7    Q.    Anywhere?

8    A.    It never says anything about one therapy being better

9    than another.

10   Q.    Would the physician reading Section 6 take away

11   anything about the superiority of one therapy over another?

12             MR. WARE:  Objection.  I think he can give his

13   opinion.

14             THE COURT:  I agree.

15             MR. RAKOCZY:  I am sorry.  I apologize.  I will

16   rephrase it.

17   BY MR. RAKOCZY:

18   Q.    What is your understanding, Dr. Jeffries, about what

19   Section 6 informs the physician?

20   A.    Honestly, this is a PI for the 40 milligram

21   medication, all it informs me is what the adverse reaction

22   incidence was for the 40 milligram medication.  If that's

23   what I am looking for in the PI, that's what I am looking

24   for, is what those numbers are.  Those are not comparative

25   numbers, I wouldn't put them side by side.  It wouldn't make

Jeffries - direct

1    any sense to me.  If a doctor chose to do that, that would

2    be his or her choice but the package insert certainly

3    doesn't tell them to do it.

4    Q.    You mentioned incidence data.  I want to followup on

5    that.  How does the incidence if ISRs or IPIRs in this

6    section relate to the severity of those reactions?

7    A.    It doesn't relate in any way.

8    Q.    So what, in summary, does Section 6.1 disclose to a

9    physician regarding selecting a patient on a 20 milligram

10   therapy to switch to the 40 milligram to reduce the severity

11   of their ISRs?

12   A.    Nothing whatsoever.

13   Q.    Does it say anything about is selecting a particular

14   patient for treatment?

15   A.    It doesn't say anything about selecting a patient, no.

16   Q.    Let's go to the next data set that Dr. Wynn looked at

17   yesterday.  I believe it is on Page 2 of DTX-1621, again,

18   our representative package insert, I believe it is 5.1,

19   which is the IPIR incidence data.  What is your

20   understanding as a treating clinical neurologist about what

21   this section informs the physician?

22   A.    This also just describes the incidence of IPIRs in the

23   five placebo controlled 20 milligram GA therapy trials, and

24   then the incidence of IPIRs in the single 40 milligram

25   placebo controlled trial.

Jeffries - direct

1    Q.    So to be clear, does this section draw from those same

2    disparate clinical studies?

3    A.    Yes.  From the same studies.

4    Q.    Is that true of all the data sets in the package

5    inserts?

6    A.    Yes.  The only data in the package inserts is from

7    these placebo controlled trials.

8    Q.    So, again, just so we are clear, this mentions

9    incidence of patients IPIRs.  How does that relate to the

10   severity of IPIRs?

11   A.    It has no relationship to the severity.

12   Q.    Now, what would the physician then take away from this

13   section regarding selecting a 20 milligram patient for

14   treatment and then switching that patient to reduce the

15   severity of IPIRs?

16   A.    Nothing whatsoever.

17   Q.    What about switching a patient from the 20 milligram

18   to the 40 milligram, for any reason?

19   A.    It doesn't say anything about doing that.  There

20   wouldn't be any reason.

21   Q.    Would Section 5.1 suggest to the physician --

22              MR. WARE:  Objection.

23              THE COURT:  Sustained.

24              MR. RAKOCZY:  I apologize.

25   BY MR. RAKOCZY:

Jeffries - direct

1    Q.    What does Section 5.1 inform the physician about the

2    superiority of either therapy?

3    A.    There is -- this ultimately comes down to the same

4    thing.  There is no evidence here on superiority between one

5    drug and the other.  These two data sets are separate, they

6    are known to be separate, and there is no reason -- there is

7    no reasonable source in comparing the two drugs.  Otherwise,

8    you would have to say placebo was better than the other two.

9    Q.    So was any of the data in Section 5.1 or any other

10   section derived from head-to-head trials of the 20 milligram

11   versus the 40 milligram?

12   A.    No, there is no head-to-head data throughout the

13   entire package insert.

14   Q.    I apologize, I forgot to ask you earlier on the

15   incidence data in section 6.1.  I want to ask you for both

16   sections, 6.1 -- 6 and 5, does this incidence data relate

17   to -- strike that.

18             The incidence data in Section 6 and Section 5,

19   what does it relate to in terms of patients?

20   A.    The considerable occurrence of these adverse reactions

21   in the population of patients who were studied.

22   Q.    So not an individual patient?

23   A.    No.

24             MR. WARE:  Objection.

25             THE COURT:  Sustained.

1          THE WITNESS:  A population --

2          THE COURT:  He needs to post a non-leading

3    question.  He doesn't want you to testify.

4          THE WITNESS:  I apologize.

5    BY MR. RAKOCZY:

6    Q.    What type of -- strike that.

7          What generally does incidence data relate to?

8    A.    Incidence data relates to occurrences of --

9    occurrences within a population that's being evaluated.  So

10   it's how often something happens within the population as

11   opposed to how often something happens within an individual

12   within the population.

13   Q.    Did you hear Dr. Wynn's testimony that Section 5.1 and

14   6.1 would suggest to a physician that the 40 milligram

15   therapy is safer than the 20 milligram therapy?

16   A.    I did.

17   Q.    Do you agree with that?

18   A.    No, I don't.

19   Q.    Why not?

20   A.    Because, again, there is never comparative data.

21   There is never a point at which it says we took 20

22   milligrams and compare it to 40 milligrams in these

23   individuals.

24          This data should not be compared.  It

25   specifically tells you not to compare it.  So the idea that

Jeffries - direct

1    we would suddenly say, well, let's compare this doesn't make

2    any sense to me.

3              To take these numbers in these separate

4    populations and feel that one is going to be safer in a

5    given individual than the other just doesn't hold water.

6    Q.   Let's keep marching through and go to the next section

7    Dr. Wynn mentioned, which I believe is Section 5.3 on Page 3

8    of 1621.  You see it's entitled Lipoatrophy and Skin

9    Necrosis?

10   A.   Yes, sir.

11   Q.   What does this section inform the physician?

12   A.   This is about the incidence of lipoatrophy in the

13   placebo controlled trials of 20 milligrams and the placebo

14   controlled trials on skin necrosis.

15   Q.   Can you refresh us on what is lipoatrophy?

16   A.   Sure.  Lipoatrophy is just the destruction of

17   subcutaneous fat at the injection site.

18   Q.   Just to clarify, what type of clinical data was this

19   section derived from?

20   A.   This is from the placebo controlled trials.

21   Q.   So was there any head-to-head data on the 20 milligram

22   versus the 40 milligram therapy?

23   A.   No, there is not.  There is no head-to-head data at

24   all throughout the entire package insert.

25   Q.   What would the physician take away from this section

1   on lipoatrophy?

2   A.    Just the numbers that you see in front of you, that it

3   occurred in approximately 2 percent of those patients in

4   those five placebo controlled trials decades ago and  0.5

5   percent of the patients in the 40 milligram placebo

6   controlled trials I think done about five or six years ago.

7   Q.    What does this section tell the physician about the

8   severity of lipotrophy in the various subjects?

9   A.    Nothing whatsoever.  It doesn't refer to severity at

10  all.  The only thing that it does say is that you can

11  minimize these events by rotating sites.  But it doesn't say

12  anything about severity one way or the other.  Just how you

13  can decrease the frequency of them.

14  Q.    Are there other parts of the package insert that talk

15  about how to assist patients with lipoatrophy?

16  A.    I think there are instructions actually at the end,

17  there is a discussion of decreasing lipotrophy by rotating

18  injection sites appropriately.

19  Q.    Before we leave this section and go to that section,

20  what if anything -- strike that.

21        To what extent in your opinion does this section

22  inform the physician about selecting a particular patient

23  for treatment or switching that patient in order to reduce

24  the severity of lipotrophy?

25  A.    It doesn't say anything about that at all.

Jeffries - direct

1   Q.    Let's turn very quickly to the patient information

2   section you mentioned, which I believe is at the end on Page

3   18 of DTX-1621.  What does this section generally describe

4   to the physician?

5   A.    Again, this is really just a pamphlet for the patient,

6   him or herself.  It is directed at them.  It is about the

7   use of the medication.

8   Q.    Does this section inform the patient about injection

9   reactions?

10  A.    It does.  It talks about injection reactions and the

11  way to minimize them is to rotate through the sites that

12  they recommend.

13  Q.    Does the patient information section counsel a patient

14  on one therapy over another?

15  A.    No, not at all.  There is no mention of the two

16  therapies or changing therapies.  Not at all.

17  Q.    I would like to go to what I believe is one of the

18  last pieces of information or data sets that Dr. Wynn looked

19  at.  It is the discontinuation data on Page 4 of DTX-1621.

20  Are you there?

21  A.    I am.

22  Q.    What does this section inform the physician?

23  A.    This is the incidence of discontinuation in the

24  placebo control in this case of the 20 milligram medication.

25  Q.    How does the discontinuation rate from a study relate

Jeffries - direct

1    to the severity of ISRs or IPIRs?

2    A.    It doesn't.  This is discontinuation because of

3    adverse reactions.  But patients can discontinue because of

4    the frequency of adverse reactions as well or frankly just

5    the presence of adverse reactions.  Patients don't like

6    adverse reactions.  It is not all about what the severity of

7    them was.

8    Q.    So does this section in your view -- strike that.

9          What does this section inform the physician

10   about severity?

11   A.    Nothing whatsoever.  It doesn't mention anything about

12   severity.

13   Q.    Does this section -- strike that.

14         Does this section on discontinuation data inform

15   the physician anything about selecting a particular patient

16   for treatment?

17   A.    It says nothing about selection of patients.

18   Q.    What about switching a patient from the 20 milligram

19   therapy to the 40 milligram therapy to reduce the severity

20   of ISRs or IPIRs?

21   A.    Nothing is mentioned about switching at all.

22   Q.    Does Section 6.1 say anything about the intensity of

23   ISRs or IPIRs?

24   A.    No, it says nothing about the intensity of ISRs and

25   IPIRs, except for that language that I said before, where it

Jeffries - direct

1    mentions that adverse reactions were usually mild in

2    intensity both in the 20 milligram and the 40 milligram

3    dosage forms.

4    Q.    Have we now discussed all of your opinions regarding

5    the defendants' package inserts, including the parts that

6    Dr. Wynn testified about yesterday?

7    A.    Yes, sir, we have.

8    Q.    Let's try and talk about -- strike that.

9          Let's talk about some of the information that

10   Dr. Wynn testified about that is not in the defendants'

11   package inserts.  I want to start with the Glacier study.

12         Are you familiar with that study?

13   A.    Yes, sir, I am.

14   Q.    What companies have been promoting Glacier to

15   physicians?

16   A.    Teva.

17   Q.    Who sponsored Glacier, to your knowledge?

18   A.    Teva did.

19   Q.    Where in the package inserts does data from the

20   Glacier study appear?

21   A.    It does not appear in the package inserts at all.

22   There is no data whatsoever from Glacier.

23   Q.    Dr. Wynn also referenced a publication by Wolinsky.

24   It is at Joint Trial Exhibit 7134, which is on your screen.

25   Are you familiar with this publication?

Jeffries - direct

1    A.    Yes, sir.  I am.

2    Q.    Where in the defendants' package inserts is the

3    Wolinsky publication contained or referenced?

4    A.    It is never referenced at all.

5    Q.    Did you hear Dr. Wynn mention a Glacier extension

6    phase poster?

7    A.    I did.

8    Q.    On your screen, you should see JTX-7137.  Is this the

9    Glacier poster?

10   A.    Yes, sir, it is.

11   Q.    Did you review this document?

12   A.    I did.

13   Q.    Where in the defendants' package inserts is this

14   Glacier poster referenced or contained?

15   A.    It is never referenced at all.

16   Q.    Is the Glacier poster or the Wolinsky publication, are

17   those instructions from the defendants?

18   A.    No.  I mean, if anything, if they were going be

19   instructed, they would be instructions from Teva.

20   Q.    Do you know when Glacier was performed, Dr. Jeffries?

21   A.    I think within the last two years.

22   Q.    Was it performed after the data in the defendants'

23   package inserts was obtained?

24   A.    Yes, it was.

25   Q.    Dr. Wynn also referenced the GALA study.  Did you hear

1    that?

2    A.    I did.

3    Q.    Does data from the GALA study appear in the

4    defendants' package inserts?

5    A.    Yes.  It's some of the incidence data that we were

6    referencing earlier.

7    Q.    Dr. Wynn also referenced a publication discussing

8    GALA, which I believe is at Joint Trial Exhibit 7090.  Are

9    you familiar with that publication?

10   A.    I am.

11   Q.    Where in the defendants' package inserts does this

12   GALA publication appear?

13   A.    It doesn't appear on the package inserts and it's not

14   referenced -- it's not directly referenced in any event.

15   Q.    Who performed the GALA study?

16   A.    Teva did.

17   Q.    What is your general understanding?  We have heard --

18   strike that.

19             What is your general understanding of what GALA

20   studied?

21   A.    It studied three times a week glatiramer versus

22   placebo.

23   Q.    Did GALA study patients who were already taking the 20

24   milligram therapy?

25   A.    No, it did not.  This is a placebo controlled trial

1    and patients who were already on glatiramer were excluded.

2    Q.    Is GALA referenced by name on the package inserts?

3    A.    No, it is not.

4    Q.    I would like to sum up for the Court on that.  Reduced

5    severity limitations, could you please look at DDX-1400,

6    Slide 24.  Dr. Jeffries, does this slide set forth the

7    reduced severity limitations of the asserted claims of the

8    '776 patent --

9              MR. WARE:  Objection.  Leading.

10             THE COURT:  Rephrase.

11             MR. RAKOCZY:  Your Honor, I apologize.  I am

12   trying to move quickly.  I thought it was noncontroversial.

13   I will rephrase.

14   BY MR. RAKOCZY:

15   Q.    What does DDX-1400, Slide 24 set forth, Dr. Jeffries?

16   A.    The reduced severity limitations in, I think this is

17   just in the '776 patent.

18   Q.    In your opinion, Dr. Jeffries, as a treating clinical

19   neurologist and having reviewed all the defendants' package

20   inserts, do those inserts instruct, encourage or otherwise

21   suggest the selection of a patient that is currently taking

22   the 20 milligram GA regimen and has switched to the 40

23   milligram three times a week regimen in order to reduce the

24   severity of ISRs or IPIRs as required by all the asserted

25   claims of the '776 patent ?

Jeffries - direct

1    A.    No, they do not.

2    Q.    What do you conclude then regarding alleged indirect

3    infringement of the reduced severity limitations found in

4    all asserted claims of the '776 patent?

5    A.    There is no indirect infringement.

6    Q.    I would like to switch gears now and talk about the

7    '250 and the '413 patents, if you could please look at

8    DDX-1400, Slide 25.  What have you set forth here regarding

9    the claims of the '250 patent?

10   A.    These are the switching claims, the requirement that

11   the patient be on 20 milligrams glatiramer acetate

12   immediately prior to being switched to 40 milligrams.

13   Q.    Let's look at DDX-1400, Slide 26.  What have you set

14   forth here for the '413 patent?

15   A.    This is the same requirement of switching from the 20

16   milligrams glatiramer to the 40 milligrams.

17   Q.    Do your opinions and conclusions as to the prior GA

18   therapy limitations of the '776 patent apply equally to

19   Claims 14 to 17 of the '250 patent and Claim 7 of the '413

20   patent?

21   A.    Yes, they do.

22   Q.    Could we look at DDX 1400, Slide 27.  In your opinion

23   as a treating clinical neurologist having reviewed all the

24   package inserts, do those inserts instruct, encourage or

25   suggest the selection of a patient who is currently taking

Jeffries - direct

1    the 20 milligram therapy then switching that patient to the

2    40 milligram three times a week therapy as required by

3    Claims 14 and 17 of the '250 patent and Claim 7 of the '413

4    patent?

5    A.    No, they did not.

6    Q.    What do you conclude of the alleged indirect

7    infringement of the prior GA therapy limitations of Claims

8    14 to 17 of the '250 patent and Claim 7 of the '413 patent?

9    A.    There is no indirect infringement.

10   Q.    Dr. Jeffries, I would like to move on, one last topic,

11   the allegations of contributory infringement.  You mentioned

12   earlier that you reviewed Dr. Bell's opening expert report?

13   A.    Yes, sir, I did.

14   Q.    What was your understanding of what Dr. Bell's opening

15   report indicated?

16   A.    That --

17          MR. WARE:  Objection, Your Honor.  Dr. Bell

18   hasn't testified.  So he is going to do what, rebut a

19   report?

20          MR. RAKOCZY:  He relied on Dr. Bell's report,

21   Your Honor, for the non-switching patients.  They should

22   have put Dr. Bell on in their primary infringement case.

23   They didn't.  I merely want to ask the witness his

24   understanding of what Dr. Bell said --

25          THE COURT:  Overruled.

1    BY MR. RAKOCZY:

2    Q.    Did you review Dr. Bell's opening report?

3    A.    I did.

4    Q.    And what did that report indicate to you regarding

5    non-switching patients, to go back to our definition,

6    patients who were not already taking the 20 milligram daily

7    therapy?

8    A.    Dr. Bell concluded that there would be a substantial

9    number of patients who would be placed on the 40 milligram

10   glatiramer who had not previously been on the 20 milligram

11   glatiramer.

12   Q.    Is that consistent with your understanding as a

13   treating clinical neurologist?

14   A.    Yes, sir, it is.

15   Q.    Let's go back to one of your summary slides, DDX 1400,

16   Slide 28.  Can you refresh us again on what you set forth

17   here?

18   A.    Sure.  There would be patients who were diagnosed with

19   multiple sclerosis but had never been on any medication who

20   could be placed on the 40 milligram generic.  There are

21   patients who were on an MS therapy that was not GA who could

22   be placed on the 40 milligram generic.  And there are

23   patients who are on the branded 40 milligram Copaxone

24   product who could be switched to generic.

25   Q.    Would this be a substantial number of patients in your

Jeffries - direct

1    view?

2    A.    Yes, sir, I believe it would.

3    Q.    Dr. Jeffries, let's sum up for the Court.  Have you

4    reviewed the patents in suit and the defendants' package

5    inserts?

6    A.    Yes, sir, I have.

7    Q.    Did you hear Dr. Wynn's testimony?

8    A.    I did.

9    Q.    And you reviewed Dr. Bell's opening report?

10   A.    Indeed, I did.

11   Q.    In your opinion, would the defendants directly

12   infringe any asserted claim of any patent in suit?

13   A.    No, they would not.

14   Q.    In your opinion, would the defendants indirectly

15   infringe the asserted claims of the '776 patent, Claims 14

16   to 17 of the '250 patent, or Claim 7 of the '413 patent upon

17   the launch of their respective 40 milligram GA products?

18   A.    No, sir, they would not.

19             MR. RAKOCZY:  Thank you, Dr. Jeffries.

20             Your Honor, I pass the witness.

21             THE COURT:  Let's take a stretch.

22             (Recess taken.)

23             THE COURT:  Your witness, Mr. Ware.

24             MR. WARE:  Thank you.

25                  CROSS-EXAMINATION.

Jeffries - cross

1    BY MR. WARE:

2    Q.    Dr. Jeffries, good afternoon.

3    A.    Good afternoon, Mr. Ware.  Nice to see you again.

4    Q.    Nice to see you as well, sir.

5          You do not regard yourself as expert in multiple

6    sclerosis as a specialty.  Isn't that correct?

7    A.    Multiple sclerosis is not a specialty.  It is a

8    subspecialty.  I do view myself as an expert in multiple

9    sclerosis.

10   Q.    You don't regard yourself as having a subspecialty in

11   multiple sclerosis.  Perhaps I should put it that way.  Is

12   that right?

13   A.    I have a focus on multiple sclerosis:  I didn't do a

14   fellowship on multiple sclerosis.  But I have cultivated an

15   MS practice of significance.

16   Q.    I understand that.  You treat MS patients.  But you

17   don't regard yourself as having a subspecialty in multiple

18   sclerosis as many physicians do.  Is that correct?

19   A.    I don't think that I would use that terminology, no.

20   But it is my focus.

21   Q.    Well, when you say it's your focus, it's not the

22   largest volume by percentage of the patients you treat.

23   Isn't that right?

24   A.    I see general neurology.  I don't only see MS

25   patients.  I have cultivated MS as my focus, and in a group

Jeffries - cross

1    of 20 partners, I have more MS patients than anybody else in

2    the Washington, D.C. area.  As a percentage, no, because

3    headaches are far more common than MS, for instance.  But I

4    see a very large volume.

5    Q.    The point is, you regard yourself as a generalist and

6    in other contexts you see anything that walks in the door.

7    Correct?

8    A.    I do.

9    Q.    And the bulk of your patients, the largest majority of

10   the patients whom you see are not MS patients.  I am not

11   diminishing your skills in treating an MS patient.  But

12   that's a fact, is it not?

13   A.    The majority of my patients are not MS patients, but a

14   plurality, a near plurality probably are.

15   Q.    You mentioned as part of your training that you did

16   two fellowships, if I understood it.  Is that right?

17   A.    Yes, sir.

18   Q.    During those fellowships, to the extent you treated MS

19   patients at all, it was a minor part of that training.  Is

20   that correct?

21   A.    During those two years, yes, sir.

22   Q.    Neurophysiology, you said you have trained partly in

23   clinical neurophysiology.  Isn't that right?

24   A.    Correct.

25   Q.    During that year you saw relatively few if any MS

Jeffries - cross

1   patients, isn't that right?

2   A.    Relatively few, yes, sir.

3   Q.    That is equally true of your latest or more recent

4   fellowship, which was in epilepsy.  Is that so?

5   A.    That one year, yes, sir.

6   Q.    You are not a member of any MS-specific society.  Is

7   that accurate?

8   A.    That's true, yes.

9   Q.    You are, however, a member of an epilepsy society, the

10  American Epilepsy Society?

11  A.    As I have been since my epilepsy fellowship, yes.

12  Q.    Understood.  You don't train or teach interns or

13  residents in the Washington, D.C. area as part of clinical

14  programs at any hospital in multiple sclerosis.  Correct?

15  A.    As a private practitioner, no, I don't.

16  Q.    Now, I think you indicated that some of your patients

17  have switched to 40 milligram Copaxone.  Is that so?

18  A.    Yes, sir.

19  Q.    By percentage, that is a lot of your patients, is it

20  not, more than half?

21  A.    It is probably more than half, yes.

22  Q.    And you have made the decision, for whatever reasons,

23  that Copaxone 40 milligram is preferred for those patients.

24  Isn't that so?

25  A.    I don't know that I would necessarily say that.  I

Jeffries - cross

1    mean, for most of those patients, they made that decision.

2    Q.    I heard you say that.  If I understood you correctly,

3    you give patients options with respect to the disease

4    modifying therapies applicable to multiple sclerosis.  But

5    you don't even really recommend a particular therapy to your

6    patients.  Is that so?

7    A.    That is generally correct.

8    Q.    So the patients literally do pick their own therapy?

9    A.    All of the therapies work.  I give the patient all of

10   the options.  There are patients who have limitations.  If

11   you have --

12   Q.    If I may, Doctor, I am asking whether, in fact, I

13   heard accurately that you don't actually recommend a

14   medication for a specific patient.  You give them options

15   and they choose?

16   A.    That's correct.

17   Q.    Now, you are aware, are you not, that most multiple

18   sclerosis treaters and other physicians in fact do recommend

19   specific therapies?

20   A.    I absolutely disagree.

21   Q.    When the defendants' ANDA products, meaning a generic

22   version of Copaxone 40 milligram, comes to the market, you

23   would expect some of your patients to switch to that generic

24   40 milligram, would you not?

25   A.    I would expect some, most likely.

1    Q.    And you showed us a slide earlier, it's your

2    DDX-1400.20, of some categories of relapsing remitting MS

3    patients by treatment.  I think you indicated that among the

4    patients who might use the generic 40 general milligram

5    glatiramer acetate should the ANDA products be approved and

6    launched would be the GA naive patients, those who have

7    never been diagnosed at this point but who may be diagnosed

8    in the future, at which point the products are available,

9    correct?

10   A.    Actually, this was patients who had been diagnosed but

11   hadn't been placed on a drug.

12   Q.    Fair enough.  You have GA naive patients who are on

13   different therapies as another category.  Correct?

14   A.    Correct.

15   Q.    And a third category are those patients taking 40

16   milligram Copaxone who you have indicated might well switch

17   to one of the ANDA products, a 40 milligram generic.

18   Correct?

19   A.    They might.

20   Q.    There is a fourth category, that is, patients

21   currently taking 20 milligram therapy or at the time taking

22   20 milligram therapy who might also switch to 40 milligram

23   generic ANDA drugs.  Correct?

24   A.    Correct.

25   Q.    So among the class of patients who would be likely to

1    use defendants' ANDA products should they be approved and

2    launched are patients then currently taking 20 milligram

3    glatiramer acetate who might switch to the generic 40

4    milligram glatiramer acetate of your clients, or the

5    companies who have retained you.  Correct?

6    A.    I think I understood your question.

7    Q.    Well, let me do a little better job of that.

8          I think you have said that among those patients

9    in the future, should ANDA products be available, would be

10   patients then taking 20 milligram glatiramer acetate, it

11   could be a generic or it could be a brand, who would then

12   switch to the defendants' ANDA product 40 milligram

13   glatiramer acetate.  Correct?

14   A.    There are patients who might switch.

15   Q.    Those patients following that switching from 20

16   milligrams glatiramer acetate to the ANDA products might

17   well infringe some of the claims of these patents.  Correct?

18   A.    The patients might infringe?

19   Q.    Thank you.  Fair point.  There might be infringement

20   as a result of those patients then taking 20 milligrams who

21   switched to the ANDA products following which there is a

22   reduction in IPIRs or ISRs.  Isn't that so?

23   A.    Again, infringement by the patients?

24   Q.    No.  Infringement, any kind of infringement.  That is

25   to say -- let me try something different.

1          Among the claims of the '776 patent and the

2     other patents are those claims which relate specifically to

3     taking 40 milligram glatiramer acetate following which there

4     is a reduction in IPIRs or ISRs.  Correct?

5     A.    My view on that is that the requirement is that the

6     switch is intended to make that happen.  So the patient has

7     to have had ISRs on IPIRs, and they are switched in an

8     attempt to lessen those.

9     Q.    All right.  We are currently talking about patients

10    who at the time the ANDA products are launched are on 20

11    milligram glatiramer acetate, and they may, in fact, have

12    injection site reactions or immediate post-injection site

13    reactions.  Correct?

14    A.    They could, certainly.

15    Q.    If those patients were to switch to one of the ANDA

16    products, a 40 milligram generic, and if those IPIRs or ISRs

17    were to improve as a result, they would come within the

18    language and limitations of certain claims of the patents,

19    would they not?

20    A.    I think the patients would be directly infringing.

21    Q.    Let's talk, if we may, about some of your testimony

22    regarding the package inserts.

23          For that purpose, I am going work from

24    Plaintiffs' Trial Exhibit 579.  But if you are more

25    comfortable working with the one you started with -- why

Jeffries - cross

1    don't you take a look at PTX-579, which should be in the

2    binder in front of you.

3              Directing you, if I may, to the first page,

4    about which you gave us some opinions, you were asked some

5    questions about indications and usage.  Do you recall?

6    A.    Yes, sir.

7    Q.    And I think you testified, quote, "Physicians can do

8    what they want," despite the fact that a specific indication

9    has been approved by the FDA.  Correct?

10   A.    That's true.

11   Q.    What you meant by that was there is a world in which

12   physicians could go off-label and prescribe a drug for

13   something outside its indications, that's legal to do,

14   regardless of whether it's good judgment.  Correct?

15   A.    It is legal to do and it's commonly done.

16   Q.    It is commonly done with certain drugs.

17             Are you aware of MS practitioners who in fact

18   use glatiramer acetate to treat some other indication?

19   A.    Currently, no.  I am sure it has been used in

20   non-relapsing forms of MS with Copaxone.

21   Q.    Let's talk about you, in your practice for a moment.

22   Do you prescribe off-label glatiramer acetate for conditions

23   other than relapsing remitting multiple sclerosis?

24   A.    No, I have not.

25   Q.    And you have not at any time in your career that that

Jeffries - cross

1    drug has been available, have you?

2    A.    There is no FDA-approved drug for progressive forms of

3    MS.  So many MS patients who have a progressive form are on

4    one of these relapsing drugs.  Do I know for certain that I

5    have prescribed Copaxone to one of these progressive

6    patients?  I don't know that for sure.

7              I know that I have prescribed medications that

8    were FDA-approved for relapsing progressive patients in the

9    hopes of giving them some benefit.

10   Q.    Doctor, just to cut through it here, you don't

11   remember a single instance in your nine or ten-year

12   postgraduate career in which you prescribed off-label

13   glatiramer acetate for an indication other than relapsing

14   remitting multiple sclerosis.  Right?

15   A.    I don't off the top of my head.

16   Q.    You also indicated that the indications and usage

17   section of the package insert is, quote, "not an

18   instruction."  Is that right?

19   A.    Yes.

20   Q.    By that you also mean that the physician can prescribe

21   off-label for glatiramer acetate?

22   A.    Absolutely.

23   Q.    But the FDA has approved only for the specific

24   indication listed in the package insert.  Am I right?

25   A.    That is correct.

Jeffries - cross

1    Q.    You talked a little bit about the recommended dose

2    section.  I want to draw your attention over to Section 5 on

3    the opposite page, which says Warnings and Precautions.  You

4    would agree that any responsible physician treating multiple

5    sclerosis would make himself or herself aware of those

6    warnings and precautions, would you not?

7    A.    I think, yes, we would make ourselves aware of the

8    possible risks associated with the medication.

9    Q.    And when you say possible risks, the risks of which

10   you would make yourself aware, as the competent professional

11   you obviously are, would include what's written in the

12   package insert under Warnings and Precautions, IPIRs, chest

13   pain, lipoatrophy, and so forth.  Correct?

14   A.    Yes, sir.

15   Q.    That would be within the constellation of side effects

16   about which you would be informed before you prescribed the

17   drug.  Isn't that right?

18   A.    About a specific drug at a specific dosage form, yes,

19   sir.

20   Q.    The FDA has approved everything in this label, and

21   neither the generic companies, the defendants in this

22   courtroom, nor Teva is permitted to go outside that label in

23   terms of the language.  Isn't that correct?

24   A.    As I understand it, yes.

25   Q.    And you know that there is no ability of any of the

Jeffries - cross

1    generic companies who are defendants in the case, should

2    their ANDA product be approved, to make any changes,

3    including changes to say that 40 milligram Copaxone is

4    superior to 20.  Isn't that right?

5    A.    That's my understanding.

6    Q.    Moreover, there is no evidence -- I think you were

7    asked a question about Efficacy.  Perhaps you misspoke.  You

8    didn't hear Dr. Wynn testify in this courtroom that 40

9    milligram Copaxone was more efficacious than 20 milligrams,

10   did you?

11   A.    I don't remember being specifically asked about

12   efficacy.

13   Q.    In any event, you don't recall his testifying?

14   A.    I don't remember.  He did not testify that it is more

15   efficacious.

16   Q.    A physician himself or herself about the warnings and

17   precautions that you reviewed, in order to get informed,

18   would have to read the information.  Isn't that so?

19   A.    Not necessarily.  I mean, this information, wouldn't

20   he or she have to read it somewhere?  That is the most

21   likely way of learning it, probably.  But I also would say

22   that this information is presented in presentations, it's

23   presented, it can be presented by one's colleagues, and

24   certainly, you know, it's in promotional materials and

25   things like that.

1    Q.    But, Doctor, you would not prescribe the drug for the

2    first time without reading the detailed information

3    someplace, either in the package insert or in your case

4    using the software that is available in your office that

5    puts it up on the screen for you.  Is that right?

6    A.    I wouldn't prescribe it without learning about the

7    information.

8    Q.    And no responsible physician would do so.  Isn't that

9    right?

10   A.    I don't think so.

11   Q.    Any physician becoming informed about the drug would

12   read, for example, about immediate and post-injection

13   reactions in Section 5.1 and would accordingly read the

14   comparison that is in that paragraph.  That is, that

15   approximately 16 percent of patients exposed to GA 20

16   milligram had certain reactions, and two percent of patients

17   on 40 milligram, they would see that comparison.  Correct?

18   A.    That's not what is being compared.  They compare 16

19   milligrams of patients on glatiramer acetate 20 milligrams

20   compared to four percent on placebo, and two percent on 40

21   milligrams compared to non-placebo.  Unless you are going to

22   tell me that they are comparing placebos as well, I don't

23   think that is valid.

24   Q.    Are you saying, Doctor, that reading Paragraph 6.1,

25   despite the fact that there is a comparison there that

Jeffries - cross

1    physicians would take no note of the difference between 16

2    percent and 2 percent because they would feel that the data

3    is invalid?

4    A.    The comparison is to the placebo.  It specifically

5    uses the word compared to.  I am not sure what you are

6    pointing out.  I am not saying that we ignore anything.  But

7    I am saying that we recognize that you can't compare that

8    data.

9    Q.    Okay.  Let's put that aside for the moment.  You will

10   agree, will you not, that a physician getting herself or

11   himself educated on the drug in order to prescribe it would

12   see that comparison, and then would make a judgment what

13   value it has to that physician.  Isn't that so?

14   A.    If he or she read this specific paragraph, which I am

15   not certain is the only way to get this information.

16   Q.    When you say it's not the only way to get this

17   information, you mentioned talking to colleagues or going to

18   meetings?

19   A.    Or as you said, the software in my medical records,

20   electronic medical records, which does not produce in toto

21   the information from the PI as verbiage.

22   Q.    But, Doctor, you know that the information to which

23   physicians become exposed in order to prescribe the drug is

24   derived from the package insert, correct?  They may see it

25   on the screen or they may hear about it, but the fact is,

Jeffries - cross

1    it's all data and information that has been approved by the

2    FDA and contained in the package insert.  Isn't that so?

3    A.    And the 40 milligram data would be about the 40

4    milligrams and wouldn't reference the 20 milligrams.

5    Q.    Sir, my question is, am I not correct that becoming

6    informed for any physician would involve, whether they read

7    it on your computer screen or read it on a literal package

8    insert, they would be getting the information disclosed by

9    the package inserts?

10   A.    Once again, this information is not what would show up

11   on a computer screen because it's not only about the 40

12   milligram medication.

13         So to answer your question, if they read this

14   paragraph, then they would get the information.  If they

15   obtained the information elsewhere, they would not

16   necessarily get both the placebo controlled information from

17   the 40 and the 20.

18   Q.    And is it your testimony, based on your experience,

19   that most physicians who treat multiple sclerosis never

20   having prescribed glatiramer acetate would not read the

21   package insert, whether on a computer screen or literally?

22   A.    Yes, that is my testimony.

23   Q.    Let me direct you to Paragraph 5.2.  There is

24   information there regarding chest pain.  Would you regard

25   chest pain as potentially a severe reaction, adverse event?

Jeffries - cross

1   A.    Severity is not determined by me.  Any adverse event

2   is potentially a severe adverse event.

3   Q.    All right.  So you are saying any adverse event is

4   potentially a serious, a severe adverse event.  Is that

5   correct?

6   A.    It depends on the patient's perspective.

7   Q.    All right.  So when we talk about severity from your

8   perspective, the determinant of whether or not a particular

9   injection site reaction or IPIR is severe is a function of

10  the patient's perception of that adverse event.  Correct?

11  A.    Which is entirely subjective.

12  Q.    Okay.  So the indications here of chest pain for a

13  population of patients or individual patients, those chest

14  pains may be perceived by that patient as severe.  Correct?

15  A.    I presume they may.

16  Q.    That same paragraph also contains a comparison.

17  Understanding that the data is derived from two different

18  studies and understanding your view on that, but the fact

19  is, the paragraph does provide the physician with

20  information regarding 13 percent of 20 milligram patients

21  who have a certain reaction and two percent of GA 40

22  patients.  Right?

23  A.    That is there.

24  Q.    And if we went down to Paragraph 5.3, we would have a

25  similar comparative, which shows, regardless whether it is

1    in separate studies, that four times as many patients on 20

2    milligrams experienced this kind of ISR or IPIR, namely,

3    lipoatrophy or skin necrosis.  Correct?

4    A.    It does say that two percent who were exposed on 20

5    milligram experienced lipoatrophy.  It also says that 0.5

6    percent exposed on 40 milligram experienced lipoatrophy.

7    Q.    My point is simply that a physician exposed to the

8    package insert would see this information and would make a

9    judgment with respect to what it means to that physician,

10   what its import is.  Isn't that right?

11   A.    That would be a physician's decision, yes.

12   Q.    So some physicians might treat this as comparative

13   data, and draw certain inferences from it, and other

14   physicians might not.  Correct?

15   A.    I can't say what certain physicians would do.  But

16   certainly it is within the realm of possibility.

17   Q.    You said, I believe, that Section 5.3 and its

18   discussion regarding lipoatrophy and skin necrosis does not

19   relate to severity.  Is that your testimony?

20   A.    Yes, sir.

21   Q.    You don't regard lipoatrophy, the loss of fatty

22   tissue, subcutaneously that leaves permanent, irreversible

23   marks on a person's arms or legs, as a severe adverse event?

24   A.    No, I don't.  Again, I don't grade severe.

25   Q.    Your point is, the patient might think it's severe.

Jeffries - cross

1    In your professional world, to you, that means it's severe,

2    because the patient's subjective judgment controls?

3    A.    Some patients may think it's severe.  Other patients

4    may not think it's severe.  My question from my perspective,

5    is whether the condition is a significant enough condition

6    for the patient that they want to come off the medication.

7    Q.    There are other potential consequences.  This mentions

8    necrosis, skin necrosis.  Does it not?

9    A.    Yes.

10   Q.    That's death at the injection site, death at the skin

11   or at the tissue surrounding the injection site?

12   A.    That's what it says, yes.

13   Q.    You would regard that as a severe adverse event, would

14   you not?

15   A.    I would regard that as likely a reason to change

16   medication.  Again, I don't grade injection site reactions

17   as severe.

18   Q.    So in your practice treating MS patients, you don't

19   make a judgment whether or not a particular adverse event is

20   or is not severe, you leave that to the patient subjective

21   judgment?

22   A.    Yes, because the issue again is whether the patient is

23   willing and able to stay on medication or whether they feel

24   they need to change to something else.

25   Q.    All right.  Let me ask you to turn to the adverse

Jeffries - cross

1    reactions, Section 6 and 6.1 in the clinical trials data on

2    Page 579.4 and .5.

3              Among the information here on Section 6.1 is

4    discontinuation data.  Correct?  At the bottom of Page

5    579.4, under GA injection 20 milligrams?

6    A.    Yes, sir.

7    Q.    Now, some of the conditions to which that paragraph

8    speaks are certainly severe adverse events, are they not?

9    A.    Again, you are asking me to grade adverse events.  I

10   don't grade adverse events this way.  If a patient walks

11   into my office and says they have an adverse event, we talk

12   about what the event is, I write it down and we discuss

13   whether this is something they can continue with or not.

14   Q.    Okay.  Your only issue for the patent is not whether a

15   particular consequence of the injections is perceived by

16   them as severe, your question is, is the medication

17   tolerable.  Is that right?

18   A.    Yes.

19   Q.    But that can't be the case if the patient is

20   experiencing necrosis.  You might have to treat it.  Isn't

21   that right?  Or someone might have to treat it?

22   A.    In theory, someone might.  As I said, I mean, I think

23   that necrosis is a reason to change medication.  I wouldn't

24   encourage a patient to stay on medication with necrosis only

25   because there is risk associated with it.

Jeffries - cross

1    Q.    If a patient perceived necrosis or lipoatrophy as

2    severe, you wouldn't disagree with that judgment, would you?

3    A.    I wouldn't disagree with their judgment about

4    anything.  If they had a pin prick of erythema and they said

5    it's severe, I wouldn't say that's not severe.  If they

6    wouldn't stay on the drug and that's something they couldn't

7    tolerate, we need to do something about it.

8    Q.    You testified on direct regarding Table 1 and 2 and

9    were critical of the comparison that Dr. Wynn did.  Is that

10   correct?

11   A.    Yes, sir.

12   Q.    You have also said in your testimony that you would

13   not ignore anything.  Isn't that right?

14   A.    Yes, sir.

15   Q.    And what you meant by that was, to the extent that

16   data is made available to you as a treating physician, you

17   would evaluate the data and take it into account.  Isn't

18   that correct?

19   A.    I would.

20   Q.    Among the things you might take into account is the

21   data in Table 1 and Table 2?

22   A.    I might, yes.

23   Q.    And you might make judgments on the basis of those

24   data, might you not?

25   A.    Separately, yes.

Jeffries - cross

1    Q.    Okay.  Separately or even together.  You are not

2    saying, when you point to Section 6.1 and the language that

3    says you shouldn't compare two different clinical studies

4    because they are different in time, they are different in

5    cohort, they are different in lots of ways, you don't mean

6    by that that as a treating physician you don't look at the

7    information and make judgments on the basis of it, do you?

8    A.    I make judgments for each medication individually.  I

9    am not comparing the medication.  I -- I mean, the data,

10   because, again, the data was in different groups.  As I said

11   in my direct, I am asked all the time by new drug

12   manufacturers in particular to look at what an old drug said

13   about something and what their new data looks like.  And

14   they ask me all the time to say, well, isn't this better

15   data.  But it's not.  It's not.  We don't know how those two

16   things compare.  And that is the case here as well.

17   Q.    Doctor, these data would be in any package insert and

18   are in the package inserts of the defendants.  Isn't that

19   correct?

20   A.    They are.

21   Q.    These are approved by the FDA.  Correct?

22   A.    To be in the PI, yes.

23   Q.    And physicians reading this information can make a

24   decision with respect to whether or not they choose to

25   compare these data or not.  Right?

1   A.    Physicians can certainly make their own decision about

2   it, yes.

3   Q.    Now, you said, I think, that there is nothing in the

4   package inserts that instructs the doctors to do anything.

5   Is that right?

6   A.    Yes, sir.

7   Q.    Presumably, you are excluding from that the

8   instructions for use on the first page?

9   A.    Yeah.  I mean, I think that the instructions for use

10  are the way that the FDA intends for the medication to be

11  used.  I am sure that theoretically it wouldn't be illegal

12  to go against that.  But I think for the most part we follow

13  the instructions for use.

14  Q.    Right.  And the point of following the instructions

15  for use is that the package insert for the manufacturer and

16  the FDA have determined a safe way in which to use the drug,

17  and you look at that and you follow that regimen in order to

18  practice at a high level in treating MS patients.  Correct?

19  A.    That information is the information that the FDA has

20  approved -- the information about how the FDA has approved

21  the use of the drug.  So it is expected that that would be a

22  safe and effective way to use the drug.

23  Q.    And every physician prescribing GA, which is the

24  subject of these package inserts, would follow that

25  instruction.  Correct?  It's there for them?

Jeffries - cross

1    A.    It is there for them.  All the information is there

2    for them.  Can I speak to whether they all would follow it?

3    No.  My expectation, my expectation is that they would, yes.

4    Q.    Certainly, if those physicians were responsible and

5    met the standards, the high standards of your practice or

6    other professionals with whom you work, they would follow

7    that regimen, would they not?  They would follow the

8    instruction?

9    A.    Are we talking about GA or are we speaking in general?

10   Q.    We are talking about GA.

11   A.    Yes.  With this particular instruction for use, they

12   would follow it.

13   Q.    In fact, the instruction for use section is not the

14   only area of the package insert that involves instructions

15   to doctors, is it?

16   A.    I am not sure what you are referencing.

17   Q.    Let me direct you to Page 19, PTX-579.19.  I think you

18   touched on this, the so-called patient counseling

19   information.  I am not sure your testimony was clear, but

20   this is not information for patients to read, this is

21   information for physicians like yourself.  Isn't that right?

22   A.    Yes, it is.  This is counseling information that the

23   FDA wants you to relate to your patient.

24   Q.    And in this section, the package insert is quite

25   specific in instructing the doctor almost what to say to the

Jeffries - cross

1    patients.  Isn't that right?

2    A.    It is quite specific.

3    Q.    Yes.  And among the things it says, if we just take

4    the first one, Advise the patient to read the FDA-approved

5    labeling.  And it goes on, with respect to -- this would be

6    Page 19.  579.19, the section is Patient Counseling

7    Information.  Let's see if we can get it for everybody.

8              If we go to the top, under Pregnancy, for

9    example, the package insert is really quite specific even

10   there in telling the doctor what he is to do for purposes of

11   prescribing this medication, including, quote, Instruct

12   patients that if they are pregnant or plan to become

13   pregnant, and it goes on.  Correct?

14   A.    It does go on.  This is a recommendation for what

15   is -- what the FDA wants physicians to tell patients about

16   the medication.  I think that it is rare for a physician to

17   sit down with a patient and read all of this information

18   directly to the patient about the medication.  I doubt

19   seriously that most of us cover everything in the sampling

20   information every time.

21   Q.    Not every patient would be pregnant, either.  Isn't

22   that right?  I mean, this information --

23   A.    Well, no.  But -- if we are going to talk about this,

24   this says if they are pregnant or they plan to be pregnant.

25   That would only fail to apply to males.

Jeffries - cross

1    Q.    In any event, this is, is quite specific in advising

2    physicians in some detail about what they should do.

3    Correct?

4    A.    It advises physicians about what the FDA believes

5    should be done, yes.

6    Q.    And that's true, also, of immediate post-injection

7    reactions, below that?

8    A.    Yes.

9    Q.    In which it says, Advise patients that GA may cause

10   various symptoms.  Right?

11   A.    It does say that, yes.

12   Q.    It says that with respect to chest pain, "Advise

13   patients that they may experience transient chest pain"?

14   A.    It does say that.

15   Q.    And it says that with respect to lipoatrophy and skin

16   necrosis.  Correct?

17   A.    It does.

18   Q.    So, in fact, the package insert does contain specific

19   instructions in certain areas.  Is that correct?

20   A.    In certain areas, it does.

21   Q.    And physicians, including you, would be expected and

22   do, by and large, follow those instructions.  Correct?

23   A.    To some extent, yes.

24   Q.    Would you disagree with the proposition that the

25   package insert is there to assist the physician?

1    A.    No.

2    Q.    You agree with that, it is there to assist the

3    physician?

4    A.    I would not disagree with that.

5    Q.    It is there to provide information on the basis of

6    which the physician can do his job and treat the patient.

7    Correct?

8    A.    Absolutely.

9    Q.    And so to that extent, there is at least an academic

10   partnership between the package insert and the physician who

11   reads the information.   Right?

12   A.    I can accept that.

13   Q.    During your direct testimony you referred to the GALA

14   trial and the GALA study and to the Glacier study and

15   Glacier extension.   Am I correct?

16   A.    Yes, sir.

17   Q.    Those are three sources with which you have

18   familiarized yourself.   Is that right?

19   A.    Yes.

20   Q.    And you indicated that the GALA data, part of the GALA

21   data is, in fact, in the package insert.   Correct?

22   A.    It is.

23   Q.    And with respect to the Glacier paper, you believe

24   that paper provided valuable information to physicians,

25   including you.   Correct?

Jeffries - cross

1    A.    In an academic sense.

2    Q.    Well, when you say in an academic sense, you read the

3    paper, you read it shortly after it was available to

4    professionals, did you not?

5    A.    I did.

6    Q.    You didn't read it for the first time for this

7    lawsuit?

8    A.    No, I did not.

9    Q.    You read it because it was of interest to you in

10   treating MS patients.  Am I correct?

11   A.    I read it because it was published in a reputable

12   journal.  It was information that, again, was of academic

13   interest.

14   Q.    All right.  When you say academic interest, you keep

15   up with papers like Glacier in the field in order to stay

16   informed and to practice at a high level of medicine.

17   Correct?

18   A.    I do.

19   Q.    You also looked at the Glacier extension, I take it.

20   Is that right?

21   A.    I did.  I think possibly for the first time in the

22   lawsuit.

23   Q.    Okay.  The Glacier extension was a poster presented at

24   a followup meeting.  Isn't that so?

25   A.    Yes, it was.

Jeffries - redirect

1                MR. WARE:  Just one more second, Your Honor.

2                (Pause.)

3                MR. WARE:  Thank you.  I have nothing further.

4                THE COURT:  Thank you, Mr. Ware.

5                Mr. Rakoczy.

6                MR. RAKOCZY:  Very briefly, Your Honor, if I

7        may.

8                        REDIRECT EXAMINATION

9        BY MR. RAKOCZY:

10       Q.    Dr. Jeffries, do you recall you were asked some

11       questions about Sections 5.1, 5.2 and 5.3 from the warnings

12       and 6.1 from the adverse reaction section?

13       A.    Yes, sir.

14       Q.    Do you also recall being asked a question or several

15       questions about the patient counseling information at the

16       back of the package insert?

17       A.    Yes, sir.

18       Q.    And you were referred to a couple sections, one for

19       example under pregnancy that says instruct patients?

20       A.    Yes, sir.

21       Q.    How does that compare to what you see in the Sections

22       5.1, 5.2, 5.3 and 6.1?

23       A.    The patient counseling information specifically talks

24       about instructing patients.  The information in Sections 5

25       and 6 is data that is presented without any instruction,

1    and, you know, is there for a physician to make a decision

2    as to what they want to do with it.

3    Q.    Do you recall it being asked numerous questions from

4    Sections 5 and 6 about comparisons in those sections?

5    A.    Yes, sir.

6    Q.    Do you believe they are comparisons?

7    A.    I don't.  I mean, I think there are comparisons

8    between active drug and placebo.  It says that repeatedly.

9    I don't think that it directly compares the 40 milligram to

10   a 20 milligram.

11   Q.    If a physician wanted to make a judgment -- strike

12   that.

13         I think the term used was an informed physician.

14   Assume an informed physician wanted to make a judgment about

15   that data, why would he or she be doing that?

16   A.    For his or her own reasons.  No one is being

17   instructed to do so.  It is the choice the physician makes.

18   Q.    Do you recall being asked a question by Teva counsel

19   about whether if there is a patient on the 20 milligram GA

20   therapy and if that patient has an ISR and if that patient

21   switches to the 40 milligram GA therapy and if that same

22   patient has a reduction in ISRs, would that somehow mean

23   that the patient had infringed.  Do you recall that?

24   A.    I do.

25   Q.    Have you seen any evidence from anyone here of such an

1    individual patient?

2    A.    No.

3              MR. RAKOCZY:  No further questions, Your Honor.

4              THE COURT:  Thank you, Doctor.

5              (Witness excused.)

6              THE COURT:  Counsel, with regard to the, I guess

7    it's Khan's 2009 reference, we know that the parties

8    disagree over its permissible use.  And I want to make -- I

9    am going to agree with the defendants on this particular

10   point, as I think I have already indicated.

11             But I will just be a little more expansive.

12             I guess my first observation is, it sort of I

13   think may not matter, but the case law suggested to me by

14   the plaintiffs seemed to deal with 102 versus 103 issues.  I

15   am not sure that that really makes a difference in the final

16   analysis.

17             It seems that the cases instruct that references

18   of post data the critical date can be used to show the level

19   of skill in the art at or around the time the invention that

20   is made.

21             I think it's worth noting perhaps even further

22   that the Federal Circuit case law -- and these are all

23   Federal Circuit cases that we are referencing that my law

24   clerk and I have reviewed -- seems to indicate that internal

25   nonpublic documents can also be used to show one of ordinary

1    skill in the art.

2             At the same time I will just share a little bit

3    of language from a couple of the cases.

4             This first quote is from a case decided by a

5    panel, than then Circuit Judge Gajarsa was presiding with

6    the panel, He authored the opinion.

7             The District Court erred in finding that

8    Octoxynol-40 was not used in pharmaceuticals prior to its

9    use in the patented invention.  This finding is clearly

10   contradicted by statements in the record made by Lidgate and

11   Fu, the inventors of the patent '493 Lidgate and Fu are both

12   named authors of a pharmaceutical report published in

13   September 1987 that clearly states that the API in question,

14   I will call it 40, was a well known ingredient in

15   pharmaceutical products.  Although Syntex contends that

16   because this report was published five days after the

17   priority date of the '493, the patent discloses no, quote,

18   prior uses of 40, we think it incredulous that 40 could

19   progress from no use to, quote, well known in pharmaceutical

20   products, end quote, in a matter of five days.  Accordingly

21   this report reflects that the use of 40 in pharmaceutical

22   compositions was known in the art at the relevant time and

23   an important fact to consider in assessing the obviousness

24   of the claims in suit.

25             I know we are talking about a slightly longer

1    period of time, three weeks.  I think there was argument and

2    there may be or will be evidence adduced that the reference

3    in question, the study that led to this publication had been

4    ongoing two years.

5              You find, I find language in the Newell case

6    that, just a short quote here, counsel:  that references

7    which do not qualify as prior art because they postdate the

8    claimed invention may be relied upon to show the level of

9    ordinary skill in art at or around the time of the invention

10   was made.

11             And further, I think that was from Newell.

12             Continuing on, you see in the Newell case:

13   However, there was evidence that others of ordinary skill in

14   the art had prior to Ferguson's invention proposed securing

15   other less satisfactory strippable shade material,

16   telescoping rollers to achieve do-it-yourself adjustability

17   without tools -- and there is a footnote that says Newell

18   argues that a 1967 internal memorandum of a Kenney employee

19   proposes this combination was inadmissible because it is not

20   technically, quote, prior art.  However, it was admissible

21   for the purpose indicated, the Court indicated in a

22   footnote.

23             A case called Betts v. Litton, Judge Miller at

24   the time, writes the following.

25             T&B alleges that the trial court improperly

1   relied on unpublished internal criteria generated by T&B

2   marketing and engineering department, the M&E criteria, as a

3   prior art finding that the assignment itself required a

4   difference in spacing between the apertures between the

5   bottom and the top of the connectors.  However, what the

6   Court did was to find that the offsetting of paired of

7   apertures between the upper and lower portion of the

8   connector housing was not taught by the prior art straight D

9   connector.  It then used the M&E criteria as evidence of the

10  fact that accomplishing a pitch change by means of

11  offsetting pier apertures would have been within the

12  knowledge of one of ordinary skill in the art.  Thus, the

13  M&E criteria, though not technically prior art in the

14  patent, were properly used as indicators of the level of

15  ordinary skill in the art to which the invention pertained.

16          I could go on.

17          So that's the ruling as to Khan.

18          As to the clinical trial protocol, I think both

19  Mr. Anstaett and Ms. Mazzochi suggested correctly that it is

20  an admission of a party opponent.

21          MS. MAZZOCHI:  Yes.

22          THE COURT:  I agree.  Therefore, it is fair game

23  here.  Okay.

24          Anything else?

25          We will see you in the morning.

1           I will leave you with just one thing.  We just

2    had the passing of -- he is fortunately still with us -- for

3    those baseball fans out there, of a great announcer.  I am a

4    Mets fan, not a Dodgers fan.  I am still mad at them for

5    leaving Brooklyn.  But it goes like this:  Statistics are

6    used much like a drunk uses a lamppost, for support, not

7    illumination.

8           (Court recessed at 4:50 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

'

**'250** [23] - 504:10, 504:12, 526:17, 581:10, 581:11, 617:2, 617:8, 618:23, 619:5, 621:14, 622:9, 623:3, 632:17, 646:9, 646:18, 652:19, 652:21, 689:7, 689:9, 689:19, 690:3, 690:8, 692:16

**'302** [4] - 617:4, 617:10, 623:4, 652:19

**'413** [18] - 526:17, 581:11, 617:3, 617:9, 618:23, 619:5, 621:13, 623:4, 646:10, 646:19, 652:19, 652:22, 689:7, 689:14, 689:19, 690:3, 690:8, 692:16

**'493** [2] - 722:11, 722:17

**'776** [38] - 526:2, 581:21, 582:1, 617:5, 617:11, 618:24, 619:4, 621:14, 622:10, 623:2, 632:17, 646:11, 646:18, 647:7, 647:22, 650:9, 650:12, 650:21, 651:5, 651:11, 651:15, 651:18, 652:19, 652:20, 657:2, 658:3, 660:15, 665:9, 670:10, 670:19, 670:24, 688:8, 688:17, 688:25, 689:4, 689:18, 692:15, 699:1

---

**0**

---

**0.5** [2] - 682:4, 708:5
**0014** [1] - 537:9
**0021** [1] - 537:8

---

**1**

---

**1** [22] - 526:2, 541:9, 581:21, 617:2, 617:3, 623:1, 623:2, 623:3, 623:4,

646:10, 650:11, 650:21, 651:5, 661:13, 661:14, 665:11, 670:10, 671:22, 671:24, 711:8, 711:21
**10** [2] - 623:4, 647:4
**10,000** [1] - 527:12
**10,000-page** [1] - 527:11
**100** [1] - 577:12
**100,000** [1] - 577:15
**1006** [1] - 534:11
**101** [1] - 564:3
**101.9** [2] - 545:11, 545:15
**102** [2] - 502:20, 721:14
**103** [2] - 502:20, 721:14
**10710001** [1] - 596:11
**10727001** [3] - 596:17, 597:13, 597:22
**10727004** [1] - 559:3
**11** [2] - 623:4, 647:18
**11.27** [1] - 596:9
**1154** [2] - 504:8, 504:11
**1186** [1] - 506:21
**11th** [1] - 490:23
**12** [14] - 526:2, 581:22, 617:2, 617:3, 617:4, 617:7, 617:9, 623:2, 646:10, 650:10, 650:20, 651:5, 651:12, 670:10
**120** [1] - 512:21
**13** [5] - 617:4, 617:10, 623:3, 651:10, 707:20
**13.04** [1] - 595:23
**1317** [1] - 506:20
**1335** [1] - 500:20
**1351** [1] - 506:22
**1371** [2] - 500:2, 500:5
**14** [16] - 526:16, 581:10, 617:9, 618:23, 619:5, 621:13, 622:9, 646:9, 646:18, 646:21, 652:15, 652:21, 689:19, 690:3, 690:8, 692:15
**14-1171-GMS** [1] - 480:4
**140** [1] - 512:21
**1400** [8] - 645:1, 646:4, 651:10, 656:13, 663:5, 670:8, 689:22,

691:15
**15** [2] - 623:3, 656:13
**150** [3] - 614:23, 636:21, 641:18
**16** [13] - 526:2, 581:22, 617:4, 617:9, 623:2, 646:10, 651:12, 658:3, 668:21, 670:11, 704:15, 704:18, 705:1
**1621** [1] - 681:8
**17** [19] - 526:7, 526:17, 581:11, 581:22, 617:10, 623:2, 623:3, 632:17, 646:9, 646:11, 646:18, 652:21, 659:2, 668:21, 670:11, 689:19, 690:3, 690:8, 692:16
**1772.29** [1] - 596:19
**18** [9] - 614:1, 617:7, 618:23, 619:5, 621:14, 622:9, 659:24, 669:14, 683:3
**19** [6] - 617:5, 617:9, 617:10, 660:15, 714:17, 715:6
**19.55** [1] - 595:22
**1918** [1] - 571:6
**1967** [1] - 723:18
**1987** [1] - 722:13
**1999** [2] - 635:16, 636:13
**1st** [1] - 529:12

---

**2**

---

**2** [31] - 526:2, 534:23, 581:21, 585:5, 585:14, 585:15, 585:18, 585:21, 585:23, 611:11, 611:12, 611:20, 617:4, 617:7, 617:8, 617:9, 623:2, 635:7, 646:10, 664:9, 664:22, 665:11, 665:18, 670:10, 671:23, 672:1, 677:17, 682:3, 705:2, 711:8, 711:21
**20** [220] - 483:24, 484:22, 484:24, 484:25, 485:15, 486:14, 491:16, 493:9, 493:11, 498:1, 498:6, 512:19, 512:20,

523:10, 523:17, 523:19, 524:2, 525:2, 525:4, 527:21, 533:6, 535:1, 535:6, 536:16, 540:15, 543:14, 543:15, 544:5, 544:15, 545:14, 546:13, 546:16, 547:7, 547:15, 547:22, 547:24, 551:19, 551:22, 552:8, 554:8, 554:22, 554:25, 555:15, 556:5, 556:18, 557:3, 559:13, 559:19, 560:4, 560:8, 560:20, 560:24, 561:8, 561:11, 562:4, 562:6, 562:17, 562:19, 562:20, 563:21, 564:22, 565:1, 565:3, 565:6, 567:8, 567:16, 568:6, 574:10, 580:13, 580:22, 584:3, 584:6, 584:18, 584:20, 586:24, 587:3, 587:13, 587:15, 588:1, 588:8, 588:12, 588:18, 589:1, 589:13, 589:25, 590:22, 592:3, 594:6, 594:18, 595:13, 595:23, 596:13, 596:20, 596:22, 597:9, 597:15, 598:4, 598:8, 598:18, 599:1, 599:19, 599:21, 600:9, 600:17, 600:22, 601:19, 601:23, 602:1, 602:4, 602:8, 604:9, 604:15, 604:25, 605:18, 606:3, 606:10, 606:22, 606:25, 607:9, 607:18, 608:3, 612:11, 612:16, 612:18, 617:2, 617:3, 617:8, 619:9, 619:22, 620:8, 620:25, 621:20, 623:3, 637:6, 637:7, 643:10, 643:17, 644:8, 650:15,

651:7, 651:9, 651:20, 651:25, 652:2, 652:8, 655:24, 658:5, 658:12, 658:21, 659:10, 660:7, 660:12, 660:18, 661:1, 663:2, 663:5, 663:13, 663:22, 663:23, 666:3, 666:16, 666:25, 667:3, 667:9, 668:9, 668:12, 669:4, 669:22, 669:24, 670:3, 670:16, 671:8, 671:17, 671:25, 672:8, 672:20, 673:11, 673:25, 674:7, 677:9, 677:23, 678:13, 678:17, 679:10, 680:15, 680:21, 681:13, 681:21, 683:24, 684:18, 685:2, 687:23, 688:22, 689:11, 689:15, 690:1, 691:6, 691:10, 694:1, 697:21, 697:22, 698:2, 698:10, 698:15, 698:20, 699:10, 703:4, 703:9, 704:15, 704:19, 706:4, 706:17, 707:20, 708:1, 708:4, 710:5, 720:10, 720:19
**200** [2] - 636:21, 641:18
**2000** [1] - 522:5
**2002** [4] - 504:22, 509:25, 514:13, 515:14
**2004** [1] - 638:9
**2005** [1] - 500:2
**2007** [1] - 498:8
**2008** [4] - 504:21, 509:25, 514:12, 515:13
**2009** [17] - 497:22, 499:10, 501:21, 502:15, 504:8, 505:17, 509:2, 509:3, 510:24, 512:11, 513:21, 514:14, 514:25, 515:15, 515:19, 637:12, 721:7
**2010** [1] - 542:1

**2013** [1] - 529:12

**2015** [8] - 524:10, 527:24, 530:18, 533:9, 541:10, 551:21, 554:18, 579:5

**2016** [2] - 480:7, 519:11

**207** [1] - 575:25

**209** [1] - 576:1

**21** [1] - 617:5, 617:10, 670:8, 670:20

**22** [1] - 671:3

**23** [1] - 674:6

**238.32** [1] - 596:19

**24** [4] - 617:5, 617:10, 688:6, 688:15

**25** [6] - 520:17, 520:21, 673:18, 673:24, 674:18, 689:8

**26** [3] - 492:12, 498:15, 689:13

**27** [1] - 689:22

**271** [1] - 489:12

**271(a)** [1] - 618:25

**271(b** [1] - 621:15

**271(e** [1] - 489:14

**271(e)(2)(4** [1] - 488:24

**271(e)(4)(1** [1] - 489:3

**271(e)(4)(A** [1] - 490:7

**271(e)(4)(B** [1] - 490:4

**28** [2] - 480:7, 691:16

**283** [1] - 488:20

**296.95** [3] - 596:23, 597:20, 598:1

---

## 3

**3** [17] - 480:8, 537:15, 552:11, 579:17, 583:18, 583:21, 584:1, 584:14, 584:21, 611:25, 612:3, 612:25, 613:4, 614:23, 673:3, 681:7

**3's** [1] - 536:25

**300** [1] - 597:8

**31.54** [1] - 596:6

**315** [1] - 500:20

**3446** [1] - 527:9

**35.3** [1] - 535:7

**373** [1] - 583:11

---

## 4

**4** [7] - 583:8, 611:8, 639:7, 640:25,

671:20, 674:8, 683:19

**40** [253] - 480:4, 483:25, 485:12, 485:15, 485:23, 486:5, 494:16, 504:25, 510:12, 512:21, 521:9, 523:12, 523:17, 523:19, 523:20, 524:1, 524:2, 525:1, 525:5, 533:7, 535:2, 535:8, 536:16, 539:24, 540:15, 543:10, 543:16, 544:5, 544:15, 545:18, 545:20, 545:21, 546:12, 546:17, 547:7, 547:8, 547:10, 547:16, 547:22, 547:24, 548:1, 551:22, 552:9, 554:7, 554:20, 554:25, 555:14, 556:4, 556:18, 557:3, 559:14, 560:8, 560:21, 560:24, 561:8, 561:10, 561:13, 561:24, 562:4, 562:17, 562:20, 563:20, 563:21, 563:22, 564:21, 564:25, 567:9, 567:16, 568:6, 568:8, 574:10, 580:12, 580:22, 581:15, 581:24, 584:3, 584:6, 584:21, 586:25, 587:3, 587:13, 587:14, 587:16, 587:25, 588:6, 588:14, 588:17, 589:2, 589:14, 589:16, 590:1, 590:21, 592:3, 594:8, 594:16, 595:14, 596:1, 596:5, 596:13, 596:25, 597:7, 597:14, 597:21, 597:22, 598:3, 598:8, 598:17, 598:23, 598:24, 598:25, 599:1, 599:19, 599:21, 599:23, 600:6, 600:17, 601:1, 601:3, 601:9,

601:23, 602:1, 602:4, 602:10, 602:14, 602:21, 602:22, 603:9, 603:21, 603:22, 604:1, 604:6, 604:9, 604:14, 604:15, 604:17, 604:24, 605:13, 605:18, 605:22, 605:23, 605:24, 606:25, 607:9, 607:10, 607:18, 607:22, 612:22, 613:2, 615:10, 615:15, 619:21, 621:22, 637:6, 637:8, 643:10, 643:18, 644:8, 650:17, 651:21, 651:23, 651:25, 652:3, 652:5, 652:6, 652:9, 652:10, 652:11, 654:14, 654:18, 655:25, 658:7, 658:13, 658:17, 658:20, 659:7, 659:25, 660:8, 662:5, 663:3, 663:12, 663:24, 663:25, 664:24, 666:19, 666:25, 667:5, 667:10, 668:11, 668:13, 669:5, 669:22, 669:25, 670:18, 671:17, 672:2, 672:9, 672:21, 673:11, 674:1, 674:8, 676:20, 676:22, 677:10, 677:24, 678:18, 679:11, 680:14, 680:22, 681:22, 682:5, 684:19, 685:2, 688:22, 689:12, 689:16, 690:2, 691:9, 691:20, 691:22, 691:23, 692:17, 695:17, 695:23, 696:22, 696:24, 697:4, 697:15, 697:17, 697:22, 698:3, 698:12, 699:3, 699:16, 703:3, 703:8, 704:17, 704:20, 706:3, 706:11, 706:17, 707:21, 708:6, 720:9,

720:21, 722:14, 722:18, 722:21

**407** [2] - 500:2, 500:5

**41** [1] - 561:23

**413** [1] - 622:8

**42.81** [1] - 596:2

**43** [1] - 538:22

**45** [2] - 546:5, 649:13

**45-degree** [5] - 544:12, 546:11, 546:16, 548:1, 557:4

**47** [3] - 593:12, 594:1, 594:2

**48** [10] - 600:23, 601:3, 601:7, 602:25, 603:3, 603:9, 603:21, 604:1, 604:4

**49** [14] - 562:2, 564:7, 565:4, 600:7, 601:1, 601:2, 602:25, 603:3, 603:9, 603:21, 604:1, 604:4, 605:21

**49-to-one** [1] - 565:3

**4:50** [1] - 725:8

---

## 5

**5** [20] - 526:2, 581:21, 603:25, 606:5, 606:14, 617:4, 623:2, 632:17, 646:10, 650:11, 650:21, 651:5, 670:10, 679:16, 679:18, 702:2, 710:2, 719:24, 720:4

**5.1** [8] - 677:18, 678:21, 679:1, 679:9, 680:13, 704:13, 719:11, 719:22

**5.18** [3] - 586:2, 586:13, 591:6

**5.2** [3] - 706:23, 719:11, 719:22

**5.3** [5] - 681:7, 707:24, 708:17, 719:11, 719:22

**5.37** [1] - 559:9

**5.4** [1] - 591:16

**5.48** [2] - 591:7, 591:15

**50** [7] - 570:23, 571:5, 571:6, 571:8, 604:5, 606:14, 606:16

**50-percent** [1] - 606:5

**500** [2] - 636:15, 641:20

**511** [1] - 506:21

**52(c** [3] - 616:17, 621:13, 621:17

**55.40** [1] - 595:22

**56** [1] - 547:21

**560** [1] - 506:20

**57-year-old** [1] - 538:22

**579** [1] - 699:24

**579.19** [1] - 715:6

**579.4** [2] - 710:2, 710:5

**581.53** [1] - 596:22

---

## 6

**6** [16] - 526:7, 581:21, 581:22, 617:8, 617:10, 623:2, 632:17, 646:10, 670:10, 676:10, 676:19, 679:16, 679:18, 710:1, 719:25, 720:4

**6.1** [17] - 657:21, 666:8, 666:11, 673:3, 673:8, 674:13, 677:8, 679:15, 679:16, 680:14, 684:22, 704:24, 710:1, 710:3, 712:2, 719:12, 719:22

---

## 7

**7** [18] - 526:17, 581:11, 617:4, 617:10, 618:22, 619:4, 621:13, 622:8, 623:3, 645:1, 645:20, 646:10, 646:19, 652:21, 689:19, 690:3, 690:8, 692:16

**70.4** [1] - 535:6

**7001** [1] - 634:16

**7002** [1] - 634:16

**7003** [1] - 634:17

**7012** [1] - 595:4

**7090** [1] - 687:8

**7134** [2] - 583:9, 685:24

**715** [1] - 506:22

**78.21** [1] - 593:11

---

## 8

**8** [4] - 617:8, 646:4, 671:21, 674:8

**88.61** [3] - 596:23,

597:20, 597:23

# 9

**9** [10] - 526:2, 581:22,
617:2, 617:4, 617:7,
617:9, 623:2,
646:10, 646:21,
670:10
**91.25** [1] - 593:17
**97** [7] - 546:18, 547:2,
547:3, 547:4,
547:21, 548:3, 562:2
**9:00** [1] - 480:7

# A

**a.m** [1] - 480:7
**aback** [1] - 516:9
**aberrant** [1] - 575:8
**ability** [3] - 629:11,
640:10, 702:25
**able** [16] - 485:5,
486:4, 488:20,
502:13, 511:2,
517:25, 537:1,
549:18, 560:23,
599:11, 623:5,
629:24, 630:23,
642:4, 642:7, 709:23
**abreast** [1] - 637:21
**absence** [1] - 580:15
**absent** [1] - 571:4
**absolutely** [12] -
484:10, 498:24,
505:3, 515:6,
515:20, 606:23,
622:22, 645:13,
656:9, 696:20,
701:22, 717:8
**abstract** [1] - 504:9
**absurd** [2] - 570:17,
571:14
**abundance** [2] -
502:3, 632:22
**abundantly** [1] -
498:16
**academic** [5] - 717:9,
718:1, 718:2,
718:12, 718:14
**Academy** [2] - 637:18,
638:1
**accept** [1] - 717:12
**accepted** [2] - 522:11,
638:24
**access** [5] - 508:12,
508:17, 545:13,
611:18, 632:1
**accomplishing** [1] -
724:10

**accordance** [1] -
585:18
**accordingly** [3] -
551:4, 704:13,
722:20
**account** [4] - 531:5,
585:15, 711:17,
711:20
**accounting** [1] -
585:16
**accounts** [1] - 520:21
**accurate** [2] - 576:11,
695:7
**accurately** [2] -
519:22, 696:13
**accusations** [1] -
485:5
**accused** [1] - 621:3
**acetate** [25] - 498:1,
499:12, 567:9,
567:10, 615:10,
615:15, 637:4,
643:11, 651:8,
660:19, 689:11,
697:5, 698:3, 698:4,
698:10, 698:13,
698:16, 699:3,
699:11, 700:18,
700:22, 701:13,
701:21, 704:19,
706:20
**achieve** [1] - 723:16
**act** [1] - 629:20
**Act** [1] - 489:3
**action** [1] - 489:2
**active** [2] - 520:24,
720:8
**actively** [1] - 620:23
**activities** [3] - 530:6,
610:4, 654:14
**activity** [1] - 610:3
**actual** [2] - 545:7,
593:19
**adaptation** [1] - 600:3
**add** [3] - 503:4,
600:21, 602:17
**added** [1] - 612:8
**addition** [2] - 556:12,
618:14
**additional** [13] -
485:7, 495:8, 516:7,
542:25, 573:8,
616:3, 617:25,
625:17, 632:15,
632:19, 632:20,
633:1, 633:2
**additionally** [1] -
493:18
**address** [8] - 493:24,
497:8, 503:21,

505:15, 509:14,
525:11, 618:9,
634:24
**address..** [1] - 626:6
**addressed** [1] -
491:22
**addresses** [1] -
624:14
**adduce** [1] - 626:23
**adduced** [2] - 619:19,
723:2
**adequate** [1] - 512:10
**adjustability** [1] -
723:16
**adjustment** [1] -
580:25
**administer** [4] -
654:18, 654:22,
664:14, 664:25
**administered** [2] -
567:9, 567:10
**administering** [1] -
658:12
**administration** [3] -
520:8, 654:12, 658:5
**Administration** [1] -
656:1
**administrators** [7] -
535:23, 544:23,
573:19, 574:2,
574:8, 574:19, 575:5
**admissible** [4] -
499:9, 505:14,
639:12, 723:20
**admission** [6] - 503:6,
503:8, 510:17,
630:3, 630:20,
724:20
**admissions** [4] -
513:10, 513:12,
514:24, 630:10
**admit** [1] - 623:15
**admitted** [2] - 503:10,
514:8
**ado** [1] - 489:21
**adopted** [6] - 531:24,
532:1, 535:22,
544:22, 572:11,
574:25
**Adverse** [1] - 665:17
**adverse** [40] - 522:25,
524:24, 548:2,
552:17, 552:22,
552:23, 567:11,
656:18, 657:6,
657:12, 657:18,
665:22, 666:18,
667:20, 671:24,
672:2, 672:6,
674:15, 676:21,

679:20, 684:3,
684:4, 684:5, 684:6,
685:1, 706:25,
707:1, 707:2, 707:3,
707:4, 707:10,
708:23, 709:13,
709:19, 709:25,
710:8, 710:9,
710:10, 710:11,
719:12
**advise** [6] - 568:20,
568:23, 569:1,
569:23, 715:4, 716:9
**Advise** [1] - 716:12
**advised** [1] - 571:12
**advises** [1] - 716:4
**advising** [1] - 716:1
**advocate** [1] - 492:5
**advocates** [1] - 492:2
**affect** [3] - 580:11,
655:21, 655:22
**affected** [1] - 567:10
**affecting** [1] - 587:8
**affidavit** [4] - 494:5,
494:6, 494:13,
495:19
**affidavits** [1] - 495:8
**afford** [1] - 626:12
**Africa** [1] - 520:3
**after-the-fact** [2] -
537:22, 539:1
**afternoon** [10] -
608:12, 608:13,
610:25, 633:13,
633:23, 633:24,
634:2, 634:3, 693:2,
693:3
**agency** [1] - 630:21
**aggregate** [1] - 592:9
**ago** [6] - 484:4,
551:19, 589:6,
625:7, 682:4, 682:6
**agree** [47] - 496:9,
498:25, 511:4,
511:25, 524:15,
584:4, 584:15,
584:16, 585:17,
587:12, 587:24,
588:16, 588:19,
588:24, 593:4,
593:20, 594:3,
594:10, 594:13,
601:5, 601:7, 602:7,
602:11, 604:3,
605:20, 605:25,
607:11, 611:18,
612:21, 612:24,
617:19, 617:20,
617:23, 618:2,
618:5, 623:6,

626:22, 639:21,
653:1, 659:16,
676:14, 680:17,
702:4, 705:10,
717:2, 721:9, 724:22
**agreeable** [2] -
538:22, 538:24
**agreed** [7] - 510:21,
511:15, 514:8,
598:13, 611:24,
616:5, 632:23
**agreeing** [1] - 493:1
**agreement** [2] -
613:24, 614:17
**ahead** [9] - 489:23,
499:25, 515:11,
528:18, 538:4,
613:10, 614:20,
627:22, 666:11
**allegation** [1] - 628:5
**allegations** [1] -
690:11
**alleged** [4] - 644:19,
644:22, 646:16,
652:24, 670:22,
689:2, 690:6
**alleges** [1] - 723:25
**allowed** [2] - 504:20,
630:11
**allows** [3] - 538:16,
624:14, 714:25
**almost** [3] - 517:6,
624:14, 714:25
**alone** [3] - 533:14,
564:8, 571:13
**alternative** [3] -
625:21, 625:25,
626:4
**alternatives** [1] -
625:19
**amended** [1] - 633:7
**American** [8] - 521:3,
541:20, 636:8,
637:18, 638:1,
638:3, 695:10
**Amneal** [2] - 481:24,
481:24
**Amneal's** [1] - 655:13
**Ampyra** [1] - 643:14
**analyses** [26] -
530:23, 530:25,
533:5, 538:15,
548:19, 567:12,
573:7, 578:4,
578:20, 579:2,
579:3, 579:4, 579:6,
579:11, 579:13,
580:17, 581:4,
581:8, 581:12,
584:13, 584:14,
584:17, 590:5,

590:10, 590:12,
590:13
**analysis** [167] -
502:21, 516:19,
517:4, 517:6, 519:5,
522:8, 522:22,
524:11, 524:18,
524:22, 525:3,
526:4, 526:11,
526:25, 528:3,
528:5, 528:6, 531:5,
531:7, 531:14,
531:15, 531:21,
531:22, 533:6,
533:7, 533:17,
534:19, 536:3,
536:11, 536:12,
536:18, 536:19,
536:25, 537:14,
537:19, 538:4,
538:7, 538:8,
538:10, 538:12,
538:15, 539:22,
543:1, 543:2, 543:8,
543:18, 543:19,
544:1, 544:8,
544:20, 548:5,
549:1, 549:3,
549:11, 550:4,
551:1, 551:13,
551:15, 551:17,
551:18, 551:20,
551:22, 552:3,
552:12, 552:18,
552:25, 553:4,
553:13, 553:14,
553:20, 554:19,
555:9, 555:23,
555:25, 556:2,
556:6, 556:9,
556:12, 556:15,
556:21, 556:24,
556:25, 558:16,
558:25, 561:12,
561:20, 561:24,
562:19, 563:22,
564:14, 564:16,
565:8, 565:11,
565:15, 565:23,
566:4, 566:5, 566:8,
566:17, 566:22,
568:5, 571:25,
572:4, 572:16,
572:18, 573:3,
573:8, 574:14,
575:4, 575:8,
575:24, 577:7,
578:6, 578:13,
578:19, 578:22,
578:25, 579:5,
579:9, 579:10,

579:16, 580:8,
580:9, 581:1,
581:12, 582:24,
583:1, 583:2,
583:21, 584:1,
584:7, 584:11,
585:19, 586:19,
586:22, 589:15,
589:19, 590:7,
590:8, 590:17,
592:5, 592:8,
592:19, 597:5,
598:7, 599:13,
600:6, 601:19,
601:20, 602:20,
602:23, 604:11,
604:13, 604:23,
605:10, 605:14,
608:23, 610:15,
610:18, 613:15,
674:4, 721:16
**analyze** [9] - 522:2,
525:7, 550:5,
550:19, 554:12,
565:23, 572:7,
575:25, 578:4
**analyzed** [4] - 505:6,
532:7, 559:9, 596:23
**analyzers** [1] - 544:23
**analyzing** [4] - 525:20,
526:1, 565:8, 569:23
**AND** [1] - 480:2
**ANDA** [14] - 490:10,
615:12, 696:21,
697:5, 697:17,
697:23, 698:1,
698:9, 698:12,
698:16, 698:21,
699:10, 699:15,
703:2
**ANDAs** [1] - 620:14
**ANDERSON** [1] -
481:14
**animation** [1] - 560:16
**announcer** [1] - 725:3
**announcing** [1] -
498:9
**annual** [2] - 587:14,
638:2
**annualize** [1] - 545:1
**annualized** [32] -
534:25, 535:5,
536:15, 544:16,
544:17, 545:10,
547:22, 547:24,
552:17, 552:24,
559:15, 560:4,
560:24, 588:6,
593:2, 594:4,
595:22, 595:23,

596:2, 596:5, 596:9,
596:20, 597:8,
597:14, 597:23,
611:12, 611:16,
611:19, 612:3,
612:13, 612:15
**annualizing** [1] -
553:16
**Anstaett** [11] - 503:5,
503:16, 503:22,
505:15, 507:22,
508:14, 508:22,
517:25, 628:14,
628:15, 724:19
**ANSTAETT** [21] -
481:3, 497:8,
497:14, 498:7,
498:21, 498:24,
499:2, 500:1,
500:13, 502:1,
503:23, 507:1,
509:14, 512:8,
514:6, 514:21,
515:6, 515:8,
515:10, 515:12,
516:9
**answer** [23] - 538:19,
538:20, 538:24,
541:2, 558:1, 558:6,
558:9, 558:10,
558:12, 568:24,
569:4, 577:23,
578:7, 590:10,
603:5, 603:6,
604:22, 605:3,
610:7, 610:12,
613:3, 632:6, 706:13
**Answer** [4] - 615:1,
615:4, 615:7, 615:12
**answered** [2] - 512:3,
604:19
**ANTHONY** [2] -
481:21, 482:8
**anti** [2] - 521:16,
521:17
**anti-inflammatory** [2]
- 521:16, 521:17
**antibodies** [1] -
643:14
**anticipate** [1] - 532:14
**anticipated** [3] -
553:5, 566:11,
652:14
**anticipating** [6] -
487:4, 507:21,
567:24, 627:18,
627:20, 627:23
**antipsychotics** [1] -
521:16
**anxiety** [1] - 644:3

**anxiously** [1] - 626:18
**anyway** [2] - 488:4,
571:6
**apart** [9] - 487:24,
490:23, 511:2,
513:2, 514:24,
668:3, 672:4,
674:24, 674:25
**apertures** [3] - 724:4,
724:7, 724:11
**API** [1] - 722:13
**apologies** [1] - 595:8
**apologize** [8] -
528:15, 640:17,
674:3, 676:15,
678:24, 679:14,
680:4, 688:11
**Apotex** [3] - 490:3,
500:2, 500:5
**Appeal** [4] - 499:4,
500:19, 505:16,
505:23
**appeal** [2] - 499:6,
633:4
**appear** [7] - 605:3,
674:21, 685:20,
685:21, 687:3,
687:12, 687:13
**appearance** [1] -
553:25
**APPEARANCES** [3] -
480:11, 481:1, 482:1
**appeared** [1] - 497:24
**appellate** [1] - 632:23
**apples** [1] - 589:7
**applicable** [3] -
494:15, 656:10,
696:4
**application** [4] -
500:24, 508:18,
513:15, 520:9
**applications** [1] -
520:22
**applied** [16] - 519:4,
519:5, 520:4,
520:19, 528:4,
550:15, 550:20,
564:1, 564:3,
565:17, 570:16,
571:3, 571:15,
590:18, 594:17,
594:18
**Applied** [1] - 521:4
**applies** [1] - 592:8
**apply** [5] - 539:8,
613:14, 645:15,
689:18, 715:25
**applying** [2] - 526:20,
539:7
**appreciate** [1] - 483:6

**approach** [4] - 582:6,
592:17, 613:20,
641:22
**appropriate** [8] -
484:9, 512:12,
516:21, 575:24,
577:12, 577:17,
675:13, 675:25
**appropriately** [2] -
598:15, 682:18
**approval** [3] - 615:14,
624:5, 624:19
**approve** [1] - 489:6
**approved** [26] -
500:22, 621:4,
621:8, 622:4,
641:25, 642:19,
654:19, 656:24,
658:18, 661:18,
662:7, 663:25,
664:13, 697:5,
698:1, 700:9, 701:2,
701:8, 701:23,
702:20, 703:2,
706:1, 712:21,
713:20, 715:4
**approves** [1] - 621:11
**approving** [1] - 490:10
**approximate** [1] -
589:4
**April** [1] - 519:11
**area** [13] - 493:3,
520:9, 520:18,
520:19, 520:20,
520:22, 634:13,
635:10, 635:22,
639:20, 694:2,
695:13, 714:14
**areas** [5] - 519:4,
521:21, 653:14,
716:19, 716:20
**argues** [1] - 723:18
**argument** [5] - 489:14,
498:22, 524:12,
625:17, 723:1
**arguments** [3] - 515:3,
624:12, 626:9
**Ari** [1] - 497:10
**arise** [3] - 538:13,
564:8, 565:19
**arisen** [2] - 497:15,
500:15
**arises** [1] - 538:14
**arithmetic** [2] -
594:12, 601:6
**arm** [44] - 533:7,
584:6, 584:19,
584:20, 584:21,
588:17, 588:18,
589:1, 589:2,

589:16, 590:21,
590:23, 595:24,
596:1, 596:6,
596:20, 596:22,
597:1, 597:7, 597:9,
597:23, 598:1,
598:3, 598:4, 599:1,
599:2, 599:19,
599:20, 599:21,
599:22, 600:22,
604:14, 604:15,
606:25, 607:9,
607:10, 612:4,
612:11, 612:16,
612:18, 612:20,
612:22
**arms** [8] - 523:6,
523:9, 584:3,
592:21, 611:13,
708:23
**arrived** [1] - 558:23
**art** [90] - 497:22,
497:23, 498:13,
498:19, 499:10,
499:18, 500:23,
501:8, 501:14,
502:5, 502:6, 502:8,
502:10, 502:13,
502:16, 502:22,
503:2, 503:3, 503:8,
503:11, 503:13,
503:18, 503:25,
504:4, 504:6,
504:13, 504:16,
504:23, 505:7,
506:6, 507:6,
507:16, 508:12,
508:16, 509:6,
509:10, 509:24,
510:6, 511:19,
511:20, 512:19,
513:14, 513:18,
513:20, 514:11,
514:12, 514:16,
515:5, 515:7, 515:8,
515:14, 515:17,
516:5, 516:20,
517:5, 517:7,
627:13, 627:25,
628:9, 628:12,
628:20, 628:22,
629:9, 629:12,
629:15, 629:21,
630:2, 630:5, 630:8,
630:10, 630:21,
631:2, 631:8, 645:4,
645:16, 647:1,
721:19, 722:1,
722:22, 723:7,
723:9, 723:14,
723:20, 724:3,

724:8, 724:12,
724:13, 724:15
**article** [20] - 510:25,
524:9, 533:9, 534:3,
534:22, 534:24,
535:24, 537:4,
540:25, 541:9,
551:21, 551:24,
552:7, 552:10,
573:7, 575:6, 579:6,
583:4, 584:1, 585:24
**articles** [6] - 541:24,
542:1, 542:5,
542:11, 639:11
**artisans** [2] - 499:11,
499:20
**aside** [2] - 505:25,
705:9
**assembled** [2] -
675:6, 675:9
**assert** [2] - 553:6,
617:22
**asserted** [16] - 569:18,
617:2, 625:24,
632:22, 646:7,
646:13, 646:17,
652:18, 652:20,
670:9, 670:19,
688:7, 688:24,
689:4, 692:12,
692:15
**asserting** [3] - 499:15,
504:5, 632:17
**assertion** [1] - 631:7
**assertions** [2] -
517:23, 518:1
**assessing** [1] - 722:23
**assessment** [1] -
617:19
**Assessment** [1] -
541:11
**assigned** [3] - 523:10,
540:10, 564:23
**assignment** [2] -
574:9, 724:3
**assist** [5] - 522:15,
635:1, 682:15,
716:25, 717:2
**associated** [8] -
538:10, 642:21,
643:19, 657:10,
665:22, 665:23,
702:8, 710:25
**Associates** [3] -
519:1, 519:3, 520:15
**associates** [1] - 496:6
**Association** [2] -
521:3, 541:20
**association** [1] -
638:4

**assume** [3] - 589:21,
642:12, 720:14
**assumed** [1] - 622:17
**assuming** [2] -
583:10, 589:17
**assumption** [2] -
531:16, 588:19
**assumptions** [2] -
653:19, 654:4
**Atkins** [1] - 638:3
**attempt** [1] - 699:8
**attend** [1] - 638:1
**attended** [2] - 492:16,
637:25
**attending** [1] - 636:3
**attention** [16] -
484:18, 510:8,
510:9, 513:5,
570:13, 583:19,
585:6, 586:1,
593:13, 595:18,
597:12, 627:3,
635:6, 640:15,
669:13, 702:2
**attorneys** [1] - 493:19
**attribute** [1] - 548:18
**attributes** [5] - 527:4,
541:14, 542:21,
577:21, 621:7
**Aubagio** [1] - 643:13
**audit** [1] - 572:10
**August** [1] - 529:12
**author's** [1] - 533:10
**authored** [1] - 722:6
**authority** [5] - 490:1,
498:23, 499:23,
507:1, 507:4
**authors** [8] - 527:23,
530:18, 533:16,
533:24, 534:2,
541:17, 544:23,
722:12
**available** [12] - 491:5,
491:11, 494:12,
628:10, 637:10,
663:21, 697:8,
698:9, 701:1, 704:4,
711:16, 718:3
**avoiding** [1] - 486:20
**avonex** [1] - 643:12
**await** [1] - 626:18
**aware** [9] - 489:25,
531:3, 532:16,
532:19, 696:17,
700:17, 702:5,
702:7, 702:10
**axes** [1] - 544:14
**axis** [9] - 544:14,
544:15, 545:24,
557:3, 557:4, 557:7,

560:1

------------------

# B

**B.V** [1] - 482:12
**Bachelor's** [1] - 520:2
**background** [7] -
485:8, 519:25,
522:7, 523:15,
528:12, 580:5,
603:13
**baffled** [1] - 591:9
**bag** [1] - 509:17
**balancing** [1] - 488:21
**bar** [14] - 537:2,
551:18, 553:21,
555:12, 555:13,
555:14, 559:25,
560:1, 560:3,
560:20, 560:22,
612:10, 612:14
**bars** [5] - 535:2,
535:5, 536:2, 560:16
**baseball** [1] - 725:3
**based** [37] - 493:10,
499:18, 502:13,
505:1, 517:23,
517:25, 526:11,
539:20, 560:18,
567:11, 573:3,
576:2, 580:8,
580:14, 581:1,
581:11, 594:14,
599:23, 604:1,
605:10, 610:20,
616:9, 619:6,
620:14, 620:19,
621:4, 623:20,
623:21, 624:2,
624:3, 627:20,
629:1, 642:5, 643:1,
651:8, 670:14,
706:18
**baseline** [1] - 641:12
**bases** [1] - 616:25
**basic** [1] - 639:5
**basis** [14] - 500:25,
545:10, 552:23,
552:24, 559:16,
566:15, 576:4,
576:6, 577:23,
580:16, 580:20,
711:23, 712:7, 717:5
**Bayard** [1] - 480:19
**bearing** [2] - 553:10,
566:19
**became** [1] - 636:3
**become** [4] - 620:16,
654:1, 705:23,
715:12

**becoming** [2] -
704:11, 706:5
**BEFORE** [1] - 480:10
**began** [1] - 635:16
**beginning** [1] - 523:11
**begun** [1] - 498:8
**behalf** [2] - 617:1,
634:11
**behold** [2] - 505:8,
510:10
**BELGAM** [1] - 482:6
**believes** [3] - 653:16,
656:25, 716:4
**Bell** [4] - 690:17,
690:22, 690:24,
691:8
**bell** [1] - 646:25
**Bell's** [5] - 690:12,
690:14, 690:20,
691:2, 692:9
**belongs** [1] - 598:15
**below** [2] - 546:10,
716:7
**Bench** [3] - 480:8,
483:15, 515:21
**benefit** [4] - 505:6,
570:21, 571:9, 701:9
**benign** [1] - 643:21
**Bennett** [1] - 492:3
**BENNETT** [2] -
480:15, 492:21
**best** [1] - 605:2
**best.** [1] - 614:16
**Betaseron** [1] - 643:12
**better** [70] - 498:23,
499:23, 561:12,
561:24, 562:2,
562:6, 562:16,
562:19, 564:7,
564:21, 564:25,
565:3, 565:6, 568:6,
568:8, 592:3,
592:12, 594:6,
594:8, 594:16,
594:17, 595:13,
595:14, 596:13,
598:8, 598:18,
600:6, 600:9,
600:21, 601:1,
601:3, 601:6, 601:9,
601:19, 602:8,
602:13, 602:14,
602:20, 602:21,
603:8, 603:9,
603:21, 603:22,
603:25, 604:6,
604:8, 604:9,
604:17, 604:24,
605:2, 605:5, 605:6,
605:13, 605:21,

605:23, 605:24,
606:3, 608:3,
633:10, 675:24,
676:5, 676:8, 679:8,
698:7, 712:14
**Betts** [1] - 723:23
**between** [30] - 500:16,
517:1, 542:5, 556:7,
556:10, 560:24,
564:5, 564:7, 584:3,
584:6, 584:20,
588:21, 592:25,
602:12, 602:24,
603:3, 603:8,
603:20, 605:16,
606:18, 611:22,
649:22, 672:15,
679:4, 705:1,
717:10, 720:8,
724:4, 724:7
**beyond** [3] - 557:21,
568:22, 640:12
**bias** [2] - 577:24,
577:25
**big** [4] - 532:6, 565:19,
583:6, 595:3
**BILSON** [1] - 482:2
**bin** [1] - 598:9
**binder** [14] - 519:9,
524:5, 527:7,
528:25, 534:4,
541:4, 543:21,
583:6, 586:8,
586:10, 591:3,
595:2, 700:2
**binders** [1] - 633:19
**biostatistical** [1] -
522:8
**biostatistics** [1] -
520:22
**bit** [16] - 487:15,
500:14, 528:12,
539:6, 540:4, 543:5,
544:8, 556:24,
559:6, 567:18,
571:18, 592:18,
632:10, 635:4,
702:1, 722:2
**black** [1] - 595:2
**blank** [1] - 544:11
**blaze** [1] - 555:9
**blazed** [2] - 554:19,
579:7
**bleed** [1] - 649:11
**bleeds** [1] - 649:9
**blinded** [2] - 540:12,
574:9
**Blinded** [1] - 541:11
**BLOODWORTH** [69] -
481:5, 484:14,

487:7, 488:1,
488:12, 490:3,
490:9, 492:10,
493:5, 493:8,
495:14, 495:18,
496:3, 496:23,
514:19, 519:12,
519:20, 522:10,
528:9, 528:13,
548:17, 549:6,
549:8, 549:15,
549:21, 550:8,
550:24, 551:11,
557:21, 558:1,
568:22, 569:1,
569:4, 569:15,
569:19, 576:9,
576:14, 576:19,
582:6, 582:8,
582:13, 582:17,
586:3, 586:9,
586:13, 586:15,
587:11, 587:20,
587:22, 590:8,
590:9, 591:7,
591:19, 593:22,
593:25, 608:10,
608:11, 613:20,
614:9, 614:13,
616:16, 616:20,
618:11, 618:19,
622:21, 626:24,
628:15, 633:6,
633:10
**Bloodworth** [27] -
488:11, 492:8,
494:24, 501:6,
501:9, 503:17,
509:19, 511:6,
511:9, 511:13,
511:15, 511:23,
512:5, 512:14,
513:24, 514:2,
514:3, 514:18,
582:18, 608:9,
616:15, 617:23,
623:11, 624:12,
625:17, 626:10,
628:7
**Bloodworth's** [2] -
587:6, 613:13
**BLOOODWORTH** [1] -
492:16
**blue** [4] - 546:3,
591:14, 651:4, 651:6
**Board** [5] - 499:4,
500:19, 505:17,
505:23, 636:9
**board** [3] - 499:6,
636:7, 636:8

**body** [2] - 546:4, 575:8
**body's** [1] - 640:3
**boils** [1] - 564:6
**Bone** [2] - 624:14,
625:6
**book** [1] - 564:3
**Boston** [2] - 481:22,
635:22
**bottom** [13] - 531:19,
531:20, 534:1,
545:16, 567:3,
572:11, 577:15,
583:12, 591:13,
611:8, 638:13,
710:4, 724:5
**bottom-line** [1] -
534:1
**brain** [2] - 640:2,
640:11
**brand** [1] - 698:11
**branded** [5] - 652:5,
659:7, 663:12,
663:24, 691:23
**BRANDON** [1] - 481:6
**BRAUERMAN** [1] -
480:18
**break** [6] - 567:18,
582:4, 587:18,
587:20, 626:21,
658:4
**BRENNER** [2] - 482:8,
492:14
**BRENNER-LEIFER**
[2] - 482:8, 492:14
**BRETT** [1] - 482:9
**brief** [2] - 522:6,
522:18
**briefing** [2] - 491:23,
516:13
**briefly** [16] - 525:10,
639:6, 639:8,
639:24, 641:7,
645:2, 646:12,
646:16, 646:21,
650:9, 652:16,
653:4, 656:14,
658:3, 669:15, 719:6
**bright** [1] - 577:5
**bring** [4] - 503:15,
530:9, 625:9, 631:22
**brings** [1] - 620:11
**broad** [2] - 506:4,
550:16
**broke** [1] - 490:23
**broken** [1] - 640:9
**Brooklyn** [1] - 725:5
**brought** [3] - 484:17,
489:2, 507:19
**BRUSSIERE** [1] -
480:19

**bucket** [2] - 660:2,
671:1
**buckets** [1] - 658:11
**Budd** [1] - 482:4
**built** [2] - 533:4,
558:25
**bulk** [2] - 573:20,
694:9
**burden** [3] - 487:1,
488:4, 623:13
**burning** [1] - 529:12
**business** [1] - 520:8
**BY** [42] - 518:22,
519:21, 522:14,
526:10, 527:15,
528:17, 528:19,
531:13, 534:17,
548:23, 551:12,
555:7, 557:24,
558:15, 567:21,
570:6, 577:1,
582:17, 586:9,
586:15, 587:11,
587:22, 590:9,
591:19, 593:25,
608:11, 610:24,
613:12, 634:1,
639:2, 639:23,
640:22, 645:14,
657:17, 659:22,
676:17, 678:25,
680:5, 688:14,
691:1, 693:1, 719:9

# C

**C.A** [1] - 480:4
**CAFC** [2] - 498:23,
506:23
**calculate** [2] - 551:14,
561:23
**calculating** [2] -
574:16, 594:4
**calculation** [6] -
531:16, 531:19,
537:19, 537:20,
545:21, 558:21
**calculations** [12] -
524:20, 524:23,
531:18, 532:4,
533:11, 533:12,
533:15, 533:20,
534:2, 562:18,
578:9, 585:24
**California** [1] - 520:5
**cancer** [1] - 624:25
**cannot** [7] - 584:15,
612:19, 612:23,
612:25, 613:3,
620:6, 667:21

**capable** [1] - 515:21
**card** [13] - 529:9,
529:11, 529:18,
529:21, 529:22,
529:24, 530:11,
532:21, 571:19,
609:7, 609:12,
609:17, 609:18
**cards** [10] - 528:15,
529:6, 529:24,
530:7, 530:9,
530:12, 530:15,
531:9, 532:17,
537:25
**Care** [2] - 624:14,
625:6
**care** [3] - 489:20,
636:21
**career** [4] - 636:17,
641:20, 700:25,
701:12
**careful** [2] - 485:6,
518:16
**caregivers** [1] -
654:21
**caring** [1] - 636:22
**carry** [1] - 623:12
**carrying** [1] - 531:18
**case** [100] - 483:25,
484:3, 484:6,
484:10, 484:22,
485:17, 485:22,
490:4, 490:17,
491:10, 491:18,
495:11, 497:12,
498:16, 499:7,
499:24, 500:2,
500:3, 500:9,
500:18, 500:21,
501:15, 502:11,
503:4, 503:7, 503:9,
505:7, 506:20,
507:15, 508:18,
521:23, 521:25,
522:1, 522:3, 525:9,
526:21, 532:4,
532:18, 534:9,
537:2, 538:5, 538:8,
538:11, 538:25,
540:13, 542:10,
543:3, 543:8, 563:1,
566:23, 568:1,
570:22, 580:3,
580:18, 582:10,
589:8, 590:19,
594:22, 597:10,
613:15, 615:25,
616:5, 616:22,
617:17, 619:3,
620:14, 621:1,

621:5, 623:17,
624:4, 624:14,
624:18, 624:23,
625:1, 625:6, 625:7,
626:1, 629:24,
632:24, 634:10,
644:12, 644:15,
654:7, 657:20,
661:20, 665:1,
672:10, 683:24,
690:22, 703:1,
704:3, 710:19,
712:16, 721:13,
721:22, 722:4,
723:5, 723:12,
723:23
**cases** [15] - 491:9,
498:20, 504:1,
506:14, 506:19,
506:23, 542:12,
542:13, 542:14,
620:20, 631:8,
631:9, 721:17,
721:23, 722:3
**CASES** [1] - 480:4
**cat** [1] - 509:17
**categories** [19] -
538:1, 539:2, 556:7,
560:6, 563:3, 563:7,
564:14, 564:15,
564:17, 564:18,
568:6, 568:8,
595:13, 595:15,
606:3, 610:20, 697:2
**categorized** [1] -
561:12
**category** [11] - 562:23,
563:4, 563:18,
564:19, 595:17,
595:18, 603:25,
628:11, 697:13,
697:15, 697:20
**causing** [1] - 640:4
**caution** [2] - 502:3,
632:22
**cells** [2] - 640:13,
640:14
**center** [5] - 530:15,
635:10, 635:11,
635:12, 636:4
**centers** [1] - 530:10
**central** [3] - 640:1,
640:5, 640:6
**certain** [18] - 495:12,
508:20, 517:24,
524:20, 619:21,
629:1, 633:17,
699:18, 700:16,
701:4, 704:16,
705:15, 707:21,

708:13, 708:15,
716:19, 716:20
**certainly** [33] - 488:21,
505:12, 505:20,
512:4, 521:14,
523:5, 534:20,
539:14, 553:15,
557:11, 560:20,
564:17, 572:17,
577:6, 594:10,
598:14, 602:11,
617:20, 624:7,
626:1, 639:22,
641:24, 656:16,
658:25, 660:4,
669:12, 677:2,
699:14, 703:24,
708:16, 710:8,
713:1, 714:4
**certifications** [1] -
636:7
**certified** [1] - 636:8
**cetera** [2] - 490:12,
642:10
**Chads** [1] - 522:3
**chain** [2] - 605:14,
605:16
**chance** [5] - 564:8,
564:9, 565:20,
579:25, 626:21
**change** [24] - 488:3,
493:14, 531:21,
532:12, 570:21,
572:12, 572:21,
572:25, 574:11,
574:12, 574:19,
578:15, 578:18,
584:14, 585:15,
640:19, 646:1,
648:6, 651:21,
709:15, 709:24,
710:23, 724:10
**changed** [1] - 532:2,
532:9, 572:22,
572:24, 572:25,
629:21, 648:16,
650:17, 660:8,
663:24, 663:25
**changes** [5] - 572:3,
572:13, 572:22,
703:2, 703:3
**changing** [2] - 531:16,
683:16
**characteristics** [1] -
541:14
**characterization** [3] -
576:10, 628:23,
672:8
**characterize** [1] -
483:14

**characterizing** [3] -
594:9, 628:22, 630:9
**chart** [23] - 544:13,
544:16, 544:18,
545:13, 545:16,
545:24, 545:25,
546:3, 547:4,
559:11, 562:18,
564:18, 566:24,
567:3, 623:16,
633:7, 673:13,
673:17, 673:19,
673:21, 673:23,
674:19, 675:3
**charts** [4] - 543:21,
543:23, 551:18,
554:1
**check** [2] - 569:12,
618:1
**checking** [1] - 617:24
**chest** [8] - 644:2,
702:12, 706:24,
706:25, 707:12,
707:13, 716:12,
716:13
**Chicago** [3] - 481:16,
520:12, 520:14
**chicken** [1] - 550:22
**Chief** [1] - 485:1
**child** [1] - 649:11
**choice** [7] - 486:19,
510:12, 601:21,
674:10, 674:12,
677:2, 720:17
**choices** [1] - 539:18
**choose** [7] - 575:15,
653:12, 662:8,
665:7, 696:15,
712:24
**choosing** [3] - 641:23,
663:18, 666:1
**chose** [3] - 541:17,
541:23, 677:1
**chosen** [4] - 615:11,
650:16, 651:21,
651:24
**CHRIS** [1] - 481:15
**CHRISTOPHER** [1] -
481:21
**chronic** [1] - 640:1
**circuit** [1] - 722:5
**Circuit** [9] - 498:17,
499:24, 500:2,
500:14, 504:2,
506:2, 625:12,
721:22, 721:23
**circumstances** [2] -
538:7, 577:17
**citation** [2] - 501:8,
515:20

**citations** [3] - 498:17,
499:24, 515:13
**cite** [2] - 500:12, 631:9
**cited** [5] - 500:18,
503:5, 506:15,
639:16, 650:4
**cites** [2] - 500:4,
504:21
**City** [2] - 493:3, 493:4
**Civil** [1] - 616:17
**Claim** [16] - 526:17,
581:10, 581:11,
618:22, 619:4,
621:13, 622:8,
632:17, 646:10,
646:19, 652:21,
689:19, 690:3,
690:8, 692:16
**claim** [25] - 525:9,
525:10, 526:19,
526:21, 539:7,
548:13, 553:1,
581:6, 607:14,
613:15, 625:5,
625:21, 632:16,
632:21, 633:3,
645:17, 647:1,
647:3, 647:5,
647:19, 648:1,
651:8, 651:17,
657:25, 692:12
**claimed** [1] - 723:8
**claims** [74] - 526:4,
526:7, 539:8,
548:16, 599:8,
605:12, 616:21,
617:13, 617:15,
617:22, 617:25,
618:2, 618:9,
618:14, 618:24,
619:4, 619:16,
619:24, 620:7,
620:9, 621:7,
621:10, 621:14,
621:16, 622:9,
622:25, 623:13,
623:15, 623:17,
623:19, 624:10,
624:21, 625:24,
626:3, 626:22,
632:15, 632:18,
633:17, 634:25,
644:17, 645:7,
645:17, 646:1,
646:4, 646:7,
646:13, 646:18,
650:10, 650:13,
650:14, 650:21,
651:11, 652:1,
652:19, 652:20,

652:21, 653:6,
653:9, 654:10,
658:4, 658:15,
670:9, 670:19,
688:7, 688:25,
689:4, 689:9,
689:10, 692:15,
698:17, 699:1,
699:2, 699:18,
722:24
**Claims** [26] - 526:2,
526:16, 581:21,
617:2, 617:7, 617:8,
618:23, 619:5,
621:13, 622:9,
623:1, 623:2, 623:3,
623:4, 646:9,
646:10, 646:18,
650:11, 650:21,
651:5, 651:12,
670:10, 689:19,
690:3, 690:7, 692:15
**clarification** [1] -
590:4
**clarify** [2] - 618:11,
681:18
**clarifying** [1] - 585:13
**class** [1] - 697:25
**classification** [1] -
539:1
**classified** [3] - 560:11,
561:9, 562:15
**classify** [2] - 537:22,
561:7
**clean** [1] - 603:6
**cleanup** [1] - 613:23
**clear** [26] - 489:10,
494:20, 498:16,
501:15, 502:1,
503:9, 503:16,
504:1, 505:18,
507:8, 507:12,
523:17, 527:23,
550:8, 552:25,
580:24, 621:9,
622:19, 622:22,
623:13, 662:8,
666:24, 672:11,
678:1, 678:8, 714:19
**clearer** [1] - 514:22
**clearly** [8] - 485:10,
513:1, 559:7,
605:12, 648:17,
722:9, 722:13
**clerk** [5] - 491:20,
492:23, 506:17,
631:10, 721:24
**clever** [1] - 495:4
**click** [1] - 560:15
**clients** [1] - 698:4

**clinical** [47] - 508:1, 508:3, 509:3, 509:5, 539:15, 540:7, 541:24, 541:25, 542:8, 542:9, 549:3, 550:17, 569:23, 615:13, 619:20, 620:4, 627:10, 627:11, 634:14, 635:9, 635:25, 638:5, 641:16, 656:19, 657:21, 661:23, 662:19, 666:10, 666:12, 666:24, 667:18, 667:20, 667:22, 670:13, 675:19, 677:20, 678:2, 681:18, 688:18, 689:23, 691:13, 694:23, 695:13, 710:1, 712:3, 724:18

**clinicals** [1] - 539:17

**clip** [3] - 613:25, 614:5, 615:19

**clips** [2] - 616:3, 616:6

**closer** [2] - 593:4, 671:19

**cobbling** [1] - 653:13

**code** [2] - 530:4, 533:24

**coding** [3] - 559:17, 560:2, 591:8

**cognition** [1] - 640:20

**cohort** [1] - 712:5

**Coie** [2] - 481:4, 481:7

**coincide** [1] - 547:6

**colleague** [1] - 570:3

**colleagues** [5] - 499:1, 550:10, 617:19, 703:23, 705:17

**collected** [5] - 527:2, 530:8, 530:13, 537:21, 539:3

**collection** [4] - 529:2, 537:24, 539:4, 642:18

**colloquy** [2] - 483:10, 512:9

**color** [1] - 560:2

**colored** [4] - 559:25, 560:1, 560:20, 560:22

**Columbia** [1] - 637:20

**column** [3] - 596:8, 596:16, 617:13

**combination** [4] - 499:16, 504:6, 556:3, 723:19

**combine** [1] - 592:13

**comfort** [2] - 512:22, 512:24

**comfortable** [3] - 512:17, 639:20, 699:25

**coming** [6] - 491:8, 508:9, 519:12, 539:19, 560:5, 567:24

**commenced** [1] - 504:10

**comments** [3] - 486:2, 531:24, 532:3

**commercial** [3] - 485:16, 489:8, 490:12

**commercially** [1] - 658:18

**commit** [1] - 610:12

**committed** [1] - 593:18

**common** [4] - 540:18, 641:5, 641:6, 694:3

**commonly** [3] - 643:22, 700:15, 700:16

**communication** [1] - 609:13

**community** [1] - 638:15

**companies** [6] - 619:2, 675:23, 685:14, 698:5, 702:21, 703:1

**Company** [1] - 481:25

**company** [1] - 490:18

**comparative** [4] - 676:24, 680:20, 707:25, 708:12

**compare** [20] - 560:16, 560:23, 604:11, 606:1, 620:3, 666:21, 668:2, 668:6, 674:14, 675:4, 675:21, 680:22, 680:25, 681:18, 704:18, 705:7, 712:3, 712:16, 712:25, 719:21

**compared** [23] - 498:2, 533:14, 536:16, 543:10, 544:5, 554:7, 555:13, 556:5, 556:18, 557:3, 560:10, 561:8, 567:16, 580:22, 606:25, 667:15,

667:21, 673:12, 680:24, 704:18, 704:20, 704:21, 705:5

**compares** [2] - 554:20, 720:9

**comparing** [9] - 524:25, 551:22, 579:7, 604:8, 666:9, 667:13, 679:7, 704:22, 712:9

**comparison** [17] - 552:9, 554:20, 554:22, 557:15, 560:14, 570:11, 570:14, 674:12, 675:15, 675:25, 704:14, 704:17, 704:25, 705:4, 705:12, 707:16, 711:9

**comparisons** [8] - 525:21, 525:22, 568:18, 599:12, 599:16, 720:4, 720:6, 720:7

**compelling** [2] - 576:4, 580:16

**competent** [1] - 702:10

**competition** [1] - 484:24

**complain** [3] - 507:21, 569:13, 569:15

**complained** [1] - 568:4

**complaint** [3] - 490:19, 507:23, 627:16

**complaints** [1] - 509:11

**completed** [1] - 551:2

**completely** [5] - 510:24, 629:17, 668:3, 668:4, 668:14

**complex** [1] - 536:5

**complicated** [2] - 537:18, 560:13

**compositions** [1] - 722:22

**computer** [8] - 520:4, 520:9, 533:22, 533:23, 533:24, 706:7, 706:11, 706:21

**conceive** [1] - 592:16

**conceived** [1] - 556:20

**concentration** [1] - 520:9

**concept** [1] - 606:7

**concepts** [1] - 649:21

**concern** [2] - 490:16, 538:14

**concerning** [4] - 493:25, 524:23, 531:8, 581:23

**concerns** [1] - 538:12

**conclude** [9] - 526:13, 561:4, 573:4, 580:19, 581:18, 582:2, 604:4, 689:2, 690:6

**concluded** [3] - 536:12, 605:12, 691:8

**concluding** [1] - 580:21

**conclusion** [21] - 524:15, 526:11, 536:10, 536:14, 540:1, 542:4, 552:14, 553:25, 558:22, 558:23, 566:21, 567:7, 571:14, 572:25, 580:10, 580:12, 581:14, 581:23, 599:15, 670:22, 671:12

**conclusions** [16] - 486:23, 487:12, 489:11, 494:7, 532:13, 532:15, 539:22, 553:19, 565:25, 570:17, 575:22, 578:17, 579:12, 581:8, 689:17

**condensed** [1] - 487:13

**condition** [2] - 709:5

**conditions** [6] - 667:19, 668:4, 668:8, 675:20, 700:22, 710:7

**conduct** [7] - 543:8, 549:1, 550:3, 552:18, 557:25, 566:7, 615:13

**conducted** [6] - 498:1, 508:21, 539:16, 579:4, 667:19, 668:7

**conducting** [1] - 543:16

**confer** [3] - 487:20, 618:5, 626:21

**conference** [9] - 483:15, 487:20, 495:2, 495:9, 496:18, 497:5,

497:7, 638:3, 638:4

**conferences** [1] - 637:25

**conferred** [1] - 484:16

**confess** [1] - 488:22

**confidence** [1] - 537:5

**confidential** [2] - 496:24, 537:7

**confirm** [4] - 492:20, 533:19, 533:25, 555:16

**confirmed** [1] - 507:22

**conflated** [1] - 653:22

**conform** [1] - 532:2

**conforms** [1] - 585:20

**confused** [2] - 501:24, 549:12

**confusing** [1] - 549:13

**confusion** [3] - 502:1, 503:24, 632:15

**conjunction** [2] - 645:17, 663:19

**connected** [1] - 614:5

**connection** [2] - 538:15, 644:13

**connector** [2] - 724:8, 724:9

**connectors** [1] - 724:5

**consequence** [5] - 537:9, 570:15, 573:7, 590:14, 710:15

**consequences** [1] - 709:7

**conservative** [2] - 564:24, 601:21

**conservatively** [1] - 565:5

**consider** [6] - 515:16, 515:22, 539:12, 630:17, 644:18, 722:23

**considerable** [1] - 679:20

**consideration** [1] - 502:19

**considered** [2] - 499:8, 501:1

**consisted** [1] - 527:3

**consistent** [8] - 504:1, 549:2, 549:4, 552:6, 558:22, 576:17, 577:20, 691:12

**consistently** [1] - 571:15

**CONSOLIDATED** [2] - 480:4

**consolidated** [1] - 530:17

**constant** [1] - 631:7

constellation [1] - 702:15

constraining [1] - 631:6

constructed [2] - 585:18, 585:20

construction [13] - 526:19, 539:7, 613:15, 625:5, 632:21, 633:3, 645:18, 647:2, 647:3, 647:5, 647:19, 648:1, 651:8

constructions [2] - 526:21, 651:17

construed [4] - 539:8, 619:24, 632:21, 633:2

consult [2] - 568:23, 586:4

consultation [2] - 568:20, 570:12

consulted [2] - 521:10, 533:9

consulting [4] - 519:1, 519:4, 520:15, 520:19

contain [4] - 529:9, 529:18, 632:20, 716:18

contained [3] - 686:3, 686:14, 706:2

containing [1] - 627:13

contains [3] - 606:12, 609:6, 707:16

contemplated [1] - 574:15

contend [1] - 498:13

contended [1] - 500:9

contending [2] - 503:24, 503:25

contends [1] - 722:15

content [1] - 484:1

contents [1] - 512:6

contest [1] - 489:12

contesting [1] - 625:23

context [6] - 503:9, 507:19, 508:24, 511:25, 626:2, 647:6

contexts [1] - 694:6

continue [7] - 506:11, 523:10, 523:25, 608:9, 608:17, 641:10, 710:13

CONTINUED [2] - 481:1, 482:1

continued [3] - 524:1, 545:20, 575:9

continues [1] - 495:4

continuing [1] - 723:12

continuously [1] - 636:16

contraceptives [1] - 521:19

contradicted [1] - 722:10

contrary [4] - 494:9, 546:15, 576:6, 625:6

contrary-wise [1] - 546:15

contributory [3] - 621:18, 625:16, 690:11

control [1] - 683:24

controlled [17] - 666:16, 666:19, 667:2, 668:9, 671:25, 672:2, 674:2, 677:23, 677:25, 678:7, 681:13, 681:14, 681:20, 682:4, 682:6, 687:25, 706:16

controls [1] - 709:2

controversial [3] - 549:20, 659:17, 666:23

convene [1] - 496:9

conversation [2] - 493:23, 569:20

conversations [3] - 569:16, 569:22, 615:5

coordinates [1] - 547:6

COPAXONE [1] - 480:4

Copaxone [15] - 644:4, 644:8, 659:7, 663:12, 663:24, 691:23, 695:17, 695:23, 696:22, 697:16, 700:20, 701:5, 703:3, 703:9

copies [1] - 621:6

copy [3] - 492:21, 507:2, 519:11

cord [2] - 640:2, 640:12

core [34] - 522:22, 523:2, 523:6, 523:24, 524:1, 524:11, 524:18, 525:2, 525:3, 527:21, 533:6, 533:7, 533:13,

534:19, 536:11, 543:13, 543:17, 543:20, 544:1, 546:19, 551:15, 551:23, 551:25, 552:3, 552:19, 554:13, 554:22, 555:8, 555:24, 561:21, 567:12, 570:25, 573:8, 579:8

corner [2] - 560:3, 583:12

Corp [1] - 500:20

correct [108] - 489:24, 505:16, 525:6, 532:18, 554:9, 566:17, 577:13, 581:5, 582:21, 582:25, 583:3, 583:22, 584:3, 585:9, 585:16, 585:22, 586:21, 587:1, 587:4, 588:18, 589:10, 589:23, 591:21, 592:22, 595:6, 595:24, 596:2, 596:9, 596:24, 597:3, 597:24, 598:21, 599:5, 599:6, 599:22, 600:8, 600:11, 600:24, 601:4, 603:10, 604:9, 605:1, 606:22, 607:1, 608:20, 608:25, 609:5, 609:19, 609:22, 610:6, 610:17, 611:17, 612:2, 612:20, 622:22, 625:13, 641:21, 667:4, 693:6, 693:18, 694:7, 694:20, 694:24, 695:14, 696:7, 696:16, 697:9, 697:13, 697:14, 697:18, 697:23, 697:24, 698:5, 698:13, 698:17, 699:4, 699:13, 700:9, 700:14, 701:25, 702:13, 702:23, 704:17, 705:24, 706:5, 707:5, 707:10, 707:14, 708:3, 708:14, 710:4, 711:10, 711:18, 712:19, 712:21,

713:18, 713:25, 715:13, 716:3, 716:16, 716:19, 716:22, 717:7, 717:15, 717:21, 717:25, 718:10, 718:17

correction [4] - 597:2, 597:3, 611:14, 612:6

correctly [3] - 534:3, 696:2, 724:19

correlation [1] - 649:22

correspond [1] - 529:11

corresponding [4] - 525:21, 525:22, 559:14, 560:21

correspondingly [1] - 560:5

corresponds [3] - 534:23, 559:4, 559:13

corroborate [2] - 510:15, 516:20

corroborates [1] - 505:4

COTTRELL [1] - 481:2

counsel [13] - 484:21, 492:15, 501:23, 570:1, 615:4, 630:14, 669:1, 669:4, 669:7, 683:13, 720:18, 721:6, 723:6

Counsel [7] - 480:20, 481:9, 481:17, 481:23, 482:5, 482:11, 483:2

counseling [5] - 668:22, 714:18, 714:22, 719:15, 719:23

Counseling [1] - 715:6

count [1] - 547:2

counted [4] - 553:15, 574:23, 604:13, 612:9

counterfactual [2] - 607:6, 607:7

counterfactually [1] - 607:2

counting [4] - 535:12, 574:16, 579:3, 585:15

counts [3] - 535:19, 548:9, 585:23

couple [14] - 493:5, 497:17, 521:13,

535:9, 544:7, 567:23, 600:12, 614:14, 615:24, 651:10, 658:11, 668:17, 719:18, 722:3

course [17] - 492:24, 505:13, 527:2, 537:11, 548:1, 553:25, 570:13, 572:23, 587:2, 598:10, 602:8, 621:24, 633:4, 648:13, 649:8, 649:13, 658:23

Court [38] - 483:7, 483:23, 484:8, 484:22, 485:2, 491:4, 491:7, 495:18, 497:6, 503:5, 505:21, 520:1, 523:3, 529:4, 533:8, 539:8, 541:7, 553:12, 614:6, 619:25, 629:18, 630:17, 641:23, 650:12, 653:1, 653:4, 656:14, 659:14, 664:9, 665:18, 673:7, 688:4, 692:3, 722:7, 723:21, 724:6, 725:8

COURT [171] - 480:1, 483:1, 483:3, 483:12, 488:5, 488:11, 488:13, 488:17, 488:25, 489:4, 489:9, 489:17, 490:2, 490:6, 490:14, 491:1, 491:4, 491:8, 491:20, 492:15, 492:22, 493:7, 493:24, 494:5, 494:18, 494:22, 495:17, 495:20, 496:1, 496:5, 496:17, 496:22, 496:25, 497:2, 497:4, 497:13, 498:6, 498:20, 498:23, 499:1, 499:25, 500:12, 501:2, 501:17, 501:23, 503:22, 506:1, 506:10, 506:23, 506:25, 507:9, 507:18, 508:6, 509:13, 514:18, 515:4, 515:11, 515:25,

516:8, 517:19,
517:22, 518:6,
518:7, 518:11,
518:14, 518:16,
518:20, 519:14,
519:18, 522:11,
528:18, 531:10,
534:15, 548:22,
549:7, 549:13,
549:20, 551:5,
551:10, 558:3,
558:7, 558:10,
558:13, 568:25,
569:3, 569:7,
569:11, 569:13,
569:17, 569:25,
576:13, 576:15,
576:18, 576:21,
576:25, 582:4,
582:7, 582:12,
582:15, 586:6,
586:12, 587:9,
587:18, 590:3,
590:7, 591:6,
591:10, 591:13,
593:24, 608:5,
608:8, 610:23,
613:7, 613:10,
613:18, 614:7,
614:11, 614:17,
614:20, 615:17,
615:20, 615:22,
616:7, 616:11,
616:14, 616:19,
617:18, 618:4,
618:10, 618:18,
622:12, 622:17,
622:23, 623:5,
623:8, 626:7, 627:1,
627:7, 627:15,
627:18, 627:22,
628:13, 630:4,
630:15, 631:5,
631:16, 632:2,
632:12, 633:5,
633:12, 633:18,
633:23, 638:24,
639:15, 639:19,
640:15, 645:11,
659:16, 659:20,
676:14, 678:23,
679:25, 680:2,
688:10, 690:25,
692:21, 692:23,
719:4, 721:4, 721:6,
724:22
**court** [4] - 521:6,
634:8, 644:24,
723:25
**Court's** [11] - 526:21,
539:7, 613:14,

645:17, 647:1,
647:3, 647:5,
647:19, 648:1,
651:8, 651:17
**courtroom** [4] -
519:16, 576:3,
702:22, 703:8
**cover** [3] - 639:5,
652:1, 715:19
**coverings** [1] - 640:6
**Cox** [1] - 521:16
**create** [3] - 546:22,
577:25, 609:22
**created** [1] - 546:24
**creation** [1] - 537:22
**credibility** [12] -
501:11, 510:14,
511:14, 513:4,
514:1, 514:4,
517:11, 517:15,
517:19, 628:6,
629:24, 631:21
**credible** [1] - 517:20
**criteria** [4] - 724:1,
724:2, 724:9, 724:13
**critical** [8] - 515:20,
516:14, 538:14,
614:12, 614:13,
614:15, 711:9,
721:18
**criticism** [16] - 531:6,
531:23, 551:4,
568:10, 568:12,
570:19, 570:25,
571:14, 571:17,
572:12, 573:4,
573:6, 573:11,
573:14, 573:17,
575:14
**criticisms** [5] -
531:25, 532:3,
567:23, 572:8,
572:10
**criticized** [1] - 531:2
**cross** [9] - 501:5,
501:7, 503:18,
509:18, 513:9,
516:21, 547:9,
551:23, 582:4
**CROSS** [2] - 582:16,
692:25
**cross-examination** [4]
- 501:5, 501:7,
509:18, 516:21
**CROSS-
EXAMINATION** [2] -
582:16, 692:25
**cross-examine** [1] -
513:9
**cross-sectionally** [1] -

551:23
**crystal** [2] - 504:1,
666:24
**crystal-clear** [2] -
504:1, 666:24
**culled** [1] - 529:15
**cultivated** [2] -
693:14, 693:25
**current** [3] - 625:12,
637:15, 637:21
**cursor** [1] - 559:11
**cut** [2] - 506:11,
701:10
**cuts** [1] - 546:5
**CV** [3] - 519:11,
519:22, 637:15
**CVs** [1] - 519:16

# D

**D.C** [6] - 480:17,
481:8, 482:10,
635:10, 694:2,
695:13
**daily** [22] - 498:2,
498:3, 498:5,
504:14, 512:20,
523:19, 530:6,
567:9, 610:3, 610:4,
644:8, 658:12,
658:22, 659:11,
660:12, 663:22,
666:3, 667:3, 667:9,
670:17, 672:20,
691:6
**damage** [1] - 640:4
**damaged** [1] - 640:13
**damages** [1] - 626:1
**DARYL** [1] - 480:14
**dashed** [1] - 559:12
**data** [189] - 522:9,
525:4, 525:20,
526:24, 527:1,
527:3, 527:13,
527:18, 530:17,
530:19, 531:3,
531:8, 531:23,
532:2, 532:5, 532:6,
532:9, 532:10,
532:21, 532:23,
532:24, 533:13,
534:11, 537:20,
537:24, 538:17,
538:18, 538:22,
538:23, 539:1,
539:4, 539:17,
540:22, 543:8,
543:20, 544:2,
544:25, 545:5,
545:7, 545:17,

545:22, 546:10,
546:15, 546:19,
548:4, 549:17,
549:24, 550:6,
550:18, 550:23,
552:19, 554:13,
555:24, 556:19,
560:18, 561:21,
567:13, 569:23,
571:19, 571:22,
572:4, 572:8,
572:13, 572:20,
573:4, 573:25,
574:7, 575:8, 575:9,
575:10, 575:16,
576:5, 577:7, 577:9,
577:10, 577:18,
577:25, 578:8,
578:13, 580:9,
580:16, 580:17,
581:15, 581:24,
582:2, 585:14,
585:21, 591:23,
594:24, 598:7,
599:3, 599:4,
599:24, 608:23,
609:22, 609:23,
620:19, 650:3,
650:6, 653:20,
653:22, 653:23,
654:2, 666:9,
666:15, 666:18,
666:21, 666:25,
667:7, 667:13,
667:15, 668:2,
668:6, 668:18,
671:24, 672:1,
672:24, 673:4,
673:8, 673:10,
673:12, 673:15,
673:25, 674:1,
674:7, 674:8,
674:10, 674:12,
674:14, 674:15,
674:23, 675:7,
675:9, 675:18,
677:4, 677:16,
677:19, 678:4,
678:6, 679:5, 679:9,
679:12, 679:15,
679:16, 679:18,
680:7, 680:8,
680:20, 680:24,
681:18, 681:21,
681:23, 683:18,
683:19, 684:14,
685:19, 685:22,
686:22, 687:3,
687:5, 705:2, 705:8,
706:1, 706:3,
707:17, 708:13,

710:1, 710:4,
711:16, 711:17,
711:21, 711:24,
712:9, 712:10,
712:13, 712:15,
712:17, 712:25,
717:20, 717:21,
719:25, 720:15,
721:18
**data-like** [1] - 545:5
**data-mine** [1] - 538:17
**database** [15] -
527:24, 528:2,
528:7, 529:10,
530:13, 531:3,
532:7, 533:4, 536:5,
543:1, 543:9, 545:1,
567:13, 609:19,
609:21
**databases** [3] -
530:19, 530:23,
530:25
**date** [28] - 497:24,
498:9, 498:11,
498:19, 499:11,
499:15, 499:22,
500:4, 500:7,
500:10, 500:16,
503:3, 503:8, 504:3,
504:4, 504:9,
507:17, 508:5,
508:25, 516:6,
517:5, 627:12,
627:14, 628:10,
631:3, 637:23,
721:18, 722:17
**dated** [2] - 508:5,
627:12
**dates** [1] - 500:23
**DAVID** [1] - 481:3
**dAVID** [1] - 482:2
**days** [30] - 500:3,
500:6, 500:10,
500:16, 512:20,
535:7, 535:10,
535:20, 544:16,
544:17, 544:19,
544:20, 545:11,
552:6, 553:15,
553:17, 557:6,
557:12, 558:17,
558:22, 565:21,
575:2, 581:2,
586:20, 588:25,
648:11, 722:16,
722:20
**DDX** [9] - 645:1,
646:4, 646:21,
651:10, 656:13,
663:5, 670:8,

689:22, 691:15

**DDX-1400** [22] - 635:7, 639:7, 640:25, 645:20, 647:4, 647:18, 650:10, 650:20, 651:5, 652:15, 658:2, 659:2, 659:24, 660:15, 670:7, 670:20, 671:2, 674:6, 688:5, 688:15, 689:8, 689:13

**DDX-1400.20** [1] - 697:2

**DDX-1550.3** [1] - 600:2

**deal** [2] - 490:22, 721:14

**dealing** [1] - 491:13

**dealt** [3] - 490:19, 493:11, 539:17

**DEANNE** [1] - 481:13

**death** [2] - 709:10

**decades** [3] - 668:3, 668:10, 682:4

**decide** [2] - 506:14, 530:3

**decided** [2] - 574:11, 722:4

**decimal** [2] - 536:8, 537:3

**decision** [19] - 500:19, 507:3, 517:10, 537:22, 624:13, 625:6, 625:7, 642:8, 642:11, 643:4, 643:5, 663:17, 695:22, 696:1, 708:11, 712:24, 713:1, 720:1

**decision-making** [1] - 642:8

**decisions** [3] - 525:18, 638:16, 642:25

**declaration** [6] - 483:22, 484:23, 485:8, 485:21, 486:13, 491:13

**declarations** [1] - 499:5

**decrease** [3] - 547:15, 648:17, 682:13

**decreases** [1] - 640:10

**decreasing** [1] - 682:17

**deemed** [1] - 593:10

**deeper** [1] - 668:20

**default** [4] - 577:3,

577:5, 577:6

**Defendant** [1] - 482:5

**defendant** [1] - 646:14

**Defendants** [4] - 481:9, 481:17, 481:23, 482:11

**defendants** [52] - 484:2, 484:9, 486:14, 490:18, 495:11, 497:9, 497:14, 501:13, 502:17, 527:11, 531:2, 531:10, 531:25, 532:10, 567:24, 568:4, 571:18, 571:22, 573:11, 581:25, 582:19, 611:1, 617:1, 618:22, 619:1, 619:10, 620:18, 620:20, 622:18, 622:20, 624:16, 630:18, 631:20, 633:15, 634:11, 638:20, 644:15, 644:19, 646:17, 653:6, 654:16, 654:22, 655:1, 655:4, 672:13, 686:17, 692:11, 692:14, 702:21, 703:1, 712:18, 721:9

**defendants'** [51] - 497:15, 524:12, 531:23, 539:24, 553:5, 566:12, 572:8, 581:16, 599:7, 605:11, 619:15, 620:3, 621:21, 621:24, 622:6, 646:25, 650:3, 654:13, 654:18, 655:8, 655:18, 655:20, 656:11, 656:15, 658:2, 658:17, 658:20, 660:20, 660:23, 661:4, 661:11, 662:5, 664:4, 664:24, 667:8, 670:14, 671:13, 671:23, 674:20, 685:5, 685:10, 686:2, 686:13, 686:22, 687:4, 687:11, 688:19, 692:4, 696:21, 698:1, 698:12

**defense** [4] - 484:2, 623:18, 626:23, 640:4

**defenses** [1] - 510:14

**deference** [1] - 490:21

**define** [1] - 593:6

**defined** [1] - 603:12

**defines** [1] - 609:4

**definition** [10] - 574:11, 610:15, 610:16, 610:19, 645:6, 645:15, 645:21, 645:23, 646:2, 691:5

**definitions** [2] - 609:25, 610:4

**degree** [3] - 520:2, 546:5, 563:9

**degrees** [2] - 520:7, 556:11

**DeKalb** [1] - 500:20

**DELAWARE** [1] - 480:2

**Delaware** [1] - 480:6

**delete** [1] - 577:17

**deleted** [2] - 578:7, 578:11

**deleting** [1] - 577:23

**demonstrate** [1] - 582:2

**demonstrates** [1] - 581:24

**demonstrative** [1] - 674:17

**denied** [1] - 485:1

**dense** [1] - 610:11

**dep** [2] - 613:23, 613:25

**department** [1] - 724:2

**dependence** [1] - 581:22

**dependency** [1] - 526:7

**dependent** [1] - 526:7

**depicted** [1] - 671:22

**deposed** [5] - 484:4, 484:11, 486:15, 491:15, 607:16

**deposition** [19] - 484:5, 485:4, 485:9, 486:7, 491:17, 492:16, 492:17, 493:11, 494:15, 494:17, 495:15, 558:5, 569:17, 569:20, 571:1, 582:14, 614:22, 615:6

**depositions** [1] - 496:13

**derived** [4] - 679:10, 681:19, 705:24, 707:17

**describe** [15] - 519:25, 520:11, 523:3, 526:24, 533:8, 540:5, 541:7, 580:25, 590:14, 590:18, 590:25, 641:22, 649:4, 649:6, 683:3

**described** [10] - 534:3, 539:3, 542:19, 553:16, 565:19, 571:24, 573:1, 573:3, 574:15, 641:2

**describes** [3] - 497:25, 527:18, 677:22

**describing** [3] - 527:4, 533:22, 541:24

**description** [2] - 530:3, 533:10

**descriptions** [1] - 529:25

**design** [5] - 537:16, 537:21, 540:19, 637:24, 638:7

**designated** [1] - 614:2

**designation** [1] - 613:23

**designed** [1] - 539:18

**desk** [1] - 631:9

**despite** [5] - 487:1, 653:17, 659:4, 700:8, 704:25

**destruction** [1] - 681:16

**detail** [8] - 524:17, 531:1, 543:24, 544:8, 641:17, 642:16, 647:23, 716:2

**detailed** [2] - 566:25, 704:2

**details** [2] - 545:21, 566:23

**determinant** [1] - 707:8

**determination** [2] - 592:11, 596:12

**determinations** [5] - 517:15, 517:20, 517:24, 592:10

**determine** [7] - 548:11, 560:11, 591:24, 612:19, 612:23, 612:25, 626:3

**determined** [4] -

528:7, 528:21, 707:1, 713:16

**determines** [1] - 556:16

**determining** [1] - 564:6

**devices** [1] - 521:20

**devise** [1] - 592:13

**diagnosed** [5] - 622:1, 691:18, 697:7, 697:10

**Diagnosis** [1] - 638:10

**diagnosis** [2] - 638:21, 659:5

**dial** [3] - 491:4, 491:7, 507:18

**diary** [18] - 528:15, 529:6, 529:18, 529:22, 529:24, 530:7, 530:12, 530:15, 531:9, 532:17, 532:20, 549:17, 571:19, 609:7, 609:12, 609:17, 609:18

**difference** [20] - 517:1, 531:20, 532:5, 537:9, 552:7, 557:10, 584:2, 584:5, 584:20, 588:21, 602:12, 602:16, 603:2, 603:20, 606:18, 649:19, 655:22, 705:1, 721:15, 724:4

**differences** [3] - 532:11, 565:18, 655:20

**Different** [1] - 547:3

**different** [70] - 485:21, 485:22, 502:25, 506:5, 506:8, 507:20, 508:23, 516:23, 517:4, 517:13, 533:22, 533:23, 536:2, 537:8, 552:16, 553:7, 553:8, 553:22, 553:24, 554:12, 554:15, 556:19, 557:7, 557:8, 557:9, 563:4, 565:9, 566:14, 567:1, 568:5, 575:1, 579:1, 579:11, 579:14, 579:24, 589:5, 589:9, 592:21, 594:7, 594:18, 596:14, 603:1, 604:16,

631:12, 637:1,
640:18, 640:23,
641:1, 647:12,
647:13, 648:24,
649:20, 668:3,
668:4, 668:7,
668:14, 674:11,
674:23, 675:21,
697:13, 698:25,
707:17, 712:3,
712:4, 712:5, 712:10
**differentiate** [1] -
672:17
**differentiation** [1] -
672:15
**differently** [1] - 668:12
**difficult** [2] - 488:22,
603:4
**difficulties** [1] -
640:20
**diminished** [1] -
516:22
**diminishing** [1] -
694:11
**direct** [45] - 583:18,
583:19, 585:4,
585:5, 585:7, 586:2,
586:10, 586:16,
591:4, 592:4,
592:17, 595:5,
596:25, 598:12,
598:17, 598:21,
601:13, 601:18,
606:8, 608:19,
618:25, 623:21,
623:25, 624:8,
625:14, 635:6,
640:15, 644:18,
646:6, 646:13,
646:15, 652:2,
652:18, 653:6,
654:6, 654:25,
655:2, 655:4, 659:2,
669:13, 706:23,
711:8, 712:11,
714:17, 717:13
**DIRECT** [2] - 518:21,
633:25
**directed** [6] - 597:11,
623:14, 624:21,
654:11, 657:23,
683:6
**directing** [1] - 700:3
**direction** [1] - 609:6
**directly** [13] - 515:1,
556:13, 618:22,
624:14, 653:16,
654:22, 667:15,
667:21, 687:14,
692:11, 699:20,

715:18, 720:9
**disadvantage** [1] -
495:12
**disagree** [16] - 488:1,
488:2, 493:8,
494:19, 512:8,
590:25, 593:20,
632:2, 653:2, 653:3,
696:20, 711:2,
711:3, 716:24,
717:4, 721:8
**disagreement** [1] -
630:4
**disclose** [2] - 673:8,
677:8
**disclosed** [3] -
492:13, 500:11,
706:8
**discloses** [1] - 722:17
**disclosure** [2] -
486:10, 499:18
**disclosures** [2] -
486:11, 487:13
**discomforting** [1] -
610:2
**discontinuation** [6] -
683:19, 683:23,
683:25, 684:2,
684:14, 710:4
**discontinue** [1] -
684:3
**discovered** [1] -
494:12
**discovery** [2] -
483:18, 483:22
**discrete** [1] - 485:25
**discuss** [3] - 633:16,
641:16, 710:12
**discussed** [5] - 501:8,
543:3, 600:13,
616:1, 685:4
**discussing** [5] -
514:14, 567:12,
639:20, 656:15,
687:7
**discussion** [9] -
491:21, 507:4,
507:20, 512:12,
542:24, 656:6,
666:1, 682:17,
708:18
**discussions** [3] -
487:24, 490:23,
581:13
**disease** [2] - 643:21,
696:3
**disorder** [3] - 639:25,
640:1, 641:14
**disorders** [1] - 638:22
**disparate** [1] - 678:2

**displayed** [1] - 535:25
**dispute** [9] - 494:8,
504:23, 515:13,
515:14, 515:15,
622:5, 659:9, 659:19
**disputed** [1] - 508:13
**distinct** [3] - 485:24,
547:4, 579:4
**distinction** [2] -
611:22, 631:18
**distinguish** [3] -
580:4, 669:24
**distinguishes** [2] -
556:7, 556:9
**distribution** [1] -
565:11
**District** [2] - 637:20,
722:7
**DISTRICT** [2] - 480:1,
480:2
**do-it-yourself** [1] -
723:16
**doctor** [19] - 517:14,
527:16, 549:5,
567:7, 570:8, 587:7,
613:18, 638:24,
639:19, 640:15,
653:24, 670:3,
677:1, 696:12,
701:10, 704:1,
712:17, 714:25,
715:10
**Doctor** [10] - 518:14,
521:22, 522:11,
633:23, 637:15,
638:14, 639:10,
704:24, 705:22,
721:4
**doctorate** [1] - 520:7
**doctors** [12] - 517:17,
539:18, 619:11,
620:23, 621:10,
624:2, 624:17,
625:9, 653:12,
653:16, 713:4,
714:15
**document** [48] -
501:6, 501:10,
503:17, 504:17,
504:20, 505:10,
507:8, 507:11,
507:12, 508:2,
508:4, 508:11,
508:16, 508:17,
508:24, 509:6,
510:6, 511:7,
511:10, 511:14,
511:25, 512:6,
513:1, 514:7, 514:9,
515:7, 515:8, 516:2,

516:3, 517:11,
595:5, 595:7, 595:9,
595:10, 627:11,
627:25, 628:6,
628:10, 629:5,
629:10, 630:8,
630:18, 632:1,
686:11
**documents** [12] -
486:16, 486:17,
486:18, 509:12,
514:5, 515:24,
516:4, 529:3,
530:16, 554:4,
646:22, 721:25
**Dodgers** [1] - 725:4
**DOMINICK** [1] -
481:11
**done** [20] - 521:15,
521:18, 521:19,
528:5, 538:5,
540:23, 553:7,
566:13, 580:9,
602:19, 615:9,
651:12, 651:14,
668:3, 668:10,
675:19, 682:6,
700:15, 700:16,
716:5
**door** [1] - 694:6
**dosage** [6] - 498:2,
660:8, 664:14,
685:3, 702:18
**Dosage** [1] - 656:1
**dosages** [1] - 656:4
**dose** [8] - 512:19,
516:17, 523:18,
656:17, 656:21,
660:18, 664:8, 702:1
**dosed** [1] - 642:10
**doses** [1] - 512:23
**dosing** [14] - 498:1,
499:12, 499:21,
504:13, 504:22,
504:23, 504:25,
510:4, 510:12,
512:18, 512:20,
516:12, 523:19,
523:20
**dot** [7] - 545:16,
545:23, 546:3,
547:11, 559:4,
559:5, 559:13
**dots** [5] - 547:2,
547:4, 547:6,
547:10, 583:15
**double** [3] - 617:24,
618:1, 631:24
**double-check** [1] -
618:1

**double-checking** [1] -
617:24
**doubt** [1] - 715:18
**down** [24] - 518:16,
543:5, 564:6, 570:5,
587:19, 587:21,
588:23, 596:16,
616:23, 623:6,
631:24, 632:10,
639:21, 640:9,
641:11, 658:4,
659:18, 659:21,
663:20, 679:3,
707:24, 710:12,
715:17
**Dr** [217] - 492:11,
497:10, 497:18,
497:19, 497:25,
499:4, 499:21,
501:5, 501:9, 502:9,
502:17, 502:23,
502:25, 503:1,
503:18, 503:20,
504:6, 504:19,
504:20, 505:2,
505:9, 505:11,
507:11, 507:16,
508:6, 508:10,
509:7, 509:9,
509:18, 509:20,
509:22, 510:6,
510:15, 510:21,
511:7, 511:14,
511:16, 512:2,
512:16, 512:24,
512:25, 513:3,
513:7, 513:12,
513:13, 514:1,
514:7, 514:23,
516:10, 517:10,
518:10, 518:23,
522:7, 522:15,
523:13, 523:15,
523:21, 525:12,
525:14, 525:15,
526:20, 528:6,
528:20, 530:19,
533:2, 535:9, 536:1,
536:17, 539:20,
540:4, 542:23,
548:17, 548:24,
549:4, 549:9,
549:10, 549:11,
549:15, 549:16,
549:17, 549:24,
550:2, 550:4, 550:8,
550:13, 550:14,
550:16, 550:17,
550:20, 550:21,
550:23, 550:25,
551:1, 551:2,

551:13, 558:16, 565:7, 566:6, 567:22, 571:16, 575:13, 576:6, 576:10, 577:2, 581:13, 581:23, 582:18, 586:16, 587:6, 587:23, 590:6, 590:11, 597:19, 600:3, 605:6, 605:17, 608:12, 608:18, 610:21, 610:25, 613:6, 613:22, 618:13, 624:1, 624:6, 628:4, 630:18, 630:23, 631:18, 631:20, 631:23, 631:24, 633:15, 634:2, 638:20, 639:3, 639:24, 644:15, 644:22, 644:24, 645:15, 645:23, 646:5, 646:12, 650:1, 652:17, 652:23, 653:2, 653:3, 653:5, 653:20, 655:3, 655:9, 655:14, 655:18, 657:2, 658:17, 659:8, 659:23, 661:16, 664:11, 665:12, 666:11, 667:14, 667:24, 668:18, 668:23, 670:13, 671:10, 671:23, 672:25, 673:13, 673:20, 673:23, 673:25, 674:18, 674:19, 676:18, 677:16, 680:13, 681:7, 683:18, 685:6, 685:10, 685:23, 686:5, 686:20, 686:25, 687:7, 688:6, 688:15, 688:18, 690:10, 690:12, 690:14, 690:17, 690:20, 690:22, 690:24, 691:2, 691:8, 692:3, 692:7, 692:9, 692:19, 693:2, 703:8, 711:9, 719:10
**dr** [1] - 587:12
**draft** [1] - 511:11
**drafted** [1] - 508:4
**dramatically** [1] -

674:11
**draw** [5] - 593:13, 595:18, 678:1, 702:2, 708:13
**drawing** [2] - 570:13, 599:10
**drawn** [3] - 544:12, 578:17, 594:23
**drill** [1] - 663:20
**DRL** [1] - 482:5
**drop** [1] - 575:24
**dropped** [2] - 578:23, 618:7
**dropping** [3] - 576:5, 618:3, 618:15
**Drs** [1] - 646:25
**drug** [25] - 500:7, 637:24, 663:5, 667:21, 667:22, 675:23, 675:24, 679:5, 697:11, 700:12, 701:1, 701:2, 702:17, 702:18, 704:1, 704:11, 705:11, 705:23, 711:6, 712:11, 712:12, 713:16, 713:21, 713:22, 720:8
**drugs** [6] - 521:16, 521:17, 679:7, 697:23, 700:16, 701:4
**drunk** [1] - 725:6
**DTX-107.4** [1] - 638:8
**DTX-1586** [1] - 637:14
**DTX-1619** [1] - 655:13
**DTX-1620** [1] - 655:13
**DTX-1621** [12] - 655:15, 656:7, 661:14, 664:22, 665:18, 668:21, 671:20, 671:21, 673:3, 677:17, 683:3, 683:19
**DTX-1622** [1] - 655:14
**DTX-3012** [1] - 655:12
**Duane** [2] - 481:20, 481:22
**due** [4] - 514:10, 603:14, 630:24, 640:3
**duly** [2] - 518:12, 633:20
**during** [22] - 491:1, 491:21, 492:23, 501:5, 501:7, 523:22, 523:24, 524:12, 527:21, 535:15, 543:16,

551:23, 557:13, 592:17, 598:20, 657:1, 673:14, 694:18, 694:21, 694:25, 717:13
**DX-1621** [1] - 664:9

# E

**E(4)(B** [1] - 489:7
**e)(4)(A** [1] - 489:5
**Early** [1] - 638:10
**easiest** [2] - 495:22, 649:5
**easily** [3] - 490:19, 605:20, 610:1
**east** [1] - 635:13
**easy** [2] - 602:11, 616:24
**eBay** [3] - 488:21, 489:20, 490:4
**ECFR** [2] - 530:17, 609:19
**ECRF** [4] - 527:3, 532:2, 532:24, 599:3
**edit** [1] - 577:25
**educated** [1] - 705:11
**education** [1] - 519:22
**educational** [1] - 519:25
**effect** [15] - 488:6, 488:8, 503:2, 531:7, 547:9, 567:4, 578:12, 578:14, 579:24, 580:2, 580:3, 580:6, 623:9, 632:7
**effective** [2] - 641:25, 713:22
**effectively** [1] - 568:16
**effects** [4] - 643:19, 643:22, 669:2, 702:15
**efficacious** [2] - 703:9, 703:15
**efficacy** [3] - 615:9, 703:7, 703:12
**effort** [1] - 490:22
**egg** [1] - 550:22
**eight** [1] - 565:5
**either** [26] - 519:15, 523:10, 548:3, 564:23, 598:24, 599:1, 599:19, 600:16, 600:22, 601:11, 602:3, 602:4, 602:6, 604:14, 606:4, 607:8, 607:9, 607:21, 641:11,

644:7, 659:17, 669:21, 679:2, 704:3, 715:21
**election** [1] - 522:4
**electronic** [21] - 527:1, 527:3, 527:13, 527:18, 528:2, 529:10, 529:13, 529:16, 530:13, 530:16, 530:17, 530:19, 530:22, 530:24, 532:7, 532:24, 533:13, 573:25, 574:7, 705:20
**element** [4] - 503:7, 545:5, 545:7, 659:24
**Element** [1] - 506:6
**elementary** [1] - 564:2
**elements** [3] - 487:16, 526:12, 658:12
**elicit** [1] - 528:16
**eliminate** [1] - 623:17
**ELIZABETH** [2] - 480:15, 482:8
**elsewhere** [1] - 706:15
**eludes** [1] - 606:16
**embarrass** [1] - 483:16
**EMILY** [1] - 481:6
**emphasize** [2] - 514:6, 675:2
**empirical** [1] - 573:6
**employed** [2] - 520:16, 610:19
**employee** [1] - 723:18
**en** [1] - 572:13
**encompass** [1] - 659:9
**encompasses** [1] - 640:2
**encounter** [1] - 490:14
**encountered** [1] - 606:13
**encourage** [7] - 619:11, 620:22, 620:23, 670:15, 688:20, 689:24, 710:24
**encourages** [1] - 625:1
**end** [19] - 488:13, 493:1, 496:13, 503:13, 506:16, 532:5, 539:4, 542:11, 583:19, 585:8, 585:11, 585:12, 591:18, 625:3, 632:8, 672:5, 682:16, 683:2,

722:20
**End** [2] - 496:18, 497:7
**ending** [1] - 495:3
**endlessly** [1] - 484:11
**Enerio** [1] - 481:11
**engage** [1] - 489:7
**engaged** [1] - 487:20
**engineering** [1] - 724:2
**England** [1] - 541:21
**enormous** [1] - 494:18
**ensure** [1] - 629:10
**enter** [2] - 489:16, 621:17
**entered** [3] - 528:7, 530:15, 618:8
**enters** [1] - 486:5
**entertain** [1] - 483:7
**entire** [11] - 484:1, 541:22, 578:8, 597:10, 626:2, 626:3, 661:6, 672:7, 672:14, 679:13, 681:24
**entirely** [4] - 507:19, 528:4, 532:21, 707:11
**entitled** [10] - 488:23, 513:3, 513:7, 513:9, 611:16, 629:23, 638:9, 668:21, 669:14, 681:8
**entry** [15] - 484:24, 485:23, 529:10, 530:19, 531:3, 531:9, 531:23, 532:10, 571:19, 571:22, 572:8, 573:5, 616:18, 617:14, 622:8
**epidemiology** [2] - 520:23, 653:25
**Epilepsy** [1] - 695:10
**epilepsy** [6] - 636:1, 637:19, 637:22, 695:4, 695:9, 695:11
**equally** [3] - 656:10, 689:18, 695:3
**equivalent** [4] - 593:10, 593:11, 593:15, 593:16
**Eric** [2] - 633:16, 634:6
**ERIC** [1] - 633:20
**ERIN** [1] - 481:15
**ERLICH** [1] - 481:14
**Ernst** [1] - 482:9
**errand** [1] - 626:8
**erred** [1] - 722:7

**error** [4] - 505:18, 505:21, 530:20, 577:13
**error-free** [1] - 530:20
**errors** [2] - 532:10, 573:4
**erythema** [3] - 648:11, 648:15, 711:4
**ESQ** [33] - 480:12, 480:12, 480:14, 480:14, 480:15, 480:15, 480:16, 480:18, 480:19, 481:2, 481:3, 481:5, 481:6, 481:6, 481:7, 481:11, 481:12, 481:13, 481:13, 481:14, 481:14, 481:15, 481:15, 481:19, 481:21, 481:21, 482:2, 482:3, 482:6, 482:8, 482:8, 482:9
**essentially** [11] - 512:18, 536:13, 537:6, 544:11, 552:6, 564:10, 580:18, 629:11, 640:7, 640:19, 642:2
**establish** [2] - 553:1, 624:7
**established** [3] - 500:7, 501:22, 625:14
**et** [2] - 490:12, 642:10
**evaluate** [3] - 644:16, 644:21, 711:17
**evaluated** [1] - 680:9
**evaluation** [1] - 654:5
**event** [26] - 491:19, 548:2, 557:2, 558:17, 558:22, 581:1, 581:2, 585:16, 626:18, 629:20, 647:15, 648:22, 687:14, 703:13, 706:25, 707:1, 707:2, 707:3, 707:4, 707:10, 708:23, 709:13, 709:19, 710:11, 710:12, 716:1
**events** [19] - 522:25, 524:25, 552:17, 552:22, 552:23, 553:23, 557:17, 558:17, 567:11, 574:22, 575:2, 592:14, 671:25,

672:2, 682:11, 710:8, 710:9, 710:10
**eventually** [1] - 544:17
**evidence** [65] - 488:9, 488:14, 491:23, 493:15, 498:19, 499:9, 500:22, 501:14, 502:4, 502:16, 502:19, 504:3, 508:5, 510:1, 510:19, 511:17, 512:7, 519:13, 519:18, 534:11, 551:3, 602:1, 605:22, 606:24, 607:2, 607:3, 607:5, 614:10, 614:11, 616:9, 617:6, 617:15, 617:25, 618:13, 619:2, 619:10, 619:16, 619:17, 619:19, 620:2, 620:12, 620:18, 620:21, 621:17, 621:23, 623:1, 623:12, 623:24, 624:6, 624:15, 625:3, 625:11, 626:11, 626:23, 632:10, 632:19, 632:24, 633:2, 679:4, 703:6, 720:25, 723:2, 723:13, 724:9
**exact** [2] - 510:11, 525:4
**exactly** [16] - 495:23, 498:7, 538:2, 539:15, 551:17, 554:19, 557:8, 562:21, 588:19, 589:17, 602:15, 603:2, 603:17, 607:19, 627:16, 673:22
**examination** [9] - 501:5, 501:7, 509:18, 516:21, 586:11, 591:4, 595:6, 598:21, 608:20
**EXAMINATION** [6] - 518:21, 582:16, 613:11, 633:25, 692:25, 719:8
**examine** [1] - 513:9
**examined** [3] - 510:20, 518:13, 633:21
**example** [23] - 529:5,

529:6, 530:5, 550:25, 562:8, 562:12, 562:21, 562:25, 563:5, 592:25, 593:9, 594:9, 594:11, 594:13, 594:23, 606:19, 608:1, 608:21, 612:10, 648:8, 704:12, 715:9, 719:19
**examples** [2] - 521:13, 643:20
**exceed** [1] - 570:23
**except** [3] - 554:20, 593:5, 684:25
**excerpt** [4] - 527:6, 529:2, 534:5, 534:22
**excerpts** [1] - 527:13
**excess** [5] - 603:25, 604:4, 604:5, 604:20, 606:14
**exchange** [1] - 497:20
**exchanged** [1] - 497:16
**exchanges** [1] - 487:8
**exclude** [2] - 498:12, 499:7
**excluded** [2] - 668:16, 688:1
**excluding** [1] - 713:7
**excruciating** [1] - 496:14
**excuse** [2] - 586:3, 604:12
**excused** [3] - 613:18, 613:19, 721:5
**excusing** [1] - 624:24
**exercise** [1] - 651:13
**Exhibit** [5] - 504:8, 504:11, 685:24, 687:8, 699:24
**exhibit** [6] - 484:2, 492:18, 494:13, 507:3, 583:5, 583:16
**exhibits** [5] - 492:12, 497:16, 497:18, 536:8, 555:6
**exist** [1] - 576:7
**existing** [1] - 500:23
**expanded** [1] - 559:5
**expansive** [1] - 721:11
**expect** [7] - 497:19, 522:21, 623:8, 662:21, 662:23, 696:23, 696:25
**expectation** [4] - 628:25, 629:3, 714:3
**expected** [7] - 551:14, 587:2, 587:7, 642:1,

649:17, 713:21, 716:21
**expectedness** [1] - 553:10
**experience** [35] - 519:23, 520:11, 524:25, 525:1, 527:5, 527:19, 529:8, 535:14, 543:10, 543:12, 551:23, 554:21, 556:13, 556:15, 557:13, 557:18, 561:8, 590:17, 596:5, 599:24, 635:5, 636:25, 637:3, 638:5, 641:8, 644:4, 644:5, 644:7, 648:5, 657:21, 660:11, 662:19, 666:12, 706:18, 716:13
**experienced** [21] - 528:23, 545:11, 546:13, 547:14, 547:21, 548:2, 549:3, 549:22, 561:2, 563:2, 591:24, 595:22, 596:1, 596:4, 597:8, 598:3, 598:25, 649:7, 708:2, 708:5, 708:6
**experiences** [4] - 563:9, 593:1, 658:8, 660:1
**experiencing** [2] - 560:12, 710:20
**expert** [29] - 502:21, 505:11, 505:12, 507:15, 509:7, 513:4, 513:8, 516:2, 517:3, 522:8, 522:11, 551:2, 553:5, 566:12, 593:8, 607:15, 627:24, 628:9, 630:19, 633:16, 634:10, 638:20, 638:24, 646:24, 673:20, 673:21, 690:12, 693:5, 693:8
**expert's** [6] - 516:18, 569:6, 569:9, 569:11, 628:9, 631:2
**expertise** [3] - 599:11, 634:13, 639:20
**experts** [8] - 497:10, 497:17, 510:7, 513:9, 516:3,

516:21, 628:22, 629:8
**expiration** [2] - 489:7, 490:11
**explain** [33] - 527:16, 529:4, 537:11, 540:7, 543:5, 544:7, 544:9, 544:25, 545:3, 553:12, 555:8, 556:23, 557:1, 557:10, 558:24, 559:8, 559:9, 560:13, 560:17, 562:24, 564:15, 571:25, 573:14, 579:20, 579:22, 584:9, 589:6, 602:17, 606:17, 607:12, 615:24, 653:4, 674:4
**explained** [5] - 556:22, 557:11, 560:2, 562:4, 580:15
**explaining** [1] - 639:10
**explore** [1] - 502:6
**exposed** [5] - 704:15, 705:23, 708:4, 708:6, 708:7
**express** [3] - 620:2, 663:14, 669:21
**expressed** [3] - 599:14, 612:12, 612:13
**expressing** [1] - 575:1
**Extavia** [1] - 643:12
**extension** [29] - 522:23, 523:23, 523:24, 524:2, 524:22, 525:3, 543:11, 543:18, 543:20, 544:2, 545:18, 545:20, 546:19, 551:15, 551:25, 552:3, 552:19, 554:13, 554:20, 555:9, 555:24, 561:21, 567:12, 573:8, 579:8, 686:5, 717:15, 718:19, 718:23
**extensive** [1] - 569:10
**extent** [12] - 483:10, 594:9, 631:20, 637:21, 660:23, 671:12, 672:18, 682:21, 694:18, 711:15, 716:23, 717:9

**extraordinarily** [1] - 649:16
**extremely** [5] - 575:7, 584:18, 584:23, 649:9, 649:12

# F

**F.3d** [6] - 500:2, 500:5, 500:20, 506:20, 506:21, 506:22
**face** [1] - 537:8
**facetious** [1] - 499:1
**facie** [1] - 487:15
**fact** [45] - 486:22, 487:6, 487:12, 488:3, 492:6, 493:14, 494:8, 510:21, 512:22, 514:2, 517:2, 534:23, 535:7, 537:22, 539:1, 539:6, 548:10, 555:12, 575:22, 577:24, 578:1, 580:17, 597:13, 620:6, 631:6, 631:23, 631:25, 634:18, 653:17, 662:23, 668:15, 694:12, 696:12, 696:18, 699:11, 700:8, 700:17, 704:25, 705:25, 707:18, 714:13, 716:18, 717:21, 722:23, 724:10
**fact-finders** [1] - 631:6
**factor** [5] - 610:14, 610:18, 629:4
**factors** [2] - 490:5, 642:6
**facts** [4] - 486:24, 577:20, 590:18, 594:21
**faculty** [1] - 520:13
**fail** [1] - 715:25
**failings** [1] - 495:12
**failure** [3] - 493:25, 494:1, 494:7
**fair** [17] - 490:17, 495:10, 496:1, 496:2, 502:2, 510:5, 516:19, 585:13, 599:23, 602:2, 610:14, 636:25, 639:17, 645:11, 697:12, 698:19, 724:22
**fairly** [1] - 569:13

**fairness** [3] - 483:24, 484:8, 492:8
**fall** [1] - 628:11
**fallacy** [2] - 607:12, 607:13
**falls** [2] - 546:10, 546:15
**familiar** [8] - 568:10, 570:16, 571:15, 637:10, 642:12, 685:12, 685:25, 687:9
**familiarized** [1] - 717:18
**fan** [2] - 725:4
**fans** [1] - 725:3
**far** [13] - 517:13, 540:4, 544:11, 579:24, 588:14, 617:13, 619:3, 626:14, 639:11, 643:21, 653:7, 654:6, 694:3
**fat** [1] - 681:17
**fatty** [1] - 708:21
**FDA** [45] - 489:6, 490:10, 504:24, 510:3, 510:11, 513:6, 516:17, 516:24, 517:16, 615:12, 615:14, 621:4, 621:8, 621:11, 622:4, 628:19, 628:21, 628:24, 629:5, 641:25, 642:19, 656:25, 661:18, 662:7, 662:11, 664:13, 668:1, 668:24, 700:9, 701:2, 701:8, 701:23, 702:20, 706:2, 712:21, 713:10, 713:16, 713:19, 713:20, 714:23, 715:4, 715:15, 716:4
**FDA-approved** [6] - 621:4, 622:4, 641:25, 701:2, 701:8, 715:4
**fear** [1] - 599:10
**federal** [1] - 630:21
**Federal** [10] - 498:17, 499:23, 500:2, 500:14, 504:2, 506:2, 616:17, 625:12, 721:22, 721:23
**Felice** [2] - 491:24,

495:5
**fell** [1] - 487:24
**fellow** [1] - 521:2
**fellowship** [3] - 693:14, 695:4, 695:11
**fellowships** [5] - 635:22, 635:24, 636:2, 694:16, 694:18
**felt** [2] - 484:8, 641:13
**Ferguson's** [1] - 723:14
**feverishly** [1] - 514:18
**few** [8] - 496:17, 499:14, 521:1, 611:2, 625:7, 643:20, 694:25, 695:2
**fewer** [3] - 571:4, 571:8, 589:18
**fiber** [1] - 640:12
**field** [3] - 599:17, 638:25, 718:15
**fields** [2] - 520:3, 522:12
**fifth** [1] - 596:16
**FIGG** [6] - 482:8, 576:24, 610:24, 613:5, 630:13, 630:16
**Figg** [9] - 482:9, 573:12, 576:20, 576:22, 610:23, 610:25, 611:7, 630:25
**Figg's** [1] - 632:3
**figure** [6] - 494:10, 534:24, 560:8, 585:3, 611:22, 612:19
**Figure** [18] - 534:23, 536:25, 537:15, 552:11, 579:17, 583:18, 583:21, 584:1, 584:14, 584:21, 611:11, 611:20, 611:25, 612:3, 612:25, 613:3
**figured** [2] - 560:18, 632:14
**figures** [1] - 534:14
**file** [2] - 527:3, 527:18
**filed** [2] - 483:22, 513:15
**filing** [7] - 500:23, 503:3, 503:8, 627:12, 627:13, 628:10, 631:3
**fill** [1] - 529:7

**final** [5] - 486:22, 487:9, 487:19, 721:15
**finders** [1] - 631:6
**findings** [9] - 486:22, 487:6, 487:11, 489:11, 493:16, 494:8, 616:18, 617:14, 618:21
**fine** [5] - 519:15, 534:15, 576:24, 614:19, 645:9
**Finger** [1] - 481:2
**finish** [2] - 515:9, 567:22
**firm** [2] - 519:1, 520:15
**first** [37] - 483:5, 484:15, 491:21, 499:6, 501:4, 509:15, 523:7, 535:10, 552:8, 554:16, 554:17, 573:18, 595:21, 602:19, 611:11, 612:10, 616:1, 616:24, 617:1, 622:5, 627:4, 633:15, 635:25, 638:13, 653:5, 653:8, 658:12, 700:3, 704:2, 713:8, 715:4, 718:6, 718:21, 721:12, 722:4
**first-line** [1] - 622:5
**FITZPATRICK** [1] - 481:21
**five** [13] - 500:3, 500:6, 500:10, 500:16, 518:3, 596:16, 666:16, 667:4, 677:23, 682:4, 682:6, 722:16, 722:20
**flagged** [2] - 487:18, 528:6
**flaw** [1] - 493:14
**flawed** [1] - 510:10
**Flechter** [10] - 504:22, 509:25, 510:8, 512:1, 514:12, 514:14, 514:25, 515:14, 515:15, 515:19
**Florida** [1] - 522:3
**flu** [7] - 571:3, 571:4, 571:5, 571:6, 571:7, 571:13, 624:23
**flushing** [1] - 644:3

**fly** [1] - 594:12
**focus** [12] - 519:3, 612:18, 625:8, 634:14, 636:10, 636:11, 659:24, 673:4, 693:13, 693:20, 693:21, 693:25
**focused** [1] - 672:25
**focuses** [6] - 556:2, 556:13, 583:2, 607:20, 611:12, 612:3
**focusing** [2] - 557:12, 676:4
**folks** [1] - 492:22
**follow** [10] - 592:18, 630:13, 713:12, 713:17, 713:24, 714:2, 714:6, 714:7, 714:12, 716:22
**followed** [5] - 497:5, 554:17, 555:9, 635:20, 635:22
**following** [13] - 483:8, 491:24, 546:9, 574:13, 579:7, 583:15, 633:3, 637:24, 698:15, 698:21, 699:3, 713:14, 723:24
**follows** [3] - 518:13, 554:19, 633:22
**followup** [4] - 535:9, 611:2, 677:4, 718:24
**fool's** [1] - 626:8
**foot** [1] - 591:12
**footnote** [10] - 514:13, 593:12, 593:20, 593:21, 594:2, 594:10, 594:14, 611:19, 723:17, 723:22
**footnotes** [3] - 513:18, 514:11, 514:15
**FOR** [1] - 480:2
**FORBES** [1] - 481:15
**forgot** [1] - 679:14
**form** [11] - 530:16, 537:18, 540:10, 609:7, 636:23, 658:19, 660:8, 674:22, 701:3, 702:18
**formed** [4] - 634:20, 646:5, 646:6, 646:8
**forming** [2] - 610:8, 646:22
**forms** [13] - 609:13, 609:16, 637:6,

637:11, 661:21, 661:22, 662:12, 662:17, 662:24, 663:6, 685:3, 700:20, 701:2
**formulations** [2] - 637:8, 643:11
**Forte** [1] - 509:25
**forth** [10] - 486:13, 645:3, 645:20, 660:16, 688:6, 688:15, 689:8, 689:14, 691:16, 702:13
**fortunately** [1] - 725:2
**forward** [2] - 488:4, 623:16
**foundation** [11] - 509:19, 509:21, 510:20, 511:8, 512:10, 528:9, 548:20, 550:17, 630:19, 645:8, 673:19
**foundationally** [1] - 632:5
**four** [17] - 516:10, 523:7, 541:17, 541:18, 541:21, 541:25, 542:7, 542:20, 564:14, 564:18, 634:17, 646:24, 672:4, 674:23, 674:25, 704:20, 708:1
**fourth** [3] - 583:10, 598:24, 697:20
**Fox** [1] - 506:20
**frankly** [5] - 487:2, 582:22, 629:24, 675:23, 684:4
**FREDERICK** [1] - 481:2
**free** [2] - 484:12, 530:20
**frequency** [65] - 522:24, 524:23, 526:15, 526:16, 534:19, 535:13, 535:21, 535:23, 535:25, 536:10, 543:19, 544:1, 544:4, 544:21, 544:22, 545:1, 547:15, 548:13, 548:15, 549:5, 550:6, 551:14, 551:20, 552:3, 552:18, 553:2, 553:20, 556:25,

557:12, 557:14, 573:9, 574:12, 574:20, 575:1, 575:11, 578:13, 578:14, 581:9, 581:17, 581:18, 585:8, 585:10, 586:22, 586:24, 587:7, 592:20, 604:20, 619:6, 619:16, 619:23, 620:1, 623:20, 624:9, 647:10, 647:11, 647:15, 648:17, 648:24, 649:1, 649:12, 649:14, 682:13, 684:4
**frequent** [3] - 499:21, 504:14, 648:5
**frequently** [5] - 498:4, 499:12, 549:22, 584:24, 675:23
**front** [5] - 484:19, 611:7, 629:13, 682:2, 700:2
**Fu** [2] - 722:11
**full** [3] - 545:11, 553:18, 634:4
**fully** [3] - 505:10, 515:3, 616:2
**fulsomely** [1] - 626:13
**function** [1] - 707:9
**fundamental** [4] - 486:21, 488:5, 490:15, 493:14
**fundamentally** [2] - 516:1, 628:21
**fundamentals** [1] - 639:5
**furthermore** [2] - 513:8, 514:17
**future** [1] - 697:8, 698:9

# G

**GA** [223] - 523:10, 523:12, 523:17, 523:19, 524:1, 524:2, 525:1, 525:2, 525:4, 525:5, 527:21, 533:6, 533:7, 535:1, 535:2, 535:6, 535:8, 536:16, 539:24, 540:15, 543:10, 543:14, 543:15, 543:16, 544:5, 544:15, 545:14,

545:17, 545:20, 545:21, 546:12, 546:16, 546:17, 547:7, 547:8, 547:15, 547:16, 547:22, 547:24, 551:22, 552:8, 552:9, 554:7, 554:20, 554:22, 554:25, 555:14, 555:15, 556:4, 556:5, 556:17, 556:18, 557:3, 559:13, 559:14, 559:19, 560:4, 560:8, 560:20, 560:21, 560:24, 561:8, 561:10, 561:11, 561:13, 561:24, 562:4, 562:6, 562:16, 562:17, 562:19, 562:20, 563:21, 564:21, 564:22, 564:25, 565:1, 565:3, 565:6, 567:16, 574:10, 580:12, 580:13, 580:22, 581:15, 581:24, 584:3, 584:6, 586:24, 586:25, 587:3, 587:13, 587:14, 587:15, 587:16, 587:24, 588:1, 588:6, 588:8, 588:12, 588:14, 588:17, 588:25, 589:2, 589:13, 589:14, 589:25, 592:3, 595:13, 595:14, 597:21, 598:17, 598:18, 600:6, 600:9, 600:17, 600:22, 601:1, 601:3, 601:9, 601:19, 602:8, 602:10, 602:13, 602:14, 602:21, 602:22, 603:8, 603:9, 603:21, 603:22, 604:1, 604:6, 604:9, 604:17, 605:13, 605:21, 605:23, 605:24, 606:3, 607:22, 608:3, 637:4, 637:8, 643:18, 643:19, 644:5, 654:15, 654:18, 654:23,

658:12, 658:15, 658:18, 659:6, 659:11, 660:12, 660:14, 660:24, 662:5, 663:8, 663:9, 663:10, 663:13, 663:22, 664:1, 664:24, 670:6, 670:9, 670:17, 670:23, 675:10, 677:23, 688:22, 689:17, 690:7, 691:21, 692:17, 697:6, 697:12, 704:15, 707:21, 710:5, 713:23, 714:9, 714:10, 716:9, 720:19, 720:21
**Gajarsa** [1] - 722:5
**GALA** [29] - 504:18, 505:3, 505:6, 505:8, 508:3, 509:15, 509:22, 509:23, 510:5, 510:16, 515:1, 614:24, 627:11, 628:19, 628:21, 628:23, 629:6, 686:25, 687:3, 687:8, 687:12, 687:15, 687:19, 687:23, 688:2, 717:13, 717:14, 717:20
**GALLIGAN** [1] - 481:15
**game** [3] - 516:19, 621:6, 724:22
**gathered** [1] - 575:9
**GATTUSO** [1] - 481:11
**gears** [1] - 689:6
**general** [11] - 539:14, 580:2, 594:22, 641:22, 649:2, 655:7, 687:17, 687:19, 693:24, 697:4, 714:9
**generalist** [1] - 694:5
**generally** [15] - 533:8, 542:3, 543:25, 634:23, 642:16, 644:14, 656:20, 656:23, 657:8, 664:10, 671:18, 673:7, 680:7, 683:3, 696:7
**generate** [3] - 592:14, 592:24, 609:21
**generated** [1] - 724:1
**generic** [21] - 484:24,

485:12, 485:23, 486:5, 491:19, 652:6, 654:14, 663:25, 691:20, 691:22, 691:24, 696:21, 696:23, 697:4, 697:17, 697:23, 698:3, 698:11, 699:16, 702:21, 703:1
**generics** [1] - 620:9
**genetic** [1] - 500:19
**genetics** [1] - 500:20
**gesticulating** [1] - 570:4
**Gilenya** [1] - 643:13
**given** [11] - 484:9, 523:25, 525:18, 540:10, 597:10, 642:2, 647:8, 648:3, 651:3, 660:11, 681:5
**Glacier** [96] - 522:22, 522:23, 523:2, 523:3, 523:5, 523:8, 523:16, 523:23, 524:10, 524:11, 524:13, 524:19, 525:20, 526:23, 527:2, 528:8, 528:20, 531:3, 531:9, 533:1, 533:4, 533:14, 535:22, 536:25, 537:16, 538:4, 540:5, 542:21, 542:25, 543:1, 543:9, 543:10, 543:11, 543:16, 544:24, 544:25, 550:5, 551:4, 551:16, 552:1, 554:13, 567:13, 573:19, 573:21, 574:2, 574:15, 575:4, 575:16, 575:21, 575:22, 576:5, 578:8, 578:13, 579:8, 580:20, 580:25, 581:15, 581:24, 582:2, 583:4, 583:21, 584:1, 585:7, 585:24, 608:24, 609:5, 609:9, 609:24, 610:17, 611:2, 611:13, 612:4, 615:3, 620:11, 620:13, 620:16, 620:19, 620:21, 623:21,

685:11, 685:14, 685:17, 685:20, 685:22, 686:5, 686:9, 686:14, 686:16, 686:20, 717:14, 717:15, 717:23, 718:15, 718:19, 718:23

**glad** [4] - 593:20, 602:17, 603:5, 607:12

**glatiramer** [40] - 498:1, 499:12, 567:9, 567:10, 615:10, 615:15, 637:3, 643:11, 643:21, 650:15, 650:17, 651:7, 652:3, 655:24, 660:19, 661:2, 666:17, 668:10, 668:16, 671:25, 687:21, 688:1, 689:11, 689:16, 691:10, 691:11, 697:5, 698:3, 698:4, 698:10, 698:13, 698:16, 699:3, 699:11, 700:18, 700:22, 701:13, 701:21, 704:19, 706:20

**GmbH** [1] - 481:25

**goal** [1] - 568:2

**Goldman** [1] - 482:2

**Goodwin** [1] - 480:17

**grade** [4] - 708:24, 709:16, 710:9, 710:10

**graduate** [1] - 520:6

**granted** [1] - 558:13

**graph** [8] - 544:10, 544:12, 546:4, 546:22, 559:5, 559:7, 612:10, 612:15

**graphing** [1] - 548:4

**graphs** [1] - 553:21

**great** [3] - 591:20, 650:25, 725:3

**greatly** [1] - 617:16

**GREB** [1] - 481:6

**Green** [28] - 497:10, 497:18, 497:19, 498:14, 499:4, 502:23, 502:25, 503:20, 504:6, 505:2, 505:9, 505:11, 507:16, 508:7, 508:10,

509:7, 509:9, 510:6, 511:16, 513:3, 513:7, 513:12, 513:13, 551:2, 630:18, 630:23, 631:25

**green** [1] - 545:23

**Green's** [2] - 510:15, 551:3

**GREGORY** [1] - 480:10

**grossly** [2] - 577:14, 577:16

**group** [7] - 598:15, 613:2, 635:13, 661:18, 662:8, 668:24, 693:25

**grouped** [1] - 564:15

**groups** [2] - 595:16, 712:10

**guarantee** [1] - 516:13

**guess** [5] - 494:2, 632:7, 650:23, 721:6, 721:12

**guys** [1] - 506:1

## H

**half** [7] - 520:21, 588:1, 588:2, 588:4, 607:16, 695:20, 695:21

**Hall** [1] - 482:2

**hand** [23] - 534:21, 534:25, 535:3, 545:8, 545:9, 545:22, 548:8, 554:2, 555:12, 555:13, 555:14, 560:2, 566:1, 566:24, 582:10, 582:14, 583:12, 595:12, 615:19, 633:6, 638:13

**hand-wrote** [1] - 633:6

**handle** [2] - 614:4, 615:20

**handled** [1] - 574:3

**handwriting** [1] - 633:11

**hanging** [1] - 522:3

**HANK** [1] - 482:3

**happy** [3] - 537:10, 606:20, 626:6

**hard** [2] - 594:11, 620:8

**harm** [21] - 483:11, 483:19, 483:23, 484:1, 484:23, 485:1, 485:3,

485:13, 485:21, 485:22, 486:2, 486:4, 486:17, 486:21, 487:5, 487:8, 488:10, 488:15, 491:13, 491:18, 494:14

**Hassler** [13] - 483:10, 484:23, 486:4, 486:6, 486:11, 487:4, 489:21, 491:14, 492:18, 492:25, 493:17, 493:18, 621:23

**Hassler's** [3] - 485:4, 485:9, 622:3

**Hatch** [4] - 489:3, 621:1, 621:5, 624:4

**Hatch-Waxman** [4] - 489:3, 621:1, 621:5, 624:4

**head** [10] - 570:1, 679:10, 679:12, 681:21, 681:23, 701:15

**head-to-head** [4] - 679:10, 679:12, 681:21, 681:23

**headaches** [1] - 694:3

**heading** [3] - 544:16, 672:3, 672:4

**hear** [24] - 515:22, 516:13, 524:12, 540:4, 549:11, 550:23, 573:12, 616:11, 618:16, 632:6, 632:24, 632:25, 633:1, 644:24, 645:23, 649:25, 655:3, 665:8, 680:13, 686:5, 686:25, 692:7, 703:8, 705:25

**heard** [23] - 498:3, 521:24, 536:17, 550:2, 550:16, 568:3, 571:18, 576:3, 576:4, 576:6, 617:6, 618:13, 623:12, 624:1, 639:6, 647:10, 650:1, 652:23, 659:8, 659:14, 687:17, 696:2, 696:13

**hearing** [3] - 484:15, 497:11, 639:13

**hearsay** [1] - 528:10

**HECKEL** [1] - 482:3

**heights** [1] - 537:2

**held** [1] - 493:2

**hello** [1] - 582:18

**help** [5] - 545:3, 586:14, 600:1, 603:5, 674:4

**helpful** [4] - 498:17, 534:12, 546:8, 616:22

**herself** [7] - 563:15, 654:20, 669:16, 683:6, 702:5, 703:16, 705:10

**Heyman** [1] - 481:11

**high** [9] - 564:3, 584:18, 584:23, 649:9, 649:16, 654:10, 713:18, 714:5, 718:16

**higher** [6] - 561:19, 563:3, 563:7, 563:10, 590:22, 613:1

**highlighted** [4] - 591:20, 631:10, 650:23, 671:5

**highlighting** [3] - 650:21, 651:4, 651:12

**highly** [10] - 536:14, 544:3, 552:4, 555:16, 565:17, 567:4, 567:14, 573:15, 573:23, 575:14

**Hills** [1] - 482:4

**himself** [3] - 702:5, 703:16, 705:11

**histories** [1] - 573:21

**history** [2] - 541:22, 661:23

**hit** [1] - 567:25

**hoc** [6] - 538:6, 538:8, 538:10, 538:12, 538:15

**hold** [3] - 636:5, 671:19, 681:5

**holds** [1] - 544:5

**hole** [1] - 519:2

**HOLLAND** [30] - 480:15, 501:3, 501:19, 501:24, 502:7, 505:12, 506:5, 506:19, 506:24, 507:5, 507:10, 508:1, 508:8, 511:4, 513:11, 515:7, 515:9, 516:1, 517:1, 517:21, 627:6, 627:9, 627:17,

627:20, 627:23, 630:6, 630:12, 630:24, 631:14, 631:17

**Holland** [10] - 501:2, 501:17, 502:2, 504:18, 506:10, 509:16, 512:15, 514:10, 515:12, 627:2

**Holland's** [1] - 511:22

**honestly** [2] - 551:7, 676:20

**Honor** [157] - 483:6, 483:9, 484:12, 484:14, 485:4, 485:6, 485:18, 486:8, 486:20, 487:7, 487:17, 488:19, 490:3, 490:21, 491:6, 493:2, 493:5, 493:21, 495:21, 496:20, 496:24, 497:8, 499:17, 499:19, 501:3, 501:11, 501:12, 501:25, 502:2, 502:8, 503:15, 503:23, 507:5, 509:15, 509:17, 510:25, 511:4, 511:13, 511:21, 512:5, 512:8, 513:11, 514:6, 514:20, 514:21, 515:16, 515:20, 516:1, 518:9, 518:15, 519:13, 519:15, 519:20, 522:6, 522:13, 526:6, 527:8, 528:11, 531:11, 534:7, 534:16, 548:21, 549:6, 549:8, 549:15, 549:21, 550:1, 550:19, 551:9, 551:11, 555:6, 557:21, 557:23, 558:2, 558:4, 558:8, 558:11, 558:14, 567:17, 569:1, 569:5, 576:9, 576:14, 576:16, 576:19, 576:20, 576:24, 582:3, 582:6, 582:11, 582:13, 586:3, 587:5, 587:10, 587:21, 591:11,

591:17, 593:23,
597:19, 608:10,
610:22, 613:9,
613:17, 613:20,
613:24, 614:3,
614:19, 614:21,
615:18, 615:21,
615:23, 616:16,
616:20, 617:12,
617:20, 618:6,
618:11, 618:20,
621:1, 621:12,
621:16, 622:7,
622:11, 622:15,
622:22, 622:24,
623:7, 623:10,
624:13, 626:24,
627:6, 627:10,
627:17, 628:16,
628:18, 629:2,
630:12, 631:14,
631:17, 632:14,
633:6, 633:11,
633:13, 633:24,
638:19, 638:23,
639:1, 639:9,
657:16, 659:19,
688:11, 690:17,
690:21, 692:20,
719:1, 719:6, 721:3
**Honor's** [1] - 517:9
**HONORABLE** [1] -
480:10
**hope** [1] - 611:2
**hopefully** [1] - 592:7
**hopes** [1] - 701:9
**Hopkins** [1] - 635:18
**horizontal** [4] -
544:14, 545:13,
559:12, 560:3
**hormone** [1] - 521:18
**hospital** [1] - 695:14
**host** [1] - 515:23
**hour** [3] - 490:23,
607:4, 607:16
**hours** [1] - 516:10
**housing** [1] - 724:8
**Howard** [1] - 635:19
**hundred** [2] - 542:5,
577:11
**hypothetical** [2] -
545:6, 590:5
**hypothetically** [3] -
589:20, 593:11,
593:16

---

I

---

**idea** [2] - 626:17,
680:25

**identical** [8] - 536:7,
536:13, 537:2,
537:5, 537:6, 547:5,
548:10, 566:2
**identified** [10] -
483:17, 483:18,
486:11, 491:14,
532:10, 538:4,
545:8, 559:3,
571:22, 573:18
**identify** [4] - 496:16,
534:10, 534:12,
656:14
**identifying** [1] -
538:21
**ignore** [3] - 624:16,
705:6, 711:13
**ignored** [1] - 620:2
**ignores** [3] - 568:16,
570:10, 674:13
**II** [1] - 521:17
**III** [4] - 481:2, 541:24,
542:6, 542:8
**IL** [1] - 481:16
**illegal** [1] - 713:11
**illogical** [1] - 568:16
**illumination** [1] -
725:7
**illustrate** [2] - 559:23,
570:16
**illustrates** [1] - 559:22
**illustrative** [3] -
594:23, 606:19,
608:21
**imbalance** [5] - 564:7,
565:4, 565:19, 567:2
**imbedded** [1] - 509:3
**immediate** [8] - 619:7,
643:23, 644:1,
647:9, 647:17,
699:12, 704:12,
716:6
**immediately** [5] -
620:4, 650:15,
651:7, 660:18,
689:12
**impact** [1] - 656:4
**impacted** [1] - 571:22
**impart** [1] - 668:25
**implausible** [2] -
577:14, 577:16
**implemented** [1] -
534:2
**implementing** [1] -
533:21
**implicate** [1] - 515:17
**implicated** [1] - 515:2
**implication** [1] -
578:16
**import** [3] - 593:21,

594:12, 708:10
**Importance** [1] -
638:10
**important** [15] -
485:17, 490:25,
491:9, 491:10,
552:7, 559:15,
568:15, 568:17,
570:10, 570:14,
579:19, 611:14,
612:6, 642:3, 722:23
**importantly** [3] -
536:5, 540:13,
580:15
**impose** [1] - 489:22
**improper** [4] - 502:20,
503:14, 510:24,
511:18
**improperly** [1] -
723:25
**improve** [1] - 699:17
**improved** [4] - 539:23,
619:6, 619:12, 620:7
**improving** [1] - 641:11
**IN** [3] - 480:1, 480:2,
480:4
**inadmissible** [1] -
723:19
**inappropriate** [1] -
654:4
**inasmuch** [1] - 662:16
**Inc** [5] - 481:9, 481:10,
481:18, 481:18,
482:11
**incidence** [41] -
619:21, 619:23,
619:24, 648:20,
648:21, 648:22,
648:24, 649:1,
649:9, 649:15,
649:19, 649:23,
650:6, 653:22,
653:23, 654:2,
666:15, 666:18,
671:24, 672:1,
673:4, 673:8,
673:10, 673:15,
674:1, 676:22,
677:4, 677:5,
677:19, 677:22,
677:24, 678:9,
679:15, 679:16,
679:18, 680:7,
680:8, 681:12,
683:23, 687:5
**inclined** [1] - 511:22
**include** [7] - 526:8,
541:19, 575:9,
585:24, 616:3,
659:3, 702:11

**included** [4] - 501:7,
565:2, 601:19,
620:15
**includes** [2] - 559:25,
583:1
**including** [16] -
483:17, 504:19,
521:16, 521:19,
536:6, 575:10,
580:15, 597:11,
624:8, 635:15,
638:22, 685:5,
703:3, 715:11,
716:21, 717:25
**Inconclusive** [1] -
562:23
**inconclusive** [26] -
563:1, 563:13,
563:18, 564:19,
564:20, 590:19,
590:20, 591:21,
591:23, 594:22,
595:1, 595:14,
595:18, 596:15,
596:17, 597:5,
597:10, 598:7,
598:15, 600:12,
600:22, 601:8,
601:10, 601:17,
601:25, 606:3
**Inconclusives** [1] -
564:23
**inconclusives** [3] -
565:2, 565:5, 592:2
**inconsistent** [1] -
492:7
**incorrect** [2] - 568:13,
568:14
**increase** [1] - 602:6
**increased** [2] -
591:25, 620:24
**incredulous** [2] -
500:14, 722:18
**indeed** [6] - 529:11,
530:25, 540:2,
586:23, 589:18,
692:10
**independent** [2] -
650:11, 651:11
**indicate** [4] - 546:7,
649:20, 691:4,
721:24
**indicated** [13] -
491:22, 547:12,
618:2, 662:25,
690:15, 695:16,
697:3, 697:16,
701:16, 717:20,
721:10, 723:21
**indicates** [1] - 567:4

**indicating** [1] - 544:17
**indication** [5] - 669:7,
700:8, 700:18,
701:13, 701:24
**indications** [11] -
579:12, 621:4,
642:20, 656:16,
656:20, 661:12,
661:15, 700:5,
700:13, 701:16,
707:12
**Indications** [6] -
661:25, 662:2,
662:14, 663:1,
663:14, 664:3
**indicators** [1] - 724:14
**indirect** [14] - 644:19,
646:7, 646:8,
646:17, 646:20,
652:20, 653:7,
655:6, 670:23,
670:25, 689:2,
689:5, 690:6, 690:9
**indirectly** [2] - 618:22,
692:14
**indisputably** [4] -
509:24, 514:12,
514:16, 515:4
**individual** [37] -
527:19, 539:19,
543:12, 546:1,
552:8, 556:14,
556:16, 556:17,
559:2, 559:4,
559:10, 559:16,
561:9, 563:10,
564:21, 572:10,
572:23, 574:16,
574:17, 575:2,
590:17, 592:9,
592:11, 594:21,
599:23, 601:16,
602:5, 607:25,
608:2, 608:3,
625:21, 651:22,
679:22, 680:11,
681:5, 707:13, 721:1
**individually** [3] -
532:1, 601:14, 712:8
**individuals** [7] -
525:4, 532:16,
546:2, 570:22,
571:9, 648:23,
680:23
**induced** [4] - 619:2,
621:15, 623:22,
625:14
**inducement** [2] -
624:11, 625:13
**Industrial** [1] - 521:4

**infer** [1] - 499:20
**inferences** [1] - 708:13
**inflammatory** [2] - 521:16, 521:17
**inform** [20] - 539:18, 630:22, 656:22, 657:19, 660:23, 661:15, 662:4, 664:11, 664:15, 664:23, 665:19, 666:14, 668:22, 679:1, 681:11, 682:22, 683:8, 683:22, 684:9, 684:14
**information** [73] - 484:19, 494:11, 516:11, 516:14, 517:8, 529:9, 529:18, 530:7, 530:12, 530:15, 545:25, 568:17, 570:11, 609:18, 619:14, 619:20, 620:5, 625:10, 627:13, 642:18, 653:11, 653:15, 657:9, 668:22, 668:24, 669:18, 674:9, 675:1, 675:5, 683:1, 683:13, 683:18, 685:9, 703:18, 703:19, 703:22, 704:2, 704:7, 705:15, 705:17, 705:21, 705:22, 706:1, 706:8, 706:10, 706:14, 706:15, 706:16, 706:24, 707:20, 708:8, 710:3, 712:7, 712:23, 713:19, 713:20, 714:1, 714:19, 714:20, 714:21, 714:22, 715:17, 715:20, 715:22, 717:5, 717:11, 717:24, 718:12, 719:15, 719:23, 719:24
**Information** [2] - 669:15, 715:7
**informative** [2] - 513:6, 675:1
**informed** [7] - 702:16, 703:17, 704:11, 706:6, 718:16, 720:13, 720:14

**informs** [4] - 661:17, 676:19, 676:21, 677:21
**Infrequently** [1] - 541:11
**infringe** [10] - 599:8, 605:11, 618:22, 625:5, 625:24, 653:9, 692:12, 692:15, 698:17, 698:18
**infringed** [2] - 621:15, 720:23
**infringement** [53] - 567:22, 599:13, 599:14, 615:25, 617:14, 618:12, 618:25, 619:2, 621:3, 621:15, 621:18, 623:18, 623:22, 623:25, 624:8, 625:14, 625:15, 625:16, 632:19, 644:17, 644:18, 644:19, 644:22, 646:6, 646:8, 646:9, 646:13, 646:15, 646:17, 646:20, 652:18, 652:20, 652:24, 653:6, 653:7, 654:5, 654:6, 655:1, 655:2, 655:4, 655:6, 670:23, 670:25, 689:3, 689:5, 690:7, 690:9, 690:11, 690:22, 698:19, 698:23, 698:24
**infringing** [7] - 622:6, 624:24, 625:19, 625:20, 625:25, 626:4, 699:20
**ingredient** [2] - 500:8, 722:14
**inherently** [1] - 513:15
**inhibitors** [1] - 521:17
**initial** [2] - 486:10, 653:7
**inject** [6] - 587:3, 588:12, 588:13, 648:10, 648:11, 648:13
**injected** [3] - 589:13, 590:1, 590:2
**injection** [71] - 522:24, 524:24, 528:21, 529:12, 549:18, 552:23, 553:9, 553:13, 553:18,

553:20, 553:23, 554:7, 566:7, 566:15, 566:19, 566:22, 566:25, 567:11, 587:7, 587:13, 588:7, 588:10, 588:11, 588:13, 588:16, 588:20, 588:21, 589:9, 589:10, 589:12, 589:14, 589:18, 590:21, 590:22, 597:9, 609:11, 615:15, 619:7, 643:23, 643:24, 643:25, 644:1, 647:9, 647:16, 647:17, 647:25, 648:3, 648:9, 648:12, 648:14, 650:16, 651:3, 651:20, 652:4, 671:7, 681:17, 682:18, 683:8, 683:10, 699:12, 704:12, 707:9, 709:10, 709:11, 709:16, 710:5, 716:6
**injection-related** [2] - 522:24, 567:11
**injections** [9] - 504:14, 540:16, 587:16, 587:25, 588:1, 589:18, 668:11, 668:12, 710:15
**injunction** [12] - 485:1, 488:15, 488:20, 488:23, 489:9, 489:12, 489:13, 489:14, 489:16, 489:19, 489:22, 490:9
**injunctions** [1] - 490:4
**injunctive** [1] - 489:13
**input** [3] - 531:16, 572:24, 643:6
**inquire** [1] - 484:13
**inquiry** [2] - 502:12, 601:14
**insert** [52] - 621:11, 642:17, 642:18, 643:1, 653:10, 653:14, 653:15, 653:17, 655:12, 655:13, 655:14, 655:15, 655:16, 656:7, 656:8, 657:22, 661:14,

662:22, 664:10, 667:17, 669:3, 671:10, 675:3, 675:7, 675:9, 675:15, 676:4, 676:5, 677:2, 677:18, 679:13, 681:24, 682:14, 701:17, 701:24, 702:12, 704:3, 705:24, 706:2, 706:8, 706:21, 708:8, 712:17, 713:15, 714:14, 714:24, 715:9, 716:18, 716:25, 717:10, 717:21, 719:16
**inserts** [61] - 619:15, 620:15, 620:16, 642:13, 642:15, 642:23, 647:1, 650:4, 653:8, 653:20, 655:8, 655:9, 655:18, 655:21, 655:23, 656:11, 656:15, 657:12, 658:2, 660:21, 660:23, 660:25, 661:4, 661:12, 662:20, 664:4, 667:7, 667:8, 668:20, 670:15, 671:13, 671:16, 671:23, 672:13, 672:16, 672:18, 674:20, 674:21, 678:5, 678:6, 685:5, 685:11, 685:19, 685:21, 686:2, 686:13, 686:23, 687:4, 687:11, 687:13, 688:2, 688:20, 689:24, 692:5, 699:22, 706:9, 712:18, 713:4, 713:24
**insignificance** [1] - 580:1
**instance** [3] - 540:24, 694:3, 701:11
**instead** [7] - 527:13, 552:12, 553:16, 565:3, 575:2, 575:25, 593:14
**instruct** [13] - 653:9, 653:10, 657:12, 665:5, 669:10, 670:15, 671:13, 672:19, 688:20,

689:24, 715:11, 719:19, 721:17
**instructed** [3] - 529:7, 686:19, 720:17
**instructing** [2] - 714:25, 719:24
**instruction** [15] - 530:10, 609:16, 620:3, 656:21, 662:10, 665:24, 666:5, 666:8, 675:14, 701:18, 713:25, 714:8, 714:11, 714:13, 719:25
**Instruction** [1] - 665:4
**instructions** [16] - 614:3, 656:17, 661:3, 661:5, 661:7, 666:7, 682:16, 686:17, 686:19, 713:8, 713:9, 713:13, 713:14, 714:14, 716:19, 716:22
**Instructions** [2] - 664:21, 664:22
**instructs** [1] - 713:4
**insulation** [1] - 640:8
**intend** [7] - 502:3, 502:4, 504:15, 515:3, 603:3, 652:17, 654:17
**intended** [4] - 546:8, 664:13, 669:17, 699:6
**intending** [1] - 505:10
**intends** [1] - 713:10
**intensity** [16] - 619:17, 620:1, 647:8, 648:16, 651:22, 660:10, 671:16, 671:18, 672:6, 672:7, 672:12, 672:15, 674:16, 684:22, 684:24, 685:2
**intensive** [1] - 520:10
**intentionally** [1] - 668:16
**interest** [5] - 630:3, 630:10, 718:9, 718:13, 718:14
**interested** [3] - 499:11, 499:20, 511:11
**interesting** [2] - 621:5, 674:10
**interests** [2] - 492:8, 506:12

**interfere** [1] - 610:2
**interferons** [1] - 643:12
**intermediate** [1] - 574:7
**internal** [11] - 507:8, 508:2, 508:24, 509:11, 516:11, 517:11, 628:6, 635:20, 721:24, 723:18, 724:1
**international** [1] - 506:21
**International** [1] - 506:21
**interns** [1] - 695:12
**internship** [1] - 635:20
**interpret** [5] - 549:16, 549:18, 549:23, 549:24, 550:18
**interpretation** [4] - 489:25, 557:5, 605:8, 605:9
**interpreted** [1] - 548:14
**interpreting** [3] - 548:15, 603:23, 604:3
**interrogatories** [1] - 492:13
**intertwined** [1] - 513:21
**interval** [2] - 537:6, 537:7
**intervening** [1] - 629:20
**intervention** [4] - 570:21, 571:4, 571:9, 571:10
**introduced** [1] - 629:10
**invalid** [1] - 705:3
**invalidate** [1] - 499:17
**invalidating** [1] - 504:16
**invalidity** [4] - 497:11, 497:15, 617:16, 632:20
**invention** [13] - 503:7, 503:12, 504:12, 506:7, 517:3, 624:2, 630:20, 721:19, 722:9, 723:8, 723:9, 723:14, 724:15
**inventors** [3] - 503:6, 503:10, 722:11
**investigate** [3] - 504:13, 531:25, 540:18
**invitation** [1] - 505:20

**inviting** [1] - 590:13
**involve** [1] - 706:6
**involved** [1] - 638:6
**involves** [3] - 538:21, 640:3, 714:14
**involving** [1] - 522:4
**IPIR** [4] - 649:20, 677:19, 707:9, 708:2
**IPIRs** [47] - 582:22, 582:24, 583:1, 583:2, 619:17, 619:18, 644:1, 647:11, 647:25, 648:3, 648:20, 649:2, 649:23, 650:16, 650:18, 651:20, 651:22, 658:6, 658:9, 658:13, 660:2, 660:7, 660:9, 660:10, 660:11, 669:24, 671:14, 671:16, 672:12, 672:16, 672:22, 677:5, 677:22, 677:24, 678:9, 678:10, 678:15, 684:1, 684:20, 684:23, 684:25, 688:24, 698:22, 699:4, 699:7, 699:16, 702:12
**IPIRS** [1] - 644:5
**IPR** [1] - 648:25
**IPRs** [1] - 499:6
**IRAE** [51] - 527:4, 529:7, 535:7, 535:10, 535:16, 535:17, 535:19, 535:20, 544:16, 544:17, 544:19, 544:20, 545:11, 546:11, 546:12, 548:2, 548:4, 549:22, 552:5, 553:15, 553:17, 557:2, 557:6, 557:9, 557:11, 557:17, 557:19, 559:15, 559:16, 561:6, 561:8, 566:2, 566:4, 574:12, 574:16, 574:20, 574:22, 574:24, 575:1, 575:2, 581:1, 581:2, 584:24, 585:16, 586:20, 588:25, 595:13, 596:9, 609:11
**IRAEs** [91] - 524:24,

525:7, 534:25, 535:6, 535:12, 535:13, 535:20, 535:21, 536:15, 537:23, 539:1, 539:5, 543:12, 544:1, 544:5, 544:6, 545:11, 547:7, 547:8, 547:15, 548:12, 551:14, 552:13, 554:2, 555:19, 556:3, 556:4, 556:11, 557:6, 557:12, 559:20, 559:21, 560:5, 560:12, 560:24, 561:2, 561:3, 561:5, 561:10, 562:1, 562:15, 563:8, 563:10, 563:12, 565:22, 566:3, 567:5, 567:15, 573:20, 574:12, 574:17, 574:21, 574:23, 575:1, 580:23, 581:1, 582:20, 582:23, 585:9, 585:10, 585:16, 591:21, 595:22, 595:23, 596:2, 596:5, 596:20, 596:23, 597:8, 597:14, 597:23, 598:4, 598:24, 600:7, 600:10, 600:13, 600:17, 600:23, 601:3, 602:13, 604:15, 611:12, 611:16, 612:11, 612:16
**irrelevant** [1] - 604:2
**irreparable** [14] - 483:11, 483:19, 483:23, 484:1, 484:25, 485:3, 485:22, 486:2, 487:8, 488:9, 488:15, 491:13, 491:18, 494:14
**irreversible** [1] - 708:22
**isolated** [1] - 547:25
**ISR** [14] - 566:1, 566:4, 587:13, 587:14, 588:6, 592:13, 593:9, 593:15, 648:25, 649:19, 673:4, 673:14,

708:2, 720:20
**ISRs** [85] - 525:7, 544:1, 544:6, 548:5, 548:12, 551:15, 552:12, 554:2, 555:19, 555:21, 562:1, 565:23, 566:3, 567:5, 567:16, 580:23, 582:22, 591:21, 592:21, 592:25, 593:10, 593:11, 593:15, 593:16, 594:5, 598:25, 599:2, 600:7, 600:10, 600:13, 600:17, 600:23, 601:2, 601:4, 602:13, 604:15, 612:4, 612:19, 612:23, 613:1, 619:17, 619:18, 643:24, 644:5, 644:7, 647:11, 648:5, 648:6, 648:20, 649:2, 649:23, 650:18, 651:22, 652:11, 658:6, 658:8, 658:13, 660:2, 660:7, 660:9, 660:10, 660:11, 661:8, 661:10, 669:24, 670:4, 671:8, 671:14, 671:16, 672:12, 672:16, 672:20, 672:22, 677:5, 677:11, 684:1, 684:20, 684:23, 684:24, 688:24, 698:22, 699:4, 699:7, 699:16, 720:22
**issue** [66] - 483:4, 484:1, 484:5, 484:12, 485:17, 485:24, 486:12, 486:15, 486:19, 486:21, 487:2, 487:8, 487:19, 487:25, 490:2, 490:16, 490:22, 491:12, 492:4, 492:14, 493:9, 493:20, 497:9, 497:15, 497:20, 497:22, 498:7, 498:12, 498:14, 498:15, 499:8, 501:5, 501:12,

503:15, 507:4, 507:9, 507:19, 507:24, 507:25, 508:19, 509:12, 509:15, 512:11, 513:11, 514:24, 517:11, 525:9, 525:23, 531:17, 538:6, 538:9, 538:11, 548:16, 571:25, 586:4, 613:23, 616:21, 625:17, 627:3, 627:7, 627:9, 628:8, 630:16, 631:21, 709:22, 710:14
**issues** [18] - 483:20, 484:17, 485:21, 501:10, 508:15, 515:2, 526:15, 526:20, 531:8, 571:19, 571:22, 616:4, 623:23, 633:16, 634:24, 640:20, 654:6, 721:14
**itching** [1] - 643:25
**itself** [8] - 503:25, 509:16, 526:24, 585:12, 640:12, 643:25, 653:17, 724:3

---

## J

**Jackson** [1] - 519:2
**JAMA** [1] - 541:19
**JAMES** [1] - 480:16
**Jeffries** [31] - 633:16, 634:6, 638:20, 639:3, 639:24, 644:15, 645:15, 646:5, 646:12, 652:17, 655:18, 658:17, 659:23, 661:16, 664:11, 666:11, 667:24, 668:23, 670:13, 671:23, 674:18, 676:18, 686:20, 688:6, 688:15, 688:18, 690:10, 692:3, 692:19, 693:2, 719:10
**JEFFRIES** [1] - 633:20
**jeffries** [1] - 634:2
**Jenkins** [1] - 482:7
**job** [3] - 628:9, 698:7, 717:6
**JOHN** [2] - 480:12,

480:15
**Johns** [1] - 635:18
**join** [2] - 520:15,
622:15
**Joint** [2] - 685:24,
687:8
**jointly** [1] - 534:9
**Joseph** [1] - 614:22
**journal** [1] - 718:12
**Journal** [2] - 541:19,
541:21
**journals** [7] - 541:16,
541:19, 541:23,
541:25, 542:7,
542:20, 637:23
**JTX-7000** [1] - 634:16
**JTX-7012** [1] - 595:2
**JTX-7029** [2] - 527:6,
527:16
**JTX-7029.3428** [1] -
527:9
**JTX-7088** [2] - 541:5,
541:7
**JTX-7134** [6] - 524:5,
527:24, 536:25,
539:21, 583:5, 611:3
**JTX-7134.4** [1] -
583:13
**JTX-7137** [1] - 686:8
**judge** [1] - 576:17
**Judge** [2] - 722:5,
723:23
**Judge..** [1] - 491:25
**judged** [1] - 557:17
**judges** [3] - 492:5,
495:2, 506:4
**judgment** [17] -
557:16, 563:13,
563:14, 563:15,
564:20, 564:22,
622:8, 700:14,
705:12, 708:9,
709:2, 709:19,
709:21, 711:2,
711:3, 720:11,
720:14
**judgments** [3] -
711:23, 712:7, 712:8
**jump** [1] - 668:18
**June** [1] - 541:10
**Justice** [1] - 485:1
**justified** [1] - 510:11

### K

**Kahan** [2] - 541:8,
542:19
**Kansas** [2] - 493:3
**KAREN** [1] - 480:12
**Katzenstein** [1] -

482:7
**keep** [4] - 567:20,
637:21, 681:6,
718:14
**KELLER** [1] - 480:12
**Keller** [1] - 480:13
**Kenney** [1] - 723:18
**key** [1] - 540:9
**Khan** [23] - 497:22,
497:25, 499:21,
502:9, 502:15,
502:17, 503:1,
504:8, 504:21,
505:17, 508:19,
508:22, 509:1,
509:3, 509:24,
510:7, 510:24,
512:11, 514:12,
514:25, 515:13,
724:17
**Khan's** [1] - 721:7
**kind** [12] - 503:13,
538:9, 561:7,
570:11, 572:17,
577:22, 589:5,
602:5, 652:1,
666:24, 698:24,
708:2
**kinds** [1] - 640:18
**Klinger** [26] - 492:11,
501:6, 501:10,
503:18, 504:19,
504:20, 507:11,
509:20, 509:22,
510:21, 511:7,
511:14, 512:2,
512:16, 512:24,
512:25, 513:3,
514:1, 514:8,
514:23, 516:10,
517:10, 628:4,
631:19, 631:20,
631:23
**Klinger's** [2] - 509:18,
514:1
**knock** [3] - 623:19,
659:18, 659:21
**knowing** [1] - 484:7
**knowledge** [10] -
483:19, 486:12,
486:15, 491:15,
502:24, 506:6,
605:2, 662:20,
685:17, 724:12
**known** [11] - 486:15,
500:7, 517:7,
521:17, 577:20,
620:21, 679:6,
722:14, 722:19,
722:22

**KROON** [1] - 481:21

### L

**label** [26] - 540:5,
540:11, 540:12,
541:13, 542:8,
596:15, 601:17,
611:18, 620:3,
620:8, 620:10,
620:13, 621:6,
624:13, 624:18,
624:21, 624:23,
625:1, 625:8,
700:12, 700:22,
701:12, 701:21,
702:20, 702:22
**labeled** [4] - 544:15,
577:8, 601:6
**labeling** [1] - 715:5
**labels** [4] - 619:20,
620:12, 620:13,
624:3
**lack** [1] - 616:9
**laid** [6] - 485:9,
509:20, 510:20,
511:8, 512:10, 642:9
**lamppost** [1] - 725:6
**Lancet** [1] - 541:20
**language** [16] - 526:9,
605:9, 606:6,
606:12, 606:13,
606:14, 607:24,
618:8, 655:23,
672:8, 684:25,
699:18, 702:23,
712:2, 722:3, 723:5
**large** [8] - 522:9,
527:3, 529:2,
545:15, 545:23,
559:5, 694:4, 716:22
**largest** [4] - 635:12,
636:11, 693:22,
694:9
**Larner** [1] - 482:4
**last** [14] - 484:17,
487:17, 495:7,
509:16, 515:25,
568:5, 583:5,
613:23, 614:1,
643:16, 683:18,
686:21, 690:10
**late** [2] - 487:18,
567:19
**latest** [1] - 695:3
**latter** [1] - 579:13
**laughter** [1] - 506:3
**launch** [3] - 485:11,
491:19, 692:17
**launched** [3] - 697:6,

698:2, 699:10
**Laurentius** [1] -
518:10
**LAURENTIUS** [1] -
518:12
**law** [16] - 486:23,
487:12, 489:25,
490:6, 491:20,
492:23, 494:7,
498:16, 501:15,
506:17, 625:12,
626:1, 631:9,
721:13, 721:22,
721:23
**lawsuit** [2] - 718:7,
718:22
**lawyers** [2] - 494:19,
495:4
**lay** [2] - 509:19,
550:13
**Layton** [1] - 481:2
**lead** [3] - 490:20,
546:2, 554:18
**lead-up** [1] - 490:20
**leading** [5] - 487:9,
645:9, 657:14,
680:2, 688:9
**leads** [3] - 512:23,
564:11, 570:17
**learning** [2] - 703:21,
704:6
**least** [10] - 494:23,
533:3, 561:17,
561:19, 616:25,
623:6, 625:4,
625:24, 666:8, 717:9
**leave** [6] - 488:14,
496:11, 632:9,
682:19, 709:20,
725:1
**leaves** [2] - 617:12,
708:22
**leaving** [1] - 725:5
**led** [2] - 516:12, 723:3
**ledge** [1] - 518:17
**leeway** [1] - 592:7
**left** [12] - 534:21,
534:25, 535:3,
545:22, 554:2,
555:13, 555:14,
595:12, 612:14,
623:15, 631:9
**left-hand** [7] - 534:21,
534:25, 535:3,
545:22, 555:13,
595:12
**legal** [5] - 505:18,
505:21, 599:15,
700:13, 700:15
**legend** [2] - 560:2,

611:20
**legitimate** [1] - 490:19
**legs** [2] - 708:23
**LEIFER** [2] - 482:8,
492:14
**Lemtrada** [1] - 643:14
**lenses** [1] - 556:19
**lesions** [1] - 640:3
**less** [13] - 498:4,
499:12, 499:20,
504:13, 556:10,
561:7, 580:12,
589:7, 590:20,
596:2, 620:22,
648:5, 723:15
**lessen** [1] - 699:8
**letter** [11] - 530:3,
559:17, 562:3,
562:16, 567:2,
654:10, 713:18,
718:16, 721:18,
723:8, 724:14
**levels** [2] - 529:25,
592:14
**liability** [1] - 489:19
**library** [1] - 541:9
**Lidgate** [2] - 722:10,
722:11
**life** [1] - 649:8
**lifestyle** [1] - 642:6
**lifetime** [1] - 649:9
**light** [1] - 629:21
**likely** [4] - 696:25,
697:25, 703:21,
709:15
**limit** [1] - 491:6
**limitation** [3] - 526:3,
526:8, 662:11
**limitations** [35] -
525:9, 525:10,
526:1, 526:16,
539:23, 540:2,
548:13, 554:10,
581:10, 581:17,
581:19, 581:21,
582:1, 632:20,
633:1, 657:2, 658:1,
660:3, 660:6,
660:14, 660:24,
665:9, 665:14,
670:7, 670:9,
670:23, 671:2,
688:5, 688:7,
688:16, 689:3,
689:18, 690:7,
696:10, 699:18
**limiting** [2] - 632:21,
633:3
**Line** [1] - 614:23

**line** [14] - 529:16,
531:19, 531:20,
534:1, 544:12,
546:5, 546:8,
546:11, 546:16,
548:1, 557:4, 577:5,
591:14, 622:5
**lines** [4] - 559:11,
559:12, 614:1,
614:14
**linked** [1] - 605:15
**links** [2] - 605:16
**lipoatrophy** [13] -
681:12, 681:15,
681:16, 682:1,
682:15, 702:13,
708:3, 708:5, 708:6,
708:18, 708:21,
711:1, 716:15
**Lipoatrophy** [1] -
681:8
**lipotrophy** [3] - 682:8,
682:17, 682:24
**list** [7] - 494:13,
617:23, 617:24,
618:1, 622:25,
653:11
**listed** [2] - 595:9,
701:24
**listened** [1] - 516:10
**literal** [1] - 706:7
**literally** [2] - 696:8,
706:21
**literature** [2] - 541:2,
637:22
**litigated** [1] - 490:2
**litigation** [3] - 516:2,
521:11, 630:1
**Litton** - 723:23
**live** [1] - 486:19
**lives** [2] - 493:3, 642:2
**LLC** [1] - 481:24
**LLP** [9] - 480:13,
480:17, 481:4,
481:7, 481:11,
481:16, 481:20,
481:22, 482:7
**lo** [2] - 505:8, 510:10
**locate** [1] - 611:3
**lock** [1] - 588:24
**logic** [6] - 570:15,
570:19, 571:3,
571:12, 571:14,
605:14
**logical** [1] - 607:12
**logistic** [1] - 493:6
**logistically** [1] -
493:21
**logistics** [1] - 496:2
**longitudinally** [1] -

551:25
**look** [78] - 492:23,
494:22, 494:23,
495:7, 499:19,
501:13, 501:19,
503:4, 506:8,
506:14, 506:17,
506:25, 518:1,
525:25, 526:3,
529:1, 533:5, 537:8,
540:21, 541:22,
543:22, 549:5,
550:23, 552:21,
553:12, 553:19,
558:20, 562:5,
577:8, 583:18,
593:19, 594:25,
595:12, 595:21,
597:20, 600:1,
604:11, 608:14,
611:11, 611:25,
612:22, 626:12,
628:9, 629:3,
629:25, 634:16,
637:14, 638:8,
639:7, 640:25,
645:1, 646:4,
646:21, 647:4,
647:18, 651:10,
652:15, 655:11,
656:13, 658:2,
661:13, 663:5,
665:3, 670:7, 671:2,
671:19, 671:20,
673:17, 675:24,
688:5, 689:7,
689:13, 689:22,
700:1, 712:6,
712:12, 713:17
**looked** [17] - 526:14,
526:16, 529:17,
540:22, 543:14,
548:13, 552:22,
553:17, 564:19,
565:4, 572:20,
578:12, 578:13,
631:10, 677:16,
683:18, 718:19
**looking** [27] - 507:16,
509:7, 509:10,
509:11, 511:18,
536:9, 537:14,
539:11, 546:25,
547:10, 552:17,
554:24, 554:25,
555:18, 560:19,
563:16, 575:17,
581:17, 588:25,
591:15, 596:8,
597:19, 599:8,
600:4, 642:5, 676:23

**looks** [8] - 535:13,
535:14, 556:14,
590:17, 591:10,
626:2, 653:14,
712:13
**loosely** [1] - 577:4
**loss** [1] - 708:21
**lost** [1] - 518:17
**low** [2] - 649:12,
649:14
**lower** [28] - 546:12,
546:16, 547:22,
547:23, 560:12,
561:2, 561:3,
561:10, 561:13,
561:14, 561:16,
561:17, 561:19,
562:3, 562:14,
562:16, 563:2,
563:6, 563:11,
587:15, 588:17,
613:1, 619:21,
619:23, 724:7
**lumped** [2] - 611:23,
612:1
**lunch** [2] - 608:6,
613:14
**Luncheon** [1] - 608:7

# M

**M&E** [3] - 724:2,
724:9, 724:13
**M.D** [1] - 634:6
**M.D.'s** [1] - 654:1
**MA** [1] - 481:22
**mad** [1] - 725:4
**Madison** [1] - 481:4
**main** [1] - 636:11
**maintained** [1] -
663:23
**major** [1] - 520:3
**majority** [6] - 542:7,
542:12, 542:14,
566:3, 694:9, 694:13
**males** [1] - 715:25
**Manbeck** [1] - 482:9
**manner** [6] - 532:2,
551:24, 553:15,
562:3, 577:19, 592:4
**manufacture** [3] -
489:8, 490:12,
654:17
**manufacturer** [1] -
713:15
**manufacturers** [2] -
654:16, 712:12
**manufacturing** [1] -
619:1
**Marais** [51] - 518:10,

518:23, 522:7,
522:15, 523:21,
528:6, 528:20,
530:19, 533:2,
535:9, 536:1,
539:20, 542:23,
548:17, 549:9,
549:16, 549:17,
549:25, 550:9,
550:13, 550:17,
550:20, 551:13,
558:16, 565:8,
566:6, 567:23,
571:16, 575:13,
577:2, 581:13,
581:23, 582:18,
586:17, 587:6,
587:12, 587:23,
590:6, 590:11,
597:20, 600:3,
605:6, 605:17,
608:12, 608:18,
610:21, 610:25,
613:6, 624:1, 624:6
**MARAIS** [1] - 518:12
**Marais's** [2] - 549:11,
613:22
**march** [1] - 654:8
**marching** [2] - 661:11,
681:6
**margin** [2] - 570:24,
606:14
**marked** [3] - 484:2,
511:5, 583:12
**market** [10] - 485:14,
485:15, 485:16,
486:5, 621:24,
626:2, 643:10,
643:16, 675:22,
696:22
**marketed** [1] - 658:18
**marketing** [1] - 724:2
**marks** [2] - 555:10,
708:23
**Maryland** [3] - 634:7,
635:23, 637:19
**masse** [1] - 572:13
**Master's** [1] - 520:6
**matches** [1] - 529:16
**material** [8] - 489:6,
537:9, 538:9, 573:6,
578:14, 584:14,
655:25, 723:15
**materials** [1] - 703:24
**Mathematics** [1] -
521:4
**mathematics** [5] -
519:5, 520:4, 520:7,
520:8
**matter** [10] - 489:20,

535:11, 536:3,
539:14, 556:20,
561:4, 573:2, 664:5,
721:13, 722:20
**mattered** [1] - 558:17
**matters** [1] - 538:3
**MATTHEW** [1] -
481:14
**MAZZOCHI** [8] -
481:13, 486:8,
488:2, 488:3,
495:21, 628:17,
630:7, 724:21
**Mazzochi** [3] - 481:16,
631:1, 724:19
**Mazzochi's** [1] - 486:1
**McKeague's** [1] -
551:1
**McLaughlin** [1] -
482:2
**mean** [40] - 505:13,
521:25, 531:10,
531:14, 568:19,
568:20, 570:18,
580:1, 580:2, 583:1,
583:10, 584:22,
585:17, 585:23,
587:14, 588:6,
593:5, 593:6,
602:15, 603:2,
604:21, 605:4,
608:22, 609:9,
645:8, 651:19,
667:25, 668:8,
675:17, 686:18,
696:1, 701:20,
703:19, 710:22,
712:5, 712:9, 713:9,
715:22, 720:7,
720:22
**meaning** [5] - 561:16,
562:16, 565:18,
596:15, 696:21
**meaningful** [1] -
544:21
**means** [16] - 528:14,
530:5, 540:7, 540:9,
540:13, 546:11,
562:24, 579:23,
580:2, 585:1, 607:9,
610:1, 651:17,
708:9, 709:1, 724:10
**meant** [5] - 559:22,
596:25, 609:24,
700:11, 711:15
**measure** [10] - 544:21,
544:22, 553:22,
557:8, 559:1,
563:24, 571:21,
574:12, 574:20

measured [1] - 579:23
measurements [1] -
577:22
measures [2] -
561:15, 599:11
measuring [1] -
535:21
mechanisms [1] -
640:4
MedChi [1] - 637:19
Medical [3] - 541:20,
637:19, 637:20
medical [12] - 517:14,
517:17, 521:19,
541:1, 541:18,
541:25, 635:19,
638:15, 649:3,
654:21, 705:19,
705:20
medication [44] -
521:14, 642:2,
642:10, 642:19,
642:21, 643:15,
651:9, 654:12,
654:17, 656:24,
657:10, 657:24,
659:3, 659:4,
661:17, 662:9,
663:9, 664:12,
664:14, 665:2,
665:22, 669:2,
669:18, 675:22,
676:21, 676:22,
683:7, 683:24,
691:19, 696:14,
702:8, 706:12,
709:6, 709:16,
709:23, 710:16,
710:23, 710:24,
712:8, 712:9,
713:10, 715:11,
715:16, 715:18
medications [8] -
641:24, 642:3,
642:5, 642:9, 643:9,
643:13, 663:11,
701:7
medicine [3] - 635:20,
665:23, 718:16
medicines [2] -
641:25
meet [2] - 485:2,
487:20
meet-and-confer [1] -
487:20
meeting [2] - 608:4,
718:24
meetings [1] - 705:18
member [5] - 521:3,
637:17, 638:17,

695:6, 695:9
memorandum [1] -
723:18
memory [4] - 593:19,
610:12, 626:15,
626:16
mental [1] - 594:12
mention [7] - 661:9,
661:22, 663:16,
672:11, 683:15,
684:11, 686:5
mentioned [21] -
583:20, 594:1,
615:8, 643:17,
647:3, 652:23,
659:25, 664:7,
664:9, 665:13,
667:13, 670:9,
671:1, 675:14,
677:4, 681:7, 683:2,
684:21, 690:11,
694:15, 705:17
mentions [4] - 674:14,
678:8, 685:1, 709:7
mere [2] - 565:20,
579:25
merely [1] - 690:23
Meridia [1] - 521:15
met [7] - 484:16,
526:12, 526:13,
539:23, 540:2,
553:1, 714:5
metering [1] - 638:2
method [3] - 558:23,
575:10, 621:8
methods [3] - 520:10,
522:8, 533:21
Methods [1] - 533:9
metric [11] - 535:22,
535:24, 535:25,
557:9, 557:12,
575:1, 575:3, 575:5,
575:7, 575:11
Mets [1] - 725:4
MG [1] - 480:4
mg [1] - 658:12
middle [3] - 527:10,
546:6, 591:13
might [31] - 514:19,
521:24, 550:10,
553:6, 582:13,
582:15, 583:5,
601:10, 614:16,
616:22, 649:13,
697:4, 697:4,
697:16, 697:19,
697:22, 698:3,
698:14, 698:16,
698:18, 698:19,
708:12, 708:14,

708:25, 710:20,
710:21, 710:22,
711:20, 711:22,
711:23, 711:24
mike [1] - 568:25
mild [46] - 530:1,
537:25, 549:18,
549:22, 556:8,
559:17, 559:20,
560:5, 560:24,
561:2, 561:5,
561:14, 562:13,
562:14, 563:6,
563:12, 589:12,
589:17, 589:22,
589:25, 590:22,
592:25, 593:1,
593:10, 593:11,
593:16, 594:4,
595:22, 596:2,
596:19, 596:23,
609:1, 609:4, 609:8,
609:11, 609:18,
609:25, 610:1,
610:4, 610:16,
611:12, 611:22,
671:18, 672:6,
674:16, 685:1
Miller [3] - 638:9,
639:8, 723:23
milligram [203] -
483:24, 483:25,
484:22, 484:24,
484:25, 485:12,
485:15, 485:16,
485:23, 486:5,
486:14, 493:9,
493:11, 494:16,
510:12, 512:19,
584:6, 584:19,
584:20, 584:21,
588:12, 588:14,
589:1, 589:13,
589:15, 589:16,
590:1, 590:21,
590:23, 594:18,
595:24, 596:1,
596:6, 596:20,
596:22, 597:1,
597:7, 597:9,
597:14, 597:15,
597:22, 598:3,
598:4, 599:1,
599:19, 599:20,
599:21, 599:22,
601:23, 604:14,
604:15, 604:25,
606:22, 606:25,
607:9, 607:10,
607:18, 612:11,
612:16, 612:18,

612:22, 613:2,
615:15, 619:9,
619:22, 620:8,
620:25, 621:20,
621:22, 637:6,
637:7, 637:8,
643:11, 643:17,
643:18, 644:8,
644:9, 651:25,
652:5, 652:6,
652:10, 652:11,
654:15, 654:18,
655:24, 655:25,
658:17, 658:20,
658:21, 659:7,
659:11, 660:7,
660:8, 660:12,
660:18, 662:5,
663:2, 663:3,
663:22, 663:23,
664:24, 666:3,
666:17, 666:19,
666:25, 667:1,
667:3, 667:5, 667:9,
667:10, 668:10,
668:12, 668:13,
669:4, 669:5,
669:22, 669:24,
669:25, 670:3,
670:17, 670:18,
671:25, 672:2,
672:9, 672:20,
672:21, 673:11,
673:25, 674:1,
674:7, 674:8,
676:20, 676:22,
677:9, 677:10,
677:23, 677:24,
678:13, 678:17,
678:18, 679:10,
679:11, 680:14,
680:15, 681:21,
681:22, 682:5,
683:24, 684:18,
684:19, 685:2,
687:24, 688:22,
688:23, 690:1,
690:2, 691:6, 691:9,
691:10, 691:20,
691:22, 691:23,
692:17, 695:17,
695:23, 696:22,
696:24, 697:4,
697:16, 697:17,
697:21, 697:22,
698:2, 698:4,
698:10, 698:12,
699:3, 699:11,
699:16, 703:3,
703:9, 704:16,
704:17, 706:3,

706:12, 707:20,
708:5, 708:6, 720:9,
720:10, 720:19,
720:21
milligrams [53] -
491:16, 498:1,
498:6, 504:25,
512:21, 523:19,
523:20, 567:8,
567:9, 594:16,
605:18, 605:19,
650:15, 650:17,
651:7, 651:9,
651:20, 651:21,
651:23, 652:2,
652:3, 652:9, 658:5,
658:7, 658:14,
660:1, 661:2,
663:12, 663:13,
663:24, 664:1,
668:11, 671:8,
671:17, 680:22,
681:13, 689:11,
689:12, 689:16,
698:16, 698:20,
703:9, 704:19,
704:21, 706:4,
708:2, 710:5
milliliter [1] - 615:15
millimeters [2] -
648:10, 648:15
mind [6] - 497:3,
518:1, 550:25,
594:20, 603:18,
604:10
mine [1] - 538:17
minimize [2] - 682:11,
683:11
minor [2] - 520:8,
694:19
minute [1] - 589:6
minutes [4] - 496:17,
518:4, 544:7, 551:19
mischaracterizing [1]
- 511:6
misrepresent [2] -
485:20, 486:1
misrepresentation [1]
- 486:9
missing [1] - 532:21
Mississippi [1] -
635:13
misspeak [1] - 589:24
misspoke [2] -
497:23, 703:7
misspoken [1] -
550:10
mistake [1] - 613:25
mistyped [1] - 577:11
MITROKOSTAS [5] -

480:16, 614:19, 614:21, 615:18, 615:21

**Mitrokostas** [1] - 614:18

**mix** [1] - 511:19

**moderate** [46] - 530:2, 536:18, 537:25, 556:3, 556:4, 556:8, 559:18, 559:21, 560:25, 561:3, 561:6, 561:14, 562:15, 563:7, 563:11, 589:14, 590:1, 590:21, 592:25, 593:2, 593:9, 593:14, 594:4, 595:22, 596:4, 596:5, 596:23, 597:15, 597:19, 597:23, 598:4, 609:1, 609:4, 609:8, 609:11, 609:18, 609:25, 610:2, 610:5, 610:16, 611:12, 611:22, 611:25, 612:4, 612:11, 612:15

**moderates** [1] - 589:21

**modified** [2] - 532:5, 585:18

**modifying** [1] - 696:4

**Molino** [1] - 481:16

**moment** [5] - 653:21, 660:21, 666:22, 700:21, 705:9

**Momenta** [4] - 481:18, 622:15, 633:14

**Monday** [1] - 618:3

**monoclonal** [1] - 643:13

**month** [2] - 637:24, 643:16

**months** [2] - 484:4, 523:7

**moreover** [1] - 703:6

**morning** [11] - 483:1, 483:2, 484:19, 518:9, 518:14, 518:15, 518:23, 518:24, 519:7, 616:2, 724:25

**Morris** [2] - 481:20, 481:22

**most** [19] - 491:17, 495:1, 520:20, 568:15, 584:8, 584:9, 584:15,

641:6, 642:3, 642:8, 649:6, 696:1, 696:17, 696:25, 703:20, 706:19, 713:12, 715:19

**motion** [9] - 484:18, 616:11, 616:17, 616:25, 618:16, 618:19, 622:16, 623:1, 623:24

**motions** [1] - 616:9

**motivated** [1] - 504:13

**motivation** [7] - 499:9, 499:10, 500:15, 501:1, 502:5, 503:2, 508:23

**move** [18] - 551:9, 552:15, 558:1, 576:9, 581:20, 614:4, 618:20, 621:12, 623:1, 644:11, 652:10, 652:13, 654:5, 655:6, 668:20, 671:1, 688:12, 690:10

**moved** [4] - 499:7, 520:12, 520:14, 664:1

**moving** [3] - 498:12, 560:16, 652:9

**MR** [158] - 483:6, 483:9, 483:13, 487:17, 488:8, 488:16, 488:19, 489:2, 489:5, 489:10, 489:24, 490:7, 490:21, 491:3, 491:6, 491:12, 492:21, 493:2, 493:22, 494:2, 494:6, 494:21, 496:16, 496:20, 497:1, 497:3, 497:8, 497:14, 498:7, 498:21, 498:24, 499:2, 500:1, 500:13, 502:1, 503:23, 507:1, 509:14, 512:8, 514:6, 514:21, 515:6, 515:8, 515:10, 515:12, 516:9, 518:9, 518:22, 519:15, 519:21, 522:6, 522:13, 522:14, 526:6, 526:10, 527:8, 527:15,

528:11, 528:16, 528:17, 528:19, 531:13, 534:7, 534:16, 534:17, 548:20, 548:23, 550:1, 550:19, 551:7, 551:12, 555:5, 555:7, 557:23, 557:24, 558:4, 558:8, 558:11, 558:14, 558:15, 567:21, 569:10, 569:12, 569:21, 570:6, 576:16, 576:24, 577:1, 582:3, 586:14, 587:5, 587:10, 590:4, 610:24, 613:5, 613:8, 613:12, 613:17, 614:19, 614:21, 615:18, 615:21, 615:23, 616:8, 616:12, 617:20, 618:6, 622:14, 622:19, 622:24, 623:7, 623:10, 630:13, 630:16, 632:14, 633:8, 633:13, 634:1, 638:19, 638:23, 639:1, 639:2, 639:9, 639:16, 639:21, 639:23, 640:22, 645:8, 645:13, 645:14, 657:14, 657:16, 657:17, 659:13, 659:18, 659:22, 676:12, 676:15, 676:17, 678:22, 678:24, 678:25, 679:24, 680:5, 688:9, 688:11, 688:14, 690:17, 690:20, 691:1, 692:19, 692:24, 693:1, 719:1, 719:3, 719:6, 719:9, 721:3

**MS** [180] - 484:14, 486:8, 487:7, 488:1, 488:2, 488:3, 488:12, 490:3, 490:9, 492:10, 492:14, 492:16, 493:5, 493:8, 495:14, 495:18, 495:21, 496:3, 496:23, 501:3, 501:19, 501:24,

502:7, 505:12, 506:5, 506:19, 506:24, 507:5, 507:10, 508:1, 508:8, 511:4, 513:11, 514:19, 515:7, 515:9, 516:1, 517:1, 517:21, 519:12, 519:20, 522:10, 525:16, 528:9, 528:13, 548:17, 549:6, 549:8, 549:15, 549:21, 550:8, 550:24, 551:11, 557:21, 558:1, 568:22, 569:1, 569:4, 569:15, 569:19, 576:8, 576:9, 576:14, 576:19, 582:6, 582:8, 582:13, 582:17, 586:3, 586:9, 586:13, 586:15, 587:11, 587:20, 587:22, 590:8, 590:9, 591:7, 591:19, 593:22, 593:25, 608:10, 608:11, 613:20, 614:9, 614:13, 616:16, 616:20, 618:11, 618:19, 622:21, 624:20, 624:22, 625:2, 626:24, 627:6, 627:9, 627:17, 627:20, 627:23, 628:15, 628:17, 630:6, 630:7, 630:12, 630:24, 631:14, 631:17, 633:6, 633:10, 635:15, 636:11, 636:13, 636:16, 636:19, 636:21, 636:22, 636:23, 637:1, 637:11, 637:22, 637:25, 638:16, 639:5, 639:8, 639:24, 640:18, 640:23, 640:24, 641:1, 641:3, 641:4, 641:8, 641:18, 641:23, 641:24, 641:25, 642:1, 642:13, 642:23, 642:25, 643:4, 643:7, 649:2, 649:3, 658:19, 659:5, 661:22,

662:20, 663:6, 663:18, 664:2, 675:9, 691:21, 693:15, 693:16, 693:24, 693:25, 694:1, 694:3, 694:10, 694:11, 694:13, 694:18, 694:25, 695:6, 697:2, 700:17, 700:20, 701:3, 709:18, 713:18, 718:10, 724:21

**MS-specific** [1] - 695:6

**multinomial** [1] - 565:11

**multiple** [29] - 574:21, 574:22, 622:1, 634:15, 637:23, 638:22, 639:25, 640:24, 641:3, 661:21, 662:12, 662:17, 662:24, 663:11, 691:19, 693:5, 693:7, 693:8, 693:11, 693:13, 693:14, 693:17, 695:14, 696:4, 696:17, 700:23, 701:14, 702:4, 706:19

**Multiple** [2] - 638:10, 638:14

**must** [3] - 570:23, 657:13, 657:23

**myelin** [1] - 640:13

**Myelin** [1] - 640:8

**Mylan** [10] - 481:9, 481:10, 484:21, 492:18, 582:19, 613:25, 615:8, 615:11, 620:20, 620:21

**Mylan's** [2] - 616:25, 655:12

**N**

**naive** [3] - 659:3, 697:6, 697:12

**name** [4] - 521:1, 610:25, 634:4, 688:2

**named** [1] - 722:12

**namely** [1] - 708:2

**narrow** [2] - 623:16, 631:6

**nature** [6] - 483:25, 538:8, 573:14, 615:14, 629:21,

657:14

**NEAL** [1] - 482:6

**near** [2] - 591:17, 694:14

**nearly** [1] - 597:8

**necessarily** [4] - 588:9, 695:25, 703:19, 706:16

**necessary** [1] - 552:25

**Necrosis** [1] - 681:9

**necrosis** [10] - 681:14, 708:3, 708:18, 709:8, 710:20, 710:23, 710:24, 711:1, 716:16

**need** [6] - 497:2, 519:18, 568:25, 586:4, 709:24, 711:7

**needed** [1] - 612:6

**needs** [4] - 550:23, 632:5, 639:15, 680:2

**negotiation** [1] - 491:2

**nerve** [1] - 640:12

**nerves** [2] - 640:5, 640:6

**nervous** [3] - 640:1, 640:5, 640:6

**net** [2] - 488:6, 488:8

**neurologic** [1] - 641:9

**neurological** [1] - 635:14

**neurologist** [11] - 634:14, 635:9, 651:16, 662:19, 670:14, 675:6, 675:8, 677:20, 688:19, 689:23, 691:13

**Neurology** [1] - 637:18

**neurology** [11] - 635:10, 635:11, 635:12, 635:13, 636:3, 636:8, 636:9, 636:10, 638:4, 638:21, 693:24

**Neurology's** [1] - 638:1

**neurophysiology** [3] - 635:25, 694:22, 694:23

**never** [22] - 483:17, 483:18, 484:17, 495:3, 604:13, 606:13, 629:3, 659:4, 663:8, 663:9, 663:10, 664:7, 674:14, 676:8, 680:20, 680:21, 686:4, 686:15,

691:19, 697:7, 706:19

**never-ending** [1] - 495:3

**nevertheless** [2] - 530:22, 587:14

**new** [3] - 675:22, 712:11, 712:13

**New** [1] - 541:20

**Newell** [4] - 723:5, 723:11, 723:12, 723:17

**newest** [1] - 643:14

**next** [21] - 530:2, 535:1, 542:17, 544:9, 545:3, 547:19, 554:10, 555:21, 558:9, 559:6, 559:22, 559:25, 560:1, 562:9, 562:23, 562:25, 636:2, 666:23, 669:14, 677:16, 681:6

**nice** [2] - 693:3, 693:4

**nicely** [1] - 485:10

**NICHOLAS** [1] - 480:16

**night** [4] - 484:17, 497:21, 613:24, 614:1

**nine** [1] - 701:11

**NJ** [1] - 482:4

**nobody** [3] - 510:7, 510:9, 513:4

**non** [16] - 568:7, 622:6, 625:19, 625:20, 625:25, 626:4, 632:21, 633:3, 658:24, 664:1, 675:10, 680:2, 690:21, 691:5, 700:20, 704:21

**non-GA** [2] - 664:1, 675:10

**non-infringing** [5] - 622:6, 625:19, 625:20, 625:25, 626:4

**non-leading** [1] - 680:2

**non-limiting** [2] - 632:21, 633:3

**non-placebo** [1] - 704:21

**non-reactors** [1] - 568:7

**non-relapsing** [1] - 700:20

**non-switcher** [1] - 658:24

**non-switching** [2] - 690:21, 691:5

**noncontroversial** [1] - 688:12

**none** [4] - 533:23, 655:5, 666:7, 667:12

**noninfringement** [3] - 621:3, 633:17, 634:25

**nonpublic** [7] - 501:6, 507:11, 509:12, 516:11, 516:14, 627:11, 721:25

**normal** [2] - 530:6, 610:4

**normally** [1] - 676:3

**nose** [1] - 649:11

**nosebleed** [2] - 649:8, 649:12

**nosebleeds** [3] - 649:7, 649:14, 649:15

**note** [1] - 705:1

**nothing** [25] - 486:21, 489:21, 565:10, 572:22, 618:13, 633:1, 650:7, 650:8, 653:5, 657:22, 660:25, 664:17, 666:3, 669:6, 669:9, 671:15, 677:12, 678:16, 682:9, 684:11, 684:17, 684:21, 684:24, 713:3, 719:3

**notice** [9] - 484:9, 485:19, 487:14, 487:18, 494:1, 494:3, 494:4, 536:1, 557:6

**noting** [1] - 721:21

**notion** [1] - 510:23

**notwithstanding** [1] - 578:7

**nowhere** [2] - 599:25, 672:14

**number** [17] - 521:21, 527:20, 536:7, 542:20, 554:7, 561:5, 583:16, 584:10, 586:12, 589:19, 590:6, 590:12, 593:1, 595:8, 624:12, 691:9, 691:25

**numbers** [33] - 532:12, 534:1, 536:2, 548:8,

553:21, 566:2, 566:23, 566:25, 572:23, 572:24, 572:25, 573:19, 578:15, 578:16, 578:17, 583:16, 591:12, 594:23, 594:25, 597:1, 597:4, 597:11, 597:20, 600:19, 601:17, 603:15, 675:24, 676:24, 676:25, 681:3, 682:2

**numbness** [1] - 640:19

**numeric** [1] - 553:24

**numerous** [1] - 720:3

**nutshell** [1] - 651:15

# O

**obesity** [1] - 521:14

**object** [2] - 486:8, 494:24

**objected** [2] - 487:18, 576:20

**objection** [28] - 496:22, 511:17, 514:4, 519:12, 522:10, 528:9, 548:17, 549:6, 549:7, 549:14, 557:21, 568:22, 569:25, 570:2, 576:9, 576:21, 576:23, 587:5, 638:23, 639:9, 645:8, 657:14, 659:13, 676:12, 678:22, 679:24, 688:9, 690:17

**objections** [3] - 490:7, 497:17, 587:6

**observation** [2] - 504:7, 721:12

**observations** [4] - 577:24, 578:1, 578:8

**observed** [1] - 667:20

**obtained** [5] - 520:2, 520:6, 533:15, 686:23, 706:15

**obvious** [1] - 516:15

**obviously** [8] - 491:9, 491:14, 506:9, 639:10, 647:22, 649:17, 651:17, 702:11

**obviousness** [6] - 499:15, 510:2, 515:2, 516:4,

630:20, 722:23

**occasion** [1] - 654:21

**occupation** [1] - 635:8

**occur** [1] - 535:16

**occurred** [3] - 535:19, 649:5, 682:3

**occurrence** [5] - 535:12, 539:5, 571:11, 647:16, 679:20

**occurrences** [2] - 680:8, 680:9

**occurring** [2] - 574:21, 589:19

**occurs** [2] - 647:15, 648:22

**Octoxynol-40** [1] - 722:8

**odds** [3] - 606:11, 628:21, 629:18

**OF** [1] - 480:2

**off-label** [5] - 624:18, 700:12, 700:22, 701:12, 701:21

**offer** [8] - 502:4, 502:5, 502:17, 506:10, 513:7, 522:7, 555:6, 581:25

**offered** [3] - 505:7, 581:16, 628:7

**offering** [1] - 507:15

**offers** [1] - 505:9

**office** [2] - 704:4, 710:11

**offness** [1] - 604:6

**offsetting** [2] - 724:6, 724:11

**often** [8] - 491:7, 568:21, 587:3, 647:15, 648:22, 648:23, 680:10, 680:11

**old** [1] - 712:12

**oligodendrocytes** [1] - 640:14

**omitted** [1] - 614:1

**once** [4] - 649:12, 654:19, 663:25, 706:10

**one** [127] - 496:3, 497:10, 497:14, 500:18, 505:23, 507:7, 508:10, 513:18, 513:23, 523:6, 530:20, 530:21, 535:13, 535:17, 535:19, 535:20, 537:3, 537:12, 540:3, 541:23, 542:6,

546:21, 547:23,
555:5, 555:11,
557:6, 557:13,
557:19, 561:17,
561:19, 562:21,
562:22, 563:1,
563:2, 563:4, 564:2,
564:7, 568:3,
571:12, 572:13,
573:10, 573:12,
574:23, 578:3,
579:6, 580:6,
582:14, 588:11,
588:12, 588:20,
588:23, 589:12,
589:13, 589:17,
589:25, 590:1,
590:14, 593:2,
593:3, 593:6, 593:9,
593:13, 593:14,
594:17, 595:3,
596:18, 600:9,
604:3, 607:19,
609:13, 609:16,
610:7, 611:14,
613:8, 613:22,
615:4, 616:24,
617:4, 626:2, 627:4,
629:22, 630:13,
631:12, 632:4,
641:5, 643:10,
648:18, 649:5,
649:18, 664:1,
664:3, 664:18,
664:19, 665:4,
666:6, 667:6, 669:7,
675:21, 676:5,
676:8, 676:11,
679:4, 681:4,
682:12, 683:14,
683:17, 690:10,
691:15, 695:5,
697:17, 699:15,
699:25, 701:4,
701:5, 715:4, 719:1,
719:18, 720:16,
721:25, 724:12,
725:1
**one's** [1] - 703:23
**ones** [3] - 534:10,
597:11, 671:10
**ongoing** [1] - 723:4
**onset** [1] - 641:9
**open** [6] - 540:5,
540:11, 540:12,
541:13, 542:8, 616:7
**Open** [1] - 541:12
**opening** [10] - 524:12,
568:3, 573:13,
617:21, 618:3,

646:24, 690:12,
690:14, 691:2, 692:9
**openings** [1] - 543:4
**operative** [1] - 486:24
**opine** [1] - 607:15
**opined** [1] - 672:25
**opining** [1] - 630:19
**opinion** [35] - 505:24,
538:7, 566:16,
568:12, 568:13,
575:13, 575:19,
575:23, 576:3,
576:13, 576:14,
576:15, 581:14,
583:25, 594:14,
599:14, 630:22,
631:2, 646:12,
649:22, 654:23,
654:25, 656:4,
660:22, 662:4,
667:14, 670:13,
671:12, 676:13,
682:21, 688:18,
689:22, 692:11,
692:14, 722:6
**opinions** [33] - 505:4,
505:5, 505:7, 509:8,
510:15, 513:7,
516:20, 549:12,
610:9, 627:25,
628:3, 634:20,
634:24, 639:4,
644:11, 644:13,
644:22, 646:5,
646:6, 646:8,
646:16, 646:23,
652:13, 652:14,
652:16, 655:3,
655:10, 655:21,
655:22, 656:10,
685:4, 689:17, 700:4
**opponent** [1] - 724:20
**opportunity** [7] -
484:10, 495:22,
523:25, 538:17,
618:4, 626:12
**opposed** [2] - 659:14,
680:11
**opposite** [4] - 517:6,
580:1, 580:7, 702:3
**options** [6] - 663:15,
663:21, 664:6,
696:3, 696:10,
696:14
**oral** [2] - 521:19,
643:12
**orange** [1] - 560:7
**oranges** [1] - 589:7
**order** [27] - 486:22,
487:10, 489:6,

489:7, 491:2,
493:25, 501:13,
501:20, 531:19,
541:2, 560:10,
592:24, 619:12,
627:21, 647:19,
650:17, 652:3,
652:9, 652:11,
654:1, 682:23,
688:23, 703:17,
705:11, 705:23,
713:17, 718:15
**ordered** [1] - 497:6
**orders** [3] - 647:2,
647:3, 647:5
**ordinary** [19] - 502:12,
503:3, 508:12,
508:16, 512:2,
513:20, 516:5,
517:5, 517:7,
517:18, 631:3,
645:4, 645:16,
645:24, 721:25,
723:9, 723:13,
724:12, 724:15
**oriented** [1] - 598:23
**original** [8] - 533:16,
533:24, 537:3,
537:15, 537:21,
537:24, 539:4,
574:14
**originally** [2] - 537:25,
575:12
**otherwise** [2] - 679:7,
688:20
**ought** [1] - 645:10
**ourselves** [1] - 702:7
**Outcome** [1] - 541:11
**outcome** [3] - 522:4,
570:14, 592:9
**outlier** [8] - 573:15,
575:14, 575:20,
577:8, 577:10,
585:1, 585:21,
585:25
**outliers** [7] - 573:13,
573:22, 577:9,
578:4, 578:23,
580:11, 585:2
**output** [1] - 572:24
**outranks** [1] - 563:11
**outside** [9] - 511:25,
599:10, 599:17,
615:4, 649:3,
653:15, 676:3,
700:13, 702:22
**overall** [5] - 532:13,
599:14, 660:22,
671:11, 671:15
**overlaid** [1] - 559:11

**overlap** [2] - 525:12,
668:15
**overrides** [1] - 563:11
**overruled** [3] - 576:18,
576:23, 690:25
**overruling** [3] -
569:25, 570:1,
576:21
**overview** [2] - 522:19,
655:8
**own** [13] - 554:21,
559:17, 566:16,
573:8, 580:17,
590:16, 606:19,
640:4, 641:16,
642:22, 696:8,
713:1, 720:16
**owner** [2] - 500:9,
630:21

# P

**P.A** [3] - 480:19,
481:2, 482:2
**P.C** [1] - 482:9
**p.m** [1] - 725:8
**package** [108] -
619:15, 620:15,
620:16, 642:12,
642:15, 642:16,
642:18, 642:22,
643:1, 647:1, 650:4,
653:8, 653:10,
653:14, 653:15,
653:17, 653:20,
655:8, 655:12,
655:13, 655:14,
655:15, 655:16,
655:18, 655:21,
655:23, 656:7,
656:8, 656:11,
656:15, 657:12,
657:22, 658:2,
660:20, 660:23,
660:25, 661:4,
661:11, 661:13,
662:20, 662:22,
664:4, 667:7, 667:8,
667:17, 668:20,
669:3, 670:14,
671:10, 671:13,
671:15, 671:23,
672:13, 672:16,
672:18, 674:20,
674:21, 675:2,
675:7, 675:9,
675:14, 676:4,
676:5, 677:2,
677:18, 678:4,
678:6, 679:13,

681:24, 682:14,
685:5, 685:11,
685:19, 685:21,
686:2, 686:13,
686:23, 687:4,
687:11, 687:13,
688:2, 688:19,
689:24, 692:4,
699:22, 701:17,
701:24, 702:12,
704:3, 705:24,
706:2, 706:7, 706:9,
706:21, 708:8,
712:17, 712:18,
713:4, 713:15,
713:24, 714:14,
714:24, 715:9,
716:18, 716:25,
717:10, 717:21,
719:16
**Page** [21] - 583:8,
614:23, 661:13,
664:9, 664:22,
665:18, 668:21,
669:13, 671:20,
671:21, 673:3,
674:8, 677:17,
681:7, 683:2,
683:19, 710:2,
710:4, 714:17, 715:6
**page** [13] - 499:3,
527:17, 527:18,
527:20, 537:4,
583:10, 583:16,
611:8, 611:10,
638:13, 700:3,
702:3, 713:8
**pages** [4] - 527:12,
672:4, 674:23,
674:25
**paid** [2] - 510:8, 510:9
**pain** [9] - 542:9, 644:1,
644:2, 702:13,
706:24, 706:25,
707:12, 716:12,
716:13
**pains** [1] - 707:14
**paired** [1] - 724:6
**pamphlet** [2] - 669:16,
683:5
**pandemic** [1] - 571:6
**panel** [8] - 534:21,
535:1, 535:3, 545:9,
555:16, 566:25,
722:5, 722:6
**panels** [3] - 534:21,
536:7, 554:4
**paper** [28] - 524:6,
524:8, 527:24,
532:20, 533:18,

536:19, 536:25,
537:2, 539:21,
541:4, 541:8,
541:16, 542:25,
544:12, 551:16,
555:10, 582:14,
583:21, 585:7,
609:22, 609:24,
611:3, 638:9,
638:11, 639:8,
717:23, 717:24,
718:3
**papers** [3] - 542:18,
542:20, 718:15
**paragraph** [7] - 672:5,
704:14, 705:14,
706:14, 707:16,
707:19, 710:7
**Paragraph** [3] -
704:24, 706:23,
707:24
**parallel** [2] - 545:21,
551:22
**paralleling** [1] -
551:17
**parameters** [1] - 564:5
**pare** [1] - 623:6
**paring** [1] - 632:9
**parse** [1] - 626:8
**part** [21] - 483:15,
491:17, 505:1,
511:1, 537:15,
537:21, 539:3,
540:11, 570:14,
584:8, 584:9,
584:15, 599:13,
621:24, 647:19,
674:10, 694:15,
694:19, 695:13,
713:12, 717:20
**partial** [4] - 616:18,
617:14, 618:20,
622:8
**participants** [2] -
523:24, 540:9
**participating** [1] -
523:5
**particular** [25] -
497:22, 526:4,
533:10, 537:18,
538:5, 566:14,
636:10, 637:3,
637:11, 664:16,
666:1, 669:10,
670:10, 677:13,
682:22, 684:15,
696:5, 707:8,
709:19, 710:15,
712:12, 714:11,

721:9
**particularly** [2] -
654:3, 671:10
**parties** [6] - 488:14,
491:10, 497:16,
497:20, 637:4, 721:7
**parties'** [1] - 488:6
**partitioned** [1] -
559:19
**partitioning** [1] -
559:23
**partly** [3] - 533:19,
533:25, 694:22
**partners** [1] - 694:1
**partnership** [1] -
717:10
**parts** [3] - 611:4,
682:14, 685:5
**party** [2] - 510:17,
724:20
**pass** [3] - 496:8,
633:18, 692:20
**passing** [1] - 725:2
**past** [3] - 499:3,
520:21, 623:1
**patent** [93] - 489:6,
499:5, 500:9,
500:23, 504:10,
504:12, 508:18,
513:15, 525:9,
526:2, 581:11,
582:1, 601:22,
605:3, 605:9,
605:17, 606:6,
606:9, 606:11,
606:12, 606:15,
606:21, 607:14,
607:24, 617:3,
617:4, 617:5, 617:8,
617:9, 617:10,
617:11, 618:23,
618:24, 619:4,
621:14, 623:2,
623:3, 623:4,
624:24, 630:21,
632:18, 646:7,
646:9, 646:10,
646:11, 646:18,
646:19, 647:7,
647:22, 650:9,
650:12, 650:22,
651:5, 651:11,
651:16, 651:18,
652:21, 652:22,
655:1, 657:2, 658:4,
660:15, 665:10,
670:10, 670:19,
670:24, 688:8,
688:17, 688:25,
689:4, 689:9,

689:14, 689:18,
689:19, 689:20,
690:3, 690:4, 690:8,
692:12, 692:15,
692:16, 699:1,
710:14, 722:11,
722:17, 724:14
**Patent** [4] - 499:4,
500:18, 505:16,
505:22
**patented** [1] - 722:9
**patentholder** [1] -
510:18
**patents** [29] - 490:11,
499:7, 499:18,
616:15, 582:21,
604:23, 610:5,
610:8, 610:10,
610:11, 625:21,
627:12, 627:14,
633:17, 634:17,
634:18, 634:21,
634:25, 639:4,
644:16, 646:14,
646:24, 652:19,
654:11, 689:7,
692:4, 698:17,
699:2, 699:18
**patience** [1] - 608:18
**Patient** [2] - 669:14,
715:6
**patient** [196] - 525:18,
527:4, 527:19,
527:20, 529:6,
529:19, 532:25,
535:14, 539:9,
539:13, 540:11,
545:6, 545:8,
545:10, 545:19,
546:11, 546:13,
546:16, 547:23,
549:17, 556:16,
556:17, 557:13,
557:16, 557:19,
559:1, 559:2, 559:3,
559:4, 559:10,
559:13, 560:5,
560:9, 560:11,
560:18, 561:1,
561:4, 561:7, 561:9,
561:10, 561:14,
561:16, 561:18,
562:5, 562:8,
562:12, 562:13,
562:14, 562:15,
563:1, 563:6, 563:8,
563:14, 564:9,
567:8, 576:8,
588:10, 589:13,
589:15, 590:17,

593:9, 593:14,
594:15, 594:17,
594:24, 595:1,
595:8, 595:21,
596:1, 596:11,
596:12, 596:17,
597:5, 597:7,
597:13, 597:18,
597:21, 598:3,
598:8, 598:9,
598:14, 601:25,
602:5, 602:8, 602:9,
604:24, 607:23,
607:25, 608:2,
608:3, 625:4,
636:12, 638:6,
641:13, 642:6,
643:5, 648:5, 648:9,
650:14, 651:3,
651:6, 651:9,
651:19, 651:24,
652:8, 654:12,
654:20, 657:13,
658:6, 658:8,
659:25, 660:5,
660:17, 661:1,
661:8, 662:15,
662:21, 663:2,
663:19, 663:21,
664:6, 664:16,
664:17, 665:24,
666:2, 666:3, 666:6,
667:9, 668:3,
668:14, 668:21,
669:1, 669:4, 669:7,
669:11, 669:16,
670:2, 670:16,
670:17, 671:7,
672:19, 672:21,
675:20, 677:9,
677:14, 677:15,
678:13, 678:14,
678:17, 679:22,
682:22, 682:23,
683:1, 683:5, 683:8,
683:13, 684:15,
684:18, 688:21,
689:11, 689:25,
690:1, 694:11,
696:9, 696:14,
699:6, 707:14,
708:25, 709:6,
709:20, 709:22,
710:10, 710:19,
710:24, 711:1,
714:18, 714:23,
715:4, 715:17,
715:18, 715:21,
717:6, 719:15,
719:23, 720:19,
720:20, 720:22,

720:23, 721:1
**patient's** [10] - 559:17,
601:16, 647:8,
647:16, 648:3,
651:22, 661:23,
707:6, 707:10, 709:2
**patients** [242] - 523:5,
524:1, 524:2, 524:3,
524:25, 525:1,
525:16, 527:5,
528:22, 529:7,
530:9, 532:25,
539:19, 540:14,
542:12, 542:14,
542:15, 543:10,
543:13, 546:18,
547:5, 547:7, 547:9,
547:14, 547:21,
548:1, 548:3, 552:1,
552:8, 554:21,
556:14, 561:20,
561:24, 562:2,
562:5, 562:19,
564:21, 565:20,
568:5, 570:20,
570:22, 573:15,
573:18, 573:23,
573:24, 573:25,
574:3, 574:6, 574:9,
574:10, 575:7,
575:10, 575:14,
575:15, 575:21,
575:24, 575:25,
576:5, 576:7,
580:11, 584:18,
584:22, 584:23,
585:1, 585:22,
585:25, 587:2,
591:21, 591:23,
598:25, 599:7,
599:20, 599:23,
600:12, 600:16,
600:17, 600:21,
601:1, 601:2, 601:5,
601:8, 602:13,
602:20, 602:21,
603:20, 604:8,
604:12, 604:14,
604:16, 604:17,
605:11, 605:12,
605:21, 605:23,
606:2, 609:7,
609:10, 609:14,
619:11, 619:12,
620:19, 620:23,
621:19, 621:20,
621:21, 621:25,
624:2, 624:20,
625:4, 625:9,
635:14, 635:15,
636:11, 636:13,

636:16, 636:19,
636:21, 636:22,
637:8, 638:16,
638:21, 638:22,
641:8, 641:18,
641:23, 642:1,
642:23, 642:24,
642:25, 643:7,
643:18, 643:22,
644:4, 644:7,
658:19, 658:24,
659:3, 659:5, 659:6,
659:10, 660:7,
660:11, 661:9,
661:20, 662:12,
662:16, 663:6,
663:7, 663:8,
663:10, 663:11,
663:13, 665:7,
668:15, 668:25,
678:9, 679:19,
679:21, 682:3,
682:5, 682:15,
684:3, 684:5,
684:17, 687:23,
688:1, 690:21,
691:5, 691:6, 691:9,
691:18, 691:21,
691:23, 691:25,
693:16, 693:22,
693:25, 694:1,
694:9, 694:10,
694:13, 694:19,
695:1, 695:16,
695:19, 695:23,
696:1, 696:3, 696:6,
696:8, 696:10,
696:23, 697:3,
697:4, 697:6,
697:10, 697:12,
697:15, 697:20,
697:25, 698:2,
698:8, 698:10,
698:14, 698:15,
698:18, 698:20,
698:23, 699:9,
699:15, 699:20,
701:3, 701:6, 701:8,
704:15, 704:16,
704:19, 707:13,
707:20, 707:22,
708:1, 709:3,
709:18, 713:18,
714:20, 715:1,
715:12, 715:15,
716:9, 716:13,
718:10, 719:19,
719:24
**patients'** [1] - 573:21
**PAUL** [1] - 480:14
**Pause** [2] - 586:7,
719:2
**pay** [1] - 513:5
**PDF** [2] - 527:11,
527:17
**PDX-35.56** [1] - 581:20
**PDX-4** [3] - 673:18,
673:24, 674:18
**PDX-5.16** [2] - 608:14,
609:4
**PDX-5.18** [3] - 534:5,
536:1, 588:25
**PDX-5.19** [1] - 536:23
**PDX-5.2** [1] - 522:18
**PDX-5.21** [1] - 542:17
**PDX-5.23** [1] - 543:17
**PDX-5.24** [1] - 544:9
**PDX-5.26** [2] - 546:25,
547:12
**PDX-5.27** [2] - 547:19,
548:11
**PDX-5.28** [1] - 552:2
**PDX-5.31** [1] - 553:19
**PDX-5.33** [2] - 555:3,
555:19
**PDX-5.35** [1] - 556:25
**PDX-5.36** [1] - 559:9
**PDX-5.37** [1] - 559:24
**PDX-5.4** [1] - 523:1
**PDX-5.40** [1] - 560:17
**PDX-5.43** [1] - 562:11
**PDX-5.50** [2] - 565:25,
598:19
**PDX-5.51** [1] - 566:21
**PDX-5.55** [1] - 581:7
**PDX-5.8** [1] - 525:25
**peer** [1] - 575:6
**peer-reviewed** [1] -
575:6
**people** [13] - 492:5,
495:1, 532:20,
532:23, 547:3,
554:24, 563:17,
563:20, 563:22,
571:5, 573:22,
578:11, 625:2
**per** [25] - 535:6, 535:7,
545:11, 552:17,
552:23, 553:13,
553:17, 553:18,
553:20, 553:23,
554:7, 566:7,
566:15, 566:19,
566:22, 566:25,
587:13, 587:16,
587:17, 588:7,
600:17, 615:15
**per-day** [1] - 553:13
**per-injection** [6] -
552:23, 553:13,
566:7, 566:15,

566:19, 566:25
**perceive** [1] - 549:10
**perceived** [3] -
707:14, 710:15,
711:1
**percent** [20] - 532:25,
570:23, 571:5,
571:7, 571:8, 604:6,
606:14, 606:16,
682:3, 682:5,
704:15, 704:16,
704:20, 705:2,
707:20, 707:21,
708:4, 708:6
**percentage** [3] -
693:22, 694:2,
695:19
**perception** [1] -
707:10
**perfectly** [5] - 510:5,
516:21, 565:12,
629:23, 639:19
**perform** [5] - 531:5,
531:22, 551:13,
558:21, 615:11
**performed** [23] -
524:23, 531:7,
532:4, 533:11,
533:20, 541:1,
551:17, 551:22,
554:18, 556:13,
556:20, 556:21,
578:9, 579:2,
579:13, 584:12,
584:17, 590:12,
598:11, 644:12,
686:20, 686:22,
687:15
**perhaps** [4] - 618:4,
693:11, 703:7,
721:21
**period** [4] - 535:15,
641:10, 641:13,
723:1
**Perkins** [2] - 481:4,
481:7
**permanent** [1] -
708:22
**permissible** [1] -
721:8
**permission** [1] - 510:5
**permit** [2] - 512:5,
517:10
**permitted** [6] - 501:9,
509:21, 511:13,
514:7, 517:23,
702:22
**PERNIC** [1] - 481:13
**person** [18] - 491:14,
502:12, 503:2,

508:11, 508:16,
512:1, 513:19,
516:5, 517:5, 517:6,
517:18, 539:12,
545:17, 563:10,
631:3, 645:3,
645:15, 645:24
**person's** [1] - 708:23
**personally** [3] - 486:9,
561:5, 637:7
**perspective** [9] -
525:16, 525:19,
528:14, 537:10,
548:15, 601:16,
707:6, 707:8, 709:4
**perspectives** [1] -
488:6
**pertained** [1] - 724:15
**pertaining** [1] - 594:21
**pertinent** [1] - 493:13
**Pfizer** [2] - 482:12,
611:1
**pharmaceutical** [6] -
500:8, 654:16,
722:12, 722:15,
722:19, 722:21
**pharmaceuticals** [3] -
521:11, 625:7, 722:8
**Pharmaceuticals** [5] -
481:10, 481:18,
481:24, 481:24,
482:11
**Phase** [3] - 541:24,
542:6, 542:8
**phase** [21] - 522:23,
523:7, 523:25,
524:1, 524:3,
524:11, 524:18,
524:22, 525:2,
527:22, 533:13,
534:19, 543:11,
543:13, 551:23,
551:25, 554:21,
554:22, 686:6
**Phillips** [1] - 482:2
**Philly** [2] - 626:14
**photograph** [2] -
558:25, 626:15
**photographic** [1] -
626:16
**phrase** [1] - 582:21
**physically** [1] - 530:8
**physician** [68] -
525:16, 548:15,
548:18, 549:16,
549:23, 550:15,
550:24, 636:3,
639:13, 653:9,
656:22, 657:23,
660:24, 661:15,

661:17, 662:5,
663:19, 664:6,
664:11, 664:15,
664:23, 665:20,
666:14, 667:23,
668:23, 669:10,
672:19, 675:3,
676:10, 676:19,
677:9, 677:21,
678:12, 678:21,
679:1, 680:14,
681:11, 681:25,
682:7, 682:22,
683:4, 683:22,
684:9, 684:15,
701:20, 702:4,
703:16, 704:8,
704:11, 705:10,
705:13, 706:6,
707:19, 708:7,
708:9, 711:16,
712:6, 713:23,
715:16, 716:25,
717:3, 717:6,
717:10, 720:1,
720:11, 720:13,
720:14, 720:17
**physician's** [1] -
708:11
**physicians** [32] -
568:21, 568:23,
569:2, 569:16,
569:20, 569:22,
570:12, 657:13,
657:19, 662:8,
667:25, 668:25,
685:15, 693:18,
696:18, 700:7,
700:12, 705:1,
705:23, 706:19,
708:12, 708:14,
708:15, 712:23,
713:1, 714:4,
714:21, 715:15,
716:2, 716:4,
716:21, 717:24
**PI** [6] - 672:4, 672:7,
676:20, 676:23,
705:21, 712:22
**pick** [4] - 590:13,
590:16, 614:22,
696:8
**picked** [1] - 607:25
**picture** [1] - 578:25
**piece** [2] - 504:16,
544:11
**pieces** [2] - 523:3,
683:18
**pier** [1] - 724:11
**pin** [1] - 711:4

**pink** [3] - 650:24, 650:25, 651:2
**pipeline** [1] - 637:24
**Pls** [3] - 661:6, 664:7, 672:14
**pitch** [1] - 724:10
**pitfalls** [4] - 642:20, 657:9, 665:23, 669:2
**place** [2] - 483:8, 537:3
**placebo** [32] - 619:22, 619:23, 666:16, 666:19, 667:2, 667:3, 667:5, 668:9, 671:25, 672:2, 674:2, 674:9, 674:10, 674:25, 677:23, 677:25, 678:7, 679:8, 681:13, 681:20, 682:4, 682:5, 683:24, 687:22, 687:25, 704:20, 704:21, 705:4, 706:16, 720:8
**placebos** [1] - 704:22
**placed** [5] - 560:21, 691:9, 691:20, 691:22, 697:11
**places** [1] - 536:8
**plaintiff** [2] - 492:4, 631:5
**plaintiffs** [21] - 484:16, 485:13, 485:14, 492:19, 493:15, 496:4, 498:22, 518:10, 522:7, 531:8, 615:25, 617:1, 617:7, 618:14, 618:21, 619:3, 619:19, 621:5, 621:6, 639:18, 721:14
**Plaintiffs** [1] - 480:20
**plaintiffs'** [3] - 620:2, 621:19, 621:23
**Plaintiffs'** [1] - 699:24
**plan** [7] - 497:18, 537:20, 574:14, 585:19, 585:20, 715:12, 715:24
**planned** [1] - 654:14
**planning** [1] - 503:20
**Plant** [1] - 500:19
**play** [1] - 616:5
**played** [2] - 613:23, 613:25
**Plegridy** [1] - 643:12
**PLOS** [1] - 541:9
**plot** [4] - 546:1,

546:10, 546:18, 557:2
**plotted** [3] - 545:12, 546:4, 547:10
**plurality** [2] - 694:14
**podium** [1] - 613:21
**point** [41] - 485:7, 487:17, 493:13, 493:24, 495:6, 502:2, 511:22, 512:7, 514:19, 529:25, 539:4, 542:11, 545:23, 546:3, 546:10, 546:15, 547:9, 547:25, 563:21, 564:18, 574:7, 574:8, 585:8, 585:11, 585:12, 611:21, 630:11, 630:13, 657:5, 666:23, 674:15, 680:21, 694:5, 697:7, 697:8, 698:19, 708:7, 708:25, 712:2, 713:14, 721:10
**pointed** [4] - 531:8, 550:11, 657:6, 671:10
**pointing** [3] - 603:13, 603:14, 705:6
**points** [6] - 505:15, 530:1, 577:7, 580:16, 605:14
**polemic** [1] - 495:3
**poor** [1] - 496:6
**Poorly** [1] - 541:12
**population** [22] - 533:1, 539:11, 539:12, 571:7, 571:9, 576:8, 577:21, 578:2, 624:22, 636:12, 648:4, 648:23, 649:10, 649:16, 662:15, 662:21, 679:21, 680:1, 680:9, 680:10, 680:12, 707:13
**populations** [4] - 668:4, 668:14, 675:20, 681:4
**portion** [9] - 497:11, 527:19, 541:1, 559:7, 560:4, 568:23, 569:2, 617:16, 724:7
**portions** [4] - 495:16, 495:17, 512:15,

610:10
**position** [5] - 489:15, 577:4, 577:6, 636:5
**possibility** [1] - 708:16
**possible** [8] - 592:13, 603:23, 642:20, 657:20, 665:21, 669:1, 702:8, 702:9
**possibly** [4] - 563:14, 606:16, 626:13, 718:21
**post** [20] - 501:8, 501:14, 503:18, 511:19, 538:6, 538:8, 538:10, 538:12, 538:15, 619:7, 643:23, 644:1, 647:9, 647:17, 680:2, 699:12, 704:12, 716:6, 721:18
**post-injection** [7] - 619:7, 644:1, 647:9, 647:17, 699:12, 704:12, 716:6
**pOSTAL** [1] - 482:9
**postdate** [1] - 723:7
**postdated** [2] - 509:12, 627:13
**postdates** [1] - 508:17
**poster** [5] - 686:6, 686:9, 686:14, 686:16, 718:23
**postgraduate** [1] - 701:12
**posttrial** [1] - 516:13
**potential** [2] - 580:5, 709:7
**potentially** [5] - 491:23, 499:19, 706:25, 707:2, 707:4
**practice** [12] - 520:19, 624:2, 635:13, 641:16, 642:22, 643:3, 693:15, 700:21, 709:18, 713:18, 714:5, 718:16
**practicing** [5] - 634:14, 635:9, 651:16, 675:6, 675:8
**practitioner** [1] - 695:15
**practitioners** [1] - 700:17
**pre** [3] - 511:19, 538:16, 539:3
**pre-described** [1] - 539:3

**pre-specified** [1] - 538:16
**precautions** [6] - 656:18, 657:6, 657:11, 657:18, 702:6, 703:17
**Precautions** [3] - 665:17, 702:3, 702:12
**precise** [1] - 532:11
**precisely** [1] - 585:10
**precluded** [2] - 483:11, 488:9
**predefined** [1] - 539:3
**preeminent** [4] - 541:18, 541:25, 542:7, 542:20
**preference** [3] - 663:15, 664:5, 669:21
**preferred** [1] - 695:23
**pregnancy** [2] - 715:8, 719:19
**pregnant** [5] - 715:12, 715:13, 715:21, 715:24
**premise** [2] - 606:18, 653:8
**premium** [1] - 484:8
**preparation** [1] - 615:6
**prepare** [4] - 522:15, 623:10, 665:2, 674:3
**prepared** [10] - 502:17, 545:2, 547:17, 560:13, 560:15, 564:12, 582:8, 635:1, 668:12, 673:20
**prescribe** [10] - 637:7, 642:23, 643:17, 700:12, 700:22, 701:20, 704:1, 704:6, 705:11, 705:23
**prescribed** [9] - 643:7, 643:9, 643:15, 658:20, 701:5, 701:7, 701:12, 702:16, 706:20
**prescribing** [3] - 642:25, 713:23, 715:11
**prescription** [1] - 489:18
**presence** [2] - 575:20, 684:5
**presentations** [1] - 703:22
**presented** [10] -

598:20, 617:15, 622:25, 623:23, 673:14, 703:22, 703:23, 718:23, 719:25
**presenting** [1] - 594:11
**presents** [1] - 673:10
**preserve** [1] - 632:23
**preserving** [1] - 633:4
**presidential** [1] - 522:4
**presiding** [1] - 722:5
**presumably** [1] - 713:7
**presume** [1] - 707:15
**pretrial** [9] - 486:22, 487:9, 487:13, 487:19, 491:2, 493:16, 501:13, 501:19, 627:21
**pretty** [1] - 643:21
**prevent** [2] - 530:5, 610:3
**previous** [2] - 547:25, 578:7
**previously** [12] - 521:10, 529:10, 556:24, 557:5, 557:11, 650:15, 651:7, 660:18, 661:1, 671:6, 671:8, 691:10
**prick** [1] - 711:4
**prima** [1] - 487:15
**primarily** [3] - 640:5, 641:2, 642:6
**primary** [5] - 539:4, 585:8, 585:11, 641:4, 690:22
**principal** [1] - 607:20
**priori** [1] - 538:20
**priority** [20] - 497:24, 498:9, 498:10, 498:19, 499:11, 499:15, 499:22, 500:3, 500:7, 500:10, 500:16, 504:3, 504:4, 504:9, 507:17, 508:5, 508:25, 516:6, 517:5, 722:17
**private** [3] - 520:14, 635:13, 695:15
**probability** [4] - 564:5, 565:11, 565:12, 603:25
**probing** [1] - 629:24
**problem** [9] - 490:24, 505:24, 507:22,

509:1, 509:2,
511:24, 516:7,
550:22, 551:9
**problems** [2] - 493:20,
628:2
**Procedure** [1] -
616:17
**procedure** [7] -
531:15, 564:1,
564:2, 564:4,
564:10, 564:24,
565:17
**proceed** [1] - 582:11
**proceeding** [3] -
525:24, 553:11,
576:3
**proceedings** [1] -
492:24
**process** [3] - 546:21,
574:15, 632:22
**Procter** [2] - 480:17,
481:11
**produce** [3] - 486:18,
640:13, 705:20
**produced** [3] - 486:16,
491:13, 492:19
**producing** [2] -
486:17, 671:6
**product** [32] - 484:24,
484:25, 485:12,
485:22, 485:23,
485:24, 486:14,
493:12, 605:11,
615:10, 615:16,
619:9, 620:8,
620:25, 621:11,
621:19, 621:21,
621:22, 624:17,
624:20, 652:6,
652:10, 652:11,
659:7, 665:1,
666:17, 691:24,
698:12, 703:2
**products** [31] -
490:10, 500:8,
539:24, 599:7,
619:11, 621:25,
622:4, 622:7, 624:3,
643:18, 654:15,
654:19, 654:23,
658:18, 658:20,
662:6, 664:24,
667:1, 692:17,
696:21, 697:5,
697:8, 697:17,
698:1, 698:9,
698:16, 698:21,
699:10, 699:16,
722:15, 722:20
**profession** [1] - 577:6

**professional** [6] -
520:11, 520:24,
521:5, 637:17,
702:10, 709:1
**professionals** [3] -
654:21, 714:6, 718:4
**proffer** [2] - 618:13,
638:20
**proffered** [2] - 618:21,
619:3
**program** [1] - 635:21
**programs** [2] - 533:24,
695:14
**progress** [1] - 722:19
**progressive** [9] -
639:25, 640:1,
641:3, 641:4, 701:2,
701:3, 701:5, 701:8
**prohibition** [1] -
490:10
**prominent** [1] -
520:20
**promise** [1] - 496:10
**promote** [1] - 620:19
**promoting** [1] -
685:14
**promotional** [1] -
703:24
**proof** [1] - 494:7
**proofs** [1] - 618:12
**proper** [1] - 606:1
**properly** [3] - 533:19,
550:20, 724:14
**proportion** [5] -
570:20, 570:22,
612:19, 612:23,
613:1
**proposed** [9] - 486:22,
487:5, 487:11,
489:11, 493:16,
574:19, 574:25,
646:25, 723:14
**proposes** [1] - 723:19
**proposition** [3] -
576:7, 594:22,
716:24
**propounded** [1] -
632:5
**protocol** [30] - 504:18,
505:3, 505:6, 505:8,
508:1, 508:3, 509:4,
509:5, 509:15,
509:22, 509:24,
510:16, 511:3,
511:5, 514:17,
515:1, 516:16,
516:23, 592:13,
594:5, 594:7,
594:15, 627:11,
628:19, 628:21,

628:24, 629:6,
630:2, 724:18
**protocols** [1] - 596:14
**prove** [2] - 501:20,
503:2
**proved** [1] - 617:21
**proven** [2] - 601:22,
607:21
**provide** [6] - 519:4,
527:12, 527:13,
528:12, 707:19,
717:5
**provided** [12] - 510:1,
512:25, 523:16,
527:1, 527:18,
530:18, 533:13,
551:2, 609:7,
609:16, 625:10,
717:24
**provides** [3] - 512:18,
529:24, 580:20
**providing** [1] - 593:8
**Psychiatry** [1] - 636:9
**PTAB** [6] - 499:8,
500:25, 504:7,
507:3, 629:13
**PTX-109** [2] - 528:25,
529:4
**PTX-109.330** [1] -
529:16
**PTX-14** [1] - 519:9
**PTX-35** [1] - 534:4
**PTX-38** [1] - 555:4
**PTX-39** [2] - 543:21,
552:11
**PTX-579** [1] - 700:1
**PTX-579.19** [1] -
714:17
**PTX-655** [1] - 614:23
**public** [12] - 501:15,
501:21, 502:4,
502:18, 502:19,
508:2, 516:3, 516:4,
517:7, 541:9, 628:1,
628:12
**publication** [17] -
497:23, 498:9,
501:14, 503:19,
503:25, 504:21,
504:22, 533:16,
554:18, 685:23,
685:25, 686:3,
686:16, 687:7,
687:9, 687:12, 723:3
**publications** [3] -
498:18, 499:13,
500:22
**published** [14] -
500:3, 500:6,
500:10, 500:17,

504:9, 524:9,
535:24, 541:10,
542:6, 575:6,
620:17, 718:11,
722:12, 722:16
**pull** [4] - 534:5,
555:21, 650:9,
671:21
**purpose** [8] - 494:16,
501:18, 546:9,
594:10, 616:8,
632:18, 699:23,
723:21
**purposes** [9] - 501:1,
511:14, 513:4,
557:15, 563:22,
598:9, 616:6,
620:24, 715:10
**pursued** [1] - 664:6
**pursuing** [1] - 505:19
**put** [40] - 486:13,
486:21, 487:5,
487:11, 487:15,
488:4, 488:14,
489:15, 493:15,
494:1, 495:12,
495:24, 502:3,
508:4, 510:15,
511:17, 525:25,
543:17, 544:9,
551:3, 568:4, 598:9,
598:14, 611:4,
617:25, 624:15,
632:3, 633:8,
653:23, 654:2,
658:10, 662:11,
666:10, 673:21,
675:18, 676:25,
690:22, 693:11,
705:9
**puts** [2] - 484:8, 704:5
**putting** [2] - 488:9,
494:3

**Q**

**qualifications** [2] -
549:17, 635:4
**qualified** [1] - 548:18
**qualifier** [1] - 602:18
**qualify** [1] - 723:7
**qualitative** [2] -
532:13, 578:17
**quarterback** [1] -
626:17
**questioned** [1] -
569:17
**questioning** [3] -
514:7, 514:23,
517:10

**questions** [34] -
483:11, 493:6,
493:10, 493:11,
494:15, 494:17,
495:8, 509:21,
514:5, 525:23,
535:9, 541:2, 582:3,
600:5, 610:22,
611:2, 613:6, 613:8,
613:14, 613:17,
626:5, 628:7,
631:13, 631:15,
631:16, 631:19,
631:22, 632:3,
645:9, 700:5,
719:11, 719:15,
720:3, 721:3
**quick** [4] - 518:2,
626:21, 652:13,
655:7
**quickly** [5] - 581:6,
654:8, 668:17,
683:1, 688:12
**quite** [20] - 502:7,
505:8, 511:2,
514:24, 553:22,
553:24, 573:19,
577:15, 584:4,
584:24, 592:23,
609:8, 610:11,
641:14, 714:24,
715:2, 715:9, 716:1
**quote** [10] - 638:14,
700:7, 701:17,
715:11, 722:4,
722:17, 722:19,
722:20, 723:6,
723:20
**quotes** [1] - 631:10

**R**

**RACHEL** [1] - 481:13
**raise** [6] - 487:7,
487:22, 497:20,
508:9, 538:9, 538:12
**raised** [5] - 490:16,
490:18, 497:17,
508:8, 531:18
**raises** [1] - 538:6
**RAKOCZY** [31] -
481:12, 622:14,
622:19, 633:13,
634:1, 638:19,
639:1, 639:2,
639:16, 639:21,
639:23, 640:22,
645:13, 645:14,
657:16, 657:17,
659:18, 659:22,

676:15, 676:17,
678:24, 678:25,
680:5, 688:11,
688:14, 690:20,
691:1, 692:19,
719:6, 719:9, 721:3
**Rakoczy** [7] - 481:16,
622:12, 622:14,
633:12, 633:14,
659:17, 719:5
**ran** [4] - 571:24,
572:4, 572:19, 578:8
**randomized** [2] -
523:6, 527:21
**rank** [1] - 563:8
**rapid** [1] - 641:9
**Rapmaster** [1] -
506:20
**rare** [1] - 715:16
**rarely** [1] - 530:21
**rate** [54] - 534:25,
535:20, 536:15,
536:16, 545:11,
546:12, 546:16,
547:22, 547:24,
551:14, 552:5,
552:22, 553:17,
556:4, 559:15,
559:19, 559:20,
560:4, 560:23,
560:24, 561:2,
561:3, 562:3,
562:14, 563:3,
563:7, 563:10,
571:11, 574:16,
587:13, 587:14,
588:6, 588:8,
588:16, 588:21,
589:8, 592:15,
592:24, 593:2,
593:3, 593:6, 593:7,
594:4, 604:6, 612:3,
612:12, 612:13,
619:25, 647:16,
683:25
**raters** [2] - 542:12,
542:14
**rates** [22] - 522:2,
535:5, 544:17,
553:10, 557:2,
560:10, 562:12,
563:2, 563:6,
563:11, 563:16,
563:23, 566:19,
593:11, 593:16,
599:12, 599:16,
611:12, 611:16,
612:15, 667:20,
667:21
**rather** [12] - 487:22,

541:22, 551:24,
552:23, 553:6,
553:13, 553:18,
553:23, 558:5,
566:13, 568:7,
577:24
**rating** [2] - 542:9,
542:10
**ratings** [3] - 542:9,
542:10, 542:13
**ratio** [4] - 537:5,
537:7, 589:4, 589:5
**rational** [1] - 561:6
**rationale** [5] - 504:24,
505:9, 513:17,
516:12, 517:9
**rationales** [1] - 629:6
**re** [4] - 496:9, 572:4,
572:19, 578:8
**RE** [1] - 480:4
**re-convene** [1] - 496:9
**re-ran** [3] - 572:4,
572:19, 578:8
**reach** [7] - 526:12,
536:10, 539:22,
553:20, 565:25,
566:21, 581:23
**reached** [1] - 510:16
**reaches** [1] - 571:14
**reaction** [33] - 529:20,
529:23, 549:19,
563:21, 588:11,
588:13, 588:20,
588:21, 589:9,
589:10, 589:12,
589:14, 589:17,
598:24, 599:18,
600:16, 600:22,
602:3, 604:14,
606:4, 607:8,
607:21, 609:11,
648:9, 657:19,
667:20, 676:21,
706:25, 707:9,
707:21, 719:12
**Reaction** [1] - 665:17
**reactions** [58] - 528:8,
528:21, 528:23,
536:18, 554:7,
562:20, 580:12,
580:13, 588:17,
589:19, 590:21,
590:22, 597:9,
599:1, 612:1, 619:7,
619:8, 619:21,
643:23, 643:24,
644:2, 647:9,
647:17, 647:25,
648:3, 648:12,
648:15, 648:16,

650:16, 651:3,
651:20, 652:4,
656:18, 657:7,
657:12, 665:15,
665:22, 666:18,
671:7, 672:6,
674:15, 677:6,
679:20, 683:9,
683:10, 684:3,
684:4, 684:5, 684:6,
685:1, 699:12,
699:13, 704:13,
704:16, 709:16,
710:1, 716:7
**reactive** [3] - 573:15,
573:24, 575:14
**reactors** [1] - 568:7
**read** [25] - 485:7,
512:15, 515:18,
533:19, 606:15,
614:5, 614:15,
669:17, 703:18,
703:20, 704:12,
704:13, 705:14,
706:6, 706:7,
706:13, 706:20,
714:20, 715:4,
715:17, 718:2,
718:3, 718:6, 718:9,
718:11
**readily** [5] - 588:19,
594:13, 598:13,
599:16, 601:5
**reading** [6] - 606:13,
637:23, 676:10,
704:2, 704:24,
712:23
**reads** [2] - 611:18,
717:11
**real** [1] - 654:8
**reality** [2] - 662:9,
675:22
**realize** [2] - 542:17,
599:12
**really** [13] - 543:2,
566:4, 620:13,
622:5, 630:17,
639:15, 642:5,
642:8, 654:2, 683:5,
696:5, 715:9, 721:15
**realm** [1] - 708:16
**reason** [16] - 503:9,
504:24, 507:23,
512:17, 513:25,
556:21, 566:18,
577:9, 604:10,
622:7, 675:16,
678:18, 678:20,
679:6, 709:15,
710:23

**reasonable** [3] -
628:25, 675:18,
679:7
**reasonably** [3] -
515:13, 541:18,
557:17
**reasons** [11] - 505:23,
510:3, 515:23,
516:17, 553:5,
556:1, 566:11,
568:15, 628:11,
695:22, 720:16
**rebut** [1] - 690:18
**rebuttal** [1] - 568:1
**recalled** [1] - 492:11
**receive** [3] - 523:10,
527:21, 571:5
**receiving** [6] - 523:10,
524:25, 540:14,
540:15, 542:16,
543:14
**recent** [1] - 695:3
**recently** [1] - 622:1
**Recess** [5] - 496:19,
518:5, 582:5,
632:11, 692:22
**recess** [1] - 608:7
**recessed** [1] - 725:8
**recognize** [4] - 524:6,
584:12, 654:1, 705:7
**recognizes** [1] -
573:17
**recognizing** [1] -
574:6
**recollection** [2] -
492:17, 593:23
**recommend** [5] -
664:5, 683:12,
696:5, 696:13,
696:18
**recommendation** [1] -
715:14
**recommended** [4] -
656:17, 656:21,
664:8, 702:1
**record** [24] - 502:16,
513:25, 527:8,
529:7, 529:12,
529:13, 529:15,
529:17, 529:19,
529:22, 534:13,
535:13, 552:11,
609:10, 610:1,
614:15, 614:21,
615:22, 616:7,
622:21, 626:12,
634:4, 673:18,
722:10
**recorded** [5] - 541:22,
547:7, 548:2,

573:20, 573:21
**recording** [1] - 527:4
**records** [2] - 705:19,
705:20
**red** [2] - 545:15, 560:7
**Reddy's** [1] - 655:14
**redirect** [1] - 613:7
**REDIRECT** [2] -
613:11, 719:8
**redness** [2] - 643:25,
648:10
**reduce** [11] - 599:25,
650:17, 652:3,
652:9, 652:11,
672:22, 677:10,
678:14, 682:23,
684:19, 688:23
**reduced** [41] - 591:24,
601:22, 602:1,
602:4, 605:18,
606:10, 606:12,
607:1, 619:6, 619:8,
619:13, 619:15,
619:16, 619:17,
619:25, 620:1,
620:7, 620:24,
623:19, 623:20,
624:8, 624:9,
647:24, 648:2,
651:18, 651:19,
657:1, 658:8, 660:1,
660:3, 660:5, 665:9,
665:13, 671:2,
671:6, 688:4, 688:7,
688:16, 689:3
**reducing** [1] - 651:2
**reduction** [39] -
536:15, 544:4,
546:14, 548:12,
552:5, 554:1, 554:6,
555:11, 555:17,
556:3, 556:17,
567:15, 570:23,
571:10, 580:22,
585:8, 585:12,
589:15, 599:20,
599:24, 602:6,
602:9, 606:7,
606:15, 606:21,
606:24, 607:3,
607:4, 607:5,
607:10, 607:18,
607:22, 607:23,
650:19, 651:21,
660:9, 698:22,
699:4, 720:22
**refer** [15] - 513:13,
513:14, 523:2,
523:16, 524:3,
532:6, 585:6,

590:16, 595:9,
605:15, 658:11,
658:14, 660:2,
660:6, 682:9
**reference** [24] -
497:22, 499:5,
500:3, 500:6,
500:10, 501:21,
502:16, 504:2,
505:17, 507:6,
508:20, 508:22,
508:24, 509:2,
509:3, 510:24,
513:22, 514:13,
515:19, 544:12,
546:8, 706:4, 721:7,
723:2
**referenced** [15] -
535:10, 546:5,
564:13, 595:8,
614:25, 685:23,
686:3, 686:4,
686:14, 686:15,
686:25, 687:7,
687:14, 688:2
**references** [18] -
502:14, 503:18,
507:14, 509:24,
509:25, 513:16,
514:12, 514:25,
516:22, 628:20,
629:1, 629:14,
629:15, 630:1,
661:1, 721:17, 723:6
**referencing** [4] -
484:20, 687:6,
714:16, 721:23
**referred** [7] - 525:8,
577:23, 592:17,
612:7, 615:3,
717:13, 719:18
**referring** [11] - 523:18,
583:23, 584:25,
592:6, 604:18,
607:24, 611:19,
627:10, 639:11,
656:1, 674:18
**refers** [6] - 523:19,
523:20, 564:17,
584:11, 647:8,
647:15
**refined** [3] - 556:9,
579:9, 590:16
**reflect** [3] - 519:22,
532:9, 564:8
**reflected** [2] - 537:20,
555:12
**reflects** [2] - 504:11,
722:21
**refocus** - 627:2,

627:15
**refresh** [3] - 593:22,
681:15, 691:16
**regard** [11] - 489:6,
644:22, 693:5,
693:10, 693:17,
694:5, 706:24,
708:21, 709:13,
709:15, 721:6
**regarding** [34] - 488:9,
567:8, 568:12,
608:23, 609:1,
642:19, 653:20,
654:25, 655:4,
655:24, 657:9,
657:23, 660:24,
661:3, 661:7,
663:17, 665:13,
666:5, 669:1, 669:4,
671:13, 673:8,
673:14, 677:9,
678:13, 685:4,
689:2, 689:8, 691:4,
699:22, 706:24,
707:20, 708:18,
711:8
**regardless** [2] -
700:14, 707:25
**regimen** [34] - 504:25,
510:4, 510:13,
512:18, 512:20,
516:17, 525:1,
525:2, 527:21,
548:3, 563:2, 563:3,
581:15, 581:16,
581:24, 587:15,
587:25, 588:1,
588:14, 597:14,
597:15, 597:21,
604:25, 605:13,
644:8, 644:9,
658:22, 659:11,
660:12, 688:22,
688:23, 713:17,
714:7
**regimens** [1] - 504:13
**regurgitate** [1] -
631:11
**relapse** [1] - 641:15
**relapses** [1] - 641:9
**relapsing** [20] -
624:20, 624:22,
636:23, 637:11,
641:2, 641:4, 641:8,
658:19, 661:20,
661:22, 662:12,
662:17, 662:24,
663:6, 697:2,
700:20, 700:23,
701:4, 701:8, 701:13

**relate** [11] - 616:4,
677:6, 677:7, 678:9,
679:16, 679:19,
680:7, 683:25,
699:2, 708:19,
714:23
**related** [10] - 485:21,
486:17, 503:15,
522:24, 524:24,
552:15, 567:11,
582:24, 633:16,
653:15
**relates** [3] - 525:13,
648:22, 680:8
**relating** [1] - 617:7
**relationship** [2] -
564:4, 678:11
**relative** [12] - 532:6,
554:25, 599:21,
601:23, 604:25,
605:18, 606:10,
606:22, 607:18,
619:8
**relatively** [2] - 694:25,
695:2
**relevant** [10] - 495:16,
495:17, 498:14,
500:17, 501:1,
503:11, 511:3,
604:7, 629:22,
722:22
**reliability** [1] - 575:16
**reliably** [1] - 581:24
**reliance** [1] - 551:3
**relied** [11] - 499:4,
512:2, 514:16,
608:19, 620:5,
650:4, 650:6,
668:19, 690:20,
723:8, 724:1
**relief** [1] - 489:13
**relies** [1] - 508:19
**rely** [9] - 504:2, 510:6,
511:19, 513:3,
516:4, 528:2,
530:22, 530:24,
657:3
**relying** [4] - 516:3,
549:9, 551:5, 608:22
**remaining** [2] -
617:13, 632:16
**remember** [9] - 492:6,
501:11, 539:8,
551:7, 583:23,
600:15, 701:11,
703:11, 703:14
**remind** [3] - 492:2,
492:3, 501:4
**reminded** [2] - 491:20,
500:4

**remission** [1] - 641:15
**remitting** [7] - 624:20,
624:22, 641:3,
641:8, 697:2,
700:23, 701:14
**remove** [1] - 577:25
**removed** [1] - 577:7
**removing** [5] - 577:24,
580:16, 580:18,
584:17, 585:2
**rendering** [1] - 645:16
**repeat** [3] - 523:15,
533:17, 572:3
**repeated** [2] - 532:3,
533:12
**repeatedly** [1] - 720:8
**rephrase** [5] - 599:18,
645:12, 676:16,
688:10, 688:13
**replicate** [3] - 533:17,
536:19, 537:1
**replicated** [3] -
524:20, 534:19,
551:21
**replicating** [2] - 534:1,
579:14
**replication** [8] - 536:2,
536:4, 536:11,
536:24, 539:21,
543:7, 579:5, 586:19
**report** [28] - 498:15,
505:11, 505:13,
506:9, 513:8,
538:20, 547:8,
551:2, 551:6,
557:22, 569:6,
569:9, 569:11,
583:22, 593:8,
639:17, 673:20,
673:21, 690:12,
690:15, 690:19,
690:20, 691:2,
691:4, 692:9,
722:12, 722:16,
722:21
**Reported** [1] - 541:12
**reported** [29] - 504:10,
524:20, 533:15,
536:8, 537:3,
541:15, 542:1,
547:22, 547:23,
554:3, 555:15,
567:3, 579:17,
584:18, 584:23,
584:24, 585:3,
585:14, 586:24,
596:4, 596:21,
597:23, 598:23,
599:3, 599:4,
612:11, 612:16,

619:21
**reporting** [3] - 557:16,
557:18, 557:19
**reports** [11] - 542:8,
545:10, 547:17,
551:1, 569:3, 571:2,
573:1, 585:21,
596:8, 607:15,
646:25
**represent** [3] - 565:16,
582:19, 611:1
**representation** [3] -
494:9, 513:24, 630:8
**representations** [2] -
483:13, 483:16
**representative** [5] -
578:2, 656:8,
661:13, 664:10,
677:18
**represented** [2] -
551:18, 618:15
**representing** [1] -
559:13
**represents** [2] - 560:4,
604:5
**reputable** [1] - 718:11
**request** [4] - 558:11,
558:13, 617:14,
622:8
**requests** [1] - 483:18
**require** [9] - 502:21,
604:23, 615:13,
619:5, 619:25,
632:19, 650:13,
650:14, 658:4
**required** [8] - 489:22,
542:10, 542:13,
652:7, 670:18,
688:24, 690:2, 724:3
**requirement** [9] -
606:6, 606:17,
651:2, 651:6, 652:8,
671:6, 689:10,
689:15, 699:5
**requirements** [4] -
503:14, 615:12,
658:5, 660:17
**requires** [8] - 489:18,
570:20, 601:22,
603:12, 605:18,
606:9, 606:21,
624:21, 648:2
**reread** [1] - 594:2
**research** [1] - 541:9
**researchers** [1] -
538:16
**reserve** [2] - 626:7,
626:18
**residency** [2] -
635:16, 635:21

**residents** [1] - 695:13
**resolution** [1] - 487:21
**resolve** [9] - 487:23,
487:25, 495:10,
496:9, 496:10,
515:16, 592:2,
601:14, 659:14
**resolved** [1] - 616:2
**resolving** [1] - 641:11
**respect** [28] - 491:18,
494:7, 494:18,
504:17, 509:8,
514:10, 522:24,
537:5, 537:6,
539:14, 543:12,
579:16, 603:14,
603:17, 627:25,
630:24, 630:25,
634:20, 639:13,
654:14, 665:9,
696:3, 708:9,
712:24, 715:5,
716:12, 716:15,
717:23
**respectfully** [2] -
605:4, 607:11
**respective** [2] -
654:23, 692:17
**respectively** [1] -
601:4
**respond** [10] - 483:2,
495:23, 496:1,
496:4, 496:25,
568:1, 568:2,
622:13, 628:17,
644:21
**response** [5] - 483:18,
492:13, 577:12,
613:13, 623:11
**responsible** [3] -
702:4, 704:8, 714:4
**rest** [2] - 615:25, 642:2
**restart** [1] - 507:20
**restrictions** [1] -
490:12
**result** [22] - 495:12,
552:6, 554:5,
555:20, 558:19,
558:22, 563:25,
565:16, 565:20,
579:17, 579:25,
594:6, 594:8,
603:10, 603:11,
603:16, 625:2,
631:12, 640:18,
698:20, 699:17
**resulting** [1] - 658:13
**results** [26] - 498:10,
524:10, 531:20,
533:14, 533:15,

534:18, 537:1,
539:20, 543:25,
550:7, 555:8, 560:7,
565:14, 571:23,
572:20, 572:21,
575:16, 578:12,
578:15, 587:8,
596:11, 604:23,
609:23, 620:3, 658:6
**resume** [1] - 632:8
**retained** [3] - 522:2,
634:10, 698:5
**revealed** [1] - 568:17
**reversal** [2] - 579:20,
579:22
**review** [8] - 533:10,
610:8, 619:25,
642:22, 647:4,
670:14, 686:11,
691:2
**reviewed** [19] -
511:10, 511:12,
575:6, 576:2,
610:10, 634:18,
638:9, 638:11,
646:22, 646:24,
647:20, 655:17,
688:19, 689:23,
690:12, 692:4,
692:9, 703:17,
721:24
**revised** [1] - 572:20
**revisit** [1] - 495:2
**revisiting** [2] - 493:9,
510:23
**RICHARD** [1] - 481:19
**Richards** [1] - 481:2
**right-hand** [12] -
545:8, 545:9,
545:22, 548:8,
554:2, 555:12,
555:14, 560:2,
566:1, 566:24,
583:12, 638:13
**rights** [2] - 632:23,
633:4
**RILEY** [1] - 481:19
**risk** [3] - 537:5, 537:7,
710:25
**risks** [10] - 642:9,
642:20, 657:9,
657:20, 665:22,
669:2, 669:19,
702:8, 702:9
**ROBERT** [1] - 481:7
**roles** [1] - 485:10
**rollers** [1] - 723:16
**rotate** [1] - 683:11
**rotating** [2] - 682:11,
682:17

**rothwell** [1] - 482:9
**roughly** [1] - 532:25
**routinely** [3] - 530:24,
570:12, 583:15
**row** [1] - 598:24
**Royal** [1] - 521:2
**RRMS** [4] - 641:6,
641:7, 643:8, 643:18
**rule** [1] - 580:6
**Rule** [5] - 492:12,
498:15, 534:11,
616:17, 621:13
**ruled** [4] - 491:24,
498:20, 509:20,
632:7
**ruling** [4] - 488:7,
492:6, 517:12,
724:17
**rulings** [2] - 495:2,
499:3
**rummage** [1] - 538:17
**run** [6] - 503:13,
510:5, 516:25,
533:5, 555:25,
571:21

---

# S

**s.r.o** [1] - 482:12
**safe** [2] - 713:16,
713:22
**safer** [2] - 680:15,
681:4
**safety** [1] - 615:9
**sale** [2] - 581:16,
581:25
**sample** [3] - 527:17,
545:5, 559:1
**sampling** [1] - 715:19
**sandbagged** [1] -
485:18
**Sandoz** [8] - 481:18,
616:3, 622:14,
622:15, 633:14,
655:15, 655:23,
656:7
**Sanovian** [1] - 506:22
**SARA** [1] - 480:19
**satisfaction** [1] -
495:10
**satisfactory** [1] -
723:15
**satisfies** [2] - 548:12,
581:16
**satisfy** [2] - 581:18,
581:25
**save** [2] - 614:5,
643:10
**saw** [6] - 526:19,
529:10, 537:24,

539:23, 553:1,
694:25
**scale** [3] - 529:25,
530:1, 609:1
**scales** [1] - 557:7
**scatter** [1] - 557:2
**schedule** [2] - 487:10,
523:18
**scheme** [2] - 591:8,
592:16
**school** [3] - 564:3,
635:17, 635:19
**science** [2] - 520:4,
541:10
**scientifically** [3] -
568:17, 570:10,
604:2
**Sclerosis** [2] - 638:10,
638:14
**sclerosis** [25] - 622:2,
634:15, 638:22,
639:25, 641:3,
661:21, 662:13,
662:17, 662:24,
663:11, 691:19,
693:6, 693:7, 693:9,
693:11, 693:13,
693:14, 693:18,
695:14, 696:4,
696:18, 700:23,
701:14, 702:5,
706:19
**scope** [5] - 492:12,
557:22, 568:22,
645:7, 676:3
**screen** [22] - 519:10,
522:20, 529:14,
534:20, 536:22,
607:8, 608:16,
611:5, 634:16,
637:14, 638:8,
650:25, 651:1,
655:12, 671:22,
685:24, 686:8,
704:5, 705:25,
706:7, 706:11,
706:21
**sealed** [2] - 496:21,
497:6
**search** [1] - 541:17
**searched** [1] - 541:23
**seats** [3] - 483:3,
608:8, 632:12
**second** [22] - 486:16,
498:22, 504:17,
507:9, 507:24,
509:14, 529:15,
555:23, 555:25,
556:12, 556:21,
566:18, 608:16,

616:2, 627:3, 627:7,
627:9, 636:1, 671:1,
671:19, 719:1
**secondary** [1] - 641:3
**secondly** [1] - 553:9
**Section** [24] - 488:20,
502:20, 661:14,
668:21, 669:15,
673:3, 676:10,
676:19, 677:8,
678:21, 679:1,
679:9, 679:18,
680:13, 681:7,
684:22, 702:2,
704:13, 708:17,
710:1, 710:3, 712:2
**section** [54] - 489:4,
489:5, 513:17,
533:10, 656:17,
656:20, 656:21,
657:11, 657:12,
661:13, 661:25,
662:2, 662:14,
663:1, 663:14,
664:3, 664:8,
664:10, 664:21,
664:23, 666:12,
666:14, 667:16,
669:14, 669:21,
677:6, 677:21,
678:1, 678:13,
679:10, 679:15,
681:6, 681:11,
681:19, 681:25,
682:7, 682:19,
682:21, 683:2,
683:3, 683:8,
683:13, 683:22,
684:8, 684:9,
684:13, 684:14,
701:17, 702:2,
714:13, 714:24,
715:6, 719:12
**sectionally** [1] -
551:23
**Sections** [2] - 719:11,
719:24
**sections** [27] - 489:1,
507:13, 511:11,
656:2, 656:14,
656:22, 657:3,
657:5, 657:8,
657:19, 660:21,
665:8, 665:11,
665:12, 665:17,
665:19, 665:21,
665:25, 666:8,
668:17, 671:9,
674:23, 679:16,
719:18, 719:21,

720:4

**sector** [1] - 520:14
**securing** [1] - 723:14
**Security** [1] - 506:21
**see** [60] - 485:20,
495:9, 496:6,
496:11, 503:5,
518:19, 531:19,
532:5, 544:10,
547:2, 547:4, 557:7,
558:16, 559:7,
559:24, 560:20,
561:1, 562:5,
562:11, 562:12,
563:4, 565:14,
565:25, 570:1,
578:22, 578:24,
590:24, 595:14,
595:16, 596:18,
597:4, 611:20,
612:9, 612:14,
614:12, 614:14,
639:12, 643:22,
648:23, 661:14,
670:19, 673:4,
681:8, 682:2, 686:8,
693:3, 693:4,
693:24, 694:4,
694:6, 694:10,
704:17, 705:12,
705:24, 708:8,
715:7, 719:21,
723:12, 724:25
**seeing** [1] - 510:16
**seek** [1] - 581:25
**seeking** [2] - 624:4,
624:19
**seem** [1] - 674:11
**sees** [1] - 555:11
**segment** [1] - 560:3
**segmented** [1] - 560:1
**segments** [2] -
560:21, 560:22
**select** [1] - 669:10
**selected** [2] - 504:25,
658:7
**selecting** [12] - 661:7,
661:9, 663:2,
664:15, 666:3,
672:19, 677:9,
677:13, 677:15,
678:13, 682:22,
684:15
**selection** [6] - 516:18,
638:7, 670:16,
684:17, 688:21,
689:25
**sell** [1] - 624:17
**send** [1] - 496:4
**sens** [1] - 578:19

**sense** [10] - 556:9,
562:2, 570:8,
626:21, 641:14,
652:12, 677:1,
681:2, 718:1, 718:2
**sensitivity** [25] -
531:7, 531:14,
531:15, 531:21,
531:22, 558:16,
571:24, 572:15,
572:18, 578:3,
578:6, 578:19,
578:23, 579:3,
579:10, 580:8,
581:12, 583:21,
584:1, 584:7,
584:11, 584:13,
584:17, 590:13
**sensory** [1] - 640:20
**sentence** [2] - 515:9,
515:18
**separate** [9] - 513:2,
530:16, 631:15,
631:16, 674:2,
679:5, 679:6, 681:3,
708:1
**separately** [7] - 509:5,
556:8, 560:10,
565:23, 666:17,
711:25, 712:1
**September** [2] - 480:7,
722:13
**sequestered** [1] -
493:19
**serious** [2] - 659:9,
707:4
**seriously** [1] - 715:19
**serves** [1] - 640:7
**services** [1] - 519:4
**set** [20] - 532:24,
538:23, 548:20,
554:13, 573:25,
578:8, 580:17,
591:23, 597:10,
626:3, 645:3,
645:20, 653:11,
660:16, 677:16,
688:6, 688:15,
689:8, 689:13,
691:16
**sets** [15] - 522:9,
550:6, 606:11,
606:9, 666:21,
666:25, 667:14,
667:15, 668:2,
668:18, 672:24,
675:18, 678:4,
679:5, 683:18
**setting** [2] - 505:25,
540:8

**settling** [1] - 641:11
**seven** [9] - 512:20,
563:19, 565:2,
587:16, 591:20,
600:13, 648:11,
648:12
**sevenths** [4] - 588:3,
588:4, 588:5, 588:7
**several** [5] - 556:1,
557:17, 568:15,
638:3, 719:14
**severe** [75] - 530:2,
530:5, 536:18,
537:25, 556:3,
556:4, 556:8,
556:10, 556:11,
557:18, 559:18,
559:21, 560:25,
561:3, 561:6, 561:8,
561:15, 562:13,
562:14, 562:20,
563:7, 563:10,
580:13, 592:25,
593:2, 594:4,
595:23, 596:8,
596:19, 596:23,
597:8, 597:13,
597:15, 597:18,
597:19, 598:4,
609:2, 609:5, 609:8,
609:11, 609:18,
609:25, 610:3,
610:5, 610:16,
611:13, 611:23,
612:1, 612:4,
612:11, 612:16,
612:20, 612:23,
613:1, 706:25,
707:2, 707:4, 707:9,
707:14, 708:23,
708:24, 708:25,
709:1, 709:3, 709:4,
709:13, 709:17,
709:20, 710:8,
710:16, 711:2, 711:5
**severes** [1] - 589:21
**severity** [157] - 522:24,
524:24, 526:1,
528:7, 528:8,
528:21, 528:24,
529:19, 529:23,
536:18, 536:25,
537:14, 538:11,
539:2, 539:21,
539:23, 542:10,
549:5, 554:10,
554:12, 555:1,
555:9, 555:23,
556:2, 556:7,
556:17, 557:15,

557:16, 559:2,
559:10, 559:17,
560:8, 560:12,
560:18, 561:10,
561:13, 562:3,
562:16, 563:3,
563:4, 563:7, 566:7,
566:22, 567:11,
567:15, 570:23,
573:9, 578:20,
578:22, 578:25,
579:2, 579:4, 579:5,
579:6, 579:11,
579:17, 580:18,
580:22, 581:20,
582:1, 589:9,
589:16, 590:12,
591:25, 592:14,
592:21, 598:1,
599:21, 601:23,
602:1, 602:4, 602:9,
602:23, 605:18,
606:7, 606:10,
606:12, 606:15,
606:22, 606:24,
607:1, 607:3, 607:4,
607:6, 607:18,
607:22, 608:24,
609:1, 610:15,
619:8, 619:13,
619:16, 620:1,
620:7, 620:24,
623:19, 624:9,
647:6, 647:8,
647:11, 647:24,
648:2, 648:6,
648:16, 648:24,
649:1, 649:17,
649:20, 649:23,
650:7, 650:18,
651:3, 651:18,
651:19, 652:3,
652:10, 652:11,
653:23, 654:3,
657:1, 658:8, 660:2,
660:3, 660:5, 660:9,
665:9, 665:13,
671:2, 671:7,
671:14, 671:16,
672:12, 672:16,
672:22, 677:6,
677:10, 678:10,
678:11, 678:15,
682:8, 682:9,
682:12, 682:24,
684:1, 684:6,
684:10, 684:12,
684:19, 688:5,
688:7, 688:16,
688:24, 689:3,
707:1, 707:7, 708:19

**shade** [1] - 723:15
**shaking** [1] - 570:1
**Shannon** [1] - 582:18
**SHANNON** [1] - 481:5
**share** [1] - 722:2
**SHAW** [1] - 480:12
**Shaw** [1] - 480:13
**Short** [1] - 482:4
**short** [5] - 497:5,
555:13, 613:8,
616:3, 723:6
**shortly** [1] - 718:3
**shot** [1] - 571:13
**shoulders** [1] - 506:4
**show** [11] - 535:5,
544:18, 558:5,
559:12, 560:16,
604:24, 607:18,
706:10, 721:18,
721:25, 723:8
**showed** [3] - 562:22,
599:20, 697:1
**showing** [5] - 485:2,
501:16, 605:21,
606:9, 618:21
**shown** [14] - 527:20,
529:13, 536:6,
536:21, 545:15,
545:21, 545:23,
546:3, 548:8,
551:18, 566:1,
602:9, 607:1, 671:3
**shows** [9] - 499:9,
529:11, 534:20,
545:5, 546:24,
554:1, 564:12,
581:15, 707:25
**sibutramine** [1] -
521:15
**side** [33] - 534:21,
534:25, 535:3,
535:4, 545:8, 545:9,
545:22, 548:8,
554:2, 555:12,
555:13, 555:14,
560:21, 566:1,
566:24, 595:12,
621:10, 626:22,
643:19, 643:21,
653:24, 654:2,
654:3, 669:2,
675:18, 675:19,
676:25, 702:15
**sidebar** [10] - 483:7,
483:8, 495:9,
496:18, 496:21,
497:1, 497:2, 497:5,
497:7, 616:1
**sides** [2] - 490:17,
626:9

**sign** [1] - 591:2
**signal** [2] - 565:17, 580:5
**significance** [8] - 536:6, 563:25, 579:23, 583:22, 585:2, 602:24, 605:23, 693:15
**significant** [26] - 536:15, 544:4, 552:5, 554:5, 556:4, 555:17, 565:18, 567:4, 567:15, 570:24, 579:18, 579:19, 580:22, 584:2, 584:5, 584:10, 584:20, 603:10, 603:11, 603:16, 603:24, 604:5, 604:20, 621:24, 709:5
**Silver** [1] - 634:6
**similar** [8] - 505:9, 560:25, 566:4, 578:19, 624:15, 673:19, 673:21, 707:25
**similarly** [3] - 526:20, 612:14, 612:22
**simple** [2] - 603:6, 605:17
**simplify** [1] - 658:10
**simply** [10] - 502:5, 504:7, 532:1, 572:11, 577:19, 579:14, 588:22, 612:8, 620:12, 708:7
**single** [19] - 520:20, 545:6, 547:11, 547:25, 561:6, 565:3, 574:21, 588:20, 592:14, 592:24, 594:23, 594:24, 595:1, 607:23, 607:25, 635:12, 666:18, 677:24, 701:11
**sit** [2] - 570:5, 715:17
**site** [39] - 528:21, 529:13, 549:18, 588:11, 588:13, 588:17, 589:9, 589:10, 589:12, 589:14, 590:21, 590:22, 597:9, 609:11, 619:7, 631:8, 643:23, 643:24, 647:9, 647:16, 647:25, 648:3, 648:9,

648:12, 648:14, 650:16, 651:3, 651:20, 652:4, 671:7, 681:17, 699:12, 707:9, 709:10, 709:11, 709:16
**sites** [3] - 682:11, 682:18, 683:11
**situation** [2] - 558:4, 676:2
**situations** [3] - 570:16, 571:15, 674:16
**Siwik** [1] - 481:16
**six** [5] - 484:4, 597:11, 648:10, 648:15, 682:6
**skill** [20] - 502:13, 503:3, 508:12, 508:16, 512:2, 513:20, 516:5, 517:5, 517:7, 517:18, 631:3, 645:4, 645:16, 645:24, 721:19, 722:1, 723:9, 723:13, 724:12, 724:15
**skilled** [3] - 499:11, 499:20, 504:12
**skills** [1] - 694:11
**Skin** [1] - 681:8
**skin** [6] - 681:14, 708:3, 708:18, 709:8, 709:10, 716:15
**SLEET** [1] - 480:10
**slice** [1] - 578:2
**slide** [54] - 522:20, 534:5, 534:20, 534:21, 535:3, 535:4, 535:25, 536:8, 536:21, 542:17, 544:9, 545:4, 545:5, 545:9, 545:22, 546:24, 547:17, 547:19, 547:25, 548:9, 551:19, 555:21, 559:6, 559:22, 559:25, 560:13, 560:23, 562:9, 562:25, 564:12, 566:24, 566:25, 586:1, 591:20, 598:20, 599:5, 600:1, 600:3, 608:19, 609:6, 616:21, 639:7,

645:1, 645:20, 646:4, 650:24, 659:2, 659:23, 670:7, 670:8, 673:24, 674:4, 688:6, 697:1
**Slide** [48] - 523:1, 525:25, 543:17, 546:25, 548:11, 552:2, 555:3, 555:18, 556:25, 559:9, 559:24, 561:23, 562:11, 581:7, 581:20, 608:14, 635:7, 639:7, 640:25, 645:1, 645:20, 646:21, 647:4, 647:18, 650:10, 650:20, 651:4, 651:5, 651:10, 652:15, 656:13, 658:3, 659:24, 660:15, 663:5, 670:7, 670:8, 670:20, 671:3, 673:18, 674:6, 674:18, 688:6, 688:15, 689:8, 689:13, 689:22, 691:16
**SlidePDX-5.9** [1] - 526:15
**slides** [7] - 497:21, 522:15, 545:2, 582:9, 591:4, 635:1, 691:15
**slightly** [4] - 536:2, 552:15, 560:13, 722:25
**slow** [2] - 500:4, 543:5
**small** [4] - 611:14, 612:6, 638:15, 638:17
**smart** [2] - 495:4, 674:12
**smith** [1] - 482:7
**so-called** [10] - 522:3, 522:23, 527:2, 538:6, 564:5, 573:13, 575:20, 585:1, 585:25, 714:18
**Sobecki** [1] - 614:22
**societies** [3] - 520:24, 521:5, 637:17
**society** [2] - 695:6, 695:9
**Society** [6] - 521:2, 521:4, 637:19,

637:20, 695:10
**software** [3] - 533:23, 704:4, 705:19
**solely** [1] - 583:2
**solution** [1] - 627:4
**solve** [1] - 551:9
**solved** [1] - 490:24
**someone** [4] - 483:19, 540:23, 710:21, 710:22
**someplace** [1] - 704:3
**sometimes** [7] - 519:16, 519:17, 538:9, 538:12, 538:14, 565:7, 654:20
**somewhat** [2] - 562:14, 563:10
**somewhere** [1] - 703:20
**sorry** [5] - 531:11, 549:15, 589:23, 591:8, 676:15
**sort** [8] - 489:22, 558:25, 622:17, 640:20, 644:3, 649:4, 653:13, 721:12
**sought** [1] - 510:4
**source** [1] - 679:7
**sources** [2] - 673:22, 717:17
**South** [1] - 520:3
**spacing** [1] - 724:4
**spans** [1] - 520:19
**speaking** [4] - 485:6, 577:4, 622:20, 714:9
**speaks** [1] - 710:8
**specialty** [3] - 635:12, 693:6, 693:7
**specific** [28] - 513:24, 538:3, 542:24, 569:21, 582:24, 583:2, 594:21, 594:24, 632:8, 644:12, 649:2, 659:1, 662:18, 671:9, 672:24, 695:6, 696:14, 696:19, 700:8, 701:23, 702:18, 705:14, 714:25, 715:2, 715:9, 716:1, 716:18
**specifically** [15] - 489:12, 526:8, 547:6, 614:25, 637:5, 657:23, 657:25, 665:13, 666:20, 675:4,

680:25, 699:2, 703:11, 705:4, 719:23
**specifics** [4] - 634:23, 639:3, 655:9, 660:21
**specified** [2] - 537:19, 538:16
**specify** [2] - 662:14, 665:6
**speed** [1] - 655:11
**spend** [2] - 519:6, 645:2
**spent** [1] - 607:4
**spinal** [2] - 640:2, 640:11
**sponsored** [1] - 685:17
**Spring** [2] - 506:20, 634:6
**SRI** [1] - 506:20
**staff** [1] - 530:14
**stand** [10] - 502:23, 517:2, 517:24, 518:8, 573:20, 577:19, 627:24, 628:4, 629:9, 631:19
**standard** [7] - 564:1, 564:4, 565:7, 565:12, 572:15, 572:17, 624:7
**standardized** [5] - 592:15, 592:24, 593:3, 593:6, 593:7
**standards** [2] - 714:5
**standing** [2] - 489:13, 492:4
**stands** [1] - 488:7
**Stanford** [3] - 520:5, 520:6, 520:12
**stark** [1] - 575:11
**start** [17] - 496:17, 507:25, 533:6, 543:19, 549:25, 581:9, 582:20, 654:6, 655:7, 660:14, 661:11, 661:12, 665:14, 665:16, 665:17, 673:3, 685:11
**started** [6] - 499:14, 499:21, 506:12, 543:15, 567:19, 699:25
**starting** [1] - 614:23
**starts** [1] - 583:11
**state** [7] - 498:19, 500:23, 502:22, 538:19, 629:21, 634:4, 664:5
**State** [1] - 637:19

**statement** [8] -
    513:17, 513:19,
    550:9, 591:2,
    666:22, 667:23,
    672:7, 674:13
**statements** [9] -
    508:20, 508:25,
    511:16, 511:18,
    514:8, 628:20,
    630:9, 722:10
**STATES** [1] - 480:1
**states** [1] - 722:13
**Statistical** [2] - 521:2,
    521:3
**statistical** [42] - 519:5,
    520:10, 520:22,
    522:8, 522:22,
    525:22, 526:4,
    528:3, 528:4,
    528:14, 536:6,
    537:19, 538:3,
    549:10, 550:3,
    550:13, 550:15,
    551:1, 551:13,
    563:24, 564:1,
    564:2, 564:4,
    564:11, 565:15,
    574:14, 575:4,
    579:12, 579:23,
    579:25, 583:22,
    585:2, 585:19,
    598:10, 599:11,
    602:12, 602:16,
    602:20, 602:24,
    603:2, 603:20,
    605:22
**statistically** [26] -
    536:14, 544:4,
    550:18, 552:5,
    554:4, 554:6,
    555:17, 565:18,
    567:4, 567:14,
    570:24, 579:18,
    579:19, 580:21,
    584:2, 584:5,
    584:10, 584:19,
    603:10, 603:11,
    603:15, 603:16,
    603:24, 604:5,
    604:16, 604:20
**statistician** [14] -
    525:20, 534:8,
    537:10, 549:2,
    563:16, 569:23,
    570:9, 575:23,
    576:4, 601:13,
    601:15, 603:5,
    606:13
**statisticians** [3] -
    530:22, 530:24,

540:22
**statistics** [12] - 519:7,
    520:7, 520:18,
    520:20, 536:5,
    537:4, 554:3,
    555:15, 565:7,
    565:13, 653:25,
    725:5
**stats** [1] - 564:3
**statute** [2] - 489:22,
    490:13
**statutory** [2] - 489:9,
    489:18
**stay** [8] - 512:12,
    572:23, 632:23,
    637:23, 709:23,
    710:24, 711:6,
    718:15
**Stellenbosch** [1] -
    520:2
**step** [3] - 550:25,
    556:6, 588:24
**STEPHEN** [1] - 480:18
**steroidal** [1] - 521:17
**still** [17] - 487:11,
    493:14, 493:15,
    493:16, 514:3,
    520:16, 563:20,
    563:22, 593:5,
    597:22, 604:21,
    630:2, 630:24,
    636:5, 654:7, 725:2,
    725:4
**stipulation** [4] - 618:5,
    618:8, 623:8, 633:9
**stood** [2] - 575:11,
    575:12
**stop** [3] - 495:6,
    557:23, 674:3
**storage** [1] - 665:1
**story** [1] - 598:16
**straight** [1] - 724:8
**straightforward** [1] -
    628:18
**streamline** [1] -
    617:16
**stress** [2] - 510:19,
    514:21
**stretch** [2] - 518:2,
    692:21
**strictly** [1] - 561:16
**strike** [22] - 558:1,
    558:3, 558:8,
    558:10, 558:12,
    576:10, 587:23,
    604:12, 649:25,
    657:16, 662:3,
    665:15, 673:19,
    675:7, 679:17,
    680:6, 682:20,

684:8, 684:13,
    685:8, 687:18,
    720:11
**strippable** [1] - 723:15
**stripped** [2] - 674:8,
    674:25
**strongly** [1] - 493:8
**structures** [2] - 640:4,
    640:5
**student** [1] - 520:6
**studied** [7] - 520:5,
    523:22, 541:16,
    542:1, 679:21,
    687:20, 687:21
**studies** [14] - 498:3,
    505:1, 513:5, 513:6,
    514:15, 572:19,
    615:11, 615:13,
    653:24, 678:2,
    678:3, 707:18,
    708:1, 712:3
**study** [71] - 497:25,
    498:8, 498:10,
    499:14, 499:21,
    504:10, 510:1,
    516:25, 523:2,
    523:4, 523:6, 523:8,
    523:16, 523:23,
    523:25, 524:10,
    524:11, 524:19,
    524:21, 526:23,
    527:2, 527:22,
    528:8, 528:20,
    530:10, 533:4,
    533:5, 533:14,
    535:22, 535:23,
    538:5, 539:5,
    539:11, 539:12,
    540:5, 540:9,
    540:19, 541:1,
    541:13, 542:19,
    543:11, 543:13,
    550:6, 551:15,
    573:19, 573:21,
    574:3, 574:15,
    574:19, 575:4,
    575:9, 575:22,
    579:8, 580:20,
    580:25, 611:13,
    612:5, 615:9,
    620:11, 623:21,
    683:25, 685:11,
    685:12, 685:20,
    686:25, 687:3,
    687:15, 687:23,
    717:14, 723:3
**stuff** [2] - 510:21,
    515:1
**subcutaneous** [1] -
    681:17

**subcutaneously** [1] -
    708:22
**subheading** [1] -
    656:19
**subject** [10] - 483:23,
    490:4, 491:23,
    556:20, 615:24,
    615:25, 616:5,
    616:10, 659:17,
    713:24
**subjective** [3] -
    707:11, 709:2,
    709:20
**subjects** [1] - 682:8
**submission** [4] -
    487:9, 496:4,
    615:13, 620:14
**submissions** [1] -
    626:19
**submit** [2] - 495:15,
    506:13
**submitted** [6] -
    484:23, 516:24,
    607:15, 620:16,
    628:19, 629:5
**subset** [5] - 538:22,
    538:23, 542:18,
    638:15, 638:17
**subsets** [2] - 542:18
**subsetting** [1] -
    538:25
**subspecialty** [3] -
    693:8, 693:10,
    693:17
**substance** [2] -
    494:14, 572:22
**substantial** [21] -
    536:14, 542:7,
    542:11, 542:14,
    544:3, 552:4, 554:1,
    554:4, 555:11,
    555:16, 567:14,
    580:19, 580:20,
    580:21, 622:6,
    625:18, 625:20,
    625:25, 626:3,
    691:8, 691:25
**substantially** [2] -
    552:14, 555:20
**substantive** [2] -
    493:22, 525:23
**substantively** [1] -
    494:3
**success** [3] - 485:16,
    628:25, 629:3
**successful** [1] -
    632:13
**suddenly** [1] - 681:1
**suffered** [1] - 571:7
**suffering** [3] - 643:8,

670:4, 672:20
**sufficient** [6] - 509:21,
    623:1, 623:12,
    623:24, 625:11,
    656:6
**sufficiently** [2] -
    610:2, 610:12
**suggest** [9] - 534:9,
    626:2, 631:12,
    670:15, 674:11,
    678:21, 680:14,
    688:21, 689:25
**suggested** [6] - 532:2,
    566:12, 572:12,
    674:15, 721:13,
    724:19
**suggestion** [1] -
    484:13
**suggests** [1] - 631:12
**suit** [19] - 516:15,
    582:21, 610:5,
    610:8, 610:10,
    627:12, 627:14,
    633:17, 634:17,
    634:25, 639:4,
    644:16, 646:7,
    646:14, 654:11,
    655:1, 692:4,
    692:12, 722:24
**suite** [1] - 578:9
**sum** [7] - 600:23,
    606:2, 612:3, 612:7,
    670:6, 688:4, 692:3
**summaries** [1] -
    534:11
**summarize** [5] -
    547:14, 606:2,
    652:16, 653:1, 658:3
**summarizes** [1] -
    522:20
**summary** [9] - 536:5,
    537:4, 547:18,
    554:3, 577:3,
    652:13, 659:23,
    677:8, 691:15
**superior** [1] - 703:4
**superiority** [3] -
    676:11, 679:2, 679:4
**supplemental** [1] -
    486:10
**support** [5] - 508:20,
    508:24, 615:14,
    629:17, 725:6
**supported** [3] -
    513:17, 536:13
**supposed** [3] -
    507:16, 517:4, 668:6
**supposedly** [1] -
    493:10
**Supreme** [4] - 483:22,

484:22, 485:2, 495:18

**surprised** [1] - 569:14

**surprising** [1] - 566:3

**surprisingly** [1] - 541:4

**surrounding** [1] - 709:11

**survive** [1] - 623:24

**suspect** [2] - 616:14, 618:6

**sustained** [5] - 576:20, 587:9, 645:11, 678:23, 679:25

**sustaining** [1] - 514:4

**SWANSON** [1] - 481:7

**Swanson** [1] - 492:17

**swelling** [1] - 644:1

**switch** [16] - 523:11, 651:24, 652:5, 669:7, 670:3, 670:17, 677:10, 689:6, 696:23, 697:16, 697:22, 698:3, 698:12, 698:14, 699:6, 699:15

**switched** [12] - 524:2, 543:15, 552:9, 579:18, 658:7, 667:10, 688:22, 689:12, 691:24, 695:17, 698:21, 699:7

**switcher** [4] - 545:19, 552:1, 554:21, 658:24

**switchers** [2] - 524:4, 543:15

**switches** [4] - 652:1, 652:2, 659:25, 720:21

**switching** [21] - 547:15, 567:8, 658:13, 661:3, 663:3, 664:18, 664:19, 666:5, 669:9, 672:21, 678:14, 678:17, 682:23, 684:18, 684:21, 689:10, 689:15, 690:1, 690:21, 691:5, 698:15

**sworn** [2] - 518:12, 633:21

**symptoms** [8] - 530:5, 610:1, 610:2, 610:3, 640:19, 641:10,

716:10

**Syntex** [5] - 500:1, 500:5, 503:4, 506:7, 722:15

**Synthon** [5] - 482:11, 482:12, 611:1, 655:15, 655:23

**synthon** [1] - 482:12

**system** [4] - 583:14, 640:1, 640:5, 640:7

**systematic** [1] - 541:1

**systemic** [1] - 644:2

**systems** [1] - 500:20

─────────────

# T

**T&B** [2] - 723:25, 724:1

**table** [11] - 548:9, 548:14, 563:17, 585:17, 598:10, 598:14, 600:20, 603:14, 604:4, 625:9, 630:14

**Table** [13] - 585:5, 585:14, 585:15, 585:18, 585:21, 585:23, 671:22, 671:23, 671:24, 672:1, 711:8, 711:21

**tables** [2] - 672:4, 673:25

**talks** [7] - 664:12, 664:25, 665:1, 666:15, 666:17, 683:10, 719:23

**target** [3] - 495:23, 662:15, 662:21

**taught** [5] - 629:15, 629:16, 629:18, 630:1, 724:8

**teach** [1] - 695:12

**teams** [1] - 496:5

**tease** [3] - 513:19, 513:22, 515:19

**tecfidera** [1] - 643:13

**technical** [1] - 586:4

**technically** [2] - 723:20, 724:13

**telescoping** [1] - 723:16

**ten** [3] - 520:13, 532:25, 701:11

**ten-year** [1] - 701:11

**tend** [1] - 659:16

**term** [9] - 531:15, 573:22, 592:6, 603:11, 647:6, 647:10, 648:18, 720:13

**terminology** [1] - 693:19

**terms** [12] - 523:18, 553:1, 575:6, 581:6, 629:23, 632:24, 647:11, 649:1, 649:3, 663:5, 679:19, 702:23

**test** [4] - 564:10, 565:16, 571:21, 598:10

**testified** [26] - 518:13, 521:6, 521:10, 573:1, 578:10, 579:9, 580:10, 580:14, 583:20, 585:3, 592:4, 598:11, 598:16, 601:12, 601:18, 604:1, 605:10, 606:7, 607:16, 633:21, 634:8, 685:6, 685:10, 690:18, 700:7, 711:8

**testify** [14] - 503:20, 522:3, 534:9, 550:14, 599:11, 599:16, 609:14, 609:15, 644:24, 650:1, 659:9, 680:3, 703:8, 703:14

**testifying** [5] - 516:11, 549:9, 607:5, 645:10, 703:13

**testimonial** [1] - 506:12

**testimony** [56] - 484:20, 492:11, 502:9, 504:19, 507:12, 512:25, 515:22, 522:16, 523:13, 525:12, 525:13, 525:15, 525:19, 548:24, 549:10, 550:2, 550:12, 550:16, 550:20, 567:22, 571:2, 576:6, 576:10, 576:12, 583:20, 583:23, 585:7, 586:2, 586:16, 592:17, 607:20, 609:17, 613:22, 614:2, 621:9, 622:3, 635:2, 650:5, 652:16, 652:23, 653:2, 653:3, 655:4, 657:1, 659:15, 665:8, 673:14, 680:13,

692:7, 699:21, 706:18, 706:22, 708:19, 711:12, 714:19, 717:13

**testing** [1] - 564:4

**tests** [1] - 564:11

**tetanus** [1] - 571:13

**Teva** [27] - 486:5, 486:13, 495:10, 504:24, 505:8, 510:3, 510:11, 510:18, 513:5, 513:10, 516:11, 516:16, 516:22, 517:15, 573:18, 620:6, 628:20, 628:23, 629:11, 629:25, 631:23, 685:16, 685:18, 686:19, 687:16, 702:22, 720:18

**Teva's** [4] - 484:25, 510:7, 621:22, 629:24

**THE** [185] - 480:1, 480:2, 483:1, 483:3, 483:12, 488:5, 488:11, 488:13, 488:17, 488:25, 489:4, 489:9, 489:17, 490:2, 490:6, 490:14, 491:1, 491:4, 491:8, 491:20, 492:15, 492:22, 493:7, 493:24, 494:5, 494:18, 494:22, 495:17, 495:20, 496:1, 496:5, 496:17, 496:22, 496:25, 497:2, 497:4, 497:13, 498:6, 498:20, 498:23, 499:1, 499:25, 500:12, 501:2, 501:17, 501:23, 503:22, 506:1, 506:10, 506:23, 506:25, 507:9, 507:18, 508:6, 509:13, 514:18, 515:4, 515:11, 515:25, 516:8, 517:19, 517:22, 518:6, 518:7, 518:11, 518:14, 518:15, 518:16, 518:19, 518:20, 519:14, 519:18, 522:11,

528:18, 531:10, 531:11, 534:15, 548:22, 549:7, 549:13, 549:20, 551:5, 551:10, 558:3, 558:7, 558:10, 558:13, 568:25, 569:3, 569:7, 569:11, 569:13, 569:17, 569:25, 576:13, 576:15, 576:18, 576:21, 576:25, 582:4, 582:7, 582:12, 582:15, 584:22, 586:6, 586:8, 586:12, 587:9, 587:18, 590:3, 590:7, 591:6, 591:8, 591:10, 591:11, 591:13, 591:15, 593:24, 608:5, 608:8, 610:23, 613:7, 613:10, 613:18, 614:7, 614:11, 614:17, 614:20, 615:17, 615:20, 615:22, 616:7, 616:11, 616:14, 616:19, 617:18, 618:4, 618:10, 618:18, 622:12, 622:17, 622:23, 623:5, 623:8, 626:7, 627:1, 627:7, 627:15, 627:18, 627:22, 628:13, 630:4, 630:15, 631:5, 631:16, 632:2, 632:12, 633:5, 633:12, 633:18, 633:23, 633:24, 638:24, 639:15, 639:19, 639:22, 640:15, 640:17, 645:11, 659:16, 659:20, 676:14, 678:23, 679:25, 680:1, 680:2, 680:4, 688:10, 690:25, 692:21, 692:23, 719:4, 721:4, 721:6, 724:22

**theirs** [2] - 642:2, 642:8

**themselves** [5] - 503:10, 528:22, 534:2, 540:17, 542:12

**theoretically** [1] - 713:11

**theory** [1] - 710:22

**therapies** [18] - 521:18, 525:17, 557:14, 637:1, 637:10, 642:13, 643:7, 659:6, 661:4, 663:6, 664:2, 683:16, 696:4, 696:9, 696:19, 697:13

**therapy** [69] - 525:18, 535:1, 535:2, 535:8, 543:11, 543:14, 641:23, 642:23, 643:4, 658:15, 660:14, 660:24, 661:23, 662:20, 663:2, 663:3, 663:15, 663:18, 663:21, 663:22, 663:23, 664:18, 664:20, 665:5, 665:7, 666:6, 667:3, 667:9, 667:11, 669:5, 669:8, 669:22, 669:25, 670:3, 670:6, 670:17, 670:18, 670:23, 672:9, 672:20, 672:22, 675:10, 676:5, 676:8, 676:11, 677:10, 677:23, 679:2, 680:15, 681:22, 683:14, 684:19, 687:24, 689:18, 690:1, 690:2, 690:7, 691:7, 691:21, 696:5, 696:8, 697:21, 697:22, 720:20, 720:21

**therefore** [9] - 533:25, 557:20, 562:15, 563:8, 564:25, 571:10, 605:3, 621:12, 724:22

**therein** [1] - 504:10

**thinking** [4] - 502:10, 513:20, 516:5, 606:19

**third** [4] - 508:19, 514:13, 659:24, 697:15

**THOMAS** [1] - 481:14

**thousand** [1] - 577:11

**three** [54] - 497:24, 498:10, 499:6,

504:9, 504:25, 510:12, 512:21, 513:18, 514:11, 516:10, 520:3, 523:20, 529:25, 530:1, 541:21, 542:5, 556:7, 560:10, 561:14, 564:17, 565:8, 567:10, 568:5, 567:2, 579:4, 579:11, 587:17, 588:3, 588:4, 588:5, 588:7, 590:12, 593:15, 595:13, 595:16, 607:15, 629:17, 632:15, 644:9, 648:13, 648:14, 658:7, 658:14, 660:1, 667:10, 670:18, 672:21, 687:21, 688:23, 690:2, 717:17, 723:1

**three-point** [1] - 529:25

**three-sevenths** [4] - 588:3, 588:4, 588:5, 588:7

**throughout** [8] - 636:17, 649:10, 661:5, 661:6, 664:7, 672:14, 679:12, 681:24

**thrown** [1] - 648:19

**throws** [1] - 568:16

**tie** [4] - 561:17, 562:13, 595:17, 607:21

**timeline** [1] - 488:1

**tissue** [2] - 708:22, 709:11

**title** [1] - 541:11

**titled** [1] - 665:4

**titles** [1] - 485:10

**today** [18] - 488:7, 490:20, 496:14, 497:20, 522:16, 523:4, 578:10, 580:10, 581:9, 607:17, 610:9, 617:6, 618:13, 629:1, 629:8, 634:24, 636:5, 656:6

**today's** [1] - 615:6

**together** [13] - 495:24, 517:22, 564:15, 565:9, 572:14, 605:15, 611:23, 612:1, 612:9, 633:8,

653:13, 712:1

**tolerability** [8] - 615:10, 619:6, 619:12, 619:15, 620:7, 620:24, 623:20, 624:9

**tolerable** [1] - 710:17

**tolerate** [1] - 711:7

**tolerated** [1] - 610:1

**tomorrow** [2] - 493:4, 497:19

**Tony** [1] - 610:25

**took** [8] - 483:8, 492:17, 511:5, 511:7, 653:25, 673:25, 674:7, 680:21

**tools** [1] - 723:17

**top** [11] - 529:21, 531:21, 536:7, 537:4, 547:10, 554:3, 555:15, 560:2, 701:15, 715:8, 724:5

**topic** [2] - 552:16, 690:10

**topics** [1] - 565:12

**total** [6] - 512:19, 547:21, 548:3, 579:2, 590:22, 612:10

**totally** [1] - 524:13

**toto** [1] - 705:20

**touch** [1] - 668:17

**touched** [1] - 714:18

**towards** [1] - 487:21

**tracked** [1] - 516:18

**trade** [1] - 561:5

**tradeoff** [1] - 561:6

**traditional** [1] - 490:13

**trail** [2] - 554:19, 579:7

**train** [1] - 695:12

**trained** [1] - 694:22

**training** [2] - 694:15, 694:19

**transcript** [6] - 495:15, 496:21, 511:5, 511:21, 512:9, 512:15

**transferred** [1] - 609:19

**transient** [1] - 716:13

**transmission** [1] - 640:10

**treat** [18] - 619:12, 620:23, 621:19, 621:21, 621:25, 625:2, 637:11, 641:17, 657:13,

693:16, 693:22, 700:18, 706:19, 708:12, 710:20, 710:21, 717:6

**treated** [6] - 564:24, 574:22, 574:23, 636:14, 636:16, 694:18

**treaters** [1] - 696:18

**treating** [20] - 556:8, 565:5, 624:24, 635:14, 636:20, 637:1, 662:19, 663:21, 670:13, 677:20, 688:18, 689:23, 691:13, 694:11, 702:4, 709:18, 711:16, 712:6, 713:18, 718:10

**treatises** [1] - 565:12

**treatment** [36] - 523:11, 523:12, 525:17, 530:14, 535:6, 535:7, 535:14, 535:15, 539:18, 539:19, 540:10, 540:12, 540:14, 542:16, 545:12, 545:13, 548:3, 552:24, 553:18, 553:24, 565:21, 574:9, 589:20, 622:5, 638:15, 638:21, 661:20, 662:16, 664:16, 669:11, 677:14, 678:14, 682:23, 684:16, 697:3

**Treatment** [1] - 638:14

**treatments** [1] - 540:15

**treats** [2] - 525:16, 598:17

**Trial** [8] - 480:8, 499:4, 500:19, 505:16, 505:23, 685:24, 687:8, 699:24

**trial** [64] - 487:24, 490:16, 491:9, 499:6, 505:3, 505:6, 505:8, 506:4, 508:1, 508:3, 508:21, 509:3, 509:5, 509:15, 509:22, 509:23, 510:5, 510:7, 510:8, 510:16, 512:15, 515:21, 516:16,

516:23, 522:4, 522:22, 523:11, 525:20, 527:5, 533:1, 537:16, 540:4, 540:7, 542:8, 543:16, 544:24, 549:3, 552:1, 569:24, 574:11, 575:4, 608:24, 609:2, 609:5, 609:9, 610:17, 614:24, 615:2, 617:22, 618:7, 620:21, 627:10, 627:11, 629:17, 632:18, 638:7, 666:19, 672:3, 677:25, 687:25, 717:14, 723:25, 724:18

**trials** [46] - 510:11, 539:15, 539:17, 541:13, 541:14, 541:24, 541:25, 542:6, 542:9, 550:17, 614:25, 619:20, 619:22, 620:4, 638:5, 656:19, 657:21, 666:10, 666:12, 666:16, 666:24, 667:2, 667:4, 667:8, 667:19, 667:20, 667:22, 668:2, 668:7, 668:9, 672:1, 673:11, 674:2, 675:19, 677:23, 678:7, 679:10, 681:13, 681:14, 681:20, 682:4, 682:6, 710:1

**Trials** [1] - 541:12

**tried** [6] - 487:22, 501:7, 503:17, 514:2, 549:1, 550:3

**trinomial** [8] - 564:5, 564:14, 564:17, 565:8, 565:10, 592:5, 592:8, 601:18

**true** [11] - 483:21, 489:17, 491:8, 566:12, 567:5, 577:11, 678:4, 695:3, 695:8, 700:10, 716:6

**truly** [2] - 561:17, 561:19

**try** [17] - 503:2, 523:15, 548:20, 558:5, 567:25, 572:10, 591:24,

603:8, 616:24, 620:22, 626:8, 639:5, 658:10, 674:4, 675:23, 685:8, 698:25

**trying** [22] - 489:15, 495:23, 528:11, 528:16, 550:2, 550:5, 569:7, 590:24, 591:1, 593:13, 611:21, 614:5, 623:16, 623:19, 629:12, 629:16, 631:18, 631:22, 631:24, 659:18, 688:12

**tufts** [1] - 635:21

**turn** [29] - 519:9, 524:5, 525:10, 526:23, 527:6, 528:25, 534:4, 541:5, 542:24, 552:2, 554:10, 555:23, 563:17, 564:20, 573:10, 581:6, 583:4, 583:8, 586:1, 591:3, 595:1, 598:19, 611:8, 624:11, 625:16, 665:12, 666:11, 683:1, 709:25

**turned** [2] - 566:11, 626:15

**turns** [2] - 513:5, 562:21

**twice** [10] - 498:2, 514:14, 586:25, 587:3, 587:13, 587:16, 587:25, 588:2, 588:4, 589:1

**two** [84] - 483:4, 485:20, 497:4, 497:25, 498:4, 499:14, 499:21, 504:11, 508:15, 514:11, 518:18, 523:6, 523:9, 526:6, 534:21, 535:5, 540:15, 542:5, 544:14, 546:2, 553:5, 554:4, 554:15, 559:11, 561:18, 563:8, 566:11, 568:8, 573:15, 573:18, 573:23, 573:25, 574:3, 574:6, 575:7, 575:10, 575:14, 575:20, 576:5, 578:11, 578:23,

579:6, 579:13, 580:11, 580:16, 580:17, 585:21, 585:24, 589:5, 589:7, 593:10, 605:15, 613:8, 616:1, 616:24, 628:2, 628:11, 631:15, 631:16, 635:22, 658:12, 666:8, 666:9, 666:21, 668:2, 672:4, 673:25, 675:18, 679:5, 679:7, 679:8, 683:15, 686:21, 694:16, 694:21, 704:16, 704:20, 707:17, 707:21, 708:4, 712:3, 712:15, 723:4

**two-year** [1] - 497:25

**twofold** [1] - 589:4

**type** [12] - 548:2, 550:4, 557:2, 592:19, 641:5, 641:6, 650:3, 660:5, 669:3, 672:1, 680:6, 681:18

**types** [5] - 550:6, 640:23, 640:24, 641:1, 641:2

**typical** [3] - 528:2, 528:4, 643:19

**typically** [3] - 495:1, 530:20, 538:21

**Tysabri** [1] - 643:14

---

## U

**U.S** [1] - 483:22

**U.S.D.C.J** [1] - 480:10

**ultimate** [4] - 567:7, 581:8, 663:17, 670:22

**ultimately** [7] - 494:10, 530:17, 575:3, 642:10, 643:3, 643:5, 679:3

**unable** [1] - 607:11

**unaffected** [1] - 580:18

**unambiguously** [1] - 560:12

**unblinded** [3] - 540:5, 540:13, 542:15

**unchanged** [1] - 579:15

**uncommon** [1] - 621:2

**under** [89] - 488:20,

488:23, 489:2, 490:13, 492:12, 502:20, 534:11, 536:16, 553:24, 561:13, 561:24, 564:21, 564:22, 565:6, 568:6, 568:8, 583:20, 583:25, 584:7, 589:15, 589:16, 591:21, 592:3, 592:19, 594:6, 594:8, 594:16, 594:18, 595:12, 595:13, 595:14, 595:17, 596:13, 596:14, 597:7, 597:9, 597:14, 597:15, 597:22, 598:7, 598:8, 600:6, 600:9, 600:22, 601:1, 601:3, 601:9, 601:19, 602:8, 602:13, 602:14, 602:21, 602:22, 603:8, 603:9, 603:21, 603:22, 603:25, 604:6, 604:8, 604:9, 604:17, 604:24, 605:13, 605:21, 605:23, 605:24, 606:2, 606:3, 608:3, 616:17, 618:25, 621:13, 621:15, 625:12, 638:13, 666:8, 667:19, 668:4, 668:7, 675:19, 702:12, 710:5, 715:8, 719:19

**undergraduate** [1] - 635:18

**underlying** [3] - 572:4, 578:2, 640:12

**undermine** [2] - 575:15, 575:21

**understandings** [1] - 639:14

**understood** [13] - 487:14, 517:9, 525:15, 533:20, 549:24, 609:10, 609:15, 625:8, 628:4, 694:16, 695:12, 696:2, 698:6

**undertake** [1] - 620:7

**undervoting** [1] - 522:2

**undisputed** [5] - 619:1, 619:14,

620:6, 621:9, 621:18

**unduly** [1] - 631:5

**unexpected** [1] - 536:4

**unexpectedness** [2] - 553:11, 566:20

**unfortunately** [1] - 622:1

**UNITED** [1] - 480:1

**universe** [3] - 486:24, 534:13, 663:7

**university** [1] - 520:3

**University** [6] - 520:5, 520:12, 520:14, 635:19, 635:22

**unless** [2] - 626:5, 704:21

**unpredictable** [1] - 629:13

**unpublished** [1] - 724:1

**unrelated** [1] - 649:21

**unreliable** [2] - 524:13, 580:12

**untenable** [1] - 568:13

**unusual** [5] - 565:10, 573:19, 577:25, 578:1, 580:16

**up** [61] - 485:11, 487:9, 490:20, 491:4, 491:7, 492:4, 493:1, 494:10, 501:5, 502:1, 503:15, 503:16, 507:19, 509:17, 510:15, 518:16, 519:10, 522:18, 525:25, 528:23, 529:16, 534:5, 536:7, 536:21, 540:3, 543:3, 543:17, 544:9, 544:18, 547:2, 548:9, 552:16, 554:1, 555:21, 556:23, 568:25, 582:10, 582:14, 591:2, 592:18, 593:2, 598:19, 600:21, 600:23, 603:6, 606:2, 608:16, 614:22, 625:3, 629:8, 630:13, 637:23, 650:10, 655:11, 670:6, 671:21, 688:4, 692:3, 704:5, 706:10, 718:15

**upper** [1] - 724:7

**upshot** [2] - 498:18,

500:13

**usage** [7] - 656:17, 656:20, 656:24, 661:12, 661:15, 700:5, 701:16

**Usage** [6] - 661:25, 662:2, 662:14, 663:1, 663:14, 664:3

**useful** [1] - 539:12

**uses** [6] - 500:11, 622:6, 625:24, 705:5, 722:18, 725:6

**usual** [1] - 546:2

---

## V

**vaccine** [4] - 571:3, 571:4, 571:5, 571:13

**valid** [1] - 704:23

**validity** [2] - 575:21, 616:4

**valuable** [1] - 717:24

**value** [14] - 536:6, 545:12, 545:15, 559:13, 559:14, 564:11, 564:12, 564:13, 567:3, 577:11, 577:14, 593:1, 619:24, 705:13

**values** [9] - 537:8, 546:2, 547:5, 553:24, 565:14, 565:16, 577:19, 584:18, 584:23

**Vanda** [1] - 625:7

**variability** [1] - 565:20

**variables** [1] - 565:9

**variation** [1] - 564:9

**varied** [2] - 653:14, 653:24

**variety** [1] - 484:17

**various** [12] - 495:11, 521:18, 541:14, 548:19, 592:14, 619:20, 620:4, 633:16, 637:10, 642:13, 682:8, 716:10

**vary** [1] - 649:18

**varying** [2] - 667:19, 675:20

**vast** [1] - 566:3

**verbiage** [1] - 705:21

**verdict** [1] - 623:14

**verify** [1] - 485:5

**version** [2] - 527:17, 696:22

**versus** [32] - 498:3, 498:4, 506:21,

506:22, 533:7,
543:17, 543:20,
544:2, 546:19,
549:23, 551:15,
552:3, 552:19,
554:13, 555:9,
555:24, 561:21,
573:8, 596:13,
602:21, 604:1,
605:24, 619:22,
619:23, 667:3,
667:5, 669:4,
669:25, 679:11,
681:22, 687:21,
721:14

**vertical** [5] - 544:15,
545:23, 557:4,
559:12, 611:18

**video** [2] - 614:6,
614:8

**view** [16] - 488:11,
488:12, 505:17,
511:22, 516:23,
602:23, 622:24,
631:6, 650:14,
651:16, 684:8,
692:1, 693:8, 699:5,
707:18

**virtually** [4] - 516:18,
636:24, 638:2, 649:7

**vis-à-vis** [2] - 485:15,
485:23

**visibly** [2] - 567:1,
578:16

**vision** [1] - 640:19

**visits** [1] - 530:9

**volume** [2] - 693:22,
694:4

# W

**waiver** [1] - 487:8

**WALDRON** [1] -
481:13

**walks** [2] - 694:6,
710:10

**wants** [6] - 483:5,
502:23, 508:22,
511:17, 714:23,
715:15

**WARE** [33] - 480:14,
483:6, 483:9,
483:13, 488:8,
488:16, 490:21,
491:3, 491:6,
491:12, 493:2,
493:22, 494:2,
494:6, 494:21,
496:16, 496:20,
497:1, 497:3,

638:23, 639:9,
645:8, 657:14,
659:13, 676:12,
678:22, 679:24,
688:9, 690:17,
692:24, 693:1,
719:1, 719:3

**Ware** [10] - 484:20,
490:16, 490:18,
493:1, 494:19,
495:23, 496:14,
692:23, 693:3, 719:4

**warnings** [8] - 656:18,
657:6, 657:11,
657:18, 665:14,
702:6, 703:16,
719:11

**Warnings** [3] - 665:16,
702:3, 702:12

**Washington** [6] -
480:17, 481:8,
482:10, 635:10,
694:2, 695:13

**watch** [2] - 614:6,
614:7

**water** [1] - 681:5

**Waxman** [4] - 489:3,
621:1, 621:5, 624:4

**ways** [4] - 554:12,
554:15, 629:12,
712:5

**weakness** [1] - 640:19

**Wecker** [3] - 519:1,
519:3, 520:15

**Wednesday** [1] -
480:7

**week** [23] - 487:25,
498:2, 498:4, 505:1,
510:12, 512:20,
567:10, 587:16,
587:17, 629:17,
644:9, 648:11,
648:13, 648:14,
658:7, 658:14,
660:1, 667:10,
670:18, 672:22,
687:21, 688:23,
690:2

**weekly** [4] - 512:19,
512:22, 514:15,
523:20

**weeks** [6] - 497:24,
498:10, 499:14,
504:9, 625:7, 723:1

**weight** [5] - 592:20,
593:1, 593:15,
594:16, 594:18

**weighting** [6] -
592:13, 592:19,
594:5, 594:7,

594:15, 596:14

**well-defined** [1] -
603:12

**well-known** [1] - 500:7

**Wentzylvania** [1] -
626:15

**whatsoever** [14] -
515:17, 620:12,
650:8, 655:5,
660:25, 666:2,
666:7, 667:12,
669:6, 677:12,
678:16, 682:9,
684:11, 685:22

**whereas** [1] - 655:24

**white** [2] - 586:10,
591:3

**WHITE** [1] - 481:6

**whole** [8] - 509:6,
515:23, 593:18,
598:16, 600:19,
614:6, 614:7, 625:22

**wholesale** [2] - 532:1,
572:12

**WI** [1] - 481:4

**widely** [2] - 667:19,
675:20

**Wiesen** [6] - 518:20,
518:24, 569:18,
590:3, 613:7, 617:18

**WIESEN** [68] - 480:14,
487:17, 488:19,
489:2, 489:5,
489:10, 489:24,
490:7, 518:9,
518:22, 519:15,
519:21, 522:6,
522:13, 522:14,
526:6, 526:10,
527:8, 527:15,
528:11, 528:16,
528:17, 528:19,
531:13, 534:7,
534:16, 534:17,
548:20, 548:23,
550:1, 550:19,
551:7, 551:12,
555:5, 555:7,
557:23, 557:24,
558:4, 558:8,
558:11, 558:14,
558:15, 567:17,
567:21, 569:10,
569:12, 569:21,
570:6, 576:16,
577:1, 582:3,
586:14, 587:5,
587:10, 590:4,
613:8, 613:12,
613:17, 615:23,

616:8, 616:12,
617:20, 618:6,
622:24, 623:7,
623:10, 632:14,
633:8

**William** [4] - 519:1,
519:3, 520:15,
622:14

**WILLIAM** [2] - 480:16,
481:12

**william** [1] - 633:14

**willing** [5] - 491:22,
632:6, 642:4, 642:7,
709:23

**Wilmington** [1] -
480:6

**win** [1] - 489:16

**winner** [1] - 489:19

**wire** [1] - 640:10

**wires** [1] - 640:7

**wise** [1] - 546:15

**wish** [1] - 530:21

**withdraw** [1] - 551:8

**withdrawn** [1] -
587:23

**witness** [18] - 510:20,
512:5, 517:2,
517:24, 518:7,
518:13, 518:17,
551:6, 614:1,
631:23, 631:25,
633:15, 633:21,
645:10, 659:14,
690:23, 692:20,
692:23

**Witness** [2] - 613:19,
721:5

**WITNESS** [13] -
518:15, 518:19,
531:11, 584:22,
586:8, 591:8,
591:11, 591:15,
633:24, 639:22,
640:17, 680:1, 680:4

**witness'** [1] - 593:22

**witnesses** [3] -
497:15, 527:14,
617:21

**Wolinsky** [42] - 524:9,
524:21, 527:24,
530:18, 533:9,
533:16, 534:1,
534:19, 534:22,
534:24, 535:24,
536:3, 536:11,
536:12, 536:19,
537:2, 537:15,
539:20, 543:7,
544:22, 551:21,
551:24, 552:7,

552:10, 554:18,
554:19, 554:23,
555:10, 555:24,
556:2, 556:15,
573:7, 575:6, 579:5,
579:7, 579:14,
579:16, 579:18,
586:19, 685:23,
686:3, 686:16

**women** [1] - 538:23

**wonder** [1] - 489:23

**word** [2] - 515:25,
705:5

**words** [10] - 504:11,
538:17, 542:15,
543:14, 546:13,
605:2, 605:6, 605:7,
605:8, 611:20

**works** [3] - 493:3,
557:12, 570:16

**world** [3] - 541:19,
700:11, 709:1

**worse** [2] - 564:7,
564:25

**worth** [2] - 515:23,
721:21

**wow** [1] - 587:18

**write** [3] - 492:22,
507:13, 710:12

**writes** [1] - 723:24

**writing** [1] - 514:18

**written** [3] - 609:6,
616:23, 702:11

**wrote** [1] - 633:6

**Wynn** [48] - 523:16,
525:12, 525:14,
526:20, 536:17,
540:4, 549:10,
549:11, 550:4,
550:14, 550:16,
550:21, 550:23,
550:25, 576:6,
618:13, 624:1,
624:6, 644:22,
644:24, 646:25,
650:1, 653:5,
653:20, 655:3,
657:2, 659:8,
665:13, 667:14,
668:19, 671:10,
672:25, 673:13,
673:20, 673:23,
673:25, 674:19,
677:16, 681:7,
683:18, 685:6,
685:10, 685:23,
686:5, 686:25,
687:7, 703:8, 711:9

**Wynn's** [14] - 523:13,
525:15, 548:24,

549:4, 549:9, 550:2,
576:10, 645:23,
652:23, 653:2,
653:3, 655:10,
680:13, 692:7
**Wyoming** [1] - 519:2

## Y

**year** [14] - 497:25,
535:6, 535:7,
541:23, 542:6,
545:12, 552:24,
553:18, 553:23,
589:19, 638:2,
694:25, 695:5,
701:11
**years** [12] - 499:14,
499:22, 504:11,
520:13, 520:17,
520:21, 539:16,
649:13, 682:6,
686:21, 694:21,
723:4
**yellow** [2] - 560:3,
560:7
**yesterday** [18] - 483:9,
484:7, 496:14,
523:13, 525:14,
526:20, 548:24,
550:5, 576:7, 617:6,
618:12, 622:4,
644:24, 645:23,
672:25, 673:13,
677:17, 685:6
**young** [1] - 626:16
**yourself** [8] - 693:5,
693:10, 693:17,
694:5, 702:10,
714:21, 717:18,
723:16

## Z

**zero** [11] - 535:18,
547:7, 547:8, 547:9,
562:12, 563:20,
563:23, 602:5
**zero-zero** [3] - 547:9,
563:20, 563:23
**zoom** [1] - 559:6
**Zynbryta** [1] - 643:16