1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4    IN RE COPAXONE 40 MG          )      C.A. No. 14-1171-GMS
     CONSOLIDATED CASES            )      (CONSOLIDATED)
5
                                - - -
6
                          Wilmington, Delaware.
7                    Thursday, September 29, 2016
                             9:00 a.m.
8                     Day 4 of Bench Trial

9                          - - -

10   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

11   APPEARANCES:

12           JOHN W. SHAW, ESQ., and
             KAREN E. KELLER, ESQ.
13           Shaw Keller LLP
                    -and-
14           PAUL W. WARE, ESQ.,
             DARYL WIESEN, ESQ.,
15           JOHN T. BENNETT, ESQ.,
             ELIZABETH J. HOLLAND, ESQ.,
16           NICHOLAS K. MITROKOSTAS, ESQ., and
             WILLIAM JAMES, ESQ.,
17           Goodwin Procter LLP
             (Washington, D.C.)
18                  -and-
             STEPHEN B. BRAUERMAN, ESQ., and
19           SARA BRUSSIERE, ESQ.
             Bayard P.A.
20
                          Counsel for Plaintiffs
21

22

23

24

25

```
 1    APPEARANCES CONTINUED:

 2              FREDERICK L. COTTRELL, III, ESQ.
               Richards, Layton & Finger, P.A.
 3                   -and-
               DAVID L. ANSTAETT, ESQ.
 4             Perkins Coie LLP
               (Madison, WI)
 5                   -and-
               SHANNON M. BLOODWORTH, ESQ.,
 6             BRANDON M. WHITE, ESQ.
               EMILY J. GREB, ESQ., and
 7             ROBERT D. SWANSON, ESQ.
               Perkins Coie, LLP
 8             (Washington, D.C.)

 9                             Counsel for Defendants
                               Mylan, Inc. and
10                             Mylan Pharmaceuticals, Inc.

11             DOMINICK T. GATTUSO, ESQ.
               Procter Heyman & Enerio LLP
12                   -and-
               WILLIAM A. RAKOCZY, ESQ.,
13             DEANNE M. MAZZOCHI, ESQ.,
               RACHEL PERNIC WALDRON, ESQ.,
14             MATTHEW V. ANDERSON, ESQ.,
               THOMAS H. ERLICH, ESQ.
15             ERIN FORBES, ESQ., and
               CHRIS GALLIGAN, ESQ.
16             Rakoczy Molino Mazzochi & Siwik LLP
               (Chicago, IL)
17
                               Counsel for Defendants
18                             Sandoz Inc. and Momenta
                               Pharmaceuticals, Inc.
19
               RICHARD W. RILEY, ESQ.
20             Duane Morris LLP
                     -and-
21             CHRISTOPHER S. KROON, ESQ., and
               ANTHONY J. FITZPATRICK, ESQ.
22             Duane Morris LLP
               (Boston, MA)
23
                               Counsel for Defendants
24                             Amneal Pharmaceuticals LLC
                               and Amneal Pharmaceuticals
25                             Company GmbH
```

1    **APPEARANCES CONTINUED:**

2              DAVID BILSON, ESQ.
               Phillips, Goldman, McLaughlin & Hall, P.A.
3                   -and-
               HANK HECKEL, ESQ.
4              Budd Larner
               (Short Hills, NJ)

5
                              Counsel for Defendant DRL

6
               NEAL C. BELGAM, ESQ.
7              Smith Katzenstein & Jenkins LLP
                    -and-
8              E. ANTHONY FIGG, ESQ.,
               ELIZABETH R. BRENNER-LEIFER, ESQ., and
9              BRETT A. POSTAL, ESQ.
               Rothwell, Figg, Ernst & Manbeck, P.C.
10             (Washington, D.C.)

11                            Counsel for Defendants
                              Synthon Pharmaceuticals, Inc.,
12                            Synthon B.V., and Synthon s.r.o.,
                              and Pfizer

13
                              -  -  -

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    THE COURT:  Good morning.  Please, take your

 2       seats.

 3                    (Counsel respond "Good morning.")

 4                    THE COURT:  Mr. Buckson, have you called about

 5       the temperature?

 6                    CHIEF DEPUTY CLERK BUCKSON:  No, but I will.

 7                    THE COURT:  All right.  Where are we?

 8                    MR. FIGG:  Good morning, Your Honor.

 9                    Our first live witness today is going to be Dr.

10       Ian McKeague, who is a biostatistician, whose testimony I

11       hope the Court finds illuminating.

12                    But before that, we have two witnesses whose

13       testimony we would like to present by deposition.  My

14       colleague, Ms. Brenner-Leifer, will introduce that.

15                    MR. FIGG:  We represent the defendants and we

16       would like to start -- first we're going to start the

17       plaintiffs' 30(b)(6) witness on the Glacier study.

18       Mr. Scott Kolodny, Medical Director, U.S. Medical Director

19       for MS at Teva, he's the person in charge of Glacier study

20       at Teva and he is also a named author on Glacier manuscript.

21                    May I approach, your Honor.

22                    THE COURT:  Yes, you may.  About how long will

23       this run?

24                    MS. BRENNER-LEIFER:  Just shy of 42 minutes,

25       your Honor.
```

```
 1                    THE COURT:  Okay.  Do we have transcription or

 2      is it going to appear on this?

 3                    MS. BRENNER-LEIFER:  Your Honor, the front of

 4      your binder.

 5                    THE COURT:  I see it.

 6                    MS. BRENNER-LEIFER:  There's a table of contents

 7      and the transcript of the deposition testimony.  Behind is

 8      the deposition exhibits.  On the screen you'll see both the

 9      witness, the testimony, and the exhibits that are

10      introduced.

11                    THE COURT:  Thank you.

12                    MS. BRENNER-LEIFER:  Thank you.

13                    (The videotaped deposition of Scott William

14      Kolodny was played as follows.)

15                    "Question:  Good morning.  Would you please

16      state your name for the record.

17                    "Answer:  Scott William Kolodny.

18                    "Question:  And you were in charge of the

19      Glacier study at Teva; is that right?

20                    "Answer:  I was one person who was in charge of

21      the Glacier study at Teva.

22                    "Question:  What was your specific role as the

23      lead, as one of the leads, for Glacier?

24                    "Answer:  I was involved in the initial

25      discussions about the need for Glacier.  I was involved in
```

Kolody - depo.

1    the initial study design of Glacier.  I was involved in the

2    synopsis creation, protocol creation.

3              "Question:  And then at that point we had a

4    formal study, and I was one of the clinical leads.  So I was

5    involved in the CRO selection process, and I oversaw the CRO

6    and oversaw the study.

7              "Throughout, I then was part of the review of

8    the results once the study was completed, and I was also

9    involved in the manuscript creation and subsequent

10   presentation of the results.

11             "Question:  When you were talking about the

12   manuscript, do you mean the clinical study report?

13             "Answer:  That was not what I meant.  When I

14   say the manuscript, this would be the publication

15   specifically.

16             "Question:  Is that the Wolinsky paper?

17             "Answer:  That is correct.  I did not directly

18   handle Scientific Communications Group, but I was involved

19   as an author and that of the clinical lead and parts of the

20   review process.

21             "Question:  Your current position at Teva is

22   global senior medical director --

23             "Answer:  That's correct.  For multiple

24   sclerosis.

25             "Question:  Okay.  I'm going to hand you what's

Kolodny - depo.

1    been marked as Exhibit 1 for your deposition.  Would you

2    look at that, and tell me if you've seen it?

3                "Answer:  Yes, I have.

4                "Question:  Now, this is now, this is the notice

5    of deposition of plaintiffs pursuant to Federal Rule of

6    Civil Procedure 30(b)(6).

7                Do you understand you're testifying on behalf of

8    plaintiffs with regard to Topics 12, 13, 44 and 45?

9                "Answer:  Can you give me those numbers again,

10   please?

11               "Question:  Sure.  Topics -- if you turn to Page

12   eight of the document, Topics 12 and 13 relate to FORTE,

13   GALA and GLACIER studies, and you're being designated to

14   testify on behalf of plaintiffs with regard to the Glacier

15   study.

16               "Answer:  I am aware of that.

17               "Question:  If you turn to Topics 44 and 45,

18   which is on the last page, Topic 44 relates to the benefits

19   and disadvantages of Copaxone 40-milligram over other drugs

20   for the treatment of MS, including, but not limited, to the

21   Copaxone 20 mg product.

22               And Topic 45 is another topic relating to the

23   Glacier study.

24               "Answer:  Yes, I am aware.

25               "Question:  Dr. Kolodny, can you identify what

1    has been marked as Exhibit 6?

2              "Answer:  This is an e-mail from Carol Childers

3    to myself, Mike Sheehy, John Hassler, Ginny Lemberger

4    and Ron Carnal, dated Tuesday, December 11, 2012 at

5    2:00 p.m.

6              "Question:  Does Teva make promotional claims

7    based on the outcome of Glacier?

8              "Answer:  No.

9              "Question:  Dr. Kolodny, take a moment to review

10   Exhibit 8, and when you're done, please identify it for the

11   record.

12             "Answer:  Okay.

13             "Question.  Can you identify this exhibit,

14   please?

15             "Answer:  This is an e-mail exchange between

16   myself and Mike Sheehy, the last e-mail dated at the top of

17   the page Thursday, July 25, 2013 at 4:12 p.m.

18             "Question:  Directing your attention to the

19   bottom of the first page, there's an e-mail from you to

20   Mike Sheehy, which you're providing an anecdote about a

21   friend of yours in the Houston area.

22             "Do you see that?

23             "Answer:  I do.

24             "Question:  And you are discussing a friend of

25   yours who has multiple sclerosis and had previously used

1    Copaxone, but then switched to Rebif because he had needle

2    fatigue; is that correct?

3              "Answer:  That's correct.

4              "Question:  And what is needle fatigue?

5              "Answer:  Where you get tired of injections.

6              "Question:  Was this something that was common

7    with the 20 mg Copaxone product?

8              "Answer:  I would say this is a feeling that we

9    heard on a number of occasions.

10             "Question:  And Rebif is injected three times a

11   week, right?

12             "Answer:  That's correct.

13             "Question:  Dr. Kolodny, had you heard at

14   Teva that there were a number of patients who had quit

15   the Copaxone 20-milligram product because of injection

16   fatigue?

17             "Answer:  While working at Teva, over the

18   course of my working at Teva, I have heard of reports of

19   patients changing therapy because they had injection

20   fatigue, yes.

21             "Question:  Okay.  And they're changing therapy

22   from the 20 mg product because of injection fatigue?

23             "Answer:  Yes.

24             "Question:  And there were other products on the

25   market that competed with Copaxone that were administered

1    less frequently, correct?

2              "Answer:  Yes.

3              "Question:  And Rebif is one of those drugs,

4    right?

5              "Answer:  Rebif would be administered less

6    frequently than Copaxone 20 milligrams.

7              "Question:  And Rebif is administered three

8    times a week, correct?

9              "Answer:  That's correct.

10             "Question:  And Teva wanted to make a Copaxone

11   product that would be administered three times a week to

12   complete with Rebif?

13             "Answer:  I have no knowledge of Teva, their

14   intentions, one way or another.

15             "Question:  Well, had people at Teva that you

16   talked to talked about this subject?

17             "Answer:  I never heard a discussion while

18   employed at Teva concerning the creation of a

19   three-times-a-week formulation to compete with Rebif.

20             "Question:  Well, were there discussions at Teva

21   concerning creation of a three times a week product to keep

22   those Copaxone patients that wanted to switch away from the

23   20 mg product because of injection fatigue?

24             "Answer:  I never specifically heard a

25   conversation that addressed the creation of three times a

1    week specifically for needle fatigue.

2              "Question:  Dr. Kolodny, could you identify

3    Exhibit 9, please?

4              "Answer:  It is a letter written to Glacier

5    investigators and study teams, dated October 21, 2013.

6              "Question:  Did you prepare this document, Dr.

7    Kolodny?

8              "Answer:  I did not.

9              "Question:  You signed it, right?

10              "Answer:  I did sign the document.

11              "Question:  Do you agree with the contents of

12    the document?

13              "Answer:  I have no reason to disagree with the

14    contents of the document.

15              "Question:  Had you found that the start dates

16    and resolution dates that were entered in the eCRF were not

17    accurate?

18              "Answer:  No.

19              "Question:  How did you know if they were

20    accurate?

21              "Answer:  We really -- it was up to the

22    discretion of the person entering the data to ensure the

23    accuracy of it.

24              "We independently, you know, cannot have

25    verified secondarily the accuracy of that information.  But

Kolodny - depo.

1    that is true of any clinical trial.  The sites enter data

2    into an eCRF or some similar type of process, and then it's

3    transported eventually, you know, to the company for

4    analysis.

5                "So there's no company that can ensure that the

6    sites, because no company sits at the site and watches the

7    input of the data.

8                "Question:  But you could have gotten the

9    patient diary cards if you wanted to, right?

10                "Answer:  Yes, we could have requested the

11    patient diary cards.

12                "Question:  And you didn't do that?

13                "Answer:  We did not.

14                "Question:  So you never did any check to see if

15    the patient diary cards were accurately entered into the

16    eCRF?

17                "Answer:  To my knowledge, we never did.

18                "Question:  And the number of queries, what does

19    that mean?

20                "Answer:  When data comes to us, we have coders

21    that review it and assign a code to it.  To accurately

22    assign the proper code, you have to have enough information

23    that's there.

24                "So if there's not enough information to

25    accurately assign the proper code, we queried the sites to

Kolodny - depo.

1    get additional information.

2              "Question:  And proper code, what kind of a code

3    are you talking about; medical code?

4              "Answer:  PT codes, preferred terms.  It has to

5    do -- we utilize an MedDRA database of terms, and so it has

6    to be able to be assigned.  There are a number -- one of the

7    levels is called a PT code or a preferred term.

8              "Question:  Now, how did you ensure that

9    patients were given instructions on how to fill out the

10   patient diary cards?

11             "Answer:  We offered no additional assurances or

12   did not seek additional assurances beyond the instruction to

13   the site.

14             "Question:  At the beginning of the study?

15             "Answer:  At the beginning of the study.  But we

16   also did not have any indication that we needed to reaffirm

17   those instructions or provide additional instructions.

18             "Question:  Well, I'm confused, because you just

19   said that there were instances where the information wasn't

20   sufficient to assign proper code?

21             "Answer:  Well, yeah, that's from a coding

22   perspective, and that induces queries, and that happens all

23   the time.

24             "But what I was speaking to was in regard to

25   were we not seeing the expected site reactions, were the

Kolodny - depo.

1    patients not coming in, and every patient in the study not

2    having injection-site reactions, that kind of thing.

3              "We did not see anything out of the ordinary

4    that would have triggered, you know, a retraining of the

5    sites, for example, or some other type of action.

6              "Question:  And he also seems to indicate that

7    he's unaware of any data to suggest that TIW specifically

8    addresses an unmet clinical need, right?

9              "Answer:  It would appear so.

10             "Question:  And then you write after that, 'I am

11   not aware of any published or presented data on this topic,'

12   right?

13             "Answer:  That is correct.

14             "Question:  And the topics to which you're

15   referring are whether there's an unmet clinical need that

16   the TIW specifically addresses, right?

17             "Answer:  That would appear to be the case.

18             "Question:  Are you aware today of any published

19   or presented data on this topic?

20             "Answer:  Which topic?

21             "Question:  Whether there's an unmet clinical

22   need that the TIW specifically addresses.

23             "Answer:  I'm not aware of anything published

24   that addresses that specific question.

25             "Question:  Dr. Kolodny, can you identify

1     **Exhibit 12?**

2                      **"Answer:  It appears to be the clinical study**

3     **report from study GA-MS-303, which I believe is the number**

4     **for Glacier.**

5                      **"Question:  This is appendix Section 16.1.3,**

6     **correct?**

7                      **"Answer:  I see 16.1.3.  I don't see that it's**

8     **appendix.**

9                      **"Question:  And on the next page is an**

10    **information and consent form.  Do you see that?**

11                     **"Answer:  Yes, I do.**

12                     **"Question:  Was this given to all of the**

13    **patients enrolled in Glacier?**

14                     **"Answer:  Yes.**

15                     **"Question:  Are you aware of any other**

16    **information that was provided from Teva to patients in**

17    **written form besides this?**

18                     **"Answer:  I am not.**

19                     **"Question:  Could you turn to Page 3 of the**

20    **information and consent form.**

21                     **"Answer:  Okay.**

22                     **"Question:  At the very bottom of the page, with**

23    **respect to the 'baseline visit' --**

24                     **"Answer:  Okay.**

25                     **"Question:  -- it says, 'You will be provided**

1    with a diary to record injection-related reactions defined

2    as any injection-site reaction (for example, local pain,

3    swelling, redness, et cetera) or events related to immediate

4    post rejection reaction (flushing, chest pain, palpitations,

5    anxiety, shortness of breath, throat constriction, and/or

6    skin rashes/hives).'

7                    "Was any other specific information provided

8    regarding how to define injection related reactions?

9                    "Answer:  I don't believe so.

10                   "Question:  Okay.  And in the next sentence,

11   the information and consent form says, 'You should record

12   any injection related reaction that you have,' right?

13                   "Answer.  Yes, it says that.

14                   "Question:  It doesn't say you must record any

15   injection related reaction that you have?

16                   "Answer:  No, it does not.

17                   "Question:  Was it a requirement that the

18   patients must record any injection related reaction that

19   they have?

20                   "Answer:  It was an expectation that they would.

21   Nowhere, to my knowledge, did it say you are required to.

22                   "Question:  This information and consent form

23   says 'within this diary you will report when the reaction

24   begins and ends and the intensity (severity).  The intensity

25   of these reactions will be classified as follows in the

1    diary,' and then there's a list of three bullet points,

2    'mild, moderate and severe.'

3                "'Mild' is 'symptoms which are easily

4    tolerated.'

5                "'Moderate' means 'symptoms that interfere with

6    daily activity.'

7                "And 'severe means symptoms which prevent normal

8    daily activities.'

9                "Was there any more information provided to

10   patients regarding how to categorize mild, moderate and

11   severe?

12               "Answer:  Not that I'm aware of.

13               "Question:  And do you agree that a person's

14   measurement of the intensity of their reactions is somewhat

15   subjective?

16               "Answer:  It completely depends on the

17   individual patient as to whether it might or might not be

18   subjective or more objective.

19               "Question:  Well, there's no -- there's no --

20   nothing indicated against -- nothing identified here against

21   which a patient can objectively categorize something as what

22   is easily tolerated and what interferes with their daily

23   activities, right?

24               "Answer:  There's nothing on here that defines

25   easily tolerated, interferes with daily activity, or

Kolodny - depo.

1    prevents normal daily activities.

2              "Question:  So it's up to the patient to

3    interpret that as best they can?  Right?

4              "Answer:  If the site did not give examples of

5    that or not, then that would be the case.

6              "Question:  And you're not aware of any site

7    giving examples or not giving examples of how to define

8    intensity, right?

9              "Answer:  I am not aware of a site giving or not

10   giving examples.

11             "Question:  Dr. Kolodny, can you identify what

12   has been marked as Exhibit 13?

13             "Answer:  Yes.  This was -- this is an example

14   of a Glacier injection-related reaction diary card.

15             "Question:  And this is the diary card that was

16   given to each of the patients in the study, correct?

17             "Answer:  That is correct.

18             "Question:  And there was no checklist given to

19   the patient to keep track that they did make the injections

20   on the schedule for that arm, correct?

21             "Answer:  That is correct.

22             "Question:  I'm asking how does Teva know that a

23   patient complied with the protocol requiring them to make

24   the injections in the first place?

25             "Answer:  We have no way -- we had no way of

1    independently verifying that.  But in all Copaxone studies,

2    we never independently verified that.

3                "Question:  Now, in half of the participants

4    that were assigned to give or receive GA 40 mg per ml

5    injected into the skin three times per week, what were the

6    instructions given to the patient regarding which days of

7    the week to inject the 40 mg?

8                "Answer:  There were no specific instructions as

9    to which day of the week to inject.

10               "Question:  Were they instructed to skip a day

11   between injections?

12               "Answer:  The instruction that was given was to

13   inject three times per week.

14               "Question:  Now, going back to the diary card.

15   Okay.  I just want to make sure I understand 100 percent.

16   The patients were not specifically instructed to skip a day

17   between injections if they were in the 40 mg arm?

18               "Answer:  They did not receive a specific

19   instruction to skip -- to skip a day.

20               "Question:  Okay.  But were they instructed to

21   take three injections a week?

22               "Answer:  That is correct.

23               "Question:  So they could inject three

24   consecutive days in that week?

25               "Answer:  That would be a theoretical

Kolodny - depo.

1    possibility.

2                "Question:  That wasn't a violation of the

3    protocol in Glacier for a patient to inject 40 mgs in three

4    consecutive days in that week, correct?

5                "Answer:  Can I read the protocol just to be

6    sure?

7                "Question:  I will get the protocol.  Fair

8    question.

9                "The reason why I ask you that question with

10   regard to this document is because this is the information

11   that was given to the patients, and if you would like to

12   review this and double-check that that's the case, that the

13   patients were not instructed to skip a day, I'll let you

14   take the time to do that.

15               Answer:  I'd be happy to review.

16               "Question:  Great.

17               "Answer:  There is nothing in this document

18   that --

19               "Question:  Instructs?

20               "Answer:  -- instructs the patient to take it

21   every, you know, three consecutive days or instructions

22   in any way how to take the drug other than three times a

23   week.

24               "Question:  Dr. Kolodny, on top of the patient

25   diary card marked as Exhibit 16, there's a number 10699-004.

Kolodny - depo.

1    Now, the first numbers in the patient I.D. refer to the

2    investigator site, correct?

3              "Answer:  I believe that is true.

4              "Question:  And the last three numbers refer to

5    the patient number assigned?

6              "Answer:  Yes.

7              "Question:  And it's the investigator's

8    responsibility to correctly enter the information from the

9    diary cards into the eCRF, correct?

10             "Answer:  They are the ones that enter the

11   patient's information from the diary cards into the eCRF.

12             "Question:  Okay.  Exhibit 25 has been marked.

13   It says it's a 'Teva Branded Pharmaceutical Product R&D,

14   Inc., Statistical Analysis Plan' for Glacier in the

15   extension phase.

16             "There's two patients with a high number of

17   IRAEs identified here.  If you look in the -- in the first

18   big paragraph beginning with the word 'Based' --

19             "Answer:  Okay.

20             "Question:  -- and then about six lines down it

21   says, 'Following an IRAE distribution check.'  Do you see

22   that?

23             "Answer:  Yes, I do.

24             "Question:  It says, 'two patients with an

25   extremely high number of IRAEs were found in the data;

1     patient 10727001 with 657 IRAEs.'  And patient 10716003 with

2     404 IRAEs, while the range of IRAEs for the rest of the

3     patients was between zero and 284 IRAEs.

4          "Then it says, 'In order to evaluate the

5     influence of these two observations on the overall parameter

6     estimate for IRAE rate, the primary model was fitted to the

7     overall data with and without the above extreme values.

8     This investigation revealed yearly IRAE event for all

9     patients is 132.5 while yearly IRAE event rate after

10    excluding two patients with extreme values is 100.3.

11    Therefore inclusion or exclusion of these two patients could

12    influence dramatically an overall event rate estimate.'

13          "Do you see that?

14          "Answer:  I do.

15          "Question:  Do you think it's correct to exclude

16    patients based on an anomalous amount of IRAEs?

17          "Answer:  The decision was a team decision

18    following the statistical analysis that's described here.

19    The decision was made because we wanted to -- we did not

20    want outliers or potential outliers influencing the overall

21    group.

22          "The study database, you know, had not been

23    locked.  The decision was made and the statistical analysis

24    plan was redone, and so it was still considered, you know,

25    before the database lock.  So it wasn't after reviewing

Kolodny - depo.

1    the data or the results of the study and deciding to

2    re-analyze.

3            "What I said is, a number of patients who

4    had multiple adverse events on the same day had one adverse

5    event, let's say, for example, an injection-site reaction,

6    that started at a given point, and claimed to have another

7    one starting within the -- before the time that that ended,

8    such that there was overlap, and we couldn't -- we would

9    not be able to know whether that was two separate adverse

10   events or one that was continued on for a certain amount of

11   time.

12           "Question:  Okay.  So we're on page 33 of the

13   extension phase, 'Statistical asset analysis plan,'

14   correct?

15           "Answer:  That is correct.

16           "Question:  And this says it's a post hoc

17   analysis, correct?

18           "Answer:  That does.

19           "Question:  In your own words, what is a post

20   hoc analysis?

21           "Answer:  A post hoc analysis is an analysis,

22   statistical analysis, that is carried out after the or is

23   performed after the original SAP or statistical analysis

24   plan was created, and an analysis that is carried out after

25   the database has been locked.

1              "Question:  Okay.  Under Section 8.1, second

2    paragraph says, 'A similar summary will present injection

3    related AEs by SOC, PT, treatment group, and combined

4    severity classes where events with mild severity will be

5    presented in one column.'  And moderate and severe events

6    will be presented in a single combined column.

7              "Do you see that?

8              "Answer:  I do.

9              "Question:  Why were moderate and severe events

10   combined?

11             "Answer:  They were combined because we had so

12   few severe adverse events in the study to create a separate

13   column to give an idea of the more severe injection site

14   reactions.  So moderate, severe.

15             "Question:  Any other reason?

16             "Answer:  Not that I'm aware of.

17             "Question:  Dr. Kolodny, Exhibit 26 has been

18   marked, it's entitled 'Listing 16.2.2 protocol violations by

19   treatment group ITT analysis set.'

20             "Do you see that?

21             "Answer:  Yes.

22             "Question:  Are you familiar with this document?

23             "Answer:  Not this one in particular.  I am

24   familiar with the tables listing graphs in general.

25             "Question:  Okay.  Could you turn to Page 6

Kolodny - depo.

1    of 6.

2              "There's a patient listed there 10729005.  Do

3    you see that?

4              "Answer:  9005, yes.

5              "Question:  Now, this patient took Tysabri.  Do

6    you see that?

7              "Answer:  I do.

8              "Question:  Okay.  And that's one of the

9    exclusion criteria, correct?

10             "Answer:  Yes.

11             "Question:  If a patient took Tysabri, then they

12   weren't supposed to be in the study, right?

13             "Answer:  That was an exclusion criteria.

14             "Question:  Would you look at the day in the

15   'Day' column.  It says minus five?

16             "Answer:  Yes.

17             "Question:  It says minus five, right?

18             "Answer:  It does.

19             "Question:  So that means that the people at the

20   investigator learned that before the study began, that the

21   person had taken Tysabri, right?

22             "Answer:  That would indicate that, yes.

23             "Question:  And still, they were included in the

24   study, despite in the screening phase knowing that that

25   person had take taken Tysabri?

Kolodny - depo.

1              "Answer:  The minus five would indicate that.

2              "Question:  So they did not follow the protocol

3       for excluding patients, correct?

4              "Answer:  This patient's inclusion in the

5       study would have been or should have been a protocol

6       violation.

7              "Question:  Would you look at patient 10714002.

8              "Answer:  Okay.

9              "Question:  This person is indicated as having

10      reported ISRs without returning ISR diary?

11             "Mr. Bennett:  What page are you on, Liz?

12             "Ms. Brenner-Leifer:  I'm sorry.  It's Bates

13      number 1615957.

14             "Question:  Do you see that?

15             "Answer:  Yes, I do.

16             "Question:  Was the diary card ever obtained?

17             "Answer:  I do not know.

18             "Question:  Still, the patient was allowed to

19      continue, despite not having filled out the diary card,

20      right?

21             "Answer:  Yes, it appears that way.

22             "Question:  As you said earlier, you asked them?

23      You didn't make them do it, right?

24             "Answer:  We did not require it, no.

25             "Question:  Dr. Kolodny, the court reporter has

Kolodny - depo.

1    marked as Exhibit 27 the clinical study report that was

2    produced in this case.

3              "Do you recognize this document?

4              "Answer:  Yes.

5              "Question:  Dr. Kolodny, can you identify

6    Exhibit 28?

7              "Answer:  Exhibit 28 is the published manuscript

8    from the Glacier study in 'Multiple sclerosis and related

9    disorders.'

10             "Question:  And you said that there was a

11   company that helped write the paper?

12             "Answer:  Yes.  Our global Scientific

13   Communications Group utilizes outside vendors to assist in

14   the drafting of the manuscript.

15             "Question:  Okay.  And you're an author on this

16   paper because of your involvement in the Glacier study?

17             "Answer:  That is correct.

18             "Question:  Severity and rate of injection

19   reactions was not the primary end point for this study,

20   correct?

21             "Answer:  Severity of IRAEs and rate of

22   injection site reaction were not the primary endpoint.

23             "Question:  Now, did you have any concerns that

24   by asking that question you would potentially bias the

25   patient into thinking that the 40 was going to be more

Kolodny - depo.

1    convenient than the 20?

2              "Answer:  Can you repeat it one more time?

3              "Question:  Now, did you have any concerns that

4    by asking that question, you would potentially bias the

5    patient into thinking that the 40 was going to be more vent

6    than the 20?

7              "Answer:  We were concerned -- we were aware

8    that that question could bias a patient -- it could bias the

9    patient in either direction, either in favor or not in favor

10   of Copaxone 40 milligrams three times a week.

11             "Question:  In what way could it bias them in

12   favor?

13             "Answer:  In favor of --

14             "Question:  Yes.  You said you were aware that

15   the question could bias a patient in either direction,

16   either in favor or not in favor.  How could it bias the

17   patient in favor of thinking that Copaxone 40 mgs three

18   times a week would be more convenient?

19             "Answer:  I say that, because any particular

20   questionnaire can potentially bias a patient.  A bias in

21   favor of it, an example would be that they wanted to be

22   on potentially on 40 milligrams three times a week, and

23   because they wanted to be there, they could respond more

24   favorably.

25             "Question:  Respond more favorably how?

1          "Answer:  Potentially in their responses to

2   questionnaires, theoretically -- theoretically altering --

3   not altering would not be the word, but in their reporting

4   of injection-site reactions or injection-related adverse

5   events, that is a possibility of it:

6          "But as I said, it's also a possibility that

7   they may have had too high an expectation, and the

8   experience could go the other way as well.

9          "Question:  Okay.  And in the last line of Table

10  2, there is data given for patients with greater than one

11  ISR, right?

12         "Answer:  Greater than or equal to.

13         "Question:  But 44 percent of the patients in

14  that group did not report any ISRs, right?

15         "Answer:  That is correct.

16         "Question:  If you have a patient in the study

17  that did not report any injection reactions in the diary

18  card, how do you know if the patient experienced them and

19  didn't report them or just didn't experience any?

20         "Answer:  We would have no -- we as a company

21  would have no way of definitively knowing whether that

22  patient experienced an injection-site reaction and did

23  not report it or did not experience an injection site

24  reaction.

25         "Question:  Another question I want to ask you,

1    if the eCRF form does not reflect any injection related

2    reaction for a patient, how does Teva know if that is

3    because the patient didn't experience them, did experience

4    any injection site reactions or experienced them but didn't

5    put them in the diary card or did not experience them, did

6    put them in the diary card, but the investigator did not put

7    the data into the eCRF?

8         "Answer:  Teva would have no way of knowing

9    whether any of those scenarios occurred.

10        "Question:  The data in Table 2 was based on the

11   data entered into the eCRF system, correct?

12        "Answer:  Correct.

13        "Question:  And that data purports to represent

14   the number of moderate and severe IRAEs experienced by the

15   patients in the study, correct?

16        "Answer:  Yes.

17        "Question:  Can we go back to Exhibit 25.

18        Mr. Swanson:  The statistical analysis plan.

19        "Question:  So let's turn back to Page 9 of the

20   second document within that.  That's where we were before.

21   And the Bates number on that ends in 722.

22        "Question:  And because they had an extremely

23   high number of IRAEs, it made sense to exclude them as

24   outliers, right?

25        "Answer:  Because of the very high numbers of

Kolodny - depo.

1    IRAEs, it came -- it came to somebody's attention, and

2    again, I don't know whose, and it was subsequently

3    determined that that was -- that they didn't look at the

4    amount of data that was there, and verified that they were,

5    indeed, outliers, and that's based on the paragraph, and

6    then the analysis was performed.

7         "Question:  And it says at the bottom there of

8    that paragraph that 'inclusion or exclusion of these two

9    patients could influence dramatically on overall event rate

10   estimate.'

11        "Do you see that?

12        "Answer:  That is correct.

13        "Question:  And so if these two patients were

14   included, that could have a dramatic influence on the

15   ultimate result, right?

16        "Answer:  Based on this sentence, yes.

17        "Question:  Are you familiar with the visual

18   analog scale?

19        "Answer:  I have a familiarity with the visual

20   analog scale, in general.

21        "Question:  And what's your understanding of the

22   visual analog scale?

23        "Answer:  My understanding is that a patient

24   looks at various graphic representations of something, and

25   pick which most corresponds to what it is that it is trying

Kolodny - depo.

1          to depict.

2                    "Question:  And are you aware that in the SONG

3          trial that the SONG trial used the visual analog scale to

4          measure pain on injection site reactions?

5                    "Answer:  I am aware that the SONG trial

6          utilized a visual analog scale to measure pain.

7                    "Question:  And specifically the pain of

8          injection site reactions.  Right?

9                    "Answer:  Yes.

10                   "Question:  Could you have used the visual

11         analog scale to measure the severity of injection site

12         reactions in Glacier?

13                   "Answer:  That could have been a possibility to

14         be used, yes.

15                   "Question:  Could a patient have a painful

16         reaction that still does not interfere greatly with their

17         daily activities, and therefore would be rated as mild under

18         the Glacier severity scale?

19                   "Answer:  That would be possible.

20                   "Question:  So you've got Exhibit 30 in front of

21         you.  Could you identify that as the CTCAE?

22                   "Answer:  Yes.

23                   "Question:  And this is Version 4.0 published on

24         May 28, 2009.  Is that right?

25                   "Answer:  Version 4.0 published May 28, 2009.

Kolodny - depo.

1                    "Question:  Okay.  Could you turn to Page 58 of

2       the CTCAE.  Here we're under the section 'General Disorders

3       and Administration Site Conditions.'

4                    "And this would be the relevant part of this

5       CTCAE.  Is that right?

6                    "Answer:  It would appear to be relevant to what

7       we're talking about.

8                    "Question:  And it looks like the CTCAE uses

9       five grades.  Right?

10                   "Answer:  That is correct.

11                   "Question:  And the scale using Glacier has

12      three grades, mild, moderate and severe.  Right?

13                   "Answer:  That is correct.

14                   "Question:  So let's look at each of these

15      grades.  So grade one is 'Tenderness with or without

16      associated symptoms.'

17                   "Do you see that?

18                   "Answer:  I do.

19                   "Question:  And then two, three, four use 'Pain,

20      lipodystrophy,' various other things.  Three uses

21      'Ulceration or necrosis, severe tissue damage.'  Four is

22      'Life-threatening consequences,' and five is 'Death.'

23                   "Do you see that?

24                   "Answer:  Yes.

25                   "Question:  So it looks like the CTCAE is

Kolodny - depo.

1   grading the injection site reaction based on specific

2   symptoms.  Right?

3              "Answer:  It does.

4              "Question:  And the mild, moderate, severe scale

5   used in Glacier is not based on individual symptoms.  Right?

6              "Answer:  Yes.

7              "Question:  In Glacier, then, the patient just

8   reports severity based on how much it affects their daily

9   activities.  Right?

10             "Answer:  They report that based on, you know,

11  how the mild, moderate and severe is broken down.  Moderate

12  and severe are affecting, you know, daily activities in one

13  way, shape or form.

14             "Question:  So you could imagine that a patient

15  grading an injection site reaction based on the CTCAE could

16  have a different grade than the same injection site

17  reactions graded according to the Glacier scale.  Right?

18             "Answer:  It's hard to say what the differences

19  would be, but there could be differences, yes.

20             "Question:  So a patient could subjectively

21  think I am in a ton of pain, this is a terrible injection

22  site reaction, could rate that as a moderate or severe

23  injection site reaction and then a doctor could hear that

24  same story and think this is just a hypersensitive patient,

25  this particular injection site reaction is mild at most,

1    right?

2          "Answer:  That is theoretically possible."

3          MS. BRENNER-LEIFER:  Your Honor, we have another

4    deposition to play for you.  It's the subpoenaed testimony

5    of Jerry S. Wolinsky, M.D., physician and researcher at the

6    University of Texas Health Science Center.  He was the

7    principal investigator for the Glacier study.  He is the

8    first named author on the Glacier manuscript.  And he was

9    represented at the deposition by Teva's counsel, John

10    Bennett.

11          This video will take 51 minutes.

12          THE COURT:  I will be right back.

13          (Pause.)

14          THE COURT:  All right.  Please take your seats.

15          MS. BRENNER-LEIFER:  May I approach, Your Honor?

16          THE COURT:  If you must.

17          MS. BRENNER-LEIFER:  The binder is smaller.

18          (Deposition read as follows.)

19          "Question:  Good morning, Dr. Wolinsky.  How are

20    you today?

21          "Answer:  Good.

22          "Question:  Dr. Wolinsky, Exhibit 3 was produced

23    by the university; and can you identify this document for me

24    please?

25          "Answer:  This is my curriculum vitae and

1    printed --

2              "Question:  It's dated January 18, 2016.  Is

3    that correct?

4              "Answer:  That's when it was printed, yes.

5              "Question:  And was it up-to-date when you

6    printed it?

7              "Answer:  It was up-to-date as it ever gets.

8              "Question:  What do you mean by that?

9              "Answer:  One could spend their life on these

10   documents if you're not careful.

11             "Question:  Why did -- if you know, why were you

12   asked to be the primary investigator if you couldn't have an

13   investigational site at the university?

14             "Answer:  It's hard for me to -- I can project

15   what others were thinking, and I'm sure a fair amount of

16   that thinking was based on my experience and involvement

17   with the development of copolymer and Copaxone over quite a

18   long time.

19             "Question:  Were there no other investigators in

20   the study that had such experience?

21             "Answer:  No.  There are few in existence with

22   that experience.

23             "Question:  Such as who?

24             "Answer:  Pardon?

25             "Question:  Who are you referring to that have

Wolinsky - depo.

1    such level of experience with Copaxone?

2              "Answer:  Living?  Perhaps no one else.

3    Modestly.  Perhaps Comi.

4              "Question:  Comi?  C-o-m-i?

5              "Answer:  C-o-m-i.  In Milan.  Although his

6    history doesn't go back nearly as far.

7              "Question:  So when did you first get involved

8    in working on Copaxone?

9              "Answer:  It would have been around about 1974,

10   '75.

11             "Question:  Do you ever prescribe Copaxone

12   off-label?

13             "Answer:  On rare occasion.

14             "Question:  Do you ever prescribe Copaxone 20 mg

15   for use less than daily?

16             "Answer:  Rarely.

17             "Question:  Have you ever prescribed Copaxone 20

18   mgs for use three times a week?

19             "Answer:  Yes.

20             "Question:  And when did you do that?

21             "Answer:  I've been doing that for a number of

22   years for patients who are doing extremely well on the drug

23   but are having trouble with injection site problems.

24             "Question:  And did you do that prior to 2005?

25             "Answer:  Probably.

1          "Actually, I should correct myself.  I'm sorry.

2     You said three times a week.  Alternate day would be

3     correct.

4          "Question:  Do you see a significant difference

5     between three times a week and every other day?

6          "Answer:  I can't tell.  I can't tell if I see a

7     difference.  We're talking about GA 20.  I've never used it

8     three times a week.  I've used it every other day.

9          "Question:  Okay.  And that was prior to 2005?

10         "Answer:  I think so.  Rarely.

11         "Question:  I will be more specific.  Did you

12    review any patient diary cards?

13         "Answer:  No.

14         "Question:  Were you provided with any patient

15    diary cards?

16         "Answer:  No.

17         "Question:  Do you know what the -- did you ever

18    see what a sample of a patient diary card looked like?

19         "Answer:  No.

20         "Question:  Do you have any idea what was on the

21    patient diary card?

22         "Answer:  I assume the kind of information that

23    was extracted for the analyses planned.

24         "Question:  Do you know what kinds of questions

25    were on a patient diary card?  Without speculating.

Wolinsky - depo.

1                    "Answer:  No.

2                    "Question:  Dr. Wolinsky, can you identify

3       Exhibit 6, please?

4                    "Answer:  Right.  So this is a reproduction of

5       the final publication that's fully paginated as it appeared

6       in the press.

7                    "Question:  Now, this is the final publication

8       for the Glacier study.  Correct?

9                    "Answer:  Correct.

10                   "Question:  And you're the first author on the

11      paper.  And can you tell me why you're listed as first

12      author on the paper?

13                   "Answer:  Because I was considered to be the

14      principal investigator on the overall study.

15                   "Question:  Dr. Wolinsky, can you identify

16      Exhibit 7, please?

17                   "Answer:  Supplementary data.

18                   "Question:  Can you be more specific?

19                   "Answer:  It's supplementary data which should

20      have been downloaded from the website and contains

21      information which was referred to as -- in the paper itself

22      but not included in the print version proper in terms of its

23      expected importance or impact for the general readership.

24                   "Question:  Would you turn to Page 375 of

25      Exhibit 6, which is the publication, the print publication?

Wolinsky - depo.

1              "At the bottom of the second column there is

2     Appendix A, 'Supplemental Material.'

3              "Do you recognize Exhibit 7 as the

4     supplemental -- supplementary material identified at the

5     bottom of Column 2?

6              "Answer:  I think that's correct.

7              "Question:  Did anyone at Teva ever provide you

8     with any interim analyses for the Glacier study?

9              "Answer:  The only type of, if you will, interim

10    analysis that I had was reference to the number of injection

11    site reactions that were being reported, which was felt to

12    be lower than anticipated.

13             "This was the number of events overall, not the

14    number of events by randomization to either GA 20 or GA 40.

15             "Because of what seemed to be a low number of

16    events, we constructed a letter to the investigators to

17    remind them that this was an important aspect of the trial

18    and that they should not overlook anything that was being

19    reported to them and encourage the patients to record

20    reactions when they had them.

21             "Question:  Was there a concern that patients

22    were not recording reactions?

23             "Answer:  The concern was that the number of

24    events was lower than we had anticipated and perhaps this

25    might relate to the fact or the possibility that since these

1   were experienced injectors, they might be overlooking the

2   minor reactions which they had become familiar with.

3          "Question:  So there was -- there was a concern

4   that patients might be overlooking minor reactions to --

5          "Answer:  Possible.

6          "Question:  -- the injections?

7          "Answer:  It was possible.

8          "Question:  Did the number of ISRs reported

9   increase after the letter was sent?

10         "Answer:  It was a very short study and it was

11  very hard to know if that letter had any effect in reporting

12  frequency.

13         "Question:  Dr.  Wolinsky, can you identify what

14  has been marked as Exhibit 8?

15         "Answer:  Yes.  This is an e-mail exchange

16  between Joshua Steinerman and myself.

17         "Question:  So we have an e-mail with two

18  attachments.  The first attachment that is numbered 170 is a

19  letter and then beginning at 173 is a letter with some

20  red-line edits.

21         "Do you see that?

22         "Answer:  Yes.

23         "Question:  Are the red-line edits your edits?

24         "Answer:  I believe they are.

25         "Question:  Dr. Wolinsky, is it fair to say that

1    you don't know if patients were correctly reporting the

2    number of ISR events for the Glacier study?

3              "Answer:  It was a concern that the number of

4    events were relatively low and a possible explanation would

5    be that either the patients and/or the clinicians were not

6    paying enough attention to whether there were minor events.

7              "Question:  And what was the basis for this

8    concern you had?

9              "Answer:  It was brought to my attention by

10   Joshua Steinerman.

11             "Question:  You state in the first paragraph --

12   well, let me start my question over.

13             "The last sentence of that paragraph says, 'We

14   anticipate this product will be available to the broader MS

15   community in 2014, and one of the aims of Glacier is to

16   demonstrate the benefits and tolerability that can be

17   expected of this thrice weekly therapy.'

18             "Do you see that?

19             "Answer:  Yes.

20             "Question:  And I didn't read the words that

21   were crossed off.  Correct?

22             "Answer:  Correct.

23             "Question:  And was it your expectation that

24   patients would benefit from the thrice weekly therapy of

25   Copaxone 40 mgs?

Wolinsky - depo.

1            "Answer:  If the answer is clinical efficacy as

2       benefit, yes, because there was data to suggest that there

3       was clinical efficacy.

4            "Here the benefit was fewer injections and

5       presumably with fewer injections, less injection reactions.

6            "Question:  Is that what you're referring to in

7       that sentence?

8            "Is that how you understand that sentence?

9            "Answer:  The sentence was that we wanted to

10      have good data to know whether or not that was true, not to

11      change the reporting other than to make sure it was accurate

12      reporting.

13           "Question:  Well, that's --

14           "Answer:  A concern I had when the study was

15      constructed was that there might be a bias in reporting

16      because of patients' familiarity with GA 20, that they might

17      underreport any kind of ongoing reactions at GA 20 level

18      because they were so familiar with having dosed for at least

19      six months and in many cases considerably longer.

20           "Did you have the same concern of underreporting

21      for the 40 mgs?

22           "Answer:  I expect -- I anticipated based on

23      what we knew from other studies with 40 that there might be

24      more severe reactions when they did inject.

25           "And the issue of frequency of reporting was

1    blinded information just on reporting frequency.

2                "Question:  Can you explain what you mean by

3    'blinded information just on reporting frequency'?

4                "Answer:  In clinical trials, events are

5    reported and can be reported on an ongoing basis, depending

6    on how the data is collected.

7                "Usually those are reported without regard, if

8    there was randomization, to which arm of the studies those

9    events were coming from, just that there are fewer than

10   expected overall events.

11               So the information I had was that this was

12   overall events, not related to 40 or 20.  Just overall.

13               "Question:  The first sentence reads, 'while IRR

14   associated with GA are well known to patients and most

15   physicians, these are reported in Glacier in ways that

16   differ from standard.'

17               "What is the standard practice for reporting IRR

18   associated with GA?

19               "Answer:  By 'standard practice' in this

20   particular context would have meant in a clinical practice,

21   not in a trial setting.

22               "So in a clinical practice I might ask a

23   patient:  Did you have any unusual injection problems?

24               "And they might say:  No.

25               "And I would be happy and move on to the next

1       question I might have of them.

2               "I wouldn't say:  Did you have any pain?  Was

3       there a little bit of redness?  Did it swell slightly?

4               "Okay.  I wouldn't look for the minor things.  I

5       just get on with expecting that there are always minor

6       things when people inject themselves.

7               "Question:  Later in that paragraph, it's

8       written, 'Similarly, reactions and/or symptoms are recorded

9       which may not be clinically notable in other contexts, but

10      rather be assumed to be an accepted aspect of GA use.'

11              "What kinds of reactions or symptoms are

12      clinically notable?

13              "Answer:  So in my regular clinical practice

14      with Copaxone, what I take as important are prolonged

15      redness, swelling, palpable masses at injection sites,

16      prolonged pain, increased problems at injection sites of

17      lipoatrophy, tissue necrosis, immediate post-injection

18      systemic reactions which are more than mild flushing and

19      might, in fact, cause patients to call 911, thinking that

20      they are having serious issues.

21              "Those are events that I pay attention to in

22      daily practice.  Whether or not it hurts a little when the

23      needle goes in, I frankly don't care.

24              "Question:  That's to be expected?

25              "Answer:  I would think that's to be expected.

1          "Question:  And a little redness and swelling is

2     to be expected?

3          "Answer:  In some injections it's -- in some

4     patients it seems to be more frequent or at least more

5     bothersome to them than for others, if it occurs at all.

6          "Question:  And the last sentence of that

7     paragraph says, 'Perhaps most significantly, we are aware

8     that the absolute number of IRR reported in participants'

9     diaries can be large, and requires staff effort and

10    diligence in transmitting quality data via eCRF.'

11         "My first question is:  What is the eCRF?

12         "Answer:  Electronic case report form.

13         "Question:  And I'm a little bit confused by

14    your testimony earlier that there was a concern that

15    patients were not recording mild events with this statement

16    here that says, '...we are aware that the absolute number of

17    IRR reported in participants' diaries can be large...'

18         "I'm a little bit unclear whether you think that

19    the reporting was large or small.

20         "Or large but still underreported?

21         "Answer:  It was a possibility that it may have

22    not been the patients but rather the staff not reporting all

23    events.  We didn't know which .  I didn't know which.

24         "Question:  Dr. Wolinsky, can you identify what

25    has been marked as Exhibit 9?

Wolinsky - depo.

1              "Answer:  I can.  It's an e-mail exchange

2      between myself, Yulia Sidi, and Peter Feldman, in the main,

3      with others copied.

4              "Question:  Okay.  And in the second paragraph

5      you wrote, 'Second, it seems to be that it is smoke and

6      mirrors to suggest that this is a superiority trial.'

7              "And you're referring to the Glacier study?

8              "Answer:  Yes.

9              "Question:  So the answer to my question is that

10     Glacier was not a superiority trial.  Correct?

11             "Answer:  It was not.

12             "Question:  And then you wrote, 'Of course, the

13     number of reported injection site reactions should be less

14     for TIW than daily by about 50 percent or more.'

15             "Correct?  That's what you wrote.

16             "Answer:  Correct.

17             "Question:  That's what you expected, correct?

18             "Answer:  Correct.

19             "Question:  Why would the number of severe

20     adverse events relate to superiority?

21             "Answer:  I didn't want there to be any

22     confusion between the frequency of the injection sites and

23     the severity of injection sites and any perceived

24     superiority of 40 over 20 when that has never been shown in

25     terms of clinical efficacy, not an issue of tolerability.

Wolinsky - depo.

1                "Question:  And going back to the number of

2     reported injection site reactions, why did you expect that

3     the number of reported injection site reactions should be

4     less for TIW than daily by about 50 percent or more?

5                "Answer:  Well, if every time a person injected

6     themselves they had pain and reported it, then there would

7     be seven -- there would be seven reported injection site

8     reactions per patient on GA 20 per week and there would be

9     three for every GA 40 patients per week.

10               "So based on the number of reactions alone,

11    there should have been a similarly proportionate reduction

12    based just on whether or not there was a mild reaction that

13    was reported.

14               "Question:  So in your knowledge, the 40 mg

15    Copaxone three times a week is not more effective than 20

16    mgs daily?

17               "Answer:  For clinical efficacy, I don't know of

18    any demonstration of that.

19               "Question:  So in your view the 40 mg thrice

20    weekly regimen has not been shown to be more efficacious

21    than the 20 mg daily regimen?

22               "Answer:  Or less.

23               "Question:  Has not been shown to be more or

24    less efficacious?

25               "Answer:  Correct.

Wolinsky - depo.

1                "Question:  Could you turn to Exhibit 6, please,

2         which is the Glacier paper?

3                "Answer:  Okay.

4                "Question:  The paper states, 'Because

5         investigators and participants were neither blinded nor

6         masked to the treatment assignment, Glacier study outcomes

7         should be interpreted in the context of this acknowledged

8         study limitation.'

9                "How was the lack of blinding a limitation of

10        the study?

11               "Mr. Bennett:  Objection.

12               "Answer:  The possibility was that if there were

13        biases that either the patient or the physicians or any of

14        the study coordinators had in what perceived outcomes might

15        be, that since some patients were continuing on their

16        previous dose of Copaxone and dosing of Copaxone and others

17        were switched to a different formulation and everyone knew

18        that, there was no attempt at doing a double-dummy, as it's

19        called, to assure blindness, that there could be some bias

20        that would perhaps contaminate the results.

21               "Question:  What kind of biases could

22        contaminate the results?

23               "Answer:  For example, patients who were on GA

24        20 and used to taking it and presumably generally

25        comfortable with the drug might underreport their injection

1      reactions, while those who were switching to a new

2      formulation might pay closer attention to anything that

3      might have happened either directly related to the injection

4      or immediately following it or other things going on in

5      their life and attribute it to the drug, the new

6      formulation, since they would know they were on the new

7      formulation.

8              "So one of the concerns would be that there

9      might be a lack of a difference between the formulations

10     which might be a reflection of the compounding of those --

11     at least those potential biases.  There, of course, might be

12     more as well.

13             "Question:  Now, would it also be a possibility

14     that persons in the 20 mg arm might want to report reactions

15     to support a case that they should be switched to the 40?

16             "Answer:  Conceivable, but all of the patients

17     who are entering this study understood that after they had

18     completed four months, they would all have the opportunity

19     to go on to the three times a week formulation.

20             "Question:  Now, was the ability for the 20 mg

21     patients to then go on the 40 mg extension phase of the

22     study, was that an incentive for recruitment?

23             "Answer:  It could be looked at that way, but it

24     was an opportunity to , again, look at the reactions of

25     those who were switched over, crossed over, if you will,

Wolinsky - depo.

1    from 20 to 40, to see if their reactions to the 40 milligram

2    preparation were similar after the crossover to what was

3    seen with those who were on -- who were crossed over at the

4    time of random -- who were moved to 40 at the time of

5    randomization.

6              "Question:  Would you expect patients who are

7    enrolled in the Glacier to be excited about the opportunity

8    to take the 40 mg product?

9              "Answer:  I suspect that many of the patients

10   who chose to participate in that study probably were at

11   least curious if not interested in going to 40 milligram.

12             "Question:  Now, as you testified earlier this

13   morning, that you would expect a patient taking Copaxone 40

14   mgs three times a week would experience fewer injection site

15   reactions than a person taking 20 mgs Copaxone daily because

16   they are taking less than half the number of injections.

17   Right?

18             "Answer:  Correct.

19             "Question:  Now, do you think that's an

20   expectation that patients in the 40 mg arm of the Glacier

21   study also would expect?

22             "Answer:  I'm not sure what they would expect.

23             "Question:  Do you think it would be reasonable

24   for a patient to have the same expectation?

25             "Answer:  Yes.

Wolinsky - depo.

1              "Question:  So it would be reasonable for a

2     patient enrolled in the 40 mg arm of the Glacier study to

3     expect that they would experience fewer injection site

4     reactions than a person in the 20 mg daily arm of the study.

5     Correct?

6              "Answer:  I think that could be reasonable.

7              "Question:  And conversely, it would be

8     reasonable for a person in the 20 mg daily arm of this

9     Glacier study to expect that they would experience more

10    injection site reactions than a person taking 40 mgs

11    Copaxone three times a week --

12             "Answer:  That's possible.

13             "Question:  Dr. Wolinsky, could you turn to Page

14    371?

15             "The paper says, 'Patient's expectations of

16    convenience were assessed at baseline using a study-specific

17    questionnaire, in which patients reported whether they

18    expected GA 40 to be less, equally, or more convenient

19    compared with GA 20.'

20             "'Similarly, patients reported whether they

21    expected GA 40 to be less, equally, or more safe, as well as

22    effective, compared to -- compared with GA 20?'

23             "Why was this Questionnaire part of the study?

24             "Answer:  To find out what the patients'

25    expectations were and perhaps to be able to tease out any

1   systematic bias in terms of the expectation of the patients.

2            "Question:  How would it tease how the

3   systematic biases in terms of the expectations of the

4   patients?

5            "Answer:  Whether or not they all felt that

6   every -- or substantial proportion felt that the outcome

7   would be in one direction or the other.

8            "Question:  Could you turn to Exhibit 7, please,

9   the last page of that document?

10           "And 86.9 percent of the patients in both arms

11   of the study expected the 40 mg three times a week regimen

12   to be more convenient.  Correct?

13           "Answer:  Correct.

14           "Question:  So, Dr. Wolinsky, looking at the

15   data in supplemental Figure 2, would you agree that it's

16   fair to conclude that the vast majority of patients in this

17   study expected both treatment arms to be equally effective,

18   equally safe; but they also expected that the 40 mg three

19   times a week regimen would be more convenient?

20           "Answer:  Agreed.

21           "Question:  Have you ever used any TSQM form in

22   any other study?

23           "Answer:  In general.  I am not enamored with

24   patient reported outcomes.

25           "Question:  Why is that?

Wolinsky - depo.

1          "Answer:  They can't be held in my hand and

2     measured.  They have a significant subjective component.

3          "Question:  And the injection reactions in the

4     Glacier study were a combination of self-reported reactions

5     and reactions reported from nurses.  Correct?

6          "Answer:  They are self-reported outcomes.

7          "Question:  When you say patient reported

8     outcomes can't be held in your hand and measured, what do

9     you mean by that?

10         "Answer:  I mean I can't put it on a scale and

11    get a number which could be reproduced on another scale, as

12    long as the scale was standardized, and understand exactly

13    what that number means in a way that would be universally

14    understood.

15         "Why?  Because patients are individuals.  They

16    use words with different kinds of connotations and meanings.

17    They understand or don't understand how to use the scales

18    precisely.

19         "But nevertheless, one still has data from

20    groups of patients and one can hopefully get through the

21    noise that occurs in soft data to find what is meaningful

22    for the patients as a whole.

23         "Question:  Could you turn to Exhibit 6, for the

24    number of moderate and severe IRAEs, percent of total , I

25    have a simple question for you.

1                "Why were the moderate and severe IRAEs grouped

2       together?

3                "Answer:  Because there were very few severe

4       IRAEs.

5                "Question:  Why were the moderate and severe

6       ISRs grouped together?

7                "Answer:  Same reason.  And the other part of

8       the rationale was that those were likely to be more

9       meaningful than holding all of the mild, moderate and severe

10      IRAEs together as the only analysis.

11               "Question:  Could you turn to Table 3 of the

12      paper, please?

13               "There is a list of ISRs in this table.  Can you

14      identify for me, Dr. Wolinsky, which of these ISRs you would

15      put in the category of what you consider severe?

16               "Answer:  Things that are potentially bothersome

17      are injection site atrophy.

18               "Question:  Okay.  Anything else?

19               "Answer:  Injection site induration.

20               "Question:  Okay.

21               "Answer:  Injection site mass.  Injection site

22      necrosis.

23               "Question:  Okay.

24               "Answer:  The remaining are, of course, of

25      concern depending upon their magnitude more so than their

1    occurrence.

2              "Question:  Dr. Wolinsky, do you recognize

3    Exhibit 12?

4              "Answer:  It's the clinical study protocol.

5              "Question:  Could you turn to Page 9 of the

6    protocol?  Do you see the study end points?

7              "Answer:  Yes.

8              "Question:  'The primary end point' for the

9    Glacier study is the 'rate of injection related adverse

10   events in subjects treated with GA 40 mg per ml TIW

11   subcutaneously compared to subjects treated with GA 20 mg

12   per ml every day subcutaneously.'  Right?

13             "Answer:  Correct.

14             "Question:  The severity of injection related

15   reactions was not a primary endpoint of this study, correct?

16             "Answer:  Correct.

17             "Question:  And wasn't a secondary endpoint for

18   this study.  Correct?

19             "Answer:  Correct.

20             "Question:  The data in the Glacier manuscript

21   that related to the analysis of the severity of injection

22   site reactions was based on a post hoc analysis.  Correct?

23             "Answer:  In that it was not a primary or

24   secondary endpoint, correct.

25             "Question:  In fact, the injection site reaction

Wolinsky - depo.

1    severity was not even an exploratory endpoint for this

2    study.  Correct?

3              "Answer:  Correct.

4              "Question:  Dr. Wolinsky, can you identify

5    Exhibit 15, please?

6              "Answer:  This is an e-mail between myself and

7    Abi Vainstein.

8              "Question:  Then you say, 'Of course the data is

9    not ground-breaking.'

10             "Are you referring to the Glacier data?

11             "Answer:  To me, groundbreaking data is the

12   introduction of a new drug as a new indication with a new

13   mode of action and increased efficacy and better safety.

14             "This 40 milligram drug is not groundbreaking in

15   my estimation.  It is an improved convenience for patients.

16             "Question:  Dr. Wolinsky, have you seen this

17   document before?

18             "Answer:  Well, this particular document is --

19   was from Medscape, which is an outfit that reviews new

20   medical information, amongst other things.

21             "And this particular document had some embedded

22   quotes from myself and followed the presentation of the

23   results of Glacier at the American Academy of Neurology.

24             "Question:  You said, 'What we glean from this

25   study is that this 40 mg, more concentrated form of

1    glatiramer acetate three times a week is a reasonable

2    alternative for people who are growing weary of, or anxious

3    about, daily injections of this particular drug.'

4              "And then you said, 'It's important to note

5    about Glacier because in some ways it has practical

6    implications although it's not a critical study.'

7              "Is that an accurate quote?

8              "Answer:  Yes.

9              "Question:  And that is your view?

10             "Answer:  It's not groundbreaking.

11             "Question:  It says, 'Yet another GA study of

12   note compared the 20 mg and 40 mg doses and found that both

13   were safe and well tolerated, with no gain in efficacy for

14   the higher dose, commented Dr. Wolinsky.'

15             "And then this next quote -- next paragraph is a

16   quote.  It says, 'What the company hoped to show was that if

17   you give more, you get better results, but here they showed

18   that if you give more, you get what looks like -- looks to

19   be an equivalent result without an increase in side effect

20   profile, so the safety profile was the same.'

21             "Do you see that?

22             "Answer:  'Or similar,' I should have said.

23             "Question:  And are you referring to the FORTE

24   study?

25             "Answer:  Yes.

Wolinsky - depo.

1          "Question:  I want to discuss severity of

2      injection site reactions with you.  That was one of the

3      things you looked at in the Glacier trial.  Correct?

4          "Answer:  Correct.

5          "Question:  All right.  There is more than one

6      way to grade the severity of an injection site reaction,

7      isn't there?

8          "Answer:  I'm sure there is.

9          "Question:  And, for example, in Glacier

10     severity was graded as mild if it was easily tolerated, if

11     the injection site reaction was easily tolerated, moderate

12     if it interfered with normal daily activity, and severe if

13     the injection site reaction prevented normal daily activity.

14     Correct?

15         "Answer:  Correct.

16         "Question:  All right.  And that was a

17     determination made by the patients, correct?

18         "Answer:  Yes.

19         "Question:  And that was based on their

20     subjective experience of the injection site reaction,

21     correct?

22         "Answer:  Correct.

23         "Question:  Do you know who selected the method

24     of grading severity of injection site reactions in the

25     Glacier study?

Wolinsky - depo.

1               "Answer:  I actually don't know how we actually

2      came to that grading system.

3               "Question:  All right.

4               "Answer:  Or don't recall.

5               "Question:  I take it from discussions this

6      morning that you've been treating patients with glatiramer

7      acetate for a long time.  Correct?

8               "Answer:  Correct.

9               "Question:  And you said that at least as of

10     2005, you were occasionally prescribing Copaxone 20

11     milligram every other day to some patients who were having

12     particular problems with injection site reactions.  Correct?

13              "Answer:  Correct.

14              "Question:  And I take it from that at least at

15     the time you expected that injecting glatiramer acetate less

16     frequently would likely decrease the number of injection

17     site reactions that a patient experiences.

18              "Is that fair to say?

19              "Answer:  The answer is that these invariably

20     were patients with significant problems with usually

21     lipoatrophy, getting increasingly injection weary and doing

22     extremely well on the drug.

23              "So they all were a very select group of

24     patients, perhaps what one might call super-responders

25     and -- but having difficulty handling the drug.

Wolinsky - depo.

1                    "Question:  Because of the injection site

2        reactions?

3                    "Answer:  Because of the problems with the many

4        years of injections and a perhaps tendency to lipoatrophy.

5                    "Question:  So you -- it was your hope, at

6        least, and your expectation that by counseling them to

7        inject every other day rather than daily they might

8        experience fewer injection site reactions or less

9        lipoatrophy?

10                   "Answer:  At least they would be able to

11       continue on the drug by virtue of injecting themselves less,

12       less often.

13                   "Question:  And you certainly wouldn't have

14       encouraged them to inject less frequently if you thought

15       that doing so would increase the frequency of their

16       injection site reactions, correct?

17                   "Answer:  Of course not.

18                   "Question:  I understand that there was a -- you

19       report in the paper a statistically significant -- what you

20       characterize as statistically significant finding with

21       respect to severity of injection related adverse events.

22                   "My question was:  Was there a statistical

23       analysis performed on not the combined IRAEs, but just on

24       injection site reactions to see if there was a statistically

25       significant difference on that metric?

Wolinsky - depo.

1               "Answer:  There was, and there was.

2               "Question:  Where was that reported in the

3      paper?

4               "Answer:  I don't remember if we actually

5      reported it.

6               "Question:  So it's not reported in the Glacier

7      publication?

8               "Answer:  I would have to re-read it to be sure.

9               "Question:  I don't want to keep you here and

10     ask you to read it on the record.  I couldn't find it, and

11     that's why I ask.

12               "You simply don't recall if it's in the

13     publication as you sit here today?

14               "Answer:  As I sit here, without re-reading it,

15     I can't answer you with assurance.

16               "Question:  Okay.

17               "Answer:  But I do recall that that analysis was

18     done.

19               "Question:  If you look under -- in Section 3.3,

20     'Rate of ISRs,' could that be what you're recalling?

21               "And that's on Page 372 of Exhibit 6.

22               "Answer:  That's ISR rate annualized, and that

23     was a statistical analysis and obviously is there in the

24     paper.

25               "Question:  Is there a p value associated with

1 that finding that relates specifically to ISRs?

2    "Answer:  Yeah, the p value is 0006.

3    "Question:  Could the size of the difference in

4 IPIRs, moderate and severe IPIRs between two arms

5 potentially reflect bias arising from the unblinded nature

6 of the study?

7    "Answer:  As speculation, it's possible since it

8 was an unbiased study, and we discussed earlier why it would

9 have been hard to do the kind of blinding that would be

10 necessary.

11    "Question:  Did it strike you as unusual that 98

12 percent of the immediate post-injection reactions reported

13 in the 20 milligram arm were moderate or severe, whereas

14 only seven percent of the immediate post-injection reactions

15 reported in the 40 milligram arm were moderate or severe?

16    "Answer:  It is a considerable imbalance.  It is

17 not fully expected from the GALA study.  There are

18 differences in the patient population being treated in GALA

19 and in Glacier and whether or not those differences account

20 for this or not, I don't know.

21    "I think the overall reporting of events is --

22 in terms of the total number of IRAEs is what I would

23 expect -- it's actually proportionate in terms of the number

24 reported per expected injection.

25    "Question:  But I think what I understand you to

1    be saying is that the ISRs, the rate of ISRs were about what

2    you expected before you conducted the trial.

3                   "Is that fair to say?

4                   "Answer:  Correct.

5                   "Question:  Is that because you would expect

6    that -- or one would expect that when you're injecting fewer

7    times, 60 percent fewer times, you would expect to get fewer

8    injection site reactions?

9                   "Answer:  Yes.

10                  "Question:  In your experience do patients on

11   the 20 milligram daily dose occasionally forget to take a

12   dose?

13                  "Answer:  I'm sure that's true.

14                  "Question:  What do you advise a patient on the

15   20 milligram daily regimen to do if they come to you and

16   say:  Dr. Wolinsky, I missed a dose.  What should I do?

17                  "Answer:  When I'm dealing with my own

18   patients --

19                  "Question:  Yes.

20                  "Answer:  -- I tell them:  You've forgotten a

21   dose.  Don't worry about it.  Just don't make this a habit.

22                  "Question:  Doctor, do you believe that

23   glatiramer acetate works as a peptide vaccine?

24                  "Answer:  I do.

25                  "Question:  And has that informed your treatment

1    decisions with the drug?

2          "Answer:  It has in the past."

3          THE COURT:  Let's take our morning break.

4          (Recess taken.)

5          THE COURT:  Please take your seats.

6          Mr. Figg.

7          MR. FIGG:  Your Honor, we call as our next

8    witness Dr. Ian McKeague.

9            ... IAN McKEAGUE, having been duly

10       sworn as a witness, was examined and testified as

11       follows ...

12          THE COURT:  Good morning, Doctor.

13          THE WITNESS:  Good morning, Your Honor.

14          MR. FIGG:  May we approach the Bench and the

15    witness with some binders, Your Honor?

16          THE COURT:  Yes.

17          MR. FIGG:  We also have a book of the

18    demonstratives to pass up.

19          May I proceed?

20          THE COURT:  Yes, sir.

21              DIRECT EXAMINATION

22    BY MR. FIGG:

23    Q.   Dr. McKeague, would you please state again for the

24    record your full name?

25    A.   Ian Ray McKeague.

1    Q.    Could you explain to the Court what you do

2    professionally?

3    A.    I am a professor of biostatistics at Columbia

4    University in New York City.

5    Q.    What is biostatistics?

6    A.    Biostatistics is the field of study involved in the

7    design of clinical trials and other studies, other

8    biomedical studies, and the analysis of data arising from

9    such studies.

10   Q.    Do you have -- you mentioned you are at Columbia

11   University.  Do you also have experience with private

12   industry?

13   A.    I do.

14   Q.    And could you explain briefly what that has been?

15   A.    I have quite extensive experience in consulting with

16   private industry, specifically pharmaceutical companies, on

17   biomedical questions.

18   Q.    And have you consulted with them on analysis of

19   clinical trial results, for example?

20   A.    Yes, I have.

21   Q.    Could you summarize briefly your educational

22   background?

23   A.    I have a B.A. and a M.A. from Cambridge University in

24   England, as well as a Master's degree in mathematics from

25   Cambridge.  And I have a Ph.D. in statistics from the

1    University of North Carolina at Chapel Hill.

2    Q.    What did you do professionally after obtaining your

3    doctoral degree?

4    A.    My first position after doctorate was as an assistant

5    professor at Florida State University in the Department of

6    Statistics.  And I was there, promoted up through the ranks,

7    I was a full professor by 1991.  I became chair of my

8    department in the mid-nineties.  I was a named professor at

9    Florida State.  I was recruited by Columbia in 2004.

10   Q.    That is the position you have now?

11   A.    Correct.

12   Q.    Could you refer to DTX-1591.  Is that a copy of your

13   curriculum vitae?

14   A.    Yes.

15   Q.    And this identifies your publications and educational

16   background and so forth.  Correct?

17   A.    Yes.

18   Q.    Could you, please provide a brief overview of any

19   professional honors that you have received that you would

20   like to mention?

21   A.    I am a fellow of the Institute of Mathematical

22   Statistics.  They elect about ten to 15 Fellows per year.  I

23   am a Fellow of the American Statistical Association.  They

24   elect about 40 Fellows per year.

25   Q.    Doctor, do you serve on any editorial boards for

1    scientific journals?

2    A.    Yes.  I have served on the editorial board of the

3    Annals of Statistics, which is the flagship journal of the

4    Institute of Mathematical Statistics.  Also, on the

5    editorial board of the American Statistical Association, the

6    most prominent journal in statistics.

7    Q.    About how many scientific publications have you

8    authored?

9    A.    Over a hundred, mostly as a lead or senior author,

10   about half in biomedical areas.

11   Q.    And that half in the biomedical areas, are they

12   pertinent to the testimony you expect to be giving today?

13   A.    Yes.

14          MR. FIGG:  Your Honor, at this time we would

15   offer Dr. McKeague as an expert in the field of

16   biostatistics and the clinical studies, design and

17   statistical analysis of clinical trial results.

18          MR. WIESEN:  No objection, Your Honor.

19          THE COURT:  The Doctor is accepted as an expert

20   in those fields.

21   BY MR. FIGG:

22   Q.    Dr. McKeague, have you prepared a set of

23   demonstratives to assist you with your direct testimony

24   today?

25   A.    Yes.

1    Q.    What is -- before we get to that, what is the main

2    focus of your testimony today?

3    A.    My focus has to do with the claims of the '776 patent

4    in regard to infringement issues.

5    Q.    Let's refer to DDX-1500, Slide 2.  That is a

6    reproduction of Claim 1 of the '776 patent.  Is that right?

7    A.    Yes.

8    Q.    And referring to that claim, what claim limitations

9    specifically will you be talking about today?

10   A.    The claim limitation of severity, reduced severity of

11   injection site reactions in the human patient relative to 20

12   milligrams of GA administered daily.

13   Q.    Which other claims if any of the '776 patent have this

14   reduced severity requirement?

15   A.    I understand that all claims of the '776 have to do

16   with this reduced severity requirement.

17   Q.    Now, if we can refer to Defendants' Demonstrative

18   Exhibit 1500 at Slide 3, can you summarize for the Court

19   what you intend to address today during your testimony?

20   A.    Yes.  I find that there is no evidence that GA 40 mg

21   three times a week reduces the severity of ISRs and/or IPIRs

22   relative to the 20 mg GA daily.

23         My reasons for this are several.  Basically,

24   that the Glacier study design, all aspects of the study, in

25   fact, are flawed and unreliable -- well, the aspects that I

McKeague - direct

1    considered.

2           And secondly, that Dr. Marais's statistical

3    analysis of the Glacier study is misleading and was based on

4    incomplete data.  And thirdly, that both the Glacier

5    publication and Dr. Marais's analysis fail to show a

6    reduction in the severity of ISRs and/or IPIRs.

7    Q.    And so have you formed an opinion regarding whether

8    plaintiffs have shown that severity of ISRs or IRAEs is

9    reduced when a patient is switched from the 40 milligram GA

10   three times a week to 20 milligrams of GA daily?

11   A.    Yes.

12   Q.    And what is that opinion?

13   A.    My opinion is that they have failed to show that.

14   There is no evidence of reduced severity.

15          THE COURT:  You discussed IPIRs.  Did you mean

16   IRAEs?

17          MR. FIGG:  Your Honor, I actually have a slide

18   which I have cut out because I thought this had been gone

19   over.  Maybe I can clarify with the witness.

20   BY MR. FIGG:

21   Q.    You have heard the term ISRs.  What do you understand

22   that to mean?

23   A.    Injection site reactions.

24   Q.    And you have heard the term IPIRs?

25   A.    Immediate post-injection reactions.

1    Q.    And what are IRAEs?

2    A.    IRAEs are the two combined.  That is an acronym for

3    injection related adverse event.

4              MR. FIGG:  If I may, Your Honor, some of the

5    claims of the '776 require reducing the severity of ISRs,

6    and some of the claims require reducing the severity of both

7    ISRs and IPIRs.  And the Glacier paper refers to those two

8    together as IRAEs.

9              THE COURT:  I think that will help the reader of

10   this record.

11             MR. WIESEN:  I would agree with that.

12             THE COURT:  Okay.

13   BY MR. FIGG:

14   Q.    We have heard several other witnesses refer to the

15   Court's construction of the claim term severity to mean

16   intensity and the construction that frequency is distinct

17   from severity.  I am not going to go over that again with

18   you.  Have you applied those constructions when forming the

19   opinions that you are going to be talking about today?

20   A.    I have.

21   Q.    We have also heard a lot about the Glacier study

22   already.  I don't intend to ask you to repeat the

23   descriptions of that study.

24             Have you prepared a demonstrative exhibit to

25   help provide the Court with an overview of what you will be

1    talking about with regards to the Glacier study?

2    A.    Yes.  So this is just a summary of the structure of

3    the Glacier study.

4    Q.    For the record, Doctor, we have on the screen DDX 1500

5    at slide 7.

6          Can you explain what steps were involved in

7    arriving at the results that are reported in the Glacier

8    study?

9    A.    Yes.  First of all, there was a Glacier study design

10   encapsulated in the study protocol.  When the study started

11   there was data collection in the sense that patients were

12   provided with patient diary cards, we have heard about.  And

13   these patient diary cards were provided to the site

14   investigators.  And they were transcribed at the sites into

15   an electronic database, called eCRF, then the Teva

16   statisticians in the data analysis at the close of the data

17   collection, those results were used in the data publication.

18   Q.    Was the aim of the Glacier study directed to the

19   frequency or the severity of IRAEs?

20   A.    It was directed to the frequency of IRAEs.

21   Q.    Just so we are clear, what was the source of the data

22   set that was analyzed and reported in the Glacier paper, the

23   Glacier publication?

24   A.    It was the electronic database, the eCRF.

25   Q.    We heard Dr. Wolinsky talk about that a few moments

McKeague - direct

1    ago as the eCRF?

2    A.    Yes.

3    Q.    Now, referring to Defendants' Trial Exhibit 1728, what

4    do you understand this document to be?

5    A.    I understand this is a stipulation, an agreement

6    between the parties in the case regarding patient diary

7    cards that have not been provided.

8    Q.    Could we turn to Page 18 of the stipulation.  What

9    information is provided on that page?

10   A.    These are the patient IDs, ID numbers, and the site

11   locations of patients where there were missing diary cards,

12   not provided.

13   Q.    These are diary cards that Teva has not produced in

14   this case?

15   A.    That's correct.  I believe there are 20 such on this

16   document, such patient items.

17   Q.    About what percentage of the patients does that 20 or

18   so represent?

19   A.    That would be about ten percent.

20   Q.    If we could take a look at the next slide, DDX 1500,

21   at slide 10, you indicated earlier that you have found some

22   errors in the Glacier study.  With the assistance of this

23   demonstrative can you describe what types of errors you are

24   going to be talking about?

25   A.    Yes.  I am going to be talking about errors at all

McKeague - direct

1    phases of the study, study design errors, data collection

2    errors, data transcription errors, and data analysis errors,

3    and all told, the Glacier data, therefore, are flawed and

4    unreliable and therefore any analysis that results from

5    those data is also flawed and unreliable.

6    Q.    The last point on your slide refers to data analysis

7    errors.  I would like to talk about a couple of them first.

8          You have analyzed the data underlying the

9    Glacier publication.  Correct?

10   A.    I have.

11   Q.    Were you in the courtroom during Dr. Wynn's

12   examination?

13   A.    I was.

14   Q.    And were you also in the courtroom yesterday when Dr.

15   Marais testified?

16   A.    Yes.

17   Q.    And you heard this morning Dr. Kolodny's testimony in

18   which he referred to some outliers in the Glacier data?

19   A.    I did.

20   Q.    What is an outlier?

21   A.    An outlier is a data point that is far removed from

22   the bulk of the data or cloud of the data, of the other

23   data.

24   Q.    Have you identified any outliers in the Glacier data?

25   A.    Yes.  I have identified two outliers in the Glacier

1    data.

2    Q.    I would like to draw your attention to DTX-1729, which

3    is displayed on the screen, I believe, as DDX-1500 at slide

4    11.

5          What is depicted in this slide, Dr. McKeague?

6    A.    Here we see two panels, each of which is a scatter

7    plot.  Scatter plot is a standard statistical way of

8    inspecting data, especially at initial exploratory phases of

9    data analysis, to identify outliers.

10         Here we see on the left panel, which is for the

11   20 milligram arm, we see on the x axis total number of

12   IRAEs, on the y axis we see total number of moderate or

13   severe IRAEs and each dot represents a patient.  All

14   patients are depicted here.  And the right-hand panel is the

15   same thing but for the 40 milligram arm.

16   Q.    Now, what did you have to do -- withdrawn.

17         You created the plots that are shown in DDX

18   1500, Slide 11.  Correct?

19   A.    Correct.

20   Q.    What did you have to do to compile the data in that

21   way?

22   A.    I went through the electronic database, not all of it.

23   These are the data from the core phase.  So this represents

24   about 6000 of 10,000 pages in the electronic database.  I

25   counted the number of moderate and severe and total number

1   of IRAEs for all of the subjects.

2   Q.    Doctor, just to be clear, is a scatter plot, is that

3   something that you came up with for purposes of this case,

4   or is that something statisticians rely on?

5   A.    Yes.   It's a standard method of visualizing data,

6   absolutely standard, always used for inspecting

7   relationships between variables in a study.

8   Q.    Focusing on the right hand panel first, the 40

9   milligram three times a week data, how would you

10  characterize the distribution of data in that portion of

11  this slide?

12  A.    So on the right-hand panel we see the bulk of the data

13  in the lower left-hand corner and no other data points in

14  the rest of the plot.   And note that the scales on both

15  panels are the same, so we can compare them directly.

16  Q.    Focusing on the left panel, how would you characterize

17  the distribution of the data in that part of the plot?

18  A.    So on the left panel we see again the bulk of the data

19  in the lower left-hand corner, then we see these two

20  outliers circled in red.   They are very far separated from

21  the cloud data in the lower left-hand corner.   So they are

22  considered outliers.

23  Q.    Is that why you consider them outliers, just because

24  they are so far removed from the other data?

25  A.    No.   I heard -- I have heard Dr. Kolodny describe them

1    as outliers as well.  And I have also seen the statistical

2    analysis plan of the Teva biostatisticians, which describes

3    the same two points as outliers as well.

4    Q.    So let's take a look at that.  If we can refer to

5    JTX-7026.  Is that the statistical analysis plan to which

6    you just referred?

7    A.    Yes.

8    Q.    And I would like to focus you on Page 57 of that

9    document, which we will display on the screen as DDX-1500 at

10   Slide 10.  Teva's statistical analysis plan -- I am sorry, I

11   think I misspoke.  It's on the screen as DDX 1500 at slide

12   12.

13             If we look at the top of what's on the screen

14   here in the section beginning with the word "Following,"

15   Teva's statistical analysis plan identifies, quote, "two

16   patients with extremely high numbers of IRAEs."

17             Are these the same two patients that you

18   identified as outliers in your examination of the data?

19   A.    Yes.

20   Q.    The statistical analysis plan states that, "in order

21   to evaluate the influence of these two observations on the

22   overall parameter estimate for IRAE rate, the primary model

23   was fitted to the overall data (using only intercept) with

24   and without the above extreme values."

25             What do you understand that to mean?

1    A.    So I understand they fit the model, or only the

2    intercept part of the model.  That means they are just

3    computing rates without adjusting for any other baseline

4    variables.  And they found that those estimates of IRAE

5    rates were dramatically affected when they had removed the

6    two observations and two outliers.

7    Q.    So this indicates that Teva analyzed the data with and

8    without the two outliers.  Correct?

9    A.    That's correct.

10   Q.    And if we refer to the last sentence in this paragraph

11   displayed on the screen, what did Teva's statisticians

12   conclude about the impact of these two outlier patients?

13   A.    That inclusion or exclusion of these two patients

14   could dramatically influence an overall event rate estimate.

15   Q.    Is that consistent with your opinion?

16   A.    Yes, absolutely.

17   Q.    Now, let's look a little further down on that page,

18   referring to the paragraph beginning with the word Moreover.

19              The statistical analysis plan mentions some

20   things that are Pearson residuals, Deviance residuals,

21   Cook's distance, and Leverage analysis.

22              What are those things?

23   A.    These are all standard statistical methods used for

24   detecting outliers, finding the presence of outliers.

25   Q.    Does this indicate to you that the Teva statisticians

1    analyzed the data using those standard statistical methods?

2    A.    Yes.

3    Q.    Now, referring to the last paragraph on this page, did

4    Teva's statisticians identify any other outliers in the

5    Glacier data set?

6    A.    No, they did not.

7    Q.    And you are referring to the sentence that says these

8    diagnostic statistics suggested that only the two -- the

9    above two patients have high influence on the fitted

10   response?

11   A.    That's correct.

12   Q.    What did Teva do to account for the impact of these

13   two outliers on the data?

14   A.    They essentially removed the effect of these outliers

15   by proposing an alternate definition of IRAE rate for the

16   primary endpoint for the Glacier study.

17   Q.    How was the primary endpoint redefined to account for

18   these two outliers?

19   A.    It was redefined, actually, as has been explained by

20   several people already, that when there were multiple events

21   on a single day, they were collapsed to a single event, an

22   event day, just counting days where there was at least one

23   IRAE, rather than total number of IRAEs.

24   Q.    Now, that was not the endpoint that Teva had planned

25   to use when the Glacier study was designed.  Right?

McKeague - direct

1   A.   That's right.  In the original study protocol, the

2   Glacier study protocol, the endpoint was defined as total

3   number of IRAEs.

4   Q.   If we can refer to JTX-7134, which is the Glacier

5   paper that we've seen many times before already, I'd like to

6   focus your attention on Section 2.3 of that paper.

7        What definition was used of IRAE to report the

8   frequency data in the Glacier publication?

9   A.   So now we see the definition of primary endpoint of

10  the Glacier publication is now the new endpoint that I just

11  mentioned, so as it says there for each patient, multiple

12  IRAE's starting on the same day were only counted as one

13  IRAE event.

14  Q.   Now, did you hear Dr. Marais' testimony yesterday that

15  his, in his opinion, it would be improper to remove these

16  outlier data from the analysis?

17  A.   I did.

18  Q.   And what, in fact, was the effect of Teva's redefining

19  the primary endpoint for its frequency analysis?

20  A.   In effect, it was removing those outliers, because

21  this new endpoint is not as effective.  The effect is

22  minimized on this new endpoint.

23  Q.   So it doesn't appear that Teva's statisticians would

24  agree with the opinion offered by Dr. Marais yesterday?

25        MR. WIESEN:  Objection your Honor.

 1                  THE COURT:  Sustained.

 2                  MR. FIGG:  Withdrawn.

 3        BY MR. FIGG:

 4        Q.     I'd like to draw your attention to DDX-1500 at slide

 5        13.  This shows Table 2 of the Glacier publication; is that

 6        correct?

 7        A.     Correct.

 8        Q.     Can you describe in general terms, what is presented

 9        in Table 2?

10        A.     This is a summary of IRAE and ISR frequency and

11        severity numbers, a two-armed study.  For example, in the

12        third row, we see patients with at least one IRAE

13        percentage.  We see in the fifth row, we see total number of

14        moderate or severe ISRs, a percentage of total.

15        Q.     Now, you heard Dr. Wynn's testimony that he relied on

16        Table 2 to support his severity analysis of the Glacier

17        data?

18        A.     I did.

19        Q.     Did Dr. Marais discuss Table 2 at all in his direct

20        testimony?

21        A.     No.

22        Q.     Referring to the footnote at the bottom of Table 2,

23        was the modified endpoint that you described earlier for

24        IRAE used for the data presented in this table?

25        A.     No.  This footnote indicates that the number of IRAEs

1    and ISRs represented individually reported events.    So

2    it's the original endpoint as in the Glacier study protocol.

3    Q.    How were the outliers handled in the Glacier

4    publications severity analysis?

5    A.    The outliers remain in the analysis.  The effect of

6    them remain.

7    Q.    Now, Doctor, have you prepared a demonstrative exhibit

8    that analyzes the data in Table 2 without these outliers?

9    A.    Yes.

10    Q.    So if we could take a look at DDX-1500 at slide 14.

11    And let's focus first on the data that's highlighted in

12    yellow.

13          What does the Glacier publication report with

14    respect to moderate and severe IRAE when the outliers are

15    included?

16    A.    So for GA 20 arm, it reports a total of 1083, for the

17    GA 40 arm, it reports a total of 244.  And these represent

18    about 19 and 9 percent respectively.

19    Q.    So with the outliers included, the number of moderate

20    IRAEs is about twice as high in the GA 20 group as in the GA

21    40 group?

22    A.    That's correct, in terms of percentage.

23    Q.    Now, if we can continue, the chart at the right, is

24    that your calculation of the data in Table 2 without the

25    outliers?

McKeague - direct

1    A.      That is correct.  My Table 2 is without outliers and

2    are the same rows that I highlighted.

3    Q.      And what happens to the number of moderate or severe

4    IRAE when the outliers are not included in the analysis?

5    A.      In the GA 20 group, the number falls dramatically as

6    does the percentage.  The percentage is now 4.2 percent

7    compared to 9.1 percent.  Now it's roughly half the number

8    of moderate or severe IRAE.

9    Q.      So the number of moderate and severe IRAE in the GA 20

10   group goes from twice as high as those in GA 40 to half as

11   high as those in GA 40?

12   A.      In percentage terms, yes.

13   Q.      Can you now refer to the data that's highlighted in,

14   it looks like green, and explain what we see there?

15   A.      In green we see the number of moderate or severe ISRs

16   as well as percentage of the total in each group, and when I

17   recalculate those numbers without outliers, there's a

18   similar effect.  In the GA 20 group, the number dramatically

19   drops from 854 to 180, and from 15 percent to 4.2 percent.

20              So, again, we get a reversal of the

21   numbers.

22   Q.      Doctor, have you prepared a demonstrative to help show

23   the effect of these two outliers on the data?

24   A.      Yes.

25   Q.      If we could refer to DDX-1500 at slide 15, what is

1    shown in this demonstrative, Dr. McKeague?

2    A.    Here I've broken down the total number of moderate or

3    severe ISRs according to the patients, the two outlier

4    patients we mentioned that we discussed.  And in the first

5    outlier patient is indicated in red there with a total of

6    563, total moderate or severe ISRs.  The other outlier

7    patient is 111 whereas all the other 99 patients in GA 20

8    have a total of only 180 moderate or severe ISRs.

9             And so, and the GA 40 you see there's no

10   outliers.  In GA 40, we have just another 108 patients.  We

11   have 240 with moderate or severe ISRs.

12   Q.    Approximately what percentage of the moderate and

13   severe ISRs in the 20-milligram group were reported by these

14   two outlier patients?

15   A.    About 80 percent.

16   Q.    Does the Glacier paper contain any disclosure that the

17   data in Table 2 includes outliers or patients reporting

18   extremely high numbers of IRAEs?

19   A.    There's no disclosure, no mention of any outliers or

20   of the supplement of the Glacier publication mentioned, no

21   such outlier.

22   Q.    Does the Glacier paper report that the original

23   primary endpoint conceived for the study was changed to

24   effectively remove the effect of these outliers?

25             MR. WIESEN:  Objection to form, your Honor.

1          THE COURT:  Rephrase, please.

2          MR. FIGG:  Yes.

3     BY MR. FIGG:

4     Q.     You testified earlier, Doctor, that the Teva

5     statisticians altered the primary endpoint from total number

6     of IRAEs to IRAE -- days, right?

7     A.     Correct.

8     Q.     Was there any disclosure in the Glacier paper that

9     that endpoint was changed in that way?

10    A.     None whatsoever.

11    Q.     Now, Doctor, are you testifying that Teva should have

12    just removed these outliers and not mentioned them in the

13    Glacier paper?

14    A.     No, not at all.  I'm saying they should have been

15    forthcoming and transparent.  It was the responsible thing

16    to do, to inform the reader, and without that, even

17    reviewers of the paper wouldn't have known the presence of

18    outliers in the data, which have a dramatic effect on the

19    results as we've seen.

20    Q.     Doctor, let's look at another part of the Glacier

21    paper now, which is JTX-7134, and I'd like to focus your

22    attention on figure three, which is DDX-1500.17.

23          Now, you heard Dr. Wynn testify that he relied

24    on Figure 3 to support his severity analysis.

25    A.     I did.

McKeague - direct

1    Q.      What does Figure 3 illustrate?

2    A.      Figure 3 is the annualized rate of moderate or severe

3    IRAEs.  And this is in terms of event days.  It's a rate.

4    It's a frequency comparison between GA 20 and GA 40.  And it

5    indicates that roughly that there are twice the rate of

6    IRAEs in GA 20 compared to GA 40.

7    Q.      Does this figure tell us anything about the relative

8    severity of ISRs in the GA 20 and the GA 40 group?

9    A.      No.  It has nothing to do with severity at all.  It's

10   purely a rate comparison.

11   Q.      And how does the frequency of moderate and severe

12   IRAEs reported in this figure compare to the frequency of

13   injections of the GA 20 and GA 40 products?

14   A.      It's proportionate, almost, almost to the decimal

15   point.  You see the, in the GA, in the GA 40 group, they

16   were only getting three-sevenths, and roughly half the

17   number of injections.  So we expect, we might expect, or as

18   we see here, indeed, it's proportionate to that decrease in

19   number of injections.

20   Q.      Doctor, did you hear Dr. Marais' testimony on

21   cross-examination yesterday that you cannot make any

22   determinations from Figure 3 about whether the proportion

23   of ISRs that were severe is higher, lower, or the same in

24   the 40-milligram group as compared to the 20-milligram

25   group?

1    A.    Yes.

2    Q.    Does that comport with your opinion that Figure 3

3    relates to frequency and not severity?

4    A.    Yes.

5    Q.    What effect, if any, do the outliers have on the

6    results in this figure?

7    A.    Well, Dr. Marais actually analyzed, re-analyzed the

8    data for this figure without, without the outliers, and he

9    found no significant difference between the two groups.  And

10   as you see in this figure, there is a significant difference

11   here, but once you remove the outlier, that significance

12   vanishes.

13   Q.    There's a significant difference in showing that the

14   frequency of moderate and severe ISRs is about twice as high

15   in the 20 as in the 40?

16   A.    Yes.

17   Q.    All right.  How do these outliers impact your opinion

18   regarding whether the Glacier study shows that administering

19   40 milligrams of GA three times a week reduces the severity

20   of ISRs or IRAEs relative to the 20-milligram data therapy?

21   A.    The presence of these outliers actually undermines the

22   integrity of the Glacier study, of finding reduced severity

23   in GA 40 versus GA 20.

24   Q.    Doctor, I would like to switch topics now and if we

25   could look at DDX-1500.  That's slide 18.

1          Early in your testimony you mentioned errors

2     in the design of the Glacier study.  What were those

3     errors?

4     A.    Patients were not required to record injection-related

5     data in their diary cards.  They were not required to follow

6     the claimed regimen in the particular arm of the study they

7     were in.  And the study was not designed to analyze severity

8     in the first place.

9     Q.    So let's look at the first one.  What was the -- what

10    is the basis for your stating that patients were not

11    required to provide data?

12    A.    I have heard Dr. Kolodny testify to that effect, that,

13    indeed, they weren't required to fill out diary cards.

14    Q.    And how did this impact these study results?

15    A.    This -- well, we don't know for sure.

16          MR. WIESEN:  Your Honor, I'm going to object to

17    this line of questioning.  He's simply asking him to

18    interpret what a fact witness said in this courtroom on the

19    video we watched earlier.  I don't think we need a

20    statistician -- I don't think he's qualified to provide

21    testimony on that subject.

22          MR. FIGG:  Your Honor, I simply am asking Dr.

23    McKeague what is the impact of the fact that patients were

24    not required to provide the data, a fact to which Dr.

25    Kolodny testified.

1          THE COURT:  Either way, it's not a fact in

2   controversy.  Right?  I understand --

3          MR. FIGG:  I don't think so.  Simply asking --

4   I'm sorry.

5          THE COURT:  I'm addressing Mr. Wiesen.

6          MR. WIESEN:  Your Honor, he's trying to

7   characterize what did or did not happen.  I agree with

8   what -- Mr. Kolodny said what he said.  He's interpreting it

9   in a way that there's some dispute about it.

10         THE COURT:  Well, there's a dispute about --

11         MR. WIESEN:  How the information was collected

12  or what information was collected and whether it creates a

13  problem.

14         MR. FIGG:  Your Honor, I'm not asking Dr.

15  McKeague to construe or interpret what Dr. Kolodny said.  We

16  all heard what Dr. Kolodny said.

17         I'm asking Dr. McKeague to exchange his

18  opinion on what the impact of that fact was on the data

19  analysis.

20         THE COURT:  Yes.  It's a fact.  I don't think

21  so -- that's why I said it's not controversial, so I'm going

22  to overrule the objection.

23         MR. WIESEN:  Thank you, your Honor.

24  BY MR. FIGG:

25  Q.    So if you could continue with your answer, Dr.

1    McKeague.  How did this impact the data analysis?

2    A.     We can't be sure, but there are uncertainties actually

3    about recording events related to a primary endpoint of the,

4    of the study, certainly raised alarm bells.  We simply don't

5    know and that's a big question mark over the, over the

6    integrity of the data.

7    Q.     So it adds uncertainty to the results reported?

8              THE COURT:  Don't lead him, Mr. Figg.

9              MR. FIGG:  Thank you.

10             THE COURT:  Okay.

11   BY MR. FIGG:

12   Q.     The second error you identified is that patients were

13   not required to follow the claimed regimen.  If you can

14   refer to the screen, DDX-1500, at slide 19.  I'm sorry.

15   Yes.  DDX-1500 at slide 19, which is Claim 1 of the '776

16   patent.

17             What is the regimen that is required by the '776

18   patent claims?

19   A.     The regimen for the '776 patent claims in the 40

20   milligram GA requires at least one day without an injection

21   between each day in which there is an injection.

22   Q.     And what does the Glacier protocol require with

23   regard to when patients are to administer the three

24   injections?

25   A.     The Glacier protocol did not say anything about when

1    they should be administered, just three times a week.

2    That's all.

3    Q.    And, again, do you rely in part on the testimony you

4    heard from Dr. Kolodny?

5    A.    Yes, indeed.  Dr. Kolodny said exactly that.  There

6    was no, there was no requirement.  They weren't told what

7    dosing schedule to follow.  Just three times a week.

8    Q.    Did you see evidence that patients actually did not

9    follow the three times per week with a day between injection

10   regimens?

11   A.    Yes, there is evidence of that.  In fact, Dr. Marais

12   himself produced or identified ten diary cards in which

13   patients in the 40-milligram GA entered adverse events on

14   three successive days of the week.  That is in that case

15   they were injecting on three, three successive days and not

16   skipping a day between injections.

17            He identified ten such diary cards in the core

18   phase and an additional three in the extension phase.  But

19   that could be the tip of the iceberg.  We don't really know

20   how many and if patients were not instructed to skip days,

21   we can only speculate as to the total amount.

22   Q.    Does it matter that some patients didn't follow the

23   same dosing regimen?

24   A.    Yes, it does.  Certainly, for the -- if Glacier is to

25   reflect anything about the patent claim, Claim 1, indeed, if

McKeague - direct

1    that's not a -- that is not a requirement of the patient to

2    skip a day, that's inconsistent with this claim in the

3    patent.

4    Q.    The third error that you identified relating to the

5    design was that the severity analysis was not the original

6    intent of the study and was a post hoc analysis.

7          Can you explain what you mean by that?

8    A.    So a post hoc analysis is done after the, after the

9    data are collected and it does not refer to the primary,

10   secondary or exploratory aims of the study that are embodied

11   in the protocol.  So this opens up the door to cherry

12   picking and mining the data with significant results and

13   really not being transparent about how you -- you're just

14   mining the data until you find something significant.

15   Q.    Have you seen examples of cherry-picking in the

16   analysis of the Glacier data?

17   A.    Yes, I have here.

18         So the severity analysis is, in fact -- well,

19   Table 2 is an example of cherry-picking because severity was

20   not mentioned at all in the Glacier protocol.  Actually even

21   yesterday I saw examples of cherry picking with Dr. Marais'

22   analysis, the study data.

23   Q.    Doctor, we have already heard testimony on this, so I

24   will be brief here.

25         You're familiar with what the primary, secondary

1    and exploratory endpoints of the Glacier study were; is that

2    correct?

3    A.    Yes.

4    Q.    Did any of them relate to severity?

5    A.    No.  Here they are in the protocol of the Glacier

6    study and there is absolutely no mention of severity in any

7    of the endpoints.

8    Q.    Now I'd like to turn to the Glacier data collection

9    flaws that you have identified.  If we could take a look at

10   DDX-1500 at slide 21.

11            What errors have you found in the data

12   collection process?

13   A.    The data are subjective, patient-reported as we

14   heard Dr. Wolinsky talk about extensively and eloquently

15   today.

16            The pre-study questionnaire he also talked

17   about, and there's evidence that it's -- well, my opinion is

18   that it's biased to patients.

19            Teva improperly influenced data collection by

20   sending a letter to site investigators and Dr. Wolinsky also

21   discussed this letter as we heard this morning.

22   Q.    If we can take a look at slide 22 of DDX-1500, which

23   is also JTX-7028.  Just briefly, Dr. McKeague, what

24   information did patients record on their diary cards?

25   A.    So they were asked to record, in particular, to give

McKeague - direct

1    the severity rating for their symptoms, mild, moderate or

2    severe, and mild being symptoms as easily tolerated,

3    moderate being sufficiently discomforting to interfere with

4    daily activity and severe being preventing normal daily

5    activities.

6    Q.    And how would you characterize these IRA -- withdrawn.

7          How would you characterize these IRAE severity

8    definitions?

9    A.    So these are merely subjective definitions.  They

10   don't speak to specific symptoms.

11   Q.    Well --

12   A.    We can only say they are subjective.  Each patient

13   presumably has their individual opinion, as Dr. Wolinsky

14   said.  They make up their mind, they could interpret these

15   words in different ways.  They could also conflate

16   convenience with interfering with or preventing normal daily

17   activities.

18   Q.    Is there a relationship between whether the methods of

19   grading the severity is subjective with the potential for

20   introducing bias at various points in the study?

21   A.    Absolutely.  This was an open label study.  Physicians

22   knew what arm of the study they were on.  And with an open

23   label and subjective patient reported endpoints, you have to

24   be doubly careful to make sure you have very rigorous

25   measure of endpoints, yes.  And these are subjective.  We

1    can't, as Dr. Wolinsky said, you cannot hold this in your

2    hand.  You can't measure it and people can't agree on what

3    it means.

4    Q.    The second error that you referred to in the -- was

5    the pre-study questionnaire; right?

6    A.    Correct.

7    Q.    If we could pull up DDX-1500 at slide 23, which is

8    from the Glacier publication, JTX-7134.

9         What does the Glacier paper itself say about the

10   effect of a pre-study questionnaire?

11   A.    So one of the questions in the pre-study questionnaire

12   relates to convenience, whether the patient expected GA 40

13   to be more convenient, less convenient, or as convenient as

14   GA 20.  And this reports 87 percent of GA 40 patients

15   expected it to -- sorry.  87 percent of enrolled patients

16   expected GA 40 to be more convenient than GA 20.

17   Q.    And what in your opinion is the potential impact of

18   this pre-study questionnaire?

19   A.    So this basically is telling us that the patients were

20   at baseline biased or they viewed the GA 40 as more

21   convenient in overwhelming numbers, and therefore, because

22   we have a subjective endpoint, related to convenience, they

23   conflated with convenience.  The study was biased from the

24   outset.

25   Q.    Doctor, if we could now turn to the last point you've

 1    made, which was about a letter that was sent during the --

 2    in the middle of the study; right?

 3    A.    Yes.

 4    Q.    And let's look at slide 24 of DDX-1500, and that shows

 5    excerpts from DTX-1454.

 6          First of all, what is DTX-1454?

 7    A.    This, these are extracts from the letter that was sent

 8    by Teva to the site investigators late in the core phase.

 9    The same letter that Dr. Wolinsky had discussed this

10    morning.

11    Q.    Referring to the first highlighted portion, what is

12    stated as the aim of the Glacier study?

13    A.    It says, "One of the aims is to demonstrate the

14    benefits and tolerability that can be expected of this

15    thrice weekly therapy," GA 40.  And it speaks to the

16    benefits.  It's really plain convenience, I think.

17    Q.    Now, how does the letter state that injection-related

18    reactions are reported in the Glacier study as compared to

19    standard practice?

20    A.    It says that the Glacier study departs from standard

21    practice.  That the diaries are basically eliciting

22    information which would really not be elicited by a doctor,

23    so therefore departs from standard clinical practice.

24    Q.    Now, if we look at the third paragraph on this page of

25    the letter, what instruction does the letter give to study

McKeague - direct

1    investigators regarding moderate and severe reactions?

2    A.    Well, it tells them to be especially vigilant in

3    trying to increase the reporting rates of moderate and

4    severe.

5              The letter overall has the tone of an admission

6    that --

7              MR. WIESEN:  Objection, Your Honor.

8              THE COURT:  I will sustain that.

9    BY MR. FIGG:

10   Q.    Doctor, in your experience with clinical trials, how

11   appropriate was it to send a letter of this nature

12   mid-course through the study?

13   A.    Totally inappropriate.

14   Q.    I would like to now talk about the data transcription

15   errors that you have identified.  If we could turn to

16   DDX-1500, slide 25, what errors have you found in the data

17   transcription process?

18   A.    Not all data were entered into the eCRF.  There were

19   many errors in transcription of the data.

20   Q.    Now, have you prepared a summary exhibit that

21   summarizes the data transcription errors that you have

22   identified?

23   A.    I have.

24   Q.    And can we refer to DTX-1593?  What is this exhibit?

25   A.    This is one page of I believe a six-page document,

1    listing errors in diary cards as they were reflected in the

2    electronic database, the transcription of the information in

3    the diary cards that gives the patient ID and the Bates

4    number of the diary card.  And it lists the type of

5    transcription error, going on for six pages.

6    Q.    It goes on for six pages?

7    A.    Yes.

8    Q.    About how many have you identified here as having data

9    transcription errors?

10   A.    I believe it's around 70.

11   Q.    Now, let's just talk about a few of them.  We can't

12   obviously go through all of them.  Refer to patient ID No.

13   10708009.  This is shown at slide 26 of DDX-1500.  What does

14   this slide tell us?

15   A.    Well, this patient recorded a total of seven relevant

16   ISRs, five mild, two moderate.  But none of those were

17   transcribed into the electronic database.

18   Q.    Let's focus now on patient 10722010 on DDX 1500 at

19   slide 27.  What do we see here?

20   A.    This patient reported ten events as moderate, but they

21   appear as mild in the database.

22   Q.    Now, refer to patient 10718005, DDX-1500 at slide 28.

23   What do we see on this slide?

24   A.    In the severity classification, this patient recorded

25   a redness, what they described it as, as M.  But M is, of

McKeague - direct

1    course, ambiguous.  It could mean moderate or mild.  But it

2    was interpreted by the investigator as mild.  And that was

3    entered into the electronic database as mild.

4              Also, there were others.  There were two

5    entries, two dates in which it was interpreted as mild, and

6    those sort of severity on the diary card was actually left

7    blank.

8    Q.    Are these patients that we have just discussed

9    representative of the, I think you said about 60 or 70 in

10   DTX-1593?

11   A.    I believe so, yes.

12   Q.    Have you prepared a demonstrative exhibit showing the

13   issues that you have identified with the patient diary

14   cards?

15   A.    Yes.

16   Q.    If we could take a look at DDX 1500 at slide 29.

17             Now --

18             MR. FIGG:  Your Honor, just a moment.

19             THE COURT:  Yes.

20             (Pause.)

21   BY MR. FIGG:

22   Q.    Doctor, what is shown on slide 29 of DDX 1500?

23   A.    So it gives three percentages.  The first percentage,

24   43 percent, represents the proportion of patients absent

25   from the electronic database in the core phase.  So there is

1    just no record of them in the electronic database.

2              The second number, the second percentage there

3    is ten percent of patients, Teva never produced any diary

4    cards for those patients.

5              18 percent of patients had, their diary cards

6    had transcription errors.  That speaks to what we were just

7    discussing, the list of errors that I identified.

8    Q.   Dr. Marais testified yesterday that Teva's failure to

9    produce ten percent of the patient diary cards is

10   inconsequential because the data is in the eCRF.  Do you

11   recall that testimony?

12   A.   Yes.

13   Q.   Do we have any way of knowing whether there were

14   transcription errors for the ten percent of patients for

15   which diary cards have not been produced?

16   A.   No.  We have absolutely no way.  All ten percent could

17   have transcription errors, in which case that number of 18

18   percent that I mentioned could rise to 28 percent if all of

19   them had transcription errors.  That is an alarming error

20   rate.  Since the analysis relied on electronic database of

21   all these, if we have 28 percent of the data and they are

22   having errors, it just undermines the study.

23   Q.   Doctor, after accounting for the design errors, data

24   collection errors, and data transcription errors that you

25   have identified, what is the impact of those errors on your

McKeague - direct

1    opinion as to whether it has been demonstrated that

2    administration of 40 milligrams of GA three times a week

3    reduces the severity of ISRs or IRAEs relative to the 20

4    milligram daily therapy?

5    A.    It means that the Glacier study was so flawed in this

6    data collection phase, data entry phase, that we can't put

7    any credibility in any such conclusions about reduced

8    severity.

9    Q.    Doctor, I would like to switch now to a few questions

10   about Dr. Marais's analysis.

11         You heard Dr. Marais testify yesterday about

12   his, what we will call his "better off" analysis.  Right?

13   A.    I did.

14   Q.    Do you agree that this better off analysis establishes

15   that patients are experiencing a reduction in severity of

16   ISRs on the GA 40 product as compared to the GA 20 product?

17   A.    His analysis does not demonstrate that.

18   Q.    Have you prepared a demonstrative summarizing what you

19   perceived to be errors in Dr. Marais' analysis?

20   A.    Yes.

21   Q.    If we could take a look at DDX 1500 at slide 30, what

22   do you disagree with regarding Dr. Marais's better off

23   analysis?

24   A.    Well, Dr. Marias invents a definition of "better off"

25   that relates to frequency and not severity.

1          Secondly, he makes the wrong comparison.   He

2     makes a comparison of better off under GA 40 and better off

3     under GA 20.

4          And thirdly, Dr. Marais' analysis fails to

5     account for the reduction in reporting between the core and

6     extension phases.

7     Q.     Doctor, if we could look at Slide 31 of DDX 1500, why

8     does Dr. Marais' analysis not relate to severity?

9     A.     This is Dr. Marais' invented definition of better off,

10    which I have never seen before.  He concocted it.  Or if you

11    like, he cherry-picked it.  As you see, it all refers to

12    rate.  The definition, what he is talking about here is, he

13    is talking about frequency, comparing frequency of IRAEs

14    between the core and the extension phase for the switcher

15    patients who were on 20 milligrams in the core switched to

16    40 milligrams in the extension.

17         So the same patients.  And he is comparing the

18    frequencies of IRAEs in each phase.  He is looking at a

19    sub-population of the data, a subset of the data,

20    cherry-picking, if you would like.

21         Then as you see, his definition here,

22    complicated as it is, it's only referring to rates.

23    Q.     Doctor, where in the '776 patent do we find Dr.

24    Marais' better off analysis?

25    A.     It appears nowhere on the patent.

McKeague - direct

1   Q.    Well, where in the Glacier publication do we see Dr.

2   Marais' better off analysis?

3   A.    We do not see it in the Glacier paper.

4   Q.    If we can turn to -- well, let me just ask it this

5   way.  The '776 patent requires reduction of severity of ISRs

6   or IRAEs when the patient is switched from GA 20 to GA 40.

7   Right?

8   A.    Right.

9   Q.    If we turn to DDX-1500 at slide 33, what comparison

10  did Dr. Marais use in his better off analysis?

11  A.    So Dr. Marais made this comparison, as displayed

12  there.  He wanted to show that patients are, quote, better

13  off, in his definition, under GA 40.  To show something

14  using the method of what's called hypothesis testing in

15  statistics, you have to disprove the opposite of what you

16  want to prove.  He wants to show patients are better off

17  under GA 40.  The opposite of that is that patients are not

18  better off under GA 40.

19          But Dr. Marais didn't make that comparison.  His

20  comparison, as you see here, is better off under GA 20,

21  rather than better off under GA 40.

22  Q.    If we can relate that back to the '776 patent claim,

23  it requires reducing severity of ISRs, what is the opposite

24  or what you called the hypothesis of reducing severity of

25  ISRs?

1    A.    So the opposite of reducing ISRs is not reducing ISRs.

2    Q.    And what would that include?

3    A.    That would include no difference and reducing.

4    Q.    No difference or increasing?

5    A.    Sorry.  Increasing, yes.  Let's get that straight.

6    Q.    If we could refer to DDX 1500 at slide 34, if we

7    accept Dr. Marais' better off analysis, what comparison

8    should have been made?

9    A.    This is the correct comparison made with the opposite

10   of better off under GA 40 is better off under GA 20 or no

11   difference between GA 20 and GA 40, as we see in the yellow

12   box here.

13          So Dr. Marais basically ignored the no

14   difference between GA 20 and GA 40 in his comparison.  This

15   is the correct comparison, not better off under GA 40 to

16   better off under GA 40.

17   Q.    And I want to make it clear, you are not describing

18   the better off analysis, you are just explaining, if you are

19   doing that kind of analysis, how it should be done?

20   A.    Yes.

21          MR. WIESEN:  Your Honor, objection.

22          THE COURT:  I understand what's going on.

23   Overruled.

24   BY MR. FIGG:

25   Q.    Doctor, what was the effect of Dr. Marais' analysis of

1    using this wrong comparison?

2    A.    Well, the effect is, he doesn't address the claim in

3    the patent, which is the claim of reduced severity for one

4    thing.  He is testing the wrong hypothesis, basically.

5    Q.    About what percent -- I apologize, maybe you actually

6    said this already -- but what percentage of the data is

7    represented by the no difference between GA 20 and GA 40

8    that's represented and highlighted in yellow in DDX 1500

9    slide 34?

10   A.    That no difference represents about half of the data,

11   in fact.  While I don't remember well, I don't remember the

12   exact percentage, it is 40, 50 percent of the data, I

13   believe.  So he is essentially ignoring that in his

14   comparison, basically.

15   Q.    Have you conducted Dr. Marais' better off analysis

16   which includes this data?

17   A.    Yes.  When you don't throw out the data, I did the

18   correct comparison.

19   Q.    If we could look at DDX-1500 at slide 35, what is the

20   result of Dr. Marais' analysis when you use the correct

21   comparison?

22   A.    So for IRAEs we see the numbers here, numbers of

23   patients better off in his definition under GA 40 at 49 and

24   not better off under GA 40 at 48.  And that's not a

25   statistical difference.

McKeague - direct

1              So when I do that comparison, -- there is no

2    evidence, statistically significant evidence of better off

3    under GA 40 severity with ISRs.

4    Q.    Dr. Marais tried to explain his position by reference

5    to a flu vaccine.

6              How does that, if you look at the vaccine

7    analogy, relate to your analysis shown here on slide 35 of

8    DDX 1500?

9    A.    Well, I didn't really understand Dr. Marais' analogy.

10   He seemed to be wanting to compare no vaccine versus

11   vaccine.  And he was saying that I am throwing out 50

12   percent of the data.  But as we just explained, Dr. Marais

13   is the one who is throwing out data.  In the flu vaccine

14   analogy, you mentioned, he is comparing the two options of

15   having flu vaccine or no flu vaccine.  What is the

16   comparison you are concerned with?

17             My comparison is between better off and not

18   better off under GA 40, totally different question.

19   Q.    Between two alternative therapies?

20   A.    Between two alternative therapies.

21   Q.    Are you suggesting that one option would be not to

22   have any therapy at all?

23   A.    Well, no, no.  I think it would not be ethical to run

24   a trial of exposing patients to flu virus, where one arm of

25   the study had no vaccine and one did.  That would be totally

McKeague - direct

1    unconscionable.

2    Q.    You understand that Dr. Marias performed a statistical

3    analysis purporting to correct some of the various errors in

4    the Glacier process that you have identified?

5    A.    Yes.

6    Q.    In your opinion, is it possible for a statistical

7    analysis to correct the errors that you have identified in

8    your testimony here today?

9    A.    No.   When there are so many indications of a kind of

10   systemic problem in the data, no amount of selectively

11   removing isolated portions of the data can correct that.

12   Q.    Doctor, despite the fact that you believe that the

13   Glacier data is unreliable, have you conducted an analysis

14   responding to Dr. Marais' analysis of what he perceives as

15   the corrected data?

16   A.    I did.

17   Q.    If we could look at DTX-1604, which is shown on

18   Demonstrative Exhibit 1500 at slide 36, can you explain what

19   we are looking at here?   This is a very busy table.   Please

20   try to walk us through.

21   A.    Here, I went through exactly what Dr. Marais did,

22   except doing the correct comparison.   In other words,

23   testing whether patients are better off under GA 40 versus

24   not better off under GA 40.   And at no point did I find a

25   significant difference between those .   Removing all the

McKeague - direct

1    data that Dr. Marais had -- well, the errors in diary cards,

2    I removed all the data that he did in each line of his table

3    and corrected it.  I didn't find any significant difference.

4    Q.    Dr. Marais also relied on data from the Glacier

5    extension phase.  Do you recall that?

6    A.    Yes.

7    Q.    In a well-run clinical study, what would you expect

8    the relationship to be in the reporting rates throughout the

9    course of the study?

10   A.    One would expect the reporting rates would be fairly

11   steady throughout the course of the study.

12   Q.    So you would expect in a well-run study the reporting

13   rates in the core phase would be the same as the reporting

14   rates in the extension phase?

15              THE COURT:  Please rephrase, Mr. Figg, without

16   leading.

17   BY MR. FIGG:

18   Q.    Doctor, what would be the relationship between the

19   reporting rates in the core phase as compared to what you

20   would expect to see in the reporting rates in the extension

21   phase?

22   A.    In a well-run study, where we want to have credible

23   results, we would expect those reporting rates to be roughly

24   the same in the two phases.

25   Q.    Now, if we could take a look at DDX-1500 at slide 37.

McKeague - direct

1      How did the reporting in the core phase of the Glacier

2      study -- by reporting here I mean the patients reporting of

3      their results -- how did that reporting in the core phase of

4      the Glacier study compare to the reporting in the extension

5      phase?

6      A.      So we know about reporting, because if they didn't

7      report, they are not in the electronic database.   So we can

8      consider the rates of reporting in the core phase for the GA

9      40 patients, and then same patients, still under GA 40,

10     going into the extension phase.   And we see, the percentage

11     of patients reporting at least one IRAE is 58.3 percent in

12     the core phase, same patients now, extension phase, the

13     reporting rates goes down to 32.6 percent.   Roughly half.

14              It's a dramatic decrease.

15     Q.      Just so we are clear, was there any GA 20 data

16     collected in the extension phase?

17     A.      No.   All patients had switched to GA 40 in the

18     extension.

19     Q.      So all of the GA 20 is in the core phase?

20     A.      Yes.

21     Q.      What if anything was the statistical significance of

22     this decrease in reporting between the core and extension

23     phase?

24     A.      This is a highly statistically significant difference.

25     Q.      What impact if any does this decrease in reporting

1   have on Dr. Marais' analysis?

2   A.      It completely invalidates his analysis.

3   Q.      I would like to put on the screen Plaintiffs'

4   Demonstrative Exhibit 5.29.  You recall that Dr. Marais

5   used this slide to support a contention that the frequency

6   of ISRs was reduced in patients in the 40 milligram group in

7   the extension phase compared to those same patients in the

8   20 milligram core phase to a greater extent than could be

9   explained simply by the difference in injection frequency?

10              THE COURT:  What's your objection, Mr. Wiesen?

11              MR. WIESEN:  This is outside the scope of his

12   report.  As he explained in the beginning, his report

13   focused only on severity and is not on frequency.

14              MR. FIGG:  We weren't aware that Dr. Marais was

15   going to present this exhibit when Doctor --

16              THE COURT:  I am going to sustain the objection.

17              MR. FIGG:  Thank you, Dr. McKeague.  I have no

18   further questions, at least for the direct part of my

19   examination.

20              THE COURT:  We will have cross at 1:30.

21              (Luncheon recess taken.)

22              (The following took place at sidebar.)

23              THE COURT:  Never a dull moment.

24              One or more of your colleagues on the defense

25   team reported to my Chief Deputy, Mark Buckson, earlier,

McKeague - direct

1    maybe half an hour or so ago, that they observed two

2    gentlemen taking pictures of something and that they were

3    still in the courtroom.  They were identified for Mr.

4    Buckson.  I had him bring them back to me in my chambers,

5    and I have had them identify themselves and the

6    organizations they are with.

7              I have their organization's contact information,

8    their contact information.  Mr. Buckson escorted the

9    gentlemen to our IT department, where the phones are

10   currently.  They have been given access to our IT people.

11   My head of IT is in the process of deleting photos from

12   yesterday and today.

13             I asked what they had taken pictures of.  They

14   were taking pictures of the display on the screen.  I don't

15   yet know if they were recording, voice recording --

16             CHIEF DEPUTY CLERK BUCKSON:  One was.

17             THE COURT:  There we go.  One was voice

18   recording the proceedings.  I of course explained to --

19   excuse my colloquial language -- to the young knuckleheads,

20   one 29 and one 25, one with the EverGreen, the other with

21   Barclays, that, of course, unless authorized, photography is

22   not permitted in a U.S. courtroom, and that we are going to

23   hang on to their phones while they wish to remain in

24   attendance until the end of the day.

25             They have worked something out with you, Mr.

1    Buckson?

2             CHIEF DEPUTY CLERK BUCKSON:  Yes.

3             THE COURT:  I wanted to let you know that that

4    is going on, then also get your thoughts on this.

5             We don't know whether they are the only -- there

6    has been a lot of interest in the case, as I reported to

7    you, given the phone calls my court reporter has been

8    receiving about the transcript prior to our first day of

9    trial.

10            Are you interested in having me set a station up

11   outside of the courtroom and confiscating all public phones,

12   permitting attorneys to retain your phones, but not members

13   of the public?  I can make an announcement.

14            I don't know who is in here.  I could certainly

15   make an announcement that photography and recording is not

16   permitted.  Given our policy, which we still adhere to, of

17   letting the public bring in phones, and their phones are

18   camera equipment, you know, this is the 21st Century age in

19   which we live, the question really has more to do with

20   tomorrow and the other days that we are going to be here.

21   The question is whether you want me to confiscate

22   cellphones?

23            MR. FIGG:  I will speak up.

24            I think an announcement from the Court and

25   explanation of what the ramifications of doing this are

 1    would probably be effective.

 2                MS. BLOODWORTH:  Agree, Your Honor.

 3                MR. WARE:  I tend to agree with that as well.  I

 4    think it would also be appropriate for us to try and agree,

 5    if we were going to suggest something like that -- not the

 6    announcement -- I think that's appropriate, that we confer a

 7    little bit and get back to the Court.

 8                THE COURT:  That is why I didn't just order it,

 9    because I was inclined to contact the United States Marshal

10    and say, you know, we need you to do this and that.  But I

11    wanted to talk with you first.

12                We will leave it at that.  I will make an

13    announcement now.

14                Do you think that I should make an announcement

15    at the beginning of each day?

16                MR. WARE:  Yes.

17                MS. BLOODWORTH:  Yes, Your Honor.

18                THE COURT:  Okay.  All right.

19                (End of sidebar conference.)

20                THE COURT:  So before you begin, Mr. Wiesen --

21    Doctor, I'm sorry.  You can come on back up.  I apologize

22    for that.  I apologize for the delay.  But the delay is

23    occasioned by an unfortunate incident, and I'm not going to

24    go into that, but the endpoint is -- we've heard a lot about

25    endpoints.  But I dream about this stuff.

McKeague - direct

1              In any event, so in the event that there are

2    those in the audience who are unaware, photography is not

3    permitted in a United States courtroom unless and until the

4    presiding Judge grants permission for that to occur.  Not

5    only photography, but the recording, voice recording of

6    these proceedings.

7              It's a public proceeding and anyone who is that

8    interested, and I'm sure there are some here, and the two

9    young men who represented two investment houses who were

10   clearly interested, and I will leave them out of the record

11   for now.  I have not decided exactly what I'm going to do

12   with regard to contacting them.  Lest anyone claim

13   ignorance, and I believe they truly were ignorant of the

14   fact.  I do believe them.  I had them in chambers and we

15   with had one of those come to Jesus meetings.  And so that's

16   where we are.

17             I will make an announcement again at the

18   beginning of each proceeding on subsequent days, but no

19   photography.  Otherwise, I'm going to start taking

20   cellphones of members of the public outside.  We'll set up a

21   station and members of the public, the public will not be

22   permitted to bring cellphones or other recording devices

23   into this courtroom during the course of these proceedings.

24   Enough said.

25             All right.  Mr. Wiesen, your witness.

1              MR. WIESEN:  Thank you, your Honor.

2                          CROSS-EXAMINATION.

3    BY MR. WIESEN:

4    Q.    Good afternoon, Dr. McKeague.

5    A.    Good afternoon, Mr. Wiesen.

6    Q.    If we could have Dr. McKeague's direct slide,

7    DDX-1500.3.

8              MR. WIESEN:  I apologize.  We have some binders

9    to hand up.

10             THE COURT:  Yes.

11                  (Binders handed to the witness.)

12             MR. WIESEN:  Will you give us just a moment to

13   find the deposition as well?

14             THE COURT:  All right.

15             MR. WIESEN:  I'm not sure we're going to need

16   it, but it would make it easier if we did.

17             THE COURT:  All right.

18                  (Deposition transcript handed to the witness.)

19             THE COURT:  Mr. Wiesen?

20   BY MR. WIESEN:

21   Q.    Dr. McKeague, looking at your slide 1500.3, this is

22   the summary of your opinions in this case; is that correct?

23   A.    Correct.

24   Q.    And your opinion is that there's no evidence that

25   40 milligrams of GA three times a week reduces the severity

1    of ISRs and/or IPIRs relevant to 20 milligrams of GA daily;

2    is that correct?

3    A.    That's correct.

4    Q.    Now, you have not expressed an affirmative opinion

5    that there is no reduction in severity; is that right?

6    A.    I -- my opinion is exactly as I stated, there is no

7    evidence.

8    Q.    Right.  So you have not expressed an affirmative

9    opinion that there is actually no reduction in severity;

10   right?

11   A.    I'm just saying on the basis of the Glacier study,

12   which I had to look at, there could be evidence out there

13   somewhere which I'm not aware of.

14   Q.    And so I think you're agreeing with me, Dr. McKeague,

15   that your opinion is not -- you have no affirmative opinion

16   that there is no reduction in severity; right?

17   A.    No.  My opinion is confined to the -- what you see,

18   the aspects on this slide concerning Glacier study, Dr.

19   Marais' analysis, flaws in the Glacier study.

20   Q.    Your opinions are to criticize the Glacier study as

21   flawed and unreliable; right?

22   A.    Right.

23   Q.    And to criticize Dr. Marais' statistical analysis as

24   misleading?

25   A.    Right.

McKeague - cross

1    Q.    And based on incomplete data; right?

2    A.    Right.

3    Q.    And that both of these fail to show a reduction; is

4    that right?

5    A.    That's right.

6    Q.    But no affirmative opinion that there is not actually

7    a reduction.  You have not analyzed that question?

8    A.    I was tasked with examining the evidence as you see it

9    in the Glacier study.  There could be other studies I'm not

10   aware of.

11   Q.    And you have not even looked for those other studies;

12   right?

13   A.    I did not look for those other studies.

14   Q.    Could we have slide 1500.29, DDX-1500.29.

15         This is another one of your slides from your

16   direct; is that correct?

17   A.    That's correct.

18   Q.    And this summarized what you described as issues with

19   the patient diary cards?

20   A.    That's correct.

21   Q.    And the first issue you described is 43 percent of

22   patients are absent from the eCRF in core phase; right?

23   A.    Correct.

24   Q.    And you described that as an issue; is that correct?

25   A.    Correct.

1    Q.    Now, you specifically only identified the eCRF in core

2    phase here; right?

3    A.    That's what I meant.

4    Q.    Right.  And the eCRF in core phase is just the data

5    that's reported for the injection-related adverse events;

6    right?

7    A.    Just the data recorded --

8    Q.    Sorry.  Let me make sure I understand.  Well, what did

9    you mean by the eCRF in core phase?

10   A.    ECRF is the electronic database, and I'm referring to

11   the entries in the electronic database referring to core

12   phase.

13   Q.    Right.  And the adverse events for the core phase;

14   right?

15   A.    No.  I'm talking about any mention of patients in the,

16   in the core phase, in the electronic database.

17   Q.    Well, then I'm a little bit confused, Doctor.  Can you

18   turn to DTX-1530 in your binder, in the cross binder you

19   have, the white one.

20   A.    Yes.

21   Q.    This is part of the electronic database; is that

22   correct?

23               THE COURT:  Mr. Wiesen, which exhibit is this?

24               MR. WIESEN:  DTX-1530, your Honor, in the white

25   binder.

 1                    THE WITNESS:  I have trouble reading that.

 2                    THE COURT:  Can you see it?

 3                    THE WITNESS:  There are 10,000 pages in the

 4     electronic database.  I have not memorized every one of

 5     them, but I will accept your word for it.

 6     BY MR. WIESEN:

 7     Q.    Well, so, and maybe that's where our confusion is,

 8     Doctor.  I'm not referring to -- I wanted to make sure I

 9     understand by the eCRF data, you meant that 10,000 pages

10     lines of information that we've talked about?

11     A.    Yes.  My understanding is that definition is the data

12     in the eCRF.

13     Q.    All right.  And you calculated this 40 -- if we could

14     go back to DDX-1500.29.

15                    You calculated this 43 percent from looking at

16     that stipulation about the diary cards; is that correct?

17     A.    I -- well, actually, that 43 percent is a number that

18     can be extracted from Table 2 of the Glacier paper.  That's

19     a much easier way to get that number.

20     Q.    Let's go to the stipulation on the diary card,

21     DTX-1728.  And you should have this in your binder as

22     well.

23     A.    Yes.

24     Q.    And if we turn to the second page, the table for the

25     MS Clinic of Central Texas.  If we could blow that up.

McKeague - cross

1    Thank you.

2            Now, some of the patients are not in the eCRF

3    database because they have no events; right?

4    A.    Well, I'm not saying that.  I'm saying 43 percent just

5    do not appear in the electronic database.  That's a fact

6    that I'm reporting.

7    Q.    I understand that, but I want to make sure I

8    understand who is in that 43 percent and some of the people

9    who are in that 43 percent.  So let's look at this.  We've

10   got a patient I.D., 10722007; right?

11   A.    Yes.

12   Q.    Do you see that?

13   A.    Yes.

14   Q.    And for that patient we have diary cards; is that

15   correct?  That's what this means.  Diary card beginning

16   Bates number.  So we actually have in this case the diary

17   cards; is that right?

18   A.    Yes.

19   Q.    But we know that there are no IRAEs reported during

20   core phase by patient in diary card and eCRF; is that right?

21   A.    Yes.

22   Q.    So we've got diary cards, but they don't have any

23   events on them; is that correct?

24   A.    That's absolutely correct.  There are examples of

25   patients who are not listed in the eCRF because they had

McKeague - cross

1    diary cards, but there were no events recorded on them.

2    Q.    And the 43 percent that you reported as an issue

3    include those people; right?

4    A.    We don't know.   It's hard to say, you know, how that

5    43 percent breaks out.   This is -- perhaps you're right.

6    This is an example of somebody who had a diary card and

7    they reported no event.   Therefore, they're not in the

8    electronic database, but we have the diary card, so we can

9    cross-check.

10   Q.    Right.   So it's not an issue that they are not in the

11   database.   They shouldn't be in the database because they

12   have no events; right?

13   A.    Well, for this particular patient and this particular

14   diary card.   Yes, we have information.

15   Q.    Do you know how many patients on DTX-1728 fall into

16   that category?   We have cards, but there's a specific report

17   that on the cards there's no events and therefore they don't

18   appear in the eCRF database?

19   A.    DTX?

20   Q.    DTX-1728.

21   A.    That's my slide?

22   Q.    It's in both binders, I believe.

23   A.    Which slide?   Are you talking about my slide?

24   Q.    Sorry.   I'm talking about Defense Trial Exhibit 1728.

25   A.    Oh.

McKeague - cross

1          THE COURT:  It should be in there, Doctor.

2          THE WITNESS:  This one?

3          THE COURT:  In the white one, yes.  1728.

4          THE WITNESS:  Thank you.

5          THE COURT:  Are you at Page 4 or 5?

6          MR. WIESEN:  I'm at Page 2, your Honor.

7          THE COURT:  All right.

8          THE WITNESS: DTX-1728.

9          THE COURT:  Page 2.

10          MR. WIESEN:  Page 2.

11          THE WITNESS:  Page 2.  Okay.  Yes.

12          BY MR. WIESEN:

13   Q.    Do you see the entry for 10722007?  Correct?

14   A.    Yes.

15   Q.    You agree this is one of the people that falls in your

16   43 percent.  Right?

17   A.    Yes.  As I say, that 43 percent is just people who do

18   not appear in the electronic database.

19   Q.    You identified that as an issue that raised a concern

20   about the electronic database.  Right?

21   A.    Well, yes, it is an issue, yeah.

22   Q.    I don't understand why it is an issue, sir --

23   A.    Because we --

24          THE COURT:  Let him finish the question.

25   BY MR. WIESEN:

McKeague - cross

1    Q.    I am sorry, sir.

2          Let me ask it this way:  Do you agree that it's

3    not an issue, if they shouldn't be in the database because

4    they have got no events to report?

5    A.    Well, in view of the unreliability of the reporting in

6    the study, the subjective nature of the reporting and the

7    fact that 43 percent of patients do not appear in the

8    electronic database, indeed, that 43 percent is an issue on

9    its own.

10   Q.    Did you look through 1728, the stipulation about the

11   diary card, when you made that slide?

12   A.    I used the stipulation because it lists, it lists on

13   Page 18 of the stipulation when -- it lists 20 patients in

14   which no diary cards were produced.

15   Q.    Did you look at the first 17 pages of the stipulation?

16   A.    No, I didn't, not in direct detail.

17   Q.    Let's go to Page 17.

18         This is the PMG Research at the Winston-Salem

19   site.  For this one, we have 11 more patients for whom we

20   have diary cards and there is no events and so they are not

21   in the eCRF system.  Right?

22   A.    Well, I would need to investigate that question.  As I

23   say, I haven't studied this whole document.

24   Q.    Would it surprise you to know that there are 76

25   patients in this stipulation that indicate we have diary

McKeague - cross

1    cards for them, there is no IRAEs reported and that's

2    because the diary cards show that, there is no IRAEs?

3    A.    And they are not in the electronic database?

4    Q.    Correct.  Because there are no IRAEs to enter into the

5    electronic database.

6    A.    Wait a second.  On a particular diary card?

7    Q.    I am going through the stipulation, which is patient

8    ID by patient ID.  This is the agreement your counsel

9    reached with us.  Do you understand that?

10   A.    I am sure there are a lot of patients who indeed have

11   diary cards, they reported no events, therefore, they

12   didn't -- and we have the diary cards.  Of course, about ten

13   percent of diary cards were not furnished to us.

14   Q.    But if we go back to your slide, DDX-1500.29, that was

15   your second point, ten percent of the patients have no diary

16   cards?

17   A.    That is from the stipulation, exactly.

18   Q.    I am focusing on the first one.  You identified this

19   as an issue.  Will you agree with me, sir, that at least for

20   a substantial portion of this 43 percent, it's not an issue

21   or a problem because they shouldn't be in the eCRF database,

22   we have their cards and they have no events.  Right?

23   A.    Well, I have other information, Dr. Kolodny's

24   testimony, he was concerned about reporting as well.  I was

25   just using that figure to raise issues here.

McKeague - cross

1              I can't tell you.  We simply don't know.

2              THE COURT:  Doctor, this will go faster if you

3     focus on his question and try to be responsive to his

4     question.

5              THE WITNESS:  Yes, Your Honor.

6              THE COURT:  Mr. Figg will get back up and ask

7     you some additional questions after Mr. Wiesen is finished.

8              MR. WIESEN:  I will move on to another topic,

9     Your Honor.

10             THE COURT:  All right.

11    BY MR. WIESEN:

12    Q.    If we could have Dr. Marais' Slide DDX-1500.34.

13             Do you recall this conversation with Mr. Figg

14    about whether Dr. Marais makes the right or wrong comparison

15    in his analysis?

16    A.    Yes.

17    Q.    And in your view, he makes the wrong analysis.  Right?

18    A.    Right.

19    Q.    In your view, to show us a statistically significant

20    result, the better off under GA 40 category has to be

21    statistically significantly in more than 50 percent of the

22    population.  Right?

23    A.    No, I didn't say that.  I said that, if Dr. Marais is

24    trying to prove better off under GA 40, which he needs to

25    prove, he needs to disprove the opposite of that, the

McKeague - cross

1    opposite is not better off under GA 40.

2              But Dr. Marais doesn't do that comparison.   He

3    skips the no difference between GA 20 and GA 40.

4    Q.    Let's go to Dr. Marais' next slide, see if I can get

5    this right, DDX 1500.35.

6              Here you did a statistical analysis.   Correct?

7    A.    Correct.

8    Q.    And you concluded that better off under GA 40 was not

9    statistically significantly better than not better off under

10   GA 40.   Right?

11   A.    I did a test of -- I tried to -- I used the correct

12   test to try and prove the hypothesis that patients are

13   better off under GA 40.

14   Q.    To answer this question yes, to find this

15   statistically significant, the better off under GA 40 would

16   have had to have been statistically significantly more than

17   50 percent of the population.   Right?

18   A.    Yes, that's essentially correct -- not of the

19   population.

20   Q.    Of the group you are studying?

21   A.    The group we are studying.

22   Q.    So that is what you think is the statistically -- the

23   right statistical test, is if greater than 50 percent of the

24   population is better off under GA 40.   Right?

25   A.    Well, you see, Dr. Marais wants to prove -- he wants

1    to prove that they are better off under GA 40.  I am not

2    saying -- it depends on the data.  I am not saying

3    universally it's true.  For these data and this question,

4    this is the correct test.

5    Q.    Can I have my PDX-20.

6          This is a version we have made of your slide.

7    And it should look familiar because so far it is still the

8    same as what you used on direct.  Right?

9    A.    Right.

10   Q.    This is what you think would be the correct

11   comparison?  And I understand, you see other flaws in Dr.

12   Marais' analysis, but if he was doing it, this would be the

13   right statistical way to analyze it.  Right?

14   A.    In my view, this is correct.

15   Q.    And it would be better off under GA 40 versus no

16   difference and better off under GA 20.  And we have put the

17   inconclusives in the better off under GA 20 category like

18   Dr. Marais did, the conservative assumption?

19   A.    That's fine.  I agree.

20   Q.    I want to put some numbers on this and make sure I

21   understand the implications of this.  If we could have the

22   next slide.  Let's do a hypothetical, okay, Dr. McKeague?

23         We have a hundred people in the population.  50

24   are better off under GA 40.  50 have no difference between

25   GA 40 and GA 20, so they have got no reactions on either.

1    And zero are better off under GA 20.  Do you have that?

2    A.    Yes.

3    Q.    In your conclusion, would these be statistically

4    significantly different?

5    A.    They would not.  There is no evidence that patients

6    are better off than GA 40.

7    Q.    And in what you think is the right analysis, would

8    there be a reduced severity if this was the result you saw

9    in the population?

10   A.    Well, wait a sec.  As I pointed out in my direct, in

11   fact, you cannot interpret Dr. Marais' definition of better

12   off as reduced severity.  It's a frequency definition.

13   Q.    Well, would you agree that this is reduced in any way,

14   better off under GA 40, is reduced in any way compared to

15   the categories?

16   A.    As I presented, Dr. Marais had a rather complex

17   definition of "better off."

18   Q.    Just to make sure I understand, Dr. McKeague, in your

19   view, the proper analysis, if a population of a hundred came

20   out 50 were better off under GA 40, 50 had no difference,

21   and zero were better off under GA 20, you think those would

22   be the same to a doctor.  Right?

23   A.    I can't read the mind of a doctor.  To a

24   biostatistician, which I am, if we are testing a hypothesis,

25   that when 50 patients are better off in GA 40, then in this

1    case we have exactly 50 that are not better off, 50 that are

2    better off, so there is no evidence to reject the null

3    hypothesis.  So there is no evidence from that data that

4    patients are better off under GA 40.

5    Q.    This is the criticism that Dr. Marais set up the wrong

6    null hypothesis for his statistical test?

7    A.    I am giving you my -- this is the correct comparison.

8    That is what you are asking me about.  I had a separate

9    slide to explain why Dr. Marais was doing it.

10   Q.    In your view, Dr. Marais has the wrong null

11   hypothesis.  Correct?

12   A.    Yes.

13   Q.    You are looking at this from the perspective of a

14   biostatistician and have no idea of how a doctor would

15   consider this from a medical perspective?

16   A.    No.  I am looking at this from the perspective of what

17   the plaintiffs have to establish in this case.

18   Q.    Because you are not giving any affirmative opinion

19   about whether there is or isn't a reduced severity, just

20   whether evidence has been presented on it?

21   A.    My opinion is that there is no evidence of reduced

22   severity.

23   Q.    Can we take this down.

24         Let's go to Dr. McKeague's Slide 1500.14.  I

25   want to talk about the outliers, if we can, for a little

McKeague - cross

1     bit.  You talked for a while about the outliers with Mr.

2     Figg.  Right?

3     A.     Yes.

4     Q.     That was the first substantive topic you really got

5     into.  Correct?

6     A.     Well, I couldn't vouch for the order.

7     Q.     You analyzed the outliers in Table 2 of the Glacier

8     paper, PTX-7134.  Correct?

9     A.     You see my analysis on this slide, yes.

10    Q.     And all the analysis you did of the outliers used the

11    IRAE event statistic.  Right?

12    A.     Yes.  I am doing a reanalysis of Table 2, which is for

13    total number of IRAE --

14    Q.     I don't want to limit you just to this slide.

15           In your entire direct testimony you never talked

16    about doing any analysis of outliers using the IRAE event

17    day statistic.  Right?

18    A.     Well, I mentioned Dr. Marais' analysis on Table 3 -- I

19    mean Figure 3, which is indeed an event days analysis.

20    Q.     Other than that discussion of what Dr. Marais talked

21    about yesterday, you never talked about the outliers in the

22    context of event days rather than events.  Right?

23    A.     Well, I talked about it in event days and the

24    distinction -- and I talked about the results of Dr. Marais'

25    analysis on event days.  So I can't make a sweeping

1    statement, no.

2    Q.    Let's be more specific then, Dr. McKeague.   Can we

3    have slide 1500.11.

4              This is your scatter plot.   Right?

5    A.    Correct.

6    Q.    This is counting events, not event days.   Correct?

7    A.    This is counting total number of events, yes, as was

8    the primary input, originally.

9    Q.    We saw 1500.14, that was events, not event days.

10   Right?   That's events, not event days.   Right?

11   A.    This is events, yes.

12   Q.    If we go to 1500.15, that's events, not event days; is

13   that right?

14   A.    Correct.

15   Q.    If we go to 1500.16, that's events, not event days;

16   right?

17   A.    Correct.

18   Q.    Now, if we go to 1500.17 -- that was a pullout, so we

19   don't have it, your Honor.   Sorry.   That's Figure 3 from the

20   Glacier paper.   That's event days, not events; right?

21   A.    That's correct.

22   Q.    And you know that the analysis that Teva did in

23   Glacier actually used -- eventually used event days; is that

24   right?

25   A.    Yes.   In the primary endpoints as afforded to the

1    Glacier paper was event days.

2    Q.    Right.  And let's look at the statistical analysis

3    plan for a minute to see what it said about that analysis.

4    So we're going to look at JTX-7026.  Again, I suspect it's

5    in both of your binders, and we'll pull it up on the screen,

6    too.

7              Now, sir, you understand JTX- 7026 is actually

8    three documents stapled together; right?

9    A.    Yes.

10   Q.    It is the original statistical analysis plan, an

11   amended statistical analysis plan, and then the extension

12   statistical analysis plan; right?

13   A.    Correct.

14   Q.    And if we go to Page 7026.101, this is, as we see

15   here, the original version 0.1 of the statistical analysis

16   plan; is that correct?

17   A.    Correct, I do.

18   Q.    And if we turn to 7026.114, and we look at Section

19   2.5.1, the plan originally at the beginning of the study was

20   to do what's called an interim analysis; right?

21   A.    This is not the study protocol though.

22   Q.    This is a statistical analysis plan you relied on;

23   right?

24   A.    But -- well, what are you referring to, the protocol?

25   This is, as I understand, this is a statistical analysis

McKeague - cross

1   plan, which was carried out well into the study.

2   Q.    Let's go back to JTX- 7026.108, just to be clear.

3   Bottom paragraph, please.

4          I think we can rely on this one; right?

5   When differences exist in descriptions or explanations

6   provided in the protocol and this SAP, the SAP prevails.

7   Okay?

8   A.    And this is part of the original analysis plan.

9   Q.    Right.  So we can look at the section back at Section

10  2.5.1, the interim analysis.  And you disagree.  They

11  planned to do an interim analysis.  Halfway through, they

12  were going to look at the data; right?

13  A.    In the statistical plan, there's a plan for an

14  analysis of the term plan.  Yes, I agree with that.

15  Q.    Great.  That's all I wanted to know.

16          And then let's turn to JTX-7026.49.  And this

17  is -- this is the cover page of Version 2, right, in January

18  of 2014?

19  A.    Yes.  I'm not, I'm not sure about the chronology here,

20  so I can't tell you how true --

21  Q.    Okay.  Let's look at JTX- 7026.57.  This page ought to

22  be familiar at least; right?  This is the one you talked

23  about on direct, I believe; is that correct?

24  A.    At least in one of these plans.

25  Q.    Right.  And this is the rationale for Version 02; is

McKeague - cross

1    that correct?

2    A.    Version 02?

3    Q.    Do you see that?

4    A.    This is the part that identifies the two outlier

5    patients.

6    Q.    Right, but we're going to look at some other parts of

7    it just to make sure we understand.

8          So if we look at this paragraph that says,

9    "based on a 50 percent clean data transfer," do you see that

10   paragraph?  And we'll highlight it, the whole paragraph,

11   please.

12         What it says is, "based on a 50 percent clean

13   data transfer, the sponsor has examined the distribution of

14   number of IRAEs per patient using the overall cohort of

15   patients.  It is important to emphasize that although this

16   study is open label, all the patients were included in one

17   group, no information of treatment allocation was used in

18   this examination, and the final decision is made while being

19   blinded to treatment assignment."

20         Do you see that?

21   A.    Yes, I see that.

22   Q.    And you don't disagree with that; right?

23   A.    Oh, no.  I mean, I can't vouch for it.  I take their

24   word for it.

25   Q.    And so when they did this statistical analysis, the

McKeague - cross

1    Teva statisticians didn't know if these two outliers were in

2    the 20 arm or the 40 arm; right?

3    A.    I take their word for it.  Yes, sure.  They say they

4    were blinded to arm, that's the implication.

5    Q.    Right.  And so they didn't know whether any change

6    they made, what impact it would have on the ultimate results

7    they had; right?

8    A.    Well, they knew it would affect results because the

9    outliers are identified.

10   Q.    Well, let's look at that a little bit more carefully.

11   Okay?  If we take off the blowup, the next paragraph is the

12   one you had looked at; is that right?

13   A.    Mm-hmm.

14   Q.    Which talks about the outliers dramatically impacting

15   the overall event rate estimate.

16   A.    Correct.

17   Q.    Correct?

18   A.    Correct.

19   Q.    If we look two paragraphs below that though, Following

20   the above investigation," what they concluded is, "Following

21   the above investigation, an alternate definition of IRAE

22   rate was considered for primary analysis, in which IRAEs

23   with the same onset date will be counted as one IRAE as

24   these correspond to the reactions caused by the same

25   injection.  The descriptive distribution of number of IRAEs

1      while applying this alternate definition does not contain

2      extreme values."

3                     Right?

4      A.    Right.

5      Q.    So the Teva statisticians concluded if you went to the

6      IRAE event day analysis, there were no outliers; is that

7      correct?

8      A.    They -- they essentially removed the outlier effect,

9      yes.

10     Q.    But they didn't remove the people; right?

11     A.    They didn't remove the people, no.

12     Q.    They kept the data in.  They changed exactly how they

13     were going to count the endpoint; right?

14     A.    That's correct.

15     Q.    And they did that while they were blinded to what the

16     impact would be on the ultimate result; is that correct?

17     A.    Correct.

18     Q.    Can we go back a page on this, JTX-7026.56.

19                    It says, the following documents were reviewed

20     in preparation of this SAP, and one of them is ICH E9,

21     "Guidance on Statistical Principles For Clinical Trials."

22                    Do you see that?

23     A.    Yes.

24     Q.    Are you familiar with that document, sir?

25     A.    I've seen it.

McKeague - cross

1   Q.   And it should be PTX-231 in your binder.

2   A.   DTX?

3   Q.   PTX-231.  I believe it's the very first document in

4   your white binder.

5   A.   All right.  Okay.

6   Q.   You're familiar with this document?

7   A.   Well, not -- not very.

8   Q.   All right.  Well, it's from the FDA; right?

9   A.   Yes.

10  Q.   And it talks about statistical principles for clinical

11  trials; is that correct?

12  A.   Yes.

13  Q.   If you turn to PTX-231.34, Section C, it talks about

14  missing values and outliers; is that right?

15  A.   Page 18?

16  Q.   Page 31.  PTX-231.34, page 31 of the internal

17  document.  This is the FDA talking about outliers; correct?

18  Are you on 231.34?

19  A.   Do you want me to read the whole section?

20  Q.   Well, I've just got some questions for you.  This is

21  the FDA talking about outliers; right?

22  A.   Well, as I say, I don't know the whole document.

23  Q.   All right.  Well, let's see what they say.  They say,

24  "a similar approach should be adopted to exploring the

25  influence of outliers, the statistical definition of which

1    is, to some extent, arbitrary."  You agree with that; is

2    that right?

3    A.     What are they comparing it to?

4    Q.     You agree that the statistical definition of outliers

5    is, to some extent, arbitrary; right?

6    A.     It's -- it's -- to some extent.

7    Q.     Okay.  The next sentence says:  "Clear identification

8    of a particular value as an outlier is most convincing when

9    justified medically as well as statistically," and let's

10   just stop there.

11              Do you agree with that?

12   A.     Essentially, yes.

13   Q.     So you want to look at the medical attributes as

14   well to figure out whether someone is really an outlier;

15   right?

16   A.     That is important to look into.

17   Q.     And then if we skip a sentence or two down it says,

18   once again -- well, actually, we can't skip it because it

19   refers back.

20              Any outlier procedure set out in the protocol

21   or the statistical analysis plan should not be -- should be

22   as such not to favor any treatment group a priori.  We did

23   not see an outlier plan in the statistical analysis plan;

24   right?

25   A.     An outlier plan?

1    Q.    Right.  We didn't see them set forth what they should

2    do if they found outliers or something like that; is that

3    right?

4    A.    Well, they did.  They proposed changing the primary

5    endpoint to the days.

6    Q.    Right.  And if we look it says, actually, once again,

7    "his aspect of the analysis can be usefully updated during

8    blind review;" right?

9    A.    And which aspect?

10   Q.    Well, it's referring up to the outlier conversation, I

11   think; right?  And it says, this aspect of the analysis can

12   be usefully updated during blind review, which is exactly

13   what Teva did.  They went from the event to the event days,

14   and there weren't any more outliers; right?

15   A.    Well, I don't read any changing of primary endpoint

16   here.  This is a change -- they have a change of primary

17   endpoint.

18   Q.    Right.  But they provided an update during blind

19   review when they updated the statistical analysis plan;

20   right?

21   A.    Well, this is a very big update.  What does that

22   mean?

23            MR. WIESEN:  We can take that down.

24   BY MR. WIESEN:

25   Q.    Dr. McKeague, another one of your criticisms was the

1    Glacier study uses subjective criteria; is that correct?

2    A.    Yes.

3    Q.    And you understand that one of the attributes of

4    injection site reaction is pain; right?

5    A.    Correct.

6    Q.    The only way you can measure pain is subjectively; is

7    that correct?

8            MR. FIGG:  Objection, your Honor.  Mr. Wiesen

9    has pointed out numerous times that Dr. McKeague is not a

10   physician.

11           THE COURT:  Sustained.

12   BY MR. WIESEN:

13   Q.    Dr. McKeague, you're not aware of any statistical

14   analysis ever done that analyzes pain using an objective

15   measure, are you?

16   A.    Well, I heard testimony from, I think it was Dr.

17   Wolinsky, about a visual analog scale, and that --

18   Q.    But a visual analog scale, the patient subjectively

19   marks between 1 and 100 or 1 and 10 or whatever the number

20   is; right?

21           THE COURT:  Mr. Figg?

22           MR. FIGG:  Your Honor, I'm just not sure whether

23   Dr. McKeague was finished with his answer.  There have been

24   a number of interruptions.

25           THE COURT:  I agree.  Give him a chance.

1           MR. WIESEN:  I apologize, your Honor.

2      BY MR. WIESEN:

3      Q.     Doctor?

4      A.     Well, we heard Dr. Wolinsky's testimony about a visual

5      analog scale.  That -- that -- in some departments that may

6      be construed as less objective, but it seems a little more

7      objective.  But I agree, I think it's a personal thing

8      specific to an individual.  It's inherently subjective.

9      Q.     And so if you are going to do a clinical study

10     analysis that analyzes pain, you're going to have to, to

11     some extent, use subjective criteria; right?

12     A.     That's a very broad question.  Any study, you are

13     saying we have to use -- any study involving pain you have

14     to use subjective criteria?

15     Q.     Yes, sir.

16     A.     Yes.

17     Q.     But you can't tell me an example of a study that used

18     an objective criterion for pain?

19     A.     I am not a physician and I am certainly not an expert

20     in pain.  That's for sure.

21     Q.     If you could turn to JTX-7012 in your binder.  If we

22     could pull that up on the screen.  This is the list, and I

23     promise we won't look at it in this form for very long, of

24     all of the patients as Dr. Marais categorized them in terms

25     of whether they are better off under GA 40, better off under

McKeague - cross

1     GA 20, inconclusive, and the same.  Do you remember that?

2     A.    Yes.

3     Q.    And you have seen this document before.  Correct?

4     A.    Correct.

5     Q.    We talked about this, we have talked about this before

6     and some of the particular people?

7     A.    Yes.

8     Q.    And you were here for Dr. Marais' testimony.  Correct?

9     A.    I was.

10    Q.    And you saw how he explained how he compared the

11    different rates of mild, moderate and severe for each

12    individual patient to determine whether or not they were

13    better off under GA 40 or better off under GA 20.  Correct?

14    A.    I understand his definition.

15    Q.    If we could have my slide PDX-22, please.

16          I will represent to you, sir, we have graphed in

17    the same way the data for patient 10710004.  If you want to

18    go back and confirm it, you will see it is one of the

19    underlying people on JTX-7012.  My question for you, sir, is

20    would you agree --

21          MR. FIGG:  Your Honor, Mr. Wiesen's objection to

22    my asking Dr. McKeague about information from the extension

23    phase was sustained.  Now Mr. Wiesen is asking Dr. McKeague

24    about information from the extension phase.

25          MR. WIESEN:  Your Honor, my objection is he was

McKeague - cross

1    asking about frequency questions.  This is a question about

2    the analysis that Dr. Marais did that he has criticized

3    extensively.  This is exactly the data Dr. Marais relied on

4    in rendering his opinions yesterday on the better off under

5    GA 40 versus better off under GA 20.

6              MR. FIGG:  But this slide is based on the data

7    from the extension phase.  I was going to ask Dr. McKeague

8    about some of Dr. Marais' slides on the extension phase, and

9    Mr. Wiesen objected.

10              THE COURT:  On your redirect, if you want to do

11    that, I will let you.

12    BY MR. WIESEN:

13    Q.    My question is simply for this patient, patient

14    10710004, would you agree that there is a reduction in

15    severity of the injection site reactions on GA 40 compared

16    to GA 20?

17    A.    Well, given the unreliability of the data, no, I can't

18    agree to that statement.  But, of course, if a patient had

19    zero events, then there cannot be any -- there is no

20    severity of events because there are zero events.  Then

21    again, we can't trust the reliability of the data, notably

22    in the extension phase.

23    Q.    So if you assume the data is reliable, then you would

24    agree that this patient, that there is a reduction in

25    severity for this patient on GA 40 compared to GA 20.

1    Right?

2    A.    Well, the data are not reliable.  But by definition,

3    no, as I just said, no events means no severity.

4    Q.    So again, you would agree, then, that there is a

5    reduction in severity for this patient on GA 40 compared to

6    GA 20 if we assume the data is reliable?

7    A.    Well, I can't assume the data is reliable.  That is

8    the problem.

9    Q.    I am asking you to assume that the data is reliable.

10   If you assume the data is reliable, would you agree that

11   there is a reduction in severity for this patient on GA 40

12   compared to GA 20?

13   A.    I can't consider a hypothetical patient who had zero

14   events.

15            THE COURT:  Doctor, indulge Mr. Wiesen.

16            THE WITNESS:  All right.  It pains me, maybe.

17            THE COURT:  I could tell.

18            THE WITNESS:  I agree with you.

19            MR. WIESEN:  One second, Your Honor.

20            (Pause.)

21            MR. WIESEN:  No further questions.

22            THE COURT:  Mr. Figg, your redirect.

23                    REDIRECT EXAMINATION

24   BY MR. FIGG:

25   Q.    Dr. McKeague, just to be clear, you did some analyses

1    based on Dr. Marais', quote, better off approach.  Right?

2    A.    I did.

3    Q.    Just to be clear, does Dr. Marais' better off approach

4    address frequency or severity?

5    A.    Frequency.

6    Q.    Now, Mr. Wiesen asked you some questions about

7    DDX-1500.35, if we could get that on the screen.  I would

8    like for you to think about what these headings would look

9    like if we were actually answering the question regarding

10   the '776 patent claim.  Okay?

11         Where it says better off under GA 40, let's

12   assume that says reduced severity.  And in the next column,

13   what would that column be, the better off under GA 40 with

14   reduced severity, what would the next column be called?

15   A.    It would be increased severity under GA 40 or no

16   difference in severity.

17   Q.    So it would be no reduced severity?

18   A.    No reduced severity.

19         MR. WIESEN:  Objection.

20         THE COURT:  It's asked and answered.  Go ahead.

21   BY MR. FIGG:

22   Q.    So that's the analysis that is the correct one for the

23   '776.  Right?

24   A.    That's correct.

25         MR. WIESEN:  Same objection.

1           THE COURT:  Sustained.

2           Mr. Figg, please.

3    BY MR. FIGG:

4    Q.    Mr. Wiesen asked you some questions about whether you

5    had considered event days in your testimony on direct.  Do

6    you recall that?

7    A.    Yes.

8    Q.    Let's look at JTX-7134.  Let's take a look at Figure 3

9    of that.

10          Now, this refers to annualized rate of moderate

11   and severe IRAEs.  Right?

12   A.    Correct.

13   Q.    That is a frequency analysis.  Right?

14   A.    Correct.

15   Q.    Mr. Wiesen asked you whether you had considered event

16   days in connection with Figure 2, your Figure 2 analysis or

17   number of events.  Do you recall that?

18   A.    I am blanking on his question.

19   Q.    I am sorry, Table 2.

20   A.    Table 2, yes.

21   Q.    If we could look at Table 2, what do the authors of

22   the Glacier study use in Table 2?  Do they use event days?

23   A.    No, they do not.  As the note indicates, it is

24   individually reported events, total number of events.

25   Q.    So they used the number of events?

McKeague - redirect

1    A.    Correct.

2    Q.    And is this the information in the Glacier paper that

3    deals with severity?

4    A.    Yes.

5    Q.    So you used the same parameter, number of events, in

6    your analysis of severity, as the authors did in Table 2?

7              MR. WIESEN:   Objection, Your Honor.   Leading.

8              THE COURT:   Sustained.

9    BY MR. FIGG:

10   Q.    What did you use in your analysis of Table 2, Doctor,

11   and why did you do it that way?

12   A.    I used exactly the same endpoint as they use in Table

13   2 here, which is number of events, total number of events.

14   Q.    Do you still have PTX-231?   That's the guidance

15   document that Mr. Wiesen asked you about.

16   A.    Yes.

17   Q.    If you could turn to Page 231.34.   If we can focus on

18   the last sentence of Section C there.   That section says

19   that "if no procedure for dealing with outliers was foreseen

20   in the trial protocol, one analysis with the actual values

21   and at least one other analysis eliminating or reducing the

22   outlier effect should be performed."

23              I will stop there.

24              Did you see any evidence that the Teva

25   statisticians foresaw the existence of the outliers before

1    the study was performed?

2    A.      No, I didn't see any evidence that they foresaw --

3    before the data collection, no.

4    Q.      The first part of that sentence is satisfied, no

5    procedure for dealing with outliers was foreseen in the

6    trial?

7    A.      Correct.

8    Q.      It says, with one analysis with the actual values and

9    at least one other analysis eliminating or reducing the

10   outlier effect should be performed.

11           Did the Teva statisticians do that?

12   A.      They did, yes.

13   Q.      And then it says, and the difference between their

14   results should be discussed.

15           Was there any discussion of the difference

16   between the with and without analyses that Teva performed in

17   the Glacier study?

18   A.      Not in the Glacier study, no.  I should clarify that.

19   Not in the Glacier publication.

20   Q.      Not in the Glacier publication?

21   A.      Yes.

22   Q.      Not what my friends here are relying on.

23           MR. FIGG:  I think that concludes our

24   examination, Your Honor.  Thank you.

25           THE COURT:  Thank you, Doctor.  Be careful

```
 1     stepping down.

 2                    (Witness excused.)

 3                    MR. WARE:  Your Honor, can I see the Court

 4     briefly at sidebar while there is a hiatus?  It can be on or

 5     off the record.  Just logistics.  It can be off.

 6                    (Sidebar conference not reported.)

 7                    (Recess taken.)

 8                    THE COURT:  All right.  Please take your seats.

 9                    Ms. Bloodworth?

10                    MS. BLOODWORTH:  That was the last infringement

11     witness.  I'd like to make a very brief Rule 50(b) motion,

12     if I may.

13                    THE COURT:  Proceed.

14                    MS. BLOODWORTH:  I will renew yesterday's

15     motion, please, your Honor.

16                    THE COURT:  I'm not going to change my ruling on

17     that.

18                    MS. BLOODWORTH:  And for the record, under

19     direct infringement 270(a), we would move all asserted

20     claims on all patents.

21                    Under 271(b), indirect infringement, we would

22     move for the '776 patent, all claims.

23                    For the patent, the '762, '250 patents, claims

24     14 to 18.  And under 271(c), for lack of contributory

25     infringement, we would also move for those same claims, your
```

1    Honor.

2              THE COURT:  I will reserve.

3              MS. BLOODWORTH:  Thank you.

4              MR. WIESEN:  Your Honor, I don't actually think

5    it's procedurally necessary, but I suppose we would make a

6    similar motion if they've rested now on noninfringement, but

7    I won't argue beyond that, just for the record.

8              THE COURT:  Thank you.

9              I understand both sides, you do.  The CAFC

10   requires.  It may require further specificity.  If you want

11   to submit something in writing, you know, file it

12   electronically.

13             The standard ruling going forward is I'm going

14   to reserve on issues.  There's no way I'm going to be able

15   to intelligently address these motions orally.

16             MR. WIESEN:  Thank you, your Honor.

17             MS. BLOODWORTH:  Thank you, your Honor.  We will

18   look into whether it's required with more specificity.  I

19   don't believe that it is.

20             THE COURT:  I'm not sure, and the CAFC continues

21   to put its nose where it does not belong with regard to the

22   regional circuits, but that's okay.

23             MS. BLOODWORTH:  We just do what we must thank

24   you.

25             THE COURT:  Yes.

Green - direct

1          MR. ANSTAETT:  Good afternoon, your Honor.

2          THE COURT:  Good afternoon.

3          MR. ANSTAETT:  Defendants call Dr. Ari Green as

4    an expert testifying on the invalidity of the

5    patents-in-suit.

6          THE COURT:  Okay.

7          MR. ANSTAETT:  Your Honor, may we approach to

8    hand out the binders?

9          THE COURT:  Yes.

10                ... ARI GREEN, having been duly

11                sworn as a witness, was examined and testified

12                as follows ...

13                (Binder handed to the witness.)

14          THE COURT:  All right.

15          MR. ANSTAETT:  May I proceed, your Honor?

16          THE COURT:  Yes, sir.

17                      DIRECT EXAMINATION.

18    BY MR. ANSTAETT:

19    Q.    Good afternoon, Dr. Green?

20    A.    Good afternoon.

21    Q.    I'm going to ask you to state and spell your name for

22    the record one more time, please.

23    A.    Sure.  It's Ari Green, and it's spelled A-r-i.  The

24    last name is G-r-e-e-n.

25    Q.    All right.  Have you been retained as an expert

1      witness in this case?

2      A.     I have.

3      Q.     By whom?

4      A.     By the five defendants.

5      Q.     All right.  Dr. Green, what is your area of expertise?

6      A.     I'm a physician scientist.  My focus of clinical

7      interest is in caring for patients multiple sclerosis and

8      other newer neurological conditions, some of which are

9      related to MS.

10                    I also have an active research interest in

11     trying to develop outcome measures that might help us

12     develop better treatments and therapeutics for treatment of

13     MS, neurodegenerative diseases and other neurologic

14     conditions using both testing on human subjects as well as

15     on animal models.

16     Q.     All right.  Could you describe your educational

17     background for the Court, please?

18     A.     Sure.  I received my Bachelor of Arts and a Bachelor

19     of Science from Miami University in 1994.  After that, I

20     received an M.D. from Duke University.

21                    During that time I spent two years in the

22     laboratory conducting basic laboratory experiments in

23     immunology and MS as part of a Howard Hughes Medical

24     Institute program.  And subsequent to that, in 2007, I

25     received a Master's in clinical research.

1    Q.      And what is a Master's in clinical research?

2    A.      That's a post-terminal degree, a program intended for

3    people who already have an M.D. or Ph.D. or doctorate in

4    pharmacy to help make sure that they understand and are

5    conversant in the methods for conducting robust and reliable

6    clinical research protocols and then analyzing those

7    clinical research protocols as well.

8    Q.      All right.  Did you perform your own research in the

9    Master's and clinical research program?

10   A.      Yes.  That's one of the degree requirements as far as

11   the program, is to develop a research program.  So I had to

12   produce a research product and have it be critiqued by both

13   colleagues and mentors so that I could see how the process

14   unfolded.

15   Q.      Okay, Doctor.  Did you have any post-graduate medical

16   training, including internships, residencies, or

17   fellowships?

18   A.      I did.  So I did an internship in medicine at the

19   University of California, San Francisco, in 2001.

20   Subsequent to that I was a resident in the Department of

21   Neurology, capped by years as chief resident in 2005.

22                   After that I got fellowships in

23   neuroimmunology and neuroophthalmology, also at UCSF,

24   completing that in 2007.  And during that, subsequent to

25   that time, I also spent time at Queens University in

1      Belfast, studying the neuropathology of MS in the brain and

2      the retina, and that was the last part of my training.

3      Q.     All right.  What academic positions have you held?

4      A.     So from 2005 to 2007, while I was still completing my

5      fellowship training, I was a clinical instructor in the

6      department of neurology at UCSF.

7                      In 2010 or 2011, I was joint appointed to

8      the Department of Ophthalmology at the same university.  And

9      then around that time, 2012, I was -- during that time, I

10     was an assistant professor, and after that time I became an

11     associate professor around 2012.

12     Q.     Okay.  And what's your current position at the

13     University of California at San Francisco?

14     A.     So I'm currently the medical director of the Multiple

15     Sclerosis Center, Multiple Sclerosis Center at the

16     University.  I am also the director of the neurodiagnostics

17     center.

18                     I have responsibilities as a co-director of a

19     small molecule lamination program with a colleague and, in

20     addition, I was appointed a named professor in around 2009

21     or 2010 in the Department of Neurology.

22     Q.     Okay.  You mentioned the UCSF Multiple Sclerosis

23     Center.  What is that, please?

24     A.     So we are one of the largest MS centers in the world.

25     We care for approximately 7500 patients a year.  We have

Green - direct

1    probably cared in the last decade for 20 to 25,000 patients

2    with MS.

3                We also care for people with other related

4    neuroimmunological conditions and some other related

5    disorders.

6                And we are also a major research center, so

7    we're probably the leading clinical and laboratory research

8    center in the United States, at least in terms of money that

9    comes in from the National Institutes of Health and from the

10   national multiple sclerosis society.

11   Q.    Okay.  And what are your current responsibilities at

12   the University of California, San Francisco School of

13   Medicine?

14   A.    I have responsibility to teach our students, our

15   residents and our fellows as well as to mentor junior

16   faculty in their career development.  And this includes

17   teaching them about multiple sclerosis, teaching about

18   testing, such as electrophysiology or brain testing, and

19   teaching them about parts of the neurological exam or parts

20   of the ophthalmic exam.

21   Q.    How long have you been licensed as a physician by the

22   State of California?

23   A.    I was licensed in 2001.

24   Q.    Do you have any board certification?

25   A.    I do.  I was certified, excuse me, board certified in

1    psychiatry and neurology in 2007.

2    Q.    All right.  And how long have you treated patients

3    with multiple sclerosis?

4    A.    So I first started treating patients with MS as a

5    physician in around 2001, 2002.

6    Q.    Okay.  Do you have experience prescribing drugs to

7    treat patients with MS?

8    A.    I do.

9    Q.    And what drugs have you prescribed to treat MS over

10   the course of your career?

11   A.    So there are now as of just this year 14 drugs that

12   are approved for treatment in MS, and I've used all of those

13   drugs or all of those therapies in addition to off-label

14   therapies and therapies under experimental protocol.

15   Q.    Now, focusing on the time period around 2009, what

16   were the more common drugs you prescribed for MS patients at

17   that time?

18   A.    Yes.  So at that time, we had really three classes of

19   therapies, 2009.  So we had glatiramer acetate, one of the

20   injectable therapies.  We had another group of therapies,

21   interferon.  There were four drugs approved in 2009 in that

22   class with varying frequencies and injections.  Then we had

23   a total totally different drug, what's called a monoclonal

24   antibody, that was being used to prevent white blood cells

25   from getting in circulation in the brain, and that drug was

1    known as Tysabri, or natalizumab.

2    Q.    Could you describe for me generally your experiences

3    as an MS researcher?

4    A.    So my research focus again has been in trying to

5    develop and validate outcome measures and trying to test

6    them both in those animal models and then also further test

7    them in human subjects, people living with MS And part of

8    that has also been closely tied to an effort to develop

9    reparative and regenerative therapies that are able to help

10   patients either prevent or overcome disabilities developed

11   as a result of multiple sclerosis.

12   Q.    Okay.  Have you received any honors and awards related

13   to your research in neurology or MS?

14   A.    Yes, I have.

15   Q.    Could you describe them for me briefly?

16   A.    Sure.  So in 2005, I was awarded the Inaugural

17   American Academy of Neurology and the National Multiple

18   Sclerosis Society Early Clinician Scientist Award, and that

19   subsequently has been renamed the American Brain Foundation

20   Award.

21           I was then awarded an Early Career Scientist

22   support from the Howard Hughes Medical Institute.

23   Subsequent to that, I was appointed as a distinguished

24   professor in my department.  I also received a T1 catalyst

25   award for development of one of the biomarkers with one of

Green - direct

1    the trainees who I was overseeing.

2    Q.    Okay.  Are you a member of any neurology or MS

3    research organizations?

4    A.    I am.

5    Q.    Could you describe just briefly a few of those?

6    A.    Sure.  I'm a member of the American Academy of

7    Neurology, the North American Neuroophthalmology Society,

8    the American committee that's related to clinical and

9    translational research, and then within the American Academy

10   of Neurology, I'm a member of the Multiple Sclerosis Section

11   and the Neuroophthalmology sections.

12   Q.    Have you published articles and abstracts in

13   scientific journals?

14   A.    I have.

15   Q.    About how many?

16   A.    In excess of 50.  I think it might actually be 60 up

17   to date.

18   Q.    Have you been a member of any editorial boards for any

19   journals?

20   A.    I have.

21   Q.    What journals?

22   A.    I was a member of the editorial board of the journal

23   "Neurology."

24   Q.    Are you a peer reviewer for any journals?

25   A.    I am.

Green - direct

1   Q.     Have you presented any scientific lectures related to

2   MS?

3   A.     I have.   I have presented lectures internationally and

4   throughout the country.

5   Q.     Have you been a principal investigator for any

6   clinical trials related to MS treatment?

7   A.     I have.   I've overseen some of those early

8   translational research science programs that we've been

9   developing.

10          MR. ANSTAETT:   Mr. Russell, can we please see

11   JTX-7009.

12   BY MR. ANSTAETT:

13   Q.   Dr. Green, is this a copy of your curriculum vitae?

14   A.   It is.

15          MR. ANSTAETT:   Your Honor, defendants offer Dr.

16   Green as an expert in multiple sclerosis, including the

17   treatment of multiple sclerosis.

18          THE COURT:   Counsel?

19          MR. JAMES:   No objection.

20          THE COURT:   The doctor is accepted as an expert.

21   BY MR. ANSTAETT:

22   Q.   Dr. Green, you submitted three expert reports in this

23   case?

24   A.   Yes, that's true.

25   Q.   Did you review the four patents-in-suit?

1   A.   I did.

2   Q.   Did you also review the Court's claim construction

3   order?

4   A.   I did.

5   Q.   And have you reviewed the parties' proposals

6   concerning the person of ordinary skill in the art?

7   A.   I have.

8   Q.   Did you -- are your opinions that you reached the same

9   regardless of which definition of the skilled artisan is

10  used?

11  A.   Yes.

12  Q.   And did you prepare some slides in conjunction with

13  counsel concerning your testimony today?

14  A.   Yes, I did.

15  Q.   Did you help prepare some slides summarizing your

16  opinions with respect to the patents in suit?

17  A.   Yes.

18  Q.   Let's go through those.  Can we see the first slide,

19  DDX-1100.2, please.

20       Dr. Green, does this slide summarize your

21  opinions regarding the '250, '413 and '302 patents?

22  A.   Yes, it does.

23  Q.   Could you walk through it with us?

24  A.   Sure.  This slide is to highlight for the '250, '413

25  and '302 patents, there was ample evidence of motivation

1    within the prior art and in the public space.  There were

2    clearly tolerability problems that existed for glatiramer

3    acetate from its original approval, as mentioned, as I am

4    sure we will discuss, in the summary basis of approval from

5    the FDA.

6            There was existing interest in less frequent

7    dosing, which was clearly evidenced in a number of the

8    papers and publications that I am sure we will speak about.

9    But this was a major limitation for the application and use

10   of glatiramer acetate, was the problem with injection site

11   reactions.

12           And then there was in the existing literature

13   discussions of convenience that revealed or provided

14   evidence that enhanced convenience would be advantageous for

15   a therapeutic -- for a three times a week dosing regimen.

16           Lastly, there was a competitive product that

17   existed on the market that was a three times a week dosing

18   for interferon.

19   Q.    All right.  If we could see the next slide.  Dr.

20   Green, about a reasonable expectation of success, what are

21   your opinions again generally on that topic?

22   A.    I think there was a reasonable expectation of success

23   at the priority date in August of 2009 that a 40 milligram

24   dose which had been demonstrated to be effective and well

25   tolerated as well as having some potential advantages in

Green - direct

1     terms of MRI outcomes, when compared to a 20 milligram dose.

2              There was also evidence that suggested from the

3     literature that daily dosing may be unnecessary.

4     Furthermore, it was clear that there were tolerability and

5     compliance problems for daily injectable therapy, especially

6     one that has to be used potentially for many years and even

7     life-long.

8              Lastly, there was the issue that if you compare

9     the total weekly dose for three times weekly 40 milligrams

10    of Copaxone versus 20 milligrams daily, you had roughly

11    equivalent total weekly doses.

12    Q.    If we could see the next slide.  At a general level,

13    what about unexpected results.  With regard to teaching

14    away, what were your opinions with respect to those topics?

15    A.    I don't see anything in the existing literature that

16    would in fact teach away from 40 milligrams three times a

17    week dose.  In fact, as we spoke about, the outcome would

18    have been expected that a 40 milligram three times a week

19    dose provided a very good opportunity and had a likelihood

20    of achieving clinical success.

21              In addition, there is nothing in the various

22    mechanisms of action that has been suggested or demonstrated

23    in animal models of MS that suggested that this mechanism --

24    the mechanism of action would teach you away again from an

25    approach of a three times weekly glatiramer acetate

Green - direct

1    formulation.

2              Lastly, there was no reduced severity, there is

3    no evidence that the claimed dosing regimen reduces the

4    severity of injection site reactions.

5    Q.    Were you involved in the inter partes review

6    proceedings on the '250, '413 and '302 patents?

7    A.    Yes.

8    Q.    Did you submit expert reports to the Patent Trial and

9    Appeal Board in those proceedings on the obviousness of

10   these patents?

11   A.    Yes.

12   Q.    Were you deposed in those proceedings?

13   A.    I was, multiple times.

14   Q.    Do you understand that the Patent Trial and Appeal

15   Board determined that all claims of those three patents are

16   unpatentable as obvious?

17   A.    Yes.

18   Q.    The next slide, I want to talk briefly about the '776

19   patent and its limitations claiming reduced severity of

20   certain adverse events.  At a high level, could you

21   summarize your opinions for us with respect to the '776

22   patent?

23   A.    So regarding the '776 patent, there is no data or

24   information in the specification that provides adequate

25   information for written description, enablement, or utility.

1          Furthermore, if, in fact, it was found that the

2    prior art, in this context it was found that there is

3    adequate written description, then the '776 patent would

4    look just like the other three patents, the '250, '302 and

5    '413, and would in fact be obvious.

6    Q.    Dr. Green, I want to talk a little bit about

7    background, we will start very generally.  What is multiple

8    sclerosis?

9    A.    Multiple sclerosis is an auto-immune disease in which

10   for some reason the immune system of a patient

11   inappropriately starts to target the central nervous system

12   of that patient rather than the normal work it is supposed

13   to do, which is look for infectious agents or potentially

14   cancers.

15          So instead, the immune system thinks that

16   something in the central nervous system is a target that it

17   should be clearing up or removing, and so the immune cells

18   in blood migrate into the central nervous system and

19   ultimately damage these cells that produce the insulation

20   that surrounds nerve fibers, known as oligodendrocytes.  It

21   damages that insulation, that insulation is known as myelin.

22          So an auto-immune disease in which the patient's

23   immune system inappropriately targets myelin can cause

24   damage, leading to neurological dysfunction.

25   Q.    Were there different stages in the progression of

1    multiple sclerosis recognized in August 2009?

2    A.    Yes.  So before the patient even presents, as we

3    mentioned, their immune system has to do something wrong.

4    So there is a point at which the immune system begins to

5    inappropriately target or recognize something in the central

6    nervous system that it's going to go after.

7              Then after that point there is probably injury

8    that occurs before the patient ever reaches any clinical

9    attention or evaluation by a physician.

10             At some point they have symptoms, and they

11   present with a symptom, that is known as the clinically

12   isolated syndrome, that first event.  If that syndrome is

13   accompanied by an enhancing lesion on the brain MRI or they

14   have a subsequent event, that means they will reach a

15   diagnosis of relapsing remitting multiple sclerosis.  Then

16   subsequent to that, unfortunately, over many years of having

17   relapsing disease, which can be ten to 20 years, ultimately

18   the patient will have a high likelihood of developing a

19   relentless inexorable neurodegenerative decline, which will

20   be manifested by neurological dysfunction that does not

21   remit or go away.

22   Q.    What is that stage called?

23   A.    That is called the progressive phase of MS.

24   Q.    How does MS manifest itself in patients?

25   A.    Unfortunately, it can target any part of the central

Green - direct

1    nervous system.  So it can damage the brain, the spinal

2    cord, or the optic nerve.  In that context, by causing that

3    damage, it can lead to visual loss or weakness or sensory

4    loss or imbalance, loss of bowel or bladder control, and

5    even memory problems, cognition problems, and sometimes

6    rarely behavioral problems.

7    Q.    Who does MS affect?

8    A.    It affects people in the prime of their lives.  So

9    young adults, tragically, people just as they are setting up

10   their careers or they are getting ready to set up their

11   families, young people in their twenties, thirties and

12   forties is the typical kind of onset.  Ultimately, the

13   progressive phase of the disease can occur at any time

14   subsequently in adulthood.

15   Q.    Does the disease impact one gender more than the

16   other?

17   A.    It does.  For unknown reasons that are only starting

18   to become clear, it seems to affect women at a rate these

19   days approximately three times greater than it does men.

20   Q.    Could you describe, again generally, what was known as

21   of August 2009 about the origins of MS?

22   A.    As of 2009, we clearly understood that there was a

23   genetic component to the disease.  So a first degree

24   relative of someone who has MS would have about a 30 times

25   greater risk of developing MS than someone from the general

Green - direct

1    population.

2               But it's not all genetics, because if you look

3    at monogenic twins or identical twins, if it was all

4    genetic, you would expect if one twin had it the other would

5    have it.  But the fact is only 30 percent of identical twins

6    will be what are called concordant, both will have the

7    disease.  Clearly, there is a substantial contributor from

8    environmental factor or factors that a patient might

9    encounter in their daily lives that sets them up to get MS.

10   Those factors were a subject of investigation in 2009 and

11   remain so today.

12   Q.     Do clinicians work to treat the symptoms of MS?

13   A.     We do.  When patients have certain types of symptoms,

14   like bowel or bladder dysfunction or cognitive problems, or

15   if they have issues with their eye movements or walking

16   issues, we have medications that we may use to try and

17   alleviate those symptoms.

18   Q.     What do you do -- what do you use to prevent injury to

19   MS patients in the first place?

20   A.     That is the more important area of MS therapeutics.

21   We have developed, again in the last 30 years, there have

22   been these 14 therapies that have been developed.  As of

23   2009, I think it was six therapies that were available.  But

24   therapies that help as disease modifying therapies, that

25   affect the immune system and change the way the immune

Green - direct

```
 1    system behaves so that the disease doesn't occur or

 2    hopefully doesn't occur in the first place.

 3    Q.    Are those known as disease modifying therapies?

 4    A.    Yes.

 5    Q.    Is glatiramer acetate an MS disease modifying therapy?

 6    A.    Yes, it is.

 7    Q.    If we could see the next slide, please.  DDX-1100.6.

 8          Dr. Green, what MS disease modifying therapies

 9    were available in August 2009?

10    A.    As we discussed, there were the interferons.  Those

11    are medications shown through the extent of the slide here.

12    Those had variable routes of administration, one of which

13    was intermuscular, the other three were subcutaneous.  And

14    they had different periods of dosing of injection, from

15    daily -- from weekly to three times a week or every other

16    day.

17          Then in addition, there was glatiramer acetate,

18    that was a daily injection subcutaneously.  And the other

19    drug we mentioned before, which was that infusible therapy,

20    the monoclonal antibody given once monthly, that was known

21    as Tysabri or natalizumab.

22    Q.    Let me direct your attention to JTX-7111.  It is

23    DDX-1100.7 in the slides.

24          What is this, Dr. Green?

25    A.    So this is the Copaxone label from February 2009,
```

1      around the time of the priority date of the patents.

2      Q.    In 2009, what was the approved dosing regimen for

3      glatiramer acetate?

4      A.    This was a 20 milligram given subcutaneously as an

5      injection, daily.

6      Q.    In August 2009 was glatiramer acetate the only MS

7      disease modifying therapy with a dosing regimen that

8      required patients to inject themselves every day?

9      A.    Yes.

10     Q.    Let's look at JTX-7114, which is DDX-1100.8.  What is

11     this, Dr. Green?

12     A.    This is the label from around the same period, a few

13     years earlier, for Rebif, one of those interferon products,

14     this was one of the high dose, high frequency interferons

15     that was used.  And it was dosed three times a week.

16     Q.    What were the most common adverse events associated

17     with the use of glatiramer acetate as of August 2009?

18     A.    The most common adverse events all had to do with

19     complications related to injections, that included injection

20     site reactions and these immediate post-injection reactions

21     that I think have been discussed previously in the Court

22     here.

23     Q.    The Court has heard a lot about it.  Briefly, again,

24     what are injection site reactions?

25     A.    Injection site reactions are local effects of the

1    injections.  So it can be redness or inflammation.  They can

2    be pain or what's known as induration.  They can be warmth

3    at the site of the injection or they can be changes like

4    lipoatrophy or changes in the underlying subcutaneous

5    tissue.  That can be permanently disfiguring.

6    Q.    In your experience, how prevalent are injection site

7    reactions in patients who take glatiramer acetate?

8    A.    They are extraordinarily common.  So at least 85

9    percent of patients who use glatiramer acetate will develop

10   injection site reactions.

11   Q.    You also mentioned immediate post-injection reactions.

12   What are those?

13   A.    These are the more systemic reactions that people

14   sometimes get, when they get palpations, which is heart

15   racing, they can feel flushing.  It can be a very

16   frightening experience.  It typically comes immediately

17   after an injection.  So within a few minutes to an hour

18   after an injection.  And it will last about 30 minutes to an

19   hour.

20          Again, if they are not warned about these, it

21   can be extraordinarily frightening for a patient and

22   sometimes lead to a visit to an emergency room or urgent

23   care center.

24   Q.    How common are immediately post-injection reactions in

25   GA users?

1    A.      I think the estimates are that they probably occur in

2    about 15 percent of patients.  They are relatively rare even

3    when they do occur.  On the average, they occur maybe once a

4    year, once maybe even every other year.

5    Q.      How long have you been prescribing glatiramer acetate

6    to patients with MS?

7    A.      Since at least 2001 or 2002.

8    Q.      In your opinion, in August 2009, what was the biggest

9    drawback of glatiramer acetate treatment for MS patients?

10   A.      The major problem was these injection site reactions

11   and the fact that it would impact patients' ability to

12   comply with the regimen as instructed by their physician.

13   Q.      In August of 2009, was there interest among skilled

14   artisans in less frequent glatiramer acetate dosing

15   regimens?

16   A.      Absolutely.  There was substantial interest that had

17   been demonstrated in the prior art, and amongst clinicians.

18   Q.      Let's look at JTX-7079.  That's Slide DDX-1100.9.  Dr.

19   Green, is this a document you reviewed in preparing your

20   expert report?

21   A.      Yes, it is.

22   Q.      What is it?

23   A.      This is the summary basis of approval from the FDA in

24   December of 1996.  This is actually a section of that, so

25   one of the reviewers.  The reviewer is asking the question

1    of whether or not daily subcutaneous injections are

2    necessary.

3    Q.    You said the summary basis of approval, just to be

4    clear, approval for what?

5    A.    Approval for Copaxone.

6    Q.    Who is the sponsor of the material that was submitted

7    to the FDA?

8    A.    That would have been Teva.

9    Q.    What is the FDA reviewer discussing on this page?

10   A.    So the FDA reviewer is discussing, is it absolutely

11   necessary to put the patient through the discomfort of daily

12   injections in order to maintain efficacy.  In fact, the

13   reviewer specifically at the end of this paragraph

14   recommends to the sponsors that they evaluate whether or not

15   the daily injections were in fact necessary, versus a less

16   frequent intermittent route of administration of the

17   medication.

18   Q.    So the FDA made that suggestion to Teva?

19   A.    In 1996.

20   Q.    In your opinion, would the FDA reviewer's suggestion

21   motivate an ordinary person of skill in the art to do

22   anything?

23   A.    Absolutely.  As the regulator in the United States,

24   this would influence a sponsor or the pharmaceutical company

25   to consider how might we improve our product, how might we

Green - direct

1    create a product that is more tolerable or improved for our

2    patients.

3    Q.    I would like to talk to you about the concepts of

4    compliance and adherence associated with MS treatments.

5    What is compliance, please?

6    A.    Compliance is the degree to which a patient follows

7    the instructions of their physician.

8    Q.    What is adherence?

9    A.    Adherence is a similar and related concept.  It has

10   more to do with whether or not they actually follow the

11   instructions regarding a specific therapy, do they take that

12   therapy as instructed in the regimen that they have been

13   told to do so.

14   Q.    Why are compliance and adherence important for MS

15   patients?

16   A.    Well, they are crucially important because we are

17   talking about a long-term disease that can manifest over

18   decades.

19           So the issue, patients may not have symptoms for

20   long periods of time, but in fact there may be injury going

21   on.

22           So they have to stay on their medication and

23   remember to stay on their medication in order to maintain

24   its efficacy.

25   Q.    Can the frequency with which a drug has to be injected

Green - direct

1    by a patient impact compliance and adherence?

2    A.    Sure.  The frequency with which a patient takes any

3    medication can impact their compliance and adherence.  In

4    fact, there is extensive literature on the fact that for

5    people taking oral therapies like antibiotics, if you

6    increase to three or four times a day you have a sharp

7    dropoff in adherence rates.  For injectable therapies, that

8    is even more manifest.  Obviously, for something that causes

9    discomfort, it is particularly difficult to motivate a

10   patient for something they have to do on a regular basis

11   that is uncomfortable and painful.

12   Q.    Can we look at JTX-7069.  This is DDX-1100.10.

13         Dr. Green, is this a document that you reviewed

14   in preparing your expert reports?

15   A.    Yes, it is.

16   Q.    What is it?

17   A.    This is known as the Global Adherence Project.  It was

18   an abstract presented in a meeting, actually, at the meeting

19   of the European Committee for Treatment and Research in

20   Multiple Sclerosis.

21         This was a study looking at the available

22   injectable therapies at the time and their rate of adherence

23   to those different medicines.

24   Q.    Who is the lead author?

25   A.    Devonshire.

Green - direct

1    Q.      When was the abstract published?

2    A.      In 2006.

3    Q.      According to the publication, what MS disease

4    modifying therapies were studied in the Global Adherence

5    Project?

6    A.      These were all those injectable therapies available at

7    that time.  So that's Avonex once weekly injections, Rebif

8    by, two formulations, the 22 microgram and the 44 microgram

9    formulations given three times weekly, Betaseron or

10   Betaferon, just called by slightly different names in Europe

11   versus the United States, and Copaxone.

12   Q.      How often was Betaseron and Betaferon dosed?

13   A.      Those were every other day.  Rebif is three times a

14   week.

15   Q.      The next slide, DDX-1100.11, what were the results

16   reported in the Global Adherence Project?

17   A.      One can clearly see from the graphic that we prepared,

18   if you are doing injection less frequently, like Avonex,

19   once weekly, you had enhanced adherence over the other drugs

20   that had more frequent injections.  In fact, there was a

21   direct and inverse correlation between the frequency of

22   injections and the rates of adherence.

23   Q.      Okay.  And which disease modifying therapies fare the

24   best in terms of adherence?

25   A.      This would have been Avonex.

Green - direct

1    Q.    And, again, how frequently was Avonex injected?

2    A.    Once weekly.

3    Q.    And which of the modified therapies fared the worse in

4    terms of adherence?

5    A.    Copaxone.

6    Q.    Okay.  And, again, at this time, how frequently was

7    Copaxone dosed?

8    A.    Daily.

9    Q.    How did Rebif, the three-times-per week dosing

10   schedule compare to glatiramer acetate?

11   A.    Between those two.

12   Q.    Okay, Dr. Green.  I'd like to talk to you now a little

13   bit about the prior art, the patents-in-suit related to

14   glatiramer acetate doses and dosing regimens.  So let me

15   direct your attention to JTX-7107.  We're on slide

16   DDX-1100.12.

17          Did you review this document in preparing your

18   expert reports in this case?

19   A.    Yes, I did.

20   Q.    What is it?

21   A.    This is the opinion chassis application from the World

22   Intellectual Property Organization in July 2007.

23   Q.    And who is listed as the inventor?

24   A.    Irit Pinchasi.

25   Q.    Who is listed as the applicant?

1    A.      Teva Pharmaceuticals.

2    Q.      Okay.  If we could see the next slide, please,

3    DDX-1100.13.  Dr. Green, what does the Pinchasi application

4    disclose here?

5                THE COURT:  We need to slow the pace a little

6    bit.

7                MR. ANSTAETT:  I apologize to the court

8    reporter.  We've got two fast talkers.  We'll try to slow

9    that down.

10   BY MR. ANSTAETT:

11   Q.      Let me re-ask the question.

12               Looking at DDX-1100.13, Dr. Green, what does the

13   Pinchasi application disclose here?

14   A.      Yes.  So this application discloses both a 40

15   milligram formulation of glatiramer acetate as potentially

16   efficacious in the treatment of MS, and then it also

17   discloses that that treatment could be given every other day

18   both in the support for the claims as well as in one of the

19   claims from the patent application.

20   Q.      Okay.  And let's look at page JTX-7107.15.

21               Does the Pinchasi application disclose any

22   clinical data related to the 40-milligram dose of GA?

23   A.      Yes, it does.  So they discuss a study comparing

24   40 milligrams daily of glatiramer acetate versus

25   20 milligrams daily of glatiramer acetate.

Green - direct

1   Q.    All right.  And if we could see the next slide,

2   DDX-1100.15.

3            What efficacy conclusions are reported in the

4   Pinchasi application with respect to that comparison between

5   40 milligrams and 20 milligrams GA daily dosing?

6   A.    Yes.  So in this randomized double-blind study

7   they revealed that there was significant improvement in

8   efficacy for the 40-milligram formulation without any

9   corresponding increase in adverse reactions experienced by

10  the patient.

11  Q.    Okay.  And did they report anything about any other

12  potential advantages of the 40-milligram dose?

13  A.    Yes.  The major advantage was that there appeared to

14  be an accelerated rate, accelerated speed of onset of the

15  efficacy of the drug when compared to the 20 milligram

16  formulation.

17  Q.    Okay.  If we can see the next slide, and this is

18  JTX-7107.20, DDX-1100.16.

19            What does the Pinchasi application say about the

20  tolerability of the 40-milligram dose of GA?

21  A.    Yes.  So as I've called out here, it specifically said

22  that this dose was well tolerated, and it said that the

23  improvement in efficacy is, again, not accompanied by an

24  increase in the adverse reaction, which could be expected

25  from doubling the dose.

Green - direct

1    Q.    Okay.  Dr. Green, does the Pinchasi application report

2    any clinical data derived from dosing 40 milligrams of GA

3    every other day?

4    A.    No, it does not.

5    Q.    Okay.  But does it -- but does it claim that dosing

6    regimen?

7    A.    It does.

8    Q.    Have you reviewed again each of the patents-in-suit in

9    this case?

10   A.    Yes, I have.

11   Q.    Do the patents-in-suit in this case report any

12   clinical data derived from the claimed 40-milligram, three

13   times per week GA dosing regimen?

14   A.    No, they do not.

15   Q.    All right.  In a 40-milligram every-other-day dosing

16   regimen like that claimed in the Pinchasi application, how

17   often is 40 milligrams of GA administered per week to a

18   patient?

19   A.    So the first week it's given three times, and the next

20   week it's given four times, so alternating between three

21   times a week and four times a week.

22   Q.    All right.  If we could see the next slide, Dr. Green.

23   What are we looking at here?

24   A.    So we're looking at a comparison of, again, thinking

25   of the time window of two weeks or longer, what's the

1    difference in total dosing that a patient will experience by

2    using a three-times-a-week formulation of 40 milligrams

3    versus an every-other-day formulation of 40 milligrams.

4              And as is evident here, clearly, the

5    difference is 14 percent out into perpetuity, and we looked

6    at about  ten years the patients that are going to take that

7    drug    out that long, the difference of 14 percent remains

8    forever.

9    Q.    Is the Pinchasi application every other day,

10   40 milligrams a day dosing regimen the closest prior art in

11   your opinion, Dr. Green?

12   A.    Yes, it is.

13   Q.    From a therapeutic viewpoint, is there a meaningful

14   difference between an every-other-day GA dosing regimen and

15   a three-times-per-week GA dosing regimen?

16   A.    No.

17   Q.    If we could see the next slide.

18             How did the concept of interpatient variability

19   play into that analysis?

20   A.    Yes.  So drugs, medications in general, which a

21   patient has to self-administer, take the pills or medication

22   themselves, you have to have a fair degree of forgiveness.

23   There has to be recognition of the fact that patients are

24   not a hundred percent compliant and adherent and you can't

25   be on a razor's edge.  You can't be absolutely dependent on

Green - direct

1    taking it exactly instructed for the medication to still

2    work.

3                    You have to take into account the patients

4    may be different sizes.   In this context you're using the

5    same dose of glatiramer acetate whether someone is a 75 or

6    80-pound woman or a 350-pound man.   There may be differences

7    in metabolism from the drug.   There may be other differences

8    that are not accounted for and the fact the drug dosing is

9    the same for every patient.

10   Q.    Okay.   What do you advise a patient who confirmed that

11   they forgot to take one of their doses?

12   A.    Exactly as Dr. Wolinsky testified earlier today, my

13   advice to them is don't worry about it, but this is -- it's

14   important that you remain compliant or adherent generally to

15   the regimen, but if you miss a dose, just take your next

16   dose the next day.

17   Q.    All right.   Dr. Green, if we could see the next slide,

18   please.

19                   In August 2009, was a three-times-per-week

20   dosing schedule known to have particular advantages over an

21   every-other-day schedule from a compliance and adherence

22   standpoint?

23   A.    Yes, though as shown here, a three-times-a week,

24   regular, same-day-each-week regimen would allow for patients

25   to schedule their lives much more realistically than

1    something that's every other day and falls haphazardly

2    throughout the week and would potentially impact their daily

3    or weekly activities.

4    Q.    Okay.  If we could see the next slide, please,

5    DDX-1100.20.

6              Were there any other known advantages of the

7    three-times-a-week schedule as compared to an

8    every-other-day dosing schedule again in 2009?

9    A.    Again, patients can do things like take the weekend

10   off to go camping.  If they have an activity, it's the

11   same time every week like attending church, they can make

12   sure they continue to do that without it impacting their

13   daily life because they won't be doing an injection on

14   Saturday or Sunday.

15   Q.    Go camping without bringing your syringes?

16   A.    That's right.

17   Q.    Were these advantages of a three-times-a-week dosing

18   schedule something newly discovered with the advent of

19   three-times-per-week Copaxone?

20   A.    No.

21   Q.    Dr. Green, did you prepare a slide summarizing your

22   opinions concerning the main points that the Pinchasi

23   application would have taught a skilled artisan?

24   A.    Yes, I did.

25   Q.    Can we see that, please, DDX-1100.21 and just walk us

Green - direct

1    through that.

2    A.    Sure.  So the Pinchasi application revealed that a

3    40-milligram dose of GA is effective.  It revealed that it's

4    well tolerated and equally well tolerated when compared to

5    20 milligrams administered on a daily basis.  It also

6    disclosed administration every other day as well as daily to

7    treat relapsing or remitting multiple sclerosis.

8                         And, lastly, it revealed that there may be

9    some advantages for the 40-milligram dose, including a

10   faster onset of action of 20 milligrams as measured.

11   Q.    Aside from the Pinchasi application, was there other

12   prior art suggesting a 40-milligram dose of GA was effective

13   and well tolerated?

14   A.    Yes, there were.

15   Q.    If we could see the next slide, please, 1100.22, what

16   do we see here?

17   A.    So this is the other prior art in addition to the

18   Pinchasi application, which includes the Cohen publication

19   and the Comi Forte abstract, both of which revealed that

20   40 milligrams was effective, well tolerated, and both Cohen

21   and Comi agreed that there may be a more rapid onset of

22   action for the 40-milligram formulation.

23   Q.    Okay.  We've already talked about the Pinchasi

24   application, so let me direct your attention to JTX-7060.

25   We're at slide DDX-1100.23.

Green - direct

1          Is this a publication you reviewed in preparing

2    your reports, Dr. Green?

3    A.    Yes, it is.

4    Q.    What is it?

5    A.    This is a randomized, double-blind trial comparing

6    40 milligrams to 20 milligrams of GA over nine months, and

7    published in the journal "Neurology" in the year 2007.

8    Q.    Okay.  And what kind of reputation does the journal

9    "Neurology" have in your field?

10   A.    It is a preeminent journal in clinical neurosciences.

11   Q.    And you were on the editorial board of "Neurology"?

12   A.    Yes, I was.

13   Q.    Is there a connection between this Cohen 2007 article

14   and the Pinchasi application?

15   A.    Yes.  In fact, the data presented here in Cohen is

16   identical to the data that was mentioned in the background

17   for the Pinchasi application.

18   Q.    Okay.  In looking at the abstract at the beginning of

19   the article, what does Cohen report with respect to the

20   efficacy of the 40-milligram dose of GA?

21   A.    So Cohen's colleagues report that the overall efficacy

22   results suggested that 40 milligrams of GA may be more

23   effective than the currently approved 20 milligrams in

24   reducing MRI activity and clinical relapses.

25   Q.    If we could see the next slide, DDX 1100.24.  Did the

Green - direct

1    Cohen article report any potential advantages of the 40

2    milligram dose over the 20 milligram dose?

3    A.    As we were touching on at the end of the abstract,

4    there was the apparent advantage that 40 milligrams appeared

5    to suppress this MRI activity at Month 3, whereas for the 20

6    milligram dose, it took outwards of months seven, eight or

7    nine to see that effect.

8    Q.    In returning to the abstract on the next slide,

9    DDX-1100.25, what did Cohen report concerning the

10   tolerability of the 40 milligram dose?

11   A.    He specifically reported that the 40 milligram dose

12   was well tolerated, that it had an overall safety profile

13   that was similar to the 20 milligram formulation.  And he

14   does report that some features of injection site reactions

15   and immediate post-injection reactions were more common and

16   severe with the higher dose.

17          But specifically, he calls out in the

18   conclusions that GA 40 milligram was safe and well

19   tolerated.

20   Q.    Following the Cohen 2007 study, was there a larger

21   study conducted comparing the efficacy and tolerability of

22   40 milligram and 20 milligram GA daily dosing?

23   A.    Yes, there was.

24   Q.    Is that referred to as the FORTE study?

25   A.    Yes.

Green - direct

1    Q.    If we could see or look at JTX-7063.  Did you review

2    this publication in preparing your expert reports, Doctor?

3    A.    Yes, I did.

4    Q.    What is this publication?

5    A.    So this is an abstract presented at what's called the

6    WCTRIMS meeting, which is just a combination of the European

7    Committee for Treatment and Research in Multiple Sclerosis

8    and the American committee and the same, I think, Latin

9    American committee.  So all of those different societies

10   from around the world get together.  This is in Montreal in

11   2008.

12            This was a presentation of the results of the

13   FORTE trial that was the large-scale study meant to

14   reproduce the results from the Cohen study.

15   Q.    Who is the lead author?

16   A.    Giancarlo Comi.

17   Q.    Do you know Dr. Comi?

18   A.    I do.

19   Q.    Again, what year was the Comi abstract published?

20   A.    This was presented and published in 2008.

21   Q.    What conclusions did Dr. Comi report with respect to

22   the efficacy and tolerability of the 40 milligram GA dose?

23   A.    So he specifically reported that the 40 milligram and

24   20 milligram dose were both safe and well tolerated, and he

25   reported that they were actually effective in reducing

1    relapses in MRI activity.

2    Q.    The 40 milligram and 20 milligram daily dose were

3    equally effective.  Did the FORTE trial show that the 40

4    milligram dose of GA had superior efficacy as compared to

5    the 20 milligram dose?

6    A.    Not based on its primary endpoint, no.

7    Q.    If we could see the next slide, DDX-1100.27.  It's

8    still looking at the Comi abstract.  Did Dr. Comi identify

9    any of the potential advantages of the 40 milligram dose as

10   a result of this larger Phase III study?

11   A.    Yes.  So he highlighted that, again, similar to what

12   had been seen in Cohen, there seemed to be a trend for

13   faster reduction during the first period of the study, when

14   you compared the 40 milligram dose against the 20 milligram

15   dose.

16   Q.    What do you understand the meaning of the word trend

17   to be there?

18   A.    This means it doesn't reach a level of statistical

19   significance that was pre-defined, and yet still within our

20   field, we learn things from trends, especially when they

21   reproduce or reinforce an idea that we got from an earlier

22   study.  They still have a high likelihood of being true.

23   Q.    Okay.  Dr. Green, with respect to the 40-milligram

24   dose of GA, we talked about the Pinchasi application , the

25   Cohen Neurology paper, Teva's large Phase III FORTE study

1    that Dr. Comi reported on.  In your opinion, would those

2    references encouraged the skilled artisan, interested in

3    less frequent GA dosing regimens, to consider using a 40

4    milligram dosing of GA?

5    A.    Yes, they would have.

6    Q.    Did you help prepare a slide describing why a skilled

7    artisan as of August 2009 would be encouraged to pursue a

8    40-milligram dose of GA for use in a less frequent dosing

9    regimen?

10   A.    Yes, I did.

11   Q.    If we could see the next slide, please, DDX-1100.28,

12   if you could walk us through that?

13   A.    This highlights what the motivations would have been

14   for a POSA as of August 2009 to pursue use of a 40 milligram

15   dose in a less frequent dosing regimen.  It highlights that

16   40 milligrams is one of two doses that have been extensively

17   studied and for which safety and tolerability had been

18   established.  It also appeared to have a faster onset, now

19   in two separate studies, compared to the 20 milligram dose.

20         It was well tolerated, the dose here again, to

21   be safe, well tolerated and similar in tolerability to the

22   20 milligram dose.

23   Q.    You mentioned that the 40 milligram and the 20

24   milligram daily doses were found to have similar

25   tolerability profiles in the Cohen and FORTE studies.

1              Given that, what would a skilled artisan have

2    expected in terms of tolerability if the number of 40

3    milligram doses administered each week were reduced from

4    seven to three?

5    A.    As we discussed, most of the adverse events associated

6    with the use of glatiramer acetate, and in fact the most

7    troubling set of adverse events had to do with injection

8    site reactions or immediate post-injection reactions.

9              Both of those are tied to injections.  So if you

10   reduce the frequency of injections, well, it's clearly

11   obvious that you would reduce the frequency of those

12   injection site reactions or immediate post-injection

13   reactions.

14   Q.    And would a skilled artisan in 2009 have expected that

15   a patient would experience fewer injection site reactions

16   and immediate post-injection reactions with a 40 milligram

17   three times a week dosing regimen than with a 20 milligram

18   daily dosing regimen?

19   A.    Absolutely.  If it has been established that 40

20   milligrams and 20 milligrams were similar in terms of

21   tolerability, so reducing the frequency of injection, by

22   logic, we would assume to have a lower frequency of those

23   events.

24   Q.    Plaintiffs argue that the FORTE trial was a failure

25   because it didn't show that the 40 milligram dose was

1   superior to the 20 milligram dose in terms of relapse rate

2   of efficacy.  In your opinion, would the Cohen and FORTE

3   results teach skilled artisans away from pursuing the use of

4   a 40 milligram dose of GA in a less frequent dosing regimen?

5   A.    It could be characterized as a failure because it

6   failed to meet its primary end point.  But in clinical

7   research, that doesn't mean we learned nothing from the

8   study.  In fact, we often learn quite a bit from

9   unsuccessful studies.

10          In this context, we would have learned 40

11   milligrams, despite being considered an unsuccessful study,

12   we still would have learned that 40 milligrams is well

13   tolerated, may have a faster onset of action, and it appears

14   as an attractive dose to give to patients.

15   Q.    Dr. Green, we have been discussing the prior art

16   related to the 40 milligram dose of GA.  Now I would like to

17   talk to you about the prior art that's related to less

18   frequent dosing of glatiramer acetate.  Was there interest

19   in less frequent GA dosing regimens among skilled artisans

20   before August 2009?

21   A.    Yes, there was.

22   Q.    Why was that?

23   A.    Well, as was initially asked in the SBOA and mentioned

24   at the SBOA, there was this issue of could less frequent

25   dosing regimens be better in terms of tolerability for

 1  patients.  Then furthermore, there were multiple

 2  investigators who evaluated lower frequency dosing regimens

 3  to see whether or not they would be associated with

 4  maintained efficacy.

 5  Q.    And if we could see the next slide DDX-1100.29, what

 6  do we see here, Dr. Green?

 7  A.    So this is that prior art that I mentioned, starting

 8  with the SBOA, and including, then, first an investigation

 9  done by Flechter, comparing experience with every other day

10  GA compared to daily GA, then a randomized study done by

11  Khan, and furthermore the Pinchasi application, which

12  further revealed the dose of 40 milligrams to be given every

13  other day, and the Caon abstract which also extended some of

14  the results from the Khan study, the same subjects, but

15  revealed that there was less lipotrophy in that study.

16  Q.    So we have already discussed the 1996 SBOA and the

17  Pinchasi application.  Let's start with the 2002 Flechter

18  study.  Please direct your attention to JTX-7078.  We are

19  now on Slide DDX 1100.30.  Dr. Green, did you review the

20  Flechter publication in preparing your expert reports?

21  A.    Yes, I did.

22  Q.    Again, what is it?

23  A.    This is a study done by this group in Israel that

24  looked at, when they treated patients with every other day

25  Copaxone, how did it compare to when they had previously

1    treated patients with daily Copaxone.

2    Q.    When was it published?

3    A.    That was published in 2002.

4    Q.    And I believe you said that Flechter compared the

5    results of his 20 milligram every other day dosing studies

6    with the results of an earlier study he participated in

7    examining daily GA dosing?

8    A.    Yes, he did.

9    Q.    If we could see JTX-7095, slide DDX-1100.31, did you

10   review this article in preparing your expert reports in this

11   case?

12   A.    Yes, I did.  It's mentioned as the comparison in the

13   Flechter study.

14   Q.    What is this article?

15   A.    This was a paper published just from the experience

16   early on after the introduction of glatiramer for this group

17   regarding the daily use of glatiramer acetate.

18   Q.    Was Dr. Flechter one of the authors on this Meiner

19   paper?

20   A.    Yes, he was.

21   Q.    Let's go back to the Flechter paper.  What do the

22   Flechter authors report concerning their comparison of the

23   daily and every other day 20 milligram GA dosing regimen?

24   A.    Specifically, Dr. Flechter concluded that the results

25   of this study showed that, or at least suggested that

Green - direct

1    alternate day treatments were slightly better than daily

2    treatments in terms of lower dropout rates and that the

3    efficacy results were not significantly different.

4    Q.    What does the fact that there was a lower dropout rate

5    on the less frequent dosing regimen than on the daily

6    regimen suggest to a skilled artisan?

7    A.    In this context the lower dropout rate would suggest

8    that there was probably better tolerability for the every

9    other day regimen.

10   Q.    If we could see the next slide, DDX-1100.33, this is

11   from JTX-7078.5, still on the Flechter paper, what does Dr.

12   Flechter report with respect to the necessity of daily GA

13   injections?

14   A.    So he specifically reported that the dose of 20

15   milligrams on alternate days appeared to have what he called

16   a maximal effect and suggested as a consequence that daily

17   injections may be unnecessary.  And in fact, that's what he

18   concludes in the last line, in this same paragraph.

19   Q.    And if we could go to the next slide, still on the

20   Flechter paper, under the heading Conclusion, what does

21   Flechter report?

22   A.    He reports that alternate day treatment with

23   glatiramer acetate, or Copolymer I, was safe, well

24   tolerated, and probably as effective as daily Copolymer I.

25   Q.    Did the Flechter authors also encourage further study

1    of less frequent GA dosing regimens?

2    A.     Yes, in fact, they explicitly called that out and said

3    these observations should be examined in additional studies.

4    Q.     Doctor, please turn to Table 5 of the Flechter paper,

5    and look at the row of the table titled Mean Relapse Rate in

6    First Two Years of Treatment.  Because the relapse rate for

7    the alternate day treatment is shown as 0.56, whereas for

8    the daily treatment it's 0.3, there has been some suggestion

9    by plaintiffs that the patients receiving GA every other day

10   has a worse relapse rate than those taking daily GA.  Are

11   you familiar with that?

12   A.     I am.

13   Q.     Do you agree with that?

14   A.     No, I do not.

15   Q.     Why not?

16   A.     Well, a table like this has to be read and viewed in

17   context of the text.  In this context, the text provides

18   clear evidence that the Flechter data presented here is over

19   a two-year period.  Whereas the Meiner data is just

20   annualized.

21   Q.     Doctor, did you help prepare some slides to explain

22   your conclusion in that regard?

23   A.     Yes.

24   Q.     If we could see the next slide.  What do we see in

25   this slide, Dr. Green?

Green - direct

1    A.    So this shows both in the text from Flechter on our

2    left-hand side and from Meiner on our right-hand side, in

3    the two years prior, the comparison is being made for

4    Flechter over that two-year period, and again for Meiner,

5    again, in the period before people were enrolled in the

6    study, it was an annualized rate.

7    Q.    If we could see the next slide, what do we see on this

8    slide, Dr. Green?

9    A.    This shows us that for the results, the same approach

10   was taken.  For Flechter, it was over the two years of the

11   study, whereas for Meiner, it was annualized.  Part of this

12   is driven by the fact that the difference in Meiner was that

13   not every patient was studied over a full two years.  Some

14   of them were studied for one year, some for two years, and

15   some for three.

16   Q.    If we see the next slide, what is this illustrating?

17   A.    This is just to really highlight the fact that again,

18   the data in Flechter is non-annualized, whereas the data in

19   Meiner is annualized.  So these numbers are essentially

20   identical.

21   Q.    What about the authors of the Flechter paper, is their

22   conclusion consistent with your interpretation of the

23   relapse rate data in Table 5?

24   A.    That's why what I said before about viewing a table

25   like this in context is crucial.  If you look at the

1    conclusions of the authors, it is clear that they thought

2    that these values were identical or close to identical.

3            So explicitly, Flechter concluded, as we

4    discussed, that the results were not significantly different

5    between the patients studied in Flechter and the patients

6    studied in Meiner.

7    Q.    Did you provide testimony in the inter partes review

8    proceedings about your interpretation of the Flechter Table

9    5 relapse rate data?

10   A.    Yes, I did.

11   Q.    And did the PTAB agree with your interpretation in its

12   final written decision?

13           MR. JAMES:  Objection, your Honor.

14           THE COURT:  Sustained.

15           MR. ANSTAETT:  I withdraw the question.

16   BY MR. ANSTAETT:

17   Q.    Did you help prepare a slide summarizing your opinion

18   about what a skilled artisan reflecting the Flechter paper

19   would conclude with respect to the efficacy and tolerability

20   of the every-other-day dosing of GA meds?

21   A.    Yes, I did.

22   Q.    And if we could see the next slide and walk us through

23   this briefly.

24   A.    So a person of ordinary skill in the art as of 2009

25   would have looked at the Flechter paper from 2002 as

1    evidence of clear motivation.  As was mentioned by Flechter,

2    there was an interest in less frequency in dosing

3    regimens.  It also suggested maintained efficacy when you

4    switched to an every-other-day dosing regimen.  And it

5    showed that there was a potentially better tolerability.

6    Patients would find less frequent GA injections more

7    tolerable.

8    Q.    All right.  Doctor, let's look at DTX-1080.  Now we're

9    on slide DDX-1100.41.

10          Did you review this article in preparing your

11   expert reports, Dr. Green?

12   A.    Yes, I did.

13   Q.    Who is the author?

14   A.    This is Jerry Wolinsky.

15   Q.    Is that the same Jerry Wolinsky that we saw up here on

16   the screen today?

17   A.    Yes.

18   Q.    When was this article published?

19   A.    This was published in 2004.

20   Q.    Just to make it clear, it's the same Jerry Wolinsky

21   who was, or Dr. Wolinsky who was later involved in Teva's

22   Glacier study?

23   A.    Yes, it is.

24   Q.    And what is this article?

25   A.    This is a review of the experience with the

Green - direct

1    clinical treatment of glatiramer acetate for multiple

2    sclerosis.

3    Q.    Okay.  And we see here an excerpt from the article,

4    which is on page DTX-1080.0012.

5            Is one of the studies discussed in the Wolinsky

6    article the Flechter 2002 study that you and I have just

7    been discussing?

8    A.    It is.

9    Q.    And what does Dr. Wolinsky draw from Flechter 2002 in

10   his review article?

11   A.    So he says that although no firm conclusions can be

12   drawn from the communications on the relative efficacy of

13   daily and alternate day GA, that the information could

14   provide the clinician with some guidance for alternatives

15   for patients on GA that were having trouble with injection

16   sites.

17   Q.    Okay.  And you were here this morning when Dr.

18   Wolinsky's testimony was played?

19   A.    Yes.

20   Q.    All right.  And if we could see the next slide,

21   please.

22           Did Dr. Wolinsky testify concerning his own

23   practice of prescribing glatiramer acetate to his patients

24   occasionally for administration every other day?

25   A.    Yes, he did.

1    Q.    Okay.  When again was he doing that?

2    A.    He said at least as early as 2005 he was occasionally

3    prescribing Copaxone 20 milligrams every other day, hoping

4    that it might reduce injection site reactions for patients

5    who had problems with injections or needle fatigue.

6    Q.    You mentioned earlier that the Flechter paper authors

7    encouraged others in the field to continue to study less

8    frequent GA dosing regimens.  Did others conduct such

9    studies?

10   A.    Yes, they did.

11   Q.    Okay.  And if we could look at JTX-7089, this is on

12   slide DDX-1100.43.

13              Did you review this publication, Dr. Green?

14   A.    Yes, I did.

15   Q.    And who is the lead author?

16   A.    This was Omar Khan.

17   Q.    Do you know Dr. Khan?

18   A.    I did know Dr. Khan.

19   Q.    Okay.  Is that the same Dr. Khan who would later run

20   Teva's GALA study?

21   A.    Yes, it was.

22   Q.    Okay.  And when was this abstract published?

23   A.    This was published or actually presented, I believe at

24   the same meeting as the Comi article we talked about before,

25   at that meeting in Montreal in 2008.

Green - direct

1  Q.    Okay.  And what's reported in the Khan 2008 abstract,

2  Dr. Green?

3  A.    A randomized rater blinded study comparing patients

4  treated with glatiramer to receive either 20 milligrams of

5  GA, 20 milligrams daily GA versus 20 milligrams every other

6  day of GA.

7  Q.    Okay.  And if we look at the background section of Dr.

8  Khan's article, does Dr. Khan suggest why the study was

9  conducted?

10  A.    Yes.  He notes that there was considerable interest in

11  alternate dosing regimens for GA because for subcutaneous

12  injectable therapy, long-term compliance can be a problem

13  for injectable therapy where a person has to inject himself

14  every day.

15  Q.    Okay.  How many patients were involved in Dr. Khan's

16  study?

17  A.    There were 30 patients.

18  Q.    Okay.  If we see the next slide, please, DDX-1100.44,

19  what were the results of Dr. Khan's study of less frequent

20  GA dosing?

21  A.    So over the first two years of the study when the

22  patients were being compared head-to-head in a randomized

23  fashion, there were no differences in the relapse rate,

24  disease progression, or any MRI metrics between the two

25  groups.

Green - direct

1   Q.      Okay.  And what happened after the first two years of

2   the study?

3   A.      So then there was a two-year extension of the study in

4   which he offered to patients who were being treated daily,

5   would they want to switch to the every-other-day

6   formulation.

7   Q.      Okay.  And what did they choose?

8   A.      A hundred percent of them, all of them chose to switch

9   to every other day.

10  Q.      And what does that teach the skilled artisan who is

11  reading Khan 2008?

12  A.      It reveals clear and obvious patient preference for an

13  every-other-day dosing regimen when compared to a daily

14  dosing regimen given the option.

15  Q.      All right.  Dr. Green, did you help us prepare a

16  slide summarizing your opinion about what a skilled artisan

17  reviewing the Khan 2008 abstract would conclude with

18  respect to the efficacy and tolerability of less frequent GA

19  dosing?

20  A.      Yes, I did.

21  Q.      And if we could see that slide, and if you could just

22  walk us through that, please.

23  A.      Sure.  So the Khan abstract clearly again provides

24  additional evidence that there was motivation to try an

25  alternate dosing schedule compared to the 20-milligram daily

```
 1    formulation.  It also suggests that there was maintained

 2    efficacy when you switched to every-other-day dosing from

 3    daily dosing.  And lastly, it showed us that given this

 4    choice, patients would strongly prefer the every other day

 5    dosing regimen.

 6    Q.    Okay.

 7              MR. ANSTAETT:  Your Honor, may I have one moment

 8    to confer my colleague?

 9              THE COURT:  Yes.

10              (Pause while counsel conferred.)

11    BY MR. ANSTAETT:

12    Q.    Okay.  Dr. Green, let's look at JTX-7058, please, and

13    we're now on slide DDX-1100.46.

14              And, Dr. Green, did you review this publication

15    in preparing your expert reports?

16    A.    Yes, I did.

17    Q.    Okay.  Who is the lead author?

18    A.    Christina Caon.

19    Q.    And when was this abstract published?

20    A.    This was published in March of 2009.  It was an

21    abstract presented at the American Academy of Neurology

22    meeting in the year immediately following that WCTRIMS

23    meeting that I spoke about before.

24    Q.    Is that before the priority date of the

25    patents-in-suit?
```

Green - direct

1    A.    Yes, it is.

2    Q.    And what does the Khan 2009 abstract report?

3    A.    So it extends the story from the same patient

4    population that was discussed in the Khan study, and it

5    extends that story to highlight the fact that there was

6    reduced lipoatrophy in the patients who were treated with 20

7    milligrams of GA every other day.

8    Q.    What is lipoatrophy?

9    A.    Lipoatrophy is one of the more significant injection

10   site reactions, and in that context people can again have

11   permanent or disfiguring changes, loss of subcutaneous

12   tissue.  And these kind of things can be unsightly and very

13   troubling to patients, especially when they're injecting

14   themselves in places where they can't keep hidden when they

15   are doing something like wearing a bathing suit.

16   Q.    Okay.  All right, Dr. Green.  I want to direct your

17   attention now to DTX-1154, please, and we are on slide

18   DDX-1100.47.

19         Did you review this publication in preparing

20   your expert reports?

21   A.    Yes, I did.

22   Q.    Okay.  Who is the lead author?

23   A.    This is the same, Omar Khan, who we spoke about

24   before.

25   Q.    Was this abstract presented at a meeting?

Green - direct

1    A.    It was.  It was presented at the meeting in 2009.

2    Q.    And without getting into the results of the study,

3    what's reported in this abstract?

4    A.    It reports on a comparison between 20 milligrams of

5    subcutaneous GA given twice weekly versus daily GA.

6    Q.    And what was the duration of that study?

7    A.    It was two years.

8    Q.    And what was the deadline for submission of abstracts

9    for the meeting?

10   A.    This had to have been fully completed and analyzed by

11   May 5th of 2009 in order to meet the submission deadline.

12   Q.    And when was this abstract with the results of the

13   study of twice-a-day dosing of GA published?

14   A.    It was then published immediately around the time of

15   the meeting, which would have been a few weeks after the

16   priority date.

17   Q.    So given it's a two-year study and the results were

18   published in September of 2009, were there patients in the

19   two times per week GA group receiving that dosing regimen

20   before August 2009?

21   A.    Absolutely.

22              MR. JAMES:  Objection, your Honor.  Leading.

23   BY MR. ANSTAETT:

24   Q.    Dr. Green, given that it was a two-year study, when

25   would the patients in this study have taken glatiramer

1    acetate twice a week?

2    A.    At the very latest, it would have been in the spring

3    of 2007, so there would have been many patients who were in

4    the study who would have been taking the therapy well before

5    the priority date.

6    Q.    Okay.  And if we could see the next slide,

7    DDX-1100.48, does the abstract indicate what motivated Dr.

8    Khan to initiate a study of twice weekly dosing of GA?

9    A.    That's right, and that's how this study informs my own

10   opinions.  So, again, it highlights the fact that people of

11   ordinary skill in the art at the time of the priority date

12   who had considerable interest in studying a more patient

13   friendly dosing regimen that may maintain efficacy, and as a

14   consequence, be better tolerated than GA.

15   Q.    Dr. Green, did you help prepare a slide describing why

16   a skilled artisan as of August 2009 would be motivated to

17   pursue a less frequent GA dosing regimen with a reasonable

18   expectation of success?

19   A.    Yes, I did.

20   Q.    If we could see that slide.  What are those reasons

21   please?

22   A.    Well, again, as early as the time of approval of the

23   medication, regulators have suggested to the sponsor and to

24   the field that alternate dosing regimens should or could be

25   pursued.

1              Furthermore, there was the Pinchasi application

2    that disclosed a 40 milligram dosing regimen given every

3    other day.

4              The Flechter study, as we discussed, had

5    revealed that an every other day dosing regimen seemed to

6    have maintained efficacy and improved tolerability when

7    compared to daily GA.  And then the Khan study in a

8    randomized fashion reinforced and confirmed that result.

9              Furthermore, the Caon study then extended story

10   for lipoatrophy.  And there was the competitor product on

11   the market known as Rebif taken three times weekly.

12              THE COURT:  Let's take a stretch.

13              (Recess taken.)

14              THE COURT:  Obviously, we are not going to

15   finish with the Doctor today.  We are going to break at 5.

16              MR. ANSTAETT:  Thank you, Your Honor.

17   BY MR. ANSTAETT:

18   Q.    Doctor, one of the things we are also going to do

19   besides break at 5 is that you and I are going to make a big

20   effort to slow down for the court reporters' sake.

21              I do want to go back to one thing that we talked

22   about before, I am going to ask you to look at something in

23   your binder.  It's JTX-7079.  If you could just turn to Page

24   1 of that document.

25              We will get it up on the monitor for you as well

Green - direct

1      .

2                       Are you there?

3      A.    Yes, I am.

4      Q.    This is the 1996 SBOA that we had talked about

5      previously.  Do you recall that?

6      A.    Yes, I do.

7      Q.    Do you recall what the FDA reviewer's observation was

8      in the SBOA?

9      A.    Yes, I do.

10     Q.    What was that, if you could just describe it?

11     A.    It was to ask the question if daily glatiramer acetate

12     injections were necessary.

13     Q.    And I just want to make clear, if you could read, on

14     Page 1 of that document, Paragraph 4, you don't have to read

15     it out loud, but could you just let us know what it says

16     about when that became publicly available?

17     A.    Okay.

18     Q.    When, according to that paragraph, did it become

19     publicly available?

20     A.    So it appears that via a Freedom of Information Act

21     approval letter it was made public on April 8th, 2005.

22     Q.    Thank you, Dr. Green.  You can set that aside.

23                       I would like to go back to slide DDX 1100.49, we

24     covered a lot of information before the break.

25                       So again, looking at that exhibit, does this

1    describe the prior art available before the priority date

2    related to less frequent dosing of glatiramer acetate?

3    A.    Yes, it does.

4    Q.    If you could just walk us through what was available

5    again here on this slide, slowly?

6    A.    So first was the summary basis of approval with the

7    comments from the reviewer, that showed motivation that

8    existed in the field.  Then there was the Pinchasi patent

9    application, which disclosed and claimed 40 milligrams every

10   other day.

11          There was the Flechter study that compared daily

12   dosing to every other day dosing, in terms of patient

13   experience within a clinical group, and further extension of

14   that result that showed equivalent efficacy and enhanced

15   tolerability for the every other day formulation in a

16   randomized study led by Omar Khan.

17          Then there was Christina Caon extension of what

18   Omar Khan had reported, which was that there was less

19   lipoatrophy and fewer injection site reactions with the

20   every other day dosing formulation.

21          Lastly, there was the existence on the market of

22   Rebif, a three times weekly interferon, and another

23   immunomodulatory drug that was given at this more convenient

24   dosing regimen.

25   Q.    Dr. Green, you understand, I think, that Teva has

1   leveled various criticisms at the Flechter and the Khan

2   studies of dosing glatiramer acetate 20 milligrams every

3   other day?

4   A.    Yes.

5   Q.    Let's look at JTX-7022.  We are on Slide DDX 1100.50.

6          Doctor, have you reviewed this document?

7   A.    Yes, I have.

8   Q.    Doctor, as an expert opining on the obviousness of an

9   invention, if an admission is made by the patent owner to a

10  federal agency about the prior art, is that something that

11  would inform your opinion?

12  A.    Yes.

13  Q.    Now, I want to be very clear about this.  We talked

14  earlier about how you submitted expert reports and testimony

15  in the inter parties review proceedings on the '250, '413

16  and the '302 patents in which those were held unpatentable.

17          Had you seen JTX-7022 before you prepared and

18  submitted your testimony in the inter partes review

19  proceedings?

20  A.    No, I had not.

21  Q.    So you came to your opinions on obviousness of the

22  patents and the IPRs before you ever saw this document?

23  A.    That's right, completely independently of reviewing

24  this document.

25  Q.    What is JTX-7022?

1    A.      This is the GALA protocol.

2    Q.      What was the GALA clinical trial?

3    A.      That was a study evaluating Copaxone three times

4    weekly against placebo for evaluation of efficacy.

5    Q.      Did Teva submit the protocol, the GALA study protocol,

6    to the Food & Drug Administration?

7    A.      Yes.  Sorry.  This was submitted to the FDA as a

8    trial, conceivably as an attempt to get registration for

9    this drug.

10   Q.      Let's look at the page with the Bates No. JTX-7022.21,

11   and we are on Slide DDX-1100.51.

12           Dr. Green, what do we see in this section of the

13   document?

14   A.      So here, this is a description of the rationale from

15   the sponsor Teva for the dose regimen selection.  And it's

16   to try and justify to the regulator why is this dose being

17   evaluated, what's the background that it explains this dose

18   selection and this study.

19           Here they highlight that rationale the was

20   supported, where all the currently approved therapies for MS

21   were administered as injections or parenterally, I.V., and

22   could affect long-term adherence to treatment.

23           Then they said the next natural step was to try

24   and reduce that dosing frequency to find an optimal regimen

25   that maintained efficacy but reduced the burden of these

Green - direct

1    adverse events.

2    Q.    If we could see the next slide, please.

3          Here, in this slide, what does Teva discuss in

4    the next paragraph of the dose regimen selection rationale

5    that it provided to the FDA?

6    A.    So here they are discussing the literature that they

7    are using to support their rationale in the application to

8    the regulator.

9          So they are discussing, what is the existing

10   science that would support such an approach.

11         They named the exact same papers that I used

12   independently in forming my opinion here, the Flechter

13   paper, the Khan abstract, or both Khan abstracts, the Khan

14   abstract presented in 2008 at ECTRIMS and the Khan abstract

15   presented at ECTRIMS in 2009.

16   Q.    To be clear, the Flechter 2002 paper, that is one we

17   talked about earlier today, exploring 20 milligrams every

18   other day dosing?

19   A.    Yes.

20   Q.    What did the Khan 2008 abstract explore?

21   A.    20 milligrams every other day versus 20 milligrams

22   daily in a randomized trial.

23   Q.    And the Khan 2009 study, was that the one that began

24   back in 2007?

25   A.    That's correct.

Green - direct

1    Q.    Again, what was your take on motivation with respect

2    to that study?

3    A.    It provides clear evidence that people of ordinary

4    skill in the art were interested in pursuing a dosing

5    regimen that would enhance tolerability via a lower

6    frequency of injections.

7    Q.    Okay.  Let's look at the next slide.  Still in the

8    rationale for dose regimen selection, in the second

9    paragraph under that heading, what does Teva say about the

10   Flechter and Khan studies?

11   A.    So in reference to these studies, they say that they

12   demonstrated a reduction in relapse rate, which was

13   comparable to the daily injection.  And they suggested,

14   therefore, that a lower injection frequency could be

15   considered.

16   Q.    May we see the next slide, please.

17         Did Teva say that the Flechter and Khan studies

18   shed any light on the tolerability of less frequent GA

19   dosing?

20   A.    Yes.  They said that the results of these studies that

21   we have just referred to, the Flechter, Khan and, I guess

22   they are not referencing Caon, but by inference, these

23   results would support or suggest that participating subjects

24   in those studies had reduced frequency of injection site

25   reactions.

Green - direct

1          So again, as a rationale for supporting an

2     exploration of this less frequent dosing regimen as proposed

3     in GALA.

4     Q.    Okay.  If we could see the next slide.  What if

5     anything did Teva tell the FDA about the size of the

6     Flechter and Khan studies?

7     A.    Well, they said that these studies were small and

8     underpowered.  I would take a little issue with the use of

9     the term underpowered in this context because I don't think

10    they are underpowered.  In fact if you see a result, it

11    means the study is not underpowered.  But they are small

12    studies, and although they provide additional support, they

13    need to be further confirmed for definitive proof of

14    efficacy.

15    Q.    Let's look at the next slide.  Here there is a

16    reference to a GA/9016 study.  Do you have an understanding

17    of what study that is?

18    A.    Yes, that is the FORTE trial.

19    Q.    Again, what was the FORTE trial?

20    A.    That was the trial led by Giancarlo Comi that looked

21    at 40 milligrams of GA versus 20 milligrams of GA in a

22    larger study that was supposed to extend the results

23    initially from the Cohen study.  So this was a study with a

24    relapse rate and its outcome comparing 40 milligrams of GA

25    against 20 milligrams of GALA.

1    Q.      That was a big Phase III study?

2    A.      That was.

3    Q.      What does Teva say the FORTE study teaches with

4    respect to the tolerability of the 40 milligram three times

5    a week dosing regimen?

6    A.      So they said that in the context where they were being

7    given at the same frequency, the fact that the injection

8    site reactions had similar incidence for both doses, one

9    would expect that if you reduced the frequency of

10   injections, you would in fact enhance and improve subject

11   tolerability and as a consequence adherence.

12   Q.      So reduced frequency of injections increased

13   tolerability?

14   A.      That's right.

15   Q.      Dr. Green, what is your opinion about Teva's reliance

16   on these studies, particularly Flechter 2002 and Khan 2008,

17   in the GALA protocol that they gave to the FDA to explain

18   the selection of the dosing regimen in that trial?

19           MR. JAMES:   Objection, Your Honor.   I think Your

20   Honor ruled he was allowed to testify about it with respect

21   to the state of the art but not what was Teva thinking with

22   respect to these studies.

23           THE COURT:   Sustained.

24   BY MR. ANSTAETT:

25   Q.      I can rephrase.

Green - direct

1              In your opinion, what do you believe these

2       statements in Teva's proposal and dose regimen selection

3       submitted to the FDA tell you about the state of the art?

4       A.      This confirms that the state of the art in the

5       impression both of me looking at it as a person of ordinary

6       skill in the art in 2009 and the Teva scientists at the same

7       time were identical.

8              The estimation of what the prior art taught us,

9       the estimation of where the motivation lay, all that

10      information was symmetrical between my own opinions and the

11      opinions of Teva that I was unaware of at the same time.

12      Q.      Okay.  We can take that down.

13             Dr. Green, what did the prior art teach in terms

14      of the total weekly doses of glatiramer acetate that were

15      therapeutically efficacious for treating relapsing remitting

16      multiple sclerosis?

17      A.      The prior art taught us that there was a broad range

18      of doses that were in fact efficacious and well tolerated.

19      So there was the dose from 70 milligrams per week, average

20      per week when you looked at the Khan and Flechter studies,

21      and there was a dose all the way up to 280 milligrams a week

22      when you looked at the Cohen -- when you looked at the 40

23      milligram arms of the Cohen and Comi studies.

24      Q.      Can we see the next slide, please.  This is

25      DDX-1100.57.

1              Dr. Green, did you help prepare this slide?

2     A.     Yes, I did.

3     Q.     And what do we see on this slide, please?

4     A.     So this highlights that range, from the 70 milligrams

5     per week in Flechter and Khan up to the 280 milligrams the

6     in studies comparing 40 milligrams every other day.  I'm

7     sorry, 40 milligrams daily of glatiramer in the Cohen and

8     Forte studies.

9              And it also highlights the fact that the

10    pre-existing patents and the, or the pre-existing practice

11    and the patents-in-suit have doses that are roughly in the

12    middle there.  They're similar and their weekly dosing is

13    again roughly equivalent.

14    Q.     Okay.  And so just to be clear, where is the total for

15    the patents-in-suit that we're concerned with here?

16    A.     Right.  So that's the 120 milligrams.  That is

17    40 milligrams three times a week as compared to the

18    standard dosing, the Copaxone-approved dosing, which was

19    140 milligrams over the week, 20 milligrams daily.

20    Q.     And where does that total weekly dose fall within the

21    range?

22    A.     They both seem to fall somewhere close to the middle.

23    Maybe just below the middle, but close.

24    Q.     Okay.  And the words "forgiving range" are up there.

25    What does that mean?

1   A.      That, again, alludes to the, what we were talking

2   about before, which was the fact that for a drug like this,

3   you tend to hope for forgiveness.  In fact, in this context,

4   there really is a forgiving range, meaning a wide dose, a

5   wide dose range appears to be effective and appears to have

6   maintained efficacy and tolerability.

7   Q.      Okay.  Can we see the next slide, DDX-1100.59.

8           Dr. Green, what are we looking at here on this

9   slide?

10  A.      This is just to highlight that one weekly dose that's

11  different between the every-other-day dosing disclosed in

12  Pinchasi and the three-times-a-week dosing that is the

13  subject of the patents-in-suit.

14  Q.      And what's represented by the injection, the needle

15  there, the circle in the left-hand box?

16  A.      Those are the date of injections.  The one that is

17  circled is the one that's different.  That's the one dose

18  that you would not be taking if you were doing three times a

19  week as opposed to every other day dosing.

20  Q.      Just one dose?

21  A.      Just one dose.

22  Q.      Would skilled artisans consider the information in the

23  prior art on total weekly dose in isolation or would they

24  consider it in conjunction with clinical data in the art on

25  frequency of administration?

Green - direct

1   A.      They'd consider it in conjunction with what they knew

2   about frequency of administration, and so they would not

3   consider a total weekly dose just independently or in

4   isolation.

5   Q.      How would frequency of administration factor into the

6   equation?

7   A.      Well, they take what was observed, what was understood

8   about, about the dosing frequency, and, in fact, they would

9   know that from that Flechter study and the Khan study, Caon

10  study, that there was a space for most of the doses of the

11  48 hours, or for those doses of 48 hours between one dose

12  and the next.  And in this context they would know that for

13  two-thirds of the doses that are being given in a thrice

14  weekly formulation, that's the same, that's the same, that's

15  the same interdose time period, same 48 hours.

16  Q.      Well, wouldn't you need pharmacokinetic studies in

17  order to have a reasonable expectation that a reduced

18  frequency glatiramer acetate dosing regimen would work?

19  A.      No.  Pharmacokinetics in this study in the context of

20  dose selection like this are really more appropriate for

21  small molecule drugs that have receptor binding properties

22  in which you want to define the dose curve.  In this

23  context, these are drugs that have broad immunological

24  effects.

25                  Glatiramer acetate is a drug that affects

1    immunoregulatory networks.  When you are affecting the

2    immune network, the immune system does not reset every

3    24 hours.  The immune system has memory and has persistence.

4    And so as a consequence, one would readily see that

5    affecting the immune system, it's likely that these

6    differences of 48 or 72 hours are not very likely to be

7    material, and as a consequence, provide assurance that a

8    reasonable expectation of success if they were pursued as a

9    clinical regimen.

10   Q.    Well, Teva's experts have said that the total weekly

11   dose of glatiramer acetate is irrelevant.  Are you aware of

12   that?

13   A.    I am.

14   Q.    And do you agree?

15   A.    No, I don't.

16   Q.    Let's see the next slide, please.  And I'm going to

17   direct your attention back to Teva's GALA study protocol and

18   the rationale for dose regimen selection that we were just

19   talking about a couple minutes ago.

20         What does Teva say in its dosing regimen

21   selection rationale in the GALA protocol that Teva

22   submitted to the FDA about a total weekly dose of glatiramer

23   acetate?

24   A.    They say exactly what I just said, which is that

25   these doses of 120 milligrams and 140 milligrams are

Green - direct

1      approximately similar over a weekly time period.  The

2      cumulative weekly dose is roughly equivalent between those

3      two doses.

4      Q.    And that's not just your opinion.  We see that in

5      Teva's GALA protocol; is that correct?

6      A.    That's correct.  They explicitly say, this would serve

7      an opportunity to explore the increased convenience that we

8      discussed of three injections per week.

9      Q.    All right.  Dr. Green, I'm going to shift topics here

10     on you a little bit, and maybe we can still squeeze a little

11     bit in the last ten minutes.  And I want to talk to you

12     about another argument that plaintiffs have made.

13            Are you aware that plaintiffs have argued that

14     skilled artisans would have been discouraged from exploring

15     less frequent GA dosing regimens as a result of one

16     particular theory regarding glatiramer acetate's mechanism

17     of action?

18     A.    Yes, I am.

19     Q.    Okay.  Do you agree?

20     A.    No.

21     Q.    In 2009, Dr. Green, was the mechanism of action of

22     glatiramer acetate known?

23     A.    No.  It was unsettled and remains unsettled to this

24     date, although there is a limited set of potential

25     mechanisms of action that have been composed, all of which

1    operate via the immune system.

2    Q.    But do we know with certainty today, even today,

3    which mechanism of action of GA achieves its therapeutic

4    effect?

5    A.    No, we don't.

6    Q.    All right.  Let's see the next slide, please.  This is

7    slide DDX-1100.61.

8          Have you reviewed or have you seen this before,

9    Dr. Green?

10   A.    Yes, I have.

11   Q.    Okay.  And what is it?

12   A.    It's from a review article from my colleague,

13   Schrempf, reviewing the potential mechanisms of action

14   relating to GA's efficacy.

15   Q.    And what type of cells is GA, glatiramer acetate,

16   thought to affect?

17   A.    All of these pretty much speak about its activities

18   in cells involved in the immune system maybe with the

19   exception of at the end, the discussion of decreasing

20   neuronal damage.  But by and large, all of these are

21   speaking about effects, broad effects on the immune

22   system.

23   Q.    All right.

24   A.    And this is not an exhaustive list.  There are other

25   potential mechanisms of action that are not even mentioned

Green - direct

1    in this list that bear or that warrant discussion.

2    Q.    Okay.  And just for the record, I want to note that

3    this is JTX-7120.

4            Dr. Green, do you believe that a skilled artisan

5    in 2009 would have been discouraged from pursuing a less

6    frequent glatiramer acetate dosing regimen based on these

7    various proposed mechanisms of action?

8    A.    Absolutely not, and certainly not from a narrow

9    interpretation of one of these mechanisms of action.

10   Namely, the effect on bystander suppression.  Again, the

11   mechanism of action remains unsettled.  There were broad

12   possibilities and there were additional possibilities beyond

13   the list that we've produced here.

14   Q.    Are you aware of any literature as of August 2009

15   telling skilled artisans that less frequent dosing of

16   glatiramer acetate is likely to fail because of a proposed

17   mechanism of action?

18   A.    Absolutely not, and such a contention would be

19   counterfactual.  Skilled artisans were pursuing other dosing

20   regimens with lower frequency and achieving success.

21   Q.    Well, what if the human clinical data as of

22   August 2009 suggests with respect to the efficacy and

23   tolerability of less frequent glatiramer acetate dosing?

24   A.    That it worked.  That less frequent dosing was a

25   regimen that could maintain efficacy and improve

1    tolerability.

2    Q.    Okay.  Are you aware that Teva has argued that a

3    skilled artisan would be discouraged from dosing GA less

4    frequently because a constant supply of beneficial T helper

5    two or TH2 cells crossing the blood-brain barrier to reach

6    the central nervous system is required for GA's efficacy?

7    A.    No.

8    Q.    Are you aware of that argument?

9    A.    I'm aware of the argument.  It would be a very narrow

10   argument that would only consider one narrow interpretation

11   of a mechanism of action and a complete simplification of

12   the underlying pathogenesis, the underlying processes that

13   explains what happens and why MS occurs.

14                    And so, in fact, it was not -- it does not

15   make sense at all to imagine that that single narrow

16   interpretation would guide a person of ordinary skill in the

17   art as of August 2009.

18   Q.    On the list up here that we're looking at, which of

19   these, which one of these proposed mechanisms of action is

20   the one that Teva focuses on?

21   A.    I believe it's the bystander suppression mechanism.

22   Q.    Okay.  Is that proposed mechanism of action based on

23   any human clinical data?

24   A.    No.  It's entirely based on animal data for an animal

25   model of MS that's known as experimental autoimmune

Green - direct

1    encephalomyelitis.  And so data from this thing known as EAE

2    is what has guided the understanding that GA may act via

3    effects on bystander suppression.

4    Q.    Let's take a look at the next slide, and this is

5    JTX-7099.  Have you reviewed this article, Dr. Green?

6    A.    Yes, I have.

7    Q.    When was it published?

8    A.    This was published in 2001.

9    Q.    All right.  And are you aware that plaintiffs' expert,

10   Dr. Ziemssen, relies on the highlighted statement that we

11   see here and other similar statements in the prior art for

12   his proposition that daily administration of GA is necessary

13   to maintain its efficacy?

14   A.    Yes, I am.

15   Q.    And do you believe a skilled artisan would read this

16   statement and be deterred from pursuing less frequent GA

17   dosing?

18   A.    Absolutely not.  I mean, this is a review from

19   esteemed colleagues, including Neuhaus, Wekerle and

20   Hohlfield, but the reference here, in fact, is probably

21   misplaced.  The reference 64 should actually go with the

22   fact that this is T cells, sorry, activated T cells are

23   able to cross the blood-brain barrier because they are

24   activated.

25                 So that's what is covered in the Wekerle

1    paper, and, in fact, that's what the reference is for.  It

2    has nothing to do with daily immunization, and it really has

3    nothing to do GA, because that's not what was evaluated in

4    the Wekerle study.

5    Q.    The Wekerle study, in Footnote 54 here, it's cited at

6    the end of that statement?

7    A.    That's correct.

8    Q.    Did Wekerle, did that paper involve glatiramer

9    acetate?

10   A.    It did not.

11   Q.    Did it involve glatiramer acetate reactive T cells?

12   A.    It did not.

13   Q.    All right.  In your opinion, why is daily

14   administration of GA mentioned here in a sentence?

15   A.    I think the only reason is that at that time, that was

16   the dosing regimen used for treatment in GA.  It's again not

17   something supported by the reference.

18   Q.    All right.  Dr. Green, did you review the references

19   cited in Dr. Ziemssen's reports regarding mechanism of

20   action of GA?

21   A.    Yes, I did.

22   Q.    Did those references indicate to you that daily dosing

23   of GA is necessary to maintain efficacy based on a mechanism

24   of action?

25   A.    Absolutely not.

1   Q.    Okay.   Let me ask you about another particular paper.

2   It's the Angelo paper, another paper that Dr. Ziemssen

3   cited.   Are you familiar with that paper?

4   A.    Yes, I am.

5   Q.    Okay.   And Mr. Russell has pulled it up here for us.

6   That's JTX-7050.

7           Now, are you aware that Dr. Ziemssen relies on

8   the Angelov paper for the proposition that a skilled artisan

9   would be taught away from less frequent dosing of GA based

10  on its immunological effects?

11  A.    Yes, I am aware of that.

12  Q.    Do you agree with Dr. Ziemssen's statement with

13  respect to the Angelov article?

14  A.    Again, clearly, no.   Absolutely not.

15  Q.    Why not?

16  A.    Because this is a study in animal models in a disease

17  known as amyotrophic lateral sclerosis, also known

18  colloquially as Lou Gehrig's disease.   This was an

19  evaluation again of this one animal model, known as the SOD

20  1 mouse, having nothing to do human patients, having nothing

21  to do multiple sclerosis, in fact, having nothing to do a

22  dosing regimen that has absolutely no relevance to the

23  patents in suit: namely, this has nothing to do regular

24  dosing that is less frequent when compared to the dosing

25  regimen used for treatment in multiple sclerosis.

Green - direct

1          This has to do, in the experiments, mostly a

2    one-time injection of glatiramer acetate in combination a

3    substance known as Freund's Adjuvant that is meant to

4    stimulate the immune system.

5          This has zero relevance to the proceedings at

6    hand.

7    Q.    Can we see the next slide, please.

8          Is this a slide you helped prepare?

9    A.    Yes.

10   Q.    Does it summarize your opinions on what GA's various

11   proposed mechanisms of action don't teach away from less

12   frequent dosing?

13   A.    Yes.

14   Q.    Could you slowly walk us through your opinions in that

15   regard?

16   A.    Sure.  So the most important point is that clinical

17   data always trumps mechanism of action theories.  As

18   clinicians we always rely upon data we have from human

19   subjects over data we have from animal models or from

20   in-vitro studies in a test tube.

21          So skilled artisans would have relied on that

22   human clinical data that existed at the time of the priority

23   date.

24          In addition, the teaching away argument is

25   completely counterfactual, as I mentioned.  Skilled artisans

Green - direct

1    were in fact exploring less frequent dosing regimens for

2    glatiramer acetate before 2009, as evidenced by Flechter,

3    Pinchasi, Khan and Caon.

4    Q.    Counterfactual in the sense that all of those are

5    studies involving humans taking less frequent GA?

6    A.    Yes.   That's correct.

7              MR. ANSTAETT:   Your Honor, this is a good

8    breaking point, if that is okay with you.

9              THE COURT:   Let's resume at 9.

10             (Court recessed.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25