1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                 -   -   -

4    IN RE COPAXONE 40 MG          )        C.A. No. 14-1171-GMS
     CONSOLIDATED CASES            )        (CONSOLIDATED)
5                                 -   -   -

6                            Wilmington, Delaware.
7                         Friday, September 30, 2016
                                 9:00 a.m.
8                         Day 5 of Bench Trial

9                                 -   -   -

10   BEFORE:   HONORABLE GREGORY M. SLEET, U.S.D.C.J.

11   APPEARANCES:

12             JOHN W. SHAW, ESQ., and
               KAREN E. KELLER, ESQ.
13             Shaw Keller LLP
                         -and-
14             PAUL W. WARE, ESQ.,
               DARYL WIESEN, ESQ.,
15             JOHN T. BENNETT, ESQ.,
               ELIZABETH J. HOLLAND, ESQ.,
16             NICHOLAS K. MITROKOSTAS, ESQ., and
               WILLIAM JAMES, ESQ.,
17             Goodwin Procter LLP
               (Washington, D.C.)
18                       -and-
               STEPHEN B. BRAUERMAN, ESQ., and
19             SARA BRUSSIERE, ESQ.
               Bayard P.A.
20
                                Counsel for Plaintiffs
21

22

23

24

25

```
1    APPEARANCES CONTINUED:

2              FREDERICK L. COTTRELL, III, ESQ.
               Richards, Layton & Finger, P.A.
3                     -and-
               DAVID L. ANSTAETT, ESQ.
4              Perkins Coie LLP
               (Madison, WI)
5                     -and-
               SHANNON M. BLOODWORTH, ESQ.,
6              BRANDON M. WHITE, ESQ.
               EMILY J. GREB, ESQ., and
7              ROBERT D. SWANSON, ESQ.
               Perkins Coie, LLP
8              (Washington, D.C.)

9                               Counsel for Defendants
                                Mylan, Inc. and
10                              Mylan Pharmaceuticals, Inc.

11             DOMINICK T. GATTUSO, ESQ.
               Procter Heyman & Enerio LLP
12                    -and-
               WILLIAM A. RAKOCZY, ESQ.,
13             DEANNE M. MAZZOCHI, ESQ.,
               RACHEL PERNIC WALDRON, ESQ.,
14             MATTHEW V. ANDERSON, ESQ.,
               THOMAS H. ERLICH, ESQ.
15             ERIN FORBES, ESQ., and
               CHRIS GALLIGAN, ESQ.
16             Rakoczy Molino Mazzochi & Siwik LLP
               (Chicago, IL)
17
                                Counsel for Defendants
18                              Sandoz Inc. and Momenta
                                Pharmaceuticals, Inc.
19
               RICHARD W. RILEY, ESQ.
20             Duane Morris LLP
                      -and-
21             CHRISTOPHER S. KROON, ESQ., and
               ANTHONY J. FITZPATRICK, ESQ.
22             Duane Morris LLP
               (Boston, MA)
23
                                Counsel for Defendants
24                              Amneal Pharmaceuticals LLC
                                and Amneal Pharmaceuticals
25                              Company GmbH
```

1    **APPEARANCES CONTINUED:**

2                    DAVID BILSON, ESQ.
                     Phillips, Goldman, McLaughlin & Hall, P.A.
3                        -and-
                     HANK HECKEL, ESQ.
4                    Budd Larner
                     (Short Hills, NJ)
5
                                    Counsel for Defendant DRL
6
                     NEAL C. BELGAM, ESQ.
7                    Smith Katzenstein & Jenkins LLP
                         -and-
8                    E. ANTHONY FIGG, ESQ.,
                     ELIZABETH R. BRENNER-LEIFER, ESQ., and
9                    BRETT A. POSTAL, ESQ.
                     Rothwell, Figg, Ernst & Manbeck, P.C.
10                   (Washington, D.C.)

11                                  Counsel for Defendants
                                    Synthon Pharmaceuticals, Inc.,
12                                  Synthon B.V., and Synthon s.r.o.,
                                    and Pfizer
13
                                        -  -  -
14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   THE COURT:  Good morning.  Please, take your
 2      seats.
 3                   THE COURT:  Dr. Green.
 4                   MR. ANSTAETT:  Your Honor, did you want to make
 5      the admonition about the photography?
 6                   THE COURT:  Yes.  Thank you for reminding me.
 7                   The admonition that Mr. Anstaett is referring
 8      to, ladies and gentlemen, is a reminder for anyone who is
 9      not familiar with the requirement, indeed it is a
10      regulation, that cameras are noq`t permitted to be used
11      without permission of the Court in a United States
12      courtroom.
13                   There is an experiment going on somewhere in the
14      country, there is a pilot program, I understand, but we are
15      not a part of that.
16                   Anyone who is found to be recording these
17      proceedings in any way, video, audio, texting them in any
18      way, I will take appropriate measures, to include, and
19      perhaps others, confiscating the device in question.
20                   Enough said.
21                   MR. ANSTAETT:  Thank you, Your Honor.
22                   ... ARI GREEN, having been previously sworn as a
23      witness, was examined and testified further as follows ...
24      Q.           MR. ANSTAETT:  Can we see DDX-1110.58, please.
25                         DIRECT EXAMINATION CONTINUED
```

1    BY MR. ANSTAETT:

2    Q.    Dr. Green, I want to very briefly review from

3    yesterday, since we had a break.

4              Is this a slide that you helped to prepare based

5    on your expert reports?

6    A.    Yes, it is.

7    Q.    If you could just recap for us what we see on this

8    slide, with particular reference to, and again, briefly, but

9    the elements of the pieces of prior art that we discussed

10   yesterday and what they disclose in terms of both dose

11   amount and dosing frequency, please?

12   A.    Yes.  So this slide just highlights the ranges of

13   doses that had been reserved or used in prior art from

14   Flechter and Khan that used 20 milligrams every other day

15   for an average weekly dose of 70 grams, up to Cohen and

16   FORTE, which had used 40 milligrams on a daily basis,

17   totaling an average of 280 milligrams per week.

18   Q.    What do the Flechter 2002 and Khan 2008 references

19   report with respect to the efficacy of every other day GA

20   dosing?

21   A.    They reported maintaining efficacy or similar efficacy

22   to what was observed in the comparison group in Flechter 20

23   daily and in a randomized comparison group in Khan of 20

24   milligrams daily.

25   Q.    Did those references have anything to say about the

Green - direct

1    tolerability of less frequent GA dosing?

2    A.    They did.   They both suggested there was enhanced

3    tolerability from every other day dosing.

4    Q.    Then the Pinchasi 2007 PCT application, what did that

5    disclose in terms of dose and also dosing frequency?

6    A.    That disclosed a dose of 40 milligrams as effective in

7    reference to the data presented in the Cohen publication,

8    And also disclosed an every other day administration of that

9    40 milligram dose.

10   Q.    Then Cohen, just mentioned, what did that disclose,

11   what dosing regimen did that disclose and what did it

12   disclose in terms of efficacy and tolerability?

13   A.    Cohen disclosed 40 milligrams daily, and it disclosed

14   a 40 milligram dose was in fact well tolerated, and similar

15   in efficacy to the 20 milligram daily dose, but in fact

16   suggested that there may be enhanced efficacy for faster

17   onset of action.

18   Q.    Okay.   And how about the Comi FORTE trial, the larger

19   Phase III trial that followed Cohen, what did that suggest?

20   A.    That confirmed the results of the Cohen study that the

21   40 milligram dose was in fact well tolerated.   It also

22   confirmed it had similar efficacy to the 20 milligram dose.

23   Furthermore, it continued to show this trend towards

24   enhanced onset of action or faster onset of action.

25   Q.    We have the Copaxone approved doses in 2009.   What

1    does that show in terms of weekly dose?

2    A.    That was the standard clinical dose in clinical

3    practice at the time, at the time of the prior art.  That

4    would have been 20 milligrams daily.  So 140 milligrams per

5    week.

6    Q.    On the red bar there we have the patents in suit.

7    Correct?

8    A.    That's correct.

9    Q.    What does that tell you, where that bar is on the

10   graph?

11   A.    That is right approximately next to both the closest

12   prior art, Pinchasi, as well as the daily approved dose

13   which was in existence and in practice at the time of the

14   patent application.

15   Q.    Then finally, we see this shaded area with the words

16   forgiving range.  What in your opinion is that intended to

17   show?

18   A.    That is intended to show that there is a broad range

19   of doses that appeared to all maintain efficacy and in fact

20   all appeared to be associated with tolerability.

21   Q.    That was a nice recap, thank you.

22         I would like to talk to you now about your

23   ultimate opinions with reference to the asserted claims of

24   the '250, '413 and '302 patents.

25         Did you reach a conclusion about whether the

1    claims of the '250 patent, the asserted claims of the '250

2    patent was obvious?

3    A.    Yes, I did.

4    Q.    What was that conclusion?

5    A.    That conclusion was that the '250 patent was obvious

6    in light of the prior art.

7    Q.    Did you reach a conclusion about whether the claims,

8    the asserted claims of the '413 patent are obvious?

9    A.    Yes, I did.

10   Q.    What was that opinion, please?

11   A.    The conclusion that I drew was that the '413 patent

12   was obvious in light of the prior art.

13   Q.    Did you reach a conclusion about whether the asserted

14   claims of the '302 patent are obvious?

15   A.    Yes, I did.

16   Q.    What was that opinion?

17   A.    That opinion was that the '302 patent was obvious in

18   light of the prior art.

19   Q.    Dr. Green, do you understand that the Court, in its

20   claim construction order, has found that many of the terms

21   in the patents in suit are non-limiting statements of

22   intended effects of using the claimed treatment regimen?

23   A.    Yes, I did.

24   Q.    If we could see Slide DDX-1100.65.

25         Dr. Green, does this slide reflect your

1    understanding of the terms that the Court has held to be

2    non-limiting?

3    A.    Yes.

4    Q.    Do you also understand that the Court construed the

5    dosing regimen terms to mean a continuous treatment

6    requiring three and only three subcutaneous injections each

7    and every week?

8    A.    Yes.

9    Q.    And if we could see the next slide.

10         Dr. Green, did you help prepare this slide

11   grouping the claim limitations in the patents relating to

12   the 40 milligram dosages?

13   A.    Yes, I did.

14   Q.    Dr. Green, does Pinchasi application disclose a 40

15   milligram dose of glatiramer acetate for treating relapsing

16   remitting multiple sclerosis?

17   A.    Yes, it does.

18   Q.    Does the Pinchasi application disclose three

19   subcutaneous injections over a period of seven days?

20   A.    Yes, it does, because in one week there is three doses

21   and in the next week there is four.

22   Q.    Pinchasi doesn't disclose three and only three

23   subcutaneous injections each and every week, does it?

24   A.    No, it does not.

25   Q.    Would it have been obvious to a skilled artisan in

1     August 2009 to modify Pinchasi's every other day dosing

2     schedule to a three times a week dosing schedule, in your

3     opinion?

4     A.    Yes, as we discussed, there would be enhanced

5     convenience with three times a week dosing and most dosing

6     would have the exact same dosage period that would have

7     existed under the Pinchasi application.

8     Q.    Does the Pinchasi application disclose at least one

9     day between every subcutaneous injection?

10    A.    It does.

11    Q.    All right.  Now, Claim 1 of the '302 patent -- I am

12    sorry, let me take a step back.  Reducing the frequency of

13    injections from daily subcutaneous injection of a 20

14    milligram dose to a regimen of three subcutaneous injections

15    of a 40 milligram dose, does the Pinchasi application

16    disclose reducing the frequency of injections?

17    A.    Yes, it does.

18    Q.    And, again, would a skilled artisan in 2009, looking

19    at Pinchasi's 40 milligram every other day dosing regimen,

20    be motivated to reduce that every other day schedule to a

21    three times per week schedule?

22    A.    Yes, for the matter of convenience that we have

23    discussed.

24    Q.    Claim 1 of the '302 patent has no requirement of at

25    least one day between every injection.  Do you understand

1    that?

2    A.    Yes.

3    Q.    But would Claim 1 of the '302 patent nevertheless be

4    obvious for all the reasons we have discussed?

5    A.    Yes.

6    Q.    Would Claim 1 of the '302 patent, even though there is

7    no requirement of one day between injections, would it

8    nevertheless cover a dosing regimen in which the three

9    injections were administered on Monday, Wednesday and

10   Friday?

11   A.    Yes, it would, just require naming the days of the

12   week.

13   Q.    All right.  If we could see the next slide, please?

14          Did you help prepare this slide with certain

15   additional limitations in the '250, '413 and '302 patents?

16   A.    Yes, I did.

17   Q.    Dr. Green, does the Pinchasi disclose a pre-filled

18   syringe for self-administration by the patient, mannitol, pH

19   in the range, or in specific ranges in a one milliliter

20   formulation?

21   A.    Yes, it does.

22   Q.    And let me just, if we can go back to this previous

23   slide so I can make a note for the record.  This is

24   DDX-1100.72.

25          And then if we could see the next slide.  We

1    were just talking about the pharmaceutical composition

2    limitations.

3                    What do we see in this slide?

4    A.    This is actually the text of the Pinchasi application

5    and it highlights that there is a dose of glatiramer acetate

6    of 40 milligrams.  That it's in one ml of sterilized water.

7    And that the pharmaceutical composition also includes

8    mannitol in a pH range that we already discussed, and that

9    it's a prefilled syringe for subsequent administration.

10   Q.    Can we go to the next slide, please.  And, again,

11   looking at Slide DDX-1100.74.

12                   Does the Pinchasi application -- or let me ask

13   you this.  What about the limitations related to injections

14   that are administered on three specific days each week?  In

15   your opinion, does the Pinchasi application disclose that

16   limitation?

17   A.    Yes.

18   Q.    Is there anything inventive in your opinion about

19   picking particular days of the week on which to inject

20   glatiramer acetate?

21   A.    No.

22   Q.    Let's look at the patient limitations here, as we've

23   described them in DDX-1110.75.

24                   Does Pinchasi disclose administering glatiramer

25   acetate to patients suffering from a relapsing or relapsing

Green - direct

1    remitting multiple sclerosis?

2    A.    Yes, it does.

3    Q.    What about the limitations related to a patient who

4    has experienced a first clinical episode and who is

5    determined to be at high risk of developing clinically

6    definite MS or has MRI features consistent with multiple

7    sclerosis?  What kind of patients are those claims directed

8    to?

9    A.    That's the clinically isolated syndrome.  As we

10   discussed yesterday, that is the first episode of relapsing

11   MS that really just falls in a bucket of relapsing MS.

12   Q.    Would a skilled artisan in August 2009 have recognized

13   that a treatment regiment of 40 milligrams of glatiramer

14   acetate three times a week could be used with patients

15   diagnosed with clinically isolated syndrome?

16   A.    Yes.  After the PRECISe trial, they do well, that

17   glatiramer can be used to treat clinically isolated

18   syndrome.

19   Q.    Okay.  What about the limitations specifying a patient

20   who has not received prior glatiramer acetate injections?

21   Would using the claimed dosing regimen for a GA-naive

22   patient have been obvious in your opinion in August of 2009?

23   A.    Yes, for sure.  Most physicians would like the dosing

24   regimen to be used in the treatment of these patients.

25   Q.    All right.  And, finally, the limitations describing

1    specific types of lesions that patients have.  And I think

2    we see those up on the screen here.  Can you describe what

3    those are?

4    A.    Yes, these are just the characteristic descriptions of

5    MRI lesions seen in patients with MS.  It would be obvious,

6    if you are trying to treat MS, you are trying to reduce

7    lesions that fit this description.

8    Q.    Can we see the next slide, please?  And this is Slide

9    DDX-1100.78.

10             Dr. Green, did you help prepare this slide

11   grouping limitations that relates to the tolerability of the

12   claimed regimen and reduced frequency of certain adverse

13   events?

14   A.    Yes, I did.

15   Q.    Okay.  In your opinion, does the Pinchasi application

16   render obvious that a 40 milligram three times per week

17   dosing regimen would be more tolerable than a 20 milligram

18   daily dosing regimen?

19   A.    Yes.

20   Q.    And why is that?

21   A.    Because it would reduce the frequency of injections

22   and the 40 milligram dose has similar tolerability per

23   injection to the 20 milligram dose and so thereby, by

24   reducing the frequency of injection site reactions and

25   IPIRs that are tied to injections, you would improve the

1    tolerability.

2    Q.    And is there anything in the Pinchasi application

3    specifically related to this issue?

4    A.    Yes.  It's highlighted there in the Pinchasi

5    application that this administration of a 40 milligram dose,

6    it says, significantly improves efficacy.  That could be

7    arguable it is a significant improvement of efficacy, but

8    there is potentially some improvement of efficacy, but it

9    does not have the corresponding increase of adverse

10   reactions as are experienced by the patient.

11   Q.    What would a skilled artisan expect if you had

12   equivalent tolerability on 20 milligram daily and a

13   40 milligram three times a week regimen where you are

14   injecting 60 percent fewer times?  What would a skilled

15   artisan have expected in terms of tolerability?

16   A.    Because of that similar tolerability of injection, you

17   would expect that reducing the frequency of injections to be

18   associated with enhanced overall tolerability of the

19   products.

20   Q.    All right.  And if we could, just for the record,

21   we're now looking at DDX-1100.80.

22          What about the limitations we see here related

23   to reducing the frequency of ISRs or IPIRs in a patient?

24   Would those limitations have been obvious based on the

25   Pinchasi application?

Green - direct

1    A.    For the exact reasons we just spoke about, the main

2    challenge for tolerability of the product is the existence

3    of these IPIRs and ISRs, so reducing the injection frequency

4    would reduce the frequency of these events and thereby it

5    would be anticipated you would reduce the frequency of these

6    events by reducing the frequency of the injection.

7    Q.    All right.  And if we could see the next slide,

8    please.  Okay.  We're looking at DDX-1100.82.

9           We have been talking about obviousness of the

10   '250, '413, and '302 patents over Pinchasi alone.  Would the

11   asserted claims of those three patents be obvious over the

12   combination of Pinchasi and Flechter 2002?

13   A.    Yes.

14   Q.    Okay.  And why is that?

15   A.    Because Flechter would reinforce that every other day

16   dosing was in fact more tolerable.  It would demonstrate

17   that there was motivation for exploring that dosing.  It

18   would demonstrate that there was similar efficacy for every

19   other day dosing to every day dosing.  I mentioned the

20   tolerability.  And it would show there was an effective

21   total weekly dose range.  And, again, it would be the

22   70 milligrams weekly disclosed in Flechter and 280

23   milligrams disclosed weekly disclosed in Pinchasi.

24   Q.    And the improved tolerability, that aspect of it, what

25   about Flechter shows improved tolerability of the less

Green - direct

1    frequent dosing regimen?

2    A.    In Flechter.

3    Q.    In Flechter.

4    A.    Right.  So that is exactly what Flechter reported was

5    that patients -- that it was associated with improved

6    tolerability and patients were happy with the 20 milligrams

7    every other day dosing regimen.

8    Q.    All right.  Okay.  If we could see DDX-1100.83.  And

9    this is a different combination I'd like to talk to you

10   about.

11          What about the combination of the Pinchasi

12   application and the Khan 2008 and/or the Caon 2009

13   references?  In your opinion, would the asserted claims of

14   the '250, the '413, and the '302 patents be obvious over

15   that combination of the prior art?

16   A.    Yes.  Because Khan and Caon would reinforce what was

17   seen with Flechter but now with randomized data.  So, again,

18   it would demonstrate clearly within the prior art there was

19   motivation.  It would demonstrate now in a head-to-head

20   randomized study that there was similar efficacy between

21   every other day and daily dosing.  It would demonstrate

22   there was increased tolerability.

23          In fact, patients at the end of the Khan study,

24   100 percent who were on the daily dose choose to switch over

25   to the every other day dose.  It would show there was

Green - direct

1    reduced lipoatrophy looking at the Caon study.

2                And then, lastly, the total weekly dose has a

3    range between 70 milligrams and 280 milligrams.

4    Q.    And just to be clear, with the reference with respect

5    to Caon, you mentioned lipoatrophy.  Is that an injection

6    site reaction?

7    A.    Yes, it is.  It is an significant injection site

8    reaction.

9    Q.    And what did Caon report with respect to the

10   injection, excuse me, with lipoatrophy as on the

11   20 milligram every other day dosing regimen?

12   A.    There was reduced lipoatrophy in the group treated

13   with the every other day dosing regimen.

14   Q.    Okay.  All right.  If we could see the next slide,

15   DDX-1100.84.

16                What about the Pinchasi and the 1996 SBOA we

17   discussed?  In your opinion, would the asserted claims of

18   the '250, '413, and '302 patents be obvious over that

19   combination?

20   A.    Yes, because the SBOA would reveal the motivation and

21   the Pinchasi application would reveal a potential solution.

22   So if you combine those two, you would have the necessary

23   elements to render the patents obvious.

24   Q.    Okay.  And, finally, if we could see the next slide,

25   Dr. Green.  This is Slide DDX-1100.85.

Green - direct

1              What about the combination of Pinchasi and the

2     Rebif label -- and first let me ask you again, to remind us

3     what Rebif is.

4     A.    Rebif is the interferon product that is dosed three

5     times a week.

6     Q.    Okay.  In your opinion, would the asserted claims of

7     the '250, '413, and '302 patents be obvious over the

8     combination of Pinchasi and the Rebif label?

9     A.    Yes.  Because, again, it would show you would have the

10    possibility of giving a 40 milligram dose less frequently,

11    and you would combine it with the understanding about the

12    patients and provide a motivation for convenience for a

13    three times a week dosing regimen.

14    Q.    Okay.  Doctor, I want to shift gears here for a

15    moment.  And I want to talk to you about -- excuse me one

16    second.

17              (Counsel confer.)

18    BY MR. ANSTAETT:

19    Q.    Can we see DDX-1100.79.

20              I understand that I neglected to put the number

21    of this slide into the record.  And so again, Dr. Green,

22    what is the Pinchasi application disclose as we see on this

23    slide?

24    A.    It discloses that there was a maintained efficacy.

25    Again, as I mentioned before, Pinchasi argued a

1    significantly improved efficacy with the 40 milligram dose

2    compared to 20 milligrams but no corresponding increase in

3    adverse reactions.

4    Q.    And again, what would the impact of that information

5    about no corresponding increase in adverse reactions

6    experienced by patients tell a skilled artisan if that

7    skilled artisan was interested in dosing glatiramer acetate

8    only three times per week?

9    A.    That you would reduce the frequency of those injection

10   site reactions because 40 milligrams and 20 milligrams have

11   similar tolerability for dose, reducing the frequency would

12   reduce the likelihood of those events occurring.

13   Q.    DDX-1100.79.

14         Let me shift gears with you.  I want to talk to

15   you a little bit now about the '250, the '413, and the '302

16   patents, the asserted claims, and the issue of written

17   description.

18         Are you aware, Dr. Green, that plaintiffs have

19   argued it was unexpected both that the claimed 40 milligram

20   three times a week dosing regimen was effective at treating

21   MS and that it improved tolerability relative to the prior

22   art 20 milligram daily regimen?

23   A.    Yes, I am.

24   Q.    They maintain that those would have been totally

25   unexpected?

1    A.    Yes.

2    Q.    I take it you disagree?

3    A.    I fundamentally disagree.

4    Q.    Let me ask you to assume for a moment hypothetically

5    that plaintiffs are right about unexpected results.  Under

6    that hypothetical, in your opinion, would the claims of the

7    patents in suit satisfy the written description requirement?

8    A.    No.

9    Q.    Do you understand that to satisfy the written

10   description requirement the patent must describe an

11   invention understandable to a skilled artisan and show that

12   the inventor actually invented and possessed the

13   invention --

14             THE COURT:  Why don't you let him tell you --

15   why don't you let him testify.

16             MR. ANSTAETT:  I understand.

17             THE COURT:  It's that zeal.

18   BY MR. ANSTAETT:

19   Q.    Why don't you tell us what your understanding of the

20   written description requirement is?

21   A.    Sure.  So I understand the written description

22   requirement to be that within the specification of the

23   patent, there is sufficient detail.  But the person of

24   ordinary skill in the art, when reading the patent, would

25   understand that the patent applicant actually is in

1  possession of that patent.

2  Q.    Okay.  Now, why would the written description

3  requirement not be met, in your opinion, if it was

4  unexpected that the claimed 40 milligram three times a week

5  regimen was actually effective in treating MS and improving

6  tolerability relative to the 20 milligram daily dosing

7  regimen?

8  A.    Because then we are being asked to throw out all the

9  prior art.  And in view of that, we would then be left with

10  no data, because there is no clinical data, there is only a

11  prophetic example operative within the specification.

12          So no clinical data, no preclinical data, no

13  in-vitro data, that is going to help the person of ordinary

14  skill in the art in reading the application to know that the

15  claimed inventor actually is in possession of the invention.

16  Q.    All right.  Could we see the next slide, please.  This

17  is DDX-1100.87.

18          Dr. Green, is there anything in the patent's

19  prosecution history related to the placebo data in the

20  patents?

21  A.    Yes.  In fact, when the patent examiner of the '302

22  patent commented on the patent itself, as I have highlighted

23  here, it says, the results Section on Pages 31 to 36 appear

24  to be nothing more than a statement of desired outcomes or a

25  wish list against which actual experimental results are to

Green - direct

1    be evaluated.

2    Q.    Well, how does the fact that the patent specification

3    contains only a wish list of desired outcomes impact your

4    written description opinion?

5    A.    Well, again, because this would be in the requirement

6    that we throw out all the prior art, and in light of that,

7    or in view of that, then there is nothing there that tells

8    the person of ordinary skill in the art that the patent

9    applicant has anything.

10   Q.    Dr. Green, have you formed any opinions regarding

11   enablement and lack of credible utility of the

12   specifications of the '250, the '413 and the '302 patents,

13   if Teva's arguments on obviousness, and I stress this, if

14   Teva's arguments on obviousness and what the prior art

15   teaches are to be believed?

16   A.    Yes.

17   Q.    Have you reviewed Dr. Klinger's testimony that she

18   considered the efficacy of the claimed dosing regimens to be

19   a hope or a hypothesis?

20   A.    Yes.

21   Q.    Under plaintiffs' view in the prior art, is there

22   anything new contained within the patent specification that

23   was not already taught in the prior art that makes the

24   claimed dosing regimen anything more than a hypothesis?

25   A.    No.

Green - direct

1    Q.    I want to touch on a few of the Wands factors.   I

2    don't expect you to know exactly what Wands factors means.

3    Let me ask you some questions about them.   Are there any

4    working examples in the patent specification?

5    A.    No, just a prophetic example.

6    Q.    Let's talk about the amount of direction provided by

7    the inventor in the patent specification.   Does the

8    specification offer any new way of thinking or reasoning

9    about glatiramer acetate that would convince a person of

10   ordinary skill in the art that glatiramer acetate three

11   times a week dosing is workable compared to what was already

12   known in the prior art?

13   A.    No.

14   Q.    Did the Teva patent specification offer any new human

15   or animal or in-vitro data or comparative data that was not

16   known in the prior art?

17   A.    No.

18   Q.    What about a new mechanism of action theory, was a new

19   theory on mechanism of action disclosed in the patents that

20   would support three times a week dosing?

21   A.    No.

22   Q.    Was there any guidance concerning mouse spleen data or

23   high molecular weight species of glatiramer acetate of the

24   patent?

25   A.    No, there is no guidance of mouse spleen data or high

Green - direct

1  molecular weight species of glatiramoids in the patent

2  specification.

3  Q.    What do plaintiffs and Dr. Klinger say about the level

4  of predictability in the art in your opinion?

5  A.    My understanding is they say it is highly

6  unpredictable.

7  Q.    Does the specification of the patents in suit change

8  the experimental burden the skilled artisan would have faced

9  in pursuing a glatiramer acetate dosing regimen of 40

10  milligrams three times a week before 2009?

11  A.    No.  They would have been left with the complete

12  experimental burden, again, assuming we are throwing out all

13  the prior art, they are now left with nothing and they have

14  to do all the experiments to demonstrate or provide support

15  for the notion that this dosing regimen might work.

16  Q.    So what do you conclude about the Teva patent

17  specification, the specification of the patents in suit as

18  they relate to the asserted claims here if Teva is right in

19  the way that they characterize the prior art?

20  A.    It is my opinion that they would lack the necessary

21  requirements for that written description requirement, for

22  enablement or for utility.

23  Q.    All right, Dr. Green.  I want to shift gears again

24  here and talk to you about another topic.

25          Do you understand that plaintiffs have argued

1    that it failed, in particular that Teva failed in a variety

2    of efforts to develop products different than an injectable

3    glatiramer acetate therapy?

4    A.    Yes.

5    Q.    We are now looking at slide DDX 1100.88.  The first

6    one -- well, the first one on this list is the CORAL study.

7    Do you see that?

8    A.    Yes, I do.

9    Q.    The product that was tested in the CORAL study, what

10   was its route of administration?

11   A.    It was oral.  This was an oral Copaxone regimen.

12   Q.    Can the route of administration of a drug affect its

13   efficacy?

14   A.    Yes.

15   Q.    Do the claims of the patents in suit cover an orally

16   administered glatiramer acetate product?

17   A.    No, they do not.

18   Q.    Whether or not an oral glatiramer acetate worked, does

19   it change your opinion that the asserted claims of the

20   patents in suit are obvious?

21   A.    No, it does not.

22   Q.    Let's talk about the PROMISE trial next.  Are you

23   familiar with that trial?

24   A.    Yes, I am.

25   Q.    And what was examined in that trial?

Green - direct

1   A.      That was a trial of subcutaneous daily Copaxone for

2   primary progressive MS.

3   Q.      What is primary progressive MS again?

4   A.      That is a form of MS in which people just have the

5   progressive disability from onset.  They never have those

6   earlier relapses that we spoke about yesterday.

7   Q.      Focusing on the patents in suit and the asserted

8   claims, what stages of MS do the asserted claims cover?

9   A.      They cover relapsing forms of MS.  It should be noted

10  in general, for all therapies that have been used for MS,

11  until quite recently, every therapy that had been shown to

12  be effective in relapsing forms of MS had unfortunately

13  failed in attempts to treat progressive MS.

14  Q.      Again, what dose was used in the PROMISE study?

15  A.      The same 20 milligram daily dose was used in clinical

16  practice for the treatment of relapsing MS at the time of

17  the patents in suit.

18  Q.      Do the claims of the patent in suit cover the use of

19  glatiramer acetate for treating primary progressive multiple

20  sclerosis?

21  A.      No, they do not.

22  Q.      What is a DEPOT preparation of a medication?

23  A.      A DEPOT preparation is when you try and give a drug

24  under the skin and then have a slow release of the

25  medication to the patient over a long period of time.

Green - direct

1    Q.    Could that type of -- let me ask you this:  Is the

2    formulation of that type of product different than the

3    formulation of injectable glatiramer acetate?

4    A.    Yes.

5    Q.    Can the formulation and route of administration affect

6    the efficacy of glatiramer acetate treatment?

7    A.    Absolutely.

8    Q.    Do the claims of any of the patents in suit relate to

9    a DEPOT formulation of glatiramer acetate?

10   A.    No, they do not.

11   Q.    And whether or not a DEPOT formulation of glatiramer

12   acetate worked, would that change your opinion regarding the

13   obviousness of the patents in suit?

14   A.    No.

15   Q.    Now, the next purported failure is known as TV-5010.

16   Do you see that?

17   A.    Yes.

18   Q.    How does TV-5010 differ from glatiramer acetate?

19   A.    It is a higher molecular weight glatiramoid, meaning

20   on average it has a higher molecular weight than the branded

21   product.

22   Q.    So does TV-5010, would that have a different active

23   ingredient than Copaxone?

24   A.    Presumably.

25   Q.    And in your opinion, is the development of a different

1    active ingredient distinct from developing a dosing regimen

2    using the existing Copaxone drug?

3    A.    Absolutely.

4    Q.    Do the claims of the patents in suit cover

5    administration of any product other than glatiramer acetate?

6    A.    No.

7    Q.    Do the claims of the patent in suit cover

8    administration of a high molecular weight version of

9    glatiramer acetate?

10   A.    No, they do not.

11   Q.    Let's talk about the SONG trial, Dr. Green.  What did

12   the SONG trial involve?

13   A.    That was an effort to evaluate Copaxone dissolved in a

14   lower volume of fluid.

15   Q.    Did the SONG trial involve a reduced frequency

16   glatiramer acetate dosing regimen?

17   A.    No.

18   Q.    What was the dosing regimen that was used in the SONG

19   trial?

20   A.    A daily dosing of 20 milligrams dissolved in half an

21   ml of fluid.

22   Q.    Do the patents in suit cover a daily glatiramer

23   acetate dosing regimen?

24   A.    No.

25   Q.    Do the patents in suit cover a half-milliliter

1    formulation of glatiramer acetate?

2    A.    No.

3    Q.    And would whether or not a daily low volume glatiramer

4    acetate worked change your opinions about the asserted

5    claims of the patents in suit?

6    A.    No.

7    Q.    All right.  We will talk about the FORTE trial in a

8    minute.

9          But the CORAL, TV-5010, PROMISE, DEPOT, SONG,

10   did any of those efforts involve products or indications

11   similar to those covered by the claims of the patents in

12   suit?

13   A.    No.

14   Q.    Okay.  If we could see the next slide, please.  This

15   is DDX-1100.89.

16         We already talked earlier about the large Phase

17   III FORTE trial that Dr. Comi conducted.  What did Dr. Comi

18   conclude with respect to the efficacy and tolerability of

19   the 40 milligram glatiramer acetate dose?

20   A.    He concluded that the 40 milligram dose was safe and

21   well tolerated and that it was equally effective to the 20

22   milligram dose in reducing clinical relapses and MRI

23   activity.

24   Q.    Did Teva announce the results of the FORTE trial in a

25   press release?

Green - direct

1    A.    Yes, they did.

2    Q.    And if we could see the next slide, please.  This is

3    JTX-7035.1 and DDX-1100.90.

4          How did Teva characterize the tolerability of

5    the 40 milligram dose of glatiramer acetate in its press

6    release?

7    A.    So as highlighted at the end of the paragraph, they

8    noted that the higher dose appeared to maintain the

9    favorable safety and tolerability profile of the branded 20

10   milligram product.

11   Q.    If we could see the next slide, this is DDX-1100.91.

12   It's referring to JTX-7064.1.  Dr. Green, do you recognize

13   this document?

14   A.    Yes, I do.

15   Q.    What is it?

16   A.    These are the slides that Professor Comi presented at

17   the, what was called the WACTRIMS meeting that we mentioned

18   before regarding the results of the FORTE study.

19   Q.    What is WACTRIMS again, please?

20   A.    That is the World -- I am not sure what the A stands

21   for -- the World Committee for Treatment and Research in

22   Multiple Sclerosis.  It is a combination of the European arm

23   and the American arm and I believe a Latin American

24   medication arm of the same organizations.

25   Q.    Is that a big deal in your profession?

Green - direct

1 A. It is a huge international meeting that comes only

2 every few years.

3 Q. Could we see the last slide, No. 26, we are on

4 DDX-1100.92.

5   How did Mr. Comi describe the efficacy of the 40

6 milligram dose of GA in his presentation?

7 A. He described that there were no significant

8 differences in efficacy between 20 and 40 milligrams.  And

9 he described that both doses demonstrated remarkable

10 reductions compared to baseline in clinical and MRI

11 activity.

12 Q. What about the tolerability of the 40 milligram dose,

13 what did Dr. Comi have to say about that?

14 A. He commented on the positive safety and tolerability

15 seen with both doses, and that there were no unexpected

16 adverse events with the higher dose.

17 Q. Did Dr. Comi in his presentation at WACTRIMS note any

18 advantages of the 40 milligram dose over the 20 milligram

19 dose?

20 A. He did.  To confirm the suggestion from the Cohen

21 study, he saw a trend for earlier onset of activity with the

22 higher dose.

23 Q. Does Dr. Comi describe the FORTE trial as a failure

24 here?

25 A. Nowhere.

Green - direct

1    Q.      If we could see the next slide, please, we are on

2    DDX 1100.93.  This is slide 14.  What does this slide

3    report, Dr. Green?

4    A.      This is a slide reporting the reasons for early

5    termination, in fact, total numbers of early terminations,

6    in the two arms of the FORTE trial.  And then it describes

7    some of the different reasons.

8    Q.      Was adverse events one of those reasons?

9    A.      Yes, it was.

10   Q.      And what does the slide report about adverse events in

11   early termination reasons?

12   A.      It reports it is the one out of all the other factors

13   that were influencing whether or not someone discontinued

14   that has what is reported as a statistically significant

15   difference between 40 and 20 milligrams, and further reports

16   that that is mainly due to injection site reactions.  It

17   should be considered in light of the fact that there are a

18   lot of comparisons being made here, and it is standard

19   within our field to consider when you are making multiple

20   comparisons, you recognize that a statistical test is only

21   an evaluation of whether or not chance could be an

22   explanation for a difference between with two groups.

23                   In this instance, it's possible that the

24   difference between these two groups is driven by chance

25   alone.

Green - direct

1    Q.    Notwithstanding the finding with respect to adverse

2    events in early termination reasons, again, how did Dr. Comi

3    in his presentation describe the tolerability of the 40

4    milligram dose of GA?

5    A.    So, unlike the fact that this was just footnoted, he

6    highlighted in the summary conclusions that he thought these

7    two doses had similar tolerability profiles.

8    Q.    Again, to be clear, the FORTE trial that Dr. Comi is

9    talking about here, what dosing regimens were compared?

10   A.    40 milligrams daily and 20 milligrams daily.

11   Q.    Based on the FORTE data, what would a skilled artisan

12   in August 2009 have expected in terms of tolerability

13   relative to the 20 milligram daily dose of GA if the 40

14   milligram dose was injected only three days a week instead

15   of seven days a week?

16   A.    Then you would presume that you would have

17   improvements in tolerability for the very reasons that we

18   have highlighted, it would be less frequent that you would

19   have those adverse events that drive the tolerability

20   problem because all of those events are tied to injections

21   themselves.

22   Q.    We can take that down.

23         Let's move on to another topic, Dr. Green.  If

24   we can see the next slide, which is DDX 1100.94.

25         Dr. Green, are you familiar with Teva's Glacier

Green - direct

1    trial?

2    A.    I am.

3    Q.    I believe you testified earlier that you have

4    specialized training in clinical trial research?

5    A.    Yes, I do.

6    Q.    And you know that Teva has contended that the Glacier

7    trial provides or proves that the Copaxone 40 milligram

8    three times a week dosing regimen unexpectedly reduces

9    severity of injection site reactions relative to

10   administration of 20 milligrams of GA daily?

11   A.    Yes.

12   Q.    Do you agree?

13   A.    No, I do not.

14   Q.    Were you here for Dr. McKeague's trial testimony?

15   A.    Yes, I was.

16   Q.    Okay.  Do you agree with Dr. McKeague's opinion that

17   the GLACIER trial did not reliably show reduced severity of

18   injection site reactions in patients on the 40 milligrams

19   three times a week regimen as compared to 20 milligrams

20   daily?

21             MR. JAMES:  Objection leading.

22             THE COURT:  Yes.

23   BY MR. ANSTAETT:

24   Q.    What did you make of Dr. McKeague's testimony

25   regarding the Glacier trial?

1    A.    Dr. McKeague testified that the Glacier trial was

2    unreliable for a number of reasons.  He went into a detailed

3    examination of clinical trial protocol as well as the

4    clinical trial history, but fundamentally -- and he noted

5    this, but it's the biggest weakness of the trial -- the

6    trial is flawed from its inception.  It is methodologically

7    flawed for answering the question it seeks to pursue.

8    Q.    Okay.  Now, you also offered some opinions about the

9    Glacier trial in your expert reports; correct?

10    A.    Yes, I did.

11    Q.    Okay.  If we could see the next slide, please,

12    DDX-1100.95.

13           What do we see on this slide, Dr. Green, please?

14    A.    These are the issues that I identified related to the

15    Glacier study, and that undermine the conclusions that have

16    been drawn regarding unexpected results.

17           Specifically, the biggest weakness and the most

18    important one to highlight, the kind of take-home message

19    here is that this was an open label study for patient

20    reported outcomes.

21           Now, that is just an invitation for bias when

22    you construct a study in which patients and the

23    practitioners know who is getting what agent or formulation,

24    and then you ask them about what, you ask them about side

25    effects or something like that.

Green - direct

1    Q.      And when you say you asked them?

2    A.      They're being asked in the course of the study.  That

3    is the outcome you are going to measure.  That is strictly

4    patient reporting, and you selected the patients based on

5    the fact they're willing to participate in this study.  So

6    they're obviously enthusiastic about the pursuit.  Again,

7    that is a study that is deeply flawed from its inception.

8    Q.      Okay.  What about the outliers?

9    A.      Well, then the other problems are in the data

10   collection element of the study.  There was an analysis.

11   There were two outlier patients who accounted for a large

12   number of the moderate to severe IRAEs in the 20 milligram

13   arm.  An appropriate way to handle them would have been to

14   exclude them for sensitivity analysis.

15   Q.      Okay.  And what about the next bullet there?

16   A.      And then the IPIR results, when you look carefully at

17   the table, a person of ordinary skill in the art who was

18   evaluating this would have found it to be not credible.

19   Q.      Okay.  And, finally, what is the last bullet?

20   A.      And, lastly, even if there was something there in the

21   Glacier study, even the data that is reported is only a

22   difference in degree and not a difference in kind.

23   Q.      Okay.  Let's talk -- I think you summed it up nicely,

24   but let's just talk a little bit about the problem with the

25   nature of the study being unblinded.

1           If we can see the next slide, please?

2           THE COURT:  Mr. Anstaett, I'm going to ask you

3    to stop characterizing and offering into the record your

4    view of whether the witness is summing up nicely.  I'll

5    decide.

6           MR. ANSTAETT:  I understand, Your Honor.  I

7    apologize.

8           THE COURT:  You keep doing it.  Counsel is

9    trying to refrain on the other side.  So ...

10          MR. ANSTAETT:  Okay.

11          THE COURT:  Okay.

12          MR. ANSTAETT:  Understood, Your Honor.

13          THE COURT:  A word of caution.

14   BY MR. ANSTAETT:

15   Q.    What do we see, Dr. Green, in DDX-1100.96?

16   A.    So this is an e-mail response from the editor of the

17   multiple sclerosis journal to Dr. Wolinsky noting the

18   response of a reviewer and a projection of a paper for

19   publication in that journal.  And, specifically, it details

20   what the reviewers thought the problems with the study were

21   which are identical to the problems that I identified.

22   Q.    Okay.  Can we see the next slide, please?  And I want

23   to talk now about the outliers.

24          How do the outliers affect your opinions on

25   Glacier's reduced severity finding?

1    A.    Yes.  So here, you have there are two outliers who

2    accounted for 80 percent of the moderate or severe IRAEs.

3    So these two agents are so remarkably different from the

4    rest of the study participants, the rest of the cloud of

5    data, that one would look at them carefully and consider

6    did they misunderstand the instructions?  Was there some

7    other problem?  And you would exclude them from analysis.

8    Q.    Is the existence of the outliers disclosed in the

9    Glacier publication?

10   A.    No.

11   Q.    If you, as a skilled artisan, were reading that

12   publication, would you have liked to have known about the

13   existence of the outliers when reading the Glacier

14   publication?

15   A.    Yes, I would like to know that there was an analysis

16   done potentially for their inclusion and exclusion.

17   Q.    Next slide, please.  This is DDX-1100.99.

18           You referred to questionable results related

19   to immediate post-injection reactions.  Again, what are

20   immediate post injection reactions?

21   A.    So these are those systemic episodes that patients

22   have when following an injection.  They may have heart

23   racing, flushing, feelings of discomfort.  And these are the

24   ones that occurred infrequently but can be very troubling

25   for patients.

Green - direct

1    Q.      What does the Glacier publication report with respect

2    to that number of mild versus moderate and severe IPIRs in

3    the 20 milligram arm of the study?

4    A.      So in the 20 milligram arm, if you look at the data

5    and compute what percentage of those IPIRs were reported as

6    mild versus those that were reported as moderate or severe,

7    only two percent of the IPIRs in the 20 milligram arm were

8    reported as mild whereas 98 percent of those IPIRs were

9    reported as severe.

10   Q.      Can we see the next slide, please?  This is

11   DDX-1100.100.

12           What does the Glacier publication report with

13   respect to the number of mild versus moderate and severe

14   IPIRs in the 40 milligram arm of the study?

15   A.      Well, it shows that alternatively or in the other arm,

16   when you look and do the same computation, that 93 percent

17   of the IPIRs in the 40 milligram arm were reported as mild

18   whereas only seven percent were reported as moderate to

19   severe.

20   Q.      All right.  The next slide, please.  DDX-1100.101.

21           In your opinion, Dr. Green, would a skilled

22   artisan find that disparity in the data that only two

23   percent of the IPIRs in the 20 milligram were mild while in

24   the 40 milligram arm 93 percent were mild to represent a

25   credible difference between the two dosing regimens?

1    A.    No, it would just not be believable; and it would be

2    an indication of the fact that the bias that we spoke about

3    that might undermine a study of this design was in fact

4    operative in this study.

5    Q.    Okay.  Let's see the next slide, please.  This is

6    DDX-1100.102.

7          Now, using Glacier's patient reported severity

8    grading method, how are most injection site reactions in the

9    Glacier study graded by patients?

10   A.    Overall, the overwhelming majority of all the

11   injection site reactions -- again, we're talking about

12   injection site reactions and not IPIRs that we were talking

13   about in the last one, but in this context, injection site

14   reactions were almost all classified as mild.

15   Q.    And in "all," is that in both arms of the study?

16   A.    Yes, sorry.  That is in both the 20 milligram arm and

17   the 40 milligram.

18   Q.    Okay.  And do we know why the Glacier trial aggregated

19   moderate and severe injection site reactions into a single

20   category?

21   A.    Yes.  As Dr. Wolinsky testified, the reason they were

22   lumped together is because there were very few severe IRAEs.

23   Q.    And is that again in both arms of the study?

24   A.    Yes.

25   Q.    So in your opinion, even if taken at face value,

Green - direct

1    does the Glacier study show a decrease in injection site

2    rejection severity that is merely a difference in degree or

3    is it a difference in kind?

4    A.    No, it is only a difference in degree.

5    Q.    Okay.  Dr. Green, I want to switch now and talk to you

6    about the '776 patent.  And if we could see the next slide.

7          When did plaintiffs first file the patent

8    application for the '776 patent and its claims to reduced

9    severity of injection site reactions?

10   A.    On May 22nd, 2015.

11   Q.    And in the IPR proceedings on the first three patents,

12   the '250, the '413, and the '302 patents, when did you first

13   submit your expert declaration explaining that the claims of

14   those patents were obvious?

15   A.    In February of 2015.

16   Q.    So the application for the '776 patent was filed only

17   after you submitted your first IPR declaration?

18   A.    Yes.

19              MR. JAMES:  Objection.  Leading, Your Honor.

20              THE COURT:  Yes.

21   BY MR. ANSTAETT:

22   Q.    When was the application for the '776 patent filed in

23   relationship to your submission in the IPR explaining why

24   the first three patents were obvious?  What was the

25   relationship between those two submissions?

Green - direct

1    A.    It was filed afterwards, three months later.

2    Q.    When you say "filed afterwards," you are referring to

3    what?

4    A.    I'm sorry.  I'm referring to the patent application

5    for the '776 patent.

6    Q.    Okay.  Now, I want to focus on the reduced severity

7    limitations found in all the claims of the '776 patent.

8          Did you arrive at an opinion with respect to

9    whether these claims have written descriptions support in

10   the patent?

11   A.    Yes, I did.

12   Q.    And can we have the next slide, please.  This is

13   DDX-1100.106.

14         And just so we're all on the same page,

15   Dr. Green, when you say reduced severity terms, are you

16   referring to the terms that are highlighted here on this

17   slide?

18   A.    Yes, I am.  This is from claim 1, but the claims are

19   the same.  The language of the claims is the same throughout

20   the patent.

21   Q.    Do all the claims in the patent require reduced

22   severity of the injection site reaction?

23   A.    Yes, they do.

24   Q.    If we can see the next slide, DDX-1100.107.

25         Are you familiar with the Court's claim

1    construction of "severity" in this case?

2    A.    Yes, I am.

3    Q.    And could you tell us what your understanding of the

4    term "severity" is in the context of the '776 patent claims?

5    A.    Sure.  My understanding is that the Court has

6    instructed us to consider the term "severity" in its plain

7    and ordinary meaning in which severity means "the intensity

8    of a patient's injection site reaction or immediate

9    post-injectioni reaction."  It actually explicitly asked us

10   to distinguish between the concepts of severity and

11   frequency.  And it has asked us to consider the concept of

12   frequency within an individual patient.  So reduced severity

13   of a patient's injection site reactions in an individual

14   patient.

15   Q.    And, Dr. Green, let me ask you, what is your

16   understanding of the Court's construction of "frequency?"

17   A.    Oh, I'm sorry.  My understanding of the Court's

18   construction of "frequency" is that is "the rate of

19   occurrence of a patient's injection site reactions for

20   immediate post-injectioni reactions."

21   Q.    Okay.  And, Dr. Green, did you help prepare a slide

22   summarizing your opinions on written description?

23   A.    Yes, I did.

24   Q.    And what is the basis for your opinion with respect to

25   the written description on the '776 patent?

Green - direct

1  A.    So the principle issue is, in fact, there is no

2  mention or limited mention of anything having to do with

3  tolerability or severity within the patent specification.

4  In fact, there is nothing in the specification that tells a

5  person of ordinary skill in the art that administration will

6  specifically reduce severity of injection site reactions as

7  opposed to frequency of those events.

8  Q.    Did you consider, Dr. Green, the example in the '776

9  patent in arriving at your opinions?

10  A.    Yes, I did.

11  Q.    Okay.  Does the example in the '776 patent include any

12  clinical data or results relating to the severity of

13  injection site reactions?

14  A.    No, it does not.

15  Q.    Well, again, I'm going to ask you a hypothetical

16  question, okay?

17          What if the proposed clinical trial described

18  in the prophetic example in the patents had actually been

19  performed?  In your opinion, would the results of that trial

20  show whether the claimed regimen reduced the severity of

21  injection site reactions relative to a 20 milligram daily GA

22  dosing regimen?

23  A.    No.  The prophetic example offered within the patent

24  specification deals with a 40 milligram three times a week

25  dosing regimen against a placebo trial.  You could make no

Green - direct

1    assertions whatsoever about the comparison between

2    40 milligrams and 20 milligrams and especially with an

3    individual patient.

4         Furthermore, the outcome detailed in the

5    prophetic example is, in fact, an efficacy outcome.  So you

6    could not have any conclusions regarding the effect on

7    injection site reaction severity based on the example even

8    if that clinical trial was done or there was evidence to

9    support it.

10   Q.    Okay.  You mentioned outcome measures, generally

11   speaking.  What are outcome measures in clinical trials?

12   A.    That is a predefined parameter that an investigator is

13   going to use to assess whether or not a therapy has a

14   meaningful biological effect or a meaningful therapeutic

15   effect.

16   Q.    Can we see the next slide, please?  This is

17   DDX-1100.109.

18        Does the example in the '776 patent

19   specification have any primary or secondary outcome measures

20   relating to the severity of injection site reactions?

21   A.    No, it does not.  The primary outcome measure named in

22   the prophetic example is strictly an efficacy outcome and

23   the secondary outcomes are only radiological measures, MRI

24   measures that would be supportive of that efficacy outcome,

25   so nothing to do with adverse events or injection site

1    reactions or severity in the outcome measures.

2    Q.    Are there also exploratory endpoints in the example?

3    A.    Yes there are.

4    Q.    If we could see the next slide, please?  This is

5    DDX-1100.110.

6          Are these the exploratory endpoints in the

7    example.

8    A.    Yes, they are.

9    Q.    What is an exploratory endpoint?

10   A.    These are additional outcomes an investigator may look

11   at to say help drive future investigations or science,

12   something that may be of scientific interest but that you

13   are not quite sure whether or not it's significant enough

14   or important enough or hasn't been validated yet so you are

15   going to try to look at it within the trial so it can drive

16   future research.

17   Q.    I'm not going to ask you to read all the exploratory

18   endpoints out loud, but you have reviewed them?

19   A.    Yes, I have.

20   Q.    Do any of the exploratory endpoints in the example

21   relate to the severity of infection site reactions?

22   A.    No.  The only mention of the word "severity" comes in

23   the last exploratory endpoint which has to do actually with

24   symptom severity, meaning severity measure related not to a

25   side effect but to the disease itself.  So it is an efficacy

Green - direct

1   measurement having nothing to do with adverse events

2   measurement or adverse event quantification.

3   Q.    Okay.  If we could see the next slide, please,

4   DDX-1100.111.

5         Were there any other outcome measures that were

6   proposed in the example in the patent specification?

7   A.    Yes.  They refer generally to measuring adverse

8   events, measuring things like vital signs and measuring

9   tolerability, which in this context they take to be just a

10  proportion of subjects who prematurely discontinue or

11  prematurely discontinue due to adverse events.

12        But, again, there is no description here

13  whatsoever of how those adverse events are going to be

14  compiled and, even more so, absolutely no description of how

15  they're going to be graded or assessed.

16  Q.    The safety outcome adverse events, what would that

17  tell you about the severity of injection site reaction from

18  a claimed dosing regimen relative to a 20 milligram daily GA

19  dosing regimen?

20  A.    It can't tell you anything again because the trial

21  design was 40 milligrams three times a week versus placebo,

22  so it could tell you nothing about that.  And, again, the

23  outcome has nothing to do with adverse events.  It can't

24  tell you much about that at all, lastly, because you don't

25  know how that is going to be measured within the context of

Green - direct

1    the trial.

2    Q.    One of the tolerability outcomes is proportion of

3    subjects, percent, who prematurely discontinue from the

4    study due to AEs.  Would that outcome measure inform a

5    skilled artisan that the inventor possessed a method for

6    reducing injection site reactions relative to 20 milligrams

7    daily?

8    A.    No, because there are lots of reasons why someone

9    might discontinue from the study having nothing to do with

10   the severity of the injection site.  There is the broad

11   topic of tolerability that is not strictly severity of the

12   injection site reactions, it would also relate to the

13   frequency of the injection site reactions.

14   Q.    So does an improvement in tolerability necessarily

15   mean you have reduced severity of injection site reactions?

16   A.    No.

17          MR. JAMES:  Objection, Your Honor.  Leading.

18          THE COURT:  Sustained.

19   BY MR. ANSTAETT:

20   Q.    Does tolerability tell you anything about severity of

21   injection site reactions?

22   A.    No.  They are two separate concepts.  Tolerability is

23   a broad concept.  And severity might be a contributor to the

24   tolerability or assessment of that severity.  But those two

25   concepts are not symmetrical.

Green - direct

1    Q.    You mentioned earlier the two arms that are in the

2    prophetic example.  What treatment recommendation does the

3    example propose to compare?  If we could see the next slide,

4    it is DDX-1100.12?

5    A.    It proposes to compare 40 milligrams three times a

6    week of GA against placebo.

7    Q.    If we could see DDX-1100.113?

8    A.    If I could say one more thing.  The other thing it

9    proposes is to do that in a double-blinded fashion, which is

10   not the way in which anything was ever generally

11   subsequently assessed in comparing 40 milligrams to 20

12   milligrams for assessment of adverse events.

13   Q.    Okay.  DDX 1100.113.  Were any patients identified for

14   exclusion from the clinical trial proposed in Example 1?

15   A.    Yes.  Explicitly the trial excluded participation for

16   patients who had ever been treated for with glatiramer

17   acetate or another glatiramoid.  This is a significant

18   problem given the Court's construction of how we are to

19   consider this notion of severity within an individual

20   patient.

21          Specifically, within the context of this trial,

22   there is no way to compare what someone who received a 40

23   milligram dose who previously had been dosed at 20

24   milligrams would do because they are explicitly excluded

25   from participation.

Green - direct

1    Q.    Aside from the prophetic example, did you review the

2    rest of the '776 patent in arriving at your opinions?

3    A.    Yes, I did.

4    Q.    Other than in the '776 patent claims, did you find any

5    references to severity in the patent?

6    A.    Yes.  There were three times that the word severity is

7    mentioned in the patent.

8    Q.    If we could see the next slide, DDX-1100.14.  What do

9    we see here, Dr. Green?

10   A.    This highlights in the background section of the

11   patent as well as in the exploratory end points mentioned in

12   the example given in the specification the times the

13   severity is mentioned.  Both times it actually has to do

14   with severity as measures of disease activity.  So severity

15   of relapses or severity of symptoms and their impact on

16   work.  No relevance to severity of adverse events or

17   specifically to severity of injection site reactions.

18   Q.    If we could see the next slide, DDX-1100.115, is this

19   the third reference, Dr. Green?

20   A.    Yes.

21   Q.    In your opinion, does that show that the inventors

22   possessed a method for reducing severity of ISRs relative to

23   20 milligrams daily?

24   A.    No.  Because again it gives no clarification of how

25   the severity is going to be measured and it collapses the

1    notions of frequency and severity together, and doesn't

2    again allow one to separate them out for measurement of

3    severity specifically.

4    Q.    Dr. Green, if the 40 milligram three times a week

5    dosing regimen is more tolerable than 20 milligrams daily,

6    does that say anything about reducing the severity of ISRs?

7    A.    Could you ask the question again?

8    Q.    Sure.  If the 40 milligram three times a week dosing

9    regimen is more tolerable than 20 milligrams daily dosing,

10   does that necessarily say anything about the severity of

11   ISRs?

12              MR. JAMES:  Objection.  Leading.

13              THE COURT:  No, I don't think that is leading.

14              MR. ANSTAETT:  Thank you, Your Honor.

15   BY MR. ANSTAETT:

16   Q.    You can answer.

17   A.    No, it tells you nothing about the severity of the

18   ISRs.

19   Q.    You touched on this briefly earlier.  Just to be

20   clear.  Does the '776 patent tell a skilled artisan how to

21   measure the severity of injection site reactions?

22   A.    It does not.  It provides no guidance regarding the

23   mechanism, means or rubric that should be used to measure

24   adverse events, including injection site reactions.

25   Q.    Is there one standard way in the art that's used to

Green - direct

1    measure the severity of injection site reactions associated

2    with MS to disease modifying therapies?

3    A.    No, there is not.

4    Q.    I want to turn to a different topic now.

5          As part of your review of the claims of the '776

6    patent, were you asked to consider whether the reduced

7    severity claims were invalid for lack of enablement and

8    utility?

9    A.    Yes.

10   Q.    Did you reach any opinions on that issue?

11   A.    I did.

12   Q.    If we could see the next slide, please.  This is

13   DDX 1100.116.  Did you help prepare this slide to summarize

14   your opinions?

15   A.    I did.

16   Q.    Could you please do that for us?

17   A.    Yes.  So given my understanding of the concept of

18   enablement, which would be that a person of ordinary skill

19   in the art could read the patent, and then know what was

20   being described and in fact practice it, that if those were

21   the requirements, there is nothing in the patent

22   specification that would be enabling in the specification

23   that would allow a POSA to perform such a function or

24   perform such a task.

25          So, in essence, there is a failure to have an

Green - direct

1    enabling disclosure.

2            And the issue of utility, does this invention do

3    what it says it does, there is the problem that the flawed

4    Glacier trial is not evidence that the 40 milligram three

5    times a week dosing regimen reduces severity.  Still to this

6    day, we have no evidence of a reduction in severity of

7    injection site reactions or IPIRS associated with a three

8    times a week formulation of glatiramer acetate.

9    Q.   Does the '776 patent provide any direction to skilled

10   artisans about how to achieve a reduction in the severity of

11   injection site reactions?

12   A.   No, it does not.

13   Q.   Did you consider the Glacier trial data and reported

14   results in your enablement and utility analyses?

15   A.   Yes, I did.

16   Q.   I am not going to ask you to go over the Glacier trial

17   again.  But do you believe that the Glacier trial reliably

18   demonstrates that the 40 milligrams three times a week

19   dosing regimen results in reduced severity of ISRs relative

20   to 20 milligrams daily?

21            MR. JAMES:  Objection, Your Honor.

22   BY MR. ANSTAETT:

23   Q.   What do you believe the Glacier trial demonstrates if

24   anything with respect to a reduction in severity of

25   injection site reactions on the 40 milligrams three times a

Green - direct

1   week regimen compared to the 20 milligram daily dosing

2   regimen?

3   A.    It doesn't demonstrate anything to me, again because

4   of those fundamental implicit biases built within the study

5   design.

6   Q.    What do you conclude overall then about whether the

7   specification supports the utility and enablement

8   specifically of the reduced severity elements of the '776

9   patent?

10  A.    I conclude that it fails to meet those requirements.

11  Q.    Dr. Green, do you understand that Teva has taken the

12  position that a disclosure of improved tolerability with the

13  claimed dosing regimen 20 milligrams daily would also

14  disclose reduced severity of injection site reactions?

15  A.    Yes.

16  Q.    Do you agree that the disclosure of improved

17  tolerability is synonymous with reduced severity?

18  A.    No.

19  Q.    Can you have improved tolerability with GA without a

20  reduction in the severity of injection site reactions or

21  immediate post-injection reactions?

22  A.    Yes, of course.  You could reduce the frequency of

23  those events.  And that would not be a reduction in severity

24  but just a reduction in how many times they happen.  And it

25  would obviously improve tolerability.  If you limited the

Green - direct

1    occurrence of these events to once a year, that would be a

2    significant improvement, but it may be that the actual

3    severity of individual injection site reactions would not

4    change.

5    Q.    Notwithstanding that, I am going to ask you a

6    hypothetical.  I want you to assume that plaintiffs are

7    right and that a disclosure of GA 40 milligrams three times

8    a week regimen, that that regimen improves tolerability

9    relative to the 20 milligram daily regimen also discloses

10   reduced severity of injection site reactions.  That is a

11   hypothetical.  Okay?

12              On that assumption, would the reduced severity

13   terms in the '776 patent have been obvious to a skilled

14   artisan as of August 2009?

15   A.    In that context, if you take that approach, the

16   problem becomes the '776 patent becomes just like the '250

17   and the '302 and the '413 patents and is rendered obvious.

18   Q.    It has also been suggested that lipoatrophy is an

19   inherently severe injection site reaction and that a

20   reduction in the frequency of lipoatrophy equates to a

21   reduction of severity of injection site reactions?

22              MR. JAMES:  Objection, Your Honor.  This is not

23   in his expert report.

24              MR. ANSTAETT:  Your Honor, may we approach?

25              THE COURT:  You can talk to one another and see

Green - direct

1    if it's in the expert report.  This shouldn't be

2    controversial.  It is either there or it's not.

3              (Counsel confer.)

4              MR. ANSTAETT:  I believe that we have agreed

5    that I can proceed with these questions.

6              THE COURT:  Good.

7    BY MR. ANSTAETT:

8    Q.    Let me start again.  It also has been suggested that

9    lipoatrophy is an inherently severe injection site reaction

10   and that a reduction in the frequency of lipoatrophy equates

11   to a reduction of severity of injection site reactions.

12             Do you believe that frequency and severity can

13   be conflated in those ways?

14   A.    No.

15   Q.    But let's again do one of my hypotheticals, and assume

16   that a disclosure of less frequent lipoatrophy is a

17   disclosure of a reduction in the severity of injection site

18   reactions.

19             In that case, would the reduced severity terms

20   in the '776 patent have been obvious to a skilled artisan in

21   August of 2009?

22   A.    Yes, because there was the Caon study, that study

23   which had demonstrated a reduction in the frequency of

24   lipoatrophy with an every other day dosing regimen of

25   glatiramer acetate.

Green - direct

1    Q.    And that's the Caon 2009 reference that we have talked

2    about in the prior art?

3    A.    2009, yes, March of 2009, correct.

4    Q.    Are the reduced severity terms the only terms in the

5    asserted claims of the '776 patent that differ materially

6    from the terms of the first three patents?

7    A.    Yes.

8              MR. ANSTAETT:  Your Honor, if I could have one

9    moment to consult with my colleagues.

10             THE COURT:  Yes.

11             (Pause.)

12             MR. ANSTAETT:  Almost done, Your Honor.

13   BY MR. ANSTAETT:

14   Q.    Dr. Green, in forming your opinions, have you seen any

15   evidence that tolerability is improved in a three times a

16   week 40 milligram dosing regimen over the 40 milligram every

17   other day dosing regimen that's disclosed in the Pinchasi

18   application?

19   A.    That that would improve tolerability and not just

20   patient convenience or compliance?

21   Q.    Exactly.

22   A.    No, I have seen no evidence of that.

23             MR. ANSTAETT:  Thank you, Your Honor.  I have no

24   further questions.

25             THE COURT:  Let's take a stretch.  Then we will

Green - cross

```
1    have cross.

2                    (Recess taken.)

3                    THE COURT:  Dr. Green.

4                    Do you have cross binders?

5                    MR. JAMES:  Yes.  We will hand those up.

6                    Thank you, Your Honor.

7                         CROSS-EXAMINATION

8    BY MR. JAMES:

9    Q.    Hello, Dr. Green.

10   A.    Hi, Mr. James, how are you?

11   Q.    I am fine.

12         On your direct examination yesterday and today

13   you talked about the mechanism of action of glatiramer

14   acetate.  Right?

15   A.    Yes.

16   Q.    And you testified that there was uncertainty about the

17   mechanism of action and therefore it didn't teach away from

18   the claimed invention.  Right?

19   A.    Yes.

20   Q.    And you said that there were these papers, you

21   recognized there were papers that were raised by Dr.

22   Ziemssen in the IPR proceeding?

23   A.    Yes.

24   Q.    And that you disagreed with his opinions about those

25   papers.  Right?
```

1    A.    Yes.

2    Q.    You disagreed with Dr. Ziemmsen's opinion about the

3    necessity of daily dosing.  Right?

4    A.    Yes.

5    Q.    Dr. Green, you are not an expert in the mechanism of

6    action of glatiramer acetate.  Correct?

7    A.    No.  I am a treating clinical neurophysiologist with

8    expertise in treatment with patients with MS.  I also have

9    expertise in therapeutic development in the space.

10          So although I may not be someone who has

11   published broadly or widely on the subject of glatiramer

12   acetate, I have lectured on the topic, I have taught

13   residents and students about it.  I have taught our fellows

14   about it.  I teach our junior faculty about it.

15          I think I have a fair amount of expertise on the

16   topic.  In fact, I am recognized for that expertise.  I have

17   given talks at the international meetings on the topic.

18   Q.    Dr. Green, I think you have a copy of your deposition

19   transcripts in front of you.  The IPR transcript is the very

20   first one.  I think it's from October of 2015.

21          THE COURT:  How did we identify these?

22          MR. JAMES:  It would be on the date October 22,

23   2015.

24          THE COURT:  Yes.  One of these thin ones.

25   BY MR. JAMES:

1    Q.     If you could turn to Page 35, please?

2               THE COURT:  Volume 2?

3               MR. JAMES:  It should be the IPR transcript,

4    Volume 1.

5               THE COURT:  Okay.

6               What lines, counsel?

7               MR. JAMES:  Lines 9 to 13.

8               THE WITNESS:  On which page?

9               THE COURT:  35.

10   BY MR. JAMES:

11   Q.     35.

12   A.     Thank you.

13   Q.     I will give you a chance to read that.  It says, the

14   question was asked:

15               "Do you consider yourself an expert in the

16   mechanism of action of glatiramer acetate?"

17               There was an objection.  Your answer:  "No."

18               Was that your testimony?

19   A.     I think it bears --

20               THE COURT:  I am going to let him finish the

21   answer.

22               THE WITNESS:  I think that bears some

23   clarification.  I think in that context my feeling was I was

24   being asked am I world renowned expert in this field.  And I

25   was answering plainly, as I think I answered earlier today,

1    the answer to that is I am not a world renowned expert as in

2    someone who publishes specifically on that topic.  Although

3    I do feel I have expertise, especially clinical expertise,

4    in the use of product.

5    BY MR. JAMES:

6    Q.    You would agree that Dr. Ziemssen is a world renowned

7    expert on the glatiramer acetate mechanism of action.

8    Correct?

9    A.    I would agree that there are world renowned experts on

10   the topic.  I am not sure where I would place Dr. Ziemssen.

11   Q.    You cited many of his papers in your expert reports.

12   Correct?

13   A.    Well, one of the purposes of citing those papers was

14   to provide an example that this restricted single mechanism

15   of action that was mentioned as a justification for the

16   argument about teaching away was in fact an invalid

17   argument.  It was just to say, as a point of fact, Dr.

18   Ziemssen, many others would concur, has shown clear evidence

19   that the mechanism of action was unknown and that the

20   mechanism of action was -- there is a multiplicity of

21   different types of mechanisms of action that may have been

22   participating in the therapeutic effect of the drug.

23   Q.    You mentioned on direct examination you have done some

24   work on animal models.  Right?

25   A.    Yes.

1    Q.    And you referenced some research that was being done

2    at the University of California-San Francisco on multiple

3    sclerosis; correct?

4    A.    Yes.

5    Q.    But you have never performed any research related to

6    glatiramer acetate; correct?

7    A.    Yes, that's true.

8    Q.    And you haven't published any papers on glatiramer

9    acetate, correct?

10   A.    Yes.  Although again I think that doesn't necessarily

11   disqualify me from discussing the mechanism of action.  It

12   is an expectation in our field that people who are going to

13   be physician scientists who use the product, people who are

14   going to teach students and residents about the products are

15   going to be, are going to be well aware of the literature

16   surrounding the mechanisms of action and capable of reading

17   that literature and critically evaluating.

18   Q.    Other than prescribing Copaxone, Dr. Green, you

19   haven't done any work with GA; correct?

20   A.    When you say "any work with GA," maybe you can clarify

21   what you mean.

22   Q.    You haven't done any research, you haven't written any

23   papers on use of glatiramer acetate; correct?

24   A.    The work I have done would include lecturing students,

25   reading that literature.  That is all work.    That is all

1       part of my professional responsibilities.  So I would, I

2       would take exception to your notion that I have done no work

3       on the topic.

4                   Again, I think it is not I have not done

5       specific.  My laboratory research has not been around GA.

6       The field frankly has moved beyond GA in many regards in

7       termed of therapeutic investigation, and it is not the focus

8       of my laboratory.

9       Q.     If you can turn in that same deposition transcript

10      that I had you look at a moment ago to page 49, lines 11 to

11      13.

12      A.     (Witness complies.)

13      Q.     Do you have that?  I'll give you a moment to read it.

14      A.     I read it.

15      Q.                "Question:  Have you done any work with

16      glatiramer acetate other than prescribing the drug Copaxone?

17                "Answer:  No."

18      A.     So, again, I think in this context, it should be

19      viewed that while I may have misspoken here, I may have

20      misunderstood the purpose or intention of your question.

21                  I think right now, I can more clearly tell you

22      that if we think about my professional responsibilities,

23      it's clear that I have done work related to GA mainly in

24      reading the literature, staying abreast of it, being able to

25      lecture upon it.

Green - cross

1              But you are absolutely right it is not the

2      scientific focus of my laboratory, and it is not something

3      that I have used in testing animal models.  Again, that

4      work was done mainly largely in the years preceding the

5      introduction of the drug or immediately after its

6      introduction.  My laboratory program was set up after that

7      time.

8      Q.    If we could see DDX-1100.58.  I think that is, I'm

9      going to call it Slide 58, Mr. Chase.

10             Dr. Green, this is a slide you used during your

11     testimony?

12     A.    Yes.

13     Q.    And on this slide, you show various prior art

14     references and then you show the total weekly doses of GA

15     that you have calculated; right?

16     A.    Yes.

17     Q.    And then you used the phrase "forgiving range."  Do

18     you see that?

19     A.    Yes.

20     Q.    You can't point to a single prior art reference that

21     uses the phrase "forgiving range" with respect to glatiramer

22     acetate, correct?

23     A.    No, that is a conclusion that a person of ordinary

24     skill in the art would draw from reading this literature and

25     knowing about the concept that drugs may have a capacity to

Green - cross

1    be therapeutically effective across a range of doses.   It

2    doesn't have to be explicitly mentioned within that

3    literature but it is something that a person of ordinary

4    skill in the art would bring to reading those publications.

5    Q.    Okay.   I appreciate your answer.   Just to make sure I

6    understand, you are saying that you did not find the term

7    "forgiving range" in the prior art with respect to GA;

8    correct?

9    A.    That is correct.

10   Q.    And if we look at the, in the middle of this chart,

11   you have Yeda patents 2009, 40 milligrams three times a

12   week, 120 milligrams a week; correct?

13   A.    Yes.

14   Q.    And prior to August 20th, 2009, that red bar didn't

15   exist, did it?

16   A.    I'm not sure how it is material to my testimony, but

17   the answer to that is, yes, no one had specifically used the

18   exact dose of 120 milligrams.   It doesn't mean that someone

19   who said they were going to use a dose of 142 milligrams

20   would have been doing anything innovative.   Again, because

21   there isn't specific mention of the exact dose was not in

22   the literature to me is literally immaterial to my opinion.

23   Q.    But whether it has been given or not, in fact, there

24   was nothing in the prior art that even said to administer

25   glatiramer acetate three times weekly; right?

1    A.    Right.  Again, as I opined I think earlier, the

2    application use of that regimen was obvious.  As I said, in

3    that dosing, it had not been explicitly described.  It was

4    just obvious.

5    Q.    And so what you did on this slide was you took the

6    total weekly dose of the claimed regimen, 120 milligrams,

7    and you plugged it in to the total weekly dose of all of

8    these other regimens that you discussed; right?

9    A.    I think that is fair.  I mean I absolutely put it in

10   context of the existing prior art.  That is the way that

11   one would view the innovativeness or the inventiveness of a

12   claim.  It would be to say, well, let's look at it compared

13   to what we did before.

14   Q.    Right.  In fact, what you did here was to take the

15   claims of the patents in suit and evaluate how they would

16   have been viewed at the time with respect to the prior art;

17   correct?

18   A.    Absolutely not.  If you are asking me if, in

19   hindsight, I looked at the claims of the patent and then

20   went back to look at the literature is to find support, that

21   is absolutely not what I did.  I read the claims of the

22   patent to evaluate them and then considered them in light

23   of the prior art that I knew about and then the prior art I

24   further investigated.  But that is very different from

25   saying I looked at the claims of the patent and then tried

1    to find justification or support for an obviousness argument

2    based upon what existed in the prior art.

3    Q.    There was another deposition transcript that I gave

4    you from the IPR.  It is Volume 2.  It was a deposition that

5    was taken last April, April 6th, 2016.  Do you have that?

6    A.    Yes.

7    Q.    And if you could turn in there to page 316, please.

8    A.    (Witness complies.)

9    Q.    Line 12.

10              THE COURT:  Line 12 through?

11              MR. JAMES:  Twenty-five, Your Honor.

12              THE COURT:  Take a moment to read that to

13   yourself.

14              (Witness complies.)

15   BY MR. JAMES:

16   Q.    Have you had a chance to read that, Dr. Green?

17   A.    Yes.

18              MR. ANSTAETT:  Your Honor, I object.  That is

19   improper impeachment.

20              THE COURT:  I agree.  I'll sustain that

21   objection.

22   BY MR. JAMES:

23   Q.    In fact, Dr. Green, what you did here as shown by the

24   slide that you put up was a backward-looking analysis.  You

25   took the claims of the patents in suit, you multiplied 40

1    milligrams times three times a week, and then you plugged it

2    into this chart showing how it lines up with the doses that

3    had been tested in the prior art; correct?

4    A.    I wasn't using this visualization as a way to teach

5    myself.  I was using it as a way to provide evidence to the

6    court.  This isn't what I did in advance.  This is what I

7    did in preparation for testimony in this courtroom.  So I

8    categorically would say that is not true.

9    Q.    Now, you also suggested that the person of skill in

10   the art would have been interested in the total weekly dose

11   of glatiramer acetate in terms of evaluating whether they

12   would have expected glatiramer acetate to be effective;

13   right?

14   A.    Yes.

15   Q.    So I have taken this chart -- if you could pull up,

16   Mr. Chase, slide 57.  I believe it's referred to as PDX-31,

17   Mr. Chase.  I'm sorry, PDX.

18           I apologize, Your Honor.

19   BY MR. JAMES:

20   Q.    Okay.  Dr. Green, so what I've done is I just took the

21   very same chart that you put up and I arranged it

22   chronologically.  Okay?

23   A.    Okay.

24   Q.    And do you see that in 1996, Copaxone was approved,

25   20 milligrams daily.  That is 140 milligrams a week; right?

Green - cross

1    A.    Yes.

2    Q.    Now, you offered an opinion about the Flechter paper

3    from 2002; right?

4    A.    Yes.

5    Q.    And in that paper, Dr. Flechter tested 20 milligrams

6    every other day; right?

7    A.    Yes.

8    Q.    And you said that is a 70 milligram -- on average, a

9    70 milligram per week dose; right?

10   A.    Yes.

11   Q.    So there was no effort there to maintain the total

12   weekly dose of glatiramer acetate; correct?  He cut it in

13   half.

14   A.    Right.  He was exploring alternative dosing regimens.

15   So this is an iterative process by which you would arrive at

16   the appropriate dose.  You can't explore every dose between

17   one dose and another.  You have to select one, and then say

18   what do I learn?  And the whole process is a squeezing back

19   to an optimal dose or to a dose that you have a fair degree

20   of confidence is going to work, a reasonable expectation of

21   success in a pursuit of a clinical program that you are

22   going to achieve success.

23   Q.    You would agree with me that he didn't try to maintain

24   a total weekly dose of 140 milligrams; correct?

25   A.    He didn't exactly maintain that exact dose.  He didn't

1    explore a dose of five milligrams, he didn't explore a dose

2    of 1,000 milligrams.  He explored a dose that was close, not

3    exactly the same, because that would be useless,

4    scientifically.  He explored a new dose that was somewhat

5    different in trying to inform the art.

6    Q.    I don't want to belabor the point, but it is not

7    somewhat different, Dr. Green, it is half the dose; right?

8    A.    Well, I guess that would be a quibble on semantics in

9    this context because I think on this context while it is

10   somewhat different, it is not drastically different.

11   Q.    Then the next study that came out, Cohen 2007, was

12   40 milligrams daily; correct?

13   A.    Yes.

14   Q.    And in that study, they used a total weekly dose of

15   280 milligrams; right?

16   A.    Yes.

17   Q.    So they took the dose that Dr. Flechter had used and

18   they increased it by 400 percent; right?

19   A.    Yes.  So now you are misunderstanding the purpose of

20   the Cohen exploration or study, correct.  But, correct, it

21   did increase the dose in that way.  They were looking to see

22   if a 40 milligram product would have enhanced efficacy, so

23   that was a very different investigation.  It doesn't have to

24   be specifically exploring the total weekly dose to be

25   informative for my opinions.

Green - cross

1   Q.    And then the next piece of prior art that you raised

2   is Pinchasi 2007.  Correct?

3   A.    Yes.

4   Q.    Now, the only data in Pinchasi is data on the

5   administration of 40 milligrams daily; correct?

6   A.    As I testified, yes.

7   Q.    Exactly the same data that is shown in the Cohen

8   study, right?

9   A.    Absolutely.

10  Q.    There is no data on 40 milligrams every other day

11  administration that you have listed on this chart; right?

12  A.    No, it's only that it discloses it.  It discusses it

13  and it clearly indicates that the people were at Teva were

14  thinking about combinations of prior art like Flechter in

15  combination with prior art about the 40 milligram dose from

16  Cohen.

17  Q.    There is no data in 2007 to show that 40 milligrams

18  every other day would have been effective; correct?

19  A.    I think that is an inarguable point, of course.  That

20  is what we discussed at length.

21  Q.    Then the next reference that came out was Khan 2008.

22  And, again, he cut the, he cut the dose in half compared to

23  the 140 milligrams on average that you have listed here for

24  Pinchasi; correct?

25  A.    He used the same dose that was used in Flechter, but

1    now it is reported in a randomized fashion.  Again, I think

2    there is a misrepresentation in the way in which the

3    scientific process is moving forward here.  There wasn't --

4    the primary purpose of all these explorations was not to

5    explore the total weekly dose, it was to explore alternative

6    regimens.  And in that context, total weekly dose is there.

7              Finally, there is a nice arc building up to the

8    period just prior to 2009 that would tell you at the

9    priority date of 2009 this formulation of three times a week

10   40 milligrams would be obvious.

11   Q.    Well, in fact, the arc doesn't exist, does it, Doctor?

12   It goes from Khan 70 milligrams a week.  The next trial is

13   the for the trial in 2008, it goes up to 280 milligrams a

14   week, and then it comes back down with the filing of the

15   patents in suit to 120 milligrams a week.  That is not an

16   arc, is it?

17   A.    No, in fact, I think you are incorrect.  In fact,

18   there is a trend, a movement in favor of evaluating these

19   alternative doses, and there is ultimately an exploration of

20   the fact that less frequent dosing regimens with a higher

21   dose product are likely to be effective, and that will

22   satisfy the tolerability requirement that is the motivation

23   that exists within the art that was previously evidenced on

24   multiple occasions.

25   Q.    So I'd like to talk about -- well, let back up for

Green - cross

1    just a moment.

2              In 2009, the only regimen that was approved on

3    the market for patients was 20 milligrams daily.  Right?

4    A.    Yes.

5    Q.    The regimen of Flechter and the regimen of Khan,

6    20 milligrams every other day, those were not approved for

7    use in patients in 2009; correct?

8    A.    Yes.

9    Q.    And the regimen of Cohen, 40 milligrams daily which

10   was later tested in the FORTE trial also wasn't on the

11   market, was it?

12   A.    That's the purpose of the research is to explore

13   alternative dosing regimens.  That is why these were

14   research protocols approved by institutional review boards.

15   They were investigatory.  They're trying to establish what

16   are the alternative dosing regimens, what might be

17   available.

18   Q.    I'd like to turn to the Flechter reference.  Flechter

19   was 20 milligrams every other day.  It was a one arm study;

20   correct?

21   A.    Well, no.  It's not a one arm study.  It is a

22   comparison between the experience of 20 milligrams every

23   other day to their earlier experience with 20 milligrams

24   daily.  In that way, it is an open label study.

25   Q.    It was an open label study; correct?

1    A.      Right.  And I would agree with you that there are

2    problems with open label studies in drawing firm conclusions

3    from them.  They only point and indicate in a direction.

4    They can drive the art, but they don't prove anything within

5    the art.

6    Q.      It was an uncontrolled study as well; correct?

7    A.      That's right.  I mean this is, I would agree with you,

8    again, that Flechter is not the highest class of evidence,

9    but it is still an important element of the prior art

10   because this is the iterative procedure that goes on in

11   scientific investigation.  We start with the valuation and

12   look for things that are -- you know, we're not going to

13   expend millions of dollars and tons of resources and patient

14   time and put patients at risk for something that may not

15   work, so we study it early in a small group of patients and

16   we advance the process.  That's the way in which an FDA

17   approval works.

18   Q.      Can we put up DDX-1100.40, please.

19   BY MR. JAMES:

20   Q.      Dr. Green, this is your summary slide on Flechter.

21   Correct?

22   A.      Yes.

23   Q.      And at the top of this slide, it says, "Reduced

24   frequency GA dosing is effective and well tolerated."

25           Correct?

Green - cross

1    A.    It does.  It explains it more at the bullet point

2    labeled Efficacious, which says that it suggests that a 20

3    milligram every other day dosing regimen is similarly

4    effective.

5    Q.    In fact, Flechter itself says that the conclusions in

6    the paper can't be used to draw any conclusions about

7    efficacy.  Correct?

8    A.    That's not correct at all.  It says to look at the

9    conclusions specifically within Flechter.  Flechter does say

10   you wouldn't -- what I take him to mean is you wouldn't draw

11   firm conclusions, you wouldn't say let's switch everybody

12   over to every other day dosing.  But Flechter clearly

13   believed -- he published the work.  He firmly believed this

14   would influence the art in an important way.

15   Q.    Could we look at JTX-7078, please, Page 15.

16         On the left-hand column at the top of the first

17   full paragraph.  This was a part of the Flechter reference

18   that I don't think came up in your direct examination, Dr.

19   Green.  But the first sentence says, "The study reported

20   here was uncontrolled; therefore, all conclusions cannot be

21   used to prove efficacy."

22         That's what it says.  Right?

23   A.    I think you are misunderstanding the operative word.

24   The operative word is proved.  That is exactly what I said

25   to you.  Again, you don't prove efficacy from the study.

Green - cross

1    You indicate the possibility of efficacy.  You provide the

2    context for reasonable expectation of success when you

3    further pursue this in a randomized study, which was done in

4    Khan.

5    Q.    Let's look at Table 5, please.

6          Dr. Green, if you would just help orient us

7    here, Dr. Flechter had patients that he administered the

8    drug to every other day.  Correct?

9    A.    Yes.

10   Q.    And there were 68 of them.  Right?

11   A.    Yes.

12   Q.    And he put together this table where he puts some data

13   from his alternate day group, and he compares it to what he

14   calls daily treatment.  Right?

15   A.    Yes.

16   Q.    And that daily treatment data, that came from a study

17   by Dr. Meiner.  Right?

18   A.    Dr. Flechter was an author on that.  But yes, Meiner

19   was the first author.

20   Q.    It was an earlier study?

21   A.    Yes.

22   Q.    Conducted years before Flechter was published.

23   Correct?

24   A.    Well, I don't know if we know the timing of when it

25   was actually conducted.  I don't know how long it took Dr.

1      Flechter to compile and analyze his timing.  So I don't know

2      the relevant timing of those two studies.

3      Q.     You would agree that because these clinical trials

4      were done at different times, that you really can't draw any

5      comparisons between the two sets of data.  Right?

6      A.     No, I wouldn't say that at all.  Again, you can draw

7      comparisons.  It's just the reliability of the comparisons

8      that matters.  It's how much would you feel absolutely

9      confident that the results of the study are unequivocally

10     true.

11            Again, this is scientific process.  We build our

12     way towards answers.  We disprove things that we see are not

13     true.  And then we build towards the truth.  And that takes

14     time.

15     Q.     Well, you would agree that the patient populations

16     were different.  Right?

17     A.     I guess I am not sure what you mean by patient

18     populations then.

19     Q.     It wasn't the same set of patients in the 68 patients

20     that Dr. Flechter looked at and the 271 patients that Dr.

21     Meiner reported on.  Right?

22     A.     You are asking if it was the exact same patients?  I

23     presume they were not the same patients, although they were

24     seen in the same clinic.  It's possible that some of the

25     patients in the Meiner study were the patients in the

1    Flechter study.  Frankly, I think it's immaterial to an

2    evaluation of what this -- what I have used this study to

3    indicate.

4    Q.    Well, it's a fact, isn't it, that the overall relapse

5    rate in patients suffering from MS during this time was

6    declining.  Right?

7    A.    So --

8    Q.    The relapse rate in untreated MS patients was

9    declining during that time frame.  Right?

10   A.    You mean globally, everywhere?

11   Q.    Correct.

12   A.    No, I think you have to be a little careful with that

13   claim.  The thing you have to consider there is that within

14   clinical trials, the basis for that claim, I think what you

15   have just mentioned requires some context, is within the

16   placebo arms of clinical trials that were done from the

17   early stage of clinical trials first done in the late 1980s

18   and early 1990s, up until the mid- and late 2000s, there

19   seemed to be a reduction in the relapse rate recorded.  But

20   there were substantial differences in the way in which we

21   adjudicated those end points.

22          In fact, in the earlier clinical trials it was

23   just either the patient reporting a relapse or the principal

24   investigator saying that a patient had a relapse.

25          Established in the late nineties, early 2000

Green - cross

1    were these things as end point adjudication remedies on

2    which I have served on multi-national multi-site clinical

3    trials.  In that context, these adjudication committees are

4    charged with the responsibility to evaluate whether or not a

5    relapse is truly a relapse.

6            The reason this is relevant is, when you look at

7    those rates of relapse, a part of the reason for the

8    reduction in relapse rate from those early to later trials

9    is the validation of the relapses that occurs later in the

10   course of MS trial development.

11           Furthermore, the patients who participated in

12   trials did change.  Early in the course of clinical trials,

13   I was at the Cleveland Clinic in 1989 and 1990 when some of

14   the earliest therapies were being tested, patients would

15   drive to the Cleveland Clinic from Minnesota to participate

16   in those clinical trials.  Patients were desperate.  There

17   were no therapies available.  By the time you arrived in the

18   mid-2000s, patients had alternatives for therapy.

19           There is lots of reasons behind that decline

20   that you mentioned.

21   Q.    Thank you, Dr. Green.

22           I think what you said at the end of that answer

23   was that there was a decline in the relapse rate that was

24   being reported for untreated MS patients.  Right?

25   A.    No.  Again, I think you are mischaracterizing what I

1    have just said.  The reason I had to say what I said at the

2    length that I said it, and I won't do it again to torture

3    the Court, but the reason I said that is because it requires

4    explanation.  It can't be said the way you said it.

5    Q.    You would agree that because these patient populations

6    were not the same, you can't compare these data sets to one

7    another.  Right?

8    A.    No.  As I said earlier, I would not agree to that

9    contention.  You can compare the data sets.  You just have

10   to do it carefully and you have to recognize what the

11   limitations, what the limited conclusions you can draw from

12   it are.

13   Q.    Let's look at Table 4, Mr. Chase.  It's on Page 12.

14         I am sorry.  I have the wrong table there.  On

15   Page 13.  The table at the bottom.  The next page.  I am

16   sorry.  I think I have the wrong reference here.

17         7078.2.  Thank you.

18         Dr. Green, 68 patients were enrolled by Dr.

19   Flechter.  Correct?

20   A.    Yes.

21   Q.    And only 41 patients completed the trial.  Right?

22   A.    Yes.

23   Q.    So 27 patients dropped out?

24   A.    Yes.

25   Q.    That's 40 percent of the patients.  Right?

1    A.    I can't do that math in my head.  I will trust you on

2    it.

3    Q.    When he calculated the relapse rate, Dr. Flechter

4    didn't take into account what the relapse rates were in

5    those 27 patients.  Right?

6    A.    Again, I would have -- if we want to look at it, I

7    think you are probably right, but I don't know.

8    Q.    Isn't it a fact that the person of skill in the art

9    would not have known what the mean relapse rate would have

10   been for those patients who dropped out?

11   A.    That's generally an issue in the field with dropouts.

12   Again, it's exactly the reason that when one looks at data

13   like this one wouldn't draw firm conclusions, one wouldn't

14   claim that this was proof of efficacy.  But one would,

15   again, take the learning from this, take the teaching from

16   this, that alternate dosing regimens appeared to suggest

17   similar efficacy and enhanced tolerability.  That's the

18   important lesson from Flechter.  It drives the art forward.

19   Q.    Well, you are drawing conclusions about similar

20   efficacy based on Dr. Flechter's results.  Right?  His

21   relapse rate results.

22   A.    Right.  And Dr. Flechter's regressions in his report.

23   And he was an author on both papers.  He participated in

24   both studies.

25   Q.    Without knowing the relapse rate for these 27

1   patients, you couldn't have known what the relapse rates

2   actually were in the patients that Dr. Flechter studied.

3   Correct?

4   A.   I mean, this is, again, a general problem in the

5   field.  For example, within the field for a long time, after

6   the introduction of a new therapy, including the

7   introduction of Copaxone, it was repeatedly argued in

8   marketing publications that people who stayed on the drug

9   long term had great clinical outcomes.  That is a biased way

10  to evaluate things.

11           Teva did this, in terms of this whole marketing

12  program related to Copaxone.  But it doesn't mean the work

13  is totally invalid.  It just means that you take a skeptical

14  view of the data.  You take a careful, scientific critical

15  view of the data.

16  Q.   You would agree that the fact that he doesn't account

17  for these dropouts is a weakness in the data in Flechter.

18  Correct?

19  A.   Sure.  I have never maintained that the Flechter study

20  is without flaw.  Again, the question is, what does it tell

21  us and what conclusions can we draw from it, and the fact

22  that it was then confirmed in a randomized study conducted

23  by Omar Khan.

24  Q.   We will come to that in just a moment.

25           If we could look at the conclusion of Flechter,

1    on Page 15, on the right-hand column.  The second sentence,

2    Dr. Flechter says that the preliminary observations that he

3    has made will have to be examined in larger studies.  Right?

4    A.    Yes.  I think that's another inarguable point.

5    Q.    And there were no such larger studies that were ever

6    carried out on 40 milligrams every other day.  Right?

7    A.    Now I am a little lost.  You just mentioned 40

8    milligrams.

9    Q.    I am sorry.  20 milligrams every other day.  Thank

10   you.  There were no such larger studies that were ever

11   carried out on 20 milligrams every other day.  Right?

12   A.    Well, in this context a randomized study was done.  So

13   a more rigorous evaluation was done.  Was the total end

14   larger?  No.  But the methodological approach was more

15   air-tight.  It was a more reliable study and confirmed those

16   earlier results.

17          It's interesting that you are at such pains and

18   efforts to dismantle the Flechter study when in fact it was

19   something that Teva relied upon to regulators in their GALA

20   protocol in their rationale for the trial design.

21   Q.    Let's talk about that for just a second.  The GALA

22   protocol that you relied on, that wasn't in the prior art.

23   Right?

24   A.    I didn't say I relied upon it.  In fact, as I said, I

25   think it came out in my testimony, I viewed it only after I

Green - cross

1    came up with my opinions.  In fact, it's only proof that

2    independently of forming those opinions, or independently of

3    what folks at Teva was thinking, I was thinking the exact

4    same thing using the same data.

5              They didn't think Flechter was useless.  They

6    referenced it to a regulator.

7    Q.    But the fact is that the GALA protocol itself was not

8    in the prior art.  Correct?

9    A.    I think I have just answered that question before.

10   Q.    And the GALA protocol does not -- let me back up.

11             The GALA protocol relies on information that was

12   not available to the person of skill in the art in August

13   2009.  Right?

14   A.    It references specifically Flechter.  It references

15   Khan.  It references both Khans as justification and support

16   in the rationale.  So it references that exact prior art

17   that I have spoken about that you are now saying or

18   suggesting is invalid or entirely unreliable.

19   Q.    Well, it references Khan 2009.  Correct?

20   A.    It does.

21   Q.    That was not available to the person of skill in the

22   art in August 2009.  Right?

23   A.    The results of the study or the fact that the study

24   was done?

25   Q.    There is no evidence that that was in the prior art,

Green - cross

1   August 2009, there is no evidence that any person of skill

2   in the art knew about it.  Right?

3   A.      There is no explanation in the GALA protocol of how

4   the people who were applying from Teva were using that

5   information.  I don't know that they weren't just using it

6   in the same way that I am using it, which is to say there

7   was a motivation to pursue alternate dosing regimens as an

8   approach to try to evaluate whether or not an alternate

9   dosing regimen may work in the treatment of multiple

10  sclerosis in the presence of glatiramer acetate.

11  Q.      There is no evidence that the Khan 2009 trial was in

12  the prior art to the patents in suit.  Right?

13  A.      The results of the study, do you mean?

14  Q.      The study in any fashion, there is no evidence in this

15  case that it was known by people of skill in the art prior

16  to August 20, 2009.  Right?

17  A.      There you are absolutely wrong.  It would have been in

18  clinicaltrials.gov, I imagine, as would be required in a

19  study like that.

20  Q.      Did you offer evidence about that?

21  A.      I did not.

22  Q.      In fact, the GALA protocol was written after Dr.

23  Klinger had filed her patent application.  Right?

24  A.      I don't know that that is a fact.  We could look at

25  the dates.  I would be happy to look at it with you.

Green - cross

1    Q.    The document you are relying on, Dr. Green, is dated

2    after August 20, 2009, the GALA protocol.  Right?

3    A.    I see.  That's true.  That is again an internal

4    rationale within the company.  What I was discussing with

5    you is not to say somehow that that GALA protocol was

6    produced publicly before the priority date.  What I was

7    telling you is it is evidence that the thinking within Teva

8    was identical to mine.  There was not some special

9    additional information or data that was being used to

10   motivate this investigation of this alternate dosing

11   regimen.

12   Q.    Just so we are not on the same page, the GALA protocol

13   rationale that you testified about was written after the

14   fact, after the patent application in this case was filed.

15   Right?

16   A.    Yes.  But it mentions nothing about rat spleens or

17   anything else that has been suggested in testimony here that

18   might have motivated someone, as a rationale for why someone

19   would pursue such an approach as a therapeutic, again, in

20   front of a regulator.

21   Q.    We have put up a slide about the GALA protocol.

22   Correct?

23   A.    I believe so.

24   Q.    And in that slide you called out a sentence that

25   relies on three different prior art references or three

1    different references, anyway.  Right?

2    A.    Yes.

3    Q.    Flechter 2002.  Right?

4    A.    Yes.

5    Q.    Khan 2008.  Right?

6    A.    Yes.

7    Q.    And Khan 2009.  Right?

8    A.    Yes.

9    Q.    And that Khan 2009 abstract was not in the prior art.

10   Right?

11   A.    As we have established -- I mean as we have discussed,

12   I think it would have been known about.  I mean, patients

13   would have had to enroll in 2007.  The paper was submitted,

14   the abstract was submitted in May of 2009 to this

15   international meeting.  So some people of ordinary skill in

16   the art would have read it on that occasion.

17              Again, I have not used it to say the results

18   support my argument.  I have just used it again as an

19   example that the piece is an example of most of motivation,

20   to indicate that people of ordinary skill in the art were

21   thinking about this, against the teaching away arguments

22   that have been made by experts for the plaintiff.

23   Q.    Let's talk about the Khan 2008 abstract.  That

24   discloses a comparison of 20 milligrams daily and 20

25   milligrams every other day.  Right?

Green - cross

1    A.    Yes.

2    Q.    No 40 milligram dose is described.   Right?

3    A.    Yes.

4    Q.    No three times weekly regimen is described.   Right?

5    A.    Yes.

6    Q.    And it was written six years after the Flechter paper

7    came out.   Right?

8    A.    Well, it's a four-year study.   So it is clear why it

9    was six years.   It took four years to complete the study.

10   So Flechter was published.   That takes time to be taken up

11   within the art.   Khan planned something.   He has got to get

12   the money in order to do it.   He has got to enroll the

13   patients.   He studies it for four years.   The first patient

14   is enrolled on day one, the last patient is enrolled six

15   months or one year later.

16         It is absolutely natural that it took six years

17   for that to come out.   There is nothing mysterious about

18   that whatsoever.

19   Q.    Dr. Khan was still testing 20 milligrams every other

20   day even after the Flechter paper that you have relied on.

21   Right?

22   A.    Now I guess -- that seems obvious.   Yes, he was doing

23   that after Flechter.   He used -- Flechter helped support and

24   motivate him probably to make that investigation.

25   Q.    That's because Flechter hadn't answered the question

1    about whether or not 20 milligrams every other day was

2    effective.  Right?

3    A.    Again, because that's the nature of clinical research.

4    We start off with observational studies.  We then built up

5    towards investing time and resources in trial investigations

6    that require all these rigorous controls that are necessary.

7            We have seen the risks of not having rigorous

8    control within a trial.  It can totally undermine the

9    possibility of drawing conclusions from it.

10           So we do the observation studies early, but we

11   cannot conclusively rely on it.  And then we build our way

12   towards studies that we can conclusively rely on.  That is

13   again the requirement of the regulators.  That is why we

14   have Phase III clinical trials that are used to confirm.

15           I think, my understanding -- and I am totally

16   willing to hear otherwise -- is that that is not the

17   standard for the patent.  The standard for the patent is, is

18   there a reasonable expectation of success.  Not is there

19   conclusive proof via Phase III clinical trial that something

20   has absolutely demonstrated efficacy.  That would change the

21   patents for all pharmaceuticals in the United States as far

22   as I would imagine.

23   Q.    Rebif, you relied on Rebif in your obviousness

24   analysis.  Correct?

25   A.    Yes.

Green - cross

1  Q.    The three times a week regimen from Rebif.  Right?

2  A.    Yes.

3  Q.    And Rebif was approved in the United States in 2003.

4  Is that correct?

5  A.    No.  In 2002, I believe.  In March of 2002.

6  Q.    I stand corrected, 2002.

7         Despite the Rebif regimen being in the prior

8  art, Dr. Khan didn't adopt a three times a week regimen, did

9  he?

10  A.    No, because again, as I mentioned, this whole process

11  is iterative.  He starts with something that he had seen

12  before in Flechter, and potentially build in that direction.

13  Q.    The Khan reference provides no quantitative data;

14  correct?

15  A.    The Khan reference provides no quantitative data.  We

16  should look at it, but you are probably right.  There is

17  quantitation in terms of the number of patients who

18  participated, but if I'm recalling correctly, I don't

19  remember any quantitative analytical data.  It is abstract.

20  You are limited by the number of words you can include.

21  Q.    Because there is no data, a person of skill in the art

22  would not have been able to critically analyze the results

23  and the conclusions that Dr. Khan reports; correct?

24  A.    It would know the reputation of Dr. Khan, and

25  Dr. Khan, as a friend and as a colleague, he was held in

1    highest esteem.  So they would have judged it based on the

2    fact he is a highly esteemed colleague that dedicated

3    himself to the investigation of therapeutics in MS.  Well,

4    they would have, they would have thought he wouldn't present

5    data that was somehow analytically flawed in a way that

6    would make it unreliable.

7    Q.    But he would have known about that three times a week

8    regimen from Rebif; right?

9    A.    I think just as we discussed, yes.

10   Q.    So if we could put up, Mr. Chase, JTX-7089.

11         This is the Khan abstract, Dr. Green?

12   A.    It is.

13   Q.    And just before the, just before the methods section,

14   it says that the primary endpoint was based on a composite

15   of clinical MRI and immunologic outcomes.  Right?

16   A.    Yes.

17   Q.    And he doesn't tell us anything about how he weighted

18   any of those outcomes in his results; correct?

19   A.    That's correct.  Although he later on, if we look

20   at the rest of it and not just your highlighted portion, I

21   can't really see it right now unless I have a copy of the

22   document.

23         MR. JAMES:  Take it down, Mr. Chase.

24   BY THE WITNESS:

25   A.    He does say about -- let's see.  I mean he discusses

Green - cross

1       that it suggests that GA is equally effective in RRMS.  And

2       he talks about both groups in the results section.  If you

3       want to highlight this for me, after it says the 30 patients

4       were randomized to GA 20 milligrams subcutaneous given QD or

5       QOD.

6       Q.    Where are you?  Right here?

7       A.    After results.  So maybe we should go to highlight the

8       next sentence.

9       Q.    Okay.

10      A.    Maybe you are not going to highlight for me.

11      Q.    We can highlight it for you.

12      A.    Both groups were well matched for age.  And he says

13      after two years, there was no difference in relapse rate.

14      Then he said after two years, there were no differences in

15      relapse rate, change in T2W lesion volume or Gd enhancing

16      lesions between the two groups.

17              So now he is naming those measures of efficacy

18      that those would find reliable.  So, again, given the

19      reputation of Dr. Kahn -- and hopefully I don't go on

20      because he was my close friend and, as the Court may know,

21      he has recently passed away, I would take exception to the

22      notion that this was somehow an unreliable result or an

23      unreliable study that a person of ordinary skill in the art

24      would not have considered or relied upon.

25      Q.    Well, he says, at the end -- if we could look at that

Green - cross

1    Mr. Chase -- that large multicenter studies are warranted to

2    confirm our findings; correct?

3    A.    It aligns exactly with what I told you, of course.

4    This is part of the iterative process.

5    Q.    This is not the end of the story.  This doesn't prove

6    efficacy of 20 milligrams every other day, right?

7    A.    That's right.  That is why additional studies would

8    need to be done in order to prove unequivocally for a

9    regulator or for registration or approval that this regimen

10   worked.

11   Q.    And Kahn was never published as a full paper, was it?

12   A.    I believe that is true.

13   Q.    Now, you focused on the fact that the patients in this

14   study chose to switch from daily therapy to every other day

15   therapy; right?

16   A.    I'm not sure I focused on it, but I have mentioned it.

17   Q.    Well, you mentioned it.  You said that that shows that

18   it was improved tolerability.  Would you take away from it

19   that it was improved tolerability of an every other day

20   regimen?  That is what you said.  Right?

21   A.    That was additional evidence in combination with the

22   fact that we spoke about the Kahn study and specifically

23   discussed about the tolerability profile.

24   Q.    If we look at the method section right in the middle,

25   these were treatment-naive RRMS patients.  Right?

1    A.    Yes.

2    Q.    So these patients had never been given GA.   Right?

3    A.    That's true.

4    Q.    So at the end of two years, when they were offered the

5    option of changing to the every other day regimen, they

6    didn't have any experience with both regimens in order to

7    draw a conclusion about tolerability, did they?

8    A.    So you highlighted the point that there was a strong

9    motivation and patient preference for alternative dosing

10   regimens other than every day.  I think that is clear.

11            And in this context, obviously, my expectation

12   would be that the investigators would have sat down with

13   the patients and discussed with them about the data that

14   existed, what they had.  And I mean this is part of the

15   obligation of conducting a clinical study is you informed

16   patients once the study is completed what the results of the

17   study were.

18   Q.    Exactly, Dr. Green.  We don't know what these patients

19   were told about the efficacy of these two regimens, do we?

20   A.    No, we would have presumed they were told exactly what

21   we're being told here.

22   Q.    I understand that you are presuming it.  But it

23   doesn't say what they were told in this abstract, does it?

24   A.    That already suggested maybe they were told it had

25   enhanced efficacy.  I guess I don't understand the line of

1    questioning.

2              In this context, if the patients were told what

3    we're being told here, that the efficacy was equivalent,

4    then they're going to make the decision based on patient

5    preference, which is I think the very argument that I made.

6    Patient preference would be for less frequency dosing

7    regimen.  There is nothing innovative, inventive about

8    saying that or trying to patent it.

9    Q.    The only point that I am making, Dr. Green, is that

10   you don't know whether the patients were provided with the

11   results of the first two years of the study when Dr. Kahn

12   gave them an option to switch to the every other day group;

13   right?

14   A.    Again, it would be my expectation that it was

15   discussed but it is not written in an abstract that is

16   limited to 300 words, you are correct.

17   Q.    In fact, this was never published as a paper, was it?

18   A.    I think you asked that question before, and I answered

19   it.  The answer is no, it was never published as a paper.

20   Q.    Right.  And we don't have clinical protocol that would

21   tell you what the patients were told when they were offered

22   the option of switching; right?

23   A.    Right.  I haven't seen that clinical trial protocol,

24   no.  It would be unusual again not to talk to the patients

25   about that result.

1   Q.    Let's look at DDX-1100.28, please, Mr. Chase.

2         This is your summary slide, Dr. Green, of the

3   motivation to use a 40 milligram dose of GA in a less

4   frequent dosing regimen.

5   A.    Yes.

6   Q.    And you mentioned in the middle bullet, faster onset.

7   You say there is a trend showing a more rapid onset of

8   action on MRI activity.  Correct?

9   A.    Yes.

10  Q.    But if we look at Caon, if we look at Caon, that is

11  JTX-7058.  If we can blow that up.

12        And this is the very same study that Dr. Khan

13  reported; correct?

14  A.    Yes.

15  Q.    But it was published several months later, in 2009.

16  Right?

17  A.    It was after, and they were sending the story at

18  different major international conferences.

19  Q.    Right.  In March 2009.  Correct?

20  A.    Correct.

21  Q.    And then, in the middle, just before design and

22  methods, the author acknowledges that recent studies failed

23  to show improved efficacy with higher than the recommended

24  dose.  Do you see that?

25  A.    Right.  So, okay.

1    Q.    Do you see that, Dr. Green?

2    A.    Yes.

3    Q.    And that is a reference to the FORTE and Cohen trials;

4    right?

5    A.    Yes.  But, again, what they're saying, they failed to

6    show improved efficacy, well, that was what the FORTE, what

7    the FORTE investigator said.  They did not say there was

8    improved efficacy.  They just said that there was this trend

9    towards a faster onset of action when measured by MRI

10   activity.  That was the primary endpoint.  So this statement

11   is not in contention or under argument.

12   Q.    Dr. Green, the FORTE trial failed on its primary

13   endpoint; right?

14   A.    It didn't meet the primary endpoint.  That's correct.

15   Q.    It failed on its primary endpoint?

16   A.    Yeah, but that doesn't mean -- you can't, you can't

17   take that result and therefore conclude that you learn

18   nothing from the study.  When a study fails, we learn a lot

19   from a failed study.  We learn about how we might do future

20   studies, which is what exactly would happen with the FORTE

21   study.  You wouldn't discard it whole-cloth.  You would say

22   we invested a lot of time and money, what did we learn?  And

23   you would investigate and evaluate for future studies.

24   Q.    Well, Dr. Khan, and his colleague, Dr. Caon, they

25   published this abstract six months after the FORTE results

1    come out.  They say that the recent studies failed to show

2    improved efficacy with higher than the recommended dose.

3    But they don't say anything about faster onset, do they?

4    A.      No, because again this is an abstract.  They're

5    limited by the number of words.  Many times, I have written

6    abstracts, writing it late at night, before it's due for

7    submission or throwing it back and forth between the

8    different coauthors, and we have to cut words out.  So the

9    fact they didn't mention that is largely immaterial.  It's

10   an abstract.  They didn't have the space to discuss that.

11            They still I'm sure were fully aware of the fact

12   of how Dr. Comi had characterized the work both at that time

13   in the presentation and later in publication.

14   Q.      And they don't reference a 40 milligram dose here.

15   Right?  They don't recommend the use of a 40 milligram dose

16   on any regimen, do they?

17   A.      You asked two questions there.  They did reference a

18   40 milligram dose.  They were referencing it by talking

19   about the higher than recommended dose.

20   Q.      That is fair, thank you.  And they said it failed?

21   A.      They said that the study to evaluate its efficacy did

22   not meet its primary endpoint.

23            Again, I'm not sure what you are alluding to by

24   calling it a failure, but if you are trying to say you would

25   throw the study out, as we discussed, you would not.

1   Q.   Now, Dr. Green, you treat MS patients; right?

2   A.   Yes.

3   Q.   And you testified that multiple sclerosis is a disease

4   of young people; right?

5   A.   Predominantly young adults, yes.

6   Q.   It is a devastating and progressive disease, isn't it?

7   A.   It can be, yes.

8   Q.   And you testified that the injury to the CNS, to the

9   central nervous system, that can occur without any clinical

10  signs; right?

11  A.   Correct.

12  Q.   So the inflammatory process that is damaging the brain

13  can be happening while we're not seeing any clinical result

14  in the patient; right?

15  A.   That is exactly right.

16  Q.   And you mention there are 14 currently available

17  disease modifying therapies; right?

18  A.   Yes.

19  Q.   And you keep up with the literature on MS; right?

20  A.   I do.

21  Q.   You are aware of results of clinical trials in MS

22  therapies as they come out?

23  A.   Yes, I am.

24  Q.   For example, you are aware of the results of the GALA

25  trial when they were published?

Green - cross

1    A.    Yes.

2    Q.    You read that paper?

3    A.    Yes.

4    Q.    In treating patients with relapsing remitting multiple

5    sclerosis, you recommend one of the disease modifying

6    therapies to the patient, don't you?

7    A.    Well, I will describe, I think maybe it is a

8    misunderstanding of the nature of the physician and patient

9    relationship.  I would -- I don't specifically advocate for

10   a particular therapy.  I discuss with the patient what their

11   needs are.  I discuss with them what their life situation

12   is, what their future plans are, and what their concerns

13   are, and I tailor the discussion of those available

14   therapies due to thinking about what therapies I might be

15   able to offer.

16   Q.    You offer your judgment about which therapy they

17   should take, though; correct?

18   A.    "Should" is too strong a word there, right?  When we

19   have 14 therapies, we have a number of different options

20   that we have to consider and discuss with the patient.  They

21   have a role in participating in that selection of their

22   therapy.

23   Q.    But it's not your testimony that you simply throw all

24   of the available options on the table and let them choose.

25   That's not your testimony, is it?

1   A.   Of course not.

2   Q.   Now, you testified that compliance and adherence are

3   important because clinical signs might not appear for some

4   time after the CNS damage occurs.  Right?

5   A.   Yes.

6   Q.   And the reason for that, the reason that compliance

7   and adherence are important is that if you are not adherent

8   to your regimen or not compliant with your regimen that you

9   can have underlying damage that occurs.  Right?

10  A.   Yes.

11  Q.   You don't recommend to your patients that they skip

12  doses of glatiramer acetate, do you?

13  A.   In which -- under which regimen?  I don't know which

14  regimen we are talking about.

15  Q.   Under any regimen.  You don't recommend that they skip

16  doses of their drug, do you?

17  A.   No.  I think that is immaterial to my opinion of

18  whether or not an alternate dosing regimen was obvious.

19  But, no, I don't recommend that.  If I were to recommend

20  that they were to alter their dosing regimen, I would

21  recommend that they alter their dosing regimen in a way that

22  was regular, not in a way that was haphazard or irregular.

23  Q.   I want to just talk about a couple other pieces of

24  prior art.

25       The Cohen paper, that's 7060, this is a paper

1    you reviewed, Dr. Green?

2    A.    Yes.

3    Q.    And this was a paper, if you could pull up the first

4    page of the paper, this is a paper in which they studied 20

5    milligrams daily versus 40 milligrams daily and they used an

6    MRI end point.  Right?

7    A.    Yes.

8    Q.    Not a clinical end point?

9    A.    Well, the primary efficacy end point was MRI.

10   Q.    The primary end point was MRI.  Thank you.

11            If we look at the results as demonstrated in the

12   abstract, he says just before the conclusions, there is a

13   sentence that begins "Some features."

14            Do you see that?

15   A.    Yes.

16   Q.    And it says, "Some features of the injection site

17   reactions and immediate post-injection reactions were more

18   common and severe with the higher dose."

19            Do you see that?

20   A.    Yes.  I highlighted this exact same section within my

21   direct testimony.

22   Q.    That would have been the interpretation of a person of

23   skill in the art at the time, that the 40 milligram dose

24   would be expected to be associated with more severe adverse

25   events.  Right?

Green - cross

1   A.    No.   That's exactly not what was concluded in the

2   Cohen study.   Again, I also think you are viewing the Cohen

3   study in isolation.

4           What I have been asked to opine upon is what a

5   person of ordinary skill in the art would have thought at

6   the time of the priority date, at which time they would have

7   both Cohen and Comi to make a judgment by.

8           But it specifically says under the conclusions

9   that 40 milligrams was safe and well tolerated.   Those --

10  that's the explicit language.

11  Q.    Now, have you looked at the defendants' documents to

12  see if their interpretation of the state of the art at the

13  time is the same as what you are proposing to the Court?

14          MR. ANSTAETT:   Objection, Your Honor.   I don't

15  know what he means by defendants' documents.

16          MR. JAMES:   Any of the defendants' production

17  documents where they opine or give statements about what the

18  prior art references say or suggest.   In the same way that

19  the GALA protocol references the prior art.

20          MR. ANSTAETT:   I certainly would hope that he

21  is, Mr. James is not asking a question about the million

22  pages of document production from all the different

23  defendants in this case.

24          THE COURT:   Maybe I should see counsel.   I don't

25  understand where we are going with this.

Green - cross

```
 1                    (The following took place at sidebar.)

 2                    (Pending question read.)

 3              THE COURT:  I don't understand the question.

 4              MR. JAMES:  I am sorry, Your Honor.  My only

 5    point is that he is offering an interpretation of the prior

 6    art.  There are documents in the defendants' productions in

 7    which they offer a different interpretation of the prior

 8    art.  I wanted to ask him if he had looked at that.

 9              THE COURT:  Why don't you ask him that.  I

10    think -- you object to that question?

11              MR. ANSTAETT:  I object to that question on a

12    number of grounds.  If he wants to identify a particular

13    document, I think that would potentially help.  But I think

14    what he is talking about are documents from certain of the

15    defendants, not things that were submitted to a regulatory

16    agency like the GALA protocol -- and I want to be completely

17    candid, I don't know this for sure -- but because the

18    defendants are all different and competitors, I don't know

19    that we have had production, that Mylan, for instance, has

20    had production of Synthon internal documents on these

21    things.

22              THE COURT:  Mr. Anstaett, if I were you with

23    this witness, I wouldn't interpose a single objection.  Let

24    Mr. James question him all he wants.

25                    (End of sidebar conference.)
```

1        THE COURT:  Mr. James, I think you formed a

2    better question at sidebar.  Why don't you try again.

3        MR. JAMES:  Thank you, Your Honor.

4    BY MR. JAMES:

5    Q.    I think the question I proposed at sidebar was, have

6    you looked at any of the defendants' documents to see if

7    their interpretation of the prior art is the same as what

8    you are offering to the Court?

9    A.    I am sorry.  I would need to understand, I don't

10   understand what the concept -- what the term defendants'

11   documents means in that context.  Do you mean the references

12   that I have relied upon or other people have relied upon?

13   Q.    No.  I mean internal communications from the

14   defendants that the documents that we were given by them

15   during production that have statements that bear on the

16   interpretation of the prior art in the same way that you are

17   testifying to the Court, have you looked at any of those?

18   A.    No.  I think the prior art -- not the prior art, but

19   the reference that I was looking at for the GALA protocol

20   was in front of regulators.  I would consider that

21   differently.  But at the same time, I have not looked at any

22   defendants' documents or internal communication between the

23   defendants in relation to this case.

24   Q.    I don't want to look at many of these, but maybe a

25   couple.  If we could look at PTX-491.

```
 1                    MS. BLOODWORTH:  Objection, Your Honor.  Can we
 2       not publish this until we know what it is.
 3                    THE COURT:  Yes.
 4                    MS. BLOODWORTH:  Thank you.
 5       BY MR. JAMES:
 6       Q.    It is in your binder, Dr. Green.
 7       A.    Which binder?
 8       Q.    The white binder.
 9                    MS. MAZZOCHI:  Your Honor, this is a document
10       that has been marked highly confidential.  I would make a
11       motion that the courtroom be sealed because this is highly
12       confidential.
13                    THE COURT:  I am not sealing this courtroom.
14       Therefore, we need to see one another at sidebar.
15                    (The following took place at sidebar.)
16                    THE COURT:  As lead counsel, your colleague, Mr.
17       Ware, may want to hear what I am about to say.
18                    I want to be real candid.  Maybe even to a
19       fault.  Look, Mr. James, you are a good lawyer.  But you
20       want to be careful where you go with this.  I am only going
21       to permit a certain amount of interpretation in this
22       process, given the quality of this witness' testimony.  That
23       should be enough said.  Hint, hint.
24                    I am not going to permit the display of
25       documents that require the clearing of this courtroom.  It's
```

Green - cross

1    not going to happen.

2              MR. JAMES:  Thank you, Your Honor.

3              (End of sidebar conference.)

4              MR. JAMES:  May I have a moment to confer with

5    my colleague?

6              (Counsel confer.)

7    BY MR. JAMES:

8    Q.    Dr. Green, let's look at the Pinchasi reference just

9    for a moment.  7107.

10             You reviewed this for your testimony.  Correct?

11   A.    Yes.

12   Q.    And this, again, is, this reference is based on the

13   Cohen data?

14   A.    Are you asking me if the Cohen data is included as

15   part of the support or reference in this study, in this

16   application?

17   Q.    Correct.

18   A.    Yes.

19   Q.    You would agree with me that although there is a claim

20   to 40 milligrams every other day, there is no data from the

21   administration of 40 milligrams every other day in the

22   reference.  Right?

23   A.    I think it's identical to the patents in suit.  There

24   is a lack of a working claim in the background that would

25   support the claims.  That's right.

Green - cross

1   Q.    There is no clinical trial protocol for a 40

2   milligrams every other day dose.  Right?

3   A.    No.

4   Q.    But you have offered the opinion that the Pinchasi 40

5   milligram every other day regimen satisfied any long-felt

6   need that there was for a less frequent GA dosing regimen.

7   Right?

8   A.    In terms of description, it describes that potential

9   solution to this problem of tolerability that exists for 20

10  milligrams on a daily basis, yes.

11  Q.    So we are on the same page, it is your opinion that

12  the 40 milligram every other day disclosure in Pinchasi

13  satisfied any long-felt need for a less frequent GA dosing

14  regimen.  Right?

15  A.    The only concern I have with the construction of your

16  question there is it seems to use legal terminology that we

17  don't typically use in clinical practice.  I am familiar, I

18  have heard this term of long-felt unmet need.  But I think

19  you would have to explain it to me again in order for me to

20  provide an opinion right now specifically to answer your

21  exact question.

22  Q.    Well, in fact, you used that exact terminology in your

23  expert report, didn't you?

24  A.    I may have, with the advice of counsel, it may have

25  helped guide me at that point.  I am just telling you right

Green - cross

```
 1    now, I want to understand what you are asking me

 2    specifically so I can answer it as clearly as possible.

 3    Q.    That's fair.  If we could put up his reply report,

 4    Page 6.  I just -- I would like for you to look at Page 6.

 5    If we look at the end of Paragraph 14, just above 15 right

 6    there, it says, at the end, the last sentence, "Both the 20

 7    milligram GA every other day and the 40 milligram GA every

 8    other day regimens disclosed in the prior art satisfy any

 9    long-felt need for an efficacious less frequently

10    administered GA treatment."

11              That's what you said in your report.  Right?

12    A.    That's right.  I am sorry.  Are we looking at my

13    report that I submitted to this Court or are we talking

14    about my IPR?

15    Q.    I have it up there, if you would like to look at it.

16    It's your reply report in the case.

17    A.    Thank you.

18              Okay.  I accept that that is in my report.

19    Q.    I am just asking you to confirm, that is your opinion,

20    that the Pinchasi 40 milligram every other day regimen in

21    the application, in your opinion, it satisfies any long-felt

22    need for a less frequent GA dosing regimen.  Right?

23    A.    If by satisfying any long-felt need what we are saying

24    is it provides a solution to an existing problem, then the

25    answer is yes.  It's not a way to market or produce this
```

1    product.  So I guess that's the distinction I would make in

2    my own mind.  But I am sure at the time that I wrote this I

3    was clear on that topic.  It's been a few months, maybe I am

4    a little less clear at this moment.

5    Q.    I am going to change topics.

6          Maybe we can turn to slide 87 from DDX-1100,

7    Mr. Chase.

8          This is a slide you put up during your

9    examination; correct?

10   A.    Yes.

11   Q.    And this is a portion of the prosecution history of

12   the '302 patent, right?

13   A.    Yes.

14   Q.    And you highlight a sentence there that says that the

15   example in the patent appears to be a "wish list."  Right?

16   And that is what the title of your slide is.  Right?

17   A.    That's right.

18   Q.    And you believe that that is a bad thing, that the

19   example is a wish list.  Right?

20   A.    I guess I don't know what the normative statement

21   "bad" means in that context.  I'm not making a normative

22   claim.  I'm just saying, I'm just quoting what the Examiner

23   said and, to me, it's, I was mentioning this in issue about

24   whether or not there is adequate written description in the

25   patent language.

1    Q.    That is fair.  So you see it as evidence that there

2    might not be adequate support in the patent specification.

3    A.    That's right.

4    Q.    Right?  But the Examiner never evidenced, he never

5    rejected the claims because there wasn't adequate support in

6    the patent specification based on this example, did he?

7    A.    I think that is actually right.  That is the reason

8    why we have a court system and the PTAB system, to help

9    adjudicate and evaluate whether or not Patent Examiners may

10   sometimes get these things wrong.  They have -- I imagine

11   they have a pretty tough job.  They've got to review lots

12   and lots of patents and they might sometimes get it wrong.

13   Q.    And you reviewed the rest of the prosecution history

14   to see what happened after this?

15   A.    In the past.  I haven't reviewed it recently.  But,

16   yes, I reviewed the document.

17   Q.    Okay.  And if we look at 7006.1007.  That's a portion

18   of the prosecution history.  And if you would like to look

19   at it, it's in your binder, but I can put it on the screen

20   for you.  I'll do both.

21   A.    That's in the white binder?

22   Q.    Yes, in the white binder, 7006.  And I'm specifically

23   looking at page .1007.

24   A.    It has an additional number "-14" on here; is that

25   correct?  I'm looking at JTX.  What am I supposed to be

1   looking at?

2   Q.   Did I say?  I said JTX, didn't I?

3   A.   I don't know.  I'm sorry.

4   Q.   Okay.  JTX-7006.1007.  And you are right, there is a

5   "-14" on your tab, yes.

6        And you understand that this is a paper that was

7   filed after the Examiner interview that occurred that we

8   looked at just a moment ago that you put up on your slide?

9   A.   Yes.

10  Q.   And let's look at exactly what was said here.  If we

11  look at page number .1012, Mr. Chase.

12       (Counsel confer.)

13       MR. JAMES:  It is 1012, this page here.

14       And if we look at the paragraph that begins with

15  Examiner Ulm, about two thirds of the way down.

16       Do you have that, Mr. Green?

17  A.   Yes.

18  Q.   It says:  Examiner Ulm referred to the specification

19  to refresh his memory, and then stated that he was aware

20  that Example 1 was not an actual example.  And he said it

21  would be reasonable to understand that, that it wasn't an

22  actual example.

23       Do you see that?

24  A.   I think that aligns request my opinions.  It is a

25  prophetic example.  He mentioned -- I'm not sure if we're

1    looking at the exact same spot, but it was mentioned above,

2    two paragraphs above.

3    Q.    And the very next thing that happened after this

4    Examiner interview that you showed us and this paper that

5    was submitted was that the claims were allowed; correct?

6    A.    I believe that is what the document says.  And I'm not

7    sure.  I mean I think there is many different ways that the

8    Patent Examiner, they get things wrong, and I'm not sure

9    whether or not this is a typical way.  I don't, I don't

10   spend my time reviewing Patent Examiner's conduct or their,

11   you know, their process, but in this case, it doesn't change

12   my opinion.  My opinion would still be this patent was

13   obvious.

14              MR. JAMES:  Your Honor, I don't have that much

15   left, but I think I might need a couple of minutes.  Could

16   we a take a lunch break and we come back and I'll be ready

17   to just wrap up?

18              THE COURT:  Okay.  Let's come back in an hour.

19              MR. JAMES:  Thank you, Your Honor.

20              (Lunch recess taken.)

21              *     *     *

22              THE COURT:  Good afternoon.  Please, take your

23   seats.

24              Dr. Green.

25   BY MR. JAMES:

1    Q.    Good afternoon.

2    A.    Good afternoon.

3    Q.    Dr. Green, would you agree that with glatiramer

4    acetate there are a lot of unknowns and unknowables in

5    selecting a new treatment regimen?

6    A.    I am not exactly sure what that means.  But if you are

7    asking me if there are factors that you wouldn't know before

8    you tested a regimen, that's why you would test it.  You

9    would want to learn more.

10         But that would be the case for any new regimen

11   you were developing.  There are unknowns.  That's why you

12   would perform the clinical experiment or scientific

13   experiment to evaluate it.

14   Q.    And in August 2009, a person of skill in the art would

15   not have had a reasonable expectation that a once weekly

16   dose of 140 milligrams of GA would be effective to treat

17   multiple sclerosis.  Right?

18   A.    I think that aligns with my testimony.  Part of my

19   testimony was that it's not just the cumulative weekly dose,

20   but you have to consider the frequency of injection.

21   Q.    And in August 2009, a person of skill would not have

22   had a reasonable expectation that a 70 milligram twice

23   weekly regimen would be effective.  Right?

24   A.    As of that time, if the Khan publication, the results

25   were not out, I think that's probably true.  Again, we are

1    now approaching closer to a dose that someone would say,

2    well, it has some potential.  Clearly, Dr. Khan thought

3    there was a potential that that would be effective even back

4    as far as 2007.

5    Q.    And the reason that a person of skill in the art would

6    not think that it's necessarily true that it would have been

7    obvious to give a 70 milligram dose twice a week would be,

8    amongst other reasons, the gaps between the doses.  Right?

9    A.    They had also never tested a 70 milligram dose in

10   human subjects.  In this context we are talking about doses

11   that have been tested on multiple occasions, 20 milligrams

12   and 40 milligrams.  But the gaps in that context would be

13   important.  Probably more important -- in a twice weekly

14   dose, you would have a 72-hour gap and a 96-hour gap, you

15   would probably be a little more cautious or dissuaded by the

16   96-hour gap.  Although again, there is nothing specifically

17   that would teach you away from that approach.  It is just

18   you would be careful and cautious in considering it.

19              MR. JAMES:  I have no further questions, Your

20   Honor.

21              THE COURT:  All right, Mr. James.

22              MR. ANSTAETT:  Your Honor, we have no redirect.

23              THE COURT:  Dr. Green , thank you.

24              (Witness excused.)

25              MS. MAZZOCHI:  Good afternoon, Your Honor.

1    Deanne Mazzochi.

2              Question for Your Honor.  The defendants have

3    about a half hour's worth of deposition designations.  We

4    could do them now and then call our next witness, Dr.

5    Pleasure -- the plaintiffs do have a witness that they also

6    wanted to call today, Dr. Bell.  With Your Honor's

7    indulgence, we would be happy to save the playing of the 30

8    minutes or so of deposition transcripts to Wednesday, when

9    we reconvene, so that we can try to get the witnesses on and

10   off the stand, if that is okay with you.

11             THE COURT:  You don't need to twist my arm.

12             MS. MAZZOCHI:  I want it to be clear that they

13   will be out of order, so we won't be able to fully rest our

14   case until those are played.

15             With that, defendants call to the stand --

16             MR. WARE:  Your Honor, we are not agreeable to

17   defendants not finishing the case.  I mean, if we are

18   talking about only 30 minutes of deposition, we are not

19   amenable to postponing that until next Wednesday.  They are

20   ready to play them.  We have anticipated that.

21             We will be able to get depositions done, Dr.

22   Pleasure done, and in the event we have time, I have brought

23   in a witness that we can put on to fill your day.

24             MS. MAZZOCHI:  I am sorry.

25             THE COURT:  I thought you two had worked this

1    out.

2              MS. MAZZOCHI:  I thought we had, too.

3              THE COURT:  Let's play the deps.

4              MS. BLOODWORTH:  Your Honor, I think I have the

5    task of introducing those.  So if we may approach with the

6    binders, we have three deposition clips which will in total

7    run about 25 minutes.  Would you like the three binders for

8    each now?

9              THE COURT:  Yes.

10             MS. BLOODWORTH:  Your Honor, we will first be

11   hearing from Dr. Rivka Kreitman.  She is the head of global

12   search evaluation and alliance management.  Her deposition

13   clip report is DTX-1804.  The clip will be approximately 14

14   minutes.  Your Honor should have on the cover sheet the clip

15   report sheet.

16             THE COURT:  I have it.

17             MS. BLOODWORTH:  Thank you, Your Honor.

18             "Answer:  My name is Rivka, R-i-v-k-a, Kreitman,

19   K-r-e-i-t-m-a-n.

20             "Question:  Could you describe for me your --

21   the first education you received after high school?

22             "Answer:  Actually, Ph.D.  I was in a direct

23   course to Ph.D.

24             "Question:  Okay.  And what is the -- what is

25   the Ph.D. in?

1          "Answer:  Biochemistry.

2          "Question:  And where did you receive your

3     Ph.D.?

4          "Answer:  The Weizmann Institute of Sciences in

5     Israel.

6          "Question:  About what year did you start

7     working at the Tel Aviv Medical School?

8          "Answer:  In 1990 or '91.

9          "Question:  And about how long did you have that

10    job, the biochemist scientist; is that --

11         "Answer:  Yeah.

12         "Question:  -- fair?

13         "How long were you --

14         "Answer:  A little bit over a year.

15         "Question:  Okay.  And what did you do next?

16         "Answer:  Started working for Teva.

17         "Question:  So that was about 1991?

18         "Answer:  '93.

19         "Ms. Greb:  Okay.  To get started again, I'd

20    like to mark this as Exhibit 3, please, I think we're on.

21    Exhibit 3 is TEVCOP00518822.

22         "Question:  Is Exhibit 3 a document you have

23    seen before?

24         "Answer:  I wrote it, so I guess I saw it.

25         "Question:  Okay.  And what is it?

1            "Answer:  What is the question?

2            "Question:  What is the document that was marked

3    Exhibit 3?

4            "Answer:  It's an e-mail.

5            "Question:  Okay.  Going to the top of the

6    e-mail that was written by you, you write, 'If 40 milligram

7    daily and EOD' -- EOD is every other day, correct?"

8            "Answer:  Yes.

9            "Question:  So you were worried that if Teva

10   developed either 40 milligram daily or every other day,

11   people would just use the 20 milligram product daily or

12   every other day instead of 40?

13           "Answer:  That's what I wrote here.

14           "Question:  So introducing Exhibit 4 which is

15   TEVCOP00510807.

16           "Is Exhibit 4 a document you have seen before?

17           "Answer:  Yes.

18           "Question:  What is Exhibit 4?

19           "Answer:  It's an e-mail discussion on an

20   ancillary study that was proposed in Canada.

21           "Question:  And this was an e-mail chain that

22   you were copied on; correct?

23           "Answer:  Yes.

24           "Question:  What's the 9006 study?

25           "Answer:  That's the Phase II study.

Kreitman - depo.

1          "Question:  So that would've -- is that the --

2    that would have been the precursor to the 9016?

3          "Answer:  Yes, that's the Phase II prior to the

4    Phase III.

5          "Question:  Okay.  He notes, 'Some injection

6    site reaction were more frequent.'

7          And then he goes on in the next sentence, 'We

8    also know that there is a large variation in how different

9    sites, investigators, nurses, et cetera, qualify the

10   different sites of injection site reactions.'

11         "Do you see that?

12         "Answer:  Yes.

13         "Question:  So he's saying that different sites

14   in this study may report -- may report injection site

15   reactions differently; correct?

16         "Answer:  That's what he's saying here, yes.

17         "Question:  Exhibit 5, I'd like to mark

18   TEVCOP00689243 as Exhibit 5.

19         "Is this a document you recognize?

20         "Answer:  Yes.

21         "Question:  And what is this?

22         "Answer:  An e-mail exchange.

23         "Question:  And if you go to the last page,

24   which is 236, it looks like it's an e-mail from Judy

25   Abdullah; is that right?

Kreitman - depo.

1              "Answer:  On page 35?

2              "Question:  36.  The last page.

3              "Answer:  36 is an e-mail from Etty Amir.

4              "Question:  Oh, yeah.  I'm sorry.  To Judy

5      Abdullah; is that right?

6              "Answer:  Yes.

7              "Question:  Okay.  And you're copied on it?

8              It looks like the subject line is 'GA every

9      other day;' is that right?

10             "Answer:  Yes.

11             "Question:  Judy writes, 'Indeed, we are hearing

12     that many of their patients are already decreasing dose

13     in -- dosing frequency to alternative days.'

14             "Do you see that?

15             "Answer:  Yes.

16             "Question:  That would be reducing the

17     20 milligram every day dosing regimen to 20 milligrams every

18     other day?

19             "Answer:  That's my understanding.

20             "Question:  Okay.  So in 2007 Judy, a Teva

21     employee, knew that patients were using the 20 milligram

22     dosage form every other day; correct?

23             "Answer:  No, I don't think that that's what

24     she's saying she knew.  I think that she's saying that is

25     what she is hearing.

Kreitman - depo.

1        "Question:  Someone is telling her that?

2        "Answer:  That is what she is writing.

3        "Question:  Is Exhibit 11 a document that you

4   recognize?

5        "Answer:  I'm copied on it, so I assume I have.

6   But I don't recall it.

7        "Question:  Okay.  And what is it?

8        "Answer:  It's an e-mail exchange.

9        "Question:  Okay.  If you go to the -- the last

10  page, 465, it looks like the initial e-mail is from someone

11  named Francois Blanchette?

12       "Answer:  Um-hmm.

13       "Question:  Who is Francois Blanchette?

14       "Answer:  He was a medical -- he was in Canada.

15  I don't know exactly what was his role.

16       "Question:  So you, it looks like your e-mail is

17  in response to a document that Francois put together; is

18  that right?

19       "Answer:  It seems like it.

20       "Question:  If you look at your response to

21  Francois, it looks like the third paragraph down, you note

22  there's a sentence that starts, 'however, the point ...'

23       "Do you see where I'm looking?

24       "Answer:  Yep.

25       "Question:  'However, the point that we wanted

Kreitman - depo.

1      to make related to dose total weekly.'

2              "Why would we care about total weekly dose?

3              "Answer:  It's my understanding that when you

4      change any element, whether it's frequency or other, you try

5      not to change too many elements at the same time.  So if it

6      doesn't work, you know what it is not working by.  So if you

7      change like both of the dose and the frequency, and it

8      doesn't work, you don't know whether the frequency was the

9      issue or the dose was an issue.

10             "Question:  And when you are talking about dose

11     in that context, you're talking about the whole dose a

12     patient would receive over a week?

13             "Answer:  Yes.

14             "Question:  Right?

15             "Why would you use a week as the measurement

16     that you'd want to keep the dose similar at?

17             "Answer:  It's the -- the easiest unit you can

18     look at in my view.

19             "Question:  When you say 'easiest,' what do you

20     mean?

21             "Answer:  You can the same look at them monthly,

22     but for me it's too much of a jump.

23             "Question:  What do you mean 'too much of a

24     jump?'

25             "Answer:  So if you would look in changing the

Kreitman - depo.

1    weekly dosing, you will look at the weekly unit.  If you

2    would look at the monthly dose -- dosing, you would look at

3    the month.  So if -- if I -- we are talking about the once

4    monthly, I wouldn't look at the week, I would look at the

5    month.

6              "Question:  Okay.  But at least for here for

7    glatiramer acetate, you thought it would be reasonable to

8    look at how much GA a patient was receiving in a week when

9    you were looking to make modifications to the dosing

10   regimen?

11             "Answer:  Yes.

12             "Question:  Let's mark what will be Exhibit 16,

13   which is TEVCOP00676740.

14             "Is this a document that you have seen before?

15             "Answer:  Yes.

16             "Question:  And what is it?  This is an e-mail

17   exchange where Ety Klinger sent an e-mail that you respond

18   to; is that right?

19             "Answer:  Yes.

20             "Question:  What's the third one on the list?

21             "Answer:  Time to market.

22             "She writes the time to market -- that the -- in

23   the time to market there may be generic products in the

24   market and that the improved convenience may -- may not be

25   compensated for the price difference.

Kreitman - depo.

1          "Question:  So you -- there would have been a

2    concern of losing sales to generic competition; right?

3          "Answer:  I think -- I think she says that

4    people may be willing to sacrifice their convenience for

5    price.

6          "Question:  And it wouldn't be in Teva's

7    interest to make a new drug that -- a new dosing -- it

8    wouldn't be in Teva's interest to make a new dosing regimen

9    when people would just pick the generic instead of their

10   dosing regimen anyways, right?

11         "Answer:  Right.

12         "Question:  Is this a document you recognize?

13         "Answer:  Yes.

14         "Question:  And what is it?

15         "Answer:  It's a discussion on a study that was

16   performed by Teva Pharmascience.

17         "Question:  Okay.  And what was this study?

18         "Answer:  It was the SONG trial.

19         "Question:  And it -- the last e-mail on the

20   chain on the first page is an e-mail from you to Mike Netz,

21   what do you write 'Indeed, the concerns are legitimate and,

22   therefore, worrisome.'

23         "And why would you be concerned about the

24   clinical relevance of the outcome of the study?

25         "Answer:  Because they wanted to submit it and I

Kreitman - depo.

1    did not believe that you should submit such results.

2                 "Question:  And why didn't you think they should

3    be submitted?

4                 "Answer:  'Cause my judgment from an R&D

5    perspective was that it was not clinically significant, the

6    difference.

7                 "Question:  So if you turn to Page 418633, it's

8    the sixth page of the e-mail, Andy Rankin recites a concern

9    kind of in the middle of the page.  He says, 'My major

10   concern would also be around lack of blinding, particularly

11   important with pain where the subject is self-scoring.  This

12   is a real problem and I don't know how one could draw

13   conclusions from observations in such an open trial design.'

14                "Do you see that?

15                "Answer:  Yes.

16                "Question:  Is that one of the concerns you are

17   referring to?

18                "Answer:  Yes.

19                "Question:  And then he concludes, 'In summary,

20   difficult to interpret the clinical significance of the data

21   due to open design and very low VAS scores in absence of

22   meaningful pain or impact instruments question clinical

23   significance of the difference between the two volumes."

24                "Is that -- do you agree with that?

25                "Answer:  Yes.

1             MS. BLOODWORTH:  Your Honor, we would next like

2    to play a deposition video clip from Dr. Irit Pinchasi.

3    Dr. Pinchasi, when she left Teva, was the Vice President of

4    Global Innovative R&D.  It's marked DTX-1803, and the clip

5    will run for five minutes and 33 seconds, approximately.

6             THE COURT:  Okay.  Thank you.

7             (Irit Pinchasi designations placed in record.)

8             "Question:  Good morning, Dr. Pinchasi.  It's

9    nice to meet you.  Would you please state your full name for

10   the record?

11            "Answer:  Dr. Irit Pinchasi.

12            "Question:  And then you -- you obtained a

13   master's degree from Tel Aviv University --

14            "Answer:  Correct.

15            "Question:  -- in 1976?

16            "Answer:  Correct.

17            "Question:  And that was a master of science.

18   Was there any emphasis there in terms of the major

19   coursework?

20            "Answer:  It was biochemistry.

21            "Question:  Biochemistry?

22            "Answer:  Biochemistry.

23            "Question:  And then you received a doctorate

24   degree from Tel Aviv University in 1984.

25            "Answer:  Right.

1          "Question:  And what was the subject of that?

2          "Answer:  That was neurobiochemistry.

3          "Question:  Okay. You -- when did you join Teva?

4          "Answer:  In '86.

5          "Question:  Dr. Pinchasi, we marked as

6    Plaintiff's Exhibit or -- excuse me -- as Pinchasi

7    Exhibit 10, a document bearing Bates No. 517454.

8          This is an e-mail exchange between you and a --

9    and a Shaul Kadosh, correct?

10          "Answer:  Yes, Mr. Shaul Kadosh.

11          "Question:  And other people are copied on the

12   e-mail exchange, right?

13          "Answer:  Correct.

14          "Question:  Was the term used power

15   calculations?

16          "Answer:  Yes.

17          "Question:  Is Kadosh a statistician?

18          "Answer:  Yes.

19          "Question:  So you were, you were engaged in

20   discussions about how many patients need to be in the study

21   to answer the questions you wanted to have answered?

22          "Answer:  Correct.

23          "Question:  And your assumptions for this study

24   would be that 40 milligrams daily is better than

25   20 milligrams daily, correct?

1      "Answer:  Correct, that's what's written here.

2              "Question:  Or that 40 milligrams every other

3      day should be at least as good as 20 milligrams daily?

4              "Answer:  That's what's written.

5              "Question:  Did, did Teva -- I think you

6      indicated to me Teva sponsored that study, right, that Cohen

7      study?

8              "Answer:  Yes.

9              "Question:  Is it correct that the data in the

10     Cohen study suggested that there may be greater efficacy

11     with the 40 versus the 20 but that data was not

12     statistically significant to the point where you could state

13     that affirmatively?

14             "Answer:  The way I understand the Cohen

15     results, the primary endpoint did not reach statistical

16     significance, so ...

17             "Question:  And the primary endpoint was?

18             "Answer:  The number of Gadolinium-enhancing

19     lesions in months seven, eight, and nine, if I remember

20     correctly.

21             "Question:  And that was a measure of efficacy?

22             "Answer:  Correct.

23             "Question:  And so the efficacy endpoint was

24     suggesting a higher level of efficacy, but you couldn't

25     state that affirmatively because it wasn't statistically

Pinchasi - depo.

1    significant?

2                "Answer:  That's the way I understand the data.

3                "Question:  Okay.  Did you regard the data on

4    the 40 milligram project as promising?

5                "Answer:  We, we tended to see positive hints in

6    there that merit additional research.

7                "Question:  You are a named inventor on a patent

8    application that Teva filed concerning the 40 milligram

9    regimen for administering glatiramer acetate, correct?

10               "Answer:  Correct.

11               "Question:  Doctor, we've asked the reporter to

12   mark as Pinchasi Exhibit 28, a document entitled Declaration

13   and Power of Attorney.

14               "Would you turn to the last page of this

15   exhibit?

16               "Is that your signature on the last page?

17               "Answer:  Yes.

18               "Question:  And if we look to -- back to the

19   claims in Pinchasi Exhibit 26, claim 3 says, 'The method of

20   claim 1, where in the periodic administration is every other

21   day.'

22               "Do you see that?

23               "Answer:  Yes.

24               "Question:  So is it your understanding that

25   what that covers is a method of alleviating a symptom by

1    administering 40 milligrams of glatiramer acetate

2    subcutaneously every other day to the patient?

3             "Answer:  That was my understanding.

4             "Question:  Did you ever in -- in compliance

5    with this obligation to disclose information material to

6    patentability, did you ever tell anyone at Teva who was

7    involved with this patent application that you didn't think

8    the method described in Claim 3 of the application would

9    work?

10            "Answer:  I don't remember saying so.  I don't

11   remember not saying so.  I don't remember.

12            "Question:  Okay.  Dr. Pinchasi, I just have a

13   couple questions of you.  Do you have Pinchasi 10 in front

14   of you?  That's Pinchasi Exhibit 10.  It's one page.

15            "Answer:  Getting there.

16            "Question:  You have that?

17            "Answer:  Yes.

18            "Question:  And you recall that counsel asked

19   you some questions about this e-mail exchange earlier today?

20            "Answer:  Yes, I do.

21            "Question:  And the e-mail at the bottom of

22   Pinchasi 10 is an e-mail that you wrote to Shaul Kadosh in

23   May of 2002, right?

24            "Answer:  Correct.

25            "Question:  And the subject is Power Sensitivity

1    Analysis, correct?

2            "Answer:  Correct.

3            "Question:  Could you explain what a power

4    sensitivity analysis is?

5            "Answer:  As a nonexpert, my understanding is

6    that you -- you compare several designs for clinical studies

7    in this case in order to -- to find out what the power of

8    the studies will be and what is it sensitive to, sample

9    size, endpoint definition, et cetera, et cetera, but this is

10   a very nonprofessional explanation.

11           "Question:  Now, when you were writing this

12   e-mail, what was your understanding about what assumptions

13   mean in a power calculation?

14           "Answer:  Assumptions is what you base your

15   non-hypothesis on, and based on this you calculate the

16   sample size that you need in order to address this

17   hypothesis.  So if you assume superiority it's one issue.

18   If you assume comparability, it's a different issue.  Sample

19   sizes change significantly with these assumptions.

20           "Question:  I asked you whether it would be a

21   larger or smaller clinical trial if the second assumption

22   was made?

23           "Answer:  And my best understanding is that it

24   will be larger.

25           "Question:  Why is that?

1               "Answer:  Because it's harder to prove

2    comparability than to prove superiority.

3               "Question:  Did you have data to support that

4    assumption, that 40 milligrams every other day was at least

5    as good as 20 milligrams daily?

6               "Answer:  At that point in time in '92 -- in

7    2002, I don't think so.  I -- I have to rearrange the

8    chronology of everything that we knew by then, but I don't

9    think so."

10             MS. BLOODWORTH:  Your Honor, the last video

11    deposition clip will be from a gentleman named Michael

12    Sheehy.  He is the director of brand product marketing for

13    Copaxone.  The clip will run a little over a minute.  For

14    the record, it is DTX-1802.

15             "Question:  Good morning, Mr. -- is it 'Shay-He'

16    or 'She-He'?

17             "Answer:  'She-He.'

18             "Question:  If you could look at Exhibit 21.

19    And this is an August 9, 2013 e-mail from you.  Correct?

20             "Answer:  Yes.

21             "Question:  And according to this e-mail, you

22    are trying to get a meeting scheduled to "determine what

23    incentive comp design would drive the biggest and fastest

24    conversion to 40 milligram"?

25             "Answer:  Um-hum.

Sheehy - depo.

1          "Question:  What do you mean when you say

2     'incentive comp' here?

3          "Answer:  That would be for the sales force.

4          "Question:  So if you viewed the 20 milligram as

5     another competitor, how did you use the incentive comp

6     structure to encourage the sales force to push the 40

7     milligram product?

8          "Answer:  We set levels of 40 milligram

9     conversion for them.

10         "Question:  Okay.  Got you.  As opposed to

11    setting, for example, 40 milligram sales targets that were

12    higher than 20 milligram?

13         "Answer:  That's correct.  It was all

14    conversion."

15         MS. MAZZOCHI:  Your Honor, I would like to call

16    Dr. Samuel Pleasure to the stand.

17         Your Honor, can I start the process of handing

18    out binders?

19         THE COURT:  Yes, Ms. Mazzochi.

20         ... SAMUEL J. PLEASURE, having been duly sworn

21    as a witness, was examined and testified as follows ...

22         MS. MAZZOCHI:  Your Honor, may we approach the

23    witness and yourself with binders and exhibits?

24         THE COURT:  No.  We want you to collect these

25    first.

Pleasure - direct

1              MS. MAZZOCHI:  Your Honor, I think we should

2    have our binder as well as some slides.

3                       DIRECT EXAMINATION

4    BY MS. MAZZOCHI:

5    Q.    Good afternoon, Dr. Pleasure.  Have you been retained

6    by the defendants as an expert witness in this case?

7    A.    Yes, I have.

8    Q.    If you could take a look at JTX-7000, 7001, 7002 and

9    7003, which are U.S. Patent Numbers, 9,155,776, 8,232,250,

10   8,399,413 and 8,969,302 in your binder.  Have you reviewed

11   these patents?

12   A.    Yes, I have.

13   Q.    Have you formed any opinions on the validity or

14   invalidity of any claims in these patents?

15   A.    Yes, I have.

16   Q.    And have you prepared demonstrative slides to assist

17   you in presenting your opinions today?

18   A.    Yes.

19   Q.    Let's briefly discuss your qualifications.  This is

20   DDX 1200.2.  What is your educational background?

21   A.    I went to the University of Pennsylvania for my B.A.,

22   and then following that my M.D. and Ph.D., which was in

23   neuroscience.

24   Q.    Did you do a residency and internship as part of your

25   medical training?

1    A.    Yes.  I did my internship at an affiliated hospital in

2    Philadelphia, before moving to San Francisco to do my

3    residency in neurology at UCSF, where I was a resident from

4    1994 to 1997, and chief resident from 1996 to 1997.

5    Q.    Did you do any fellowships?

6    A.    Yes.  I did a fellowship in neuroscience research from

7    1997 to 2000.

8    Q.    Do you hold any board certifications that focus on any

9    particular clinical specialty?

10   A.    Yes.  I am board certified by the American Board of

11   Psychiatry and Neurology.

12   Q.    Can you describe your current employment and titles?

13   A.    Yes.  I am a professor and vice chairman of neurology

14   at UCSF, and also the Glenn W. Johnson Junior Memorial

15   Endowed Chair of Neurology in the Department of Neurology.

16   Q.    For what topical area was your endowed chair donated?

17   A.    It was donated for pursuit of research related to

18   regeneration and repair of multiple sclerosis.

19   Q.    Do you teach any courses involving MS?

20   A.    Yes, I teach medical students and graduate students

21   and residents and fellows at UCSF.  The course work that I

22   teach is predominantly focused on questions of how

23   regeneration and repair happen in the nervous system,

24   including some lectures on repair and regeneration following

25   demyelination and disease.

1   Q.    Do you train and supervise medical students and

2   residents and fellows in the area of MS?

3   A.    Yes, I do.  I am a clinician in the MS Center at UCSF,

4   which, as you have heard from Dr. Green, is a large and busy

5   MS center.

6         And I supervise medical students, residents, and

7   fellows, both there and also at our hospitals at UCSF.

8   Q.    Can you briefly describe the general areas in which

9   you publish?

10  A.    Yes.  I have published a number of peer-reviewed

11  papers.  Most of them are focused on questions of

12  neuroscience having to do with development, regeneration and

13  repair of the nervous system.  Some of them have focused on

14  regeneration and repair of the cells that make myelin, the

15  oligodendrocytes that we have heard about during this

16  proceeding.

17  Q.    Have you received any federal funding or other funding

18  for work on MS?

19  A.    Yes.  I received funding from the NIH continuously

20  since 2000 when I started my own laboratory, and several of

21  those grants have been focused on questions that are

22  relevant to MS.

23        In addition, I have received funding from the

24  National Multiple Sclerosis Society, and the Race to Erase

25  MS, which is an MS charitable foundation.

Pleasure - direct

1  Q.     Have you been involved with peer review of funding for

2  neurology or MS research?

3  A.     Yes.  So I have been on grant review panels for the

4  NIH since about 2003 or 2004, a number of them.  I was a

5  standing member on one of the main grant review panels for

6  reviewing research related to regeneration and repair of the

7  nervous system at the NIH for five years, serving as chair

8  for one year.

9              In addition, I for the last four or five years

10  have been a member of a grant review panel at the National

11  MS Society that reviews MS-related research grants.

12  Q.     Have you ever heard of the Neurogenesis and Cell Phase

13  Study Section at the National Institutes of Health?

14  A.     Yes.  That is the study section that I was the chair

15  of.

16  Q.     For what years did you serve as the chair?

17  A.     I would have to refer to my CV.  I served as the chair

18  I believe probably from 2007 to 2008.  But I have to refer

19  to my CV to be sure.

20  Q.     What is that study section responsible for MS at NIH?

21  A.     So neurogenesis and cell phase are processes that have

22  to do with the development and production of certain kinds

23  of cells in the developing brain, including neurons and

24  glia, including oligodendrocytes.  That study section also

25  is one of the more busy study sections for reviewing grants

1    that have to do with the repair of the nervous system after

2    injury in the adult and related to the production of new

3    versions of those same studies, including oligodendrocytes.

4    Q.    Have you served as an editor or peer reviewer of any

5    journals?

6    A.    I am the reviewing editor of the Journal of

7    Neuroscience, which is one of the preeminent neuroscience

8    journals, also publishes clinical work, and I am also editor

9    of Developmental Neuroscience, Brain Plasticity.

10   Q.    Have you ever worked with the MS Society?

11   A.    Yes.  So, as I had mentioned briefly before, in the

12   last four or five years I have been on one of the MS

13   Society's grant review panels.  That means that I go twice a

14   year to New York to review grants in a large panel where

15   about 10 or 12 scientists review about 60 to 80 grants in a

16   period of one or two days and who make funding

17   recommendations to the society.

18              I also neglected to mention before, I think you

19   asked me about peer review as well as this editorial stuff?

20   Q.    I did.

21   A.    Sorry.  I forgot to answer that.

22              As far as peer review, I have reviewed papers

23   for a multitude of journals, including some of the more

24   prestigious journals, like Cell, Science, Nature, and

25   Neuron, Legionary Science, the Journal of Neuroscience.

1          I also reviewed grants of the main health

2      journals, such as Neurology, Chemical Neurology.

3      Q.    Have you held any leadership roles in any national

4      neurological association?

5      A.    Yes.  I was a member of the board of directors of the

6      American Neurological Association for three years, which is

7      the world's oldest neurological association.  And it's the

8      main academic neurology association.

9          And I was also a chair of their Scientific

10     Program Advisory Committee for two years and a member of

11     that committee for several other years.  That committee is

12     responsible for designing their yearly meeting, which occurs

13     once a year.  It is a large national meeting.

14     Q.    All right.  Can you describe your work with the

15     ANA/ASENT joint work group?

16     A.    Yes.  So during my time on the board of directors of

17     the ANA, I was asked to join a working group that included

18     members of the ANA leadership and the ASENT leadership,

19     which is the American Society for Experimental

20     Neurotherapeutics.

21         This work group was intended to attempt to

22     understand and tackle roadblocks that might be barriers for

23     the development of therapeutics by trying to break down

24     barriers between the academic neurologists and the industry.

25     Q.    In what year did you begin caring for MS patients and

1    writing prescriptions for them?

2    A.    I began caring for MS patients during my neurology

3    residency.   That would have been 1994.

4    Q.    For how many years have you had experience with a drug

5    known as glatiramer acetate?

6    A.    I have been prescribing it since soon after it was

7    released in 1997.

8    Q.    When did you last prescribe it?

9    A.    It was last week sometime, electronically, while I was

10   here in Delaware, actually.

11   Q.    Have you prescribed the 40 milligram three times a

12   week glatiramer acetate dosing regimen?

13   A.    Yes, I have.

14   Q.    Have you prescribed the Sandoz Glatopa 20 milligram

15   glatiramer acetate product?

16   A.    I have.

17   Q.    And when and why?

18   A.    Typically, Glatopa I have prescribed for patients for

19   whose insurance is unwilling to cover the 40 milligram three

20   times per week dosing for Copaxone or for patients who may

21   not have insurance who may be unable to pay for Copaxone.

22                 MS. MAZZOCHI:   Your Honor, we move to have Dr.

23   Pleasure qualified as an expert in the area neurology,

24   clinical medicine related neurology, treatment of multiple

25   sclerosis patients, and the practice of medicine, including

1    uses for glatiramer acetate.

2              MS. HOLLAND:  No objection, Your Honor.

3              THE COURT:  The Doctor is accepted as an expert

4    in those fields.

5    BY MS. MAZZOCHI:

6    Q.    When it comes to the patents that are asserted here,

7    what is your understanding of the earliest possible

8    application date presented for each patent?

9    A.    As you can see here on the slide, that would be August

10   20, 2009 for all four patents.

11   Q.    What are some of the key attributes of a person of

12   ordinary skill in the art as of August 20th, 2009 as it

13   relates to the asserted patents here?

14   A.    So here is shown the definition of a person of

15   ordinary skill, excerpts of it as accepted by the PTAB or

16   put forward by the PTAB.  It includes several elements.

17             First, several years of experience in the

18   pharmaceutical industry or in practicing medicine.  Then

19   experience with the administration and formulation of

20   therapeutic agents, dosing schedules, and frequencies of

21   drug development study design.

22             Third, a Ph.D. in pharmacology or an M.D. with

23   experience in clinical pharmacology.

24             And lastly, they added a person of ordinary

25   skill in the art would also have a degree and experience

1    treating MS with GA.

2    Q.    Have you seen the various descriptions of the person

3    of ordinary skill in the art set forth in this case?

4    A.    Yes.

5    Q.    To the extent the PTAB's definition may differ in word

6    choices from any others offered by you or Teva's experts, do

7    your opinions change as a result of those differences in

8    person of ordinary skill in the art descriptions?

9    A.    No, I don't believe so.

10   Q.    Regardless of which description you look at, as of

11   August 20, 2009, were you at least a person of ordinary

12   skill in the art?

13   A.    Yes.

14   Q.    All right.  Dr. Pleasure, let's talk about some of the

15   claim language that appears in the '776 patent asserted

16   claims.  And, in particular, let's talk about the reduced

17   severity language.

18          Have you reviewed all of the asserted '776

19   patent claims?

20   A.    Yes.

21   Q.    And do all the '776 patent claims include the reduced

22   severity element?

23   A.    They all do.

24   Q.    What is it that is supposed to achieve reduced

25   severity within the context of the claims?

Pleasure - direct

1    A.      So if you examine here claims 1 and 2, you can see

2    at the top, it's a method of treating a human patient -- so

3    we're dealing with new patients here.  And it further says,

4    so as to thereby treat the human with reduced severity of

5    injection site reactions relative to the administration of

6    20 milligrams of glatiramer acetate.

7            And then in claim 2, it further says, the method

8    of claim 1, which induces reduced frequency and severity of

9    immediate post-injection reactions and injection site

10   reactions.

11   Q.      Does every asserted '776 patent claim require reduced

12   severity of at least an injection site reaction?

13   A.      Yes.

14   Q.      Can you briefly summarize why in your opinion the

15   asserted '776 patents reduced severity claims are

16   indefinite?

17   A.      Yes.  So on this slide, I have put the four points

18   that I would like to cover and I'll come back to.

19           So, first, the patent.  The patent does not pick

20   any particular method for measuring the severity of either

21   ISRs or IPIRs.  There is just no measurement method in the

22   patent.

23           Secondly, the art at the time, contemporaneously

24   with the patent and around that time discloses that there

25   are actually a multitude of measurement methods one could

Pleasure - direct

1    use that are established in papers, in literature and other

2    places that there are a number of different ways one might

3    go about doing this.

4         Thirdly, the art makes clear that there is not a

5    single measurement method, and this not really a preferable

6    measurement method under some of that same literature.

7         And, fourthly, the consequence of this is that

8    you end up with a set of methodology that give you highly

9    subjective assessments.  You can have great difficulty in

10   determining whether particular patients, the severity of a

11   particular patient's reactions fall within or outside the

12   claim language.

13   Q.    All right.  So let's start with the '776 patent and

14   some of the things that are contained within it.

15        Does the '776 patent's equate tolerability to

16   severity in your opinion?

17   A.    Clearly not.  Here, in the patent, I described, as

18   used herein, tolerability relates to the level of discomfort

19   associated with GA treatment.  And it further notes -- and

20   here is the key -- that tolerability is associated with the

21   frequency and severity of post-injectioni reactions and

22   injection site reactions.

23        So what is key here is the tolerability is

24   different than frequency and severity.  Frequency being the

25   rate of occurrence of events over some unit of time and

Pleasure - direct

1   severity being the intensity of the individual events.

2   Q.    Can you provide the Court with an example of how a

3   change in tolerability of the glatiramer acetate regimen

4   could be due to something other than a change in the

5   severity of ISRs?

6   A.    Certainly.  So I can think of several kinds of

7   examples.  One, for instance, would be that a patient who

8   may have frequent but -- have frequent occurrences of a

9   particular injection site reaction such as itching which

10  might be graded individually as not being in any -- there

11  is no particular way to grade them but they are frequent in

12  occurrence, that that patient may decide they can no longer

13  tolerate the medicine and that changing that frequency might

14  be important.

15  Q.    All right.  Can you provide another example of how a

16  patient's determination of whether a drug regimen is

17  tolerable or not can change in a way that has nothing

18  whatsoever to do with ISR frequency or severity?

19  A.    Yes.  So I have had occasion to take care of a number

20  of patients, and I suspect other neurologists have as well,

21  who upon starting glatiramer acetate have a number of

22  injection site reactions which they find to be difficult to

23  tolerate and they may then come back after starting the

24  medication to talk to me and say, well, I find this

25  intolerable essentially and I have difficulty tolerating the

Pleasure - direct

1    medication.  I want to try one of the other medications

2    available, in which case we discuss other medications, and

3    we might decide to try an interferon or decide to try an

4    oral medication like Tecfidera.

5             So the patient might switch to that medicine and

6    then they might find the side effects and adverse events

7    associated with that medication are actually more

8    objectionable, and that patient -- and this happened several

9    times -- that patient will say to me I preferred the

10   glatiramer acetate.  I don't actually find those quite so

11   intolerable as I thought, and we go back to the glatiramer

12   acetate.

13   Q.   So let's focus in on what is reduced severity when it

14   comes to ISRs.  Does the '776 patent list things that it

15   considers to be injection site reactions, abbreviated as

16   ISRs?

17   A.   Yes, it does.  And in the patents, that section     is

18   here on the slide.  And you can see as used herein,

19   injection site reaction refers to a reaction.  And I have

20   highlighted several examples of different types of

21   reactions, but it is erythema, which is redness, and

22   hemorrhage, induration, inflammation, mass, pain, and

23   pruritus, which is itching, and urticaria, and welting.

24   Q.   For the record, that particular passage is at

25   JTX-7003.15.

Pleasure - direct

1          During the infringement case, did Teva's Dr.

2    Wynn also identify lipoatrophy as an ISR?

3    A.    He did.

4          MS. MAZZOCHI:  And, Your Honor, this is part of

5    the Dow test we're going to start moving into.

6    BY MS. MAZZOCHI:

7    Q.    In your opinion, does the patent pick any measurement

8    method to use to assess reduced severity of an ISR?

9    A.    No, I don't believe there is any method proposed in

10   the patent.

11   Q.    Were you here for Dr. Wynn's testimony?

12   A.    Yes, I was.

13   Q.    Did you hear Dr. Wynn identify anywhere in the '776

14   patent that instructs a person of ordinary skill in the art

15   how to measure the comparative severity of any ISR?

16         MS. HOLLAND:  I'm going to object to this.  Dr.

17   Wynn was here not to talk about indefiniteness, which is

18   what I think Ms. Mazzochi is questioning the witness about.

19         MS. MAZZOCHI:  He is talking about, he had to

20   come up with some method to assess severity.

21         So one part of our analysis here, Your Honor, is

22   there are lots of different methods that can be used to

23   assess severity, and we're just starting with the fact that

24   whatever method it is that Dr. Wynn used, he didn't find any

25   particular one in the patent.  I think he admitted to that.

1          THE COURT:  I think that is fair game.

2    Overruled.

3    BY MS. MAZZOCHI:

4    Q.    Would you like me to repeat the question again?

5    A.    No, I think I remember it.

6    Q.    Okay.

7    A.    Yes, Dr. Wynn mentioned in his testimony there was

8    not -- the question is:

9          "Question:  There is nothing in the patents in

10   suit that describe how to measure severity.  Correct?"

11         And he answered:

12         "Answer:  Correct."

13   Q.    To your knowledge, has there ever been any suggestion

14   by Teva that the '776 patent itself or its prosecution

15   history pointed to a particular method that the person of

16   ordinary skill in the art should use to evaluate severity?

17   A.    I'm not aware of any.  But Dr. Fox, who is, who I

18   believe is a consultant and will be testifying for Teva, was

19   noted to say in his report --

20         THE COURT:  Hold on a second.  Do you have an

21   objection?

22         MS. HOLLAND:  Yes, Your Honor.  I'm sorry for

23   the lateness of the objection, but what Dr. Fox said in his

24   rebuttal expert report is hearsay.  He hasn't been called to

25   testify here, and I don't believe that Dr. Pleasure is

1   relying on Dr. Fox's opinion in some way.  I just think it

2   is hearsay at this point.

3               THE COURT:  At this point it is.

4               MS. BLOODWORTH:  Right.  Your Honor, we

5   obviously understand that Dr. Fox is going to be coming here

6   to testify, but as part of the meet and confer we had with

7   counsel yesterday, we actually discussed this slide and they

8   said that they didn't have a problem with us displaying the

9   slide.  It was just going to be recognizing that Dr. Fox

10  would have to come in and testify about it.

11              THE COURT:  Is that correct, Ms. Holland?

12              MS. HOLLAND:  Can I check with my colleague?

13              (Counsel confer.)

14              MS. HOLLAND:  It is my understanding from my

15  colleague, and I apologize, I wasn't on that meet and

16  confer, Ms. Mazzochi made a representation she was not going

17  to use this slide for the truth of the matters asserted and

18  that she was just going to use it to say what Dr. Pleasure

19  was responding to.  And if that is what it is limited to,

20  Your Honor, I don't have an objection.

21              MS. MAZZOCHI:  Right.

22              THE COURT:  That is what I understood was the

23  question was.

24              MS. HOLLAND:  That is what I thought it was.

25              MS. MAZZOCHI:  That was the question.

1           THE COURT:  You withdraw your objection.

2           MS. HOLLAND:  Yes, Your Honor.

3           THE COURT:  All right.

4      By THE WITNESS:

5      A.     I remember the question, I believe.  And Dr. Fox

6      stated in his rebuttal report, neither the claims, nor the

7      specification limit the severity terms to a particular

8      method of evaluating severity.  They simply describe reduced

9      severity of IPIRs and ISRs relative to the 20 milligram

10     daily regimen.

11     Q.     And, Dr. Pleasure, were you here when Dr. Klinger

12     testified?

13     A.     Yes.

14     Q.     Do you recall what Dr. Klinger indicated her approach

15     was when it came to grading severity?

16           MS. HOLLAND:  Your Honor, I don't believe that

17     we did get a slide with Dr. Klinger's testimony in advance.

18     And there is nothing, there is no reliance by Dr. Pleasure

19     on Dr. Klinger in his expert report or anywhere else.  Her

20     testimony is her testimony for the Court to analyze.

21           THE COURT:  I'm going to sustain this objection.

22           MS. MAZZOCHI:  Thank you, Your Honor.  I'll move

23     on.

24     BY MS. MAZZOCHI:

25     Q.     In your opinion, Dr. Pleasure, did the '776 patent

1    give the person of ordinary skill in the art any guidance as

2    to how to assess or grade any injection related events for

3    reduced severity?

4    A.    No, I don't believe there are any ways to do that.

5              MS. MAZZOCHI:  All right.  Your Honor, we're

6    going to go to the second part of the Dow test.

7    BY MS. MAZZOCHI:

8    Q.    Dr. Pleasure, in your opinion, does the medical

9    literature provide any method to measure, grade, or assess

10   injection site reactions in terms of severity?

11   A.    Yes.  There actually are a number of ways that this

12   was being done around the time of the patents with mixed

13   success.  Listed on the slide are a number of those

14   contemporaneous or near contemporaneous references that

15   describe different ways to do that.

16             MS. MAZZOCHI:  All right.  For the record, we're

17   looking at, listed here on the slide, it is DTX-1179,

18   DTX-1169, DTX-1072, DTX-1170, DTX-1190, and JTX-7134.

19   BY MS. MAZZOCHI:

20   Q.    Dr. Pleasure, of these articles that you listed here,

21   on Slide DDX-1200.16, which listed injection related events

22   specifically in MS patients?

23   A.    So the five articles in the bottom part of the slide,

24   the Anderson/SONG trial, which is the publication of the

25   SONG trial, the publication by Edgar and colleagues,

1    publication by Pardo, publication by Stewart and colleagues,

2    as well as the Glacier publication.

3                MS. MAZZOCHI:   Again, for the record, those are

4    DTX-1169, 1072, 1170, 1190, and JTX-7134.

5    BY MS. MAZZOCHI:

6    Q.    Dr. Pleasure, which of the clinical trials or studies

7    that you have listed here had ties to Teva?

8    A.    So the SONG trial, first one; the Pardo trial, in the

9    middle; and the Glacier trial at the bottom.

10   Q.    All right.  Which of these involved, as an author or

11   investigator, Dr. Fox, Teva's expert, who is going to be

12   responding to your indefiniteness opinions?

13   A.    So Dr. Fox was an author Of the SONG trial and was

14   also involved in the Glacier trial.

15   Q.    All right.  Now, which standard of those that are

16   listed here did Dr. Fox at one point during this case

17   suggest should be applied to the '776 patent claims to

18   assess reduced severity?

19   A.    None of those that I have mentioned but instead the

20   Common Terminology Criteria for Adverse Events which is

21   listed at the top.

22   Q.    Is that abbreviated to CTCAE?

23   A.    Yes.

24   Q.    That is DTX-1179?

25   A.    Yes.

1    Q.      All right.  Is the CTCAE standard that Dr. Fox

2    mentioned for the '776 patent one that Dr. Fox ever applied

3    within his Teva-related glatiramer acetate publications that

4    are listed here?

5                MS. HOLLAND:  Objection, Your Honor.  The

6    question was what Dr. Fox has put in his own publication.

7    I'm not sure that Dr. Pleasure can answer that question, but

8    that is a question for Dr. Fox.

9                MS. MAZZOCHI:  He can look at the papers that

10   Dr. Fox authored.  They're listed here.

11               THE COURT:  What was the question again?

12               MS. MAZZOCHI:  Yes.  Is the CTCAE standard that

13   Dr. Fox is said to invoke for the '776 patent one that

14   Dr. Fox ever applied within his Teva-related glatiramer

15   acetate publications listed here when assessing injection

16   site reactions?

17               THE COURT:  Ms. Holland, is this something the

18   doctor can't review?

19               MS. HOLLAND:  No, Your Honor.  The question

20   changed.  If the question is limited to what we see on the

21   slide, I am okay with it.  If it is a general question about

22   what Dr. Fox has written up, I have an issue.

23               MS. MAZZOCHI:  I'm sorry.  I apologize.  That is

24   what I asked.

25               THE COURT:  Do you understand the question?

Pleasure - direct

1              THE WITNESS:  Yes, I do.

2              Dr. Fox did not use the CTCAE criteria in any of

3    the studies that are here listed on the slide.  And I

4    believe he was an author in the SONG trial and was involved

5    in the Glacier trial.

6    BY MS. MAZZOCHI:

7    Q.     Dr. Pleasure, even though there are many approaches to

8    approach ISR injections, had the art picked any one of the

9    approaches in the articles that are listed here as the

10   accepted way to assess ISR severity in the context of

11   glatiramer acetate injections?

12   A.     No, it's very clear that the art hasn't, had not at

13   that time picked a single measurement method to be used.

14   Q.     Did the art anywhere state that at least one of these

15   methods that had been listed here widely accepted as one

16   that could assess ISR severity?

17   A.     No, not at all.

18   Q.     Did anyone in the MS field recognize this lack of a

19   clear or widely accepted definition of severity in the art?

20   A.     Yes, indeed they did.  And here, on the slide, are two

21   excerpts from the top, the paper by Gabriel Pardo, and that

22   has a section about the planning of the study.  You can see

23   in that section where it is highlighted, it says:  "In the

24   planning of the study, no consistent the system

25   characterization of an LISR associated with an

1   immunomodulator was found in the MS literature."  And this

2   was a Teva study with Pardo.

3                    In addition, the Stewart, et al paper that has a

4   section that notes:  "Although ISRs are universally

5   recognized to be an issue with the use of injectable disease

6   modifying therapy for MS, the term currently has no standard

7   definition, nor is there any widely accepted method for

8   grading the severity of ISRs."

9   Q.   So that Pardo quote that you just gave, is that found

10  at DTX-1170.00003?

11  A.   Yes.

12  Q.   Is the Stewart quote found at DTX-1190.00002?

13  A.   Yes.

14  Q.   Who funded the Pardo study?

15  A.   As I mentioned, it's a -- it was a Teva sponsored

16  study.

17  Q.   So the Teva-sponsored study didn't have a consistent

18  characterization?

19                    MS. HOLLAND:  Objection.  Leading.

20                    THE COURT:  Sustained.

21  BY MS. MAZZOCHI:

22  Q.   Now, the Stewart paper published in what year?

23  A.   It was in 2012.

24  Q.   So if Stewart published in 2012, why should we give

25  any consideration to his statement here that there is no

1    widely accepted method for grading the severity of ISRs when

2    it comes to the '776 patent?

3    A.    Well, there certainly was not such a standard three

4    years before in 2009 that was suddenly forgotten or

5    overruled.  There really was not a standard at that time.

6    Q.    Dr. Pleasure, why does it matter that the person of

7    ordinary skill in the art has no widely accepted

8    methodologies to pick from here to assess reduced severity

9    of ISRs?

10   A.    So, as I mentioned earlier, the consequences are the

11   highly subjective nature of the assessments that then

12   happen.

13         Here, you note that multiple measurement methods

14   exist to assess the same kind of reaction.  And we will go

15   through those example by example, that you can get a

16   different -- using a different method, you can get different

17   severity scores for different -- for the same reaction in

18   different measurement methods.

19         A person of ordinary skill in the art would know

20   that the outcome changes depending on which method you pick.

21   This is a big problem, because it leaves you in a situation

22   where you can't tell whether a patient is within or outside

23   the claims.  You don't know which method to use.  You don't

24   know whether an individual patient has reduced intensity

25   reactions or not.

Pleasure - direct

1  Q.    Dr. Pleasure, did anyone at Teva recognize that this

2  is a potential problem?

3  A.    Yes.

4  Q.    Have you relied on Dr. Kolodny's testimony in this

5  case?

6  A.    Yes, to help indicate that that was seen as a problem.

7  Q.    What did you rely on his testimony for regarding this

8  issue?

9  A.    So he was asked a question about the subjectivity of

10  pain measurements and pain intensity.  And he recognized in

11  response to the question that a patient and a doctor may

12  have different perceptions of the same injection site

13  reaction, in this particular case pain, but as we will show,

14  that may not be the only case.

15  Q.    If you assume that you have a patient switching from a

16  20 milligram dosing regimen to the claimed 40 milligram

17  dosing regimen, in your opinion, can that same patient's ISR

18  symptoms, such as pain, be classified as mild under one

19  method and severe under another one?

20  A.    Yes.  Clearly, that's the case.

21  Q.    So, then, what's the consequence for the person of

22  ordinary skill in the art looking at the '776 patent,

23  knowing that the same symptom, with the same intensity, can

24  be classified as mild under one method or severe under

25  another?

1  A.      It leaves that person of skill in the art really with

2  the inability to know whether they are infringing or

3  otherwise going against the patent without having any method

4  that they are informed they are supposed to use.

5          Someone could come back after the fact and say

6  you used the wrong method.  You were supposed to use this

7  method.  And then you find out that you are in trouble.

8  Q.      In your opinion, is the decision on whether you

9  experience reduced severity method-dependent?

10 A.      Yes.

11 Q.      Do you have some ways to illustrate how that is so?

12 A.      Yes.

13 Q.      So, Dr. Pleasure, let's start going through some of

14 these methods then.  You mentioned earlier that there was a

15 particular standard that Dr. Fox had raised at one point in

16 this case as something the skilled artisan could use to

17 evaluate severity in the context of the '776 patent claims.

18 What is that standard?

19 A.      So this is the Common Terminology Criteria for Adverse

20 Events, abbreviated CTCAE, which was published on May 28th,

21 2009, And was subsequently revised June 14th, 2010.  It was

22 published by the U.S. Department of Health and Human

23 Services, which oversees the National Institutes of Health.

24 Q.      And is a copy of CTCAE found at DTX-1179 in your

25 binder?

Pleasure - direct

1    A.    Yes.

2    Q.    What page from the CTCAE standards has Dr. Fox pointed

3    to as the standards he would pick to guide the skilled

4    artisan to assess severity of glatiramer acetate injection

5    site reactions in the context of the '776 patent?

6    A.    He referred to Page 2 of the CTCAE standards.

7    Q.    In this general grade classification, does Page 2 of

8    the CTCAE identify a threshold grade one needs to cross in

9    order to classify an adverse event as severe?

10   A.    Yes.  So Page 2 of the CTCAE has a general guidance

11   for grading severity that goes from Grade 1 to Grade 5,

12   Grade 3 being severe.

13         It's focused predominantly on non-specific

14   symptoms but on very general descriptives.

15   Q.    Does this Page 2 of the CTCAE attempt to directly

16   address how one should grade ISRs?

17   A.    No.

18   Q.    Now, assuming the person of ordinary skill in the art

19   wanted to look at the CTCAE standards to evaluate patients'

20   injection site reactions, is this Page 2 the only CTCAE

21   standard that such a person could look to to apply?

22   A.    No.  I would look at Page 58.

23   Q.    What appears within the CTCAE standards at Page 58 of

24   the document which is at DTX-1179.00060.

25   A.    So the CTCAE has a large compendium of different types

1    of adverse events that would happen in response to a variety

2    of therapies.  On Page 58 there is a section that gives a

3    grading system for injection site reactions specifically.

4    Q.    Now, what do you have highlighted here on Slide

5    DDX 1200.23?

6    A.    So there highlighted is just the fact that this is for

7    adverse events.  An adverse event is for injection site

8    reaction.

9    Q.    In terms of the grades that are given here, are those

10   identical to the ones that we just saw in the CTCAE on Page

11   2?

12   A.    No.

13   Q.    What are some of the differences?

14   A.    Well, here, the grades are giving very specific

15   symptoms or signs that are associated with injection site

16   reactions, and assigning those sort of ordinally to

17   different grade severities, still a 1 to 5 grading system,

18   however.

19   Q.    Nevertheless, even within the same CTCAE publication,

20   are there different severity measurement methods?

21   A.    Yes, clearly.

22   Q.    Tell me, the CTCAE standards on Page 58 for injection

23   site reactions, what grade is given to lipoatrophy?

24   A.    Lipoatrophy is described here with lipodystrophy,

25   which is synonymous with lipoatrophy, and is given a grade

1    of Grade 2 or moderate, on Page 58 for the ISRs.

2    Q.    Whether we look at the CTCAE's general guidelines on

3    Page 2 or the injection site reaction classifications on

4    Page 58, is lipoatrophy ever classified as Grade 3, severe?

5    A.    I don't believe it would be.  So here, clearly, under

6    the Page 58 standards, it's clearly Grade 2, moderate.  But

7    under the Grade 2 or Grade 3 standards on Page 2, as you can

8    see, the descriptors there are more vague.  However, I don't

9    believe that lipoatrophy would really ever be severe or

10   medically significant, nor would it ever, I believe, be

11   disabling or limiting of self-caring ADLs, which are

12   essentially the kind of activities of daily living that

13   involve feeding yourself or cleaning yourself.

14          I think perhaps one could say that it is

15   sometimes moderate, Grade 2, because it might require local

16   or non-invasive intervention, as is noted in Grade 2 for the

17   Page 2 standards.  But it also would usually not affect age

18   appropriate instrumental ADLs, which are the types of things

19   that one has to be able to do to go shopping or to pay --

20   balance your checkbook or things like that.  But I suppose

21   there could be some aesthetic reasons why someone might

22   decide they were not able to do those things.

23   Q.    Let's take a look at some of the specific references

24   that evaluated side effects associated with a glatiramer

25   acetate injection.  I would like to direct your attention to

1     DTX-1169 in your binder entitled Anderson, et al.,

2     Tolerability and Safety of Novel Half-Milliliter

3     Formulations of Glatiramer Acetate for SC Injection, an Open

4     Label Multi-Center Randomized Comparative Study.

5              Did you review this paper for your opinions in

6     this case?

7     A.    Yes.

8     Q.    Who was the named author?

9     A.    So, the first author was G. Anderson.  And this is the

10    so-called SONG trial.

11    Q.    Did Teva sponsor this trial?

12    A.    Yes, they did.

13    Q.    Did Dr. Fox have any role with regard to this study?

14    A.    Dr. Fox was one of the authors on this study.

15    Q.    What was the primary clinical outcome that the SONG

16    trial measured?

17    A.    So the primary clinical outcome was the total

18    injection pain rating using a scale called the Visual Analog

19    Scale at zero minutes and five minutes.

20              This Visual Analog scale is a scale where the

21    patient is given a line that is 100 millimeters long, and

22    asked to draw a mark on that line that indicates where their

23    pain score is, with zero on the line being no pain, and 100

24    millimeters on the line being the worst possible pain.

25    Q.    And is the passage that you just were looking at

1    DTX-1169.00003?

2    A.    Yes, it is.

3    Q.    So this Visual Analog scale, and the putting of

4    something on a 100 millimeter line, is that the same

5    approach as the CTCAE 1 to 5 scale?

6    A.    No.  Not at all.

7    Q.    Did Dr. Anderson's SONG protocol dictate the time at

8    which the injection site reaction of pain must be measured?

9    A.    Yes.  They measured the pain immediately after

10   injection and five minutes after injection.

11   Q.    Did either of the CTCAE methods we looked at on Page 2

12   or on Page 58 place any time limits on when one should

13   assess injection-related events, as was done in SONG?

14   A.    No.

15   Q.    In the context of the SONG trial, if we look at Figure

16   1, which is at DTX-1169.00004, what were the average Visual

17   Analog scale pain scores reported for the two tested

18   glatiramer acetate 20 milligram formulations?

19   A.    So for the immediate post-injection pain, those scores

20   ranged from 8 millimeters to 12 millimeters.  And for the

21   five-minute post-injection score, it was from 12 millimeters

22   to 16 millimeters or 15 millimeters, somewhere around there.

23   Q.    So even if we were to look at the highest pain score

24   reported for the 20 milligram glatiramer acetate injection

25   product, and measure that number on the VAS scale, where

Pleasure - direct

1    would the pain assessment be?

2    A.    Here on the slide is a, sort of a mockup of the VAS

3    scale.   Clearly, it is more than 100 millimeters long on the

4    slide.   But what I have done is put a yellow bar about 15

5    percent of the way across from the left to the right, which

6    indicates a score of -- sort of the higher end of the scores

7    that were seen in the study of 15.

8    Q.    And is the visual depiction of the VAS score that you

9    have here, was that obtained from a document DTX-1183?

10   A.    Yes.

11   Q.    So even if we divided the Visual Analog scale into a

12   zero to five scale, what fifth would the SONG study results

13   fall into?

14   A.    Clearly, it would be in the lowest quintile, the

15   bottom fifth.

16   Q.    Dr. Pleasure, I would like to direct your attention to

17   DTX-1377.   Have you reviewed any internal documents

18   indicating what Teva scientists thought of the intensity of

19   the pain recorded with the 20 milligram product during the

20   SONG trial?

21   A.    Yes, I have.   This is an e-mail from Rivka Kreitman,

22   who I believe we just heard from in the depositions.

23          MS. HOLLAND:   I have an objection to the

24   document for use for this purpose, Your Honor.   We are

25   supposed to be assessing things as of August 2009.   This is

1     a 2010 e-mail.

2              MS. MAZZOCHI:  I am happy to discuss it at

3     sidebar, Your Honor.

4              (The following took place at sidebar.)

5              MS. MAZZOCHI:  Your Honor, it's very

6     straightforward.  We are simply using the Teva e-mail to

7     corroborate the fact that their scientists internally gave

8     one classification of pain score for the SONG trial that is

9     at odds with one that they made later.  And it's going to

10    just get into this -- it's going to be offered for the idea

11    that depending on which method you pick and how you

12    interpret some of these results, it's going to change the

13    answer as to whether you call it severe or not.

14             MS. HOLLAND:  The question has to be dealt with

15    as of August 2009.  This is a later document.  If Ms.

16    Mazzochi wants to make the point that there were different

17    standards using different trials, I think that is what Dr.

18    Pleasure is referring to in his testimony.

19             But Dr. Kreitman, a year and a half after the

20    priority date here, making statements about what she thinks

21    about pain scales I don't think is relevant to the issue at

22    hand here on the indefiniteness argument that defendants are

23    making.

24             MS. MAZZOCHI:  I think it is because it goes

25    directly to the point that depending on which method you

1   apply you get different outcomes.  That is the whole point

2   of the indefiniteness analysis and the Dow standard, if you

3   have got multiple methods that are available to the person

4   of ordinary skill in the art or even in the same method and

5   it can be applied differently to get to different outcomes,

6   then that leads to indefiniteness of the claims because you

7   don't know if you are inside or outside the claims.

8            THE COURT:  I don't think that was the complaint

9   that Ms. Holland had about the substance, at least the

10  rationale you advance for the proposition for which you

11  advance it.  It's the timing of the evidence about which she

12  complains.  You haven't responded to that.

13           MS. MAZZOCHI:  Let me address that.  I think, if

14  somebody basically has one of these methods, even if two

15  years later they apply it and they say, I get a different

16  result from this different method, that is still evidence

17  that the methods themselves are sufficiently imprecise and

18  that a method can't be picked to give a definite answer as

19  to what is reduced severity when they are talking about

20  these injection site reactions.

21           MS. HOLLAND:  Again, Your Honor --

22           THE COURT:  Understanding the cutoff, apart from

23  sort of this -- I don't mean this as a criticism -- but I

24  think the objection sort of parrots a little bit the one you

25  had with regard to Khan and the protocol, the argument I

1    rejected.   It seems to reflect that kind of thinking, which

2    courts have rejected.

3              MS. HOLLAND:   I understand your point, Your

4    Honor.   I don't mean to mix issues here.   But something

5    happened this morning on Dr. Green's testimony that sort of

6    was an objection by defense that said it's inconsistent with

7    that position.

8              What Mr. James wanted to do this morning is put

9    up some documents from defendants' files that show that they

10   viewed FORTE as a failure and that they believed it was a

11   failure because people in the art don't choose something

12   that is not the effective minimum dose.   That is what we

13   wanted to put up on the screen.

14             Your Honor, I agree with you, if we had been

15   entitled --

16             THE COURT:   Why didn't you put it up on the

17   screen?

18             MS. HOLLAND:   There was a ruling against us on

19   that.

20             MR. FIGG:   No.

21             THE COURT:   Mr. Figg --

22             MR. FIGG:   I think you cautioned Mr. James.   But

23   I don't think you made a ruling.

24             THE COURT:   I don't think I ruled.   I disagree

25   with your recollection.

1       MS. HOLLAND:  I apologize, Your Honor.  My

2  recollection is that you said that Mr. James shouldn't use

3  documents where you would have to seal the courtroom.

4       THE COURT:  That's right.  But that didn't go to

5  the point -- that was an entirely different rationale for

6  that ruling, Ms. Holland.  You are mixing your metaphors, as

7  it were.

8       If you really want to go back to that, I will

9  let Mr. James back on the witness stand.  If you really want

10  to do that, if you really want to push this argument with

11  me, then we can do that.

12       MS. HOLLAND:  Your Honor, I don't want to push

13  it with you.  I understand what your ruling was.  Maybe I

14  was misconstruing --

15       THE COURT:  I think you did misconstrue --

16       MS. HOLLAND:  Maybe we all did when we walked

17  away.  And I apologize.

18       THE COURT:  The ruling was quite a practical one

19  in many respects.  Again, if you want to push that, I will

20  let you -- we will clear the courtroom.

21       MS. HOLLAND:  I don't think we have to, because

22  I think those documents will come in in deposition

23  designations.  We did want to ask Dr. Green about them.  If

24  your ruling is in this trial that use --

25       THE COURT:  These rulings are on an

Pleasure - direct

1    objection-by-objection basis.

2         What I have said to you is that I sense a

3    similar rationale for this objection that I addressed in a

4    previous objection.  Tell me if the two are distinguishable.

5    If they are, and you have a different basis that you want to

6    advance, I am open to it.

7         MS. HOLLAND:  I believe they are

8    distinguishable, Your Honor, for the reason that my

9    understanding is, from the previous ruling on the clinical

10   trial protocol, was that it was a statement by Teva about a

11   prior art reference and that Teva's understanding of the

12   prior art reference later in time could be looked at as

13   evidence of what people may think.

14        THE COURT:  Colloquially, it is sort of what I

15   call the "Don't act like an ostrich" ruling.  These things

16   are happening in the real world and POSAs are aware --

17        MS. HOLLAND:  Absolutely.

18        THE COURT:  That was the rationale and that is

19   what the CAFC held, a long time ago, 1980s case.  Why isn't

20   this the same?  Why isn't this an analogous situation, is

21   essentially my question to you, Ms. Holland.  Why wouldn't I

22   be putting my head in the sand, as it were, to ignore what

23   Teva said, albeit post the critical date?  Has this view

24   just developed post the critical date?

25        MS. HOLLAND:  I don't know.  There is no

1     testimony from Dr. Kreitman.

2               THE COURT:  Do you know, Ms. Mazzochi, that

3     might bolster your argument a little bit.

4               MS. MAZZOCHI:  If we wanted to draw a parallel,

5     we could certainly talk about the 20 milligram case that

6     went up to the Supreme Court that talked about the

7     indefiniteness issue.  And I am sure Mr. Anstaett can

8     comment on that.

9               I don't think there are proofs on indefiniteness

10    and showing that if you applied this standard versus that

11    standard was restricted to pre, pre-critical date evidence.

12              Subsequent evidence can come in to demonstrate

13    that the method gives you definite results.

14              MS. HOLLAND:  It absolutely was.  I was part of

15    that case.  And I would only add that there was nothing new

16    about this Visual Analog scale that happened between 2009

17    and -- Your Honor, to move things along, I will withdraw the

18    objection.

19              THE COURT:  I don't want to beat you over the

20    head.

21              MS. HOLLAND:  You are not doing that, Your

22    Honor.  If I really felt strongly about it, I would pursue

23    it.

24              THE COURT:  I know you have a thick skin.

25              (End of sidebar conference.)

Pleasure - direct

1          (Sidebar conference ends.)

2              MS. MAZZOCHI:  May I proceed, Your Honor?

3              THE COURT:  Yes.

4              MS. MAZZOCHI:  Thank you.

5      BY MS. MAZZOCHI:

6      Q.    All right.  Just so that we can get resituated.  We're

7      looking at I believe DTX-1377.  And, Dr. Pleasure, did you

8      rely on this document in formulating your opinions in this

9      case?

10     A.    Yes.

11     Q.    All right.  How did the Teva scientists characterize

12     the results in the SONG trial in these internal e-mails?

13     A.    They, Dr. Kreitman said a number of things about it.

14     One of the points I thought was quite interesting and

15     relevant is that she raised the point there was a clinical

16     difference.  Despite the fact that there was statistically

17     significant difference in the changes in the pain score with

18     the VAS scale, that this was unlikely to be seen as

19     clinically significant.

20              She went on to say:  And I think we should --

21     and this is a quote -- we should be careful how we position

22     it as (the good news) is that Copaxone doesn't induce much

23     pain.

24     Q.    All right.  So how can it be that you can have a

25     statistically significant difference in pain on the VAS

1   scale but still have it not be clinically significant?

2   A.    Well, statistical significance is just, it does not

3   tell us what the clinical results of those things are.  The

4   patient would still say I believe in either case the pain

5   was not that high.  So whether it would be of clinical

6   significance by way of what it would make a patient do or

7   decisions the patient would make is very, very difficult to

8   interpret and it would be completely subjective to the

9   individual patients in their own perception of pain.

10  Q.    Did the '776 patent ever make any clarification as to

11  whether any question of reduced severity should be perceived

12  from a statistically significant perspective versus a

13  clinically significant perspective?

14  A.    No.

15        MS. MAZZOCHI:  All right.  I'd like to turn next

16  to JTX-7005.  And, Your Honor, this is one of the file

17  histories.  It's a very large document so I'm just going to

18  direct the witness's attention to Page 929 in the exhibit.

19        THE COURT:  Okay.

20  BY MS. MAZZOCHI:

21  Q.    Dr. Pleasure, did you rely on any portions of the file

22  history to support your opinions in this case?

23  A.    Yes.

24  Q.    All right.  How did Teva characterize the pain results

25  of the SONG trial in the prosecution history for the patents

Pleasure - direct

1  asserted here?

2  A.   So it was characterized chiefly by the sentence I

3  highlighted here:  Pain immediately following injection and

4  at later time points was relatively low for both

5  formulations.

6  Q.   All right.  So when Teva was referring to the pain

7  at the different time points as relatively low for both

8  formulations, were those two formulations performing -- I'm

9  sorry -- statistically significantly different on the VAS

10 scale?

11 A.   Yes.

12 Q.   All right.  Now, how was the type of injection pain

13 that was reported in the SONG trial graded under the Page 58

14 CTCAE injection site scale that we looked at earlier?

15 A.   So on the Page 58 standards, which are again for

16 injection site reaction specifically, pain is always graded

17 as a moderate or Grade 2 reaction.

18 Q.   All right.  And this is in your slide at DDX-1200.30?

19 A.   Yes.

20 Q.   All right.  And how is injection pain graded under the

21 CTCAE general guidelines on Page 2?

22 A.   Well, on Page 2, the grading would depend entirely

23 on a number of other factors.  For instance, whether it

24 required hospitalization, which I doubt would be the case

25 here, for pain.  But whether it is considered moderate or

1    mild, whether it interferes with age appropriate ADLs, which

2    I again don't think would be very likely with the amount of

3    level of pain we're talking about here, but again it is

4    difficult to predict.  It depends on the patient.

5    Q.    Are these classifications of the ISR, injection site

6    reaction pain, consistent with one another?

7    A.    No.

8    Q.    And why not?

9    A.    Well, I mean in the CTCAE injection site reaction

10   standards on Page 58, pain is a moderate symptom, and that

11   is, that is clear that is just the only place where pain is

12   listed.

13          And then it's dependent subjective according to

14   the Page 2 standards, and in the VAS scale, it is all low

15   for both formulations that were injected in that study.

16   Q.    So that difference in outcome based on method type

17   chosen, is that going to apply even if you are looking at

18   the same patient?

19   A.    Yes.

20   Q.    All right.  Now, if we jump back to the SONG study,

21   which was DTX-1169.  And I'd like to direct your attention

22   to Pages 0003 and 0005.

23          Does the SONG study measure any other types of

24   adverse events besides pain?

25   A.    Yes, the SONG study also measured other injection site

1  reactions, including redness, itching, swelling, and what

2  they called "lump."

3  Q.   And what methodologies did the SONG study apply to

4  grade the intensity of these ISRs?

5  A.   So to do, to grade severity at what they called

6  severity, what they called the severity score, they made a

7  score from 0 to 12 for each patient where each of the four

8  reactions that they were grading was graded on a scale from

9  0 to 3, 0 being optimum and 3 being severe, presumably mild

10  being 1 and moderate being 2, although they were not

11  explicit with that.

12  Q.   So if I understand, each ISR got a score and then they

13  were all added up?

14  A.   Yes.

15  Q.   All right.  Now, for any given patient, did the CTCAE

16  standard, either one of them, call for adding up the grades

17  for multiple symptoms?

18  A.   No.

19  Q.   Now, would local injection site reaction symptoms of

20  itching and redness be classified under the Page 58 CTCAE

21  injection site reaction standard?

22  A.   So here on this slide, we have that comparison.  And

23  you can see that down below, under the Page 58 standards,

24  being Grade 1, mild, you have erythema which is redness

25  itching.

Pleasure - direct

1  Q.    All right.  So in Anderson, which is the highest grade

2  itching can get?

3  A.    Presumably it can get a Grade 3 or severe.

4  Q.    And what about for the injection site reaction

5  standard?  What is the highest grade it can get?

6  A.    I don't think it's probably ever likely to be

7  medically significant.  Although rarely, rarely, rarely it

8  could be.  But for the most part, itching would fall under

9  mild or moderate, Grades 1 and 2.

10  Q.    All right.  If we can go back to the SONG study,

11  DTX-1169.0006, which is on Page 1922 of the article, last

12  full paragraph on the page, in the left-hand column.

13        What happened to the first patient described

14  there in connection with glatiramer acetate injections?

15  A.    So in this section of the paper, the SONG study, it is

16  describing adverse, other adverse events that happened

17  during the course of the study.  And they note one patient

18  reported injection site necrosis on Day 2.  And they further

19  qualify this event was mild in intensity.

20  Q.    If we were to take a look at the CTCAE Page 58

21  injection site reaction classification system, how is the

22  necrosis graded in this section?

23  A.    So, again, the Page 58 standard on the bottom of this

24  slide, you can see that Grade 3 includes ulceration or

25  necrosis, so it would also be Grade 3, severe.

1  Q.    So necrosis is mild for one patient in the SONG study

2  but it's also Grade 3 severe in the CTCAE?

3              THE COURT:  Sustained.

4              MS. HOLLAND:  Objection.

5              MS. MAZZOCHI:  Sorry, Your Honor.

6  BY MS. MAZZOCHI:

7  Q.    Dr. Pleasure, the comparison you just made, was that

8  found at DDX-1200.34?

9  A.    Yes.

10 Q.    Now, if we use the Page 2 standard that Teva's expert

11 Dr. Fox told you and applied that to necrosis, what could we

12 get in terms of a severity classification?

13 A.    Well, again, it would depend on a number of other

14 factors.  Necrosis can be serious and can be medically

15 important, so it's possible that it could happen and lead

16 to hospitalization or prolongation of hospitalization.

17              So it could be severe at times, but more

18 typically it is something that happens in an outpatient

19 and would not require hospitalization, would likely require

20 local or noninvasive intervention, so typically would be

21 Grade 2 or moderate under the Page 2 standards.

22 Q.    So when we're assessing the identical symptoms of

23 itchiness, redness, necrosis, do the SONG and CTCAE

24 methodologies get the person of ordinary skill in the art to

25 the same grade?

Pleasure - direct

1    A.    No.

2    Q.    It's method dependent?

3    A.    Yes.

4    Q.    Let's talk a little bit about the lipoatrophy side

5    effect that Teva discussed earlier in the trial.  Have you

6    treated patients who have experienced lipoatrophy as a

7    result of glatiramer acetate injections?

8    A.    Yes, I have.

9    Q.    And have those patients experienced lipoatrophy on

10   both the 20 and 40 milligram products?

11   A.    You mean individual patients experiencing lipoatrophy

12   on both?

13   Q.    Yes.

14   A.    I have seen that, yes.  I have seen it on patients

15   that were on the 20 and also on patients who have only been

16   on the 40.

17   Q.    And do you recall how Dr. Wynn characterized the

18   lipoatrophy during the trial?

19   A.    Yes, Dr. Wynn was asked if it was considered a quite

20   severe and disfiguring injection site reaction.  And he

21   affirmed, yes.

22   Q.    All right.  On this question of side effect assessment

23   of lipoatrophy associated with glatiramer acetate

24   injections, did you review the Edgar study, lipoatrophy in

25   patients with multiple sclerosis on glatiramer acetate,

Pleasure - direct

1    which is at DTX-1072 in your binder?

2    A.    Yes, I did.

3    Q.    All right.  And did you rely on it in connection with

4    your indefiniteness opinions here?

5    A.    I did.

6    Q.    Directing your attention to DTX-1072.0002, which is

7    Page 59 of the article, right-hand column.

8          How did the Edgar study characterize the

9    assignment of severity?

10   A.    So in the article by Edgar and colleagues, they noted

11   that the assignment of severity included subjective

12   designations which they based on several criteria that they

13   measured.

14   Q.    And what were some of those criteria?

15   A.    So they were, for instance, the overall injection site

16   areas that were affected, the number of areas in one

17   injection site, general location, the surface area that was

18   infected -- affected, and the length of time on therapy, for

19   instance.

20   Q.    Directing your attention to that same page of that

21   Edgar article, DTX-1072, what method of lipoatrophy grading

22   or classification was used for the glatiramer acetate

23   patients in this study?

24   A.    So in Dr. Edgar's study, they found that there were

25   patients who were mild, patients who were moderate, patients

1    that were severe.  They defined those by specific criteria

2    using those measurements that I just mentioned.

3              For instance, a severe patient would include

4    large area of depressions greater than 10 centimeters

5    square, greater than 1.5 centimeters in depth in at least

6    two areas, plus multiple smaller areas in all injection

7    sites used.

8    Q.    Did Dr. Edgar provide any visuals of what constituted

9    moderate or severe lipoatrophy?

10   A.    Yes, the study did include those.

11   Q.    So of these pictures which appear at DTX-1072.00004,

12   which of these cases did Dr. Edgar's method classify as

13   moderate?

14             MS. HOLLAND:  Your Honor, I don't believe that

15   Dr. Pleasure had these visuals anywhere in his report.  They

16   hadn't been disclosed to us in terms of Dr. Pleasure's

17   testimony.

18             MS. MAZZOCHI:  They are in the article.  He

19   talked about the article.

20             MS. HOLLAND:  They're from?

21             MS. MAZZOCHI:  Yes, they're from the article.

22             UNIDENTIFIED SPEAKER:  That's not in the report.

23             THE COURT:  Counsel, why don't you confer.

24             MS. HOLLAND:  Sure.  Thank you, Your Honor.

25             (Counsel confer.)

1       MS. HOLLAND:  We worked it out, Your Honor.  I

2   withdraw the objection.

3       THE COURT:  Great.

4       MS. MAZZOCHI:  Thank you.

5   BY MS. MAZZOCHI:

6   Q.    Which of these cases did Dr. Edgar classify as

7   moderate?

8   A.    So she classified a patient in Figure 3 on the right,

9   Case No. 5, as moderate.

10  Q.    And which case did she classify as severe?

11  A.    That's the patient on the left, Case 4, Figure 2.

12  Q.    Now, under the methodology that Dr. Edgar used, how

13  would the lipoatrophy effects that she classified as mild be

14  classified as CTCAE Page 58 injection site reaction

15  standards?

16  A.    So as we mentioned already, Page 58 injection site

17  standards of the CTCAE grade lipoatrophy as a Grade 2,

18  moderate lipoatrophy.

19  Q.    And of the methodology, Dr. Edgar used, how would the

20  lipoatrophy she classified as severe be graded under the

21  CTCAE Page 58 injection site reaction standards?

22  A.    They would still be Grade 2, moderate.

23  Q.    All right.  And do the CTCAE standards ever account

24  for the variation based on how big or small or deep the area

25  affected by lipoatrophy is as was done by Dr. Edgar 's

Pleasure - direct

1    method?

2    A.    They don't.

3    Q.    And under the generic CTCAE standard that Dr. Fox

4    pointed to on Page 2 of the CTCAE, how would the lipoatrophy

5    that Dr. Edgar classified as severe be graded?

6    A.    Well, in my opinion, the lipoatrophy would never reach

7    medical severity.  It probably would be under the category

8    of mild, Grade 1.

9         I suppose there might be some situations where

10   a person for aesthetic reasons might decide they did not

11   want to go out shopping or to go out, do some of their

12   instrumental ADI, but they would not be unable to.  They

13   would be choosing not to.

14   Q.    So in your opinion, is the Edgar paper consistent or

15   inconsistent with the premise that there is a standard and

16   widely accepted method in the art for grading the severity

17   of ISRs if ISRs includes lipoatrophy?

18   A.    It's inconsistent with that.

19   Q.    I would like to direct your attention to DTX-1322.

20   Was anyone at Teva to your knowledge aware of the Edgar

21   publication?

22   A.    Yes, they were.

23   Q.    Did you rely on this e-mail to support your opinions

24   in this case?

25   A.    Yes.  There are two e-mails, actually, back and forth.

1   Q.    What about these internal e-mails is relevant to your

2   opinions here?

3   A.    So in the top e-mail, which is from the director of

4   scientific and medical affairs, to Ety Klinger among others,

5   there was a note that some people at corporate, this is the

6   highlighting here, some people at corporate and us, too, in

7   parenthesis, are upset with the publication by Edgar which

8   states an incidence of 45 percent.

9           So they were clearly aware of it.  And they

10   contemplated the idea of proactively looking for lipoatrophy

11   retrospectively, essentially, this is not a quote, but

12   retrospectively look for lipoatrophy on patients who have

13   been on GA for more than two years.

14           We may see high numbers, too.  That would be a

15   retrospective analysis of lipoatrophy in patients who have

16   been on therapy for a long time.

17   Q.    And what else did you rely on in support of your

18   opinions from this e-mail?

19   A.    Sure.  So in response, Ron Newman, who was the

20   corporate medical doctor, wrote:

21           We are not worrying about a potential high level

22   of lipoatrophy as this will actually allow us to define the

23   minimal requirements to define a skin lesion as lipoatrophy.

24   Q.    What was the date of this e-mail?

25   A.    It was 2000 -- they are both in 2006, August 2006.

1    One, sort of the European standard was 1408, and the other

2    one is the American standard.

3    Q.    So what would this e-mail suggest to a person of

4    ordinary skill in the art as a reasonably certain way to

5    assess the severity of the ISR lipoatrophy?

6    A.    Well, it tells us a couple of things.  First of all,

7    its tells us that in Teva's own mind, it appears that they

8    had not defined the minimal requirements for deciding

9    whether something was lipoatrophy.  And that is significant.

10   Q.    This e-mail sent in 2006.  To your knowledge, was a

11   standard method or widely accepted method for grading

12   lipoatrophy ever one that became widely accepted by 2009?

13   A.    No.

14   Q.    Let's take a look at another glatiramer acetate

15   injection site reaction paper, PTX-1170, by J.R. Pardo, et

16   al., in the Journal of Neuroscience and Nursing.

17            Did you review this paper in connection with

18   your opinions in this case?

19   A.    I did.

20   Q.    Was this a Teva study?

21   A.    Yes.

22   Q.    Would you take a look at the first page of the

23   article, DTX-1170.0001, bottom right-hand side of the

24   screen.

25            What types of symptoms for local injection site

1    reaction are identified here?

2    A.    They reviewed the injection site reactions that

3    include an area of redness, an area that was warm to the

4    touch, an area that was painful, a raised area around the

5    injection site, a trace of blood around the injection site

6    or a bubble at the injection site.

7    Q.    Did Dr. Pardo make any comment on any difficulties he

8    faced when planning the study?

9    A.    Yes.  So Dr. Pardo, we quoted a portion before, he

10   said in the planning of the study, no consistent

11   characterization of an ISR associated with an

12   immunomodulator was found in the MS literature.

13   Q.    Is that quote at DTX-1170.0003?

14   A.    Yes.

15   Q.    What was the date of the Pardo publication?

16   A.    2010.

17   Q.    Was this a Teva-associated publication?

18   A.    Yes.

19   Q.    If I can direct your attention to the second page of

20   the article, DTX-1170.0002, right-hand column, it states

21   that as part of the study patients attended three clinic

22   visits.  What was Dr. Pardo trying to do in order to address

23   this problem that there is no consistent characterization

24   method for assessing ISR reactions in the MS literature?

25   A.    So the way that they designed the study was to attempt

Pleasure - direct

1    to address this problem by having the first visit of the

2    study be essentially a training visit.  The patient comes to

3    the visit and does an injection with an investigator,

4    presumably trained in whatever way they are using to analyze

5    ISRs, in the presence of that investigator.  And the two of

6    them would then compare and decide how to evaluate the ISRs

7    that occur in response to that injection.

8              And then they would report their evaluations in

9    the daily diary.

10   Q.    All right.  You have got underlined here "Patients

11   achieved a concordance level of at least 75 percent with

12   that other study investigator, they were provided with a 14

13   day self-injection diary."

14             What was the purpose of this measuring of the

15   concordance level of at least 75 percent between the

16   patients and their study investigator?

17   A.    Well, I presume, and again, this is my opinion from

18   reading the paper, that the first study was designed to

19   train patients, and that they must have had some difficulty

20   in having concordance, because they clearly set some level

21   of concordance that was necessary in order of importance of

22   the grading of the ISR between the patients and the

23   investigator that they would have as a minimal level of

24   concordance that would allow them to decide that that

25   patient should be included in the study.

1  Q.   So if the patients and the study investigators in the

2  study only had to agree on the grading and characterization

3  of the ISRs 75 percent of the time, what does that say about

4  the other 25 percent of the time?

5  A.   Well, it says that up to 25 percent of the time or

6  theoretically up until one in four ISRs, there might be

7  discordance between the investigator and the patient.  They

8  might disagree about the severity of the ISR that they are

9  both looking at at the same time.

10  Q.   All right.  But if you have the patients who are in

11  this Pardo study using the same scale, and they are with

12  their caregiver, and they are looking at the same ISR at the

13  same time, how is it that they are not agreeing up to 25

14  percent of the time?  How is that possible?

15  A.   Because the standards are not really methodologically

16  sufficient to allow, assure an accurate rating of the

17  intensity.

18  Q.   If we can turn to Page 42 of the Pardo paper,

19  DTX-1170.000003, what was the primary outcome measure that

20  was being assessed?

21  A.   The primary outcome measure was the total number of

22  ISRs at five minutes after injection, and these were summed

23  up across a 14-day study section.

24  Q.   In that same section what was the secondary outcome

25  marker they assessed?

Pleasure - direct

1    A.      They listed total number of ISRs immediately following

2    injection and another one at two minutes following

3    injection.

4            They also described another secondary outcome

5    which they called the Bothersome rating.  And they asked the

6    patients how bothersome each injection was, and recorded

7    daily -- this was recorded daily on a ten-point schedule,

8    with 1 being equivalent to Not Bothersome and ten being

9    equivalent to Severely Bothersome.

10   Q.      Are each of these three methods for the primary

11   outcome, secondary outcome, and Bothersome scale, are they

12   all attempting to assess the intensity of injection site

13   reactions in some way?

14   A.      Yes.

15   Q.      Are the methods identical?

16   A.      No, not at all.

17   Q.      Would you turn to Page 43 of the paper,

18   DTX-1170.00004, left-hand column, the last seven lines of

19   the first full paragraph on that page, there is another

20   reference to another post hoc analysis evaluated whether

21   there were differences in the severity of the reaction

22   scores recorded by the patients in the baseline.  Do you see

23   that?

24   A.      Yes, I do.

25   Q.      What method did they do for this post hac analysis?

Pleasure - direct

1    A.    What they did was they assigned a severity score to

2    each patient based on the percentage of days in each period

3    that the patient recorded between zero and six types of

4    ISRs.

5    Q.    Is that the same method that was used in the three

6    methods we just looked at?

7    A.    No.  It is a different method.

8    Q.    How was severity measured then in the post hac -- I am

9    sorry.  If we have got all these standards in Pardo, we have

10   got the summation standard, percentage day standard, and the

11   Bothersome scale, let's start first with the primary outcome

12   measure, which was the five-minute injection summed across

13   14 days.

14          Is this comparable to any CTCAE standards?

15   A.    No.

16   Q.    If we look at the Bothersome standard, is that

17   comparable to any CTCAE methodology?

18   A.    No.

19   Q.    Can you get concordant results -- can you be assured

20   you are going to get concordant results under the CTCAE

21   standards and Dr. Pardo's Bothersome scale?  For example, if

22   you are looking at the same injection site reaction.

23   A.    Clearly not.  The Bothersome scale is entirely

24   subjective.  It is a ten-point scale.  There is no way to

25   know how one would make assessments of that in comparison to

Pleasure - direct

1     the CTCAE.

2     Q.    And this comparison is set forth at DDX-1200.50?

3     A.    Yes.

4     Q.    If we can take look at the next slide and focus on the

5     post hac analysis that assigned a severity score to patients

6     with itching and redness.  I would like you to assume a Dr.

7     Pardo patient who had all six ISRs reportedly every single

8     day at the top of the severity scale.

9            How would that patient be graded under the CTCAE

10    injection standards?

11    A.    Certainly, one would, using the CTCAE standards on

12    Page 58 for injection site reactions, for instance, for an

13    area of redness, that would always be -- erythema was Grade

14    1, no matter what the severity score was given in Dr.

15    Pardo's scale.  Similarly, for warmth to touch, it would

16    categorically be Grade 1.

17           There is not a clear place to put some of the

18    other scores here.  So it is hard to know what one would

19    could do about those.  But, clearly, one would never get

20    severe with either warmth or redness.

21    Q.    So is the Pardo paper consistent or inconsistent with

22    the premise that there is a standard and widely accepted

23    method for grading each area of ISRs and IPIRS used in the

24    art that a person of ordinary skill in the art could apply

25    to the '776 patent for the types of reactions seen in Pardo?

1   A.    It shows that there was no such method.

2   Q.    Let's turn next to the Stewart paper, DTX-1190.  Did

3   you also consider Stewart, Injectable Multiple Sclerosis

4   Medications, a Patient Survey of Factors Associated With

5   Injection Site Reactions, DTX-1190, in connection with your

6   indefiniteness opinions in this case?

7   A.    I did.

8   Q.    What method did Stewart apply to assess injection

9   related events as mild, moderate or severe?

10  A.    Stewart came up with a new set of criteria, where mild

11  was usually transient, and involved some of the ISRs,

12  including heat, redness, swelling and/or bruising.  Moderate

13  was possibly not transient.  And it involved discomfort and

14  itching and pain, and a couple of other things.  And 3 was

15  severe, which essentially involved, you know, skin

16  destructive type lesions, like scabs or infections or

17  necrosis.

18        And of import, Stewart noted that the categories

19  of mild, moderate and severe were not mutually exclusive.

20  Patients could have ISRs that could fit into multiple

21  categories.

22  Q.    So the types of patients that Stewart identified as

23  ones who could have multiple ISRs across multiple

24  categories, does the '776 patent give any guidance as to

25  which ISR you are even supposed to pick to do the ultimate

Pleasure - direct

1    assessment of severity?

2    A.    No, none.

3    Q.    I would like to direct your attention to

4    DTX-1190.0002.  Again, this is the Stewart paper at Page 47

5    of the article, last paragraph in the right-hand column.

6          What did Stewart acknowledge when he was

7    planning his ISR assessment?

8    A.    So he clearly was recognizing the problem that we are

9    seeing.  Although ISRs -- this is a quote -- Although ISRs

10   are universally recognized to be an issue of the use of

11   injectable DMTs for MS, the term currently has no standard

12   definition, nor is there any widely accepted method for

13   grading the severity of ISRs.

14   Q.    And when you said nor is there any widely accepted

15   method for grading the severity of ISRs, was that a direct

16   quote from the Stewart paper?

17   A.    Yes, that's all the underlined portion.

18   Q.    Is this a peer-reviewed publication?

19   A.    Yes.

20   Q.    Now, is the Stewart paper consistent or inconsistent

21   with the premise that there is a standard and widely

22   accepted method for grading the severity of ISRs that would

23   have been available to a person of ordinary skill in the art

24   to use with the '776 patent?

25   A.    It is inconsistent with that.

1    Q.    Let's go next to the GLACIER method, which is

2    JTX-7134.  Dr. Pleasure, have you reviewed and relied on the

3    Wolinsky GLACIER publication in this case, JTX-7134?

4    A.    I have.

5    Q.    Was Dr. Fox involved in this study?

6    A.    I believe Dr. Fox was a site investigator.

7    Q.    Now, when the GLACIER study, JTX-7134, tried to assess

8    ISR severity, did it use any of the methods that I just

9    reviewed from the MS literature?

10   A.    No.

11   Q.    All right.  Where do these definitions come from?

12   A.    So the definition of severity was defined -- was

13   defined strictly by the patient.  And it was defined as mild

14   if the injection related adverse event was, in quotes,

15   easily tolerated, moderate if it interferes with normal

16   daily activity, or severe if it prevents normal daily

17   activity.

18   Q.    Are these daily activity concepts as expressed in the

19   GLACIER method description synonymous with the types of

20   activity descriptions that we saw listed on Page 2 of the

21   CTCAE?

22   A.    Absolutely not.  In the CTCAE on Page 2, you have

23   listed for Grade 2 moderate age appropriate instrumental

24   ADLs as being limited in moderate grade reactions.

25             Underneath is the footnote that says what those

1    are, Instrumental ADLs referring to preparing meals,

2    shopping for groceries or clothes, using the telephone,

3    managing money, et cetera.

4              For Grade 3, which includes limiting of

5    self-care ADLs, the activities of daily living that are

6    included there are, for instance, bathing, dressing,

7    undressing, feeding yourself, using the toilet, et cetera.

8    Q.    Now, if we go back to JTX-7134.2, Page 371 of the

9    article, how did the Glacier study generally characterize

10   the ISRs of the lipoatrophy and skin necrosis?

11   A.    It called out those two ISRs and called them more

12   severe ISRs, such as lipoatrophy and skin necrosis, occur

13   less frequently.

14   Q.    In your opinion, does lipoatrophy actually meet the

15   criteria for severe, namely, prevents normal daily activity?

16   A.    Well, I think this was discussed a little bit in the

17   Court.  I mean, generally, lipoatrophy would not limit,

18   would not block normal daily activity.

19              It certainly wouldn't usually prevent it.  If

20   your daily activity requires you to wear a bathing suit,

21   then perhaps for aesthetic reasons you might decide that it

22   does prevent your normal daily activity.  But it wouldn't

23   actually be for physical reasons.  It would be for purely

24   aesthetic reasons, I believe.

25   Q.    All right.  Now, one of the things that Dr. Wynn

Pleasure - direct

1    talked about during the infringement case is he talked about

2    the frequency of the injection site reaction of warmth being

3    almost 11 times as common on a daily basis than the three

4    times a week administration.

5              How is warmth graded under the CTCAE Page 58

6    standards?

7    A.    So here you can see the quote from Dr. Wynn's

8    testimony, and he mentioned that warmth was 11 times more

9    common.  And using that as some measure of I'm not sure

10   what, really, and here, you can see that in the CTCAE

11   standard for injection site reactions on Page 58, warmth is

12   always Grade 1.

13   Q.    Now, one of the other things that Dr. Wynn identified

14   was the injection site reaction of bruising.

15             How is bruising graded under the CTCAE injection

16   site reaction standard?

17   A.    So bruising doesn't actually appear in the injection

18   site reaction standards on Page 58 of the CTCAE, as far as I

19   can tell.

20   Q.    All right.  So it doesn't even meet the mild

21   threshold?

22             MS. HOLLAND:  Objection.

23   A.    Well, I can say it's not there.

24             THE COURT:  Sustained.

25             MS. MAZZOCHI:  Sorry.

1  BY MS. MAZZOCHI:

2  Q.    Does bruising meet the mild threshold under the CTCAE

3  standard?

4  A.    It's not listed, and so it presumably doesn't meet, it

5  doesn't meet the standards, period.

6  Q.    All right.  But did Dr. Stewart grade warmth and

7  bruising in DTX-1190?

8  A.    Yes, he did.  Dr. Stewart, here on this slide, you can

9  see down below Dr. Wynn's testimony, and you can see that

10  Dr. Stewart graded this as mild with involving heat, would

11  be warmth, and bruising are both mild.

12  Q.    All right.  If we can turn to Glacier Table 3 which is

13  the ISR frequency in annualized rate table.  That is at

14  JTX-7134.5.

15        Does this table mention the symptoms that the

16  Glacier text called a more severe ISR?

17  A.    Yes, they're both, lipoatrophy and necrosis are in

18  this table.

19  Q.    Did the necrosis frequency go up or down when

20  comparing patients on glatiramer acetate 20 milligrams daily

21  and patients on 40 milligrams GA three times a week?

22  A.    It went up.

23  Q.    And did the lipoatrophy frequency go up or down   when

24  comparing patients on glatiramer acetate 20 milligrams

25  daily --

Pleasure - direct

1   A.      It went --

2   Q.      -- versus the 40 milligrams three times a week

3   patients?

4   A.      Sorry.  It went up, although it was very infrequent.

5   Q.      All right.  Dr. Pleasure, can you illustrate for the

6   Court how it is that the same symptom in the same patient

7   can change classification systems depending on which method

8   is applied?

9   A.      So there are a couple of examples to follow.  So, for

10  instance, we already heard a little bit about the SONG study

11  where we have patients who had a statistically significant

12  difference in their pain measured at 8 versus 11 depending

13  on whether they used a half milliliter formulation of the

14  glatiramer acetate or one millimeter of glatiramer acetate,

15  both at 20 milligrams.  And those were both at the far left

16  end of the VAS scale.  So they would certainly, as was

17  questioned by Dr. Kreitman, would not be clinically

18  significant despite the clinically statistical difference.

19          The GLACIER study would ask the patients to

20  determine whether a dose severity interfered with normal

21  daily activity or prevented daily activity.  It's difficult

22  to know without any further information.  And in the CTCAE,

23  Page 58, those would always be classified as Grade 2,

24  moderate.

25  Q.      So how can a person of ordinary skill in the art

1    determine whether a patient has experienced reduced severity

2    for pain in the context of the '776 patent given all these

3    different methods?

4    A.    Since there is no method given in the patent, there is

5    no way to know.

6    Q.    Let's take a look at all the methods from the

7    publications sponsored by Teva side by side, and I will

8    direct your attention to DDX-1200.62, which has the SONG

9    study, DTX-1169; CTCAE, DTX-1179; GLACIER, JTX-7134; and the

10   Pardo paper, DTX-1170.  And I'll ask you to focus on the

11   same symptoms of the redness, itching.

12         Do those same symptoms all get classified the

13   same way?

14   A.    No.  So the different studies and approaches give you

15   different classifications.  So, for instance, in the SONG

16   study, redness/itching, the patient is asked to grade it on

17   a severity scale of 0 to 3.  So the redness/itching that you

18   see, it will be graded as mild, moderate or severe or

19   absent.

20         In the GLACIER study, it would entirely depend

21   on whether, the severity would depend on whether that

22   redness and/or itching led to an interference with normal

23   daily activity or were easily tolerated.

24         I would say that redness would usually be easily

25   tolerated unless, of course, we're talking about the person

1   who had red marks and wants to wear a short skirt or

2   something.  But typically, otherwise, if it's the itching or

3   if it's someone that is not going to wear a short skirt,

4   then it would be easily tolerated.

5           In addition, itching is a remarkably variable

6   symptom from person to person.  Some people are extremely

7   bothered by itching and other people are really not bothered

8   by itching.

9           So the severity, according to the GLACIER

10  standards, would be extremely subjective for the individual.

11  It might even be dependent on what the person is doing that

12  day.  Itching would bother some people much more if they're

13  doing one thing than it would if they're doing something

14  else, so how do we have the standard work here?

15          And then the Pardo study, the bothersome index

16  essentially would presumably be what you would do or you

17  might do some sort of frequency measure of how many

18  different symptoms you have every day over a 12 -- over a

19  14 day period, but it is clearly different from each other.

20          And then the CTCAE standard for injection site

21  reaction, on Page 58, would grade both redness and itching

22  always as mild.

23  Q.    All right.  So did Teva's own methods in Teva's own

24  funded publications lead to consistent or inconsistent

25  outcomes for severity assessments when it comes to redness

1    itching?

2    A.    It was clearly inconsistent.

3    Q.    So if you can sum up, what are some problems with the

4    "reduced severity" term when it comes to the measurement

5    methodologist in the '776 patent?

6    A.    So really I think that the three features that I have

7    already identified are really important.

8              So, first, the patent.  The patent doesn't pick

9    a method.  It doesn't give us a method.  If it gave us a

10   method, we could live with the method, but there is no

11   method that is in there.

12             The art at the time clearly shows that there

13   were a multitude of different methods that one could look

14   at, and that they were inconsistent with each other.

15             The art also clearly shows that you failed to

16   pick, that there is no -- a POSA doesn't have a method that

17   they can pick as a sole appropriate method or even the most

18   appropriate method because each of them is designed for

19   different purposes and allow different, different benefits,

20   and different drawbacks.

21   Q.    All right.  So at the beginning of your testimony, you

22   also stated -- and I think this is your next bullet point on

23   the slide -- that a separate problem with the "reduced

24   severity" term involved the subjectivity of the

25   measurements.  Can you explain that, please?

1  A.    Yes.  So all of these problems compounded,

2  particularly the multitude of methods, the language of

3  picking a specific method, leads you to a situation where

4  you have a great deal of subjectivity, depending on the

5  method, depending on the patient, depending on the day.

6          The signs and symptoms that comprise the ISRs

7  can be largely aesthetic in nature at times.

8          They can be dependent on the patient perception.

9          They can be dependent on external circumstances.

10  For instance, what time of year it is, or what the patient

11  is doing that day or what the patient is going to be doing

12  next week.  We really don't know.

13          In addition, obviously, there is, there is the

14  possibility of variability from injection to injection,

15  because depending on how you do the injection at that

16  particular time can lead you to end up with different ISRs.

17          The literature clearly shows that there are

18  these multitude of methods that seem to have different goals

19  in mind, depending on the study, and there was no clear

20  standard.  So that is the consequence of having no clear

21  use.

22  Q.    Were you in the courtroom when Dr. Wynn testified that

23  he thought 40 percent of MS patients might have some degree

24  of cognitive impairment and that can lead patients to

25  sometimes report more ISRs with areas of redness or

Pleasure - direct

1    scarring?

2    A.    Yes, I was.

3    Q.    All right.  If we accept that as true, what does that

4    tell you about the subjectivity of classifying ISR severity

5    particularly under any patient driven standard?

6    A.    Well, I mean it tells us a number of things.

7              First of all, presuming that what Dr. Wynn meant

8    is that patients would not be capable of doing injections

9    properly, then it tells us clearly how well the patients are

10   trained to do the injections is important.

11             Now, it's worthwhile with those non-physicians

12   in the audience and the Court to know that Teva has a

13   system where patients are trained in how to give themselves

14   injections.  A nurse, in most places in the country, a nurse

15   goes to the patient's house and trains them, that nurse or

16   other trainer.  And that nurse assesses if the patient is

17   capable of giving the injections safely and, if not, will

18   inform the doctor, and it may be decided that a different

19   caretaker has to give the injections.

20             So I don't know whether what Dr. Wynn was saying

21   was correct about the presumed outlier patients, but it

22   clearly indicates there is another level of variability

23   here.  Patients who are incapable of doing injection regimen

24   properly will have different ISRs even whichever regimen is

25   prescribed.

1    Q.    What would that indicate about indefiniteness of the

2    "reduced severity" term in your opinion?

3    A.    I think all these factors that we talked about

4    indicate the "reduced severity" term is indefinite.

5    Q.    Let's see how all this fits together with the '776

6    patent claims.  And, again, Dr. Pleasure, do all of the

7    asserted claims from the '776 patent contain the "reduced

8    severity" term?

9    A.    They do.

10   Q.    All right.  And what did you ultimately conclude about

11   whether the "reduced severity" term in the '776 patent has a

12   scope that is reasonably certain to the person of ordinary

13   skill in the art?

14   A.    So as I have listed here on the screen, there is no

15   reasonable certainty on what method to use to assess, what

16   comparative standard to use, the patent and the literature

17   do not pick a method and, therefore, the difficulty of

18   ascertaining whether the claim scope covers a particular

19   patient or not.

20   Q.    Dr. Pleasure, what do you ultimately conclude about

21   whether the "reduced severity" term in the '776 patent is

22   definite or indefinite from the perspective of a person of

23   ordinary skill in the art?

24   A.    Indefinite.

25            MS. MAZZOCHI:  Your Honor, I'm going to quickly

1    shift gears.  It should only take about five minutes.

2                    THE COURT:  Okay.

3                    MS. MAZZOCHI:  If I can have your indulgence.

4    We just need to authenticate a couple things and lay the

5    foundation for a couple exhibits.

6    BY MS. MAZZOCHI:

7    Q.    Dr. Pleasure, in the United States, are there online

8    communities where patients discuss their MS therapy?

9    A.    Yes, they are very, very popular among patients.

10   Q.    Have you ever heard of the MS list?

11   A.    I think you are speaking of "This is MS" chatroom?

12   Q.    Yes, "This is MS."  Yes.  And can you explain what

13   that is?

14   A.    So it's a forum for patients to be able to ask

15   questions of other patients and also of caregivers.  They

16   will write in with questions and worries:  What should I

17   expect when I take this medicine?  What should I do if I

18   have this problem?  And it's clearly not the same as talking

19   to a doctor but it is a pretty active.

20   Q.    And do you have in your binder DTX-1142, 2075, 2076,

21   2077, 2078, 2079, 2080, and 2081?

22                    THE COURT:  Hold on a second.  Yes?

23                    MS. HOLLAND:  Yes, Your Honor.  I just want

24   the record to be clear.  We have objections to all these

25   exhibits on hearsay grounds, and I believe that Ms. Mazzochi

1      understands that.

2                  With the representation that all Dr. Pleasure

3      is going to do, is going to be doing here is just saying he

4      actually pulled these off the Internet, so if that is all

5      that is happening --

6                  MS. MAZZOCHI:  Yes.

7                  MS. HOLLAND:  -- as long as the record is clear

8      that there is no agreement that these are actually admitted

9      into evidence at this point.

10                 THE COURT:  Okay.

11                 MS. MAZZOCHI:  Yes.  We can separately argue

12     whether they're hearsay, et cetera.

13                 THE COURT:  Don't go there.

14                 MS. MAZZOCHI:  Right.

15                 THE COURT:  Do you concur with your colleague?

16                 MS. MAZZOCHI:  Yes.  We're just using this

17     opportunity to explain Dr. Pleasure is the one who found

18     these on the Internet and created the copies for us to have

19     here today.

20                 THE COURT:  Okay.

21                 MS. MAZZOCHI:  Thank you.

22                 THE COURT:  Is that satisfactory, Ms. Holland?

23                 MS. HOLLAND:  Yes.  Thank you, Your Honor.

24                 MS. MAZZOCHI:  All right.

25     BY THE WITNESS:

1   A.    Yes, I found those in the binder.

2   Q.    Have you seen these documents before?

3   A.    Yes.

4   Q.    And are these printouts you prepared from "This is MS"

5   chatroom?

6   A.    Yes.

7   Q.    And do those printouts reflect patient postings that

8   you found?

9   A.    Yes.

10  Q.    All right.  And, Dr. Pleasure, let's talk about

11  another set of exhibits.  Were you the recipient of

12  marketing messages about Rebif versus Copaxone in the 2004

13  to 2008 time frame?

14  A.    Yes.  I spoke with representatives and saw

15  advertisements in journals as well as heard about it at

16  meetings and things like that.

17  Q.    All right.  I'd like to direct your attention to

18  DTX-1275, 1286, and 2071 to 2073.

19        Have you seen those documents before?

20  A.    I'm assuming that they're in the right place, and

21  those are the right numbers, but, yes, I know which ones you

22  are speaking of, and I have seen them all.

23  Q.    All right.  Do they constitute printouts reflecting

24  Rebif marketing materials or items from a website?

25  A.    Yes.

1    MS. HOLLAND:  I have an objection, Your Honor.

2    I think the agreement was that Dr. Pleasure is just going

3    to say whatever the exhibit is, that he is the one who

4    pulled it off the website.  I don't believe we should be

5    characterizing it now that we have the objection.

6    MS. MAZZOCHI:  That's fine.  I'm happy to

7    proceed in that way.

8    THE COURT:  I will strike the response.

9    MS. HOLLAND:  Thank you.

10    MS. MAZZOCHI:  Thank you.

11    THE COURT:  And ask you to restate the question.

12    MS. MAZZOCHI:  Sure.  I'll do it this way.

13    BY MS. MAZZOCHI:

14    Q.    Dr. Pleasure, did you --

15    THE COURT:  Strike the question, the previous

16    question as well.

17    MS. MAZZOCHI:  Let me do it this way.

18    BY MS. MAZZOCHI:

19    Q.    Dr. Pleasure, do you have DTX-1275, 1286, and 2071 to

20    2073 in your binder?

21    A.    1275 ... yes.

22    And then what?  1286?

23    Q.    1286.

24    A.    Yes.

25    Q.    2071 to 2073.

Pleasure - direct

1    A.      2071, let me find it.

2            Yes.

3            And yes.

4            And yes.

5    Q.      All right.  And to the extent the exhibits reflect

6    printouts from a website, did you secure and prepare these

7    printouts through the Internet's Wayback Machine?

8    A.      Yes, not these specific copies that are in the binder

9    but the ones that were furnished to counsel.

10   Q.      Okay.  And for all of these exhibits that we have just

11   discussed from "This is MS" and from the Wayback Machine,

12   did you amend or alter the web pages as you found them

13   online in any of the exhibits that we just looked at?

14   A.      No.

15           MS. MAZZOCHI:  With that, Your Honor, I think

16   I'm done.

17           THE COURT:  Let's take a break.

18           (Brief recess taken.)

19           *     *     *

20           (Proceedings reconvened after recess.)

21           THE COURT:  All right.  Doctor, please.

22           (Witness retakes witness stand.)

23           THE COURT:  Please.

24           MS. HOLLAND:  Thank you, Your Honor.

25           THE COURT:  Your witness.

1              MS. HOLLAND:  I believe we're handing up

2     binders.

3              THE COURT:  Oh, yes.  Yes.

4              MS. HOLLAND:  In case he didn't have enough,

5     Your Honor.

6                         CROSS-EXAMINATION

7     BY MS. HOLLAND:

8     Q.    Good afternoon, Dr. Pleasure.

9     A.    Hello.

10    Q.    Dr. Pleasure, is it fair to say that epilepsy and

11    epilepsy treatment have been the focus of your career?

12    A.    Not the sole focus of my career.

13    Q.    Well, do you recall giving some testimony in a case in

14    this courthouse that Judge Stark was trying in November?

15    A.    Yes, two floors up.

16    Q.    And that was lacosamide; correct?

17    A.    Yes.

18    Q.    And that is an epilepsy drug?

19    A.    It is an epilepsy drug.

20    Q.    Do you recall telling Judge Stark, when you were

21    testifying about the epilepsy drug, that epilepsy and

22    epilepsy treatment were the focus of your career?

23             THE COURT:  Hold on just a second.

24             Yes?

25             MS. MAZZOCHI:  Objection, Your Honor.  Hearsay.

1           She said "do you recall telling Judge Stark."  I

2    mean this --

3           THE COURT:  Overruled.  Yes?

4           MS. MAZZOCHI:  And actually, Your Honor, can I

5    have a sidebar really quickly?  Because I have just seen

6    their exhibits and I just ...

7           THE COURT:  Do you have a problem with the

8    exhibits in addition to the question?

9           MS. MAZZOCHI:  I want to get some guidance so I

10   know what I can and can't do.

11          THE COURT:  Okay.  Let's go.

12          (Sidebar conference held.)

13          THE COURT:  Hearsay?

14          MS. MAZZOCHI:  I'm sorry, no.  All right.  So

15   she basically has a bunch of exhibits from his prior cases,

16   you know, here in Delaware.  I just want to know so we know

17   for future reference for our experts, is all of that fair

18   game?

19          THE COURT:  Impeachment is fair game.

20          MS. MAZZOCHI:  Impeachment is fair game, I

21   understand that.  I want to make sure she isn't going to

22   start questioning --

23          THE COURT:  I don't know what you are --

24          MS. MAZZOCHI:  If she is going to start reading

25   in just parts of his testimony.  She's got District Court

 1     documents.

 2                 THE COURT:  I'm not going to micromanage how you

 3     guys practice; okay?

 4                 MS. MAZZOCHI:  Okay.

 5                 THE COURT:  You are experienced lawyers.  You

 6     should know what you are doing out here.

 7                 MS. MAZZOCHI:  Okay.

 8                 THE COURT:  If there is an objection, object.

 9                 MS. MAZZOCHI:  All right.  Thank you, Your

10     Honor.

11                 (Sidebar conference ends.)

12     BY MS. HOLLAND:

13     Q.    I think I'm going to -- I may repeat a question or

14     two.  I want to make sure I remember where we were.

15                 So you do remember testifying at a lacosamide

16     trial in November of 2015; right?

17     A.    Yes.

18     Q.    And that was a case on an epilepsy drug?

19     A.    It was.

20     Q.    Okay.  Do you recall at that trial telling the Court

21     and testifying that epilepsy and epilepsy treatment were the

22     focus of your career?

23     A.    Well, I think that it's -- I do remember that, but  I

24     think the clarification is warranted in the sense that I

25     think that my career, my research career has now spanned

Pleasure - cross

```
 1    15 years as an independent researcher and longer than that.

 2    And I published quite a bit on a variety of things.  Brain

 3    development has to do with both epilepsy and MS.  I don't

 4    think I meant an answer to mean it was the sole focus of my

 5    career.

 6    Q.    But the focus of your career hasn't changed since

 7    November of 2015; right?

 8    A.    Epilepsy was not the sole focus of my career, ever.

 9    The focus of my career includes the basic research that my

10    laboratory does as well as my clinical interest as well as

11    other research interests that are disease related.

12    Q.    I just want to get an answer to that specific

13    question, though.  Is it fair to say epilepsy and epilepsy

14    treatment have been the focus of your career?

15    A.    I answered that.  I think that it is one of the

16    focuses of my career.  I have other focuses of my career as

17    well.

18    Q.    Now, you mentioned a research fellowship in your

19    direct testimony.  Do you recall that?

20    A.    Yes.

21    Q.    And that research fellowship was related to epilepsy

22    development; right?

23    A.    It was related to development of the brain actually, a

24    particular portion of the brain called the hippocampus that

25    is important to learning and memory as well as epilepsy.
```

Pleasure - cross

1    Q.    Do you recall testifying before Judge Stark on the

2    epilepsy treatment that your fellowship was related to

3    epilepsy development?

4    A.    Could you point me to where you are referring?

5    Q.    Sure.  If you go to Tab 3 in the binder in front of

6    you.

7    A.    Okay.

8    Q.    And you go to Page 223.

9    A.    Okay.

10   Q.    I'm sorry.  224.

11   A.    Okay.

12   Q.    And just to put, just to direct you to the right

13   place, this is questioning that your counsel was doing of

14   you at that trial.  And if you look on Page 224 at Line 23

15   to 25, you can look at that before my next question.

16   A.    Right.  No, I see that.  And I already responded to

17   your question about that.

18   Q.    Well, let me just read it into the record then.

19              The question was from your own lawyer.  The

20   question was:

21              "Question:  Is it fair to say that epilepsy and

22   epilepsy treatment have been the focus of your career?"

23              And you answered:

24              "Answer:  Yes."

25              Is that what it says in the transcript?

1    A.      That is what it says.

2    Q.      Thank you.   Okay.

3    Q.      Now, most of the papers from your laboratory are also

4    related to epilepsy.   Right?

5    A.      I would say that's probably not true.   That's not

6    accurate.

7    Q.      Why don't we go back, since the transcript is probably

8    still open, let's go to Page 223, this is from the

9    Lacosamide trial and the epilepsy drug.   I would like you to

10   look at Page 223, Lines 9 to 16.   I just want you to look at

11   those lines, then I am going to ask you a question, but I

12   haven't asked it yet.

13           Have you had a chance to review them?

14   A.      Yes.

15   Q.      Were you asked by your lawyer in that case:   Have any

16   of the papers related to epilepsy?

17           And did you answer:   Well, I would say generally

18   most of the papers from my laboratory are related to

19   epilepsy.

20           MS. MAZZOCHI:   Objection, Your Honor.   That is

21   improper impeachment.   It's not inconsistent with his prior

22   answer.

23           THE COURT:   I think you have to go into the

24   answer, later into the answer.   Overruled.   Go ahead.

25   BY MS. HOLLAND:

Pleasure - cross

1   Q.      So you said, "Generally, most of the papers from my

2   laboratory are related to epilepsy."

3           Is that what you said in that answer?

4   A.      Could I read the rest of the paragraph?

5   Q.      Sure.

6   A.      Okay.  So, as I said in the testimony, I said,

7   "Generally, most of the papers from my laboratory are

8   related to epilepsy, either directly or in the sense that

9   they address the etiology of epilepsy in some fashion, but

10  some of them have been much more directly related to

11  epilepsy, having to do with epilepsy in animal models or

12  studying animal models that have a tendency to have

13  seizures."

14  Q.      None of the your publications relate to the study of

15  MS in patients.  Is that right?

16  A.      In virtually the same way that my answer is correct

17  here for epilepsy, it can be seen that it is correct for

18  several papers from my CV as well.

19  Q.      Let me try to ask the question again.  We must have

20  had a miscommunication.

21          You don't have any publications that relate to

22  the study of MS in patients who are experiencing MS.  Isn't

23  that right?

24  A.      I am not a clinical researcher.

25  Q.      So while we are on that topic, you have no

1    publications on clinical trials of MS therapies.  Is that

2    right?

3    A.    That is true.  I do not.  I am not a clinical trials

4    person.

5    Q.    You have never designed a clinical trial.  Correct?

6    A.    I have not designed a clinical trial.

7    Q.    You have, never, ever, been an investigator in a

8    clinical trial.  Is that right?

9    A.    I have contributed numerous patients to clinical

10   trials, but I have not been an investigator in a clinical

11   trial.

12   Q.    And you don't have any publications that relate to the

13   use of GA or glatiramer acetate to treat patients.  Is that

14   right?

15   A.    That's correct.

16   Q.    Now, you only spend about 20 percent of your

17   professional time with patients.  Is that true?

18   A.    That's about true, yes.  It's always approximate, but,

19   yes.

20   Q.    And 80 percent of your time you spend in preclinical

21   research.  Is that right?

22   A.    It depends upon the definition of preclinical.  I need

23   you to be a little more specific.

24   Q.    Let ask it differently then.  Is it fair to say that

25   20 percent of your time is spent with patients, your

Pleasure - cross

1    professional time?

2    A.    Yes.

3    Q.    And then the other 80 percent you are doing other

4    things in your professional career.  Right?

5    A.    Mostly doing research in my laboratory that has

6    relevance to a variety of diseases.

7    Q.    But you are not actually treating patients during that

8    80 percent of the time.  Right?

9    A.    Correct.

10   Q.    Now, you don't have expertise in pharmacology.  Right?

11   A.    Well, that depends on what you mean by expertise.  I

12   am not a pharmacologist by training, but as a clinical

13   neurologist who takes care of patients, I obviously have

14   experience in the kinds -- some of the sort of practical

15   things about pharmacology that are important.  My Ph.D. in

16   neuroscience included neuropharmacology.

17   Q.    But you don't consider yourself a clinical

18   pharmacologist.  Right?

19   A.    Oh, no.  I am a physician.

20   Q.    I want to talk about your indefiniteness opinions.

21   Can we go to Slide DDX-1220.6.  I hope I have the right

22   version because the numbers may have changed overnight.  It

23   is the slide that Ms. Mazzochi showed you that had the claim

24   limitations.

25         If we look at Claim 1, that contains a

Pleasure - cross

1    limitation you testified about that says, Treating a human

2    patient suffering from a relapsing form of MS while inducing

3    reduced severity of injection site reactions."

4              Right?

5    A.    I see that.

6    Q.    And you understand that according to the Court's claim

7    construction, I think it was actually by stipulation of the

8    parties, severity refers to the intensity of an injection

9    site reaction.   Right?

10   A.    Yes.

11   Q.    And many injection site reactions are dependent on

12   patient perception.   Right?

13   A.    I am not sure what you mean by many.   Do you mean many

14   types or many individuals?

15   Q.    Let me try it again then.

16              If a patient says they are in pain, it depends

17   on the patient's perception of that reaction.   Right?

18   A.    Pain is a notably pretty subjective symptom, that's

19   correct, I think as was stated by someone else.

20   Q.    Now, you have never evaluated an injection site

21   reaction or an IPIR in the context of a clinical trial.

22   Right?

23   A.    I believe that's true.

24   Q.    So let's just talk about your clinical practice then.

25   I think you testified in your direct examination that you

1    have patients who have experienced ISRs or IPIRs.  Right?

2    A.    Yes.

3    Q.    And I think you also said that you discuss the

4    tolerability of those reactions with them?

5    A.    I do.

6    Q.    And is it fair to say that most of the time those

7    reactions occur actually when they are not in your office?

8    A.    That's true, yes.

9    Q.    And so there is no way for you to really evaluate them

10   except depending on reports from patients.  Right?

11   A.    Well, the most important question that I have for

12   those patients when they come to see me is, whatever adverse

13   events you are experiencing, are they things that you

14   tolerate?  Are they bothering you enough that you would

15   discontinue the medicine?

16   Q.    And you rely on the patients for their kind of

17   self-evaluation on that issue.  Right?

18   A.    Certainly, one needs to rely on the patient for some

19   aspects of this.  However, one of the things that's

20   difficult and hard to rely on the patients in some ways is

21   that it's my experience that when a patient comes to see me

22   and we discuss any adverse events they are having, the one

23   that they have had most recently is probably the one that

24   they are going to talk about the most.  Whereas the ones

25   they might have had three months ago may be ones they don't

Pleasure - cross

1   talk about.

2   Q.   In any event, you don't have an independent way to

3   assess, for example, how much pain a patient is in, you rely

4   on a patient.  Right?

5   A.   At the time that they are in my office, yes, and if I

6   ask them how much pain were they in, they might give me some

7   indication that it was bearable pain or not.  But each

8   person is different.  So each person's tolerance of pain is

9   different.

10  Q.   That's exactly the point I am trying to get at.

11           Why don't we look back at the claim.  It refers

12  to a method of treating a human patient.  Okay?

13  A.   Yes.

14  Q.   Just for the moment, I want to focus on a particular

15  patient, a hypothetical patient, but one patient, who comes

16  into your office with injection site reactions.  That

17  patient is in the best position to assess whether one

18  injection site reaction is worse than the other.  Right?

19  A.   In a certain sense, if you are speaking about pain

20  specifically, they would probably be in the best position to

21  tell me whether one injection site reaction was more painful

22  than another.

23           However, it is important to realize that

24  injection site reactions vary tremendously even within the

25  same patient.

Pleasure - cross

1             So that it would be unusual for a patient to

2    come and tell me that they have had -- every injection site

3    reaction feels exactly the same.  They would tell me, I have

4    been having a lot of them and I can't tolerate them anymore

5    because they are painful.

6    Q.    Why don't we do this.  Why don't we concentrate on

7    pain as example of an injection site reaction.  Okay?

8    A.    Okay.

9    Q.    I am talking about a particular patient who has pain

10   with injection site reactions.  That patient can come into

11   your office and say, the Injection site reaction I had on my

12   shot on Day X was more intense than the reaction on Day Y.

13   Right?

14   A.    That's not something in my experience a patient has

15   ever said to me.

16   Q.    But if you were going to assess relative intensity of

17   injection site reactions, you have to assess it based on how

18   the patient experienced it.  Right?

19   A.    Right.  But I am concerned with whether the patient is

20   tolerating the medication well enough to continue it.  That

21   is the main concern.

22   Q.    I am sorry to cut you off.  That is separate question.

23   That is not what I am dealing with right now.  Right now I

24   only want to know about the relative intensity of injection

25   site reactions.  And I think you agree with me that the

1    patient is in the best position to assess the relative

2    intensity, for example, of pain that they experience with

3    two reactions.   Right?

4    A.    Well, you know, barring, of course, the aspects of

5    memory and the vagaries of memory and what the person was

6    doing that day and all those kinds of things.   I think it is

7    very hard for the patient themselves, the patient is the

8    ultimate arbiter of whether they can continue the medicine,

9    whether the reactions they are having, whether pain or any

10   other, are too difficult for them to tolerate.

11          However, objectively, patients would admit that

12   sometimes the same pain would bother them more than other

13   times.   So they would say that it bothered them more then or

14   another time.

15   Q.    But the patient knows -- I assume all of us in the

16   courtroom have experienced pain at one time or another.

17   People can appreciate the different intensity of pain from

18   different sources.   Wouldn't you agree with that as a

19   doctor?

20   A.    I think one of the things we saw, for instance, from

21   the SONG study, was that the difference on the Visual Analog

22   scale was very, very small.   And I am not sure that an

23   individual would, if, given those pains, absent the

24   knowledge they were getting the .5 milliliter injection or

25   one milliliter injection, would have actually been able to

Pleasure - cross

1    discriminate them.

2    Q.    Let me ask it this way then.   Let's say a patient is

3    comparing reaction from an injection taking a 40 milligram

4    three times a week dose and a 20 milligram daily dose, the

5    patient is comparing those two.   The patient says, I had a

6    worse injection site reaction, more intense, on the 20

7    milligram?

8    A.    What type of injection type reaction?

9    Q.    That pain, we are talking about pain.

10          That relative intensity of the two injections is

11   not going to change no matter what scale you put them on.

12   Isn't that right?   They are still going to be ordered in the

13   same way, more intense or less intense?

14   A.    I disagree with your premise, because it's not true

15   that patients would have the same injection pain from every

16   injection of 20 milligrams.   And it's also not true that the

17   patients would have the same pain from every injection of 40

18   milligrams.   Therefore, even within the same formulation,

19   the amount of pain they have would depend on where they

20   injected it, whether they did the appropriate things before

21   injecting to help minimize pain, like, for instance, warming

22   the area, giving the injection and using ice afterwards.

23   All of those things will contribute to whether the patient

24   has more or less pain.

25   Q.    Thank you, Doctor.   But I think my question was a

1    little different.  Let me try it again.  Hopefully, you can

2    give me an answer to what I think I am asking.

3                Let's say a patient has an injection site

4    reaction from 20 milligram every day, one injection site

5    reaction, one experience of pain, and has another injection

6    site reaction, again, one reaction, one experience of pain

7    from the 40 milligrams three times a week.  And the patient

8    says, My pain was more intense on the 20 milligram than on

9    the 40 milligram.

10                I am just asking about the relative intensity of

11    the pain.  The relative intensity of the pain doesn't change

12    based on what scale you put them on.  Wouldn't you agree

13    with that?

14    A.    No -- well, I think the patient -- if the scale that

15    you are asking me to apply -- what scale are you asking me

16    to apply?  You are asking me I think to apply the patient

17    scale.  Right?  The patient's subjective scale?

18    Q.    Yes.

19    A.    And I know, as a clinician who has taken care of

20    patients for a pretty long time now, that actually the

21    patient's pain scale will vary at different times.

22                You have asked me to construct a situation which

23    is not ever in reality what happens.  You are presumably

24    telling me that I would have a patient who today injected 20

25    milligrams in one arm and tomorrow injected 40 milligrams in

Pleasure - cross

1    another arm, which never happens in reality, right?

2              So patients are either on 20 milligrams daily,

3    or they are on 40 milligrams three times a week.  If I have

4    a patient who has switched to 40 milligrams, let's say,

5    which I know is where you are going, they would recollect --

6    their recollection of, Well, you know, six months ago, Doc,

7    it was better or worse, I don't think that that recollection

8    is reliable.

9    Q.    Doctor, you talked about a lot of hypothetical

10   situations in your direct testimony.  Right?  Remember, you

11   had a scale and said, well, if you looked at it on this

12   scale it would look one way but on another scale it would

13   look a different way.  Those were all hypotheticals.  Right?

14   A.    I don't think most of those were, by my lights,

15   hypotheticals.  I think most of them were categorical

16   definitions based on a scale.

17   Q.    Let me ask, in your testimony, you haven't pointed to

18   a single example of a clinical research study where

19   different scales were used within the same study.  Right?

20   A.    Well, I think the Pardo study is different scales

21   within the same study, actually.  It had at least three

22   different scales.  I don't think they compared the data to

23   tell us --

24   Q.    Have you pointed to any study where a patient's pain,

25   an actual study, a single example, where the patient was

1    tested on different scales of severity and came out

2    differently on the different scales?

3    A.    Well, I don't think that that was actually the

4    intention of any of the studies --

5    Q.    I am just -- I just want to know whether or not you

6    pointed to any actual example of an actual patient who had a

7    different severity score in one study than in another.

8    A.    Yes, I did, actually, because --

9    Q.    In a single study?

10   A.    In a single study.

11           MS. MAZZOCHI:  Your Honor --

12           THE COURT:  Ms. Holland, let him finish his

13   answer.  You are driving my court reporters a little wacky.

14           MS. HOLLAND:  I am sorry if I am talking too

15   fast as well.

16           THE WITNESS:  I believe I did actually talk

17   about examples of reactions that were graded in one way in

18   one study and clearly would have been graded and were graded

19   in a different way in another study.  For instance,

20   lipoatrophy, or, for instance, necrosis in the SONG study,

21   which was described as being mild in intensity but clearly

22   would, according to other standards, not be.

23   BY MS. HOLLAND:

24   Q.    I think I need to ask the question again, because I

25   thought my question was focused on whether you had cited any

Pleasure - cross

1    study where a single particular patient was tested on two

2    different scales and had two different -- let me ask it that

3    way first.

4           You haven't cited a single clinical study with

5    evidence that one patient's symptoms of ISRs were tested in

6    different ways on different scales?

7    A.    I would say that we have seen abundant clinical

8    studies where patients with the same category of ISRs have

9    had different severity measures within that study at

10   different times.

11   Q.    I am sorry.  I am trying to get -- I want an answer to

12   my question, which is:  Have you pointed to any studies

13   where one individual patient was tested on different scales

14   and had different results?

15   A.    I don't think such a study is present in the

16   literature.

17   Q.    Thank you.

18          You also haven't pointed to any examples from

19   your clinical practice?  You haven't pointed to any in your

20   testimony.  Correct?

21   A.    I wonder -- I thought I did discuss, for instance,

22   patients who decided that -- I need clarification on the

23   question.

24   Q.    Let me ask it again then.  You haven't pointed to a

25   single example, in clinical practice or in any research

Pleasure - cross

1   study, where the use of different severity scales on a

2   particular patient, an actual patient, has produced a

3   meaningfully different result as to whether it was severe or

4   not?

5   A.      Well, typically, I wouldn't actually use severity

6   scales to evaluate my patients in clinical practice.  I

7   would ask them whether they are tolerating the medicine well

8   and whether they want to continue on that medicine or think

9   about switching to a different one.

10  Q.      So you don't have any personal experience with the

11  scales we were talking about in your direct testimony?

12  A.      I wouldn't have used any of these scales in my

13  clinical practice.  I don't see the value of them for the

14  most part for a practitioner.  It would be more for a study.

15  For a study, one would look to those studies.

16              MS. HOLLAND:  Can I have a moment, Your Honor?

17              THE COURT:  Yes.

18              MS. HOLLAND:  No further questions, Your Honor.

19              THE COURT:  Ms. Mazzochi, anything else?

20                    REDIRECT EXAMINATION

21  BY MS. MAZZOCHI:

22  Q.      Dr. Pleasure, I think counsel cut you off.  You

23  mentioned that there was a patient, I believe, in the SONG

24  study.

25              Can we have DDX 1200.33, on this slide from

1   DTX-1169.00006 from the SONG study?

2   A.    Yes.

3   Q.    What is the description of the one patient here?

4   A.    So there is a patient who reported injection site

5   necrosis, which was characterized as mild in intensity.

6   Q.    And that's one patient?

7   A.    That was one patient.

8   Q.    And how would that one patient be graded under the

9   CTCAE Page 58 injection site reaction standard?

10  A.    Well, they would have been considered to be severe,

11  Grade 3.  I think that would have been the standard of, for

12  instance, Dr. Wynn as well.

13  Q.    Under the GLACIER standard, how would that patient

14  have been classified?

15  A.    So the GLACIER standard called them more severe ISRs,

16  lipoatrophy and necrosis, so I would assume they would

17  consider that severe.

18  Q.    Under the CTCAE Page 2 standard that Dr. Fox cited

19  during this case, how would that same patient be graded?

20  A.    Well, again, as I said in my direct testimony, it

21  depends on whether it requires medical intervention or

22  whether it required local or non-invasive intervention.

23        So it could be Grade 2 if it was just minimal

24  and required non-invasive intervention.  That would be my

25  typical experience with a small area of necrosis, it would

1    be moderate, Grade 2 scale.

2    Q.    And when it comes to injection site reaction sites

3    such as necrosis or lipoatrophy, who in your opinion is in a

4    better position to assess relative intensity, you or the

5    patient?

6    A.    Actually, since these are sometimes, you know,

7    patients really only have their own lipoatrophy to look at,

8    usually.  And they may be more or less perturbed about it

9    and have difficulty with powerability because of it, but as

10   far as intensity goes, physicians who take care of patients

11   who have lipoatrophy would have be in a better position to

12   compare them.

13             Similarly, a necrosis, whether it was a

14   significant area of necrosis that required debridement and

15   hospitalization or whether it was a small area, most

16   patients would not have much experience with that.

17   Hopefully, not more than one time.

18             MS. MAZZOCHI:  Thank you very much.

19             No further questions, Your Honor.

20             THE COURT:  Thank you, Dr. Pleasure.

21             MS. MAZZOCHI:  Your Honor, on behalf of the

22   defendants, that ends our invalidity case-in-chief.

23             THE COURT:  All right.

24             MS. MAZZOCHI:  Thank you.

25             THE COURT:  Mr. Wiesen.

1        MR. WIESEN:  Your Honor, I will be brief, I

2   promise.

3        Now that the defendants' evidence on validity

4   has come in, we move under Rule 52(c).

5        THE COURT:  Oh, come on, Mr. Wiesen.  Really?

6        MR. WIESEN:  Your Honor, there is one issue I

7   would like to address very, very briefly.

8        THE COURT:  Well, address the one issue you

9   think has merit because all the others cannot possibly.

10        MR. WIESEN:  And the one issue is the 112 issues

11   on the '250, '413, and '302 patents addressed by Dr. Green.

12        THE COURT:  All right.

13        MR. WIESEN:  They were written description and

14   enablement, and Dr. Green did not, actually to my surprise,

15   quite frankly, put the specification even up on the screen

16   to talk about that argument.  He simply said the example is

17   prophetic.  Therefore, there is no written description or

18   enablement and he moved on.

19        And I think legally, Your Honor, that is

20   insufficient.  The law is plain prophetic examples have to

21   be considered and analyzed.  We have cited the case law on

22   that in our proposed findings from 688 to 691.

23        You can look at the defendants' own proposed

24   findings, Paragraph 1174, which acknowledges that is the

25   law.  And having not addressed the specification at all on

1    Section 112, this is for the '250, '413 and '302 -- I'm not

2    talking about the '776.  For that, they have failed to put

3    on adequate evidence to prove their case.

4              THE COURT:  Let me get a response.  I see

5    Mr. Anstaett looming in the background.

6              MR. ANSTAETT:  If Your Honor would like a

7    response?

8              THE COURT:  Well, yes.  Mr. Wiesen wisely picks

9    his strongest point.

10             MR. ANSTAETT:  If that is his strongest point,

11   I'll set the commentary aside.

12             THE COURT:  Okay.

13             MR. ANSTAETT:  Dr. Green clearly talked about

14   the specification of all of the patents.  The specification

15   of all the patents is exactly the same.  The scope --

16             THE COURT:  I'm going to cut you off right now.

17             MR. ANSTAETT:  Okay.

18             THE COURT:  Because here we go again.  I have

19   counsel making representations like both of you have made,

20   and I'm not criticizing.  You are advocates, and I'm

21   expected to recall?  I don't think so.  I'll reserve.

22             MR. ANSTAETT:  Thank you, Your Honor.

23             MR. WIESEN:  Thank you, Your Honor.

24             THE COURT:  Mr. Ware.

25             MR. WARE:  Your Honor, mindful of your

1  admonition that it's late in the afternoon, you are

2  disinclined to hear any of it -- and I just want to say

3  before I make this request, I am a Jets fan.

4           THE COURT:  Is that true?  You are from New

5  England?

6           MR. WARE:  Despite having been born in Boston,

7  lived in Boston --

8           THE COURT:  Yes.

9           MR. WARE:  -- practiced in Boston, I have never

10 heard of the New England Patriots.

11          THE COURT:  Okay.

12          (Laughter.)

13          MR. WARE:  In any event, Your Honor, I would

14 like to call a live witness rather than do video.  Teva

15 calls Gregory Bell.

16

17          ... GREGORY KNOX BELL, have been first duly

18 sworn, was examined and testified as follows ...

19          THE COURT:  Good afternoon, Doctor.

20          THE WITNESS:  Good afternoon.

21          THE COURT:  Do we have a bottle of water?

22          They have it.  He has got it.  Okay.  Let's

23 bring him up a bottle of water.

24          (Water passed to the witness.)

25          THE WITNESS:  Thanks.

1          THE COURT:  Did they hand you the binders?

2          THE WITNESS:  I don't think so.

3          THE COURT:  They're coming.

4          THE WITNESS:  Are they?

5          UNIDENTIFIED PARALEGAL:  I thought I gave him

6     his binder.  No?

7          THE COURT:  No.

8          There you go.

9          (Binders passed forward.)

10          THE WITNESS:  Ah, thank you.

11          THE COURT:  All right, Mr. Ware.

12          MR. WARE:  Thank you, Your Honor.

13                    DIRECT EXAMINATION

14     BY MR. WARE:

15     Q.    Dr. Bell, can you tell us where you are currently

16     employed?

17     A.    I'm at Charles River Associates, based out of Boston.

18     Q.    Briefly tell us what Charles River Associates is.

19     A.    We're a global economics and management consulting

20     firm.

21     Q.    Do you specialize in some particular disciplines

22     within Charles River?

23     A.    Yes.  I lead the global life sciences practice within

24     CRA.

25     Q.    Broadly speaking, what is the global life sciences

Bell - direct

1  practice?  What are among the industries that you look at?

2  A.    So we work with pharmaceutical firms, device firms,

3  diagnostics, wellness issues, and in that context, working

4  on strategy concerns, i.e., how to launch products and

5  market them, policy issues around how governments might

6  create room for innovation, and expert witness kind of work.

7  Q.    How long have you led the life sciences group at

8  Charles River Associates, approximately?

9  A.    Gosh, 20 years.

10 Q.    And does your role include administrative duties as

11 well as substantive advice and consulting?

12 A.    Sadly, yes, it does.

13 Q.    Can you give us some examples in the area of

14 pharmaceuticals in which you have been or for which you have

15 been engaged?

16 A.    Oh, sure.  Well, I've been involved in the launches of

17 probably more than 30 products, 30 pharmaceutical products.

18 I've been doing the work on pricing, contracting of managed

19 care organizations, positioning strategy, value

20 propositions, i.e., how the product might be sold

21 effectively to physicians, to payers on a national and

22 global basis, to patients for products, how competitors

23 might respond to launches, and then this kind of work flows

24 over the lifecycle.  So as the product grows, reaches

25 maturity, how it will respond to generics, that kind of

Bell - direct

1    thing.  That is the strategy work.

2              On the policy side, it is involved in work

3    around how to create an environment for innovation from a

4    national or from a regional policy perspective.

5              And then with respect to litigation, I have

6    been involved in a number of cases regarding damages from

7    patent infringement, commercial breach issues, commercial

8    reasonable efforts, antitrust issues, transfer pricing

9    issues, valuation, et cetera.

10   Q.    Have you been engaged by any of the entities who are

11   defendants in this courtroom?

12   A.    Yes, I have.

13   Q.    And tell us by whom?

14   A.    Well, I certainly have been engaged by Pfizer.  I've

15   been engaged by Sandoz.  I'm not sure.

16   Q.    Mylan?  Dr. Reddy's?

17   A.    Yes, Mylan and Dr. Reddy's.  I've been engaged by both

18   of those, that's right.

19   Q.    Have you had occasion to give advice or consulting or

20   both in the market for multiple sclerosis drugs?

21   A.    Yes, I have.

22   Q.    Can you describe briefly for us your formal education?

23   A.    So, I am a -- well, my formal education?

24   Undergraduate degree with highest honors in Business

25   Administration, minor in Economics.

Bell - direct

1               I'm a chartered accountant in Canada, same thing

2     as a CPA here in the U.S.

3               I have an MBA with high honors from Harvard.

4               And a Ph.D. in Business Economics from Harvard.

5     Q.     And have you testified and been qualified as an expert

6     in federal courts and other courts of the United States?

7     A.     Yes.

8               MR. WARE:  Your Honor, I offer Dr. Bell at this

9     time as an expert in the economics of the pharmaceutical

10    industry.

11              MR. FITZPATRICK:  No objection.

12              THE COURT:  The Doctor is accepted as an expert

13    in the economics of pharmaceuticals.

14    BY MR. WARE:

15    Q.     Please tell us what you were asked to do in this case

16    on behalf of the plaintiffs, Teva and Yeda?

17    A.     So I was asked to assess the commercial success of

18    Copaxone 40 milligram as a secondary indicator of

19    nonobviousness with respect to the patents in suit.

20    Q.     What is your understanding of the subject matter of

21    the patents in suit?

22    A.     My understanding is it's a method of use to treat

23    patients afflicted with relapsing remitting multiple

24    sclerosis using glatiramer acetate 40 milligram dosage,

25    dosed three times a week with at least one day in between

Bell - direct

 1      each dose.

 2                And I also understand that certain claims

 3      regarding this method of use refer to improvements in

 4      tolerability, i.e., the frequency and severity of injection

 5      reactions.

 6      Q.    From the perspective of an economist, why is

 7      commercial success an indicator of nonobviousness?

 8      A.    Well, so the basic idea is that the market abhors a

 9      vacuum.  So the sense would be that if there is a

10      significant market opportunity out there, and the ability to

11      achieve that opportunity is obvious, then somebody is going

12      to go after it.  And so the idea would be an innovation

13      would have been launched earlier, for instance, if it were

14      obvious.

15                So with respect to assessing whether or not an

16      innovation is nonobvious, I do think economics has something

17      to say because economics can help assess whether or not

18      there was that market opportunity for the product and then

19      assess whether or not achieving that market opportunity was

20      due to the patented attributes at issue.

21                So there is that nexus side.  So I might often

22      refer to the first part as kind of commercial success, but

23      really commercial success is both pieces.  Whether or not

24      that is that market opportunity, and then whether or not

25      there is a nexus between the patented attributes and the

Bell - direct

1   ability to realize that opportunity.

2   Q.    Tell us what attributes or what information you

3   considered for purposes of conducting your analysis?

4   A.    It's the standard types of information.  To assess

5   opportunity, you are going to be looking at financial

6   information, sales, profits.

7           From a nexus perspective, you are going to look

8   at how the product is marketed, market research around why,

9   for instance, physicians are prescribing the product, why

10  the patients are using the product, that sort of thing.

11  Q.    Did you have occasion to review any of the testimony

12  of Dr. Wynn, for example?

13  A.    Yes, I did.

14  Q.    What factors did you consider most important for

15  purposes of coming to your opinion and determining whether

16  Copaxone 40 milligram was a commercial success?

17  A.    Well, so up on the screen there, on the left-hand side

18  is kind of the factors considered with respect to assessing

19  the size of the market opportunity, and then the right-hand

20  side is the second piece, i.e., the nexus, the ability to

21  get that opportunity due to the patented attributes.

22  Q.    With respect to each of the three categories, sales,

23  performance relative to competitors, and profitability, what

24  does each of those metrics tell you as an economist?

25  A.    Well, for instance, sales is indicating just whether

1   or not there is demand for the product.

2          Performance relative to competitors, if

3   appropriate in the circumstances, will say whether or not

4   the product is performing better or worse than some of its

5   competitors.

6          And then profitability is speaking to the

7   existence of this market opportunity such that if it were

8   obvious how to go get it, presumably it would have been done

9   earlier.

10  Q.   Well, let me direct you then to the sales information

11  that you looked at.

12         First of all, where did you get the sales

13  information?  How did you derive that information?

14  A.   So there were two sources for the sales information.

15  There was some information on prescriptions which comes from

16  IMS as the standard supplier of data to the pharmaceutical

17  industry, and then there was net sales, dollars information

18  that comes from the Teva financials.

19  Q.   With respect to evaluating sales, what indicators or

20  data, what categories did you look at?  You mentioned

21  prescriptions and you mentioned sales themselves.  What do

22  you mean by that?

23         Let's put it this way:  With respect to

24  prescriptions, what did you look at and consider?

25  A.   Oh, well, the IMS data and information on how

Bell - direct

1    prescriptions to Copaxone 40 changed over time from its

2    launch through to the end of 2015.

3    Q.     And with respect to sales, did you have certain

4    financial information?

5    A.     Yes, I did.  Again, net sales from Teva from launch

6    through at least the end of 2015.

7    Q.     And directing your attention to a graphic that you

8    prepared with respect to prescriptions, what do we see here?

9    A.     Well, this is indicating the product was launched in

10   the first quarter of 2014, basically at the end of

11   January-start of February 2014.  And so 13,000 prescriptions

12   in the first quarter.  271,000 prescriptions in the first

13   year.  These are just U.S. prescriptions.  Another 480,000

14   prescriptions in the second year, 2015.

15          In this two-year period, basically since launch,

16   we are talking about, you know, 750,000 prescriptions of

17   Copaxone 40 milligram in the U.S.

18   Q.     Remind us what your source of total prescription data

19   was?

20   A.     Again, this is the information coming from IMS.

21   Q.     What entities does that IMS data capture, that is,

22   from what sources is the data surveyed?

23   A.     Typically, this is coming from the pharmacies.  They

24   are the ones who are tracking and reporting to IMS how many

25   prescriptions they are dispensing for different products.

Bell - direct

1   Q.      Is that data, IMS data, about which I am sure the

2   Court over time has heard a lot, typically used by

3   economists in evaluating issues in the pharmaceutical

4   industry?

5   A.      Sure.  It's used by economists.  It's used by the

6   companies themselves.  It's pretty standard information.

7   Q.      Let me direct you to another graphic that you

8   prepared.  What does this reflect?

9   A.      So this is the net dollar sales.  This is coming from

10  the Teva financials.  Just to be clear, it is the net sales,

11  i.e., sales less the price concessions that might be

12  associated with it.

13          So rebates, discounts, co-pay coupons, et

14  cetera.

15          And in the first quarter of 2014 they had sales

16  of 193 million dollars.  In the first year, 2014, 1.4

17  billion dollars of sales of Copaxone 40, again in the U.S.

18  alone.  In the second year, 2015, another 2.3 billion

19  dollars of net sales.

20          The bottom line, over those two years, 3.8

21  billion dollars of sales of Copaxone 40 in the U.S.

22  Q.      Have you had occasion to review a portion of Mr.

23  Hassler's 's testimony with respect to sales or net sales in

24  the first six months of 2016?

25  A.      I have, yes.

Bell - direct

1    Q.    And what is that figure?

2    A.    Well, my recollection is it was around 1.3 billion for

3    the first six months of 2016, likely indicating that 2016

4    sales are going to end up higher than 2015.

5    Q.    In the aggregate, the net sales since launch are on

6    the order of what?

7    A.    Well, 3.8 billion through the end of 2015, there is

8    another 1.3, say, on top of that, it would be about 5.1.

9    Certainly five billion.  Again, I want to make clear, just

10   the U.S.

11   Q.    Is 5 billion dollars in sales high, low, or an average

12   pharmaceutical product?

13   A.    Well, there are certainly terms used in the

14   pharmaceutical industry, blockbuster product, typically it's

15   been suggested that blockbuster product might be a billion

16   dollars a year in sales.  Whether that is U.S. sales, global

17   sales, you know, I mean it's not like there is any formal

18   definition.

19         But Copaxone 40 milligram is a substantial

20   product in the industry.  There is no question about that.

21   Q.    With respect to your graphic and the net sales that

22   are reflected here, I think you indicated that you derived

23   those from Teva internal documentation?

24   A.    Yes, that's my understanding.

25   Q.    Directing your attention in your book to Joint Trial

Bell - direct

1    Exhibit 7018.  I don't remember if we have any of that for

2    the screen.

3            We have seen it before and Mr. Hassler testified

4    regarding it.

5            Can you just tell us what that is, whether you

6    recognize it?

7    A.    Yes.  This is the information on the net sales of, for

8    instance, Copaxone 40 milligram by quarter for 2014 through

9    2015.

10   Q.    I don't know if it is possible or worth it, but if

11   possible, highlight the third line under Net Sales.

12           Those numbers are consistent, are they not, with

13   the graphic you just showed us?

14   A.    Well, I certainly hope so.  It was my intention that

15   they be.  That is the information.

16           So it is not including the 20 milligram.  It's

17   just the 40 milligram, the last kind of eight columns there.

18   Q.    What is the difference between gross sales and net

19   sales, as you understand it?

20   A.    Well, again, gross sales are typically sales at WAC,

21   which is an acronym referred to as wholesale acquisition

22   cost.  But the important number typically is net sales,

23   which is the gross sales less rebates that may be paid to

24   organizations, discounts, like a two-percent prompt pay

25   discount that a wholesaler might take advantage of, coupon

Bell - direct

1    cards that are paid out, government required rebates, et

2    cetera.

3    Q.    Net sales are the dollars actually received by the

4    company.  Is that correct?

5    A.    That's right.  Well, they are the dollars they

6    received after all of these deductions have been taken.

7    Q.    Understood.  Let's turn to your next indicator of

8    commercial success performance relevant to competitors.

9              Did you select drugs, other drugs, with which to

10   compare Copaxone 40 milligram?

11   A.    Sure.  I mean, I assessed performance relative to

12   competitors based on the other first-line disease modifying

13   therapies, that's what we see here.  The products on the

14   left are all injectables.  They are what we typically call

15   the ABCREs, that is sort of the interferons, Avonex,

16   Betaseron, Rebif, Extavia, then C being Copaxone as a

17   glatiramer acetate, Glatopa being the generic version of

18   Copaxone 20, and Plegridy basically being a long-acting form

19   of Avonex, dosed once a month, I think.

20              Those are the injectables.

21              Then there are also orals that tend to be

22   prescribed as a first-line therapy for multiple sclerosis,

23   Tecfidera, Gilenya, and Aubagio.

24   Q.    Remind us what the term first-line therapy means, as

25   distinguished from what?

Bell - direct

1   A.    I am not a clinician, but these are the products that

2   tend to be used when a patient may first present with

3   relapsing or remitting multiple sclerosis as an example, as

4   opposed to second line, which may be products that are

5   reserved for patients that aren't doing as well as might be

6   hoped.   Typically second-line products would be Tysabri,

7   Lemtrada.   This is consistent with, for instance, what the

8   National Multiple Sclerosis Society has come out with and

9   certainly consistent with my consulting work in the MS

10  space, where I have dealt with both the first-line and

11  second-line disease modifying therapies.

12  Q.    And tell us what observation you made with respect to

13  how Copaxone 40 milligram has performed relative to other

14  first-line therapies?

15  A.    Well, as you can see on the wrapup there, what I am

16  looking at here is number of prescriptions.   Copaxone 40,

17  clearly, is the market leader among these products.   And

18  it's been in that position for a few quarters now.

19  Q.    Were you able to compare, was it possible for you to

20  compare net sales of Copaxone 40 milligram against other

21  first-line therapies and their net sales?

22  A.    Well, the only one I was able to do that with or one I

23  could do that with would be Copaxone 20.   Everything else is

24  managed by another company.   And they are the only ones with

25  the information on net sales, and that tends to be

Bell - direct

1  confidential information.  Whether or not they report their

2  net sales for a particular product in public filings, et

3  cetera, I am not sure.

4  Q.    You did not have access to the net sales of anybody

5  except Teva.  Is that correct?

6  A.    Yes.  That's typically the case, you only know the net

7  sales information for the company that you are working with

8  because you have got access to their financial information.

9  Q.    Let's talk about profitability.  Tell us what you

10 considered.  And perhaps in that regard if we could look at

11 another graphic.

12 A.    Sure.  So the profitability we are looking at here, it

13 is coming off that same exhibit that you showed me earlier,

14 I am basically looking at net sales less the cost of sales,

15 less the marketing expenses associated with the product, and

16 the specific general anatomy expenses.  That sort of thing.

17         What I will say is the information I had for

18 cost of sales and expenses was not broken out between

19 Copaxone 20 and Copaxone 40.  So while I had net sales

20 information at the 20-40 split, I didn't have the cost

21 information.  So these numbers likely understate, or do

22 understate Copaxone 40 profits, because to the extent there

23 were manufacturing costs associated with Copaxone 20 or

24 marketing costs associated with Copaxone 20 from Q1 2014

25 forward, I have just lumped them all together and charged

1      them against Copaxone 40.

2      Q.     What observations -- what were, from your

3      observations, the operating profits?

4      A.     Well, they start relatively low, 5.5 million dollars

5      in the first quarter, not unusual, launches of

6      pharmaceutical products that actually generate losses in

7      early quarters because of the significant marketing

8      expenditures that may be associated with the launch.

9             But over the course of the first year, 2014, we

10     have got roughly 860 million dollars of profits being

11     generated by Copaxone 40.  Second year, another 1.8 billion

12     dollars of profits.

13            So over the two years, ending with the end of

14     2015, and considering U.S. sales only, we are talking about

15     2.6 billion in profits for Copaxone 40.

16     Q.     Those figures, by definition, do not take into account

17     anything beyond the end of 2015.  Is that correct?

18     A.     Yes.  That's absolutely correct, sure.

19     Q.     Are you aware of defendants' expert, Dr. Hay's

20     criticism that these numbers do not indicate profitability

21     because they don't include Teva's R&D costs for developing

22     Copaxone 40?

23     A.     Yes, I am aware of the criticism.

24     Q.     What observations can you make for us with respect to

25     that criticism?

Bell - direct

1  A.     Well, you know, and I have been in the pharmaceutical

2  industry for a long time, 2.6 billion dollars in profits in

3  just the first two years of the product, and we are talking

4  about a product where the underlying molecule had already

5  been discovered, glatiramer acetate was already known, there

6  are going to be R&D costs associated,but, you know, clinical

7  trial costs and that sort of thing.  We are talking in the

8  low hundreds of millions of dollars, two, three, four

9  hundred million dollars maybe.  And that's a stretch.

10          So there is just -- they are just not even in

11  the same order of magnitude as the --  the profits.  And

12  again, these are only the profits in the U.S. and these are

13  only the profits through 2014.

14  Q.     I think you mean perhaps 2015?

15  A.     Through 2015, I am sorry.  Yes.  Thank you.

16  Q.     Let's turn your attention then to the question of

17  nexus, which you identified at the beginning.

18          How did you determine whether Copaxone's

19  performance and sales and profitability related to the

20  patents in suit or the claims of the patents in suit?

21  A.     Well, I looked at a couple of different things.

22  Certainly, one of the first things to consider is that here

23  in the U.S., for new pharmaceuticals, they have to be

24  approved by the FDA as being safe and efficacious.

25          The product that was put into clinical trials

1   was glatiramer acetate, 40 milligrams, dosed three times a

2   week, with at least one day between each administration.

3            That is the method of use that the patents

4   relate to.

5            It's that method of use that was shown to be

6   safe and efficacious, and therefore the reason for the FDA

7   to approve the product, and hence, that approval leads to

8   the sales and the profits in the U.S. that I have seen.

9            In that respect, the nexus, i.e., the method of

10  use that is in the patents, is the immediate method of use

11  that was tested and approved, and enabled the sales and

12  profits to be made.

13           But I also looked at and considered why it was

14  that physicians were prescribing the product and what they

15  perceived about the product and similar characterization

16  with respect to what patients saw from the product.

17  Q.    As you understood whatever the relevant test is for

18  commercial success, do the claimed features of the patent

19  have to be the only inspiration or reason for sales in order

20  for commercial success to be determined, or to have a nexus?

21  A.    No, certainly not.  It is my understanding that they

22  absolutely have to be tied to the reasons for the success.

23  But they may well not be the sole reasons.  For instance,

24  price could certainly play a role.

25           The marketing spend could play a role in

1   success.  And one of the things I looked at is, hey, do

2   those other aspects of the product play what I might

3   consider to be an unduly significant role in the success of

4   the product.

5   Q.    Did you consider whether Copaxone 20 and just the

6   brand Copaxone played a role?

7   A.    Well, I am certainly aware of Copaxone 20.  There is

8   no question that many of the sales of Copaxone 40 are as a

9   result of physicians switching patients presumably looking

10  for that better patient experience, and patients, at least

11  most of them, embracing that opportunity.

12  Q.    You indicated that you also looked at information

13  regarding patients and physicians, is that correct?, and

14  their perspectives?

15  A.    Yes, that's right.

16  Q.    And did you read at least part of the testimony of

17  Mr. Hassler?

18  A.    Yes, I read Mr. Hassler's testimony.

19  Q.    What else did you do by reviewing materials relevant

20  to the perspective of physicians and patients?

21  A.    There was market research that Teva had commissioned.

22        There was market research that came in discovery

23  with respect to one of the defendants looking at Copaxone 20

24  and Copaxone 40.

25        There were marketing messages.  And what

Bell - direct

1  prescribers were remembering from those marketing messages

2  of.

3              There was formulary information.

4              So, you know, a lot, a raft of information on,

5  you know, marketing and perceptions of the product.

6  Q.    From your observation, what were the key messages from

7  Teva to physicians and patients?

8  A.    Well, I actually think we might have a slide on that.

9              But this is reflecting what the physicians were

10  perceiving.  That three times a week dosing, clearly, one of

11  the top issues, a proven mix of efficacy, safety, and

12  tolerability.  Next one is talking about safety and

13  tolerability.  Those are significantly high.

14             And then there is the zero dollar co-pay which

15  was available but certainly not at the same level of these

16  other messages.

17  Q.    Let me stop you for a minute.  You are looking at a

18  graphic of Joint Trial Exhibit 7016.13.  Correct?

19  A.    Yes, that is my understanding.  Yes.

20  Q.    What does it mean, statements associated with Copaxone

21  40 milligram?

22  A.    So --

23  Q.    Who is doing the associating, and what does this

24  document come from?

25  A.    So this would be market research where the research

1   organization is going out and asking physicians and

2   influencers, what you might call KOLs, and there are 140 of

3   them that happened to respond here, around what statements

4   do you associate with Copaxone 40 milligram.  And so this

5   is what they are remembering as the messages that they

6   associate with Copaxone 40.

7   Q.      What is the significance of, for example, the second

8   and third bars with respect to a proven mix of efficacy,

9   safety, and tolerability and demonstrated safety and

10  tolerability profile?

11  A.      That the safety and tolerability of Copaxone 40 is

12  certainly something that physicians are associating with

13  Copaxone 40.

14  Q.      Did you make any observations about how physicians

15  perceive Copaxone 40 milligrams as against Copaxone

16  20 milligrams?

17  A.      Yes.  And, strangely enough, that is the next slide.

18  Q.      Directing -- hang on.  Directing you to Joint Trial

19  Exhibit 7013 at page 32.

20          What are we looking at and how do you interpret

21  it?

22  A.      So here we are, that the market research is looking at

23  physicians who are at least aware of Copaxone 40.  Because,

24  remember, it was only introduced in January/February of

25  2014.

1            It's looking at what we call three waves.  There

2    was a study done in August of 2015, 142 respondents.  A

3    study done in November of 2014, 184 respondents.  A study

4    done in July 2014, 151 respondents.

5    Q.    All of that information is immediately below the

6    title; is that correct?

7    A.    Yes.  Yes, that is right.

8    Q.    And then tell us what the blue refers to, what the

9    gray refers to, and what the yellow or whatever that color

10   is refers to?

11   A.    So here, they're asked across a number of attributes,

12   right there on the left-hand side, and they're using what we

13   call a Likert scale.  So they might say how do you, how do

14   you consider dosing frequency between Copaxone 40 and

15   Copaxone 20?  You think Copaxone 40 is, you know, a very

16   substantially better, substantially better, about the same,

17   not as good, you know, et cetera?

18            And I think this was a seven point Likert scale,

19   and I think six and seven are the blue stuff; one and two is

20   the yellowish stuff; and three, four, five, i.e., meaning

21   they're about the same, are the gray bars.  And then you

22   just are looking at each one of the attributes.

23            So when it comes to dosing frequency, for

24   instance, 81 percent of the physicians had Copaxone 40 being

25   much better than Copaxone 20 on dosing frequency, 15 percent

1    of the physicians thought it was about the same.  Four

2    percent of the physicians actually thought Copaxone 20 was

3    better on dosing frequency.  That is kind of how you read

4    this information.

5    Q.    So with respect to each of the attributes in the far

6    left-hand column, there is this comparator and obviously the

7    data that is obviously entered here; right?

8    A.    That's right.

9    Q.    Let's move on.  Let me ask you whether or not you did

10   anything or whether you made any comparison with respect to

11   physician opinions regarding Copaxone 40 as against Glatopa,

12   the existing 20 milligram generic?

13   A.    Sure.  Well, the next slide that is up there is

14   talking about reasons why prescribing might increase over

15   the next six months.

16   Q.    So let me stop you.  How is this derived?  What is the

17   question put to physicians?

18   A.    Oh.  It may well be do you expect your prescribing of

19   Copaxone 40 to increase in the next six months?  Yes/no.

20         Do you expect prescribing Glatopa to increase in

21   the next six months?  Yes/no.

22         And then for each one of those, you would ask,

23   and why?  And you would ask them, is it because of this

24   feature or that feature?

25         And, typically, more than one answer is allowed.

Bell - direct

1              So, you know, a physician who expects

2      prescribing Copaxone 40 to increase in the future may select

3      several reasons.  So, for instance, those who expected to

4      increase prescribing of Copaxone 40 in the next six months,

5      29 percent of the reasons said, well, it's because more

6      patients are switching to Copaxone 40.

7              That's what we call sort of a derivative reason,

8      so you want to get a little, probe a little more why are

9      they switching, or why are you switching them from one MT to

10     Copaxone 40?

11             And then the reasons, for instance, are

12     convenience/ease of use, 22 percent.

13             Tolerability/side effects presumably being

14     better, 22 percent.

15             Safety/AE, that is adverse events profile,

16     20 percent.

17     Q.    Now, is it fair to say, there are certain N numbers

18     below Copaxone 40 milligram and Glatopa.  That is indicating

19     a pretty small sample, is it not?

20     A.    Well, yes.  You know, you start to get more concerned

21     when you are talking about less than 30, but sure.  These

22     are what 41 physicians happened to say about Copaxone

23     40 milligram and what 49 physicians happened to say about

24     Glatopa.

25     Q.    All right.  Did you also review certain information

Bell - direct

1  from any of the defendants regarding 40 milligram three

2  times a week dosing regimen?

3  A.    Yes.  As I indicated, for instance, one of the

4  documents in production was a study that Pfizer had

5  commissioned from a firm called ZS Associates.  They would

6  be one of the competitors of my practice in terms of the

7  provision of some strategic consulting advice.

8        So ZS Associates talked to a group of

9  neurologists and patients about, in what is shown on this

10  slide, their perceptions of 20 milligram Copaxone as

11  compared to their perceptions of 40 milligram Copaxone.  And

12  kind of the top panel is -- sorry.  I'm just saying, the top

13  panel is referring to the kind of patient commentary.  You

14  can see a couple of verbatims there in the callout box.

15        The bottom panel is referring more to what the

16  physicians were saying.

17  Q.    When it refers to neuros, it's talking about

18  neurologists?

19  A.    Yes, that is correct.  Yes.

20  Q.    And you have been looking at graphics with respect to

21  Plaintiff's Trial Exhibit 553 at Page 15.  Correct?

22  A.    Yes.

23  Q.    All right.  Each of these -- well, you tell us.  Who

24  is making the observations that we see on the screen?

25  A.    Well, the verbatim sort of in the caption box reads:

Bell - direct

1    The 40 milligram was such a blessing -- it made a huge

2    difference in my quality of life ... I would hate to be

3    forced back to 20 milligram and have to start all over again

4    with that bad experience.

5              So that is a patient verbatim.  This would be

6    market research done either in person or over the phone and

7    talking to multiple sclerosis patients on Copaxone.

8              And then the top part is the market research

9    organization summarizing some of the other things they

10   heard, like advantages of 209 fewer injections per year,

11   less pain and damage to skin, freedom from injections on

12   weekends, traveling for a few days without meds.

13             So that is the market researchers characterizing

14   several responses.

15   Q.    All right.  Let's turn our attention to pricing and

16   some other observations.

17             Did you assess whether Teva's pricing of

18   Copaxone 40 may have been a driver of Copaxone 40 sales?

19   A.    I did.  Sure.

20   Q.    Okay.

21   A.    What I found is that it's not an undue driver of

22   Copaxone sales.  And the way I think to look at that, you

23   might remember a couple of slides further back, physicians,

24   the majority of them not seeing a difference between

25   Copaxone 40 and Copaxone 20 with respect to managed care

1   access.  And, in fact, in managed care, I wasn't aware there

2   was any managed care organization that was preferring

3   Copaxone 40 with respect to Copaxone 20.  What you might

4   expect, for instance, if it is significantly less expensive,

5   the managed care organization to have Copaxone 40.  And no

6   managed care organization was preferring Copaxone 40 as

7   compared to the other first line disease modifying

8   therapies.  The ABCREs, obviously, as you can see:  Gilenya,

9   Aubagio, Tecfidera.  Those are those first line disease

10  modifying therapies.

11          So managed care organizations weren't seeing it

12  as significantly cheaper.

13          And patients weren't seeing it as significantly

14  cheaper.

15          It did have a zero co-pay card at the time that

16  it was launched; a number of other products, and certainly

17  the new products also had zero co-pay cards.

18          Most of the ABCRDs, have had zero co-pay.

19  Aubagio had zero co-pay.

20  Q.   Okay.  I want to move you along here.

21  A.   Okay.

22  Q.   It's late on the day on Friday, and everybody has had

23  it.

24  A.   All right.

25  Q.   So let's talk for a minute about whether you had

Bell - direct

1    information regarding the pricing.

2              Did Teva make Copaxone 40 milligram at launch so

3    much cheaper that everybody was induced to buy it anyway?

4    What observations did you make on that?

5    A.    Well, I think those are the observations I was just

6    talking about.

7    Q.    Are there any further observations?  From what you saw

8    of Teva's documents and what you understand from

9    Mr. Hassler's testimony, what was the company's goal with

10   respect to the pricing between Copaxone 40 milligram and

11   Copaxone 20 milligram?

12             MR. FITZPATRICK:  Your Honor, I object.

13   Mr. Hassler already testified about this, and the witness is

14   not qualified to talk about Teva's goal.

15             MR. WARE:  I think he is, but I will slightly

16   rephrase it.

17   BY MR. WARE:

18   Q.    Based on your expertise, did you make observations to

19   you of what appear to be Teva's pricing goals when it priced

20   Copaxone 40 as against Copaxone 20?

21   A.    Well, sure.  As a standard issue, and when launching a

22   product, one of the questions is what kind of access do we

23   want to have for that product.  In other words, how

24   difficult is it going to be for a patient or a physician to

25   get the prescription for the product and have that

Bell - direct

1    prescription dispensed.

2            And so with Copaxone 40 it was my understanding

3    that Teva had approached its pricing strategy in such a way

4    that there would not be any undue barriers to access to

5    Copaxone 40, a legitimate concern because managed care was

6    looking at the potential for a generic version of Copaxone

7    20 to be coming on the market and, as a result, may well

8    prefer that patients not end up switching over to Copaxone

9    40 purely from their cost perspective.

10   Q.   Dr. Bell, are you aware of criticism that perhaps Teva

11   used outside marketing enhancement or was overly aggressive

12   in marketing a product and that that is what drove sales?

13   A.   Well, I certainly assessed that.  And I don't believe

14   that to be the case.  I think it is pretty clear that that

15   is not the case.

16   Q.   And directing your attention to a graphic identified

17   as Plaintiff's Demonstrative Exhibit 6.18, derived from

18   Plaintiff's Trial Exhibit 31, JTX7033 and JTX7037, what are

19   we looking at here?

20   A.   All I have done here is just graph the promotional

21   spend which is information that IMS tracks as a percent of

22   the IMS dollar sales, right?  So I'm using the information

23   that I have for all of these products.

24           And what you see here is all of the ABCREs plus

25   two of the others, Tecfidera and Gilenya.  I don't actually

Bell - direct

1   show Aubagio on here because Aubagio's promotional spending

2   for sales dollar many times over this period from the first

3   quarter of 2012 through the first quarter of 2015 is

4   significantly higher than what we're seeing here.

5           But what I want to point to is that heavy blue

6   line or light blue line, that is Copaxone 40.  And as you

7   can see, Copaxone 40 isn't spending significantly more on

8   marketing promotions relative to the sales that it is

9   generating than its competing products.

10  Q.    And let me direct you quickly to a slide that does

11  have Aubagio, and I'm not going to ask you any questions

12  about it except whether the line we see that is more

13  vertical reflects the spend with regard to Aubagio relative

14  to its sales?

15  A.    Yes, that is right.  You can see it is several times

16  much higher.

17  Q.    Are you aware of a criticism of Dr. Hay that in effect

18  the success of Copaxone 40 milligram was as a result of his,

19  quote, "cannibalizing" Copaxone 20 milligram sales?

20  A.    Yes, I am.

21  Q.    What observations did you make about that and what is

22  your opinion with respect to that criticism?

23  A.    Well, certainly, there are several Copaxone 20 people

24  who are on Copaxone 20, move to Copaxone 40 presumably for

25  that better patient experience.  But it's also the case from

Bell - direct

1    a statistical perspective that Copaxone 40, the launch of

2    Copaxone 40, directly helped the Copaxone brand.  In other

3    words, it benefited it in a way that is in excess of simply

4    transitioning patients from Copaxone 20 to Copaxone 40.

5    Q.    Did you prepare a graphic that is a comparative of

6    new-to-brand prescriptions both before launch and after

7    launch?

8    A.    Yes.  That's what we see here.  And just quickly, the

9    new-to-brand could be newly diagnosed patients, so it's

10   their first script, or it could be that they are switching

11   from one of the other first, typically first-line disease

12   modifying therapies.

13          So after the launch of Tecfidera, around the end

14   of March 2013, there is basically a ten-week -- or there is

15   ten four-week periods until the launch of Copaxone 40 at

16   the -- oh, my goodness -- at the end of January/start of

17   February.

18          During that time the Copaxone franchise, which

19   is only Copaxone 20, averaged about 1500 new-to-brand

20   prescriptions per four-week period.

21          Then, once Copaxone 40 launches, looking at the

22   same time period, i.e., the next ten four-week periods, you

23   see a substantial increase to 2,097 new-to-brand

24   prescriptions for the Copaxone franchise.  That's an

25   increase of 39 percent coming in the period after the launch

Bell - direct

1   of Copaxone 40.

2   Q.    What does that change in that second quarter, the

3   increase of 39 percent, indicate to you?

4   A.    Well, again, it's showing that the launch of Copaxone

5   40 had a favorable effect on the performance of the Copaxone

6   brand, meaning that it can't just be that Copaxone 40 sales

7   are cannibalizing Copaxone 20 sales.

8   Q.    Can you describe the second analysis or any other

9   analysis you did with respect to prescription shares?

10  A.    Sure.  As I indicated, I did a regression analysis.

11  Just quickly, what I am looking at here, and it is on the

12  screen, is just the Copaxone brand share.

13  Q.    Here is your graphic identified as Plaintiffs'

14  Demonstrative Exhibit 6.25.  Is that right?

15  A.    Yes, that's correct.

16        What I am looking at here is the period from

17  around the start of 2013, when only Copaxone 20 is in the

18  market, up to, for instance, the launch of Copaxone 40,

19  right at February 2014/end of January.

20        What you see is over time, over this basically

21  year period, Copaxone brand has been going down.  And it's

22  been going down at about .6, to 0.6 per month.  So basically

23  after ten months you would expect that it has gone down

24  about six percent.  Sure enough, it starts slightly above 39

25  percent and finishes up after 12 months slightly above 31

Bell - direct

1    percent.

2            So it's going down over some time.

3            Then we have the Copaxone 40 launch, and I take

4    that period up through an event, which was Tecfidera, which

5    you might recall was the second most popular, in terms of

6    prescriptions, disease modifying therapy.  And in November

7    2014, it reported out a significant adverse event, PML,

8    basically a significant brain issue.  And so one might

9    expect, after that event, that, hey, there could be, you

10   know, more Copaxone brand prescriptions because physicians

11   are scared off Tecfidera.  Patients might be scared off.

12   And you would have folks moving into the Copaxone brand not

13   because of the launch of Copaxone 40 but because of this

14   problem with one of the other products that it tended to

15   compete with.

16           So what I show is, from the launch of Copaxone

17   40 up to that period in November 2014, that downward trend

18   has not only stopped, it's actually been reversed and is

19   going up at a rate of .09 percent per month.  The double

20   stars just mean that is significant at the 95-percent

21   confidence level.

22           So it's obvious, or at least from my

23   perspective, it is apparent that the launch of Copaxone 40

24   has had a favorable impact on the Copaxone brand, and as a

25   result, Copaxone 40 has not grown just because of

Bell - direct

1  cannibalizing Copaxone 20 sales.

2  Q.   You are aware of criticism of your decision to end the

3  information at November 2014.  Is that correct?

4  A.   I am, yes.

5  Q.   And you said that was because of adverse events that

6  showed up with Tecfidera.  Is that correct?

7  A.   That was my reason, yes.

8  Q.   And because those were serious events, what conclusion

9  did you draw with respect to the appropriateness of

10 considering information after that event?

11 A.   Well, I think, once you get beyond that date, you

12 could have a positive increase in Copaxone share, as I said,

13 being due to doctors getting scared about prescribing

14 Tecfidera and instead prescribing one of the other

15 first-line disease modifying therapies.

16          But I will also add that, you know, shortly

17 after that event, Plegridy and Lemtrada were launched, and

18 of course further on Glatopa was launched, so you have got

19 more products coming in and you are going to have lower

20 shares of the existing products.

21 Q.   Did you take Dr. Hay's regression analysis and graph

22 that?

23 A.   Yes.  That is the next slide.

24 Q.   Directing you, then, to Plaintiffs' Demonstrative

25 Exhibit 6.26 from Defendants' Trial Exhibit 1576, tell us

1   what you observed and what we are looking at here?

2   A.    Well, here it's the same type of analysis, and it's

3   the same data through November 2014.  Dr. Hay extends the

4   analysis, I believe, through the first quarter of 2016, and

5   so Dr. Hay basically says, look, there is a decline in

6   Copaxone share before Copaxone 40 launches, obviously

7   correct, and he says, and there is a decline in Copaxone

8   share after Copaxone 40 launches.  Also correct.

9   Q.    Let me stop you there.

10          Is there significance to the slope of the line

11  post-launch?

12  A.    Well, that is sort of the point.  Both slopes are

13  significant.  There is no question that both are negative.

14  But there is an order of magnitude difference in how

15  negative.  So before Copaxone 40 launches, Dr. Hay finds

16  that share is declining at about .55 percent per month for

17  the Copaxone brand.  But after Copaxone 40 launches, and

18  including the time when Plegridy launches, when Lemtrada

19  launches, and when Glatopa launches -- that is a generic

20  version of Copaxone 20 -- obviously, that Copaxone brand

21  declines, but it declines at a lot slower rate.  It's down

22  from .55 percent per month or five and a half points in ten

23  months to .05 percent per month or half a point over the

24  course of ten months.

25          The difference between those two numbers is

Bell - direct

1  statistically significant.  So whether you use the time

2  period that I used, which actually I think is more

3  appropriate, or whether you use Dr. Hay's time period, the

4  consequence is the same.  It is evident that the launch of

5  Copaxone 40 is doing more with the Copaxone brand than just

6  Copaxone 20 alone.  And that implies it's not just

7  cannibalizing sales of Copaxone 20.

8  Q.    Let me just quickly ask you whether or not you are

9  aware of criticisms regarding the possibility of blocking

10  patents.

11              Did you investigate that?

12  A.    I did, yes.

13  Q.    Let me direct you -- you don't necessarily have to

14  look at them -- but Joint Trial Exhibit 7127 and 7128 are

15  patents.  What observations did you make about the extent to

16  which there were blocking patents that would have prevented

17  defendants from entering the market or doing research with

18  respect to a three times a week 40 milligram glatiramer

19  acetate?

20  A.    It is apparent, there weren't really blocking patents

21  to that.  I mean, the two patents you referenced are patents

22  from Mapi Pharmaceuticals.  They are talking about a DEPOT

23  formulation of glatiramer acetate, that is something that

24  would be implanted and then release the product over a

25  longer period of time.  I think it might be up to six months

Bell - direct

1    in these patents.

2              So again, the point would be, look, other work

3    was going on with respect to glatiramer acetate, and if

4    three times a week at 40 milligrams were obvious, and we are

5    talking about an opportunity in the marketplace that was 2.6

6    billion dollars, just on U.S. sales and just in the first

7    two years of the product, that opportunity would have been

8    seized up by somebody.

9    Q.   Okay.  Could you respond ever so briefly to one

10   further criticism.  That is that you failed to define a,

11   quote, relevant market.  Did you give consideration to that?

12   A.   Yes.  Relevant market is a charged term in economics.

13   Obviously, it is a big antitrust issue.

14              I testify on relevant market definition.  It

15   requires a lot of work.  It is not necessary when you are

16   talking about commercial success.  Commercial success is

17   about was there an opportunity in the marketplace.  And

18   that's what I looked at.

19   Q.   Did you ultimately come to a conclusion with respect

20   to what the primary reasons for Copaxone 40 milligrams

21   commercial success was?

22   A.   I did.  We are talking about nigh on 5 billion of

23   sales up through the first half of 2016 through the first

24   two years, 2.6 billion in profits, it is clear there was the

25   market opportunity.

1       The market opportunities are associated with the

2   patented attributes.  It is 40 milligrams, three times a

3   week, at least a day in between, and delivering claimed

4   benefits with respect to frequency and severity of injection

5   reactions, i.e., tolerability.

6   Q.    There has been some testimony in the courtroom

7   regarding life cycle management.  Have you had occasion to

8   advise pharmaceutical companies regarding issues of life

9   cycle management?

10          MR. FITZPATRICK:  Objection, Your Honor.  It is

11  not in his report.

12          THE COURT:  Mr. Ware.

13          MR. WARE:   I believe it is, Your Honor.

14          MR. FITZPATRICK:  I will withdraw the objection

15  subject to what the question is going to be like.

16          THE COURT:  All right.

17  BY MR. WARE:

18  Q.    Is life cycle management a phenomenon that is unique

19  to Teva or Copaxone 40?

20  A.    No, just to be clear, nor is it unique to the

21  pharmaceutical industry.  It's a standard issue around

22  brands in industry, whether it is consumer goods,

23  pharmaceuticals, take your pick.

24  Q.    Were you asked to respond to Dr. Hay's opinions

25  concerning life cycle management?

Bell - direct

1    A.    I was.

2    Q.    First of all, what is your understanding of his

3    opinion as expressed?

4    A.    Well, that's a bit difficult.  My general sense is

5    that somehow, I believe Dr. Hay's suggesting that because

6    life cycle management was part of the reason why Copaxone 40

7    came into being, that means that it is not nonobvious.  I

8    don't think he says that it is not a commercial success,

9    just that that means it is nonobvious.  I believe that is a

10   characterization.

11   Q.    What observations can you make regarding that

12   criticism?

13   A.    Look, life cycle management is part of the regular

14   course of business.  There are brands, and one is always

15   looking, particularly in the pharmaceutical industry, for

16   ways to improve the patient experience.  And, you know, for

17   an injectable product, it might be making it oral, it might

18   be reducing the frequency that the product has to be taken,

19   so you have got, you know, long-acting products, like a

20   DEPOT formulation, that sort of thing.  So that's a constant

21   effort in the industry.  The challenge, of course, is

22   figuring out how to do it.

23   Q.    Does the fact that Teva in this case or any

24   pharmaceutical company engages in life cycle management mean

25   that there is no scientific innovation with respect to such

Bell - direct

1   management?  In other words, is life cycle management

2   inconsistent with scientific innovation?

3   A.    No.   In fact, to the extent life cycle management ends

4   up with a product that's accepted in the marketplace, that

5   typically is the result of innovation that has been

6   successful, i.e., these longer acting versions of products.

7   That sort of thing.

8              MR. WARE:  No further questions.

9              THE COURT:  So, counsel, how much -- I don't

10  want to shorten your cross.  How long do you think?

11             MR. FITZPATRICK:  The direct went longer than I

12  had anticipated, Your Honor.  I would say I have got 30 to

13  45 minutes.

14             THE COURT:  I am assuming, Mr. Ware, that in

15  calling the gentleman at the hour that you did, he can

16  return on Wednesday.

17             MR. WARE:  We will have to make that happen one

18  way or another.  I mean, this took longer than I anticipated

19  and it is later than I anticipated.

20             THE COURT:  As you said, I think we are all a

21  little wrung out, and it's Friday.  I am sure folks would

22  like to get home for the weekend and everything else.

23             We will adjourn until Wednesday at 9:00.

24             MR. WARE:  Your Honor, may I ask the Court one

25  question?  You will recall the issue regarding irreparable

1   harm and Mr. Hassler's testimony.  You requested -- could we

2   see you briefly at sidebar?

3                   THE COURT:  Okay.

4                   (The following took place at sidebar.)

5                   MR. WARE:  So you requested filing from the

6   parties on this issue.  And my question is simply whether or

7   not -- we have a filing ready, three and a half pages -- if

8   it is of any advantage for the Court to get it today or

9   tonight.

10                   THE COURT:  I am not going to do anything with

11   it tonight.

12                   MR. WARE:  I know that.  Defendants propose to

13   respond on Tuesday at noon.

14                   MS. BLOODWORTH:  I think what we were thinking

15   when you set your order was whether or not we should give

16   you information about whether the Hassler affidavit and the

17   testimony in the deposition would cause Your Honor to

18   overrule sustainment of Mr. Hassler's testimony.  I guess

19   when you made that decision you wanted your typical sort of

20   discovery letter submitted from the parties on that.

21                   THE COURT:  Discovery letter.

22                   MS. BLOODWORTH:  A limited three-page letter on

23   the limited issue.

24                   THE COURT:  I don't recall what was on my mind

25   at the time.  You guys, there is a record.  Go back and look

1    at it and do what I asked you to do.

2                 MS. BLOODWORTH:  Your Honor didn't specify.  I

3    didn't want to submit a voluminous filing.

4                 THE COURT:  There is no point in you submitting

5    a voluminous filing.

6                 MR. WARE:  Your Honor, we have a

7    three-and-a-half-page document.  We are prepared to file it.

8    We are fine whenever defendants file their response.

9                 MS. BLOODWORTH:  We could talk, because the

10   transcript expressly says you should send yours to us and we

11   will respond and submit one joint filing.

12                MR. WARE:  I don't think it was a joint filing.

13                THE COURT:  It was serial, I think.

14                Okay.  Take care.

15                (End of sidebar conference.)

16                (Court recessed at 5:00 p.m.)

17                              -  -  -

18

19

20

21

22

23

24

25