1                    IN THE UNITED STATES DISTRICT COURT

2                   IN AND FOR THE DISTRICT OF DELAWARE

3                              -   -   -

4    IN RE COPAXONE 40 MG            )        C.A. No. 14-1171-GMS
     CONSOLIDATED CASES              )          (CONSOLIDATED)
5
                                -   -   -
6
                           Wilmington, Delaware.
7                        Wednesday, October 5, 2016
                               9:00 a.m.
8                        Day 6 of Bench Trial

9                              -   -   -

10   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

11   APPEARANCES:

12            JOHN W. SHAW, ESQ., and
              KAREN E. KELLER, ESQ.
13            Shaw Keller LLP
                    -and-
14            PAUL W. WARE, ESQ.,
              DARYL WIESEN, ESQ.,
15            JOHN T. BENNETT, ESQ.,
              ELIZABETH J. HOLLAND, ESQ.,
16            NICHOLAS K. MITROKOSTAS, ESQ., and
              WILLIAM JAMES, ESQ.,
17            Goodwin Procter LLP
              (Washington, D.C.)
18                  -and-
              STEPHEN B. BRAUERMAN, ESQ., and
19            SARA BRUSSIERE, ESQ.
              Bayard P.A.
20
                              Counsel for Plaintiffs
21

22

23

24

25

1    **APPEARANCES CONTINUED:**

2            FREDERICK L. COTTRELL, III, ESQ.
             Richards, Layton & Finger, P.A.
3                    -and-
             DAVID L. ANSTAETT, ESQ.
4            Perkins Coie LLP
             (Madison, WI)
5                    -and-
             SHANNON M. BLOODWORTH, ESQ.,
6            BRANDON M. WHITE, ESQ.,
             EMILY J. GREB, ESQ., and
7            ROBERT D. SWANSON, ESQ.
             Perkins Coie, LLP
8            (Washington, D.C.)

9                              Counsel for Defendants
                               Mylan, Inc. and
10                             Mylan Pharmaceuticals, Inc.

11           DOMINICK T. GATTUSO, ESQ.
             Procter Heyman & Enerio LLP
12                   -and-
             WILLIAM A. RAKOCZY, ESQ.,
13           DEANNE M. MAZZOCHI, ESQ.,
             RACHEL PERNIC WALDRON, ESQ.,
14           MATTHEW V. ANDERSON, ESQ.,
             THOMAS H. ERLICH, ESQ.
15           ERIN FORBES, ESQ., and
             CHRIS GALLIGAN, ESQ.
16           Rakoczy Molino Mazzochi & Siwik LLP
             (Chicago, IL)
17
                               Counsel for Defendants
18                             Sandoz Inc. and Momenta
                               Pharmaceuticals, Inc.
19
             RICHARD W. RILEY, ESQ.
20           Duane Morris LLP
                     -and-
21           CHRISTOPHER S. KROON, ESQ., and
             ANTHONY J. FITZPATRICK, ESQ.
22           Duane Morris LLP
             (Boston, MA)
23
                               Counsel for Defendants
24                             Amneal Pharmaceuticals LLC
                               and Amneal Pharmaceuticals
25                             Company GmbH

```
 1    APPEARANCES CONTINUED:

 2                   DAVID BILSON, ESQ.
                     Phillips, Goldman, McLaughlin & Hall, P.A.
 3                        -and-
                     HANK HECKEL, ESQ.
 4                   Budd Larner
                     (Short Hills, NJ)
 5
                                    Counsel for Defendant DRL
 6
                     NEAL C. BELGAM, ESQ.
 7                   Smith Katzenstein & Jenkins LLP
                          -and-
 8                   E. ANTHONY FIGG, ESQ.,
                     ELIZABETH R. BRENNER-LEIFER, ESQ., and
 9                   BRETT A. POSTAL, ESQ.
                     Rothwell, Figg, Ernst & Manbeck, P.C.
10                   (Washington, D.C.)

11                                  Counsel for Defendants
                                    Synthon Pharmaceuticals, Inc.,
12                                  Synthon B.V., and Synthon s.r.o.,
                                    and Pfizer
13
                                    -   -   -
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    THE COURT:  Good morning.

 2                    One housekeeping, matter.  I have a Judges'

 3       meeting tomorrow so we won't start until 9:30 tomorrow

 4       morning.  And I have events at the noon hour, so we will be

 5       breaking from 12 till 1:30.

 6                    I am ready.  I understand there is an issue.

 7                    MR. FIGG:  Your Honor, there was an issue, an

 8       evidentiary issue.

 9                    THE COURT:  You say there was.

10                    MR. FIGG:  It still exists, unfortunately.  I am

11       not sure whether you would like to deal with that now.  It

12       has to do with some testimony and an exhibit --

13                    THE COURT:  Mr. Figg, use your judgment.  If you

14       think it is going to be critical for us to deal with it this

15       morning, then I will.  If you don't, then use your judgment.

16                    MR. FIGG:  My judgment is we should probably

17       raise it immediately before the reading of the deposition

18       that it involves, rather than --

19                    THE COURT:  I will accept your judgment.  I am

20       ready to go.

21                    MR. FIGG:  Okay.

22                    MR. JAMES:  Good morning, Your Honor.

23       Plaintiffs call Dr. Tjalf Ziemssen to the stand.

24                    While he is making his way up, we have binders

25       of exhibits.
```

```
 1              THE COURT:  Why don't you wait until Mr. Buckson
 2    swears the witness.
 3              ... TJALF ZIEMSSEN, having been duly sworn as a
 4    witness, was examined and testified as follows ...
 5                         DIRECT EXAMINATION
 6    BY MR. JAMES:
 7    Q.    Could you please introduce yourself to the Court?
 8    A.    My name is Tjalf Ziemssen, and I am from Germany.
 9    Q.    Where are you employed, Dr. Ziemssen?
10    A.    At the moment I am employed at the Carl-Gustav Carus
11    University Clinic in Dresden, Germany.
12    Q.    What positions do you hold there?
13    A.    At the moment I am director of the Center for Clinical
14    Neuroscience and vice director of the Department of
15    Neurology, University of Dresden.
16    Q.    Do you treat patients for multiple sclerosis?
17    A.    Yes, I do.
18    Q.    Where do you do that?
19    A.    I treat my patients at the MS Center at the
20    university, MS Center, in Dresden, at the university.
21    Q.    Can you tell us a little bit about the MS Center at
22    Dresden University?
23    A.    The MS Center at the University of Dresden is the
24    biggest academic MS Center in Germany.  We have just been
25    awarded as being the best MS Center in Germany.
```

Ziemssen - direct

1    Q.    Do you do research?

2    A.    Yes, I do.

3    Q.    What is the focus of your research?

4    A.    The focus of my research is immunology, especially the

5    mechanism of action, but I am interested in other research

6    topics around MS.

7    Q.    When you say the mechanism of action, what do you mean

8    by that?  What are you studying the mechanism of action of?

9    A.    I would like to understand how drugs are working in MS

10   patients.

11   Q.    How long have you been researching the mechanism of

12   action of MS drugs?

13   A.    Now 16 years.

14   Q.    Have you researched the mechanism of action of

15   glatiramer acetate?

16   A.    Yes, I have.

17   Q.    Is this your first time testifying as an expert as a

18   trial in the United States?

19   A.    Yes, it is.

20   Q.    I am going to put up on the screen a copy of PTX-16.

21   Can you identify this document?

22   A.    Yes.  This is my CV.

23   Q.    Does it accurately reflect your education and

24   experience?

25   A.    Yes, it does.

1   Q.      I would like to turn to your training now.  What

2   degrees do you hold, Dr. Ziemssen?

3   A.      I hold an M.D.  I hold a Ph.D.  and I hold a

4   Habilitation, that is a German thing to become a full

5   professor, you have to undergo Habilitation.

6   Q.      Where is your M.D. from?

7   A.      My M.D. is from the University of Bochum, Germany.

8   Q.      When did you receive that degree?

9   A.      In 1998.

10  Q.      What did you do after you finished your M.D.?

11  A.      I started my internship at the University Clinic in

12  Dresden, and I finished my doctoral thesis.

13  Q.      When did you finish your thesis?

14  A.      I finished my thesis in 1999.

15  Q.      Can you tell us what the topic of your thesis was?

16  A.      The topic of my thesis was the hormone metabolism in

17  the human prostate.

18  Q.      Did you pursue any postdoctoral training?

19  A.      Yes.  I was post-doc as a scholar of the Max-Planck

20  Society and of the German Research Foundation at the

21  Max-Planck Institute of Neurobiology in Martinsried, which

22  is close to Munich.

23  Q.      Were you in any particular department at the

24  Max-Planck Institute?

25  A.      I joined the Department of Neuroimmunology.

Ziemssen - direct

1   Q.   Can you explain what neuroimmunology is?

2   A.   Neuroimmunology, it is a very interesting science,

3   which is investigating the relationship between the immune

4   system and the nervous system.

5   Q.   How long have you been studying neuroimmunology?

6   A.   Since 2000.

7   Q.   During your postdoctoral appointment, did you study

8   the mechanism of action of drugs for multiple sclerosis?

9   A.   Yes, I did.

10  Q.   Which drugs did you study?

11  A.   I looked for steroids, I looked for interferons, I

12  looked for glatiramer acetate, and I looked for Natalizumab.

13  Q.   What is Natalizumab?

14  A.   It is a monoclonal antibody.

15  Q.   Did you treat any MS patients during your postdoctoral

16  training?

17  A.   Yes, I did.

18  Q.   Did you treat any of them with glatiramer acetate?

19  A.   So GA was available in 2001 because it was approved in

20  2001 in Germany, and I started to treat patients since 2001.

21  Q.   After you finished your training at the Max-Planck

22  Institute, what did you do next?

23  A.   I returned to Dresden.  I set up the clinical center

24  there.  And I continued my research.

25  Q.   From that time to the present, have you been at the

Ziemssen - direct

1   University of Dresden?

2   A.     Yes, that's true.

3   Q.     What are your responsibilities, very generally, as

4   director of the Center of Clinical Neuroscience?

5   A.     So I have clinical responsibilities, and I have

6   research responsibilities.

7   Q.     Can you describe your clinical responsibilities?

8   A.     Yes.  So I am heading the MS Center, so supervising

9   the care of the MS patients in our center, and I am

10  interested, or I am heading the outpatient clinic for

11  patients with autonomic disorders.  So patients, fainting

12  patients or other disorders, I am looking at.

13  Q.     Did you play any role in founding the Multiple

14  Sclerosis Center at the University of Dresden?

15  A.     I was the founder.  After the German Democratic

16  Republic, the former German Democratic Republic, everything

17  had to be set up from the beginning.

18  Q.     How many patients does the Multiple Sclerosis Center

19  see per month?

20  A.     We see a thousand patients per month.

21  Q.     How many patients do you see per month?

22  A.     So I have to supervise all patients because I am the

23  only consultant at the center.  But personally, I take care

24  of around 400, 500 patients per month.

25  Q.     Approximately how much of your time is dedicated to

Ziemssen - direct

1    clinical practice?

2    A.    80 percent.

3    Q.    Since you moved to Dresden, have you been continuing

4    to study the mechanism of action of MS drugs?

5    A.    Yes, I did.

6    Q.    Which ones have you studied?

7    A.    Nearly all drugs which are available now, the new ones

8    at this time, the drugs which will come some time, some

9    monoclonal antibodies, small molecules, fingolimod,

10   teriflunomide, DMF.  So I am really interested understanding

11   all drugs, as well as the mechanism of action.

12   Q.    Why do you study the mechanisms of action of these

13   drugs?

14   A.    Because my ultimate goal is to treat my patients with

15   the best care, and for this purpose, because I cannot do

16   experiments like animal experiments with my patients, I have

17   to understand how the drugs are working.  And if I

18   understand how the drugs are working, I can improve my

19   management of my patients.

20   Q.    Do you have experience with clinical trials?

21   A.    Yes, I have.

22   Q.    How many clinical trials have you been involved in in

23   your career?

24   A.    More than 100 MS clinical trials I have been involved

25   in.

Ziemssen - direct

1  Q.    Did any of those clinical trials involve glatiramer

2  acetate?

3  A.    Yes.

4  Q.    How many?

5  A.    Probably more than 15.

6  Q.    Have you been involved in clinical trials with

7  interferons?

8  A.    Yes, I have.

9  Q.    Approximately how many?

10  A.    Probably 25.

11  Q.    Have you been involved in clinical trials with other

12  MS drugs?

13  A.    Yes, I have.

14  Q.    How many currently active clinical trials do you have

15  going at the MS Center?

16  A.    So at the MS Center in Dresden, we have actually 25

17  ongoing trials with more than 200 patients.

18  Q.    Have you ever designed a clinical trial for a drug

19  used to treat MS?

20  A.    I did not design a clinical trial by myself.  But I

21  was a member of steering boards and the steering boards

22  advising the pharmaceutical industry how to develop designs

23  of clinical trials.

24  Q.    Have you published any papers on multiple sclerosis?

25  A.    Yes, I have.

Ziemssen - direct

1    Q.    Approximately how many?

2    A.    More than 90 papers.

3    Q.    Do any of those papers involve the use of glatiramer

4    acetate to treat patients?

5    A.    Yes, they do.

6    Q.    How many?

7    A.    More than 20.

8    Q.    Have you published any papers on the mechanism of

9    action of glatiramer acetate?

10   A.    Yes, I have.

11   Q.    What journals have you published these mechanisms of

12   action papers in?

13   A.    So, very different journals.  We have published in a

14   very prestigious journals like Neurology, like Brain, on the

15   one side.  On behalf of local national journals, German,

16   Austrian journals, which were more available to the general

17   neurologists.

18            So we have a broad range of target journals.

19   Q.    Have you given any lectures on the mechanism of action

20   of MS?

21   A.    Yes.  A lot of lectures, more than a hundred in the

22   United States, in the rest of the world.  I was invited, for

23   example, at the Scripps Institute here in San Diego to

24   lecture about the mechanism of action of glatiramer acetate.

25   Q.    How many papers have you published this year, Dr.

1    Ziemssen?

2    A.    24.

3    Q.    Have you ever collaborated on any NIH grants?

4    A.    Yes.   We have collaborated on the topic of immunology

5    with the NIH, but we are collaborating quite closely with

6    other U.S. universities, for example, the UCSF, we have a

7    longstanding collaboration with the University of San

8    Francisco.

9    Q.    Do you belong to any professional societies?

10   A.    Yes, I do.

11   Q.    Can you describe those for us?

12   A.    I am a member of the American Academy of Neurology, of

13   the European Academy of Neurology, of the German National

14   Neurological Society, of the MS Society, of the European

15   Autonomic Society.

16   Q.    Do you attend international meetings on multiple

17   sclerosis?

18   A.    Yes, I do.

19   Q.    Can you tell us what kinds of meetings you attend?

20   A.    The American Academy of Neurology, the European

21   meetings, and then, of course, all the MS meetings, we have

22   talked about ACTRIMS, LACTRIMS, ECTRIMS, all those type of

23   meetings.

24   Q.    Have you received any awards for your research, Dr.

25   Ziemssen?

1    A.     Yes.   I received, for example, the NIH, the Young

2    Investigator Award for my Ph.D. thesis.   Then I have, for

3    example, received the award of the Charcot Foundation,

4    Charcot was the person who first described the disease, I

5    got the award of this society for my work on the mechanism

6    of action.

7    Q.     Have you received any other recognition for your work?

8    A.     Yes.   Two weeks ago, I was awarded the Honorary Chair

9    of the Symposium at the German Neurological Society, which

10   was dedicated to the mechanism of action, and I was able to

11   be Honorary Chair of the Symposium.

12          MR. JAMES:   Your Honor, plaintiffs offer Dr.

13   Ziemssen as an expert in the clinical treatment of MS,

14   clinical trials on MS therapies, neuroimmunology and the

15   mechanism of action of drugs used to treat MS, including GA.

16          MR. ANSTAETT:   No objection, Your Honor.

17          THE COURT:   The Doctor is accepted as an expert

18   in those fields.

19   BY MR. JAMES:

20   Q.     Dr. Ziemssen, what issue were you asked to consider in

21   this case?

22   A.     I was asked to consider whether a person of ordinary

23   skill in the art in 2009 would find it obvious to administer

24   a dose of 40-milligram glatiramer acetate three times weekly

25   to treat MS.

Ziemssen - direct

1    Q.    Have you formed an opinion on that issue?

2    A.    Yes, I did.

3    Q.    What is your opinion?

4    A.    It was not obvious to a person of ordinary skill in

5    the art in 2009 to administer GA at a dose of 40 milligrams

6    three times weekly to treat MS.

7    Q.    Can you explain why not?

8    A.    Yes.  First, I think a person of ordinary skill is not

9    motivated in 2009 to use a dose of 40 milligram glatiramer

10   acetate.  Second, a person of ordinary skill is not

11   motivated in 2009 to use less frequent dosing of glatiramer

12   acetate than daily.  And third, a person of ordinary skill

13   in the art would not have reasonable expectation of success

14   that administering glatiramer acetate at a dose of 40

15   milligrams three times per week would maintain efficacy and

16   tolerability.

17   Q.    I would like to talk about the first point you made.

18   Can you explain why the person of ordinary skill in the art

19   would not have been motivated to use a three times weekly

20   dosing regimen?

21   A.    So it was known to a POSA in 2009 that the very

22   special mechanism of action of glatiramer acetate, for this

23   mechanism, it was necessary to apply the drug frequently.

24   And a less frequent application of the drug would have not

25   been of advantage regarding the efficacy of the drug.  So

Ziemssen - direct

1   the POSA would have realized that applying the drug less

2   frequently, it would be associated with the danger to lose

3   efficacy.

4   Q.    Why do you say the POSA was not motivated to use a 40

5   milligram dose in 2009?

6   A.    So in 2009, we had the data of the FORTE trial

7   available.  The FORTE trial has demonstrated that the

8   40-milligram dose was not superior to the 20-milligram dose,

9   and a person of ordinary skill would use the minimum

10  effective dose.  You would use only a higher dose if you

11  could expect higher efficacy.  But as the FORTE trial had

12  demonstrated, that there was no increase in efficacy, I

13  think a POSA would have not been motivated to go for a

14  40-milligram dose.

15  Q.    Now, finally, on the third point you made, why is it

16  that the POSA would not have had a reasonable expectation of

17  success with a 40 milligram three times a week regimen with

18  at least one day between each injection?

19  A.    So in 2009, the pharmacokinetics and pharmacodynamics,

20  as well as the fact, what is the active molecule, what is

21  the active ingredient of glatiramer acetate, was not known.

22  And that's why it was not possible, really, to predict, if

23  you change on the one side the dose from 20 to 40 and on the

24  other side the dosing frequency from every day to three

25  times in a week, I think it was not -- you could not predict

Ziemssen - direct

1    and you had to fear losing efficacy.  If you look at the

2    dosing regimen of three times of a week, we have a

3    significant gap, we have a gap of 72 hours up to 96 hours in

4    between the injections.

5                I think, because of these gaps and this regimen,

6    I think a POSA would not have a reasonable expectation of

7    success in 2009.

8    Q.    Were you here for Dr. Green's testimony?

9    A.    Yes, I was.

10   Q.    Did you hear Dr. Green testify that the Pinchasi

11   application is the closest prior art?

12   A.    Yes, I heard it.

13   Q.    Dr. Ziemssen, in your opinion, if a person of skill in

14   2009 was looking for a new glatiramer acetate regimen, would

15   they have been motivated to start with the Pinchasi

16   application?

17   A.    No, I don't think so.

18   Q.    Why not?

19   A.    Because as I have stated, we had the negative results

20   of the FORTE trial.  So 40 milligram was not better than 20

21   milligram.  And I have talked about the minimum effective

22   dose.  And that's why I think the dose, which was available

23   to a POSA in 2009, was really the dose 20 milligrams daily.

24   Q.    We will come back to Pinchasi in a little bit.  I want

25   to turn to a different topic now.  Dr. Ziemssen, did you

Ziemssen - direct

1   review the patents in suit for this case?

2   A.      Yes.

3   Q.      They are on the screen, PDX7.2?

4   A.      Yes, I did.

5   Q.      Did you review and analyze the claims of each of the

6   patents?

7   A.      Yes, I did.

8   Q.      You understand that the terms and the claims have been

9   construed by the Court in this case?

10  A.      Yes.

11  Q.      Did you take those claim constructions into account in

12  rendering your opinions on the validity of the asserted

13  claims?

14  A.      Yes, I did.

15  Q.      Did you apply the Court's constructions in rendering

16  your opinions in this case?

17  A.      Yes, I did.

18  Q.      Have you reviewed the parties' definitions of the

19  person of ordinary skill in the art?

20  A.      Yes, I did.

21  Q.      And can you comment on whether your opinions would

22  vary depending on which definition of the person of ordinary

23  skill in the art was ultimately adopted?

24  A.      No.  My opinion would be the same under either

25  definition.

Ziemssen - direct

1   Q.    And as of August 2009 were you a person of ordinary

2   skill in the art?

3   A.    I was at least a person of ordinary skill in the art.

4   Q.    And have you rendered your opinions in this case from

5   the point of view of a person of ordinary skill in the art

6   as of August 2009?

7   A.    Yes, I did.

8   Q.    I would like to turn now to the topic of multiple

9   sclerosis.  The Court has heard a good bit about multiple

10  sclerosis in this case already.  But perhaps you could tell

11  us from your vantage point what multiple sclerosis is, Dr.

12  Ziemssen?

13  A.    Yes.  Multiple sclerosis, as we have heard last week,

14  is a disease where the immune system is attacking the myelin

15  sheath in the central nervous system.

16  Q.    Is an understanding of MS relevant to your opinions in

17  this case?

18  A.    As I have stated, the mechanism of action, I think

19  it's crucial to a person of ordinary skill in the art, and

20  for understanding this mechanism of action, I think it's

21  crucial to understand what our thoughts about the

22  pathophysiology -- about what is happening in multiple

23  sclerosis.

24  Q.    What was that word you used a minute ago,

25  pathophysiology?

Ziemssen - direct

1   A.    Yes.

2   Q.    What does that mean?

3   A.    That is a little bit like mechanism of action of MS.

4   Q.    Let's talk about what was known about multiple

5   sclerosis and its cause in 2009.  If we could put up the

6   next slide, which is PDX-7.3.  Can you tell us what we are

7   seeing here, Dr. Ziemssen?

8   A.    That is a slice of the human brain.  You can see here,

9   it's macroscopic, so it is really in the same size, you can

10  see here, here, that is the so-called gray matter, that is

11  the cerebral cortex, where you have the nerve cells inside.

12  Then you can see the white matter, so this here is the white

13  matter.

14             The white matter, it's a fatty substance because

15  the white matter is consisting of myelin and myelin is the

16  substance which is ensheathing the axons, so the extension

17  of the nerve cells.

18  Q.    Can you just tell us -- we are going to get to this in

19  a moment -- what is an axon?

20  A.    An axon is an extension of the nerve cell.  Of course,

21  nerve cells, they have to communicate, for this purpose,

22  they have to have the extensions to talk to each other.

23  Q.    On this picture, there is a dark circle right there

24  that I have drawn a circle around.  What is that?

25  A.    That is an MS lesion, we call it, that is a

Ziemssen - direct

1   demyelination.

2   Q.    How can you tell that it is demyelinated?

3   A.    You can see, it's not any more white.  So it has the

4   same color as the gray matter.  That is due to the fact that

5   the myelin sheath, the fatty substance, is lost, it has been

6   destroyed by the immune system.  And that's why you see the

7   pure nerve cells, the pure axons in this area.

8   Q.    So you touched on neurons just a moment ago, Dr.

9   Ziemssen.  What are neurons?

10  A.    Neurons are nerve cells that are the basic units in

11  our central nervous system.  They are communicating, they

12  are sending electrical signals to each other.  And that is,

13  I think, very important for us human beings, that we have

14  neurons which communicate.

15  Q.    Let's put up PDX-7.4.  Dr. Ziemssen, is this a slide

16  that you created for your presentation here today?

17  A.    Yes, I did.

18  Q.    Can you tell us what we're seeing here?

19  A.    So we see a neuron, and you can see here, this

20  extensions are the so-called dendrites.  This is information

21  entry for the neuron.  Then we have here what are a what

22  I've circled.  That is the cell body.  Then we have the

23  five long axon, and you can see that these axon is insulated

24  by a specific structure.  It's a living cell.  It's an

25  oligodendrocyte.  We call it myelin.  We call it myelin, but

1    in reality, it's a cell.  It's the so-called

2    oligodendrocyte.

3    Q.     If we can go to the next part of this slide.  Can you

4    tell us what happens with multiple sclerosis?

5    A.     That is a situation which is happening in multiple

6    sclerosis patients.  You see that the myelin sheath is

7    attacked.  It's destroyed.  And I think it's easy to

8    understand that not only the myelin sheath, which is a

9    reversible defect, but the axon can be destroyed as well.

10   Because the axon cannot be, cannot regrow, that's why this

11   would be important for the disability.

12   Q.     I would like to talk about the impact of this damage.

13   If we could put up the next slide, DDX-7.5.

14          Doctor, could you explain what we're seeing

15   here?

16   A.     Well, in the upper part, we can see the interneural

17   communication, so one neuron is talking to the other neuron.

18   You see the information flow.  The information can flow

19   because the axon is insulated by the myelin axon substance,

20   which is important for the conduction of the electrical

21   signal.

22   Q.     And then in the middle part of that slide where it

23   says partial information flow, what do we see there?

24   A.     You can see that some part of the myelin is destroyed.

25   In this area when this happens, the neurological function is

Ziemssen - direct

1   lost and we call it a relapse.  So that means if it happens,

2   for example, in the optic nerve, you cannot see anymore.  If

3   it happens some places where your motor nerves are, you

4   cannot move the muscle.  Then it's a situation which is

5   accounting for this neurological deficit we call a relapse

6   in an MS patient.

7   Q.    And at the bottom it says, no information flow.  Could

8   you explain that?

9   A.    That is the worst case scenario for the MS physician.

10  We are most worried about this because that's a complete

11  destruction not only of the myelin sheath, but of the axon,

12  and that is really accounting for irreversible disability,

13  so that we would like to stop.  That should not happen

14  because that is at the end involvement for, or that is

15  crucial for the negative prognosis of our patient.

16  Q.    Was it known in 2009 what kind of cells caused the

17  damage that we see here?

18  A.    Yes, it was known.

19  Q.    What kinds of cells were they?

20  A.    So it has been, so it was the T cell which was crucial

21  cell.

22  Q.    Was it any particular kind of T cell?

23  A.    It was the so-called T helper 1 cell.

24  Q.    Is that also called the Th1 cell?

25  A.    That is right.

Ziemssen - direct

1    Q.     And where did the process that caused the Th1 cells to

2    attack the immune system, where does that begin?  If we

3    could go to the next slide, please.

4    A.     So the process of this, neurological process usually

5    starts in the periphery.  That means it doesn't start in the

6    central nervous system, but it starts outside.

7                         And if you look here at the figure, they

8    are the lymphoid organs.  They are the headquarters of the

9    immune system, and you can see a lymph node, which is

10   usually, where usually a lot of the immune cells are based.

11   Q.     Okay.  And are there immune cells in the lymph nodes

12   that are important to this case?

13   A.     Yes, they are.

14   Q.     Now, you mentioned that the Th1 cells caused damage

15   that we see with MS.  What do the Th1 cells normally do?

16   A.     So Th1 cells are very crucial to fight against

17   pathogens, bacteria.  They fight against cancer cells, so we

18   need them.  We need them in the normal situation.

19   Q.     How do they fight those different kinds of pathogens

20   and cancer cells, et cetera, just very briefly?

21   A.     Yes.  So they are able to kill MS pathogens.  They can

22   secrete factors, so-called cytokines, which can affect other

23   cells, which can induce inflammation, which are crucial for

24   the inflammatory process.

25   Q.     Why did these Th1 cells become active against the

1    body's own brain tissue?

2    A.    That is a question we don't know yet.

3    Q.    And do we know how the Th1 cells become active against

4    the body's own brain tissue?

5    A.    It's not known a hundred percent.  We believe that

6    there is some structure in the lymph node which is similar,

7    which it's able to activate the cells, to turn on the cell.

8    The T cells are activated, and if the cells are activated,

9    the disease has started.

10   Q.    Let's go to PDX-7.7, Mr. Chase.  And, very briefly,

11   Dr. Ziemssen, could you walk us through what happens with

12   the Th1 cell?

13   A.    We can see the T cells.  The T cells are the orange

14   cells.  You can see the T cells are called a specific

15   structure.  That's why they have the "W" on the cell.  And

16   these cells, they have to get activated.  You can see they

17   bind to the so-called antigen presenting cells that are

18   activated cells.  And when they have bound to the cell,

19   these cells get activated.

20             You can see the arrow, and that is in

21   principle the start of the MS cascade.  Now the cells are

22   able to leave the lymph node and to enter the brain.

23   Q.    Now, you mention activated.  Could you tell us what

24   you mean by activated?

25   A.    Yes.  It's a little bit like cells turning on and

Ziemssen - direct

1    turning off.  So if you activate cells and they have much

2    more power, they're able to leave the lymph node.  They're

3    able to leave the blood vessel, so that is a crucial process

4    in immunology that you have to activate to turn on the

5    cells.

6    Q.    After they're activated, where do they go?

7    A.    They leave the lymph nodes.  They are circulating

8    around and then they find their way to the brain.

9    Q.    Let's go to the next slide, PDX-7.8.  And, Doctor,

10   there's a lot on this slide.  Just very briefly orient us as

11   to what we're seeing here.

12   A.    Yes.  So in the middle, in the middle here of the

13   slide, you can see the neuron.  That is the neuron, the

14   nerve cells, and you can see what we have seen before.  This

15   is an axon.  And this axon again is the myelin substance

16   that's around this axon.  And what is involved as well for

17   the brain, there has to be -- the brain has -- the brain has

18   to receive oxygen.  The brain has to receive glucose, so the

19   brain cells could work.  That's why we have blood vessels in

20   the whole brain tissue.

21   Q.    All right.  There's a little bit of animation on this

22   slide.  If we could run that.

23         And, Dr. Ziemssen, tell us what we're seeing

24   there with those orange cells going through the blood

25   vessel.

1    A.    So there are T cells as well, but these T cells, you

2    can see they are not activated, and that means these T cells

3    are not able to cross the blood-brain barrier.  The only

4    activated cells could do.

5    Q.    You mentioned the blood-brain barrier a couple of

6    times.  Could you just tell us briefly what that is and show

7    it to us?

8    A.    So it's crucial that the immune system is not able to

9    enter the brain because in the brain, it's such a complex

10   structure.  The immune system would enter the brain and it

11   could destroy a lot of things.  That is why we have a

12   so-called blood-brain barrier, which means that the immune

13   system is normally not able to enter the brain.

14   Q.    Now, what happens after the Th1 cells pass through the

15   blood-brain barrier?

16         Let's go to the next part of the slide,

17   Mr. Chase.

18   A.    So we can see, activated cells are able to cross the

19   blood-brain barrier, and in the brain these cells are

20   reactivated, so it's a second step to turn on these cells.

21   That is done by recognition of their antigen, and then these

22   cells are able to move to the myelin sheath.  They're

23   secreting cytokines, the red bubbles, and by this process

24   they can destroy the myelin sheath.

25   Q.    Do they do any other damage?

Ziemssen - direct

1    A.    Yes.  In addition, these cells can open the

2    blood-brain barrier.  The cells are entering, turn on again

3    of the reactivation.  You can see the cells, basically

4    cytokines, close to the vessel, and so the vessel is open.

5    These T cells are acting like a Trojan horse.  Yes.  So

6    they're opening the blood-brain barrier for other cells.

7    Q.    For the record, those slides are PDX-7.9 through

8    PDX-7.12.

9          Now, this damage that you are discussing, Dr.

10   Ziemssen, can it be visualized in a patient?

11   A.    Yes.  We have the MRI, the magnetic resonance imaging,

12   which can tell us where the blood-brain barrier has been

13   destroyed.

14   Q.    So we are looking now at PDX-7.13.  Can you tell us

15   what we're seeing here, please?

16   A.    This is a slice of an MS patient, a brain slice.  And

17   you can see all of this white -- all these white dots, that

18   is acute inflammation.

19   Q.    Now, I understand this is a video.  Can you explain

20   very briefly what the video shows?

21   A.    So this was created during my time at Queens Square in

22   London.  And we put a patient every week in an MRI scan and

23   we got an image every week.  This patient was clinically

24   stable, so had no immunological deficit over a period of one

25   year.

Ziemssen - direct

```
1                     As you can see nicely, what happens, you

2      see a lot of new white dots are appearing, disappearing.

3      That is inflammatory activity in an MS patient and it's not

4      seen in the clinical picture of the patient.

5      Q.    So the patient had these inflammatory lesions

6      appearing, but you didn't see any clinical deficits?

7      A.    No.

8      Q.    Is that right?

9      A.    No.  No, subclinical disease activity.

10     Q.    And how is that possible these lesions could be

11     occurring without the patient having some sort of

12     neurological sign?

13     A.    We would only see neurological signs if the lesions

14     are in areas where the brain, where they are crucial to the

15     brain.  So 90 percent of our brain, we would not recognize

16     if there are lesions inside.

17     Q.    Now, are these inflammatory lesions that we've been

18     talking about, are they significant in the progression of

19     multiple sclerosis?

20     A.    Yes.  At the end, the accumulation of these lesions

21     are responsible for the negative outcome of patient.  So

22     more lesions, more disability.

23     Q.    Now, this fact that you have these subclinical

24     inflammatory lesions going on, is it relevant to the issues

25     in this case?
```

Ziemssen - direct

1    A.      Of course.  So I usually say when I show this slide,

2    MS never sleeps, so we have an ongoing disease process, and

3    that's why we have to fight against this disease.  Not only

4    during the disease.  You have to fight it during the whole

5    period when the patient is presenting or has diagnosed with

6    such a disease.

7    Q.      Now, is the loss of axons and brain tissue over time,

8    is that reversible with treatment in MS?

9    A.      Unfortunately, not.  So what is lost cannot be

10   regained.  That is the crucial, that is the crucial problem

11   for at the end, the disability of our patient.

12   Q.      I want to turn now to glatiramer acetate, which we've

13   also heard a lot about in this trial, and I want to go to

14   the next slide, PDX-7.14.

15          Dr. Ziemssen, can you explain briefly the

16   structure of glatiramer acetate?

17   A.      So glatiramer acetate is not one specific active

18   molecule.  Glatiramer acetate is a mixture of different

19   polypeptides.  Polypeptides that are chains consisting of

20   amino acids.  And that there are crucial things with

21   glatiramer acetate, that the polypeptide chains, they

22   consist of this four amino acids.  So glutamic acid, lysine,

23   alanine and tyrosine.  We have very different polypeptide

24   chains in this mixture of glatiramer acetate.

25   Q.      You are saying not all of the chains are the same?

1    A.    No.  They are very variable in length and the

2    composition is very variable as well.

3    Q.    Now, is it known how many and which of these molecules

4    in the glatiramer mixtures are active in treating multiple

5    sclerosis?

6    A.    No.  We don't know what is the active portion of this

7    mixture, and it may be that for one patient, one mixture,

8    specific mixture part of this mixture is crucial.  For the

9    other patient, it may be another part, but it's not possible

10   to isolate the active ingredient and to characterize it.

11   Q.    Now, can you compare for us the structure of

12   glatiramer acetate to the structure of most pharmaceutical

13   active ingredients that we're all familiar with?

14   A.    I have never seen a drug like glatiramer acetate, so

15   like mixture, because other drugs, they are usually very

16   well defined molecules.  So they're characterized.  You can

17   measure them.  You can follow them, but here, it's really a

18   mixture.  It's completely different than other drugs that we

19   know.

20   Q.    I'd like to talk now about how GA works, and before

21   we do that, could you tell us why, in your opinion, the

22   mechanism of action is relevant to the issues in this

23   case?

24   A.    Because we have no clue on pharmacokinetics and

25   pharmacodynamics.  That's why we have to understand how the

1    drug is working, and because this understanding would be

2    crucial regarding our ideas of dose and dosing.

3    Q.      All right.  Let's go to PDX-7.15, the next slide.  And

4    I want to talk about very briefly about how most drugs work.

5    I've put up this slide.  Can you tell us what we're seeing

6    here, Dr. Ziemssen?

7    A.      So that is a typical drug, so it's the receptor, an

8    antenna for the drug.  And if the drug is binding to the

9    receptor, then we have a change of property of the cell.

10   Q.      Now, you have the word Rebif on your slide here for

11   the drug part.  Why do you have that?

12   A.      Yes, because that is the typical mechanisms of an

13   interferon.  Interferon binds to the receptor, to the

14   interferon receptor, which is available on different cell

15   types.

16   Q.      Does glatiramer acetate work this way?

17   A.      No.

18   Q.      Now, before we go any further, Dr. Ziemssen, have all

19   of the facets of the mechanisms of action in glatiramer

20   acetate been worked out?

21   A.      No, I don't think so.

22   Q.      Were there basic features of the mechanisms of action

23   that were generally accepted in 2009?

24   A.      Yes.  There is a general principle that glatiramer

25   acetate is really is used as an inhibitor.

1   Q.    Let's walk through what was known.  I'm going to put

2   up the next slide, PDX-7.17.  And, Dr. Ziemssen, can you

3   tell us what we're seeing here.

4   A.    So that is the subcutaneous tissue, and you can see

5   the syringe, which includes glatiramer acetate.

6   Q.    Okay.  Let's go to the next slide, please, 7.18.

7   A.    So now glatiramer acetate is injected in the

8   subcutaneous tissue.  You can see this polypeptide chain now

9   in the subcutaneous tissue, and it's now, for the immune

10  system, this is now a foreign body.  So it's an attack of a

11  substance which should not be there.  That's why the police

12  of the immune system, so the cells that are the cells here,

13  this is dendrite and macrophages, so cells which can digest

14  molecules are coming to the lesion and digesting them,

15  glatiramer acetate.

16  Q.    Let's stop there just for a second, and we're going to

17  talk a little bit more about what happened, but this would

18  be slide PDX-7.19 through slide PDX-7.24.

19        Can you walk us what happens after the injection

20  of glatiramer acetate?

21  A.    Very quickly, the polypeptide mixture is degrading.

22  You can see that the polypeptide chains, they are not very

23  long anymore, and then at the end there is a very quick

24  process.  The dendritic cells, the macrophages, they take

25  up the rest of the glatiramer acetate.  They remove the

 1   material, subcutaneous tissue, and these cells, they now

 2   have to go to the immunological headquarters, to the lymph

 3   node, to tell the other immune cells there is a new foreign

 4   substance in the subcutaneous tissue.  We have to react to

 5   this molecule.

 6   Q.     Okay.  Before we go to the next slide, Dr. Ziemssen,

 7   how long does this process take for the glatiramer acetate

 8   to be broken down in the subcutaneous tissue?

 9   A.     It's a very quick process.  Ninety percent of this

10   subcutaneous mixture degraded within an hour.

11   Q.     And can the process be impacted by changing the dose

12   of glatiramer acetate or the dosing frequency?

13   A.     That is, of course -- that is, of course, effective.

14   We don't know, so it's not possible to measure.  And

15   so   what happens if you change the dose of glatiramer

16   acetate?

17   Q.     Does glatiramer acetate get into the bloodstream like

18   most drugs after it has been injected?

19   A.     No.  It's digested at the local subcutaneous tissue.

20   No significant amount of glatiramer acetate reaches the

21   bloodstream.

22   Q.     Okay.  Let's go back to our slides.  You mentioned

23   that the immune cells then go to the lymph nodes.  Why do

24   they do that?

25   A.     Because they have to tell the other immune cells what

1    they have found.  Now, an immune response to this substance

2    has to be generated because it could be a harmful substance,

3    which could have reached the subcutaneous tissue.

4    Q.    Okay.  We've put up PDX-7.25, Dr. Ziemssen.  What do

5    we see here?

6    A.    That is the lymph node.  Again, we know from the MS

7    mechanisms of action, and now the glatiramer acetate cells,

8    and so the macrophages dendritic cells with glatiramer

9    acetate inside, they go into the lymph node and they show

10   what they have found in the subcutaneous tissue.  They've

11   bound to other cells.  You can see here, that is a symbol

12   for the ability of these cells to show this glatiramer

13   acetate to other cells.

14   Q.    Let's go to the next slide, Mr. Chase, PDX-7.27.

15         Dr. Ziemssen, now there are some cells on the

16   screen labeled TH2 cells.  Can you explain what we're seeing

17   here?

18   A.    Because that is a patient who is on glatiramer acetate

19   treatment, he has already cells which are specific to

20   glatiramer acetate, so you can see these cells fixed to

21   glatiramer acetate presented by this antigen presenting

22   cell.

23   Q.    Okay.  And we can go ahead and go forward with the

24   slides, Mr. Chase.

25         What happens when the GA is presented to the TH2

1    cells, Dr. Ziemssen?

2    A.    Every time glatiramer acetate is presented to the

3    cell, these cells get activated.  They can proliferate, so

4    you get more cells.  You can see from three cells, we get

5    six cells, and after this activation, the cells are turned

6    on by the application of the drug, after the application of

7    the drug, and these cells can leave the lymph node and they

8    can, of course, go on their way to the brain.

9    Q.    For the record, these are slides PDX-7.27 to 7.31.

10             Let's go to the next slide.  When these Th2

11   cells get to the brain, what do they do, Dr. Ziemssen?

12   A.    As I have stated, these T cells are activated.  So

13   these T cells are able to leave the blood vessel, and inside

14   the brain these cells are reactivated because glatiramer

15   acetate is a little bit like myelin, these cells get

16   reactivated.  That means these cells can act in the brain,

17   they can stay in the brain, and these cells can secrete

18   anti-inflammatory factors.  And by this secretion of this

19   so-called Th2 cytokine, so anti-inflammatory molecules,

20   these cells can down-regulate inflammation in the brain.

21   Q.    Do these cells have an effect on the damage to the

22   blood brain barrier?

23   A.    Yes.  That is crucial as well.  So the cells, after

24   they have left into the brain tissue, got reactivated, they

25   can secrete factors.  With these factors, they can

Ziemssen - direct

1   down-regulate inflammation which is close to the vessel, and

2   by this mechanism, the original structure of the blood brain

3   barrier could be restored.

4   Q.    Now, after the Th2 cells have this effect, what

5   happens to them?

6   A.    Usually, if an immunological cell is activated, this

7   cell will die.  That is a general principle in human

8   immunology, because to have activated cells surviving for a

9   long time period, it would not be healthy at all for our

10  immune system.

11  Q.    Did this anti-inflammatory effect that you have been

12  describing, did it have a commonly accepted name in 2009?

13  A.    If you down-regulate information in the brain, so at

14  the inflammatory site, we call it bystander suppression.

15  Q.    In 2009 was the administration of glatiramer acetate

16  thought to turn off the ongoing inflammatory effect of these

17  Th1 cells that you have shown us on these slides?

18  A.    No.  The treatment of glatiramer acetate was not able

19  to change the general effect on the Th1 cells going into the

20  brain.  That's why it was necessary to have an ongoing

21  treatment, to fight against this ongoing inflammatory Th1

22  story.

23  Q.    Have you created a slide to illustrate how glatiramer

24  acetate provides its beneficial effect in patients?

25  A.    Yes, I did.

1    Q.      Let's go to the next slide.  This is Slide PDX-7.36.

2    Dr. Ziemssen, what do we see here?

3    A.      That is a description of the brain.  You can see the

4    brain in the background.  And it is what is the ratio

5    between inflammation and anti-inflammation in the brain.  So

6    pro-MS or anti-MS in the brain.

7    Q.      When you have multiple sclerosis, what is the status

8    of that balance?

9    A.      We have the Th1 cells, so these red cells, so we have

10   much more pro-inflammatory in the brain.

11   Q.      What happens when you add glatiramer acetate, if we

12   could go to the next slide?

13   A.      So by the activation of GA-specific cells entering the

14   brain, we can change the balance between pro-inflammation to

15   more anti-inflammatory.

16   Q.      That is PDX-7.37 for the record.

17           If you give additional glatiramer acetate

18   treatment, what will happen?

19   A.      At the end we have a very positive effect as we can

20   switch the balance from pro-inflammation to

21   anti-inflammation.  That is of course the situation we would

22   like to have in all of our MS patients, because that would

23   mean less significant inflammation in the brain.

24   Q.      That is Slide PDX-7.38.

25           This balance that you have shown, Dr. Ziemssen,

Ziemssen - direct

1   how does this factor into your opinions in this case?

2   A.    I think it's very crucial, because we don't have

3   pharmacokinetics and pharmacodynamics, but we do know that

4   the daily administration of the drug would mean a daily

5   activation.  A daily activation would mean a daily migration

6   of the cells into the brain.  And that's why the dosing

7   issue  I think is quite significantly related to the

8   mechanism of action.

9   Q.    Before we leave this subject, if we can go to the next

10  slide, this is Slide 7.39, there is a little bit of

11  animation here, Dr. Ziemssen.  If we could send those

12  forward.

13        There are some blue cells going through the

14  blood vessel, Dr. Ziemssen.  Can you explain that?

15  A.    They are non-activated glatiramer acetate specific

16  cells.  That means only when the cells are activated, even

17  if you have them available, but you need to have them

18  activated because only in the activated cells, these cells

19  are able to cross the blood brain barrier.  That is an

20  example of a patient who forgot an injection.  That means

21  the Th2 cells are in the bloodstream but these cells are not

22  able to enter the brain.

23  Q.    Dr. Ziemssen, I want to turn now to the question of

24  some animal studies on the mechanism of action.  Was it

25  known in 2009 that only activated cells could cross the

Ziemssen - direct

1    blood brain barrier and get into the brain tissue?

2    A.    Yes, it was known.

3    Q.    And what was the basis for that understanding?

4    A.    There have been some pivotal pioneering studies in the

5    eighties and nineties looking at this important mechanism.

6    Q.    Have you created a slide to summarize what was known

7    on that issue?

8    A.    Yes, I did.

9    Q.    Let's put up PDX-7.40.   This is a slide that has a

10   summary of references, JTX-7132 and JTX-7084.

11          Dr. Ziemssen, could you explain this slide to

12   the Court, please?

13   A.    It is of course very special because Professor Wekerle

14   was my mentor at the Max-Planck Institute and was a pioneer

15   in describing T cells.   So he was able to show that only

16   activated T cells are able to enter the brain.   And then

17   Hickey, the second author, he was able to demonstrate, it is

18   not only necessary that the cells are activated, but inside

19   the brain they had to have a second activation step, a

20   second turn-on mechanism.

21   Q.    You mentioned that these are animal studies.   Are

22   these studies relevant to the study of multiple sclerosis in

23   people?

24   A.    Yes, they are.

25   Q.    Did either of these studies look specifically at Th2

Ziemssen - direct

1    cells?

2    A.    No.

3    Q.    Did either of the studies specifically address

4    glatiramer acetate?

5    A.    No.

6    Q.    Did you hear Dr. Green testify that Wekerle has

7    nothing to do with daily administration and nothing to do

8    with glatiramer acetate?

9    A.    Yes.

10   Q.    Do you agree with that?

11   A.    No, I don't agree with the statement, because these

12   studies are really investigating an important effect that

13   only activated cells can enter the brain, whether you have

14   cells specific for glatiramer acetate or specific for

15   another substance, I think it's irrelevant, because this

16   activation step is necessary for cells to get in.

17   Q.    For the record, in case I didn't say it earlier, the

18   Hickey and Wekerle references are JTX-7132 and 7084.

19         Doctor, did you rely on those in rendering your

20   opinions in this case?

21   A.    Yes.

22   Q.    Okay.  How do Hickey and Wekerle, the slide you have

23   put up here, how does that relate to daily administration?

24   A.    As I have cited, only if you apply the drug daily, you

25   get the cells activated daily, and you have a chance that

Ziemssen - direct

1    these cells will migrate into the brain.

2    Q.    Does it matter that Wekerle did not use glatiramer

3    acetate in his experiment?

4    A.    No.  As I have stated, it is a general principle.  It

5    is a pioneering study on this.

6    Q.    Were there other animal studies that were dedicated to

7    working out glatiramer acetate's mechanism of action?

8    A.    Yes, there are.

9    Q.    Let's put up the next slide.  That is PDX-7.41.  Dr.

10   Ziemssen, is this a slide that you put together for your

11   testimony here today?

12   A.    Yes.  That is a slide I put together.

13   Q.    For the record, this reference is Aharoni 1997,

14   JTX-7044, Aharoni 1998, JTX-7045, Aharoni 2000, JTX-7046,

15   and Aharoni 2003, JTX-7047.

16              Did you rely on all these references in

17   rendering your opinion?

18   A.    Yes, I did.

19   Q.    Can you explain what these studies show?

20   A.    Here is a form of the glatiramer acetate, you can see

21   that these cells are inducing Th2 cells.  And this induction

22   was able to treat MS animal model disease, which is called

23   experimental autoimmune encephalomyelitis, EAE, that is the

24   animal model.  You can see here, they introduce the term

25   bystander suppression.  Anti-inflammatory cells enter into

1    the brain and decrease inflammation in the brain.  You can

2    see Th2 cells are able to enter into the brain.

3              And that was a finding of my group, I personally

4    was very much involved to demonstrate that these T cells are

5    not only able to secrete anti-inflammatory factors, but

6    these cells are able to secrete protectors.  So I was able

7    to demonstrate that these cells are able to secrete factors

8    which can help the regeneration of neurons.

9    Q.    We touched on the animal studies.  I want to turn to

10   the studies of the mechanism of action in humans.  Dr.

11   Ziemssen, prior to 2009, were you studying the mechanism of

12   action of glatiramer acetate?

13   A.    Yes, I did.

14   Q.    And can you outline very briefly the sorts of things

15   you were working on in that time frame?

16   A.    So I was especially interested in whether this

17   mechanism of action described in animals was valid in human

18   patients as well.

19              And as I have shown, it was crucial for the

20   mechanism of action that these GA T-cells enter the brain

21   and in the brain they would act anti-inflammatory, that is

22   why I was interested, are these T-cells in human patients

23   able to enter the brain.

24   Q.    Did you hear Dr. Green testify that your mechanism of

25   action evidence is entirely based on animal data?

1    A.    Yes, I heard it.

2    Q.    Is that right?

3    A.    No, it is not right.  There are a lot of human studies

4    about the mechanism of action.

5    Q.    Let's put up JTX-7142 on the screen, Mr. Chase.

6          Dr. Ziemssen, what is this reference?

7    A.    That is a paper which I published about the presence

8    of glatiramer acetate-specific T-cells in the brains of

9    human MS patients.

10   Q.    What year did you publish this?

11   A.    I think it was 2007.

12   Q.    Maybe we could just back out a little bit --

13   A.    It was accepted 2007, 2008 published.

14   Q.    Thank you very much.

15         Can you explain very generally what you were

16   studying here, Dr. Ziemssen?

17   A.    Of course, it's a quite a complex study, because you

18   cannot look into the brain of MS patients.  But what we did,

19   we analyzed the so-called cerebrospinal fluid.  So there is

20   some fluid around the brain cells, and by a spinal tap, by

21   putting a needle in the vesicular space, you can get this

22   fluid out of the vertebral column.

23         And we analyzed this cerebrospinal fluid before

24   patients had been treated with glatiramer acetate and after

25   patients had been treated with glatiramer acetate.

Ziemssen - direct

1   Q.     Let's put up Slide PDX-7.42.  We have highlighted a

2   little section here, Dr. Ziemssen.  Could you explain to the

3   Court briefly what you found?

4   A.     Yes.  Before treatment, we have not been able to

5   describe any glatiramer acetate specific cell.  Only after

6   one year of treatment we have been able to describe Th2

7   glatiramer acetate specific T-cells in the brain compartment

8   of our patients.

9   Q.     And what's the significance of that finding for this

10  case?

11  A.     The significance is that really GA specific T-cells

12  are acting in human MS patients in the brain as we have seen

13  it in the animal model.  That is why there is activation

14  which is necessary to get the cells into the brain, it's

15  crucial.

16  Q.     Were there any other studies that looked for evidence

17  that these Th2 cells were acting in the brains of MS

18  patients?

19  A.     There had been another group of Norway, Hestvik is the

20  first author, and they have demonstrated the same, that only

21  in GA treated patients we have glatiramer acetate specific

22  T-cells in the cerebrospinal fluid in the brain.

23  Q.     We have put up on the screen the cover of JTX-7083,

24  Dr. Ziemssen.  Is this the cover of the Hestvik paper?

25  A.     That is the Hestvik paper.

Ziemssen - direct

1  Q.    And very briefly, again, remind us exactly what he

2  found?

3  A.    So he found that after a certain treatment period, and

4  the GA specific T-cells of the Th2 phenotype, so the typical

5  GA profile of cells, have been demonstrated in the

6  cerebrospinal fluid, so in the brain.

7  Q.    Prior to 2009, Dr. Ziemssen, were there any summaries

8  or references that summarized what was known about the

9  mechanism of action of GA in humans?

10 A.    Yes, there had been a lot of references dealing with

11 the mechanism of action of glatiramer acetate.

12 Q.    Let's put up JTX-7141.  Dr. Ziemssen, can you identify

13 this reference for us?

14 A.    Yes.  That is my reference, it was a review article,

15 an extensive review article about the mechanism of the

16 action of glatiramer acetate.

17 Q.    What year did you publish this?

18 A.    It was in 2007.

19 Q.    And let's look at PDX-7.43.  This is an excerpt from

20 Page 7141.26.  Dr. Ziemssen, briefly tell us what we see on

21 this slide?

22 A.    So that is a figure which was cited in several

23 textbooks of neurology, which was cited in other papers.

24 It's the principles of the mechanism which I have described

25 before.  GA specific T-cells are activated by antigen

1    presenting cells.  The daily activation leads to the ability

2    to enter the brain.  In the brain they get activated and in

3    the brain these cells are able to secrete anti-inflammatory

4    and neuroprotective factors causing bystander suppression.

5    Q.    Let's put up Dr. Green's Slide 61 from his testimony.

6    It's DDX-1100.61.

7          Dr. Ziemssen, have you seen this slide

8    previously?

9    A.    Yes, I have seen it.

10   Q.    What is this, that Dr. Green was showing us?

11   A.    That is my table I prepared for this review article.

12   Q.    Let's put up JTX-7120 on the screen, Mr. Chase.

13         Dr. Ziemssen, is this the review article that

14   your table came from?

15   A.    That is the review article, yes.

16   Q.    Did you hear Dr. Green interpret your table and say

17   that bystander suppression is just one narrow interpretation

18   of the mechanism of action?

19   A.    Yes, I heard it.

20   Q.    Do you agree with that?

21   A.    No, I don't agree.

22   Q.    Can you explain why?

23   A.    As I have told you, I showed you the figure that the

24   immunological response created by glatiramer acetate was at

25   the end leading the immune system into the brain.  That is

Ziemssen - direct

1       why the mechanism of GA-specific cells, not only T-cells,

2       there are other cells which can be of benefit as well, these

3       lead at the end to bystander suppression.  Bystander

4       suppression means that you have an immune system response

5       which is able to down-regulate the inflammation in the brain

6       at the lesion site.

7       Q.      Let's look at JTX-7120.4.  This is a page from this

8       reference, Dr. Ziemssen.  We are going to blow up the you

9       were left-hand column.  I have highlighted a passage here.

10              Can you explain what this says?

11      A.      That is what I have mentioned a minute ago, that

12      bystander suppression means that the immune system is down

13      regulating the pro-inflammatory MS process at lesion at the

14      lesion site.  So in the brain, that is really one essential

15      mechanism of action.

16      Q.      Dr. Ziemssen, now that we have looked at some of the

17      background animal and human studies that you've relied on, I

18      would like to transition to the question of less frequent

19      dosing of glatiramer acetate?

20              THE COURT:  Since you're changing topics, let's

21      take a quick stretch.

22              (Short recess taken.)

23                      -  -  -

24              (Proceedings resumed after the short recess.)

25              THE COURT:  All right.

1    BY MR. JAMES:

2    Q.    Dr. Ziemssen, as I mentioned before we took our break,

3    I'd like to turn now to the question of less frequent

4    dosing.

5          In August of 2009, would a person of skill have

6    been motivated to dose GA three times weekly?

7    A.    No, a POSA wouldn't.

8    Q.    Why is that?

9    A.    I demonstrated the mechanisms of action and a POSA in

10   2009 would think that the daily activation of the drug, it's

11   necessary for the daily activation.  The daily activation

12   itself is crucial for the ability of the cells to enter the

13   brain, because only activated cells activate GA specific

14   cells that can enter the brain.

15   Q.    And what would it mean to decrease the number of

16   activated T cells, TH2 cells entering a brain?

17   A.    So as I have shown with this balance, there has been

18   inflammation.  If it would have less TH2 in the brain, that

19   would mean the inflammation part of the balance would switch

20   to more inflammation to more pro-inflammation, and that

21   would be more lesions, more relapses, more disability.

22   Q.    Let's look at PDX-7.44, Mr. Chase.

23         Dr. Ziemssen, is this a slide you've created for

24   your testimony?

25   A.    Yes, I did.

1   Q.      And can you tell us how this supports your opinions in

2   this case?

3   A.      So as I have demonstrated, if you have less immune

4   cells because these cells are less frequently activated

5   and can go less frequently into the brain, so we have to

6   shift to more pro-inflammation in the brain, and that is

7   causing, of course, a more severe and a more -- more severe

8   disease.

9   Q.      And then if we add glatiramer acetate, can you remind

10  us what we see here?

11  A.      So that is, a POSA would have understood that applying

12  glatiramer acetate on a regular daily basis, that would mean

13  you would have a significant amount, because it has been

14  tested in a lot of clinical studies, and you would have

15  enough GA, TH2 cells in the brain providing

16  anti-inflammation and providing bystander suppression.

17  Q.      And that last slide is PDX-7.45 for the record.

18          Dr. Ziemssen, did you hear Dr. Green testify

19  that the immune system has memory and persistence and that

20  that fact would suggest that you wouldn't have needed to

21  dose GA frequently?

22  A.      Yes, I heard it.

23  Q.      And do you agree with that?

24  A.      No, I don't agree.  We all, all of us, we have GA

25  specific T cells in our blood, but it's necessary to get

Ziemssen - direct

1    these cells activate, because only the activated cells, they

2    can enter the brain.  And that's why the activation of the

3    cells was linked to the daily application.  Of course, you

4    have GA specific T cells, but at the end, it's crucial to

5    activate them.

6    Q.    Was there prior art available prior to August of 2009

7    that noted the importance of daily administration of

8    glatiramer acetate?

9    A.    There are a lot of papers available citing this, the

10   need of daily application of glatiramer acetate.

11   Q.    Okay.  Let's look at JTX-7141.  That's a reference

12   that we've already looked at.  Mr. Chase, if you could pull

13   up the cover.

14          And, again, Dr. Ziemssen, I think you said this

15   was a review you wrote in 2007?

16   A.    That's right.  International Review.

17   Q.    Do you review or do you refer -- excuse me.  Do you

18   refer to the daily administration of glatiramer acetate in

19   this paper?

20   A.    Yes, I do.

21   Q.    Let's turn to JTX-7141.26.  And I'm going to put --

22   perhaps you could turn to JTX-7141.26?

23   A.    Yes.

24   Q.    In your binder of materials?

25   A.    Yes.

Ziemssen - direct

1   Q.    I believe the one you have a demonstrative, but in the

2   other one, you have the actual papers.

3   A.    Okay.

4   Q.    Do you have that?

5   A.    Yes.

6   Q.    Could you turn to Page 26?

7   A.    Yes.

8   Q.    And I'm going to put up a portion of the text from

9   that page on the screen.

10  A.    Mm-hmm.

11  Q.    And this is from the end of the paper where you were

12  drawing some conclusions; is that right?

13  A.    Yes, it is.

14  Q.    And you say in Part 3 on that page that their constant

15  daily immunization should enable them to enter the CNS.

16  The daily immunization seems to be important for the

17  induction and maintenance of the regulatory/suppressive

18  immune cell populations.

19         Could you explain the significance of the that

20  to the Court?

21  A.    What I have stated before, that it was necessary to

22  activate the cells, and that could only happen by the daily

23  immunization by the daily application of glatiramer acetate,

24  because only these activated cells enable them to enter the

25  brain.  And that's why, yes, in 2007, as I have stated, and

1   a lot of times lectured that the daily immunization seems to

2   be important for the induction and maintenance of the

3   suppressive immunological effect in the brain.

4   Q.    For the record, that excerpt is on slide PDX-7.46.

5                        Now, this view that you stated here on the

6   screen, Dr. Ziemssen, was it related to your understanding

7   of the mechanisms of action?

8   A.    Yes, it was.

9   Q.    And do you have an opinion as to what the view of the

10  person of skill in the art in 2009 would have been with

11  respect to daily dosing of glatiramer acetate?

12  A.    A POSA would have recognized these statements, and so

13  it was obvious, because this mechanisms of action was

14  available in textbooks, has been discussed at various

15  conferences, and I think it was crucial for the POSA to

16  administer glatiramer acetate daily to get this constant

17  activation, to get this constant effect of the GA specific T

18  cells.

19  Q.    Were there other papers in the prior art that

20  referenced the importance of daily administration of GA?

21  A.    Yes.  There were several other papers.

22  Q.    And I want to look at the next slide.  This is

23  PDX-7.47.  And there's a lot of information on this slide,

24  Dr. Ziemssen.  Is this a slide you put together for your

25  testimony?

1    A.    Yes, I did.

2    Q.    Okay.  And just for the record, the slide references

3    Exhibit JTX-7070, 7099, 7138, 7062, 7139, 7140 and 7120.

4          Dr. Ziemssen, did you rely on all of these

5    references in rendering your opinions in this case?

6    A.    Yes, I did.

7    Q.    All right.  And can you just briefly give us an

8    overview of what these various excerpts from these

9    references are about?

10   A.    So all references are mentioning and are really having

11   the concept of daily injections.  And I think it is

12   important to see that it was not only our concept, but

13   looking here at the Duda reference, Duda was a researcher at

14   Harvard in Boston, and she published this statement in the

15   Journal of Clinical Investigation.

16         Comi, we have heard in the trial about him.

17   He's head of the MS center in Milan.  He wrote about this.

18   Then Munich.  So in Munich, investigating the mechanisms of

19   action.  And then, of course, our group was referring to

20   daily activation, constant daily activation, the need of

21   daily activation to get the cells activated so that they can

22   migrate to the brain.

23   Q.    Were you aware of these references prior to August of

24   2009?

25   A.    Yes.  They have been published in prestigious journals

1    and they have been cited over a hundred times.

2    Q.    Would the POSA, the person of ordinary skill in the

3    art, would they have been aware of these statements in

4    August 2009?

5    A.    Yes.

6    Q.    Did you hear the testimony of Dr. Green, that the only

7    reason daily was recited in the prior art that we have on

8    the screen was that the dose, that was the only dosing

9    regimen that was being used in the treatment of MS?

10   A.    Yes, I heard it.

11   Q.    Do you agree with that?

12   A.    No, because I've shown the mechanisms of action was

13   related to the necessary steps that these cells had to be

14   activated daily, because only activated cells are able to

15   enter the brain.

16   Q.    We've been talking about the mechanisms of action and

17   how it relates to the frequency of dosing.

18          Were there any other models that related to the

19   need for daily administration of glatiramer acetate?

20   A.    Yes, there have been.

21   Q.    And can you tell us what those were?

22   A.    It's the Angelov reference.

23   Q.    Okay.  Let's put up on the screen Angelov.  That's

24   JTX-7050.

25          Dr. Ziemssen, is this a copy of the Angelov

Ziemssen - direct

1   paper?

2   A.    Yes, it is.

3   Q.    And did you rely on this paper in rendering your

4   opinions?

5   A.    Yes, I did.

6   Q.    Now, in very basic terms, what is Angelov about?

7   A.    Angelov, the main topic of Angelov is not -- the a

8   main topic is neurodegenerative disease, one disease where

9   nerve cells died.  In this paper, motor nerve cells and this

10  disease is called amyotrophic lateral sclerosis, or Lou

11  Gehrig's disease.

12  Q.    And why is this paper relevant at all to the use of

13  glatiramer acetate for multiple sclerosis?

14  A.    Because it's the -- it's a paper which is

15  investigating the effect of dosing frequency on outcomes in

16  the MS animal model.

17  Q.    Was it in the MS animal model that they were

18  investigating the outcome of the GA administration?

19  A.    The MS animal model is mentioned.

20  Q.    Okay.  Let's look at the next slide.  And, Dr.

21  Ziemssen, is this a slide that you created, PDX-7.48?

22  A.    Yes, I did.

23  Q.    Okay.  And can you just start by telling us what you

24  are depicting on the slide?

25  A.    It's a quite complicated paper, and what they have

Ziemssen - direct

1   investigated when they analyzed, there's a glatiramer

2   acetate is a factor to treat ALS, An ALS animal model.  They

3   recognized that if they give the drug daily, it does not

4   work good in ALS.  Only if they give glatiramer acetate less

5   frequently, then it's working in the ALS animal model.  But

6   interestingly, and it was reported in the paper as well, if

7   you give -- daily dosing, which is not effective in the ALS

8   animal model, but if you go to less frequent dosing, you

9   don't see an effect on MS anymore, and that is really

10  teaching you that the dosing frequency has an impact whether

11  glatiramer acetate is effective in MS animal model or in ALS

12  animal models.

13  Q.    Now, if we look at the right-hand column, less

14  frequent dosing, can you tell us how that column influences

15  your opinions in this case with respect to less frequent

16  dosing?

17  A.    Yes.  So we see as Angelov dosed it, we don't have TH2

18  cells in glatiramer acetate dosed less frequently, and that

19  may be the fact that we don't have TH2 cells, so

20  anti-inflammatory cells, that these this regimen is not

21  effective in the MS animal model.

22  Q.    Would that have motivated a person of skill in

23  the art to use less frequent dosing of glatiramer acetate in

24  MS?

25  A.    No.

Ziemssen - direct

1   Q.      Why not?

2   A.      Because if you have less frequent dosing, the effect

3   in the MS model is, it demonstrates lower efficacy.  I think

4   a POSA would have been taught away from using less frequent

5   dosing.

6   Q.      Did you hear Dr. Green's testimony regarding your

7   Angelov paper, the paper that you've provided to the Court

8   today?

9   A.      Yes, I've heard it.

10  Q.      And did you understand that he had some criticisms of

11  your reliance on Angelov?

12  A.      Yes.

13  Q.      What did you understand his criticisms to be?

14  A.      I think it is difficult to understand that really the

15  less frequent dosing regimen is really related to less

16  efficacy clinically.  Of course, the main topic of the paper

17  is ALS, but Angelov is mentioning that changing this

18  frequency of regimen, it has a negative impact on the MS

19  animal model.

20  Q.      I would like to turn to the question of the comparison

21  of clinical data and mechanisms of action.

22          Did you hear Dr. Green's testimony regarding how

23  a person of skill in the art would weigh the mechanisms of

24  action information versus clinical data?

25  A.      Yes.  I've heard it.

Ziemssen - direct

1    Q.    And what did you understand his testimony on that

2    point to be?

3    A.    That clinical data always trumps animal data.

4    Q.    And do you agree with that?

5    A.    No, I don't.

6    Q.    Why not?

7    A.    Because it depends -- that is a blanket statement.  It

8    depends really on the quality of the data.  Of course, if

9    you have well performed clinical trials, so there's -- if

10   it's a lot of patients, they are really powered to

11   investigate the question, then we could rely on them, and

12   then I would give first priority to well performed clinical

13   studies.  But if we don't have really clinical studies on

14   this issue, but we have on the other side animal model and

15   human immunological work, which is really, which is really

16   very dedicated by different groups demonstrating that the

17   daily application is necessary, I would put priority to this

18   data if you don't have clinical data, sufficient clinical

19   data available.

20   Q.    In this case that we're here talking about today,

21   would the person of skill in the art have thought that the

22   clinical data would trump the mechanisms of action

23   information that was available?

24   A.    No.

25   Q.    Why not?

1    A.      Because as we see, the clinical data we have available

2    for less frequent dosing are really not sufficient to tell

3    the POSA whether it would be efficacious to go for less

4    frequent dosing.

5    Q.      Dr. Ziemssen, I would like to turn now to some

6    of the bases for Dr. Green's opinion that the person of

7    skill in the art would have been motivated to select a less

8    frequent regimen for glatiramer acetate, and I would like to

9    start with his testimony on adherence, the topic of

10   adherence.

11           And if we could -- we'll look at the Devonshire

12   abstract.  Did you hear Dr. Green in his testimony rely on

13   the Devonshire abstract?

14   A.      Yes, I heard him.

15   Q.      In your opinion, does the Devonshire abstract provide

16   any support for the idea that glatiramer acetate should be

17   dosed three times weekly?

18   A.      No, it doesn't.

19   Q.      Okay.  I've put up on the screen the Devonshire

20   abstract.  It's JTX-7069 in your binder.  And can you

21   confirm that this is the Devonshire abstract that you are

22   testifying about, Dr. Ziemssen?

23   A.      Yes, it is.

24   Q.      Now, it mentions in the title something called the

25   Global Adherence Project.  What is that?

1   A.    The Global Adherence Project is a retrospective

2   survey where MS patients on different treatments have been

3   asked.

4   Q.    Okay.  And if we look at just to explore what kind of

5   survey it was, if we look under design and methods on the

6   right-hand side of that page, JTX-7069.3, it says that it

7   was a retrospective paper based survey.

8         Can you explain exactly how this worked in the

9   Devonshire abstract?

10  A.    Yes.  It was a retrospective assessment.  So the

11  patients have been asked to remember whether they would have

12  forgotten any injection, one injection in the past four

13  weeks.

14  Q.    And how would the person of skill in the art have

15  viewed this kind of retrospective study?

16  A.    Okay.  It's a poor study design, because you have to

17  remember.  It deals with a topic of adherence that you have

18  forgotten an injection, and then you have to remember

19  retrospective with a patient whether you have forgotten an

20  injection.

21  Q.    Now, under the conclusions section, Mr. Chase, if we

22  could go toward the bottom of the abstract.  I have

23  highlighted some text there at the bottom, Dr. Ziemssen.

24        Does the Devonshire paper list the reasons

25  that were identified for non-adherence to their dosing

1     regimen?

2     A.     Yes, it's stated there.

3     Q.     And what were the reasons that were listed?

4     A.     The use treatment, then the duration of treatment with

5     this MS drug, and then the duration of MS --

6     Q.     Just for the record, it says several univariate

7     factors including current DMT used.   What is DMT?

8     A.     MS drug.

9     Q.     What does DMT stand for?

10    A.     Disease modifying therapy.

11    Q.     The drug used and then the duration of the drug used;

12    is that right?

13    A.     Yes.

14    Q.     Does Devonshire list frequency of administration as a

15    factor that caused the different adherence rates in these

16    drugs?

17    A.     No, she doesn't.

18    Q.     Would Devonshire have encouraged a person of skill in

19    the art to use a three times weekly regimen of glatiramer

20    acetate?

21    A.     No.

22    Q.     And why not?

23    A.     Because it's, first, as I stated, it's a study design,

24    and then I think looking at this data, there is really no

25    clue that a three-times-a-week regimen should be an

1    advantage in the volunteers.

2    Q.    Dr. Ziemssen, are you aware of any Phase 3 data on

3    whether patients are more likely to stay on a three times

4    weekly regimen as compared to a daily regimen of GA?

5    A.    Yes, I am.

6    Q.    And what paper are you aware of?

7    A.    It's the big Regard Trial published by Mikol and

8    colleagues.

9    Q.    Okay.  If we can turn to JTX-7096.  We'll put that up

10   on the screen.  There is a reference in the title to the

11   REGARD study.

12         Dr. Ziemssen, tell us what the REGARD study

13   was.

14   A.    The REGARD trial was a clinical Phase 3 trial

15   investigating Rebif 44 micrograms versus glatiramer acetate.

16   So a head-to-head trial to see whether Copaxone is better

17   or whether Rebif is better.

18   Q.    And remind us what the two treatment regimens were for

19   these two different drugs, Rebif and glatiramer acetate.

20   A.    So Rebif three times per week and glatiramer acetate

21   daily.

22   Q.    And if we could turn to Page 7096.7, we have an

23   excerpt from that page to put on the screen.  That's on

24   Slide PDX-7.49.

25         What results did Mikol provide in this regard,

Ziemssen - direct

1     Dr. Ziemssen?

2     A.     So he reported the compliance rate, and the compliance

3     rate is the real uptake of the drug, the real application of

4     the drug by the patient during the two years of clinical

5     study.

6     Q.     All right.  Can you just tell us again, what is

7     compliance?

8     A.     So compliance means, the compliance rate means so you

9     give all syringes to the patient, and you get back the used

10    syringes and the unused syringes, and so you can calculate

11    what are the, what are the injections the patient had

12    applied and how many injections should have been applied by

13    the patient.

14    Q.     From that can you calculate how many injections they

15    missed?

16    A.     Yes, you can.

17    Q.     And Rebif, remind us what Rebif is.

18    A.     Three times a week Interferon.

19    Q.     Now, with these data -- well, perhaps before we leave

20    this, tell us what the data were that Mikol reported on

21    compliance comparing daily GA and three times a week

22    Rebif.

23    A.     So the Rebif three times a week compliance was

24    85.7 percent, and the compliance rate for the daily

25    glatiramer acetate was 92.3 percent.

1   Q.    Would those data provide a motivation to the person of

2   skill in the art to use glatiramer acetate three times a

3   week?

4   A.    No.

5   Q.    Why not?

6   A.    Because you can see here that the compliance rate

7   already for the daily regimen, it's much better than for a

8   three times a week regimen.

9   Q.    How would a person of skill in the art have weighed

10  these data from the Mikol REGARD study as compared to those

11  of Devonshire?

12  A.    So as I have stated, Devonshire was a retrospective

13  survey where the patient had to remember whether they had

14  forgotten an injection, and here, a Phase 3 study, highest

15  clinical evidence to prove really the efficacy of the two

16  regimens.  So that is the highest clinical evidence.

17  Q.    Did you hear Dr. Green testify that the person of

18  skill in the art would have been motivated to use a

19  three-times weekly regimen because it had been used with the

20  interferon Rebif?

21  A.    Yes, I heard him.

22  Q.    Do you agree with that?

23  A.    No, I don't.

24  Q.    Why not?

25  A.    Because you cannot, you cannot take a regimen from a

1    completely different drug and use it for a drug which has a

2    completely different mechanism of action, is a completely

3    different molecule.  That is not possible.

4    Q.    You said it was complete different drug.  Have you

5    prepared a slide to explain the differences to the Court?

6    A.    Yes, I did.

7    Q.    Let's go to the next slide.  That's PDX-7.50.

8          Dr. Ziemssen, can you explain what you are

9    showing on this slide?

10   A.    So I've shown, I present on the left side the

11   characteristics of interferon.  On the right side I present

12   characteristics of glatiramer acetate.

13         Rebif is a very well defined molecule which

14   binds to a receptor.  We've seen it already in the

15   mechanisms of action.

16         Glatiramer acetate, there's no -- it's not a

17   specific molecule.  It's a mixture.  So glatiramer acetate,

18   the mixture itself, can do nothing by itself.  It has to be

19   digested by the immune system.  It has to be -- there has to

20   be a generation of a GA specific immune response.

21         This immune response was active, so it's an

22   indirect mechanism.  GA has no receptors, but it's inducing

23   an immune response, and this immune response is crucial.

24   That's why we have, for example, for interferon, we have

25   pharmacokinetic data.  We do know we can measure, for

1    example, Rebif in systemic circulation.  We do know that

2    Rebif is accumulating over time.  We do know that's why we

3    can go for a three times a week dosing of Rebif because it's

4    accumulating over time, so we can have gaps with the

5    injections.

6                 But this glatiramer acetate, it's not measurable

7    in the bloodstream, so we don't have data and it will not be

8    in the bloodstream, and that's why we have no

9    pharmacokinetic data on this.

10   Q.   Now, how would these differences between interferons

11   and glatiramer acetate have influenced the thinking of the

12   person of skill in the art with respect to the regimens of

13   Rebif and glatiramer acetate?

14   A.   You cannot exchange a Rebif regimen for a Copaxone

15   regimen or vice-versa.  They're separate drugs, completely

16   different, and it's not possible to plug in, to plug

17   Copaxone into a Rebif regimen.

18   Q.   Let's go to the next slide, 7.51.

19                 Dr. Ziemssen, what were the interferons that

20   were available in 2009?

21   A.   So Betaferon, Avonex, Rebif and Extavia.

22   Q.   And if you could just explain to the Court the various

23   treatment regimens that were used for each of these

24   products.

25   A.   So Betaferon and Extavia, they have to be applied

Ziemssen - direct

1    every other day, so quite a constant way.  Avonex was a once

2    weekly drug.  And Rebif, as we have discussed, was a three

3    times a week drug.

4    Q.    And did you put this slide together for your

5    testimony?

6    A.    Yes, I did.

7    Q.    For the record, the sources are JTX-7055, 7112, 7114,

8    and PTX-310.

9          Did you rely on those references in offering

10   your opinions today?

11   A.    Yes, I did.

12   Q.    And if the person of skill in the art were going to

13   implement an interferon regimen with GA, which regimen would

14   they have chosen?

15   A.    I would go for once weekly, because it's much more

16   convenient to the patient.

17   Q.    And in August of 2009, was Rebif the most recently

18   approved interferon product for the treatment of relapsing

19   remitting multiple sclerosis?

20   A.    No.  It was Extavia.

21   Q.    And did Extavia use a three times a week dosing

22   regimen?

23   A.    No.  Extavia was dosed every other day.

24   Q.    And what would that have suggested to the person of

25   ordinary skill in the art about an every other day regimen

1    versus a three-times-a-week regimen?

2    A.    Even in 2009, there was no tendency to apply all

3    interferon at a dose of three times a week.  Extavia was

4    given every other day.

5    Q.    I want to talk a little bit about pharmacokinetics and

6    pharmacodynamics, which you mentioned a couple of times

7    today.

8          What are pharmacokinetics?

9    A.    Pharmacokinetics is the science of investigating the

10   fate of a drug in the human body.

11   Q.    What do you mean by that, fate of the drug?

12   A.    So how the drug is absorbed, how the drug is

13   distributed around the human body, how the drug is

14   metabolized, and how the drug is excreted, so the story of

15   the drug inside the human body.

16   Q.    What are pharmacodynamics?

17   A.    Pharmacodynamics, it's not investigating the drug

18   itself.  It's investigating what are the effects of the

19   drug.  So the kinetics of the drug's effect.

20   Q.    How do you measure pharmacokinetics?

21   A.    You have to measure the drug at different time

22   points as molecules.  For example, in the -- in serum, in

23   plasma.

24   Q.    And what sorts of information do pharmacokinetics

25   provide?

Ziemssen - direct

1    A.    So you know when the drug is appearing in the

2    bloodstream, you know when the maximum concentration is in

3    the bloodstream, you know when the drug is removed from the

4    bloodstream.  So all of these parameters can be calculated

5    by pharmacokinetics.

6    Q.    And were the pharmacokinetics of glatiramer acetate

7    known in 2009?

8    A.    No.

9    Q.    Why not?

10   A.    Because as I've demonstrated, no glatiramer acetate

11   was reaching the bloodstream, so it was not possible to

12   measure the drug in the bloodstream, so no pharmacokinetic

13   analysis was possible for glatiramer acetate.

14   Q.    And can you comment on the impact of the lack of

15   pharmacokinetic and pharmacodynamic data when you are making

16   a change to a dosing regimen?

17   A.    Of course.  It's impossible to predict what different

18   doses and different dose frequencies would evoke because if

19   you have no pharmacokinetics, you don't know what will

20   happen if you change, for example, the dose or the dose

21   frequency.

22   Q.    How does that influence the person of skill in the

23   arts reliance on the mechanism of action in this case?

24   A.    I think if you have no pharmacodynamic data and if

25   it's not predictable, I think the mechanism of action is

Ziemssen - direct

1    getting more and more important, because then the POSA would

2    look at the mechanism of action, what is the mechanism of

3    this drug.

4              So what is important regarding dosing looking at

5    the mechanism of action, and there I think it was quite

6    crucial that the daily application with the daily activation

7    was a necessary step for providing efficacy by GA treatment.

8    Q.    I want to turn now to the specific references that

9    were relied on by Dr. Green.

10              I want to start with the summary basis of

11   approval.  It's been referred to in this case as the SBOA.

12              Did you hear Dr. Green testify that the SBOA

13   would have provided motivation to a person of skill in the

14   art to dose GA less frequently?

15   A.    Yes, I heard it.

16   Q.    Do you agree with that?

17   A.    No, I don't.

18   Q.    We will explore that just a little bit more.

19              To start with, what was the date of the SBOA?

20   A.    It was a document which was before the approval of

21   glatiramer acetate.  So it was in 1996, 13 years before the

22   priority date.

23   Q.    And if we turn to JTX-7079.252, I believe we have a

24   slide to put up.  We are going to have an excerpt put up

25   from that page.  This is a section of the SBOA that Dr.

1   Green relied on.  Is that right?

2   A.    Yes, that's right.

3   Q.    Can you explain what the FDA reviewer is saying here?

4   A.    So the FDA reviewer is asking the question whether

5   daily subcutaneous injections of glatiramer acetate or

6   Copolymer I are necessary.

7   Q.    Did he say why he was interested in that question?

8   A.    So he had no idea whether less frequent glatiramer

9   acetate applications would be efficacious.  He only asked

10  these questions because he had concerns that there would be

11  an actual accumulation of glatiramer acetate over time.

12  Q.    And how is that shown in the passage that we put up on

13  the screen?

14  A.    So he asked whether there is a problem in humans with

15  saturation of the clearance mechanism.  So the clearance

16  mechanism is a mechanism of how to get rid of the drug.

17  Q.    Did the SBOA refer to a 40-milligram dose?

18  A.    No, of course not.  As you have a problem with an

19  excretion, if you looked at the mechanism to clear the drug,

20  it has a potential problem, so you would not go to a higher

21  dose of a drug.

22  Q.    But did the SBOA specifically even refer to --

23  A.    No, no.

24  Q.    Based on the reviewers's statement, would the person

25  of skill in the art have considered using a 40-milligram

1    **dose of GA?**

2    **A.    No.**

3    **Q.    Why not?**

4    **A.    Because, as I stated, if you have a problem with the**

5    **clearance mechanism, you would not increase dose.**

6    **Q.    Now, would the person of skill in the art have**

7    **understood this statement by the FDA reviewer in 1996 to**

8    **suggest that daily injections are not necessary?**

9    **A.    No.  He is just asking the question whether there is a**

10   **potential accumulation of the drug, but there is no**

11   **statement that this less frequent application will be**

12   **efficacious.**

13   **Q.    Does the SBOA refer to a three times weekly regimen?**

14   **A.    No.**

15   **Q.    In 2009, would the examiner's stated concern about the**

16   **saturation of the clearance mechanism, would that have been**

17   **a concern to the person of skill in the art?**

18   **A.    I would say, in 2009, the POSA would have known this**

19   **question is answered.  We have more than 2000 patients in**

20   **clinical trials for a period of more than 12 years in**

21   **clinical practice, millions of injections.**

22            **So if it is known in 2009, there is no problem**

23   **with the clearance mechanism.  There is no accumulation.**

24   **And we have data, and we will come to the FORTE study in a**

25   **minute where patients have received over a period of more**

Ziemssen - direct

1    than a year 40 milligrams seven times a week.  So a much

2    higher dose.  And we have seen even in these high-dose

3    patients, we have not seen a problem with the clearance

4    mechanism.  So this question is answered in 2009 and not any

5    more relevant.

6    Q.    I want to turn now to the Flechter reference.  That is

7    JTX-7078.

8          Have you reviewed this document, Dr. Ziemssen?

9    A.    Yes, I did.

10   Q.    Does Flechter disclose a 40-milligram dose of

11   glatiramer acetate?

12   A.    No, he doesn't.

13   Q.    Does Flechter disclose a three times a week regimen?

14   A.    No, he doesn't.

15   Q.    What does Flechter describe?

16   A.    Flechter is describing a small group of patients

17   treated with glatiramer acetate 20 milligram every other day

18   for a period of two years without a matched control group.

19   Q.    What do you mean a matched control group?

20   A.    If you have a new regimen, in glatiramer acetate,

21   every other day, as a new regimen, it is a change to the

22   existing regimen, you have to have something you would like

23   to compare this regimen with, because if you have just one

24   group of 20 milligrams every other day, you don't know.  You

25   have to put it into context with a group which has the same

Ziemssen - direct

1  characteristics, which should have the same baseline

2  characteristics, the best would be comparable MS patients,

3  similar MS patients where other regimens have been

4  investigated.

5  Q.   Is it necessary to have a matched control group to

6  prove efficacy of a pharmaceutical product?

7  A.   Yes, it is necessary.

8  Q.   Do the authors of the Flechter paper say anything

9  about whether the results can be relied upon to draw any

10  conclusions about efficacy?

11  A.   Yes.  It's recognized, this lack of matched group is

12  recognized by the authors.  And they state in the discussion

13  section that all conclusions cannot be used to prove

14  efficacy.

15  Q.   And that is on Page 7078.5, the passage is up on the

16  screen.

17         Does Dr. Flechter compare the 20-milligram

18  alternate day patients and the results that he obtained to

19  any other results?

20  A.   Yes, he has a group he is comparing the data with.  It

21  is the Meiner study.

22  Q.   Was the Meiner study carried out at the same time as

23  the Flechter patients were treated?

24  A.   No.  It was a study which was performed years before

25  the Flechter trial.

Ziemssen - direct

1    Q.    Were the groups studied by Meiner and the patients

2    studied by Flechter, were they matched?

3    A.    No, there was no matching.  The two groups of every

4    other day and daily GA 20 were different.

5    Q.    Is that shown in the data that's provided in the

6    Flechter paper?

7    A.    Yes.  It's demonstrated there.

8    Q.    Let's just go to Table 5 for a moment, Mr. Chase.

9          Dr. Ziemssen, could you explain what you mean

10   about the groups not being matched?

11   A.    So here you can see the columns on the left side, you

12   can see the alternate day treatment group.  And on the right

13   column you see the daily group.

14         If you look, for example, for the mean duration,

15   so how long did the patients suffer from multiple sclerosis,

16   you can see it is significantly different, 6.9, 8.3.

17   Q.    If we look at the conclusion of Flechter, Dr.

18   Ziemssen, Dr. Flechter says that the results suggest that

19   the alternate day administration is probably as effective as

20   daily administration.  Right?

21   A.    Yes, it's stated there.

22   Q.    Would that indicate to a person of skill in the art

23   that less frequent administration of GA at 20 milligrams was

24   effective?

25   A.    Of course not.

Ziemssen - direct

1  Q.    Did you hear Dr. Green testify that because Flechter

2  demonstrated a result it was not underpowered?

3  A.    Yes, I heard him say that.

4  Q.    Can you comment on that?

5  A.    No, I can't agree, because you need a lot of patients

6  to demonstrate that two regimens really have the same

7  efficacy.

8        So probably calculating, doing raw estimation,

9  you would have 5,000 patients in the one group with an every

10 other day regimen and 5,000 patients in a daily regimen to

11 draw conclusions about efficacy.

12       If you look here at the numbers, 41 patients in

13 the every other day group, you can see that it's, by a

14 factor of more than 100, far away of the patient numbers

15 which are needed to draw conclusions.

16 Q.    Now, would this paper by Dr. Flechter and his

17 conclusion, would this have provided the person of ordinary

18 skill in the art with a reasonable expectation of success

19 that a 40 milligram three times a week regimen would be

20 effective?

21 A.    No.

22 Q.    Why not?

23 A.    First of all, this study is not powered.  It has not

24 the statistical power to demonstrate that less frequent

25 dosing is efficacious.  And if you look here , the Flechter

Ziemssen - direct

1   study is dealing with every other day.  It's not dealing

2   with three times a week.

3   Q.      Now, were you here when Dr. Green testified that the

4   second sentence in the conclusion would have encouraged

5   further study of a less frequent dosing regimen?

6   A.      Yes, I have heard.

7   Q.      Do you agree with that?

8   A.      I see there that he asked, or that he acknowledged

9   that larger studies are necessary.  But I think that is an

10  acknowledgment of the limitations of this trial, because he

11  states that the small study is not able to demonstrate any

12  efficacy results, hence, the larger studies are necessary.

13  Q.      You mentioned a moment ago that the Flechter paper was

14  about every other day dosing instead of three times a week

15  dosing.  In your opinion, would a person of skill in the art

16  have thought that those two dosing regimens were

17  significantly different?

18  A.      Of course, because every other day dosing means you

19  have always the same interval between each injection.  You

20  have always 48 hours between each injection.  And with three

21  times a week, you have, between every injection you have a

22  gap of 48 hours, but you have for some injections a gap of

23  72 hours or even 96 hours.  So the gap is really increasing

24  in size and you don't have a similar frequent application of

25  the drug.

Ziemssen - direct

1    Q.    We will come back to this, but what would the person

2    of skill in the art have expected with those gaps in dosing?

3    A.    Looking at the mechanism of action, where the daily

4    application, the constant activation of cells will be

5    necessary, such a gap would not be considered to be helpful,

6    to be of advantage regarding efficacy.

7    Q.    Did anyone ever do a larger scale version of the

8    Flechter 20 milligrams every other day study?

9    A.    Never, ever.

10   Q.    Let's look at DDX-1100.38.

11         This is a slide that Dr. Green put up during his

12   testimony.  Did you hear Dr. Green testify about this slide?

13   A.    Yes.

14   Q.    And -- could you just explain what is shown on the

15   slide, so we can get -- we are on the same page here?

16   A.    In the table of the Flechter publication, there is a

17   report of relapse rate.  And that is .56 for the Flechter

18   trial and that is .3 for the Meiner trial.

19         What is depicted here, that although these

20   values are in one line, they do not mean the same parameter.

21   So Flechter is reporting a non-annualized relapse rate and

22   Meiner is reporting an annualized relapse rate, which should

23   say again how flawed the Flechter study is.

24   Q.    That was Dr. Green's testimony.  Correct?

25   A.    Yes.

1    Q.    The language that is shown here from Meiner, is that

2    language provided in the Flechter paper?

3    A.    No, it isn't.

4    Q.    Does it say in the Flechter paper not annualized for

5    the 0.56 data point and annualized for the 0.3 data point?

6    A.    No.

7    Q.    Now, if you assumed, Dr. Ziemssen, that 0.56 and 0.3

8    were the same or they weren't significantly different, what

9    would that have suggested to the person of skill in the art

10   with respect to the equivalence of these two dosing regimen

11   mechanisms?

12   A.    It doesn't matter, because this study is not powered

13   enough.  We have too few patients really to draw a

14   conclusion.  The probability that these effects are by

15   chance and not by evidence, it's very high.

16   Q.    Let's turn to Table 2 of Flechter.  That's on Page

17   7078.2.  Can you tell us what's shown in Table 2, Dr.

18   Ziemssen?

19   A.    The relapses in the two years before the study took

20   place are listed, and the relapses during the two years of

21   clinical study with every other day glatiramer acetate are

22   depicted.

23   Q.    How many people started on the Flechter trial?

24   A.    So 68 patients started.

25   Q.    And how many completed the trial?

Ziemssen - direct

1  A.    **41.**

2  Q.    **And does the paper specifically indicate why those**

3  **particular 27 patients dropped out?**

4  A.    **Not specifically.**

5  Q.    **What types of patients generally drop out of a**

6  **clinical trial?**

7  A.    **Usually patients drop out who are not doing well, so**

8  **if you have an adverse event, you drop out of a clinical**

9  **trial, or if you have active disease.**

10        **So usually patients are leaving a clinical trial**

11  **who are not doing well.**

12  Q.    **Is it possible that not accounting for these 27**

13  **patients could have influenced the results reported by Dr.**

14  **Flechter?**

15  A.    **Of course, because all patients not doing well, having**

16  **adverse events or having disease activity, could have left**

17  **the clinical trial.**

18  Q.    **Is it appropriate to not include people who drop out**

19  **of a clinical trial in the statistical analysis of the**

20  **results of the trial?**

21  A.    **No, it is not appropriate.  You have to consider these**

22  **dropouts.**

23  Q.    **How would this exclusion of dropout patients have**

24  **influenced the person of skill in the art's interpretation**

25  **of Flechter?**

Ziemssen - direct

1    A.    Again, a POSA would have recognized that this study,

2    that this study has severe flaws.

3    Q.    Let's look at Page 7078.3 of Flechter, in the lower

4    right right-hand column, under Disability Accumulation.  It

5    says that the results obtained show that the EDSS scores

6    remained stable during the first year and subsequently

7    mildly deteriorated.

8            Before we get to the results there, Dr.

9    Ziemssen, can you explain to the Court what EDSS stands for?

10   A.    So EDSS means expanded disability status scale.  It is

11   our instrument to measure disability in patients.  So zero

12   is no disability, ten is death.  So that is the scale we are

13   measuring.  Here it is stated what the patients did over a

14   period of two years time.

15   Q.    What happened with respect to the EDSS scores in the

16   second year?

17   A.    In the second year, we had a deterioration, a mild

18   deterioration of the EDSS.

19   Q.    What would that indicate to the person of skill in the

20   art?

21   A.    That is a progression of disease, that is not what we

22   like to achieve.

23   Q.    Would that suggest anything to the person of skill in

24   the art about the efficacy of the every other day regimen ?

25   A.    I think that is not in favor of every other day dosing

1    regimen.

2    Q.    Did you hear Dr. Green testify that Flechter suggested

3    that alternate day administration was slightly better in

4    terms of dropout rate?

5    A.    Yes, I heard it.

6    Q.    Let's look at the sentence that's just under Table 5,

7    Mr. Chase.  That's on Page 7078.4.  I have put the sentence

8    up on the screen.  What does it say about dropout rate?

9    A.    It is stated that the results were not significantly

10   different except for a lower dropout rate in the present

11   study or the Flechter study.

12   Q.    What does it cite for support?

13   A.    Table 5.

14   Q.    Does Table 5 provide any support for that assertion?

15   A.    No, Table 5 does not.

16   Q.    Let's look at Table 5.

17         Dr. Ziemssen, what does Table 5 show us with

18   respect to dropout rate?

19   A.    If you look at the line of premature terminations, it

20   is marked as we can see that the premature discontinuation

21   rate was 39.7 in the alternate day treatment group and 36.5

22   in the daily treatment group.

23   Q.    Which group had the larger dropout rate?

24   A.    Alternate day treatment group.

25   Q.    Would those data suggest to the person of skill in the

1    art that the every other day regimen had better

2    tolerability?

3    A.    No.

4    Q.    How would the POSA, the person of skill in the art,

5    have analyzed Flechter in light of the issues we have been

6    discussing?

7    A.    As I have stated, the POSA would have recognized that

8    the Flechter study is a severely flawed study, that it's not

9    powered, it does not have enough patients, and looking at

10   the details, it does not demonstrate an advantage to every

11   other day regimen.

12   Q.    Did you hear Dr. Green testify that it would have been

13   obvious that less frequent administration would lead to less

14   frequent injection site reactions and immediate

15   post-injection reactions?

16   A.    Yes.  I have heard it.

17   Q.    Are there any data in Flechter bearing on whether that

18   is, in fact, the case in this trial?

19   A.    Yes.  There are data comparing Meiner and Flechter.

20   Q.    Have you compared those data?

21   A.    Yes, I did.

22   Q.    Did you prepare a slide showing your comparison?

23   A.    Yes, I prepared a slide.

24   Q.    Let's look at PDX-7.55.  Is this a slide that you

25   prepared, Dr. Ziemssen?

Ziemssen - direct

1   A.    Yes, this slide was prepared by me.

2   Q.    Before we discuss the results, can you explain to the

3   Court what you are depicting here?

4   A.    So I am comparing the alternate day group which has

5   been described as the Flechter trial.  And I am looking at

6   the daily treatment group, the clinical trial, which was

7   performed before by Dr. Meiner.

8              Then I have depicted the adverse event rate and

9   the premature discontinuation rate in these two patient

10  groups.

11  Q.    What did the data show us about the comparison of

12  these two trials on the basis of these factors?

13  A.    So you have more adverse events in the Flechter study

14  than in the Meiner study.

15             So more adverse events in the alternate day

16  group than in the daily group.

17             If you look at the premature termination of

18  patients leaving the trial, and especially patients leaving

19  the trial because of adverse events, you can see that this

20  proportion is a higher proportion, is higher in the

21  alternate day group than the in the daily group.

22  Q.    What would the person of skill in the art have

23  concluded about the tolerability of these regimens from

24  these data?

25  A.    There is no advantage for every other day glatiramer

1    acetate, even a disadvantage.  You have more adverse events

2    and you have a higher probability to terminate your regimen

3    if you are on alternate day GA 20 regimen.

4    Q.    Professor Ziemssen, is there any teaching that the

5    person of skill in the art can draw from the Flechter

6    reference?

7    A.    As stated, we have several flaws of this trial.  So we

8    cannot draw efficacy.  But, of course, we can recognize that

9    it's safe, there are no specific safety issues applying

10   glatiramer acetate every other day.  But beyond a general

11   idea that there are no specific, no special safety things

12   happening, we cannot draw any conclusions.

13   Q.    Let's turn to Khan 2008, that is JTX-7089, put that up

14   on the screen.  Is this the Khan abstract?

15   A.    Yes, it is.

16   Q.    Can you describe to the Court the study that was done

17   here?

18   A.    So Khan's trial was investigating glatiramer acetate

19   20 milligram versus glatiramer acetate 20 milligram every

20   other day.  But again, it was a very small study, it was a

21   controlled trial, so patients have been randomized, so this

22   problem of the Flechter trial we don't have, so 15 patients

23   have been randomized to the every day glatiramer acetate

24   regimen and 15 patients have been randomized to the every

25   other day regimen.  Then they have been observed for

1  prospective assessment of two years.

2  Q.    In terms of size, can you characterize the Khan 2008

3  study?

4  A.    I have already mentioned that the 41 patients in the

5  Flechter trial were totally insufficient to draw

6  conclusions.  Now we are moving even to a smaller study,

7  which means that because of the study size, I have depicted

8  that we need 5,000 patients per group to derive really

9  conclusions about efficacy, I think it shows us that in this

10  study, already from the beginning on, it was clear that

11  there was no clue on efficacy outcomes in this clinical

12  trial.

13  Q.    Does it disclose a 40-milligram dose?

14  A.    No.

15  Q.    Does Khan 2008 disclose three times a week dosing?

16  A.    No.

17  Q.    It says in the title that it's rater-blinded.  What

18  does that mean?

19  A.    Rater-blinded is a specific type of study.  So the

20  patient is aware whether he gets every other day or every

21  day.  The treating physician is as well aware.  Only the

22  physician who is doing the neurological examination every

23  six months, he does not know whether the patient is on daily

24  or on every other day.

25            All other people involved, patient and treating

1    physician, they know which regimen is applied.

2    Q.    And can the fact that the patient and the doctor know

3    which treatment the patient is on, can that influence the

4    results?

5    A.    Of course.

6    Q.    In what way?

7    A.    Because if you are an investigator, and you are

8    looking at whether every other day treatment regimen is

9    really an option for patients, you are, of course, more

10   positive, you are of course more positive in the direction

11   of this 20 milligram every other day regimen.

12   Q.    What was the end point that Dr. Khan used in his

13   study?

14   A.    It was a composite end point of clinical, MRI and

15   immunologic outcomes.

16   Q.    Have you ever seen such an end point?

17   A.    Never.

18   Q.    Does Dr. Khan explain how the various parts of this

19   end point, the clinical, MRI, and immunologic outcomes, how

20   they were weighted in his results?

21   A.    No.  The end point is not further mentioned.  There

22   are no data presented, no result data presented on the

23   primary end point in this abstract.

24   Q.    What would the person of skill in the art think about

25   such an end point?

Ziemssen - direct

1    A.    In a very simple small study, this end point is much

2    too complex.

3    Q.    And what's the import of that, Doctor?

4    A.    That you cannot derive conclusions from such an end

5    point, because it's really too complex in a very small

6    simple trial.

7    Q.    Would the Khan 2008 abstract have suggested to the

8    person of skill in the art in 2009 that 20 milligrams of GA

9    can be dosed less frequently than daily and be as effective

10   as daily administration?

11   A.    No.

12   Q.    Why not?

13   A.    Because his study has too few participants to draw

14   these conclusions.  That's why looking at this data -- so we

15   don't have data presented there, but looking at this

16   abstract, it's very clear that because of the low patient

17   number, we cannot draw efficacy conclusions.

18   Q.    But Dr. Khan at the end, he says that it may be

19   equally effective.  Right?  He said the study suggests that

20   20 milligrams every day may be equally effective as 20

21   milligrams every other day.  Right?

22   A.    It may be or it may not be.  So that is a problem of

23   such clinical trials.  And the FDA is really saying that

24   such clinical trials are really dangerous because these

25   trials are telling you it may be efficacious, but as we

1    don't have the power, we cannot go --

2              MR. ANSTAETT:  Your Honor, I have an objection.

3    I don't think there is anything about what the FDA says

4    about trials of this size in his expert report.

5              THE COURT:  Overruled.

6    BY MR. JAMES:

7    Q.    Thank you, Dr. Ziemssen.

8              Does Dr. Khan provide any data in his abstract?

9    A.    No, there are no data in his abstract.

10   Q.    Did he provide any statistical analysis?

11   A.    No statistical analysis.

12   Q.    Were the Khan data ever published in a full paper?

13   A.    Not to my knowledge.

14   Q.    Now, did you see where Dr. Khan says that after two

15   years all patients in the every day group opted to switch to

16   the every other day regimen?

17   A.    Yes, I see this.

18   Q.    Does that provide you with any information about the

19   relative tolerability of the every other day regimen as

20   compared to the every day regimen?

21   A.    No, it doesn't.

22   Q.    Why not?

23   A.    Because both patient groups were treatment naive.  So

24   in this clinical trial they have been treated with

25   glatiramer acetate for the first time.  So the one group, 15

1    patients, had GA 20 milligram daily for the first time, and

2    the other group had 20 milligram GA every other day for the

3    first time.  So they did not have a chance to experience

4    what the other treatment regimen is like.

5            Then of course we don't know what has been told

6    to the patient.  We don't have the protocol.  Usually in the

7    extension of such a study it's stated what the patient --

8    what is the information which was provided to the patient.

9            For example, if all patients have been informed

10   that the every other day treatment regimen is as effective

11   as the daily treatment regimen, I think it's very easy to

12   understand that all patients would switch to the every other

13   day treatment group.  But we don't know.

14   Q.    Let's look at that the Caon reference, JTX-7058, that

15   is an abstract as well.  We have that up on the screen.  Dr.

16   Ziemssen, is this reporting the same data from the same

17   study that's described in the Khan 2008 abstract?

18   A.    Yes, I think so.

19   Q.    Does Caon suggest beyond what Khan disclosed -- let me

20   back up and start over with that question.

21            Does Caon suggest anything beyond what Khan

22   disclosed with respect to a 40-milligram dose?

23   A.    No , there is no 40-milligram dose mentioned in this

24   abstract.

25   Q.    Does Caon suggest a three times weekly dosing regimen?

Ziemssen - direct

1    A.    No.

2    Q.    Now, Caon says that lipoatrophy, injection related

3    lipoatrophy was significantly less in the every other day

4    group?  Do you see that?

5    A.    Yes, I see this.

6    Q.    Does that suggest that the alternate day regimen was

7    more tolerable than the daily regimen?

8    A.    No, it doesn't.

9    Q.    Why not?

10   A.    Because only lipoatrophy is mentioned.  There is no

11   mentioning of other side effects, like injection site

12   reactions or immediate post-injection reactions.

13           Again, for the lipoatrophy, no data are

14   provided.  We have a very small group.  15 patients on the

15   one side, 15 patients on the other side.  And really to

16   demonstrate significant difference of lipoatrophy, which is

17   not a very common side effect, I think it's very difficult

18   to understand.

19   Q.    Does Caon provide any information to the person of

20   skill in the art regarding the comparison between a

21   20-milligram every other day regimen and a 40-milligram

22   three times a week regimen with respect to lipoatrophy?

23   A.    No, she doesn't.

24   Q.    Let's take for a moment about Khan 2009.  That's

25   DTX-1154.  Have you reviewed that abstract?

Ziemssen - direct

1    A.    Yes, I did.

2    Q.    Was Khan 2009 part of the prior art?

3    A.    No.

4    Q.    Were you aware of the study prior to August 2009?

5    A.    No.

6    Q.    Does Khan 2009 provide any evidence that persons of

7    skill in the art were motivated to administer a 40-milligram

8    dose of glatiramer acetate?

9    A.    No.

10   Q.    What dose did Dr. Khan use in 2009?

11   A.    In this abstract, he is using 20 milligram glatiramer

12   acetate twice a week.

13   Q.    Does the Khan 2009 abstract provide any evidence that

14   persons of skill in the art were motivated to adopt the

15   three times weekly treatment regimen of Rebif?

16   A.    No.  I see here a twice a week treatment regimen.

17   Q.    Does Khan 2009 provide any evidence that a person of

18   skill in the art would have been motivated to maintain the

19   total weekly dose of glatiramer acetate at approximately 140

20   milligrams a week?

21   A.    No.  Looking here at the total weekly dose, there is

22   40 milligrams per week.  It is much lower of a total weekly

23   dose.

24   Q.    We have heard some testimony about the GALA trial

25   protocol.  Have you reviewed the protocol for the GALA

1    trial?

2    A.    Yes, I did.  I was a GALA investigator.

3    Q.    Did you rely on the GALA protocol in rendering your

4    opinions in this case?

5    A.    No.

6    Q.    Why not?

7    A.    Because it was not prior art.

8    Q.    Do you know whether the Flechter/Khan 2008 and Khan

9    2009 references were cited in the GALA protocol?

10   A.    I think.  I think they are cited, yes.

11   Q.    When you read the rationale for the protocol, did you

12   have an understanding as to why those references had been

13   cited?

14   A.    I think if you apply the clinical study to the FDA you

15   would like to reference all clinical studies which have been

16   performed in this area.  And as we have discussed, we don't

17   have many dose-frequency studies.  And that's why I think

18   it's the standard of care to include these references in

19   such a document like the GALA protocol, to inform the FDA

20   about studies which have been performed before.

21   Q.    I want to come back now to the question of comparison

22   of every other day and three times a week.  And I want you

23   to make an assumption that is contrary to the testimony you

24   have given this morning.  I want you to assume that Khan and

25   Flechter demonstrate that every other day administration of

1       glatiramer acetate is effective.   Okay?

2       A.    It's a hypothetical.

3       Q.    Yes.

4       A.    Okay.

5       Q.    Now.   In that scenario, would the person of ordinary

6       skill in the art have been motivated to further reduce the

7       frequency of dosing to three times a week?

8       A.    No.   The POSA wouldn't.

9       Q.    Why not?

10      A.    Because every other day and three times a week, it's a

11      different treatment regimen, and we know this quite well in

12      the MS field because we have two interferons which are

13      provided in different dosing, we have one interferon which

14      is given every other day and one interferon which was given

15      three times a week.   There is no mixing of this treatment

16      regimen.

17      Q.    Have you created a slide to illustrate your opinion on

18      this point?

19      A.    Yes, I did.

20      Q.    Let's put up PDX-7.56.   Dr. Ziemssen, could you

21      explain what's shown on the slide?

22      A.    You can see, then see regular treatment regimen of

23      every other day.   So you have usually one treatment gap of

24      48 hours.

25      Q.    I'm sorry.   This.   Can you just identify this, the one

Ziemssen - direct

1    at the top?

2    A.      The one at the top.  Sorry.

3    Q.      And then the two little calendars at the bottom, can

4    you explain what you are showing there?

5    A.      That is a three times weekly regimen with a 72-hour

6    gap.  Then you have a three times weekly regimen with a

7    96-hour gap.

8    Q.      What do the little yellow boxes represent on your

9    slide, Doctor?

10   A.      Those are the gaps when no glatiramer acetate is

11   applied.

12   Q.      And what did the person of skill in the art in 2009,

13   what would they have expected to happen over those gaps?

14   A.      I have talked about the mechanisms of action and the

15   activation of the cell.  During this phase, no activation

16   of GA cells would have taken place.  It's not only a break

17   of one day, but it's a break of two or three days in

18   between, and that's why the POSA would have expected that

19   the balance between pro-inflammation and anti-inflammation

20   in the brain would have shifted during this gap to more

21   inflammation.

22   Q.      Have you tried to illustrate that on a slide?

23   A.      Yes.

24   Q.      If we could put up the next part of the slide,

25   Mr. Chase.

Ziemssen - direct

1          **What is shown here?**

2     A.     **This is the balance between pro-inflammation and**

3     **anti-inflammation, because you have a gap.  So glatiramer**

4     **acetate cannot act because the immune system is not**

5     **activated.  You -- a POSA would have severe concerns that**

6     **during this gap, there would not have been enough glatiramer**

7     **acetate cells available in an activated state to fight**

8     **against MS.**

9     Q.     **And what would the effect on the patient have been if**

10    **you didn't have enough activated anti-inflammatory cells?**

11    A.     **More lesions.  More relapses.  More severity.**

12    Q.     **Was there anything in the prior art that suggested**

13    **that increasing the dose of glatiramer acetate would**

14    **increase the duration of action such that you could bridge**

15    **those gaps?**

16    A.     **No.**

17    Q.     **In August of 2009, would the person of skill in the**

18    **art have had a reasonable expectation that a glatiramer**

19    **acetate dosing regimen with a 96-hour gap between doses**

20    **would be effective to treat multiple sclerosis?**

21    A.     **No.**

22    Q.     **In August 2009, would the person of skill in the art**

23    **have had a reasonable expectation that a glatiramer acetate**

24    **dosing regimen with a 72-hour gap between doses would be**

25    **effective to treat multiple sclerosis?**

1    A.     No.

2    Q.     And I want to turn now to the question of total

3    weekly, dose and this was shown by Dr. Green with slide DDX-

4    1100.3.

5           Were you here for Dr. Green's testimony about

6    this slide?

7    A.     Yes.

8    Q.     Now, do you agree that the total weekly dose was a

9    concept that would have provided the person of skill in the

10   art with a reasonable expectation of success that a

11   40-milligram three times a week regimen would be effective?

12   A.     No.

13   Q.     Why is that?

14   A.     Because the concept of total weekly dose was not an

15   established concept in the clinical trials which have been

16   performed with glatiramer acetate.

17   Q.     Let's put up a slide that was used during

18   cross-examination, PDX-7.53.

19          Was there anything in the prior art that

20   suggested that you should maintain a roughly equivalent

21   total weekly dose of GA?

22   A.     No.  If you look at all clinical studies, you have a

23   very broad range of total weekly dose, so there's no -- so

24   there's no tendency visible to have assert weekly dose

25   because it's really mixing up between 70 and 280.

Ziemssen - direct

1    Q.    Let's look at PDX-7.54.  This is a slide that Dr.

2    Green used in his testimony.  And it says "forgiving range"

3    there, Dr. Ziemssen.

4              Was the concept of a forgiving range of weekly

5    doses of glatiramer acetate, was that disclosed in the prior

6    art?

7    A.    No.

8    Q.    Would the person of skill in the art read the prior

9    art and draw the conclusion that there was a forgiving range

10   of weekly doses of glatiramer acetate?

11   A.    No.

12   Q.    I would like to turn now to the references that

13   contain data on the administration of a 40-milligram

14   dose.

15             Dr. Ziemssen, what was the first paper available

16   to the person of skill in the art describing the

17   administration of a 40-milligram dose of GA?

18   A.    It was the Cohen paper.

19   Q.    Let's look at the Cohen paper.  It's JTX-7060.

20             And, Dr. Ziemssen, what was the trial --

21             THE COURT:  Got to take a quick stretch.

22             (Short recess taken.)

23                           -  -  -

24             (Proceedings resumed after the short recess.)

25             THE COURT:  Please take your seats.  Sorry about

1    that, Mr. James.

2              MR. JAMES:  Thank you, Your Honor.

3    BY MR. JAMES:

4    Q.    As I mentioned, Dr. Ziemssen, we've been talking about

5    the less frequent administration prior art.  I want to turn

6    now to prior art that addresses the 40-milligram dose, and I

7    think we were at the point of the Cohen paper.

8              Can you describe to the Court what was, what the

9    two arms of the Cohen study were?

10   A.    So the Cohen study tried to investigate whether a GA

11   40-milligram dose was superior to a GA 20-milligram dose

12   regarding an endpoint using MRI.

13   Q.    And how often were these two doses administered?

14   A.    Every day.

15   Q.    All right.  And can you explain what you mean by an

16   MRI endpoint?

17   A.    Yes.  To have not a huge trial, because it would be

18   expensive and difficult.

19              You start, if you investigate a new

20   regimen, you start an MRI based trial, because there you

21   could see with a lot of less patients in both study arms,

22   you can investigate whether there is superiority of the

23   regimens.

24   Q.    And they were looking at those MRI images that we

25   showed earlier?

Ziemssen - direct

1    A.    Yes.   They looked for the new lesions at month seven,

2    new lesions on the month seven, eight and nine.

3    Q.    Okay.   We'll get to in just a moment.

4          Just so we're clear, does the Cohen paper

5    disclose the administration of 40 milligrams every other

6    day?

7    A.    No.

8    Q.    Does it disclose the administration of a 40-milligram

9    dose on any schedule other than daily?

10   A.    No.

11   Q.    Let's turn to Table 2, Page 7060.5.   And if you could

12   pull up the top of the table.   Thank you, Mr. Chase.

13         And, Dr. Ziemssen, could you explain the results

14   of the Cohen trial with respect to the primary endpoint and

15   maybe just tell us about the primary endpoint again.

16   A.    The primary endpoint, it was the cumulative number of

17   new lesions, so active lesions which demonstrated you've got

18   a lesion with gadolinium enhancement, which is, which can go

19   into the brain tissue if you have disturbed blood vessels or

20   the blood vessels are open, as we've seen before.

21         You can see as we're looking at the total

22   number at 7,8, 9, you can see of those, the numerical number

23   with 3.6 was higher in the 20-milligram group than in the

24   40-milligram group.   In the 40-milligram group, they had had

25   numerically less lesions, but if you look at this P value,

Ziemssen - direct

1   so the P value was 0.08, so it did not reach statistical

2   significance.

3                   So there was no other way to look at the

4   study.  It was not possible to demonstrate superiority of

5   the 40-milligram dose daily versus the 20-milligram dose

6   using this endpoint.

7   Q.    And what conclusion would the person of skill in the

8   art have drawn from the fact that the study failed to reach

9   statistical significance on its primary endpoint?

10  A.    So you perform MRI trials to get an estimate whether

11  it's likely that if you run a larger clinical study to get

12  approval, so not looking for MRI, but looking for relapse

13  rate.  You look for the probability that these studies will

14  be successful later on.

15  Q.    Does this show that the 40-milligram dose was better

16  than the 20-milligram dose?

17  A.    No.  No statistical significance regarding the primary

18  endpoint.

19  Q.    Would the person of skill in the art have been

20  motivated by Cohen to pursue a 40-milligram dose on the

21  basis of Cohen?

22  A.    Looking at the primary endpoint, I would say no.  Some

23  low tiered endpoints that have demonstrated advantage of

24  40 milligrams, but I think the POSA would recognize the

25  failed primary endpoint not demonstrating superiority as an

Ziemssen - direct

1   argument not to pursue.

2   Q.    Does the Cohen paper report any results for the

3   adverse events in the two arms of the trial?

4   A.    Yes, it does.

5   Q.    And let's look at Table 3.  That's on Page 7060.6.

6         Dr. Ziemssen, could you explain what's shown in

7   Table 3 of the Cohen paper?

8   A.    So we have, again, a table.  In the left column we

9   have the adverse events in the 20-milligram group and on the

10  right side we have adverse events in the 40-milligram daily

11  group.  And if you look at the different adverse events, you

12  can see that most of the, nearly all adverse events were

13  more frequent in the 40-milligram group compared to the

14  20-milligram group.

15  Q.    Is there statistical significance attached to these

16  results that are reported in Table 3?

17  A.    No.  There's no statistical significance attached.

18  They are using the five-percent difference method.

19  Q.    What's that?

20  A.    So they are looking for adverse events which are at

21  least five percent more frequent in the one or in the other

22  group.

23  Q.    Does this say that in the caption of the Table 3?

24  Does it say that?

25  A.    Yes.

Ziemssen - direct

1    Q.    That they're using a five-percent rule?

2    A.    Yes.  Frequency differing by five percent or greater.

3    Q.    And is that a standard method for reporting adverse

4    events in clinical trials?

5    A.    Yes.  It's one method to report adverse events.

6    Q.    Now, does Cohen say anything about the relative

7    severity of the adverse events between the two arms of the

8    trial?

9    A.    He does, in the text.

10   Q.    What does he say?

11   A.    He says --

12   Q.    Let's look on Page 7060.6.  I think that's the top

13   section that has been pulled out on the slide.

14         Can you discuss that, please?

15   A.    Yes.  So Cohen is reporting that IPIR, immediate post

16   injection reactions, they are moderate, most often moderate

17   severity in the 40-milligram group, but they are only mild

18   in the 20-milligram group.

19   Q.    Okay.  And in the bottom selection that we've pulled

20   out there, that's from Page 7060.7.  What does it say about

21   the severity of the two arms of the trial there?

22   A.    Again, he says that some aspects were more common with

23   the higher dose, and the injections seemed to be somewhat

24   more painful.  So we have that pain and severity was higher

25   with the 40-milligram dose than the 20-milligram dose.

1   Again, he's referring that the immediate post injection

2   reactions also were somewhat more common and severe.

3   Q.      Now if, we go to Page 7060.7, the bottom portion of

4   this section that we have pulled out, can you tell us what

5   Dr. Cohen concluded about the 40-milligram dose?

6   A.      He concluded that the larger, longer study will be

7   necessary to confirm the sustainability of the efficacy

8   advantage of the higher dose.

9   Q.      And was a longer study performed?

10  A.      Yes.  The FORTE trial.

11  Q.      We have heard a bit about the FORTE trial in this case

12  so far.  But could you briefly remind us what was studied in

13  FORTE?

14  A.      So the FORTE trial was a trial, a huge clinical trial

15  to get approval for, potential approval for 40-milligram

16  daily dose, so patients had been treated with 20-milligram

17  daily and with 40-milligram daily.

18             A thousand patients have been included.

19             That was a study which should have demonstrated

20  superiority of 40 milligram versus 20 milligram.  So not

21  equivalence.  And that means that you have -- that you would

22  have much more patients, if you compare the patient numbers

23  again with Flechter and Khan, you would see that there are

24  really dimensions between trials like FORTE and Khan and

25  Flechter.

1   Q.    Let's break that down for a moment.  You mentioned

2   superiority.  What did you mean by that?

3   A.    Superiority means this study was investigating whether

4   40 milligram was better than 20 milligrams.  And the

5   criterion was better efficacy a week after.

6   Q.    They used more than a thousand patients.  Is that

7   right?

8   A.    Yes.

9   Q.    Why did they need to use so many patients?

10  A.    To demonstrate the statistical effect.  So you have to

11  have enough patients in this study that the effect you

12  describe is not by chance.  It should be really by

13  scientific evidence and not by chance.

14  Q.    If they were trying to show the equivalence of the two

15  regimens, how many patients might they have needed?

16  A.    Much more, probably five or six times more -- 5,000

17  patients.

18  Q.    Did you have any involvement in the FORTE trial?

19  A.    I was an investigator.

20  Q.    When was the FORTE trial completed?

21  A.    In 2008.

22  Q.    Were the results of the FORTE trial disseminated to

23  the MS community after the study was completed?

24  A.    Yes, they were.

25  Q.    Were you aware of the results of this trial when they

1   were released?

2   A.    Yes, I was informed.

3   Q.    Let's look at JTX-7035.

4         Dr. Ziemssen, can you tell us what JTX-7035 is?

5   A.    So if clinical results are for first time published,

6   it is usually done with such a press release, you know, all

7   financial people, investigators, they get -- they are

8   informed by a report like this.

9   Q.    So this is the press release announcing the FORTE

10  results.  Is that right?

11  A.    Yes, that's right.

12  Q.    Did you see it at the time?

13  A.    I received it as an investigator.

14  Q.    What does it say, the FORTE press release, what does

15  it say about the efficacy of a 40-milligram dose of GA?

16  A.    So it's stated that the 40-milligram dose did not

17  demonstrate increased efficacy in reducing the relapse rate.

18  Q.    What does that mean to a person of skill in the art?

19  A.    No advantage to 40 milligram.

20  Q.    Just below that, in the next paragraph, Mr. Chase, if

21  you would pull that up, what does it say in the FORTE press

22  release about the 20-milligram dose, Dr. Ziemssen?

23  A.    So it's stated -- we have to go back to the last part.

24  Q.    I think it's in the second paragraph that's pulled up

25  there.

Ziemssen - direct

1    A.    So the study reaffirms that Copaxone 20 milligram, the

2    leading multiple sclerosis therapy, remains the optimal

3    treatment dose with unexpected long-term efficacy, confirmed

4    over ten years.

5    Q.    In your opinion, would that have been the opinion of a

6    person of skill in the art at the time?

7    A.    Of course.

8    Q.    Did you hear Dr. Green's testimony that it is

9    important not to ignore the results of trials that fail in

10   their primary end point?

11   A.    Yes, I heard it.

12   Q.    In doing your analysis, did you ignore the results of

13   the FORTE trial?

14   A.    No, I don't ignore it.  I recognize that 40 milligram

15   has no advantage over 20 milligram and that's why I think 20

16   milligram remains the optimum dose.

17   Q.    And what information would the person of skill in the

18   art have taken from the results of the FORTE trial with

19   respect to the 40-milligram dose?

20   A.    As stated here, no superiority of the 40-milligram

21   dose over the 20-milligram dose.

22   Q.    Let's look at the Comi slides, JTX-7064.  Before we

23   talk about the slides themselves, Dr. Ziemssen, did you

24   attend any presentations of the FORTE results in 2008?

25   A.    Yes.  I was attending the WCTRIMS meeting in Montreal,

Ziemssen - direct

1    we have spoken of a lot of times about that before, I

2    attended this meeting.

3    Q.    Were there any slides presented that day on the FORTE

4    results?

5    A.    Yes.  On Saturday the FORTE results had been presented

6    as part of a lecture of the late-breaking news session.

7    Q.    Who presented the results?

8    A.    Giancarlo Comi from Milan.

9    Q.    The JTX-7064 that we put up on the screen, are these

10   the slides that Dr. Comi presented that day?

11   A.    Yes.

12   Q.    Do the slides present any information about the

13   comparative tolerability of the 20-milligram and

14   40-milligram doses?

15   A.    Yes, they are.  Comparable tolerability.

16   Q.    Let's look at Page 7064.5.

17         In the middle panel there is a slide called

18   Early Termination Reasons.

19         Can you explain the information that's provided

20   in this slide, Dr. Ziemssen?

21   A.    So we have already discussed, when we talked about the

22   Flechter study, that it's of really significant importance

23   to look at the patients who left the trial, because they are

24   patients not doing well.  They are having adverse events or

25   the drug is not working.

1                       Here, Dr. Comi is reporting about the reasons

2       why patients terminated the FORTE trial.

3       Q.      And what does Dr. Comi report about terminating

4       because of adverse events?

5       A.      If you look in the line here, adverse events, patients

6       discontinued the trial because of adverse events, you can

7       see that there have been 48 percent in the daily group and

8       it has been 20 milligram group, and it has been 9.0 percent

9       in the 40-milligram dose.

10      Q.      Just to make sure we are clear, you said 48 percent.

11      Does that say 4.8 percent?

12      A.      4.8, sorry.

13      Q.      Would the person of skill in the art -- strike that.

14                      Does it say anything about statistical

15      significance of that finding?

16      A.      Yes.  If you follow the asterisk to the bottom, you

17      can see that it is stated that it is statistically

18      significant compared to 20 milligram.

19      Q.      And would the person of skill in the art have thought

20      that these results were important?

21      A.      Yes.  Especially as it explains that the difference is

22      mainly due to injection site reactions which have been

23      documented at the bottom of the slide.

24      Q.      Would a person of skill in the art have found an early

25      termination event to be an important event?

1    A.    It is an important event, but the patient has to leave

2    the clinical trial.

3    Q.    Why is that?

4    A.    Because it is usually the last option.  The patient

5    enters the clinical trial, and you get him into the trial to

6    really improve his management.  And if a patient has to

7    leave this clinical trial, it's very bad.  I can tell it

8    just as an investigator.

9    Q.    Now, after Dr. Comi presented his results at the

10   Montreal meeting in 2008, what was your opinion about the

11   40-milligram dose?

12   A.    The 40-milligram dose is dead.

13   Q.    Do you think that the person of skill in the art would

14   have had the same view?

15   A.    I think so.

16   Q.    Let's look at JTX-7104 in your binder.  We will pull

17   it up on the screen.  It says MedScape.  Can you explain

18   what Exhibit 7104 is?

19   A.    MedScape is an online educational portal for

20   neurologists, so neurologists not attending conferences or

21   having a short summary on findings in the field of

22   neurology, they can look at this web page and then they are

23   informed about the late-breaking news.

24   Q.    Do you give lessons on MedScape?

25   A.    Yes, I do.

Ziemssen - direct

1  Q.    And this title, the title of this article in MedScape

2  Is Doubling the Dose of Glatiramer Acetate Does Not Increase

3  Efficacy.

4         Is there anything in here, any quote from Dr.

5  Comi about the results?

6  A.    Yes, there is.

7  Q.    Let's look in the middle of the page.  I will pull up

8  a section here.  Can you read Dr. Comi's quote?

9  A.    So what Dr. Comi told us is, in this MedScape article,

10  "We expected that doubling the dose would significantly

11  increase the effect, and that is not true.  End of story."

12  Q.    Was that your opinion in 2008?

13  A.    Yes.

14  Q.    And do you believe that would have been the opinion of

15  the person of skill in the art of 2009?

16  A.    Yes, I think so.

17  Q.    If we look at the next page, there is a quote from a

18  Dr. Siva.  Do you who know Dr. Siva is?

19  A.    Dr. Siva is head of the MS Center in Istanbul, Turkey.

20  Q.    What does have Dr. Siva say here about the

21  40-milligram dose?

22  A.    "Then, enough is enough, and you don't need more.  The

23  current dose of glatiramer acetate that we are treating our

24  patients with is enough."

25  Q.    What was the current dose again?

Ziemssen - direct

1    A.    20 milligrams daily.

2    Q.    After FORTE, would the person of skill in the art have

3    thought that the 40-milligram dose wouldn't work at all?

4    A.    No.   The FORTE trial has demonstrated that 40

5    milligram of GA was not superior to 20 milligrams.   But the

6    problem is you have to look at the benefit-risk profile of a

7    dose.   So 40 milligrams demonstrated no increased efficacy,

8    but more adverse events, leading to early termination.

9          So the benefit-risk assessment was not better

10   than 20 milligrams, was worse than 20 milligrams.   That's

11   why the 40-milligram dose was dead at that time.

12   Q.    Have you heard of a concept called minimum effective

13   dose?

14   A.    Yes.

15   Q.    Can you explain how that factors into your opinions

16   about the 40-milligram dose of GA?

17   A.    So in treating patients we would like to use the

18   minimum effective dose.   We would only use a higher dose if

19   this higher dose would be associated with higher efficacy.

20         And the FORTE trial has demonstrated no superior

21   efficacy, and that's why we will stay with the minimum

22   effective dose, and this dose is 20 milligrams daily.

23   Q.    Did you hear Dr. Green testify that the faster onset

24   of effect with the 40-milligram dose would have motivated

25   the person of skill in the art to pursue the 40-milligram

Ziemssen - direct

1  dose?

2  A.    Yes, I have heard it.

3  Q.    And in your opinion, would that have provided any

4  motivation to pursue the 40-milligram dose after FORTE?

5  A.    First of all, I do not agree with that interpretation

6  of the MRI results.  And second, even looking on the

7  clinical study results relapse rate, there is no advantage

8  for the 40-milligram dose, and that's why the POSA would

9  look at the clinical, hard clinical data, and looking at the

10  hard clinical data, there is no difference for 40 versus 20.

11  Q.    With respect to faster onset in particular, Dr.

12  Ziemssen, would that have motivated a POSA to pursue the

13  40-milligram dose?

14  A.    No.

15  Q.    I want to turn now to the Pinchasi application.  That

16  is JTX-7107.  Before we get started, Dr. Ziemssen, can you

17  tell us what the filing date of the Pinchasi application

18  was?

19  A.    The filing date was 2007.

20  Q.    When were the results of the FORTE trial published?

21  A.    2008.

22  Q.    Let me just go back to something that I asked you

23  about a moment ago, the faster onset.  You said that it

24  would not have motivated a person of skill in art.  Can you

25  explain to us why?

Ziemssen - direct

1   A.     There was a lot of discussion whether, for example,

2   comparing interferons and glatiramer acetate that

3   interferons would have an earlier onset than glatiramer

4   acetate, looking at MRI.  And at the end, looking at the big

5   comparative trials between interferons and glatiramer

6   acetate, there was no significant difference.

7           So we had been aware of this argument using MRI.

8   But the lecture from looking at the head-to-head trial,

9   comparing interferons and glatiramer acetate, these studies

10  have told us that it is not of clinical relevance.

11  Q.     That's faster onset.  Is that what you mean?

12  A.     Yes.

13  Q.     I want to turn back now Pinchasi.  Going back to Dr.

14  Green's testimony, you heard him testify that Pinchasi was

15  the closest prior art.  Right?

16  A.     Yes.

17  Q.     And do you agree with that?

18  A.     No, I don't agree.

19  Q.     I want to talk about why that is.  Does the Pinchasi

20  application disclose any clinical study data?

21  A.     Yes, it does.

22  Q.     What clinical study data does it provide?

23  A.     The Cohen study.  So the MRI 40 milligram daily study.

24  Q.     Does the Pinchasi application contain a claim to every

25  other day administration of a 40-milligram dose ?

Ziemssen - direct

1   A.   Yes, it does.

2   Q.   Does the Pinchasi application disclose any clinical

3   data for the every other day administration of a

4   40-milligram dose?

5   A.   No, no clinical data on every other day.

6   Q.   Does the Pinchasi application disclose a clinical

7   trial protocol for an every other day regimen?

8   A.   No clinical trial protocol.

9   Q.   Does the Pinchasi application mention a three times

10  weekly dosing regimen?

11  A.   No, no three times weekly dosing regimen.

12  Q.   Would the Pinchasi application have caused the person

13  of skill in the art to change their opinion on the necessity

14  of daily dosing of GA in 2009?

15  A.   No.  As I have talked about the mechanism of action, I

16  think it was very clear to keep up with this daily

17  administration.

18  Q.   And why would Pinchasi not have suggested to a person

19  of skill in the art that they could go to less frequent

20  dosing?

21  A.   Because the belief of the POSA was going for less

22  frequent dosing because of the mechanisms of action would

23  decrease efficacy.

24  Q.   Is there anything in Pinchasi that would suggest

25  otherwise?

1    A.    No.

2    Q.    Now, if in 2009 a person of skill in the art were

3    deciding on the dosing schedule for a glatiramer acetate

4    regimen, would they have chosen Pinchasi as their starting

5    point?

6    A.    No.

7    Q.    Can you explain why not?

8    A.    Yes.  Because Pinchasi is disclosing 40 milligram.  An

9    40 milligrams, a dose of 40 milligrams was dead after the

10   negative FORTE trial.  So that's why the starting point

11   would be not 40 milligram but would be 20 milligram.

12   Q.    Have you created a slide to summarize the clinical

13   data that have been raised by the defendants in this case?

14   A.    Yes, I did.

15   Q.    Let's put up this slide.  Dr. Ziemssen, is this a

16   slide you created?

17   A.    Yes, I did.

18   Q.    Can you just explain to us what's shown here?

19   A.    Yes.  It's a slide.  It's a table where I put both

20   changes to glatiramer acetate dose and to dosing frequency.

21   So you can see on the right axis, we have 20 milligram And

22   40 milligram.  And you can see here on the x axis, you can

23   see the different treatment regimen, daily, every other day

24   and three times weekly.

25   Q.    Okay.  I want to start with the cell in the upper

1    left-hand column.  That's daily 20 milligrams.  What was

2    available in the prior art for daily administration of 20

3    milligrams of GA?

4    A.    So that was the clinical standard.  So we had lots of

5    clinical studies, study patients.  So all over the world,

6    patients had been treated with 20 milligrams daily.  It was

7    the approved dose.

8    Q.    Before I go on, I think I neglected to say that this

9    is PDX-7.57.

10            Let's go down to 40 milligrams daily.  Based on

11   the information that's been raised by the defendants in this

12   case, what was available in the prior art about 40

13   milligrams daily?

14   A.    So we had the Cohen MRI study and the mentioned FORTE

15   trial.

16   Q.    Moving to 20 milligrams every other day, what was

17   available in the prior art on 20 milligrams every other day?

18   A.    As we have discussed, the Flechter study, and the Khan

19   study that observational pilot, very small studies.

20   Q.    What about clinical data raised by the defendants on

21   40 milligrams every other day, what is available for that?

22   A.    There are no clinical data.

23   Q.    And what about 20 milligrams three times a week, are

24   there any clinical data raised by the defendants on 20

25   milligrams three times a week?

1    A.    No data.

2    Q.    And I think it probably is clear now, but is there any

3    clinical data in the prior art on 40 milligrams three times

4    a week?

5    A.    No data.

6    Q.    How does this chart impact your opinions in this case,

7    Dr. Ziemssen?

8    A.    So here we have the different dosing and dosing

9    frequency on one screen.  We can see, going to 40 milligram,

10   I think it was stopped in 2008 because the FORTE trial was

11   not demonstrating an efficacy advantage.

12          Then going on the right way, to less frequent

13   dosing, we see that there are only small studies that have

14   been performed, Flechter and Khan, which are not able to

15   tell you something about efficacy.

16          So putting, again, the mechanisms of action into

17   the scheme, I think a POSA would have been motivated to stay

18   at the 20 milligram daily dose.

19   Q.    Now, if you assume that as a POSA you were asked in

20   2009 to investigate a new dosing regimen for GA without any

21   knowledge of the claims in this case, would you have started

22   your analysis with a three times weekly regimen?

23   A.    No.

24   Q.    Can you explain why not?

25   A.    There is no data available.  It hasn't been mentioned

Ziemssen - direct

1    in the prior art.

2    Q.    If you add your opinions that you have offered today

3    about the mechanisms of action, how would that have altered

4    your opinions as evidenced by this chart that you have

5    provided?

6    A.    Putting in context my opinion on the mechanisms of

7    action, the whole right side of this graph will disappear,

8    because it would not be of advantage to have a treatment gap

9    of 72 hours or up to 96 hours.

10   Q.    I want to turn to the other claims in these patents

11   that have additional limitations.  Did you create a chart

12   with the additional limitations in the other patent claims?

13   A.    Yes, I did.

14   Q.    I am going to put up this chart.  It's PDX-7.58.  I

15   wanted to go through this slide.  First, maybe you could

16   just tell us what you have depicted on this slide, Dr.

17   Ziemssen?

18   A.    I included the additional limitations of the claims on

19   a slide.

20   Q.    I want to start with reduced frequency of ISRs and

21   IPIRs.  Those are in Claim 14 of the '250 patent, Claim 7 of

22   the '413 patent, Claim 16 of the '250 patent and Claim 17 of

23   the '250 patent, and then Claims 2 and 9 of the '776 patent.

24         Would it have been obvious to the person of

25   skill in the art in 2009 to reduce the frequency of IPIRs or

Ziemssen - direct

1   ISRs by administering 40 milligrams of glatiramer acetate on

2   a three times weekly regimen?

3   A.    No.

4   Q.    Why not?

5   A.    Because looking at the prior art, and we have to

6   consider two different steps, we have to consider the higher

7   dose of 40 milligrams, so the Cohen study and FORTE trial

8   are telling you that you have more frequent adverse events,

9   and looking at the Flechter trial, what we have done, there

10  is no advantage of going to a less frequent dose.  Even if

11  you look at the data face values, you see more frequent

12  adverse events in the every other day group.

13           So I think putting this data, prior art

14  together, it is not obvious that a three times a week

15  regimen would decrease frequency.

16  Q.    Now, I want to stop you for a moment.  Is it your

17  opinion that less frequent administration would not be

18  expected to result in fewer or less frequent injection site

19  reactions, Dr. Ziemssen?

20  A.    I have to consider the prior art.  And looking at the

21  Flechter study, and we have discussed it, looking at the

22  adverse events, comparing Flechter and Meiner, there is no

23  advantage for the every other day.

24  Q.    Are there any data in the prior art raised by the

25  defendants that show that a less frequent administration

1    regimen results in less frequent injection related adverse

2    events?

3    A.    I have seen no data.

4    Q.    Let's look at the severity limitations.  These are in

5    the '776 patent, Claims 1, 5, 6, 12, 16 and 17, and also

6    Claims 2 and 9 of the '776 patent.

7              Dr. Ziemssen, would it have been obvious to the

8    person of skill in the art in 2009 to reduce the severity of

9    immediate post-injection reactions or injection site

10   reactions by administering 40 milligrams of glatiramer

11   acetate on a three times weekly regimen?

12   A.    No.

13   Q.    Can you explain why not?

14   A.    Again, I have to look at the prior art.  And looking

15   at the 40 milligram story, so Cohen's study, the FORTE

16   trial, and we have seen, we have just looked at it, that the

17   IPIRS, the immediate post-injection reactions, have been

18   more severe, more severe pain in the 40 milligram group.

19             Then looking at less frequent dosing, we have

20   seen that the discontinuation rate was higher in the

21   Flechter study.

22             Again, putting this together, I think it's not

23   obvious that using a three times a week GA 40 milligram

24   treatment regimen would decrease severity.

25   Q.    Finally, I want to turn to the '250 patent, Claim 15.

Ziemssen - direct

1    It's directed to increased tolerability.  Would it have been

2    obvious to the person of skill in the art in 2009 to

3    increase the tolerability of the regimen by administering 40

4    milligrams of GA on a three times weekly regimen?

5    A.    I have already mentioned the frequency and the

6    severity, and putting frequency and severity together, which

7    are crucial for tolerability, I cannot see that it's obvious

8    that a 40 milligram treatment regimen three times a week

9    would have decreased tolerability if it had demonstrated,

10   like the prior art is telling us, more severe and more

11   frequent adverse events.

12   Q.    I want to turn very briefly now to the question of

13   unexpected results.

14          You have testified that in 2009 you believed

15   that it was necessary to have daily injections of GA in

16   order for the drug to be effective in MS.  Right?

17   A.    Yes.

18   Q.    Did it later turn out that you were wrong about that?

19   A.    Yes.

20   Q.    And was that unexpected?

21   A.    It was unexpected.

22   Q.    And in your opinion, is there evidence that

23   demonstrates unexpected results for the 40 milligram three

24   times a week regimen?

25   A.    Yes.  Two studies, the GALA trial and the GLACIER

1    trial.

2    Q.    Thank you.  Let's turn to PTX-141 in your binder.  If

3    we could put that up on the screen, Mr. Chase.

4              Can you tell us what PTX-141 is, Dr. Ziemssen?

5    A.    That is the press release about the successful study

6    GALA study demonstrating superior efficacy of GA 40

7    milligram three times a week versus placebo.

8    Q.    How did the GALA results demonstrate unexpected

9    results?

10   A.    As I have stated, a POSA would not have had reasonable

11   expectation of success that a treatment regimen of 40

12   milligrams three times a week would work in 2009.  That's

13   why having a positive Phase III study, with this clinical

14   end point, I think is an unexpected result.

15   Q.    You also mentioned that the GLACIER trial results

16   provided unexpected results related to the 40-milligram

17   three times a week regimen.  Correct?

18   A.    Yes, I did.

19   Q.    Now, if we turn to JTX-7134 in your binder, and put it

20   up on the screen.  Is this the paper that describes the

21   results of the GLACIER trial?

22   A.    It is the GLACIER paper, yes.

23   Q.    What was studied in the GLACIER trial?

24   A.    The GLACIER trial was an open label randomized study

25   to look for the safety and tolerability of two groups,

1   glatiramer acetate 40 milligram three times weekly versus 20

2   milligrams daily.

3   Q.    If we could pull up the abstract, and the highlighted

4   portion here, could you describe the results that were shown

5   in the GLACIER trial?

6   A.    This is now a trial not looking for efficacy end

7   points, but looking for safety and tolerability end points.

8   That's why we have the mean annualized rate of injection

9   associated adverse events as an end point.  And this rate is

10  reduced by 50 percent for the 40-milligram three times a

11  week treatment group, that is in contrast to the

12  20-milligram treatment group.

13  Q.    What does it say with respect to severity of the 40

14  milligrams three times a week regimen?

15  A.    It is stated in this paper there was a 60 percent

16  reduction in the occurrence of moderate and severe events.

17  Q.    Why in your opinion were these results unexpected?

18  A.    I have talked about why it would not have been obvious

19  to increase -- to decrease severity, and to decrease

20  frequency, increase tolerability by using a three times a

21  week 40 milligram treatment regimen.

22  Q.    Have you been here in the courtroom when the

23  defendants' experts have criticized the GLACIER study?

24  A.    Yes, I have been.

25  Q.    Have you been involved in patient reported outcome

1   tolerability studies?

2   A.     Yes.  I have done a lot of such patient reported

3   outcome trials.

4   Q.     Did the defendants' experts' criticisms of the GLACIER

5   trial affect your reliance on the GLACIER study?

6          MS. MAZZOCHI:  Your Honor, this witness never

7   talked about any of these issues in his expert report.  He

8   never commented on any of our experts' comments on the

9   GLACIER trial.  His expert report opinions are limited to

10  one conclusory paragraph in his expert report.  This is not

11  in there.

12         MR. JAMES:  Your Honor, in his expert report he

13  says that he relied on the GLACIER study as evidence of

14  unexpected results.  I am not going to ask him anything more

15  than that, that he is relying on it.  All I have asked is

16  did you consider the criticisms and does that change your

17  opinion.

18         MS. MAZZOCHI:  No.  He already asked him if he

19  is relying on it and to what extent he is relying on it.

20  This witness, despite having our expert criticisms, never

21  responded to those.

22         THE COURT:  As just described, I will permit the

23  question.

24         MS. MAZZOCHI:  Thank you.

25  BY MR. JAMES:

Ziemssen - direct

1   Q.    Do the defendants' experts' criticisms of the GLACIER

2   trial affect your reliance on the results of the GLACIER

3   study?

4   A.    No.  Of course, we have the subjective trial.  We have

5   to ask patients pattern about these.  I think it is quite

6   normal in studies where you have to involve patients.  But

7   it is important to involve patients because it is person

8   their tolerability and not about the physicians'

9   tolerability.

10  Q.    I want to turn now very briefly to a summary of your

11  obviousness positions.  And did you create a slide to

12  illustrate your opinions?

13  A.    Yes, I did.

14  Q.    Is PDX-7.59 a slide that you created?

15  A.    Yes, I did.

16  Q.    You understand that the defendants have proffered

17  various combinations of prior art that they say render the

18  claims obvious?

19  A.    Yes.

20  Q.    Let's start with the Pinchasi reference.  Would the

21  Pinchasi reference alone have rendered the claims obvious to

22  a person of skill in the art in August 2009?

23  A.    So Pinchasi is disclosing a 40-milligram daily dose,

24  inclusive clinical trial data, clinical data, and is

25  disclosing 40 milligram every other day without clinical

1    data.

2              So putting this data together after the negative

3    FORTE trial, so there was no motivation to a POSA to use a

4    40-milligram dose because the FORTE trial had demonstrated

5    there is no superior efficacy but there are increased

6    adverse events using the FORTE trial, that is why looking at

7    the Pinchasi patent application in 2009 after the negative

8    FORTE trial, I think there is no motivation.

9    Q.    And if we look at the next combination, it's Pinchasi

10   in combination with Flechter, would that have rendered the

11   claims obvious to a person of skill in the art in August

12   2009?

13   A.    So Flechter is providing no additional data, so

14   Flechter is disclosing a clinical study which was not

15   powered to demonstrate really that dosing regimens, 20

16   milligram every day, 20 milligram every other day, have

17   really the same efficacy.  And looking at the mechanisms of

18   action, I think, in 2009, a POSA would have considered that

19   less frequent dosing should not be considered unless you

20   have really a huge clinical trial demonstrating this.

21              So putting this reference together, I think

22   there is no reasonable expectation of success.

23   Q.    Would adding Flechter to the Pinchasi reference have

24   provided a motivation to a person of skill in the art in

25   2009 to make the 40 milligram three times a week regimen?

Ziemssen - direct

1    A.    No.

2    Q.    Now, looking at the next combination, would Pinchasi

3    in combination with the Khan 2008 abstract or the Caon

4    abstract have render the 40 milligram three times a week

5    regimen obvious to a person of skill in the art?

6    A.    No, because this additional data, they don't provide

7    new studies, better studies, so it's the same as the

8    Flechter reference.  So again, there is no motivation to

9    combine these combinations regarding three times weekly 40

10   milligram dose.

11   Q.    Let's go to the next combination, Pinchasi plus the

12   summary basis of approval.  Would that have rendered the

13   claims to a 40-milligram three times a week regimen obvious

14   to pattern of skill in the art in August 2009?

15   A.    No.  As I have stated, the question of the FDA

16   reviewer mentioned in the SBOA, 13 years ago, before the

17   priority date, it was already answered by a lot of clinical

18   studies and by patients treated in the clinical practice,

19   and that's why even combining the SBOA, whose questions are

20   answered 13 years later in combination with Pinchasi, does

21   not make the combination obvious.

22   Q.    Does Pinchasi in combination with the SBOA provide the

23   person of skill in the art with motivation to make the

24   40-milligram three times a week regimen?

25   A.    No.

Ziemssen - direct

1   Q.      Would Pinchasi in combination with the Rebif label

2   have provided the person of ordinary skill in the art with

3   motivation to make the 40-milligram three times a week

4   regimen?

5   A.      No, because Rebif is a completely different drug.  As

6   I have said, it's not appropriate to plug a different drug

7   into a regimen of a completely other drug.  That is why I

8   think the combination of Pinchasi and Rebif is not

9   appropriate.

10  Q.      Now, finally, if the person of skill in the art in

11  2009, August 2009, had been motivated by any of the prior

12  art to try a 40-milligram three times a week regimen with at

13  least a day between each injection, would the person of

14  skill in the art have had a reasonable expectation of

15  success?

16  A.      No.  A person of ordinary skill in the art would have

17  no reasonable expectation of success.  I have talked about

18  the mechanisms of action, it would teach you away from less

19  frequent application of the drug.  I have talked about the

20  increase of dose, which demonstrated no increased efficacy,

21  But increased adverse events.

22          So taking together the prior art, the knowledge

23  about the mechanisms of action, the unpredictability of a

24  superior complex disease, like multiple sclerosis, I think

25  there was no reasonable expectation to a POSA in 2009 to

Ziemssen - cross

1    dose glatiramer acid 40 milligrams three times a week with

2    at least one day between injections.

3                    MR. JAMES:  I have no further questions.

4                    THE COURT:  We will have cross-examination at

5    1:30.

6                    (Luncheon recess taken.)

7                    Afternoon Session, 1:33 p.m.

8                    THE COURT:  All right, Doctor.  Please take your

9    seats.  Hand out the binders.

10                    MR. ANSTAETT:  May we approach, your Honor?

11                    (Binders handed to the witness and to the

12   Court.)

13                    THE COURT:  Mr. Anstaett?

14                    MR. ANSTAETT:  We may have just a few more

15   binders to get out.

16                    CROSS-EXAMINATION

17   BY MR. ANSTAETT:

18   Q.    Good afternoon, Dr. Ziemssen?

19   A.    Good afternoon.

20   Q.    We last met at your deposition on August 1st.

21   A.    In Washington.

22   Q.    In Washington, yes.  It's good to see you again.

23                    Let me orient you to the materials we've handed

24   you.  There should be a cross-examination binder in front of

25   you.

Ziemssen - cross

1              Do you have that?

2     A.     Yes.

3     Q.     Okay.  And you also have your deposition transcript in

4     this case as well as your expert report in this case; is

5     that right?

6     A.     Yes, I do.

7     Q.     Okay.  And if we need your deposition transcript or

8     your expert report that you submitted in the inter partes

9     review proceedings, we don't have those up there for you,

10    but if they become necessary, we'll bring up copies of those

11    to you.  Okay?

12    A.     Thank you.

13    Q.     Now, Doctor, you testified at some length this morning

14    about a proposed mechanisms of action of glatiramer acetate;

15    is that correct?

16    A.     Yes, I presented some information.

17    Q.     Okay.  And you described glatiramer acetate's

18    mechanisms of action as poorly understood and complex; is

19    that correct?

20    A.     I don't agree with that statement.

21    Q.     So you don't recall expressing that opinion in your

22    expert report in this case?

23    A.     I didn't hear your question.

24    Q.     I said you don't recall expressing that opinion in

25    your expert report in this case?

Ziemssen - cross

1    A.    Sorry, I did not -- I did not hear that.  It's poorly

2    understood, yes.

3    Q.    All right.  You said it was poorly understood and

4    complex.  All right?

5    A.    Yes.

6    Q.    Okay.  And I think we would agree with one another

7    that as of August 2009, glatiramer acetate's

8    pharmacokinetic/pharmacodynamic profile remained unknown; is

9    that right?

10   A.    Yes, that's right.

11   Q.    Okay.  But as I understand it, in your opinion, in

12   August 2009, prevalent theories on GA's mechanisms of action

13   predicted frequent dosing would be required to ensure

14   efficacy and a POSA familiar with immunology would have

15   thought that daily immunization was needed to maintain a

16   steady supply of beneficial activated TH2 cells to the

17   brain; is that right?

18   A.    Sir, as I've told you in my direct, so the daily

19   activation of the GA specific T cells would have been

20   considered to be crucial for the efficacy of the drug.

21   Q.    Okay.  And, in fact, it's your opinion based on your

22   mechanisms of action theory that more frequent than daily

23   dosing of glatiramer acetate, not less, would have been the

24   rational choice for a skilled artisan in August 2009; is

25   that correct?

1    A.    No, that's not right.

2    Q.    All right.

3    A.    From the immunological perspective, of course, it

4    would be good to have more frequent dosing, but I am a

5    clinician.  I'm treating patients, and I am aware that the

6    20-milligram daily application has proven efficacy, and

7    that's why I think what the mechanism of action is telling

8    us, that we should go for 20 milligrams daily.

9    Q.    Well, do you recall, Doctor, saying in your expert

10   report from an objective viewpoint, more frequent dosing,

11   not less, would have been the rational choice?

12   A.    For an immunologist, I think it's quite easy to

13   understand and perhaps demonstrated by the mechanism of

14   action.  So if you would like to get more activated cells,

15   you would have to give it more frequently.  But that is

16   regarding the immunology.  Of course, you have to put it

17   into clinical context.

18   Q.    And when you say more frequent in that context,

19   you mean more than once daily from an immunological

20   perspective?

21   A.    Yes, more frequently, because it was just to tell you

22   that the way you would go would be not less frequently, but

23   would be more frequently.

24   Q.    But, of course, I think what I heard you just

25   recognize is patients don't want to inject themselves more

Ziemssen - cross

1    frequently than daily with glatiramer acetate; is that

2    right?

3    A.    None of my patients have injected themselves more than

4    daily.

5    Q.    Certainly, patients don't like to inject themselves

6    more than once daily with glatiramer acetate in your

7    experience; is that right?

8    A.    I think the patients are doing well with the once

9    daily injection, but I think it would put a lot of burden on

10   the patient to inject more frequently than daily.

11   Q.    All right.  And you would agree with me, would you

12   not, that there are no studies of more frequent GA dosing

13   than daily, there were no such studies before the priority

14   date?

15   A.    There were no human studies applying glatiramer

16   acetate more frequently than daily.

17   Q.    And you were not aware of any such studies that had

18   been conducted after the priority date despite these

19   mechanisms of action that you talked about?

20   A.    I'm not aware of it, no.

21   Q.    Now, it's also your opinion that skilled artisans in

22   August of 2009 had no general interest in changing the

23   20-milligram daily GA dosing regimen to a less frequent

24   dosing regimen; is that correct?

25   A.    That is not right.

1    Q.    Okay.

2    A.    I stated that the person of ordinary skill in the art

3    would see that there is an approved 20-milligram daily dose

4    of glatiramer acetate and you would need really a study,

5    adequate study to show the physician that less frequent

6    dosing would be as efficacious as daily dosing.

7    Q.    Well, let me see if I can get at this another way,

8    Doctor.  Let me just ask you:  In August 2009, was there

9    interest among skilled artisans in developing a GA dosing

10   regimen that would reduce the frequency of injection site

11   reactions while maintaining the efficacy of the approved

12   20-milligram daily dosing regimen for treating relapsing,

13   remitting multiple sclerosis?

14   A.    I don't think that in 2009 there was a general

15   tendency for perform this study.

16   Q.    Okay.  But we can agree, as we see in JTX-7078, that

17   Dr. Flechter and his colleagues conducted a two-year study

18   of 20-milligram every other day GA dosing, the results of

19   which he reported in 2002; right?

20   A.    Yes.  The Flechter trial was one of the two trials

21   investigating less frequent application of glatiramer

22   acetate.

23   Q.    So there's no doubt before August 20th, 2009,

24   researchers in the field had conducted studies in

25   patients examining less frequent dosing of GA; is that

Ziemssen - cross

1   right?

2   A.     So two small studies had been performed on glatiramer

3   acetate 20-milligram every other day.

4   Q.     All right.  And in Dr. Flechter's paper, in the

5   conclusion section, he reports that the results of his trial

6   suggested that alternate day treatment with Copolymer 1 is

7   safe, well tolerated, and probably as effective as daily

8   Copolymer 1 in reducing relapse rate and slowing neurologic

9   deterioration; is that correct?

10  A.     That's stated in his conclusion, yes.

11  Q.     Just for the record, Copolymer 1 is another name for

12  glatiramer acetate?

13  A.     That's right.

14  Q.     And in his paper Dr. Flechter didn't report that he

15  had envisioned a new mechanism of action for GA or that he

16  had pK data that would justify every other day dosing, did

17  he?

18  A.     Flechter did not mention mechanism of action and

19  Flechter does not mention the pharmacokinetics and

20  pharmacodynamics.

21  Q.     And Dr. Flechter didn't say at the end of this study,

22  you can forget this less frequent GA dosing stuff.  In fact,

23  he encouraged others in the field to take up larger studies

24  of less frequent dosing of GA, did he not?

25  A.     I don't agree with the statement.

Ziemssen - cross

1    Q.    All right.  Well, if we could see the conclusion up

2    here, he, Dr. Flechter says, the results of this trial

3    suggest that alternate day treatment with Copolymer 1 is

4    safe, well tolerated, and probably as effective as daily

5    Copolymer 1 in reducing relapse rate and slowing neurologic

6    deterioration?

7            THE COURT:  Slow down.  It's not a race,

8    Mr. Anstaett.

9            MR. ANSTAETT:  I apologize.

10           THE COURT:  We're recording this.

11           MR. ANSTAETT:  I apologize, Madam Court

12   Reporter.

13   BY MR. ANSTAETT:

14   Q.    And Dr. Flechter goes on to say, however, these

15   preliminary observations will have to be examined in larger

16   studies, preferably comparing daily with alternate day

17   administration of Copolymer 1 in a blinded manner.

18           He encouraged others to take up this study, did

19   he not?

20   A.    No.  I don't think that the sentence had to be read in

21   that way.  I think one sentence acknowledged the low patient

22   number, yes.  In this study design.  So he acknowledges

23   that in principle what he does earlier in his discussion

24   section you cannot draw any conclusions regarding efficacy,

25   because this study was not controlled.  He acknowledged that

Ziemssen - cross

1    his study is not powered to measure efficacy to demonstrate

2    that the treatments are as efficacious, and that's why he,

3    he had this second sentence there.

4    Q.    The second sentence says, Others should continue this

5    investigation of less frequent dosing because my study shows

6    that there are potentially promising results.  Right?

7    A.    No.  I see that it's an acknowledgment, that this

8    study was not powered, and if you would draw any

9    conclusions, you would have to run a larger trial.

10          But this trial was really just an idea, so it

11   wasn't powered to demonstrate efficacy.  And that's why the

12   second sentence.

13   Q.    All right.  If we could turn to Dr. Khan's abstract,

14   JTX-7089, we can agree, can we not, that Dr. Khan did in

15   fact -- let me ask you this:  Let me take a step back.  You

16   have heard of Dr. Khan, of course.  Right?

17   A.    Yes.

18   Q.    You have met several times before he passed away?

19   A.    I knew him, yes.

20   Q.    In his abstract that you discussed this morning, we

21   can agree that he did, in fact, conduct a randomized

22   prospective rater-blinded four-year pilot study comparing

23   the effects of 20 milligram every other day dosing and daily

24   dosing for the treatment of relapsing remitting multiple

25   sclerosis.  Right?

1    A.    I see that statement, yes, sir, yes.

2    Q.    Dr. Khan reports here, in his abstract, before the

3    priority date, that there was considerable interest in

4    alternate dosing regimens of GA in relapsing remitting

5    multiple sclerosis.  Right?

6    A.    It is stated here sir, yes.

7    Q.    Not no general interest, but considerable interest.

8    Right?

9    A.    I only can recognize as a POSA in 2009, there have

10   been only two small studies, the Flechter study and the Khan

11   trial that really investigated less frequent dosing and

12   those, whether two small studies are of considerable

13   interest, I don't know.

14   Q.    And Dr. Khan says that this considerable interest is a

15   result of the fact that daily subcutaneous injectable

16   therapy can be challenging for long-term patient compliance.

17   Correct?

18   A.    I see that statement, yes, sir, yes.

19   Q.    Like Dr. Flechter before him, Dr. Khan didn't say,

20   after he had conducted this four-year study, forget about

21   less frequent dosing, it doesn't work, again, he encouraged

22   others in his field to continue to pursue studies of less

23   frequent GA dosing.  Correct?

24   A.    It's stated in the conclusions section.

25   Q.    In fact, Teva would later retain Dr. Khan to run the

1    GALA study that compared 40 milligrams GA administered three

2    times a week to placebo.  Correct?

3    A.      There was the GALA study, yes.

4    Q.      Let's talk about the GALA trial.

5            I am going to direct your attention to JTX-7022.

6    We will get it up here on the screen for you, Doctor.  This

7    is the GALA trial protocol.  You are familiar with that

8    because you were an investigator on the GALA trial.

9    Correct?

10   A.      I have been an investigator on the GALA trial, yes.

11   Q.      By the way, did you enroll any of your own patients in

12   the GALA trial?

13   A.      Yes, my own patients.

14   Q.      Do you know how many?

15   A.      Probably ten, I would say.

16   Q.      Let's, if we could turn to JTX-7022.17, do you see

17   there is a section headed Glatiramer Acetate Mechanisms of

18   Action?

19   A.      Yes, I see this.

20   Q.      If you could turn the page over to JTX-7022.18.  At

21   the top, do you see where it says, there is a sentence there

22   that says, starts with the word "Upon"?

23   A.      Yes.

24   Q.      It says, "Upon repeated exposure to GA, the specific

25   proliferative response of PBLs" -- those are peripheral

Ziemssen - cross

1  blood lymphocytes.   Right?

2  A.    Yes.

3  Q.    "-- decrease and GA-specific T-cells shift from a Th1

4  (pro-inflammatory) to a Th2 (anti-inflammatory) phenotype."

5          Do you see that?

6  A.    That is a statement there, yes.

7  Q.    That is the T cell shift you were discussing this

8  morning?

9  A.    That is the Th1-Th2 shift which occurs in the first

10  months of treatment, yes.

11  Q.    In the next sentence, Teva tells the FDA, "These

12  pharmacodynamic parameters are indicative of

13  immunoavailibility.   However, no correlation between these

14  immunological responses and clinical efficacy has been

15  established."

16          Do you see that?

17  A.    Yes, I see this.

18  Q.    So Teva told the FDA in the GALA clinical trial

19  protocol that there are no established correlation between

20  this T cell shift on which you rely and the clinical

21  efficacy of glatiramer acetate?

22  A.    It is stated in the clinical study protocol that there

23  is no correlation of the T cell shift that has been

24  established.

25          The question is, what does establish mean?

1    There have been several reports on correlation between

2    immunological responses and clinical efficacy?

3    Q.    But no established correlation between this T cell

4    shift and clinical efficacy has been established according

5    to Teva?

6    A.    There had been no Phase III clinical trial

7    investigating whether this immunological response is linked

8    to clinical efficacy.

9    Q.    Now, Doctor, I would like you to turn to JTX-7022.21.

10   I would like you to look under the heading that says

11   Rationale For Dose Regimen Selection.  I think we have it on

12   the screen here.  The second paragraph in that section

13   begins with the sentence, "Further support for this

14   rationale was provided by several small scale investigator

15   initiated studies which explored a reduced injection

16   frequency of GA."

17             Do you see that?

18   A.    Yes, I have mentioned that in my direct this morning.

19   Q.    And we have got the footnote, there is a couple

20   footnotes after that sentence, 21 and 22, we have those

21   highlighted up there for you.  We can agree that what Teva

22   is referring to there is the Flechter 2002 study and the

23   Khan 2008 study.  Correct?

24   A.    As I mentioned this morning, when I talked about the

25   GALA protocol, I think the standard of care, if you write a

Ziemssen - cross

1    protocol to the FDA, that you include references which seem

2    to be in dispute, to mention those references, yes.

3    Q.     I did hear you say that.  Teva cited Dr. Khan's prior

4    art study.  Right?

5    A.     Yes.  Flechter and Khan.

6    Q.     And, as you say, they cited Dr. Flechter's study as

7    well.  But they did not cite the prior art you discussed on

8    mechanisms of action in this dose regimen selection

9    rationale section, do they, Doctor?

10   A.     What do you mean exactly?

11   Q.     You said it's the standard of care to present the

12   prior art that's relevant to the dosing regimen.  And we see

13   that Teva has pointed to the Flechter and Khan studies, but

14   they haven't pointed to the literature that you were

15   referring to on your direct examination this morning, have

16   they?

17   A.     They have mentioned the mechanisms of action, the

18   section before it.  We had a look at it.

19   Q.     In which they said there is no tie to clinical

20   efficacy of this T cell shift.  Right?

21   A.     They stated that there is no established relation, so

22   a Phase III trial really proving the link between

23   pharmacodynamic and clinical outcome.

24   Q.     As of August 2009 that study had not been conducted.

25   Correct?

1   A.      To my knowledge, really, an immunological study to

2   link the pharmacodynamic effect of glatiramer acetate and

3   the clinical effect, I am not aware of a study.

4   Q.      Now, if we can go back to the dose regimen selection

5   rationale.  Referring to the Flechter and Khan studies, Teva

6   told the FDA the results of these studies demonstrated

7   effects in a relapse rate reduction which were comparable to

8   daily injections of GA 20 milligrams, suggesting a lower

9   injection frequency can be considered.  Right?

10  A.      That is stated there.

11  Q.      And Teva also said, these results of these studies

12  also suggest that participating subjects found the reduced

13  frequency regimens preferable and associated with a lower --

14  there is a word missing there -- of injection related

15  adverse events.

16          Do you see that as well?

17  A.      That is stated in the paragraph as well, yes.

18  Q.      And while in the protocol Teva told the FDA and GALA

19  investigators such as yourself that although the Flechter

20  and Khan studies were small, they do provide additional

21  support for the rationale of the current study.  Correct?

22  A.      But looking at the last paragraph, it's stated that

23  they are small and underpowered to show significant effect

24  on clinical end points.

25          So I think Teva is acknowledging that

1    investigators had an idea to go for less frequent dosing.

2    But here, I think the statement is clearly that it is not

3    more than an idea, because you see here, these studies are

4    small and underpowered.  So they cannot show any efficacy.

5    Q.    That is a suggestion.

6    A.    It's an idea.

7    Q.    What Teva said was that while acknowledging those

8    limitations that you just mentioned, they do provide

9    additional support for the rationale of the current proposed

10   study -- and to be clear, the current proposed study was 40

11   milligrams three times a week.  Right?

12   A.    That is the rationale for the GALA study, yes.

13   Q.    Now, it's also your opinion that a skilled artisan

14   would not consider total weekly dose as relevant and as of

15   importance for GA.  Correct?

16   A.    I stated that the concept of total weekly dose was not

17   a concept which was available or which was around for a POSA

18   in 2009.

19   Q.    You disagree with Dr. Green on that score?

20   A.    Yes, I do.

21   Q.    But, again, if we look at 7022.22, Teva told the FDA

22   here, in the first full paragraph, "Three weekly doses of 40

23   milligrams GA would give a cumulative weekly dose of 120

24   milligrams, approximately similar to the 140 milligram

25   cumulative weekly dose given today with daily injections of

Ziemssen - cross

1    20 milligrams.  This would serve as an opportunity to

2    explore the increased convenience of three injections a

3    week, without substantially reducing the total GA dose

4    administered."

5              Do you see that?

6    A.    Yes.

7    Q.    And were you here in the courtroom for Dr. Klinger's

8    testimony?

9    A.    Yes, I was.

10   Q.    If we could see Dr. Klinger's testimony from day one

11   at Page 158, Lines 17 to 23, she testified that she also

12   felt comfortable that the total exposure of the drug would

13   not be changed.  If we inject in a week 40 milligram, then

14   there is 40, three times 40 is 120, so the total exposure of

15   the amount of drug that the immune system of a patient will

16   be exposed to will not be that dramatically different.

17              Right?

18   A.    I see the statement, right.

19   Q.    So you are on a different page than Dr. Klinger in

20   that regard.  Right?

21   A.    No.  I have stated that this concept of weekly dose

22   was not known to a POSA in 2009.  So this information I got

23   here at court, the information about weekly dose I saw in

24   the GALA study protocol.  But for a POSA in 2009, this

25   concept of total weekly dose was not relevant.

Ziemssen - cross

```
 1    Q.      But you were here for Dr. Green's testimony as well.

 2    Right?  You were in the courtroom for Dr. Green's testimony?

 3    A.      Yes, I was.

 4    Q.      And you heard Dr. Green testify that he had submitted

 5    an expert report in the IPR proceedings that mentioned this

 6    very rationale, the total weekly dose would be the same, and

 7    he submitted those papers and that opinion before he had

 8    ever seen these Teva internal documents?

 9    A.      I don't know.

10    Q.      Dr. Ziemssen, you know that MS can be a painful and

11    debilitating disease.  Right?

12    A.      Yes, I treat a lot of MS patients, yes.

13    Q.      And it's important to treat patients who are diagnosed

14    with MS quickly to slow progression of the disease.  Right?

15    A.      Yes.  We already started to treat the so-called

16    clinically isolated syndrome.  So patients without a

17    diagnosis of MS, they are already treated with interferons

18    or GA.

19    Q.      I think you said on your direct testimony what is lost

20    cannot be regained or something to that effect.  Right?

21    A.      That is my statement, yes.

22    Q.      It is your opinion, as I understand it, that as of

23    August 2009 a skilled artisan reading Example 1 of the

24    patents in suit would have had no reasonable expectation

25    that a 40-milligram dose of GA administered three times a
```

Ziemssen - cross

1    week would be effective for treating relapsed remitting

2    multiple sclerosis?

3    A.    Yes.  It is my statement that it was not obvious that

4    that would be successful, yes.

5    Q.    Let's look at 7036.1.  Teva announced at the top line

6    efficacy results of the GALA study in 2012, several years

7    after the patent's priority date.  Correct?

8    A.    Okay.  So that is the press release of the GALA study,

9    2012.

10   Q.    That's the release of the top line results.  That was

11   in 2012.  Right?

12   A.    2012, yes.

13   Q.    Until the GALA efficacy results were first announced

14   in 2012, in your opinion, the results of the GALA trial were

15   unexpected.  Right?

16   A.    Yes, because I would not have -- because I thought --

17   it did not have a reasonable expectation of success.

18   Q.    And it's also your opinion that before the priority

19   date, skilled artisans such as yourself had no reasonable

20   expectation that treatment with a 40-milligram three times a

21   week dosing regimen would improve the tolerability of GA

22   treatment relative to GA 20 milligrams administered daily.

23   Correct?

24   A.    Yes.  I have mentioned that looking at the prior art.

25   Q.    In fact , in your opinion, even after reading the

1     clinical trial protocol and Example 1 of the patents in

2     suit, the skilled artisan would still have no reasonable

3     expectation that the claimed dosing regimen would improve

4     the tolerability of GA treatment relative to the

5     20-milligram daily dose.  Correct?

6     A.    Yes.  I think there is no reasonable expectation, yes.

7     Q.    Okay.  And you were a site investigator for the GALA

8     trial.

9     A.    Yes, I am.

10    Q.    Do I understand that to mean that patients under your

11    care participated in the GALA trial?

12    A.    As I stated, we are running a lot of clinical trials

13    and that's why we are very familiar with what it does mean

14    if a patient participates in a clinical trial.

15    Q.    And you said about ten of your patients you enrolled

16    in the GALA trial?

17    A.    I think so, yes.

18    Q.    Does that also mean that patients under your care in

19    Dresden who participated in the GALA trial were randomized

20    to either take 40 milligrams of glatiramer acetate three

21    times per week or to take placebo injections?

22    A.    Yes.  I think -- fortunately now, we don't have any

23    placebo controlled trials anymore.  But in the past, we had

24    to use placebo controls to show efficacy.  That's why it is

25    crucial to educate the patient that on the one side he can

Ziemssen - cross

1    go on a 20-milligram daily regimen, which is approved, or

2    the patient can go -- can go on to experimental study

3    design.

4              That's why all clinical studies, they are

5    evaluated by the ethical committee, and the patient is

6    informed several times.  So I sit together with the patient

7    at three time points to explain what does it mean to get --

8    to enroll in the clinical study, because there is a risk

9    that you are on placebo.

10   Q.    All right.  And the placebo controlled phase of the

11   GALA trial lasted 12 months.  Correct?

12   A.    Yes.

13   Q.    And to participate in the GALA trial, a patient had to

14   have a confirmed and documented MS diagnosis.  Correct?

15   A.    As for all clinical studies looking for new drugs,

16   they had, yes.

17   Q.    So you were willing to enroll some of your own MS

18   patients in the GALA trial to receive either no treatment at

19   all, placebo, or a GA dosing regimen that you did not

20   reasonably expect would be effective in treating relapsing

21   remitting multiple sclerosis?

22   A.    So I had no reasonable expectation.  But I looked at

23   the study protocol and I realized, this study protocol can

24   give us a solution to this question, whereas, for example,

25   looking at the study protocols of Cohen and Flechter,

Ziemssen - cross

1     looking at the study protocols, it is very clear that these

2     studies cannot answer the question whether less frequent

3     dosing will be efficacious.

4              Looking at the GALA protocol, I think it was

5     very -- it was very clear to me that this study will solve

6     the question whether less frequent dosing is possible.

7     That's why I looked at the clinical trial protocol.  I was

8     skeptical, but I was hopeful that this study would work.

9     Q.    But you just told me that even after reading that

10    protocol, you did not have a reasonable expectation that

11    that dosing regimen would work.  Correct?

12    A.    I was skeptical.  But I was hopeful, because that is

13    the only way to really go forward.

14    Q.    Doctor, did you tell your ethical review board that

15    you were going to enroll your patients in the clinical trial

16    to receive either no treatment at all or treatment that you

17    had no reasonable expectation would work?

18    A.    We discussed it in our ethical board.  It advised,

19    informed consent that a new regimen is tested where we don't

20    know what will be the effect.  Of course, all patients have

21    been told that every day glatiramer acetate 20 milligram is

22    available.  So patients, a lot of patients, they don't  want

23    -- they do not want to be enrolled into the GALA trial.  But

24    we had some patients, they wanted to get enrolled in the

25    GALA trial.

Ziemssen - cross

1    Q.    My question for you is, did you tell those patients

2    that I have looked at the Flechter studies, the Khan studies

3    on less frequent GA dosing, and they don't give me any

4    confidence that it will work, I don't have a reasonable

5    expectation that this will work?

6              Did you tell your patients that?

7    A.    I told my patients that I am skeptical, yes.

8    Q.    All right.  Could we see your slide PDX-7.56 that we

9    had this morning.

10             This is a slide you used in your direct

11   examination; is that correct?

12   A.    Yes, I did.

13   Q.    You helped design it?

14   A.    Yes.

15   Q.    Okay.  And at the top we see every other day dosing

16   regimen; is that correct?

17   A.    Yes.

18   Q.    We don't have those kind of T cell balance beams

19   there, teeter-totters there for low dosing data; is that

20   right?

21   A.    Because we don't know.

22   Q.    Okay.  And now at the bottom of the slide, you show

23   two 96-hour gaps between doses over the course of three

24   weeks; right?

25   A.    Yes.

Ziemssen - cross

1   Q.    And in the middle, the example in the middle of your

2   slide, you show a dosing schedule in which 67 percent of the

3   administered doses have only a single day between

4   injections; right?

5   A.    Yes.  Yes.

6   Q.    I'm saying in the middle one 67 percent of the

7   injections have only a single day in between injections;

8   right?

9   A.    Usually, they usually -- between injections which have

10  one day in between and then you have a larger gap.

11  Q.    Only 33 percent of the doses in that middle example

12  have a two-day gap between injections; right?

13  A.    You have every week, you have one gap.

14  Q.    Okay.

15  A.    Two days.

16  Q.    And do you understand, Doctor, that your middle

17  example there, three times a week administration of GA with

18  that one 72-hour gap a week is a regimen that's covered by

19  the patents-in-suit in this case?

20  A.    Yes.

21  Q.    That's just Monday, Wednesday, Friday dosing every

22  week; right?

23  A.    You could do it on other days, yes.

24  Q.    All right.  But you also understand that if that

25  middle example in your slide, the Monday, Wednesday, Friday

```
 1    dosing is obvious, then the claimed dosing regimen is

 2    obvious irrespective of whether you could rearrange the

 3    doses so that there is a 86-hour gap; is that right?

 4    A.    What I wanted to say, that every other day is

 5    different than three times weekly, and I think that is

 6    obvious even if you look at the 72-hour gap or the 96-hour

 7    gap.

 8    Q.    You put a lot of emphasize on that 96-hour gap, right,

 9    in your direct testimony?

10    A.    Yes.  I mentioned the 96-hour gap, but I always talked

11    about the 72-hour gap as well.

12    Q.    Right.  That 72-hour gap, if that dosing regimen is

13    obvious with the 72-hour gap, then the dosing regimen is

14    obvious irrespective, as I say, about whether you rearrange

15    the doses somehow to create a 96-hour gap; right?

16    A.    What I wanted to show is that every other day, it's

17    different than three times a week.

18    Q.    I don't think anybody disputes that every other day is

19    different than three times a week, but my question is, and

20    if you don't have an answer to it, that's fine.  But do you

21    understand that if the middle one is obvious, even though

22    you've shown a dosing regimen with 96-hour gaps, the claimed

23    dosing regimen is obvious?

24    A.    Yes.  I think three times weekly, yes.

25    Q.    Okay.  All right.  Now, you discussed a number of
```

Ziemssen - cross

1    papers with Mr. James this morning related to this

2    mechanisms of action theory; right?

3                THE COURT:  You should adjust the mike so

4    everyone can hear you.

5                MR. ANSTAETT:  I'm sorry.

6                THE COURT:  I can hear you and we can hear you

7    up here.

8                MR. ANSTAETT:  I'm usually too loud.

9    BY MR. ANSTAETT:

10   Q.    You discussed a number of papers with Mr. James this

11   morning related to this mechanisms of action theory; is that

12   right?

13   A.    Yes.

14   Q.    Okay.  And you discussed Wekerle '96 paper, that's

15   JTX-7132 that's on your slide, PDX-7.40?

16   A.    Yes.  I mentioned Wekerle, who was my mentor.

17   Q.    All right.  I think you told Mr. James, you agree that

18   this Wekerle paper does not mention or involve glatiramer

19   acetate; right?

20   A.    No.  It's a study investigating that T cells have to

21   be activated, and it's not important what are the

22   specificity of the T cells.  The T cells had to be

23   activated.

24   Q.    But so my question was, the Wekerle paper does not

25   involve GA, does not mention GA; right?

Ziemssen - cross

1    A.    I had mentioned in my direct that this paper, GA, this

2    was a time before GA.

3    Q.    And Wekerle involved experiments done in animals;

4    right?

5    A.    Wekerle was related to animal experiments, yes.

6    Q.    And Wekerle does not mention that daily activation of

7    T cells is necessary for T cells across the blood-brain

8    barrier.  It just mentioned that T cells have to be

9    activated; is that correct?

10   A.    Yes.  So T cells have to be activated and only the

11   activated T cells can cross a blood-brain barrier.

12   Q.    You discussed a Hickey 1991 paper as well; right?

13   That's also on that same slide you see there?

14   A.    Yes.

15   Q.    And Hickey was a review article that reported results

16   on a study.

17   A.    Hickey included original data as well.  They have done

18   immunological experiments as well.

19   Q.    In rats?

20   A.    Yes.

21   Q.    And Hickey also does not involve or mention glatiramer

22   acetate; is that correct?

23   A.    It's again, the title of the paper demonstrates

24   that T cells had to be activated to enter the brain.

25   Q.    Hickey does not address the frequency of GA dosing

1    needed to activate T cells; right?

2    A.    No.  Hickey mentioned that if you activate T cells,

3    T cells are able to enter the brain.

4    Q.    Okay.  Let's look at PDX-7.41 of your presentation,

5    please.  Again, this is a slide that you used in your direct

6    examination; is that correct?

7    A.    Yes, I did.

8    Q.    And you discussed four papers by Aharoni; right?  For

9    the record, those are JTX-7044, 7045, 7046 and 7047.  And

10   you discussed those four papers; right?

11   A.    Yes.

12   Q.    As your slide says here, these are all studies

13   performed in animals; is that right?

14   A.    Yes.

15   Q.    These are all statements involving an experimental

16   animal model of MS known as EAE in mice; is that correct?

17   A.    So this paper, these papers were around experimental

18   autoimmune encephalomyelitis.

19   Q.    That's EAE.  Right.

20          They're not human clinical studies like Dr. Khan

21   or Dr. Flechter, less frequent dosing in actual human

22   patients; right?

23   A.    They are well performed, well published animal

24   studies.

25   Q.    All right.  So I think the answer to my question is

1    yes?

2    A.    Yes.

3    Q.    Now, you also discussed the Angelov 2003 paper; is

4    that right?

5    A.    Yes, I did.

6    Q.    All right.  And that was a study reporting results

7    using GA in an experimental mouse model of a different

8    disease, amyotrophic lateral sclerosis?

9    A.    Yes.

10   Q.    The paper is, therapeutic vaccine for acute and

11   chronic motor neuron diseases:  Implications for amyotrophic

12   lateral sclerosis; right?

13   A.    Yes.

14   Q.    That's more commonly known in this country as Lou

15   Gehrig's disease?

16   A.    I know.

17   Q.    And that paper was published in 2003; is that

18   correct?

19   A.    Yes.

20   Q.    And so it's certainly -- the Angelov paper certainly

21   did not discourage Dr. Khan from running his less frequent

22   GA dosing human clinical trials he completed in 2008;

23   right?

24   A.    I don't know.  I cannot tell you when Omar Khan

25   started to recruit for his clinical studies.  I don't

Ziemssen - cross

1    know.

2    Q.    Okay.  Well --

3    A.    Four-year trial.  I don't know.

4    Q.    It's a four-year trial.  It's published in 2008; is

5    that right?

6    A.    I don't know.

7    Q.    Okay.  In the method section of Angelov and in the

8    results section of Angelov, there's no mention of EAE or MS

9    or animal models of MS?

10   A.    As I've stated in my direct, the animal model of MS is

11   mentioned in the discussion section.

12   Q.    All right.  And a POSA reading Angelov in 2009

13   would have also been aware of Dr. Khan and Dr. Flechter's

14   less frequent GA dosing human clinical trials; is that

15   right?

16   A.    Yes.  A POSA would be, would be aware of the study,

17   but as we have discussed it already, these studies are

18   underpowered and cannot prove any efficacy.

19   Q.    What was the maximum number of injections given to the

20   mice, maximum number of injections given to the mice in

21   Angelov?

22   A.    You mean in the ALS part?

23   Q.    Yes.

24   A.    I think three, four injections.

25   Q.    Three, four injections total.  All right.

Ziemssen - cross

1    A.    The problem, but the problem is looking at the Angelov

2    paper, the first part, the administration of glatiramer

3    acetate was always done with Freund's Adjuvant, and so they

4    so talked about that it makes the effect more long lasting,

5    but if you go to the discussion section, they are discussing

6    that using glatiramer acetate without adjuvant has a much

7    shorter effect.

8    Q.    But these three or four injections that were given to

9    the mice in the Angelov paper, over what period of time were

10   those administered?

11   A.    Over a month.

12   Q.    Three or four injections in a month?

13   A.    Yes.

14   Q.    Okay.  All right.  Now, you also discussed in your

15   direct examination and one of your own papers that

16   investigates the presence of GA specific T cells in the

17   cerebrospinal fluid of humans; is that correct?

18   A.    Yes.

19   Q.    That's Ziemssen 2008; right?

20   A.    Yes.

21   Q.    Okay.  Now, a lot of the criticisms of Flechter and

22   Khan that you've leveled are they've got too few patients in

23   their studies; right?  But I didn't hear how many patients

24   were involved in your Ziemssen 2008 study.

25   A.    Only a few patients, because the patients had to

1    undergo a spinal tap at the beginning of treatment and at

2    the end of treatment, and to really get a needle in the

3    vertebral column, to get the cerebrospinal fluid.  I think

4    it's not a method we can perform in a lot of patients.

5    Q.     To put a sharper point on it, the number of patients

6    involved in that trial were three; is that right?

7    A.     But I'm not looking for efficacy.  I'm looking for

8    demonstrating immunological results, and the immunological

9    result looking at my paper and looking at the Hestvik paper

10   were very clear.

11   Q.     Okay.  But, again, can we agree your paper involved

12   three patients?

13   A.     Those three patients were kind to let me take an

14   injection before and take one after treatment.

15   Q.     And Ziemssen 2008 is not a human clinical trial like

16   that run by Drs. Khan and Flechter; right?

17   A.     I'm not claiming efficacy and this was an

18   observational study.  I wanted to investigate, do I -- am I

19   able to find glatiramer acetate specific T cells in the

20   brain, and before treatment, I was not able to find them,

21   and after treatment, in all of the three patients, I was

22   able to find them.

23   Q.     In three patients; right?  But you made kind of a big

24   deal that, yes, some of my clinical trials involved humans;

25   is that right?  But this trial we're talking about is a

Ziemssen - cross

```
 1    trial involving three humans and it doesn't look at efficacy

 2    or relapse rate or any of those metrics; right?

 3    A.    But I'm describing a neurological phenomenon and I'm

 4    not claiming that a treatment regimen is efficacious, so I'm

 5    just investigating immunological findings.

 6    Q.    Okay.  And you also mentioned the Hestvik paper there;

 7    right?

 8    A.    Yes.

 9    Q.    That was another one of the human patients --

10    A.    Yes.

11    Q.    -- that you mentioned.  And, again, how many patients

12    did Hestvik involve?

13    A.    Which reference is this.

14    Q.    It's JTX-7083.  I apologize.  I should have pointed

15    you to that.  If you want to look at JTX-7083.2 under the

16    Materials and Methods Section.

17    A.    Five patients.

18    Q.    Five patients in that study.  Okay.

19          Now, going back to your paper, you said you

20    tested the cerebrospinal fluid of patients; right?

21    A.    I looked in the cerebrospinal spinal before treatment

22    and after GA.

23    Q.    And the GA treatment was daily GA treatment .  Right?

24    A.    Yes.  Daily GA treatment.  That was the only approved

25    GA treatment.
```

Ziemssen - cross

1   Q.      That was the only approved GA treatment.  Right?  Did

2   you ever test the CSF of patients who had been treated with

3   GA less frequently than daily?

4   A.      No, I haven't.

5   Q.      Did the Hestvik paper investigate the presence of GA

6   specific T-cells in patients treated with less frequent than

7   daily GA injections?

8   A.      No.  It was daily injections.

9   Q.      Let's look at PDX-7.47, please.  You went through

10  these papers as well.  Right?

11  A.      Yes.

12  Q.      And these are papers ranging from 2000 to 2007.  They

13  are publications.  Right?

14  A.      That is a selection of papers.  There are probably

15  more papers, because these papers have been often cited.  So

16  probably you will find more references.

17  Q.      I am going to limit you to what you talked about in

18  your direct examination.  These are all from 2000 to 2007.

19  Right?

20  A.      Yes.

21  Q.      I think you would agree with me that at that time the

22  only approved glatiramer acetate dosing regimen was 20

23  milligram daily injections.  Right?

24  A.      The approved dose was 20 milligrams daily.

25  Q.      And none of the papers on your Slide 7.47 report on

1    immunological patients treated with less than daily dosing

2    regimen.  Right?

3    A.      As you have stated, the only papers looking at less

4    frequent dosing have been Flechter and Khan.

5    Q.      Doctor, as we sit here today, the GALA protocol has

6    shown that the 40-milligram dose of GA administered three

7    times per week is efficacious in treating RRMS?

8    A.      Not the protocol.  It is the GALA study.

9    Q.      I thought I said GALA trial.

10           As we sit here today, the GALA trial has shown

11   that the 40-milligram dose of GA administered three times a

12   week is efficacious in treating RRMS.  Right?

13   A.      That has been shown by the GALA trial, yes.

14   Q.      You now prescribe 40 milligrams three times a week to

15   your patients?

16   A.      I prescribed GA, and I prescribe 40 milligrams three

17   times a week.

18   Q.      Even as you sit here today, in 2016, knowing that that

19   40-milligram three times a week dosing regimen is effective,

20   you still can't say whether or not administering 40

21   milligrams of GA three times a week is sufficient to

22   activate GA specific Th2 cells such that they can cross the

23   blood brain barrier and enter the CNS.  Correct ?

24   A.      That is actually investigated in another trial.

25   Q.      But even as you sit here today, you can't say that.

Ziemssen - cross

1    Right?  That trial is ongoing?

2    A.    At the moment we don't have data.  We are

3    investigating it.

4    Q.    You certainly didn't have data on that back in 2009.

5    Right?

6    A.    I was asked to take the position of 2009, yes.

7    Q.    And back in 2009, you didn't have that data.  That

8    trial is ongoing.  Right?

9    A.    In 2009, I think the proposed mechanism actually

10   wasn't that way, that we believed that daily application of

11   the drug will be necessary.

12   Q.    And so even as you sit here today you don't know if

13   this particular mechanism of action is responsible for GA's

14   clinical efficacy.  Right?

15   A.    What do you mean?

16   Q.    You don't know if this T cell shift that you have been

17   talking about is responsible for GA's clinical efficacy.

18   Right?

19   A.    I do know that the generation of a GA specific immune

20   response is crucial for the efficacy of glatiramer acetate.

21   Q.    My question is you don't know if that particular

22   mechanism of action is responsible for GA's clinical

23   efficacy.  Right?

24   A.    What do you mean exactly, which part of the mechanism?

25   Q.    The T cell shift that you were talking about.

Ziemssen - cross

```
 1    A.      The T cell shift is one part of the mechanism of

 2    action.  But the mechanism of action is much more complex

 3    and has much more other cells involved.

 4    Q.      Much more complex than just this T cell shift that you

 5    talked about this morning?

 6    A.      The T cell shift is one part of this mechanism of

 7    action.

 8    Q.      Let's shift categories a little bit and talk about the

 9    40-milligram dose of GA.

10            I turn your attention to JTX-7107, that is the

11    Pinchasi application.  Correct?

12    A.      Yes.

13    Q.      We can agree that the Pinchasi application claims a

14    dosing regimen in which 40 milligrams of GA is dosed every

15    other day.  Correct?

16    A.      As I stated in my direct, it's one of the claims, yes.

17    Q.      And you said you believe Pinchasi is not the closest

18    prior art because it has no data.  Right?  It has no data on

19    the 40-milligram every other day dosing regimen.  Right?

20    A.      No.  That was not my statement this morning.

21    Q.      Is that one of the reasons you believe that Pinchasi

22    is not the closest prior art?

23    A.      No.  My statement was that because of the unsuccessful

24    FORTE trial, Pinchasi was not any more the closest reference

25    because the FORTE trial has demonstrated that there is no
```

Ziemssen - cross

1    increased efficacy by the 40-milligram dose but there is

2    increased side effects.

3    Q.    Okay.  But -- I promise you I will get to the FORTE

4    trial.  Let me ask you this:  Is the fact that the Pinchasi

5    application lacks data on the every other day dosing regimen

6    one of the reasons you think it's not the closest prior art?

7    A.    No.  As I stated, the Pinchasi reference is not the

8    closest prior art because after the negative FORTE trial, a

9    POSA would not have been motivated to use a 40-milligram

10   dose anymore.

11   Q.    All right.  I misunderstood you then.

12         If we look at PDX-7.60 from your presentation

13   this morning, you do point out the fact that Pinchasi's

14   every other day dosing regimen has no data.  Right?

15   A.    So Pinchasi's application includes data for daily 40

16   milligram but no clinical data for every other day 40

17   milligram.

18   Q.    That puts it somewhat on the same footing as the

19   patents in suit, right, because the patents in suit contain

20   no data on the 40-milligram three times a week dosing

21   regimen.  Right?

22   A.    The patents in suit include no clinical data.  But the

23   straightforward clinical study protocol, the GALA study

24   protocol, which is included in the patent application.

25   Q.    Sure, it is a protocol for a trial that hasn't been

Ziemssen - cross

1    run yet.  Right?

2    A.    It is a straightforward clinical study protocol, which

3    is able to answer the question whether three times

4    glatiramer acetate 40 milligrams per week is efficacious.

5    Q.    It's able to answer the question, but it had not

6    answered the question.  Right?  Because it had not been run

7    at the time the patent application was filed.  We can agree

8    on that, can't we?

9    A.    It's a clinical study protocol.  It's a trial which

10   had not been performed.

11   Q.    Now, I think we can also agree, based on your

12   testimony this morning, that the clinical data in Pinchasi

13   which compares 40 milligrams and 20 milligrams of GA dosed

14   daily is based on the Cohen study reported in Neurology in

15   2007.  Correct?

16   A.    So Pinchasi includes the data of the Cohen trial.

17   Q.    And Teva funded that study by Cohen.  Correct?

18   A.    It's a Teva-sponsored trial.

19   Q.    Let's turn to JTX-7060, which is Cohen 2007.  The

20   primary efficacy end point was the total number of

21   gadolinium-enhancing lesions on an MRI?

22   A.    Yes, I told you this morning.

23   Q.    And on that end point there was a trend favoring the

24   40-milligram dose .  Right?

25   A.    Yes.  I have demonstrated that the numbers are in

Ziemssen - cross

1    favor of 40 milligram, but this difference did not reach

2    statistically significant, 0.8.

3    Q.      And in the Conclusions section, Dr. Cohen and his

4    colleagues, including Wynn, who we heard from earlier in the

5    trial, state that glatiramer acetate 40 milligrams was safe

6    and well tolerated.  Overall efficacy results suggested that

7    a 40-milligram dose of GA may be more effective than the

8    currently approved 20-milligram daily dose in reducing MRI

9    activity and clinical relapse.

10                   Correct?

11   A.      Yes, that is stated in the abstract.

12   Q.      And following Cohen 2007 report of this trend in the

13   data, Teva was sufficiently encouraged to conduct a large

14   Phase III clinical trial of 40 milligrams GA versus 20

15   milligrams GA daily.  Correct?

16   A.      Teva performed after Cohen the FORTE trial, yes.

17   Q.      That was the FORTE trial.

18                   You mentioned Dr. Comi earlier today.  Dr. Comi

19   was the primary investigator for the FORTE study.  Right?

20   A.      Yes, he was.

21   Q.      Dr. Comi is an experienced clinical study

22   investigator, isn't he?

23   A.      He is a study investigator, yes.

24   Q.      He is an experienced one?

25   A.      He is an experienced one, yes.

1    Q.    Let's look at JTX-7063.1.  This is Dr. Comi's abstract

2    reporting on the results of the FORTE trial.  Right?

3    A.    Yes.

4    Q.    And Dr. Comi and his colleagues reported in the

5    conclusions section of his abstract describing the results

6    of the FORTE trial that in RRMS patients both 40 milligrams

7    and the currently approved 20 milligram doses were safe and

8    well tolerated and were equally effective in reducing

9    clinical relapses in MRI activity.  Correct?

10   A.    That is stated there sir, yes.

11   Q.    Dr. Comi also reports that there was a trend in this

12   large Phase III clinical trial for a faster reduction in MRI

13   metrics in the first trimester in the 40-milligram dose

14   compared to the 20-milligram dose.  Right?

15   A.    That is stated in the abstract, yes.

16   Q.    And the Cohen 2007 paper had also reported that faster

17   onset of action of that 40-milligram dose.  Correct?

18   A.    Which parameter do you mean specifically?

19   Q.    I am sorry?

20   A.    Which parameter in Cohen do you mean specifically?

21   Q.    Well, if we look at Cohen, again, JTX-7060, in the

22   abstract, it's about midway through, I am going to test Mr.

23   Russell's skills here, if he can pull it out, it says, "A

24   difference between the two dose groups emerged as early as

25   month 3, 52 percent reduction in p value, .0051."

Ziemssen - cross

1   A.   You mean gadolinium enhancing lesion at month 3.

2   Q.   Right.

3   A.   Okay.

4   Q.   You also discussed in your direct examination the

5   slides that Dr. Comi presented at WCTRINS.  Right?  That is

6   a big deal in your profession.  WCTRINS is a big conference?

7   A.   Yes, it is the biggest MS conference.  People from all

8   over the world join in Montreal.

9   Q.   And let's look at JTX-7064.4 at Slide 10, please.

10  This slide is titled Sample Size and Power Considerations?

11  A.   Yes.

12  Q.   We can agree that the FORTE study was powered to try

13  to find a 30-percent improvement in the 40-milligram product

14  versus the 20-milligram product for the efficacy end point.

15  Right?

16  A.   So he called it a superiority trial, so it should be

17  superior for -- 40 milligrams should be superior over 20

18  milligrams.

19  Q.   Right.  Further reduce annual relapse rate by 30

20  percent compared to GA 20 milligrams daily.  That is in the

21  last bullet.  Right?

22  A.   Yes.

23  Q.   And the FORTE study did not hit this 30 percent

24  target.  Right?

25  A.   Yes.  The study was not successful demonstrating the

Ziemssen - cross

1    successful primary end point.

2    Q.    Then you went to Slide 14 in your direct examination.

3    I would like to look at a different slide with you here now.

4    That's Slide 26.   It's the summary and conclusions slide

5    that Dr. Comi presented.   Do you see that?

6    A.    Yes.

7    Q.    While the FORTE study didn't hit the 30-percent

8    improvement target over the 20-milligram dose, here, Dr.

9    Comi, in his presentation at WCTRINS, was comfortable

10   concluding that there was no significant difference in

11   efficacy measures between GA 20 milligrams and GA 40

12   milligrams.   Correct?

13   A.    That's stated there.

14   Q.    He concluded that both doses demonstrated remarkable

15   reduction compared to baseline in clinical and MRI activity?

16   A.    That's stated there.

17   Q.    He determined that the doses had a good safety and

18   tolerability profile, no unexpected adverse effect with the

19   high dose.   Do you see that?

20   A.    That's stated there, sir.

21   Q.    And he also reported that there was a trend for an

22   earlier effect of the high dose on MRI activity.   Right?

23   A.    That's stated there, yes.

24   Q.    Now, I thought I heard you say this morning that

25   40 milligrams is dead based on the Forte trial?

Ziemssen - cross

1    A.    Yes.   Looking at this data, 40 milligrams is not

2    demonstrating a significant benefit over 20 milligrams.   Why

3    should you go for 40 milligrams?

4    Q.    So your reading of this, Dr. Comi's presentation to

5    his colleagues at, the summary and conclusions of the

6    Forte study, you read this and you see 40 milligrams is

7    dead?

8    A.    Yes.   That was the citation of Professor Comi himself.

9    He said, "End of Story."

10   Q.    He said, "End of Story."   Right?   Okay.   So with that,

11   I think you're referring to the Medscape article you talked

12   about earlier; right?

13   A.    Yes, I am.

14   Q.    All right.   Let's look at that.   That's JTX-7104.

15         And Mr. James pointed you to a couple of

16   passages from this article including the end of story

17   statement from Dr. Comi; right?

18   A.    Yes.

19   Q.    All right.   Let's look at what Dr. Comi says right

20   after that statement.   And, again, we're on 7104.1.   He

21   says, but we had two positive aspects of the trial with a

22   tremendous amount of patients, with both doses.

23         If you look at the change from baseline to end,

24   there was a 70 percent drop in the MRI activity.   So, if we

25   need a confirmation that glatiramer acetate is very active,

1    this is the confirmation.  Previous studies had only had 200

2    to 300 patients.  Were smaller; right?

3              So that's one of the positive aspects that Dr.

4    Comi mentioned; right?

5    A.    Yes.  This study was really well powered.  I mentioned

6    already the number of patients benefitting in the group and

7    I think that was for the glatiramer acetate proof of

8    concept, that this treatment is working.

9    Q.    Dr. Comi mentioned another positive aspect from the

10   Forte trial; right?  He says -- I will quote it for you:

11   "With the high dose, that's the 40-milligram dose, there

12   was an anticipation of the effect.  By the end of the

13   third month, it didn't matter which dose you had, you

14   are in the same condition.  However, you accumulate more

15   lesions in the first three months with the low dose than

16   with the high dose.  So, if you want to have a quicker

17   response to the treatment, then the high dose may have some

18   advantages."

19              Right?

20   A.    That's what he's stating.

21   Q.    That Dr. Comi stating that; right?  Okay.

22              Now, let's go back.  I want to talk to you a

23   little bit more about Forte.  Let's look at the GALA

24   clinical trial protocol.

25              And do you see there's a heading there for study

1   rationale?  We'll try to get it on the screen here, make it

2   a little bit easier.  I know the binders get tiresome.

3   A.   Yes.

4   Q.   Okay.  Let's look at the third paragraph under this

5   section.  It says, "Teva recently evaluated the safety,

6   tolerability and efficacy of a higher dose of GA

7   (40 milligrams a day) compared to the 20-milligram daily

8   dose in patients with RRMS in a large Phase III study

9   (GA/9016, Forte)."

10                   Do you see that?

11  A.   I see that.

12  Q.   There's a footnote there.  Do you see that Footnote

13  19?

14  A.   Yes.  It's a reference to the abstract.

15  Q.   That's the Comi abstract that we were just discussing;

16  right?

17                   And Teva told the FDA in this document and

18  clinical investigators in the GALA process such as yourself

19  that's results of the Forte study showed that the

20  40-milligram dose is similarly effective as the 20-milligram

21  dose in reducing relapse rate and MRI rate; right?

22  A.   I see the statement.

23  Q.   Okay.  And on Page JTX-7022.21, Teva also points

24  out that no special safety concerns were raised in Study

25  GA/9016 (Forte) for subjects treated with either GA

Ziemssen - cross

1    20 milligrams a day or GA 40 milligrams a day.  The

2    well-known available safety profile was maintained.

3              Correct?

4    A.    Yes.

5    Q.    Finally, Dr. Ziemssen, let's look at the last

6    paragraph of the dose rate selection rationale section of

7    the GALA trial protocol.

8              Now, you would agree with me, I think, that in a

9    three times a week dosing regimen, a patient administers

10   about 57 percent fewer injections each week than on the

11   daily dosing regimen; is that right?

12   A.    Yes.

13   Q.    Okay.

14   A.    You get less injections.

15   Q.    Yes.  And in the protocol, Teva told the FDA that in

16   light of the Forte study results, in the reduction of

17   frequency on a three times a week regimen, one may certainly

18   expect a reduction in the frequency of injection reactions

19   with this new dose regimen, further enhancing subject

20   adherence to treatment; is that correct?

21   A.    That is stated in the GALA protocol, yes.

22   Q.    I take it you disagree with Teva in that regard?

23   A.    Which, which section do you mean?

24   Q.    Well, that it would have been expected from the

25   results of the Forte trial and the fact that you have to

1    inject 57 percent fewer times with this dosing regimen, that

2    one would certainly expect that you would see a reduction in

3    injection site reactions.

4    A.    That is stated there, yes.

5    Q.    Do you agree?

6    A.    I think the problem with the GALA protocol, we have

7    several things which are not completely correct.  For

8    example, you had mentioned before the Forte trial has

9    demonstrated that 20 milligrams and 40 milligrams are

10   equivalent.  That is not right.  That does not have to be

11   demonstrated by the Forte trial.  The Forte trial has

12   demonstrated that 40 milligrams of glatiramer acetate is not

13   superior to 20 milligrams.

14   Q.    Dr. Comi said, similar efficacy in his slides; right?

15   We can agree on that.  He said that in his abstract, right,

16   reporting on the Forte trial?  We just read those.

17   A.    I think I should be correct.  The study looking for

18   better 40 milligrams is superior than 20 milligrams and then

19   you cannot say as a result of the trial that both of those

20   are equivalent.

21   Q.    Sorry.

22   A.    You can say, you can say that 40 milligrams was not

23   better than 20 milligrams.

24   Q.    I guess you disagree with Dr. Comi in that regard?

25   A.    I look at the clinical study protocol and it was a

1    superiority trial.

2    Q.    All right.  Just a few more questions.  Well,

3    actually, can I consult with my colleagues very quickly,

4    your Honor?

5              MR. ANSTAETT:  Your Honor, I'm going to pass the

6    witness to my colleague, Ms. Mazzochi.

7              MS. MAZZOCHI:  Your Honor, may we approach the

8    witness with our set of binders?

9              THE COURT:  Yes.

10             MS. MAZZOCHI:  Thank you.

11             (Binders handed to the Court and to the

12   witness.)

13             MS. MAZZOCHI:  May I proceed your Honor?

14             THE COURT:  You may.

15             MS. MAZZOCHI:  Thank you.

16   BY MS. MAZZOCHI:

17   Q.    Dr. Ziemssen, good afternoon.  You and I also met at

18   your deposition in Washington.  In general, can we agree

19   that extending the time to first confirmed relapse is a good

20   thing compared to shortening the time?

21   A.    I did not get what you mean.

22   Q.    Right.  Let me say it again for you.  In general, can

23   we agree that extending the time to first confirmed relapse

24   is a good thing compared to shortening the time?

25   A.    To me, it is a study looking at the parameter of first

Ziemssen - cross

1    relapse.

2    Q.    First relapse, time of first relapse?

3    A.    In a clinical trial?

4    Q.    Sure.

5    A.    In a clinical trial, which is the first relapse that

6    happens at a later stage.

7    Q.    So the time to first relapse, the first confirmed

8    relapse should be as long as possible; right?

9    A.    That is one of the parameters which we should look

10   at.

11   Q.    All right.  Dr. Ziemssen, I'm going to direct you to

12   JTX-7107.21, the top of the page of Teva's Pinchasi patent

13   application.

14   A.    Is it in your binder, or --

15   Q.    It is, but I'm putting it up on the screen for you

16   now.

17   A.    All right.

18   Q.    And I would like to direct your attention to the

19   paragraph --

20            THE COURT:  Why don't you slow down, Ms.

21   Mazzochi.

22            MS. MAZZOCHI:  Sure.

23            THE WITNESS:  I don't have JTX --

24   BY MS. MAZZOCHI:

25   Q.    In the binder we just gave you.

Ziemssen - cross

1   A.    Only DTX.

2             THE COURT:  There's only DTX in there.

3             MS. MAZZOCHI:  That's fine.  You can use this

4   one, the black one.  The black one.

5             THE COURT:  The black one.  Use the one you were

6   just looking at during Mr. Anstaett's examination.

7             Exhibit number again?

8             MS. MAZZOCHI:  JTX-7107.21, top of the page.

9             THE COURT:  You're going to want me to keep up

10  as well.  Okay?

11            MS. MAZZOCHI:  It's on the screen before you as

12  well.

13  BY MS. MAZZOCHI:

14  Q.    All right.  Do you see where the paragraph begins,

15  "Also observed was the accelerated rate at which the

16  40 milligrams per day dose became effective as compared to

17  the 20 milligrams per day dose"?

18            Do you see that?

19  A.    Yes, I see that.

20  Q.    All right.  And can we agree that Teva's Pinchasi

21  patent application disclosed here that this accelerated

22  rate at which the 40-milligram per day dose became effective

23  as compared to the 20 milligrams per day dose was

24  unexpected?

25  A.    So I don't see, I don't see the data proving this, but

Ziemssen - cross

1    I see the statement.

2    Q.    You see the statement.  All right.

3          And one piece of -- well, the patent application

4    follows this unexpected statement up by saying,

5    "Specifically, the 40 milligrams per day dose showed

6    efficacy, as measured by MRI, by the third month, whereas

7    the 20 milligrams per day dose did not show efficacy until

8    the sixth month."

9          Is that correct?

10   A.    That is the statement.

11   Q.    All right.  And one piece of data that Teva's

12   Pinchasi application reported to support that unexpected

13   result was at JTX-7107.17.  Namely, the data at Table 2

14   reporting a post hoc analysis regarding T1, Gd enhancing

15   lesions at month three.

16         Do you see that?

17   A.    Yes, I see that.

18   Q.    We can agree that according to this table, the

19   result reported was statistically significant given the

20   0.0051 P value listed there.  Is that fair?

21   A.    This seems to be significant, yes.

22   Q.    Okay.  And I'm going to direct your attention now to

23   the Comi slide 22 that was in JTX-7064, Page 8, which

24   has the Forte Phase III data for number T1, Gd enhancing

25   lesions in the frequent MRI cohort on a month-by-month

Ziemssen - cross

1    basis.

2              Do you have that?

3    A.    I see it.

4    Q.    We can agree we see at month three, Comi reports a

5    34 percent reduction versus baseline with an 40-milligram

6    product and an 18 percent reduction versus baseline for the

7    20-milligram product; is that right?

8    A.    I see the statement, but we have to see and you have

9    to be very careful there.  Look at the green line and the

10   blue line.

11   Q.    Sir, I'm just asking, are those the numbers that

12   Mr. Comi, Dr. Comi reported there?

13   A.    I have to say, because you are relying on this

14   analysis, and I have to say, looking at the baseline value,

15   look at month zero.  You can see that those groups, the

16   green group and the blue group are not starting at the same

17   level.

18   Q.    Sir --

19   A.    That's why you cannot use this type of analysis.  You

20   don't have the same baseline group characteristics.

21   Q.    Sir, could you just --

22              THE COURT:  So here's how we do it.  Okay?

23              Doctor, try your best to answer counsel's

24   question.

25              THE WITNESS:  Sorry.

Ziemssen - cross

```
 1                THE COURT:  And Mr. James is going to get back

 2     up and ask some additional questions.

 3                THE WITNESS:  Sorry.

 4     BY MS. MAZZOCHI:

 5     Q.    All right.  All I'm asking, Doctor, is:  Can we agree

 6     that the 40-milligram dose at month three, Comi reported a

 7     34 percent reduction versus baseline with a 40-milligram

 8     product and an 18-percent reduction versus baseline for the

 9     20-milligram product?

10     A.    That is stated here.

11     Q.    Okay.  And the total relative reduction of the

12     40-milligram dose versus the 20-milligram dose that

13     Dr. Comi noted here at month three for these lesions was

14     38 percent; right?

15     A.    That is stated here.

16     Q.    All right.  Now, you didn't mention in your expert

17     report that those in the art abandoned the three-month onset

18     idea or why.  So what head-to-head article were you

19     referring to in your direct testimony as somehow evidencing

20     people abandoning the three-month lesion data?

21     A.    I have said, I wanted just to tell you why the

22     three-month data are not right, you cannot draw this

23     conclusion.

24     Q.    No, no, sir.  The interferon.  When you said based on

25     studies with interferon versus glatiramer acetate, the
```

1    people abandoned three-month difference, what article was

2    that?

3    A.    No.   What I stated, we had a lot of head-to-head

4    trials with interferon, glatiramer acetate.   We have the

5    REGARD trial investigating Rebif versus Copaxone.   We had

6    the INCOMMON trial where they're investigating interferon

7    and Copaxone, and in all of these trials, the MRI result at

8    the beginning of the study were better for interferon than

9    for glatiramer acetate, but then looking at the end of the

10   result, yes, so the clinical efficacy was the same.

11   Q.    All right.   I'm just asking, which were the articles

12   that you that you were relying on for that premise because

13   it's not cited in your expert report, so I just want to

14   know.

15   A.    It's a REGARD trial.   I have cited it in my expert

16   report.   I presented the data today.   It's a Mikol

17   reference.

18   Q.    That's it?

19   A.    That's it.

20   Q.    Okay.   Now, in JTX-7064.5, the Cohen slides, you

21   pointed to slide number 14 as reporting that 4.8 percent of

22   the 20-milligram patients and 9.0 percent of the

23   40-milligram patients dropped out because of adverse events.

24   Yes?

25   A.    That is stated in the, in the slide, yes.

Ziemssen - cross

1    Q.    Okay.   Now, you said this slide showed that patients

2    experienced more pain.   This slide doesn't say that patients

3    are experiencing more severe pain, do they?

4    A.    The pain was mentioned in the -- in the Cohen trial.

5    Q.    In your direct examination you said the slide shows

6    that patients were experiencing more pain.

7    A.    No.   That is, that is part of the injection in

8    the Comi publication, that the injection had been more

9    painful.

10   Q.    That's all the Cohen Phase II study.   That's what you

11   are referring to?

12   A.    Yes.

13   Q.    You weren't referring to these slides?

14   A.    No.   It was the Cohen trial.

15   Q.    Now, you noted that those adverse events were made up

16   of a lot of injection site reactions.   But lots of things

17   can impact the tolerability of a regimen's injections.   Is

18   that fair?

19   A.    Yes, as a general statement, I think I cannot

20   disagree.

21   Q.    For example, when it comes to injectable drugs the

22   needle itself may play a role in the tolerability of the

23   injectable drug.   Right?

24   A.    Yes, the needle plays a role.

25   Q.    The ease of using the injection site system can play a

Ziemssen - cross

1   role?

2   A.      The injection itself plays a role, yes.

3   Q.      The type and quality of training each patient is

4   provided on how to do the injection can play a role.  Yes?

5   A.      The quality of the nurse, yes.

6   Q.      Whether the patient warms the drug before injection

7   can play a role?

8   A.      I think so, yes.

9   Q.      Whether the patient cools or ices the injection can

10  impact the overall injection experience.  Is that fair?

11  A.      Yes.

12  Q.      Doctor, you mentioned that you have some patients on

13  GA 20 milligrams daily and some on the 40 milligrams three

14  times a week.  For your 40-milligram patients, is it fair to

15  say that the main argument in the three times a week

16  regimen's favor is that they have to inject less frequently?

17  A.      Yes, I see that as the main argument.

18  Q.      And you consider your office to be a very

19  patient-centered MS Center?

20  A.      Yes, I think our center is very patient-centered.

21  Q.      And if you want high patient adherence to a drug

22  regimen, the best practice is to inform the patient and let

23  them make the final decision on their treatment.  Is that

24  fair?

25  A.      We call it shared decision-making.  That is we are

Ziemssen - cross

1    investing a lot of time with the patients, sitting together,

2    and at the end it is the decision of the patient, yes.

3    Q.    We can agree that patients are more likely to be

4    invested in their therapy if they are the ones making their

5    choice.  Right?

6    A.    The patient has to be in charge of the decision.  That

7    is crucial.

8    Q.    Right.  In the early part of August 2009, we can agree

9    that a person of ordinary skill in the art would have liked

10   to have had, if they could, an alternative, efficacious,

11   every other day dosing regimen simply because the person of

12   ordinary skill in the art is always interested to have

13   multiple efficacious treatment regimens?  Is that fair?

14   A.    We are interested to have as many as possible

15   efficacious treatment regimens, because that offers the

16   patient different choices.

17   Q.    Right.  Now, you talked about the severity of ISRs and

18   IPIRs in Cohen, so we are on the same page on that.

19             When it comes to severe adverse events, in your

20   definition, those are the ones that you have to get to the

21   hospital and you have to get specific treatment of this

22   adverse event.  Is that fair?

23   A.    I have mentioned that looking at the IPIRs, the

24   difference was that they have been mild in the 20 milligram

25   group and they have been moderate in the 40 milligram group.

1     Moderate is usually not associated with hospitalization,

2     yes.

3     Q.    Sir, let me try to make my question a little more

4     simple so you can answer it.  How would you define severe?

5     A.    You mean in clinical studies, a severe side effect?

6     Q.    No.  I am just asking the question, how would you

7     define severe?

8               THE COURT:  Severe reaction?

9               MS. MAZZOCHI:  Just severe.

10              THE COURT:  Severe what?

11    BY MS. MAZZOCHI:

12    Q.    Maybe I can get it at it this way.

13              MS. MAZZOCHI:  May I direct the witness to his

14    deposition testimony?

15              THE COURT:  No.

16              MS. MAZZOCHI:  He had no problem answering the

17    question there.

18              THE COURT:  That's all not proper impeachment.

19    Let's slow down and ask the question.

20    BY MS MAZZOCHI:

21    Q.    That was the question, sir.  How would you define

22    severe?

23    A.    Severity in clinical studies, where we had mild --

24              THE COURT:  What is your definition of the word

25    severe?

1              THE WITNESS:  Severe means, in a clinical study

2    business --

3              THE COURT:  No, I think she is asking broadly.

4              THE WITNESS:  Severe means that the patient has

5    to get physicians' care to deal with this side effect.  They

6    have to come to the physician to get professional help.

7    BY MS. MAZZOCHI:

8    Q.    Thank you.  I think you mentioned you are in the

9    clinical trial business.  So is severe usually defined in

10   the clinical trial business in the clinical study protocol?

11   A.    Yes, there is a section about adverse events, because

12   severe adverse events have to be reported in 24 hours.

13   Q.    Okay.  Now, if you have Patient A taking the

14   20-milligram daily GA regimen over a fixed period of time,

15   he experiences 100 mild injection reactions, Patient A then

16   switches to the 40-milligram three times a week product, and

17   experiences only 90 mild injection reactions, then of course

18   the severity of the injection reactions does not seem to be

19   different.  Right?

20   A.    A hundred mild before and 90 mild after.  So it's the

21   same?

22   Q.    Right.

23   A.    So no change of severity, yes.

24   Q.    Thank you.

25              Now, I think you spoke earlier about the

Ziemssen - cross

1    Flechter and Meiner studies and whether you could compare

2    those results.  Do you recall that?

3    A.    Yes, I talked about Flechter and Meiner.

4    Q.    Is it your belief that a person of ordinary skill in

5    the art generally would not use cross-study comparisons

6    between different study populations as a basis for drawing

7    conclusions with respect to comparative efficacy?

8    A.    That is not what I have stated.  I stated it is

9    necessary, if you have two groups of patients, you have to

10   have a certain process, which is called matching.

11          So you have to match, if you don't have

12   randomization like in a clinical trial, and you have two

13   groups, then you have to match one patient from one group to

14   the other group.

15          One possible technique, methodology, for

16   example, is propensity matching.  We use it quite a lot,

17   because if we have different studies available, we have to

18   compare.  And by a matching procedure, we can match.

19          But as I have demonstrated, the Flechter-Meiner

20   groups, they have not been matched.  That's why you cannot

21   draw conclusions.

22   Q.    Do you think, then -- let me rephrase the question.

23          Is it your belief that absent identical

24   randomized patient populations, a person of ordinary skill

25   in the art generally would not use cross-study comparisons

1    between different study populations as a basis for drawing

2    conclusions with respect to comparative efficacy?

3    A.    That is not what I have stated.  If you don't have

4    randomization, we have to apply an appropriate matching

5    procedure.  And then we can go for cross-study comparisons.

6    Q.    Would one need to do propensity matching in order to

7    draw conclusions from cross-study comparisons?

8    A.    So propensity matching is one method.  But we have to

9    define a method which makes both groups comparative.  And

10   that is a matching procedure, propensity matching is one

11   method we could use.

12   Q.    I am going to direct your attention to the Flechter

13   paper, which is JTX-7078.4.  And go back to Table 5.  You

14   focused in this table on the line relating to premature

15   termination of 99 of 271 patients of the daily study versus

16   27 of 68 in Flechter.  That was the one that you were

17   focusing on.  Right?

18   A.    I started in the text.  And in the text, the reference

19   was to Table 5.  That's why I looked at Table 5.

20   Q.    Right.  And the line in Table 5 that you looked at was

21   premature terminations total?

22   A.    Yes.

23   Q.    That's where you got your numbers from?

24   A.    Yes.  Premature termination for both study groups.

25   Q.    If we look two lines up in that table, you see the

1    line that says, Number of patients who completed two years

2    of treatment percentage.

3    A.    Yes, I see this.

4    Q.    So for the alternate day treatment, how many patients

5    actually completed two years of the daily GA study?

6    A.    So I have mentioned in my direct that we lost 27

7    patients.  We lost 40 percent.

8    Q.    But 60.3 percent made it through two years on the

9    alternate day treatment.  Right?

10   A.    Yes.

11   Q.    And the number of patients who completed two years of

12   treatment on the daily regimen was only 39.5 percent.  Do

13   you see that?

14   A.    That is stated, yes.

15   Q.    That is about a 50-percent increase in the number of

16   patients who were able to stick with their GA dosing for a

17   full two years using the every other day dosing.  Right?

18   A.    That is stated in the table, yes.

19   Q.    And if we go to JTX-7078.5, the first column, the

20   first full paragraph, you see the text that starts off, It

21   should be stressed?  So that 39.7 percent versus 60.3

22   percent number that I directed you to, those are the numbers

23   that Dr. Flechter cited to say it should be stressed that

24   the dropout rate was lower in the alternate day group than

25   in the daily injection regimen.

Ziemssen - cross

 1                     Do you see that?

 2    A.     Yes.

 3    Q.     And he reports a p value there of less than 0.01.  So

 4    that's a statistically significant p value.  Right?

 5    A.     That's statistically significant, yes.

 6    Q.     Doctor, I would like to follow up on some of your

 7    opinions about Rebif.  I would like to direct your attention

 8    to DTX-2071.00005.  That's in the binder that I gave you.

 9    The black with the yellow.

10               MR. JAMES:  Your Honor, we have an objection to

11    these documents.  There is no -- the documents are hearsay.

12    There is no sponsoring witness.  Doctor Pleasure said --  we

13    have an authenticating declaration, but we don't have

14    anybody in this case who is putting anything in to explain

15    their meaning.

16               I don't think that I necessarily have an

17    objection to him being cross-examined on them.  But we

18    object to them coming into evidence.

19               THE COURT:  Okay.

20               MR. JAMES:  This particular document.

21               THE COURT:  Which exhibit are we talking about

22    right now?

23               MR. JAMES:  The Rebif document that she has just

24    flashed --

25               MS. MAZZOCHI:  A page from the Rebif website.

```
 1              THE COURT:  Okay.  I am not going to let it in
 2    at this point.  We may have to discuss that later.  Right
 3    now, I am going to agree with Mr. James.  It's hearsay.  It
 4    is hearsay.  He is not objecting to you cross-examining him
 5    on it.  You haven't moved it.
 6              MS. MAZZOCHI:  I am not offering it for the
 7    truth of the matter asserted.  So it is not going to be
 8    hearsay --
 9              THE COURT:  Are you looking to move it into
10    evidence?
11              MS. MAZZOCHI:  Not at this point in time.
12              THE COURT:  Let's cross the bridge if we come to
13    it.
14              MR. JAMES:  Thank you, Your Honor.
15              THE WITNESS:  Which number is it?
16    BY MS. MAZZOCHI:
17    Q.    DTX-2071.0005.
18              And this is a snapshot of the Rebif website,
19    August 17, 2007 from the Wayback Machine?
20    A.    Could you repeat the number?
21    Q.    DTX-2071.0005.  I have got the section up on the
22    screen here for you as well.
23    A.    Okay.
24    Q.    Can we agree that one rationale as a reason why Rebif
25    may be right for patients is because patients can take their
```

Ziemssen - cross

 1    injections on Monday, Wednesday and Friday, so that they

 2    have injection-free weekends?

 3    A.     That is an argument to go for Rebif for some patients.

 4    But other patients, they prefer the every other day regimen

 5    because it's more difficult to forget here an injection than

 6    if you would go for every other day.

 7    Q.     I am going to now direct your attention to

 8    DTX-2073.0005.  I will pull this up, It is up on the screen

 9    as well.

10            Again, this is from the Rebif website.  I would

11    like to direct your attention particularly to the heading

12    Rebif Therapy You Can Live With.

13            MR. JAMES:  Your Honor, this is another document

14    that we object to.  Again, it's hearsay.  I don't think that

15    she can impeach him with something that is not a statement

16    that he made earlier.

17            Again, I don't think that this should come into

18    evidence.

19            THE COURT:  Again, she hasn't moved it.  Your

20    point about impeachment may resonate.  Let's see counsel.

21            (The following took place at sidebar.)

22            THE COURT:  Did you guys exchange these

23    documents and talk about these documents before today?

24            MS. MAZZOCHI:  Yes.

25            THE COURT:  Should we have not have discussed

Ziemssen - cross

```
 1      this earlier?  Did you not know you were going to want to

 2      use these?

 3                   MS. MAZZOCHI:  I did, and counsel for

 4      plaintiffs, we met and conferred again last night, they said

 5      this morning they didn't think it was appropriate to raise

 6      it before you this morning.  They would rather just see how

 7      it came in.

 8                   THE COURT:  Mr. Figg, is this the issue you

 9      wanted to raise?

10                   MR. FIGG:  No, sir.

11                   THE COURT:  So I won't blame you.

12                   MS. HOLLAND:  Your Honor, if I can give some

13      background.

14                   I am not sure if you recall during Dr.

15      Pleasure's testimony there was some testimony where Ms.

16      Mazzochi said she was going just going to ask him about them

17      to see if he pulled them off the Internet.  These are the

18      ones we are talking about now.

19                   THE COURT:  Mr. James, you have an objection at

20      least to this one, because I think you agreed it was okay

21      for her to cross on the first one.

22                   MR. JAMES:  I guess, Your Honor, there is a

23      whole binder full of documents, they all raise different

24      kinds of issues.

25                   This is a hearsay document.  She is
```

Ziemssen - cross

1  cross-examining him on it.  She can't impeach him with

2  someone else's statement.  That's what this whole binder is

3  full of, is statements out of court that she wants to

4  cross-examine my witness about.  I don't think that's

5  appropriate.

6            MS. MAZZOCHI:  Your Honor, number one, I

7  disagree that it is hearsay in the following sense.  These

8  are authenticated documents as being publicly published on

9  people's websites.

10           And the fact that people --

11           THE COURT:  What rule is it that you are citing?

12           MS. MAZZOCHI:  That they are not hearsay.

13           THE COURT:  I am saying, tell me what rule, what

14  section of the rule?

15           MS. MAZZOCHI:  Actually, I can give you a

16  statement from, if I can cite, for example, you actually had

17  a --

18           THE COURT:  Just give me the rule, counsel.  I

19  asked for the rule.

20           MS. MAZZOCHI:  The rule is that --

21           THE COURT:  No rule?  I will get the rules.

22  Here we go.

23           MS. MAZZOCHI:  They are not being offered for

24  the truth.

25           THE COURT:  I understand that concept.  But it

1    seems like they are, in point of fact.

2              MS. MAZZOCHI:  No.

3              THE COURT:  You say no.  It seems like they are.

4              MS. MAZZOCHI:  If I can give you the background,

5    the only objection they have raised to these documents is

6    they are hearsay.  All I am saying is that they are not

7    hearsay because I am not offering them for the truth of

8    matter asserted.

9              What they are is they are statements that have

10   been made on public websites.

11             THE COURT:  Are they statements by this witness?

12             MS. MAZZOCHI:  No.

13             THE COURT:  That is his objection, they are not

14   prior statements by the witness upon which he can properly

15   be impeached.  That is his objection, aside from the

16   hearsay.

17             MS. MAZZOCHI:  But, Your Honor, he spent the

18   whole part of the direct testimony talking about how the

19   person of ordinary skill in the art wouldn't think about

20   Rebif, wouldn't look at Rebif, wouldn't look at this dosing

21   regimen in any way, shape or form that is applicable to the

22   questions that are at issue here.  All I will try to do is

23   go through a variety of statements that were in fact public.

24             THE COURT:  You want to impeach him with

25   statements that are not his, that are not attributable to

Ziemssen - cross

1    him in any way.

2              MS. MAZZOCHI:  I am not impeaching him with his

3    own statements.  What these are is these are effectively

4    prior art publications because they are published on a

5    website.  And I have exchanges from the PTO --

6              THE COURT:  I don't think -- if you have some

7    case that is directly on point with what you are trying to

8    do that addresses Mr. James's objection, which, as I

9    understand it -- do you want to restate your objection?

10             MR. JAMES:  Yes, Your Honor.  I object to the

11   witness being impeached with these documents which are not

12   his statements.  They are hearsay statements by others which

13   are being offered for the truth of the matter asserted.

14             If I could just address the authentication for a

15   moment.

16             Dr. Pleasure said he printed out some things

17   from the web.  The things that he printed out are like chat

18   room posts from people.  We have no idea even if they are

19   patients.  They say things about using the product this way

20   and that way.  And there is simply no -- there is no way

21   that he could authenticate those statements.

22             THE COURT:  Mr. Anstaett, do you think this is

23   proper impeachment?

24             MR. ANSTAETT:  I see a distinction here.  My

25   view is this is just like anything else.  I mean, Dr.

1   Ziemssen may say something in his direct testimony that

2   nobody was interested in Rebif, I am not saying he said

3   that, just as an example, if I have an article from a

4   publication that says that there was interest in Rebif, or,

5   you know, that people were attracted to the three times a

6   week dosing regimen --

7              THE COURT:  Then you are offering the documents

8   for the truth of the matter.  You can't get around that, in

9   spite of what Ms. Mazzochi said.  You can't get around that

10  point, if that's the point you want to make.

11             MR. JAMES:  That would be hearsay.

12             THE COURT:  I am not going to let you do it.

13             Take it up.

14             MS. MAZZOCHI:  Your Honor, may I make an offer

15  of proof?

16             THE COURT:  Okay.

17             MS. MAZZOCHI:  Thank you.

18             I would like to note for the record that we have

19  a series of documents, I will provide the Court by letter if

20  I can --

21             THE COURT:  I am not going to take them by

22  letter.

23             MS. MAZZOCHI:  I will name them off by what

24  their numbers are.

25             I will make an offer of proof that these

Ziemssen - cross

1    documents, if they would have been presented to the witness,

2    would have contradicted some of the statements he has --

3    some of the opinions he has on how no one in the art was

4    thinking about Rebif and dosing convenience.  No one was

5    comparing Rebif with Copaxone.  No patients were interested

6    in taking --

7                    THE COURT:  I am not sure that you are not

8    mischaracterizing his testimony.  I didn't hear that.

9                    I think -- this is hyperbolic.  I have told you

10   a couple of times, with me, you need to slow down.

11                   Make your offer of proof at an appropriate time.

12   I am not going to permit this style of examination.

13                   I completely understand you disagreeing with the

14   doctor's comments about Rebif.  I completely think this is

15   much ado about not as much as you think it is from this fact

16   finder's point of view.

17                   You might want to exercise some caution here.

18                   (End of sidebar conference.)

19                   THE COURT:  Let's take a stretch.

20                   (Recess taken.)

21                   THE COURT:  All right.  Please, take your seats.

22                   Ms. Mazzochi?

23                   MS. MAZZOCHI:  Thank you.

24   BY MS. MAZZOCHI:

25   Q.    Doctor, in your, you highlighted the Mikol 2008 paper,

1   said there were lower compliance rates of 85.7 percent for

2   Rebif versus 92.39 for glatiramer acetate.  Teva tried to

3   argue that the person of ordinary skill in the art might not

4   believe Rebif three times a week would be a better regimen

5   than daily glatiramer acetate.

6           But if we can go back to the paper itself, I'd

7   like to direct your attention to JTX-7096.7, upper left-hand

8   corner.  And do you see where the paper reads, "Immediate

9   post-injection systemic reaction caused five of 375

10  patients to discontinue treatment in the glatiramer acetate

11  group (one percent) but no patients in the interferon beta

12  one A group withdrew, and then it has a statistical value, P

13  equals 0.030."

14          Do you see that?

15  A.    Yes.

16  Q.    That's a statistically significant P value; is that

17  right?

18  A.    Yes.

19  Q.    And the interferon group they're referring to is

20  the one taking three times per week interferon; is that

21  right?

22  A.    Yes.

23  Q.    Right.

24  A.    It's known that interferons do not show IPIRs.  That's

25  why you have to look at the paragraph above, that

Ziemssen - cross

1    demonstrates more frequent flu-like symptoms in the

2    interferon group.

3    Q.    So you complained that the CaonIP abstract only talked

4    about lipoatrophy and not IPRs or ISRs.

5          Let's take a look at this same paper,

6    JTX-7096.8, Table 4, which lists the most common events

7    in the REGARD study.  And let's look first about two-thirds

8    of the way down at immediate post-injection drug reaction.

9          So, again, there is zero patients for,

10   experiencing those for Rebif and the GA patients had more;

11   right?

12   A.    It's known that Rebif is not causing an injection site

13   rejection.  It's a side effect of glatiramer acetate.

14   Q.    All right.  Well, now let's go down then to the

15   injection site reaction, in particular where it says local.

16   And let's start at the first one, where the difference was

17   statistically significant.

18          And do you see the item that says -- let's do

19   injection site pruritis?

20   A.    I don't see that one.

21   Q.    We're going to pull that up.  Do you see injection

22   site pruritis on the screen?

23   A.    Yes.

24   Q.    And for the GA patients, they had significantly more

25   than the Rebif three times a week injections; right?

1    A.    As it says in the paper, yes.

2    Q.    All right.  And if we look at injection site swelling

3    further down in the table, again, the daily glatiramer

4    acetate patients had significantly more than the three times

5    a week Rebif patients; right?

6    A.    That's stated there.

7    Q.    This is statistically significantly more?

8    A.    It's stated there.

9    Q.    And if we look at injection site in duration, again,

10   the glatiramer acetate daily patients had more of this

11   injection site reaction than the Rebif three times a week,

12   and that difference, too, was statistically significant; is

13   that right?

14   A.    Yes.

15   Q.    All right.  And, Dr. Ziemssen, if we're considering

16   the number of doses each of these patients are going to

17   be taking in the study, can we agree that if a patient

18   misses two out of 30 doses within a month of Copaxone

19   daily, that's about a 93 percent adherence rate?  28 divided

20   by 30?

21   A.    Yes.

22   Q.    All right.  And if a patient misses two doses that

23   month of the 12 Rebif that are scheduled, that's about an

24   83 percent adherence rate.  Is that fair?

25   A.    So we look at the numbers which had not been given

Ziemssen - cross

1    although they should have been given.

2    Q.    All right.  Dr. Ziemssen, in your demonstrative,

3    PDX-7.35 was your graphic that I think showed some activated

4    and Th2 cells in the brain; right?

5    A.    Yes.

6    Q.    I think you indicated it was bad if these cells stayed

7    around for a long period of time in the brain?

8    A.    That's not what I stated.

9    Q.    And you're okay with them sticking around in the

10   brain?

11   A.    They do not stick in the brain because activated cells

12   are prone to die.  Yes?  So it's a principle in our immune

13   system, but it would be very harmful if all activated cells

14   would run around, stay forever.  It's crucial in our immune

15   system that activated cells, the activation means they're

16   prone to die.

17   Q.    All right.  But no paper says that the GA-specific

18   activated TH2 cells you were referencing here will die

19   within 24 hours once they've crossed the blood-brain barrier

20   to be in the central nervous system in genus; right?

21   A.    We don't know.  We don't know.

22   Q.    All right.  All right.  And, Dr. Ziemssen, you cited

23   your paper at JTX-7142 as human work relating to this

24   mechanism.

25   A.    JTX?

Ziemssen - cross

1   Q.    JTX-7142, so that should be in the binder that

2   plaintiffs gave you.

3   A.    Okay.

4   Q.    And I'm going to direct you to JTX-7142.1.

5   A.    Yes.

6   Q.    Okay.  Do you remember this paper, sir?

7   A.    Yes.  It's my paper.

8   Q.    All right.  And you tested cerebrospinal fluid that

9   you harvested from patients, but after they were on

10  glatiramer acetate for a year; right?

11  A.    Yes.

12  Q.    All right.  You didn't test -- I mean, you had this

13  vicious stent in their spine, and you didn't just say, let's

14  see what happens after a day and see what the response is.

15  You waited until after they had been on glatiramer acetate

16  daily for a year; is that right?

17  A.    Yes.  So the study was approved, we did a spinal tap

18  before, and then one year of treatment.

19  Q.    Sure.  Now, if we look in the right-hand column on

20  JTX-7142.1, you grew the T cells that you harvested from the

21  cerebrospinal fluid of these patients for 14 to 21 days;

22  right?

23  A.    Yes.  That is a technique which would be called clonal

24  expansion.

25  Q.    Right.  I've actually done some, so I get it?

1    A.    Okay.

2    Q.    It says until the next restimulation with GA.  So you

3    grew them for 14 to 21 days and then you exposed them to

4    glatiramer acetate; right?

5    A.    Yes.  We had to grow up T cell lines.

6    Q.    Right.  And this is being done outside a human body?

7    A.    Yes.

8    Q.    And then it says, "Until analysis, GA specific T

9    cell cultures underwent five to seven rounds of

10    restimulation."

11            So you went with five to seven generations of

12    these T cell growths, right?

13    A.    So we had one cell, one cell, and to analyze, because

14    one cell could not be analyzed, one cell, we have to culture

15    until we have at least 50,000 cells.

16    Q.    All right.

17    A.    And we have to undergo these rounds of restimulation,

18    which is typical for clonal expansion.

19    Q.    All right.  And in the text of your article at

20    JTX-7142.1, right-hand column, let's go to the next

21    paragraph that begins, For analysis.

22            Do you see that?

23    A.    Yes.

24    Q.    All right.  Now, it says, For analysis, you have your

25    ten to the fifth active cells.  They were stimulated.

Ziemssen - cross

1   A.    Not active.  At that time, they were stimulated.

2   Q.    All right.  They were stimulated.  Right?  All right.

3   Let me rephrase.

4          After you stimulated them with GA, then they

5   became active; right?

6   A.    No.  You take the agent, antigen loaded cells, and you

7   put them together through the T cells to get the T cells

8   activated.

9   Q.    Okay.  But then it says, supernatants were analyzed

10  after 72 hours.

11         Do you see that?

12  A.    Yes.

13  Q.    So you waited 72 hours after you stimulated the cells

14  with GA before you analyzed the compounds of cells secreted;

15  rights?

16  A.    We didn't analyze it.  We had to look.  It's optimized

17  for such a culture.

18  Q.    All right.  Nevertheless, after 72 hours, you found

19  the materials from the cells you were looking for; is that

20  right?

21  A.    So you got the supernatants, but the cells were mostly

22  dead at that time.

23  Q.    Okay.  But you, nevertheless, were, in fact, able to

24  stimulate these cytokine concentrations and you were able to

25  get cells stimulated so that they would produce the

1    cytokines; right?

2    A.    That's an optimized assay.  We followed the protocol.

3    Q.    Yes, right.  And that protocol included a 72-hour wait

4    period before you analyzed them?

5    A.    Yes.

6    Q.    72 hours?

7    A.    Yes.

8    Q.    Okay.  All right.  Now, Dr. Ziemssen, you also had

9    slide PDX-7.15 in your direct examination and you talked

10   about Rebif's mechanisms of action?

11   A.    Right.  I talked about it.

12   Q.    And you said that, and in this one you made a point of

13   saying that Rebif, this interferon, has a known target

14   receptor, and that's one of the reasons why it's different

15   from Copaxone here.  Is that fair?

16   A.    That is an immune receptor, yes.

17   Q.    Take a look at DTX-1626.00011.

18   A.    Where is it?  Which volume?

19   Q.    Let me check for you.  I believe it is in my

20   binder.  That should be the third tab in one that has

21   the yellow.

22   A.    DTX?

23   Q.    1626.

24   A.    1626?

25   Q.    Yes.

Ziemssen - cross

1   A.   Yes.

2   Q.   And I am going to direct you to page 00011 at the

3   bottom.

4   A.   Yes.

5   Q.   And this is the labeling for Rebif that was in effect

6   even as late as 2015.

7        Have you seen this labeling before?

8   A.   Not in English, but in German.

9   Q.   Okay.  I would like to direct your attention to

10  Section 12.1, mechanisms of action for Rebif.

11       What does it say there?

12  A.   The mechanisms by which Rebif exerts its therapeutic

13  effects in patients with multiple sclerosis is not known.

14  Q.   Okay.  And take a look at Section 12.2, which is right

15  below, Pharmacodynamics.

16       And according to the first line in this

17  FDA-approved label, does it state that the relationship

18  between serum interferon beta-1A levels and measurable

19  pharmacodynamic activities to the mechanisms by which Rebif

20  exerts its effects in multiple sclerosis are unknown?

21  A.   That is what they said.

22  Q.   They don't identify a particular receptor target, do

23  they?

24  A.   That is an interferon receptor.

25  Q.   But it's not identified here.  You can't promote it in

1    the labeling for MS; right?  For Rebif?

2    A.    There are plenty of papers that Rebif is binding to a

3    receptor.

4    Q.    But, nevertheless, despite the fact that the

5    mechanisms of action is unknown and the pharmacodynamics are

6    unknown in the context of MS, doctors still dosed it three

7    times a week anyway; right?

8    A.    It's known if we go to 12.3.  Suggesting that there is

9    an accumulation of interferon beta 1A due to the repeat

10   administration.  That is clear that you can use it three

11   times a week, because it has an accumulation.  If you give

12   it three times in a week, that's fine.  Accumulation, you

13   can go less frequently.

14   Q.    But, Doctor, as you stated before, there is no paper

15   that tells you how long the TH2 helper cells you've

16   identified actually stay accumulated in the brain; is that

17   right?

18   A.    We do know that activated cells have a limited

19   half-life, but I cannot tell you exactly what is the

20   half-life of the TH2 GA cell.

21   Q.    Okay.

22         MS. MAZZOCHI:  All right.  Thank you, your

23   Honor.  I will pass the witness.

24         THE COURT:  Anybody else on the defense team?

25         MR. ANSTAETT:  No.

1       THE COURT:  Mr. James, your redirect.

2       MR. JAMES:  Your Honor, I just have very few

3  questions.

4       THE COURT:  Okay.

5               REDIRECT EXAMINATION.

6  BY MR. JAMES:

7  Q.    Dr. Ziemssen, do you recall being asked some questions

8  by counsel about whether the TH1, TH2 shift was one part of

9  the mechanism of action?

10  A.    Yes, I remember.

11  Q.    If we could pull up 7120, JTX-7120.  And while we're

12  doing that, Dr. Ziemssen, had the mechanisms of action of

13  glatiramer acetate been completely worked out by

14  August 2009?

15  A.    No, not completely.

16  Q.    Let's look at 7120.4.  Again, this is a paper that you

17  wrote in 2007?

18  A.    Yes.

19  Q.    In the upper left-hand column, Mr. Chase, if you could

20  pull that up, and do you see the sentence that begins, This

21  so-called bystander suppression?  Do you see that?

22  A.    Yes.

23  Q.    Is that a reference to the Th1 to Th2 shift you have

24  been discussing?

25  A.    Yes.  It's a reference to Th2 cells migrating into the

1    brain, yes.

2    Q.     It says this so-called bystander suppression is

3    regarded as an essential part of the mechanisms of action of

4    GA.

5              Do you see that?

6    A.     Yes.

7    Q.     Dr. Ziemssen, do you have an opinion as to whether

8    that would have been the view of the person of skill in the

9    art in August of 2009?

10   A.     It would have been the opinion of the POSA in 2009,

11   yes.

12   Q.     Let's go to Exhibit 7064, JTX.

13             Dr. Ziemssen, do you recall being asked some

14   questions about whether the faster onset of the 40-milligram

15   dose might motivate a person of skill in the art to use it?

16   A.     Yes, I remember.

17   Q.     You were asked some questions about Slide 22, this is

18   the slide presentation that Dr. Comi made at the WCTRIMS

19   conference in 2008.  Is that right?

20   A.     Yes, he did.

21   Q.     Here is Slide 22.  You were asked some questions about

22   it.  And you weren't allowed to give your answer.  So I

23   would just like you to explain whether or not in your

24   opinion you can draw any conclusions from this about whether

25   there was in fact a faster onset for the 40-milligram

Ziemssen - redirect

1    product?

2    A.    The problem on this analysis is, if you look at the

3    green line, and then the blue line, if you look at the time

4    point zero, you can see that in the 40-milligram group, that

5    is the green line, they have already at the beginning much

6    more lesions than the 20-milligram group.

7              You can see that even the arrows of standard

8    deviation, you can see the approximate bell curve, and you

9    can see the arrows of standard deviation, that they do not

10   cross.  So it is really a different baseline point.

11             So the patients in the 40-milligram group, they

12   have a baseline, much more lesions, much more active

13   lesions, than the patients on 20.  Why is this the case?

14   It's only a smaller patient group.  You can see frequent MRI

15   cohort, only 234 patients have been included in the

16   subanalysis.

17             That means these groups are not matched

18   together.  So the 40-milligram group is much more active at

19   the beginning than the 20-milligram group.

20             Then I think it's easy to understand, because

21   there is a general tendency that inflammation is decreasing

22   over time, if you have more inflammation, the inflammation

23   is decreasing much faster than if you have less

24   inflammation.  We call it regression to the mean.

25             If you have much inflammation, you go -- the

1397
Ziemssen - redirect

```
 1    probability is you go down at a higher speed, it's higher.

 2              That's why you cannot rely on this analysis,

 3    because the baseline characteristics are different.

 4    Q.   So in your opinion, Dr. Ziemssen, can a person of

 5    skill in the art draw the conclusion that there actually was

 6    a faster onset with the 40 dose here?

 7    A.   Not relying on this data.

 8    Q.   Let's look at the MedScape article, 7104.  Do you

 9    recall you were asked some questions about what Dr. Comi

10    said in the MedScape article?

11    A.   Yes.

12    Q.   Let's pull up the last paragraph on that page, Mr.

13    Chase.  There do you see another quote from Dr. Comi, Dr.

14    Ziemssen?

15    A.   Yes, I see that.

16    Q.   And he says, Dr. Comi suggested that it might be

17    useful to give some patients the higher dose for only a

18    month or two, then he says, "Sometimes patients start with

19    very active disease, and you are afraid to wait two to three

20    months to have a complete effect, he said."

21              Do you see that?

22    A.   I see he said this.

23    Q.   Is he talking there about the faster onset?

24    A.   I think so, yes.

25    Q.   Does Dr. Siva respond to this assertion by Dr. Comi?
```

Ziemssen - redirect

1    A.    No.

2    Q.    Well, if we look at the next page, does Dr. Siva at

3    the top of the next page, if we can pull up the paragraph,

4    Dr. Ziemssen, if you could look at the top, it says asked

5    for comments on these findings, Sessions Moderator Askel

6    Siva commented on how much are we really gaining from one to

7    two months with a higher dose of glatiramer acetate.

8              Did he comment on that?

9    A.    Yes.

10   Q.    Was he commenting on Dr. Comi's faster onset?

11   A.    Yes, he did.

12   Q.    What was his ultimate conclusion about whether he

13   should go to a 40-milligram dose?

14   A.    No.  He was not sure, and he recommended probably to

15   use a completely different drug.

16   Q.    If we look at the next paragraph, Dr. Siva says it

17   seems there might be a certain dose for all medications at

18   which you attain satiety in the receptors, and enough is

19   enough?

20   A.    I see that.

21   Q.    What would that have conveyed to a person skilled in

22   the art about the 40-milligram dose and the faster onsets?

23   A.    I think, looking at this data, I think it was not

24   proven that there was really an effect, an early effect of

25   the 40-milligram dose.

Ziemssen - redirect

1    Q.    Would the person of skill in the art have been

2    motivated by this to use a 40-milligram dose of GA?

3    A.    No.

4    Q.    The last document I would like to look at is 7096.

5    A.    That is the REGARD study.

6    Q.    If we could go to -- first, let me just ask you a

7    foundational question.  Do you recall being asked about the

8    difference in generic related adverse events between Rebif

9    and GA?

10   A.    Yes.  I remember.

11   Q.    Do you recall that you gave some testimony about the

12   IPIR, the distinction in IPIRs between Rebif and GA?

13   A.    Yes.

14   Q.    Could you explain the difference in IPIR incidence

15   between Rebif and GA?

16   A.    So we don't know IPIRs, in other drugs than GA.  It is

17   a very specific adverse effect.  In no other medication --

18   we only observe in patients treated with glatiramer acetate.

19   That is why I think, for me, it's not surprising that we

20   don't have IPIRs in Rebif, in the Rebif group, and only

21   IPIRs in the Copaxone group because it is not a mechanism --

22   it is not a side effect which is known for Rebif patients.

23   Q.    Do you recall you were shown some data about

24   differences in Immediate post injection reaction between

25   Rebif and GA?

Ziemssen - redirect

1    A.    Yes, I know.

2    Q.    Let me ask you this:  Would the differences in

3    injection related adverse events between GA and Rebif have

4    motivated the person of skill in the art to adopt the three

5    times weekly regimen?

6    A.    I don't believe that these differences are due to the

7    fact that there is a different injection frequency.

8              So if you inject Rebif, and I did it, and I did

9    inject glatiramer acetate by myself as well, it is a

10   different drug.  Glatiramer acetate technically is injected

11   in the subcutaneous tissue.  That is what I have

12   demonstrated, inducing some inflammation.

13             So these inflammation cells are coming in,

14   digesting glatiramer acetate, and that's why you have more

15   inflammation.  But that is due to the fact that you are

16   using glatiramer acetate, not due to the fact that you are

17   losing Rebif.

18   Q.    Would the person of skill in the art be motivated by

19   those differences to adopting the three times weekly

20   medications of Rebif?

21   A.    No.  It is a medication effect.

22             MR. JAMES:  I have no further questions.

23             THE COURT:  Thank you, Doctor.  Please be

24   careful stepping down.

25             THE WITNESS:  Thank you.

1          (Witness excused.)

2          MR. WARE:  Your Honor, you will recall on

3   Friday, we had the direct examination of Dr. Bell.  We would

4   now like to proceed with the cross-examination.  I just want

5   to warn you that we also have some video to play.  We could

6   do some of that first, and then put Dr. Bell on.  But we

7   want to be sure to complete Dr. Bell.  I don't think that is

8   going to take more than 45 minutes at the outside.

9          THE COURT:  I think you should proceed with Dr.

10  Bell.

11          ... GREGORY BELL, having been previously sworn

12  as a witness, was examined and testified further as

13  follows ...

14          MR. ANSTAETT:  Your Honor, I have learned some

15  things from Mr. Ware during the course of this trial.  One

16  is to ask your permission if I may leave the courtroom.

17          THE COURT:  Sure.

18          Counsel.

19          MR. FITZGERALD:  Thank you, Your Honor.  Anthony

20  Fitzpatrick from Duane Morris on behalf of Amneal.

21                    CROSS-EXAMINATION

22  BY MR. FITZGERALD:

23  Q.    Good afternoon, Dr. Bell.

24  A.    Good afternoon.

25  Q.    Doctor, I know it's been a long day, but I want to

1   harken back a little bit to your direct examination.  In the

2   course of your direct examination, you compared Copaxone 40

3   milligram with certain other products that you characterized

4   as first-line multiple sclerosis therapies.  Correct?

5   A.      First-line disease modifying therapies, yes.

6   Q.      And you relied upon that comparison to support your

7   conclusions about how Copaxone 40 milligram has performed in

8   the marketplace.  Correct?

9   A.      I used that comparison, sure, yes.

10  Q.      But you didn't go through the exercise of formally

11  defining the relevant market in which Copaxone 40 milligram

12  participates.  Correct?

13  A.      That's correct.  I did not define an antitrust market

14  with respect to Copaxone 40.

15  Q.      And there were certain products that you didn't

16  include in your comparative analysis.  Right?

17  A.      Well, sure.

18  Q.      You didn't include Tysabri.  Right?

19  A.      Not with respect to the shares, that's correct.

20  Q.      And you didn't include Lemtrada?

21  A.      Again, not with respect to shares, no.

22  Q.      Yet Teva itself has characterized both of those

23  products as first-line therapies.  Right?

24  A.      I don't know one way or the other whether they have or

25  not.

Bell - cross

1    Q.    Well, let's look at an exhibit that you relied on in

2    your direct testimony, which is JTX-7013.  I should say, I

3    should have prefaced all of this by saying, you have got two

4    sets of binders.  One set is the white binders from your

5    direct, and then two, I hope, black binders, numbered 1 and

6    2, Binder 1 has some exhibits that we are going to refer to,

7    and Binder 2 has your deposition transcript and your report

8    and so on in case we need to refer to those.

9            So you may want to start with the black Binder

10   No. 1.  Just for ease of reference.  You have got JTX-7013.

11   A.    Okay.

12   Q.    That is a Teva document that you referred to on

13   direct, which contains the market survey results that you

14   referred to.  Right?

15   A.    Yes.  Certainly some of them, yes.

16   Q.    If I can direct your attention in particular to

17   JTX-7013, Page No. 8, this is a chart that reports data

18   relating to products discussed with relapsing remitting

19   multiple sclerosis patients initiating first-line therapy.

20   Right?

21   A.    Yes.

22   Q.    And then it's got a list of such products, or a chart

23   of such products, that includes Tysabri and Lemtrada.

24   Right?

25   A.    Yes.

Bell - cross

1    Q.    And you also, in the course of your expert report

2    cited to an analyst report from Credit Suisse.  Do you

3    remember that?

4    A.    Vaguely, yes.

5    Q.    That was JTX-7081, which should also be in your

6    binder?

7    A.    Okay.

8    Q.    And if you turn to the second page of that exhibit,

9    there is an Exhibit 2 within that exhibit which shows

10   multiple sclerosis market share by drug post Tecfidera

11   launch.  Do you see that?

12   A.    Yes.

13   Q.    It shows over the course of the period that this

14   analyst was looking at a market share for Tysabri of 12

15   percent.  Right?

16   A.    Yes.

17   Q.    Another product that you didn't look at in your

18   comparison was Novantrone.  Correct?

19   A.    Sure.  Yes.  That's right.

20   Q.    And again, Teva considered Novantrone to be part of

21   the treatment landscape for relapsing form of multiple

22   sclerosis.  Right?

23             MR. WARE:  Objection, counsel's statement as to

24   what Teva thought.

25             THE COURT:  Rephrase.

1  BY MR. FITZGERALD:

2  Q.    Do you know whether Teva considered Novantrone to be a

3  product that competed with Copaxone in the marketplace?

4  A.    I don't recall much one way or the other about what

5  Teva considered regarding Novantrone.  Again, speaking from

6  my experience, it's really not a particularly relevant

7  concern.

8  Q.    Well, I am asking you now, Doctor, about what Teva

9  considered.  Let's look and see if we can refresh your

10  memory.  Let's look at PTX-652, which is another document

11  that you referred to in the course of your direct

12  examination.  If we can look at the first page of that one

13  first, Mr. Russell.

14        This is a document related to a program run by

15  Teva relating to the introduction of Copaxone 40 milligram.

16  If we can look at PTX-652, Page 3.  It's got a slide showing

17  the treatment landscape.  Do you see that?

18  A.    Yes.

19  Q.    And the treatment landscape includes both Novantrone

20  and Tysabri.  Right?

21  A.    Yes.  They are both listed there.

22  Q.    And you indicated during your direct examination that

23  you had read Mr. Hassler's testimony from this trial.

24  Right?

25  A.    Yes.

Bell - cross

1    Q.    And Mr. Hassler testified during his testimony looking

2    at this exhibit that Novantrone and Tysabri were competitive

3    products that competed with Copaxone 40 in the marketplace.

4    Right?

5    A.    I don't specifically recall one way or the other.

6    Q.    Let's look, if we can, at the trial transcript from

7    Day 2, it's in your binder, but Mr. Russell will put it up

8    on the screen.  If we look in particular at Page 296, Lines

9    8 to 15.

10            Mr. Hassler was asked about this PTX-652.  In

11   particular, Page 3 that we just looked at.  And he was

12   asked, "Is this a representation of the treatment landscape

13   for the 40 milligram when the 40 milligram product launched?

14            "Answer:  Yes.

15            "Question:  Those are all competitive products

16   that compete with Copaxone in the marketplace?

17            "Answer:  Yes."

18            Do you see that?

19   A.    Yes.

20   Q.    And in the course of your direct testimony, you

21   testified that in looking at nexus, in analyzing nexus, you

22   looked at how the product is marketed.  Right?

23   A.    Correct.

24   Q.    And you also looked at market research about why

25   physicians were prescribing the product and why patients are

1   using it.  Right?

2   A.     Yes.  I think that's a fair characterization.

3   Q.     And you testified also in your direct examination that

4   dosing three times a week with at least a day in between and

5   reduction in frequency and severity of injection reactions

6   were the primary reasons for Copaxone 40's commercial

7   success.  Right?

8   A.     I don't recall whether I used the word primary or not.

9   But they are certainly, from my perspective, critical to the

10  success of the product, yes, The patented attributes being

11  critical to the success of the product.

12  Q.     Now, Copaxone 20 milligram has been on the market in

13  the United States for 20 years.  Right?

14  A.     I think that's about right.  It was launched sometime

15  in the mid-nineties, I think.

16  Q.     And Teva has been promoting Copaxone continuously

17  during that time.  Correct?

18  A.     Sure.

19  Q.     And they promote it through sales representatives who

20  detail it to physicians.  Right?

21  A.     Yes.

22  Q.     And they promote it directly to patients also.  Right?

23  A.     Sure, through the website and stuff like that.

24  Q.     And Teva introduced Copaxone, the 40-milligram

25  product, in 2014.  Right?

Bell - cross

1    A.    Correct.  Later on in the start.  Right.

2    Q.    When they did so, they called it Copaxone.  Correct?

3    A.    Copaxone 40, yes.

4    Q.    They didn't come up with a new or different product

5    name.  Right?

6    A.    Not that I am aware of.

7    Q.    They didn't call it Copax 2.  Right?

8    A.    Again, not that I am aware of.

9    Q.    Instead, they used exactly the same name, Copaxone,

10   that they had been using for almost two decades at that

11   time.  Right?

12   A.    Sure.

13   Q.    That was so that they would get the benefit of the

14   existing market recognition of Copaxone among physicians and

15   patients.  Correct?

16   A.    Yes.  It's the benefit that is attributed to

17   glatiramer acetate, just like all the work that had been

18   done for Copaxone and glatiramer acetate transfers over to

19   Glatopa as a generic glatiramer acetate.

20   Q.    Well, the product was promoted by that same army of

21   sales representatives who had been promoting Copaxone 20.

22   Right?

23   A.    I believe that's correct, yes.

24   Q.    Those sales representatives have established

25   relationships with neurologists.  Right?

Bell - cross

1    A.    Sure.

2    Q.    And, in fact, Teva created financial incentives for

3    those sales representatives to convert patients from the 20

4    milligram to the 40 milligram.  Right?

5    A.    As I sit here, I don't explicitly recall the details

6    of the incentive compensation, but there could well have

7    been incentive compensation related to a physician's 40

8    share as compare to his or her 20 share.

9    Q.    Were you here on Friday when an excerpt was played

10   from the testimony of Mike Sheehy of Teva?

11   A.    No, I wasn't.

12   Q.    You remember, you remember Mr. Sheehy's transcript,

13   his deposition transcript in connection with preparing your

14   report.  Right?

15   A.    Yes.

16   Q.    Let's see if we can refresh your memory on the

17   incentive compensation.

18          Mr. Russell, if we can get the trial transcript,

19   Day 5, at Page 1088.  Beginning at Line 3 down to Line 13.

20          Mr. Sheehy was asked:

21          "So if you viewed the 20 milligram as another

22   competitor, how did you use the incentive comp structure to

23   encourage the sales force to push the 40-milligram product?

24          "Answer:  We set levels of 40 milligram

25   conversion for them.

```
 1                "Question:  Okay.  Got you.  As opposed to

 2      setting, for example, 40 milligram sales targets that were

 3      higher than 20 milligram?

 4                "Answer:  That's correct.  It was all

 5      conversion."

 6                Do you see that?

 7      A.    Sure.

 8      Q.    So Mr. Sheehy was describing an incentive comp

 9      structure for their sales representatives that was designed

10      to incentivize them to convert patients from 20 to 40.

11      Right?

12      A.    Right.  Which I think is basically what I said in

13      answer to the previous question.

14      Q.    And to facilitate conversion from 20 to 40, those

15      sales representatives went so far as to fill out the

16      necessary forms for the physicians.  Right?

17      A.    I don't recall that.

18      Q.    Let's refer to JTX-7016, which is an exhibit that I

19      believe you referred to during your direct.

20                This is a Teva presentation.  If we look in

21      particular at Page 26, we see a report from one physician --

22      let me know when you have that?

23      A.    Okay.

24      Q.    One physician was asked, And how easy or difficult is

25      that conversion?  And his, I believe it's a he, his answer
```

Bell - cross

1   was, "Oh, from my standpoint, it's very simple.  Teva reps

2   gave me pre-populated forms and all I got to do is put the

3   patient's name, date of birth on it, and sign my name.

4   That's it.  So it takes me literally maybe a minute to make

5   the conversion.  I don't have to fill out the form."

6           Do you see that?

7   A.    Sure.  Is he referring to a prescription form that

8   would normally be preprinted?

9   Q.    I think at the top of the screen you can see it says

10  Enrollment Forms?

11  A.    So that is that the enrollment form for the Shared

12  Solutions program?

13  Q.    By the way, the question is, how easy or difficult is

14  that conversion.  Right?

15  A.    Well, apparently, with respect to an enrollment form,

16  that is likely to be enrollment with respect to Shared

17  Solutions, maybe?  I don't know.  I have never heard of an

18  enrollment form with respect to converting a patient from

19  one prescription to another.  Like, it's not a prior

20  authorization form or a step added or anything like that.

21  Q.    Nonetheless, Doctor, what this doctor is describing is

22  the process whereby, in connection with converting patients,

23  Teva sales reps were filling out forms to assist them .

24  Right?

25  A.    No.  I wouldn't agree with that characterization, I

Bell - cross

1    don't think.

2    Q.    You don't agree even though it says And how easy or

3    difficult is that conversion?

4    A.    Because we are talking about an enrollment form.  And

5    it may just be enrolling the patient in the Shared Solutions

6    program, they were on the Shared Solutions program for the

7    20 milligram and now they are going to be identified to

8    Shared Solutions, which is tracking, you know, the shipment

9    of the product and stuff like that, to get the 40 milligram.

10   Q.    Is so it's a form related to conversion from 20 to 40;

11   right?

12   A.    Well, it's a form related to the shared solution

13   patient support system.

14   Q.    Now, after Teva introduced the 40 milligram product,

15   it stopped all promotional spending on the 20-milligram

16   product; is that correct?

17   A.    I believe it certainly stopped the vast majority of

18   it, and I'm not sure I recall if it stopped every iota, but

19   my understanding, for instance, that certainly shared

20   solutions continued for 20-milligram patients.

21   Q.    And Teva priced the 40-milligram product lower than

22   the 20-milligram product; is that correct?

23   A.    Price is a very difficult issue in pharmaceuticals.

24   So I understand that the WAC price, the list price, was

25   slightly lower.  For instance, the price to Medicaid for the

Bell - cross

1   20 was considerably less than the price to Medicaid for the

2   40.  So price depends on the payer or the channel.

3   Q.    Well, it's your understanding that Teva's net price

4   for Copaxone 40 was lower than the net price than for

5   Copaxone 20; right?

6   A.    Broadly speaking, I think in general that is -- that

7   was a true statement.  Again, it's not going to be that --

8   that isn't going to be the case for every channel.  But on

9   average, I believe that to be true.

10  Q.    And you referred just a few moments ago to Glatopa?

11  A.    Yes.  Right.

12  Q.    Glatopa is a generic form of Copaxone 20-milligram

13  daily?

14  A.    Correct.

15  Q.    And Teva even priced Copaxone 40 lower than, the net

16  price of Copaxone 40 even lower than the net price of

17  Glatopa; right?

18  A.    I'm not aware of that.

19  Q.    And you have not performed any analysis to identify

20  any single product from which Copaxone 40 took market share

21  other than Copaxone 20; right?

22  A.    Well, I'm not sure that's necessarily true.  My report

23  also talks about it having a net gain with respect to

24  Glatopa, but otherwise I looked at Copaxone 40 taking

25  the share from the other ABCREs, and the three orals, which

Bell - cross

1    are generally considered to be the first line disease

2    modifying therapy, and that's consistent certainly with my

3    experience consulting in the category and with, for

4    instance, the National MS Society.

5    Q.    Well, you didn't perform an analysis as to whether

6    Copaxone 40 was taking any prescriptions away from Rebif;

7    right?

8    A.    Not individually, no, but as Rebif is part of the

9    ABCREs, it was part of the group that Copaxone 40 was

10   taking share from, the Copaxone brand was taking shares

11   from.

12   Q.    But there's no product within that group that you can

13   say was a product, a particular single product that Copaxone

14   40 took prescriptions away from; right?

15   A.    No, not any one specific product, and it was not a

16   particularly relevant aspect of my analysis to identify a

17   specific product.  It's competing with a group of products.

18   Q.    Now, if we can go back to that Credit Suisse report,

19   which is JTX-7081, Mr. Russell.  It should be in your binder

20   also.

21   A.    Yes.

22   Q.    And let's look again at that Exhibit 2, because I

23   think that's pertinent to this market share issue.

24         Again, this is an exhibit and it's a Credit

25   Suisse analyst report and the title of it is MS market share

Bell - cross

1    by drug (post-Tecfidera launch).

2              MR. FITZPATRICK:  Now, Mr. Russell, if you could

3    enlarge the portion at the bottom, orange.  Perfect.  Thank

4    you.

5              Actually, Mr. Russell, if you could enlarge the

6    entire orange section across the bottom.  Can you do that?

7    That's great.  Thank you.

8    BY MR. FITZPATRICK:

9    Q.    So the orange portion here, Dr. Bell, is, and it does

10    not show up very well on the large screen, but on the

11    smaller screen, the orange portion shows the percentage

12    market share, according to this report, for Copaxone

13    20-milligram daily; right?

14    A.    According to this report, yes.

15    Q.    And at the beginning of the period, its market share

16    is 35.9 percent; right?

17    A.    That's the number that's there, yes.

18    Q.    And if we go across to, at the bottom, it shows week

19    post-Tecfidera launch?

20    A.    Yes.

21    Q.    And if we go to about week, let's say week 43 or

22    44 --

23    A.    Okay.

24    Q.    -- the market share for Copaxone 20-milligram daily is

25    approximately 30 percent; right?

1   A.   Yes.

2   Q.   And then if we go across to the right-hand side, we

3   see that by this time, Copaxone 40 three times a week has

4   launched; right?

5   A.   Correct.

6   Q.   That's the lavender color there; correct?

7   A.   Correct.

8   Q.   And so by the end of the period, Copaxone daily had

9   the market share of 20.6 percent and Copaxone 40 had the

10  market share of 9.4 percent; right?

11  A.   Yes.

12  Q.   And those totaled 30 percent; is that correct?

13  A.   Yes.   Ten weeks after it launches, sure.

14  Q.   So within ten weeks after launch, Copaxone 40 had

15  grown to 9.4 percent; right?

16  A.   According to this, yes.

17  Q.   And Copaxone 20 had dropped from 30 to 20.6; is that

18  right?

19  A.   According to this, yes.

20  Q.   Now, you're familiar with the GLACIER trial; is that

21  correct?

22  A.   Correct.

23  Q.   And that was a trial that compared Copaxone 40 with

24  Copaxone 20; is that correct?

25  A.   Yes.   It's my understanding that it was patients who

1   had previously been on Copaxone 20 and then 40 or something

2   like that, but, yes.

3   Q.    And the results of the trial included data relating to

4   injection reactions; right?

5   A.    I believe so.

6   Q.    But Teva can't promote the results of that trial; is

7   that correct?

8   A.    I -- I believe that is correct, that they can't

9   promote it in the sense that their sales reps can't

10  talk about it.  Their, what I might call MSLs are allowed

11  to provide physicians with the article if physicians

12  request it.

13  Q.    And Teva can't promote that Copaxone 40 would

14  reduce the severity of injection reactions; is that

15  correct?

16  A.    Well, maybe you should define what you mean by

17  "promote."  I mean, they're allowed to provide the

18  information, and certainly, the information is out

19  there in the -- in the marketplace for physicians to

20  consider.

21  Q.    They can't use it in promotional materials, is that

22  correct, for the product?

23  A.    Again, just to be clear, they can't use it in what

24  the FDA would consider to be promotional materials, but

25  they --

1   Q.      Right.

2   A.      They are certainly allowed to drop the article if the

3   physician requests it and answer questions.

4   Q.      And they can't tell patients that Copaxone 40 will

5   reduce the severity of injection site reactions as compared

6   to the 20-milligram product; is that correct?

7   A.      Well, if by "they" you mean "Teva," I don't think they

8   can do that.  Again, there's no restriction on patients

9   having access to the information.

10  Q.      Now, I would like to ask you some questions.  I want

11  to go back to JTX-7013, which is the survey report that you

12  referred to during your direct testimony.

13          Do you have that?

14  A.      Yes.

15  Q.      Now, you indicated on your direct testimony that this

16  document contains data from a survey of physicians and also

17  of patients; right?

18  A.      Yes, that's correct.

19  Q.      And I want to look in particular at page 32 of

20  JTX-7013.  This is a page that you had excerpted out for one

21  of your slides; is that right?

22  A.      That's correct, yes.

23  Q.      And I want to focus in particular at the -- on the

24  lines in this slide relating to tolerability and side

25  effects.

1          MR. FITZPATRICK:  Mr. Russell, can we pull this

2     up?  Thank you.

3     BY MR. FITZPATRICK:

4     Q.     So here, the data that's reported in this -- this

5     particular slide is reporting on data from physicians;

6     right?

7     A.     Yes, that's correct.

8     Q.     And the physicians said that for tolerability,

9     66 percent considered the 20 and the 40 to be equivalent,

10    and five percent said the 20 was better; right?

11    A.     That's correct, yes.

12    Q.     So 71 percent of the physician respondents were of

13    the view that the 20-milligram was equivalent or better

14    than the 40-milligram regarding tolerability; is that

15    correct?

16    A.     Yes, that's correct.

17    Q.     And for side effects, 71 percent of the physicians

18    viewed the products as equivalent; right?

19    A.     Sure, yes.

20    Q.     And five percent viewed 20-milligram as better; is

21    that right?

22    A.     Correct.

23    Q.     And so 76 percent said that the 20-milligram was

24    equivalent or better; is that correct?

25    A.     Sure, the same way 95 percent said the 40-milligram

1    was equivalent or better.

2    Q.    Now, if we can turn then to Page 103 in this exhibit.

3    This page, 103, reports the corresponding data from

4    patients; right?

5    A.    Well, yes.  I mean, it's data in terms of perceptions

6    of Copaxone 40 among users.  They say it's among current

7    users.

8    Q.    Right.  At the top it says perception of three times a

9    week Copaxone 40-milligram compared to daily Copaxone

10   20-milligram; right?

11   A.    Correct.  Yes.

12   Q.    Among patients; is that correct?

13   A.    It's patients who are answering this, yes.

14   Q.    And, again, Mr. Russell, if we can bring up the

15   tolerability line and the side effects line.

16         On tolerability here, we see that 71 percent of

17   the patients regarded the two as equivalent; right?

18   A.    Yes.

19   Q.    And nine percent regarded 20-milligram as better;

20   right?

21   A.    Yes.

22   Q.    So 80 percent of patients regarded 20-milligram as

23   equivalent to or better than the 40-milligram; is that

24   right?

25   A.    Correct.  Using this scale here, yes.

1   Q.   And 76 percent viewed the 20-milligram as equivalent

2   on side effects; right?

3   A.   Correct.

4   Q.   And nine percent viewed 20-milligram as better; is

5   that correct?

6   A.   Yes.

7   Q.   So 85 percent of the patients responding viewed

8   20-milligram as equivalent to or better than the

9   40-milligram on side effects; right?

10  A.   That's what the data are indicating.

11  Q.   And then if we turn to Page 134 in DT -- I'm sorry,

12  in JTX-7013, this is a slide, again, reporting on patients,

13  and they are reporting on their rationale for requesting

14  Copaxone.

15       Do you see that?

16  A.   Yes.

17  Q.   And on the right-hand side it has got data on patients

18  who requested the three times a week Copaxone 40-milligram;

19  is that correct?

20  A.   Correct.

21  Q.   And it reports on various reasons or various

22  rationales for requesting the product; is that right?

23  A.   Yes.

24  Q.   And it reports for more tolerable/less side effects,

25  just four percent of patients provided that rationale for

Bell - cross

1    requesting the product; is that correct?

2    A.    Well, yes.  Of course, these are patients who have not

3    used the product yet, so I'm not sure how they would have

4    been able to experience the less tolerability, or the more

5    tolerability or the less side effects.

6    Q.    Nonetheless, that's the data that's reported here; is

7    that correct, Doctor?

8    A.    Well, yes.  I'm not sure of the relevance again.

9    Q.    Now, during your direct examination, Doctor, you

10   indicated that you would be concerned about survey evidence

11   where the number of survey respondents was below 30.

12               Do you remember that?

13   A.    Yes, and there are issues with how you can extrapolate

14   from what are called small samples.  You don't get the same

15   benefit of a lot of large numbers of injections.  As a rule

16   of thumb, if sample size is under 30, in order to

17   extrapolate, you may need to do some corrections.

18   Q.    And also during your direct examination, you referred

19   to the survey that was performed on behalf of Pfizer.

20               Do you remember that?

21   A.    Yes.

22   Q.    All right.  PTX-553.  It should be in your binder

23   also.  PTX-553.

24               So if we look at Page 5 of that exhibit,

25   PTX-553.5, this is a slide or a document that reports on the

1    sampling that was done for this survey.  Right?

2    A.    Correct.

3    Q.    And it says at the top, in the box at the top, our

4    sample includes 12 neurologists and 16 patients.  Half of

5    the patients are currently on the 20-milligram and half on

6    the 40-milligram Copaxone.

7              Do you see that?

8    A.    Yes.

9    Q.    So the total in for this survey was 28 people;

10   right?

11   A.    That's correct, yes.

12   Q.    Now, let's turn to talk about financial data.  The

13   financial data that you looked at relating to Copaxone 40 is

14   data that you got from Teva; is that correct?

15   A.    That's correct, yes.

16             MR. FITZPATRICK:  And if we can pull up, Mr.

17   Russell, PTX-25.

18   BY MR. FITZPATRICK:

19   Q.    This is Exhibit C from your expert report; is that

20   correct?

21   A.    Correct.

22   Q.    And you've got numbers here for gross sales, net

23   sales, cost of goods sold, and other expenses; is that

24   correct?

25   A.    Yes.

1    Q.    Now, you don't know which Teva entity is booking the

2    gross sales; is that correct?

3    A.    I'm not -- I'm not sure what you mean by which Teva

4    entity.

5    Q.    You don't know which particular Teva legal entity,

6    which company or entity is booking the gross sales; is that

7    correct?

8    A.    As I sit here, I don't, I don't recall.

9    Q.    And you don't know which entity is booking the net

10   sales; is that correct?

11   A.    I might be a bit surprised to hear that the gross

12   sales were booked by a different company than the net sales.

13   I'm not sure that would be possible.  But I don't know which

14   entity is booking the sales.

15   Q.    And you don't know which entity is booking the COGS?

16   A.    Well, maybe we should be clear.  Booking the COGS for

17   what purpose?

18   Q.    For the purpose that's reflected on this document.

19   A.    Well, Teva consolidated entity is booking the COGS.

20   Q.    But you don't know which particular Teva entity, which

21   legal entity is booking the COGS; right?

22   A.    But it's not relevant for my analysis of the product.

23   Q.    That's not my question to you.  My question is:

24   You don't know which Teva entity is booking the COGS;

25   right?

1    A.    Well, again, there's an issue in terms of, what do you

2    mean by booking the COGS then?

3    Q.    The COGS that are reported here in this exhibit --

4    A.    Yes.

5    Q.    -- these numbers that run across line three --

6    A.    Yes.

7    Q.    -- you don't know which Teva entity books those

8    particular numbers in its accounts; right?

9    A.    I think you are using a phrase, books those numbers,

10   and I think you need to explain what is it that you mean by

11   books those numbers, and then maybe I can answer your

12   question.

13   Q.    Well, you don't know which entity is reporting this

14   particular number, these COGs numbers that run across Line 3

15   in its accounting records?

16   A.    Well, my understanding is it's the entity that's

17   manufacturing the product, would be recording the costs of

18   manufacturing the COG product in the first instance.

19   Q.    And you can't identify that entity?

20   A.    Not as I sit here, I don't explicitly recall.

21   Q.    And the lines for sales expenses and marketing

22   expenses, you don't know which Teva entity records those

23   items, or entities?

24   A.    Not specifically.  Again, not particularly relevant to

25   my analysis.

Bell - cross

1   Q.      And you didn't conduct a return on investment analysis

2   for Copaxone 40 milligram.  Right?

3   A.      No, I did not.  I did enough analysis to know that the

4   return on the investment was considerably more than a

5   hundred percent, and so did not feel it necessary to come up

6   with a finer number than that.

7   Q.      Well, you didn't look at the investment component of

8   the return on investment analysis.  Right?

9   A.      Again, not the specific investment component.  I have

10  done a lot of work in the pharmaceutical industry.  I am

11  aware of costs of research and development that are

12  associated with products, and in comparison to the 2.6

13  billion dollars of sales, or 2.6 billion dollars in profits

14  that was just up on the screen there, in the course of just

15  two years, and only considering the U.S., it's painfully

16  obvious the return on investment is substantially more than

17  a hundred percent.

18  Q.      But you didn't perform the analysis, you didn't run

19  the numbers to come up with that.  Right?

20  A.      I ran the numbers sufficient to come up with my

21  conclusion that it's substantially more than a hundred

22  percent.  I didn't come up with a specific number.

23  Q.      That's because you never looked at the investment

24  component in total for the product.  Correct?

25  A.      I did not have a perspective on the investment total

1    for Copaxone 40 milligram, that is correct.  I was aware of

2    what's typically required to advance a product to sale here

3    in the U.S.

4              Again, 2.6 billion in profits in just the first

5    two years, in just the U.S., that's the -- the technical

6    term is probably a no-brainer.

7    Q.    One analysis that you did perform is a statistical

8    analysis called a regression analysis.  Right?

9    A.    Yes.

10   Q.    And you performed that in support of your contention

11   that Copaxone 40 grew the Copaxone brand?

12   A.    That's what the analysis showed, yes.

13   Q.    That was illustrated in your demonstrative PDX-6.25,

14   if we can get that, Mr. Russell.

15              Thank you.

16              So this Demonstrative PDX-6.25 is an

17   illustration of the regression analysis that you performed.

18   Correct?

19   A.    Yes.

20   Q.    And the black line running vertically marks the date

21   of entry of Copaxone 40 into the market.  Right?

22   A.    Right.  The date that it shows up in the data, that's

23   right.

24   Q.    And your regression analysis covered the period from

25   when it entered the market in February of 2014 through the

1    end of October of that year.  Right?

2    A.    Right.  I think it was through the week before the

3    announcement of the Tecfidera PML incident.

4    Q.    And the Tecfidera PML incident was an incident

5    relating to a very significant side effect of Tecfidera.

6    Correct?

7    A.    That's correct.  Well, it was the first time it had

8    been observed, I believe, in sort of real clinical practice.

9    Q.    And you stopped your regression analysis at that point

10   in time because of your assumption that that negative news

11   about Tecfidera could benefit Copaxone 40.  Correct?

12   A.    Sure.  Of course, there is a couple of events that

13   happened right after that, like the launches of Plegridy and

14   the launch of Glatopa.  Yes.  But I cut it off at the

15   Tecfidera PML incident as the first of say those three

16   events.

17   Q.    And so your regression analysis covers the first nine

18   months of Copaxone being on the market.  Correct?

19   A.    Yes.  I think that's about right, yes.

20   Q.    Through, as we said, just about October-November of

21   2014.  Correct?

22   A.    Right.  I think it's definitely through the end of

23   October, may include the first week of November .  I can't

24   explicitly recall.

25   Q.    In fact, it's the case that over that period, if we

Bell - cross

1    look at the entire period from February of 2014 all the way

2    through let's say the end of last year, in fact, the market

3    share for the Copaxone brand continued to decline.   Correct?

4    A.    Well, the share went down because it had the launch of

5    Plegridy and the launch of Glatopa.   You would expect the

6    share to go down.

7    Q.    So the share continued to decline after that time.

8    Right?

9    A.    I am sorry.   Continued to decline from where?

10   Q.    Well, it was declining, and if we go to PDX-6.26, we

11   will see this, it was declining prior to the introduction of

12   Copaxone 40.   Right?

13   A.    Yes.

14   Q.    And it continued to decline after the entry of

15   Copaxone 40.   Right?

16   A.    Hang on.   Not quite.   It was declining --

17              THE COURT:   Hold on.

18              MR. FITZGERALD:   Sorry, Your Honor.

19              THE WITNESS:   It was declining prior to the

20   introduction of Copaxone 40.

21              If we could go back to the previous slide, then

22   for the period of time up to the Tecfidera PML event, it is

23   clearly going up.   Now let's go to the next slide.   You can

24   sort of see that -- whoops -- going up right sort of through

25   there.

1           Then, about three weeks after the Tecfidera PML

2   event you have the launch of Plegridy, which is the monthly

3   version of Avonex, which is one of the AV series, and is one

4   of the clear competitors for Copaxone 40.  And sure,

5   Plegridy comes in, takes some scripts.  What happens to the

6   share of Copaxone 40, and the share of many of the other

7   products?  They are depressed, because of the entry of this

8   new competitor.

9           And then you have got about halfway through

10  2015, right around that significant drop -- sorry, right

11  there, you have got the entry of Glatopa, which in fact of

12  course is the generic version of Copaxone 20.  Obviously,

13  you would expect that to have a negative effect as well.

14          What you do see, if you look at the total

15  effect, it does turn out to be the case that the total

16  effect from launch of Copaxone 40 through the end of 2015,

17  it's a net negative of .05 percent per month, which, of

18  course, is dramatically less, and statistically

19  significantly less, than the negative of .55 percent per

20  month, which was the case prior to the entry of Copaxone 40.

21  Q.    Thank you, Doctor.  That was really the answer to my

22  question.

23          MR. FITZGERALD:  No further questions, Your

24  Honor.

25          THE COURT:  Mr. Ware?

1     MR. WARE:  Just a couple, Your Honor.

2                REDIRECT EXAMINATION

3    BY MR. WARE:

4    Q.   Dr. Bell, you were asked some questions regarding the

5    launch pricing of Copaxone 40 milligram versus Copaxone 20

6    milligram.

7              Do you recall testimony of Mr. Hassler in that

8    respect and how -- what the goals of Teva were with respect

9    to comparative pricing at launch?

10   A.   My understanding was the goal was to make it

11   comparable from a payor perspective, such that there would

12   be no obvious reason for the payors to block access to

13   Copaxone 40.  My recollection was the list price might have

14   been two percent less.  That's the WAC.  It's not entirely

15   clear that the net price to any payor was any different than

16   Copaxone -- than the Copaxone 20 price.  And I believe that

17   was the testimony that was from Mr. Hassler.

18   Q.   When you refer to WAC, you are referring to what's

19   known as wholesale acquisition cost.  Correct?

20   A.   That's correct.  We would often call it the list

21   price, yes.

22   Q.   And wholesale acquisition cost or list price is not a

23   price that anyone pays.  Is that correct?

24   A.   Well, not quite.

25   Q.   Let's go with virtually any one.

1    A.    Most of the wholesalers take advantage of the two

2    percent discount.  So most of them are paying WAC less two

3    percent.

4    Q.    And are there also things known as rebates and

5    discounts and specific contractual terms with many

6    purchasing entities?

7    A.    Yes.  With many third-party payors, so the managed

8    care organizations get rebates and some of them that take

9    title to the merchandise will get discounts.

10   Q.    In performing your analysis, you selected what you

11   described as first-line therapies.  Is that right?

12   A.    Yes.

13   Q.    And did you further sub-select among some category of

14   first-line therapies?

15   A.    Well, sure.  Typically, they are looked at as the

16   injectables, which are the ABCREs, plus Plegridy and

17   Glatopa, and then the orals, which are Gilenya, Aubatio, and

18   Tecfidera.

19   Q.    You were asked some specific questions about having

20   excluded Lemtrada and Tysabri.  Tell us why you thought it

21   was appropriate to do that?

22   A.    Well, Lemtrada, Tysabri and Novantrone are all what we

23   call infused products, so you sit in a chair and you have

24   your arm out and the product drips in over a period of time,

25   as opposed to a simple straightforward injection.

1        But fundamentally, they are products that could

2    have more serious side effects associated with them.  And as

3    a result, they are typically considered to be the

4    second-line products, as is consistent, for instance, with

5    the way two of them, I'm sorry -- they haven't launched yet,

6    are described, in the National Multiple Sclerosis Society

7    discussion of these products.

8    Q.    Let me direct you now to Joint Trial Exhibit 7013 from

9    which I think you were shown three slides.

10   A.    Okay.

11   Q.    And let's start with 7013.32, or page 32.

12   A.    Okay.

13   Q.    Tell us, first of all, what the source of this is.

14         It says Healogix in the right-hand corner.  What

15   was Healogix to your understanding?

16   A.    Healogix was sort of a research market firm that was

17   hired by Teva to do this research.  They may have been the

18   ones that did the tracking studies.  I don't specifically

19   recall.

20   Q.    All right.  And as you explained in your direct, this

21   represents, to your understanding, physician perceptions; is

22   that right?

23   A.    That's right.  Yes.

24   Q.    What doctors think at some point in time?

25   A.    Well, yes.  It's their perceptions of the product.  It

1    may not be the reasons for prescribing the product, but

2    perceptions for the product.

3    Q.      And how do you read -- let's go to, for example, the

4    tolerability line and the side effect lines about two-thirds

5    of the way down.

6            How do you interpret these data?

7    A.      Well, I interpret them as, you know, a not

8    insubstantial number of physicians consider Copaxone 40 to

9    be substantially better than Copaxone 20 in both

10   tolerability and side effects.  You know, roughly five and

11   six times as many.

12   Q.      You're referring, with respect to tolerability, to the

13   29 percent as regards Copaxone 40 versus five percent for

14   Copaxone 20?

15   A.      That's correct.  Sure.

16   Q.      And similarly, the five percent with respect to side

17   effects versus 24 percent for Copaxone 40?

18   A.      That's right.  Yes.

19   Q.      The gray area in the middle, how do you interpret the

20   gray area in the middle?

21   A.      Well, gray area in the middle, as you've blown up the

22   legend there, that's where it's generally, when you are

23   doing market research, you can consider to be sort of

24   equivalents.  I believe I talked in my direct about this

25   being what's called a scale, basically seven points.  You

Bell - redirect

1  know, a lot, lot better, a lot better, better, about the

2  same, not as good, really not as good, really, really not as

3  good.  And kind of three of five, which is about the same, a

4  little bit less better, a little bit worse, are generally

5  considered to be the same.

6  Q.    Is it fair to read the tolerability line as saying,

7  95 percent of the responding physicians indicated that

8  Copaxone 40 was either equivalent or better in terms of

9  tolerability?

10 A.    Absolutely, sure.

11 Q.    And is it likewise fair to read the side effects line

12 as saying, 95 percent of physicians responded that

13 40 milligrams was either equivalent or better?

14 A.    Absolutely, yes.

15 Q.    And let's just take a look at the next slide quickly.

16 The same, which would be Joint Trial Exhibit 7013.103.  And

17 this is likewise reflecting physician perspectives; is that

18 correct?

19 A.    No.  These are patients.

20 Q.    Okay.  And these are patients who are currently using

21 what?

22 A.    In my understanding, they're patients who are

23 currently using Copaxone 40.  It is a little difficult to

24 understand what's being said here, because then it also says

25 underneath it, patients aware of Copaxone 40 who used

Bell - redirect

1    another therapy previously.  I don't know whether aware of

2    meant they had actually used it or not.

3    Q.    Right.  I don't want to go over this, but similarly,

4    the dark blue reflects those patients who favor 40-milligram

5    Copaxone; is that right?  And the lighter blue on the far

6    left, those patients who believe the 20-milligram is

7    significantly better; is that correct?

8    A.    Yes.  Characterized as the prior therapy being

9    significantly better and, again, it's the same seven point

10   scale.

11   Q.    So with respect to, for example, the side effects

12   line, that can be read to say that 91 percent of patients

13   believed that Copaxone 40-milligram is either equivalent or

14   better in terms of side effect profile; is that correct?

15   A.    Yes, sure.

16   Q.    Let's not do the third one.

17          I just want to ask you about your regression

18   analysis and the slope that you discussed.  You indicated

19   that you terminated your analysis in the regression

20   analysis.

21          Could we put up the slide again?  I've forgotten

22   the number.  I think it's PDX-6.25.

23          You indicated that there were some events which

24   occurred in November 2014 which caused you to terminate the

25   data; is that correct?

1   A.      Yes.   There was at least one event that happened in

2   November and then another event that happened either in late

3   November or December is my recollection.

4   Q.      Tell us what the event was with respect to Tecfidera.

5   A.      So Tecfidera is one of the orals and you might

6   remember in the direct, the second most prescribed of the

7   therapies that I was considering to be first line of these

8   modifying therapies, had an incident of what's called PML.

9   I'm not going to remember what PML stands for.  It's a very

10  bad thing with respect to the brain.  It's actually -- it is

11  actually the standard problem considered to be with Tysabri.

12  And one of the very many reasons why Tysabri is second line

13  is that because that the incidence of TML is higher,

14  significantly higher for Tysabri.

15  Q.      From the point of view of an economist doing a

16  regression analysis, what was the importance of your

17  excluding data following that event?  Why is that fair as

18  opposed to rigging the system here?

19  A.      Well, so one of the significant competitors of

20  Copaxone 40, i.e., Tecfidera, the next biggest product, just

21  had a bad event analysis, so one might anticipate that

22  physicians might curtail some of their prescribing of

23  Tecfidera.

24              Patients might be very concerned about

25  being started on Tecfidera, and as a result, you know,

Bell - redirect

1    Copaxone 40 share might have increased, but it would have

2    been an increase that had nothing to do with the launch of

3    Copaxone 40.  It would have been due to what happened

4    otherwise, and so I don't think it would be fair or

5    appropriate to include it in an assessment of what did the

6    launch of Copaxone 40 in and of itself mean to the Copaxone

7    brand.

8    Q.    Not because it would have understated the numbers, but

9    because it would have overstated the numbers; is that

10   correct?

11   A.    The expectation was that it would end up overstating

12   the number.  That's correct.

13   Q.    You mentioned also the launch of Glatopa.  What effect

14   had you included it would you expect that to have had on

15   Copaxone 40?

16   A.    Just like the launch of Plegridy, they're going to

17   take the Copaxone share overall down because they're first

18   line disease modifying therapies that were launched and

19   taking share and the shares have to add up to a hundred, so

20   you have to count them somewhere.

21   Q.    What was your purpose in doing a regression analysis

22   specifically as a result of which -- yes, as a result of

23   which you excluded those data?

24   A.    Well, again, what I'm trying to focus on is what did

25   the entry of Copaxone 40 mean to the Copaxone brand, not

1    what did the entry of Plegridy mean to the Copaxone brand or

2    what did the entry of Glatopa mean to the Copaxone brand.

3    What was the significance of Copaxone 40?  And what it

4    showed is clearly, Copaxone 40 was doing considerably more

5    than, quote unquote, cannibalizing Copaxone 20.

6              MR. WARE:  Nothing further, your Honor.

7              THE COURT:  All right.  Thank you, Doctor.

8    You're excused.

9              (Witness excused.)

10             MR. WARE:  Your Honor, I think given that we're

11   talking about 20 minutes, we'll forego.  I know you I know

12   you would like to see some video, but I think we'll forego

13   that and do it in the morning.

14             THE COURT:  Okay.  A couple things.  I

15   think --

16             MS. BLOODWORTH:  Your Honor, my only concern

17   with that is we have to call Dr. Fox with that and Dr. Hay

18   and tomorrow is our last day for trial.  Our designations

19   aren't involved in the video.  I don't know how long they're

20   going to take.

21             THE COURT:  Let's find out.

22             MR. WIESEN:  If I can, your Honor.

23             THE COURT:  Yes.

24             MR. WIESEN:  The deposition designations we have

25   remaining are four witnesses from various defendants.  It's

1    about a half-hour of plaintiffs' designations, about a

2    half-hour of defendants' designations, so about an hour of

3    video total among the four people.

4              We then have Dr. Fox as our last witness.  We

5    anticipate the direct taking approximately 90 minutes.  Then

6    we understand they only have Dr. Hay, we believe.  So I

7    think, although it would be tight tomorrow, I think we ought

8    to be able to do it.

9              MS. BLOODWORTH:  Just for the record, your

10   Honor, we preserved the right to recall Dr. Green, if

11   necessary, but my only concern was, again, we have a long

12   lunch tomorrow with the Federal Bar Association.

13             THE COURT:  And we have a later start.

14             MS. BLOODWORTH:  Yes, your Honor.

15             THE COURT:  It's cruel and unusual punishment,

16   to ask my staff and I to -- let me consult with my

17   reporters.

18             MR. WARE:  Your Honor, we would propose playing

19   one 20 minutes and stop.

20             THE COURT:  Mr. Maurer and Ms. Gunning are

21   willing to sit.  I am going to take a short break if I am

22   going to stay out here any longer.

23             Mr. Wiesen, about 45 minutes total?

24             MR. WIESEN:  An hour total.  One that has a

25   dispute that Mr. Figg has, we can leave that for the

```
 1          morning, the other three would be about 40 minutes.

 2                    THE COURT:  Okay.  We can do that.  We will do

 3          that.

 4                    Where is Mr. Hassler?

 5                    MR. WARE:  In Kansas City.

 6                    THE COURT:  What is counsel's view of where I am

 7          left?

 8                    I have got your submissions.  I have read them.

 9          I am prepared to rule.

10                    MR. WARE:  Your Honor, I think it's up in the

11          air.  We cannot realistically get him here tomorrow and put

12          him on the stand.  There is always the option that the

13          Court, if the Court were inclined to grant the request, then

14          we could still await the end of the trial and see what the

15          Court's decision is.  If appropriate, we will then deal with

16          it.

17                    THE COURT:  Here is what I am going to do.

18                    I don't need to hear anything from either side.

19                    Essentially, this is an issue that has been

20          advanced in the main by Sandoz and Momenta, as I understand

21          it.

22                    That said, and aside from that, I am a little

23          bit at sea as to how we get to a place like that with

24          lawyers of this level of sophistication and parties who are

25          spending as much money as they are spending and as much
```

1   money that is at stake here and of course the assets

2   themselves.

3           So I am disappointed that I am hearing this from

4   both sides.

5           I am not altogether confident that Teva has

6   acted as I suggested, I think at the end of our first

7   discussion or one of the discussions we had, a bit

8   unilaterally, and perhaps not intentionally usurping the

9   Court's authority, but nevertheless potentially having that

10  net effect.  Judges don't like that, obviously, I don't.

11  And you know that.

12          As is correctly pointed out in, I think it's,

13  the Court is well known to everyone here, as is memorialized

14  in the submission on behalf of defendants, the Court's have

15  the inherent authority, the District Court has authority, to

16  manage our dockets and try to do so in as efficient and

17  cost-effective way for the parties, in as fair a process as

18  possible.

19          I think it would be, under the circumstances, an

20  extreme sanction for me to preclude the evidence that Teva

21  seeks to present, having said all that I have said.

22          I am not confident, Momenta and Sandoz, contrary

23  to what you write in your submission, that bifurcation would

24  deny you irrevocably, as is said earlier in your submission,

25  the opportunity to fully investigate plaintiff's claim to

1    injunctive relief and to some evidence of rebuttal.  As you

2    correctly point out, I have a lot of authority, I am not the

3    king, but I have a lot of authority.

4             And I am prepared to exercise that authority, if

5    necessary, if necessary.  And that's it.  There is a trial

6    afoot here.  There may not be a need for us to go any

7    further than the verdict in this case.  That's a

8    possibility.

9             This is an open question.

10            But should there be -- should Teva be the

11   verdict winner, then there will be a need, and I can manage

12   that need to, in the interests of the defendants, having

13   full and fair opportunity to discovery, discovery on the

14   subject of the eBay factors.

15            That is the Court's ruling.

16            So at some point, should it become necessary to

17   summon Mr. Hassler back to witness stand, we can do that.

18   And we can talk about this in a later status conference.  We

19   will get on the phone again, should it be necessary, at some

20   point in the relatively near term, and do that.

21            I am going to take a quick break.

22            (Recess taken.)

23            2525.

24

25            THE COURT:  Mr. Wiesen.

```
 1                    MR. WIESEN:  Thank you, Your Honor.

 2                    The first witness we are going hear from is Dr.

 3      James Roach, who is the senior VP of development and chief

 4      medical officer of defendant Momenta.  We have the binder

 5      there.  The total run time is approximately 24 minutes,

 6      split almost evenly between the plaintiffs' designations and

 7      the defendants' counter-designations.

 8                    This is the witness that had some of the

 9      infringement issues that we all agreed we would hold over

10      till now and play them all at once.

11                    THE COURT:  Okay.

12                    (Deposition played as follows.)

13                    "Question.  Good morning.  Is it Dr. Roach?

14                    "Answer:  It is.

15                    "Question:  What degree do you hold?

16                    "Answer:  M.D., medical degree.

17                    "Question:  From what school?

18                    "Answer:  Georgetown University School of

19      Medicine.

20                    "Question:  When did you get that?

21                    "Answer:  1985.

22                    "Question:  Do you hold any degrees other than

23      the Bachelor's and the medical degree?

24                    "Answer:  No.

25                    "Question:  You're currently employed at
```

Roach - depo.

1    Momenta.  Is that right?

2                "Answer:  Yes.

3                "Question:  What's your role at Momenta?

4                "Answer:  Senior vice president of development

5    and chief medical officer.

6                "Question:  When did you first start working on

7    a generic form of Copaxone?

8                "Answer:  When did I personally --

9                "Question:  Yes.

10               "Answer:  -- start working?  When I came to

11   Momenta, people at Momenta were already working on Copaxone.

12               "Question:  And did you start working on it

13   immediately upon coming to Momenta?

14               "Answer:  To the extent -- most of the work on

15   Copaxone had really nothing to do with my group or my

16   responsibilities, but to the extent anybody would have been

17   involved, you know, if any issues were to come up, I guess,

18   you know, I could have been working on Copaxone, yes.

19               "Question:  Are you familiar with the

20   pharmacokinetics of Copaxone or glatiramer acetate

21   generally?

22               "Answer:  Not that -- not in any significant

23   detail, no.

24               "Question:  Did you have any involvement in the

25   preparation or filing of the ANDA for the generic 40 mg

Roach - depo.

1    three times a week Copaxone product?

2              "Answer:  Personally?

3              "Question:  Yes.

4              "Answer:  Very little.

5              "Question:  You understand this case concerns

6    Teva asserting certain patents against Momenta and Sandoz.

7    Right?

8              "Answer:  I mean, very generally.

9              "Question:  Have you ever reviewed those

10   patents?

11             "Answer:  No.  I'm fairly certain I never sat

12   down and reviewed a patent.  I shouldn't say no with

13   certainty, but I don't recall ever sitting down and

14   reviewing a patent.

15             "Question:  Other than the regulatory, the

16   medical affairs and the animal facility falling under your

17   rubric in your group, has your group had any involvement in

18   the generic Copaxone 40 milligram three times a week

19   project?

20             "Answer:  Yeah, other than that, I don't think

21   so.

22             "Question:  Dr. Roach, the court reporter has

23   handed you what we've marked as Roach Exhibit 3.  It bears

24   the Bates numbers SDZ(70)0020275 to 79.

25             "This document, Dr. Roach, is entitled 'U.S.

1   Launch Team Meeting Minutes,' Dated June 4th, 2010.  Do you

2   see that?

3                "Answer:  Yes, I do.

4                "Question:  And on the U.S. launch invited guest

5   list on the right-hand side, the last person listed is CMO,

6   Momenta, Jim Roach.  Do you see that?

7                "Answer:  I do.

8                "Question:  Is that you?

9                "Answer:  I presume it is.  Yes, it is.

10               "Question:  Were you present at this meeting?

11               "Answer; I don't recall.

12               "Question:  Do you recall what the status was of

13   any clinical trial or study concerning the Copaxone three

14   times a week 40-milligram product as of June 2010?

15               "Answer:  No, I don't.

16               "Question:  Would you have reviewed these

17   minutes before they were finalized?

18               "Answer:  I don't recall.

19               "Question:  Would someone have reviewed these

20   minutes to make sure they accurately reflected the meeting?

21               "Answer:  I would presume so.  I don't know.

22               "Question:  At Momenta and Sandoz, they endeavor

23   to make sure the meeting minutes were accurate.  Correct?

24               "Answer:  I wouldn't speculate on that.

25               "Question:  So from the meeting minutes, it

Roach - depo.

1    appears that David Xu led the discussion of Teva's three

2    times a week formulation.  Correct?

3                "Answer:  I can't speak to who actually led the

4    discussion.  I can see what's written here in terms of David

5    being appointed as the lead.

6                "Question:  Do you recall engaging in this

7    discussion?

8                "Answer:  No, I don't.

9                "Question:  And according to these meeting

10   minutes, it says Teva's formulation and study design were

11   discussed.  Right?

12               "Answer:  Again, I see this in the minutes.

13               "Question:  And then in the next sentence it

14   says, Regulatory offered a possible 50-50 chance of having

15   it approved.  Right?

16               "Answer:  I see that.

17               "Question:  Do you recall any discussion of the

18   likelihood of getting approval for a 40 milligram three time

19   a week product for Copaxone in 2010 at Momenta or Sandoz?

20               "Answer:  No.  No, I do not.

21               "Question:  And then it indicates, and medical

22   indicated a much lower probability, less than 20 percent of

23   success rate.  Do you see that?

24               "Answer:  Yes, I see what's written here.

25               "Question:  And medical was your group.

Roach - depo.

1    Correct?

2              "Answer:  Medical -- I'm not sure, honestly,

3    what this refers to or who specifically this could be

4    referring to, people at Sandoz, people at Momenta.  Medical,

5    you know, honestly, medical -- there is no group at either

6    Momenta or Sandoz called medical.

7              "Question:  As far as you were aware or are

8    aware, did anybody who was at this meeting other than you

9    have responsibility for anything associated with medical at

10   Sandoz or Momenta in 2010?

11             "Answer:  I think different people could have

12   participated in different discussions.  And just as an aside

13   in looking at these minutes, although I can't be sure about

14   when this means, right, if you look at the front page of the

15   minutes, I see a lot of check boxes or checks here.  And I

16   note that I don't see a check next to my name, you know, for

17   what's that's worth.  I would assume what that means is that

18   who may have participated in the meeting.  I don't know.

19   But just as an aside, I am not even sure that I participated

20   in this meeting.

21             "Question:  Okay.  Looking at this list, though,

22   of people who were either team members or invited guests,

23   can you identify anyone else that you're aware had medical

24   responsibilities in 2010 other than you?

25             "Answer:  I would say on this list as identified

Roach - depo.

1    by functions, I don't know about medical, but I have to

2    reiterate that what medical meant in this context, in this

3    particular statement and where it came from, whether -- it

4    could well have come from somebody at Sandoz for all I know.

5    I don't see any representation here that this was medical,

6    meaning me, and as I stated, I'm not even sure that I

7    participated in this discussion.

8            "Question:  Do you recall any discussions at

9    Momenta or Sandoz about the likelihood of success of the

10   GALA three times a week 40-milligram study before it was

11   completed by Teva?

12           "Answer:  No, I don't.  I don't recall

13   discussions of this.

14           "Question:  At no time do you recall discussing

15   the GALA results before they were released?

16           "Answer:  At no time do I -- might we have

17   participated in discussions as results became available?

18   Maybe.  I don't -- I certainly don't recall any specifics of

19   timing or any specifics of any discussions we may have held.

20           "Question:  Do you recall whether anybody from

21   medical at Momenta expressed the view that there was a less

22   than 20 percent chance that the GALA study would be

23   successful?

24           "The Witness:  No, I have no recollection of

25   those discussions.

Roach - depo.

1              "Question:  Dr. Roach, the court reporter has

2       handed you a document we've marked as roach Exhibit 4.  It

3       bears the Bates Number SDZ (70) 0021556 to 1559.  It is an

4       e-mail chain that, as with most e-mail chains, start at the

5       end and moves forward the time.  Have you seen this before?

6              "The Witness:  Yeah.  Is it okay if I -- I'd

7       like to.

8              "Question:  Are you familiar with this e-mail

9       chain?

10             "Answer.  No.

11             "Question:  You're included in this e-mail

12      chain; correct?

13             "Answer:  I see the e-mail chain in front of me,

14      yes.

15             "Question:  Do you have any doubt or question

16      about whether you participated in this e-mail chain in

17      2010?

18             "Answer:  No.  It certainly appears, based on

19      the e-mail stream, and I assume it's correct, that I

20      participated in this e-mail chain.

21             "Question:  You just don't recall it?

22             "Answer:  I don't recall it, no.  When was this?

23      This was June of 2010?

24             "Question:  Yes, sir.

25             "Answer:  No, I don't recall this.

Roach - depo.

1              "Question:  And you provide comments on the

2      meeting minutes; correct?

3              "Answer.  It looks like I provided one comment

4      with respect to the following.

5              "Question:  Right.  Does this suggest to you

6      that you were at the meeting since you were commenting on

7      what was actually discussed in the minutes?

8              "The Witness:  No, I don't think it necessarily

9      does.  I received the minutes and I had one comment with

10     respect to the following.  I think that -- I see what's

11     written here.  I don't think that has any implication one

12     way or another as to whether I was actually at the meeting

13     or not.

14             "Mr. Wiesen:

15             "Question:  So this e-mail doesn't suggest to

16     you that you were at the meeting?

17             "Answer:  No, not at all.

18             "Question:  The comment you offered was

19     specifically another discussion of the Teva three-times-a-

20     week formulation, correct?

21             "Answer:  Yes, it appears that's the yes, it

22     appears that's what I was commenting on.

23             "Question:  And you write, I'll refer to my --

24     sorry.  I'll defer to my regulatory colleagues for their

25     assessment, but I don't recall drawing a conclusion that the

Roach - depo.

1    POS of Teva's GALA study or ultimate approval was less than

2    20 percent for the three times weekly dosing regimen.  Do

3    you see that?

4                "Answer:  Yes, I do.

5                "Question:  What does POS mean?

6                "Answer:  I presume that means probability of

7    success.  Probability of success, yeah.  I mean, I would

8    assume that's what it means.

9                "Question:  Do you recall analyzing the

10   probability of success of Teva's GALA study before it was

11   completed?

12               THE WITNESS:  No, I don't.

13               "Question:  In the next sentence you write,

14   if I had to put a number on it, I would probably come up to

15   at least 50 percent, for what that is worth.  Do you see

16   that?

17               "Answer:  I do.

18               "Question:  So based on your knowledge

19   concerning Copaxone in June of 2010, your analysis was that

20   there was a 50 percent chance that the GALA study would be

21   successful; is that right?

22               "The Witness:  Actually, as I look at what I

23   wrote here and, you know, pointing out again this was a long

24   time ago, I didn't say anything specifically about Teva's

25   GALA study.  I put in parentheses our ultimate approval.

Roach - depo.

1    Certainly, this number could be related to ultimate

2    approval.  A lot of things go into an approval decision,

3    right, about what the agency may or may not require for

4    approval independent of the results of any one study.

5             "And if I look at this -- you know, if I look at

6    the specific language here, well, if I had to put a number

7    on it, I would probably come up to at least 50 percent, for

8    what that is worth, it seems like I'm providing -- you know,

9    again, I don't recall the specifics of this e-mail, but it

10   seems like I'm providing quite a few caveats on my -- on

11   whatever I'm referring to here.

12            "Question:  What I'm trying to ask you is, do

13   you remember specifically, not what the words are, but what

14   you meant when you wrote that?

15            "The Witness:  Do I remember what I meant when I

16   wrote that?  I think I meant what I wrote.  I don't -- you

17   know, I think I meant what I wrote.  I mean, I see the words

18   here.  I don't -- I don't know how to expand upon that other

19   than what's here.  I do make this distinction, I think, you

20   know, about POS of a study versus ultimate approval.

21            "Question:  If you turn to the e-mail before --

22   that responded to yours, if you turn to the next page back,

23   21557?

24            "Answer:  Responded to this e-mail that I just

25   wrote?

Roach - depo.

1           "Question:  Do you recall receiving this e-mail?

2           "Answer:  No.

3           "Question:  Do you recall discussing with Mr. Xu

4    or Mr. McCamish whether there were concerns that the three

5    time a week dosing would not be as effective as every day

6    dosing of Copaxone?

7           "Answer:  No, I have no recollection of

8    any of those discussions or if they occurred, for that

9    matter.

10          "Question:  Do you know what study that's

11   referring to?

12          "Answer:  No, not specifically.

13          "Question:  Do you recall looking at any studies

14   that compared 20 milligrams daily with 40 milligrams daily

15   of Copaxone?

16          "Answer:  40 daily and 20 daily.  Vaguely.  I

17   don't recall specifics of that.  That was a long time ago.

18          "Question:  Do you recall if that was the Forte

19   study, F-o-r-t-e?

20          "Answer:  No, I don't.

21          "Question:  And then you go on to write, 'The

22   overall safety and side effect profile of the 40-milligram

23   dose in this trial was similar, although it was associated

24   with a greater incidence of certain adverse effects.'  Do

25   you see that?

Roach - depo.

1               "Answer:  Yes.

2               "Question.  And so your e-mail does appear to be

3      a quote from part of the Cohen paper?

4               "The Witness:  Hold on one second.  I'm just

5      trying to determine what specifically was a quote and what

6      wasn't a quote.  Okay.

7               "Question:  Have you determined that the entire

8      third paragraph of your e-mail is a quote from the Cohen

9      paper?

10              "The Witness:  It appears to be a quote.  Did I

11     actually look word by word?  I mean, I don't want to make a

12     mistake in that regard, but it certainly seems that on

13     quick review, this appears to be a quote from the Cohen

14     paper.

15              "Question:  Does that make you think that you

16     carefully read the Cohen paper back in 2010?

17              "The Witness:  Not necessarily, no.  And I don't

18     want to speculate on that.  I certainly seem to cut and

19     paste if that's what I did, and I don't recall that, a

20     particular paragraph on a -- on safety perspective.

21              "Question:  Dr. Roach, we've handed you what's

22     been marked as roach Exhibit 6.  It's another e-mail chain,

23     bears the Bates numbers SDZ (70 )0021501 to 52005.  Are you

24     familiar with this document?

25              "Answer:  No.

Roach - depo.

1               "Question:  If you turn to Page 2 1504, it's an

2      e-mail from Sridevi Colten to David Xu, copying Barbara

3      Rosengren and you.  Do you see that?

4               "Answer:  I do.

5               "Question:  Do you recall any discussions

6      concerning the GALA study now in June of 2011, so a year

7      after the prior e-mails we were looking at?

8               "Answer:  No, I don't have any recollection of

9      specific discussions about that.

10              "Question:  Do you recall any e-mails about this

11     issue?

12              "Answer:  No.

13              "Question:  In the last sentence, you wrote,

14     'As an aside, I personally am not convinced they will show

15     robust efficacy in an every-other-day dosing schedule and

16     wouldn't be surprised if other AEs show up with this higher

17     dose.'  Do you see that?

18              "Answer:  You said on the -- the end of my

19     e-mail?

20              "Question:  Yes, sir.  I'm sorry, the first

21     paragraph -- the last sentence of the first paragraph of

22     your e-mail.

23              "Answer.  Sorry, hold on.  I do see that.

24              "Question:  And by AEs, you mean adverse events,

25     correct?

Roach - depo.

1              "Answer:  Yes.

2              "Question:  So you wrote you wouldn't be

3    surprised if other adverse events show up with this higher

4    dose of 40 milligrams, correct?

5              "The Witness:  I see what I wrote here.  I mean,

6    I see what's in the e-mail.

7              "Question:  You don't remember what you were

8    thinking at that time as you sit here today?

9              "The Witness:  No, I don't.  When was this

10   again?  June of 2011?  No, I don't.

11             "Question:  So in your role as medical -- in

12   your role at Momenta, you never looked at the definitions or

13   any of the add adverse events or injection site reactions

14   that happened with Copaxone?

15             "The Witness:  I'm sorry, the last part?

16             You know, the last part of your question -- I'm

17   sorry, the word -- that is a very vague question and there

18   was one thing I wanted to point out.  The last phrase of the

19   question was what?  Sorry.

20             (Record read as requested.)

21             "The Witness:  Right.  So definitions, you know,

22   I'm not an expert in this area, but certainly these things

23   can be evaluated in many different ways.  I don't recall if

24   I ever looked at or know how specifically any of these were

25   assessed in any trial.

Roach - depo.

1              "So putting aside the definitions piece of it,

2     which I have no idea about, you know, at some point in my

3     role would I have looked at a label that might have

4     described injection site reaction or if I looked at a paper

5     that reported injection site reactions?

6              "I suspect at some point I probably did.   I

7     don't recall specifically when or what papers or labels I

8     would have looked at when.   You know, I'm sure that at some

9     point if I was to look at a label, these kinds of adverse

10    events would be reported in the label.   I have no idea how

11    they were assessed.

12             "Question:  Dr. Roach, I've given you what we've

13    marked as Roach Deposition Exhibit 12.   It's another e-mail

14    chain bearing the Bates Nos. SDZ (70) 0024275 to 277.

15             "Do you recognize these e-mails?

16             "Answer:  No, I don't.

17             "Question:  And if you look at the first e-mail

18    chronologically on Page 2, it appears to be an e-mail from

19    you to you; is that right?

20             "Answer:  It appears to be.   Yep.

21             "Question:  And it concerns an e-mail or some

22    information about Teva's GLACIER trial, is that right?

23             "Answer:  Bear with me just a minute.   Yes, it

24    appears to be in relation to a GLACIER trial.

25             "Question:  Do you recall any discussions of the

1   GLACIER study at Momenta?

2           "The Witness:  Not specifically, no.

3           "Question:  Dr. Roach, I've handed you what

4   we've marked as Roach Exhibit 14.  It's the Joint Steering

5   Committee II meeting minutes (Roman Numeral II) from

6   February 6, 2014.  Bears the Bates numbers MMT (70) 009038

7   to 91.

8           "And, one again, you're listed as a JSC member

9   for Momenta on the left-hand side, correct?

10          "Answer:  Correct.

11          "Question:  And there's an X next to your name

12  suggesting you were present at this meeting?

13          "Answer.  You know, if only this X equals on

14  this page actually had an explanation, but yes, I would

15  assume that that meant that I was in attendance.

16          "Question:  If you look up above the two,

17  there's a line that's not redacted that says, 'Medical

18  Affairs.'

19          "Do you see that?

20          "Answer:  I do.

21          "Question:  And that's your group, correct?

22          "The Witness:  I'm responsible for medical

23  affairs at Momenta, or I oversee medical affairs at Momenta.

24          "Mr. Wiesen:

25          "Question:  It says, 'Compare and contrast

1    Copaxone 40-milligram per milliliter label with 20-milligram

2    per milliliter label especially with respect to AEs.  Do you

3    see that?

4             "Answer:  I did see that.

5             "Question:  And AEs are adverse events, correct?

6             "The Witness:  Yes, AEs are adverse events.

7             "Question:  All right.  I've handed you what's

8    been -- or the court reporter has handed you what's been

9    marked as Roach Exhibit 19.  It's a series of e-mails

10   bearing the Bates numbers MMT (70) 0008464 to 8468.  The

11   e-mails from May 22nd and 23rd of 2014.

12            "Do you remember these e-mails?

13            "Answer:  I don't, no.

14            "Question:  Take a look at them quickly.  It

15   begins with an e-mail from Ben Shapiro to you, May 22nd,

16   2014, correct?

17            "Answer:  Yes.

18            "Question:  And the subject is 'Copaxone three

19   times weekly.' Right?

20            "Answer:  Yeah, that's what's listed in the

21   subject line, yep.

22            "Question:  And he poses a series of questions

23   to you concerning Copaxone three times weekly, correct?

24            "The Witness:  Yeah, I'm reading his e-mail and

25   he's asking me other questions, yes.

Roach - depo.

1              "Question:  You wrote, so in summary, although

2      Teva did not run a head to head comparison of 20 milligrams

3      daily versus 40 milligrams 3 times weekly -- then you have a

4      parenthetical --

5              "Answer:  Yes.

6              "Question:  -- the historical data within their

7      own studies and label, as well as data recently developed by

8      Biogen, strongly suggests that these formulations are

9      essentially equivalent in efficacy.  That was your

10     conclusion, correct?

11             "The Witness:  Yeah, again, in terms of drawing

12     conclusions or not, I can only comment on what I wrote, and

13     what you read back to me is what I wrote at that time.

14             "Question:  Do you remember what the basis was

15     for that conclusion in your e-mail to Dr. Shapiro?

16             "Answer:  No, I don't.

17             "Question:  What was the basis for that

18     conclusion?

19             "Answer:  I can't speculate on that.

20             "Question:  But you reached that conclusion,

21     correct?

22             "The Witness:  Again, reaching a conclusion --

23     you know, a board member asked me a question.  I tried to do

24     what I could do to put together a response to his questions

25     and, you know, move on.  You know, I see the words that I

Roach - depo.

1    wrote here.  I can't tell you exactly what I was thinking at

2    that time when I wrote them or -- I was just trying to

3    address questions asked to me by a board member.

4              "Mr. Wiesen:

5              "Question:  You didn't intend Dr. Shapiro

6    to take these as conclusions you were drawing from the

7    data?

8              "The Witness:  Yeah, I don't recall speculating

9    on conclusions.  I was giving him my impression of the data

10   to date at that time, and this is what I wrote, or at least

11   this is -- you know, this is how I answered his questions as

12   posed at that time.

13             "Question:  So in the second topic you talk at

14   the bottom of this Page 8465, is less injection side effects

15   in 40 versus 20.  Do you see that?

16             "Answer:  I do.

17             "Question:  You start off by saying this is a

18   tricky one.  What did you mean by that?

19             "Answer:  I have no idea.

20             Question:  Then you write, as mentioned above in

21   the Cohen 2007 study, it certainly appears that injection

22   site reactions were more common and severe with the 40 daily

23   versus the 20 daily .

24             "Do you recall what that conclusion was?

25             "Answer:  No, I don't.

Roach - depo.

1          "Question: Then you write, However, when they

2     moved to a three times weekly strategy, data reported in the

3     Khan 2013 paper and label suggest, interestingly, a lower

4     incidence of injection site reactions in the 40 weekly as

5     compared with historical data from the 20.  Do you see that?

6               "Answer:  I do.

7               "Question:  And you know the Khan 2013 paper is

8     the GALA study.   Correct?

9               "Answer:   I believe that's a paper that you

10    showed me.  Actually, I'm not sure.  You showed me a Cohen

11    paper.  Did you show me a Khan paper?

12              "Question:  I'm sure I showed you the Khan

13    paper.

14              "And you forwarded this to them by saying, FYI,

15    been working for a while on this response this a.m.  Do you

16    recall that?

17              "Answer:  I do.

18              "Question:  Do you recall how long you be you

19    spent working on this response to Dr. Shapiro's questions?

20              "Answer:  I don't -- no, I don't recall.

21              "Question:  Did Dr. Shapiro do you the lovely

22    favor of asking you these questions on the Friday before

23    Memorial Day?

24              "Answer:  Apparently so.  Or Thursday, whenever

25    he sent me the original message, Thursday -- yeah, Thursday

 1    afternoon."

 2                MR. WIESEN:  Your Honor, that's all from Dr.

 3    Roach.  The second witness that we will play will be about a

 4    ten-minute total deposition, is of Maurice Weijers.  He is

 5    the project manager R&D from defendant Synthon.  Again, this

 6    is plaintiffs' designations and defendants'

 7    counter-designations put together.

 8                (Deposition played as follows:)

 9                "Question:  Could you spell your name for the

10    record, please?

11                "Answer:  My last name?

12                "Question:  Your full name.

13                "Answer:  Full name?  That's M-a-u-r-i-c-e.  My

14    last name is spelled W-e-i-j-e-r-s.

15                "Question:  Now, you're currently employed at

16    Synthon; is that correct?

17                "Answer:  Correct.

18                "Question:  How long have you worked at Synthon?

19                "Answer:  I started in September '98.

20                "Question:  And what is your current title at

21    Synthon?

22                "Answer:  My current title is project manager,

23    R&D.

24                "Question:  Now, were you a project manager for

25    the development of a 20-milligram daily glatiramer acetate

Weijers - depo.

1    product?

2             "Answer:  That is correct.

3             "Question:  And were you also project manager

4    for the development of a 40-milligram three times a week

5    glatiramer acetate product?

6             "Answer:  That's correct.

7             "Question:  I just handed you two documents that

8    have been marked Exhibits MW13 and MW14.  Exhibit 13 has

9    production number 15368, and Exhibit 14 has Production Nos.

10   15370 through 373.

11            "Who is Dr. Christian Wolf?

12            "Answer:  I don't recall.  He might be a

13   consultant.  I don't know.

14            "Question:  Do you know if Dr. Wolf ever worked

15   for Synthon?

16            "Answer:  To the best of my memory, no.

17            "Question:  In your e-mail in Exhibit 13 you

18   write, 'Dear all, yesterday the options for a 40-milligram

19   clinical study were discussed in the presence of Dr.

20   Christian Wolf.'

21            "Are you with me?

22            "Answer:  Yes.

23            "Question:  Okay.  You go on to state, 'Dr. Wolf

24   was of the opinion that the current GALA study (Teva) is not

25   appropriately designed.  See attached presentation prepared

Weijers - depo.

1       by Dr. Wolf.'

2                       "Do you see that?

3                       "Answer:  Yes.

4                       "Question:  And then you go on to state, 'BTW,

5       consulted neurologists in both E.U. and U.S. are also not

6       convinced that the new 40 milligram per milliliter three

7       times weekly will be successful.'  Do you see that?

8                       "Answer:  Yes.

9                       "Question:  Do you know what BTW in that

10      sentence stands for?

11                      "Answer:  I tend to use that for 'by the way.'

12                      "Question:  So in this sentence, you are

13      communicating to your colleagues at Synthon that consulted

14      neurologists in both the E.U. and the U.S. were not

15      convinced that new 40 milligram per milliliter three times

16      weekly will be successful; right?

17                      "Answer:  That's what's stated here.

18                      "Question:  Do you know what that statement is

19      based on?

20                      "Answer:  No.  That could be regulatory.

21                      "Question:  Did you personally ever consult with

22      neurologists in the E.U. or in the U.S. about whether the

23      40-milligram three times weekly glatiramer acetate product

24      would be successful?

25                      "Answer:  No.  My colleagues from clinical will

Weijers - depo.

1    do that.

2              "Question:  Sitting here today, do you recall

3    your colleagues from clinical communicating to you that they

4    had consulted with neurologists in the E.U. and U.S. who

5    were not convinced that the 40 milligram three times a week

6    regimen would be successful?

7              "Answer:  No.

8              "Question:  But is it fair to say, though, that

9    based on this statement in your e-mail, your colleagues in

10   clinical did communicate to you that they had consulted with

11   neurologists in both the E.U. and the U.S. who were not

12   convinced that the three times a week glatiramer acetate

13   regimen would be successful?

14             "Answer:  The only thing that I can comment on

15   is that the sentence to the best of my knowledge could also

16   be applicable to the registration of the 40-milligram

17   product.

18             "Question:  What do you mean by that?

19             "Answer:  Yeah, if it could be a successful

20   registration for the 40 milligram.  I'm not sure if there

21   are -- I'm not convinced that they are discussing the

22   outcome.

23             "Question:  Well, what were you discussing when

24   you wrote that sentence?

25             "Answer:  Yeah, as I'm not a clinician, but I

Weijers - depo.

1     think it's what I meant, that it was related to regulatory,

2     to the regulatory approval of the --

3               "Question:  But if it was coming from your

4     colleagues in clinical, wouldn't they have been talking to

5     you about clinical outcomes of the study as opposed to

6     regulatory outcomes?

7               "Answer:  No, I don't think so, not necessarily.

8     Not necessarily.

9               "Question:  But it's possible they could have

10    been talking about the clinical outcomes?

11              "Answer:  But also could be the regulatory

12    implications.

13              "Question:  So one possibility of what you meant

14    by this sentence was that your colleagues in the clinical

15    department at Synthon consulted with neurologists in the

16    E.U. and the U.S., who were not convinced that the

17    40-milligram three times a week regimen would be successful.

18    Fair?

19              "Answer:  With regard to registration, not with

20    regard to the clinical outcome.  That's not what it says

21    here.

22              "Question:  But you testified before that one

23    possibilities of what you meant here was that your

24    colleagues in clinical consulted with neurologists in the

25    E.U. and the U.S., who were not convinced that the 40

Weijers - depo.

1   milligram three times a week regimen would be successful

2   clinically.  Correct?  That's one possibility of what you

3   meant?

4            "Answer:  I still think it was I meant

5   regulatory in the end.  Could be clinical, but I think it's

6   regulatory.

7            "Question:  I just handed you a document marked

8   MW17 which has production Nos. 1024 through 1028.

9            "Have you seen this document before?

10           "Answer:  Could be.

11           "Question:  Did you prepare this document?

12           "Answer:  I think so.

13           "Question:  This document is entitled 'GATE 1

14   feasibility phase, glatiramer acetate, 40 milligrams per

15   milliliter.'  Did I read that right?

16           "Answer:  That's correct.

17           "Question:  And it's dated January 27th, 2012;

18   right?

19           "Answer:  That's correct.

20           "Question:  If you flip to the last page of the

21   document with the production numbers 1028, there's a heading

22   at the top of the page that says 'Business Risks.'  Do you

23   see that?

24           "Answer:  Yes.

25           "Question:  And there's a table beneath that

Engels - depo.

1    three risks identified; right?

2              "Answer:  Yes.

3              "Question:  First risk is 'failure, Teva's Gala

4    trial 40 milligrams per milliliter;' right?

5              "Answer:  Correct.

6              "Question:  Do you have an understanding as to

7    why failure of Teva's GALA trial with the 40 milligram

8    formulation of glatiramer acetate was perceived to be a risk

9    in January 2012?

10             "Answer:  Well, I'm not a clinician, but I think

11   in every trial, there's a risk.

12             "Question:  Every trial, there's a risk that the

13   product will fail?

14             "Answer:  That the trial will fail."

15             MR. WIESEN:  Your Honor, that's the end of that

16   deposition.

17             The third and final deposition we propose

18   playing tonight is thankfully short.  It's about four and a

19   half minutes.  It's from David Engels, senior director,

20   portfolio for lead defendant Pfizer.

21             (Deposition played as follows.)

22             "Question:  Can you please state your name for

23   the record?

24             "Answer:  David Engels.

25             "Question:  Where do you live?

Engels - depo.

1              "Answer:  I live in Belle Mead, New Jersey.

2              "Question:  Mr. Engels, the court reporter has

3    handed you what's been marked as Engels Exhibit 5, which is

4    a document bearing Bates numbers 13 -- bearing Bates numbers

5    PFE-40mgGA 0013273 through 311.

6              "Do you have that?

7              "Answer:  Yes.

8              "Question:  Do you recognize this document?

9    And, once again, feel free to take your time to review the

10   document before answering my question.

11             "Answer:  Thank you.

12             "Yes, I do remember reviewing it.  The first

13   time was yesterday with counsel.

14             "Question:  So you don't recall receiving this

15   e-mail from Laura Giezeman on November 25, 2014?

16             "Answer:  No.

17             "Question:  Who is Laura Giezeman?

18             "Answer:  Based on the bottom, she is a business

19   consultant with ZS Associates.

20             "Question:  Now, is the survey that's attached

21   to this e-mail in Exhibit 5 from ZS Associates something

22   that Stephen Smith would have had responsibility for

23   commissioning?

24             "Answer:  Again, Stephen did all the market

25   research.  I can't definitively say that he commissioned

1    this one.  High probability that he did, but I can't for

2    sure say that he did.

3              "Question:  If you could turn to Page 279, which

4    is the executive summary?

5              "And I want to direct your attention to the

6    third bullet point under the first section, 'What is

7    happening today:  The Copaxone patient experience,' which

8    states, 'Many neuros and patients see Teva's 40-milligram

9    administration as a significant benefit.'

10             "Do you see that?

11             "Answer:  Yes.

12             "Question:  Based on the study that Pfizer

13   commissioned, is its understanding that neurologists and

14   patients see Teva's 40 milligram three times a week dosing

15   regimen a significant patient for the market, a significant

16   benefit for the market?

17             "Answer:  So all this is is somebody from an

18   outside firm talking to 16 patients and 12 neurologists only

19   to make a statement that they subjectively put on here

20   without talking about any dose.  Just dosing or schedule,

21   just 40 milligram.

22             "Question:  Mr. Engels, the Court Reporter has

23   handed you what's been marked as Engels Deposition Exhibit

24   8, which is a document bearing Bates Nos. PFE40mgGA0013490

25   to 529.

Engels - depo.

1                    "Do you have that document?

2                    "Answer:  Yes.

3                    "Question:  Do you recognize this document?

4                    "Answer:  Yes.

5                    "Question:  Is this a document that you reviewed

6      in preparing for your deposition today?

7                    "Answer:  I did see this from counsel yesterday.

8                    "Question:  Do you recall receiving this -- now,

9      this is a chain of e-mails on which you're copied, is that

10     correct?

11                   "Answer:  Yes.

12                   "Question:  And then there's a series of

13     attachments.

14                   "Answer:  Yes.

15                   "Question:  If you go back to Page 492, there's

16     a section at the top 'Background.'  Do you see that?

17                   "Answer:  Yes.

18                   "Question:  It says, 'Teva failed Phase III

19     trial comparing 40 milligram to 20 milligram published in

20     January 2011, resulting in 20 milligram only market

21     assumption.'

22                   "Answer:  Yes, I see that."

23                   MR. WIESEN:  That concludes that short one, Your

24     Honor.

25                   That leaves us with one more deposition

1475

Engels - depo.

1      designation that we propose playing tomorrow since there is

2      a dispute over one piece of it.  We can resolve that in the

3      morning.  And then we will have Dr. Fox here in person.

4                  THE COURT:  All right.

5                  MR. WIESEN:  We would like to thank you and your

6      staff for agreeing to stay late so we could get this all in.

7                  THE COURT:  Good evening.  You are very welcome.

8                  (Court recessed at 5:35 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25