```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                               -  -  -

 4    IN RE COPAXONE 40 MG          )      C.A. No. 14-1171-GMS
      CONSOLIDATED CASES            )         (CONSOLIDATED)
 5
                                    -  -  -
 6
                            Wilmington, Delaware.
 7                         Thursday, October 6, 2016
                                 9:00 a.m.
 8                         Day 7 of Bench Trial

 9                               -  -  -

10    BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

11    APPEARANCES:

12            JOHN W. SHAW, ESQ., and
              KAREN E. KELLER, ESQ.
13            Shaw Keller LLP
                    -and-
14            PAUL W. WARE, ESQ.,
              DARYL WIESEN, ESQ.,
15            JOHN T. BENNETT, ESQ.,
              ELIZABETH J. HOLLAND, ESQ.,
16            NICHOLAS K. MITROKOSTAS, ESQ., and
              WILLIAM JAMES, ESQ.,
17            Goodwin Procter LLP
              (Washington, D.C.)
18                    -and-
              STEPHEN B. BRAUERMAN, ESQ., and
19            SARA BRUSSIERE, ESQ.
              Bayard P.A.
20
                             Counsel for Plaintiffs
21

22

23

24

25
```

1    **APPEARANCES CONTINUED:**

2              FREDERICK L. COTTRELL, III, ESQ.
             Richards, Layton & Finger, P.A.
3                   -and-
             DAVID L. ANSTAETT, ESQ.
4            Perkins Coie LLP
             (Madison, WI)
5                   -and-
             SHANNON M. BLOODWORTH, ESQ.,
6            BRANDON M. WHITE, ESQ.,
             EMILY J. GREB, ESQ., and
7            ROBERT D. SWANSON, ESQ.
             Perkins Coie, LLP
8            (Washington, D.C.)

9                             Counsel for Defendants
                             Mylan, Inc. and
10                            Mylan Pharmaceuticals, Inc.

11             DOMINICK T. GATTUSO, ESQ.
             Procter Heyman & Enerio LLP
12                  -and-
             WILLIAM A. RAKOCZY, ESQ.,
13           DEANNE M. MAZZOCHI, ESQ.,
             RACHEL PERNIC WALDRON, ESQ.,
14           MATTHEW V. ANDERSON, ESQ.,
             THOMAS H. ERLICH, ESQ.
15           ERIN FORBES, ESQ., and
             CHRIS GALLIGAN, ESQ.
16           Rakoczy Molino Mazzochi & Siwik LLP
             (Chicago, IL)
17
                             Counsel for Defendants
18                            Sandoz Inc. and Momenta
                             Pharmaceuticals, Inc.
19
             RICHARD W. RILEY, ESQ.
20           Duane Morris LLP
                    -and-
21           CHRISTOPHER S. KROON, ESQ., and
             ANTHONY J. FITZPATRICK, ESQ.
22           Duane Morris LLP
             (Boston, MA)
23
                             Counsel for Defendants
24                            Amneal Pharmaceuticals LLC
                             and Amneal Pharmaceuticals
25                            Company GmbH

1    **APPEARANCES CONTINUED:**

2                    DAVID BILSON, ESQ.
                     Phillips, Goldman, McLaughlin & Hall, P.A.
3                         -and-
                     HANK HECKEL, ESQ.
4                    Budd Larner
                     (Short Hills, NJ)
5
                                    Counsel for Defendant DRL
6
                     NEAL C. BELGAM, ESQ.
7                    Smith Katzenstein & Jenkins LLP
                          -and-
8                    E. ANTHONY FIGG, ESQ.,
                     ELIZABETH R. BRENNER-LEIFER, ESQ., and
9                    BRETT A. POSTAL, ESQ.
                     Rothwell, Figg, Ernst & Manbeck, P.C.
10                   (Washington, D.C.)

11                                   Counsel for Defendants
                                     Synthon Pharmaceuticals, Inc.,
12                                   Synthon B.V., and Synthon s.r.o.,
                                     and Pfizer
13
                                         -   -   -
14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.  Please, be seated.

 2              Let's start the video.

 3              MR. WIESEN:  Your Honor, as I think we warned

 4    you last night, we have one dispute about this video that we

 5    weren't able to resolve.  Mr. Figg has an objection to one

 6    portion of it.  He is objecting to the admission of two

 7    documents that go with it.  I will let him tell you his

 8    objection, then I can respond, if that is okay.

 9              THE COURT:  Yes, Mr. Figg.

10              MR. FIGG:  Yes.  Mr. Wiesen is correct.

11              We are disputing the admissibility of documents

12    PTX-604 and 605 that are referenced in the deposition

13    testimony the plaintiffs want to play.  This is the

14    deposition testimony of Dr. Gerrit Voortman, who is

15    currently the regulatory affairs head at Synthon.

16              We object to them because of lack of foundation

17    and hearsay, Your Honor.

18              The main document is a draft of a protocol for a

19    clinical trial that was briefly discussed for conducting in

20    Russia in 2012, so well after all of the events surrounding

21    the patents in suit.  The protocol was never finalized, and

22    it was never submitted to any regulatory agency.  Synthon

23    did not prepare the protocol.  There is no evidence of who

24    prepared the protocol or that Synthon had any involvement in

25    its preparation.
```

1                    The plaintiffs have failed to establish any

2      foundation for this document.  And I would like to just read

3      briefly from Dr. Voortman's testimony about the document.

4      He is referring to Deposition Exhibit 12, which is the draft

5      protocol PTX-605.

6                    "Question:  Do you recognize Exhibit 12?

7                    "Answer:  No, I don't recognize it."

8                    THE COURT:  Mr. Figg, who is this testifying?

9                    MR. FIGG:  Dr. Voortman, V-o-o-r-t-m-a-n.

10                   THE COURT:  Go ahead, start reading.

11                   MR. FIGG:  "Do you recognize Exhibit 12?

12                   "Answer:  No, I don't recognize it.

13                   "Do you recall reviewing the document when it

14     was sent to you by Dr. Krotkova?"

15                   Who was a colleague of his in Russia.

16                   "Answer:  No, I do not remember reviewing it.

17                   "Question:  Do you recall ever reviewing a draft

18     of a protocol comparing 20-milligram daily glatiramer

19     acetate to 40 milligrams every other day?

20                   "Answer:  No, I don't recall reviewing such a

21     protocol."

22                   At this point, my colleague interjected a

23     objection, a foundation objection to this.  At another point

24     very close to this testimony, he was asked:

25                   "Do you know who prepared Exhibit 12?

1            "Answer:  It should say somewhere.  Normally,

2    there is an author on the protocol."

3            And he was then reviewing the document.

4            "Question:  Let me ask you a different question,

5    maybe.  Did you contribute to the drafting of any parts of

6    Exhibit 12?

7            "Answer:  I did not contribute to this draft

8    protocol.

9            "Question:  And I know I sort of interrupted you

10   reviewing the document before.  But were you able to

11   conclude from flipping through it whether this was prepared

12   by someone at Synthon?

13           "Answer:  No.  I think this was prepared by a

14   CRO.

15           "Question:  Do you know which CRO?

16           "Answer:  We have been talking to several.  No,

17   I don't know for this one.  It should say it somewhere."

18           So Teva argues, Your Honor, that this is a

19   business record exception to the hearsay rule.  But Teva has

20   not adduced any evidence that it was prepared by someone

21   with knowledge of the subject matter.  The preparer is

22   unknown.

23           They did not establish it was prepared in

24   Synthon's regularly conducted business or that it was kept

25   in the ordinary course of business.  It has not been shown

1    that it is a statement against the interest of the declarant

2    because we don't know who the declarant was.  It has not

3    been shown that it is a party admission because the

4    declarant here, whoever prepared this thing, is not known.

5           Dr. Voortman was deposed in the middle of fact

6    discovery.  There was no followup by plaintiffs.  This was

7    kind of a minor event.  It took maybe five minutes in Dr.

8    Voortman's deposition.  There was no followup discovery,

9    written or any subsequent notice of deposition.

10          We don't know where this protocol came from,

11   what it was based on, how knowledgeable the preparer was,

12   whether it was based on some other protocol that they had

13   seen.  We don't know any of these things.

14          So we think it's just improper at this late

15   stage, during the last day of trial, to use this witness to

16   get this document into evidence.

17          THE COURT:  This is one of the exhibits.

18          MR. FIGG:  The other exhibit is a very short

19   e-mail from Ms. Krotkova just transmitting it to Dr.

20   Voortman, it is a transmittal --

21          THE COURT:  Same issues?

22          MR. FIGG:  That e-mail has no relevance absent

23   the protocol.

24          THE COURT:  Absent the protocol.

25          MR. FIGG:  So we ask that those documents be

1    excluded and also the accompanying testimony.  I understand

2    plaintiffs have prepared two versions of the testimony, sort

3    of with and without.  So we can proceed quickly.

4              THE COURT:  Let's hear from plaintiffs.  Mr.

5    Wiesen.

6              MR. WIESEN:  Thank you, Your Honor.

7              A couple of responses to that.

8              First, and we are triple-checking this, but I

9    don't believe there was a foundation objection made during

10   the deposition, which means that it's waived.  That is a

11   form objection that we could have tried to cure had it been

12   made during the deposition.

13             Having not objected that we had not set the

14   proper foundation to question the witness, I think that that

15   would be waived for the moment here.

16             Beyond that, the suggestion that there is no

17   foundation, the question you asked about the second document

18   is an important one because what the second document --

19   actually the first one, Exhibit 11, is an e-mail to Dr.

20   Voortman transmitting the protocol.  So whether he says he

21   remembers receiving it or not, it is apparent from the

22   record that he did receive it.  And if you look at the face

23   of the document, it indicates it was prepared for Synthon,

24   and Synthon's name is, quite frankly, all over the document,

25   as the sponsor.  We don't know which agent of Synthon

1   prepared this document, it's true.  But the fact that it was

2   sent to Synthon, it indicates it was prepared for Synthon,

3   is sufficient to set the foundation for the witness to talk

4   about the document, which he was perfectly comfortable doing

5   during his deposition.

6          We believe therefore it is not hearsay, it's a

7   business record, as it appears to have been kept in the

8   normal course of business.  And it is an admission of a

9   party opponent, because that rule specifically includes

10   statements of agents.  And on the face of the document it

11   indicates it was prepared for Synthon by a CRO that's an

12   agent.  It is therefore not hearsay, the document and the

13   transmittal e-mail should come into evidence, and you should

14   hear the testimony accompanying it.

15          THE COURT:  Mr. Figg, you are both diametrically

16   opposed in your views.

17          MR. FIGG:  I suppose you see that from time to

18   time.

19          THE COURT:  Perhaps not usually as stark as

20   this.

21          MR. FIGG:  Let me address a few things that Mr.

22   Wiesen said.

23          With regard to foundation, here was the verbatim

24   objection that the attorney defending the witness made:  "I

25   just want to make a general objection to this line of

1       questioning given that Dr. Voortman has indicated he doesn't

2       remember reviewing this or ever reviewing a protocol of a

3       similar nature."

4               Then he said, "You can answer the question

5       subject to the objection."

6               So I think he clearly did preserve based on lack

7       of foundation.

8               THE COURT:  What did he say again?

9               MR. FIGG:  I will read it verbatim.

10              THE COURT:  Please.

11              MR. FIGG:  This is by Mr. Cockrum:  "I just want

12      to make a general objection to this line of questioning,

13      given that Mr. Voortman has indicated he doesn't remember

14      reviewing this or ever reviewing a protocol of a similar

15      nature.  But you can answer the question if you would like,

16      if you can."

17              That was his objection.

18              Now, with regard to Mr. Wiesen's agency

19      argument, there has been no evidence that this unknown

20      possible CRO was an agent of Synthon.  They could have done

21      the followup discovery and perhaps we would know the answer

22      to that.  I don't know the answer to it.  I don't have any

23      idea.

24              But they certainly have not established an

25      agency relationship between Synthon and whoever prepared

1     this document.

2               Let's keep in mind what Dr. Voortman actually

3     said.  He said, "I think this was prepared by a CRO.

4               "Do you know which?  We have been talking to

5     several.

6               "No, I don't know for this one.  It should say."

7               So it is pretty clear that Dr. Voortman was

8     speculating there.  He said "I think" it was a CRO.  He

9     couldn't identify who prepared the document.

10              So I think the plaintiffs fail on all of the

11    fronts.

12              THE COURT:  Would you address Mr. Wiesen's point

13    about the e-mail and its connecting, that is what he uses to

14    connect to?

15              MR. FIGG:  I can read that to you as well.

16              THE COURT:  Okay.

17              MR. WIESEN:  Your Honor, we can hand up a copy

18    if you would like as well?

19              THE COURT:  I would appreciate it.

20              MR. FIGG:  It's one line, Your Honor.

21              THE COURT:  Okay.

22              MR. FIGG:  It's one line from Anna Krotkova to

23    Gerrit Voortman.

24              THE COURT:  Who is Anna Krotkova?  Do we know

25    who she is?

1       MR. FIGG:  Yes.  It says, "Dear Gerrit, please

2   find attached the protocol draft for the 40 milligram study.

3   Best regards, Anna.

4       And Anna's closing information on the

5   information is:  Anna Krotkova, Ph.D., Regional Clinical

6   Trial Manager, LLC, "Synthon", then there is an address in

7   Russia that I can't pronounce.  And then her e-mail address

8   which is a Synthon.com e-mail address.

9       THE COURT:  So Mr. Wiesen says that they're

10  connected.  It establishes the agency, that is this agency.

11      MR. FIGG:  Well --

12      THE COURT:  Talk about it.

13      MR. FIGG:  She is simply relaying something that

14  she apparently received from someone.  We don't know who.

15  We don't know what the qualifications of that someone were.

16  She is simply transmitting this.  She is not making any

17  commentary on it.  She is not endorsing it or anything else.

18  She is simply the liaison.  Again, I would say --

19      THE COURT:  Is there anything -- that Mr. Wiesen

20  also alludes to the questioning that took place of Dr.

21  Voortman.  Is there anything in your view during the

22  questioning that might establish the relationship?  I know

23  what he read to me.

24      MR. FIGG:  Yes.  No, no.  I mean he did identify

25  Ms. Krotkova as a colleague of his in Russia.  That is the

1    extent of it.  So, no.  If this issue had been flagged, and

2    proper discovery had been taken, then we would have facts,

3    you know, on which the Court could perhaps make a ...

4              THE COURT:  I'll hear one more time from

5    Mr. Wiesen, and then I'll give you the last word.

6              MR. FIGG:  Thank you.

7              THE COURT:  Mr. Wiesen, forget your waiver

8    argument.

9              MR. WIESEN:  Okay.

10             THE COURT:  I'm not impressed.

11             MR. WIESEN:  Thank you, Your Honor.  I think

12   it's worth looking at the document itself for a moment.

13             THE COURT:  Yes.

14             MR. WIESEN:  And without handing it up.  It

15   indicates on its face --

16             THE COURT:  Why don't you hand it up.

17             MR. WIESEN:  I will have -- can I have a clean

18   copy?

19             (Counsel confer.)

20             MR. WIESEN:  Give us one second to make sure we

21   have the right document.

22             THE COURT:  Okay.

23             (Documents passed forward.)

24             MR. WIESEN:  Thank you, Your Honor.  And if

25   you look at the protocol, just on its face, it says:  the

1    project of clinical study protocol, gives the name,

2    subcutaneous injection solution, 40 milligrams produced by

3    Synthon BV.  On every single page, on the bottom left-hand

4    corner, it says Sponsor:  Synthon BV.

5              Mr. Figg is correct it doesn't indicate who made

6    it.  But the idea that a witness can avoid setting a

7    foundation and create the inadmissibility of the document

8    simply by saying, yes, I received it by e-mail but, no, I

9    don't remember it, given the indicia of reliability on the

10   face of the document that it was produced for Synthon, I

11   think here, what we see is that there is a clinical trial

12   protocol that they're doing where they take measurements of

13   severity that are similar to what we have seen in other

14   clinical trial protocols.  And you can take into account

15   the fact that we don't know who drafted it and listen to

16   Dr. Voortman's testimony about it and give it the weight you

17   see fit, but in terms of establishing a foundation that it's

18   a business record and/or an admission of a party opponent

19   giving the facial indicia of reliability and the fact it

20   was forwarded from one Synthon employee to another Synthon

21   employee suggests that that is sufficient for it to fall

22   into the hearsay exception.

23              THE COURT:  Okay.  Mr. Figg, any last word on

24   it?

25              MR. FIGG:  Your Honor, if we accept that this

1        was a document prepared by somebody for Synthon, I don't

2        think that gets Mr. Wiesen where he needs to be.  Because

3        there, you can't attribute it to Synthon.  There is no

4        evidence that there was an agency relationship with this

5        CRO.  He said they talked.

6                THE COURT:  Well, the protocol in the lower left

7        hand corner says "Sponsor:  Synthon BV."

8                MR. FIGG:  Well, if somebody is drafting a

9        protocol that is going to be sent to a company, they will

10       identify in that draft the name of that company.  That

11       doesn't mean Synthon had anything whatsoever to do with

12       preparing it.  In fact, Dr. Voortman who was the person in

13       charge of these sorts of activities said they didn't.  He

14       made no contribution to this.

15               So this was just something that came in over the

16       transom, as far as we know.  It's significant that came in

17       over the transom, somebody prepared it for Synthon to look

18       at.  We have no idea who they were, what they knew, or

19       anything else about them.

20               This is simply a failure of the plaintiffs to do

21       the follow-up discovery that they needed to do if they

22       wanted to establish this.  And they didn't do it.

23               They have -- the only thing they have is the

24       testimony from a witness who knew nothing whatsoever about

25       it.

1                    THE COURT:  Well, generally speaking, as you

2      well know, Mr. Figg, given your years of experience, the

3      Federal Rules of Evidence say that is included, not

4      excluded.  And I'm not certain I agree with you there is a

5      serious reliability concern.

6                    Therefore, I think, and I think there is a

7      connector in both the e-mail and the language at the bottom

8      of the left-hand corner of the page.  I don't think it is as

9      quite as -- the generation of the document is not quite as

10     much of a mystery as you make it out to be.

11                   I understand your argument.  It's a good

12     argument.  I simply don't agree with you, frankly.  And I

13     rather agree with Mr. Wiesen.  It is not a question of, I

14     think it fits within both exceptions, admission of a party

15     and business record.  I think that the foundation has been

16     established for the admission of the document as a business

17     record.

18                   At the end of the day, it really does go to

19     weight and what weight I'm going to attribute to this

20     document given the arguments you are making.

21                   MR. FIGG:  Okay.  Thank you, Your Honor.

22                   THE COURT:  All right.

23                   MR. WIESEN:  Your Honor, then with that, we'll

24     play the deposition of Mr. Voortman.  Mr. Voortman is the

25     Vice President of Regulatory Affairs for Synthon

Voortman - depo.

1    Pharmaceutical, BV.  We'll hand up binders that have the

2    clip reports and all the exhibits.  And I think we have them

3    prepared for the full run.  It's about 20 minutes with all

4    the testimony including those two documents.

5                    THE COURT:  All right.

6                    (Designations of Gerrit Voortman placed in record.)

7                    "Question:  Could you please state and spell

8    your full name for the record?

9                    "Answer:  My name is Gerrit Voortman.

10                   "Question:  You're still employed at Synthon

11   today; is that right?

12                   "Answer:  I'm still employed at Synthon.

13   Correct me.  I started working for Synthon BV, which is the

14   generics company.  And in October 2014, I switched to

15   another business unit called Synthon Biopharmaceuticals BV.

16                   "Question:  At some point while you were working

17   at Synthon, you were a member of a team that was responsible

18   for developing a generic version of Teva's 40 milligram

19   three-times-a-week Copaxone product, right?

20                   "Answer:  I was a member of that team.

21                   "Question:  I just handed you two documents that

22   have been marked as Exhibits GV-2 and GV-3.  GV-2 has

23   production number 2376.  GV-3 has production numbers 2377

24   through 2387.

25                   "Starting with Exhibit 2, the bottom e-mail, the

Voortman - depo.

1    original e-mail, does this appear to be an e-mail from you

2    to some of your colleagues at Synthon dated January 4th,

3    2011?

4                "Answer:  It has my name as the sender.

5                "Question:  Did you prepare the presentation in

6    Exhibit 3?

7                "Answer:  I prepared that presentation.

8                "Question:  If you turn to the next page, I

9    believe the top half of the slide is the same as what was on

10   the previous slide, but beneath that, there's a heading

11   titled '40 Milligram Once Daily Study.'

12               "Do you see that?

13               "Answer:  I see that.

14               "Question:  The first bullet point says, 'Cohen

15   study, 40 milligram seemed to be better.'

16               "Do you see that?

17               "Answer:  I see that.

18               "Question:  Then the next bullet point says,

19   'FORTE, 40 milligram not better than 20 milligrams.'

20               "Do you see that?

21               "Answer:  I see that.

22               "Question:  So is it fair to say that as of

23   2011, when you sent this presentation, it was your

24   understanding that the 40 milligram dose of glatiramer

25   acetate was not any better than the 20 milligram daily dose

Voortman - depo.

1    of glatiramer acetate, based on the results of the FORTE

2    study?

3              "Answer:  That's not what you can extract from

4    this slide.

5              "Question:  Why not?

6              "Answer:  Because there's one study where

7    40 milligram seemed to be better, and there's one study

8    where it is not better.

9              "Question:  In your note next to the Cohen

10   study, where you wrote, '40 milligram seemed to be better,'

11   do you know -- do you recall why you included the language

12   'seemed to be'?

13             "Answer:  No.  Then I would have to read the

14   publication again.

15             "Question:  So you don't remember why you didn't

16   just write 40 milligram was better than 20 milligram?

17             "Answer:  No, I don't remember that.

18             "Question:  You would agree that based on your

19   interpretation of the results of the FORTE study, you

20   concluded that the 40 milligram was not better than the

21   20 milligram, correct?

22             "Answer:  That's what it says here.

23             "Question:  And that was your understanding of

24   the results of the study, right?

25             "Answer:  I wrote this statement.

Voortman - depo.

1           "Question:  I just handed you a document that's

2    been marked as Exhibit GV-4.  It has production numbers

3    15329 through 15351.

4           "Does this appear to be a series of slides

5    titled, 'GTR Status, GATE, and Possibilities, Other Dosing

6    Regimen,' dated July 6th, 2011?

7           "Answer:  That is what it says.

8           "Question:  Is it fair to say that you created

9    these slides in Exhibit 4?

10          "Answer:  It has my name on it, so I guess I

11   created it.

12          "Question:  If you could turn to Slide 15, it

13   has the production numbers 15343.  There's a slide --

14   there's a slide titled 'GALA Study Positioning.'  Do you see

15   that?

16          "Answer:  I see that.

17          "Question:  The first sentence says, 'GALA study

18   likely not acceptable for official registration, certainly

19   not acceptable for MS community?'

20          "Do you see that?

21          "Answer:  I see that.

22          "Question:  Do you recall why, in or around July

23   of 2011, the GALA study was considered to be not acceptable

24   for the MS community, in your view?

25          "Answer:  Well, I think it says it in bullet

Voortman - depo.

1    point 1.  You cannot do a comparison to the 20-milligram

2    daily.

3              "Question:  So because you couldn't or because

4    the study didn't do a comparison against the 20-milligram

5    daily product, in your view, the GALA study would not be

6    acceptable for the MS community.  Is that what you meant by

7    that?

8              "Answer:  That is indeed what is meant here,

9    yes.

10             "Question:  Then further down in No. 1, it

11   states, 'The new regimen could be worse, equivalent, or

12   better.  No one can tell,' exclamation point.

13             "Do you see that?

14             "Answer:  I see that.

15             "Question:  Now, when you say, 'The new regimen'

16   here, you're referring to the three times weekly regimen,

17   correct?

18             "Answer:  Correct.

19             "Question:  So is it fair to say that as of July

20   2011, at least in your mind, you had no idea whether the

21   40-milligram three times a week regimen was going to work.

22   Fair?

23             "Answer:  That's what it says here.  It could be

24   worse.  It could be equivalent.  It could be better.

25             "Question:  No one can tell, right?

Voortman - depo.

 1                  "Answer:  No one can tell.  That's what it says.

 2                  "Question:  And even with the data and the

 3       results of that Cohen and FORTE study, where a 40-milligram

 4       daily Copaxone product was compared to a 20-milligram

 5       product, in your mind, it was your opinion that the

 6       40-milligram three times a week product, no one knew whether

 7       it was going to work even with the results of the Cohen and

 8       FORTE's study; is that right?

 9                  "Answer:  That's not what it says here.

10                  "Question:  What does it say?

11                  "Answer:  That you cannot predict the exact

12       outcome.

13                  "Question:  But what you're saying here is not

14       only can you not predict the exact outcome, you can't even

15       predict whether it's going to be better, worse, or

16       equivalent to the 20-milligram product, right?

17                  "Answer:  Can you repeat it?

18                  "Question:  Sure.

19                  "What you were saying in this slide was that

20       even with the data on the 40-milligram daily glatiramer

21       acetate from Cohen and FORTE, you still couldn't predict

22       whether the 40-milligram three times a week regimen was

23       going to be better, equivalent, or worse than the

24       20-milligram daily regimen, right?

25                  "Answer:  Well, these studies were indicative.

Voortman - depo.

1            "Question:  I'm sorry.  I didn't understand the

2    last answer.

3            "Answer:  The Cohen study and the FORTE study

4    were indicative for what the GALA study would be.

5            "Question:  How are they indicative?

6            "Answer:  Because they give some results on the

7    40 milligram.

8            "Question:  But even with those results, it was

9    still your opinion in July of 2011 that it couldn't be

10   predicted whether the 40-milligram three times a week

11   regimen would be better, equivalent, or worse than the

12   20-milligram daily regimen, correct?

13           "Answer:  I think we are talking about different

14   things.  From the Cohen study and the FORTE study, you could

15   get an indication that 40 milligram has an effect in MS

16   patients.

17           "Question:  But I'm just focusing on your

18   statement here where you were talking about the 40-milligram

19   three times a week regimen that Teva was testing in the GALA

20   study.  And at the time you wrote this in July of 2011, it

21   was at least your opinion that even with the Cohen and FORTE

22   study results, it could not be predicted whether the

23   40-milligram three times a week regimen would be better,

24   equivalent, or worse than the 20-milligram daily product,

25   right?

Voortman - depo.

1              "Answer:  That is because there was no direct

2     comparison to the 20 milligram.  We are talking about

3     different studies.  That's always difficult to interpret.

4     You can get an indication from other studies, but it doesn't

5     tell you what the real situation will be.

6              "Question:  I just handed you what's been marked

7     as Exhibit GV 8.  This has production numbers 10490 through

8     10491.  Does this appear to be a memo titled 'US GTR

9     Regulatory Strategy,' authored by Ruth Hill and dated July

10    18th, 2011?

11             "Answer:  This is a memo with that title and

12    that date.

13             "Question:  And based on the heading here, you

14    received a copy of this memo at some point, right?

15             "Answer:  It seems so.

16             "Question:  Okay.  Just beneath that there's a

17    sentence that reads, 'As the lowest effective dose of GTR

18    has not been established, the strengths and dosing regimens

19    that could be pursued by Synthon are numerous.'

20             "Do you see that?

21             "Answer:  I see that.

22             "Question:  Well, let's break it down.  As of

23    July 2011, would you agree that the lowest effective dose of

24    GTR had not been established?

25             "Answer:  Well, at 20 and 40, they are almost

Voortman - depo.

1    comparable results.  You could expect that lower doses were

2    also -- okay.

3              "Question:  You agree with it?

4              "Answer:  I think I can agree with it.

5              "Question:  And can you agree with the second

6    part that as of July 2011, 'The strengths and dosing

7    regimens that could be pursued by Synthon were numerous'?

8              "Answer:  Well, in principle, they are infinite.

9              "Question:  I just handed you two documents that

10   have been marked Exhibit GV 11 and GV 12.  GV 11 has

11   production No. 2089, and GV 12 has production Nos. 2090

12   through 2148.

13             "Starting with Exhibit 11, does this appear to

14   be an e-mail from Anna Krotkova to you dated January 23rd,

15   2012?

16             "Answer:  It does.

17             "Question:  And the e-mail has the subject

18   'Glatiramer 40 milligram final,' correct?

19             "Answer:  It has that subject.

20             "Question:  And Anna Krotkova writes to you,

21   'Dear Gerrit, please find attached a protocol draft for the

22   40-milligram study.  Kind regards, Anna.'  Correct?

23             "Answer:  Correct.

24             "Question:  Do you recognize Exhibit 12?

25             "Answer:  No, I don't recognize it.

Voortman - depo.

1              "Question:  The question was, does Exhibit 12

2     appear to be a draft protocol for a Phase III clinical study

3     comparing a 20-milligram daily glatiramer acetate product to

4     a 40-milligram every other day glatiramer acetate product?

5              "Answer:  This indeed seems like a draft

6     protocol for such a study.

7              "Question:  This protocol was never executed,

8     correct?

9              "Answer:  This protocol was never executed.

10              "Question:  The 40-milligram every other day

11     glatiramer acetate product that is described in this

12     clinical protocol, was that, at the time this was drafted,

13     intended to be for the U.S. market or somewhere outside the

14     U.S.?

15              "Answer:  This was intended for outside the U.S.

16              "Question:  Was there ever any consideration

17     given to developing a 40-milligram every other day

18     glatiramer acetate product for the U.S. market, to the best

19     of your memory?

20              "Answer:  To the best of my memory, there was

21     not.

22              "Question:  Do you know who prepared Exhibit 12?

23              "Answer:  It should say it somewhere.  Normally

24     there is an author on the protocol.

25                        (Document review.)

Voortman - depo.

1            "Question:  Let me ask a different question,

2  maybe.

3            "Did you contribute to drafting any parts of

4  Exhibit 12?

5            "Answer:  I did not contribute to this draft

6  protocol.

7            "Question:  And I know I sort of interrupted you

8  reviewing the document before, but were you able to conclude

9  from flipping through it whether this was prepared by

10  someone at Synthon?

11            "Answer:  No, I think this was prepared by a

12  CRO.

13            "Question:  Do you know which CRO?

14            "Answer:  We have been talking to several.  No,

15  I don't know for this one.  It should say it somewhere.

16            "Question:  Do you recall reviewing this

17  document when it was sent to you by Dr. Krotkova?

18            "Answer:  No, I don't -- I do not remember

19  reviewing it.

20            "Question:  Do you recall ever reviewing a draft

21  of a protocol comparing 20 milligram daily glatiramer

22  acetate to 40 milligrams every other day?

23            "Answer:  No, I don't recall reviewing such a

24  protocol.

25            "Question:  Okay.  If you could flip ahead to a

Voortman - depo.

1    page that ends in 2124.  There's a heading in the middle of

2    the page, 13.2, 'Severity of an Adverse Event.'

3                "Do you see that?

4                "Answer:  I see that.

5                "Question:  Then it says, 'The severity of

6    adverse events will be determined in accordance with the

7    following classification.'  Then there's beneath that,

8    'mild, moderate, and severe.'

9                "Do you see that?

10               "Answer:  I see that.

11               "Question:  Do you have an understanding as to

12   who came up with this classification here?

13               "Answer:  I think this is an international

14   standard of rating adverse events.

15               "Question:  So it's your understanding that

16   there is an international standard where severity of adverse

17   events are classified as either mild, moderate, or severe?

18               "Answer:  I think there's even an ICH guideline

19   that says something about this, but this is fairly standard

20   internationally.

21               "Question:  Do you know whether this

22   classification of adverse events, mild, moderate, and

23   severe, is applicable to injection site reactions?

24               "Answer:  Because they are also adverse events.

25               "Question:  So it would be applicable to them?

Fox - direct

1              "Answer:  Why not?

2              "Question:  So is that 'yes'?

3              "Answer:  They would be applicable.

4              (Designations end.)

5              MR. WIESEN:  Your Honor, that concludes the

6       videotape depositions.  There was one other small dispute

7       but I think that we're not sure whether it is going to arise

8       or not.  Mr. Ware will address it during the Hay direct if

9       it comes up, if that is okay.

10             THE COURT:  That's fine.

11             MR. WIESEN:  Mr. Bennett has the next live

12      witness.

13             THE COURT:  All right.

14             MR. BENNETT:  Good morning, Your Honor.  John

15      Bennett for plaintiffs.

16             Our next witness is going to address the 112

17      defenses that have been asserted by the defendants.

18             Plaintiffs call Dr. Edward Fox.

19             ... EDWARD JOSEPH FOX, having been first duly

20      sworn, was examined and testified as follows ...

21             THE COURT:  Good morning, Dr. Fox.

22             THE WITNESS:  Good morning.

23                        DIRECT EXAMINATION

24      BY MR. WIESEN:

25      Q.   Good morning.

Fox - direct

1    A.    Good morning.

2    Q.    Doctor, could you please introduce yourself to the

3    Court?

4    A.    Yes.  I'm Dr. Edward Fox, MD, Ph.D.

5    Q.    Where do you live, sir?

6    A.    I live just outside of Austin, Texas in Round Rock,

7    Texas.

8    Q.    What is your employment there?

9    A.    I am a practitioner and a clinical researcher for

10   Central Texas Neurology Consultants.

11   Q.    What are your responsibilities at Central Texas

12   Neurology Consultants?

13   A.    I am first and foremost a clinician in that I see

14   patients.

15         I also am a clinical researcher and have

16   research trials there.

17         And, lastly, I am an educator in that I do some

18   teaching as well.

19   Q.    Do you have any responsibilities with respect to a

20   clinic there?

21   A.    Yes.  I am the Director of the Multiple Sclerosis

22   Clinic of Central Texas.

23   Q.    Doctor, how long have you been in practice?

24   A.    I have been in practice since 1992, continuously.

25   Q.    Could you please briefly describe your educational

Fox - direct

1    background, sir?

2    A.    Yes.  I received my Bachelor's Degree at Washington

3    University in St. Louis, completing it in 1981.

4              I then entered a federally funded medical

5    scientist training program at Baylor College of Medicine in

6    Houston where I received an MD and a Ph.D.

7    Q.    And when did you receive those degrees, sir?

8    A.    In 1987, I received the Ph.D.; in 1988, the medical

9    degree.

10   Q.    Doctor, you mentioned immunology.  Could you briefly

11   describe what that is?

12   A.    Yes.  My Ph.D. was in immunology, which was the study

13   of the immune system, which is the interaction of white

14   blood cells and protecting the body against foreign agents.

15   Q.    What did do you after receiving your degree, sir?

16   A.    I entered a residency program at Baylor College of

17   Medicine.  First, a one year preliminary in internal

18   medicine and then a three year neurology program.

19   Q.    Did you hold any leadership positions during that

20   time?

21   A.    Yes.  During my final year in 1991, I was selected to

22   be the Chief Resident.  And I received the award for most

23   outstanding academic resident.

24   Q.    After completing your residency, did you begin your

25   practice at Central Texas Neurology?

Fox - direct

1   A.     I did in 1992, and have been in continuous practice

2   since that time.

3   Q.     Now, Doctor, you mentioned earlier that one of your

4   roles there is being the Director of the MS Clinic of

5   Central Texas; is that right?

6   A.     That is true.

7   Q.     First, what is the MS Clinical Center of Texas?

8   A.     It's a comprehensive medical center for MS patients

9   where the patients are seen in clinic and clinical trials

10  are also performed in that area; and, as I said, it is part

11  of a teaching organization as well.

12  Q.     And how long have you been the director there?

13  A.     Since the onset of my practice.

14  Q.     Let's focus in on your treatment of patients, sir.

15  How many patients do you currently have under your care?

16  A.     I am currently following 1,400 patients.

17  Q.     How many of those patients are MS patients?

18  A.     The vast majority of them have multiple sclerosis.

19  Some do not have the established diagnosis but they're being

20  monitored for similar disorders to determine whether they

21  will go on to have multiple sclerosis.

22  Q.     Since beginning your practice in 1992, sir,

23  approximately how many MS patients have you treated in

24  total?

25  A.     I have seen about 10,000 patients with multiple

Fox - direct

1    sclerosis.

2    Q.    Are you still seeing patients today?

3    A.    I am.

4    Q.    How many patients did you see last week?

5    A.    Between 50 and 60.  It was a normal clinic week last

6    week.

7    Q.    Now, Doctor, you also mentioned you perform an

8    academic role.  Do you have any formal academic

9    appointments?

10   A.    I do.  Since 2004, I've been a Clinical Assistant

11   Professor of Neurology at the University of Texas medical

12   branch.  But there is a brand new medical school that has

13   just opened in Austin this year and I'm going to be Clinical

14   Associate Professor of Neurology there.

15   Q.    What are your responsibilities in these roles?

16   A.    Residents in the neurology program or pediatric

17   neurology program come into our center and learn about the

18   treatment of multiple sclerosis and learn how to conduct

19   clinical trials.

20   Q.    Doctor, could you briefly describe what kinds of

21   clinical research you're involved in?

22   A.    For a number of years, I've been involved in clinical

23   research program at the Phase I, II, III and IV levels.

24   Q.    Over the course of your career, how many different

25   clinical trials have you been involved in?

Fox - direct

```
 1   A.      I've been involved in approximately 250 clinical

 2   trials.

 3   Q.      And how many of those trials related to MS treatments?

 4   A.      Almost all of them did.

 5   Q.      How many trials did your clinic participate in in the

 6   past two years?

 7   A.      Twenty-six trials.

 8   Q.      And of those 26, how many were involved Teva and how

 9   many involved other companies?

10   A.      Approximately five involved Teva, and 21 of the trials

11   were with other companies.

12   Q.      Now, Doctor, what is your role personally in the

13   conduct of these trials?

14   A.      I am the principal investigator, principal

15   investigator of all trials.  I can be a lead investigator as

16   well in some trials.

17   Q.      What is the role of a principal investigator?

18   A.      The principal investigator is responsible for the

19   conduct of the trial at that site.  So all direction and

20   delegation of activities are through the primary

21   investigator who has to sign off on all medical activities

22   during that.

23   Q.      What is the role of the lead investigator?

24   A.      The lead investigator is the primary investigator but

25   also has the ultimate responsibility for the conduct of the
```

Fox - direct

1    trial as a whole at all centers, and is usually responsible

2    for the evaluation, the data collection, and eventually

3    publication of that material.

4    Q.    How many multi-center studies have you been the lead

5    investigator on and what were your responsibilities?

6    A.    I was the lead investigator in five multi-center

7    trials.  I have also been the investigator in a number of

8    investigator-initiated trials, which are single-center

9    trials just done at the Multiple Sclerosis Clinic of Central

10   Texas.

11   Q.    What types of MS treatments have you studied in your

12   clinical research?

13   A.    I have been involved in research on all of the

14   products that are available as preventative medicines for

15   multiple sclerosis.  So that includes the biologic products

16   and small molecules.  I have also been involved in some

17   clinical trials involving medical devices that could be used

18   to assist with symptoms of multiple sclerosis.

19   Q.    Have you studied the disease-modifying treatments that

20   have been discussed in this case?

21   A.    Yes, I have, all of them.

22   Q.    Have you published any of this research, sir?

23   A.    Yes, I have.  I have about 300 publications, which

24   include manuscripts for peer-reviewed journals, as well as

25   abstracts for clinical meetings around the world.

1   Q.      Has your clinical research included assessments of the

2   tolerability of treatments for MS?

3   A.      Yes, they have.

4   Q.      Have you performed assessments in clinical trials

5   regarding the severity of injection related adverse events?

6   A.      Yes.  In every trial related to injections, there have

7   been assessments of the severity of adverse events.

8   Q.      Doctor, do you have expertise with respect to the

9   design of clinical trials?

10  A.      Yes, I have been involved in the steering committee

11  activities, which is advisory groups for development of the

12  clinical protocols.

13  Q.      And do you have experience designing clinical trial

14  end points related to tolerability, including severity of

15  injection related adverse events?

16  A.      Yes.  One of the many roles of a steering committee is

17  to give advice regarding outcome measures, which could be

18  efficacy, safety, or tolerability outcomes.

19  Q.      Doctor, has any of your clinical research pertained to

20  the drug known as glatiramer acetate or Copaxone?

21  A.      Yes, it has.

22  Q.      Could you just briefly describe some of those trials?

23  A.      Yes.  I am involved in several trials.  There have

24  been a couple of trials that were sponsored by other

25  companies, where they were head-to-head comparator trials

Fox - direct

1    between another product and Copaxone.

2            For Teva, I have been principal investigator in

3    the FORTE trial, which, as we have heard, is the comparator

4    trial between 20 milligrams and 40 milligrams of GA given on

5    a daily basis.  And I was also a principal investigator in

6    the SONG trial, which was evaluating a full cc versus a half

7    cc of 20 milligrams of GA given daily.

8    Q.    Were you involved in the Glacier study that we have

9    heard about in this case?

10   A.    Yes, I was a principal investigator there.

11   Q.    Doctor, what is your experience treating MS patients

12   with Copaxone?

13   A.    I have been prescribing Copaxone for some patients

14   since its launch in 1997.  And I have been also prescribing

15   glatiramer acetate 40 milligrams three times weekly since

16   its launch as well.

17   Q.    What has been your experience with the 40-milligram

18   product?

19   A.    My patients have expressed a considerable increase in

20   their satisfaction with the medication.

21   Q.    Why is that, sir?

22   A.    They have related that the convenience of less

23   frequent dosing is important to them.  But they have also

24   been very pleased at the reduction in the severity they have

25   seen with the injection site reactions and the immediate

Fox - direct

1    post-injection reactions.

2    Q.    Doctor, did you publish any of this clinical research

3    you have been involved in with respect to Copaxone?

4    A.    I was a co-author on the SONG trial.

5    Q.    Doctor, do you perform any editorial roles for

6    scientific journals?

7    A.    Yes, I do.  I have been on the editorial board and the

8    development board for a number of continuing medical

9    education programs over the years.  I have also been on

10   editorial boards for groups that have published manuscripts

11   and reviews regarding multiple sclerosis.

12   Q.    What are some of the journals that you have been

13   involved in?

14   A.    I have been a reviewer for Neurology, for Multiple

15   Sclerosis, the Journal of Immunology, and a number of

16   others.

17   Q.    Have you won any awards or honors for your work, sir?

18   A.    On a national level, for the American Academy of

19   Neurology, I was elected to be on the Board of the Multiple

20   Sclerosis Section of the AAN, and I was selected to be a

21   Fellow of the academy, which is given to those members who

22   have not only attended a number of meetings but also

23   developed educational programs for them.

24            For the National Multiple Sclerosis Society I

25   was inducted into the Volunteer Hall of Fame for my work

Fox - direct

1      with patients and their families in educating them about MS.

2                  On a state level, I am now in this upcoming year

3      going to be the president-elect of the Texas Neurologic

4      Society, which is the organization that represents all

5      neurologists in the State of Texas.

6      Q.     Doctor, if you could look at PTX-13 in your binder.

7      Could you just confirm that this is a copy of your

8      curriculum vitae?

9      A.     It is.

10                 MR. BENNETT:  Your Honor, plaintiffs offer Dr.

11     Fox as an expert in multiple sclerosis, treating multiple

12     sclerosis with glatiramer acetate and other therapies, and

13     the design and conduct of clinical trials related to

14     multiple sclerosis.

15                 THE COURT:  Ms. Bloodworth?

16                 MS. BLOODWORTH:  No objection, Your Honor.

17                 THE COURT:  The Doctor is accepted as an expert

18     in those fields.

19     BY MR. BENNETT:

20     Q.     Dr. Fox, were you retained as an expert in this case?

21     A.     I was.

22     Q.     Who retained you?

23     A.     Counsel for Teva.

24     Q.     What were you asked to do?

25     A.     I was asked to review a number of documents, including

Fox - direct

1    the patents in the case, and also to review the experts for

2    the defendants.

3    Q.    Doctor, have you, with the assistance of counsel,

4    prepared a collection of slides that explain your opinions

5    in this case and the bases for them?

6    A.    Yes, I have.

7    Q.    If we could have PDX-8.2, please.

8          Doctor, what issues were you asked to assess?

9    A.    I was asked to comment on the indefiniteness, the

10   written description, and enablement regarding the '776

11   patent.  And I was also asked to render opinions regarding

12   the written description and enablement of the '250, '413 and

13   '302 patents.

14   Q.    Let's pull up PDX-8.3, please.

15         At a high level, Doctor, what are your opinions

16   on these issues?

17   A.    My opinion is that the reduced severity term from the

18   '776 patent is not indefinite, that it is well described;

19   that the inventions of the '776 patent are adequately

20   described and enabled; and that the '250, '413 and '302

21   patents are adequately described and enabled as well.

22   Q.    Doctor, did you perform your analysis in this case

23   from the perspective of a person of ordinary skill in the

24   art in August 2009?

25   A.    I did.

Fox - direct

1    Q.    Have you formed an opinion as to the qualifications

2    such a person would have at that time?

3    A.    I have.

4    Q.    With reference to PDX-8.4, sir, what is your opinion

5    regarding the proper definition of a person of ordinary

6    skill in the art?

7    A.    A person of ordinary skill in the art should have

8    several years of experience in the pharmaceutical industry

9    or in practicing medicine, should have experience with the

10   administration or formulation of therapeutic agents, dosing

11   schedules, and frequency, and the drug development study and

12   design.

13         He should also have a Ph.D. in pharmacology or

14   be a physician with experience in clinical pharmacology and

15   access to persons with expertise in statistics and

16   experience with MS and GA.

17   Q.    Is this definition substantially the same as the ones

18   offered earlier by Drs. Wynn and Ziemmsen, to your

19   knowledge, sir?

20   A.    Yes, it is.

21   Q.    Were you at least a person of ordinary skill in the

22   art in August 2009?

23   A.    Yes, I was.

24   Q.    Are you aware that the defendants' experts have

25   suggested a slightly different definition for a person of

Fox - direct

1    ordinary skill?

2    A.    I am aware of that.

3    Q.    Would it affect any of your opinions if the Court

4    adopted plaintiffs' or defendants' definition for the person

5    of ordinary skill?

6    A.    No, it would not.

7    Q.    Doctor, are you aware of Dr. Pleasure's opinion that

8    the asserted claims of the '776 patent are invalid because

9    the term reduced severity is indefinite?

10    A.    I am aware of that.

11    Q.    Do you agree with that opinion?

12    A.    No, I do not.

13    Q.    Doctor, in your opinion, would a person of skill in

14    August 2009 have understood what the term reduced severity

15    meant in connection with injection related adverse events?

16    A.    Yes.  There is a plain meaning of these terms.  So

17    reduced severity of injection site reactions or immediate

18    post-injection reactions would be well understood by a POSA

19    in 2009.

20    Q.    Let's look first at the claim, Doctor, which is

21    PDX-8.5.

22            What is related here?  We are looking at Claim 1

23    of the '776 patent, sir.

24    A.    Claim 1 describes a method of treating a human patient

25    with relapsing multiple sclerosis, and it says and is

Fox - direct

1    highlighted here, while inducing reduced severity of

2    injection site reactions in the human patient relative to

3    administration of 20 milligrams of glatiramer acetate

4    subcutaneous daily.

5                At the end, it is repeated that this is a

6    reduction in severity relating to the previous dosage of

7    20-milligram daily of GA.

8    Q.    What kind of severity assessment is being referred to

9    here?

10   A.    The severity is for the injection site reactions.  So

11   these are the reactions that occur after administration of

12   each dosage of medication.

13   Q.    The reference to the 20-milligram product, what does

14   that tell you about what kind of assessment, severity

15   assessment is referred to here?

16   A.    That all assessments of severity of reactions are

17   relative to the administration of 20 milligrams of GA.

18                So it's not an absolute difference, it is a

19   relative difference, compared to 20 milligrams, which was

20   well understood.

21   Q.    Let's pull up PDX-8.6, please.

22                Doctor, beginning at Column 7, Line 34 of the

23   '776 patent, is there a definition regarding what an

24   injection site reaction is?

25   A.    Yes, this is the common definition that would be used

1    for injection site reaction.  It describes the specific

2    symptoms that can be related to the injection, such as

3    redness or erythema, hemorrhage, induration, which is

4    swelling, inflammation, mass, pain, pruritis, or itching,

5    urticaria, or welt that occurs immediately around the site

6    of injection.

7    Q.    Moving ahead to PDX-8.7, beginning at Column 7, Line

8    15 of the patent, is there also a definition regarding what

9    an immediate post-injection reaction is?

10   A.    Yes.  This is the definition that has been given in

11   many sources prior to this that they define in this patent,

12   an immediate post-injection reaction is referring to a

13   constellation of symptoms which includes palpitations,

14   feeling hot, hot flashes, and so on.

15   Q.    Doctor, are you aware that the parties in this case

16   have agreed to a meaning of the term severity as it relates

17   to injection related adverse events?

18   A.    Yes, I am aware of that.

19   Q.    Doctor, what is the definition of severity that the

20   parties have agreed to?

21   A.    Severity is the intensity of a patient's injection

22   site reactions and immediate post-injection reactions.

23   Q.    Does that definition comport with the understanding of

24   a person of skill in the art as of August 2009?

25   A.    Yes, absolutely.

Fox - direct

1    Q.     Doctor, were you aware of any confusion among persons

2    of skill in August 2009 about what a reduction in the

3    severity of injection related adverse events meant?

4    A.     No, this was well understood by a POSA in 2009.

5    Q.     Were you aware of any confusion among patients at that

6    time about what a reduction in severity of injection related

7    adverse events meant?

8    A.     Patients were well aware of what a reduction in

9    severity of those events would be.

10   Q.     Doctor, have you actually performed measurements

11   yourself of the severity of injection related adverse events

12   associated with treatments like glatiramer acetate?

13   A.     Yes.  Literally thousands of times.  In clinical

14   trials, when I see patients, I am always asked about the

15   tolerability of the medication they are on.  It's of

16   paramount importance because it relates to the ability of

17   the patient to stay on that medicine.  So I am routinely

18   asking these questions.

19   Q.     Have you also performed assessments of severity of

20   injection related adverse events in your clinical research?

21   A.     Yes.  In clinical research, as I stated, it is part of

22   the regulatory requirements that we observe adverse events

23   and that we rate those adverse events.

24   Q.     Now, Doctor, how do you assess whether a reduction in

25   the severity of an injection related adverse event has

1   occurred in a patient?

2   A.    You would have a baseline.  You would look at the

3   adverse events at one point in time and then you would

4   follow it over a time using a similar mechanism to be able

5   to rate it and determine whether there has been a reduction

6   in the severity of those adverse events.

7   Q.    Do you perform these kinds of assessments in your

8   clinical practice?

9   A.    I do.  This is part of medical documentation that is

10  routinely done.

11  Q.    And have you performed these types of assessments in

12  your clinical trial experience as well?

13  A.    Yes.  In every clinical trial where there is an

14  assessment of adverse events, there is what is referred to

15  as clinical research forms, and a clinical research form is

16  a listing of all adverse events that are seen, where you

17  list the event, the start date, the stop date, there is a

18  line for severity.  After that there is a discussion about

19  whether it is related to the investigational product or not.

20          Then lastly, there is a descriptor about whether

21  there has been any ultimate alteration of the treatment

22  based on that event, whether there was discontinuation of

23  the medication or any additional symptomatic medicines that

24  are taken.

25          This is a clinical research form that is signed

Fox - direct

1    off by every principal investigator after making those

2    determinations.

3    Q.      Doctor, do you agree with Dr. Pleasure's opinion that

4    there was no established method in 2009 for measuring a

5    reduction in the severity of injection related adverse

6    events?

7    A.      No, I do not.

8    Q.      Why do you disagree?

9    A.      Because there have been a number of scales that

10   adequately are able to distinguish between mild, moderate

11   and severe reactions to any medication, and certainly it was

12   well understood to a POSA in 2009 that these rating scales

13   would be used in an effort to be able to show a reduction in

14   severity of adverse events.

15   Q.      If we could move ahead to PDX-8.9, please.

16           Doctor, in your opinion, what established

17   methodologies existed as of August 2009 for measuring the

18   severity of injection related adverse events?

19   A.      This is the main criteria that is used.  It is

20   referred to as the common terminology criteria for adverse

21   events, or CTCAE.

22           And the common part of it is this is the

23   international standard that has been discussed earlier this

24   morning, that you would want a grading system for adverse

25   events.

Fox - direct

```
 1              In this case it's a five-point scale.  But for

 2    the purposes of discussion, discussion we will have today,

 3    Grade 4 and 5 is not going to be really discussed because

 4    this is life-threatening consequences or death related to

 5    adverse events, which has not been a question with

 6    glatiramer acetate.

 7              This gets to Grades 1, 2 and 3, mild, moderate

 8    and severe.

 9    Q.    Was this methodology well known to persons of skill in

10    2009?

11    A.    Absolutely.  It was used in clinical practice as well

12    as clinical trials.

13    Q.    Have you employed this methodology yourself?

14    A.    I have.

15    Q.    Now, Doctor, did you read Dr. Pleasure's testimony

16    that the CTCAE has two different scales that could be used

17    to measure severity of injection related adverse events?

18    A.    Yes, I have.

19    Q.    Do you agree with him that the scale listed later in

20    the document on Page 58 would be -- I am referring, Your

21    Honor, to DTX-1179 -- do you agree with him that that scale

22    on Page 58 would be more appropriate for measuring a

23    reduction in the severity of injection related adverse

24    events?

25    A.    No, I don't, because that is a listing of all adverse
```

Fox - direct

1    events in one bucket for injection site reactions.

2              So in listing it that way it is well understood

3    that some adverse events related to injection reactions are

4    more severe than others, such as lipoatrophy.  So

5    lipoatrophy is in a different category than redness or pain.

6    So these different buckets are used to give grades of

7    severity of the type of reaction.

8              But what's more important for the discussion

9    here is to be able to look at each one of those events

10   separately.  So if we are talking about pain, let's describe

11   it as mild, moderate or severe, Grade 1, Grade 2, Grade 3,

12   and not lump everybody with pain in the same bucket as one

13   grade of events.

14             So this is the common terminology that is used

15   for all events.  And when we are talking about adverse

16   events related to injections, we should take each one

17   individually and grade them.

18   Q.    Doctor, how would a person of skill apply a scale like

19   the CTCAE to assess whether a reduction in severity of

20   injection related adverse events occurred?

21   A.    You would have a baseline.  You would look at what the

22   grade is of the adverse event at one point in time.  Then

23   you would follow it over time to determine whether there was

24   a change in that grade.  Therefore, a change in Grade 3 to 2

25   or from 2 to 1, or 1 to absent, any one of those would be

Fox - direct

1    considered to be an improvement in a reduction in severity.

2    Q.    Now, Doctor, do you agree with Dr. Pleasure that there

3    are multiple methodologies that could be used to measure the

4    severity of injection related adverse events in clinical

5    trials?

6    A.    Yes, there are.  But they all are based on the same

7    system of being able to rate the severity of mild, moderate,

8    and severe, so we do have a number of different scales that

9    yield similar results.

10   Q.    What are some of the scales that you have used in your

11   own clinical research?

12   A.    Besides the CTCAE, I also used a visual analog scale

13   as well as using the scale that was used in the Glacier's

14   trial.

15   Q.    What is the visual analog scale?

16   A.    It is a scale from zero to 100 where there is a line

17   that is drawn of 100 millimeters in length and the range is

18   from none to the greatest, and the patient is asked to make

19   a mark on this line to rate where on the scale it is.

20        The investigator or the staff would then measure

21   that line to determine what the number is on a scale of zero

22   to 100 attributable to that event, and that would be what

23   was reported as the, in the granular scale, the degree of

24   severity was for that event.

25   Q.    What methodology was employed in the Glacier study?

Fox - direct

1    A.    The Glacier study was similar to the CTCAE, and it was

2    rated as mild, moderate, and severe, but it was based on the

3    effects of injection reactions on activities of daily

4    living.

5    Q.    How do these different scales compare to one another,

6    sir?

7    A.    They are very similar.  They're different amounts of

8    grading system that.  The two I mentioned are Grades 1, 2,

9    and 3.  The visual analog scale is up to 100.  So it has

10   different levels of granularity, but they all are an effort

11   to be able to rate the severity of adverse events.

12   Q.    Doctor, are these the only ways to assess injection

13   related?

14   A.    No.  As Dr. Pleasure mentioned, there are others as

15   well that do the same thing.

16   Q.    In your opinion, sir, does the existence of these

17   different scales mean that a person of skill could not

18   determine whether or not the severity of an injection

19   related adverse event had been reduced in 2009?

20   A.    No.  A person of ordinary skill in the art in 2009

21   understood there were multiple scales but that they all

22   related to severity of reactions.

23   Q.    Doctor, in your clinical, your clinical research

24   experience, do these scales produce different events when

25   employed to assess a reduction of the severity of injection

Fox - direct

1    related adverse events?

2    A.    No, they do not.  If you have continuity in the method

3    that is used, you get reproducible results.

4    Q.    Why are there multiple scales to measure the severity

5    of injection related adverse events?

6    A.    There are studies where you are going to be looking at

7    the adverse events as reported by the patient, and there are

8    ones that will be as reported by visual observation by

9    investigator.

10          When you have an outcome such as this, which is,

11   for instance, with pain being very subjective, you want to

12   have a number of different methods you can look at because

13   the more ways you look at a situation, the more that you get

14   the continuity of the data and the understanding of the POSA

15   as to what the meaning of reduction of severity would be.

16   Q.    Is it common in research to have different multiple

17   endpoints or outcomes?

18   A.    Yes, it is.  Not just for the tolerability of a

19   medication but for the efficacy as well.

20   Q.    So for by way of analogy, what types of different

21   endpoints could be used for efficacy?

22   A.    We have heard in this case the term "annualized

23   relapse rate" a number of times.  And an annualized relapse

24   rate is one of the well known methods of rating a treatment

25   for MS as to how effective it is.  But you could also look

1    at when the first relapse occurs, so the time of first

2    relapse, or you could look at it as the proportion of

3    patients who relapse which are just the percentage of people

4    that have a relapse over a period of time.

5              All of these are involving relapses, and they

6    all give useful information about relapses, and they're all

7    accepted ways of evaluating a treatment to determine whether

8    it's successful or not.

9    Q.    Does the existence of these different methodologies

10   mean that persons of skill can't determine when a treatment

11   is effective?

12   A.    No, it would be very clear to a POSA.

13   Q.    Now, returning to reduced severity of injection

14   related adverse events, sir, despite the different

15   methodologies that you mentioned, were persons of skill in

16   2009 still able to discern whether MS treatments including

17   Copaxone reduced the severity of injection related adverse

18   events?

19   A.    Yes, it would be very clear to a POSA if there was a

20   reduction of severity.

21   Q.    And, again, why is that?  How would a POSA apply a

22   scale to measure that reduction?

23   A.    Based on the relative reduction of the severity of the

24   reaction.  So the baseline would be made and followed over

25   time to determine whether, in fact, there had been a

Fox - direct

1    reduction in the severity of the injection reaction.

2    Q.    Would a person of skill apply different scales within

3    the same patient or study to measure a reduction?

4    A.    No, they would keep the continuity of one scale so

5    they would be able to document it accurately.

6    Q.    Doctor, are you aware of any evidence using one method

7    for assessing severity rather than another would give a

8    different result as to whether there is a reduction in the

9    severity of injection related adverse events?

10   A.    No, we have not seen that.

11   Q.    How does this compare to other instances where grading

12   methodology is used in your opinion?

13   A.    This compares favorably.  We have a number of

14   different ways we looked at it and continuity has been very

15   high among the different methods at being able to evaluate

16   tolerability and therefore reduction of the severity of

17   events over time.

18   Q.    Are there other examples of grading methodologies,

19   sir, that are analogous to this severity grading system?

20   A.    Yes, there are.  In the grading system that we have

21   here, where the different granularity could be from one to

22   three compared to zero to 100, that is no different than the

23   grading system that we might have in a classroom where we

24   would be grading someone on an A-B-C-D-E-F, or a zero to 100

25   scale.  It would be readily understood there are better

Fox - direct

1    grades than others and that even though the systems are not

2    only different when it comes to their grading systems, the

3    outcomes would be the same.

4    Q.    Doctor, have you ever used different scales in the

5    same patient to assess a relative reduction of severity?

6    A.    No, I have not.

7    Q.    Are you aware of any persons of skill doing that, to

8    your knowledge?

9    A.    No, that would not make any sense.

10    Q.    Now, Doctor, we've heard a lot of testimony about the

11    Glacier study.  Is the Glacier study a reliable method to

12    assess relative severity of injection related adverse

13    events, in your opinion?

14    A.    Yes, it is.

15    Q.    How does -- strike that.  And, again, how does the

16    Glacier methodology compare with the CTCAE?

17    A.    It is very similar in that it does have a Grade 1, 2,

18    and 3, but it focuses in on the effects on activities of

19    daily living as its outcome measure.  Glacier primary

20    outcome measure of the trial was this type of scale.

21    Q.    Doctor, in your opinion, based on all the evidence

22    that we have discussed, would a person of skill in 2009 have

23    been able to determine with reasonable certainty whether a

24    40 milligram three times per week GA dosing regimen results

25    in reduced severity of injection related adverse events in a

Fox - direct

1  patient relative to the GA 20 milligram a day treatment?

2  A.    Yes, that information would certainly be available to

3  a POSA.

4  Q.    Now, Doctor, are you aware of Dr. Green's opinion that

5  the reduced severity limitations of the '776 patent are not

6  adequately described in the patent specification?

7  A.    Yes, I am aware of that.

8  Q.    Do you agree with that opinion?

9  A.    No, I do not.

10  Q.    At a high level sir, why do you disagree?

11  A.    There is adequate written description.  The terms  are

12  defined, and the document as a whole, the patent explains

13  very clearly that the method that is being looked at is a

14  reduction of severity of adverse events in comparison to

15  20 milligrams per day.

16  Q.    First, Doctor what is your understanding of the

17  written description requirement?

18  A.    It has to be adequately described so that a POSA would

19  be able to understand the meanings of the terminology.

20  Q.    If we could move ahead to PDX-8.10, please.

21        Doctor, does the specification of the '776

22  patent mention the severity of injection related adverse

23  events?

24  A.    It does.  There is a definition within the

25  specification:  As used herein -- meaning throughout the

Fox - direct

1    entire document -- tolerability relates to the level of

2    discomfort associated with GA treatment.

3              And then it specifies that tolerability is

4    associated with the frequency and severity of postinjection

5    reactions and injection site reactions.

6    Q.   Doctor, how would that definition be applied by a

7    person of skill reading the patent specification?

8    A.   A person of skill would understand that every time the

9    word "tolerability" is used, it is referring to both the

10   frequency and the severity of postinjection reactions and

11   immediate postinjection reactions.

12   Q.   Doctor, is severity the same thing as frequency?

13   A.   No, they're related, but they are separate topics.

14   Q.   How do they relate to one another?

15   A.   There, as I mentioned before with the CTCAE, there are

16   some events like lipoatrophy that would be considered to be

17   more severe.  So if there is a decrease in the frequency of

18   lipoatrophy, there would, by definition, then also be a

19   decrease in the severity of the adverse events.

20   Q.   So do you consider these two concepts to be mutually

21   exclusive?

22   A.   No, they are not.  They are related.

23   Q.   If we can move ahead to PDX-8.11.

24              Are you aware, sir that the Court has issued an

25   order construing the meanings of certain claim terms in the

1    '776 patent, including the "reduced severity" terms?

2    A.    Yes, I'm aware of that.

3    Q.    Did you review that order?  And have you applied those

4    constructions for purposes of your opinions today?

5    A.    I have.

6    Q.    With reference to PDX-8.12, did you also apply the

7    agreed upon definitions for the terms "frequency" and

8    "severity" in the context of an injection related adverse

9    events that we examined earlier?

10   A.    Yes.  Frequency does mean the rate of occurrence of a

11   patient's ISRs and/or IPIRs.  And severity, as I mentioned

12   before, is the intensity of a patient's reactions.

13   Q.    If we can go ahead to PDX-8.13.

14         Doctor, beginning at Column 2 of the patent at

15   Line 66.  Where does the patent first discuss tolerability?

16   A.    The summary of the invention specifies that in the

17   passage that you see on the slide.  It provides a method of

18   increasing the tolerability of GA treatment in a human

19   patient with multiple sclerosis or clinically isolated

20   syndrome.  And then it goes on to describe it as being a

21   reduction of the frequency of the subcutaneous injections,

22   and it shows the therapeutically effective dosage as being

23   at the bottom of being 40 milligrams per mil.

24         So this is a description of an increase of the

25   tolerability of the drug in comparison to 20 milligrams a

Fox - direct

1    day.

2    Q.    And how, to a person of skill, would that concept

3    relate to reducing severity?

4    A.    This would indicate that the inventor certainly    had

5    in his possession the means to be able to improve

6    tolerability by reducing the severity of the reactions.

7    Q.    Doctor, at the time of the patent application, what

8    dose of glatiramer acetate was commercially available?

9    A.    It was 20 milligram daily, subcutaneous.

10   Q.    Does the patent mention the 20 milligram product?

11   A.    Yes, it does.

12   Q.    Let's pull up PDX-8.14, please.

13         Looking at the background of the invention

14   section, sir, at Column 2, Line 18.  What information is

15   disclosed here?

16   A.    It gives its trade name of Copaxone and refers to the

17   prescribing information.  So the full label of the product

18   which was well known to POSAs in 2009.  It defines it as

19   being 20 milligram daily dosage, and what the indication is

20   for it, meaning which patients would be appropriate for

21   treatment with Copaxone.

22   Q.    And if we could look ahead to Column 15 in looking at

23   PDX-8.15.

24         Looking here at Line 52 of the patent, sir.

25   What does this passage relate to a person of skill?

Fox - direct

1    A.     It begins with the long known observation that

2    drawback to GA therapy was the daily injection which were

3    considered inconvenient.  And it was also recognizing that

4    the 20 milligram daily product had a relatively high

5    incidence of injection site reactions.

6                And it is mentioned here, 70 percent of patients

7    who received GA 20 milligrams a day experienced these

8    reactions.  It describes, as was mentioned elsewhere, what

9    the individual symptoms are that are being referred to in

10   that 70 percent.

11   Q.     Would a person of skill understand what product is

12   being referred to here?

13   A.     Yes.  Absolutely.  The understanding was clear that

14   the GA that was available at that time was the 20 milligram

15   daily appearance of the drug.

16   Q.     With regard to these disclosures, sir, in the patent

17   regarding the 20 milligram product, would a person of skill

18   understand what GA treatment the inventor intended to

19   improve?

20   A.     Yes.  So the comparison is now being made to

21   40 milligrams three times a day which it did define in the

22   specification.  It would be 40 milligrams three times a week

23   with at least one day in between each dosage.

24   Q.     If we could move ahead to PDX-8.16.

25                Doctor, looking at Column 5, beginning at Line

Fox - direct

1  23 of the patent.  What does this paragraph convey to a

2  person of skill about the invention?

3  A.      This, within the detailed description of the

4  invention, describes at the very beginning, this is a method

5  for increasing the tolerability of GA treatment.

6  Tolerability being understood as being the reduction in the

7  frequency and the intensity or severity of the reactions.

8              And, again, it describes who it is for, to a

9  patient with relapsing remitting MS, and also it is for

10  subcutaneous injections three times a week.

11              (Counsel confer.)

12  Q.      Doctor, just to make it clear on the record.  The

13  reference to the GA 40 milligram regimen in the patent, is

14  that a three times a week regimen?

15  A.      Yes, this is 40 milligrams three times a week with at

16  least one day in between each injection.

17  Q.      Okay.  Thank you, sir.  Let's move ahead to PDX-8.17.

18              Are there additional passages from the detailed

19  description of the invention section, sir, that discuss

20  improved tolerability?

21  A.      Yes, there are three mentions that I listed on this

22  slide.

23              This is the first one:  method of treatment for

24  relapsing remitting multiple sclerosis in which the

25  frequency of an immediate postinjection reaction or the

Fox - direct

1    frequency of an injection site reaction is reduced relative

2    to the 20 milligrams per day dosing.

3             The second is a description of increasing the

4    tolerability by reducing the frequency of immediate

5    postinjection reaction.

6             And the third is improving the tolerability by

7    reducing the frequency of injection site reaction.

8             So these are three instances within the '776

9    patent where there is the description of the tolerability of

10   40 milligrams weekly as being superior in a reduction to the

11   frequency of these reactions.

12   Q.   How do these passages inform your opinion regarding

13   the adequacy of the patent's description of reduced severity

14   of injection related adverse events?

15   A.   It would be very clear to a POSA looking at this

16   that the inventor did have possession of the invention of

17   40 milligrams three times weekly and causing a reduction in

18   the severity of adverse events.

19   Q.   And just for record, sir, the citations on PDX-8.17

20   are to Line 5, or excuse me, Column 5, Lines 19 through 22,

21   Column 5, Lines 33 through 36 and Column 5, Lines 54 through

22   57; is that correct?

23   A.   That is correct.

24   Q.   Doctor, we've heard in these proceedings that the '776

25   patent specification only discloses the element of reduced

1   severity once in the context of the definition for

2   tolerability.

3           With reference to PDX-8.18, do you agree that is

4   how a person of ordinary skill would read the patent

5   disclosure?

6   A.    No, I would not.  Because it was fully described and

7   defined in the document.  Every time the word "tolerability"

8   occurs, it would be well understood to a POSA that

9   tolerability refers to the association of the frequency and

10  severity of postinjection reactions and injection site

11  reactions.

12  Q.    Doctor, if I could turn your attention to Example 1 of

13  the specification.

14          How does Example 1 inform your opinion that

15  there is sufficient written description for the reduced

16  severity claims?

17  A.    Example 1 is a detailed definition of a clinical

18  trial.  It's a multinational, multicenter randomized Phase

19  III or pivotal trial with parallel groups evaluating

20  patients who are receiving glatiramer acetate 40 milligrams

21  subcutaneously three times a week and the other group being

22  patients receiving placebo, and this would be done in a

23  double blind fashion in an effort to look at the efficacy of

24  the drug, the safety of the drug, and the tolerability of

25  the drug.

Fox - direct

1    Q.    If we could move ahead to PDX-8.20, please.

2          Doctor, beginning at Line 56, are there safety

3    and tolerability outcome measures described in Example 1?

4    A.    Yes.  As well as having efficacy measures that are

5    well detailed in Example 1, we also have the safety and

6    tolerability outcome measures.

7          For safety, there is adverse events, which I

8    mentioned many times is a means of being able to document

9    all events that take place, whether they are related to the

10   experimental drug or not, and a rating those events.

11         Vital signs, ECG findings, and blood work,

12   clinical laboratory parameters would also be collected to

13   monitor for safety during the trial.

14         There are two different tolerability measures

15   that are listed there as well.  One is the proportion of

16   patients who prematurely discontinued from the study, why

17   they discontinued from the study, and when they discontinued

18   from the study.

19         And the other is looking at the same thing but

20   specifically looking at those patients who discontinued

21   because of adverse events and when they quit the drug.

22   Q.    Doctor, the rating that you referred to in your prior

23   answer, what are you referring to by that?

24   A.    Yes.  Again, the CTCAE or some similar method, this

25   trial was, the example was listing the adverse events that

Fox - direct

1    would be rated in terms of level of severity.

2    Q.    Doctor, what do these discontinuation rate outcome

3    measures tell you about the severity of injection related

4    adverse events?

5    A.    It was well understood to a POSA in 2009 that the

6    severity of adverse events is directly related to the

7    ability of a person in a trial to be able to continue on

8    that medication.  So by evaluating this continuation rate,

9    this is one way of looking at the severity of adverse events

10   that take place during the course of the trial.

11              MR. BENNETT:  Sure, Your Honor.

12              THE COURT:  Let's take a break.

13              (Brief recess taken.)

14              *    *    *

15              (Proceedings reconvened after recess.)

16              THE COURT:  Please, take your seats.  Mr.

17   Bennett, please.

18              MR. BENNETT:  Thank you, Your Honor.

19   BY MR. BENNETT:

20   Q.    Dr. Fox, referring to PDX-8.20, with reference to

21   these outcome measures, these tolerability outcome measures,

22   would they allow a person of skill to do a comparison with

23   the 20-milligram daily treatment with respect to the

24   severity of injection site adverse reaction events?

25   A.    Yes, they would, because we would be looking at the

1    adverse events, the type of event, the severity of the

2    event, and the rate of discontinuation due to those events.

3    We would be able to compare it to the historical perspective

4    we have had on 20 milligrams a day that have been used in

5    previous trials as well as in clinical practice.

6    Q.    How do these various outcome measures inform your

7    opinion about the adequacy of the written description of the

8    reduced severity claims?

9    A.    The description is valid, because this is a

10   well-designed large pivotal trial that would be based on the

11   ability to be able to very adequately look at the safety and

12   tolerability outcomes and be able to show that there was a

13   reduction in severity.

14   Q.    Doctor, are you aware that Dr. Green has offered an

15   opinion that the reduced severity claims are also not

16   adequately described because there is no data in the patent

17   from the clinical trial that is described?

18   A.    Yes, I am aware of that.

19   Q.    Do you agree with that opinion?

20   A.    No, I do not.

21   Q.    Why not?

22   A.    Firstly, because it's not just the example.

23   Throughout the entire patent, there are a number of

24   documentations of the purpose of the patent that is

25   describing a more tolerable medication based on reduced

1   frequency of dosing, and that is compared to the

2   20-milligram daily dosing.

3            This example is a very straightforward, Phase

4   III pivotal trial that is to be done, which is the gold

5   standard for being able to get medication to market.

6            My understanding is that prophetic example is

7   sufficient when given in sufficient detail, as this is.

8   Q.    Doctor, based on these various disclosures about

9   improved tolerability that we talked about, what is your

10  opinion about whether the reduced severity claims have

11  adequate written description?

12  A.    I am sorry.  Can you repeat that?

13  Q.    Based on these various disclosures that we have

14  discussed this morning, what is your opinion about whether

15  the reduced severity claims have adequate written

16  description in the '776 patent?

17  A.    Yes.  The '776 patent has adequate description of it

18  because not only does it define it but it goes on to explain

19  exactly through this Example 1 how this is to be measured.

20  Q.    Doctor, would this convey to a person of skill about

21  what the inventor possessed?

22  A.    Yes.  It would certainly show that at the time that

23  this was written, the inventor had a credible rationale for

24  moving forward with 40 milligrams three times weekly dosing

25  in comparison to 20 milligrams a day in an effort to show

Fox - direct

1    reduced severity.

2    Q.    Now, Doctor, did you also review Dr. Green's testimony

3    that the claims of the '776 patent directed to reduced

4    severity were not adequately enabled?

5    A.    Yes, I did review this.

6    Q.    Do you agree with that opinion?

7    A.    No, I do not.

8    Q.    Why not?

9    A.    Because a POSA seeing this document, the '776 patent,

10   would clearly understand that this is a product that could

11   be given in clinical practice and would need no additional

12   experimentation to do so.

13   Q.    Doctor, what is your understanding of the enablement

14   requirement?

15   A.    That it does have to be again adequately described, so

16   that a POSA would be able to enable it and that it would be

17   able to be given in the course of clinical practice.

18   Q.    Doctor, in your opinion, would a person of skill

19   reading the patent be able to administer 40 milligrams of

20   glatiramer acetate three times per week with reduced

21   severity of injection related adverse events?

22   A.    Yes, because the POSA had a lot of information

23   regarding the 20-milligram daily dosage and experience in

24   giving the 20-milligram daily dosage and would be able to

25   administer 40 milligrams three times weekly with no

Fox - direct

1   additional experimentation.

2   Q.      Would a person of skill in 2009 know how to determine

3   whether the three times per week 40 milligram regimen

4   reduced the severity of injection related adverse events?

5   A.      Yes, because we had the means by which this could be

6   measured in severity scales, it would be possible for a POSA

7   to be able to measure the tolerability of the medication and

8   to see that there would be a reduction in severity of the

9   adverse events taking place with somebody taking this

10  product.

11  Q.      Can we move ahead to PDX-8.21.  Doctor, did you

12  consider what are called the Wands factors in forming your

13  opinion about whether a POSA would require undue

14  experimentation to practice the '776 patent claims?

15  A.      Yes, I did consider the Wands factors.

16  Q.      Doctor, how much experimentation in your opinion would

17  a person of skill need to perform to practice the claim

18  regimen?

19  A.      Not only would there be no undue experimentation,

20  there would be no additional experimentation at all required

21  by a POSA to be able to practice the invention.

22  Q.      Would the person of skill require direction or

23  guidance in order to administer the 40 milligrams three

24  times a week regimen?

25  A.      No.  The POSA had plenty of experience in giving

1   injectable medicines as a whole, including glatiramer

2   acetate at 20 milligrams a day.  And so would need no

3   additional instruction.

4   Q.    Would a person of skill, were persons of skill

5   sufficiently skilled to practice the claimed invention?

6   A.    Yes.  It would take no additional learning or

7   experimentation.

8   Q.    Now, with regard to Dr. Green's opinion, sir, do you

9   agree with Dr. Green that the predictability of the art

10  factor suggests undue experimentation would be required?

11  A.    No, I do not agree with that.

12  Q.    Why not?

13  A.    Because although there is some unpredictability, for

14  instance, hearing yesterday about mechanism of action of the

15  drug, that is unpredictable, but there is no

16  unpredictability about actually being able to administer a

17  subcutaneous injection of 40 milligrams three times of a

18  week.  There is no ambiguity there and no difficulty in

19  being able to practice the art.

20  Q.    What about Dr. Green's testimony concerning a working

21  example again, does that suggest to you that undue

22  experimentation would be required to practice the invention?

23  A.    No.  Example 1, although it does not include data

24  within the description of the example, certainly, it does

25  show that the inventor had possession of a product that did

Fox - direct

1    decrease the severity of the adverse events and would need

2    no additional experimentation once that pivotal trial had

3    been done.

4    Q.    Doctor, did you review Dr. Green's testimony that the

5    invention of the '776 patent is not operable?

6    A.    Yes, I did.

7    Q.    Do you agree with that opinion?

8    A.    No, I disagree.

9    Q.    Was the clinical trial described in Example 1

10   eventually carried out?

11   A.    Yes, it was.  It was the GALA trial.

12   Q.    At a high level, sir, what were the results reported

13   in GALA regarding the tolerability of the 40-milligram three

14   times a week regimen?

15   A.    The GALA was a highly successful trial in meeting its

16   end points.  The primary end point was the efficacy of the

17   medication and it did indeed reduce the annualized relapse

18   rate compared to placebo.  But it also gave us a wealth of

19   information about the tolerability of the medicine.  What

20   was seen in that trial was a low level of discontinuation

21   rate because of adverse events as well as a low incidence of

22   the moderate to severe adverse events related to injections.

23          So it allowed a POSA to be able to look at the

24   results of the GALA trial and be able to compare it to the

25   existing history we have, both clinically and research, on

Fox - direct

1    the 20-milligram daily dosage.

2    Q.    Let's pull up PDX-8.22.

3              This is with reference to JTX-7090, the GALA

4    publication, sir.

5              What did GALA convey with respect to the

6    severity of adverse events on Page 6 of the GALA

7    publication?

8    A.    Yes.  The adverse events were documented as per

9    routine, and they were, if they were injection site

10   reactions, they were rated as well on the mild, moderate to

11   severe scale.  What was seen, that on 40 milligrams three

12   times weekly GA, 99.9 percent of all of those were in the

13   mild to moderate range on the severity scale.

14   Q.    What would that convey to a person of skill?

15   A.    That this was a tolerable medication and in fact when

16   compared to the existing knowledge based on 20 milligrams

17   daily was more tolerable, based on the reduction of severity

18   in the mild to moderate category.

19   Q.    Moving to 8.23, sir, which references Page 7 of the

20   GALA study, what did GALA report with respect to the

21   discontinuation rate that was observed due to adverse

22   events?

23   A.    The adverse events that led to discontinuation of the

24   drug, as I said, that would be caused by the drug, occurred

25   in 3.1 percent of the patients in the GA group and 1.3 in

1    placebo group.  The highest rate of discontinuation was due

2    to the injection site reactions and caused a discontinuation

3    of the GA 40 milligrams three times weekly in 1.0 percent of

4    patients.

5    Q.    Doctor, how did this discontinuation rate compare

6    historically to 40 the milligram dosing?

7    A.    Very favorably.  This GALA study showed a clear

8    indication that 40 milligrams three times a week was a more

9    tolerable rate based on the low rate of discontinuation as

10   well as the very low rate of severe adverse events related

11   to injection site reactions.

12   Q.    Can you move ahead to PDX-8.24, please.

13          This is referenced on Page 7 of the GALA study

14   in the conclusion section.

15          What did this passage, sir, from the GALA study

16   report with respect to the tolerability of the 40-milligram

17   three times a week regimen?

18   A.    Dr. Khan in this peer-reviewed paper made commentary

19   in the discussion section about the tolerability of GA 40

20   milligrams.  The first sentence says that it was safe and

21   well tolerated, which is clearly indicated by the data in

22   this trial.

23          The safety profile, which safety is to be

24   separated out from tolerability, safety was comparable to 20

25   milligrams daily and it had been well established in

Fox - direct

1    previous trials.

2              They were making comparisons of the reactions

3    that took place in the tolerability measures, and they were

4    predominantly mild and led to discontinuation of only one

5    percent.  And there was a comparison in this passage,

6    notably, the incidence of ISRs in patients treated with GA

7    40 milligrams three times a week was approximately 20 to 50

8    percent less compared to the previous studies of patients on

9    GA 20 milligram and 40 milligram daily.  And the reference

10   is listed there from previous trials that had already been

11   published in peer-reviewed journals.

12             They then also compared the systemic immediate

13   post-injection reactions or IPIRs of 7.6 percent, which was

14   considerably less than the 15 percent that are reported in

15   the two trials cited in this passage.

16   Q.    Doctor, with respect to Example 1 in the patent, how

17   do these passages from the GALA study inform your opinion

18   about how a person of skill would interpret the disclosure

19   of Example 1?

20   A.    Yes.  In Example 1, it is very clear that this is the

21   proposal that became the GALA study.  So the GALA study

22   recapitulated what was stated in the '776 patent as to being

23   what the outcomes were.  So it, in fact, did show a

24   reduction in the severity of adverse events, as was listed

25   in Example 1.

Fox - direct

1  Q.     Does this inform your opinion about the comparative

2  nature of Example 1?

3  A.     Yes.  Because the data is listed here in the section

4  in GALA, it allows us to go back to Example 1 and say that

5  the passages that refer to the improved tolerability was

6  related to these outcome measures, that the reduction in the

7  frequency and the severity of the adverse reactions is based

8  on injection site reactions and immediate post-injection

9  reactions.

10  Q.     Doctor, did you make treatment decisions with your own

11  patients on the basis of these findings in GALA?

12  A.     I did.

13  Q.     And what did you decide to do?

14  A.     I did offer GA 40 milligrams three times weekly to my

15  patients, who were very desiring of a more convenient

16  treatment.  So after launch, I discussed this with my

17  patients and a number of patients chose to go on this

18  medicine.

19  Q.     Did you recommend it to your patients?

20  A.     I did in fact recommend it to my patients, based on

21  the numbers that I was able to quote from the GALA study

22  compared to what they already knew about GA 20-milligram

23  daily dosing.

24  Q.     Doctor, we have also heard about the Glacier study in

25  this case.  Did Glacier indicate anything with respect to

Fox - direct

1    the reduction in the severity of injection related adverse

2    events with the 40 milligrams three times per week regimen?

3    A.    Yes.   It was an additional piece of information about

4    the tolerability of the medication in a real-world setting,

5    looking at patients who are on 20 milligrams daily and were

6    willing to be randomized into one of two groups, to remain

7    on that daily, or be placed on 40 milligrams of GA three

8    times a week.

9    Q.    If we could please pull up PDX-8.25.  Doctor, what

10   does Figure 2 of the Glacier study report?

11   A.    This was the primary outcome measure of the study.  So

12   it was looking at the adjusted mean annualized injection

13   related adverse events.  Just looking at the number of

14   adverse events occurring over a period of a year, as can be

15   seen in this, the bar for GA 20 milligrams daily is much

16   higher than it is for GA 40 milligrams three times a week,

17   showing for those patients who switched from 20 to 40

18   milligrams, they reported a substantially lower incidence of

19   injection related adverse events after decreasing the

20   frequency to three times weekly.

21   Q.    If we can move ahead to PDX-8.26.

22         Doctor, what did Table 2 of the Glacier study

23   report with respect to --  what did Table 2 of the Glacier

24   study report with respect to injection site adverse events?

25   A.    It divides it into the injection related adverse

Fox - direct

1  events, and specifically the injection site reactions, and

2  looks at the total number of events and also looks at the

3  number of moderate or severe events.

4            And in each of these cases, you can see that for

5  the GA 40 arm, which is three times weekly dosing, that

6  there was a reduction in the number and in the severity of

7  reactions, compared to the 20-milligram daily dosage.

8  Q.    How did the proportion of moderate and severe adverse

9  events compare between the two dosing regimens?

10 A.    There was a reduction in the number of moderate or

11 severe injection site reactions for the patients who were on

12 GA 40 compared to 20.  This again shows that the GA 40

13 milligrams three times a week dosing is more tolerable in

14 severity of adverse events.

15 Q.    Let's move ahead to PDX-8.27.  Doctor, what was

16 reported in Figure 3 of the Glacier study?

17 A.    Figure 3 looks at the mean annualized moderate and

18 severe injection related adverse events.  So for the GA 20

19 daily arm, that was 2.2 events that were rated as moderate

20 or severe, whereas it was only severe .9 for the GA 40 three

21 times weekly group, again showing improvement in the

22 severity of the injection related adverse events for those

23 patients who switched from 20 to 40 milligrams three times

24 weekly.

25 Q.    Doctor, does the data that we have reviewed from the

Fox - direct

1    GALA and Glacier study indicate that the reduced severity --

2    strike that, Your Honor.

3              What does the data from the GALA and Glacier

4    studies indicate to you about the operability of the reduced

5    severity claims in the '776 patent?

6    A.    It shows that Example 1 and the document as a whole in

7    its claims of stating improved tolerability based on reduced

8    severity of adverse events was seen in two different

9    well-designed clinical trials, both the GALA and the Glacier

10   study.

11   Q.    How did these results from GALA and Glacier compare to

12   what you have observed in your own clinical practice?

13   A.    This has been very similar.  I have been very

14   satisfied with the ability of my patients to be able to

15   tolerate the medication and remain on the medicine as was

16   seen in these two clinical trials.

17   Q.    Does this evidence -- strike that.

18             What would this evidence that we have just

19   reviewed from the GALA and Glacier studies indicate about

20   whether the invention of the '776 patent, the reduction in

21   severity, actually works?

22   A.    The utility is proven by this.  It does actually work,

23   and it is shown in these two clinical trials, as was stated

24   in the '776 patent.

25   Q.    Doctor, based on all the evidence that we have

Fox - direct

1    discussed, would a person of skill know how to practice the

2    invention set forth in the reduced severity claims of the

3    '776 patent?

4    A.    Yes.  They would perform it exactly as it was done in

5    the trial.

6    Q.    Okay.  Let's now move on to the final module on the

7    first three patents, the '250, '413 and the '302 patents.

8          Doctor, have you reviewed Dr. Green's testimony

9    regarding the written description and enablement of the

10   '250, '413 and '302 patents?

11   A.    I have.

12   Q.    And just by way of background, is the specification of

13   those patents substantially identical among the three?

14   A.    Yes, amongst those three, they are essentially

15   identical documents.

16   Q.    And is the specification the same as what's in the

17   '776 patent as well?

18   A.    They are the same.

19   Q.    Doctor, do you agree with Dr. Green's opinions that

20   the '250, '413 and 302 patents are not adequately described

21   or enabled due to the specification's reliance on a

22   prophetic example?

23   A.    No, I do not agree with those opinions.

24   Q.    Why do you disagree?

25   A.    First, in the written description, I find that the

Fox - direct

1    descriptions within the three patents in question are

2    similar to the '776 patent.  As I have explained before,

3    there is adequate description of the invention to be able to

4    state that the inventor had clear possession of the product

5    itself, and a rational criteria to move forward on it.  When

6    it comes to the enablement, I find that it is thorough and

7    the ability to practice this would not require any

8    additional experimentation on a POSA's part.

9    Q.    Let's move ahead to PDX-8.28.  Doctor, what's

10   described in the first paragraph of the summary of invention

11   section of the '250 patent at Column 2, Line 55?

12   A.    In the summary of the invention, it lists the method

13   of alleviating a symptom of relapsing remitting MS in people

14   with relapsing MS or clinically isolated syndrome, then it

15   goes on to describe it as three subcutaneous injections of

16   therapeutically effective dose of glatiramer acetate over a

17   period of seven days with at least one day between each

18   subcutaneous injection so as to therefore alleviate the

19   symptom of the patient.

20   Q.    If we could move ahead to PDX-8.29.  Doctor, does the

21   specification go on to mention a particular dosage amount?

22   A.    Yes, the summary of invention mentions the dosage as a

23   therapeutically effective dose at 40 milligrams per ml.

24   Q.    If we go ahead to PDX-8.30, this is in the detailed

25   description of the invention section at Column 4 of the

1    patent.  Looking at the first paragraph, beginning at Line

2    2, what do these first paragraphs of that section convey to

3    a person of skill?

4    A.    It again does show that the indication for this would

5    be for patients with relapsing remitting MS or clinically

6    isolated syndrome.  And it describes it as three

7    subcutaneous injections of a therapeutically effective dose

8    over a period of seven days with at least one day in between

9    each dosage.

10   Q.    And if we can go ahead to PDX-8.31.

11             Again, sir, what is described in the first few

12   paragraphs of Example 1 which appears in the '250 patent?

13   A.    Example 1 is a description of a multinational,

14   multicenter randomized Phase III trial.  This is the

15   trial that was required by the FDA for licensing of the

16   medication.  It describes it as being 40 milligrams

17   administered three times a week.  And it's to assess the

18   efficacy, the safety, and the tolerability of the

19   medication.

20   Q.    What does this passage from Example 1 say about the

21   size of the study?

22   A.    It does talk about it being multinational and

23   multicenter which would be understood to a POSA as having to

24   be a very large trial indeed.

25   Q.    If we can move ahead to PDX-8.32.

Fox - direct

1              We're looking at Column 9 of the '250 patent

2    beginning at Line 12, sir.  What information is relayed

3    here?

4    A.    It states that subjects with relapsing remitting

5    multiple sclerosis would need to be at least 1,350, which

6    makes this a very large, very expensive trial that is

7    typical for a licensing trial to the FDA.

8    Q.    What does this information mean to a person of skill

9    reading the patent disclosure, in your opinion?

10   A.    That moving forward with this, it means that the

11   inventor certainly had in their possession information that

12   would warrant such a large, involved trial to move forward

13   with the medication to show that there was reduced severity

14   of adverse events when compared to 20 milligrams daily.

15   Q.    If we can move ahead to PDX-8.33.

16              Doctor, what is the primary outcome measure that

17   is set forth in Example 1?

18   A.    That is one of the very limited number of outcome

19   measures that are allowed by the FDA for licensing.  It's

20   the total number of confirmed relapses during the 12 month

21   placebo control phase which, in other words, is annualized

22   relapse rate.

23   Q.    Was this the same primary endpoint that was eventually

24   employed in the GALA Study?

25   A.    Yes, it was.

Fox - direct

1   Q.     Was this endpoint typically used to determine the

2   efficacy of MS treatments?

3   A.     Yes, it is.  It is by far the most commonly used

4   outcome measure to approve the medication for MS and has

5   been used in every medication that is currently on the

6   market.

7   Q.     Does this endpoint tell you whether a drug is useful

8   for treating MS?

9   A.     Yes, it does.  It gives a clinical measure of disease

10  activity that we recognize as being very important in

11  controlling in order to prevent long term disability.

12  Q.     Please pull up PDX-8.34.

13         Doctor, are there secondary outcome measures

14  that are also set forth in Example 1?

15  A.     Yes, there are several that are listed here.  These

16  are all MRI measurements of disease activity.

17         It talks about the number of new lesions at the

18  end of 12 months.  Lesions that enhance, which means when

19  you inject the dye, there are lesions that light up that

20  show activity inflammation.  And then brain atrophy is a

21  measure of tissue damage taking place.

22         All of these were over a 12 month period which

23  was during the time of the placebo control time point of the

24  trial.  So all of these taken together, secondary outcome

25  measures, are clear clinical measures of disease activity

Fox - direct

1    utilizing MRI technology.

2    Q.     Are these endpoints also useful in determining the

3    efficacy of an MS treatment?

4    A.     Yes, they are.  They are also commonly used in

5    clinical trials in an effort to be able to determine the

6    level of disease activity that might not be clinically

7    evident to the researchers.

8    Q.     Could we move forward to PDX-8.35, please.

9           Doctor, with reference to the Results section,

10   which appears at the beginning of Column 13, Line 45, what

11   result is described for the primary outcome measure?

12   A.     The primary outcome measure that was listed in the

13   '250 patent specification states that treatment with

14   40 milligrams three times weekly will reduce the subject

15   population annualized relapse rate by 30 percent or more

16   when compared to the placebo group; and the trial was sized

17   to the extent that a 30 percent reduction would be highly

18   significant.

19          Treatment then with 40 milligrams three times

20   weekly would be at least as effective as 20 milligrams

21   subcutaneous GA daily administration at reducing the subject

22   population annualized relapse rate.

23   Q.     What does this information tell you about comparisons

24   to the 20 milligram product?

25   A.     This is looking at a relative comparison and that the

Fox - direct

1    40 milligrams three times a week would be at least as

2    effective as the 20 milligram dosage as was well understood

3    by a POSA in 2009.

4    Q.    If we could please move forward to PDX-8.36.

5          Doctor, what are the results listed for the

6    secondary outcome measures?

7    A.    All three of the secondary outcome measures are listed

8    here, the new lesions, enhancing lesions, and brain atrophy.

9    And these three outcome measures were being described as

10   being at least as effective as 20 milligrams subcutaneous GA

11   daily administration.

12         So in each case, the MRI findings from Example 1

13   would be compared to the historical perspective of the

14   entirety of the trials done for 20 milligrams per day as

15   well as experience in clinical practice.

16   Q.    Doctor, how do the various disclosures that we've just

17   discussed, including the summary of the invention, the

18   information in the detailed description of the invention,

19   and the example in Example 1, inform your opinion about the

20   adequacy of the written description of the '250, '413, and

21   '302 patents?

22   A.    The document as a whole, because of the clear

23   definitions of the outcomes, clear definitions of the

24   purpose of it, which is the reduction in the severity of

25   injection reactions, would inform a POSA that the inventor

1  had full possession of the information to move forward with

2  a product that would be effective and more tolerable than

3  20 milligrams per day.

4  Q.    Doctor, are you aware of the opinion offered by

5  Dr. Green that the inventions claimed in the '250, '413,

6  and '302 patents are not adequately described because the

7  specification does not include any actual data from the

8  clinical trial?

9  A.    I'm aware of those opinions.

10 Q.    Do you agree with that opinion?

11 A.    No, I do not.

12 Q.    Why not?

13 A.    Because the Example 1 as a prophetic example is very

14 well described.  The outcome measures have been described

15 and a POSA would understand that this is a clear indication

16 that the inventor had an ability to be able to look at

17 40 milligrams three times weekly and be able to show that it

18 was in fact a more tolerable invention.  So it was, it was

19 well described, and it was enabled in that a person using

20 Example No. 1 would be able to practice the art.

21 Q.    Now, Doctor, just briefly returning to an issue we

22 already talked about with respect to enablement.  Would a

23 person of skill require an undue amount of experimentation

24 to practice the claimed inventors of these patents, the

25 dosing regimen?

Fox - direct

1    A.    No, the 40 milligrams three times a week dosage would

2    be very straightforward for a POSA to be able to administer.

3    Q.    Do the portions of the specification that we just ran

4    through with respect to written description inform your

5    opinion about the enablement of these patents?

6    A.    Yes.  Without any additional experimentation, a POSA

7    would be able to implement 40 milligrams three times weekly

8    as a treatment for multiple sclerosis.

9    Q.    Now, Doctor, let's just briefly return to Column 2,

10   please, which is PDX-8.37, the '250 patent.  And, again,

11   this is the Summary of the Invention section.

12         Doctor, would a person of skill be able to a

13   administer the claimed regimen disclosed in the disclosure

14   set forth here?

15   A.    Yes.  So listing the therapeutically effective dose of

16   glatiramer acetate at 40 milligrams per mil instructs the

17   POSA on what the dosage and the administration frequency

18   would be given for this medication and, without any

19   additional experimentation, it would be readily understood

20   and be able to be administered.

21   Q.    Okay.  And these disclosures we talked about pertain

22   to efficacy as well as tolerability, sir?

23   A.    It lists the efficacy as well as safety and

24   tolerability.  And tolerability is being defined as the

25   frequency and the intensity or severity of the adverse

Fox - direct

1    events, yes.

2    Q.     Doctor, having read the patent, would a person of

3    skill have to conduct a significant amount of

4    experimentation in order to know how to practice the claimed

5    invention?

6    A.     Now, no additional experimentation would be necessary.

7    Q.     Did you review and consider what are called the Wands

8    Factors in connection with these patents as well?

9    A.     Yes, I did.

10   Q.     And, again, how did you review those factors and form

11   your opinion about the sufficiency of the enablement of the

12   '250, '413, and '302 patents?

13   A.     The Wands Factors were met in that there was no

14   additional experimentation to be required by a POSA to be

15   able to act on the invention and be able to perform it.

16   Q.     Now, finally, Doctor, did you review Dr. Green's

17   testimony to the effect that the 40 milligrams three times

18   per week regimen was not sufficiently enabled because the

19   specification of these patents does not include actual data

20   from a clinical trial?

21   A.     Yes, I'm aware of his opinion.

22   Q.     Do you agree with that opinion?

23   A.     No, I do not.

24   Q.     And, again, at a very high level, why not?

25   A.     Because Example 1 indicates that the inventor did have

1    a means to look forward, a credible rationale for moving

2    forward with 40 milligrams three times per week and

3    contained sufficient information to be able to have an

4    example that was meant for a registration trial allowing for

5    approval of the medication.

6    Q.    And what would this disclosure convey about the

7    utility of the invention of these three patents?

8    A.    Because this describes fully the GALA trial, which was

9    a successful trial, it shows in fact that it did have

10   utility and it could be used, and that the product, the

11   invention actually worked.

12   Q.    And just briefly, Doctor, let me have you go to

13   PDX-8.38.

14              What was the finding of the GALA Study with

15   respect to the primary outcome measures set forth in Example

16   1?

17   A.    The primary outcome measure did show a 34 percent

18   reduction in the risk of confirmed relapse compared with

19   placebo, which was very much in line with what was stated

20   in the patent, that there would be at least a 30 percent

21   reduction in annualized relapse rate.

22   Q.    How did these results inform your opinion about the

23   adequacy of the enablement of the '250, '413, and '302

24   patents?

25   A.    The GALA trial showed very clearly that the invention

Fox - cross

1   did work as described within the patents.

2              MR. BENNETT:  Thank you very much, Doctor.

3              THE COURT:  All right.  Let's start

4   cross-examination now.  If you want to do it for ten

5   minutes, that's fine with me.

6              MR. RAKOCZY:  It's up to you.  I won't finish in

7   ten minutes.

8              THE COURT:  All right.  Let's get started.

9   Let's go.

10             MR. RAKOCZY:  May we pass up some binders, Your

11  Honor?

12             (Binders passed forward.)

13             UNIDENTIFIED SPEAKER:  May I approach, Your

14  Honor?

15             THE COURT:  Yes.

16             MR. RAKOCZY:  Thank you, Your Honor.

17                      CROSS-EXAMINATION

18  BY MR. RAKOCZY:

19  Q.    Good morning, Dr. Fox.

20  A.    Good morning.

21  Q.    My name is William Rakoczy.  I represent Sandoz and

22  Momenta.  I have a few questions, followed by my colleague

23  from Mylan.

24             Dr. Fox, in your view, the '776 patent's 40

25  milligram three times a week regimen, it improves

1    tolerability by reducing the frequency and severity of ISRs

2    and IPIRs; is that fair?

3    A.    What was stated in the patents is that there would be

4    improved tolerability, and tolerability was defined as the

5    reduction in frequency and the -- excuse me, the reduction

6    of frequency and the reduction of severity of injection site

7    reactions.

8    Q.    In your view, severity and frequency are not mutually

9    exclusive; correct?

10   A.    Correct.

11   Q.    But they are distinct concepts, we can agree on that?

12   A.    They are two different concepts that are interrelated.

13   Q.    Now, you would agree that to determine severity, the

14   main guidance to consider is the intensity and the duration

15   of the injection reaction; is that fair?

16   A.    Each one of these can be measured.  As I mentioned, in

17   clinical research forums, we do not only measure the

18   severity of the reaction but also the duration as well.

19   Q.    When you are looking at severity, though, you are

20   looking at intensity and duration; is that correct?

21   A.    These are two separate documentations.  One is how

22   long something lasts, and the other is how severe it is

23   while it is there.

24   Q.    No, the longer the duration of an event, the longer it

25   is likely to effect the patient's activities of daily

Fox - cross

1   living; is that correct?

2   A.   That would depend on the event being discussed.

3   Q.   Now, it's also your opinion that if severity is

4   mentioned in the asserted claims, then tolerability is being

5   mentioned as well; correct?

6   A.   Yes, severity is within the terminology or the

7   definition of tolerability.

8   Q.   So if I understand you correctly, reducing severity

9   and increasing tolerability are essentially the same thing;

10  is that correct?

11  A.   That mischaracterizes what I said.

12  Q.   So if you improve the tolerability of the regimen, you

13  are reducing the severity of the ISRs; is that correct?

14  A.   I would say that if you were reducing the severity of

15  the ISRs, you are improving the tolerability.

16  Q.   Now, if you improved the tolerability of the regimen,

17  then you inherently reduce the severity of the ISRs?

18  A.   You can reduce the -- you can improve tolerability in

19  one way by reducing the severity of the ISRs.

20  Q.   Now, let's talk about how you measure the severity and

21  tolerability.  You would generally agree that severity can

22  be very subjective; correct?

23  A.   It depends on what is being measured.  There are

24  different adverse events that are more objective and more

25  subjective.

Fox - cross

1    Q.    All right.  I'll ask it again, because I have this

2    right out of your expert report.  Severity can be a very

3    subjective determination; correct?

4    A.    This was in the context of the description of specific

5    adverse events.  It can be subjective.  I agree with you

6    that some adverse events are subjective, others are

7    objective.

8    Q.    And you agree a single person can have a variety of

9    reactions, sometimes even at the same time; correct?

10   A.    Correct.

11   Q.    And you would also generally agree that a certain

12   category of reaction may be inherently more or less severe

13   than another category of reaction; correct?

14   A.    I would agree with that statement.

15   Q.    Now, I believe you mentioned the GALA trial.  Is that

16   correct?

17   A.    I have.

18   Q.    You mentioned that GALA showed that the 40 milligram

19   three times a week regimen increased tolerability, and I

20   think you mentioned making some comparisons over some

21   historical 20 milligram data.  Correct?

22   A.    As well as the experience in clinical practice, yes.

23   Q.    And I believe one of the comparisons you mentioned was

24   comparisons of incidence data with the 40 milligram regimen

25   over the 20 milligram daily regimen historically.  Correct?

Fox - cross

1    A.    Yes.

2    Q.    Now, why don't we take a look at JTX-7008.  It's in

3    your binder, but I will put it up on the screen as well.

4    You have seen this before.  This is the Copaxone package

5    insert.  Correct?

6    A.    Yes.

7    Q.    And this has some of that data in it; correct?

8    Incidence data for the historical 20 milligram versus

9    placebo trial?

10   A.    Yes.

11   Q.    As well as the 40 milligram versus placebo trial;

12   correct?

13   A.    Correct.

14   Q.    And what I want to focus on, and I will, it's on Pages

15   2 and 3 of Joint Trial Exhibit 7008.  I want to pull up

16   Table 1 from the 20 milligram versus placebo trial and put

17   it right next to Table 2 which is the 40 milligram versus

18   placebo trial.  And I think you have seen these.  Correct?

19   A.    Yes.

20   Q.    Now, just to be clear, now we're talking about data

21   that came from two separate sets of clinical trials.  Right?

22   A.    That is correct.

23   Q.    So the 20 milligram versus placebo trial with the

24   incidence of adverse events is in Table 1.  Is that right?

25   A.    It is.

Fox - cross

```
 1    Q.    And the incidence of adverse events in the 40

 2    milligram versus placebo trial is in Table 2.  Is that

 3    correct?

 4    A.    That is correct.

 5    Q.    Okay.  I highlighted some on your screen here, just a

 6    couple things.

 7               Now, just to be clear, incidence is different

 8    from frequency and severity; correct?

 9    A.    That is correct.

10    Q.    Now, you see I have highlighted on the screen in Table

11    1 and Table 2 from the package insert of JTX-7008 the

12    injection site pain reaction.  Do you see that?

13    A.    I do.

14    Q.    Now, if you look on Table 1, we have got a 20-percent

15    incidence of injection site pain with the placebo in the

16    20-milligram trials.  Correct?

17    A.    Yes.

18    Q.    And if we look at Table 2, we have got a two-percent

19    incidence of injection site pain on the placebo injection

20    from the 40-milligram trials.  Correct?

21    A.    That is correct.

22    Q.    Now, the placebo injections, that is without drug.

23    Right?

24    A.    That is correct.

25    Q.    That's just a needle stick?
```

1   A.    Yes, it is.

2   Q.    So using your assumptions here, in your comparisons of

3   incidence data then, the placebo injections from these

4   trials, from the 20 milligram trials, had increased severity

5   over the 40-milligram placebo injections.  Is that right?

6   A.    No.  I would not say that.

7   Q.    Well, we are looking at different incidence numbers,

8   correct?  20 percent for the 20-milligram placebo, two

9   percent for the 40-milligram placebo, doesn't that show

10  reduced severity of injection site reaction pain for the

11  40-milligram placebo?

12  A.    That does not say severity.  It is not listing mild,

13  moderate or severe definitions.

14  Q.    So we can't use incidence data at all when we are

15  talking about severity then.  You would agree with that?

16  A.    No, I would not.  I would say that you look at

17  discontinuation rates at the same time that you are looking

18  at incident rates to give you some information.

19  Q.    But not the placebo incidence rates?

20  A.    You have mentioned it's just a needle stick, but it's

21  not.  They were injecting one cc of fluid into their tissues

22  on a daily basis.  So if you were looking at injection site

23  pain, you need to take other factors into account, rather

24  than it just being whether Copaxone was received or not.

25  Q.    Because these trials were conducted under variable

Fox - cross

1   conditions.  Correct?

2   A.    I wouldn't say variable conditions.  These were two

3   different products that were being looked at, one 20

4   milligrams per milliliter and one 40 milligrams per

5   milliliter.

6   Q.    Well, the label says don't directly compare these

7   because they were done under variable or widely variable

8   conditions.  Correct?

9   A.    This is an FDA mandate that they want to list them

10  separately.  There is a descriptor that has always been used

11  in labeling to say that you should take these at face value

12  and look at each and make your own determination.

13  Q.    I want to make sure --

14            THE COURT:  We will resume this at 1:30.

15            MR. RAKOCZY:  Absolutely, Your Honor.  Thank

16  you.

17            (Luncheon recess taken.)

18            THE COURT:  Mr. Rakoczy, please, resume your

19  examination.

20            MR. RAKOCZY:  Thank you, Your Honor.

21  BY MR. RAKOCZY:

22  Q.    Dr. Fox, I think when we left off we were talking

23  briefly about Tables 1 and 2 from the Copaxone package

24  insert.  Do you recall that?

25  A.    I do.

Fox - cross

1  Q.    Can we at least agree, again, the incidence of adverse

2  events for the placebos for the 20 mg was 20 percent, 40 mgs

3  was 2 percent.  Correct?

4  A.    That's what we see here.

5  Q.    You rely in part on discontinuation data for your

6  tolerability pain and discontinuation path data in part

7  relies on incidence of adverse events.  Correct?

8  A.    I would agree that the patients who are discontinuing

9  a medication due to adverse events, their numbers would be

10  included within the incidence of that event.

11  Q.    All right.  So we have got a difference in injection

12  site pain on these placebos.  Now, I would like to look at

13  the standard you mentioned, the CTCAE.  If we could pull

14  that up, the demonstrative you used.  This is the CTCAE

15  standards you mentioned?  Correct?

16  A.    It is.

17  Q.    This the general guideline.  Right?

18  A.    Yes.

19  Q.    Let's take a look at the guideline that's specific to

20  injection site reactions, which I believe is DTX-1179, Page

21  60.  You have seen this before.  Correct?

22  A.    I have.

23  Q.    So we were just talking about injection site pain on

24  those placebos.  And in this specific standard, which is

25  labeled Injection Site Reactions, pain falls under the

Fox - cross

1    bucket of Grade 2 or moderate.  Correct?

2    A.    Again, this listing, which is a hierarchy of all

3    adverse events related to injection site reactions, pain is

4    listed in Level 2.

5    Q.    Okay.  So for both of those placebos, the injection

6    pain would be Grade 2 under this specific standard.  Now,

7    the patent does not require -- strike that.

8          We can agree that neither the claims nor the

9    specification of the '776 patent require any particular

10   method for measuring severity of injection site reactions.

11   Correct?

12   A.    It is understood that it is under the guidelines of a

13   Phase III clinical trial and therefore would use CTCAE or a

14   similar scale.

15   Q.    Let's take a look at Paragraph 99 of your rebuttal

16   report.  It is in the binder in front of you.  I will pull

17   it up on the screen.  It probably says "Dr. Fox Rebuttal."

18   Or "Fox Rebuttal Report."

19   A.    Yes, I see it.

20   Q.    If we look at Paragraph 99 of your rebuttal report, in

21   the middle of the paragraph, you say, quote, "Neither the

22   claims nor the specification limit the severity terms to a

23   particular method of evaluating severity."

24          That's what you wrote.  Correct?

25   A.    Yes.

Fox - cross

1    Q.    And that's correct?

2    A.    That it did not require that a specific one be used

3    because CTCAE or a similar scale would suffice.

4    Q.    Correct.  You mentioned there are multiple methods out

5    there -- I know you quibble with whether they would lead to

6    different results or not -- but you agree at least that

7    there are other methods other than the CTCAE.  Correct?

8    A.    Yes, I do agree with that.

9    Q.    Now, let's move on.  You mentioned the Glacier study.

10   Correct?

11   A.    I did.

12   Q.    You were a site investigator on Glacier.  Correct?

13   A.    Yes, I was.

14   Q.    You were in fact trained as a site investigator.

15   Right?

16   A.    I was.

17   Q.    Now, just for a little background, Glacier had a core

18   phase in which the patients were either on 20 mg daily or 40

19   mgs three times a week.  Correct?

20   A.    Correct.

21   Q.    During the core phase, I believe, there were five

22   scheduled visits.  Is that correct?

23   A.    That sounds accurate.

24   Q.    And there was no doubt in your mind it was important

25   to collect that data accurately for the patients because you

Fox - cross

1   knew it would be scrutinized very carefully later on.

2   Correct?

3   A.      The way that clinical trial is done is that the data

4   is collected and then the CRO, as has been mentioned

5   earlier, comes in and verifies that the data has been

6   correctly entered into the electronic data capture.

7   Q.      As the principal investigator for your site, you

8   actually initialed and dated every diary card entry.

9   Correct?

10  A.      As the PI, the expectation is that all clinically

11  related documents will have been seen and signed off by the

12  PI.

13  Q.      Now, in your opinion, there was clear consensus among

14  clinicians and patients about what constituted a more or

15  less severe ISR or IPIR.  Correct?

16  A.      Yes, that there was a consensus about what the term

17  severity meant.

18  Q.      And a clear consensus about what would constitute a

19  more severe or less severe event.  Correct?

20  A.      Yes, POSAs and patients alike understood the nature of

21  the severity chart.

22  Q.      Let's take a look at a patient from Glacier, I would

23  like to pull PTX-109.336 up.  Let's look at the patient

24  record for Patient 10727-004.  Do you see that?

25  A.      I do.

Fox - cross

1   Q.    I will just refer to that as "the patient."  If that's

2   okay.

3               As we see here on PTX-109.336, in both the third

4   column and the last column, we see that this patient had

5   both injections and recorded symptoms on each of October 9,

6   10, 11, 12 and 13.  Do you see that?

7   A.    On which page?

8   Q.    336.  And I have also pulled it up on your screen.

9   A.    Yes.  I do see the start date and the stop date of

10  each of those events.

11  Q.    So this patient appears to be taking daily injections,

12  which would have been the 20 milligram.  Correct?

13  A.    It is not evident from this document.  But I

14  understand your presumption.

15  Q.    Okay.  And this patient would have brought his or her

16  diary card to the visits with the clinician.  Correct?

17  A.    Yes.  That was the duty of the patient.

18  Q.    Now, if we look at Line 2, staying on this same card,

19  we see this patient recorded a symptom of having burning in

20  the left hip on October 10.  Do you see that?

21  A.    I do.

22  Q.    And this event lasted from 7:31 to 7:50 p.m., for

23  about 19 minutes.  Do you see that?

24  A.    Yes.

25  Q.    Then this patient classified that left hip burning as

Fox - cross

1    mild.  Do you see that?

2    A.    Yes, I do.

3    Q.    Let's stick with this same patient and look at what

4    happened on the 40-milligram three times a week.  Let's go

5    to PTX-109.340.  I have pulled that card up on the screen as

6    well.

7              If we look at Lines 4 and 5 of this patient

8    diary card, PTX-109.340, Lines 4 and 5, you see this patient

9    was still recording burning in the left hip in addition to

10   itching in the left hip on February 26th of 2014.  Do you

11   see that?

12   A.    I do.

13   Q.    By February of 2014, obviously, this would have been

14   the extension phase of Glacier.  Correct?

15   A.    I cannot say when this patient entered the trial at

16   the beginning, baseline or when they entered the extension

17   trial.  I would have no knowledge of this patient.

18   Q.    You were a site investigator.  We will assume for

19   purposes of my question, let's assume this patient was 40

20   milligram.  If you look at the left-hand burning now on this

21   card, it lasted for about 40 minutes, do you see that?

22   A.    I see the start and stop time there.

23   Q.    Now, the left hip burning was classified as moderate.

24   Do you see that?

25   A.    I do.

Fox - cross

1  Q.     Moderate on the Glacier scale is more intense than

2  mild.   Correct?

3  A.     Yes, it is defined as symptoms sufficiently

4  discomforting to interfere with daily activity.

5  Q.     But it is more intense.   Correct?

6  A.     Yes, in terms of the intensity or the severity of it,

7  moderate is listed as more than mild.

8  Q.     And this patient was suffering two reactions, right,

9  from the same injection, both moderate left hip burning and

10 itching in the left hip that was mild.   Correct?

11 A.     There were two different adverse events that were

12 listed by the patient here.

13 Q.     So let's look at these two cards together.   Let's pull

14 up PTX-108.336, Line 2, and let's also pull up PTX-109.330,

15 Lines 4 and 5.   So again we can see, looking at these cards,

16 that the patient initially had mild burning on October 10 in

17 the left hip and then later moderate burning in the left hip

18 in addition to mild itching.   Do you see that?

19 A.     I see what you have highlighted.

20 Q.     In your view, Dr. Fox, did this patient experience

21 reduced severity of his or her ISRs?

22 A.     In my review today, because this is the first time I

23 have obviously seen these cards.   This is not from my site.

24 Q.     I am asking you, in your view, is this evidence of

25 reduced severity of ISRs, going from mild, moderate left hip

1   burning to moderate left hip burning along with mild

2   itching?  Is that reduced severity?

3   A.    In this case, the definition of mild and moderate is

4   defined in the clinical trial.  And so the patient during

5   this period of time has evaluated these as listed here.

6          For this patient, what you have right now is an

7   isolated event that you have chosen to show where on that

8   injection, which undoubtedly was not into the exact same

9   location of the left hip, it caused a moderate reaction,

10  whereas the previous one had caused a mild reaction.

11  Q.    So is that reduced severity?

12  A.    That is not reduced severity.

13  Q.    Is that increased severity?

14  A.    For that one injection into a different location in

15  the same area of the body for that one injection, there

16  would be increased severity.

17  Q.    Now, why don't we look at what the CTCAE injection

18  site standard says.  Let's pull up DTX-1179 at Page 60.  On

19  the specific injection site reaction standard from the

20  CTCAE, the itching would all be Grade 1, mild.  Correct?

21  A.    I would not use the CTCAE criteria.

22  Q.    You would not use the injection site reaction criteria

23  from the CTCAE ?

24  A.    No.  As I have already explained, that this is a

25  bucket approach, where each are listed into different

1    categories based on their expected effects on patients.  It

2    is more appropriate to use the scale that I have mentioned

3    all along, which goes into mild, moderate and severe for

4    each one of those, where, clearly, itching can be mild,

5    moderate or severe.

6    Q.    Well, clearly, if the skilled person wanted to use the

7    specific injection site reaction standard that we have up on

8    the screen, itching would be Grade 1, Mild.  That's the

9    bucket it falls in.  Correct?

10   A.    That would not be the scale that a person of ordinary

11   skill would use.  But that is the -- itching is within

12   Category 1.

13   Q.    And the warmth would also be Category 1.  Correct?

14   A.    It is in the list of 1s.

15   Q.    Let's look at the same patient again.  Let's look at

16   some pain recordings.  Let's pull up PTX-109.331.  If you

17   look at this card, we have the same patient, 10727-0004.  If

18   you look at the first four lines in the card here, we see

19   this patient recorded injections and symptoms every day from

20   August 12 through August 15.  Do you see that?

21   A.    I do see that.

22   Q.    So is it safe to assume, if this patient was injecting

23   every day from August 12th through the 15th, that this looks

24   or appears to be 20-milligram daily?

25   A.    If the injections were done on a daily basis, I can

Fox - cross

1    make that assumption.

2    Q.    Now, if we look at Line 2, can we agree that this

3    patient on August 13th of 2013 reported injection pain from

4    7:49 through 8:10, for about 21 minutes.  Do you see that?

5    A.    Yes.

6    Q.    And this patient qualified that event as severe.  Do

7    you see that?

8    A.    I do.

9    Q.    Now, severe on the Glacier scale means symptoms which

10   prevent normal daily activities.  Correct?

11   A.    The listing, as you see in the background of that,

12   severe is symptoms which prevent normal daily activities.

13   Q.    So for about 21 minutes this patient's normal daily

14   activities were prevented in some fashion or another

15   according to this card?

16   A.    According to this card, yes.

17   Q.    Let's look at what happened for this patient in

18   November 2013, and PTX-109.338.  We are looking again at

19   Patient 10727-004.  If you look at November 13th, this

20   patient reported what she called dull sharp pain in the left

21   arm from 7:35 to 8:10 for about 35 minutes.  Do you see

22   that?

23   A.    I see that.

24   Q.    This pain was classified as moderate.  Correct?

25   A.    That's what I see.

Fox - cross

1    Q.    Now, I would like to pull up both of these cards,

2    PTX-309.331, at Line 2 and PTX-109.338, Line 1.  My

3    question, Dr. Fox, is, comparing these, which reaction was

4    more severe here, the 21 minutes of severe pain on August

5    13th or the 35 minutes of moderate pain on November 13?

6    A.    The clinical research form that was used on this

7    defined the severity as being in the wording of the patient.

8    So in this case it was a severe reaction as seen in the top

9    example.

10   Q.    So even though it lasted, the moderate reaction lasted

11   longer, that one is not more severe.  Is that right?

12   A.    The severity being measured here is on this mild,

13   moderate and severe scale.  You see the words that are

14   listed there.  That is how the data was accumulated.

15   Q.    So duration has nothing to do with the degree of

16   severity, on this scale at least?

17   A.    Duration was not used as a means of characterizing the

18   severity of the adverse event.

19   Q.    All right.  Now, if we went back to the CTCAE specific

20   injection site reaction chart we looked at, at DTX-1179,

21   Page 60, all of this pain falls under Grade 2 moderate.

22   Correct?

23   A.    In this scale, which was not used appropriately in

24   this trial, it is listed as 2.

25   Q.    Let's look at this same patient on the 40 milligrams

1    three times a week regimen.  We will quickly look at

2    PTX-109.339.  Here, if you look at Line 9, we see this

3    patient is reporting a reaction on January 1st of 2014?  Do

4    you see that?

5    A.    I see that.

6    Q.    It looks to be sharp pain in the left hip for it

7    appears to be about 23 minutes.  Do you see that?

8    A.    I do, but I am not sure whether the left has been

9    corrected to right.  It's an initial.  So I will say that is

10    the left hip.

11    Q.    It appears to be classified as moderate sharp pain in

12    the hip.  Correct?

13    A.    Yes, that is written in the severity list.

14    Q.    Now, if we look at Line 10, this same patient,

15    10727-0004, was now recording soreness in the right arm from

16    January 6 through January 12th.  That was classified as

17    mild.  Do you see that?

18    A.    I see that.

19    Q.    So my question to you is, Dr. Fox, what was more

20    intense here, the 21 minutes of moderate sharp pain in the

21    hip or six days of soreness in the right arm?

22    A.    Because I think we can all agree that interference

23    with activities of daily living is a more significant impact

24    on the patients, the one that was listed as moderate is more

25    considerable than the one that was mild.

Fox - cross

Q.    So no question in your mind, the sharp pain that was
moderate here is more severe?

A.    On the severity scale that is being used, the moderate
mild, moderate and severe, the moderate is different from
the mild.

Q.    Now, if we go back to the injection site pain scale
from the CTCAE, that pain, the pain would fall in Grade 2
moderate.  Correct?

A.    We have agreed that using this scale, which I do not
believe constitutes the scale that is used in the Glacier
trial, that is in this Category 2.

Q.    And the tenderness or the soreness would be Grade 1,
mild.  Correct?

A.    In this scale, which I believe is inappropriately
being discussed in this case, yes.

Q.    All right.  Now, the Glacier scale from these cards,
this mild, moderate, severe affecting daily activities, you
would agree that that scale is not found in the patent.
Correct?

A.    Adverse events are to be collected, and it is inherent
that a collection of adverse events, as with all clinical
trials, includes all the factors you see in those cards.

Q.    But it is inherent.  Correct?  It is not expressly set
forth in the patent anywhere.  Correct?

A.    The description of the product as being more tolerable

1    as defined by a reduction in severity, the word "severity"

2    is part of the grading scale that we use in these clinical

3    trials.

4    Q.    So severity, you know it when you see it even though

5    the patent does not give us any specific method in the

6    patent.  Is that what you are saying?

7    A.    There is a convention for the term "severity" which

8    has been agreed upon by the parties here that was in

9    conventional use by all POSAs in 2009.

10   Q.    A convention that no one bothered to put in this

11   patent; correct?

12   A.    There would be no need to put specifics of that.  When

13   you know that adverse events are being collected, it is

14   inherently obvious that the adverse events are characterized

15   the way that they should be.

16   Q.    And we agree there is more than one method out there,

17   but we also agree that neither the specification, nor the

18   claims require any particular method.  Correct, Dr. Fox?

19   A.    They require an appropriate method.

20   Q.    But no particular method; correct?

21   A.    Since as we have agreed, there are multiple scales

22   that would give the same results.  Any one of those scales

23   may have sufficed.

24   Q.    I didn't agree multiple scales give the same results.

25   My only question is the claims and the spec do not require

1    any particular method of those multiple methods out there.

2    Correct?

3    A.    Any of a number of quality measures could have been

4    used.

5              MR. RAKOCZY:  All right.  Thank you, Dr. Fox.

6              I pass the witness.

7              THE COURT:  All right, Mr. Rakoczy.

8              MS. BLOODWORTH:  Your Honor, may we approach?  I

9    think we have more binders.

10             (Binders passed forward.)

11                        CROSS-EXAMINATION

12   BY MS. BLOODWORTH:

13   Q.    So, Dr. Fox, to orient you, if I may.  There is a

14   binder of exhibits.

15   A.    Yes.

16   Q.    And then I think a copy of your rebuttal report in the

17   District Court case, and then your two dep. transcripts, one

18   from the District Court case and one from the IPR

19   proceedings.

20   A.    Yes.

21   Q.    Now, Dr. Fox, it's your opinion that if the patent was

22   filed before August 20th, 2009, the prior art would not have

23   suggested to a person of ordinary skill in the art that the

24   40 milligram three times weekly was likely to be successful.

25   Correct?

Fox - cross

1    A.    That is correct.

2    Q.    But it is also your opinion that a person of ordinary

3    skill in the art, upon reading prophetic Example 1, would

4    understand the 40 milligram three times weekly regimen was

5    highly likely to be successful; right?

6    A.    That the "highly likely" that you are referring to is

7    that it's highly likely that the inventor had possession of

8    sufficient information, a credible way forward to be able to

9    be able to have 40 milligrams three times a week as a more

10   tolerable means of administering glatiramer acetate.

11   Q.    Okay.  Well, it is also your opinion on August 20th,

12   2009 that person of ordinary skill in the art would have

13   read that prophetic example, Example 1, and expected it to

14   yield positive results.  Right?

15   A.    That that would have led the a POSA to see the Example

16   1 and recognized that for this pivotal large international

17   trial to be done, that Teva had in their possession credible

18   rationale for doing the trial.

19   Q.    And, in your opinion, the person of ordinary skill

20   in the art's change of mind between the invention being

21   completely unexpected and having possession would come about

22   because the person of ordinary skill in the art would take

23   the statements in the specification at face value.  Right?

24   A.    I don't think I would characterize it that way.

25   Q.    Okay.  Well, what -- in the patent specification, the

1    information that is listed inside the patent specification,

2    it's your opinion that the person of ordinary skill in the

3    art would take that information at face value.  Right?

4    A.    No, I disagree with the terms that you used.

5    Q.    Okay.  Can you turn to your deposition in this case,

6    please?  And if I can direct, it would be Page 50, Lines 7

7    through 11 -- or 7 through 14.

8    A.    I'm sorry.  Two very similar.

9    Q.    I think it is the one dated, I believe I took your

10   deposition in July of this year, 2016.

11   A.    This July?

12   Q.    Yes.

13   A.    What page?

14   Q.    Can you turn to Page 50, please.  And it would be

15   Lines 7 through 14.

16   A.    (Witness complies.)  Yes.

17   Q.    Okay.  So at your deposition, it was your opinion,

18   correct?, that the person of ordinary skill in the art

19   would believe that the patent application would provide

20   information to them to show it would be effective in

21   treading RMMS because they would take the statements in the

22   patent specification at face value.  Right?

23   A.    We have to take that into context with the section

24   that was being described, which is that the POSA could look

25   at the totality of the patent application and see what was

Fox - cross

1    being listed there in terms of the claims, the descriptions,

2    and the Example 1, and as a whole would be able to interpret

3    that.

4    Q.    And they would take the words at face value of the

5    patent.  Right?

6    A.    That they would find credible evidence by looking at

7    the patent that this would be sufficient to move forward

8    into a large Phase III clinical trial.

9    Q.    And the person of ordinary skill in the art, reading

10   the wording of the specification, would believe that Teva

11   had in their possession information that showed efficacy of

12   40 milligrams three times weekly.  Right?

13   A.    That they would have credible information that would

14   allow them to move forward, yes.

15   Q.    I mean that is because, in your opinion, the inventor

16   had possession of material necessary to bring forth Example

17   1 of the clinical trial in Example 1.  Right?

18   A.    In the presence of the patent of reading those, there

19   would be an understanding there was a rationale to move

20   forward with this.  That there was enough preclinical

21   information and other information that would allow a POSA to

22   understand that there was an example set forth to show the

23   results.

24   Q.    But, in fact, the patent specification does not

25   actually contain any human safety or efficacy data for the

1    40 milligram three times weekly regimen.  Right?

2    A.    Well, the prophetic example that is given does not

3    have actual data.  It does have the results set forth within

4    the patent to explain the outcomes of that example.

5    Q.    The prophetic hypothesized outcomes.  Right?

6    A.    I agree to the word, the word "prophetic," yes.

7    Hypothesized, I do not agree to.

8    Q.    Is there any data of the results of the 40 milligram

9    three times a week trial in the patent specification?

10   A.    Although we have agreed that the data for that trial

11   is not listed in the patent application, the totality of it

12   in terms of the description, the example, and the results do

13   include the information to be sufficient for a POSA to

14   interpret.

15   Q.    And the clinical trial in the GALA clinical trial was

16   not performed until after the patent application was filed.

17   Right?

18   A.    That is correct.  The GALA was subsequent to the

19   patent publication.

20   Q.    And there is no preclinical information in the patent

21   to support the possession of the 40 milligrams three times a

22   week invention being effective.  Right?

23   A.    While there was no specific preclinical data, it was

24   well understood by a POSA that a tremendous amount of work

25   had been done by Teva over the years before in humans and in

1    animals to better explain the actions of the molecule and to

2    determine where to move forward.

3    Q.    And none of that information appears in the patent.

4    Right?

5    A.    There is no preclinical data that is mentioned.  It is

6    certainly in the description of the product as being

7    40 milligrams three times a week and being compared to

8    20 milligrams a day, inherent in my mind, that all the

9    information available to a POSA in 2009 could be utilized.

10   Q.    And the information you keep referring to that Teva

11   had performed to underline the 40 milligram three times a

12   week regimen, that is not public information.  Right?

13   A.    There were no publications on 40 milligrams three

14   times weekly prior to GALA.

15   Q.    And there was no preclinical publications regarding

16   40 milligrams three times weekly prior to GALA either.

17   Right?

18   A.    Although there were no publications about

19   40 milligrams three times weekly preclinical, that does not

20   mean that a POSA believed that there could not have been

21   background data that could have been used for that.

22   Q.    There is no empirical dose ranging study in the

23   patent.  Right?

24   A.    There is no dose ranging study.

25   Q.    And there is no studies of any empirical dose ranging

Fox - cross

1   studies performed on 40 milligrams three times a week

2   available to a person of skill in the art.  Right?

3   A.    There have not been publications of that information

4   at the time of the patent.

5   Q.    And the patent specification did not reveal any

6   mechanism of action?

7              THE COURT:  Ms. Bloodworth, slow down just a

8   bit.  Just a bit.

9              MS. BLOODWORTH:  Thank you, Your Honor.  Sorry,

10  Dr. Fox.  I will try to talk slower.

11  BY MS. BLOODWORTH:

12  Q.    The patent specification does not reveal any mechanism

13  of action that would justify three times weekly dosing.

14  Right?

15  A.    This was, mechanism of action was a topic of a great

16  interest to POSAs and were well versed in the theories at

17  the time as to how this medication worked, and so there is

18  no specification in there about mechanism of action.

19  Q.    And turning to tolerability, there is also no data to

20  show that the 40 milligram three times weekly dosing regimen

21  would produce less severe injection site reactions relative

22  to 20 milligrams twice weekly.  Right?

23  A.    It is stated throughout the patent that the

24  40 milligrams three times weekly will be more tolerable than

25  20 milligrams a day.

Fox - cross

1    Q.      Right.   There is no data to support that statement.

2    Right?

3    A.      Yes.   Whereas there is no specific numbers associated

4    with that, the outcomes are clearly listed.

5    Q.      And there are no references to any study of any

6    tolerability data that a POSA would look to to support that

7    statement in the patent specification.   Right?

8    A.      I agree.

9    Q.      And there are no references to any in vitro or any

10   preclinical data indicating the toxicity of a 40 milligram

11   three times a week dosing regimen either.   Right?

12   A.      The information that was gleaned about safety of

13   40 milligrams predominantly came from the FORTE trial which

14   was given every day.

15   Q.      And the 40 milligram daily dosing that was in the

16   FORTE trial was shown to be equally efficacious to the

17   20 milligram daily dose.   Right?

18   A.      It had no improved effect over 20 milligrams a day.

19   The trial was not an equivalency trial which proved that 40

20   was the same as 20.   They were just unable to prove

21   affirmatively that 40 milligrams was superior to 20.

22   Q.      And turning back again back to the patent

23   specification for tolerability.   There was no in vitro

24   preclinical or clinical data referenced or contained within

25   the patent specification to indicate that the 40 milligram

1    three times weekly would produce less severe injection site

2    reactions compared to the 20 milligram daily.  Right?

3    A.    Reading the patent, it was a very clear what they were

4    stipulating is that 40 milligrams would be a more tolerated

5    medication than 20 milligrams a day.

6    Q.    And you are aware, right?, that Dr. Klinger testified

7    that the trial protocol was just a hypothesis?

8    A.    I have reviewed that.  And from the scientific

9    standpoint, as a scientist, when she referred to it as a

10   hypothesis, there were a number of different credible ways

11   they could have moved forward; and what was chosen, based on

12   scientific information rather than just pure hypothesis, is

13   they chose to move forward with 40 milligrams three times a

14   week.

15   Q.    And they chose that on information private to Teva.

16   Right?

17   A.    They would presumably have moved forward on that based

18   on the information they had obtained internally.

19   Q.    And, Dr. Fox, you were a site investigator for the

20   FORTE trial.  Right?

21   A.    I was.

22   Q.    And so you read the FORTE protocol before the study

23   was conducted?

24   A.    I did.

25   Q.    And reading the FORTE protocol, you understood then

Fox - cross

1    that Teva had possessed a 40 milligram daily dosing regimen

2    that had a superior efficacy to the 20 milligram daily

3    regimen.   Right?

4    A.    I would disagree with the way you characterized it.

5    Q.    Would you agree with me that upon reading the FORTE

6    protocol that you believe that there had been evidence that

7    suggested that the 40 milligram daily dose might be, might

8    be a benefit to higher dosing of glatiramer acetate?

9    A.    I would agree with your statement using the suggested

10   "and might," yes.  The Cohen study had been a valid

11   rationale for moving forward with the FORTE trial.

12   Q.    And for the GALA trial, there was no Phase II trial

13   that was performed prior to moving forward with the GALA

14   trial that is the subject of this patent specification.

15   Right?

16   A.    It was felt that there was no need for a Phase II

17   trial; and the FDA agreed to that, that a well performed

18   very large Phase III trial would suffice.

19   Q.    I think -- and, Dr. Fox, you are aware that Claims 14

20   through 18 of the '250 patent and Claim 7 of the '413 patent

21   claim improved tolerability relative to the 20 milligram

22   dose?

23   A.    I may ask you to point to that in the documents, but

24   the improved tolerability is certainly part of those

25   documents.

Fox - cross

1  Q.    Okay.  And we won't go into the specific claims.  I

2  just wanted to draw the distinction between the '250 patent

3  and the '413 for improved tolerability and then the '776

4  patent which has the claims to reduce severity.  Right?

5  A.    I understand the wording that you are referring to.

6  Q.    Okay.  In Example 1, if you want to turn to it, it's

7  JTX-7003, which is the '776 patent.

8  A.    (Witness complies.)

9  Q.    And if we could turn to, it's on Page 17, so it would

10  be 7003.17, but it's Column 11.

11  A.    Yes, I'm there.

12  Q.    And if you look around Line 29, it says "Exclusion

13  Criteria."

14  A.    Yes, I see that.

15  Q.    And then lower down, around Line 43, I believe it

16  says:  Previous use of GA or any other glatiramoid.

17            Do you see that?

18  A.    I do see that.

19  Q.    So Example 1 of the patents in suit expressly excludes

20  patients previously treated with 20 milligrams of daily

21  glatiramer acetate.  Right?

22  A.    Yes, that is the case.

23  Q.    And if we can turn to your slide, PDX-8.20.

24            Dr. Fox, this is the Slide 8.20 you looked at,

25  you talked about during your direct testimony.  Right?

Fox - cross

1    A.    Correct.

2    Q.    And this lists the safety and tolerability outcome

3    measures for the Example 1 in the specs.  Right?

4    A.    It does.

5    Q.    And the tolerability endpoint that you pointed out in

6    your direct examination are not for a 40 milligram three

7    times a week dosing regimen compared to a 20 milligram

8    daily.  Right?

9    A.    I would disagree with the way you have worded that.

10   Q.    Is the GALA trial designed to be a superiority trial

11   to the 20 milligram daily dose?

12   A.    No, it was not a superiority trial to 20 milligrams.

13   It was superiority to the placebo that allows for a relative

14   comparison between the two products.

15   Q.    And is it powered to perform a relative comparison

16   between the two products?

17   A.    As I said, the powering of it was extremely strong for

18   this trial.  By listing it as 1,350 patients, it would be

19   very clear to a POSA this is going to be very strong data

20   where we would have adequate information about safety and

21   tolerability to be able to make judgments.

22   Q.    But it wasn't powered specifically for a 20 milligram

23   arm compared to a 40 milligram three times a week arm versus

24   placebo to determine whether or not the 40 milligram three

25   times a week had improved tolerability relative to the 20.

Fox - cross

1    Right?

2    A.    Well, we agree that this was not a three arm trial, it

3    was a two arm trial with glatiramer acetate 40 milligrams

4    three times a week versus placebo.  As I said, this is a

5    pivotal trial that allows for us to have the information

6    necessary to be able to make comparisons.

7    Q.    And, in fact, this trial actually excludes the

8    patients for whom had been taking the 20 milligram dose of

9    Copaxone.  Right?

10   A.    It would be inappropriate for a Phase III trial to

11   look at treatment experienced patients with the same product

12   that is being investigated for efficacy, safety, and

13   tolerability.

14   Q.    So it's also your opinion that before the Glacier

15   clinical trial was published in 2015, a skilled artisan

16   would not know the effect of switching a patient from

17   20 milligrams daily to 40 milligrams three times a week.

18   Right?

19   A.    I wouldn't characterize my statement that way.

20   Q.    Well, is it your opinion that the purpose for

21   performing the Glacier trial was to find out whether there

22   might be an increase in adverse events seen in a patient who

23   is switching from 20 milligrams daily to 40 milligrams three

24   times per week?

25   A.    I agree in principle with what you just said now in

Fox - cross

1   that the design of the Glacier trial was to have patients

2   who are on 20 milligrams a day either switch or not switch

3   so that we could investigate the reduction in severity of

4   adverse events to patients.

5   Q.    And you know that from reading the patent

6   specification.  Right?

7   A.    The Glacier trial was not part of the patent

8   specification.

9   Q.    Right.  And you still felt that a need for the Glacier

10  trial even though you would have read the patent

11  specification in August of 2009.  Right?

12  A.    It is very common for a medication, once it is

13  available on the market, to be tested in a real world

14  scenario where patients are switching.  The majority of

15  patients in the United States with a diagnosis of MS are on

16  an agent and not newly diagnosed and treatment naive, so it

17  is important to look at real world examples such as this.

18  Q.    Maybe my question was a little bit different, Dr. Fox.

19  You still, as a physician, you still thought you needed the

20  data from the Glacier trial to know the effect of switching

21  patients from 20 milligrams to 40 milligrams three times a

22  week, and that is why the Glacier trial was performed.

23  Right?

24  A.    I supported the Glacier trial being done because I was

25  looking forward to my patients having access to 40

1   milligrams through that trial.

2   Q.    And reading the patent specification didn't alleviate

3   your concerns about switching patients from the 20

4   milligrams to the 40 milligram trial -- excuse me, dose.

5   A.    Oh, no.  I was very much, based on GALA data alone,

6   willing and able to switch patients from 20 milligrams a day

7   to 40 milligrams three a times a week.

8           The Glacier trial gives us evidence that can be

9   widely disseminated worldwide to show the specific effect.

10  This allows us to confer with our patients and give even

11  more data about what the expected results of such a switch

12  would be.

13  Q.    Your opinion is that prior to August of 2009, it would

14  be an unexpected result for the 40 milligram three times a

15  week regimen to show improved tolerability over the

16  20 milligram daily regimen.  Right?

17  A.    A POSA prior to August of 2009 had no credible

18  information that would have led to a conclusion that this

19  would be more tolerable.

20  Q.    And it's your opinion when the GALA trial results were

21  published by Khan in 2013 that those results showed

22  unexpected results for tolerability for the 40 milligram

23  three times a week dosing regimen.  Right?

24  A.    It showed extremely positive information about the

25  tolerability of this medication.

Fox - cross

1    Q.      It showed unexpected results.  Right, Dr. Fox?

2    A.      I would say that the results were confirmatory of what

3    had been seen in the past.  It was as stated in the patents.

4    And so it was not a surprise in that we already had

5    information from viewing the patent that this would     be

6    the expected result of such a trial, but it was, it was

7    confirmatory of what we had seen in the patent.

8    Q.      Can you please turn to Page 96 of your dep.

9    transcript, that same one you were looking at before.  And I

10   will direct you to read Lines 13 to 16, please.

11   A.      What page again?

12   Q.      Ninety-six.

13   A.      All right.  So you are asking me to read Lines 13?

14   Q.      Through 16.

15   A.      Through 16.

16   Q.      Yes.

17   A.              "Question:  Okay."

18               THE COURT:  Read it to yourself.

19               THE WITNESS:  Oh, I'm sorry.

20   BY THE WITNESS:

21   A.      Yes, I have read it.  Thank you.

22   Q.              "Question:  So did the GALA trial show

23   unexpected results for tolerability when it was published in

24   2013 to the person of ordinary skill in the art?"

25               You answered:

1      "Answer:  Yes, it did show unexpected results."

2      Right?

3   A.     Although this is what it says, the results as a whole

4   are different than show unexpected results.  So some aspects

5   of it may be unexpected whereas as a whole, it may not have

6   been a surprise.

7   Q.     And, specifically, the tolerability results were

8   unexpected.  Right?

9   A.     Some of the tolerability results were unexpected.

10  Q.     And also it's your opinion that Glacier showed

11  unexpected results regarding reduced severity in the

12  40 milligram arm and it was published in 2015.  Right?

13  A.     I would disagree with that comment about 2015.

14  Q.     Okay.  Can you look at that same page on your

15  deposition?  And could you look at Page 96, Lines 9 through

16  12 and please read them to yourself.

17  A.     On Page 96?

18  Q.     Yes.

19  A.     Yes.

20  Q.     So, the question was:

21      "Question:  Did the Glacier trials show

22  unexpected results to a person of ordinary skill in the art

23  as of August 2009?

24      "Answer:  Yes, it did."

25      So, Dr. Fox, simply reading the words of the

Fox - cross

1    patent specification was not enough for a person of ordinary

2    skill in the art to have an expectation of improved

3    tolerability between the 40 milligram three times weekly

4    dosing regimen and the 20 milligram daily.  Right?

5    A.    No, I disagree.  Your question was not did it show

6    unexpected results about improved tolerability of the

7    medication.  It was just any unexpected results.  The reason

8    that we do clinical trials is because we have a lot of

9    different data that we need to look at, some of which may be

10   expected, some of which may be unexpected.

11   Q.    And the Glacier study had to have the 40 milligram

12   three times a week dosing regimen relative to the

13   20 milligram arm of Copaxone for the reduced frequency of

14   ISRs.  Right?

15   A.    That was some of the data that was gleaned from the

16   Glacier trial was improvement and tolerability.

17   Q.    And, to your knowledge, that is the only head-to-head

18   trial that has been performed with 20 milligrams daily,

19   40 milligram three times a week.  Right?

20   A.    That was the first trial that was published on a large

21   scale of people who had switched from 20 to 40.

22   Q.    And that was published in 2015.  Right?

23   A.    The Glacier trial was published in 2015.

24   Q.    Okay.  Now, Dr. Fox, I believe in your direct

25   testimony you did mention that tolerability was defined in

Fox - cross

1    your opinion to be associated both with frequency and

2    severity.  Correct?

3    A.      That was not just my definition.  That was the

4    definition in the patent.

5    Q.      So just to orient you, so that is sort of switching

6    topics on you a little bit, but that is what we're going to

7    talk about a little bit now.

8            And if we could turn -- I believe you testified

9    you reviewed the patents in this suit, in the suit, all

10   four?

11   A.      Yes, I did.

12   Q.      And if we could look at JTX-7000 which is the '250

13   patent, please.  And specifically, Page 13 when you find it.

14   A.      Page 13?

15   Q.      Page 13.  I wanted to draw your attention to Claim 15.

16   A.      Yes.

17   Q.      Claim 15 of the '250 patent recites an increase in the

18   tolerability of GA treatment.  Right?

19   A.      I see where you are reading.

20   Q.      Okay.  There is no claim to reduced severity in Claim

21   15.  Correct?

22   A.      As mentioned before, tolerability has been defined as

23   including frequency and severity.

24   Q.      So is there any claim to reduced severity in Claim 15?

25   A.      It lists, it lists tolerability, and this is how it's

Case 1:14-cv-01171-GMS   Document 292   Filed 01/05/17   Page 131 of 209 PageID #: 9218

Fox - cross

1   been defined and how the parties agreed to the definition of

2   tolerability.

3   Q.    Okay.  So it's your opinion that by listing the word

4   tolerability, it also says that Claim 15 claims reduced

5   severity?

6   A.    That a POSA reading this tolerability and having seen

7   the definition of that would be able to clearly understand

8   what was meant in Claim 15 by increasing the tolerability.

9   Q.    And you also testified -- or maybe not testified but

10  also you reviewed the application that led to the

11  patents in suit.  Right?  The '687 application.

12  A.    Yes.

13  Q.    If we can look at that, please.

14  A.    Which patent?

15  Q.    Oh, I'm sorry sir.  It's DTX-1295.

16  A.    I'm at that tab.

17  Q.    Okay.  And if you can please look at Claim 10 for me

18  on Page 38.

19  A.    I'm sorry.  Claim 10 is not on Page 38 on DTX-1295.

20        I have it.  I'm sorry.  Yes, I see it.  It's

21  DTX-1295.00038.  I'm sorry.  I was looking at Page 36 at the

22  top of the page.

23  Q.    I apologize.  Yes, I meant the bottom right number.

24  There is a lot of numbers on that page.

25  A.    Yes.

Fox - cross

1   Q.    So we just looked at the '250 patent that claimed

2   improved tolerability.  Right?

3   A.    Yes.

4   Q.    And is it your opinion just for the record that Claim

5   15 requires reducing severity as well?

6   A.    Claim 10 that you had?

7   Q.    I'm sorry.  Claim 15 of the '250 that we already

8   looked at.

9   A.    It was a method of increasing the tolerability?  Yes.

10  Q.    And is that all -- and then also looking at Claim 10,

11  Claim 10 of the '687 patent, which is now DTX-1295, that

12  also claims a method for increasing the tolerability.

13  Right?

14  A.    Yes, that is the wording that I see.

15  Q.    So Claim 10 of the '687 patent application, like Claim

16  15 of the '250 patent, discloses reduced severity?

17  A.    The method of increasing the tolerability is defined

18  in the patent as including severity.

19  Q.    So is it your opinion that reduced severity is not a

20  novel element of the '776 patent claims?

21          MR. BENNETT:  Objection, Your Honor.  That is

22  asking for a legal conclusion.

23          I don't see how this is within the scope of the

24  direct either.

25          MS. BLOODWORTH:  Withdrawn.  I will rephrase.

Fox - cross

1   BY MS. BLOODWORTH:

2   Q.    So it is your opinion that reduced severity -- and we

3   can look at the '687 patent if you would like me show it to

4   you.  Is it your opinion that reduced severity in the '776

5   patent is not a unique element recited in the claims of the

6   '776 patent?

7   A.    If I understand the question correctly, that the claim

8   to increasing the tolerability of the medicine is something

9   that could be used on any product at any time.  That it's

10  certainly not a novel idea to have a change in a medication

11  to make it more tolerable.  So I'm certain there are other

12  times that the term "the method for increasing the

13  tolerability" has been used prior to the '776 patent.

14  Q.    Right.  Maybe we should look.  So I just want to draw

15  your attention to the method of increasing tolerability that

16  is here on the screen in Claim 10.  And if you would like to

17  look at the '776 patent to see what is claimed, that is

18  JTX-7003.

19  A.    Yes.  I understand the two references you were giving

20  me here.

21  Q.    Okay.  And for the record, JTX-7003 is Column 16,

22  Claim 1.

23  A.    So DTX -- what was it?

24  Q.    JTX-7003.

25  A.    7003.  Yes.

Fox - cross

1    Q.    .19.   It's the number on the bottom right-hand corner.

2    A.    .19.

3    Q.    Yes.

4    A.    Yes.   And column and line?

5    Q.    Column 16, Claim 1.

6    A.    Right.   So in this, it's a method of treating a human

7    patient suffering from a relapsing form of multiple

8    sclerosis, while inducing reduced severity of injection.

9              So this is obviously different wording than you

10   have shown me for Claim 10 of the other document.

11   Q.    And your opinion is that in Claim 10, the method of

12   treating a human patient -- I'm sorry, it's not there, but

13   the method of improving tolerability discloses reduced

14   severity.   Right?

15   A.    That tolerability is defined as the frequency and

16   severity.

17   Q.    And so, in your opinion, how is Claim 1 of the '776

18   patent different, if at all?

19   A.    It specifies that it is inducing reduced severity of

20   injection site reactions.   It is being more specific than

21   just mentioning tolerability.

22   Q.    That is right.   And where else in the patent

23   specification is more specific than just reducing

24   tolerability or just improving tolerability?

25   A.    I'm sorry.   I'm not following that.

Fox - cross

1    Q.    Sure.   Where else in the patent specification other

2    than the claims of the '776 patent does it disclose

3    specifically reducing the severity?

4    A.    Again, there are a number of occasions where this is

5    used as part of the term "tolerability."  So we have said

6    there are multiple instances of the word "tolerability"

7    being used.  Claim 1 is specifically claiming reduction in

8    severity.  But in every other case where the word

9    "tolerability" is used, it is understood to mean the

10   combination of frequency and severity.

11   Q.    So there is no other teaching in the patent

12   specification itself that would point the person of ordinary

13   skill in the art to how or why the severity of injection

14   site reactions using the 40 milligram dose would be reduced.

15   Right?

16   A.    I would disagree with characterization of that.

17   Q.    Well, tolerability and reduced severity are different,

18   sir.  Where in the patent specification is reduced severity

19   disclosed and supported?

20   A.    I think it is sufficient for.

21            THE COURT:  Is that a question, Ms. Bloodworth?

22   Is that a question?

23            MS. BLOODWORTH:  Where?  It was a W word.  Okay.

24   I'll rephrase.

25   BY MS. BLOODWORTH:

Fox - cross

1   Q.      Where in the patent specification is there specific

2   support for the concept that the 40 milligram three times a

3   week dosing regimen will reduce the severity of injection

4   site reactions separate and apart from the frequency of the

5   dosing or the general tolerability term?

6   A.      The claim, number one, is specifying what is meant by,

7   throughout the remainder of the protocol, by the use of the

8   term "tolerability."

9   Q.      It's discrete.  Right?

10  A.      Certainly, Claim 1 is well understood by POSAs to what

11  they're saying.  We can all agree what is being referred to

12  as inducing a reduction in severity of injection site

13  reactions.  And so throughout the entire document, taken as

14  a whole, the description of the product as being more

15  tolerable relative to 20 milligrams a day comes through in

16  one as being of reduced severity.

17  Q.      Then can we turn back, please, to JTX-7000, which is

18  the '250 patent?

19  A.      JTX-7000.

20  Q.      Yes.  And again turning to Claim 15.

21  A.      Yes.

22  Q.      In Claim 15 of the '250 patent, could the phrase

23  "increase the tolerability of GA treatment" being rewritten

24  to say "reduce the frequency and severity of GA treatment"

25  mean the same thing, in your opinion?

Fox - cross

1    A.    I don't know whether that could have been rewritten.

2    But if you are asking whether tolerability has been defined

3    as to those two, yes, they have.  We have agreed to that

4    point.

5    Q.    So you would agree tolerability in Claim 15 of the

6    '250 to be both reduction of the frequency and severity?

7    A.    I have agreed with the agreed term about what

8    tolerability means.

9    Q.    Okay.  Now, Dr. Fox, you also agree as of 2009, daily

10   dosing of glatiramer acetate had adherence issues.  Right?

11   A.    I have stated that a burden of use of that medication

12   was the daily administration.

13   Q.    I believe you mentioned in your direct testimony that

14   it was the most frequent injection -- it was the most

15   frequent recorded adverse event of using the Copaxone

16   20 milligram product?

17   A.    That is correct.

18   Q.    And you would agree, Dr. Fox, that patients experience

19   difficulty with daily injections?

20   A.    They may.  Certainly not as a uniform rule.  I have a

21   number of patients who are very competent about their

22   administration of the dose as a daily dose.  But overall, I

23   agree with the statement that daily dosage has been an

24   issue.

25   Q.    And that issue, the difficulty that patients

Fox - cross

1    experience with daily injections, was described in the

2    literature prior to August of 2009.  Right?

3    A.    Yes, it was.

4    Q.    And, again, as of August of 2009, you would agree that

5    the daily dosing of GA had adherence issues.  Right?

6    A.    Yes.  It was well known to POSAs that there could be

7    in some individuals adherence issues due to daily dosing.

8    Q.    And you would also agree another benefit of the three

9    times per week dosing regimen is that the patient can take

10   the weekends off.  Right?

11   A.    I certainly have had conversations with patients about

12   this.  And it is clear, and would have been in 2009, that

13   there would be a desire for less frequent dosing as long as

14   it maintained the efficacy which was of paramount importance

15   to the patients.

16   Q.    Now, Dr. Fox, I'd like to switch topics on you a

17   little bit again, and drawing your attention to the Glacier

18   study.  You addressed that during your direct testimony.

19                I just wanted to make you aware, Dr. Wynn --

20   excuse me.  Dr. Fox, are you aware of Dr. Wynn's testimony

21   that even though he was an author on the Glacier

22   publication, he was never informed about the fact that there

23   were two patients who had dramatically influenced the

24   Glacier data?

25   A.    I am not certain what he said on the matter.  You

1    might have to show me a quote, but I understand that Dr.

2    Wynn has testified here.  I was not present at the time.

3    Q.    Did you review Dr. Wynn's testimony?

4    A.    I have.  I have reviewed his testimony.

5    Q.    Let you look at Day 2, Trial Transcript, Page 424.  We

6    can put it up.

7                We're looking at Lines 6 through 16.  And Dr.

8    Wynn was asked:

9                "Question:  Prior to the submission of the

10   manuscript, no one ever discussed with you the fact that the

11   data was dramatically influenced by two patients prior to

12   this litigation.  Right?

13               "Answer:  Correct.

14               "Question:  And, in fact, you never saw Teva's

15   statistical analysis plan prior to the submission of the

16   manuscript for publication.  Right?

17               "Answer:  Not this revised plan.  Correct.

18               "Question:  You never saw this until it was

19   shown to you at your deposition in this case.  Right?

20               "Answer:  Correct."

21   Q.    And Dr. Wynn also testified that Teva never informed

22   Dr. Wynn, an author of the Glacier paper, that 80 percent of

23   the moderate and severe in your IRAEs in the 20 milligram

24   arm were attributable to two patients.  Correct?"

25               MR. BENNETT:  Objection.  I'm not sure what the

Fox - cross

1    point of this questioning is.  You have the testimony from

2    Dr. Wynn.

3                   THE COURT:  Ms. Bloodworth.

4                   MS. BLOODWORTH:  I was wondering if he knew

5    about these issues that Dr. Wynn had already testified to

6    before he testified today about the reliability and relied

7    upon the Glacier study.

8                   MR. BENNETT:  I suppose we could, those

9    questions could be asked, Your Honor.  I don't see the point

10   of going back over Dr. Wynn's testimony.

11                  THE COURT:  Are you going to plow this earth

12   with him?

13                  MS. BLOODWORTH:  We can move on.

14   so withdrawn for you, Dr. Fox.

15   BY MS. BLOODWORTH:

16   Q.    Now, one thing, though, you did rely on Figure 3 of

17   the Glacier study.  I believe you had a slide on that?

18   A.    I did.

19   Q.    It was PDX-8.27.

20   A.    What was the tab?

21   Q.    I believe it was 8.27.

22   A.    Yes.  I see it listed here.

23   Q.    This is Figure 3 from the Glacier trial.  Right?

24   A.    Yes.

25   Q.    This is what you relied upon in your direct testimony?

Fox - cross

1    A.    I did.

2    Q.    Were you aware that Dr. Marais testified that removing

3    the two extreme outlier patients from Figure 3 of the

4    Glacier publication results in the statistical significance

5    shown in Figure 3 going away before you testified here

6    today?

7    A.    Yes, I understand there has been a commentary from

8    both sides on this thus far about the validity of the

9    statistics.  I understand that statisticians did look at

10   this prior to breaking the code as to who was on what, and

11   decided that they would look at the incidence of the events

12   in a different way.

13            The severity, as listed here in Figure 3, in

14   moderate and severe, can be looked at as a whole.

15            I certainly would stand by the data as published

16   in the peer-reviewed journal.

17   Q.    Even though Dr. Marais testified here, Teva's

18   statistician, that Figure 3 would no longer show a

19   statistical significance if you took those errors into

20   account?

21   A.    Took those what?

22            MR. BENNETT:  Objection, Your Honor.

23   Mischaracterizes the testimony.  She referred to errors.

24            THE COURT:  Sustained.

25   BY MS. BLOODWORTH:

Fox - cross

1    Q.    Have you reviewed Dr. Marais's testimony before

2    testifying today?

3    A.    Yes.

4    Q.    And can we call up the day 3 trial transcript, Page

5    584.  Just to refresh your recollection, Dr. Fox, if you

6    could start at Line 19 and read through Line 6 on the next

7    page, 585?

8    A.    Okay.

9    Q.    So Dr. Marais testified about Figure 3.  Correct?

10   A.    Yes.

11   Q.    And he testified about Figure 3 that, "Your question

12   means that upon removing the outliers the statistical

13   significance reporting in this figure goes away?

14              "Yes, as I testified on direct, it does."

15              Did you review that testimony before you relied

16   on the Glacier Figure 3?

17   A.    Yes.  And I am well aware that in any clinical trial,

18   if you intentionally take out the highest reporting of data,

19   you can change the results.  That is true with any

20   manipulation of data, that you can change results by

21   excluding certain people from the trial post facto.

22   Q.    Certainly people who report 80 percent of the moderate

23   and severe IRAEs on the 20-milligram arm.  Right?

24   A.    If that is what the data show, that is what the data

25   show.

Fox - cross

1   Q.   If you could also turn back to your slide, which is

2   8.24, please.  You relied on this slide in your direct

3   testimony.  Right, Dr. Fox?

4   A.   I did.

5   Q.   Here, this is a report of the GALA study, which was

6   published by Khan in 2013.  For the record, it is JTX-7090.

7        I believe you relied upon the sentence that

8   starts with, "Notably," "Notably, the incidence of ISRs in

9   patients treated with GA 40 TIW was approximately 20 to 50

10  percent less compared with previous studies of patients

11  treated with GA 20 milligrams and 40 milligrams once daily."

12       Is that right?

13  A.   That is correct.

14  Q.   That is incidence data.  Correct?

15  A.   It says incidence, yes.

16  Q.   That is different from frequency and severity data.

17  Right?

18  A.   That is the percentage of patients reporting the

19  event.

20  Q.   And this is reporting the GALA data compared to

21  multiple 20-milligram trials that had been performed over a

22  period of years starting in 1995.  Right?

23  A.   The references are listed there, yes.

24  Q.   If we can turn to the Glacier study -- actually, we

25  can just stay with your slides and turn to 8.26.  The

Fox - cross

1  Glacier study also reports incidence data.  Right?  Between

2  the two arms?

3  A.    Which is the patients with one or more IRAEs or ISRs?

4  Q.    That's right.  Looking at Table 2, it would be the

5  bottom line, patients with greater than or equal to one ISR?

6  A.    Yes.

7  Q.    There is not a 20 to 50-percent improvement in the

8  40-milligram arm over the 20-milligram arm in Glacier for

9  the incidence data.  Right?

10  A.    Clearly, Glacier was done after, and it was for

11  patients who were already on 20 milligrams, which is a

12  completely different patient group than would be looked at

13  than patients who had no previous experience with glatiramer

14  acetate.

15  Q.    Do you know in the 20-milligram arm in the Khan study,

16  if all the of the patients were naive to GA treatment?

17  A.    I am sorry.  The Khan study, if you are talking about

18  GALA, did not have a 20-milligram arm.

19  Q.    We are talking about the Johnson study or the Comi

20  study, the ones relied upon, do you know if they were all GA

21  naive patients that were treated in those studies?

22  A.    Yes, they were.

23  Q.    Again, this is the only head-to-head clinical study

24  where 20 milligrams and 40 milligrams were administered in

25  the same formulation, in the same route of injection, same

                              Fox - cross

1    method, and analyzed by the same reviewers.  Right?

2    A.     This is the first time that patients who were on a

3    satisfactory dosage of 20 milligrams a day were either

4    switched to 40 three times a week or remained on 20

5    milligrams a day.

6    Q.     And the incidence data is similar between those two

7    arms.  Right?

8    A.     For the patients who had previously been on 20

9    milligrams a day and therefore had been preselected for

10   whether they had events that were tolerable enough to stay

11   on 20 milligrams a day, you can see that switching to 40

12   milligrams did not cause an increase in the incidence of

13   ISRs.

14   Q.     Certainly not a 20 to 50 percent one.  Right, Dr. Fox?

15   A.     Again, there is no comparing that to what was listed

16   in the GALA data because these were not the same

17   populations, they had completely different past histories.

18   Q.     You would say the same thing about the three studies

19   that were put together for the 20-milligram data that was

20   cited in GALA.  Right?  Not the same study populations, not

21   the same reviewers?

22   A.     The prior studies for patients who were naive to

23   treatment gave us an indication of what the incidence of the

24   ISRs were as was mentioned in the product label.

25              MS. BLOODWORTH:  I have no further questions.

Fox - redirect

1    Thank you, Dr. Fox.

2              THE COURT:  Redirect.

3              MR. BENNETT:  Very short, Your Honor.

4                    REDIRECT EXAMINATION

5    BY MR. BENNETT:

6    Q.    Dr. Fox, could you just explain the relationship

7    between tolerability, severity and frequency as discussed in

8    the patents?

9    A.    Yes.  So tolerability is defined in the patents as

10   being both the frequency and the severity of adverse events.

11   And so every time that tolerability is used, it means the

12   other two.  These are interdependent, they can be related in

13   an individual with multiple sclerosis, or they may be

14   completely separate events.

15   Q.    Okay.  Are those two different ways of improving

16   tolerability, improving frequency and improving severity?

17   A.    Yes, either one can constitute an improvement in

18   tolerability.

19   Q.    Doctor, we heard some testimony earlier about whether

20   the results in GALA and Glacier were unexpected results.

21   Based on the teaching of the prior art as of August 2009,

22   would a person of skill have expected the improvement in

23   tolerability evidenced by the GALA study?

24   A.    No, they would have not.  That would have been an

25   unexpected result.

1    Q.    And based on the teaching of the prior art as of

2    August 2009, would a person of skill have expected the

3    improved tolerability evidenced by the Glacier study?

4    A.    No.   The prior art would not have suggested the

5    outcome that was seen later with Glacier.

6              MR. BENNETT:   Nothing further, Your Honor.

7    Thank you.

8              THE COURT:   Let's take a break.

9              Doctor, you may step down.

10             (Witness excused.)

11             (Recess taken.)

12             MR. WARE:   Your Honor, I don't know if that is

13   the rebuttal or the direct case, but that concludes our

14   case.

15             MS. BLOODWORTH:   Your Honor, one housekeeping

16   matter, if I may, before we call Dr. Hay.   The parties, if

17   the Court is agreeable, have agreed to move into evidence

18   the prosecution histories of the four patents in suit, even

19   though they weren't used with a witness.

20             THE COURT:   You think we need the entire

21   prosecution history?

22             MS. BLOODWORTH:   We could limit them to the

23   excerpts.

24             THE COURT:   It is just me an and Ms. Felice.

25             MS. BLOODWORTH:   I think it's the appellate

1    lawyers in the back seat, Your Honor.

2            THE COURT:  I was going to say something not

3    very judicial.  You are the trial lawyers.  I know you have

4    to make an appellate record.  You need to be concerned about

5    the trier of fact and the numbers of hours in the day.

6            I will leave it there.  If you want, if the

7    parties want to move it in...

8            MS. BLOODWORTH:  It was a joint agreement.

9            THE COURT:  I would suggest excerpts.  Paper,

10   and we do use paper still, there is a psychological impact.

11   You get that much paper and you say, oh, my goodness.

12           MR. WIESEN:  Your Honor, we understand.  We can

13   probably find an excerpt.

14           THE COURT:  Mr. Wiesen, you were a clerk.  You

15   should know this.

16           MR. WIESEN:  We will work out any short excerpts

17   we need, if that is okay.  We will make sure it is not a

18   voluminous amount.

19           THE COURT:  I will leave it up to you.

20           MS. BLOODWORTH:  Thank you so much.

21           THE COURT:  Go ahead, Ms. Bloodworth.

22           MS. BLOODWORTH:  Your Honor, we would like to

23   renew our Rule 52(c) motion.  Thank you, Your Honor.

24           THE COURT:  She learns fast.

25           MR. WIESEN:  We oppose that, Your Honor.

1           THE COURT:  I will continue to reserve on all of

2     the matters under 52(c).

3           MR. KROON:  Good afternoon, Your Honor.

4     Christopher Kroon on behalf of the Amneal defendants.  The

5     defendants call Dr. Joel Hay as an expert to discuss the

6     alleged commercial success of the patents in suit.

7           ... JOEL W. HAY, having been duly sworn as a

8     witness, was examined and testified as follows ...

9           THE COURT:  Have you determined whether we are

10    going to hear from Dr. Green again?

11          MR. ANSTAETT:  We have, Your Honor.  We are not

12    going to call Dr. Green back to the stand.

13          THE COURT:  You made my day, Mr. Anstaett.

14          MS. BLOODWORTH:  I concur.

15          MR. KROON:  We have a very small binder, I think

16    probably the smallest binder.

17          If we may approach, Your Honor?

18          THE COURT:  Yes.

19          MR. KROON:  May I proceed, Your Honor?

20          THE COURT:  Yes.

21                    DIRECT EXAMINATION

22    BY MR. KROON:

23    Q.    Good afternoon, Dr. Hay.  Could you please state your

24    name and please for the record?

25    A.    Yes.  It's Joel W. Hay.  Address 22101 Dardenne

Hay - direct

1    Street, Calabasas, California  91302.

2    Q.    Have you been retained by defendants as an expert in

3    this case?

4    A.    Yes.

5    Q.    If I could please ask you to turn to DTX-1568 and if

6    we can pull that up on the screen.  Sir, do you recognize

7    this document?

8    A.    Yes, it is a copy of my CV.

9    Q.    Is it relatively up to up to date?

10   A.    Yes, it was as of the time I filed my report.

11   Q.    What is your current title?

12   A.    I am a professor of pharmaceutical economics and

13   policy at the University of Southern California.

14   Q.    And have you prepared any demonstrative slides to

15   assist in presenting your testimony today?

16   A.    Yes, I have.

17   Q.    If we could turn to DDX-1700.2.  If you can describe

18   your educational background for the Court?

19   A.    Sure, I have a Bachelor's degree summa cum laude from

20   Amherst College in economics.  I then went on to get a

21   Master's, a Master of philosophy and a Ph.D., all in

22   economics, from Yale University.

23   Q.    And looking at DDX-1700.3, after you graduated from

24   Yale, could you please describe some of the positions you

25   held?

1   A.   Yes.  I guess the more recent ones include, I was at

2   the Hoover Institution at Stanford University from 1985 to

3   1992 as a research Fellow, then I was recruited down to

4   U.S.C. to found the Department of Pharmaceutical Economics

5   and Policy at the U.S.C. School of Pharmacy.  I have been

6   attending professor ever since then.

7            In addition to that, in 1995 I got an adjunct

8   position at the UCLA Center for Pediatric Vaccine Research.

9   Q.   Do you teach courses in the field of pharmaceutical

10  economics?

11  A.   Yes, I do.

12  Q.   Have you published in that field?

13  A.   Yes.  I have published over 500 scientific abstracts,

14  conference presentations, papers, and over 200 peer-reviewed

15  publications and commentaries in scientific journals in the

16  fields of pharmaceutical and health economics, econometrics,

17  statistics, health preferences, and health care outcomes.

18  Q.   In the course of your work as a pharmaceutical

19  economist, have you published any papers specifically

20  dealing with the field of multiple sclerosis?

21  A.   Yes.  Along with a couple of my students, I published

22  a paper in CNS Drugs in 2014 on the economics of MS drugs.

23  Q.   And have you ever been qualified as an expert in a

24  Hatch-Waxman case to testify on the issue of commercial

25  success?

Hay - direct

1    A.    I have.  In fact, I have testified several times in

2    this courtroom, or at least this courthouse, in front of

3    several of the Judges, on Hatch-Waxman cases.

4    Q.    And have you ever been retained to serve as an expert

5    on behalf of Teva?

6    A.    Yes, several times.

7          MR. KROON:  In view of that brief introduction,

8    Your Honor, defendants offer Professor Hay as an expert in

9    the field of pharmaceutical economics.

10         MR. WARE:  No objection.

11         THE COURT:  The Professor is accepted as an

12   expert.

13   BY MR. KROON:

14   Q.    Dr. Hay, what were you asked to do in this case?

15   A.    I was asked to review the expert report of Dr. Bell,

16   review and comment on that, and I also submitted a report on

17   my opinions.  I also submitted another report earlier.

18   Q.    You were in the courtroom and heard the testimony from

19   Dr. Bell last week and again yesterday.  Correct?

20   A.    Yes, I did.

21   Q.    And, now, Dr. Bell has testified that Copaxone 40 has

22   3.8 billion in net sales.  That is a big number.  Doesn't

23   that answer the question whether it is a commercial success?

24         MR. WARE:  Objection.  First of all, that is the

25   wrong number.  I think the testimony was 5.1 billion dollars

1      of net sales.

2                  THE COURT:  A bigger number.

3                  MR. WARE:  Anyway, I think it's an incorrect

4      statement.

5                  THE COURT:  Do you want to rephrase.

6                  MR. KROON:  Sure.

7      BY MR. KROON:

8      Q.     Dr. Bell testified that Copaxone 40 has 5.2 billion in

9      sales.  That, too, is a big number.  Does that answer the

10     question of whether it is a commercial success?

11     A.     No.  If all we needed to do was look at a sales

12     figure, even a large one, and say that that indicates

13     commercial success, then we certainly wouldn't need expert

14     economists to opine on these issues.

15     Q.     Well, let's look together at DDX-1700.4.  Can you

16     explain why sales alone is not enough?

17     A.     Yes.  There are several issues that go into an

18     analysis of commercial success.  You have to look at the

19     various indicators of commercial success.  And crucially,

20     you have to show a nexus between those indicators and the

21     claims of the patents in suit.

22                  In this case, we have a well-known, widely-used,

23     well-understood popular medication, a molecule called

24     glatiramer acetate, which has been around for a long time.

25     And so we have to show whether or not this new product

Hay - direct

1    somehow is a formulation of GA that creates a nexus, as

2    opposed to just being part of the original molecule, and the

3    fact that it's very popular.

4              We then have to rule out other factors that

5    could also account for the commercial success of Copaxone 40

6    that clearly have no nexus in the patent claims, and

7    certainly aggressive pricing, aggressive promotion.  All of

8    those things have to be looked at.

9              Then, at the end of the day, you are going to

10   have to look at the profitability and the return on

11   investment in a comprehensive manner, and you are going to

12   have to make sure that any portion of that profitability

13   also has a nexus to the claims of the patents.

14   Q.    Well, let's talk first about pricing.  How has

15   Copaxone 40 been priced relative to the 20-milligram

16   product?

17   A.    Copaxone 40 has, since the first month of launch, also

18   been priced substantially lower than Copaxone 20, roughly

19   four to five hundred dollars lower on average.

20   Q.    Did Dr. Bell consider any pricing data in his

21   analysis?

22   A.    Well, he included pricing data in the appendices to

23   his report.  But he never actually analyzed or discussed

24   them in his report.

25   Q.    Did you review his pricing information, and if so,

1    what did you conclude?

2    A.    Yes.  I did a revenue-weighted calculation of the

3    pricing information from his spreadsheet data, and was able

4    to demonstrate that, from the entire period, from the launch

5    of Copaxone 40 right on up to the end of his data, it

6    averaged 4 to five hundred dollars less in wholesale

7    acquisition cost pricing than Copaxone 20.

8    Q.    Again, that was Dr. Bell's data?

9    A.    Yes.

10   Q.    Have you also seen any published literature that's

11   consistent with Dr. Bell's data showing the lower price for

12   Copaxone 40?

13   A.    Yes, I have.

14   Q.    I have up on the screen DDX-1700.5, which is DTX-1214.

15         Is this a document you reviewed in forming your

16   opinions in this case?

17   A.    Yes.

18   Q.    What is this document?

19         MR. WARE:  Objection, Your Honor.  The document

20   is hearsay, obviously.

21         THE COURT:  This is a demonstrative.  Right?

22         MR. KROON:  Yes, on the screen, Your Honor.  It

23   is a trial exhibit.  Certainly, Dr. Hay is an expert and can

24   rely on hearsay.

25         As to the question of admissibility, I would

1    contend that it's admissible under 803(17) as a market

2    industry analysis.

3                THE COURT:  Are you objecting to the underlying

4    information?

5                MR. WARE:  No, Your Honor.

6                THE COURT:   I think he has withdrawn his

7    objection.

8    BY MR. KROON:

9    Q.    Dr. Hay, what is this document?

10   A.    This is an industry analysis of the various drugs for

11   treating MS.  It certainly makes the point that the

12   wholesale acquisition cost for Copaxone 40 is about $400

13   less than for Copaxone 20.  And that's very consistent with

14   Dr. Bell's own data.

15   Q.    And moving to the next slide of this same document,

16   DTX-1214, which is on the screen as DDX-1700.6, how does

17   this report inform your opinions about the level of

18   co-payment the patient is responsible for?

19   A.    Well, as we have heard in testimony, Teva certainly

20   had a co-payment assistance assistance program called Shared

21   Solutions.  This assistance program actually made the co-pay

22   zero for Copaxone 40.  They were allowing patients to pay

23   nothing for that.  Yet they required patients to pay up to

24   $35 per prescription when they used Copaxone 20.

25   Q.    And what is the result of Copaxone 40 having a higher

Hay - direct

1    co-pay than the 20-milligram product?

2    A.    Well, the co-pay was significantly lower for the

3    Copaxone 40 product.  Certainly, as an economist, the

4    literature and my experience would say that a difference in

5    co-pay between a $35 per prescription and a zero dollar per

6    prescription co-pay is easily enough to convince lots of

7    patients to switch to the zero dollar solution.

8              In fact, at this time period, that was the

9    typical difference in co-pay between brand products and

10   generic products.

11   Q.    Now, you were also in court when Mr. Hassler testified

12   that Teva's pricing strategy upon the launch of the

13   40-milligram product was to put the two products on parity.

14   Do you recall that testimony?

15   A.    I do.

16   Q.    And from an economic perspective, if the 40-milligram

17   product had features that consumers truly valued over the

18   20-milligram product, how should Teva have been able to

19   price that product in the market?

20   A.    Well, assuming equivalent safety and efficacy, if

21   there was any convenience factor or any other factor that

22   was truly meaningful to patients from an economic

23   perspective, then they should have been able to charge a

24   premium price.  That's what all the economic literature says

25   on pharmaceuticals, brand name pharmaceuticals.  And that

1    has certainly been my experience.

2             If there is something that has value, then you

3    can charge a premium price.

4    Q.    Moving to the next slide, DDX-1700.7 of the same

5    Exhibit, DTX-1214, does this article also support your

6    opinions concerning the impact that pricing has on the

7    market share of the 40-milligram product?

8    A.    Yes.  It makes the point that if the drugs are

9    equivalent in terms of safety and efficacy, then pricing

10   will be the determining factor.  Other things like

11   convenience and dosing are going to be of secondary

12   importance.  Pricing will be the determining factor.

13   Q.    Again, from an economic perspective, why would Teva

14   price the 40-milligram product lower than the 20-milligram

15   product and require lower co-payments if the 40-milligram

16   product had advantages as to less frequent dosing or fewer

17   and less severe side effects?

18   A.    Well, Teva was looking at a patent expiration --

19             MR. WARE:  Objection, Your Honor.

20             THE COURT:  What is the basis?

21             MR. WARE:  This witness is now going to

22   pontificate about what Teva was thinking.

23             THE COURT:  He didn't say what Teva was

24   thinking.  I am assuming he is testifying from some source

25   as to what he understands Teva was looking at.  Let's see.

Hay - direct

1    If you want to renew, let's see.

2              THE WITNESS:  I mean, I think everyone was

3    looking at a cliff when the patent was going to expire,

4    including Teva.  And they had to aggressively convert

5    patients from the 20-milligram product to the 40-milligram

6    product.  The way to do that before this patent cliff hit

7    would be to price the product aggressively, provide

8    aggressive coupons, and get people to move over to the

9    40-milligram product.

10             This is classic life cycle management strategy.

11   It's what you need to do because you want to get doctor and

12   patients habituated to writing and taking the new product,

13   which has a patent extension, as opposed to the old one,

14   which is going to suffer generic erosion of their market

15   share.

16   BY MR. KROON:

17   Q.    We have heard the phrase life cycle management a few

18   times in this trial.  Is LCM a concept that is known in the

19   pharmaceutical industry?

20   A.    Absolutely.  It is in textbooks.  I teach it to my

21   students.  Yes, it is well known.

22   Q.    Turning to Page 8 of DTX-1379, which can be seen on

23   the screen at DDX-1700.8, can you briefly explain what this

24   is and what it is showing?

25   A.    Yes.  This is a slide put together by Dr. Klinger for

1    the Teva life cycle management team.  It states that their

2    core mission is to change the typical pattern of loss of

3    market share and profits after a drug loses its patent

4    exclusivity, and add new products with additional

5    exclusivity and keep the revenues growing and the profits

6    growing beyond the patent cliff.

7              If you look at the lower line there, what you

8    can see is that it has a very abrupt drop right where the

9    patent expires, and we call that a shark fin type graph.

10   What you want to do is avoid the shark fin and get it to

11   smooth out and to increase the revenues.

12   Q.   Now, can pricing be used as an LCM technique?

13   A.   Absolutely, particularly if you want to get people

14   switched over to the new product before the patent expires

15   and the generics can erode your market share.

16   Q.   If we can pull up on the screen DDX-1700.9, which is

17   DTX-1491, did you review this document in forming your

18   opinions in this case?

19   A.   Yes, I did.

20   Q.   This is a May 27th, 2014 e-mail from John Hassler to

21   Mike Sheehy, the director of brand product marketing.  What

22   does this document tell you about the approach for Teva's

23   pricing strategy?

24   A.   It shows that even in 2014, they are talking about

25   that they were going to not only bring the price of the

1   Copaxone 40 product in lower than the Copaxone 20, but

2   actually substantially increase the price of the

3   20-milligram product.  And the whole point of doing this is

4   to help drive conversions.  And they needed to do this to

5   forestall generic erosion of the market for Copaxone.

6   Q.    Let's talk about another LCM technique you mentioned,

7   timing.  I would like to show you Slide DDX-1700.10, which

8   is DTX-1339.  It is another Teva internal e-mail.  Did you

9   review this document in forming your opinions?

10  A.    Yes, I did.

11  Q.    How did the timing of the launch of the Copaxone 40

12  product play a role in Teva's ability to attack market

13  share?

14  A.    The purpose of their strategy was to fight generics.

15  They were up against the clock.  They knew that.  The clock

16  they were up against was this patent expiration of the

17  20-milligram product, which meant that as many people as

18  possible had to be converted to the 40 so they wouldn't have

19  to worry about prescriptions that were written for the 20

20  because they would get everybody on board with the new

21  product.

22  Q.    Now, during Dr. Bell's testimony, he testified that in

23  his opinion the launch of the 40-milligram product grew the

24  total Copaxone brand and didn't simply cannibalize the

25  20-milligram sales.  Do you recall that testimony?

1    A.    Yes.

2    Q.    And he relied on market share data to show that.

3    Directing your attention to DDX 1700.11, did you create this

4    slide?

5    A.    Yes, I did.  I took the data from Dr. Bell's exhibits

6    to his report and just graphed them on this chart.

7              What you can see is that as the lower bar, the

8    Copaxone 40, increases its market share, it's almost

9    completely offset by the drop in market share of the

10   20-milligram product.  If you add these numbers together, in

11   fact, there is a slight decline over the entire time period.

12             So on net, essentially, all that Copaxone 40 was

13   able to do, using Dr. Bell's own data, was to cannibalize

14   its sister 20-milligram product.

15             Now, I have some concerns about what he used in

16   his market share data.  But even using his own data, that's

17   what it shows.

18   Q.    Dr. Bell also talked about new to brand prescriptions.

19   The new to brand prescriptions, do they tell us anything

20   about how many people are leaving the brand?

21   A.    No, it definitely doesn't tell us anything about

22   merely stopping therapy, switching to some other product.

23   And that's important for two reasons, because we can see,

24   just from this graph, that on net the market share did not

25   go up for Copaxone products after the launch of the 40.  And

Hay - direct

1    it also makes the important point, because new to brand

2    includes people that have already been using another

3    product, that a lot of the sales, a large fraction of the

4    sales for Copaxone 40 are second line.  And that's important

5    because that means that Copaxone 40 competes against

6    second-product-line drugs.

7    Q.    Why is that relevant?

8    A.    Well, that's relevant because, as we heard Dr. Bell's

9    testimony yesterday, he said he didn't consider second-line

10   drugs in his market share analysis.  And there is no reason

11   to do that, because it's competing against second-line

12   drugs.

13   Q.    Now, in addition to the market share data appended to

14   Dr. Bell's report, did he rely on any industry reports

15   evidencing cannibalization?

16   A.    Yes, he did.

17   Q.    If we look at JTX-7081 which is DDX-1700.12, Dr. Hay,

18   can you explain what this document is?

19   A.    Yes.  I think we saw it yesterday.  This is an

20   industry analyst report from Credit Suisse, looking at the

21   drugs that are used in their market analysis to treat MS.

22   It includes both Copaxone 20 and Copaxone 40, along with

23   several of these other products.

24   Q.    If we go to the next slide , DDX-1700.13, this is a

25   closeup of the Copaxone market share.  Where in this graph

1    do you see evidence of cannibalization?

2    A.    If you look at the orange bars down there, that's

3    Copaxone 20.  And you can see that they are sort of

4    consistently dropping in market share over the time.

5              If you look at the lavender bars in the lower

6    right-hand corner, those represent the launch of Copaxone

7    40.  And you can see that even though the market share of

8    Copaxone 40 is increasing, the net sum of the 40 and the 20

9    is still going down.

10             So that's clear evidence that all Copaxone 40 is

11   doing on net is cannibalizing the Copaxone 20 product.

12   Q.    Now, Dr. Bell also testified that the launch of the

13   40-milligram product curbed the decline of the total

14   Copaxone market share.  To do that he relied on a regression

15   analysis.  Do you recall that?

16   A.    I do.

17   Q.    Can you briefly explain to the Court what a regression

18   analysis is?

19   A.    Regression analysis is a statistical method that

20   economists and some others use to look at how an outcome

21   variable changes with the change of other variables.  In

22   this case he is looking at Copaxone market share and showing

23   how that's affected by the launch of Copaxone 40, both pre

24   and post the launch of Copaxone 40.

25   Q.    Okay.  Can we look at DDX-1700.14.  Did you create

1    this graph?

2    A.    Yes.   I took the data from Dr. Bell's regression

3    analysis, and all this is is just a plot of the actual

4    market share data that he had through the end of the time

5    period of March 2016.

6              Now, I don't agree with his definition of market

7    share for several reasons, which I think we will get into.

8    But nevertheless, these are his data on market share.

9    Q.    Now, I know the Court has seen this a couple of times

10   now.   If we look quickly at the next slide, DX-1700.15, can

11   you explain what this is showing?

12   A.    Yes, this is Dr. Bell's regression analysis of the

13   market share data, and you can see that the kinked data

14   point is the launch of Copaxone 40, and his regression then

15   shows what happens in his view after the launch of Copaxone

16   40.   But you can see he stops his regression right where

17   that vertical line is in October 2014.   And that's about the

18   only point where you could do a regression and get a

19   positive coefficient.

20             If you look at the actual market data, you can

21   see that the trend is continuing to go down after October

22   2014.   Yet he claims that because his line tilted upwards,

23   about the only point where it could have, that that somehow

24   indicates that Copaxone 40 was arresting the decline in

25   Copaxone market share.

Hay - direct

1    Q.      Let's look at the next slide, DDX-1700.16.  Perhaps

2    you can explain what this is showing?

3    A.      Yes.  I took Dr. Bell's data.  I took all of his data

4    and ran the regression all the way through March of 2016,

5    and that's this, I guess it's a red line.  And it actually

6    demonstrates that both before and after the Copaxone 40

7    launch, the trend for Copaxone's market share continues to

8    go down.

9            It continues throughout the entire period

10   declining.

11   Q.      Now, did Dr. Bell provide an explanation for why he

12   stopped his regression analysis in October of 2014?

13   A.      It's not an explanation that I can understand.

14           He says that he stopped it because they got a

15   Tecfidera PML side effect that was reported widely at the

16   end of October 2014.

17           I have some problems with that, because, if

18   anything, the news about a competing product should help

19   your brand to gain market share.  It shouldn't cause it

20   going down.  Yet if you look at the trend, it's still going

21   down after that.

22           There was also a lot of things that were

23   happening in the world with PML.  So it is not as clear-cut

24   as you just make an announcement about PML and that is the

25   end of it.

1    Q.      What about the launch of Plegridy and Glatopa.  Did

2    those occur after October of 2014?  Shouldn't they have

3    taken market share away from Copaxone 40?

4    A.      Yes.  Well, in my view, a commercial success analysis,

5    you don't stop it just because another drug has hit the

6    market.  I mean, if you are commercially successful, then

7    you have to be commercially successful in the market.  You

8    don't get to stop when some other drug gets launched.

9    Q.      And, then, what are your overall conclusions that you

10   can draw from this regression analysis and why is it

11   relevant to your opinions?

12   A.      Well, my conclusions are that Copaxone market share

13   was declining before Copaxone 40, it continued to decline

14   after Copaxone 40.  And all Copaxone 40 was doing with this

15   aggressive pricing and coupons was taking market share from

16   Copaxone 20.

17   Q.      And then, to help crystallize this dispute for the

18   Court, does Dr. Bell dispute the calculations in your

19   regression analysis?

20   A.      No.  He agrees that my regression analysis is correct

21   when you do it out through the entire time period.  What he

22   complained about was he said that the regression slope after

23   the launch of Copaxone 40 isn't quite as steep as the

24   regression slope before the launch of Copaxone 40.  But

25   there are a couple of problems with that.

1          First of all, Copaxone 40 is still not arresting

2     the decline in market share.  It's still going down.  So it

3     just means it's becoming a commercial failure a little bit

4     slower.

5          But even more important from a statistical

6     perspective, he erroneously tried to say that there is a

7     difference in slope statistically, but he used the wrong

8     analysis.

9          He looked at the confidence intervals against

10    the null hypothesis that the slopes are zero, each of those

11    slopes are zero.  But if you want to test where the slopes

12    are different from each other, you have to use a test

13    against the null hypothesis that the slopes are the same.

14    When I redid the analysis and did the appropriate F test of

15    that hypothesis, I found you can't actually statistically

16    say that the slopes are different.

17          MR. WARE:  Objection.  This was not part of the

18    subject of the report.  And he didn't testify to it in his

19    deposition.  In fact, he said he had not done this so-called

20    F test, And accordingly had no results.

21          MR. KROON:  Your Honor, he is merely responding

22    to the opinions Dr. Bell gave for the first time on during

23    the course.

24          THE COURT:  Dr. Bell expressed these views in

25    his expert report, didn't he ?

Hay - direct

1              MR. WARE:  Yes.

2              THE COURT:  I will sustain the objection.  I

3    will strike that portion of the testimony.

4    BY MR. KROON:

5    Q.    Let's shift gears for a minute and talk about past

6    promotion and market awareness.  Can you briefly explain the

7    concept of brand loyalty and why it is relevant to a

8    commercial success analysis?

9    A.    Sure.  We are talking here about the brand, namely,

10   Copaxone, that has been around for nearly two decades.

11              People are familiar with this brand.  They have

12   been using it for a long time.  There is a lot of

13   experience.  There is a lot of, even brand loyalty.  And the

14   thing is that doctors, when they hear that a new product is

15   coming along and it has the same name, Copaxone, they are

16   going to automatically attach a lot of that loyalty that

17   they had to the new product, unless you give them a good

18   reason not to.  I believe it was Dr. Bell's opinion that the

19   marketing spend for the 40-milligram product was in line

20   with other first-line MS therapies.

21   Q.    If I can direct your attention to DTX-1500, Page 40,

22   which is on the screen at DDX-1700.17.  Can you explain what

23   this document is and how it is relevant to Teva's marketing

24   of Copaxone 40?

25   A.    I think Dr. Bell used a classic apples-to-oranges type

1  comparison, because he compared the market spend for

2  Copaxone 40 against the market spend for brand-new products,

3  oral medications that have never been used by anybody

4  before, different therapeutic category, where there had to

5  be some new familiarity and experience and understanding of

6  what these products could do.

7           Yet, you know, they named it Copaxone for a

8  reason.  If you look at Teva's own market research

9  documents, they found that 72.5 percent, nearly

10  three-quarters of all the sales of Copaxone 40, is a

11  carryover from physician loyalty and past promotion.

12          That means that the aggressive marketing and

13  promotion that they did use was only necessary for about a

14  quarter of the market.  So they were, in fact, spending very

15  aggressively for this small part of the market that hadn't

16  yet been convinced.

17  Q.    If we could go back for just a second and talk about

18  Dr. Bell's regression analysis.

19          Do you have an opinion as to why his analysis

20  was improper?

21  A.    Well, for several reasons, as we have discussed.  He

22  stopped at what I believe is an arbitrary time.  In addition

23  to the Tecfidera PML, there were all kinds of announcements

24  about all the drugs in this market, there are all kinds of

25  changes, and he ignored them, and that was the only one he

Hay - direct

1    even talked about.

2              Statistically, he did the wrong analysis of the

3    difference in slopes between the true regression lines that

4    go all the way out --

5              MR. WARE:  Your Honor, objection.  This is the

6    same problem.  That is to say, this witness did not disclose

7    this in the expert report.  He was deposed on it.  He had no

8    information with respect to it.

9              THE COURT:  That is sustained.

10             MR. KROON:  Your Honor, he did discuss this

11   extensively in his report.  He did a full regression

12   analysis.

13             THE COURT:  Why don't you and Mr. Ware discuss

14   this.

15             (Counsel confer.)

16             MR. KROON:  I think we have an agreement, Your

17   Honor.

18             THE COURT:  Do you withdraw the objection, Mr.

19   Ware?

20             MR. WARE:  I think so, depending on the

21   question.

22             It also depends on the scope of the witness'

23   answer, if he wanders beyond his report.

24             THE COURT:  For now I will consider the

25   objection withdrawn, while they confer.

Hay - direct

1    BY MR. KROON:

2    Q.    From a statistical perspective, without getting into

3    the details, is it proper to simply compare the slope of the

4    two regression lines and call them different?

5    A.    No.

6    Q.    And is there a test, an alternative test that should

7    be done to make that comparison?

8    A.    Yes.  As I mentioned in my deposition, it's called the

9    F test.  And it's not against the null hypothesis of the

10   slopes being zero.  It's against the null hypothesis of the

11   slopes being the same.

12            THE COURT:  He sort of said this already.  But

13   go ahead.

14   BY MR. KROON:

15   Q.    Let's transition back to the past promotion and

16   marketing awareness issue.

17            We just discussed DTX-1500.  Can I ask, do the

18   concepts of cannibalization and past promotion share a

19   relationship, and if so, how?

20   A.    Yes.  They both sort of point to the fact that, if you

21   are enabling the new brand Copaxone and you are building on

22   the nearly two decades of trust and experience with the

23   older product, then particularly if you are doing aggressive

24   pricing and aggressive promotion, you will be able to very

25   rapidly transition patients from the older product, the

1    Copaxone 20, to the newer product, the 40, and you want to

2    do that as quickly as possible under life cycle management

3    because the patent expiration clock is going to hit.

4    Q.    Now, I want to touch quickly on the issue of blocking

5    patents.

6              Directing your attention to DTX-1634, in your

7    opinion, were there any patents that would have prevented a

8    commercial entry of a less frequently dosed GA product?

9    A.    Yes.   It's my understanding that Teva had several GA

10   molecule patents that would block anyone from launching a

11   commercialized version.

12   Q.    From an economic perspective, is there any marketplace

13   motivation for a pharmaceutical company to perform research

14   on a drug that is not entering the market?

15   A.    No.   They would have little incentive to do research

16   on a product that they could see would be blocked from

17   commercialization.

18   Q.    Now, in your reports you identified numerous flaws in

19   Dr. Bell's opinions and analysis.   We are not going to go

20   back through all of them.   But DDX-1700.18 identifies some

21   of them.   Can you quickly explain these criticisms for the

22   Court?

23   A.    Yes.   Dr. Bell relied on IMS data for his market share

24   analysis and his regressions.   IMS itself admits that its

25   data is underreported and incomplete for MS drugs.

1          Dr. Bell ignored a substantial portion of MS

2     drug sales, particularly a lot of the second-line MS drugs,

3     even though Copaxone 40 is used second line.

4          Dr. Bell inappropriately relies on prescription

5     counts as measure of sales in his market analysis.  And that

6     is a real apples-and-oranges type issue.

7          And he also doesn't meaningfully consider the

8     true R&D costs of Copaxone 40, nor does he address the

9     profitability and the return on investment that results from

10    all of the data on the financial picture.

11         And he certainly doesn't tie whatever portion of

12    that profitability there is that has any nexus to the claims

13    of the patents.

14    Q.    Let's go back through those one by one quickly, if we

15    can.

16         You mentioned that IMS underreports

17    prescriptions for several MS products.  If we could pull up

18    DDX-1700.19, which is JTX-7086 at Page 32, does this

19    document support that opinion?

20    A.    Yes.  This is an IMS document itself, a report from

21    the IMS Institute, that if you look at the graph where it

22    reports several drugs, including MS drugs and other

23    specialty drugs, it says, The chart has been adjusted to

24    reflect the fact that MS products and other specialty drugs

25    are understood to be underreported by IMS.

1    Q.    Now, if IMS underreports prescriptions for MS

2    products, are there any other additional sources one could

3    consider to calculate market share in this field?

4    A.    Sure.  We use other sources all the time.  There is

5    data from third-party claims vendors, such as Thomson

6    Reuters, Optimum Health, PharMetrics, there is public data

7    sets like Medicare, Medicaid, other programs, the VA.

8          There is data from, public data that you don't

9    even have to get under confidentiality from the CDC MEPS and

10   NAMSIS.  Yes, there is lots of other data that could be

11   used.

12   Q.    With respect to the MS market, what drugs did you

13   specifically identify that were missing in Dr. Bell's

14   analysis?

15   A.    Well, there are several important drugs, some of which

16   have already been discussed.  Some of which are in the

17   Credit Suisse reports.  Things like Tysabri, Lemtrada,

18   Novantrone, Ampyra, H.P. Acthar Gel.  These are drugs that

19   have billions of dollars in sales that are used specifically

20   to treat MS.  And he simply didn't include them in his

21   market analysis.  The net effect of that is going to be that

22   he is going to overrepresent the market share of Copaxone,

23   and he is going to underrepresent the decline in Copaxone

24   market share, both before and after the launch of the

25   40-milligram product.

1    Q.    And for the record, those drugs are identified on DDX-

2    1700.20.

3              Dr. Bell also relies on total prescription data

4    to calculate market share.  If I can direct your attention

5    to the next slide, DDX-1700.21.  Can you explain why you

6    believe this is incorrect?

7    A.    Yes.  To tie these prescriptions with a category of

8    drugs that are so divergent, even suggested by IMS to have

9    some errors or problems, the problem here is that with MS

10   products, you have got different routes of administration.

11   You have got injections.  You have got infusions.  You have

12   got oral pills.  The frequency of administration varies

13   dramatically, all the way from twice a day for some of the

14   oral pills, out to once every two days, three times a week,

15   once every four weeks.  Once every three months.  And in the

16   case of Lemtrada, one prescription a year.

17             But that's a real prescription because it's

18   going to cost you over $70,000.

19             Trying to count prescriptions and use that as a

20   measure of what's going on in this market is very

21   problematic.

22   Q.    Thank you, Dr. Hay.

23             Finally, let's look at DDX-1700.22, which is

24   PTX-25.  Can you identify this document for the Court?

25   A.    Yes.  Yes, this is a Teva, at least was identified as

1   a Teva financial statement by Dr. Bell yesterday.  Although

2   he wasn't clear what the entities were that were reporting

3   any of these categories, I certainly saw nothing describing

4   what went into these various categories or which entities

5   provided which.

6               I heard Mr. Hassler's testimony, where it was

7   discussed that Aventis co-promotes Copaxone 40, and that he

8   didn't know whether the Aventis sales and marketing and

9   promotion expenses were included in here or not.

10              But the big problem here, as far as I can see,

11  and as I reported, is that the actual R&D costs of bringing

12  Copaxone 40 to market are simply not here.

13              These are all the financials after the launch of

14  Copaxone 40.  The cost of development occurs before the

15  launch of Copaxone 40.  There is only one number here,

16  $90,000 for R&D, and that's long after Copaxone 40 has been

17  launched.

18              The economic literature, including a most recent

19  paper by DiMasi et al., shows that the average cost of

20  bringing a drug to market in the United States is over 3

21  billion dollars.  So you can't just leave that out of this

22  figure.  You have got to consider it.

23  Q.    Now, Dr. Bell testified that he didn't even analyze

24  profitability or return on investment for Copaxone.  Do you

25  think that's proper?

Hay - direct

1    A.     No.   I think, if you want to do a reasonable

2    assessment of whether or not Copaxone 40 was profitable, had

3    a reasonable return on investment, you have to look at the

4    actual cost of development.   And I discussed this all the

5    way back to my declaration in the IPR case.

6    Q.     Is this return on investment part of the total profit

7    picture?

8    A.     Absolutely.   If you are going to look at profits, you

9    then have to go the further step of showing what portion of

10   those profits actually has a nexus to the claims of the

11   patent in suit rather than aggressive pricing or the fact

12   that it's a GA molecule.

13   Q.     And if we look at DDX-1700.23, Dr. Hay, in your

14   opinion, have you seen any evidence from which to conclude

15   that the methods claimed in the patent in suit are a

16   commercial success?

17   A.     No.   I mean, all I can see so far is that -- and all I

18   have seen from Dr. Bell's testimony is that Copaxone 40

19   simply cannibalized the Copaxone 20 sister product, and I

20   don't find even that market analysis to be reliable because

21   he is using the wrong metrics.   He is using prescriptions.

22   And prescriptions are a very poor way to measure the sales

23   of drugs in this category, given the wide variation in how

24   prescriptions are written.

25              He ignores the market share in his own

Hay - direct

1    appendices of his report and in his regression.  And he

2    misses some key products, like Lemtrada, Tysabri, and some

3    of these others that are selling billions of dollars.

4    Whether they are first or second line, they are still MS

5    products.

6              And he ignores that there is brand loyalty that

7    Teva itself admitted was responsible for 75 percent of the

8    Copaxone 40 sales, or roughly 75 percent.

9    Q.    So what is your final conclusion on the subject?

10   A.    My final conclusion is that what Dr. Bell presented in

11   terms of both his data and his opinions on commercial

12   success lack reliability.  And I see no evidence that this

13   product, this Copaxone 40, either has indicators of

14   commercial success that have been reliably demonstrated or

15   that any of those indicators have been shown to have a nexus

16   in the patent claims.

17             There is no question that it's convenient for

18   many patients to take a drug three times a week versus once

19   a day, particularly an injection.  But I have seen no

20   evidence here at all that anyone, not a patient, not a

21   provider, and not a payor, was actually willing to pay for

22   that convenience.  It's just not an economic issue.

23             MR. KROON:  Thank you, Your Honor .  No further

24   questions.  Pass the witness.

25             THE COURT:  Mr. Ware, your witness.

Hay - cross

1                          **CROSS-EXAMINATION**

2       **BY MR. WARE:**

3       Q.      Dr. Bell, your opinions here today are with respect to

4       the methodology and the conclusions of Dr. Bell.  Is that

5       correct?

6       A.      My name is Dr. Hay.

7       Q.      Dr. Hay, your opinions today are with respect to the

8       methodology and conclusions of Dr. Bell.  Correct?

9       A.      Yes.  I looked at whether I found Dr. Bell's opinions

10      on commercial success and the data that he relied on to be

11      reliable, and my opinions are that he didn't.

12      Q.      You did not form an opinion yourself by doing your own

13      analysis whether or not Copaxone 40 milligram is

14      commercially successful.  Correct?

15      A.      Well, it's because what I was asked to do --

16      Q.      Pardon me.  If you can answer first of all whether or

17      not you did.  You came to no opinion in this case whether or

18      not Copaxone 40 milligrams is or is not commercially

19      successful.  Correct?

20      A.      No.  The reason I didn't is because I wasn't asked by

21      counsel to do the analysis that Dr. Bell should have done.

22      I pointed out lots of the problems, like, for example, he

23      left out all the second-line drugs.

24      Q.      All right.  I don't think I need you to repeat your

25      opinion here.

1              The fact is, you did not conduct an analysis and

2    make a determination whether or not Copaxone 40 is

3    commercially successful.  Correct?

4    A.     No, because I didn't have the profit data.  I didn't

5    have a lot of the information I needed.

6    Q.     When you say no, you mean, no, I am not correct, or

7    no, you did not form such an opinion?

8    A.     Could you repeat the question?

9    Q.     Sure.  You did not, yourself, conduct whatever

10   analyses you thought appropriate and come to a conclusion

11   whether Copaxone 40 is commercially successful.  Isn't that

12   correct?

13   A.     Well, I couldn't do that because I asked for data --

14   Q.     Dr. Bell, please, did you or did you not, yourself,

15   come to a conclusion whether Copaxone 40 is commercially

16   successful?

17   A.     I am Dr. Hay.

18   Q.     Dr. Hay.

19   A.     No, I didn't form that conclusion because I wasn't

20   asked to do that by counsel.

21   Q.     Thank you, sir.

22              And you didn't come to any conclusion whether or

23   not Copaxone 40 was commercially successful at any time

24   since its launch, whether because you weren't asked to do it

25   or you didn't conduct such an analysis?

Hay - cross

1   A.      Yes, among other reasons, also, I didn't have the

2   data.

3   Q.      Now, counsel mentioned to you that there is evidence

4   in the case that net sales for Copaxone 40 over the first

5   two or two and a half years is on the order of 5 billion

6   dollars.   Correct?

7   A.      I saw that statement, yes.

8   Q.      And there is evidence from Mr. Hassler that profits

9   with respect to Copaxone 40 are on the order of 3 billion

10  dollars.   Do you understand that?

11  A.      Well, those are accounting profits and they exclude

12  the kind of things that an economist would consider.

13  Q.      Did you hear or are you aware of such testimony, sir?

14  A.      Yes, I am.   I am aware of that testimony.

15  Q.      And would you agree -- let's take the term commercial

16  success out of it, because that has a whole legal construct

17  here.

18          Would you agree that Copaxone 40 is a successful

19  product in its own right?

20  A.      Well -- by whatever measure, I am willing to agree

21  that the glatiramer acetate molecule is a successful

22  molecule.

23  Q.      Well, let's talk about Copaxone 40, which is what is

24  at issue.   You have looked at the net sales, you are aware

25  of its rough profitability in the first two years.   You

1   agree it's a highly successful product, putting aside any

2   legal construct.  Correct?

3   A.    Yeah.  I certainly wouldn't want to use a legal

4   construct, because I am not a lawyer.  But as an economist,

5   you have to consider all the things that I did consider.

6   From that perspective, as an economist, my answer would be,

7   no, I haven't seen evidence that Copaxone 40 is a successful

8   product.

9   Q.    So is it your view that 5 billion dollars in sales in

10  two and a half years and 3 billion dollars in profits, based

11  on what you know, does not tell you that Copaxone 40 is a

12  successful product, quite apart from any legal overlay?

13  A.    Again, no legal overlay.  But as an economist, I would

14  have to see the true R&D costs, I would have to see the true

15  profits after you subtract out those costs and after you

16  figure out which of these entities is reporting which costs

17  of goods and marketing across different oceans to avoid

18  taxes.  And I would have to see how any of that, any portion

19  of those profits, has some nexus to the claims of the

20  patents.

21  Q.    You didn't do any of that in your own right.  Correct?

22  You didn't make any analysis along those lines to make a

23  determination whether it's a successful product or

24  commercially successful.  Right?

25  A.    I certainly asked for many pieces of the data so I

1    could begin to look at that, and I wasn't given that data.

2    Q.    When you say you weren't given data, among your

3    clients here is Sandoz.  Isn't that correct?

4    A.    Yes.

5    Q.    And Sandoz is the manufacturer and distributor of

6    glatiramer acetate.  Is it not?

7    A.    Yes.

8    Q.    Generic Glatopa?

9    A.    Yes.

10   Q.    Did you have any conversations with Sandoz with

11   respect to which among these disease-modifying therapies

12   they believe you should consider for purposes of your

13   analysis?

14   A.    I didn't, but they would not have given me the true

15   R&D --

16   Q.    Doctor, please, if you could just respond to the

17   question, we can get through this.

18             Did you have any conversation with your own

19   client here, Sandoz, with respect to which among the

20   disease-modifying therapies they believed you should take

21   into account for purposes of determining commercial success?

22   Just yes or no.

23   A.    I didn't.  And I don't typically talk to clients about

24   those kinds of topics.

25   Q.    Regardless of whether you usually do.  You are here

Hay - cross

1    analyzing a particular marketplace, and you have made the

2    suggestion that a number of products Dr. Bell took into

3    account he should not have taken into account.  Correct?

4    A.    No.  I think I am making the opposite point.  That a

5    number of products, like Lemtrada, Tysabri, Novantrone,

6    Ampyra, H.P. Achler Gel, that he excluded, he didn't even

7    consider them.  And they sell in the billions of dollars,

8    and they should have been -- maybe you can give me a reason

9    why they are not there.  But you have to at least consider

10   them.

11   Q.    Dr. Hay, do you agree that among the disease-modifying

12   therapies Dr. Bell did consider, that you would not

13   necessarily yourself exclude any of those?  You might add

14   some, but you wouldn't exclude the ones Dr. Bell considered.

15   Correct?

16   A.    I can't, sitting here today, think of a reason to

17   exclude the ones that he did include.  I would have tried to

18   get better measures of them.

19   Q.    You would agree that in a market, including the market

20   for disease-modifying therapies for multiple sclerosis, that

21   there could be more than one commercially successful

22   product.  Correct?

23   A.    That's certainly possible.

24   Q.    And so the fact that the brand share for Copaxone goes

25   down over time as oral formulations come into the

1   marketplace or generic glatiramer acetate comes into the

2   marketplace doesn't mean that one or all of those isn't

3   commercially successful.  Correct?  Just as a principle.

4   A.    Just as a principle, that's why you have to analyze

5   it, and you have to see why did it or did it not take share

6   from these other products.

7   Q.    You mentioned the wholesale acquisition cost of

8   Copaxone 40 in your direct testimony.  Do you recall that?

9   A.    Yes.

10  Q.    And you told us that on a monthly basis, from what you

11  reviewed, Copaxone 20 was about $400 a month -- I am not

12  sure you told us what time period -- $400 more expensive

13  than Copaxone 40.  Is that correct?

14  A.    Yes.  Over the entire period of Dr. Bell's data, and I

15  analyzed his data, the revenue-weighted price of Copaxone 40

16  averaged 400 to $500 less than Copaxone 20.

17  Q.    First of all, you are talking about a monthly

18  difference.  Is that correct?

19  A.    Per prescription.

20  Q.    All right.  And a prescription in general would cover

21  approximately a month's dosage.  Correct?  Or doses?

22  A.    Typically, yes.  But, again, that's another open

23  problem.  We don't know that every prescription covered a

24  month.  Some of them may have been 90 days.  Some of them

25  may have been 60 days.

1  Q.     Dr. Hay, for purposes of the distinction you were

2  drawing --

3              MR. KROON:  Your Honor --

4              THE COURT:  Mr. Ware, let him finish his

5  response.  I understand your complaints.  I will intervene

6  if necessary.

7              Have you finished your response, Doctor?

8              THE WITNESS:  Yes, thank you, Your Honor.

9  BY MR. WARE:

10  Q.     The difference you mentioned was about $400 a month,

11  and can we agree that in general that's covering about a

12  month's supply of the medication for a patient?

13  A.     Well, I think that's still an open question, because I

14  don't know how many units of Copaxone 20 and Copaxone 40

15  were in each prescription in the IMS data.  And so that's

16  another level of unreliability that I think is still

17  outstanding.

18  Q.     Well, when you threw out this difference of $400 per

19  month, what did you understand it to mean?

20  A.     As I said, it's the revenue-weighted price in the IMS

21  data per prescription averaged across the months.

22  Q.     But did you understand it to be encompassing a month's

23  dosage forms, that $400?

24  A.     It's the difference in price per prescription.  But I

25  can't tell you how many of those prescriptions are 30 day,

1  how many are 60 day, how many are 90 days.  The information

2  wasn't there.  And Dr. Bell didn't provide it.

3  Q.    Your testimony was based on wholesale acquisition

4  cost, or I think what you referred to as WAC.  Is that

5  correct?

6  A.    Yes, looking at the price difference, that's correct.

7  Q.    And wholesale acquisition cost is a cost that's in

8  effect a list price before what we have heard termed

9  rebates, discounts, and specific contractual terms between

10  payors or buyers, large pharmacy chains, and Teva.  Isn't

11  that correct?

12  A.    I think that's correct.

13  Q.    So you don't know whether there is a difference in

14  terms of net price because you didn't have that data to

15  evaluate.  Correct?

16  A.    That's correct.

17  Q.    Now, with respect to the co-pay that you identified,

18  you said, I believe, that Copaxone 40 has zero co-pay.

19  Right?

20  A.    Yes.  The Shared Solution co-pay is prominently

21  displayed on Teva's website as zero for the Copaxone 40.

22  Q.    And you are aware, are you not, that competitive

23  injectables, MS disease-modifying therapies, first-line

24  therapies, also had zero dollar co-pays.  Isn't that right?

25  A.    I think that is -- actually, I didn't do my own

1    independent investigation.  But I am willing to believe that

2    that is true for many of them.

3    Q.     So Teva's co-pay was simply meeting the competition of

4    existing zero co-pay coupons.  Isn't that right?

5    A.     But the glaring issue is --

6    Q.     Could you respond to my question first?

7    A.     Yes.  I don't think they are just meeting it.  I think

8    they are also doing it for this life cycle management thing

9    of converting patients from the 20, which they didn't keep

10   at a zero co-pay.  They kept it at a $35 co-pay.

11   Q.     Let me ask you to go to your slide, which is PDX-59.

12   Do you see that?

13   A.     Yes.

14   Q.     Now, you, if I understand you correctly, did not come

15   to the opinion that each of these medications should have

16   been included.  Correct?  You raised a question whether Dr.

17   Bell appropriately excluded them.  But you did not arrive at

18   an opinion that you would have included them.  Correct?

19   A.     Right.  I mean, I was asked by counsel to look at my

20   opinion on Dr. Bell's data and opinions.  And I couldn't

21   find anything in his report that explained -- that even

22   discussed these products, much less explain why it would be

23   reasonable to exclude them.  I heard him say yesterday that

24   he sort of suggested that they were excluded because they

25   are second line or at least some of them are second line.

Hay - cross

1    But the reality is, so is Copaxone 40 in many cases, it is

2    also second line.  To me that is not satisfying.

3    Q.    Dr. Hay, you made no judgment that it was ultimately

4    inappropriate to exclude these because you didn't come an

5    opinion which medications should be included.  Correct?

6    A.    That's correct.  I was asked to look at what Dr. Bell

7    did.  I wasn't asked to write his report.

8    Q.    And directing you to PDX- 59, Lemtrada is a

9    second-line disease modifying therapy, is it not?

10    A.    As is Copaxone 40 in many cases.

11    Q.    Dr. Bell, is Lemtrada a second-line disease modifying

12    therapy for MS?

13    A.    I don't know that in every instance it is second line,

14    but I think generally it is.

15    Q.    And would you --

16    A.    By the way, my name is Dr. Hay.

17    Q.    I really apologize for that.  I am not sure what the

18    problem is here.  You don't even look like him.

19          (Laughter.)

20    A.    I don't recall he had a beard.

21    Q.    With my apologies, we agree that Lemtrada, at least,

22    is a second-line therapy, Dr. Hay, in most instances.

23    Correct?

24    A.    That's probably correct.

25    Q.    And if we look at PDX-60, it indicates that it should

Hay - cross

1    generally be reserved for patients who have had a prior

2    therapy.  Isn't that right?  An inadequate response, quote,

3    "to two or more drugs."  Right?

4    A.    Right.  And generally there is a qualifier saying it

5    isn't always the case, but generally.

6    Q.    I will accept that.  But let's try and understand what

7    each of these is indicated for and whether they are first

8    line or second line.  Would you do that with me?

9    A.    Sure.

10   Q.    Let's take a look at PDX-61 regarding Tysabri.

11         Tysabri, first of all, is infused intravenously,

12   is it not?  These aren't self-injection -- it's not a

13   self-injection drug.  Isn't that correct?

14   A.    That's my understanding.

15   Q.    It's infused in an infusion center or clinic or in

16   some other way.  Correct?

17   A.    Yes.

18   Q.    So patients can't use it in the same way that they can

19   use Copaxone 40 or some of the other disease-modifying

20   therapies.  Is that right?

21   A.    Right.  I made the point that there are lots of

22   different routes of administration for all of these drugs.

23   Q.    All right.  Lemtrada, by the way, is also

24   intravenously infused.  Correct?

25   A.    I believe that's correct.  Once a year.  One

1   prescription.

2   Q.    Let's go to PDX-62.  Novantrone is indicated for

3   relapsing remitting multiple sclerosis, but typically for,

4   quote, "worsening relapsing."  That is, problems that occur

5   in the course of another therapy.  Isn't that correct?

6   A.    That's certainly what these indications say, yes.

7   Q.    And it is also intravenously infused.  It's not

8   self-injected by the patient.  Correct?

9   A.    That's correct.  Again, frequency is very different

10  and these are all tradeoffs.

11  Q.    I understand the point you make.

12        Dr. Hay, let's go to PDX-63, with respect to

13  Ampyra.  That's not a disease-modifying therapy at all, is

14  it?  It's for a particular disability that may occur as a

15  result of multiple sclerosis.  Correct?

16  A.    Well, actually, there is some literature that may

17  Ampyra -- in fact, even the MS Society website talks about

18  it as a disease-modifying drug.

19        So I am not sure whether it is or is not a

20  disease-modifying drug.  I agree with you that this is what

21  it is indicated for.  This just gets to all the issues --

22  Q.    Dr. Hay, please, if you would.

23        Do you agree that this has -- this drug Ampyra

24  has a specific use and it's not as a disease-modifying

25  therapy, it's for treating a particular disabling result of

1  having MS.  Correct?  In general.

2  A.    I have read MS Society's website.  It's classified by

3  some people as a disease-modifying drug.  Many drugs are

4  used off-label for many things.

5  Q.    Apart from off-label use, you would agree that in

6  general, Ampyra is not considered a disease-modifying

7  therapy for first-line use with MS.  Isn't that right?

8  A.    I don't know, because this is exactly the kind of

9  exercise that you have to do, you have to see how it's used,

10  not how it's labeled.  This is the kind of evidence that you

11  have to bring to bear on which drugs are or are not in the

12  relevant market.

13  Q.    But, Dr. Hay, you did not make those decisions, did

14  you?  You didn't look at these drugs and include them or

15  exclude them.  You came to no opinion except to say that Dr.

16  Bell is wrong.  Correct?

17  A.    No.  I came to the opinion that in looking at his

18  report and his testimony and his data, that I was waiting to

19  see some reason, rationale, or even just a sentence,

20  something, as to why these drugs were not considered part of

21  his market share analysis.  And there was nothing.

22  Q.    At the end of the day, had you been asked to come to

23  an opinion whether or not Copaxone 40 was commercially

24  successful, you might have excluded the same medications.

25  Isn't that right?

1    A.    Well, sitting here today, I don't know, because I

2    haven't done that analysis.

3    Q.    You don't know one way or the other.  Correct?

4    A.    Because I wasn't asked to do that analysis, that's

5    correct.

6    Q.    And let me just show you quickly PDX-64.  You

7    mentioned HP Acthar Gel.  Again, this is not a

8    disease-modifying therapy for relapsing remitting multiple

9    sclerosis.  Isn't that true?

10   A.    As far as I know, that's correct.  But it's a drug

11   that sells hundreds of millions or billions of dollars

12   mostly for MS.  So it's an important drug.  And an economist

13   doesn't just look at indications.  They look at what are the

14   relevant market substitutes and complements.  And you don't

15   just exclude billion-dollar drugs because they are not

16   listed in the IMS data.

17   Q.    But as you have said, you don't know whether you, too,

18   would have excluded them for purposes of coming to an

19   opinion whether Copaxone 40 is commercially successful.

20   Correct?

21              THE COURT:  Aren't you asking him to speculate,

22   Mr. Ware, on what he would have done?  You can ask.

23              MR. WARE:  I will move on, Your Honor.

24   BY MR. WARE:

25   Q.    Let me ask you to take a look at PDX-54 .  This is

1    your graph, I take it, in the decline of the brand's market

2    share overtime.  Is that correct?

3    A.    No.  It's Dr. Bell's regression data.  I think it's

4    even on his graph.

5    Q.    Okay.  If we were to -- first of all, the scale here

6    is between, what, 29 percent and 39 percent?

7    A.    In this graph, yes.

8    Q.    Let's look at PDX-55.  If we change the scale, not all

9    the way to a hundred percent but even to 45 percent, we can

10   see that the line does decline over time.  The brand.  Is

11   that correct?  Roughly to 30 percent, from the high thirties

12   to the end of 2014, after launch.  Correct?

13   A.    Yes.  The numbers don't lie.  It doesn't matter how

14   you present them.  It shows the same thing in the previous

15   slide.

16   Q.    If I could direct your attention to PDX-56.  Certainly

17   events happened which impact all MS therapies and in

18   particular injectables after the launch of Copaxone 40.

19   Isn't that so?

20   A.    Things are happening all the time.

21   Q.    Fine.

22   A.    And you have to show that your commercial success --

23   and you don't get a pass just because something else

24   happens.  You need to --

25   Q.    Dr. Hay, if I may --

Hay - cross

1        THE COURT:  I am going to let him finish that.

2   Go ahead, Doctor.

3        THE WITNESS:  You have to, first of all, you

4   have to include all the things that happened, not just three

5   events, not just Glatopa, not just Plegridy launch, and not

6   just Tecfidera PMLs.  You have to include everything, all

7   the pricing differences of all the products, all the coupons

8   of all the products, all the side effect revelations, all

9   the clinical trials.  All of these things need to be

10  included if you want to do a reliable analysis.

11       And there is no reason why the launch of these

12  two products automatically takes market share away from

13  Copaxone 40.  If Copaxone 40 is a great product, it will

14  compete even in the face of a new launch.

15  Q.   All right.  Is it your testimony that you think

16  generic Copaxone 20 would not be expected to take some of

17  the market share of Copaxone 40?

18  A.   Well, if the convenience features of three times a

19  week are economically valuable to patients, providers, and

20  payors, then I would expect to see Copaxone 40 do very well

21  whether we are talking about a generic Glatopa or whether we

22  are talking about any new launch.

23  Q.   You would expect Glatopa to take share from Copaxone

24  20, would you not?

25  A.   From Copaxone 20, yes, because they are both, you

Hay - cross

1  know, 20 milligram, FDA approved to be essentially

2  biologically substitutable.  And, yes, I would expect it to

3  take some market share from Copaxone 20, but not from 40.

4  Q.    But the blue line we are looking at on the screen is

5  the combined 20 and 40.  Isn't that right?  It's the brand.

6  Is that correct?

7  A.    Yes.

8  Q.    And you would expect some reduction in market share

9  upon the launch of generic 20 milligram?

10  A.    Yes.  I think that's fair.  In Dr. Bell's data,

11  Glatopa took two percent and was WAC at two percent.

12  Q.    Let's look at the next slide, PDX-57.  In addition to

13  generic 20 milligram coming on the market and Plegridy,

14  during this period of time, post-launch of Copaxone 40, a

15  number of the orals began to get a foothold in the

16  marketplace.  Isn't that correct?

17  A.    Yes.  And this is exactly the kind of analysis that

18  should have been done.  You look at all these things --

19  Q.    Dr. Hay, could I stop you please?

20            THE COURT:  Overruled.  Go ahead.  Ask the

21  question.

22  BY MR. WARE:

23  Q.    Am I right that part of the influence here on the

24  decline in overall brand of Copaxone 20 and 40 combined is

25  the introduction of the oral disease-modifying therapies, as

1    we see on PDX-57?

2    A.    Well, it seems to me you are bringing --

3          THE COURT:  Doctor, let me intervene.  He gets

4    to ask the questions.  You do your best to answer them.

5    Counsel is going to get back up, as you know.  I don't have

6    to tell you how to testify.  I want to get through this in

7    this next millennium.  Okay?

8          THE WITNESS:  They definitely were launched

9    somewhat prior to the launch of Copaxone 40.

10   BY MR. WARE:

11   Q.    My point is, one of the phenomena that is occurring

12   here, Dr. Hay, is that those orals, as they grow in the

13   marketplace, would be expected to take share from the

14   Copaxone brand, whether 20 or 40, because they are an oral

15   indication.  Isn't that correct?

16   A.    I don't know.  I would have to see that analysis.  I

17   just don't know.

18   Q.    You didn't do any analysis yourself to make such a

19   judgment?

20   A.    Yes.  For many reasons, I don't -- that was not an

21   analysis that I saw or did.

22   Q.    I asked you earlier whether you had conversations with

23   Sandoz.  Did you discuss with anyone, anyone among the

24   companies whom you represent here, which of the

25   disease-modifying therapies they believe their generic will

Hay - cross

1   compete with should it be approved?

2   A.   I didn't have any discussions like that.

3   Q.   No discussions at all with any of the clients whom you

4   represent here regarding the marketplace?

5   A.   No.

6   Q.   Regarding competitive information that they have

7   concerning the marketplace?

8   A.   Not that I can recall.

9   Q.   Now, you talked in your direct testimony about

10  blocking patents to some extent.  Is that correct?

11  A.   Yes.

12  Q.   Let me ask you to take a look at what -- what's now

13  been marked and should be in your book Plaintiffs' Trial

14  Exhibit 662.1.

15          I am assuming it is in the notebook, is it?

16  A.   I am not sure where it is.

17  Q.   The number is 662.

18  A.   I have got it.

19  Q.   All right.  Is this a document you have seen before?

20  A.   I believe so.

21  Q.   And you are aware, then, that this is a patent issued

22  in 2008 to Momenta Pharmaceuticals.  Is that correct?

23  A.   That's what it appears to be, yes.

24  Q.   And Momenta is a Sandoz affiliate.  It's among the

25  clients whom you are representing here today for purposes of

Hay - cross

1    your testimony?

2    A.    I believe that's correct, yes.

3            MR. KROON:  Your Honor, I would object to this

4    exhibit.  He has characterized it as a patent.  It is not a

5    patent.

6            THE COURT:  A patent application.

7    BY MR. WARE:

8    Q.    My mistake, Dr. Hay.  This patent application relates

9    to glatiramer acetate, does it not?  Just to help you out,

10   if you look at the page numbered 1 at the top and the stamp

11   number page is 4, so it would be .4 of the exhibit you have,

12   if you look under Background, the third paragraph down in

13   the left-hand side column, you will see that it describes

14   Copolymer I and says a little bit about it, and then it says

15   that it's also known as glatiramer acetate.

16   A.    I see that, yes.

17   Q.    So this patent application filed in 2008, itself,

18   represents Momenta's effort to obtain a patent for

19   glatiramer acetate.  Correct?

20   A.    You know, I don't specifically know that.  I mean,

21   that's possibly what it says, yes.  But I don't know that.

22   Q.    You indicated you had seen the document before.  Is

23   that right?

24   A.    Yes.  But I am not a patent lawyer, so I don't know

25   how to characterize this.

Hay - cross

1    Q.    I don't think we have to go very far with this.  This

2    is a patent application with respect to glatiramer acetate,

3    filed on behalf of Momenta in 2008.  Would you agree with

4    that?

5    A.    Yes.

6    Q.    Let me next show you a document marked PTX-661 in your

7    book.  I want to direct your attention, if I can, to Page 6

8    of the document, to Paragraph 28.

9          Page 7, Dr. Hay.  Have you seen this document

10   before?

11   A.    I don't recall.

12   Q.    In any event, 28, it indicates, does it not, that

13   Sandoz has filed as of the time of this document in 2008,

14   they filed an ANDA, that is an Abbreviated New Drug

15   Application, for glatiramer acetate.  Isn't that so?

16   A.    Yes.

17   Q.    And so despite whatever you may have said about

18   blocking patents, Sandoz had filed an ANDA for glatiramer

19   acetate in 2008, and Momenta had a patent application for

20   glatiramer acetate at that time.  Correct?

21   A.    That appears to be the case.

22   Q.    So none of what you said about the potential blocking

23   patents prevented the kind of research or the filing of an

24   ANDA application that we see here.  Correct.

25          MR. RAKOCZY:  Your Honor, I have to object.  May

Hay - cross

1    we have a sidebar?

2              THE COURT:  Sure.

3              (The following took place at sidebar.)

4              THE COURT:  Are we coming close to the end?

5              MR. WARE:  Yes.

6              MR. RAKOCZY:  I didn't want to talk in front of

7    the witness.  This is highly misleading and

8    mischaracterizing the document.  He is asking him about a

9    lawsuit on the very blocking patents against the old

10   20-milligram product.

11             THE COURT:  For your benefit, Mr. Ware, it is

12   not having much of an impact on me.

13             (End of sidebar conference.)

14   BY MR. WARE:

15   Q.    Just quickly, could we turn to your chart, PDX-50.  If

16   we could turn -- this is the slide you showed a few moments

17   ago.  Is that correct?

18   A.    Yes.

19   Q.    Let me ask you to look at PDX-51.  This shows, does it

20   not, some of your calculations from your regression

21   analysis, that is, the regression slope that indicates .55

22   percent per month?

23   A.    Yes.

24   Q.    And the second slope to the right, the more gradual

25   slope, .05 percent per month.  Is that correct?

                          Hay - cross

1    A.      Those are the point estimates, yes.

2    Q.      These point estimates are ones that come from your

3    regression analysis.  Is that so?

4    A.      That's correct.

5    Q.      One way in which to interpret the regression

6    coefficients is also called a slope coefficient.  Isn't that

7    correct?

8    A.      It can be, yes.

9    Q.      If we look at the .55, over a ten-month period, what

10   that means is that the prescription share would decline by

11   five and a half percent over ten months.  Correct?

12   A.      If you take the point estimate.  But there is a wide

13   variation in the confidence interval.  So that's just the

14   point estimate projection, yes.

15   Q.      Fair enough.  And with respect to the point estimate

16   on the right, it is a half a percent over a ten-month period

17   in the slope, the regression slope that we see on the

18   right-hand side of the chart.  Correct?  At the bottom?

19   A.      That's the point estimate, correct.  But again, there

20   are confidence intervals.

21              MR. WARE:  I have nothing further, Your Honor.

22              MR. KROON:  Very brief redirect.

23              THE COURT:  I hope so.

24                      REDIRECT EXAMINATION

25   BY MR. KROON:

1   Q.    Dr. Hay, Mr. Ware asked you some questions about net

2   sales of the Copaxones.  If I can ask you a quick

3   hypothetical.  Outside the pharmaceutical context, if we had

4   a company that sold one billion hamburgers and lost a dollar

5   on every hamburger, how would you characterize the success

6   of that product?

7   A.    I would say it would be a blockbuster in terms of

8   sales but the profitability would be very bad.  And it

9   wouldn't be a commercial success.

10  Q.    So you are saying pricing and cost are important?

11  A.    Absolutely.

12  Q.    You indicated that you didn't have certain pricing

13  data.  Do you recall that testimony?

14  A.    Yes.

15  Q.    Now, does Sandoz or any other defendant in this room

16  have access to Teva's confidential pricing information 20-

17  milligram and 40-milligram products?

18  A.    No.  Only Teva has the actual rebate data for the 20

19  and 40, and I have been asking for it ever since the IPR

20  declaration --

21              MR. WARE:  Objection.

22              THE COURT:  Sustained.

23  BY MR. KROON:

24  Q.    Now, Mr. Hassler talked about the profit data that Mr.

25  Ware mentioned.  But did Mr. Hassler know what things were

1  counted in his P&L sheet, what information went into that?

2          MR. WARE:  Objection.

3          THE COURT:  If you know.

4          THE WITNESS:  I think he testified that he

5  didn't know.

6  BY MR. KROON:

7  Q.    So is there any way to know how accurate a profit

8  number is if you don't know what went into the cost

9  calculations?

10 A.    No.

11 Q.    And one last question, Dr. Hay.  From an economic

12 perspective, if there were sufficient evidence from which to

13 conclude that the economic success of Copaxone 40 was the

14 result of the claimed three times a week dosing regimen, how

15 would you expect the price of the 40-milligram product to be

16 relative to the 20-milligram product?

17         MR. WARE:  Objection.  I think he has already

18 responded to this.

19         THE COURT:  Sustained.  That's been answered.

20         MR. KROON:  That's all, Your Honor.

21         Nothing further, Your Honor.

22         THE COURT:  Thank you, Doctor.

23         (Witness excused.)

24         THE COURT:  Defendants rest?

25         MS. BLOODWORTH:  Yes, Your Honor.

```
 1                   THE COURT:  So what's the 30-month date?

 2                   MR. WIESEN:   Early February 2017, for the first

 3       defendant.

 4                   MR. RAKOCZY:  Your Honor, it is actually not.

 5       It is January 28th, is the date.  It is Teva's exclusivity

 6       expiration, which is what we are all working toward.

 7                   THE COURT:  Have you discussed among yourselves

 8       a timeline you would like to propose?  You don't have to --

 9       we don't have to leave here with one today.  I will give you

10       a chance to talk about that.  Go ahead.

11                   MR. RAKOCZY:  I was going to mention, Your

12       Honor, we had just started discussing it.  We obviously have

13       a lot of people on both sides here.  We were wondering if we

14       could get the Court's guidance, assuming January 28th is our

15       rate-limiting date.  Is there a time that the Court prefers

16       to have the fully briefed papers, or is there an amount of

17       time?

18                   THE COURT:  I believe I have just agreed to an

19       expedited timeline -- I stand corrected.  What do you want

20       to propose, counsel?  Tell me what you want to propose.

21                   MR. RAKOCZY:  Your Honor, we just want to make

22       sure the Court has everything in time so that January 28th

23       is a realistic date.  We understand you have a very busy

24       docket.

25                   THE COURT:  I have 400 patent cases.
```

1          MR. WIESEN:  I am happy to make an affirmative

2     proposal.  I know you usually prefer simultaneous briefs.

3          THE COURT:  That's what's going to happen.

4          MR. WIESEN:  We propose simultaneous briefs two

5     weeks from Monday, perhaps give us two and a half weeks to

6     do the briefs.  I know you like them short.  There is a lot

7     of issues here.

8          THE COURT:  Have you discussed or would you like

9     to discuss at present a page limit?  I am going to impose

10    one if you don't discuss one.

11         MR. WIESEN:  If you give us a moment we can

12    discuss a page limit, Your Honor.

13         (Counsel confer.)

14         THE COURT:  A little aggressive?

15         MR. WIESEN:  They think two and a half weeks is

16    a little aggressive.

17         THE COURT:  I think it is.

18         MR. WIESEN:  It's important to us that we get

19    this done as quickly as possible.  Let --

20         THE COURT:  But you got to give yourselves time

21    to do the work.  I understand that.  So if you want to maybe

22    ponder this a bit and give the defendants more of a chance

23    to talk about this, then the two of you join heads, let's

24    just -- I am not going to take more than 40 pages.  I am

25    simply not.

1           I am going to need you to give hyperlinks to the

2    record and to all authority which you may want me and my law

3    clerk to review.  That is about it.  Simultaneous

4    submissions.  And I will do my level best to meet the

5    requirements of the case and the parties.

6           MR. WIESEN:  Your Honor, can we have till next

7    Friday to jointly proposed propose a schedule?

8           THE COURT:  And do it in the form of a

9    stipulation.  I will sign it.

10          MS. BLOODWORTH:  Your Honor, also, we have the

11   final exhibit list.  We will endeavor to do that by next

12   Friday as well.

13          THE COURT:  Sure.  I am assuming that's agreed.

14          MR. WIESEN:  We need to double-check the lists

15   and make sure we all have exactly the same thing.  I don't

16   think that is an issue.

17          THE COURT:  Okay.  Anything else?

18          MR. RAKOCZY:  When you said 40 pages, did you

19   mean one 40 --

20          THE COURT:  One 40-page brief.  If after you

21   confer, given the number, you think you need more I would

22   consider it.  But not many more.

23          MR. RAKOCZY:  Understood.

24          THE COURT:  You all have basically the same

25   arguments.

1           MR. RAKOCZY:  Understood, Your Honor.

2           THE COURT:  Anything else?

3           MS. BLOODWORTH:  We will endeavor to get that to

4      you by next Friday.

5           Thank you, Your Honor.

6           THE COURT:  Safe travels, counsel.

7           (Trial concluded at 4:40 p.m.)

8

9                          -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25